JENNIFER HARTMAN KING (SBN 211313)
ALANNA LUNGREN (SBN 269668)
WILLIAM D. MARSH (SBN 200082)
J. R. PARKER (SBN 320526)
ANDREYA WOO NAZAL (SBN 327651)
HARTMAN KING PC
520 Capitol Mall, Suite 750
Sacramento, CA  95814
Telephone:  (916) 379-7530; Facsimile:  (916) 379-7535
JHartmanKing@HartmanKingLaw.com
ALungren@HartmanKingLaw.com
WMarsh@HartmanKingLaw.com
JRParker@HartmanKingLaw.com
AWooNazal@HartmanKingLaw.com

Exempt From Filing Fees Pursuant
To Government Code Section 6103

Attorneys for Defendants KATHLEEN ALLISON,
in her official capacity as Secretary of the California Department
of Corrections and Rehabilitation; and PATRICK COVELLO,
in his official capacity as Warden of California Department of
Corrections and Rehabilitation Mule Creek State Prison

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN ALLISON, in her official capacity as Secretary of the California Department of Corrections and Rehabilitation,<br><br>Defendant. | Case No. 2:20-CV-02482-WBS-AC [consolidated with 2:21-CV-00038-WBS-AC]<br><br>**DECLARATION OF TIMOTHY SIMPSON, PE, GE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION**<br><br>Date:  August 22, 2022<br>Time: 1:30 p.m.<br>Courtroom: 5<br>Judge: Hon. William B. Shubb |
| COUNTY OF AMADOR, *a public agency of the State of California,*<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN ALLISON, in her official capacity as Secretary of the California Department of Corrections and Rehabilitation; and PATRICK COVELLO, in his official capacity as Warden of California Department of Corrections and Rehabilitation Mule Creek State Prison,<br>Defendants. | (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)<br><br>Final Pretrial Conf.: February 13, 2023<br>Trial Setting Conf.: April 18, 2023 |

00053868.1

**DECLARATION OF TIMOTHY SIMPSON, PE, GE
IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION**

### DECLARATION OF TIMOTHY SIMPSON, PE, GE

I, Timothy S. Simpson, declare:

1. The facts set forth below are of my own personal knowledge and if called as a witness, I could and would competently testify thereto.

2. I am currently a Vice President and Principal Engineer for GSI Environmental Inc. ("GSI"). My office is located at 19200 Von Karman Ave., Suite 800, Irvine, California 92612. I am a professional Civil and Geotechnical Engineer and have been continuously active as a practicing consulting engineer for over 39 years. My practice includes the general fields of civil engineering, environmental engineering, geotechnical engineering, and regulatory interpretation and compliance. I have received a Bachelor of Science (B.S.) degree in Civil Engineering from Gonzaga University located in Spokane, Washington, and a Master of Science (M.S.) degree in Civil Engineering from the University of California, Irvine, California.

3. I have completed numerous training programs and seminars in environmental engineering, geotechnical engineering, storm water management, contaminant fate and transport, site characterization and remediation, environmental regulations, waste management, environmental statistics, and landfill engineering.

4. I maintain professional licenses in the fields of Civil Engineering and Geotechnical Engineering. These licenses are as follows: Professional Engineer (Civil), California, Number 41121, and Professional Engineer (Geotechnical), California, Number 2228.

5. A significant portion of my practice utilizes my expertise in storm water hydrology and civil and geotechnical engineering to evaluate Clean Water Act permitting and compliance requirements for a wide variety of industrial facilities and municipal clients.

6. I was appointed by the State Water Resources Control Board ("SWRCB") to be a member of the Industrial General Permit Training Team ("IGPTT") tasked with developing training content and testing requirements for the Qualified Industrial Storm Water Practitioner ("QISP") program. I was also the lead industry representative for the scrap metal recycling stakeholders in negotiating the Scrap Metal Recycling Sector Permit that was adopted by the Santa Ana Regional Water Quality Control Board.

00053868.1                                     1

7.     My work related to storm water permitting and engineering began in 1991 and over the past 31 years I have provided consulting services to hundreds of industrial dischargers and numerous municipalities spanning over every type of Industrial General Storm Water Permit adopted by the SWRCB, along with multiple MS4 permits. I have provided consulting and expert services for a wide range of industries and municipal clients, including chemical and paint manufactures, asphalt and concrete batch plants, petroleum refineries, landfills (active and inactive), material recovery facilities, recycling operations, automobile dismantlers, metal shredders, foundries, wineries, food processors, airports, ports, metals fabricators and finishing operations, auto dismantlers, mines, and aerospace manufacturers. My municipal permitting clients have included cities, counties, and the State of California.

8.     I currently serve as the "Group Leader" for several storm water compliance groups in California, including the Chemical Batch Processors Compliance Group, the California Paint Compliance Group, the California Wineries Compliance Group, the Container Terminal Operators Compliance Group, and the Paper, Glass and Plastic Recyclers Compliance Group.

9.     I have assisted many clients with evaluating the potential to qualify for the No Exposure Certification under California's Industrial Stormwater General Permit and I routinely assist clients with pollutant source assessments to establish appropriate monitoring programs. In addition, I have performed numerous reasonable potential analysis evaluations to establish monitoring and effluent limits for dischargers covered under individual NPDES permits.

10.     I reviewed Plaintiffs' Motion for Summary Adjudication ("MSA") papers, including the declarations of Karen Ashby and Robert Emerick, and the exhibits cited in support of the MSA. I reviewed publicly available documents and data available from the websites of the State Water Resources Control Board ("State Board") and Regional Water Quality Control Board, Central Valley Region ("Regional Board"), such as the Storm Water Multiple Application and report Tracking System ("SMARTS") and the Regional Board's web page relating to the California Department of Corrections and Rehabilitation ("CDCR") Mule Creek State Prison ("MCSP" or "Facility") water quality programs. I also reviewed documents and data disclosed or produced in discovery in the above-captioned action.

