In 2015, State Water Board staff conducted a series of stakeholder meetings with Permittees and other interested parties over several months to discuss proposed changes to the Order, specifically revising and Attachment G with updated TMDL requirements. These meetings included the CASQA Phase II Small MS4 Subcommittee, representatives of non-governmental organizations, Non-traditional Small MS4s and Regional Water Board staff. On June 5, 2017 a draft amendment to this Order was issued for a 45-day public review period. The public review period was extended by request and the due date for public comments became August 21, 2017.

## II. PERMITTING APPROACH

### Existing General Permit Approach

U.S. EPA storm water regulations for Phase II storm water permits envision a process in which entities subject to regulation develop a Storm Water Management Plan (SWMP). The SWMP contains detailed Best Management Practices (BMPs) and specific level-of- implementation information reviewed and approved by the permitting agency before the Permittee obtains coverage under the storm water permit. The existing General Permit followed this approach as suggested by U.S. EPA and simply identified goals and objectives for each of the six Minimum Control Measures.

The existing General Permit approach provides the flexibility to target an MS4's problem areas while working within the existing organizational structure. However, audits of Permittees and information gained from interviews with Regional Water Board staff revealed that many of these storm water programs lacked a baseline program and specific details in the SWMP to implement an adequate program for protection from the impacts of storm water runoff. Regional Water Board staff found it difficult to determine Permittees' compliance with the existing General Permit, due to the lack of specific requirements. The permit language did not contain specific deadlines for compliance, did not incorporate clear performance standards, and did not include measurable goals or quantifiable targets for implementation.[1]

The Regional Water Boards conducted approximately 36 on-site audits of MS4 programs[2] in the state that addressed 122 Permittees, including some Phase II Small MS4s. They found that programs with more specific permit requirements generally resulted in more comprehensive and progressive storm water management programs. For example, the more prescriptive permit requirements in the Los Angeles and San Diego MS4 permits require Permittees to be specific in how they implement their storm water program. The auditors concluded that the specificity of the provisions enabled the permitting authorities to enforce the MS4 permits and improve the quality of MS4 discharges. In addition, U.S. EPA on-site audits of MS4s throughout the nation have

Given this information, State Water Board staff aimed to write permit language clear enough to set appropriate standards and establish required outcomes.

---

[1] Storm Water Phase I MS4 Permitting: Writing more effective, measurable permits, EPA, Kosco. repeatedly shown the need for clear, measurable requirements in MS4 permits to ensure an effective and enforceable program.

[2] Assessment Report on Tetra Tech's Support of California's MS4 Storm Water Program, July 2006

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000739

**Current Order Approach**

The current approach simplifies assessment of Permittee compliance and allows the public to more easily access measurable results. The Order provisions establish compliance implementation levels such as escalating enforcement and requirements for tracking projects. Required actions include specific reporting elements to substantiate compliance with implementation levels. Regional Water Board staff will be able to evaluate each individual Permittee's compliance through an online Annual Report review and the program evaluation (audit) process.

Federal regulations and State law require that the implementation specifics of Municipal Storm Water NPDES permits be adopted after adequate public review and comment.[3] This Order's approach satisfies the public involvement requirements of both the federal Clean Water Act and the California Water Code. Permit details are known at the time of adoption of the Order. Substantive information as to how the discharger will reduce pollutants to the Maximum Extent Practicable (MEP) is not left to the details of the SWMP. The public need not guess program details until Regional Water Board review and approval of a SWMP, as was the case in the existing General Permit.

This Order specifies the actions necessary to reduce the discharge of pollutants in storm water to the MEP in a manner designed to achieve compliance with water quality standards and objectives. This set of specific actions is equivalent to the requirements that were included in a separate SWMP for each Permittee in the existing General Permit.

This order effectively prohibits non-storm water discharges into municipal storm drain systems and watercourses within the Permittees' jurisdictions.

The State Board has also identified the most critical water quality problems as priorities in this Order. The priorities include (1) discharges to Areas of Special Biological Significance (2) discharges to water bodies listed as impaired on the 303[d] list (3) Post- Construction Requirements and (4) Water Quality Monitoring Requirements. A majority of the Permittees' implementation efforts focus on the four priority areas as identified by the State Water Board.

*Permittee Diversity*

In California, Permittees face highly variable conditions both in terms of threats to water quality from their storm water discharges and resources available to manage those discharges. Consequently, making one set of prescriptive requirements work for all of them is inherently difficult. This Order contains separate provisions for Traditional and Non-traditional MS4s. The

---

[3] On January 14, 2003, the U.S. Ninth Circuit Court issued a decision in *Environmental Defense Center v. EPA* ((9th Cir. 2003) 344 F.3d 832.) This ruling upheld the Phase II regulations on all but three of the 20 issues contested. The court determined that applications for general permit coverage (including the NOI and any Storm Water Management Program [SWMP]) must be made available to the public, the applications must be reviewed and determined to meet the Maximum Extent Practicable (MEP) standard by the permitting authority before coverage commences, and there must be a process to accommodate public hearings. Regarding the issue of public participation, the Ninth Circuit noted that such participation was required because the "substantive information about how the operator of a small MS4 will reduce discharges to the maximum extent practicable" was found in the storm water management plan rather than the permit itself" (344 F3d at 857).

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000740

requirements for the Non-traditional MS4s are tailored specifically to the Non-traditional management structure. Additionally, this permit introduces the concept of compliance tiers in particular sections, designed to relieve the Regional Water Board burden of reviewing and approving individual SWMPs while preserving the ability of the Permittees to tailor requirements that address their unique circumstances.

*Non-traditional MS4 Categories and Provisions*
This Order identifies specific provisions Non-traditional MS4 Permittees must comply with in Section F and considers the following categories to be Non-traditional MS4s, but not limited to:

- Community Services Districts
- Fairgrounds
- Higher Education Institutions (Community Colleges and Universities)
- Military Bases
- Ports
- State Parks/Beaches/Historical Areas
- School Districts K-12
- State and Federal Prisons/Health Institutions
- State Vehicle Recreation Areas
- Water Agencies
- Transit Agencies

The regulations direct that the term Small MS4s includes "large hospitals" and "prison complexes." (40 C.F.R. §122.26(b)(16)(iii).) For purposes of State Water Board designation of state and federal hospitals and prisons, the Board interprets the terms "large hospital" and "prison complex" to mean health institutions and prison facilities with a resident and staff population of 5,000 or more. However, Regional Water Boards may designate smaller facilities on a case by case basis.

*Guidance Document*
The case for eliminating a SWMP for this second permit term has been clearly addressed, however, the latent advantages of having some form of a storm water management document has not.

First, a storm water management document assists Permittees in managing their storm water program. Such a document serves as guidance to (1) identify different staff involved in storm water compliance over multiple departments within the Permittee agency and, (2) provide those staff with a simple narrative connecting all the detailed, specific BMPs in relation to multiple Permittee departments. Simply put, the document provides the Permittee with a map to the compliance process.

Second, the storm water management document is an essential tool for Regional Water Board audits. During MS4 audits, the Regional Water Board typically requests and reviews a SWMP to understand the Permittee's storm water program and management structure. Although the Order contains specific details on each program requirement, it lacks the simple narrative nexus that a storm water management document can provide on how the storm water program is implemented by a specific Permittee. The guidance document may be in spreadsheet form, as a flowchart, or as a written narrative. In other words, the structure is left up to the Permittee as to the way in which they want to demonstrate or illustrate the relationship between their

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000741

storm water program and their management structure. To that end, the guidance document will provide the Permittee with a clear map to the compliance process. Therefore, although the draft Order eliminates the submittal for review and approval of a SWMP, the requirement to develop a planning/guidance document has been retained for new Permittees.

New Permittees are allowed six months to develop and upload the guidance document to SMARTS along with the NOI and appropriate fee. The document is open for public viewing, but will not be reviewed and approved by the relevant Regional Water Board.

Renewal Permittees will also submit a guidance document and are allowed six months to develop and upload the guidance document to SMARTS along with the NOI and appropriate fee.

The State Water Board recognizes that in some instances Renewal Permittees' existing SWMPs have incorporated BMPs designed to address locality-specific storm water issues and that in some cases these BMPs may, because of locality-specific factors, be more protective of water quality than the minimum requirements established by this Order. Renewal Permittees will additionally include in the guidance document the following: identification and brief description of each BMP and associated measurable goal included in the Permittee's most current SWMP that constitutes a more specific local or tailored level of implementation that may be more protective of water quality than the minimum requirements of this Order; and identification of whether the Permittee proposes to maintain, reduce, or cease implementation for each more protective, locally-tailored BMP. In no instance may a BMP be reduced or ceased if it is required by the minimum standards set by this Order. Further, for each more protective, locally-tailored BMP and associated measurable goal for which the Renewal Permittee proposes to reduce or cease implementation, the Renewal Permittee may do so only if the Permittee can demonstrate, to the Regional Water Board Executive Officer, that the reduction or cessation is in compliance with this Order and the maximum extent practicable standard, and will not result in increased pollutant discharges. This process is designed to direct Renewal Permittees, where appropriate, to continue to implement more protective, locally-tailored BMPs and measurable goals developed in the previous permit term that were specifically designed to address local storm water priorities.

**Summary of Significant Changes in this Order**
This Order significantly differs from the previous order (Order 2003-0005-DWQ) by including the following:

- Specific BMP and Management Measure Requirements
- Elimination of submission of a SWMP for review and approval by the Regional Water Boards
- Electronic filing of NOIs and Annual Reports
- Waiver Certification
- New State Water Board and Regional Water Board designation criteria
- Separate requirements for Traditional and Non-traditional MS4s
- New program management requirements
- Post-construction storm water management requirements
- TMDL implementation requirements
- Requirements for ASBS discharges
- Water quality monitoring and BMP assessment
- Program effectiveness assessment

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000742

## III. ECONOMIC CONSIDERATIONS

In 2000, the State Water Board issued a precedential order (Order WQ 2000-11 (Cities of Bellflower, et al.)) stating that cost of compliance with the programs and requirements of a municipal storm water permit is a relevant factor in determining MEP. The Order also explicitly stated that a cost benefit analysis is not required. The State Water Board discussed costs as follows:

While the standard of MEP is not defined in the storm water regulations or the Clean Water Act, the term has been defined in other federal rules...

These definitions focus mostly on technical feasibility, but cost is also a relevant factor. There must be a serious attempt to comply, and practical solutions may not be lightly rejected. If, from the list of BMPs, a permittee chooses only a few of the least expensive methods, it is likely that MEP has not been met. On the other hand, if a permittee employs all applicable BMPs except those where it can show that they are not technically feasible in the locality, or whose cost would exceed any benefit to be derived, it would have met the standard. MEP requires permittees to choose effective BMPs, and to reject applicable BMPs only where other effective BMPs will serve the same purpose, the BMPs would not be technically feasible, or the cost would be prohibitive. Thus while cost is a factor, the Regional Water Board is not required to perform a cost-benefit analysis.

(State Water Board Order WQ 2000-11, supra, p.20.) The State Water Board received extensive comments addressing the costs associated with compliance with the first publicly released Phase II small MS4 draft Order in June 2011. The depressed economic conditions in California challenge Permittees' ability to fully implement the requirements of the first draft permit. The State Water Board recognizes that many Permittees currently have limited staff and resources to implement storm water provisions. State Water Board staff carefully considered comments received regarding economic feasibility while revising the June 2011 draft Order. The Order continues to address critical water quality priorities, namely discharges to ASBS, TMDLs, and waterbodies listed as impaired on the 303(d) list, but aims to do so in a focused and cost-effective manner.

*Brief History*
State Water Board staff completed an administrative draft Order and submitted it to CASQA, U.S. EPA, Natural Resources Defense Council, Water Keepers, and Heal the Bay for informal stakeholder review in February 2011. Each of the nine Regional Water Boards also provided comments. Staff revised the draft Order to address the informal comments received and released it for 60-day public review in June 2011. Approximately 151 comments were received and several workshops were held throughout California to meet Stakeholders, answer questions and discuss the development process.

On October 6, 2011, the California Senate Select Committee on California Job Creation and Retention held a hearing on the economic impacts of the State Water Board's three general or statewide storm water permits that were under renewal: the Phase II Small MS4 permit, the Industrial General Permit, and the Caltrans statewide MS4 permit. The Executive Director of the State Water Board testified at the hearing that the comments regarding cost of compliance with the permits were being considered carefully and that the three permits required substantial revision to address the comments. Following the hearing, State Water Board staff launched Stakeholder meetings beginning in November 2011 to April 2012. The meetings were held with CASQA, National Resources Defense Council, Water Keepers, Heal the Bay

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000743

and each category of Non- traditional Small MS4 proposed for designation in the draft permit. The meetings were designed to discuss implementation challenges and solutions for each section of this Order, given the issues raised at the Senate hearing and the written comments from the June 2011 draft Order. Substantial revisions were then made and were reflected in the May 2012 draft Order. State Water Board staff attempted to reduce costs while maintaining the level of water quality protection mandated by CWA, CWC and other applicable requirements.

*Approach to Cost of Compliance*

This section is a general discussion of the more significant changes between the June 2011 and the May 2012 draft Order, including cost of compliance. It is not possible to accurately predict the cost impact of requirements that involve an unknown level of implementation or that depend on environmental variables that are as yet undefined. Only general conclusions can be drawn from this information.

It is extremely important to note that many storm water program components and their associated costs existed before any MS4 permits were issued. For example, storm drain maintenance, street sweeping and trash/litter collection costs cannot be solely or even principally attributed to MS4 permit compliance since these long-standing practices preceded the adoption of the earliest storm water permit in 1990. Even many structural BMPs (erosion protection, energy dissipation devices, detention basins etc.) are standard engineering practice for many projects and are not implemented solely to comply with permit provisions. Therefore, the true cost resulting from MS4 permit requirements is some fraction of the total storm water program costs.

The California State University, Sacramento study found that only 38% of program costs are new costs fully attributable to MS4 permits. The remainder of program costs was either pre-existing or resulted from enhancement of pre-existing programs.[4] The County of Orange found that even lesser amounts of program costs are solely attributable to MS4 permit compliance, reporting that the amount attributable to implement its Drainage Area Management Plan is less than 20% of the total budget. The remaining 80% is attributable to pre-existing programs.[5] Any increase in cost to the Permittees by the requirements of this Order will be incremental in nature.

Testimony from the California Senate Select Committee on California Job Creation and Retention hearing and comment letters on the June 2011 draft Order asserted numerous estimates of compliance costs. Generally, the estimates are based on worst-case scenarios or the most restrictive interpretation of the June 2011 draft Order. A worst-case scenario would come about, for example, if a new Traditional MS4 Permittee fails to leverage existing resources and maximize efficiencies, and does not segregate pre-existing program expenditures and new costs to implement the storm water program when considering cost of compliance. Furthermore, the assertions do not take into consideration the phased-in nature of many of the June 2011 draft Order requirements. Finally, the cost estimate assertions did not address the diversity among Permittees, specifically the different levels of compliance from a

---

[4] Ibid. p. 58

[5] County of Orange, 2000. A NPDES Annual Progress Report. P. 60. More current data from the County of Orange is not used in this discussion because the County of Orange no longer reports such information.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000744

new vs. renewal Traditional MS4 Permittee expenditure and new vs. renewal Non-traditional MS4 expenditure and funding sources.

