approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved for single sample objectives and during dry weather by June 14, 2026, while the final WLAs during wet weather are to be achieved by June 14, 2036.

### *Los Cerritos Channel Metals TMDL*
The Los Cerritos Channel Metals TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State University Long Beach and Long Beach Veterans' Affairs Medical Center, Non-traditional MS4s, are sources of storm water and non-storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
*Dry-Weather WLA (total recoverable metals) (shared) (g/day):*
  Copper:   67.2

*Wet-Weather WLAs (total recoverable metals) (shared) (g/day based on flow of 40 cfs):*
  Copper:   461.4
  Lead:     2,631.5
  Zinc:     4,510.7

Deliverables/Actions Required:
The California State University Long Beach and Long Beach Veterans' Affairs Medical Center are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs during dry weather shall be achieved by September 30, 2023. The final WLAs during wet weather shall be achieved by September 30, 2026.

### *Ballona Creek Estuary Toxic Pollutants TMDL*
The Ballona Creek Estuary Toxic Pollutants TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System, Non-traditional MS4s, are sources of storm water and non-storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000839

Wasteload Allocations (WLA):

WLAs are expressed as shared allocations amongst the MS4 permittees in the Ballona Creek watershed.

| | | |
|---|---|---|
| Cadmium: | 8.0 | kg/yr |
| Copper: | 227.3 | kg/yr |
| Lead: | 312.3 | kg/yr |
| Silver: | 6.69 | kg/yr |
| Zinc: | 1003 | kg/yr |
| Chlordane: | 8.69 | g/yr |
| DDTs: | 12.70 | g/yr |
| Total PCBs: | 21.40 | g/yr |

Deliverables/Actions Required:

The University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs shall be achieved by January 11, 2021.

### *Ballona Creek Trash TMDL*

The Ballona Creek Trash TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Los Angeles Regional Water Board has determined that the University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System, Non-traditional MS4s, are sources of storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):

Final WLA is zero trash.

Deliverables/Actions Required:

The Los Angeles Regional Water Board has determined that the contribution by these non-traditional MS4s is significant. In order for the permittees to meet their obligation to ensure that the WLA is met, the permittees will be required to implement either 1) Full Capture Systems, 2) partial capture devices and the application of institutional controls, or 3) a scientifically based alternative attainment approach.

1)  A Full Capture System is any device or series of devices that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a one-year, one hour, storm in the subdrainage area. The Rational Equation is used to compute the peak flow rate:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000840

$$Q = C * I * A$$

Where:

Q = design flow rate (cubic foot per second)
C = runoff coefficient
I = design rainfall intensity (inches per hour)
A = subdrainage area (acres)

2) Permittees employing partial capture devices or institutional controls shall use a mass balance approach based on the trash daily generation rate (DGR)[46], to demonstrate compliance.

The DGR shall be reassessed annually. Permittees may request a less frequent assessment of its DGR when the final WLA has been met (as described below) and the responsible jurisdiction continues to implement at the same level of effort partial capture devices and institutional controls for Executive Officer approval. A return to annual DGR calculation shall be required for a period of years to be determined by the Executive Officer after significant land use changes.

Permittees employing institutional controls or a combination of full capture systems, partial capture devices, and institutional controls shall be deemed in attainment of the final WLAs when the reduction of trash from the jurisdiction's baseline load, is between 99% and 100% as calculated using a mass balance approach, and the full capture systems and partial capture devices are properly sized, operated, and maintained.

Alternatively, permittees may request that the Executive Officer make a determination that a 97% to 98% reduction of the baseline load as calculated using a mass balance approach, constitutes full attainment of the final WLA if all of the following criteria are met:

a. The agency submits to the Regional Board a report for Executive Officer approval, including, two or more consecutive years of data showing that the Permittee's attainment was at or above a 97% reduction in its baseline trash load;

b. An evaluation of institutional controls in the jurisdiction demonstrating continued effectiveness and any potential enhancements; and

c. Demonstration that opportunities to implement partial capture devices have been fully exploited.

3) Permittees employing an alternative attainment approach shall conduct studies of institutional controls and partial capture devices for their particular subwatershed(s) or demonstrate that existing studies are representative and transferable to the implementing area for Executive Officer approval. Permittees shall also provide a schedule for periodic, compliance effectiveness demonstration and evaluation. Full capture systems and partial capture devices shall be properly sized, operated, and maintained consistent with sizing, operation, and maintenance schedules used to determine their effectiveness.

The TMDL specifies that the final WLA (0% of the baseload discharged) is to be achieved by September 30, 2015. The WLA is therefore effective immediately.

---

[46] The DGR is the average amount of trash deposited during a 24-hour period, as measured in a specified drainage area.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000841

### *Los Angeles River Trash TMDL*

The Los Angeles River Trash TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Los Angeles Regional Water Board has determined that the California State University Los Angeles and California State University Northridge, Non-traditional MS4s, are sources of storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):

Final WLA is zero trash.

Deliverables/Actions Required:

The Los Angeles Regional Water Board has determined that the contribution by these non-traditional MS4s is significant. In order for the permittees to meet their obligation to ensure that the WLA is met, the permittees will be required to implement either 1) Full Capture Systems, 2) partial capture devices and the application of institutional controls, or 3) a scientifically based alternative attainment approach.

1) A Full Capture device is any device that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a one-year, one hour, storm in the subdrainage area. The Rational Equation is used to compute the peak flow rate:

$$Q = C * I * A$$

Where:

        Q = design flow rate (cubic foot per second)
        C = runoff coefficient
        I = design rainfall intensity (inches per hour)
        A = subdrainage area (acres)

2) Permittees employing partial capture devices or institutional controls shall use a mass balance approach based on the trash daily generation rate (DGR)[47], to demonstrate compliance.

The DGR shall be reassessed annually. Permittees may request a less frequent assessment of its DGR when the final WLA has been met (as described below) and the responsible jurisdiction continues to implement at the same level of effort partial capture devices and institutional controls for Executive Officer approval. A return to annual DGR calculation shall be required for a period of years to be determined by the Executive Officer after significant land use changes.

Permittees employing institutional controls or a combination of full capture systems, partial capture devices, and institutional controls shall be deemed in attainment of the final WLAs when the reduction of trash from the jurisdiction's baseline load, is between 99% and

---

[47] The DGR is the average amount of trash deposited during a 24-hour period, as measured in a specified drainage area.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000842

100% as calculated using a mass balance approach, and the full capture systems and partial capture devices are properly sized, operated, and maintained.

Alternatively, permittees may request that the Executive Officer make a determination that a 97% to 98% reduction of the baseline load as calculated using a mass balance approach, constitutes full attainment of the final WLA if all of the following criteria are met:

a. The agency submits to the Regional Board a report for Executive Officer approval, including, two or more consecutive years of data showing that the Permittee's attainment was at or above a 97% reduction in its baseline trash load;

b. An evaluation of institutional controls in the jurisdiction demonstrating continued effectiveness and any potential enhancements; and

c. Demonstration that opportunities to implement partial capture devices have been fully exploited.

3) Permittees employing an alternative attainment approach shall conduct studies of institutional controls and partial capture devices for their particular subwatershed(s) or demonstrate that existing studies are representative and transferable to the implementing area for Executive Officer approval. Permittees shall also provide a schedule for periodic, compliance effectiveness demonstration and evaluation. Full capture systems and partial capture devices shall be properly sized, operated, and maintained consistent with sizing, operation, and maintenance schedules used to determine their effectiveness.

The TMDL specifies that the final WLA (0% of the baseload discharged) is to be achieved by September 30, 2016. The WLA is therefore effective immediately.

### *Ventura River Estuary Trash TMDL*
The Ventura River Estuary Trash TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Ventura County Fairgrounds (Seaside Park and Ventura County Fairgrounds), a Non-traditional MS4, is a source of storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
Final WLA is zero trash.

Deliverables/Actions Required:
The Los Angeles Regional Water Board has determined that the contribution by these non-traditional MS4s is significant. In order for the permittees to meet their obligation to ensure that the WLA is met, the permittees will be required to implement one of two options for the control of trash. The TMDL allows permittees to meet the WLA by either: 1) installing and maintaining Full Capture Systems, or 2) with Regional Water Board Executive Officer approval, implement a program for minimum frequency of assessment and collection (MFAC) in conjunction with BMPs.

1) A Full Capture device is any device that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000843

one-year, one hour, storm in the subdrainage area. The Rational Equation is used to compute the peak flow rate:

$$Q = C * I * A$$

Where:

> $Q$ = design flow rate (cubic foot per second)
> $C$ = runoff coefficient
> $I$ = design rainfall intensity (inches per hour)
> $A$ = subdrainage area (acres)

2) Attainment of the WLA through the MFAC program in conjunction with BMPs may be proposed to the Regional Water Board's Executive Officer for approval. The MFAC program must include requirements equivalent to those described in the Conditional Waiver set forth in the TMDL. The due date for submittal of the required information to select this option was October 2008. Therefore, this option is no longer available for permittees under this Order and was included only for completeness.

The TMDL specifies that the final WLA is to be achieved by March 6, 2016. The final WLA therefore is effective immediately.

## *CENTRAL VALLEY REGIONAL WATER BOARD TMDLS*

### *Lower San Joaquin River Diazinon & Chlorpyrifos TMDL*
The Lower San Joaquin River Diazinon & Chlorpyrifos TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Valley Regional Water Board has determined that the City of Patterson, a Traditional MS4, is a source of "NPDES permitted discharges" subject to this Order and is responsible for implementing the requirements of this TMDL.

Many of the permittees listed in Attachment G of the permit adopted on February 5, 2013, have been removed. These permittees are not specifically assigned allocations in the TMDL adopted by the Central Valley Regional Water Board. The removed permittees do not discharge directly to the San Joaquin River. An impaired water body segment must have TMDL-specific requirements under the TMDL. Through development of this Amendment the Central Valley Water Board has determined that only the City of Patterson, which discharges directly to the San Joaquin River, is responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The wasteload allocations for NPDES permitted municipal storm water Permittees shall not exceed the sum ($S$) of one (1) as defined below:

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \le 1.0$$

Where:

$C_D$ = diazinon concentration in micrograms per liter of point source discharge

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000844

$C_C$ = chlorpyrifos concentration in micrograms per liter of point source discharge

$WQO_D$ = acute or chronic diazinon water quality objective (0.160 and 0.100 micrograms per liter, respectively)

$WQO_C$ = acute or chronic chlorpyrifos water quality objective. (0.025 and 0.015 micrograms per liter, respectively)

For the purpose of calculating the sum (S) above, non-detectable concentrations are considered to be zero. In determining compliance with the effluent limitations in Section C.1 of this Order related to the attainment of these wasteload allocations, the Central Valley Regional Water Board will consider data or information submitted by the Permittee regarding diazinon and chlorpyrifos inputs from sources that are outside of the jurisdiction of the permitted discharge, and any applicable provisions in this Order requiring the Permittee to reduce the discharge of pollutants to the maximum extent practicable.

Deliverables/Actions Required:

To create a path towards compliance with this TMDL, the permittees are being directed to conduct an assessment of the waterbody. The assessment will be used to ascertain the loads from urban runoff, whether the waterbody is meeting its objectives, whether or not an alternative constituent is the cause of impairment and whether a synergistic effect is present. As an alternative, the permittees may participate in the Bay Delta Regional Monitoring Program, upon the Central Valley Regional Water Board Executive Officer approval.

The deadline for attainment of WLAs was December 1, 2010. Therefore, the WLA is to be achieved immediately.

### ***Sacramento and San Joaquin Delta Diazinon & Chlorpyrifos TMDL***

The Sacramento and San Joaquin Delta Diazinon & Chlorpyrifos TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Central Valley Regional Water Board has determined that the Cities of Lathrop, Lodi, Manteca, Rio Vista, Tracy, and West Sacramento and the County of San Joaquin, Traditional MS4s, are sources of "NPDES permitted dischargers" subject to this Order and are responsible for implementing the requirements of this TMDL.

