1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                         ----oo0oo----

11

12   CALIFORNIA SPORTFISHING            No. 2:20-cv-02482 WBS AC
     PROTECTION ALLIANCE,
13
               Plaintiff,
14                                      ORDER RE: MOTION FOR PARTIAL
         v.                             SUMMARY JUDGMENT[1]
15
     KATHLEEN ALLISON, et al.,
16
               Defendants.
17
     ────────────────────────────
18   COUNTY OF AMADOR, a public
     agency of the State of
19   California,

20             Plaintiff,

21       v.

22   KATHLEEN ALLISON, et al.,

23             Defendants.

24

25                         ----oo0oo----

26   ────────────────────
            [1]   Plaintiffs' motion is titled a "Motion for Summary
27   Adjudication."  (Docket No. 45.)  Because Federal Rule of Civil
     Procedure 56, upon which the motion is based, refers only to
28   "summary judgment," the court will use that term in this Order.

                                  1

1          Plaintiffs California Sportfishing Protection Alliance

2    ("CSPA") and County of Amador ("Amador") brought this now-

3    consolidated action against Kathleen Allison, in her official

4    capacity as Secretary of the California Department of Corrections

5    and Rehabilitation ("CDCR"), and Patrick Covello, in his official

6    capacity as Warden of CDCR's Mule Creek State Prison

7    (collectively "defendants"), seeking declaratory and injunctive

8    relief for alleged violations of the Clean Water Act, as amended

9    by the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et

10   seq. (See First Amended Complaint ("FAC") (Docket No. 35); Order

11   Consolidating Cases (Docket No. 18).)  Plaintiffs now move for

12   partial summary judgment.  (Docket No. 45.)

13   I.    Factual and Procedural Background

14         The CDCR, California's state prison system, owns and

15   operates Mule Creek State Prison outside of Ione, California,

16   housing roughly 4,000 prisoners.  (See Revised Stormwater

17   Collection Sys. Investigation Rep. of Findings § 1.3 (June 2020)

18   ("Revised Investigation Rep.") (Docket No. 49-7 at 18).)  In

19   addition to housing prisoners, the prison provides space and

20   utilizes prisoner labor for meat packing, coffee roasting and

21   packing, and textile manufacturing operations.  (Id. § 1.2.)  The

22   prison also owns and operates a stormwater collection system,

23   known as an MS4, which is composed of a variety of conveyances

24   (such as drains, ditches, swales, and outfalls) that operate to

25   channel storm water away from the facility, toward Mule Creek.

26   (See id. § 1.3.)  Mule Creek is a tributary to Dry Creek, which

27   in turn is a tributary to the Mokelumne River.  (Cent. Valley

28   Reg'l Water Quality Ctrl. Bd., Water Code 13383 Order to Monitor

1  Discharges to Surface Water (Dec. 22, 2020) ("Dec. 13383 Order")
2  (Docket No. 45-10 at 76).)

3        The Clean Water Act "prohibits the 'discharge of any
4  pollutant' from any 'point source' into 'navigable waters' unless
5  the discharge complies with certain other sections of the [Act]."
6  Nat. Res. Def. Council, Inc. v. County of Los Angeles, 725 F.3d
7  1194, 1198 (9th Cir. 2013) (quoting 33 U.S.C. § 1311(a)).
8  Discharges are considered compliant with the Act if they are
9  allowed by a permit issued to the discharging entity under the
10  Act's National Pollutant Discharge Elimination System ("NPDES")
11  program.  See Arkansas v. Oklahoma, 503 U.S. 91, 101-02 (1992).
12  In California, NPDES permits may be issued by state- and
13  regional-level water boards charged with establishing water
14  quality standards, which determine the maximum permissible levels
15  of various contaminants in surface waters based on the beneficial
16  uses for which a given body of water has been designated.  See
17  Nat. Res. Def. Council, 725 F.3d at 1198-99; 33 U.S.C.
18  §§ 1313(c)(2)(A), 1342; Cal. Water Code §§ 13140, 13240.

19        The Clean Water Act includes a citizen suit provision,
20  allowing citizens to bring a civil action "against any person
21  . . . who is alleged to be in violation of [ ] an effluent
22  standard or limitation under [the Act]."  33 U.S.C. § 1365(a)(1).
23  "[A]n 'effluent standard or limitation'" is in turn defined "as
24  including 'a permit or a condition of a permit issued under
25  section 1342'" of the Act.  Inland Empire Waterkeeper v. Corona
26  Clay Co., 17 F.4th 825, 835 (9th Cir. 2021) (citing 33 U.S.C.
27  § 1365(f)(7)) (emphasis omitted).  The Clean Water Act therefore
28  allows citizen suits to enforce conditions of NPDES permits.

1  <u>N.W. Env't Advocs. v. City of Portland</u>, 56 F.3d 979, 986 (9th

2  Cir. 1995) (citations omitted).

3          Two NPDES permits are relevant to plaintiffs' claims.

4  The first, the Small MS4 Permit, authorizes discharges of

5  stormwater from the prison's MS4 conveyance system, subject to

6  contaminant limitations based on applicable water quality

7  standards.  (<u>See</u> State Water Res. Ctrl. Bd. Water Quality Order

8  No. 2013-001-DWQ, NPDES Gen. Permit No. CAS000004 ("Small MS4

9  Permit") §§ B-D (Docket No. 45-11 at 211-13).)  It prohibits

10 discharge of material other than stormwater from the MS4 unless

11 specifically authorized by the Small MS4 Permit.  (<u>See</u> <u>id.</u> § B.)

