JENNIFER HARTMAN KING (SBN 211313)
ALANNA LUNGREN (SBN 269668)
WILLIAM D. MARSH (SBN 200082)
J. R. PARKER (SBN 320526)
ANDREYA WOO NAZAL (SBN 327651)
HARTMAN KING PC
520 Capitol Mall, Suite 750
Sacramento, CA  95814
Telephone:  (916) 379-7530; Facsimile:  (916) 379-7535
JHartmanKing@HartmanKingLaw.com
ALungren@HartmanKingLaw.com
WMarsh@HartmanKingLaw.com
JRParker@HartmanKingLaw.com
AWooNazal@HartmanKingLaw.com

Exempt From Filing Fees Pursuant To Government Code Section 6103

Attorneys for Defendants KATHLEEN ALLISON, in her official capacity as Secretary of the California Department of Corrections and Rehabilitation; and PATRICK COVELLO, in his official capacity as Warden of California Department of Corrections and Rehabilitation Mule Creek State Prison

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN ALLISON, in her official capacity as Secretary of the California Department of Corrections and Rehabilitation,<br><br>Defendant.<br><br>COUNTY OF AMADOR, *a public agency of the State of California,*<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN ALLISON, in her official capacity as Secretary of the California Department of Corrections and Rehabilitation; and PATRICK COVELLO, in his official capacity as Warden of California Department of Corrections and Rehabilitation Mule Creek State Prison,<br><br>Defendants. | Case No. 2:20-CV-02482-WBS-AC [consolidated with 2:21-CV-00038-WBS-AC]<br><br>**DECLARATION OF TIMOTHY SIMPSON, PE, GE IN SUPPORT OF DEFENDANTS' OPPOSITION TO CALIFORNIA SPORTFISHING PROTECTION ALLIANCE'S MOTION FOR RECONSIDERATION**<br><br>Date:  October 31, 2022<br>Time: 1:30 p.m.<br>Courtroom: 5<br>Judge: Hon. William B. Shubb<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)<br><br>Final Pretrial Conf.: February 13, 2023<br>Trial Setting Conf.: April 18, 2023 |

00055702.1

**DECLARATION OF TIMOTHY SIMPSON, PE, GE
IN SUPPORT OF OPPOSITION TO MOTION FOR RECONSIDERATION**

## DECLARATION OF TIMOTHY SIMPSON, PE, GE

I, Timothy S. Simpson, declare:

1. The facts set forth below are of my own personal knowledge and if called as a witness, I could and would competently testify thereto.

2. I am currently a Vice President and Principal Engineer for GSI Environmental Inc. ("GSI"). My office is located at 19200 Von Karman Ave., Suite 800, Irvine, California 92612. I am a professional Civil and Geotechnical Engineer and have been continuously active as a practicing consulting engineer for over 39 years. My practice includes the general fields of civil engineering, environmental engineering, geotechnical engineering, and regulatory interpretation and compliance. I have received a Bachelor of Science (B.S.) degree in Civil Engineering from Gonzaga University located in Spokane, Washington, and a Master of Science (M.S.) degree in Civil Engineering from the University of California, Irvine, California.

3. I have completed numerous training programs and seminars in environmental engineering, geotechnical engineering, storm water management, contaminant fate and transport, site characterization and remediation, environmental regulations, waste management, environmental statistics, and landfill engineering.

4. I maintain professional licenses in the fields of Civil Engineering and Geotechnical Engineering. These licenses are as follows: Professional Engineer (Civil), California, Number 41121, and Professional Engineer (Geotechnical), California, Number 2228.

5. A significant portion of my practice utilizes my expertise in storm water hydrology and civil and geotechnical engineering to evaluate Clean Water Act permitting and compliance requirements for a wide variety of industrial facilities and municipal clients.

