EXHIBIT A

Home ⇒ Water Issues ⇒ Programs ⇒ Stormwater

# Storm Water Program

**Phase II Small MS4 General Permit
Questions and Answer Document**

1. **What is MEP? How is it defined?**

   MEP is the acronym for Maximum Extent Practicable. The federal Clean Water Act (CWA) provides that National Pollutant Discharge Elimination System (NPDES) permits for Municipal Separate Storm Sewer Systems (MS4) must require municipalities to reduce pollutants in their storm water discharges to the MEP. (CWA �402(p)(3)(B).) MS4 permits "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods." (Id.)

   The MEP standard involves applying best management practices (BMPs) that are effective in reducing the discharge of pollutants in storm water runoff. In discussing the MEP standard, the State Board has said the following: "There must be a serious attempt to comply, and practical solutions may not be lightly rejected. If, from the list of BMPs, a permittee chooses only a few of the least expensive methods, it is likely that MEP has not been met. On the other hand, if a permittee employs all applicable BMPs except those where it can show that they are not technically feasible in the locality, or whose cost would exceed any benefit to be derived, it would have met the standard. MEP requires permittees to choose effective BMPs, and to reject applicable BMPs only where other effective BMPs will serve the same purpose, the BMPs would not be technically feasible, or the cost would be prohibitive." (Order No. WQ 2000-11, at p.20.) MEP is the result of the cumulative effect of implementing, continuously evaluating, and making corresponding changes to a variety of technically and economically feasible BMPs that ensures the most appropriate controls are implemented in the most effective manner. This process of implementing, evaluating, revising, or adding new BMPs is commonly referred to as the iterative approach (see question 4). For Small MS4s, EPA has stated that pollutant reductions to the MEP will be realized by implementing BMPs through the six minimum measures described in the permit. (64 Federal Register 68753.)

2. **How do I meet the MEP standard?**

   It is recognized that "pollutant reductions that represent MEP may be different for each small MS4, given the unique local hydrologic and geologic concerns that may exist and the differing possible pollutant control strategies. Therefore, each permittee will determine appropriate BMPs to satisfy each of the six minimum control measures through an evaluative process" (Federal Register, Volume 64, No. 235, page 68754, December 8, 1999.).

   The preamble to the Federal Register states: "EPA has intentionally not provided a precise definition of MEP to allow maximum flexibility in MS4 permitting. MS4s need the flexibility to optimize reductions in storm water pollutants on a location-by-location basis. EPA envisions that this evaluative process will consider such factors as conditions of receiving waters, specific local concerns, and other aspects included in a comprehensive watershed plan. Other factors may include MS4 size, climate, implementation schedules, current ability to finance the program, beneficial use of receiving water, hydrology, geology, and capacity to perform operation and maintenance." (Id.)

   We can illustrate the concept of achieving MEP with a graph of water quality benefit versus effort expended to implement the program, where the knee of the cumulative effect curve represents MEP. The Board has endorsed this approach in Order No. WQ 2000-11.



3. **How do you do "more than MEP"?**

   Receiving Water Limitations (RWL), which apply to the larger and fast-growing Small MS4s, are water quality based standards that may require additional controls beyond those that have been implemented to meet the MEP standard. You may ask, "how can controls be implemented that are in addition to the maximum?" If we plot example water quality standards on the "benefit versus effort



   graph," we see current efforts can achieve compliance with some water quality standards, while not achieving compliance with others. Once MEP has been achieved, an evaluation and assessment will take place to determine the approach to be taken to address water quality standards not being achieved. Implementing additional BMPs may be the required action, or, in some cases it may not be possible to achieve compliance with the standard through additional BMPs. In these cases other solutions must be evaluated, such as watershed-based approaches and TMDLs.

4. **What is an iterative approach and is it only applicable to Attachment 4?**

   The iterative approach is a process of implementing BMPs as outlined in your Storm Water Management Program (SWMP), evaluating the effectiveness of those BMPs, and modifying your SWMP accordingly (by changing the implementation of the BMP or replacing it with another BMP) in order to continuously achieve the discharge standard of MEP.

   The RWL contained in Attachment 4 of the Small MS4 Permit specifically require that the iterative process also be utilized if your storm water discharge is found to be causing or contributing to a violation of water quality standards. This requirement acknowledges that addressing receiving water impacts will be addressed in the same process as implemented through your

storm water programs but in a more aggressive, focused manner.