00053868.1

2

11.     MCSP is regulated as a non-traditional small MS4 pursuant to the Central Valley Water Board Order R5-2019-0006 issued on February 8, 2019, and enrolled under the Statewide National Pollutant Discharge Elimination System ("NPDES") General Permit for Waste Discharge Requirements for Storm Water Discharges From Small Separate Storm Sewer Systems ("MS4"), State Board Order 2013-0001-DWQ NPDES No. CAS000004 ("Small MS4 Permit" or "Permit").

12.     Small MS4s typically are not required to conduct analytical monitoring; however, the Regional Board issued a Water Code Section 13383 order ("13383 Order") to MCSP to implement an interim monitoring and reporting program to assess potential water quality impacts to Mule Creek while the Facility's stormwater control program was being fully developed and implemented.

13.     Under the Regional Board's Section 13383 Order, CDCR is required to conduct analytical monitoring of designated locations at MCSP, including upstream locations to evaluate background contributions. The results of the monitoring are reported to the Regional Board.

14.     The results of the analytical monitoring completed in response to the 13383 Order and reported by CDCR form the basis of Plaintiffs' consultant, Karen Ashby's, declaration in support of the MSA ("Ms. Ashby's Declaration" ECF 45-4) where she alleges that there were the following "past violations" of the Small MS4 Permit's Discharge Prohibitions (Small MS4 Permit Provision B) and Receiving Water Limitations (Small MS4 Permit Provision D) that allegedly occurred before January 27, 2021 (i.e., before the Plaintiffs' Complaints were filed in the above-entitled action):

   a. 40 past violations of the Small MS4 Permit's *E. coli* discharge prohibition based on the statistical threshold value ("STV") from samples collected from MCSP2 and MCSP3.

   b. 1 past violation of the Small MS4 Permit's *E. coli* discharge prohibition based on the geometric mean ("GM") of samples collected from MCSP3.

00053868.1                                    3

**DECLARATION OF TIMOTHY SIMPSON, PE, GE IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION**

c. 19 past violations of the MS4 Permit's receiving water limitations for *E. coli* based on samples collected at MCSP4/downstream, MCSP2/outfall and MCSP3/outfall.

d. 25 past violations of the Small MS4 Permit's discharge prohibition for metals (aluminum, iron, lead, and zinc) based on samples collected at MCSP2 and/or MCSP3.

e. 14 violations of the MS4 Permit's receiving water limitations for metals (aluminum, iron, lead and zinc) based on samples collected at MCSP4/downstream, MCSP2/outfall and MCSP3/outfall.

15. Ms. Ashby's Declaration alleges the following "ongoing violations" of the Small MS4 Permit's Discharge Prohibitions (Small MS4 Permit Provision B) and Receiving Water Limitations (Small MS4 Permit Provision D) from January 27, 2021, forward (i.e., after the Plaintiffs' Complaints were filed in the above-entitled action). These alleged "ongoing violations" are based on Ms. Ashby's interpretation of analytical monitoring reported by CDCR as follows:

i. 9 ongoing violations of the Small MS4 Permit's *E. coli* discharge prohibition based on the STV from samples collected from MCSP5 and MCSP6.

ii. 5 ongoing violations of the MS4 Permit's receiving water limitations for *E. coli* based on samples collected at MCSP4/downstream, MCSP5/outfall, and MCSP6/outfall.

iii. 77 ongoing violations of the Small MS4 Permit's discharge prohibition for metals (aluminum, iron, manganese, copper, lead, and zinc) based on samples collected at MCSP5 and/or MCSP6.

iv. 29 ongoing violations of the MS4 Permit's receiving water limitations for metals (aluminum, iron, manganese, copper, lead and zinc) based on samples collected at MCSP4/downstream, MCSP5/outfall and MCSP6/outfall.

///

00053868.1                                  4

**DECLARATION OF TIMOTHY SIMPSON, PE, GE IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION**

16.     In Ms. Ashby's Declaration, she references the Water Quality Control Plan for the California Regional Water Quality Control Board Central Valley Region, Revised February 2019, the Sacramento River Basin and the San Joaquin River Basin ("Basin Plan") (Defendants' ("Defs.'") Appendix ("Appx."), Plaintiffs' ("Pls.'") Exhibit ("Ex.") 9), and Part 3 of the Water Quality Control Plan for Inland Surface Waters, Enclosed Bays, and Estuaries of California – Bacteria Provisions and a Water Quality Standards Variance Policy ("State Control Plan – Bacteria Provisions"). Defs.' Appx., Pls.' Ex. 10. Ms. Ashby compares the analytical monitoring results reported by CDCR to the Basin Plan's water quality objectives to support Plaintiffs' allegations of past and ongoing violations listed above. For the alleged *E. coli* violations, Ms. Ashby is comparing the analytical monitoring results to the bacteria objectives provided in Table 1 from the State Control Plan – Bacteria Provisions, which is as follows:

**Table 1. REC-1 Bacteria Water Quality Objectives**

| Applicable Waters | Objective Elements | Estimated Illness Rate (NGI): 32 per 1,000 water contact recreators | |
|---|---|---|---|
| | | Magnitude | |
| | Indicator | GM (cfu/100 mL) | STV (cfu/100 mL) |
| All waters where the salinity is equal to or less than 1 ppth 95 percent or more of the time | *E. coli* | 100 | 320 |
| All waters where the salinity is greater than 1 ppth more than 5 percent of the time | Enterococci | 30 | 110 |
| The waterbody GM shall not be greater than the applicable GM magnitude in any six-week interval, calculated weekly.  The applicable STV shall not be exceeded by more than 10 percent of the samples collected in a CALENDAR MONTH, calculated in a static manner. | | | |
| NGI = National Epidemiological and Environmental Assessment of Recreational Water gastrointestinal illness rate | GM = geometric mean STV = statistical threshold value cfu = colony forming units | mL = milliliters ppth = parts per thousand | |