State Water Board staff estimated the cost of compliance in two ways. First, staff utilized cost data from the California State University (CSUS) NPDES Stormwater Cost Survey[6]. The rationale for using this document is that it's very difficult to precisely determine the true cost of implementation of the Permittees' storm water management program as affected by this Order. Reported costs of compliance for the same program element vary widely from city to city and by a very great margin that cannot be explained. However, economies of scale play a great role for the great margin of compliance costs. Some Permittees storm water programs are general funded while others utilize a service/user/utility fees to support the program. Unfortunately, those Permittees with general funded programs must compete for dollars in a dwindling economic climate. Furthermore, a study by the Los Angeles Regional Water Board reported wide variability in the cost of compliance among municipal permit holders, which was not easily explained.[7] Due to the wide diversity among the Permittees, Traditional and Non-traditional and new and renewal Permittees, the uncertainty of the extent of needed improvements, and the difficulty in isolating program costs attributable to permit compliance, the true cost of implementation can only be discussed in a general way.

Second, staff considered comparisons between the June 2011 draft Order and first term Phase I MS4 permits. The municipalities chosen in the CSUS survey were smaller Phase I cities, were early in the first permit term, and had reported cost in their annual reports. In addition, the cost categories correspond to the federal Phase II Small MS4 six minimum control measures. Given these factors, State Water Board staff estimated the worst-case scenario example to be a $32 median annual cost per household to implement the June 2011 draft Order. The CSUS survey estimated the annual cost per household for the six storm water programs ranged from $18 to $46.

Of the 100 new Traditional Small MS4s proposed to be designated, 20,000 is the average population with an average of 2.8 individuals per household, therefore the average annual cost to implement the June 2011 draft Order is approximately $229,000.

The average population of a renewal Traditional MS4 Permittee identified in the June 2011 draft Order is 27,353 with an average of 2.8 individuals per household. Therefore, the average annual cost to implement the June 2011 draft Order is approximately $313,000.

As discussed previously, the May 2012 draft Order has undergone substantial edits and no requirements have been added to the draft Order that would materially increase the cost of compliance. State Water Board staff carefully evaluated comments from Stakeholder meetings, written public comments, and testimony from the Senate Select Committee hearing. And, although the May 2012 draft Order contains these substantial revisions, the draft Order continues to protect storm water quality without overburdening Permittees and Businesses. Below is a list of some of the more significant changes to reduce costs.

1. Deleted annual cost analysis
2. Deleted Industrial/Commercial Inspection Program
3. Deleted mandatory construction inspection frequency

---

[6] California State University, NPDES Stormwater Cost Survey, 2005

[7] LARWQCB, 2003. Review and Analysis of Budget Data Submitted by the Permittees for Fiscal Years 2000-2003. p.2

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000745

4. Deleted Trash Reduction Program
5. Modified post-construction standard requirements
6. Modified Community-Based Social Marketing provision
7. Modified Non-traditional MS4 provisions
8. Extended compliance deadlines
9. Eliminated redundancy with construction inventory and tracking requirements
10. Deleted mandatory development of a citizen advisory group
11. Deleted costly IDDE monitoring, complaint response based
12. Made spatial data in a Geographic Information System (GIS) optional
13. Deleted requirement to identify 20% of storm drain system as high priority
14. Included Water Quality Monitoring Tiers

Though no firm conclusions or precise estimates can be drawn from this analysis, it is expected that the revisions to the May 2012 draft Order will significantly reduce the cost of compliance of the average annual cost per household from the estimated $32 to substantially lower.

*TMDLs*

The cost of complying with TMDL waste load allocations is not considered since TMDLs are not subject to the MEP standard. Federal law requires that NPDES permits contain effluent limitations consistent with the assumptions of any applicable wasteload allocation in a TMDL. (40 C.F.R. §122.44(d)(1)(vii)(B).)

*Benefits of Permit Costs*

The State Water Board further found in adopting Order WQ-2000-11 that in considering the cost of compliance, it is also important to consider the costs of impairment; that is, the negative impact of pollution on the economy and the positive impact of improved water quality. For example, economic benefits may result through program implementation, and alternative costs (as well as environmental impacts) may be incurred by not fully implementing the program.

Storm water management programs cannot be considered solely in terms of their costs. The programs must also be viewed in terms of their value to the public. For example, household willingness to pay for improvements in fresh water quality for fishing and boating has been estimated by U.S. EPA to be $158-210.[8] This estimate can be considered conservative, since it does not include important considerations such as marine waters benefits, wildlife benefits, or flood control benefits. The California State University, Sacramento study corroborates U.S. EPA's estimates, reporting annual household willingness to pay for statewide clean water to be $180.[9] Though these costs may be assessed differently at the state level than at the municipal level, the results indicate that there is public support for storm water management programs and that costs incurred by the Permittees to implement its storm water management program remain reasonable.

It is also important to consider the cost of not implementing a storm water management program. Urban runoff in southern California has been found to cause illness in people bathing

---

[8] Federal Register / Vol. 64, No. 235 / Wednesday, December 8, 1999 / Rules and Regulations. P. 68793.

[9] State Water Board, 2005. NPDES Storm water Cost Survey. P. iv.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000746

near storm drains.[10] A study of south Huntington Beach and north Newport Beach found that an illness rate of about 0.8% among bathers at those beaches resulted in about $3 million annually in health-related expenses.[11] Extrapolation of such illness rates and associated health expenses to the beaches and other water contact recreation areas in the state would increase these costs significantly.

Storm water runoff and its impact on receiving waters also negatively affects the tourism industry. The California Travel and Tourism Commission estimated that out-of-state visitors spent $168 per person per day (including transportation) in California in 2007. The Commission estimated total direct travel spending in California was $97.6 billion, directly supporting 924,000 jobs, with earnings of $30.6 billion. Effects on tourism from storm water runoff (e.g. beach closures) can have a significant impact on the economy. The experience of Huntington Beach provides an example of the potential economic impact of poor water quality. Approximately eight miles of Huntington Beach were closed for two months in the middle of summer of 1999, impacting beach visitation and the local economy.

Finally, the benefits of storm water management programs must be considered in conjunction with their costs. A study conducted by University of Southern California and the University of California, Los Angeles assessed the costs and benefits of implementing various approaches for achieving compliance with the MS4 permits in the Los Angeles Region. The study found that non-structural systems would cost $2.8 billion but provide $5.6 billion in benefit. If structural systems were necessary, the study found that total costs would range from $5.7 to $7.4 billion, while benefits could reach

$18 billion.[12] Costs are anticipated to be borne over many years, approximately a ten year minimum. That the benefits of the programs would considerably exceed their costs is a view corroborated by U.S. EPA, which also found that the benefits of implementation of its Phase II storm water rule would outweigh the costs.[13]

## IV.  UNFUNDED MANDATES

Article XIII B, Section 6(a) of the California Constitution provides that whenever "any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service." The requirements of this Order do not constitute state mandates that are subject to a subvention of funds.

First, the requirements of this Order do not constitute a new program or a higher level of service as compared to the requirements of the Existing Order. The overarching requirement to impose controls to reduce the pollutants in municipal storm water is dictated by the Clean Water Act and is not new to this permit cycle. (33 U.S.C. §1342(p)(3)(B).) The inclusion of new and advanced measures as the storm water programs evolve and mature over time is

---

[10] Haile, R.W., et al, 1996. An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay. Santa Monica Bay Restoration Project.

[11] Los Angeles Times, May 2, 2005. Here's What Ocean Germs Cost You: A UC Irvine Study Tallies the Cost of Treatment and Lost Wages for Beachgoers Who Get Sick.

[12] LARWQCB, 2004. Alternative Approaches to Storm water Control.

[13] Federal Register / Vol. 64, No. 235 / Wednesday, December 8, 1999 / Rules and Regulations. P. 68791.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000747

anticipated under the Clean Water Act (55 Fed. Reg. 48052), and these new and advanced measures do not constitute a new program or higher level of service. Further, this Order sets out a more detailed set of requirements compared to the 2003 Order in large part because, unlike the 2003 Order, this Order does not require submission of SWMPs. Specifics concerning how the minimum measures will be implemented, which would have been proposed in the SWMP under the 2003 Order, are now incorporated into the Order itself.

Second, and more broadly, mandates imposed by federal law, rather than by a state agency, are exempt from the requirement that the local agency's expenditures be reimbursed. (Cal. Const., art. XIII B, §9, subd. (b).) The Draft Order implements federally mandated requirements under the Clean Water Act and its requirements are therefore not subject to subvention of funds. This includes federal requirements to effectively prohibit non-storm water discharges, to reduce the discharge of pollutants to the maximum extent practicable, and to include such other provisions as the Administrator or the State determines appropriate for the control of such pollutants. (30 U.S.C. §1342(p)(3)(B).) The authority exercised under this Order is not reserved state authority under the Clean Water Act's savings clause (cf. *Burbank v. State Water Resources Control Bd*. (2005) 35 Cal.4th 613, 627-628), but instead is part of a federal mandate to develop pollutant reduction requirements for municipal separate storm sewer systems. To this extent, it is entirely federal authority that forms the legal basis to establish the permit provisions. (See, *City of Rancho Cucamonga v. Regional Water Quality Control Bd.-Santa Ana Region* (2006) 135 Cal.App.4th 1377, 1389; *Building Industry Ass'n of San Diego County v. State Water Resources Control Bd*. (2004) 124 Cal.App.4th 866, 882-883.)

Further, the maximum extent practicable standard is a flexible standard that balances a number of considerations, including technical feasibility, cost, public acceptance, regulatory compliance, and effectiveness. (*Building Ind. Asso., supra*, 124 Cal. App.4th at pp. 873, 874, 889.) Such considerations change over time with advances in technology and with experience gained in storm water management. (55 Fed.Reg. 48052.) Accordingly, the determination of whether the Draft Order conditions exceed the requirements of federal law cannot be based on a point by point comparison of the permit conditions and the six minimum measures that are required "at a minimum" to reduce pollutants to the maximum extent practicable and to protect water quality (40 C.F.R. §122.34). Likewise, individual permit provisions cannot be considered in isolation. When implementing the federal requirement to reduce pollutants to the maximum extent practicable, the entire permit must be evaluated as a whole. This is so because the permitting agency may decide that it is more practicable to expend limited municipal resources on one aspect of the permit rather than another. In other words, requirements in one area may be relaxed to account for greater expenditures in another that will reduce pollutants to the maximum extent practicable

In recent months, the County of Los Angeles and County of Sacramento Superior Courts have granted writs setting aside decisions of the Commission on State Mandates that held that certain requirements in Phase I permits constituted unfunded mandates.

In both cases, the courts found that the correct analysis in determining whether a municipal storm water permit constituted a state mandate was to evaluate whether the permit conditions were expressly specified in federal statute or regulation but whether the permit conditions exceeded the maximum extent practicable standard. *(State of Cal. v. Comm. On State Mandates* (Super. Ct. Sacramento County, 2012, No. 34-2010- 80000604), *State of Cal. v. County of Los Angeles* (Super. Ct. Los Angeles County, 2011, No. BS130730.) It should be noted that USEPA has issued an <u>online MS4 Permit Improvement Guide</u> (April 2010, available

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000748

at: http://www.epa.gov/npdes/pubs/ms4permit_improvement_guide.pdf) that recommends many provisions for Phase II MS4 permits not explicitly specified in the six minimum measures established at Code of Federal Regulations, title 40, section 122.34.

As laid out in this Fact Sheet and as supported by the record of this permitting action, the requirements of the Draft Order, taken as a whole rather than individually, are necessary to reduce the discharge of pollutants to the maximum extent practicable, to effectively prohibit non-storm water discharges, and to protect water quality. The findings as to implementing these federal requirements are the expert conclusions of the principal state agency charged with implementing the NPDES program in California. (Wat. Code, §§13001.) The requirements of the Draft Order do not constitute an unfunded mandate.

It should be noted that the Draft Order provisions to effectively prohibit non-storm water discharges are also mandated by the Clean Water Act. (33 U.S.C. §1342(p)(3)(B)(ii).) Likewise, the provisions of this Draft Order to implement total maximum daily loads (TMDLs) are federal mandates. Federal law requires that permits must contain effluent limitations consistent with the assumptions of any applicable wasteload allocation in a TMDL. (40 C.F.R. §122.44(d)(1)(vii)(B).)

Finally, even if any of the permit provisions could be considered unfunded mandates, under Government Code section 17556, subdivision (d), a state mandate is not subject to reimbursement if the local agency has the authority to charge a fee. The local agency permittees have the authority to levy service charges, fees, or assessments sufficient to pay for compliance with this Order. (See, e.g., *Apartment Ass'n of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 842.) The authority of a local agency to defray the cost of a program without raising taxes indicates that a program does not entail a cost subject to subvention. (*Clovis Unified School Dist. v. Chiang* (2010) 188 Cal. App.4th 794, 812, quoting *Connell v. Superior court* (1997) 59 Cal.App.4th 382, 401; *County of Fresno v. State of California* (1991) 53 Cal.3d 482, 487–488.)

## V.  ROLE OF THE REGIONAL WATER BOARDS

Under the Water Code, either the State Water Board or the regional boards have authority to issue NPDES permits (Wat. Code, §13377.) The State Water Board is issuing this Order; however Regional Water Board staff will continue to have the authority to evaluate each individual Permittee's compliance through online Annual Report review and by requesting a detailed annual report from Permittees anytime during the permit term. In addition, Regional Board staff can conduct program evaluations (audits). These evaluations can either be targeted or comprehensive evaluations. Responsibilities of Regional Water Board staff also include oversight of implementation and compliance with this Order. As appropriate, they can require modification to programs and other submissions, impose region-specific monitoring requirements, conduct inspections, take enforcement actions, and make additional designations of Regulated Small MS4s. The Regional Water Boards also have a role in approving water quality monitoring efforts and may also direct that dischargers carry out a particular type of education and outreach program (see discussion under Section XII).

Regional Water Boards may also issue individual permits to Regulated Small MS4s, and alternative general permits to categories of Regulated Small MS4s. In addition, Regional Water Boards may allow Phase II Permittees the ability to become Phase I Permittees within the same urbanized area. Upon issuance of such permits by a Regional Water Board, this Order shall no longer regulate the affected MS4s.

The Permittees and Regional Water Boards are encouraged to work together to accomplish the goals of the storm water program, specifically, by coordinating the oversight of construction and industrial sites. For example, certain Permittees are required to implement a construction program that must include procedures for construction site inspection and enforcement. Construction sites disturbing an acre of land or more are also subject to inspections by the Regional Water Board under the State Water Board's Construction General Permit for Storm Water Discharges associated with Construction and Land Disturbance Activities (CGP). U.S. EPA intended to provide a structure that requires permitting through the federal Clean Water Act while at the same time achieving local oversight of construction projects. A structured plan review process and field enforcement at the local level, which is also required by this Order, were cited in the preamble to the Phase II regulations as the most effective components of a construction program.

The Permittees and Regional Water Boards are encouraged to coordinate efforts and use each of their enforcement tools in the most effective manner. However, in order to further ensure coordination, this Order requires Permittees to include procedures for referring non-filers as identified in the Program Management section and violations of the storm water general permits to the Regional Water Board when observed.