The Cities of Davis, Dixon, French Camp, Morada, Vacaville, and Woodland, listed in the original permit adopted on February 5, 2013, have been removed from this TMDL. These permittees are not specifically assigned allocations in the TMDL adopted by the Central Valley Regional Water Board. The Central Valley Water Board determined that they were erroneously listed since they do not discharge directly to the Sacramento and San Joaquin Delta. The Cities of Lathrop, Lodi, Manteca, Rio Vista, Tracy and West Sacramento and the County of San Joaquin discharge directly to the Sacramento and San Joaquin Delta.

Wasteload Allocations:

The wasteload allocations for NPDES permitted municipal storm water Permittees shall not exceed the sum (S) of one (1) as defined below:

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \leq 1.0$$

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000845

Where:

$C_D$ = diazinon concentration in micrograms per liter of point source discharge

$C_C$ = chlorpyrifos concentration in micrograms per liter of point source discharge

$WQQO_D$ = acute or chronic diazinon water quality objective (0.160 and 0.100 micrograms per liter, respectively)

$WQO_C$ = acute or chronic chlorpyrifos water quality objective. (0.025 and 0.015 micrograms per liter, respectively)

For the purpose of calculating the sum (S) above, non-detectable concentrations are considered to be zero. In determining compliance with the effluent limitations in Section C.1 of this Order related to the attainment of these wasteload allocations, the Central Valley Regional Water Board will consider data or information submitted by the Permittee regarding diazinon and chlorpyrifos inputs from sources that are outside of the jurisdiction of the permitted discharge, and any applicable provisions in this Order requiring the Permittee to reduce the discharge of pollutants to the maximum extent practicable.

Deliverables/Actions Required:
To create a path towards compliance with this TMDL, the permittees are being directed to conduct an assessment of the waterbody. The assessment will be used to ascertain the loads from urban runoff, whether the waterbody is meeting its objectives, whether or not an alternative constituent is the cause of impairment and whether a synergistic effect is present. As an alternative, the permittees may participate in the Bay Delta Regional Monitoring Program, upon Executive Officer approval.

The deadline for attainment of WLAs was December 1, 2011. Therefore, the WLA is to be achieved immediately.

### ***Sacramento and Feather Rivers Diazinon & Chlorpyrifos TMDL***
The Sacramento and Feather Rivers Diazinon & Chlorpyrifos TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Valley Regional Water Board has determined that the Cities of Anderson, Marysville, Red Bluff, Redding and Yuba City, the Counties of Colusa, Shasta, Sutter and Yuba, Traditional MS4s, are sources of "Urban storm water runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

The Cities of Chico, Live Oak, Lincoln, Loomis, Roseville and Rocklin and the County of Butte, listed in the original permit adopted on February 5, 2013, have been removed from this TMDL. These permittees are not specifically assigned allocations in the TMDL adopted by the Central Valley Regional Water Board. The Central Valley Water Board determined that they were erroneously listed since they do not discharge directly to the Sacramento and/or Feather rivers. The Cities of Anderson, Colusa, Marysville, Red Bluff, Redding and Yuba City, and the Counties of Colusa, Shasta and Sutter discharge directly to the Sacramento and/or Feather rivers.

Wasteload Allocations:
The wasteload allocations for NPDES permitted municipal storm water Permittees shall not exceed the sum (S) of one (1) as defined below:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000846

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \leq 1.0$$

Where:

   $C_D$ = diazinon concentration in micrograms per liter of point source discharge

   $C_C$ = chlorpyrifos concentration in micrograms per liter of point source discharge

   $WQO_D$ = acute or chronic diazinon water quality objective (0.160 and 0.100 micrograms per liter, respectively)

   $WQO_C$ = acute or chronic chlorpyrifos water quality objective. (0.025 and 0.015 micrograms per liter, respectively)

For the purpose of calculating the sum (S) above, non-detectable concentrations are considered to be zero. In determining compliance with the effluent limitations in Section C.1 of this Order related to the attainment of these wasteload allocations, the Central Valley Regional Water Board will consider data or information submitted by the Permittee regarding diazinon and chlorpyrifos inputs from sources that are outside of the jurisdiction of the permitted discharge, and any applicable provisions in this Order requiring the Permittee to reduce the discharge of pollutants to the maximum extent practicable.

Deliverables/Actions Required:
To create a path towards compliance with this TMDL, the permittees are being directed to conduct an assessment of the waterbody. The assessment will be used to ascertain the loads from urban runoff, whether the waterbody is meeting its objectives, whether or not an alternative constituent is the cause of impairment and whether a synergistic effect is present. As an alternative, the permittees may participate in the Bay Delta Regional Monitoring Program, upon Executive Officer approval.

The deadline for attainment of WLAs was August 11, 2008. Therefore, the WLA is to be achieved immediately. The Cities of Anderson, Marysville, Red Bluff, Redding and Yuba City, the Counties of Colusa, Shasta, Sutter and Yuba may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

*Demonstration of Attainment of Diazinon and Chlorpyrifos Wasteload Allocations for ALL Diazinon and Chlorpyrifos TMDLs*
Attainment of the diazinon and chlorpyrifos wasteload allocations may be demonstrated by any one of the following methods:

   a. Submission of receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.
   b. Attainment of WLAs within the discharge (monitoring representative of the MS4 discharge may be used with Executive Officer approval).
   c. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

For those Permittees that have not demonstrated achievement of WLA by the attainment date (shown above), implementation of BMPs consistent with an Executive Officer-approved Management Plan that outlines BMPs and a schedule to reduce discharges of diazinon and

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000847

chlorpyrifos and that are capable of ultimately attaining the WLA is required. Management Plans shall be developed pursuant to the implementation schedules stated in Attachment G.

### *Lower San Joaquin River, San Joaquin River and Stockton Deep Water Ship Channel (DWSC) Organic Enrichment and Low Dissolved Oxygen TMDL*

The Lower San Joaquin River, San Joaquin River and Stockton DWSC Organic Enrichment and Low Dissolved Oxygen TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:[48]
The Central Valley Regional Water Board has determined that the Cities of Atwater, Ceres, Delhi, Hughson, Lathrop, Livingston, Los Banos, Manteca, Merced, Oakdale, Patterson, Ripon, Riverbank and Turlock, the Counties of Merced, San Joaquin and Stanislaus, Traditional MS4s, are sources of "Storm water discharges" subject to this Order and are responsible for implementing the requirements of this TMDL.

The CDPs of French Camp and Winton, listed in the originally adopted permit, have been removed from this TMDL. These permittees were removed because they exist within existing MS4 areas subject to this permit (i.e. the counties they are located in). Therefore, it was determined that these permittees should not have been included in Appendix G under this TMDL and thus have been removed.

Wasteload Allocations:
The San Joaquin River Dissolved Oxygen Control Program set the wasteload allocations for NPDES-permitted discharges of oxygen demanding substances and their precursors as the effluent limitations that were applicable on 28 January 2005. On 28 January 2005, the 2003 Phase II MS4 permit stated the following for effluent limitations in section C.1. Effluent Limitations: Permittees must implement BMPs that reduce pollutants in storm water to the technology-based standard of MEP. This Order applies these limitations to discharges from MS4s maintained by the Phase II Entities listed above. In determining compliance with permit requirements related to attainment of these wasteload allocations, credit will be given for control measures implemented after 12 July 2004.

The San Joaquin River Dissolved Oxygen Control Program defines oxygen demanding substances and their precursors as any substance or substances that consume, have the potential to consume, or contribute to the growth or formation of substances that consume or have the potential to consume oxygen from the water column.

Deliverables/Actions Required:
To comply with the WLAs established in this TMDL, the Phase II entities shall comply with the provisions of this Order. Specific actions taken to comply with this TMDL will be documented in the Annual Report along with a discussion on the effectiveness of the BMPs implemented and actions taken to improve the effectiveness in meeting the WLAs.

The permittees will also conduct monitoring to show compliance with the TMDL based upon a submitted Monitoring Plan. As an alternative, the permittees may participate in the Bay Delta

---

[48] The Fact Sheet is not consistent with the final amendment adopted by the State Water Board. (See Attachment G) The cities of Escalon and Newman should have been named here and the city of Delhi should have been removed.

Page 113

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000848

Regional Monitoring Program, upon Central Valley Regional Water Board Executive Officer approval.

The deadline for attainment of WLAs was December 31, 2011. Therefore, the WLA is to be achieved immediately. The Cities of Atwater, Ceres, Escalon, Hughson, Lathrop, Livingston, Los Banos, Manteca, Merced, Newman, Oakdale, Patterson, Ripon, Riverbank and Turlock, the Counties of Merced, San Joaquin and Stanislaus may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

*Demonstration of Compliance with Effluent Limitations Associated with Wasteload Allocations for Oxygen Demanding Substances and Their Precursors*
Compliance with the effluent limitations in Section C.1 of this permit associated with the wasteload allocations for oxygen demanding substances and their precursors may be demonstrated by any one of the following methods:

a. Receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.
b. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

For those Permittees that have not demonstrated achievement of WLA by the attainment date (shown above), implementation of BMPs consistent with an Executive Officer-approved Management Plan that outlines BMPs and a schedule to reduce discharges of oxygen demanding substances and their precursors to attain the WLA is required. Management Plans shall be developed within twelve months after adoption of this Attachment G. It is not the intention of the State Water Board or the Central Valley Water Board to take enforcement action against Permittees for violation of Section C.1 effluent limitations related to the WLA while the Plan is being developed and implemented, provided the Permittee develops the Plan in accordance with applicable implementation schedules. The Permittee may also request a time schedule order incorporating the implementation measures and compliance schedule of the Management Plan.

### Delta Methylmercury TMDL
On April 22, 2010, the Central Valley Regional Water Board adopted Resolution No. R5-2010-0043 to amend the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins (Basin Plan) to include a methylmercury TMDL and an implementation plan for the control of methylmercury and total mercury in the Sacramento-San Joaquin Delta Estuary (Delta Mercury Control Program). The Basin Plan amendment includes the addition of: (1) site-specific numeric fish tissue objectives for methylmercury; (2) the commercial and sport fishing (COMM) beneficial use designation for the Delta and Yolo Bypass; (3) methylmercury load allocations for non-point sources and wasteload allocations for point sources; and (4) an implementation plan that includes adaptive management to address mercury and methylmercury in the Delta and Yolo Bypass.

The Delta TMDL covers the Counties of Alameda, Contra Costa, Sacramento, San Joaquin, Solano and Yolo both within legal Delta boundary defined by California Water Code Section 12220 and the Yolo Bypass, a 73,300-acre floodplain on the west side of the lower Sacramento River.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000849

The Delta is on the Clean Water Act Section 303(d) List of Impaired Water Bodies because of elevated levels of mercury in fish. Beneficial uses of the Delta that are impaired due to the elevated methylmercury levels in fish are wildlife habitat (WILD) and human consumption of aquatic organisms. The Delta provides habitat for warm and cold-water species of fish and their associated aquatic communities. Additionally, the Delta and its riparian areas provide valuable wildlife habitat. There is significant use of the Delta for fishing and collection of aquatic organisms for human consumption. Further, water is diverted from the Delta for statewide municipal (MUN) and agricultural (AGR) use.

Mercury in the Central Valley comes primarily from historic mercury and gold mines and from resuspension of contaminated material in stream beds and banks downstream of the mines, as well as from modern sources such as atmospheric deposition from local and global sources, waste water treatment plants, and urban runoff. Methylmercury, the most toxic form of mercury, forms primarily by sulfate reducing bacteria methylating inorganic mercury. Sources of methylmercury include methylmercury flux from sediment in open water and wetland habitats, urban runoff, irrigated agriculture, and waste water treatment plants. Water management activities, including water storage, conveyance, and flood control, can affect the transport of mercury and the production and transport of methylmercury.

Phase II Entities:

The Delta Mercury Control Program assigns mass-based methylmercury TMDL allocations to all sources of methylmercury in the Delta and Yolo Bypass, including urban runoff from Phase I and Phase II MS4s. In the Delta and Yolo Bypass, the TMDL assigns individual methylmercury wasteload allocations to the following small urban runoff agencies:

> City of Lathrop
> City of Lodi
> City of Rio Vista
> County of San Joaquin
> City of West Sacramento
> County of Yolo
> City of Tracy

The County of Solano is being removed from this TMDL. The Delta TMDL was based on information available at the time of its development. The Delta Methylmercury TMDL Staff Report calculated urban runoff methylmercury allocations using the Department of Water Resources' land use designations for urban and other land uses within the legal Delta boundary. A recent review of Solano County's 2003 Storm Water Management Plan, which is relevant because this plan was in effect when the Delta TMDL was developed, revealed a discrepancy between the acreages used to assess urban areas. The County's Storm Water Management Plan indicated that the MS4 permit jurisdiction only applied to the County's urbanized areas defined by the 2000 Census. The County's maps indicate there are no urbanized areas within the legal Delta boundaries.