12 Under the Small MS4 Permit, the permittee is also charged with

13 monitoring discharges from the covered facility to determine

14 compliance with the permit's requirements.  (<u>See</u> <u>id.</u> § E; <u>cf.</u>

15 Dec. 13383 Order § II.)

16         The second permit, the Industrial General Permit,

17 regulates discharges of stormwater and other authorized

18 discharges from industrial facilities, such as those used for

19 meatpacking, coffee roasting, and textile production operations

20 at the prison.  (<u>See</u> NPDES Gen. Permit for Storm Water Discharges

21 Associated with Indus. Activities, Order No. CAS000001 ("Indus.

22 Gen. Permit") § XVII (Docket Nos. 45-18, 45-19).)  Although the

23 Industrial General Permit generally requires permittees to

24 prepare and implement a plan to prevent pollution of stormwater

25 from their industrial operations, an exclusion from these

26 requirements is available to permittees with storm-resistant

27 shelters that protect their industrial activities (and materials

28 used therein) from exposure to runoff and precipitation.  (<u>See</u>

4

1 | id. § XVII (Docket No. 45-19 at 6).)   If the exception applies to

2 | a permittee, the permittee is eligible to receive a No Exposure

3 | Certification.  (See id.)

4 |   Plaintiff CSPA filed this action on December 15, 2020,

5 | and plaintiff Amador filed its original action on January 7,

6 | 2021.  (Docket Nos. 1, 19.)  After the cases were consolidated,

7 | the plaintiffs jointly filed what is now the operative complaint

8 | on January 26, 2022.  (Docket No. 35.)  Plaintiffs filed the

9 | instant motion for partial summary judgment on June 28, 2022.

10 | (Pls.' Mot. for Summ. J. ("Mot.") (Docket No. 45).)

11 | II.  Defendants' Objections

12 |   In response to plaintiffs' motion, defendants have

13 | filed a 71 page list of single-spaced objections.  (See Defs.'

14 | Objs. (Docket No. 48-4).)  Although the court has not counted the

15 | individual objections, it is clear that they number in the

16 | hundreds.  One can only imagine how many attorney hours were

17 | spent coming up with what appears to be every conceivable

18 | objection and putting each into writing, and how much time

19 | plaintiffs' counsel was in turn required to spend responding to

20 | those objections.  This all-too-common practice operates as a

21 | substantial drain on the resources of the court and, likely, the

22 | clients who are billed for these countless hours of work.

23 | Counsel would do well to consider whether a particular objection

24 | is in fact meaningful and important to their clients' case before

25 | including it in a laundry list that the court must sift through

26 | before reaching a motion's merits.

27 |   Defendants' objections all appear to fall into a few

28 | categories: those based on (1) a lack of foundation or personal

5

knowledge, or on speculation; (2) improper opinion testimony;

(3) hearsay; (4) the best evidence rule; and (5) vagueness and

ambiguity.  (See generally Defs.' Objs.)  This court has

previously explained the inapplicability of many of these forms

of objections at summary judgment:

> Objections to evidence on the ground that the evidence
> is . . . speculative, . . . vague and ambiguous, or
> constitutes an improper legal conclusion are all
> duplicative of the summary judgment standard itself.
> See Burch, 433 F. Supp. 2d at 1119-20.  A court can
> award summary judgment only when there is no genuine
> dispute of material fact.  Statements based on
> improper legal conclusions or without personal
> knowledge are not facts and can only be considered as
> arguments, not as facts, on a motion for summary
> judgment.  Instead of challenging the admissibility of
> this evidence, lawyers should challenge its
> sufficiency. . . . .

Alvarez v. T-Mobile USA, Inc., 2:10-cv-2373 WBS GGH, 2011 WL

6702424, at *3 (E.D. Cal. Dec. 21, 2011).  "Objections on these

grounds are superfluous," id., and the court will overrule them.

Similarly:

> [A]t the summary judgment stage the court does not
> "focus on the admissibility of the evidence's form,"
> but rather "focuses on the admissibility of its
> contents."  Fraser v. Goodale, 342 F.3d 1032, 1036
> (9th Cir. 2003).  Objections on the basis of a failure
> to comply with the technicalities of authentication
> requirements or the best evidence rule are, therefore,
> inappropriate.  See Adams v. Kraft, --- F.Supp.2d ----
> , ----, 2011 WL 5079528, at *25 n. 5 (N.D. Cal. Oct.
> 25, 2011) ("On summary judgment, unauthenticated
> documents may be considered where it is apparent that
> they are capable of being reduced to admissible
> evidence at trial."); Hughes v. United States, 953
> F.2d 531, 543 (9th Cir. 1992) (holding that even if
> declaration violated best evidence rule, court was not
> precluded from considering declaration in awarding
> summary judgment).

Id. at *4 (alteration adopted).