6. I was appointed by the State Water Resources Control Board ("SWRCB") to be a member of the Industrial General Permit Training Team ("IGPTT") tasked with developing training content and testing requirements for the Qualified Industrial Storm Water Practitioner ("QISP") program. I was also the lead industry representative for the scrap metal recycling stakeholders in negotiating the Scrap Metal Recycling Sector Permit that was adopted by the Santa Ana Regional Water Quality Control Board.

7. My work related to storm water permitting and engineering began in 1991 and over the past 31 years I have provided consulting services to hundreds of industrial dischargers and numerous municipalities spanning over every type of Industrial General Storm Water Permit adopted by the SWRCB, along with multiple MS4 permits. I have provided consulting and expert services for a wide range of industries and municipal clients, including chemical and paint manufacturers, asphalt and concrete batch plants, petroleum refineries, landfills (active and inactive), material recovery facilities, recycling operations, automobile dismantlers, metal shredders, foundries, wineries, food processors, airports, ports, metals fabricators and finishing operations, auto dismantlers, mines, and aerospace manufacturers. My municipal permitting clients have included cities, counties, and the State of California.

8. I currently serve as the "Group Leader" for several storm water compliance groups in California, including the Chemical Batch Processors Compliance Group, the California Paint Compliance Group, the California Wineries Compliance Group, the Container Terminal Operators Compliance Group, and the Paper, Glass and Plastic Recyclers Compliance Group.

9. I have assisted many clients with evaluating the potential to qualify for the No Exposure Certification under California's Industrial Stormwater General Permit and I routinely assist clients with pollutant source assessments to establish appropriate monitoring programs. In addition, I have performed numerous reasonable potential analysis evaluations to establish monitoring and effluent limits for dischargers covered under individual National Pollutant Discharge Elimination System permits.

10. I reviewed Plaintiffs' Motion for Partial Summary Judgment ("Partial MSJ") papers, including the declarations of Karen Ashby and Dr. Robert Emerick, and the exhibits cited in support of the MSJ. I also reviewed publicly available documents and data available from the websites of the State Water Resources Control Board and Regional Water Quality Control Board, Central Valley Region ("Regional Board"), such as the Storm Water Multiple Application and report Tracking System ("SMARTS") and the Regional Board's web page relating to the California Department of Corrections and Rehabilitation ("CDCR") Mule Creek State Prison

("MCSP" or "Facility") water quality programs. I also reviewed documents and data disclosed or produced in discovery in the above-captioned action.

11. In my Declaration in Support of Defendants' Opposition to the Partial MSJ, in paragraph 22 I was referring to sampling locations MCSP2 and MCSP3 because those locations pertain to Plaintiffs' allegations of "past violations" while MCSP5 and MCSP6 pertain to alleged "ongoing" violations.

12. The Facility is regulated as a non-traditional small MS4 pursuant to the Central Valley Water Board Order R5-2019-0006 issued on February 8, 2019, and enrolled under the Statewide National Pollutant Discharge Elimination System ("NPDES") General Permit for Waste Discharge Requirements for Storm Water Discharges From Small Separate Storm Sewer Systems ("MS4"), State Board Order 2013-0001-DWQ NPDES No. CAS0004 ("Small MS4 Permit" or "Permit"). In most cases, the Small MS4 Permit does not require sampling and reporting of the Facility's stormwater discharges. But the Regional Board issued a Water Code section 13383 order ("13383 Order") to MCSP to implement an interim monitoring and reporting program to assess potential water quality impacts to Mule Creek while the Facility's stormwater control program was being fully developed and implemented.

13. In additional to not typically requiring sampling, the Small MS4 Permit does not establish numerical discharge limitations so claims of permit violations based on comparing sampling results from monitoring locations MCSP2 and MCSP3 (which are not receiving water monitoring locations) to the water quality *objectives* for *E. Coli* set forth in the Water Quality Control Plan for the California Regional Water Quality Control Board Central Valley Region, Revised February 2019, the Sacramento River Basin and the San Joaquin River Basin ("Basin Plan") and Part 3 of the Water Quality Control Plan for Inland Surface Waters, Enclosed Bays, and Estuaries of California – Bacteria Provisions and a Water Quality Standards Variance Policy ("State Control Plan – Bacteria Provisions"), both of which establish WQOs for receiving waters (i.e., do not establish WQOs for discharges or areas of influence of the discharge), is inconsistent with the Basin Plan's program of implementation for achieving WQOs.