5. **It could be cost prohibitive to develop a SWMP to address ALL the potential sources of pollutants in my community. How should I develop my SWMP given this constraint?**

   Because it may not be feasible to address all the potential sources, problem or potential problem areas should be prioritized. In evaluating sources, consideration should be given to your community's specific resources that need protection, specific pollutants of concern, and other community specific characteristics that can make certain BMPs more effective and efficient to use. For example, if your community is predominantly residential development, your program should focus less on an industrial inspection program and more on sources of pollutants from residential and commercial activities. Applicable BMPs may be landscape maintenance programs for residents and professional landscapers such as point-of-purchase displays and a "Clean Business Program".

6. **What are POCs, and how would I use them to develop my SWMP?**

   POCs is an acronym for "pollutants of concern." They are specific constituents that are relatively more prevalent in your runoff or are causing or threatening to cause impairment in your receiving water. Once these constituents are determined, BMPs should be implemented to target these pollutants. For example, if you discharge to a water body impaired for sediment, you may want to develop outreach programs that focus on sediment. BMPs may include tailgate training sessions for contractors and inspections for small municipal construction projects.

   Determining POCs can be done by water quality monitoring, reviewing water quality data from comparable discharges and comparing those data to water quality objectives, and reviewing the State Board's list of impaired water bodies. If the data indicate that water quality objectives are being exceeded, or may be exceeded in the future, then that constituent should be considered a POC. For example, if a city does not conduct water quality monitoring itself, but the city, or parts of the city has similar land use characteristics as another community that has characterized its runoff for a given area, it can be assumed that they will have the same pollutants of concern.

7. **Phase II MS4s are not required to conduct water quality monitoring, how can I ensure our SWMP is focused on the right environmental concerns without having to collect samples?**

   Although sampling is not required, several other methods may be used to focus BMP efforts. Review of Regional Water Quality Control Plans (Basin Plans) can reveal existing water quality problems in your area. Receiving water monitoring data from other entities or listing of impairment on the 303(d) list of impaired water bodies can also identify water quality problems. For indications of the quality of your discharge, you can review studies such as the National Urban Runoff Program (NURP) that have characterized runoff from different land uses or monitoring data from Phase I communities. [See discussion under POC, question #6]

8. **How do I know when I need to comply with the Receiving Water Limitations and New Development/Re-development Standards provided in Attachment 4?**

   Permittees that operate an MS4 that serves 50,000 people or more, or that serve an area of high growth (which is defined as more than 25% over 10 years), must comply with the Supplemental Provisions contained in Attachment 4 of the Small MS4 General Permit.

   For schools {K-12 [see California Basic Educational Data (CBETs), http://www.cde.ca.gov/ds/sd/cb/], community colleges, and universities}, the population considered is the student population plus the number of faculty and staff.

   Other non-traditional Small MS4s shall use average daily population (staff and visitors), given the available data.

9. **If I do not have to comply with Attachment 4 then does my SWMP need to include a Post-Construction Storm Water Management in New Development and Redevelopment Program?**

   Yes, all Permittees must have a Post Construction Storm Water Management in New Development and Redevelopment. Those that must comply with Attachment 4 shall have a program that is at least as stringent as that contained in the Design Standards in Attachment 4. Those that do not have to comply with Attachment 4 are not required to use the Design Standards in their programs.

10. **What types of information do I have to report in accordance with the non-compliance reporting provision?**

    Provision H.4 of the Small MS4 Permit requires Permittees to notify the appropriate Regional Water Quality Control Board (RWQCB) within 30 days if they cannot certify compliance and/or have had other instances of noncompliance. Instances resulting in emergencies which endanger human health or the environment, must be reported orally to the RWQCB within

24 hours from the time the discharger becomes aware of the circumstance and in writing to the RWQCB within five days of the occurrence. The following table provides examples.

| Notification Requirement: | Example Activity The Triggers Notification: |
|---|---|
| 24-hour oral notification followed with 5-day written notification | Sanitary sewer system overflow in which 5,000 gallons of sanitary wastewater is discharged through the MS4 |
| 30-day written notification | Delay in annual report submittal |
| Annual Report | Ordinance that was projected in SWMP to be adopted within the first 12 months of program implementation was not adopted until the 18th month of program implementation. |

For most cases you will use the annual report as your notification mechanism, which is consistent with Phase I MS4 practice.

11. **Do I need to know the water quality objectives of my receiving waters?**

    The purpose of the permit, and in turn, your program, is to protect water quality, and your BMPs should be designed with this goal in mind. In that light, it is important to be familiar with the water quality objectives for surface waters in your area. You should also be generally aware of the existing quality of your receiving waters compared with water quality objectives.