17.     For the alleged metals violations involving aluminum, iron, and manganese based on the municipal and domestic supply (MUN) beneficial use designation, Ms. Ashby compares the analytical results to Section 3.1.3 of the Basin Plan, which include the following secondary maximum contaminant limits ("MCLs") as specified in Title 22 of the California Code of

00053868.1                                            5

Regulations ("CCR") Section 64449:

| Constituent | MCLs / Units |
|-------------|--------------|
| Aluminum | 200 µg/L |
| Iron | 300 µg/L |
| Manganese | 50 µg/L |

18.    For the alleged metals violations involving copper, lead, and zinc and based on the municipal and domestic supply (MUN) beneficial use designation, Ms. Ashby also compares the analytical results to Section 4.1.8 of the Basin Plan which include the following numeric criteria for constituents as specified in the California Toxics Rule ("CTR"). The CTR criteria for these metals are as follows:

| Constituent | CTR Criteria / Units |
|-------------|----------------------|
| Copper | 9 µg/L dissolved (Chronic) |
| Lead | 2.5 µg/L dissolved (Chronic)<br>3.2 µg/L total (Chronic) |
| Zinc | 117 ug/L dissolved (Acute)<br>120 µg/L total (Acute) |

19.    In my opinion, Ms. Ashby inappropriately equates the observation of elevated pollutant levels above water quality standards in MCSP's stormwater discharge and receiving water to Small MS4 Permit violations without demonstrating that the discharges she considers to be ongoing violations are actually reaching the receiving waters at concentrations that she alleges are permit violations.  As explained in the State Board's Small MS4 Permit Factsheet Section IX, Provision B (Discharge Prohibitions) and Provision D (Receiving Water Limitations) of the Small MS4 Permit "both prohibit [unauthorized non-stormwater] discharges from reaching receiving waters…."[1] In addition, Provision D of the Permit specifically provides that "Discharges shall not

---

[1] A copy of the State Board's Small MS4 Factsheet is attached to Defendants' Appendix as Defendants' Ex. K.

00053868.1                                    6

cause or contribute to an exceedance of water quality standards…"[2] Defs.' Appx., Pls.' Ex. 13. As explained further below, however, the monitoring data Ms. Ashby relies upon does not establish that the "discharges" allegedly indicating "ongoing violations" have actually reached the receiving waters at concentrations that she alleges are permit violations.

20.    In addition, the State and Regional Boards have generally directed Small MS4 dischargers to *achieve compliance* with water quality standards by improving Best Management Practices ("BMPs") through the *iterative process*, not through simple application of facility-specific numeric water-quality effluent limitations. Defs.' Appx., Defs.' Ex. K, Def_21. The State Board's Small MS4 Permit Factsheet emphasizes the importance of BMPs in evaluating compliance. For example, Section XI of the Small MS4 Permit Factsheet states that the Permit requires "*implementation of BMPs in lieu of numeric water quality-based effluent limitations and further, in lieu of 'strict compliance' with water quality standards*." *Id.* at p. 21. It further states that "*the State Board…has prescribed an iterative process of BMP improvement to achieve water quality standards*." *Id.* at p. 21, citing State Water Board Orders WQ 91-03, 98-01, 2001-15; 40 C.F.R. §122.44(k).

21.    In other words, merely comparing monitoring data with water quality standards as shown in Ms. Ashby's Declaration paragraphs 10 to 21 does not support conclusions that CDCR has violated the Small MS4 Permit. Ashby Dec. ¶¶ 10-21. In practice, water quality standards can be used as reference or guidance to assess the effectiveness of BMP/control measures. As recognized in Ms. Ashby's Declaration paragraph 6 and to my knowledge, various actions and BMP improvements conducted by MCSP in cooperation with the Regional Board have occurred, including but not limited to preparation of stormwater collection investigative reports, revision of the Facility's monitoring program and conducting toxicity testing in receiving water to identify whether the MS4 discharge is contributing to toxicity in receiving water, among many other Small MS4 program implementation actions taken by MCSP following collaboration with the Regional Board. Without further evidence, it is inappropriate for Ms. Ashby to presume a Permit violation

---

[2] The Small MS4 Permit Provision D also states: "The Permittee shall comply with Receiving Water Limitations through timely implementation of control measures/BMPs and other actions to reduce pollutants in the discharges []". Defendants' Appendix as Defendants' Ex. 13.

00053868.1                                    7

**DECLARATION OF TIMOTHY SIMPSON, PE, GE IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION**

by MCSP merely based on water quality standard exceedances at the point of discharge or within receiving water.