*Dispute Resolution*

As discussed, several areas of the permit will be mandated at the discretion of the Regional Board Executive Officer after permit adoption. In this function, the Regional Water Board Executive Officers are in essence acting as agents of the State Water Board. Therefore, determinations of the Regional Water Board Executive Officers in interpreting and implementing this permit are considered actions of the State Water Board (and accordingly not actions of the Regional Water Board subject to the petition process under Water Code section 13320) except where the Regional Water Board itself acts or the Executive Officer acts under Water Code Sections 13300, 13304, or 13383. However, recognizing the need for some level of statewide consistency in interpretation and implementation of Order provisions, the Order includes a dispute resolution process where there is disagreement between a Permittee and a Regional Water Board Executive Officer. The Permittee should first attempt to resolve the issue with the Executive Officer of the Regional Water Board. If a satisfactory resolution is not obtained at the Regional Water Board level, the Permittee may submit the issue in writing to the Executive Director of the State Water Board or his designee for resolution, with a copy to the Executive Officer of the Regional Water Board. The issue must be submitted to the Executive Director within thirty days of any final determination by the Executive Officer of the Regional Water Board; after thirty days the Permittee will be deemed to have accepted the Regional Water Board Executive Officer's determination. The Executive Officer of the Regional Water Board will be provided an opportunity to respond.

## VI. ENTITIES SUBJECT TO THIS ORDER

This Order regulates discharges of storm water from Regulated Small MS4s. A Regulated Small MS4 is a Small MS4 that has been designated as regulated in accordance with criteria described in 40 C.F.R. 122.32.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000750

a. **Renewal Permittee - Traditional and Non-traditional MS4s**

All Traditional and Non-traditional MS4s currently covered under the existing General Permit are covered under this Order and must implement the requirements of this Order.

b. **New Traditional MS4 Permittee or New Urbanized Areas**

In some cases, the urbanized boundaries and/or infrastructure of previously permitted Traditional MS4 Permittees may expand to include new areas designated as urbanized under the 2010 U.S. Decennial Census (e.g., when new areas are annexed within the urbanized area). Permittees must identify and include these new urbanized areas as part of their existing storm water program. Any new urbanized areas must be indicated on Permittees permit boundary map. For cities, the permit area boundary is the city boundary. For counties, permit boundaries must include urbanized areas and places identified in Attachment A located within their jurisdictions. The boundaries must be proposed in the permit boundary map and may be developed in conjunction with the applicable Regional Water Board

New Traditional MS4 Permittees that are outside of Urbanized Areas have been designated as Regulated Small MS4s based on one or more of the following criteria developed by the State Water Board:

1) High population and population density – High population means a population of 10,000 or more. High population density means a density greater than 1,000 residents per square mile. Also considered in this definition is high density created by a non-residential population, such as tourists or commuters.

2) Discharge to Areas of Special Biological Significance (ASBS) as defined in the California Ocean Plan.

The above factors were considered when evaluating whether an MS4 outside an Urbanized Area should be regulated pursuant to this Order. An MS4 and the population that it serves need not meet all of the factors to be designated. The criteria selected to designate MS4s to be regulated are based on the potential impact to water quality due to conditions influencing discharges into their system or due to their discharge location(s).

On a case by case basis, the Regional Water Boards may designate Small MS4s outside of Urbanized Areas as Regulated Small MS4s. Case by case determinations of designation shall be based on the potential of a Small MS4's discharges to result in exceedances of water quality standards, including impairment of designated uses, or other significant water quality impacts, including habitat and biological impacts. Where such case by case designations have been recommended by the Regional Water Boards prior to adoption of this Order, the designated Small MS4s are listed on the relevant Attachments to the Order and the reasons for designation are laid out in the Fact Sheet. The Regional Water Boards may continue to make case by case determinations of designation during the permit term by notification to the discharger, which shall include a statement of reasons for the designation.

Finally, any Small MS4 that contributes substantially to the pollutant loadings of a physically interconnected municipal separate storm sewer that is regulated by the NPDES storm water program must be designated as Regulated Small MS4s. An MS4 is

Defs_000751

interconnected with a separately permitted MS4 if storm water that has entered the MS4 is discharged to another permitted MS4. In general, if the MS4 discharges more than 10 percent of its storm water to the permitted MS4, or its discharge makes up more than 10 percent of the other permitted MS4's total storm water volume, it is a significant contributor of pollutants to the permitted MS4. In specific cases, the MS4s involved or third parties may show that the 10 percent threshold is inappropriate for the MS4 in question. The definition for significant contributor of pollutants to an interconnected permitted MS4 uses a volume of 10 percent, with the assumption that storm water contains pollutants. This is meant to capture flows that may affect water quality or the permit compliance status of another MS4, but exclude incidental flows between communities.

c. **New Non-traditional MS4 Permittees**

Non-traditional MS4s include, but are not limited to, universities, prisons, large hospitals, military bases (e.g., State Army National Guard barracks), and State parks.

The previous General Permit, Water Quality Order 2003-0005-DWQ, Attachment 3 listed Non-traditional MS4s anticipated to be designated by the end of the permit term, either by the State or Regional Water Boards. However, some Non- traditional MS4s were not designated. All Non-traditional MS4s, except K-12 School Districts, Offices of Education and Community Colleges, not yet designated are now subject to this Order. These entities are listed in Attachment B.

Additional Non-traditional MS4 Permittees have been designated as Regulated Small MS4s in accordance with the same criteria described in b above.

## VII.  APPLICATION REQUIREMENTS

All Regulated Small MS4s listed in Attachments A and B are automatically designated upon adoption of this Order and must file for coverage. To file for coverage, Permittees must electronically file an NOI on the State Water Board's SMARTS website (https://smarts.waterboards.ca.gov/smarts/faces/SwSmartsLogin.jsp) and mail the appropriate permit fee to the State Water Board:

The NOI will include a statement that the discharger intends to comply with the BMP requirements of the Order in lieu of proposing BMP practices. Permittees must file the NOI by July 1, 2013.

Joint Phase II Co-Permittees or Permittees relying on Separate Implementing Entities must also electronically file an NOI via SMARTS and mail the appropriate fee to the State Water Board, by July 1, 2013.

Census Designated Places (CDPs) are included in Attachment A to clearly show that they are designated Phase II entities. However, CDPs that are located within an urbanized area and within an existing NPDES permit area do not have a government entity and as such, are not required to file separately and pay fees. The Permittee (i.e. a designated county) will name the CDPs within their jurisdiction when they file their NOI via SMARTS.

For fee purposes, in determining the total population served by the MS4, both resident and commuter populations are to be included. For example, publicly operated school complexes including universities and colleges, the total population served would include the sum of the average annual student enrollment plus staff.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000752

For community services districts, the total population served would include the resident population and any non-residents regularly employed in the areas served by the district.

Regulated Small MS4s that fail to obtain coverage under this Order or other NPDES permit for storm water discharges will be in violation of the Clean Water Act and the California Water Code.

The Order includes State and Regional Water Board contact information for questions and submittals.

*Waiver Certification*

This Order allows Regulated Small MS4s to request a waiver of requirements. Regulated Small MS4 must certify (1) their discharges do not cause or contribute to, or have the potential to cause or contribute to a water quality impairment, and (2) they meet one of the following three waiver options:

a. Option 1

   (1) The jurisdiction served by the system is less than 1,000 people;
   (2) The system is not contributing substantially to the pollutant loadings of a physically interconnected regulated MS4; and
   (3) If the small MS4 discharges any pollutants identified as a cause of impairment of any water body to which it discharges, storm water controls are not needed based on waste load allocations that are part of an EPA approved or established TMDL that addresses the pollutant(s) of concern.

b. Option 2

   (1) The jurisdiction served by the system is less than 10,000 people;
   (2) The Regional Water Board has evaluated all waters of the U.S. that receive a discharge from the system;
   (3) The Regional Water Board has determined that storm water BMPs are not needed based on wasteload allocations that are part of an EPA approved or established TMDL that addresses the pollutant(s) of concern or an equivalent analysis; and
   (4) The Regional Water Board has determined that future discharges from the Regulated Small MS4 do not have the potential to result in exceedances of water quality standards.

c. Option 3 (applicable to Small MS4s outside an Urbanized Area only)

   (1) Small Disadvantaged Community – a community with a population of 20,000 or less with an annual median household income (MHI) that is less than 80 percent of the statewide annual MHI (CWC § 79505.5 (a)).

## VIII.  POST-CONSTRUCTION STORMWATER MANAGEMENT CRITERIA FOR NEW DEVELOPMENT AND REDEVELOPMENT

This Order incorporates Site Design and Low Impact Development (LID) Runoff requirements for new development and redevelopment. The Order will incorporate runoff retention and hydromodification control criteria in the next permit term that will be keyed to specific watershed processes as identified by the State Water Board within specific Watershed

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000753

Management Zones (WMZs). The WMZs will be used to identify applicable areas and appropriate criteria for runoff retention and hydromodification control.

## IX. DISCHARGE PROHIBITIONS

### Storm Water Discharges

This Order authorizes storm water and conditionally exempt non-storm water discharges[14] from the Permittees' MS4s subject to effluent and receiving water limitations. This Order prohibits the discharge of material other than storm water, unless specifically authorized in this Order.

### Non-Storm Water Discharges

Section 402(p)(3)(B)(ii) of the Clean Water Act requires that MS4 permits include a requirement to effectively prohibit non-storm water discharges into the storm sewers. Prohibition B.3 of the Order implements this requirement. Although the Clean Water Act phrases the non-storm water discharge prohibition as a prohibition of discharges "into the storm sewers," this Order states that "discharges *through the MS4* of material other than storm water to waters of the U.S. shall be effectively prohibited." There is no meaningful distinction between the two language iterations as both prohibit discharges from reaching receiving waters and are consistent with the intent of the Clean Water Act. When discussing the effective prohibition of non-storm water discharger, U.S. EPA's preamble to its Phase I regulations uses the term "through" interchangeably with the term "into." (55 Fed. Reg. 47995.) Staff believes that the use of the phrasing "through the MS4 . . . to waters of the U.S." allows the Permittees greater flexibility with regard to utilizing dry weather diversions.

The Phase I regulations at 40 C.F.R. §122.34(b)(3)(iii). specify certain categories of non- storm water discharges that are conditionally exempt from the prohibition and the Order follows this approach. Unless authorized by a separate NPDES permit, non-storm water discharges that are not specifically exempted by this Order are prohibited. Certain enumerated conditionally exempt non-storm water discharges are allowed provided they are not found to be significant source of pollution If a discharger or a Regional Water Board Executive Officer determines that any individual or class of conditionally exempt non-storm water discharge may be a significant source of pollutants, the Regional Water Board may require the discharger to monitor and submit a report and impose BMPs to control the discharge.

### Areas of Special Biological Significance

The State Water Board adopted the California Ocean Plan (Ocean Plan) on July 6, 1972 and revised the Ocean Plan in 1978, 1983, 1988, 1990, 1997, 2000, 2005 and 2009. The Ocean Plan prohibits the discharge of waste to Areas of Special Biological Significance (ASBS). The State Water Board designates ASBS as ocean areas requiring protection of species or biological communities to the extent that alteration of natural water quality is undesirable.

The Ocean Plan states that the State Water Board may grant an exception to Ocean Plan provisions where the State Water Board determines that the exception will not compromise protection of ocean waters for beneficial uses and the public interest will be served.

---

[14] Conditionally exempt non-storm water also refers to authorized non-storm water.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000754

*UNOFFICIAL DRAFT — Not Certified by Clerk*

On October 18, 2004, the State Water Board directed several dischargers to cease the discharge of storm water and nonpoint source waste into ASBS, or request an exception to the Ocean Plan. Several of these dischargers are designated as Regulated Small MS4s.

On March 20, 2012, the State Water Board adopted Resolution 2012-0012 granting an exception from the Ocean Plan prohibition to 13 parties (Attachment D) designated as Regulated Small MS4s under this Order. In order to legally discharge into an ASBS, the parties must comply with the terms of the exception and have an appropriate authorization to discharge. Authorization for point source discharges to ASBS consists of coverage under this NPDES Order.

The parties authorized to discharge under the general exception are listed in Attachment D. The general exception contains "Special Protections" to protect beneficial uses and maintain natural water quality in ASBS. Limited by the special conditions in the resolution, parties listed in Attachment D can legally discharge waste into an ASBS as long as the discharges are also regulated under this Order.

This Order incorporates the terms of the exception and includes the monitoring requirements the 13 parties identified as Regulated Small MS4s must comply with.

## X. EFFLUENT LIMITATIONS

Consistent with Clean Water Act section 402(p)(3)(B)(iii), this Order requires that Permittees implement controls to reduce the discharge of pollutants from their MS4s to waters of the U. S. to the Maximum Extent Practicable (MEP). The MEP standard requires Permittees to apply Best Management Practices (BMPs) that are effective in reducing or eliminating the discharge of pollutants to the waters of the U.S. MEP emphasizes pollutant reduction and source control BMPs to prevent pollutants from entering storm water runoff. MEP may require treatment of the storm water runoff if it contains pollutants. The MEP standard is an ever-evolving, flexible, and advancing concept, which considers technical and economic feasibility. As knowledge about controlling urban runoff continues to evolve, so does that which constitutes MEP. BMP development is a dynamic process and may require changes over time as the Permittees gain experience and/or the state of the science and art progresses. Permittees must conduct and document evaluation and assessment of each relevant element of the program, and of the program as a whole, and revise activities, control measures/BMPs, and measurable goals, as necessary to meet MEP. MEP requires Permittees to choose effective BMPs, and to reject applicable BMPs only where other effective BMPs will serve the same purpose, the BMPs are not technically feasible, or the cost is prohibitive. Further, because local conditions vary, some BMPs may be more effective in one community than in another. MEP is the cumulative result of implementing, evaluating, and creating corresponding changes to a variety of technically appropriate and economically feasible BMPs, ensuring that the most appropriate BMPs are implemented in the most effective manner. Under 40 Code of Federal Regulations section 122.44(k)(2) & (3), the State Water Board may impose BMPs for control of storm water discharges in lieu of numeric effluent limitations.[15]

---

[15] On November 12, 2010, U.S. EPA issued a revision to a November 22, 2002, memorandum in which it had "affirm[ed] the appropriateness of an iterative, adaptive management best management practices (BMP) approach" for improving storm water management over time. In the revisions, U.S. EPA recommended that, in the case the permitting authority

Defs_000755

In 2004, the State Water Board assembled a blue ribbon panel to address the feasibility of including numeric effluent limits as part of NPDES municipal, industrial, and construction storm water permits. The panel issued a report dated June 19, 2006, which included recommendations as to the feasibility of including numeric limits in storm water permits, how such limits should be established, and what data should be required.

The report concluded that "It is not feasible at this time to set enforceable numeric effluent criteria for municipal BMPs and in particular urban discharges. However, it is possible to select and design them much more rigorously with respect to the physical, chemical and/or biological processes that take place within them, providing more confidence that the estimated mean concentrations of constituents in the effluents will be close to the design target."

Consistent with the federal regulations, the findings of the Blue Ribbon Panel, and precedential State Water Board orders (State Water Board Orders Nos. WQ 91-03 and WQ 91-04), this Order allows the Permittees to implement BMPs to comply with the requirements of the Order.

## XI.  RECEIVING WATER LIMITATIONS

Under federal law, an MS4 permit must include "controls to reduce the discharge of pollutants to the maximum extent practicable . . . and such other provisions as . . . the State determines appropriate for the control of such pollutants." (Clean Water Act §402(p)(3)(B)(iii).) Consistent with this provision, requirements to meet water quality standards are at the discretion of the permitting agency. (*Defenders of Wildlife v. Browner* (9th Cir. 1999) 191 F3d 1159.)