While methylmercury from urbanized areas covered by the County's Phase II MS4 program does discharge to the Delta, the methylmercury allocations included in the TMDL should have been assigned only to the County's MS4 urbanized areas within the Delta and Yolo Bypass. Based on the 2003 Storm Water Management Plan, the urban acreage is zero and subsequently there should not be an allocation assigned to this area. This discrepancy will be

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000850

corrected when the Central Valley Regional Water Board conducts a full review of the TMDL in 2020.

Therefore, at this time the Solano County MS4 program is not subject to the Delta Mercury Control Program requirements, including attainment of the allocations or compliance with mercury exposure reduction program (MERP) requirements.

Wasteload Allocations:
The methylmercury wasteload allocations are as follows:

**Methylmercury Wasteload Allocations Table**

| Municipality | Wasteload Allocations, Methylmercury (grams per year) |
|---|---|
| City of Lathrop | 0.097 |
| City of Lodi | 0.053 |
| City of Rio Vista | 0.0078 |
| City of Tracy | 0.65 |
| City of West Sacramento (Sacramento River subarea) | 0.36 |
| City of West Sacramento (Yolo Bypass subarea) | 0.28 |
| County of San Joaquin (Central Delta subarea) | 0.57 |
| County of San Joaquin (Mokelumne River subarea) | 0.016 |
| County of San Joaquin (Sacramento River subarea) | 0.11 |
| County of San Joaquin (San Joaquin River subarea) | 0.79 |
| County of Yolo (Sacramento River subarea) | 0.041 |
| County of Yolo (Yolo Bypass subarea) | 0.083 |

Deliverables/Actions Required:
Mercury is often attached to sediment, and the formation of methylmercury is linked in part to the concentration of mercury concentrations in sediment. Reductions in mercury concentrations will result in methylmercury reductions and subsequently methylmercury levels in fish. To comply with the TMDL, the agencies are required to implement best management practices to control erosion and sediment discharges with the goal of reducing mercury discharges. Methylmercury wasteload allocations for MS4 dischargers in the Delta and Yolo Bypass shall be met as soon as possible, but no later than December 31, 2030, unless the Central Valley Regional Water Board modifies the implementation schedule and final attainment date. Compliance will be determined by the method(s) described further in this document.

*Demonstration of Attainment of Methylmercury Wasteload Allocations:*
Compliance with the effluent limitations in Section C.1 of this permit associated with methylmercury wasteload allocations may be demonstrated by any one of the following methods:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000851

a. Management Plans shall be developed within one year after the Central Valley Regional Water Board's review of the Delta Mercury Control Program or October 20, 2022, whichever date occurs first. For those MS4 Permittees that have not demonstrated achievement of WLA by December 31, 2030, the MS4s shall implement BMPs consistent with an approved updated Management Plan that shall outline BMPs and schedule to reduce discharges of methylmercury to ultimately attain the WLA.

b. Receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.

c. Attainment of WLAs within the discharge (monitoring representative of the MS4 discharge may be used with Executive Officer approval).

d. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

### *Clear Lake Nutrients TMDL*

The Clear Lake Nutrients TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Central Valley Regional Water Board has determined that the Cities of Clearlake and Lakeport, and the County of Lake, Traditional MS4s, are sources of "storm water" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:

The County of Lake, City of Clearlake and City of Lakeport have a combined wasteload allocation of 2,000 kg phosphorus/yr, as an average annual load (five year rolling average).

Deliverables/Actions Required:

To comply with the WLAs established in this TMDL, the Phase II entities shall comply with the provisions of this Order. Specific actions taken to comply with this TMDL will be documented in the Annual Report along with a discussion on the effectiveness of the BMPs implemented and actions taken to improve the effectiveness in meeting the WLAs.

The permittees will also conduct monitoring to show compliance with the TMDL based upon a submitted Monitoring Plan. As an alternative, the permittees may participate in a regional monitoring program, upon Executive Officer approval.

The deadline for attainment of WLAs is June 19, 2017. Therefore, the WLA are effective immediately. The Cities of Clearlake and Lakeport, and the County of Lake may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### *Demonstration of Compliance with Effluent Limitations Associated with Phosphorus Wasteload Allocations*

Compliance with the effluent limitations in Section C.1 of this permit associated with the phosphorus wasteload allocation may be demonstrated by any one of the following methods:

a. Receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.

b. Attainment of WLA within the discharge (monitoring representative of the MS4 discharge may be used with Executive Officer approval).

c. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000852

d. For those Permittees that have not demonstrated achievement of WLA by the attainment date (shown above), implementation of BMPs consistent with an Executive Officer-approved Management Plan that outlines BMPs and a schedule to reduce discharges of phosphorus to ultimately attain the WLA is required. Management Plans shall be developed by [Hard Date: 12 months from Adoption]. The Central Valley Regional Water Board Executive Officer may require revisions to the Management Plan if the Management Plan is not likely to attain the waste load allocations.

## *LAHONTAN REGIONAL WATER BOARD TMDLs*

### *Middle Truckee River Watershed and Placer, Nevada and Sierra Counties Sediment TMDL*

The Middle Truckee River Watershed and Placer, Nevada and Sierra Counties Sediment TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Lahontan Regional Water Board has determined that the City of Truckee and the County of Placer, Traditional MS4s, are sources of "Urban areas" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The following wasteload allocations are applicable:

*Urban Areas Wasteload Allocations:*
    4,936 tons per year of total suspended sediment load.

*Non-urban Wasteload Allocations:*
    35,392 tons per year of total suspended sediment load.

Deliverables/Actions Required:
To comply with the WLAs of this TMDL, the permittees will be required to track and report on the amount of road sand, used for de-icing, used and recovered. The permittees will also rehabilitate old dirt roads to control erosion and to prevent erosion from legacy sites. They will also implement an Education and Outreach program for ski areas within their jurisdiction for sediment and erosion control. They will also be required to continue implementation of their municipal monitoring program.

Attainment of wasteload allocations will be determined based on a target of 25 milligrams per liter, or less, of suspended sediment. The estimated time frame for meeting the numeric targets and achieving the TMDL is 20 years (i.e. 2028).

## *SANTA ANA REGIONAL WATER BOARD TMDLs*

### *San Diego Creek, Upper and Lower Newport Bay Organochlorine Compounds TMDL*

The Newport Bay watershed is a highly urbanized watershed. The two nontraditional MS4s in this watershed, Orange County Fairgrounds and University of California - Irvine, are both tributary to traditional MS4s that discharge to the Santa Ana Delhi Channel and San Diego Creek Reach 1, respectively. The implementation requirements and wasteload allocations assigned to the traditional MS4s in the TMDLs that have been established for the Newport Bay

Page 118

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000853

watershed, including both Regional Board adopted and USEPA promulgated TMDLs that are still in effect, therefore apply to these two nontraditional MS4s.

<u>Phase II Entities:</u>

The Santa Ana Regional Water Board has determined that the University of California, Irvine and the Orange County Fairgrounds, Non-Traditional MS4s, are sources of "Urban runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

<u>Wasteload Allocations:</u>

Not Applicable

<u>Deliverables/Actions Required:</u>
The Santa Ana Regional Board has determined that the contribution by these non-traditional MS4s into the MS4 systems currently owned and operated by agencies implementing storm water programs regulated by Phase I permits are minimal in comparison. Therefore, the Santa Ana Regional Water Board has determined that for these non-traditional entities, consultation with Regional Water Board staff is needed to determine proposed actions and evaluations that will satisfy the goals and assumptions of the TMDL.

The TMDL specifies that the final WLAs are to be achieved by December 31, 2020.

### ***Lake Elsinore and Canyon Lake Nutrients TMDL***
The former March Air Reserve Base was downsized and became known as March ARB. March ARB is an active military base that covers 2,300 acres. Activities in the base proper includes military activities such as air refueling, air cargo, air reconnaissance, military interceptors, military housing, recreational and dining facilities, commercial air cargo, training facilities, schools, operations centers for troop transport and industrial, including airport operations. Land use activities are under Base commander authority. The Base is currently covered under an individual industrial storm water permit for their industrial operations and is a stakeholder under the Lake Elsinore/Canyon Lake TMDL. In addition to industrial permit monitoring, the Base monitors their compliance with the TMDL. Regional Water Board staff determined that Phase II permit coverage is an appropriate permit to address the pollutants and flows generated from Base operations. Development and redevelopment post construction controls are of particular importance to be incorporated into the base's storm water program through Phase II permit coverage.

<u>Phase II Entities:</u>

The Santa Ana Regional Water Board has determined that the March ARB, a Non-Traditional MS4, is a source of "Urban discharges" subject to this Order and is responsible for implementing the requirements of this TMDL.

<u>Wasteload Allocations: (shared for all Urban discharges)</u>
Final WLA for Total Phosphorus (expressed as 10 year rolling average):
     124 kilograms per year

Final WLA for Total Nitrogen (expressed as 10 year rolling average):
     349 kilograms per year

<u>Deliverables/Actions Required:</u>
March ARB has already committed to cooperative implementation actions, monitoring actions, special studies and implementation actions jointly with other responsible agencies as an active

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000854

paying member of the Lake Elsinore/Canyon Lake TMDL Task Force. Therefore, continuation of this commitment will be required as part of this TMDL.

The TMDL specifies that the final WLAs are to be achieved by December 31, 2020.

### ***Middle Santa Ana River Bacterial Indicator TMDL***
The Middle Santa Ana River Bacterial Indicator TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

The University of California, Riverside, the California Institute for Women and the California Institute for Men are nontraditional MS4s that are tributary to traditional MS4s that discharge to the Middle Santa Ana River (MSAR). The Regional Board adopted a Total Maximum Daily Load for bacterial indicators (E. coli) in 2005 that requires the Cities' and Counties' MS4 systems tributary to the MSAR to develop and implement Comprehensive Bacterial Reduction Plans (CBRP) to achieve attainment of the Wasteload allocations contained in the TMDL. A wide variety of entities, from traditional MS4s, to dairies, Caltrans and water and wastewater agencies have formed a stakeholder group that conduct the Regional TMDL compliance monitoring and conduct studies on the effectiveness of the BMPs implemented through the CBRP.

Phase II Entities:
The Santa Ana Regional Water Board has determined that the California State Polytechnic University, Pomona[49], the University of California, Riverside, the California Institute for Men, the California Institute for Women, and the California Rehab Center, Non-Traditional MS4s, are sources of "Urban runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The following are receiving water allocations. Logarithmic mean values shall be calculated based on a minimum of 5 samples during any 30 day period.

Dry Season (April 1 through October 31) to be achieved by December 31, 2015:
> *E. coli*
> 5–sample/30–day Logarithmic Mean less than 113 organisms per 100 milliliters, and not more than 10% of the samples exceed 212 organisms per 100 milliliters for any 30–day period.

Wet Season (November 1 through March 31) to be achieved by December 31, 2025:
> *E. coli*
> 5–sample/30–day Logarithmic Mean less than 113 organisms per 100 milliliters, and not more than 10% of the samples exceed 212 organisms per 100 milliliters for any 30–day period.

Deliverables/Actions Required:
In order to meet the goals and assumptions of this TMDL, Regional Water Board staff has determined that the entities listed may either: 1) develop and implement a facility-specific

---

[49] The Fact Sheet is not consistent with the final amendment adopted by the State Water Board. (See Attachment G) California State Polytechnic, Pomona should have been removed.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000855

CBRP or 2) participate in an updated watershed-based CBRP. The CBRP will discuss the various BMPs that will be employed and whether or not they are effective in meeting the WLA for both the dry and wet seasons.

The implementation of a Regional Water Board approved facility-specific or watershed-based CBRP will constitute compliance with the TMDL.