The same is true for hearsay.  See Sandoval v. County

6

1   of San Diego, 985 F.3d 657, 666 (9th Cir. 2021).  "If the

2   contents of a document can be presented in a form that would be

3   admissible at trial -- for example, through live testimony by the

4   author of the document -- the mere fact that the document itself

5   might be excludable hearsay provides no basis for refusing to

6   consider it on summary judgment."  Id. (citing Fraser, 342 F.3d

7   at 1036-37).  Here, as defendants have not shown, and the court

8   does not see, why the contents of the documents at issue could

9   not be properly presented at trial, the court overrules

10  defendants' objections on these grounds.

11  III. Discussion

12        Summary judgment is proper "if the movant shows that

13  there is no genuine dispute as to any material fact and the

14  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

15  P. 56(a).  A party may move for summary judgment either for one

16  or more claims or defenses, or for portions thereof.  Id.  Where

17  a court grants summary judgment only as to a portion of a claim

18  or defense, it "may enter an order stating any material fact

19  . . . that is not genuinely in dispute and treating the fact as

20  established in the case."  Id. at 56(g).

21        A material fact is one "that might affect the outcome

22  of the suit under the governing law," and a genuine issue is one

23  that could permit a reasonable trier of fact to enter a verdict

24  in the non-moving party's favor.  Anderson v. Liberty Lobby,

25  Inc., 477 U.S. 242, 248 (1986).  The moving party bears the

26  initial burden of establishing the absence of a genuine issue of

27  material fact and may satisfy this burden by presenting evidence

28  that negates an essential element of the non-moving party's

7

case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23
(1986).  Alternatively, the movant may demonstrate that the non-
moving party cannot provide evidence to support an essential
element upon which it will bear the burden of proof at
trial.  Id.  The burden then shifts to the non-moving party to
set forth specific facts to show that there is a genuine issue
for trial.  See id. at 324.  Any inferences drawn from the
underlying facts must, however, be viewed in the light most
favorable to the non-moving party.  See Matsushita Elec. Indus.
Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In their motion, plaintiffs seek summary judgment on
each of the following issues: (1) whether Mule Creek is a "Water
of the United States" within the meaning of the Clean Water Act;
(2) whether plaintiffs have Article III standing to bring this
action for injunctive relief; (3) whether defendants violated
each of four separate provisions of the Small MS4 Permit:
sections (a) B.1, (b) B.2, (c) B.3, and (d) D; and (4) whether
defendants violated the Industrial General Permit.  (Mot.)  The
court will address each issue in turn.

A.   Water of the United States

The Clean Water Act's stated objective is to "restore
and maintain the chemical, physical, and biological integrity of
the Nation's waters."  33 U.S.C. § 1251(a).  It outlaws the
unauthorized "discharge of any pollutant by any person" into
"navigable waters," which the statute defines to mean "waters of
the United States."  33 U.S.C. §§ 1311(a), 1362(7), 1362(12).
Applicable regulations define "waters of the United States" to
include "[t]ributaries."  33 C.F.R. § 328.3(a)(2); see United

States v. Moses, 496 F.3d 984, 988 n.8 ("[A] tributary of waters of the United States is itself a water of the United States.") (citations omitted).

Plaintiffs have provided evidence that Mule Creek is a tributary that leads to the Mokelumne River, a navigable water, that the state and regional water boards consider Mule Creek to be a water of the United States, and that defendants have themselves previously acknowledged that Mule Creek is a water of the United States. (See Pls.' Statement of Undisp. Facts at ¶¶ 11-13 (Docket No. 45-1); Dec. 13383 Order.) Defendants do not dispute this, (Defs.' Resp. to Pls.' Statement at ¶¶ 11-13 (Docket No. 51)), nor do they argue that Mule Creek is not a water of the United States, (see Defs.' Opp. to Mot. for Summ. J. ("Opp.") (Docket No. 48)).

The court concludes Mule Creek is a water of the United States and will enter partial summary judgment accordingly. See Fed. R. Civ. P. 56(a), (g).

B.   Standing

Plaintiffs also seek summary judgment on the issue of whether they have standing to bring this action. "In order to satisfy Article III's standing requirements in a C[lean] W[ater] A[ct] citizen enforcement action, 'a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision.'" Nat. Res. Def. Council v. S.W. Marine, Inc., 236 F.3d 985, 994 (9th Cir.

1   2000) (quoting Friends of the Earth, Inc. v. Laidlaw Env't

2   Servs., Inc., 528 U.S. 167, 180-81 (2000)) (alteration adopted).

3        1.   Amador County

4        Plaintiff Amador argues it has standing on multiple

5   grounds, including on the ground that it has expended funds and

6   other resources to monitor the impacts of stormwater discharges

7   from the prison.  "[E]conomic injuries have long been recognized

8   as sufficient to lay the basis for standing . . . ."  Sierra Club

9   v. Morton, 405 U.S. 727, 733 (1972).  In support, plaintiffs

10  point to a memorandum the county's Community Development Director

11  prepared for its Board of Supervisors in January of 2020, titled

12  "Mule Creek State Prison – Update on Releases."  (See Pls.' Ex. 4

13  (Docket No. 45-10 at 66).)