//

14. The Basin Plan states that "the Regional Water Board [is required] to establish water quality objectives, while acknowledging that it is possible for water quality to be changed to some degree without unreasonably affecting beneficial uses." The Basin Plan further explains that WQOs "do not require improvement over naturally occurring background concentrations and in cases where the natural background concentration of a particular constituent exceeds an applicable water quality objective, the natural background concentration will be considered to comply with the objective."

15. Ms. Ashby's conclusions regarding alleged receiving water limitation exceedances are based on comparing results from a single downstream monitoring location (MCSP4) to Basin Plan standards, but she has not demonstrated that discharges from MCSP are causing or contributing to actual receiving water impairments to the extent there are actual impairments to designated beneficial uses. As stated, the Basin Plan states that "the Regional Water Board [is required] to establish water quality objectives, while acknowledging that it is possible for water quality to be changed to some degree without unreasonably affecting beneficial uses. Section 303(d) of the Clean Water Act requires the states to identify water bodies that do not meet, or are not expected to meet, water quality standards (i.e., impaired water bodies). The section 303(d) listing process follows a specified data quality assurance procedure to determine data usability in the assessment in accordance with the Water Quality Control Policy for Developing California's Clean Water Act Section 303(d) List (Listing Policy).[1] Mule Creek, however, has not been designated as an impaired waterbody.

16. In addition, CDCR has conducted toxicity sampling in Mule Creek two times a year to identify whether the MS4 discharge is contributing to toxicity in the receiving water. The toxicity testing demonstrates that MCSP discharges are not creating a toxic condition in Mule Creek. Ms. Ashby disregards this data.

17. As set forth in the MS4 Fact Sheet, the State and Regional Boards have generally directed Small MS4 dischargers to achieve compliance with water quality standards by improving

---

[1] https://www.waterboards.ca.gov/board_decisions/adopted_orders/resolutions/2015/020315_8_amendment_clean_version.pdf

00055702.1                                                 4

**DECLARATION OF TIMOTHY SIMPSON, PE, GE IN SUPPORT OF OPPOSITION TO MOTION FOR RECONSIDERATION**

Best Management Practices ("BMPs") through the iterative process, not through simple application of facility-specific numeric water-quality effluent limitations. For example, Section XI of the Small MS4 Permit Factsheet states that the permit requires "implementation of BMPs in lieu of numeric water quality-based effluent limitations and further, in lieu of 'strict compliance' with water quality standards." Defendants' Request for Judicial Notice, Exhibit C ("MS4 Fact Sheet"), 21. It further states that "the State Board…has prescribed an iterative process of BMP improvement to achieve water quality standards." *Id.* at 21 (citing State Water Board Orders WQ 91-03, 98-01, 2001-15; 40 C.F.R. §122.44(k)).

18. In other words, merely comparing monitoring data with water quality objectives as shown in Ms. Ashby's Expert Report does not support conclusions that CDCR has violated the Small MS4 Permit. In practice, water quality objectives can be used as reference or guidance to assess the effectiveness of BMP/control measures. As recognized in paragraph 5 of Ms. Ashby's Expert Report and to my knowledge, various actions and BMP improvements conducted by MCSP in cooperation with the Regional Board have occurred, including but not limited to preparation of stormwater collection investigative reports, revision of the Facility's monitoring program and conducting toxicity testing in receiving water to identify whether the MS4 discharge is contributing to toxicity in receiving water, among many other Small MS4 program implementation actions taken by MCSP following collaboration with the Regional Board. Without further evidence, it is inappropriate for Ms. Ashby to presume a Permit violation by MCSP merely based on water quality standard exceedances at a single instream monitoring location located in close proximity to the two stormwater outfalls discharging stormwater from MCSP.