12. **Where do I find water quality objectives for a specific receiving water?**

    You can find water quality objectives for receiving waters in Basin Plans, which can be downloaded from the internet or reviewed at the appropriate RWQCB office. Additional standards are in the California Toxics Rule, which is also on the internet. Other statewide water quality plans are The California Ocean Plan; Water Quality Control Plan for Control of Temperature in the Coastal and Interstate Waters, and Enclosed Bays and Estuaries of California [California Thermal Plan]; Water Quality Control Plan for the San Francisco Bay/ Sacramento - San Joaquin Delta Estuary; Statewide Water Quality Control Plans - Inland Surface Waters Plan and Enclosed Bays and Estuaries Plan. These documents can be found on the internet. Additionally, http://www.owp.csus.edu/research/stormwatertools/index.php, which is an internet based watershed tool, contains water quality objectives.

13. **If I have coverage under the General Permit for Discharges of Storm Water Associated with Industrial Activity (General Industrial Permit), do I need coverage under the General Permit for the Discharge of Storm Water from Small MS4s?**

    Yes, while some Small MS4s may also be subject to the industrial permit, the MS4 permit and the General Industrial permit have different permit requirements and different standards. The Small MS4 permit requires examining all municipal activities and reducing pollutants to the MEP from those activities. Some of those activities may be subject to the General Industrial Permit, which requires development and implementation of a Storm Water Pollution Prevention Plan (SWPPP) and specific sampling and monitoring.

    There is an exception to this, however. If a non-traditional Small MS4 facility has General Industrial Permit coverage over the entire facility (not just the industrial activity area) and the SWPPP addresses the six Minimum Control Measures, discharges from the Small MS4 are not required to be covered under the Small MS4 Permit. The MS4 must submit to the RWQCB documentation that its SWPPP addresses the six Minimum Control Measures. This arrangement is still subject to public review for 60 days via the internet and approval by the RWQCB.

14. **If I am implementing a Construction Site Storm Water Runoff Control Program in compliance with the Small MS4 Permit, do I need coverage under the General Permit for Discharges of Storm Water Associated with Construction Activity (General Construction Permit) for a construction site?**

    Yes, both permits are needed because the Small MS4 Permit and the General Construction Permit are programmatically different. The Construction Site Storm Water Runoff Control Minimum Control Measure requires the municipality to develop and implement a program that provides local oversight of construction projects within the municipality to ensure that pollutants being discharged from construction sites into the MS4 are reduced. The program must include adopting an ordinance requiring storm water quality controls at construction sites, reviewing site plans, receiving comments from the public regarding the discharge of pollutants from construction sites, inspecting construction sites to ensure that pollutants are not being discharged in storm water runoff, and taking enforcement when necessary.

The General Construction Permit requires a project to have a site specific SWPPP and to implement BMPs specific to activities at the construction site. The General Construction Permit directly regulates landowners engaged in construction involving land disturbance of one acre or more.

15. **What is the purpose of measurable goals and how will they help implement our SWMP?**

    Measurable goals demonstrate and guide progress in implementing your storm water program. Setting and achieving appropriate measurable goals directs you in implementing your storm water program. If they are well thought-out, achieving them should, in turn, make a positive change in the quality of your storm water discharge. While measurable goals should be achievable, they should also be something that you are striving for, which accordingly, will demonstrate your compliance with MEP.

16. **What happens if I do not achieve my measurable goals?**

    It may become apparent through implementation of your program that measurable goals may not be completely achieved, due to constraints that were unforeseeable when the program was written. If it becomes apparent that a measurable goal will not be achieved, either in part, or in its entirety, it should be reported in your annual report. An explanation of why the measurable goal will not be achieved must be provided. The revised schedule may include a new timeframe for completing the same task, or it may be a new task. The key of measurable goals is that they allow for and demonstrate progress. In some cases, there may still be progress and pollutants may still be reduced to the MEP if only part of the measurable goal is accomplished and/or alternatives are identified and pursued.

17. **I've submitted a complete application package to the RWQCB; when will I be covered by the Small MS4 Permit?**

    Permit coverage only commences after: 1) staff has reviewed the SWMP to determine compliance with MEP and has recommended coverage under the Small MS4 Permit, 2) the SWMP is made available for public review for a minimum of 60 days, and 3) permit coverage has been approved by either the RWQCB or its Executive Officer.

18. **Do I have five years from the time permit coverage commences to implement my SWMP?**

    Yes, you have five years to implement your SWMP from when permit coverage commences.

19. **What happens if a third party requests a hearing on my SWMP?**

    During the 60-day public review period, which takes place after staff has reviewed the SWMP and recommends permit coverage, a third party (or the applicant) may request that permit coverage approval be decided by the RWQCB. The third party must request a hearing from the RWQCB in a written letter that includes the reason(s) the hearing is being requested (e.g. why the SWMP is inadequate).