22.    In most cases, Ms. Ashby's conclusions regarding alleged Permit violations are based on comparing results from MCSP's stormwater outfall monitoring and a downstream monitoring station (MCSP4) located approximately 200 feet from an MCSP outfall, to the State Control Plan – Bacteria Provision objectives for *E. coli* and Basin Plan objectives for the metals, listed above. In my opinion, this comparison is inappropriate and inconsistent with how monitoring data for dischargers regulated under the MS4 Permit is typically used to evaluate compliance. A more detailed discussion of the basis for my opinion that Ms. Ashby's declaration is unreliable with respect to permit violations is presented below:

> a. *Ms. Ashby's conclusions regarding past and ongoing receiving water limitation exceedances are based on comparing results from a single downstream monitoring location (MCSP4) to Basin Plan standards, but she has not demonstrated that discharges from MCSP are causing or contributing to actual receiving water impairments to the extent there are actual impairments to designed beneficial uses.*

i.    Section 303(d) of the Clean Water Act requires the states to identify water bodies that do not meet, or are not expected to meet, water quality standards (i.e., impaired water bodies). The 303(d) listing process follows a specified data quality assurance procedure to determine data usability in the assessment in accordance with the Water Quality Control Policy for Developing California's Clean Water Act Section 303(d) List (Listing Policy)[3]:

(1)    Data quality: In accordance with Listing Policy Section 6.1.4, *the quality of the data used in the development of the section 303(d) list shall be of **sufficient high quality** to make determinations of water quality standards attainment and must **meets the minimum quality assurance/quality control requirements as designated in relevant quality***

---

[3]https://www.waterboards.ca.gov/board_decisions/adopted_orders/resolutions/2015/020315_8_amendment_clean_version.pdf

*assurance documentation and* site-specific *sampling and analysis plans*. This includes the procedural steps wherein data used for impairment listing is vetted via the *California Environmental Data Exchange Network (CEDEN)* *or by the Water Board for its usability.*

(2) Data representativeness: In accordance with Section 6.1.5 of the Listing Policy, *samples should be representative of the water body segment*. *Samples used in the assessment must be temporally independent.*

ii. In order for the data to be acceptable for the purpose of assessing receiving water conditions for potential impairments, the above-described steps must be taken to ensure the data are reliable and representative. Ms. Ashby's Declaration does not demonstrate compliance with these steps, as it does not:

(1) Establish the presence of a quality assurance or sampling and analysis plan for the data used in her report:

(2) Demonstrate the data has gone through the robust review via either CEDEN or the Regional Board to ensure the integrity of the chemistry/bacteria record;

(3) Demonstrate the appropriateness of temporal and spatial representation of the dataset to support claims of the MCSP contributions to degraded water quality in Mule Creek or substantiate the direct use of the Basin standards at Mule Creek;

(4) Demonstrate the completion of the necessary steps under the Binomial Model Statistical Evaluation as identified in Section 6.1.5.7 of the Listing Policy that accounts for sample size, errors in sample accuracy and precision, and explicitly defines the acceptable levels of certainty in making the water quality objective exceedance determination.

iii. Because Ms. Ashby's Declaration does not demonstrate that she sufficiently evaluated the data quality and, more importantly, the data representativeness, any conclusion based on her Declaration that the Mule Creek receiving water is impaired would be unsupported.

**b. The most immediate receiving water downstream of MCSP has not been designated as impaired by the Regional Board.**

i. MCSP discharges to Mule Creek which drains to Dry Creek. Dry creek then flows into the Mokelumne River and ultimately discharges to Sacramento-San Joaquin Delta.

00053868.1                                     9

**DECLARATION OF TIMOTHY SIMPSON, PE, GE IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION**

Based on my review of the 2020-2022 303(d) List (the current watershed impairment list for the area), there is no assessment data for Mule Creek, but Dry Creek and Mokelumne Rivers have been assessed for impairments in accordance with California's listing policy. A copy of the 2020-2022 303(d) List is attached to Defendants' Appendix as Exhibit C.

   ii. Section 303(d) of the Clean Water Act requires the states to identify water bodies that do not meet, or are not expected to meet, water quality standards (i.e., impaired water bodies). State and Regional Water Boards assess water quality monitoring data for certain of California's surface waters periodically[4] to determine if they contain pollutants at levels that exceed protective water quality standards or guidance. Water bodies and pollutants that exceed protective water quality standards are placed on the State's 303(d) List.[5]  Based on California's Listing Policy,[6] in developing the 303(d) list, the State shall evaluate all existing readily available water quality-related data and information.

   iii. Based on the 2020-2022 303(d) List (the current watershed impairment list for the area), there is no assessment data for Mule Creek but there is assessment data for Dry Creek, which is the next water body receiving flows from Mule Creek, and the Water Board did not designate Dry Creek as impaired. Defs.' Appx., Defs.' Ex. C, D. Within the subsequent receiving water, Mokelumne River, there is also no impairment identified for *E. coli* based on both dry and wet weather monitoring data against the State Control Plan - Bacteria Provisions. While copper and zinc remain listed under the current 303(d) listing cycle for Mokelumne River, no additional water quality exceedances were observed under the current cycle (2020 to 2022). Defs.' Appx., Defs.' Ex. E.

   iv. In my opinion, because there is no indication of impairment in the most immediate receiving water that has been assessed (Dry Creek), any claim that MCSP is violating

---

[4] California's 303(d) list is developed in "cycles" with each cycle occurring every two years. Each Integrated Report cycle consists primarily of assessments from the three Regional Water Quality Control Boards that are identified "on-cycle" by the notice of solicitation. The other six Regional Boards that are "off-cycle" may also assess new high-priority data and make new listing or delisting decisions for one or more water segments. (Integrated Report Cycles)
[5] https://www.waterboards.ca.gov/rwqcb5/water_issues/tmdl/impaired_waters_list/; attached as a copy to Defendants' Appendix as Exhibit C.
[6] https://www.waterboards.ca.gov/board_decisions/adopted_orders/resolutions/2015/020315_8_amendment_clean_version.pdf