The State Water Board has previously determined that limitations necessary to meet water quality standards are appropriate for the control of pollutants discharged by MS4s and must be included in MS4 permits. (State Water Board Orders WQ 91-03, 98-01, 99- 05, 2001-15).). This Order accordingly prohibits discharges that cause or contribute to violations of water quality standards. Consistent with federal law, the State Water Board has also found it appropriate to require implementation of BMPs in lieu of numeric water quality-based effluent limitations and further, in lieu of "strict compliance" with water quality standards, has prescribed an iterative process of BMP improvement to achieve water quality standards. (State Water Board Orders WQ 91-03, 98-01, 2001-15; 40 C.F.R. §122.44(k).) As a result, this Order further sets out that, upon determination that a Permittee is causing or contributing to an exceedance of applicable water quality standards, the Permittee must engage in an iterative process of proposing and implementing additional control measures to prevent or reduce the pollutants causing or contributing to the exceedance. This iterative process is modeled on receiving water limitations set out in State Water Board precedential Order WQ 99-05 and required by that Order to be included in all municipal storm water permits.

---

determines that MS4 discharges have the reasonable potential to cause or contribute to a water quality excursion, the permitting authority, where feasible, include numeric effluent limitations as necessary to meet water quality standards. However, the revisions recognized that the permitting authority's decision as to how to express water quality based effluent limitations (WQBELs), i.e. as numeric effluent limitations or BMPs, would be based on an analysis of the specific facts and circumstances surrounding the permit. U.S. EPA has since invited comment on the 2010 memorandum and will be making a determination as to whether to "either retain the memorandum without change, to reissue it with revisions, or to withdraw it." http://www.epa.gov/npdes/pubs/sw_tmdlwla_comments_pdf

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000756

The Water Boards have generally directed dischargers to achieve compliance with water quality standards by improving control measures through the iterative process and, as a matter of practice, have generally declined to initiate enforcement actions against MS4 permittees who have been actively engaged in the iterative process. At the same time, however, the Water Boards have maintained that the iterative process does not provide a "safe harbor" to MS4 permittees:[16] that is, when a discharger is shown to be causing or contributing to an exceedance of water quality standards, that discharger is in violation of the relevant discharge prohibitions and receiving water limitations of the permit and potentially subject to enforcement by the Water Boards or through a citizen suit, even if the discharger is actively engaged in the iterative process.

The question of the "safe harbor" became a priority concern for storm water dischargers following the Ninth Circuit's holding in *Natural Resources Defense Council, Inc. v. County of Los Angeles* (2011) 673 F.3d 880 that engagement in the iterative process does not provide a safe harbor from liability for violations of permit terms prohibiting exceedances of water quality standards. Although the U.S. Supreme Court has reversed the judgment of the Ninth Circuit and remanded (on grounds unrelated to the "safe harbor" holding), *LA County Flood Control District v. NRDC* (2013) 568 U.S., the receiving water limitations provisions is expected to remain a significant issue for dischargers based on the position, to date, of the Water Boards that the iterative process does not provide a "safe harbor" from violations. The State Water Board has received multiple comments, from dischargers and from other interested parties, expressing confusion and concern about the Order provisions regarding receiving water limitations and the iterative process. Many commenters have stated that the provisions as currently written do not provide the dischargers with a viable path to compliance with the proposed Order. Other commenters, including environmental parties, support the current language.

As stated above, the provisions in this Order regarding receiving water limitations and the iterative process are based on precedential Board orders. Accordingly, substantially identical provisions are found in the adopted Caltrans MS4 NPDES permit, as well as the Phase I NPDES permits issued by the Regional Water Boards. Because of the broad applicability of any policy decisions regarding the receiving water limitations and iterative process provisions, the State Water Board held a public workshop on November 20, 2012, to consider this issue and seek public input.

Rather than delay consideration of adoption of the tentative Order in anticipation of any future changes to the receiving water limitations and iterative process provisions that may result from the public workshop and deliberation, the Board has added a specific reopener clause at Section H to facilitate any future revisions as necessary.

## XII.  STORM WATER MANAGEMENT PROGRAM FOR TRADITIONAL MS4S PROGRAM ELEMENTS

### Program Management

This component is essential to ensure timely implementation of all elements of the storm water program and consistency with the Order requirements. Lessons learned in California from

---

[16] *Building Industry Assn. of San Diego County v. State Water Resources Control Bd*. (2004) 124 Cal.App.4th 866; *City of Rancho Cucamonga v. Regional Water Quality Control Bd*. (2006) 135 Cal.App.4th 1377.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000757

Phase I Permittees and various municipal audits are that a Program Management element can:

1. Identify departments that assist with the implementation of the program as well as their roles and responsibilities; and
2. Maintain and enforce adequate legal authority to control pollutant discharges.

*Adequate Legal Authority and Certification*
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. §§ 122.22(b), 122.34(b)(3)(ii)(B), (b)(4)(ii)(A), and (b)(5)(ii)(B); 122.41(k). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA, EPA-833-R-07-003

Adequate legal authority is required for Permittees to implement and enforce their storm water programs. Without adequate legal authority, Permittees would be unable to perform many vital program elements such as performing inspections and requiring installation of control measures. In addition, Permittees would not be able to conduct enforcement activities, assess penalties and/or recover costs of remediation.

*Enforcement Response Plan*
Legal Authority: Clean Water Act §402(p)(3)(b); MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA, EPA-833-R-07-003

In ordinances or other regulatory mechanisms, Permittees are required to include penalty provisions to (1) ensure compliance with construction and industrial requirements, (2) to require the removal of illicit discharges, and (3) to address noncompliance with post-construction requirements. To meet these requirements, this Order requires enforcement responses that vary with the type of permit violation, and escalate if violations are repeated or not corrected. The Permittee must develop and implement an Enforcement Response Plan (ERP), which clearly describes the action to be taken for common violations associated with the construction program, illicit discharge detection and elimination, or other program elements. A well-written ERP provides guidance to inspectors on the different enforcement responses available, actions to address general permit non-filers, when and how to refer violators to the State, and how to track enforcement actions.

**Education and Outreach on Storm Water Impacts**
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(1); MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA , EPA-833-R-07-003; U.S. EPA Stormwater Phase II Final Rule Fact Sheet Series, U.S. EPA Stormwater Phase II Final Rule (64 FR 68722), EPA National Menu of Best Management Practices for Stormwater Phase II[17]; Measurable Goals Guidance for Phase II Small MS4s; U.S. EPA Getting In Step

Without a focused and comprehensive program, outreach and education efforts will be poorly coordinated and ineffective. This Order requires Permittees to develop an education and outreach program that is tailored and targeted to specific water quality issues of concern in the community. These community-wide and targeted issues should then guide the development of the comprehensive outreach program, including the creation of appropriate messages and

---

[17] http://cfpub.epa.gov/npdes/stormwater/menuofbmps/

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000758

educational materials. Outreach and education not only includes the public as the target audience, but includes Permittee staff and construction site operators as well.

This Order includes a different compliance path that, upon determination by a Regional Board Executive Officer, requires the possible implementation of Community-Based Social Marketing (CBSM). CBSM is a systematic way to change the behavior of communities to reduce their impact on the environment. Simply providing information is usually not sufficient to initiate behavior change. CBSM uses tools and findings from social psychology to discover the perceived barriers to behavior change and ways of overcoming these barriers.[18]

CBSM is also cited in EPA's Getting in Step[19] outreach guide which includes successful CBSM case studies. The CBSM path is included in Attachment E.

To ensure effective implementation of CBSM principles, Regional Water Boards who have invoked Attachment E, CBSM Requirements, are encouraged to consult with Permittees to ensure CBSM principles are implemented adequately. Regional Board staff should use the first year annual report and effectiveness assessment information during the consultation. The information gained from the consultation should assist the Regional Water Board's evaluation of program effectiveness and whether a Permittee should continue implementation of Attachment E.

In addition to external public outreach, outreach and education efforts should also be directed internally at Permittee staff who, as part of their normal job responsibilities, participate in storm water program operations such as illicit discharge detection and elimination, construction, and pollution prevention and good housekeeping. The training program will ensure proper illicit discharge and illicit connection identification, reporting and response. The construction training program will ensure that Permittee staff who is responsible for construction storm water program implementation receive adequate training. Additionally, the Permittee must develop educational materials and training for construction site operators to ensure program compliance. Construction operators must be educated about site requirements for control measures, local storm water requirements, enforcement activities, and penalties for non-compliance. Permittee staff training in pollution prevention/good housekeeping will ensure the incorporation of pollution prevention/good housekeeping techniques into Permittee operations.

A comprehensive and cohesive outreach and education program will likely be effective and well-coordinated if it involves the public, storm water program staff, and construction site operators.

This Order includes a list of potential residential and commercial pollution sources, but the Permittee may also identify other sources that contribute significant pollutant loads to the MS4. The Order identifies specific pollutant generating activities that must be addressed, including organized car washes, mobile cleaning and power washing operations, and landscape over-irrigation.

---

[18] A variation of social marketing, referred to as CBSM by Canadian environmental psychologist Doug McKenzie- Mohr
[19] Getting in Step, 3rd Edition, A Guide to Watershed Outreach Campaigns, November 2010 EPA 841-B-10-002

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000759

The Permittee is encouraged to use existing public educational materials in its program. The Permittee is also encouraged to leverage resources with other agencies and municipalities with similar public education goals.

In addition, this Order requires storm water education for school-age children. The United States suffers from a "nature deficit disorder" as discussed in popular literature (e.g., "Last Child in the Woods" by Richard Louv) and elsewhere (American Fisheries Society "Fisheries" magazine, available online at www.fisheries.org). As discussed in the "America's Great Outdoors: A Promise to Future Generations" report, in order to make environmental stewardship and conservation relevant to young Americans, environmental and place-based, experiential learning must be integrated into school curricula and school facility management across the country.[20] If a program such as Splash (www.sacsplash.org/ ),Effie Yeaw Nature Center (www.sacnature.net) or Yolo Basin (www. Yolobasin.org) does not exist, Permittees are encouraged to use California's Education and Environment Initiative Curriculum (EEI)[21] or equivalent. California's landmark EEI Curriculum is a national model designed to help prepare today's students to become future scientists, economists, and green technology leaders.

The K-12th grade curriculum is comprised of 85 units teaching select Science and History-Social Science academic standards. Each EEI Curriculum unit teaches these standards to mastery using a unique set of California Environmental Principles and Concepts. The EEI curriculum was created to bring education about the environment into the primary and secondary classrooms of more than 1,000 school districts serving over 6 million students throughout California.

Classroom education plays an integral role in any storm water pollution outreach program. Providing storm water education through schools conveys the message not only to students but to their parents. Permittees should partner with educators and experts to develop storm water-related programs for the classroom. These lessons need not be elaborate or expensive to be effective.

The Permittees' role is to support a school district's storm water education efforts, not to dictate what programs and materials the school should use. Permittees should work with school officials to identify their needs. For example, if the schools request storm water outreach materials, Permittees can provide a range of educational aids, from simple photocopied handouts, overheads, posters and slide shows, to more costly and elaborate working models and displays.

The principal goal of any public education and outreach effort is to change awareness and knowledge. The advanced level public education and outreach effort goes a step further in pursuit of changing behavior. The Permittee should develop a process to assess its public education and outreach programs and to determine necessary improvements to raise public awareness and knowledge. The Permittee is encouraged to use a variety of assessment methods to evaluate the effectiveness of different public education activities. The first evaluation assessment must be conducted before the final year of the Permittee's coverage under this permit, before the next permit is issued. Permittees should coordinate their evaluation assessment with other Permittees on a regional level to determine how best to get

---

[20] http://americasgreatoutdoors.gov/files/2011/02/AGO-Report-With-All-Appendices-3-1-11.pdf
[21] http://www.californiaeei.org/

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000760

the regional message out and how to facilitate awareness, knowledge and ultimately, behavior changes.

**Public Involvement/Participation**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(2). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Storm water management programs can be greatly improved by involving the community throughout the entire process of developing and implementing the program. Involving the public benefits both the Permittee as well as the community. By listening to public concerns and coming up with solutions together, the Permittee stands to gain public support and the community should become invested in the program. The Permittees will likewise gain more insight into the most effective ways to communicate their messages.

This Order requires the development of a public involvement strategy, which may include a citizen advisory group or process to solicit feedback on the storm water program, and opportunities for citizens to participate in implementation of the storm water program. If a citizen advisory group is developed, the group should meet with the local land use planners and provide input on land use code or ordinance updates so that land use requirements incorporate provisions for better management of storm water runoff and watershed protection. Public participation in implementation of the storm water program can include many different activities such as stream clean-ups, storm drain markings, volunteer monitoring, and participation in integrated regional water management and watershed planning efforts.

Permittees are encouraged to work together with other entities that have an impact on storm water (for example, schools, homeowner associations, Department of Transportation agencies, other MS4s). Permittees are also encouraged to work through existing advisory groups, community groups or processes in order to implement these public involvement requirements.

**Illicit Discharge Detection and Elimination**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(3). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Studies have shown that dry weather flows from the storm drain system may contribute a larger amount of some pollutants than wet weather storm water flows.[22] Detecting and eliminating these illicit discharges involves complex detective work, which makes it hard

to establish a rigid prescription to identify and correct all illicit connections. There is no single approach to take, but rather a variety of ways to get from detection to elimination. Local knowledge and available resources can play significant roles in determining which path to take. At the very least, communities need to systematically understand and characterize their stream, conveyance, and storm sewer infrastructure systems. Illicit discharges need to be identified and eliminated. The process is ongoing and the effectiveness of a program should improve with time. A well-coordinated IDDE programs can benefit from and contribute to other

---

[22] Evaluation of Non-Storm water Discharges to California Storm Drains and Potential Policies for Effective Prohibition. California Regional Water Quality Control Board. Los Angeles, CA., Duke, L.R. 1997., Results of the Nationwide Urban Runoff Program. Water Planning Division, PB 84-185552, Washington, D.C. U.S. EPA. 1983.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000761

community-wide water resources- based programs such as public education, storm water management, stream restoration, and pollution prevention.[23]

This Order requires the Permittees to address illicit discharges into the MS4. An illicit discharge is defined as any discharge to a municipal separate storm sewer system that is not composed entirely of storm water, except allowable discharges pursuant to an NPDES permit (40 C.F.R. 122.34(b)(3)).[24] This Order includes requirements that the Permittee have the legal authority to effectively prohibit non-storm water discharges from entering storm sewers as well as provisions requiring the development of a comprehensive, proactive IDDE program.

Specifically, this Order requires the development of a map that includes outfalls operated by the Permittee within the urbanized area. The map will also include identification of receiving water bodies, priority areas (i.e. areas with a history of past illicit discharges), and the permit boundary.

It is essential for Permittees to understand their stream and storm sewer systems and how illicit discharge sources are connected to outfalls that discharge to their system. To that end, this Order requires the development of an inventory that identifies potential illicit discharge sources and facilities. To proactively identify illicit discharges originating from priority inventoried sources, it is essential that an assessment is conducted at least once over the permit term. The assessment may include field observations, field screening, inspections and any other appropriate and effective survey methods that proactively identify potential illicit discharges. As an alternative, the Permittee may require a self-certification program that all appropriate BMPs are in place to prevent illicit discharges from the inventoried source or facility.