## SAN DIEGO REGIONAL WATER BOARD TMDLs

Attachment G provides specific provisions for implementing the load allocations (LAs) and wasteload allocations (WLAs) of Total Maximum Daily Loads (TMDLs) adopted by the San Diego Water Board and approved by OAL and USEPA in which Phase II dischargers are identified as responsible for discharges and subject to the requirements of the TMDLs. Each TMDL for which Phase II dischargers are identified as responsible for discharges was publicly noticed as part of the TMDL development and adoption. Additionally, San Diego Water Board staff met with each enrolled Phase II discharger to discuss the requirements of the Phase II permit and their responsibilities for compliance with the TMDLs. Therefore, Phase II dischargers were informed that their responsibilities for compliance with the TMDL will be implemented through their enrollment in the Phase II Permit.

The following requirements for implementing the TMDLs in this Order are based on and consistent with the assumptions and requirements of any available adopted and approved TMDLs that have been incorporated into the San Diego Regional Water Board's Basin Plan.

A modification to a TMDL in the Basin Plan requires a Basin Plan amendment, which includes a separate public process. If and when the TMDLs are modified in the Basin Plan, the San Diego Regional Water Board will notify the State Water Board of the need to revise the requirements of Order 2013-0001-DWQ in accordance with the Basin Plan amendment as soon as possible.

The Chollas Creek Dissolved Metals TMDL was removed from this Order because all named entities in Attachment G, as adopted, were Phase I entities and thus not subject to the requirements of this Order.

### *Bacteria Project I TMDL – Twenty Beaches and Creeks in the San Diego Region (Including Tecolote Creek)*

The Bacteria Project I Total Maximum Daily Load (Bacteria I TMDL) addresses the Clean Water Act section 303(d) bacteria impairment listings for 20 impaired water quality limited segments within the following watersheds or portions of watersheds: Laguna/San Joaquin, San Juan, San Clemente, San Luis Rey, San Marcos, San Dieguito River, Miramar Creek, Scripps HA, Tecolate HA, San Diego River, and Chollas Creek.

The greatest causes of waterbody impairments in the San Diego Region in 2002 were elevated bacteria levels and subsequent beach closures. The presence of pathogens and the probability of disease are directly correlated with the presence of human waste sources and currently measured by the density of indicator bacteria (fecal coliform, total coliform, and enterococcus) in waters used for recreation. When the Bacteria I TMDL wasteload allocations (WLAs) are achieved, health risks associated with pathogens are expected to be minimal.

Phase I and Phase II municipal dischargers are the most significant controllable sources of bacteria. With respect to Phase II dischargers, the Bacteria I TMDL is "implemented primarily

Page 121

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000856

by requiring compliance with the existing general WDRs and NPDES requirements that have been issued for Phase II MS4 discharges." Section F.5 of this Order requires dischargers within the impaired water quality segments identified in the Bacteria I TMDL to develop and/or implement a Storm Water Pollution Prevention Plans (SWPPP). This Order also requires enrolled Phase II dischargers to identify all potential bacteria contributions from their site and implement pollutant control strategies and BMPs to reduce bacteria. Non-storm water discharges are not authorized unless they meet the requirements as set forth in section B of this Order.

Because Phase II dischargers are required to develop SWPPPs with BMP implementation strategies to reduce the bacteria loads in accordance with the TMDL implementation schedule, Phase II MS4 dischargers that are enrolled and in compliance with the provisions of this Order are deemed in compliance with the Bacteria I TMDL unless they are identified as a significant source of bacteria as discussed below. The legally responsible parties (LRPs) must demonstrate that the discharges from the Phase II facility do not contribute to the bacteria wet and dry mass load impairments through monitoring data. The Regional Water Boards retain the authority to require Phase II MS4 dischargers to revise their SWPPPs, EPA Reports, or monitoring programs as well as to direct a discharger to obtain an individual NPDES permit if additional controls are necessary.

Phase II Entities:

The Bacteria Project I TMDL identifies responsible dischargers contributing to indicator bacteria exceedances in REC-1 designated receiving waters for 20 listings of beaches and inland water bodies. The specific Phase II entities within the impaired water quality segments identified in the Bacteria I TMDL are: the United States Marine Corps Base Camp Pendleton, the University of California, San Diego, San Diego State University, California State University, San Marcos, the 22nd Agricultural Association, the Marine Corps Air Station Miramar, the North County Transit District and the San Diego Veterans Administration Medical Center, all Non-Traditional MS4s.

Wasteload Allocations:

The Bacteria Project I TMDL basin plan amendment assigned the total WLA for each indicator bacteria for wet and dry mass loading to receiving waters to all identified Phase II dischargers.

The allowable load consists of two parts: 1) the bacteria load that is calculated based on the San Diego Regional Water Board's REC-1 WQOs and, 2) the bacteria load that is associated with the allowable exceedance frequency (i.e. allowable exceedance days). Allowable exceedance days are calculated based on the allowable exceedance frequency and total number of wet days in a year.

Dry Weather WLA

The Bacteria I TMDL assumes no discharge of surface runoff or bacteria from agricultural, open space, and CalTrans land uses. As such, the dry weather WLA was assigned entirely to the Municipal MS4s (Phase I and Phase II). Table, below, excerpts the dry weather WLAs assigned for Municipal MS4s (Phase I and Phase II) within the impaired water quality segments identified in the Bacteria I TMDL.

Wet Weather WLA

The Wet Weather TMDL discharges of surface runoff and bacteria was assigned to all land use allocations. The WLAs for Caltrans, agricultural, and open space were set to the existing

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000857

bacteria loads predicted for wet weather. The remainder of the wasteload allocation was assigned to Municipal MS4s (Phase I and Phase II). Table, below, excerpts the wet weather WLAs assigned for Municipal MS4s (Phase I and Phase II) within the impaired water quality segments identified in the Bacteria I TMDL.

## Table 1: Excerpts of Wasteload Allocations (WLAs)

[All units are Billion Most Probable Number/year]

| Watershed | Fecal Coliform Wet Weather | Fecal Coliform Dry Weather | Enterococcus Wet Weather | Enterococcus Dry Weather | Total Coliform Wet Weather | Total Coliform Dry Weather |
|---|---|---|---|---|---|---|
| San Joaquin Hills /Laguna Beach HSAs (901.11 and 901.12) | 37,167 | 227 | 66,417 | 40 | 880,652 | 1,134 |
| Aliso HSA (901.13) | 477,069 | 242 | 735,490 | 40 | 8,923,264 | 1,208 |
| Dana Point HSA (901.14) | 152,446 | 92 | 219,528 | 16 | 3,404,008 | 462 |
| Lower San Juan HSA (901.27) | 1,156,419 | 1,665 | 1,385,094 | 275 | 16,093,160 | 8,342 |
| San Clemente HA (901.30) | 192,653 | 192 | 295,668 | 33 | 3,477,739 | 958 |
| San Luis Rey HU (903.00) | 914,026 | 1,058 | 1,300,235 | 185 | 14,373,954 | 5,289 |
| San Marcos HA (904.50) | 6,558 | 26 | 23,771 | 5 | 298,430 | 129 |
| San Dieguito HU (905.50) | 798,175 | 1,293 | 1,763,603 | 226 | 16,660,538 | 6,468 |
| Miramar Reservoir HA (906.10) | 6,703 | 7 | 8,109 | 1 | 171,436 | 36 |
| Scripps HA (906.30) | 101,253 | 119 | 232,035 | 21 | 3,447,764 | 594 |
| Tecolote HA (906.5) | 126,806 | 234 | 471,211 | 39 | 5,136,598 | 1,171 |
| Mission San Diego/Sante e HSAs (907.11 and 907.12) | 221,117 | 1,506 | 890,617 | 248 | 10,790,520 | 7,529 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000858

| Watershed | Fecal Coliform Wet Weather | Fecal Coliform Dry Weather | Enterococcus Wet Weather | Enterococcus Dry Weather | Total Coliform Wet Weather | Total Coliform Dry Weather |
|---|---|---|---|---|---|---|
| Chollas HSA (908.22) | 252,479 | 398 | 802,918 | 66 | 9,880,784 | 1,991 |

Deliverables/Actions Required:

Implementation actions applicable to Phase II dischargers and the relevant attainment deadlines set forth in the TMDL are provided below.

**Bacteria Project I TMDL Actions and Deadlines Table**

Note A: Wet: single sample maximum REC-1 WQOs Dry: 30-day geometric mean REC-1 WQOs. The percent reduction for each compliance year applies to the total number of samples taken that comply with Resolution No. R9-2010-0001. The maximum allowable percent exceedance frequency for the single sample maximum (wet weather days only) is 22% (Resolution No. R9-2010-0001, Finding 10). For dry weather days, there is no maximum allowable exceedance and it is set at 0%. The Compliance Year percent reductions are based on the total number of samples taken. For Example: If in Year 5 of the compliance schedule, 100 samples are taken, only 50% of those samples can exceed the single sample maximum for wet weather by 22% of the maximum allowable percent exceedance frequency for the single sample maximum. By Year 10+, no samples can exceed the Exceedance Frequency. Baseline years for wet and dry days shall be as identified in Order No R9 2015-0001 Attachment E for the Bacteria I TMDL.

Note B: Priorities are defined in Resolution No. R9-2010-0001, Attachment A, pg. 63-65.

Note C: Phase II MS4 enrolled under the State General Permit for Small MS4s or issued an individual NPDES permit, are considered a Municipal Discharger along with Phase I MS4s in this Implementation Milestone item.

| Implementation Action | Responsible Party | Date |
|---|---|---|
| Submit annual progress reports or Update SWPPPs/SWMPS/LRPS in accordance with RB Accepted LRPs | Phase II Permittees | Upon Enrollment in General Permit |
| Meet Wet and Dry Weather Frequency Exceedance Milestones | Phase II MS4s | |
| 50% Reductions [Notes A, C] – Priority [Note B] 1 | Phase II MS4s | April 4, 2016 |
| 50% Reductions [Notes A, C] – Priority [Note B] 2 | Phase II MS4s | April 4, 2017 |
| 50% Reductions [Notes A, C] – Priority [Note B] 3 | Phase II MS4s | April 4, 2018 |
| 100% Reductions [Notes A, C] – Priority [Note B] 1,2,3 | Phase II MS4s | April 2, 2021+ |

The Bacteria I TMDL also requires Phase II dischargers to take other actions to control their risk of bacteria discharges such as monitoring. Because Phase I MS4s often discharge directly into the receiving waters addressed by the TMDL, the Bacteria I TMDL states that Phase I MS4s are primarily responsible for conducting the TMDL compliance monitoring. However, Phase II MS4s are also responsible for monitoring to identify sources that may need additional controls to reduce bacteria loads. Enrollment in this Order satisfies these monitoring obligations because all Phase II MS4 dischargers assigned a WLA in a TMDL are required to conduct the monitoring in Attachment G pursuant to section F.5.i.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000859

The Phase II Entities, listed above, must be in compliance with the final TMDL requirements according to the following attainment dates:

*The Wet Weather TMDL Attainment Date in parenthesis in the table below applies if the applicable Storm Water Pollution Prevention Plan does not include load reduction programs for other constituents (e.g. metals, pesticides, trash, nutrients, sediment, etc.) together with bacteria load reduction requirements of this TMDL.

| Constituent | Dry Weather TMDL Attainment Date | Wet Weather TMDL Attainment Date* |
|---|---|---|
| Total Coliform; Fecal Coliform; *Enterococcus* | April 4, 2021 | April 4, 2031 (April 4, 2021) |

A Storm Water Pollution Prevention Plan that includes a bacteria load reduction program is expected to include information similar to what is described in the section called Bacteria Load Reduction Plan Outline in Appendix P of the Final Technical Report to Order No. 2010-0001. A Storm Water Pollution Prevention Plan that includes a load reduction program for multiple constituents together with bacteria load controls is expected to include information similar to what is described in the section called Comprehensive Load Reduction Plan Outline in Appendix P of the Final Technical Report to Order No. 2010-0001. Some of the components described in both outlines may be satisfied through collaboration with the Phase I MS4 dischargers, as their efforts to comply with the Bacteria TMDL include implementing controls, monitoring, and reporting.