14       The memorandum notes that stormwater releases at the

15  prison have concerned the regional water board and local

16  residents, and it advises the Board of Supervisors that the CDCR

17  submitted a report regarding sources of contamination in

18  stormwater.  (Id.)  It thus demonstrates that Amador has expended

19  economic resources to monitor and enable itself to address

20  potential pollution caused by stormwater discharges at the

21  prison.  It is also apparent that, if the prison indeed is

22  improperly discharging contaminated stormwater, court-monitored

23  injunctive relief preventing such improper discharges would

24  obviate the need for Amador to expend further resources

25  monitoring the situation itself.  Plaintiffs have therefore

26  sufficiently established that Amador has standing, and the court

27  will enter partial summary judgment for plaintiffs accordingly.

28       2.   California Sportfishing Protection Association

1    CSPA, as an organization rather than an individual,

2   asserts organizational standing.  (Mot. at 24.)  "An association

3   has standing to bring suit on behalf of its members when [1] its

4   members would otherwise have standing to sue in their own right,

5   [2] the interests at stake are germane to the organization's

6   purpose, and [3] neither the claim asserted nor the relief

7   requested requires the participation of individual members in the

8   lawsuit."  <u>Friends of the Earth</u>, 528 U.S. at 181 (citing <u>Hunt v.</u>

9   <u>Wash. State Apple Advert. Comm'n</u>, 432 U.S. 333, 343 (1977)).

10   Defendants do not appear to dispute that the interests

11  at stake -- preventing unlawful pollution of Mule Creek -- are

12  germane to CSPA's purpose.  As one of CSPA's directors states in

13  a declaration, CSPA has "approximately 2,000 members" who use

14  rivers and streams in the region "for recreational, scientific,

15  educational and conservation purposes."  (Decl. of Richard

16  McHenry ¶¶ 1, 3 (Docket No. 45-3).)  CSPA's purposes include

17  "promoting the conservation, restoration and enhancement" of

18  state waterways to improve "the quality of sportfishing in

19  California."  (<u>Id.</u> ¶ 4.)  CSPA also engages "with state and

20  federal agencies" by giving public comment on proposed regulatory

21  action, submitting formal complaints regarding water use actions

22  and regulations, and participating in administrative proceedings

23  regarding the issuance of NPDES permits.  (<u>See id.</u> ¶¶ 5-12.)  The

24  interests at stake clearly are germane to CSPA's purpose.

25   Nor do defendants contend the claim asserted or relief

26  requested require participation of individual CSPA members, and

27  no reason why this would be the case is apparent to the court.

28  Accordingly, the only remaining issue is whether CSPA's members

11

1    would have standing to sue in their own right.  See id.

2          In support of plaintiffs' argument that CSPA's members

3    would have standing to sue on their own, plaintiffs have provided

4    declarations from three CSPA members, Richard McHenry, Edmund

5    Taylor, and Katherine Evatt.  Each of the three CSPA members

6    states in their declaration that they use or have used waterways

7    near or downstream from Mule Creek, that they are concerned those

8    waterways have become hazardous due to contaminated discharges

9    from the prison, and that their use or enjoyment of the waterways

10   has been reduced because of those concerns.  (See Decl. of

11   McHenry ¶¶ 14, 16-17; Decl. of Edmund Taylor ¶¶ 10, 13-20 (Docket

12   No. 45-7); Decl. of Katherine Evatt ¶¶ 15-16, 19-20 (Docket No.

13   45-8).)

14         Plaintiffs are also required to show that they had

15   standing at the time this action was filed.  Friends of the

16   Earth, 428 U.S. at 189 (citing Arizonans for Off. Eng. v.

17   Arizona, 520 U.S. 43, 68 n.22 (1997)).  Although in their

18   declarations the CSPA members state that they became aware of

19   pollution in Mule Creek allegedly caused by the prison, in some

20   cases by reading reports or articles, McHenry and Evatt do not

21   state when they became aware of the alleged pollution, as would

22   be necessary to show they were aware of it at the outset of this

23   litigation.  (See Decl. of McHenry ¶ 16; Decl. of Evatt ¶ 16.)

24   Accordingly, their declarations do not establish that McHenry and

25   Evatt were aware of any injury at the time this action was filed.

26         Taylor, however, has filed a supplemental declaration

27   clarifying that he first became aware of the discharges to Mule

28   Creek "as early as February of 2018," before the initiation of

1   this action, and became concerned about downstream water quality

2   at that time.  (Supp. Decl. of Edmund Taylor ¶¶ 2-3 (Docket No.

3   55-3).)  Taken together, Taylor's two declarations are sufficient

4   to show that he would have standing to sue in his own right.

5   Because Taylor is a CSPA member and the other requirements for

6   organizational standing are satisfied, plaintiffs have adequately

7   shown that CSPA has standing to sue as an organization.  See

8   Friends of the Earth, 528 U.S. at 181, 189; Nat. Res. Def.

9   Council, 236 F.3d at 994.  The court therefore will enter partial

10  summary judgment establishing that CSPA has standing.

11      C.   Violation of Small MS4 Permit

12          1.   Provision B.1

13          Plaintiffs next argue they are entitled to partial

14  summary judgment establishing that defendants violated multiple

15  provisions of section B of the Small MS4 Permit, including

16  provision B.1.  (Mot. at 27-30.)  Section B is titled "Discharge

17  Prohibitions," and provision 1 provides: "Discharges of waste

18  from the MS4 that are prohibited by Statewide Water Quality

19  Control Plans or applicable Regional Water Quality Control Plans

20  (Basin Plans) are prohibited."  (Small MS4 Permit § B.1.)