19. Ms. Ashby claims that waste discharges are prohibited in Provision B. of the Small MS4 Permit without providing references to any specific sections of the two plans where these purported prohibitions are codified. Based on my working knowledge and review of these plans, there is no specific waste discharge prohibition that applies to the Mule Creek watershed. Thus, there are no applicable waste discharges that are prohibited by these two plans.

20. CDCR, in coordination with the Regional Board, thoroughly investigated whether human waste was present in the Facility's stormwater. The results of this investigation are reflected

in the January 2021 "Quantification of Sources of Fecal Pollution at Mule Creek" study performed by Southern California Coastal Water Research Project (SCCWRP Study) which quantified sources of human fecal pollution at MCSP. This study was commissioned by the Regional Board and CDCR and it concluded that there was almost no human fecal contribution to the *E. coli* detected in stormwater and that the *E. coli* originated mostly from deer and birds. SHN's Revised Stormwater Collection System Investigation Report of Findings also concluded that sources of fecal contaminants derived from bird and ruminant animals, with almost no contribution from humans. These results indicate the major sources of *E. coli* are background non-point sources, which should be considered when assessing whether MCSP is in violation of discharge prohibitions and/or receiving water limitations.

21. Based on my professional experience, chemical indicators, such as ammonia, can also be used to evaluate potential sewage contribution. From data collected at the two stormwater outfalls during 2019-2020, most ammonia levels are non-detect or cannot be quantified. Below is a table summarizing chemical characteristic of various source samples (Table 5-3), from a study on Pathogens in Urban Stormwater System:

https://www.ascepgh.org/Resources/EWRI/Pathogens%20Paper%20August%202014.pdf

As the table indicates, detected ammonia levels are also far below the reference ammonia level for sewer or septic tanks (human fecal sources) and are more in-line with levels reported as "shallow groundwater" or "landscape irrigation." The current data does not suggest any evidence of sewage inputs from MCSP.