    If a hearing is requested, the item will be placed on the next available RWQCB meeting agenda. Because of the minimum noticing requirements, this will be at least 30 days from when a hearing is requested plus the time necessary for the administrative procedures involved in preparing for the meeting.

    Ideally, RWQCB staff will arrange a meeting between themselves, the applicant, and the party requesting the hearing (petitioner) to resolve the issues of concern. If an agreement is reached, a hearing may be avoided. If the requirements include significant revisions to the SWMP, a new notice period may be required. If an agreement is not reached, the hearing will proceed. The RWQCB will decide whether permit coverage shall commence or whether the SWMP needs to be revised after hearing testimony from interested persons.

20. **How do I measure or assess the effectiveness of our SWMP?**

    An effective program should result in a reduction of pollutants in storm water discharges, however, direct water quality improvements are often hard to detect and demonstrate. Therefore, indirect measures and assumptions may be used to assess the effectiveness of your storm water program.

    Your program must be assessed on multiple levels. One assessment is whether the BMPs you have chosen have the potential to reduce pollutants in storm water runoff. Another assessment is whether the BMPs are effective, are implemented as designed, and are maintained.

    For instance, it can be assumed that if you have a curbside oil collection program, a portion of the oil collected is oil that could have been disposed of improperly and ended up in storm water runoff. However, after tracking this program, you may find you are not collecting very much used oil because your used oil collection program requires special containers and the service is not being advertised. Therefore, the program may not be significantly reducing the amount of used oil being

disposed of improperly. In this example you can make an assumption that the BMP is good, but after analyzing the data, indications are that very few people use the service, and you can conclude the BMP is not being implemented effectively.

21. **What is to be included in the Annual Report?**

    The annual report is to show progress of program implementation. It shall include the status of measurable goals completed during the reporting period, an evaluation of BMPs and the effectiveness of their implementation, and revisions to BMPs or measurable goals with justifications as to why the revisions are necessary.

22. **What is the purpose of the Annual Report?**

    The annual report demonstrates compliance with the Small MS4 Permit, and more importantly, it is a tool for you to assess the effectiveness of your program. It is a tool for you to demonstrate your SWMP has made improvements in the quality of your storm water discharge.

    By prudently evaluating the information gathered through achieving your measurable goals (or other information), you can identify where changes may be made to make your program more effective and then proceed to determine whether the changes are feasible, and finally, implement the appropriate changes.

    For example, as part of your Construction Site Storm Water Control Program, you have a hotline, site inspectors, and one outreach workshop for contractors. After a year of implementation, the data collected indicates that there has not been a decrease in the number of complaints on the hotline regarding problem construction sites. This could indicate that while construction site control practices are improving, more people are becoming aware of the hotline, resulting in no net change in the number of calls received. However, the inspection data gathered shows that 75% of the construction sites inspected are in violation of the City's storm water ordinance. With this additional information it is more likely that the construction site control program is not effective.

    One potential solution to make the program more effective is to increase field presence by hiring 3 more inspectors. However, the City may not have the budget for that. Another possible solution is to improve your training program for contractors and developers, and to "advertise" the enforcement actions taken on the problem sites that have been inspected. To your knowledge, either solution may be effective, but the second solution is more feasible for the City so your SWMP should be revised to incorporate the modified BMPs (i.e. assess and expand training, outline procedures to highlight enforcement actions against construction sites found in violation of ordinance).

23. **Am I responsible for discharges into my MS4 from other entities?**

    Yes, wastes discharged from your system are your responsibility so discharges into your system become your responsibility. However, there are actions you can take if you determine that another entity that is not within your authority to control, is contributing pollutants to your system. The other discharges may be subject to an NPDES or other waste discharge requirements. You may work with your local RWQCB to identify and control other sources if they are beyond your authority.

24. **What are the applicable state and local noticing requirements?**

    The major notification requirements applicable to the Public Involvement and Participation Minimum Control Measure is the Bagley-Keene Open Meeting Act for state agencies and the Brown Act for city and county governments. Permittees must determine what additional state and/or local notice requirements apply.

(updated 8/5/04)

Conditions of Use | Privacy Policy
Copyright © 2022 State of California

The California Water Boards include the State Water Resources Control Board and nine Regional Boards
The State Water Board is one of six environmental entities operating under
the authority of the California Environmental Protection Agency
Cal/EPA | ARB | CalRecycle | DPR | DTSC | OEHHA | **SWRCB**

.