00053868.1       10

discharge prohibitions and/or receiving water standards is unsupported because there is no evidence that Dry Creek is actually impaired. The Dry Creek and Mokelumne assessment results are summarized in the table below:

| Receiving Water | | Dry Creek (Sacramento and San Joaquin Counties; partly in Delta Waterways, eastern portion)[7] | Mokelumne River, Lower (in Delta Waterways, eastern portion)[8] |
|---|---|---|---|
| **303(d) Listing Information** | **Copper** | • Do not list<br>• Insufficient data to determine impairment<br>• 0 of 6 samples exceed the criterion for copper (based on CTR & MCL) | • Do not delist<br>• Insufficient information to determine beneficial use support for the large and complex Delta subarea. No additional exceedance observed<br>• Will be assessed in future cycle |
| | **Lead** | • Do not list<br>• Insufficient data to determine impairment<br>• 0 of 6 samples exceed the criterion for lead (based on CTR) | • Not assessed |
| | **Zinc** | • Do not list<br>• Insufficient data to determine impairment<br>• 0 of 6 samples exceed the criterion for copper (based on CTR & MCL) | • Do not delist<br>• Insufficient data to delist<br>• No additional exceedance observed |
| | *E. coli* | • Do not list<br>• Insufficient data to determine impairment<br>• 3/13 based on *E. coli* single sample maximum allowable density of 235 (lower than STV threshold of 320) | • Do not list<br>• Assessed with sufficient data collected in both dry and wet weather<br>• 4/86 based on *E. coli* STV |
| | **Aluminum** | • Do not list<br>• Insufficient data to determine impairment<br>• 0 of 2 samples exceed the criterion for aluminum (based on Secondary MCL) | • Not assessed |
| | **Manganese** | • Not assessed | • Not assessed |

---

[7] https://www.waterboards.ca.gov/water_issues/programs/tmdl/2020_2022state_ir_reports_revised_final/apx-b/02099.shtml; attached as a copy to Defendants' Appendix as Exhibit D.
[8] https://www.waterboards.ca.gov/water_issues/programs/tmdl/2020_2022state_ir_reports_revised_final/apx-b/01297.shtml; attached as a as a copy to Defendants' Appendix as Exhibit E.

00053868.1                                      11

**DECLARATION OF TIMOTHY SIMPSON, PE, GE IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION**

| | **Iron** | • Not assessed | • Not assessed<br>• |
|---|---|---|---|

*c.* ***None of the alleged "ongoing violations" asserted in Ms. Ashby's Declaration are based upon data that establishes that any discharges from the Facility have actually reached the receiving waters at concentrations that she alleges are permit violations.***

i. To properly draw the conclusion that discharges from the Facility are reaching Mule Creek and causing or contributing to receiving water exceedances, monitoring data taken from MCSP2, MCSP3, and MCSP4 must be evaluated concurrently. However, all of the monitoring data that Ms. Ashby relied upon for her assertions that there are "ongoing violations" at the Facility are based on monitoring data collected from MCSP5, MCSP6, and MCSP4.

ii. Data collected from MCSP5 and MCSP6 are not representative of stormwater discharges to Mule Creek because stormwater runoff from these locations travels approximately 630 and 1500 feet respectively through vegetated bioswales prior to discharge to Mule Creek. Declaration of Anthony Orta ("Orta Decl.") at ¶¶ 13, 14. These bioswales are treatment BMPs that provide filtration and infiltration treatment, and runoff can also be captured into soil along the way before it even reaches Mule Creek. Therefore, analytical results from MCSP5 and MCSP6 are not representative of water quality at the point of discharge to Mule Creek, and monitoring data from these sampling points should not be used to assess compliance with discharge prohibitions and/or receiving water standards.

iii. Based on the above, Ms. Ashby's Declaration does not establish any ongoing violations at the Facility.

///

///

///

///

///

///

///

00053868.1                                          12

       **d. *In her evaluation of discharge results, Ms. Ashby also did not acknowledge the potential for background and upstream sources not associated with MCSP's operations to contribute to the alleged discharge violations she attributes to MCSP.***

       i.  In her evaluation of the analytical monitoring data, Ms. Ashby disregarded the potential for background and upstream sources, which are not associated with MCSP's operations, to contribute to alleged discharge violations she attributes exclusively to MCSP. As shown on the graph below, the upstream results from MCSP1 (the upstream monitoring location located a significant distance upgradient of the operational areas of MCSP, see Water Sampling Location Figure, Defs.' Appx., Defs.' Ex. F, had numerous *E. coli* detections above the Bacteria Provisions standards, yet Ms. Ashby attributed all the exceedances at the downstream monitoring



location (MCSP4) to discharges from MCSP. These upstream background contributions are not related to MCSP's MS4 system and should not be considered when assessing whether MCSP has caused or contributed to receiving water exceedances. Moreover, the data of downstream location MCSP4 and outfall discharges should not be used as the sole basis for assessing compliance.

       ii.  Similarly, Ms. Ashby did not account for the background and upstream sources of metals. Many of the metals detected at the downstream monitoring location (MCSP4) were also detected at the upstream monitoring location (MCSP1); yet, Ms. Ashby attributed all metals exceedances at the downstream monitoring location to discharges from the Facility. Without considering these background metals contributions, Ms. Ashby's assertions that the alleged metals exceedances at MCSP4 are attributable to the Facility are unsupported.

00053868.1                   13

> **e.  Ms. Ashby also disregarded the SCCWRP Study, which concluded that E. coli detected in sampling results is primarily from wildlife sources.**

i.  Ms. Ashby disregarded the recent study "Quantification of Sources of Fecal Pollution at Mule Creek" conducted by the Southern California Coastal Water Research Project ("SCCWRP") ("SCCWRP Study"), which quantified sources of human fecal pollution at MCSP. Defs.'Appx., Defs.' Ex. G. This study was commissioned by the Regional Board and MCSP and concluded that there was almost no human fecal contribution to the *E. coli* detected in stormwater and that "[a]nimals (birds and deer), and not human(s), were identified the primary source of fecal pollution…." Defs.' Appx., Defs.' Ex. G, at Defs_000627. SHN Engineering & Geologists' June 2020 Revised Stormwater Collection System Investigation Report of Findings ("SHN Report") also concluded that sources of fecal contaminants derived from bird and ruminant animals, with almost no contribution from humans. Defs'. Appx., Ex. H at Defs_00693. Similar to my opinion above, these results indicate the major sources of *E. coli* are background non-point sources, which should be considered when assessing whether MCSP is in violation of discharge prohibitions and/or receiving water limitations.