Further, a once per permit term survey of outfalls will identify outfalls needing sampling and possible follow-up actions[25]. The outfall inventory will also assist Permittees in the identification of "problem" outfalls, or those outfalls that may have a history of past illicit discharges. The inventory can be utilized to conduct source investigations and corrective actions for potential illicit discharges into their system.

Additionally, dry weather sampling must be conducted in each subsequent year of the permit term for outfalls identified as priority areas. While the Order specifies indicator parameters used to detect illicit discharges, the Permittee may select alternative parameters to sample that are based on local pollutants of concern. Similarly, the action level concentrations for the indicator parameters may also be tailored to match the parameters selected based on local knowledge. Finally, the outfall inventory will assist Permittees in clearly understanding the stream system and the storm sewer system within their jurisdiction.

The Permittee shall provide a mechanism for public reporting of illicit discharges and spills.

---

[23] Illicit Discharge Detection and Elimination A Guidance Manual for Program Development and Technical Assessments, CWP and Pitt, 2006

[24] Non-point source return flows from irrigated agriculture are not considered illicit discharges.

[25] The Permittee may utilize existing forms such as the CWP Outfall Reconnaissance Inventory/Sample Collection Field Sheet (http://cfpub.epa.gov/npdes/stormwater/idde.cfm) while conducting the mapping inventory and Field Sampling as specified below, in Section E.9.c.

**Construction Site Storm Water Runoff Control**
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(4). MS4 Permit
Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Permittees must implement a construction site storm water runoff management program that
includes an enforceable ordinance or other regulatory mechanism with commonly understood
and legally binding definitions. These terms should be defined consistently across other related
guidance and regulatory documents. The construction site storm water runoff management
program is designed to prevent pollutants associated with construction activity from entering
receiving water bodies (i.e. sediment, fertilizers, pesticides, paints, solvents and/or fuels).

The Permittee must ensure that construction site operators select and implement appropriate
construction site storm water runoff management measures to reduce or eliminate impacts to
receiving waters. The Permittee is required to utilize California Stormwater Quality
Association's (CASQA) Construction BMP handbook or equivalent to help guide their
Construction Program). In the case that a project proponent is not implementing appropriate
measures to reduce or eliminate impacts to receiving waters (i.e. ineffective BMPs installed),
the Permittee must take appropriate enforcement action to address the problem. Enforcement
may include verbal warnings, written notices and escalated enforcement measures as
described in the Enforcement Response Plan (Section E.6.c. of the Order).

While the construction site storm water runoff management program focuses the Permittee's
detailed inspections on projects less than one acre, Permittees must use their discretion to
provide oversight to projects that are subject to the CGP that pose a threat to water quality. For
example, in the case that a Permittee identifies a project subject to the CGP that has BMPs
that have not been maintained, the Permittee should notify the local Regional Water Board.
Priority project sites include: sites with 5 acres or more of soil disturbance, sites with one acre
or more soil disturbance that discharge to a tributary listed as impaired water for sediment or
turbidity under the CWA Section 303(d), and other sites with one acre or more of soil
disturbance determined by the Permittee or State or Regional Water Quality Control Board to
be a significant threat to water quality.

**Pollution Prevention/Good Housekeeping for Permittee Operations**
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(6)

Permittees are required to develop a program to:

a. Prevent or reduce the amount of storm water pollution generated by permittee
   operations.
b. Train employees on how to incorporate pollution prevention/good housekeeping
   techniques into permittee operations.
c. Identify appropriate control measures and measurable goals for preventing or reducing
   the amount of storm water pollution generated by permittee operations.

Permittees must first assess the areas and municipal facilities that it controls, determine which
activities may currently have a negative impact on water quality, and find solutions for any
problems. The simplest solution is to limit the number of activities that are conducted outside
and exposed to storm water.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-
EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000763

*Storm Drain System Maintenance*

Storm drain systems need maintenance to ensure that structures within the storm drain system that are meant to reduce pollutants do not become sources of pollution. Maintenance of catch basins and storm sewers will prevent the accumulation of pollutants that are later released during rain events as well as blockages, backups, and flooding. Most Permittees have an existing program to maintain the storm sewer infrastructure. Some of these programs have tended to focus on flood control and complaint response rather than reducing water quality impacts from storm water discharges.

This Order requires that the system be maintained to prevent the discharge of pollutants into receiving waters. To achieve this, the storm sewer system must be mapped and a program of regular maintenance established. The Permittee must establish a tiered maintenance schedule for the entire storm sewer system area, with the highest priority areas being maintained at the greatest frequency. Priorities are driven by water quality concerns and can be based on the land use within the watershed, the condition of the receiving water, the amount and type of material that typically accumulates in an area, or other location-specific factors. The Permittee also must use spill and illicit discharge data to track areas that may require immediate sewer infrastructure maintenance. Any waste that is collected must be disposed of in a responsible manner.

All storm sewer system maintenance procedures should be documented in the Permittee's standard operating procedures (SOPs) or similar type of documents. All staff should be trained on these SOPs. Maintenance activities should be documented and, where possible, quantified (e.g., number and location of inspections and clean- outs, type and quantity of materials removed). Characterization of the quantity, location, and composition of pollutants removed from catch basins can be used to assess the program's overall effectiveness, identify illicit discharges, and help the Permittee better prioritize implementation activities in the future.

*Pollutant Generating Activities*

This Order contains specific requirements and recommendations related to pollutant-generating activities such as discouraging conventional landscaping practices (including the application of pesticides, herbicides, and fertilizer) and operating and maintaining public streets.

Resource-sensitive landscaping practices such as integrated pest management (IPM), climate appropriate plant selection and irrigation, and mechanical (non-chemical) removal of unwanted plants are required under this Order. The use of other landscaping practices, such as mulch and compost, minimizing chemical inputs (pesticides, herbicides, and fertilizer), emphasis on maintaining and enhancing soil quality, and erosion control is required. The Order recognizes the storm water quality benefits that will likely result from implementation of the Water Efficient Landscape Ordinance required under AB 1881.

*Flood Management Projects*

The Order requires that water quality be considered when designing new and upgraded flood management projects. The focus of storm water management in the past has been to control flooding and mitigate property damage, with less emphasis on water quality protection. These structures may handle a significant amount of storm water and therefore offer an opportunity to modify their design to include water quality features for less than the cost of building new controls. This requirement applies to new and upgraded flood control projects.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000764

*Municipally-owned or operated facilities*

Municipally-owned or operated facilities often serve as the focal point of activity for municipal staff from different departments. Some municipalities have one facility at which all activities take place (e.g., the municipal maintenance yard), while others may have several specialized facilities. A comprehensive inventory and map of facilities will help Permittee staff build a better awareness of facility locations within the MS4 and their potential to contribute storm water pollutants. The facility inventory will also serve as a basis for scheduling periodic facility assessments and developing, where necessary, facility storm water pollution prevention plans.

The best way to avoid pollutant discharges is to keep precipitation and runoff from coming into contact with potential pollutants. For example, the Permittee should cover or build berms around stockpiles, create dedicated structures for stored materials, and maintain a minimum distance between stockpiles and storm water infrastructure and receiving waters.

*Inspections*

This Order requires comprehensive quarterly site inspections which is an appropriate frequency to ensure that material stockpiles that might be moved or utilized on a seasonal basis are protected from precipitation and runoff. Also, quarterly inspections will allow inspectors to observe different types of operations that occur at different times of the year (e.g., landscape maintenance crews are less active in the winter). Quarterly visual observations are required so that inspectors can see in real time the qualitative nature of the storm water discharge so that corrective action can be taken where necessary to improve on-site storm water controls.

This Order also specifies documentation requirements of inspection procedures and results, including inspection logs for each facility to ensure that the site inspections are consistent and that maintenance of storm water controls remains part of the municipality's standard operating procedures. The requirement for an inspection log will allow the Regional Water Boards to verify that periodic site inspections have been performed.

*Storm Sewer System Maintenance*

Fine particles and pollutants from run-off, run-on, atmospheric deposition, vehicle emissions, breakup of street surface materials, littering, and sanding (for improving traction in snow and ice) can accumulate in the gutters between rainfall events. Storm drain maintenance is often the last opportunity to remove pollutants before they enter the environment. Because storm drain systems effectively trap solids, they need to be cleaned periodically to prevent those materials from being picked up during high flow storm events.

Some catch basins will accumulate pollutants faster than others due to the nature of the drainage area and whether controls are present upstream of the catch basin. A priority ranking system is required for catch basins so that municipal resources are directed to the areas and structures that generate the most pollutants. Catch basins with the highest accumulations will need to be cleaned more frequently than those with low accumulations. The Order also includes a requirement that triggers catch basin cleaning when a catch basin is one-third full.[26]

Proper storm drain system cleanout includes vacuuming or manually removing debris from catch basins; vacuuming or flushing pipes to increase capacity and remove clogs; removing

---

[26] Note: This requirement was eliminated from the Final Order as adopted on February 5, 2013.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000765

sediment, debris, and overgrown vegetation from open channels; and repairing structures to ensure the integrity of the drainage system. It is important to conduct regular inspections of all storm sewer infrastructure and perform maintenance as necessary. Though these activities are intended to ensure that the storm drain system is properly maintained and that any accumulated pollutants are removed prior to discharge, if not properly executed, cleanout activities can result in pollutant discharges. The Permittee should carefully evaluate maintenance practices to minimize unintended pollutant discharges, such as flushing storm drains without capturing the discharge.

Materials removed from catch basins must not be allowed to reenter the MS4. If necessary, the material can be dewatered in a contained area and the water treated with an appropriate and approved control measure or discharged to the sanitary sewer. The solid material must be disposed of properly to avoid discharge during a storm event. Some materials removed from storm drains and open channels may require special handling and disposal, and may not be suitable for disposal in a landfill.

*Green waste on the streets*[27]
For some Traditional MS4 Permittees, residents are allowed to deposit non- containerized green waste (lawn and garden clippings) onto the street for weekly collection by the municipal staff. Permittees instruct residents to put the green waste out right before collection and to avoid putting it in gutters or near storm drains. However, green waste on the street is a potential illicit discharge and maintenance concern.[28] This Order prohibits green waste on the streets. Permittees must find additional ways to educate residents on the potential problems this practice can cause or to find alternatives to the current practice.

*Street Sweeping and Cleaning Streets*
Street sweeping and cleaning streets and parking lots is a practice that most municipalities initially conducted for aesthetic purposes or air quality benefit. However, the water quality benefits are now widely recognized. As a result, many California MS4 permits require some sort of street sweeping provision that require the MS4 to prioritize streets as high, medium, and low pollutant-generators and base the cleaning schedule appropriately.

This Order does not include street sweeping and cleaning streets as a permit requirement because MS4s already conduct these activities for aesthetics and air quality benefit. Permittees must count street sweeping not as a storm water compliance cost, but an aesthetic and air quality cost.

*Third-party contractors*
Third-party contractors conducting municipal maintenance activities must be held to the same standards as the Permittee. These expectations are required to be defined in contracts between the Permittee and its contractors; however, the Permittee is responsible for ensuring, through contractually-required documentation or periodic site visits, that contractors are using storm water controls and following standard operating procedures.

---

[27] Note: This requirement was eliminated form the Final Order as adopted on February 5, 2013.

[28] Program Evaluation Report, Sacramento Area Stormwater Program, NPDES Permit No. CA0082597, May 21, 2002, USEPA and Tetra Tech Inc.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000766

**Post Construction Storm Water Management for New Development and Re-development**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(5). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; U.S. EPA Incorporating Environmentally Sensitive Development into Municipal Stormwater Programs, EPA 833-F-07-011

In California, urban storm water is listed as the primary source of impairment for ten percent of all rivers, ten percent of all lakes and reservoirs, and 17 percent of all estuaries (2010 Integrated Report). Although these numbers may seem low, urban areas cover just six percent of the land mass of California[29], and so their influence is disproportionately large. Urbanization causes a number of changes in the landscape, including increased loads of chemical pollutants; increased toxicity; changes to flow magnitude, frequency, and seasonality of various discharges; physical changes to stream, lake, or wetland habitats; changes in the energy dynamics of food webs, sunlight, and temperature; and biotic interactions between native and exotic species.[30] These impacts are also referred to as "urban stream syndrome [31]. In addition to surface water impacts, urbanization can alter the amount and quality of storm water that infiltrates and recharges groundwater aquifers. In essence, once watershed processes are disturbed, receiving water conditions also become disturbed, (Figure 1)

In California and the rest of the United States, the challenge to storm water managers and regulators has been to establish goals and performance standards that account for the highly variable nature of urban flow and pollutant inputs while ensuring that the ultimate biological response is within "acceptable" limits. The Surface Water Ambient Monitoring Program (SWAMP) is attempting to define biological responses through their Biological Objectives Development Process. Although final results and policy recommendations from this effort are not yet available, linking urbanization drivers to biological response represents the next phase in storm water management and cannot be delayed.[32]

---

[29] U.S. Department of Agriculture, 2009

[30] Urban Storm Water Management in the United States, National Research Council, 2008.

[31] Walsh, C.J., A.H.Roy, J.W. Feminella, P.D. Cottingham, P.M. Groffman, and R.P. Morgan. 2005. The urban stream syndrome: current knowledge and the search for a cure. J. N. Am. Benthol. Soc. 24(3):706–723.

[32] Urban Storm Water Management in the United States, National Research Council, 2008.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000767

**Figure 1 – Relationship between Physical Landscape, Watershed Processes, and Receiving Water Condition**

IN AN UNDISTURBED ("INTACT") LANDSCAPE:

The Physical Landscape →

Watershed Processes →

Receiving Water Conditions

IN A DISTURBED (SPECIFICALLY, URBANIZED) LANDSCAPE:

The Physical Landscape →

Disturbance →

Disturbed Watershed Processes →

Disturbed Receiving Water Conditions

The Water Boards have historically derived site design, runoff reduction and hydromodification control criteria without identifying the dominant watershed processes and the sensitivity of receiving waterbodies to degradation of those processes. In most MS4 permits, projects are subject to the same set of criteria regardless of the dominant watershed processes and the sensitivity of receiving waters to degradation of those processes. In reality, every location on the landscape does not require the same set of control criteria because of intrinsic differences in the dominant watershed processes at each location and sensitivity of receiving waters to degradation of those processes. In recognizing this, the State Water Board is developing criteria that are more protective of receiving water quality.

The existing General Permit requires post-construction controls for areas of high growth or areas with a population greater than 50,000. These requirements are contained in Attachment 4 of Order 2003-0005-DWQ and include matching pre-development peak discharge rates, conserving natural areas, minimizing storm water pollutants of concern, protecting slopes and channels, and designing volumetric and flow through treatment measures to handle a specific volume or flow rate. These requirements represented an initial attempt at establishing performance standards that account for hydrological and geomorphological processes (Figure 1). Recent research has yielded new information on complex watershed process interactions. For example, storm water management techniques that are intended to mimic natural hydrologic functions (e.g., low impact development) can protect key hydrologic processes such as surface and base flow, and groundwater recharge. Additionally, there is increasing awareness that, while site- based requirements are important to reduce impacts from urbanization, a site-based approach alone is unable to achieve a broader set of watershed goals, especially given the State Water Board's interest in regional issues such as water reuse, groundwater management, and maintaining instream flows. Consequently, a better understanding of watershed conditions and processes has become increasingly important in the development of MS4 permits.