### *Los Peñasquitos Lagoon Sediment TMDL*
The Los Peñasquitos watershed area (Hydrologic Unit (HU) 906.00) includes the Los Peñasquitos Lagoon, the Carroll Canyon Creek, Los Peñasquitos Creek, and Carmel Creek. The Los Peñasquitos Lagoon Sediment TMDL addresses the Clean Water Act section 303(d) sediment impairment for the lagoon for impacts resulting from rapid sedimentation and habitat loss.

Sediment is particulate organic and inorganic matter that is mobilized by erosion due to wind, precipitation or anthropogenic causes and carried by water. Sediment is a natural occurrence found in runoff from all locations in the watershed in varying concentrations. Concentrated flow with intensified velocities or volumes has the capability to magnify erosion rates resulting in rill erosion, gully erosion, and channel incision which correlates to an increased sediment supply into the Lagoon. Impacts from sediment in the Lagoon include reduced tidal mixing in lagoon channels, degraded and/or net loss of salt marsh vegetation, increased potential for flooding surrounding areas, increased turbidity, and constricted wildlife corridors.

Reducing erosion and concentrated flows by utilizing Best Management Practices (BMPs) that stabilize loose soil sources and/or retaining storm water onsite will decrease the impacts from excessive and rapid sediment transport into the lagoon.

Phase II Entities:
The San Diego Regional Water Board has determined that the Marine Corps Air Station, Miramar, the North County Transit District, the San Diego Veterans Administration Medical Center and the University of California, San Diego, Non-Traditional MS4s, are "Phase II MS4 permittees" subject to this Order and are responsible for implementing the requirements of this TMDL.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000860

Wasteload Allocations:

The Los Peñasquitos Lagoon TMDL basin plan amendment assigned interim and final WLAs to all identified responsible parties. WLAs are expressed in effluent limitations. Interim effluent limitations are described in **Error! Reference source not found.** with a final effluent limitation of 2,580 tons/year assigned to all identified responsible parties. Responsible parties are jointly responsible for meeting these wasteload reduction allocations. As such, Phase II dischargers within the Los Peñasquitos watershed are required to either reduce site sediment loads to the receiving water body or demonstrating that the site discharges are not causing exceedances of the water quality based effluent limitations in **Error! Reference source not found.** (interim WQBELs) and the final WQBEL of 2,580 tons/year. Phase II dischargers are also required to sample for total suspended solids (TSS) concentrations and representative, or estimated, flow rates from discharge locations in addition to quantify contributions of sediment loads from their sites that cause or threaten to cause an exceedance of the effluent limitations in **Error! Reference source not found.** or the final WLA.

*Interim WLAs:*

**Interim Water Quality Based Effluent Sediment Limitations Expressed as a Wet Season Load in MS4 Discharges from the Watershed to Los Peñasquitos Lagoon Table**

\*Phase I MS4s, Phase II MS4s, Caltrans, and general construction and industrial permit dischargers are jointly responsible for achieving the interim and final effluent limitations.

| Interim Effluent Limitation #1 | 6,691 tons/wet season |
| Interim Effluent Limitation #2 | 5,663 tons/wet season |
| Interim Effluent Limitation #3 | 4,636 tons/wet season |
| Interim Effluent Limitation #4 | 3,608 tons/wet season |

*Final WLAs:*

The final Watershed Wasteload Allocation (Watershed WLA) of 2,580 tons/year is assigned collectively to all of the responsible parties identified in the TMDL and represents all current point and nonpoint sources of sediment from the watershed to the Lagoon. Attainment of the Final Watershed WLA requires a 67% total load reduction of sediment from the watershed.

Deliverables/Actions Required:

The implementation actions applicable to Phase II dischargers and the relevant compliance deadlines set forth in the TMDL are provided below.

| Implementation Action | Responsible Party | Date |
|---|---|---|
| Revision of SWPPPs | Construction, Industrial, and Phase II Permittees | July 14, 2015 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000861

| Implementation Action | Responsible Party | Date |
|---|---|---|
| Meet Additional Monitoring Requirements:<br>• Provide total suspended solids (TSS) concentrations and estimate of a representative flow rate from their facility discharge points during each wet season for one storm event of 0.5 inches or greater | Phase II MS4s, and general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | July 14, 2015 |
| Meet Additional Reporting Requirements:<br>• Submit TSS concentrations and the representative flow estimate as a PDF attachment to SMARTS entitled *Los Peñasquitos Lagoon Sediment TMDL Monitoring* annually on July 14 | All Phase II MS4s, general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | July 14, 2015 |
| Meet Interim Milestones:<br>• 6,691 tons/wet season<br>• 5,663 tons/wet season<br>• 4,636 tons/wet season<br>• 3,608 tons/wet season | All Phase I, Phase II MS4s, Caltrans, and general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | December 31, 2019<br>December 31, 2023<br>December 31, 2027<br>December 31, 2029 |
| Meet Final Milestone:<br>• 2,580 tons/wet season | All Phase I, Phase II MS4s, Caltrans, and general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | July 14, 2034 |

The Los Peñasquitos Lagoon Sediment TMDL requires all responsible parties to submit a Load Reduction Plan. All enrolled dischargers must identify all potential sediment contributions from their site, implement BMPs to reduce sediment and erosion, and sample discharges for flow rate and total suspended solids (TSS) to assess the facility's effect on the receiving water body and to inform the Phase I Watershed Management Area Water Quality Improvement Plan. A discharger's development or an update of a SWPPP in accordance with section F.5.f.4 satisfies the TMDL requirement to prepare a Load Reduction Plan because this Order requires enrolled dischargers to take actions to control their risk of sediment discharges. Additionally, non-storm water discharges are not authorized unless they meet the requirements as set forth in section B of this Order.

In addition to the monitoring requirements in sections E.13 (b) and E.15 (d) of the Order, Phase II dischargers are required to provide TSS concentrations and an estimate of a representative flow rate from their facility during each wet season for one storm event of 0.5 inches or greater. The Phase II discharger shall submit the TSS concentrations and representative flow estimates as a PDF attachment to SMARTS entitled Los Peñasquitos Lagoon Sediment TMDL Monitoring annually on July 14.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000862

Monitoring and Reporting

The Los Peñasquitos Lagoon Sediment TMDL requires all Responsible Parties to contribute information regarding the amount of sediment discharged from their facilities[50]. This monitoring must address, at a minimum, representative flow rates and TSS concentrations whenever long-term discharges[51] occur. The monitoring program set forth in sections E.13 (b) and E.15 (d) of the General Permit only partially meets these requirements because the General Permit does not require dischargers to monitor for representative flow rates. Therefore, dischargers must conduct additional monitoring to that required in sections E.13 (b) and E.15 (d) of the General Permit to be in compliance with the Los Peñasquitos Lagoon Sediment TMDL.

Representative flow rate can be determined by using one of the following methods: 1) flow meter or 2) the float method. The float method is a field calculated estimate in accordance with the US EPA's NPDES Storm Water Sampling Guidance Document[52] for estimating flow rates[53]. To conduct the float method, the Discharger determines the cross sectional area of the representative discharge by estimating the flow depth and flow width in feet. The flow path must be a minimum of five feet in length. For ponded or no flow, a discharger shall record a flow rate of zero. The velocity[54] is estimated by measuring the time it takes the float (e.g. a floatable object, such as an orange peel or similar object), to float between point A and point B[55]. The flow rate shall be estimated for two 15 minute intervals.

The purpose of determining the flow rate is to calculate[56] the amount (i.e. load) of sediment being discharged from the site and informing a discharger as to whether their discharge is in compliance with the watershed WQBEL. Determination of the TSS concentrations and flow rate shall be conducted at a discharger's site during the wet season (October 1 through April 30) during one storm event of 0.5 inches or greater. Regardless of the method used to

---

[50] Resolution No. R9-2012-0033, Technical Report, p. A-9

[51] The TMDL does not define the duration of a rainfall event that would result in a "long term discharge" that is required to be monitored. Based on the TMDL's findings and source identification, increased flow and sedimentation impact the lagoon primarily during wet weather rainfall events. The San Diego Water Board has determined that the definition of "a long term discharge" is equivalent to a storm event that is 0.5 inches or greater because this size of a rain event is likely to result in the type of discharge that impacts the lagoon.

[52] USEPA. NPDES Storm Water Sampling Guidance Document, http://www3.epa.gov/npdes/pubs/owm0093.pdf, EPA 833-8-92-001, July 1992,  pp.49-50, sections 3.2.2 - 3.2.4, Estimating Total Flow Volumes for the Sampled Rain Event, exhibits 3-8,3-9, Estimating Flow Rates – Float Method

[53] Flow rate (cubic foot per second) = velocity (foot per second) x Area (square foot); cubic foot per second = cubic foot per second; Area = flow depth (foot) by flow width (foot).

[54] Velocity = length from point A to point B divided by time of travel

[55] Example: flow length = 5 foot; time of travel from point A to point B = 30 seconds. Flow depth is equal to 0.5 foot. Flow width = 1 foot. V= 5 foot per 30 seconds = 0.17 foot per second. Area=0.5 foot times 1.0 foot = .5 square foot. Flow rate = Q = 0.17 foot per second x 0.5 square foot = 0.085 cubic foot per second

[56] Load, or mass of a pollutant, is calculated by multiplying flow (Q) cubic foot per second times pollutant concentration (milligram per liter); US EPA NPDES Permit Writer's Manual, pp. 6.24 -6.25

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000863

determine a representative flow rate, flow rates shall be completed concurrently with the TMDL's required TSS sampling.

Dischargers shall report results of all required monitoring annually as part of their Annual Report. Specifically, flow and TSS data shall be reported as a PDF attachment to SMARTS with the Annual Report entitled Los Peñasquitos Lagoon Sediment TMDL Monitoring. Pursuant to section E.16, as amended, of this General Permit, Annual Reports are due on or before October 15. Submittal of the General Permit Annual Report meets the TMDL requirement to inform the Phase I MS4s in the Los Peñasquitos Watershed Management Area their efforts to achieve attainment of the watershed WLA and support restoration of the Lagoon salt marsh.

<u>Compliance Determination</u>
The Los Peñasquitos Lagoon Sediment TMDL includes interim attainment milestones for Phase II dischargers, in addition to the final attainment milestone date of July 14, 2034. The Los Peñasquitos Lagoon TMDL staff report states that "it is the responsibility of the Phase I MS4 Copermittees to assume the lead role in coordinating and carrying out the necessary actions, compliance monitoring requirements, and successful implementation of the adaptive management framework required as part of this TMDL." Therefore, Phase II MS4 dischargers in the Los Peñasquitos watershed "are assumed to be in compliance with the TMDL and their contribution to the total WLA if they:

1) Are enrolled in this Order; and
2) Have updated their SWPPP to include the BMPS to be implemented with monitoring required to assess the facility or property effects on the WLA; and
3) Are in compliance with this Order, and
4) Are conducting facility and monitoring assessments as required by this Order and that monitoring shows the Phase II MS4 responsible party discharges are not contributing to the sediment impairment in the Lagoon.

Phase II dischargers are encouraged to coordinate with Phase I Copermittees to meet the applicable TMDL load reduction requirements in Attachment G using an adaptive framework approach. Phase I Copermittees described the adaptive framework approach for each Watershed Management Area in the San Diego Region in a watershed specific Water Quality Improvement Plan. Coordinated efforts by both Phase I and Phase II dischargers will accomplish the wasteload reductions required in the TMDLs faster and achieve the ultimate goal of improving water quality as soon as possible.

Moreover, the San Diego Regional Water Board retains the authority to require Phase II dischargers within the Los Peñasquitos watershed to revise their SWPPPs, ERA Reports, or monitoring programs as well as to direct a discharger to obtain an individual NPDES permit if additional controls are necessary to meet the requirements of this TMDL.

## XIV.  STORM WATER MANAGEMENT PROGRAM FOR NON-TRADITIONAL MS4

*Differences between Traditional and Non-traditional MS4s*
Because of the differences between Traditional and Non-traditional MS4s this Order includes Section F to address their specific management structure.

Non-Traditional Small MS4s required to comply with this Order are identified in Attachment B.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000864

Non-traditional MS4s differ from cities and counties, because most potential sources of illicit discharges and storm water pollution are associated with activities under their direct operational control.

Some Non-traditional MS4s may also lack the legal authority or employ a different type of enforcement mechanism than a city/county government to implement their storm water program.