21          In support of their argument, plaintiffs point to a

22  declaration from their expert, Karen Ashby, evaluating stormwater

23  data collected at various points near the prison and concluding

24  that discharges have previously violated and continue to violate

25  applicable water quality standards.  (See Decl. of Karen Ashby

26  (Docket No. 45-4).)  As plaintiffs acknowledge, these conclusions

27  are based on water quality standards applicable to surface waters

28  with the designation "MUN," denoting municipal use, and standards

13

1  for MUN-designated waters are more stringent than for those
2  without the MUN designation.  (See id. ¶ 8(C); Mot. at 17-18;
3  Pls.' Reply ("Reply") at 18 (Docket No. 55).)

4          Defendants argue that the MUN designation does not in
5  fact apply to Mule Creek and that Ashby's conclusions that the
6  prison violated applicable water quality standards are therefore
7  invalid.  (Opp. at 31-32.)  In support, defendants point to an
8  order by the regional water board listing the beneficial uses
9  applicable to Mule Creek.  That order states: "The Central Valley
10  Water Board's Water Quality Control Plan for the Sacramento River
11  and San Joaquin River Basins designates the following beneficial
12  uses for . . . Mule Creek: AGR, REC-1, REC-2, WARM, COLD, MIGR,
13  SPWN, and WILD."  (Central Valley Reg. Water Quality Ctrl. Bd.,
14  Water Code 13383 Order to Monitor Discharges to Surface Water
15  (Aug. 6, 2020) ("Aug. 13383 Order") (Docket No. 49-13 at 2).)
16  Because this list does not include the MUN designation,
17  defendants argue, it demonstrates that the regional water board
18  elected not to assign Mule Creek the MUN designation and that the
19  designation is therefore inapplicable to Mule Creek.  (Opp. at
20  31-32.)

21          Plaintiffs, on the other hand, point to the regional
22  water board's Water Quality Control Plan, which states that
23  "[t]he beneficial uses of any specifically identified water body
24  generally apply to its tributary streams," as well as a table
25  contained in the Plan listing the designated beneficial uses for
26  various surface waters in the basin.  (See Cent. Valley Reg'l.
27  Water Quality Ctrl. Bd., Water Quality Ctrl. Plan (May 2018)
28  ("Basin Plan") (Docket No. 45-10 at 135, 45-11 at 2).)  They

1   contend that the table designates the Mokelumne River as MUN and

2   that the MUN designation therefore extends to Mule Creek, based

3   on the Basin Plan's language regarding tributary designations.

4   (See Mot. at 15-16; Reply at 18.)   The table indicates that the

5   Mokelumne River is designated MUN for the length running from

6   "Sources" until the Camanche Reservoir, but not for the length

7   running from "Camanche Reservoir to Delta."   (See Basin Plan

8   (Docket No. 45-11 at 2, 6).)   However, the table does not

9   indicate at which point Dry Creek connects to the Mokelumne

10  River, (see id.), and plaintiffs have not identified other

11  evidence indicating where Dry Creek joins the river.

12          Even assuming the Basin Plan clearly indicates that the

13  portion of the Mokelumne River at which Dry Creek joins is

14  designated MUN, however, it appears to be contradicted by the

15  Board's August 2020 13383 Order, which clearly omits MUN from its

16  list of Mule Creek's beneficial uses.[2]   The 13383 Order is also

17  more specific than the Basin Plan in that it specifically

18  identifies Mule Creek and its beneficial use designations, and it

19  was also issued more recently.[3]   Although section 13241 of the

20  California Water Code provides for designation of beneficial uses

21  within a Basin Plan, as plaintiffs observe, plaintiffs also argue

22  that a more specific order under section 13383 cannot amend or

23  preempt the Basin Plan's designation of beneficial uses, an

24  argument that is not clearly supported by the provisions of the

25

26          [2]   A December 2020 13383 order likewise omits the MUN
    designation.   (See Dec. 13383 Order.)

27          [3]   Whereas the 13383 Order was issued in August of 2020,
    the Basin Plan provided by plaintiffs was most recently revised

28  in May of 2018.   (See Basin Plan; Aug. 13383 Order.)

1  Water Code upon which they rely.  See Cal. Water Code §§ 13140,
2  13240, 13241, 13383.

3        Given the Basin Plan's lack of clarity as to whether
4  the relevant portion of the Mokelumne River is designated as MUN
5  and the 13383 Order's omission of the MUN designation in listing
6  Mule Creek's beneficial uses, there is a genuine dispute of fact
7  as to whether Mule Creek in fact is designated MUN.  Because the
8  conclusions by plaintiffs' expert assume water quality standards
9  applicable under the MUN designation apply, this disputed fact is
10 material because it appears dispositive of whether her
11 conclusions are applicable to plaintiffs' claims.  Because the
12 court cannot currently rely on those conclusions in determining
13 that the prison's discharges violate section B.1 of the Small MS4
14 Permit, the court will deny summary judgment on this issue.

15        2.  Provision B.2

16        Plaintiffs also seek summary judgment establishing that
17 defendants violated provision B.2.  (Mot. at 30-31.)  Provision
18 B.2 provides: "Discharges of storm water from the MS4 to waters
19 of the U.S. in a manner causing or threatening to cause a
20 condition of pollution or nuisance as defined in Water Code
21 § 13050 are prohibited."  (Small MS4 Permit § B.2.)