//
//
//
//
//
//
//
//

//

Pathogens in Urban Stormwater Systems

**Table 5-3. Summary of Chemical Characteristics of Source Samples Collected in Birmingham, Alabama (Pitt et al. 1993)**

| Source | Conductivity (µS/cm) | Fluoride (mg/L) | Hardness (mg/L as CaCO₃) | Detergent (mg/L) | Fluorescence % scale | Potassium (mg/L) | Ammonia (mg/L) | Color (units) | Chlorine (mg/L) |
|---|---|---|---|---|---|---|---|---|---|
| **Spring Water** | | | | | | | | | |
| mean | 301 | 0.03 | 240 | 0.00 | 6.80 | 0.73 | 0.01 | 0.0 | 0.00 |
| COV | 0.04 | 1.00 | 0.03 | n/a | 0.43 | 0.10 | 2.00 | n/a | n/a |
| distribution | normal | normal | normal | uniform | normal | normal | L-norm | uniform | uniform |
| **Shallow Groundwater** | | | | | | | | | |
| mean | 51.4 | 0.06 | 27.3 | 0.00 | 29.9 | 1.19 | 0.24 | 8.0 | 0.02 |
| COV | 0.84 | 0.50 | 0.39 | n/a | 1.55 | 0.44 | 1.26 | 1.42 | 1.62 |
| distribution | normal | L-norm | normal | uniform | L-norm | normal | normal | L-norm | normal |
| **Tap Water** | | | | | | | | | |
| mean | 112 | 0.97 | 49.3 | 0.00 | 4.63 | 1.55 | 0.03 | 0.0 | 0.88 |
| COV | 0.01 | 0.01 | 0.03 | n/a | 0.08 | 0.04 | 0.23 | n/a | 0.68 |
| distribution | normal | normal | normal | uniform | normal | normal | normal | uniform | bi-modal |
| **Landscaping Irrigation** | | | | | | | | | |
| mean | 105 | 0.90 | 40.2 | 0.00 | 214 | 6.08 | 0.37 | 10.0 | 0.03 |
| COV | 0.07 | 0.11 | 0.04 | n/a | 0.16 | 0.26 | 0.25 | 0.36 | 1.02 |
| distribution | normal | normal | normal | uniform | normal | normal | normal | normal | normal |
| **Sewage** | | | | | | | | | |
| mean | 420 | 0.76 | 143 | 1.50 | 251 | 5.97 | 9.92 | 37.9 | .01 |
| COV | 0.13 | 0.23 | 0.11 | 0.82 | 0.20 | 0.23 | 0.34 | 0.55 | 2.00 |
| distribution | normal | normal | normal | normal | normal | normal | L-norm | normal | L-norm |
| **Septic Tank Discharge** | | | | | | | | | |
| mean | 502 | 0.93 | 56.8 | 3.27 | 382 | 18.8 | 87.2 | 70.6 | 0.07 |
| COV | 0.42 | 0.39 | 0.36 | 1.33 | 0.22 | 0.42 | 0.40 | 0.39 | 1.30 |
| distribution | normal | normal | L-norm | L-norm | normal | normal | normal | normal | normal |
| **Carwash** | | | | | | | | | |
| mean | 485 | 12.30 | 157 | 49.0 | 1190 | 42.7 | 0.24 | 222 | 0.07 |
| COV | 0.06 | 0.19 | 0.05 | 0.10 | 0.11 | 0.37 | 0.28 | 0.35 | 1.14 |
| distribution | normal | normal | normal | normal | normal | normal | normal | normal | bi-modal |
| **Laundry** | | | | | | | | | |
| mean | 563 | 32.82 | 36.2 | 26.9 | 1024 | 3.48 | 0.82 | 46.7 | 0.40 |
| COV | 0.21 | 0.38 | 0.08 | 0.25 | 0.12 | 0.11 | 0.14 | 0.27 | 0.26 |
| distribution | normal | normal | normal | normal | normal | normal | normal | normal | normal |
| **Radiator Waste** | | | | | | | | | |
| mean | 3280 | 149.32 | 5.60 | 15.0 | 22046 | 2802 | 26.3 | 2999 | 0.03 |
| COV | 0.21 | 0.16 | 1.88 | 0.11 | 0.04 | 0.13 | 0.89 | 0.01 | 0.52 |
| distribution | normal | normal | normal | normal | normal | normal | normal | normal | normal |
| **Plating Waste** | | | | | | | | | |
| mean | 10352 | 5.13 | 1430 | 6.81 | 293 | 1009 | 65.6 | 104 | 0.08 |
| COV | 0.45 | 0.47 | 0.32 | 0.68 | 0.70 | 1.24 | 0.66 | 0.91 | 1.20 |
| distribution | normal | normal | normal | normal | normal | L-norm | normal | normal | L-norm |

August 2014          UWRRC Technical Committee Report          86

22. Ms. Ashby failed to account for: (1) the substantial background and upstream contributors of contaminants detected in Mule Creek, including evidence of major contributions of upstream sources of *E. coli* from upstream cattle; (2) the dominant impacts of bird and deer contributions (i.e., background) to contaminants detected at the Facility itself as demonstrated by DNA testing and the 2021 Sources of Fecal Pollution Report; and, (3) stormwater toxicity data showing that discharged effluent is not toxic and poses no threat to aquatic life.

//

//

//

//

23. Ms. Ashby evaluates the analytical monitoring data and disregards the potential for background sources to contribute to what she alleges are discharge violations. As shown on the graph below, the upstream results from MCSP1 (the upstream monitoring location located a significant distance upgradient of the operational areas of MCSP) had numerous *E. coli* detections above the Bacteria Provisions standards, yet she did not consider these background sources of *E. coli* when she improperly attributed all the alleged "violations" at MCSP5 and MCSP6 to discharges from MCSP.



I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on September 29, 2022, at Laguna Beach, California.

_____

Timothy Simpson, P.E., G.E.