> **f.  Toxicity testing conducted in 2021 and 2022 did not show indications of toxicity in Mule Creek, and Ms. Ashby disregarded that this testing in 2021 and 2022 did not show any indication of toxicity.**

i.  Ms. Ashby also disregarded the toxicity testing of effluent samples conducted by MCSP pursuant to the 13383 Order. Aquatic toxicity evaluates the adverse response of aquatic organisms due to exposure of components within the effluent from an outfall. This bioassay is routinely used to determine the potential for adverse effects to aquatic organisms and is required as part of the 13383 Order which requires testing for acute toxicity using fathead minnow with survival at 96 hours as the endpoint. Available toxicity test results were reviewed by GSI for samples collected during the winter of 2021 and again in February and March of 2022. The results from these tests as provided by the laboratories were evaluated by GSI to confirm that all tests met acceptable performance criteria and then using these results, the Test of Significant Toxicity (TST) approach (USEPA 2010) was used to evaluate potential toxicity. The TST provides

00053868.1                                                   14

a pass or fail result. All samples from the three collection dates in 2021 and 2022 resulted in a pass indicating that exposure to the effluent did not result in toxicity to the survival of the fathead minnows. Ms. Ashby disregarded this data that demonstrates that discharges from MCSP are not creating a toxic condition in Mule Creek. This data further undermines Ms. Ashby's conclusions that there are ongoing violations by MCSP of the Small MS4 Permit, as Ms. Ashby suggests in her Declaration, Tables 7-11.

ii.    Specifically, the results were reviewed as follows:

(1)    For samples analyzed by Alpha Analytical Laboratories, Inc. and collected in the winter of 2021 (dated 6 December 2021) and in February of 2022 (dated 28 February 2022), results were evaluated following the TST approach (EPA 2010) where the data were transformed using an arcsine square root transformation and then a Welch's t-test was conducted. If the calculated t-value was greater than the critical t-value at an alpha of 0.1 (as given in Table A-1 of EPA 2010), then the sample is not toxic. The data collected on both sample dates in the upstream and downstream samples showed no toxicity.

(2)    For the samples collected in March 2022 (dated 15 March 2022) and analyzed by Aquatic Bioassay Consulting, Inc., the results of the statistical analysis for TST as provided by the labs' CETIS software was used. The results indicate that both samples received and tested by the lab showed no toxicity.[9]

iii.    The findings from these Acute Toxicity testing results contradict Ms. Ashby's conclusion that MCSP is violating discharge prohibitions and/or receiving water toxicity standards established for protection of aquatic life.

g.    *Ms. Ashby improperly applies the California Toxics Rule, which the Regional Board does not consider applicable to MCSP.*

i.    Ms. Ashby's Declaration includes several tables (Tables 5 and 6 for past violations and 10 and 11 for ongoing violations) which compare stormwater discharge and downstream monitoring results to California Toxics Rule (CTR) criteria for copper, lead, and zinc

---

[9] Note that the laboratory report indicates a sample location of MCSP2. The shipping laboratory did not receive a sample from a location designated MCSP2. As the date and time stamp for this sample is identical to that of MCSP4, the likely scenario is that this sample was mislabeled in shipping from the chemistry laboratory to the bioassay lab.

00053868.1                                          15

and she concludes that exceedances of CTR values represent Permit violations. In my experience, the CTR-based discharge limitations apply to dischargers enrolled under general permits with established Total Maximum Daily Loads ("TMDLs"). There is no TMDL for the watersheds receiving flow from MCSP. As such, Ms. Ashby's use of the CTR criteria as the basis for establishing alleged violations of discharge prohibitions and/or receiving water standards is unsupported. She also didn't consider hardness adjustments on the copper, lead and zinc CTR standards as specified in 40 CFR § 131.38 and for this reason, her conclusions are unreliable.

> ### h. Ms. Ashby improperly relied upon unrepresentative stormwater samples collected from ponded and/or stagnant water to assess them as Permit violations.

i. In Table 2, 4, 10 and 11 of Ms. Ashby's Declaration, Ms. Ashby summarizes what she considers Permit violations for six discharge events where samples were collected from ponded and/or stagnant water based on field records from the sampling personnel. These samples are listed below:

| Sample Date | Location | Field Note | Violation Referenced in Ashby's Declaration | Comment |
|---|---|---|---|---|
| 5/20/2019 | MCSP2 | Stagnant Water | Past Bacteria Exceedances for Outfall and Receiving Water - Tables 2 and 4 | Sample collected from MS4 outfalls MCSP2/MCSP3 with no measurable flow (stagnant/ponded water) |
| | MCSP3 | Stagnant Water | | |
| 1/16/2020 | MCSP4 | No Flow | Past Bacteria Exceedances for Outfall and Receiving Water - Tables 2 and 4 | Sample collected from downstream location with no measurable flow (ponded water) |
| 4/7/2020 | MCSP2 | No Flow | Past Bacteria Exceedances for Outfall and Receiving Water - Tables 2 and 4 | Sample collected from MS4 outfall MCSP2 with no measurable flow (stagnant/ponded water) |
| 4/20/2020 | MCSP3 | Stagnant Water | Past Bacteria Exceedances for Outfall and Receiving Water - Tables 2 and 4 | Sample collected from MS4 outfall MCSP3 with no measurable flow (stagnant/ponded water) |