This Order has specific site design and LID requirements for all projects. The LID requirements emphasize landscape-based site design features that are already required elsewhere (e.g., the Water Efficient Landscape Ordinance required under AB 1881).

Defs_000768

*Hydromodification Requirements*

This Order also incorporates a baseline peak flow matching requirement for hydromodification control. During this permit term, the State Board will work towards developing runoff retention and hydromodification control criteria that are keyed to watershed processes (See discussion in Section VIII.) Watershed management zones[33] will be delineated by the State Board during this permit term. The watershed management zones will be used to identify applicable areas and to determine appropriate criteria for runoff retention and hydromodification control. Watershed process based runoff retention and hydromodification criteria will be incorporated into the next permit. Through the development of hydromodification measures based on watershed management zones, key watershed processes will be protected, and where degraded, restored. As a result of restored and maintained watersheds, key relationships between hydrology, channel geomorphology and biological health will be created and maintained and water quality/beneficial uses protected.

The State Water Board's efforts in developing runoff retention and hydromodification control criteria keyed to watershed processes can be significantly informed by similar efforts carried out regionally under the Regional Water Boards. This Order provides at Provision E.12.k (also referenced in F.5.g.) that Small MS4s shall comply with any post- construction storm water management requirements based on a watershed process approach developed by Regional Water Boards in lieu of the post-construction requirements of E.12 (also referenced in F.5.g.). The regional watershed process- based approach must be approved by the Regional Water Board following a public process and must include the following:

- Completion of a comprehensive assessment of dominant watershed processes affected by urban storm water
- LID site design and runoff reduction measures, numeric runoff treatment and retention controls, and hydromodification controls that will maintain watershed processes and protect water quality and beneficial uses.
- A process by which Regional Board staff will actively engage Permittees to adaptively manage requirements as determined by the assessment of watershed processes.
- An annual reporting program that involves Regional Board staff and State Board staff to inform statewide watershed process based criteria.

A watershed process-based approach is already being used for Phase II MS4s that participated in the Central Coast Joint Effort for developing hydromodification control criteria. By Resolution No. R3-2012-0025 dated September 6, 2012, the Central Coast Water Board approved modifications to the SWMPs of MS4s participating in the Joint Effort. These modifications would incorporate the Central Coast-Specific Post- Construction Requirements into the SWMPs. Several petitions are currently pending before the State Water Board challenging the Resolution. In the November 16, 2012, draft of this Order, the requirements developed in the Joint Effort were proposed to be adopted into the Order as Attachment J. After receiving extensive public comment on Attachment J, the State Water Board determined that, while the Board continues to support a watershed process-based approach to hydromodification requirements, the Joint Effort process should be allowed to evolve and

_____

[33] A Watershed Management Zone (WMZ) is a combination of a Physical Landscape Zone (PLZ, based on surficial geology and slope) and direct receiving water type. Key watershed processes potentially impacted by urbanization (e.g., infiltration and groundwater recharge) are derived from each PLZ-receiving water combination.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000769

proceed, without incorporation into this Order, to address several unresolved issues acknowledged by the parties to that process, including the Regional Water Board.

Under Provisions E.12.k (also referenced in F.5.g), the Central Coast Region Small MS4s will be required to implement watershed process-based requirements developed through the Joint Effort only after those requirements have been reconsidered and approved by the Central Coast Water Board. Because the requirements cannot be imposed through existing Resolution No. R3-2012- 0025 (which operated as an update to SWMPs that are no longer required under this Order), the State Water Board expects the pending petitions on that Resolution to be moot as of adoption of this Order. As part of the petition process, the State Water Board will evaluate whether the entirety of the petitions are moot following adoption of the Order. However, any future action by a Regional Water Board, including the Central Coast Water Board, to adopt a regional watershed process-based approach would be subject to petitions for review by the State Water Board.

*Multiple-benefits Projects*
This Order encourages and allows for multiple-benefits projects at various scales. At the development site scale, multiple-benefit site design measures are required for all projects that create and/or replace more than 2,500 square feet of impervious surface. Designers are able to quantify runoff reduction using a site design runoff calculator in SMARTS for site design measures (e.g., trees, stream setbacks and buffers, and soil quality improvement). The site design measures in this Order all have multiple benefits (e.g., shading from trees, wildlife habitat from stream setbacks and buffers, less need for pesticides and irrigation from soil quality improvement) in addition to storm water runoff and pollutant load reduction. At the site and local scale, smart growth projects that utilize density, design and land use strategically to achieve multiple benefits including environmental, economic and social benefits are encouraged. For example, high density development contributes to less impervious surface than low density development, generally resulting in less vehicle-related emissions and pollutants (e.g., heavy metals, oil and grease, fine sediment), improved water and air quality results, thus, achieving environmental benefits. The clustering of populations through high density development essentially substitutes evaluation of individual site design criteria for evaluation of per capita loading (Jacob and Lopez 2009[34]). As such, Permittees may implement an alternative approach to requirements for bioretention measures if they can effectively demonstrate a reduction in runoff volume per capita. In other words, alternative compliance may be achieved through the implementation of high density development, or smart growth projects.

Section E.12.l gives "credit" and creates incentive for Permittees to identify and implement watershed scale projects that achieve multiple-benefits. When evaluating watershed-scale, multiple-benefits projects, environmental, social, technical, economic, and political considerations can become intertwined to the point of intractability. These criteria need to be systematically examined through an organizing framework for rational analysis and alternative comparison. A Multi-Criterion Decision Analysis (MCDA) approach provides a flexible, rational, and transparent means to establish decision- making criteria and prioritize alternatives, assuring that projects achieve the desired multiple-benefit outcomes. Watershed scale

---

[34] Jacob, John S. and Lopez, Ricardo. Is Denser Greener? An Evaluation of Higher Density Development as an Urban Stormwater-Quality Best Management Practice. Journal of the American Water Resources Association. June 2009: 45:3: 687 – 701.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000770

multiple-benefit projects include projects that address water quality, water supply, flood control, habitat enhancement, open space preservation, recreation, and climate change.

Once these projects are identified under Watershed Improvement Plans (Water Code §16100 et seq.), through an IRWMP process, or as part of an overall green infrastructure effort, the Permittee may impose requirements and create incentives on the site, local, and watershed scale to ensure project success.

*Post-Construction BMP Condition Assessment*

Permittees must understand how their actions reduce the discharge of pollutants to receiving waters. This is accomplished through an assessment of the performance of the Permittees BMPs, especially structural practices designed for specific pollutant/flow reductions. Only Renewal Permittees were required to install structural post- construction BMPs in the existing permit term. However, during MS4 audits by State and Regional Water Board staff, many of those BMP locations were unknown and not maintained causing water quality threats. In this Order, only Renewal Permittees are asked to implement a plan that contains simple and repeatable field observation and data management tools that can assist them in determining the relative condition of BMPs. The primary purpose is to inform Permittees of: 1) where the BMPs are located, 2) the relative urgency of water quality maintenance and, 3) provide a practical, consistent and reliable tool to track the condition of BMPs relative to observed condition at time of installation or immediately following complete maintenance. Permittees may implement this plan themselves or may be determined through a Self-Certification Annual Report submitted annually by an authorized party demonstrating proper maintenance and operations. Allowing an authorized party to conduct the BMP condition assessment offsets program costs and shifts responsibility to the party that should be maintaining the BMP they initially installed.

*Applicability*

Renewal Permittees currently listed in Attachment 4 to WQO 2003-0005-DWQ (Attachment 4) must continue to implement Attachment 4 Post-Construction Requirements up until the date when Section E.12 requirements of this Order are effective (the second year of the effective date of the Permit). All Permittees that are not subject to Attachment 4 must implement the CGP Post-Construction Requirements up until the second year of the effective date of the Permit. In the second year of the effective date of the permit, all Permittees, New and Renewal, must implement Section E.12. Post-Construction Requirements contained within this Order.

Lastly, extensive monitoring studies conducted by the California Department of Public Health (CDPH) have documented that mosquitoes opportunistically breed in structural storm water Best Management Practices (BMPs), particularly those that hold standing water for over 96 hours. Certain Low Impact Development (LID) site design measures that hold standing water such as rainwater capture systems may similarly produce mosquitoes. These structures create a potential public health concern and increase the burden on local vector control agencies that are mandated to inspect for and abate mosquitoes and other vectors within their jurisdictional boundaries. These unintended consequences can be lessened when structures incorporate design, construction, and maintenance principles developed specifically to minimize standing water available to mosquitoes[1] while having negligible effects on the capacity of the structures to provide water quality improvements as intended. The California Health and Safety Code prohibits landowners from knowingly providing habitat for or allowing the production of

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000771

mosquitoes and other vectors, and gives local vector control agencies broad inspection and abatement powers. This Order requires regulated MS4s to comply with applicable provisions of the Health and Safety Code and to cooperate and coordinate with CDPH and local mosquito and vector control agencies on vector-related issues.

**Water Quality Monitoring Requirements**

Legal Authority: Clean Water Act §§308(a), 402(p)(3)(b); 40 C.F.R. §§122.44(i), 122.48(b); MS4Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; W[35]; Ecological Condition Assessments of California's Perennial Wadeable Streams: Highlights from the Surface Water Ambient Monitoring Program's Perennial Streams Assessment (PSA ) (2000-2007)[36]; National Research Council Report on Urban Storm Water in the United States, 2008[37]

The existing General Permit included requirements meant to eliminate or reduce the discharge of pollutants to receiving waters. Improved knowledge of the water quality impacts and management practices, obtained either as part of the permit requirements or from outside sources (e.g., scientific literature, studies, and expert panels), is intended to be used in an adaptive management fashion to inform requirements in subsequent permits. As such, monitoring and assessment represents a critical component in understanding the link between permit requirements, the benefits achieved due to those requirements, and the condition of receiving waters. Aside from general knowledge that storm water discharges from urbanized watersheds contribute pollutants to receiving waters, little is known about the specific conditions in such receiving waters outside of major metropolitan areas. The effectiveness of almost a decade of storm water management in Phase I MS4s has not been systematically evaluated through receiving water monitoring.

Nationwide, there are few of analyses of available data and guidance on how Permittees should be using the data to inform their storm water management decisions.

This Order prioritizes monitoring for ASBS, TMDLs, and 303d listed waterbodies. Permittees that have a population of 50,000 or greater and are part of an urbanized area are required to choose from a number of monitoring options. These larger Permittees are assumed to have the resources to undertake monitoring. For the majority of Phase II Permittees, this permit term will be the first time a monitoring program has been implemented. As such, prioritization of monitoring allows for a firm foundation from which Phase II Permittees may initiate and develop monitoring programs that will result in improvement of local knowledge of water quality impacts and implementation of storm water management practices. Any of the monitoring requirements may be conducted through participation in a regional monitoring group. Regional

---

[35] 2010 Integrated Report can be found at:
http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml

[36] Ode, P.R.1, T.M. Kincaid2, T. Fleming3 and A.C. Rehn 9. 2011. Ecological Condition Assessments of California's Perennial Wadeable Streams: Highlights from the Surface Water Ambient Monitoring Program's Perennial Streams Assessment (PSA) (2000-2007). A collaboration between the State Water Resources Control Board's Non-Point Source Pollution Control Program (NPS Program), Surface Water Ambient Monitoring Program (SWAMP), California Department of Fish and Game Aquatic Bioassessment Laboratory, and the U.S. Environmental Protection Agency.

[37] Urban Storm Water in the United States, National Research Council, 2008 can be found at:
http://www.epa.gov/npdes/pubs/nrc_stormwaterreport.pdf

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000772

*UNOFFICIAL DRAFT — Not Certified by Clerk*

monitoring not only allows Permittees to share costs but also facilitates monitoring data and information sharing across local regions. In effect, regional programs provide a broad-scale picture of water quality condition within a watershed.

**Program Effectiveness Assessment**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R.C.F.R. § 122.34(g) 40 CFR 122.34(g)(3), CASQA Effectiveness Assessment Guide[38]; Evaluating the Effectiveness of Municipal Stormwater Programs, U.S. EPA, EPA 833-F-07-010, MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

A key requirement in the storm water Phase II rule is a report that includes "the status of compliance with permit conditions, an assessment of the appropriateness of identified [control measures] and progress towards achieving identified measurable goals for each of the minimum control measures." This assessment is critical to the storm water program framework which uses the iterative approach of implementing controls, conducting assessments, and designating refocused controls leading toward attainment of water quality standards. As a result, this Order requires a quantitative evaluation of the Permittees MS4 programs. Measurable program evaluations are critical to the development, implementation, and adaptation of effective local storm water management programs.

To date, only a small number of Phase I MS4s have provided measurable outcomes with regard to aggregate pollutant reduction achieved by their municipal storm water programs. Most Permittees, both Phase I and II, are struggling simply to organize or document their program activities and few have provided a quantitative link between program activities and water quality improvements. The few that have determined whether or not water quality is improving as a result of storm water program implementation took many years. Despite these past obstacles, the process of evaluating and understanding the relationship between the storm water program implementation and water quality needs to begin now.

Building on the monitoring and assessment program, the Permittee must conduct an annual effectiveness assessment to assess the effectiveness of prioritized BMPs, program elements and the storm water program as a whole. Prioritized BMPs include BMPs implemented based on pollutants of concern. Where pollutants of concern are unidentified, prioritized BMPs are based on common urban pollutants (i.e., sediment, bacteria, trash, nutrients). The California Stormwater Quality Association's (CASQA) Municipal Stormwater Program Effectiveness Guidance describes strategies and methods for assessing effectiveness, including examples of effectiveness assessment for each program component. The CASQA Effectiveness Guidance is available at www.casqa.org for purchase. A two-hour EPA webcast focusing on the CASQA Guide is also available (available at www.epa.gov/npdes/training under "Assessing the Effectiveness of Your Municipal Stormwater Program"). A resources document from the webcast includes a 10 page summary of the CASQA Guide and example pages from the municipal chapter:
(www.epa.gov/npdes/outreach_files/webcast/jun0408/110961/municipal_resources.pdf)

The Municipal Stormwater Program Effectiveness Assessment Guidance synthesizes information on designing and conducting program effectiveness assessments. The document also explains how to select certain methods based on programmatic outcomes and goals. The

---

[38] https://www.casqa.org/casqastore/products/tabid/154/p-7-effectiveness-assessment-guide.aspx

Defs_000773

reader is led through a series of questions and case studies to demonstrate how proper assessments are selected. Techniques are related to different level of outcomes: level one – documenting activities, level two – raising awareness, level 3 – changing behavior, level 4 – reducing loads from sources, level 5 – improving runoff quality, and level 6 – protecting receiving water quality. The Guide includes fact sheets for all six NPDES program elements, outlining methods and techniques for assessing effectiveness of each program.

**Annual Reporting**

In general, an annual report must document and summarize implementation of the storm water program during the previous year, evaluate program results and describe planned changes towards continuous improvement. The annual report also can serve as a "state of the storm water program" report for the general public or other stakeholders in the community serving as an excellent summary document to provide about the status of storm water program.

However, lessons learned from Phase I MS4 annual reports demonstrate that many Permittees tend to submit too much information, and, as a result, Regional Water Boards receive large binders full of materials that do not provide useful information to assess compliance. As a result, this Order requires Permittees to annually submit a summary of the past year activities. For example, the Permittees should not only address "bean counting" of required task, but address such questions as:

- For illicit discharge data, what are the most prevalent sources and pollutants in the illicit discharge data, and where are these illicit discharges occurring?
- How many illicit discharges have been identified, and how many of those have been resolved?
- How many outfalls or screening points were visually screened, how many had dry weather discharges or flows, at how many were field analyses completed and for what parameters, and at how many were samples collected and analyzed?
- Does the MS4 need to conduct more inspections in these areas, or develop more specific outreach targeting these sources and pollutants?