Certain Non-traditional Small MS4s such as Department of Defense and Department of Corrections and Rehabilitation Permittees required exemption from certain provisions due to security risks and/or compromised facility security.

**Program Management – Applicable to all Non-traditional MS4 Categories** Legal Authority: Clean Water Act § 40 CFR 122.26(d)(2)(i) and 40 CFR 122.34(b)(3)(ii)(B), (b)(4)(ii)(A), and (b)(5)(ii)(B).
MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA, EPA-833-R-07-003

*Program Management*
Program Management is essential to ensure that all elements of the storm water program are implemented on schedule and consistent with the Order requirements.

See Online Annual Reporting for further discussion later in this section.

*Legal Authority*
Legal authority to control discharges into a Permittee's storm sewer system is critical for compliance. Most Non-traditional MS4s lack the legal authority or employ a different type of enforcement mechanism than a city or county government to implement its storm water program. To the extent allowable under State and federal law, this Order requires each Non-traditional MS4 to operate with sufficient legal authority to control discharges into and from its MS4. The legal authority may be demonstrated by a combination of statutes, permits, contracts, orders, and interagency agreements. Non- traditional MS4 Permittees also do not generally have the authority to impose a monetary penalty. Although these differences exist, just like Traditional MS4s, Non- traditional MS4s must have the legal authority to develop, implement, and enforce the program.

*Coordination*
This Order allows Non-traditional MS4s to coordinate their storm water programs with other entities within or adjacent to their MS4 and allows the concept of a Separate Implementing Entity. A Separate Implementing Entity allows Permittees to leverage resources and skills. Additional information regarding SIEs is discussed later in this section.

**Education and Outreach Program**
Legal Authority: Clean Water Act § 40 CFR 122.34(b)(1).

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Because the population served by most Non-traditional MS4s will generally be served by the public education and outreach efforts of the local jurisdiction, the most useful supplement to those education and outreach efforts would be to label the Non-traditional MS4 catch basins. However, some Non-traditional MS4s such as universities have tenants and residents that may not be as effectively served by the local jurisdiction's public education and outreach program,

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000865

therefore a separate education and outreach program may be needed. Where the local jurisdiction's public education and outreach efforts do effectively target and reach these tenant and resident populations, the Non- traditional MS4s are not expected to duplicate those efforts.

Some Non-traditional MS4s are well suited for regional education and outreach. For example, school districts often have several schools located with a watershed or regional boundary. This Order allows Non-traditional MS4s to comply with the Education and Outreach provisions through a regional collaborative effort.

Regional outreach and collaboration requires the Permittees to define a uniform and consistent message, deciding how best to communicate the message, and how to facilitate behavioral changes.

## Public Involvement and Participation
Legal Authority: Clean Water Act § 40 CFR 122.34(b)(2)).

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Non-traditional MS4s have the same responsibilities as Traditional MS4s to ensure the storm water program is publicized and must involve the population they serve in the development of the program. However, the most effective BMP for Non-traditional MS4s is to provide up-to-date information about the storm water program online if the Non-traditional MS4 maintains a website, or the Non-traditional MS4 Permittee may choose to post information about their program on the local jurisdiction's website.

## Illicit Discharge Detection and Elimination Program
Legal Authority: Clean Water Act § 40 CFR 122.26(d)(2)(iv)(B)

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

The federal Phase II regulations require all MS4s to develop a process to trace the source of illicit discharges and eliminate them. The regulations also state that appropriate enforcement procedures and actions must be included in this process.

Unlike Traditional MS4s, Non-traditional MS4s have direct control of their own staff and contractors. Therefore, the enforcement provisions identified in the Illicit Discharge Detection and Elimination program are often not applicable to Non-traditional MS4 Permittees. Non-traditional MS4 Permittees should address illicit non-storm water discharges through the implementation of a Spill Response Plan However, Non- traditional MS4 Permittees often comply with existing state/federal regulations that required a Spill Response Plan or Hazardous Materials plan that identifies notification procedures for other operators or local agencies and includes details that are similar if not the same as a Spill Response Plan. Therefore, to leverage resources and maximize efficiencies the requirements in this Order recommend utilizing existing documents if that document contains the same information.

## Construction Site Storm Water Runoff Control and Outreach Program
The purpose of this program component is to prevent sediment and other pollutants from entering the Non-traditional MS4 during the construction phase of development projects. In general, Non-traditional MS4 Permittees will obtain coverage under, and comply with, the CGP for their own construction projects. To the extent that they have the legal authority, Non-traditional MS4s must also require other entities discharging to their MS4 to obtain coverage under and comply with the CGP during the construction phase of their projects.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000866

This Order relieves Non-traditional MS4 Permittees from development and implementation of a complete construction storm water runoff control program. This Order does require education and outreach to staff, construction site operators and contractors on how to control construction storm water runoff.

The CGP is inherently a robust permit with stringent reporting requirement for any construction project disturbing one acre or more in California. Often, Non-traditional MS4s have a few construction projects occurring at once such as those in a City or County. There are, however, very few Non-traditional MS4s that have dozens of active construction sites. Further, Non-traditional MS4 Permittees are often both the owner and contractor of a construction project. Finally, municipal governments must review and approve erosion and sediment control plans prior to the issuance of grading permits. Most all Non-traditional MS4s do not require approval from local municipalities prior to construction activity. Conditioning of a construction project is usually conducted in-house by Non-traditional MS4 Permittee staff. If contractors are brought in to conduct construction activity, this Order requires Non-traditional MS4 Permittees to include "bullet proof" contract language ensuring construction operators or contractors comply with the CGP and implement appropriate BMPs.

**Pollution Prevention and Good Housekeeping Program**
Legal Authority: Clean Water Act § 40 CFR 122.34(b)(6)

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Non-traditional MS4s have the same responsibilities as Traditional MS4s to prevent or reduce storm water pollution generated by their own operations, to train employees about pollution prevention/good housekeeping practices, and to identify appropriate measures to prevent or reduce the amount of storm water generated by their operations.

**Post-Construction Storm Water Management Program**
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(5).

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; U.S. EPA Incorporating Environmentally Sensitive Development into Municipal Stormwater Programs, EPA 833-F-07-011

This Order has specific site design and LID requirements for all projects. The LID requirements emphasize landscape-based site design features that are already required elsewhere (e.g., the California Water Efficient Landscape Ordinance). The goal during this permit term is to develop runoff retention and hydromodification control criteria that are keyed to watershed processes. Watershed management zones will be delineated by the State Board during this permit term. The Watershed management zones will be used to identify applicable areas and appropriate criteria for runoff retention and hydromodification control. Regional Boards that have approved watershed process- based criteria for post-construction will be permitted to continue requiring Permittees to implement these criteria.

**Total Maximum Daily Load (TMDL)**
The Order includes Attachment G, which identifies only those approved TMDLs in which storm water or urban run-off is listed as a source. In addition, Attachment G identifies Permittees subject to TMDLs or assigned waste load allocation. If Non-traditional MS4 Permittees have been identified in Attachment G, they must implement the specific TMDL permit requirements.

Defs_000867

**Program Effectiveness Assessment**
Non-traditional MS4s have the same responsibilities as Traditional MS4s to conduct quantitative evaluation of their storm water program.

**Online Annual Reporting**
Non-traditional MS4s have the same responsibilities as Traditional MS4s to submit online Annual Reports via SMARTS.

**Separate Implementing Entity**
Legal Authority: Clean Water Act § 40 CFR 122.35

This Order allows a Regulated MS4s to rely on a Separate Implementing Entity to meet permit requirements, as allowed by U.S. EPA in the Phase II regulations. Reliance on Separate Implementing Entity may be particularly beneficial for Non-Traditional MS4s. An example is a community service district that is charged with creating and implementing a municipal storm water program.

Co-application and cooperative implementation of the storm water program by any Permittee with another Permittee can maximize efficiency and reduce overall costs. Non-traditional MS4s are encouraged to co-apply with local jurisdictions and utilize shared resources to implement the storm water program. Additionally, co-application and cooperative storm water program implementation can achieve watershed-wide consistency.

A Permittee may rely on a Separate Implementing Entity to implement one or more program elements, if the Separate Implementing Entity can appropriately and adequately address the storm water issues of the Permittee. To do this, both entities must agree to the arrangement, and the Permittee must comply with the applicable parts of the Separate Implementing Entity's program.

In accordance with 40 Code of Federal Regulations, section 122.35(a)(3), the Permittee remains responsible for compliance with its permit obligations if the Separate Implementing Entity fails to implement the control measure(s) or any component thereof. Therefore, the entities are encouraged to enter into a legally binding agreement to minimize any uncertainty about compliance with the permit.

If the Non-traditional MS4 Permittee relies on a Separate Implementing Entity to implement all program elements and the Separate Implementing Entity also has a storm water permit, the Permittee relying on Separate Implementing Entity must still file an NOI via SMARTS, submit the appropriate fee and file online Annual Reports. Both parties must also submit to the appropriate Regional Water Board a certification of the arrangement. The arrangement is subject to the approval of the Regional Water Board Executive Officer prior to filing an electronic NOI via SMARTS.

School districts present an example of where a Separate Implementing Entity arrangement may be appropriate, either by forming an agreement with a city or with an umbrella agency, such as the County Office of Education. Because schools provide a large audience for storm water education the two entities may coordinate an education program. An individual school or a school district may agree to provide a one-hour slot for all second and fifth grade classes during which the city would make its own storm water presentation. Alternatively, the school could agree to teach a lesson in conjunction with an outdoor education science project, which may also incorporate a public involvement component. Additionally, the school and the city or

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000868

Office of Education may arrange to have the school's maintenance staff attend the other entity's training sessions.

## XV. RELATIONSHIP BETWEEN THE ORDER AND THE STATEWIDE GENERAL PERMIT FOR DISCHARGES OF STORM WATER ASSOCIATED WITH INDUSTRIAL ACTIVITY

In some cases, certain Non-traditional MS4s will be subject to both this Order and the IGP. The intent of both of these permits is to reduce pollutants in storm water, but neither permit's requirements totally encompass the other. This Order requires that Non- traditional MS4 operators address storm water program elements, while the IGP requires the development and implementation of a SWPPP for certain "industrial" activities as well as requiring specific visual and chemical monitoring.

In the Preamble to the Phase II regulations, U.S. EPA notes that for a combination permit to be acceptable, it must contain all of the requirements for each permit. Further, "when viewed in its entirety, a combination permit, which by necessity would need to contain all elements of otherwise separate industrial and MS4 permit requirements, and require NOI information for each separate industrial activity, may have few advantages when compared to obtaining separate MS4 and industrial general permit coverage." (64 Fed. Reg. 68781.) Where the permits do overlap, one program may reference the other. More specifically, the Good Housekeeping for Permittee Operations program element requires evaluation of Permittee operations, some of which may be covered under the IGP. The development and implementation of the SWPPP under the IGP will likely satisfy the Good Housekeeping requirements for those industrial activities. The Non-traditional MS4 storm water program may incorporate by reference the appropriate SWPPP.

There may be instances where a Non-traditional MS4 has, under the IGP, obtained coverage for the entire facility (rather than only those areas where industrial activities occur) and has developed a SWPPP that addresses all the program elements required by this Order. In these instances, the Non-traditional MS4 is not required to obtain coverage under this Order. The entity should, in such cases, provide to the appropriate Regional Water Board documentation that its SWPPP addresses all program elements.

## XVI. USE OF PARTNERSHIPS IN MS4 PERMITS

Since the Phase II Rule applies to all small MS4s within an urbanized area regardless of political boundaries it is very likely that multiple governments and agencies within a single geographic area are subject to NPDES permitting requirements. For example, a city government that operates a small MS4 within an urbanized area may obtain permit coverage under this Order while other MS4s in the same vicinity (such as a County, other cities, public university, or military facility) may also be covered under this Order. All MS4s are responsible for permit compliance within their jurisdiction.

Given the potential for overlapping activities in close proximity, the State Water Board encourages MS4s in a geographic area to establish cooperative agreements in implementing their storm water programs, especially with receiving water monitoring. Partnerships and agreements between Permittees and/or other agencies can minimize unnecessary duplication of effort and result in efficient use of available resources.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000869

Sharing resources can allow MS4s to focus their efforts on high priority program components. By forming partnerships, water quality can be examined and improved on a consolidated, efficient, watershed-wide scale rather than on a piece-meal, site-by-site basis.