22        Like in their argument regarding provision B.1,
23 plaintiffs appear to argue that because the measured discharges
24 from the prison exceed applicable standards, the discharges
25 necessarily violate provision B.2.  (See Mot. at 31.)  Because
26 these determinations appear to rely on the conclusion that the
27 MUN beneficial use designation applies to Mule Creek, however --
28 a point which, as noted above, is in dispute -- it is unclear how

1  probative these determinations are until plaintiffs can prove
2  that the MUN designation applies.

3          Further, unlike provision B.1, which simply prohibits
4  discharges that exceed applicable water quality standards,
5  provision B.2's plain language indicates that a violation thereof
6  requires that the discharges actually enter a water of the United
7  States.  (See Small MS4 Permit § B.2.)  Defendants argue
8  plaintiffs have not proved that the discharges upon which
9  plaintiffs rely actually reached Mule Creek and thus have not
10  proved a violation of provision B.2.  (Opp. at 31.)

11          The parties' arguments and evidence concern four
12  discharge sampling locations at various points along the MS4:
13  MCSP2, MCSP3, MCSP5, and MCSP6.  (See, e.g., id.; Mot. at 14;
14  Aug. 13383 Order; Dec. 13383 Order.)  A map of the prison, of
15  Mule Creek, and of the various sampling locations shows that
16  MCSP2 and MCSP3 are near Mule Creek and that MCSP5 and MCSP6 are
17  somewhat further away and nearer to the prison.  (See Aug. 13383
18  Order, Fig. 1 (Docket No. 49-13 at 11).)  Defendants have also
19  provided evidence that unlike MCSP2 and MCSP3, "stormwater runoff
20  from [MCSP5 and MCSP6] travels approximately 630 and 1500 feet
21  respectively through vegetated bioswales prior to discharge to
22  Mule Creek."  (Decl. of Timothy Simpson ¶ 22(c)(ii) (Docket No.
23  48-3) (citing Decl. of Anthony Orta ¶¶ 13-14 (Docket No. 48-2)).)
24  As defendants' expert, Timothy Simpson, opines in his
25  declaration, "bioswales . . . provide filtration and infiltration
26  treatment, and runoff can also be captured into soil," such that
27  concentrations of contaminants that exist in stormwater
28  discharged from MCSP5 and MCSP6 may be reduced by the time it

1    reaches Mule Creek.  (See id.)

2           Defendants argue that because plaintiffs'
3    determinations that discharged stormwater contained impermissible
4    levels of contaminants relied on samples taken from MCSP5 and
5    MCSP6, plaintiffs have not established that those levels were
6    present when the stormwater ultimately reached Mule Creek.  (Opp.
7    at 31; see Simpson Decl. at ¶¶ 19, 22(c)(ii) (opining that
8    "analytical results from MCSP5 and MCSP6 are not representative
9    of water quality at the point of discharge to Mule Creek, and
10   that plaintiffs therefore have not "demonstrat[ed] that the
11   discharges [they] consider[ ] to be ongoing violations are
12   actually reaching [Mule Creek] at concentrations that [they]
13   allege[ ] are permit violations").)  Plaintiffs do not dispute
14   that the samples upon which they rely came from MCSP5 and MCSP6
15   or that those locations are situated 630 and 1500 feet from Mule
16   Creek, but rather argue these details are irrelevant to a
17   determination that defendants violated provision B.2, based on
18   the language of a section 13383 order issued by the regional
19   water board.  (See Mot. at 30-31; Reply at 19-20.)

20          That order directs the prison to monitor discharges at
21   five locations, including MCSP5 and MCSP6.  (Dec. 13383 Order
22   § III.)  It also provides:

23       Samples and measurements taken as required herein
24       shall be representative of the volume and nature of
         the monitored discharge.  All samples shall be taken
         at the monitoring locations specified [herein] and,
25       unless otherwise specified, before the monitored flow
         joins or is diluted by any other waste stream, body of
26       water, or substance.

27   (Id. § II.A.)  Plaintiffs argue that the statement that samples
28   taken pursuant to the section 13383 order "shall be

                                    18

1   representative of the volume and nature of the monitored

2   discharge" means those samples are per se representative of the

3   concentrations of contaminants that actually reached Mule Creek

4   for purposes of establishing a violation of the Small MS4 Permit.

5   (Reply at 19-20.)

6          In support, plaintiffs rely on Natural Resources

7   Defense Council, Inc. v. County of Los Angeles, 725 F.3d 1194

8   (9th Cir. 2013).  There, in contesting alleged violations of an

9   MS4 permit, "which prohibit[ed] 'discharges from the [ ] MS4 that

10  cause or contribute to the violation of Water Quality Standards

11  or water quality objectives,'" the defendant county argued that

12  violations could not be established on the basis of discharge

13  sampling because the discharges originated from points throughout

14  the county's sewer system and thus could not be solely attributed

15  to the county itself.  See id. at 1205-06.