00053868.1                                    16

**DECLARATION OF TIMOTHY SIMPSON, PE, GE IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION**

| 3/10/2021 | MCSP6 | Insufficient Water | Past Metal Exceedances for Outfall and Receiving Water - Tables 10 and 11 | Sample collected from internal outfall MCSP 6 with no measurable flow (stagnant/ponded water) |
|---|---|---|---|---|

ii.   In considering these results to be Permit violations, as she does, Ms. Ashby fails to acknowledge the conditions under which these samples were collected and to confirm these results are suitable to assess compliance with discharge prohibitions and receiving water standards. The United States Environmental Protection Agency, many states, and the California Department of Transportation publish readily available stormwater sampling guidance which describe the importance of collecting representative samples to properly characterize pollutants in stormwater discharges. It is standard practice to consider the conditions under which samples are collected in the development of conclusions regarding the potential impact of the water quality of those samples. Ms. Ashby's Declaration does not indicate she has done that here.

iii.   Each of the following excerpts are from well-established stormwater sampling guidance and identify standard sampling protocols that Ms. Ashby did not consider in assessing permit violations for MCSP:

(1)   "Sampling sites should be free-flowing and not affected by backwater and/or tidal conditions. Proper selection of the sampling location assures the collection of representative samples."[10]

(2)   "In an attempt to provide grab samples representative of an entire storm event, to the greatest extent possible, grab samples should be collected during event peak flow. However, peak flow conditions are typically difficult to determine during a monitoring event. Therefore, grab samples should be collected using best professional judgment, during the estimated midpoint of a monitoring event, under moderate (not low) runoff flow conditions."[11]

///

///

---

[10] Washington State Department of Ecology, J. Lowe, Washington State Department of Ecology, D. DeLeon, City of Tacoma, Standard Operating Procedure for Collecting Grab Samples from Stormwater Discharges, Version 1.0, September 16, 2009.

[11] California Department of Transportation (CalTrans), "Caltrans Comprehensive Protocols Guidance Manual", CTSW-RT-03-105.51.42, November 2003.

00053868.1                                    17

### i.  *Ms. Ashby's application of the municipal and domestic supply beneficial use is unsupported and makes her opinions unreliable.*

i.  Table 5, 6, 10 and 11 of Ms. Ashby's Declaration list numerous alleged past and ongoing violations of the Small MS4 Permit's Discharge Prohibitions for outfall samples and Receiving Water Limitations for MCSP4/downstream samples based on the municipal and domestic supply (MUN) beneficial use. Ashby Decl. at pp. 36, 37, 41, 43-45. However, none of the several section 13383 Orders issued by the Regional Board to MCSP for the purpose of ensuring compliance with the Small MS4 include "MUN"[12] in the listed beneficial uses for Mule Creek. In fact, the Regional Board identifies eight other beneficial use designations that are applied to Mule Creek. Certain water quality objectives for particular constituents apply depending on a water body's designated beneficial use. Based on the application of the MUN beneficial use in her analysis, Ms. Ashby applied MCL-based standards to MCSP. If the MCL is not applied, the majority of the violations Ms. Ashby has alleged, as shown in the table below (the rest of the violation allegations are unsupported for all of the other reasons explained throughout this declaration), are not supported.

| Table Number | Total Alleged Violations | Alleged Violations Attributed to MUN Beneficial Use |
|---|---|---|
| Table 5 | 25 Alleged Past Violations of Small MS4 Permit Discharge Prohibition – Metals | 18 of 25 or 72 percent |
| Table 6 | 14 Alleged Past Violations of Small MS4 Permit Receiving Water Limitations – Metals | 11 of 14 or 78 percent |
| Table 10 | 77 Alleged Ongoing Discharge Violations – Metals | 54 of 77 or 70 percent |
| Table 11 | 29 Alleged Ongoing Violations of Small MS4 Permit's Receiving Water Limitations – Metals | 24 of 29 or 83 percent |

---

[12] Municipal and Domestic Supply (MUN) – Uses of water for community, military, or individual water supply systems, including but not limited to, drinking water supply. Defs.' Appx., Pls.' Ex. 9 at 2-1.

00053868.1                                    18

### *j.*   *Ms. Ashby's standing water observations are irrelevant.*

i. Ms. Ashby's Declaration states that standing water in storm drains represents an ongoing violation based on her observations of standing water in several catch basins, flowing water through subsurface pipelines, and ponded water within drop inlets and in the bioswales that lead to MCSP2 and MCSP3. She also describes evidence of offsite discharges, but admits she did not observe offsite discharges occurring.

ii. Ms. Ashby does not provide a basis for her determination that standing water in storm drains represent an ongoing violation and for this reason, I'm unable to fully evaluate her opinion. However, I am aware that the investigations conducted at MCSP of the stormwater collection system identified that "due to the elevation of the stormwater collection system in the Center Corridor and the groundwater elevations measured in monitoring well R-1, groundwater and/or irrigation water are most likely infiltrating into the stormwater collection system." Defs'. Appx., Defs.' Ex. H at Defs_000682. Additionally, I am also aware that MCSP is in the process of installing permanent monitoring stations at the MCSP2 and MCSP3 discharge points. This is evidence that MCSP is coordinating with the Regional Board to make continuing improvements in the Facility's BMPs consistent with the iterative process described above.

### *k.*   *Ms. Ashby's conclusion that MCSP does not qualify for the "No Exposure Certification" Criteria of the Industrial General Permit is unsupported.*

i. Ms. Ashby's final opinion states that there are industrial materials used and/or stored in areas that have exposure to rain and this represents an ongoing violation because she observed industrial exposure in areas regulated under the No Exposure Certification (NEC) criteria of the Industrial General Permit. Her opinion includes several photographs and descriptions of what she observed and what she considers industrial exposure. Her observations regarding industrial exposure include the following:

(1)   For the sewing area, Ms. Ashby states that she observed trash and debris in the uncovered loading dock and wood pallets stored outside the loading dock in an area exposed to precipitation.