In addition, Permittees use SMARTS to certify Annual Reports which verifies compliance with all requirements of this Order.

*Nexus Between Annual Reporting and Program Effectiveness Assessment*

In addition to submitting program element summaries, Permittee must analyze their yearly activities and link it to their Program Effectiveness Assessment and Improvement Plan which tracks and documents their annual and long-term effectiveness of the storm water program. For example:

- Planned Activities and Changes. The annual report should describe activities planned for the next year highlighting any changes made to improve control measures or program effectiveness.

*Detailed Annual Report*

Most major areas of this Order require Permittees to submit, via SMARTS, a summary annual report for the past year's activities. For certain program elements such as Water Quality Monitoring, Program Effectiveness Assessment, and TMDLs, more detailed annual report information is required to be tracked and submitted via SMARTS.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000774

Additionally, at any time during the permit term, the Executive Officer of the applicable Regional Water Board can request a more detailed annual report. This information may be required to determine compliance or prior to targeted or comprehensive storm water program audit. The table below shows detailed annual reporting information an Executive Officer of the applicable Regional Water Board may require:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000775

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.6.c. | By the third year Annual Report and annually thereafter, report on the Enforcement Response Plan summarizing all enforcement activities including inspections of chronic violators and the incentives, disincentives, or escalated enforcement responses at each site. Summarizations of enforcement activities shall include, at a minimum, the following information for each type of site or facility:<br>(a) Number of violations, including a listing of sites or facilities with identified violations<br>(b) Number of enforcement actions, including types<br>(c) Other follow-up actions taken<br>(d) Demonstration that compliance has been achieved for all violations, or a description of actions that are being taken to achieve compliance |
| E.7.a. | By the third year Annual Report, and annually thereafter, submit a report on the implementation and progress of the public education strategy and general program development and progress. Report on the development of education materials, methods for educational material distribution, public input, landscaping outreach, reporting of illicit discharges, proper application of pesticides, herbicides, and fertilizers, elementary school education, reduction of discharges from organized car washes, mobile cleaning and pressure washing operations, and landscape irrigation efforts. By the fifth year Annual Report, submit a report summarizing changes in public awareness and knowledge resulting from the implementation of the program and any modifications to the public outreach and education program. |
| E.7.b.1. | By the third year Annual Report, document and maintain records of the training provided and the staff trained annually. The annual report shall include the number and percentage of Permittee's applicable staff that were trained and summarize the knowledge assessment as specified in E.7.b.1.(ii)(d). |
| E.7.b.2. Permittee Staff | By the second year of the permit and annually thereafter, submit the following information:<br>a. Training topics covered<br>b. Dates of training<br>c. Number and percentage of Permittees' staff, as identified in Sections E.7.b.2. possessing the specified credentials. |
| E.7.b.2. Construction Site Operator Education | By the third year Annual Report and annually thereafter, submit a report including the following information:<br>(a) Training topics covered;<br>(b) Dates of training;<br>(c) Number and percentage of Permittee's operators and number of contractors attending each training;<br>(d) Results of any surveys conducted to demonstrate the awareness and potential behavioral changes in the attendees. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000776

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.7.b.3. | By the second year Annual Report and annually thereafter, submit a summary that includes oversight procedures and identifies and tracks all personnel requiring training and assessment and records. The annual report shall include the number and percentage of Permittee's applicable staff that were trained during the year and summarize the knowledge assessment as specified in E.7.b.3(ii)(b). |
| E.8. | By the second year Annual Report and annually thereafter, submit a description of the public involvement program and summary of the MS4s efforts related to facilitating public involvement, including efforts to engage citizen advisory groups, increase citizen participation, and involvement with the IRWMP or other watershed-level planning effort. |
| E.9.a. | Submit a map by the second year Annual Report, and annually thereafter submit either (a) a current updated outfall map, or (b) verification that no changes or additions were made to the Permittee's MS4. |
| E.9.b. | By the second year online Annual Report, submit inventory and annually thereafter an updated inventory. By the second year online Annual Report, identify the illicit discharge procedures implemented and the locations of the implementation.  Also identify in each online Annual Report the remaining inventoried facilities and priority areas still requiring illicit discharge assessment over the permit term. |
| E.9.c. | By the second year Annual Report, submit a report summarizing the field investigation results and areas of follow up actions, including the following information:<br>(a) The number of outfalls found to be flowing or ponding more than 72 hours after the last rain event;<br>(b) The number of such outfalls sampled in accordance with permit conditions;<br>(c) Sampling result in tabular form; and<br>(d) The number of outfalls found to be in exceedance of action levels |
| E.9.d. | By the second year Annual Report, submit all source investigations and corrective actions.  At a minimum the report shall include:<br>(a) Brief description of each non-stormwater discharge reported or observed;<br>(b) Date(s) the non-storm water discharge was reported or observed;<br>(c) Brief description of any actual or potential water quality impact resulting from the discharge;<br>(d) Description and results of steps taken to investigate the source of the discharge;<br>(e) Description and results of all follow-up or enforcement actions taken as a result of the investigation;<br>(f) Date the investigation was closed, and whether the discharge was eliminated. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000777

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.9.e. | Within the first year of the effective date of the permit, submit a spill response plan that contains the items specified in Section E.9.e. In subsequent Annual Reports summarize any spill response activities, and any follow-up actions, as specified in the spill response plan. |
| E.10.a. | Submit an up to date construction site inventory enumerating items listed in this Section with each Annual Report. |
| E.10.b. | By the first year Annual Report, submit a summary of review procedures. The summary should clearly indicate how the procedures will achieve compliance with all requirements of this Section, and clearly delineate responsibilities for implementing, and ensuring implementation of each aspect of the procedures. |
| E.10.c. | By the second year Annual Report and annually thereafter, submit the following information:<br>(a) Total number of active sites disturbing less than one acre of soil requiring inspection;<br>(b) Number and percentage of each type of enforcement action taken as listed in each Permittee's Enforcement Response Plan;<br>(c) Number of sites with discharges of sediment or other construction related materials, both actual and those inferred through evidence.;<br>(d) Number and percentage of violations fully corrected prior to the next rain event but no longer than 10 business days after the violations are discovered or otherwise considered corrected in a Permittee-defined timely period.<br>(e) Number and percentage of violations not fully corrected 30 days after the violations are discovered.<br>(f) Number of follow-up inspections that demonstrated the operator continued to implement BMPs according to plan and the number of follow-up inspections that required further enforcement. |
| E.11.a. | By the second year Annual Report submit the inventory and submit annual updates thereafter. |
| E.11.b. | By the second year Annual Report, submit the completed map and update annually thereafter if any of the information indicated on the map has changed. |
| E.11.c. | By the third year Annual Report, submit the results of the Permittee's annual assessment, including the list of identified hotspots and any identified deficiencies and corrective actions taken. The Permittee shall identify designated hotspots on the facility inventory updated and submitted in each subsequent year annual report. |
| E.11.d. | By the fourth year Annual Report, submit a summary of SWPPPs developed for pollutant hotspots.  In subsequent Annual Reports, submit a summary of SWPPPs updated. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000778

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.11.e. | By the fifth year Annual Report and annually thereafter, submit the following information:<br>(a) Total number of facilities required to be inspected.<br>(b) Verification that all inspections were conducted at all facilities in accordance with the requirements of this Section<br>(c) Summary of spills and corrective actions<br>(d) Summary of the results of inspections, including a summary of deficiencies noted and corrective actions taken<br>(e) Results of the quarterly visual observations of storm water discharges<br>(f) Total number of facilities inspected (visual and comprehensive inspections) and frequency of inspections<br>(g) All inspection records, reports, and logs<br>(h) Records of corrective actions taken and the results of corrective actions |
| E.11.f. | By the second year Annual Report, submit the assessment procedures and maintenance prioritization list, including a description of the method used to identify high priority storm drain system features and catch basins and number of catch basins identified as high priority. If flood conveyance maintenance is undertaken by another entity, submit a summary report of coordination by the first year Annual Report. |
| E.11.g. | By the third year Annual Report, submit a summary of the following information:<br>(a) Storm sewer maintenance schedule<br>(b) List of storm sewer systems and the maintenance priority assigned<br>(c) Documentation of all required storm sewer systems maintenance logs<br>(d) Documentation of waste material disposal procedure<br>By the third Annual Report and annually thereafter, the Permittee shall submit verification that all storm drain facilities were maintained according to the priorities, procedures, and schedules developed according to this Section. The report shall include a summary of the results of inspections, deficiencies found, corrective actions taken, and the results of corrective actions. |
| E.11.h. | By the third year Annual Report, submit the following:<br>(a) List of BMPs and associated pollutants with each O&M activity<br>(b) BMPs applied during Permittee O&M activities<br>(c) Log of quarterly BMP evaluations.<br>By the third Annual Report and annually thereafter, the Permittee shall submit verification that identified BMPs were effectively implemented for all O&M activities. |
| E.11.i. | By the third year Annual Report, submit a summary of the development and implementation process to incorporate water quality and habitat enhancement design into new or upgraded flood management projects. By the fourth year Annual Report and annually thereafter, submit a list of new or upgraded flood management projects, including a summary of water quality and habitat enhancement features incorporated into their design. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000779

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.11.j. | By the second year Annual Report, submit an evaluation of materials used and activities performed for pollution prevention and source control opportunities and a list of practices implemented to minimize the use of herbicide, pesticide, and fertilizers. By the second year Annual Report and annually thereafter, submit verification that identified BMPs were effectively implemented for all landscaping design and maintenance activities. By the second year Annual Report, submit a summary identifying the measures that the Permittee will use to demonstrate reductions in the application of pesticides, herbicides, and fertilizers.  In subsequent annual reports, verify implementation of this measure, and describe reductions in pesticide, herbicide, and fertilizer application. |
| E.12.b | By the second year Annual Report and annually thereafter, the Permittee shall submit the following information:<br>(a) A list of all project creating or replacing 2,500 square feet or more of impervious surface, as described above; and<br>(b) A brief description of site design measures applied to each project. |
| E.12.c. | For each Regulated Project approved, the following information shall be submitted by the third year Annual Report:<br>(a) Project Name, Number, Location (cross streets), and Street Address;<br>(b) Name of Developer, Phase No. (if project is being constructed in phases, each phase shall have a separate entry), Project Type (e.g., commercial, industrial, multiunit residential, mixed-use, public), and description;<br>(c) Project watershed(s);<br>(d) Total project site area and total area of land disturbed;<br>(e) Total new impervious surface area and/or total replaced impervious surface area;<br>(f) For a redevelopment or road widening project: total pre-project impervious surface area and total post-project impervious surface area;<br>(g) Status of project (e.g., application date, application deemed complete date, project approval date);<br>(h) Source control measures;<br>(i) Site design measures;<br>(j) All post-construction storm water treatment systems installed onsite, at a joint storm water treatment facility, and/or at an offsite location;<br>(k) O&M responsibility mechanism for the life of the project.<br>(l) Water quality treatment calculations used;<br>(m) Off-site compliance measures for Regulated Project (if applicable); Additional (watershed-specific) hydromodification standards used. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000780

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.12.h. | By the second year Annual Report and annually thereafter, for each Regulated Project inspected during the reporting period the following information shall be submitted in tabular form:<br>(1) Name of facility/site inspected.<br>(2) Location (street address) of facility/site inspected.<br>(3) Name of responsible operator for installed storm water treatment systems and hydromodification management controls.<br>(4) Inspection details including: date of inspection, type of inspection (e.g., initial, annual, follow-up, spot), type(s) of storm water treatment systems inspected (e.g., swale, bioretention unit, tree well, etc.) and an indication of whether the treatment system is an onsite, joint, or offsite system.<br>(5) Type of hydromodification management controls inspected.<br>(6) Inspection findings or results (e.g., proper installation, proper O&M, system not operating properly because of plugging, bypass of storm water because of improper installation, maintenance required immediately, etc.).<br>(7) Enforcement action(s) taken, if any (e.g., verbal warning, notice of violation, administrative citation, administrative order).<br>(8) A discussion of the inspection findings for the year and any common problems encountered with various types of treatment systems and/or hydromodification management controls. This discussion shall include a general comparison to the inspection findings from the previous year.<br>(9) A discussion of the effectiveness of the Permittee's O&M Program and any proposed changes to improve the O&M Program (e.g., changes in prioritization plan or frequency of O&M inspections, other changes to improve effectiveness of O & M program).<br>On an annual basis, before the wet season, provide a list of newly installed (installed within the reporting period) storm water treatment systems and hydromodification management controls to the local mosquito and vector control agency and the appropriate Regional Water Board. This list shall include the facility locations and a description of the storm water treatment measures and hydromodification management controls installed. |
| E.12.i. | By the third year Annual Report and subsequently thereafter, submit the post-construction best management practice condition assessment plan as required in E.12.i.(ii)a-d. |
| F.5.b.2. | By the third year Annual Report and annually thereafter, submit the public education strategy and general program development and progress. By the fifth year Annual Report, summarize changes in public awareness and knowledge resulting from the implementation of the program and any modifications to the public education and outreach program. If applicable, submit a report on development of education materials, methods for educational material distribution, public input, Water Efficient Landscape Ordinance, elementary school education, reduction of discharges from mobile cleaning and pressure washing operations, and landscape irrigation efforts. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000781

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| F.5.b.3. | By the third year Annual Report, submit records of the training provided and the staff trained annually. |
| F.5.b.4. | By the second year Annual Report and annually thereafter, submit a summary of oversight procedures and identify and track all personnel requiring training and assessment and records. |
| F.5.c. | By the third year Annual Report and annually thereafter, submit a description of the public involvement program and summary of the MS4s efforts related to facilitating public involvement. |
| F.5.d. | By second year Annual Report submit the outfall inventory map, and annually thereafter submit either (a) a current updated outfall map, or (b) verification that no changes or additions were made to the Permittee's MS4. |
| F.5.d.1. | By the second year Annual Report, submit a report summarizing the field investigation results and areas of follow up investigations. The report shall summarize all applicable observations.<br>By the second year of the permit term and annually thereafter, submit all source investigations and corrective actions.  At a minimum the report shall include:<br>    (a) Date(s) the non-storm water discharge was observed;<br>    (b) Results of the investigation;<br>    (c) Date the investigation was closed.<br>    (d) A summary of all non-storm water discharges that were found. |
| F.5.e. | By the second year Annual Report, the Permittee submit an updated contract language that includes CGP compliance requirements for all projects subject to the CGP. |
| F.5.f.1. | By the second year Annual Report submit and annually thereafter an updated inventory. |
| F.5.f.2. | By the second year Annual Report and annually thereafter, submit the map. |
| F.5.f.3. | By the third year Annual Report, submit the results of the Permittee's annual assessment, any identified deficiencies and corrective actions taken, list of the pollutant hotspots. |
| F.5.f.4. | By the fourth year Annual Report and annually thereafter, submit a summary of SWPPPs developed and updated for pollutant hotspots. |
| F.5.f.5. | By the fifth year Annual Report and annually thereafter, the following information shall be submitted:<br>    (a) Total number of facilities required to be inspected.<br>    (b) Total number of facilities inspected (visual and comprehensive inspections) and frequency of inspections<br>    (c) Summary of spills and corrective actions<br>    (d) Results of the quarterly visual observations of storm water discharges |
| F.5.f.6 | By the second year Annual Report, submit the assessment procedures and maintenance prioritization list. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000782

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| F.5.f.7 | By the third year Annual Report, submit a summary of the following information:<br>(a) Storm sewer maintenance schedule<br>(b) List of storm sewer systems and the priority assigned<br>(c) Documentation of all required storm sewer systems maintenance logs<br>(d) Documentation of waste material disposal procedure |
| F.5.f.8. | By the third year Annual Report, submit the following:<br>(a) List of BMPs and associated pollutants with each O&M activity<br>(b) BMPs applied during Permittee O&M activities<br>(c) Log of annual BMP evaluations. |
| F.5.f.9 | By the second year Annual Report, submit an evaluation of materials used and activities performed for pollution prevention and source control opportunities and a list of practices implemented to minimize the use of herbicide, pesticide, and fertilizers. By the second year Annual Report, submit a document identifying the measures that the Permittee will use to demonstrate reductions in the application of pesticides, herbicides, and fertilizers. In subsequent annual reports, use this measure to demonstrate reductions in pesticide, herbicide, and fertilizer application. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000783

| | |
|---|---|
| F.5.g. | By the second year Annual Report and annually thereafter, the Permittee shall submit the following information:<br><br>(a)  A list of all project creating or replacing 2,500 square feet or more of impervious surface, as described above; and<br><br>A brief description of site design measures applied to each project.<br><br>For each project approved, the following information shall be submitted by the second year Annual Report:<br><br>(a) Project Name, Number, Location (cross streets), and Street Address;<br>(b) Name of Developer, Phase No. (if project is being constructed in phases, each phase shall have a separate entry), Project Type (e.g., commercial, industrial, multiunit residential, mixed-use, public), and description;<br>(c) Project watershed(s);<br>(d) Total project site area and total area of land disturbed;<br>(e) Total new impervious surface area and/or total replaced impervious surface area;<br>(f) If a redevelopment or road widening project, total pre-project impervious surface area and total post-project impervious surface area;<br>(g) Status of project (e.g., application date, application deemed complete date, project approval date);<br>(h) Source control measures;<br>(i) Site design measures;<br>(j) All post-construction storm water treatment systems installed onsite, at a joint storm water treatment facility, and/or at an offsite location;<br>(k) O&M responsibility mechanism for the life of the project.<br>(l) Water quality treatment calculations used;<br>(m) Off-site compliance measures (if applicable)<br>(n) Additional (watershed-specific) hydromodification standards used<br><br>(a) For each project inspected during the reporting period the following information shall be submitted in tabular form as part of each year's Annual Report:<br>(1) Name of facility/site inspected.<br>(2) Location (street address) of facility/site inspected.<br>(3) Name of responsible operator for installed storm water treatment systems and hydromodification management controls.<br>(4) Inspection details including: Date of inspection, type of inspection (e.g., initial, annual, follow-up, spot), type(s) of storm water treatment systems inspected (e.g., swale, bioretention unit, tree well, etc.) and an indication of whether the treatment system is an onsite, joint, or offsite system.<br>(5) Type of hydromodification management controls inspected.<br>(6) Inspection findings or results (e.g., proper installation, proper O&M, system not operating properly because of plugging, bypass of storm water because of improper installation, maintenance required immediately, etc.).<br>(7) Enforcement action(s) taken, if any (e.g., verbal warning, notice of violation, administrative citation, administrative order).<br>(8) A discussion of the inspection findings for the year and any common problems encountered with various types of treatment |

Page 49

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000784

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| | systems and/or hydromodification management controls. This discussion shall include a general comparison to the inspection findings from the previous year.<br>(9) A discussion of the effectiveness of the Permittee's O&M Program and any proposed changes to improve the O&M Program (e.g., changes in prioritization plan or frequency of O&M inspections, other changes to improve effectiveness of program).<br>(b) On an annual basis, before the wet season, provide a list of newly installed (installed within the reporting period) storm water treatment systems and hydromodification management controls to the local mosquito and vector control agency and the appropriate Regional Water Board. This list shall include the facility locations and a description of the storm water treatment measures and hydromodification management controls installed. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000785

Program Management
Without the requirement of a SWMP, this section serves as the framework/backbone for the storm water program. This section is a consolidation of all of the Permittee's relevant ordinances or other regulatory requirements, the description of all programs and procedures (including standard forms to be used for reports and inspections) that will be implemented and enforced to comply with the permit and to document the selection, design, and installation of all storm water control measures.

Legal Authority
Without adequate legal authority the MS4 would be unable to perform many vital program functions such as performing inspections and requiring installation of control measures. In addition, the Permittee would not be able to penalize and/or attain remediation costs from violators.

Certification
Submittal and signature certifies Permittee will comply with this Order.

Enforcement Response Plan (ERP)
This Order requires Permittees to have an established, escalating enforcement policy identified in the ERP that clearly describes the action to be taken for common violations. The plan must describe the procedures to ensure compliance with local ordinances and standards, including the sanctions and enforcement mechanisms that will be used to ensure compliance. (See 40 CFR 122.26(d)(2)(i)). It is critical that the Permittee have the authority to initiate a range of enforcement actions to address the variability and severity of noncompliance.

IDDE and Good Housekeeping
Both these programs pose potential immediate threat to water quality without quick access to information submitted in SMARTS. For example, in order to respond to discharges, an effective IDDE program responds to complaints about illicit discharges or spills such as illegal connections to the storm sewer system, improper disposal of wastes, or dumping of used motor oil or other chemicals. In order to trace the origin of a suspected illicit discharge or connection, the Permittee must have an updated map of the storm drain system and a formal plan of how to locate illicit discharges and how to respond to them once they are located or reported.

Construction Inventory
To effectively conduct inspections, the Permittee must know where construction activity is occurring. A construction site inventory tracks information such as project size, disturbed area, distance to any waterbody or flow channel, when the erosion and sediment control/stormwater plan was approved by the Permittee, and whether the project is covered by the CGP. This inventory will allow the Permittee to track and target its inspections.

Effectiveness Assessment
Without assessing the effectiveness of the stormwater management program the Permittee will not know which parts of the program need to be modified to protect and/or improve water quality and instead will essentially be operating blindly.

Defs_000786

## XIII.  TOTAL MAXIMUM DAILY LOAD (TMDL)

Section 303(d) of the Clean Water Act requires States to identify waters that do not meet water quality standards after applying certain required technology-based effluent limitations ("impaired" waterbodies). States are required to compile this information in a list and submit the list to the U.S. EPA for review and approval. This list is known as the Section 303(d) list of impaired waters, which is incorporated into the Integrated Report.

This listing process requires States to prioritize waters/watersheds for future development of TMDLs. A TMDL is defined as the sum of the individual waste load allocations for point sources of pollution, plus the load allocations for nonpoint sources of pollution, plus the contribution from background sources of pollution. The Water Boards have ongoing efforts to monitor and assess water quality, to prepare the Section 303(d) list, and to subsequently develop TMDLs. The 2010 California 303(d) List identifies impaired receiving water bodies and their watersheds within the state.

TMDLs are developed by either the Regional Water Boards or U.S. EPA in response to Section 303(d) listings. Regional Water Board-developed TMDLs are subject to approval by the State Water Board, approval by the Office of Administrative Law, and ultimately approval by U.S. EPA. TMDLs developed by Regional Water Boards are incorporated as Basin Plan amendments and include implementation provisions.

TMDLs developed by U.S. EPA typically contain the total load and waste load allocations required by Section 303(d), but do not contain comprehensive implementation provisions.

TMDLs are not self-implementing but rely on other regulatory mechanisms for implementation and enforcement. Urbanized areas typically utilize municipal storm water permits as the implementation tool. Incorporation of TMDL implementation requirements into general permits (as opposed to individual MS4 permits) is difficult. First, there are numerous Traditional MS4s (municipalities) and Non-traditional MS4s such as military bases, public campuses, prison and hospital complexes covered under this Order. Second, the waste load allocations for many TMDLs are shared among several dischargers; that is, a single waste load allocation may be assigned to multiple dischargers, making it difficult to assign responsibility. Further, individual dischargers may not be explicitly identified. For example, "urban runoff" may be listed as a source of impairment, but the individual MS4s responsible for the impairment may not be identified. Third, the implementation plans adopted by the Regional Water Boards often provide for phased compliance with multiple milestones and deliverables, with optional and alternative means of compliance depending on the results of monitoring and special studies. Section C.1 of this Order requires that permittee "shall . . . reduce the discharge of pollutants . . .to achieve TMDL wasteload allocations established for discharges by the MS4s." The variance in the level of detail of TMDLs necessitates the development of TMDL-specific permit requirements to provide clarity on the Permittees' compliance responsibilities.

The Regional Water Boards submitted proposed TMDL-specific permit requirements to the State Water Board for applicable TMDLs, with statements explaining how these requirements are designed to implement the TMDLs and the corresponding wasteload allocations. (40 C.F.R. §122.44(d)(1)(vii)(B)) Sections E.15 and F.5 of this Order require permittees to comply with all applicable TMDL-based requirements listed in Attachment G; the requirements are directly enforceable through this Order. Attachment G does not restate the final applicable wasteload allocations for each TMDL; however, those wasteload allocations are specified in the Fact Sheet and this Order incorporates them by reference as appropriate.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000787

In a few cases, the TMDL-specific requirements of Attachment G are based on a load allocation, rather than a wasteload allocation. Several TMDLs incorporated into this Order assign load allocations to storm water that may not have been regulated as NPDES discharges at the time of the TMDL adoption, but have now been determined to be subject to this Order. USEPA has issued guidance providing that in such circumstances, the "NPDES permit authority could identify an appropriate allocation share and include a corresponding limitation specific to the newly permitted stormwater source."[39]

Some TMDLs do not name specific Permittees but name a category of discharges such as "urban runoff." This Order identifies the Permittees subject to the TMDL. In most cases, the permittees subject to the TMDLs are Traditional MS4s. For some TMDLs the State Water Board has determined that the TMDL requirements are also applicable to specific Non-traditional MS4s. Attachment G specifically names such permittees and sets out how the permittees will implement the TMDL. The State Water Board or the applicable Regional Water Board may, in the future, designate additional Traditional or Non-traditional MS4s based on further determination of TMDL applicability.

Attachment G assigns monitoring requirements to certain Permittees and section E.13.b. of this Order states that "Permittees shall implement any monitoring requirements assigned in Attachment G." Section E.13. also states, in part, "Traditional Small MS4 Permittees that are required to conduct monitoring of discharges to … TMDL… waterbodies… are not required to perform additional monitoring as specified in Sections E.13.d.1 and E.13.d.2." Therefore, a Permittee that is assigned TMDL-related monitoring in Attachment G is not required to implement monitoring in accordance with Sections E.13.d.1. or E.13.d.2.

Permittees will report compliance with TMDL permit requirements in the Annual Report required to be submitted electronically via SMARTS.

The previous General Permit, Water Quality Order 2003-0005-DWQ, relied in part on the preparation, approval, and implementation of a Storm Water Management Program to incorporate TMDL-specific requirements for Permittees. This Order does not rely on preparation of a Storm Water Management Program, but rather incorporates programmatic requirements, including the TMDL-specific requirements in Attachment G, in the Order itself. In some cases, as noted in the discussion below, this Order directs the Permittee to continue implementing requirements specified in the Storm Water Management Plan required by the previous 2003 Permit. In those cases, Attachment G incorporates those specific requirements by reference.

In sum, Attachment G contains specific management practice-based planning and implementation requirements that act as BMP-based WQBELs. Attachment G also contains monitoring and other requirements. These requirements are referred to in the Order as "BMP-based WQBELs and other permit requirements," and are expected to achieve the water quality results specified by the wasteload allocations. Because the ultimate purpose of TMDL implementation is to reach the water quality results specified in the TMDL wasteload allocations in order to attain water quality standards in receiving waters that are currently impaired, Attachment G requires a demonstration of attainment of the waste load allocation at the final compliance deadline. This demonstration ensures that Attachment G incorporates

---

[39] Revisions to the November 22, 2002 Memorandum 'Establishing Total Maximum Daily Load (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on Those WLAs,'" issued by USEPA, November 26, 2014.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

BMP-based WQBELs and other permit requirements that are consistent with the assumptions and requirements of the applicable waste load allocations (40 C.F.R. § 122.44(d)(1)(vii)(B)) and implements the basin plans into which the TMDL implementation plans are incorporated (Wat. Code, §§13263, subd. (a), 13377.) Permittees are to make this demonstration consistent with criteria articulated in sections E.15.b. and F.5.i.2 of the Order.

This Order implements TMDLs with either past deadlines or soon approaching deadlines. In precedential Order WQ 2015-0075, the State Water Board found that final TMDL attainment deadlines should not be extended through permitting actions. The State Water Board stated as follows:

> *Final TMDL deadlines are established and incorporated into the Basin Plans during the TMDL development process. That process invites stakeholder participation and the proposed schedule is subject to public review and comment and approval by the relevant regional water board, the State Water Board, and USEPA. The deadlines are established with consideration of the time needed for compliance for all dischargers contributing to an impairment, including industrial and construction storm water dischargers and traditional NPDES dischargers. Although we recognize that it may not always be feasible for municipal storm water dischargers to meet final TMDL deadlines, short of amending the Basin Plan to modify the deadlines (see California Association of Sanitation Agencies v. State Water Resources Control Board (2012) 208 Cal.App.4th 1438), we find it appropriate for the dischargers to request time schedule orders rather than be granted an extension within the provisions of the [regional water board permits].*
(State Water Board Order WQ 2015-0075, p. 37, fn. 110.)

Attachment G incorporates the final attainment deadlines for each TMDL; some TMDL attainment deadlines are now past. In these instances, the associated wasteload allocations are effective on the effective date of the Order, i.e. January 1, 2019. Where appropriate, the State Water Board will work with the Regional Water Boards to determine if there is any regulatory flexibility for extension of final attainment dates consistent with any particular TMDL. The State Water Board and the Regional Water Boards additionally have discretion with regard to enforcement actions and will exercise that discretion on a case-by-case basis based on all the facts underlying a violation, including how recently the Permittee was assigned TMDL-specific requirements in the permit and the Permittee's efforts, to date, to meet the TMDL-specific requirements. A permittee with a past or imminent TMDL attainment deadline may request a Time Schedule Order (TSO) from the applicable Regional Water Board in accordance with criteria established in the Order. A Regional Water Board's issuance of a TSO will establish an implementation schedule for the Permittee to comply with the TMDL requirements.

The State Water Board delayed the effective date of the Order to January 1, 2019, one year following adoption, to allow permittees additional time to demonstrate attainment of the wasteload allocations, request time schedule orders incorporating compliance schedules for the attainment of the wasteload allocations, or request consideration by the Regional Water Board Executive Officer of whether the particular regulatory language of a given TMDL allows for an extension of a deadline for attainment of the wasteload allocation.

Attachment G specifies BMP-based WQBELs and other permit requirements for attainment of the wasteload allocations even in cases where the final wasteload allocation deadline is past. These requirements are included because the Order states that it is not the intention of the State Water Board or the Regional Water Boards to take enforcement action against a

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000789