## XVII.  REGIONAL BOARD DESIGNATIONS

Designation of additional Small MS4s outside of Urbanized Areas as Regulated Small MS4s may be made by the Regional Water Boards on a case by case basis. Case by case determinations of designation are based on the potential of a Small MS4's discharges to result in exceedances of water quality standards, including impairment of designated uses, or other significant water quality impacts, including habitat and biological impacts. The tables below includes designations recommend by the Regional Water Boards prior to adoption of this Order. The Regional Water Boards may continue to make case by case determinations of designation during the permit term by notification to the discharger (which shall include a statement of reasons for the designation) and following an opportunity for public review and comment.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000870

**Traditional Small MS4s**

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Crescent City | Del Norte | 1 | 7500 population and in urbanized area |
| Bayview CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of these areas is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Cutten CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Humboldt Hill CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Myrtletown CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Pine Hills CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Ridgewood Heights USSA | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of these areas is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Rosewood USSA | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000871

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Cloverdale CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Forestville CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Guerneville CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Monte Rio | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Occidental CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Yreka City | Siskiyou | 1 | Discharges to a TMDL listed waterbody and identified on Attachment G |
| Gonzalez City | Monterey | 3 | Greater than 5,000 population |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000872

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Moss Landing CDP | Monterey | 3 | Proximity to ocean areas (Monterey Bay National Marine Sanctuary, including Elkhorn slough) |
| Blacklake CDP | San Luis Obispo | 3 | Proximity to urbanized area (Oceano, Arroyo Grande, Grover Beach and Nipomo) |
| Cayucos CDP | San Luis Obispo | 3 | Greater than 2,000 population and proximity to Pacific Ocean |
| Lake Nacimiento CDP | San Luis Obispo | 3 | Greater than 2,000 population and proximity to Lake Nacimiento (drinking water source) |
| San Miguel | San Luis Obispo | 3 | Greater than 2,000 population High Growth Rate (16.8%) |
| Shandon CDP | San Luis Obispo | 3 | High Growth Rate (31.3%) |
| Guadalupe City | Santa Barbara | 3 | Incorporated area exceeding 5,000 population |
| Hope Ranch CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Mission Canyon CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Mission Hills CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Toro Canyon CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Live Oak CDP | Santa Cruz | 3 | Greater than 5,000 population Discharges to a TMDL listed waterbody and identified on Attachment G |
| City of Avalon | Los Angeles | 4 | Proximity to sensitive water body |
| Colusa County | Colusa | 5S | Discharges to a TMDL listed waterbody and identified on Attachment G |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000873

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Amador County | Amador | 5S | Currently, there is only limited storm water management in this area, allowing discharge of pollutants to waters of the State already impacted with multiple constituents and parameters.  Storm water management is needed in these areas to reduce the pollutant loads prior to adoption of any TMDLs, which are typically not estimated to be completed until 2020 or thereafter in many cases.<br>Additionally, several waterbodies or waterbody segments within or bounding Amador County are 303(d) listed for invasive species (Cosumnes River, above Michigan Bar), mercury (Pardee Reservoir, Camanche Reservoir), pH - High (Amador Lake, Bear River from Allen to Upper Bear River Reservoir), copper (Camanche Reservoir), and zinc (Camanche Reservoir) according to the 2010 CWA 303(d) list. Camanche Reservoir drains to Lower Mokelumne River. The Lower Mokelumne River (in Delta Waterways, eastern portion) is 303(d)  listed for chlorpyrifos, copper, mercury, dissolved oxygen, unknown toxicity, and zinc. Both the Cosumnes and Mokelumne Rivers drain to the San Joaquin River, which is 303(d) listed for these same constituents and parameters. Many of these constituents are known to bind to various size sediment particles migrating into surface waters. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000874

**Non-Traditional Small MS4s**

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| Petaluma Coast Guard Training Center | Defense, Department of | 1 | Activities that could impact water quality, fueling, maintenance. Personnel that should be educated on how their activities effect water quality. |
| Alameda-Contra Costa Transit District (AC Transit) | Special District | 2 | The Alameda-Contra Costa Transit District (AC Transit) is a large special transit district like the Valley Transit Authority (VTA) and BART which are both already designated. In order to fully regulate both large bus storage and maintenance facilities and new development related to bus stops and plazas they need to be fully regulated under the Phase II stormwater permit, as they do not fall under the local city regulatory jurisdiction for all aspects of their operations. |
| AMTRAK | Special District | 2 | Within urbanized area |
| Bay Area Rapid Transit | Special District | 2 | Within urbanized area |
| CalTrain | Special District | 2 | Within urbanized area |
| Golden Gate Bridge, Highway and Transportation District | Special District | 2 | Within urbanized area |
| Valley Transit Authority | Special District | 2 | Within urbanized area |
| Port of Oakland | Port | 2 | Within urbanized area |
| Port of Redwood City | Port | 2 | Within urbanized area |
| San Jose Airport | Airport | 2 | Within urbanized area |
| Oceano Community Services District | Community Services District | 3 | Within urbanized area |
| Fort Ord Reuse Authority | Local Agency | 3 | Adjacent to urbanized area, Planned annexation into urbanized area |
| Fort Hunter Ligget, Army Garrison | Defense, Department of | 3 | Within urbanized area |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000875

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| March Air Reserve Base | Defense, Department of | 8 | The former March Air Reserve Base was downsized and became known as March ARB. March ARB is an active military base that covers 2,300 acres. Activities in the base proper includes military activities such as air refueling, air cargo, air reconnaissance, military interceptors, military housing, recreational and dining facilities, commercial air cargo, training facilities, schools, operations centers for troop transport and industrial, including airport operations. Land use activities are under Base commander authority. The base is currently covered under an individual industrial storm water permit for their industrial operations and is a stakeholder under the Lake Elsinore/Canyon Lake TMDL. In addition to industrial permit monitoring, the Base monitors their compliance with the TMDL. We believe Phase II permit coverage is an appropriate permit to address the pollutants and flows generated from Base operations. Development and redevelopment post construction controls are of particular importance to be incorporated into the base's storm water program through Phase II permit coverage. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000876

| Place name | Category | Regional Board | Justification |
|------------|----------|----------------|---------------|
| March Joint Powers Authority[1] | March Joint Powers Commission | 8 | The March JPA is a federally recognized reuse authority for the former March Air Force base. It encompasses most of the 6, 500 acres of the former active duty March Air Force Base area and approximately 450 acres adjacent to the base in the industrial area of the City of Moreno Valley. March JPA also assumed the following authorities:<br>1 - Land Use Authority - Land use authority was transferred to March JPA from the County of Riverside, City of Riverside, and City of Moreno Valley. The March JPA has adopted development and building codes and standards. The March JPA General Plan has been developed by the March JPA in accordance with state statutes, as well as the associated Master Environmental Impact Report. The March JPA General Plan is designed to implement the March Final Reuse Plan and related activities.<br>2 - Airport Authority - March Inland Port Airport Authority (MIPAA), is a governing body under the governance umbrella of the March JPA. MIPAA is responsible for the development and operation of the March Inland Port (MIP), a joint use aviation facility targeted for air cargo operations.<br>The developments approved by the March JPA to date included residential, commercial and industrial sources of pollutants. About 1/8th of the area has been developed. March JPA has the authority to develop its own MS4s within their jurisdiction and connect to MS4s owned/operated by Phase 1 permittees. Many of the functions resemble that of a local agency. Therefore, March JPA should be subject to the Phase II (or they can join our Phase 1). |

---

[1]  Note: This discharger was not designated in the final version of Attachment B of the Order adopted by the Board on February 5, 2013.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000877

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| Miramar Marine Corps Air Station | Defense, Department of | 9 | Within urbanized area |
| General Services Administration Facilities (GSA)[2] | Federal Facility | 9 | The site is the General Services Administration Facilities (GSA), located at 801 E. San Ysidro Blvd., San Ysidro, CA 92173 and is a federal facility. They are the owner and operator of a series of lateral drains which tie into a main open- trunk running and discharging along the border fence. They are responsible for the storm drains, including the new trunk slated for construction, and the entire system acts as a MS4. Additionally, GSA is the landlord of the world's busiest Land Port of Entry (LPOE). Located between San Diego and Tijuana, the San Ysidro LPOE supports 24 northbound vehicle lanes into the United States and six southbound lanes into Mexico. Every day, this land port serves over 50,000 northbound vehicles and 25,000 northbound pedestrians. GSA  maintains border crossing services, as well as increasing efficiency, security, and safety for federal agencies and the traveling public. Looking to the future, the San Ysidro LPOE is undergoing a major expansion that will include a new northbound inspection facility, primary vehicle inspection booths, secondary inspection area, administration space, and a pedestrian processing facility. A new southbound inspection facility will also be developed, and Interstate 5 will be shifted to the west to align with Mexico's planned use of a reconstructed entry facility at the vacant Virginia Avenue/El Chaparral commercial facility. |

---

[2]  Note: This discharger was not designated in the final version of Attachment B of the Order adopted by the Board on February 5, 2013.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000878

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| Metropolitan Transit System (MTS) | Transportation Agency | 9 | The Metropolitan Transit Development Board (MTDB) was created in 1975 by the passage of California Senate Bill 101 and came into existence on January 1, 1976. In 2005, MTDB changed its name to the Metropolitan Transit System (MTS). MTS licenses and regulates taxicabs, jitneys, and other private for-hire passenger transportation services by contract with the cities of San Diego, El Cajon, Imperial Beach, La Mesa, Lemon Grove, Poway, and Santee.MTS provides bus and rail services directly or by contract with public or private operators. MTS determines the routing, stops, frequency of service, and hours of operation for its existing services. MTS does a significant amount of their vehicles' maintenance. |
| North County Transit District (NCTD) | Transportation Agency | 9 | North county Transit district (NCTD) owns and operates the Sprinter Rail located along 22 miles of the rail corridor (see attached file) and adjacent staging areas within the Cities of Oceanside, Vista, San Marcos and Escondido and within the County of San Diego. The project's totaldisturbed acreage is approximately 280 acres. Storm water runoff from the project discharges directly into Waters of the State, the Municipal Separate Storm Sewer System (MS4) and, ultimately discharging to Loma Alta Creek, Buena Vista Creek, Buena Creek, San Marcos Creek, Escondido Creek and unmanned tributaries. Beginning October 2007, during construction, the San Diego Water Board hadidentified significant violations of the Stormwater Permit (99-08- DWQ). NCTD threatens to continue to discharge waste (e.g. sediment and sediment-laden water) in violation of the Basin Plan Prohibitions. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Defs_000879

# EXHIBIT L





GAVIN NEWSOM
GOVERNOR

JARED BLUMENFELD
SECRETARY FOR
ENVIRONMENTAL PROTECTION

## Central Valley Regional Water Quality Control Board

14 June 2021

Patrick Covello, Warden                    Via Email: Patrick.Covello@cdcr.ca.gov
California Department of Corrections
Mule Creek State Prison
P.O. Box 409099
Ione, CA  95640

***RECISSION OF THE 14 FEBRUARY 2018 13267 ORDER, CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION, MULE CREEK STATE
PRISON, AMADOR COUNTY***

On 14 February 2018 the Central Valley Regional Water Quality Control Board
(Regional Board) issued a 13267 Order for Technical Reports to the California
Department of Corrections and Rehabilitation (CDCR) to investigate an unpermitted
discharge of waste from the Mule Creek State Prison's stormwater collection system
into Mule Creek.

At this time, the Regional Board is rescinding the 14 February 2018 13267 Order. The
discharge to surface water will continue to be monitored under the Small Municipal
Separate Storm Sewer System (MS4) permit and 22 December 2020 13383 Order.

Because there are multiple permits issued to this facility, the Regional Board has made
a commitment to continue to make Mule Creek State Prison's compliance a priority. If
you have any questions regarding this rescission, please do not hesitate to contact the
Assistant Executive Officer John Baum at john.baum@waterboards.ca.gov.

John J.
Baum

Digitally signed
by John J. Baum
Date: 2021.06.14
15:20:46 -07'00'

(for) Patrick Pulupa
Executive Officer

cc:   Yvonne West, Director, Office of Enforcement, SWRCB
      David Boyers, Assistant Director, Office of Enforcement, SWRCB
      Nickolaus Knight, Office of Enforcement, SWQCB, Sacramento
      Bayley Toft-Dupuy, Office of Chief Council, SWQCB, Sacramento
      Howard Hold, CVRWQCB, Rancho Cordova

cc's cont. on next page



California Department of Corrections and Rehabilitation
Amador County                                     - 2 -                                     14 June 2021

Kari Holmes, CVRWQCB, Rancho Cordova
Scott Armstrong, CVRWQCB, Rancho Cordova
Lixin Fu, CVRWQCB, Rancho Cordova
Michelle Opalenik, Amador County Dept. of Environmental Health, Jackson
Grant Scavello, USEPA, San Francisco
Stacey Rhodes, City of Ione, Ione
Diane Wratten, City of Ione, Ione
Thomas Reed, City of Ione, Ione
Dan Epperson, City of Ione, Ione
Dominic Atlan, Castle Oaks Golf Course, Ione
Robin Peters, ARSA, Sutter Creek
Amy Gedney, ARSA, Sutter Creek
Eric Papathakis, Staff Council, California Department of Corrections, Sacramento
Adam Wolfe, California Department of Corrections, Sacramento
Christofer Hudgens, California Department of Corrections, Ione
Terry Bettencourt, California Department of Corrections, Sacramento
Felix Vasquez, California Department of Corrections, Sacramento
Christofer Hudgens, California Department of Corrections, Ione
Anthony Orta, California Department of Corrections, Ione
Anthony Stark, California Department of Corrections, Ione
Gregor Larabee, California Department of Corrections, Sacramento
Jim Scully, Interested Party, Ione
Jim Nevin, Interested Party, Ione
Andrew Packard, Interested Party, Petaluma
Jack Mitchell, Ledger Dispatch, Jackson
Jennifer Buckman, Bartkiewicz, Kronick & Shanahan, APC, Sacramento
Sally Baron, Interested Party, Rancho Cordova
Virginia Silva, Interested Party, Ione
David Anderson, Interested Party, Mokelumne Hill

Defs_000881

# EXHIBIT M

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**DIVISION OF ADULT INSTITUTIONS**
MULE CREEK STATE PRISON
4001 Highway 104
P.O. Box 409099
Ione, CA, 95640



Date:   February 24, 2021

State of California Water Resources Control Board
Central Valley Regional Water Quality Control Board
Sacramento Office
11020 Sun Center Drive, #200
Rancho Cordova, CA 95670-6114

Attention: Ms. Elizabeth Lee
              Senior Water Resource Control Engineer

***MULE CREEK STATE PRISON (MCSP) REQUEST FOR MODIFICATIONS TO THE
22 DECEMBER, 2020 WATER CODE SECTION 13383 ORDER TO MONITOR
DISCHARGES TO SURFACE WATER; CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION – MULE CREEK STATE PRISON,
WDID#:5S03M2000307, AMADOR COUNTY***

Dear Ms. Lee,

Please see the following requests from MCSP regarding the 22 December, 2020 Water
Code Section 13383 order, in response to the 5 February, 2021 conference call held
between the CDCR and CVRWQCB.

### III. MONITORING LOCATIONS
We request the monitoring locations be changed back to the original locations: MCSP 2
and MCSP 3. The monitoring locations identified in the December 22, 2020, 13383 Order
Table A have changed from previous versions and drafts of 13383 Orders for this facility
(August 6, 2020, and November 13, 2020) from MCSP 2 and MCSP 3, to MCSP 5 and
MCSP 6. Discharges to Mule Creek are most represented by the locations MCSP 2 and
MCSP 3. As indicated in prior correspondences, MCSP 5 is approximately 630 feet
upgradient of point of compliance MCSP 2, and MCSP 6 is approximately 1,500 feet
upgradient of point of compliance MCSP 3.

### IV. MS4 OUTFALL MONITORING REQUIREMENTS

In section IV of the December 22, 2020, 13383 Order, MCSP is required to sample once
per event when discharging through monitoring locations MCSP 5 or MCSP 6. Further
stated is outfall monitoring shall be collected concurrently with receiving water sampling.

As non-stormwater observed at MCSP 5 and MCSP 6 does not reach Mule Creek, Mule Creek is ephemeral in nature and typically dry or stagnant during observed non-stormwater flows at MCSP 5 and MCSP 6, concurrent "flowing" receiving water monitoring is not possible with respect to non-stormwater at MCSP 5 and MCSP6. Receiving water samples can only be collected during stormwater events. We request receiving water samples only be collected when water is flowing in the creek.

As written, the 13383 Order does not stipulate any period of time that is exempted from the sampling requirement, such as a discharge occurring outside of business hours. Normal hours of operations at MCSP are 0700 to 1600, Monday through Friday *(excluding holidays)*. Sampling outside of this period of time is not feasible for MCSP due to existing staffing levels, Bargaining Unit MOU's (Memorandum of Understanding), and burden of cost. In addition, the analytical lab we are under contract with (it is statewide mandatory contract) is not open on the weekends, and samples that would be taken would likely exceed maximum hold times.

MCSP is requesting a revision to the 22 December, 2020, Water Code 13383 Order that would exclude the need to sample outside of normal hours of operations, or if conditions existed that would make it unsafe to do so. In the event unsafe conditions would prevent sampling of a discharge that would otherwise normally occur, MCSP would photographically document the conditions and submit to the CVRWQCB.

MCSP is also requesting definition on what constitutes the beginning and end of an event that requires sampling, and how much time must pass before additional flow is considered a separate event that requires additional sampling. As we are requesting moving the monitoring locations to MCSP 2 and MCSP 3, and non-stormwater flows have not been observed at these locations, distinguishing the beginning and end of non-stormwater flow events at these particular locations is easy. Non-stormwater at MCSP 2 and MCSP 3 will be sampled when it is observed during normal business hours. However, frequency of stormwater events at these locations does need definition. We would like to recommend sampling stormwater flows at MSCP 2 and MCSP 3 with concurrent samples of the receiving water, for precipitation events separated by at least seven days and at a frequency of one time per month, as allowed.

We have performed a brief evaluation of data from facility locations MCSP 2, MCSP 3, MCSP 5 and MCSP 6 and receiving water locations MCSP 1 (upgradient) and MCSP 4 (downgradient). This data was historically collected on behalf of the CVRWQCB's 13267 Order. The data set from internal monitoring points MCSP 5 and MCSP 6 consist of both stormwater and non-stormwater samples. However, there are no concurrent flowing receiving water data for the non-stormwater samples. Mule Creek is ephemeral and if water is present in Mule Creek when non-stormwater sampling occurs at MCSP 5 and MCSP 6, the water in Mule Creek is stagnant. There is limited data from discharge locations MCSP 2 and MCSP 3 which are only stormwater samples, as non-stormwater is not typically observed at these locations.

We performed a limited evaluation of historical ammonia and biological oxygen demand (BOD) data from the above listed locations. The presence of BOD is correlative of decomposition of organic matter in water and is used as an index of the degree of organic

State of California Water Resources Control Board
Page 3

pollution in water. Based on collected data it appears that detected concentrations of these constituents from facility locations and receiving water locations are primarily related to stormwater samples, not non-stormwater samples. The greatest ammonia concentration detected in receiving water during a dry weather day was collected on September 16, 2019 from stagnant water in the creek, as directed by the RWQCB. This receiving water location (MCSP4) is under a bridge.

Reported concentrations of ammonia from facility samples are two orders of magnitude below the MS4 action level of 50 mg/L and one order of magnitude below the industrial general permit (IGP) numeric action level (NAL) of 2.14 mg/L. BOD concentrations are consistently less than the IGP NAL of 30 mg/L. While we understand that an evaluation of these constituents is warranted based on their connection with wastewater they are consistently not exceeding any action levels of the MS4 or IGP. CDCR requests that the CVRWQCB adds an end date to the Water Code 13383 Order that clearly states the duration of sampling required under this order, especially considering consistent results.

Thank you for your consideration in this matter, please let me know if you have any questions or need additional information.

CHRISTOFER HUDGENS
Correctional Plant Manager II
Mule Creek State Prison

Defs_000884

EXHIBIT N

**CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
CENTRAL VALLEY REGION**

| | |
|---|---|
| In the Matter of:<br><br>**CALIFORNIA DEPARTMENT OF CORRECTIONS MULE CREEK STATE PRISON** | **SETTLEMENT AGREEMENT AND STIPULATION FOR ENTRY OF ADMINISTRATIVE CIVIL LIABILITY ORDER**<br><br>**ORDER NO R5-2021-0001** |

### Section I: Introduction

1.  This Settlement Agreement and Stipulation for Entry of Administrative Civil Liability Order (Stipulated Order, Order, or ACLO) is entered into by and between the Assistant Executive Officer of the California Regional Water Quality Control Board, Central Valley Region (Central Valley Water Board), on behalf of the Central Valley Water Board Prosecution Team (Prosecution Team), and the California Department of Corrections and Rehabilitation (CDCR) (collectively known as the Parties) and is presented to the Central Valley Water Board, or its delegee, for adoption as an order by settlement, pursuant to Government Code section 11415.60.

### Section II: Background

2.  Mule Creek State Prison (Prison) opened in June 1987, and since that time has been under the jurisdiction and control of the California Department of Corrections and Rehabilitation (referred to as "Department" or "Discharger"). Through 2015, the Prison consisted of Facilities A, B, C, and their accompanying yards. These facilities are identified hereafter as the "Old Prison Facility". The Old Prison Facility contains 15 celled housing units and two dormitory housing units for approximately 2,400 - 2,500 inmates. In 2016, the Prison expanded with the construction of the Mule Creek Infill Complex (MCIC) on site containing 6 dormitory housing units for approximately 1,584 inmates.

3.  The Central Valley Water Board regulates the treatment and disposal of domestic and prison industry wastewater from Mule Creek State Prison under Waste Discharge Requirements (WDRs) Order R5-2015-0129 and requires the Department to monitor underlying groundwater for contamination related to these treatment and disposal activities.

4.  The Central Valley Water Board also regulates storm water discharges associated with both industrial and construction activities through two general permits adopted by the State Water Resources Control Board (State Water Board).

Defs_000885

Settlement & ACL Order R5-2021-0001
California Department of Corrections and Rehabilitation

5.  On 28 December 2017, Central Valley Water Board staff received a complaint via a phone call regarding an alleged illegal discharge of water of unknown origin directly into the perimeter storm water conveyance system at the Old Prison Facility which discharges into Mule Creek. The complainant stated that the discharge flows varied greatly, but occurred during every one of their numerous observations between August 2017 and January 2018.

6.  The complainant described the water being discharged as varying between clear and jet black, sometimes with solids, and sometimes steaming hot. The complaint alleged that these discharges occurred during observations both during the wet season and dry season, regardless of precipitation or irrigation. Therefore, Central Valley Water Board staff believes the source to be non-stormwater.

7.  Central Valley Water Board Compliance and Enforcement staff from the WDRs and Storm Water Units inspected Mule Creek State Prison on 4 January 2018 in response to the complaint.

    During the inspection, Central Valley Water Board staff determined that the likely source of the water described in the complaint as discharging into the perimeter storm water conveyance system was from stormwater laterals discharging from the collection and conveyance system within the Old Prison Facility into the perimeter conveyance system. Central Valley Water Board staff observed water discharging out of lateral drainpipes into the storm water collection and conveyance system that surrounds the Old Prison Facility during the inspection. This perimeter conveyance system discharges to Mule Creek, which is a water of the State and the United States.

8.  To understand the threat of this discharge, Central Valley Water Board staff collected a sample of the water from a lateral drainpipe (Sample named "Tower 4") during the 4 January 2018 inspection. In addition, Water Board staff observed a small amount of water discharging from the common collection sump, through the culvert and unlined ditch, and into Mule Creek.

9.  Central Valley Water Board staff also collected a sample from the common collection sump (Sample named "Junction") during the 4 January 2018 inspection. The laboratory results of these samples are summarized in Table 1 below. Water Board staff did not have the proper sampling equipment to sample for Volatile Organic Compounds (VOCs) or Semi Volatile Organic Compounds (SVOCs) at the time of the inspection, and therefore, there was no analysis for those compounds.

Defs_000886