16         In that case, however, there was no dispute that the

17  sampled discharges actually reached the relevant bodies of water

18  or that the levels of contaminants measured at the designated

19  monitoring points were representative of the levels that entered

20  those waters.  See id. at 1204 ("County Defendants do not dispute

21  that they are discharging pollutants from the [ ] MS4 into these

22  rivers.")  Thus, although plaintiffs point to that decision's

23  statement that "[i]f the District's monitoring data shows that

24  the level of pollutants in federally protected water bodies

25  exceeds those allowed under the Permit, then . . . the monitoring

26  data conclusively demonstrate that the County Defendants are not

27  'in compliance' with the Permit conditions," id. at 1206-07, this

28  conclusion does not clearly apply in this case because defendants

19

dispute that the concentrations of contaminants detected at MCSP5 and MCSP6 in fact reached "federally protected water bodies." And although the December 2020 13383 order provides that "measurements taken as required herein shall be representative of the volume and nature of the monitored discharge," it does not state that such discharges are considered "[d]ischarges . . . to waters of the U.S." -- the language in provision B.2 -- or otherwise clearly indicate that such discharges are to be considered representative of those that ultimately enter Mule Creek.[4]

Similarly, to establish a violation of provision B.2, the discharges into Mule Creek must "caus[e] or threaten[ ] to cause a condition of pollution or nuisance" therein.  (Small MS4 Permit § B.2.)  In support of their argument that the alleged contamination here "threaten[s] to cause a condition of pollution or nuisance," plaintiffs rely on San Diego Gas & Electric Company v. San Diego Regional Water Quality Control Board, 36 Cal. App. 5th 427 (4th Dist. 2019).  Although the court there relied on a report stating the defendant's discharge of pollutants into a bay led the pollutants to "accumulate[ ] . . . in the marine sediment," thereby making various harms to "aquatic life,

---

[4]      Plaintiffs may argue that this conclusion is implied, i.e., that the term "discharges" as used in the December 13383 order means "discharges that enter Mule Creek."  That the Small MS4 Permit itself appears to differentiate between violations that may be established based simply on "[d]ischarges . . . from the MS4" and those that must be established based on "[d]ischarges . . . from the MS4 to waters of the U.S.," however, suggests that the December 13383 order would need more specific language in order to imply the latter rather than the former. (Small MS4 Permit §§ B.1, B.2 (emphasis added).)

aquatic-dependent wildlife, and human health" likely to occur, see id. at 432, 439-40, here plaintiffs do not appear to have demonstrated that contaminants at issue here in fact reached or "accumulated . . . in" Mule Creek.

Therefore, because there appears to be a dispute of material fact as to whether the discharges upon which plaintiffs rely reached Mule Creek, the court cannot at this time conclude that defendants' discharges entered "waters of the U.S." or "caus[ed] or threaten[ed] to cause a condition of pollution or nuisance" therein. (See Small MS4 Permit § B.2.) Accordingly, summary judgment on the issue of whether defendants violated provision B.2 of the Small MS4 Permit will be denied.

### 3. Provision B.3

Provision B.3 of the Small MS4 Permit provides in part: "Discharges through the MS4 of material other than storm water to waters of the U.S. shall be effectively prohibited, except as allowed under this Provision or as otherwise authorized by a separate NPDES permit." (Id. § B.3.) Because to establish a violation of this provision, like with provision B.2, plaintiffs must establish that the contaminants at issue were "[d]ischarge[d] . . . to waters of the U.S.," the same issues identified above, regarding the alleged violations of provision B.2, apply here as well.

In arguing that defendants violated provision B.3, plaintiffs also contend that there are "defects in both the MS4 and [the prison's] sanitary sewer system that allow for indirect connections between the two systems," thereby allowing wastewater to enter and be discharged from the MS4. (Mot. at 32.) In

1   support of this contention, plaintiffs point to a regional water

2   board review of a 2019 CDCR report, in which board staff

3   concluded, based on that report, that there were "numerous

4   locations in [the MS4 and wastewater] systems where infiltration

5   and exfiltration are likely occurring," (Kenny Croyle, Rev. of

6   Revised Storm Water Sys. Investigation Findings Report, Cal.

7   Dept. of Corrs. & Rehab., Mule Creek State Prison, Amador Cnty.

8   § 2.3 (Dec. 7, 2020) (Docket No. 45-20 at 63)), as well as a 2020

9   EPA inspection report identifying "[p]otential commingling of

10  waters between the stormwater and wastewater systems" as an

11  "area[ ] of concern," (Grant Scavello, Env't Prot. Agency, Mule

12  Creek State Prison Inspection Rep. § IV.1 (Nov. 19, 2020) (Docket

13  No. 45-21 at 5) (boldface omitted)).

14          Defendants respond by noting that in response to an

15  order from the regional water board regarding these concerns, the

16  CDCR commissioned an independent investigation into the issue of

17  potential cross-connection between the two systems.  (See Revised

18  Investigation Rep., Executive Summary (Docket No. 49-6 at 97).)

19  A report prepared based on the investigation concluded that dye

20  testing, which was performed to trace whether dye added to the

21  prison's wastewater system migrated into the MS4, revealed no

22  evidence of cross-connections, and it ultimately concluded that

23  there were "no cross-connections between the stormwater and

24  sanitary sewer collection systems, nor . . . any information

25  indicating that the stormwater collection system has been or is

26  being contaminated with sewage, wastewater, or grey water." (Id.

27  §§ 3.4.2.1, 5.)  Although it appears that the reports cited by

28  plaintiffs postdate the period during which defendants'

22

1   independent investigation was conducted, the contradiction

2   between the reports nevertheless creates a genuine dispute of

3   material fact as to whether defendants are violating provision

4   B.3 based on alleged cross-contamination from the sanitary sewer

5   system.

6          Because there are multiple genuinely disputed issues of

7   fact that are germane to whether defendants have violated

8   provision B.3 of the Small MS4 Permit, summary judgment on this

9   issue will be denied.

10             4.   Section D

11         Section D of the Small MS4 Permit provides in part:

12  "Discharges shall not cause or contribute to an exceedance of

13  water quality standards contained in a Statewide Water Quality

14  Control Plan, the California Toxics Rule (CTR), or in the

15  applicable Regional Water Board Basin Plan."  (Small MS4 Permit

16  § D.)  In arguing defendants violated section D, plaintiffs rely

17  on the same conclusions by their expert that defendants'

18  discharges contained levels of contaminants that exceeded water

19  quality standards as they do in arguing defendants violated

20  provision B.1.  (See Mot. at 34-36.)  As noted above, those

21  conclusions rely on the assumption that Mule Creek has a MUN

22  beneficial use designation, but the court has concluded that

23  whether the MUN designation applies to Mule Creek is a disputed

24  issue of material fact.  Accordingly, for the same reason as with

25  provision B.1, at this time the court cannot conclude that

26  defendants are in violation of section D of the Small MS4 permit.

27  Summary judgment on the issue of whether defendants violated

28  section D of the Small MS4 Permit will therefore be denied.

23

1          D.    Violation of Industrial General Permit

2                Finally, plaintiffs argue defendants violated the

3    Industrial General Permit.  The Industrial General Permit

4    includes a host of monitoring and reporting requirements for

5    facilities engaged in industrial activities that are exposed to

6    precipitation but, as noted above, provides an exception for

7    facilities that certify their industrial activities are not

8    exposed to precipitation.  (See Indus. Gen. Permit § XVII.)

9                Plaintiffs rely on a survey of the prison's premises

10   performed by their expert, Karen Ashby, identifying locations in

11   which materials plaintiffs contend are used for industrial

12   purposes were visible and uncovered during Ashby's visit.  (See

13   Mot. at 36-37; Ashby Decl. ¶¶ 26-27.)  These consist of small

14   amounts of trash or debris near the loading dock for the sewing

15   facility; wooden pallets stored outside of industrial buildings;

16   a secondary storage container with liquid on the ground in front

17   of it, indicating a potential leak; and cardboard containers

18   located at the edge of a covered loading dock near the meat

19   packing area.  (See id.)

20               Defendants do not appear to dispute that these

21   materials were present during Ashby's inspection.  (See Opp. at

22   42-44.)  Instead, they contend the prison is in compliance with

23   the exclusion's requirements, pointing to a report by the

24   regional water board following a January 27, 2021 inspection of

25   the industrial facilities, in which the board determined that the

26   prison was indeed in compliance.  (See Cent. Valley Reg. Water

27   Quality Ctrl. Bd., Inspection Report (Feb. 11, 2021) (Docket No.

28   49-12 at 55).)

24

1          Although plaintiffs note that the Industrial General

2    Permit provides that "[i]f circumstances change and Industrial

3    Materials and Activities become exposed to rain, snow, snowmelt,

4    and/or runoff, the conditions for [the no-exposure] exclusion

5    shall no longer apply," (Indus. Gen. Permit § XVII.E.2), the

6    phrasing of this provision suggests that there must be actual --

7    rather than potential -- exposure to precipitation for an

8    otherwise-certified no-exposure exclusion to become invalidated

9    in between certification periods.  This reading finds support in

10   the language of the Industrial General Permit's initial

11   explanation of the NEC exclusion, in which it states: "Discharges

12   composed entirely of storm water that has not been exposed to

13   industrial activity are not industrial storm water discharges."

14   (Id. § XVII.A.)

15         However, plaintiffs have not shown that the materials

16   identified during Ashby's inspection were in fact exposed to

17   precipitation, or that the materials were uncovered for a period

18   long enough to support an inference that they were in fact

19   exposed.  Accordingly, there is at least a dispute of material

20   fact as to whether conditions that would invalidate the prison's

21   NEC coverage outside the context of an annual NEC inspection were

22   present at the time this action was filed.  Because the alleged

23   violation of the Industrial General Permit depends on a

24   determination that the NEC exclusion did not apply, the court

25   will deny summary judgment on the issue of whether defendants

26   violated the Industrial General Permit.

27         IT IS THEREFORE ORDERED that plaintiffs' motion for

28   partial summary judgment (Docket No. 45) be, and the same hereby

25

1    is, GRANTED IN PART and DENIED IN PART as follows:

2         • Summary judgment is GRANTED for plaintiffs,

3           establishing that (1) Mule Creek is a water of the

4           United States and (2) plaintiffs County of Amador and

5           California Sportfishing Protection Alliance have

6           standing to bring this action, <u>see</u> Fed. R. Civ. P.

7           56(a), (g);

8         • Summary judgment is DENIED in all other respects.

9    Dated:  August 29, 2022

10                                   WILLIAM B. SHUBB
                                     UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28