00053868.1                                   19

**DECLARATION OF TIMOTHY SIMPSON, PE, GE IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION**

(2)    For the industrial meat packing area, she observed indications of a leakage outside a chemical storage container and cardboard containers stored at the edge of a loading dock outside the meat packing area.

ii.    Based on my review of a declaration from Anthony Orta, the Correctional Plant Manager at MCSP, the debris in the sewing area loading dock has been removed. In addition, pursuant to relevant NEC guidance from the State of California, storage of wooden pallets does not constitute industrial exposure.[13] A copy of the NPDES General Permit for Storm Water Discharges Associated with Industrial Activities ("Industrial General Permit"), Appendix 2, Instructions for No Exposure Certification (NEC), is attached to Defendants' Appendix as Exhibit I, Ex.

iii.    For the meat packing area, Mr. Orta's declaration also includes photographs which show that the chemical storage container and carboard are no longer present and according to Mr. Orta, the storage container was moved under cover. Also according to Mr. Orta, the cardboard containers were used for construction debris for a construction project that has since been completed, and which would not be associated in any case with the industrial operations that occur at the meat packing area. Orta Decl. at ¶¶ 10, 11.

iv.    Based on the foregoing, there is no evidence that these areas do not currently qualify for NEC status under the Industrial General Permit or that an ongoing violation exists. It should be noted that these areas were inspected by the Regional Board on February 11, 2021, and the Regional Board inspector found no violations and concluded that the NEC-covered areas complied with applicable requirements.[14] He also noted that "*the interior rooms were clean and orderly, and no potential sources of stormwater pollution were observed at the loading docks, or around storm drains; waste bins were covered and in good condition.*" A true and correct copy of

---

[13] See Appendix 2 to the Industrial General Permit: Final products intended to be used outdoors (e.g., automobiles) typically pose little risk of polluting storm water since not typically contaminated with pollutants that become mobilized by contact with storm water. Final products are exempt from the requirement for protection by a storm-resistant shelter to qualify for no exposure. Similarly, containers, racks, and other transport platforms (e.g., wooden pallets) used for the storage or conveyance of final products may also be stored outside if pollutant-free or pollutants do not mobilize via contact with storm water.

00053868.1                                            20

the January 27, 2021 Central Valley Regional Water Quality Control Board Inspection Report is attached to Defendants' Appendix as Defendants' Exhibit J.

23.    Robert Emerick's Declaration submitted in support of the MSA ("Mr. Emerick's Declaration" ECF 45-2) is equally unreliable, as his conclusions that sewage is present throughout MCSP's stormwater piping network are unsupported for the following reasons:

a.    In Mr. Emerick's Declaration, he evaluates potential sources for bacterial contamination and uses the results of testing for caffeine, pharmaceuticals and personal care products in samples collected from ponded water in the bioswales to improperly conclude that sewage is present throughout MCSP's stormwater piping network and that the only source of the detected pharmaceuticals is human excrement.

b.    The investigation conducted by SHN and summarized in the Revised Stormwater Collection System Investigation of Findings ("the SHN Report") included surveying and mapping the stormwater and sanitary sewer collection systems. The physical investigation activities included a review of records documenting the stormwater and sanitary sewer collection systems, visual manhole and closed-circuit television inspections of the stormwater and sanitary sewer collection systems, dye and smoke testing of the sanitary sewer collection system, survey and mapping of the stormwater and sanitary sewer collection systems, and monitoring of the volume of surface water diverted to the sanitary sewer collection system. Defs.' Appx., Defs.' Ex. H. The investigation "did not reveal any direct cross-connections between the stormwater and the sanitary sewer collection systems at MCSP. While inspection of the sanitary sewer collection system identified sections that should be repaired, SHN did not report visual or analytical evidence of stormwater comingled with wastewater, sewage and/or grey water….no cross-connection, pipe break, or other issues that would cause the release of waste constituents to the stormwater collection system were identified…waste constituents were not identified in the stormwater collection system." Defs.' Appx., Defs.' Ex. H at Defs_000682.

c.    According to my review of a declaration signed by Anthony Orta, the Correctional Plant Manager at MCSP, inmates have access to caffeinated beverages, coffee and tea and he states that caffeinated beverages have spilled on the ground which have the potential to

00053868.1                                     21

enter MCSP's stormwater collection system. In addition, Mr. Orta also reports that medications are distributed to inmates at each housing unit and some inmates do not ingest the medications they receive and instead may deposit their medication into yard drains that are connected to MCSP's stormwater collection system. Orta Decl. ¶8.

        d.      Mr. Orta's declaration undermines Mr. Emerick's opinions that the <u>only</u> source of pharmaceuticals is human excrement and like my critique of the opinions in Ms. Ashby's Declaration, he does not acknowledge or address the findings from the SCCWRP Study. That study, which was commissioned by the Regional Board and MCSP, concluded that there was almost no human fecal contribution to the *E. coli* detected in stormwater and that the *E. coli* primarily originated from deer and birds. Mr. Emerick also disregards other possible explanations for caffeine, pharmaceuticals, and personal care products detected in samples collected from the bioswales, including the possibility of inmates depositing caffeinated soda, coffee, tea and pharmaceuticals onto surfaces that drain to the storm drain system, or directly into drain inlets that lead to the storm drain system. Orta Decl. ¶ 8.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on August 1, 2022, at Laguna Beach, California.

_____

Timothy Simpson, P.E., G.E.

**DECLARATION OF TIMOTHY SIMPSON, PE, GE IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION**