# EXHIBIT A

# NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM (NPDES) GENERAL PERMIT FOR WASTE DISCHARGE REQUIREMENTS (WDRs) FOR STORM WATER DISCHARGES FROM SMALL MUNICIPAL SEPARATE STORM SEWER SYSTEMS (MS4s)

WATER QUALITY (WQ) ORDER 2013-0001-DWQ NPDES NO. CAS000004
AS AMENDED BY ORDER WQ 2015-0133-EXEC, ORDER WQ 2016-0069-EXEC,
WQ ORDER 2017-XXXX-DWQ, ORDER WQ 2018-0001-EXEC, AND
ORDER WQ 2018-0007-EXEC

| | |
|---|---|
| WQ Order 2013-0001-DWQ was adopted by the State Water Resources Control Board on: | February 5, 2013 |
| WQ Order 2013-0001-DWQ became effective on: | July 1, 2013 |
| The Executive Director of the State Water Resources Control Board issued Order WQ 2015-0133-EXEC on: | September 2, 2015 |
| The Executive Director of the State Water Resources Control Board issued Order WQ 2016-0069-EXEC on: | June 20, 2016 |
| WQ Order 2017-XXXX-DWQ, amending Order 2013-0001-DWQ, was adopted by the State Water Resources Control Board on: | December 19, 2017 |
| The Executive Director of the State Water Resources Control Board issued Order WQ 2018-0001-EXEC on: | January 24, 2018 |
| The Executive Director of the State Water Resources Control Board issued Order WQ 2018-0007-EXEC on: | March 13, 2018 |
| The amendments to WQ Order 2013-0001-DWQ contained in WQ Order 2017-XXXX-DWQ are effective on: | January 1, 2019 |

I, Jeanine Townsend, Clerk to the Board, do hereby certify that this Order with all attachments is a full, true, and correct copy of an Order adopted by the State Water Resources Control Board on February 5, 2013, and amended by the Executive Director of the State Water Resources Control Board on September 2, 2015, June 20, 2016, and January 24, 2018, and amended by the State Water Resources Control Board on December 19, 2017.

_____
Jeanine Townsend
Clerk to the Board

FELICIA MARCUS, CHAIR | EILEEN SOBECK, EXECUTIVE DIRECTOR

1001 I Street, Sacramento, CA 95814 | Mailing Address: P.O. Box 100, Sacramento, CA 95812-0100 | www.waterboards.ca.gov

 RECYCLED PAPER

UNOFFICIAL DRAFT — Not Certified by Clerk

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**STATE WATER RESOURCES CONTROL BOARD**
**WATER QUALITY ORDER NO. 2013-0001-DWQ**

**AS AMENDED BY**
**ORDER WQ 2015-0133-EXEC,**
**ORDER WQ 2016-0069-EXEC,**
**WQ ORDER 2017-XXXX-DWQ,**
**ORDER WQ 2018-0001-EXEC, AND**
**ORDER WQ 2018-0007-EXEC**

**NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM (NPDES)**
**GENERAL PERMIT NO. CAS000004**

**WASTE DISCHARGE REQUIREMENTS (WDRs)**
**FOR STORM WATER DISCHARGES FROM SMALL MUNICIPAL SEPARATE STORM**
**SEWER SYSTEMS (MS4s) (GENERAL PERMIT)**

CONTENTS

STATE WATER RESOURCES CONTROL BOARD .......................................................... 2
WASTE DISCHARGE REQUIREMENTS (WDRS) ............................................................ 2
FINDINGS ........................................................................................................................ 6
A.  APPLICATION REQUIREMENTS FOR ALL SMALL MS4 PERMITTEES ............... 15
B.  DISCHARGE PROHIBITIONS ................................................................................. 18
C.  EFFLUENT LIMITATIONS ...................................................................................... 20
D.  RECEIVING WATER LIMITATIONS ........................................................................ 20
E.  PROVISIONS FOR ALL TRADITIONAL SMALL MS4 PERMITTEES ...................... 21
E.1.  RENEWAL TRADITIONAL SMALL MS4 PERMITTEES ........................................ 21
E.2.  NEW TRADITIONAL SMALL MS4 PERMITTEES .................................................. 21
E.3.  NON-TRADITIONAL SMALL MS4S PERMITTEES ................................................ 21
E.4.  SMALL MS4 ASBS PERMITTEES ........................................................................ 21
E.5.  SEPARATE IMPLEMENTING ENTITY (SIE) ........................................................ 22
E.6.  PROGRAM MANAGEMENT ELEMENT ................................................................ 22
E.7.  EDUCATION AND OUTREACH PROGRAM ......................................................... 26
E.8.  PUBLIC INVOLVEMENT AND PARTICIPATION PROGRAM ............................... 31
E.9.  ILLICIT DISCHARGE DETECTION AND ELIMINATION ....................................... 32
E.10.  CONSTRUCTION SITE STORM WATER RUNOFF CONTROL PROGRAM ..... 39
E.11.  POLLUTION PREVENTION/GOOD HOUSEKEEPING FOR PERMITTEE
         OPERATIONS PROGRAM ................................................................................... 41
E.12.  POST CONSTRUCTION STORM WATER MANAGEMENT PROGRAM .......... 49
E.13.  WATER QUALITY MONITORING ...................................................................... 63
E.14.  PROGRAM EFFECTIVENESS ASSESSMENT AND IMPROVEMENT ............. 73
E.15.  TOTAL MAXIMUM DAILY LOADS COMPLIANCE REQUIREMENTS ................ 76
E.16.  ANNUAL REPORTING PROGRAM .................................................................... 80
F.  NON-TRADITIONAL SMALL MS4 PERMITTEE PROVISIONS ............................... 80
F.1.  NON-TRADITIONAL SMALL MS4 CATEGORIES ................................................ 80
F.2.  SECURITY CONCERNS ....................................................................................... 81
F.3.  MAXIMIZE EFFICIENCY ...................................................................................... 81
F.4.  EQUIVALENT OR EXISTING DOCUMENT .......................................................... 81
F.5.  PROVISIONS ....................................................................................................... 81
G.  REGIONAL WATER BOARD AUTHORITIES ........................................................ 110
H.  DISPUTE RESOLUTION ...................................................................................... 110
I.   PERMIT RE-OPENER ........................................................................................... 111
J.  PERMIT EXPIRATION .......................................................................................... 111
CERTIFICATION .......................................................................................................... 112

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-
0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

**ATTACHMENTS**

Attachment A   —  Traditional Small MS4 List
Attachment B   —  Non-traditional Small MS4 List
Attachment C   —  ASBS Specific Provisions
Attachment D   —  ASBS Dischargers List
Attachment E   —  CBSM Requirements
Attachment F   —  Standard Provisions
Attachment G   —  TMDLs
Attachment H   —  Acronyms
Attachment I    —  Glossary
Designation Flow Chart
Monitoring Flow Chart

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**FINDINGS**
**The State Water Resources Control Board (State Water Board) finds that:**

1. Storm water is a resource and an asset and should not be treated as a waste product. Managing rainwater and storm water at the source is a more effective and sustainable alternative to augmenting water supply, preventing impacts from flooding, mitigating storm water pollution, creating green space, and enhancing fish and wildlife habitat. California encourages alternative, innovative, multi-objective solutions to help use and protect this valuable resource, while at the same time controlling pollution due to urban runoff.

2. As human population increases, urban development creates new pollution sources and brings with it proportionately higher levels of car emissions, car maintenance wastes, municipal sewage, pesticides, household hazardous wastes, pet wastes, trash, etc. which can either be washed or directly dumped into the municipal separate storm sewer system (MS4). As a result, the runoff leaving the developed urban area is greater in pollutant load than the pre-development runoff from the same area.  Also, when natural vegetated pervious ground cover is converted to impervious surfaces such as paved highways, streets, rooftops, walkways and parking lots, the natural absorption and infiltration abilities of the land are lost.  Therefore, runoff leaving developed urban area is significantly greater in runoff volume, velocity, peak flow rate, and duration than pre-development runoff from the same area.  The increased volume, velocity, rate, and duration of runoff greatly accelerate the erosion of downstream natural channels.  In addition, the greater the impervious cover the greater the significance of the degradation.

3. Pollutants of concern found in urban runoff include sediments, non-sediment solids, nutrients, pathogens, oxygen-demanding substances, petroleum hydrocarbons, heavy metals, floatables, polycyclic aromatic hydrocarbons (PAHs), trash, pesticides and herbicides.

4. Trash and litter are a pervasive problem in California. Controlling trash is a priority, because trash adversely affects our use of California's waterways. Trash impacts aquatic life in streams, rivers, and the ocean as well as terrestrial species in adjacent riparian and shore areas. Trash, particularly plastics, persists for years. It concentrates organic toxins, entangles and ensnares wildlife, and disrupts feeding when animals mistake plastic for food and ingest it. Additionally, trash creates aesthetic impacts, impairing our ability to enjoy our waterways.

5. The State Water Resources Control Board (State Board) is developing a statewide policy for trash control in California's waterways. The draft Trash Policy will identify trash as a separate pollutant and establish methods to control trash pollution in waterways, statewide. Following adoption of the draft Trash Policy, the State Water Board may re-open this Order to incorporate water body trash pollution control methods and introduce Trash Reduction Program requirements.

6. A higher percentage of impervious area in urban areas correlates to a greater pollutant loading, resulting in turbid water, nutrient enrichment, bacterial contamination, organic matter loads, toxic compounds, temperature increases, and increases in trash or debris.

7. Conventional landscaping features large lawns, non-native plants, abundant irrigation, and heavy use of fertilizers, herbicides, and pesticides. It frequently requires significant mowing, blowing, trimming, and removal of plants debris. Adopting more storm water-friendly

landscape practices reduces pollutants and also provides tangible water conservation, wildlife habitat, and energy saving benefits.

8.  The State Water Board recognizes that this Order affects varied and diverse entities, including agencies that are required to carry out water conservation regulations, wastewater discharge regulations, and land use regulations that may implement, all or in part, provisions of this Order. The State Water Board seeks to minimize duplicate efforts and maximize resources to achieve the greatest water quality benefit; thus the State Water Board recognizes specified related regulations, cited in the body of this Order, as equivalent to implementing designated provisions of this Order.

9.  When water quality impacts are considered during the planning stages of a project, new development and many redevelopment projects can more efficiently incorporate measures to protect water quality.

10. In California, urban storm water is listed as the primary source of impairment for ten percent of all rivers, ten percent of all lakes and reservoirs, and 17 percent of all estuaries (2010 Integrated Report). Although these numbers may seem low, urban areas cover just six percent of the land mass of California and so their influence is disproportionately large. Urbanization causes changes in the landscape, including increased loads of chemical pollutants, increased toxicity, changes to flow magnitude, frequency, and seasonality of various discharges, physical changes to stream, lake, or wetland habitats, changes in the energy dynamics of food webs, sunlight, and temperature; and biotic interactions between native and exotic species. In addition to surface water impacts, urbanization can alter the amount and quality of storm water that infiltrates and recharges groundwater aquifers.

11. Education and awareness programs help change human behavior with respect to reducing the amount of pollution generated from storm water sources within the Permittee's MS4 system. In addition to education, encouraging public participation in local storm water programs can lead to program improvement as well as enabling people to identify and report a pollution-causing activity, such as spotting an illicit discharge.

12. Field experience in conducting outfall surveys indicates that illicit discharges may be present at 2 to 5 percent of all outfalls at any given time. Given that pollutants are being introduced into the receiving water during dry weather, illicit discharges may have an amplified effect on water quality and biological diversity.[1] Therefore, implementation of an effective Illicit Discharge and Detection Elimination program in conjunction with focused wet weather monitoring, as necessary, is an essential component of an effective municipal storm water program.

13. In 1990, the U.S. Environmental Protection Agency (U.S. EPA) promulgated rules establishing Phase I of the National Pollutant Discharge Elimination System (NPDES) storm water program. The Phase I program for MS4s requires operators of "medium" and "large" MS4s, that is, those that generally serve populations of 100,000 or greater, to implement a storm water management program as a means to control polluted discharges from these MS4s.

14. A MS4 is a conveyance or system of conveyances that is: 1) owned by a state, city, town, village, or other public entity that discharges to waters of the United States; 2) designed or used to collect or convey storm water (including storm drains, pipes, ditches, etc.); 3) not a

---

[1]   Urban Stormwater Management in the United States, National research Council, 2008

Page 7

UNOFFICIAL DRAFT — Not Certified by Clerk

combined sewer; and 4) not part of a Publicly Owned Treatment Works or sewage treatment plant.

15. On December 8, 1999, U.S. EPA promulgated Phase II storm water regulations under authority of the Clean Water Act section 402(p)(6). The Phase II Storm Water requires State Water Board to issue NPDES storm water permits to operators of Small MS4s.

16. On April 30, 2003, the State Water Board adopted Water Quality Order No. 2003-0005-DWQ, NPDES General Permit CAS000004 WDRs for Storm Water Discharges from Small Municipal Separate Storm Sewer Systems (General Permit) to comply with Clean Water Act section 402(p)(6). (Available at: http://www.waterbo ards.ca.gov/board_decisions/adopted_orders/water_quality/2003/wqo/wqo2003_0005dwq .pdf).

17. Title 40 of the Code of Federal Regulations (40 C.F.R.) section 122.26(b)(16) defines Small MS4s as those not defined as "large" or "medium" MS4s under section 122.26(b)(4) or (b)(7) or designated under 40 Code of Federal Regulations section 122.26(a)(1)(v).  The term Small MS4s includes systems similar to separate storm sewer systems in municipalities, such as systems at military bases, large hospital or prison complexes, and highways and other thoroughfares. (40 C.F.R. §122.26(b)(16)(iii).)  These latter subsets of Small MS4s are referred to herein as Non-traditional Small MS4s. Non-traditional Small MS4s discharge the same types of pollutants that are typically associated with urban runoff. Separate storm sewers in very discrete areas, such as individual buildings, are not defined as Small MS4s.

18. Of the Small MS4s defined by federal regulations, only "Regulated Small MS4s" (also referred to as "Permittees" herein) must obtain an NPDES permit. Small MS4s are designated as Regulated Small MS4s in this Order in accordance with the criteria described in Findings 19-25.[2]

19. Under 40 Code of Federal Regulations section 122.32(a)(1) all Small MS4s located within an "urbanized area" as determined by the latest Decennial Census by the Bureau of the Census (Urbanized Area) are automatically designated as Regulated Small MS4s.

20. Under 40 Code of Federal Regulations sections 122.32(a)(2) and 123.35(b) the State Water Board is directed to develop a process, as well as criteria, to designate Small MS4s located outside of an Urbanized Area as Regulated Small MS4s. These criteria are to evaluate whether a storm water discharge results in or has the potential to result in exceedances of water quality standards, including impairment of designated uses, or other significant water quality impacts, including habitat and biological impacts.

21. Under guidance provided in 40 Code of Federal Regulations secton 123.35(b)(1)(ii), for determining other significant water quality impacts, U.S. EPA recommends a balanced

---

[2]  In addition to the designation criteria specified in this Order, the State Water Board may designate a Small MS4 as a Regulated Small MS4 in response to a petition received under 40 Code of Federal Regulations section 122.26(f). Any person may petition the State Water Board to require an NPDES permit for a discharge composed entirely of storm water that contributes to a violation of a water quality standard or is a significant contributor of pollutants to the waters of the United States. (Id.). The State Water Board must make a final determination on any petition within 180 days after receiving the petition. (40 C.F.R. §123.35(c).)

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

consideration of the following designation criteria on a watershed or other local basis: discharge to sensitive waters, high growth or growth potential, high population density, contiguity to an urbanized area, significant contributor of pollutants to waters of the U.S., and ineffective protection of water quality by other programs.

22. The State Water Board is required to apply the designation criteria at a minimum to all Small MS4s located outside of Urbanized Areas serving jurisdictions with a population density of at least 1,000 people per square mile and a population of at least 10,000. (40 C.F.R. §123.35(b)(2).) The State Water Board has discretion to apply the criteria to jurisdictions with smaller population or lower density. All such jurisdictions are then Regulated Small MS4s.

23. In developing the designation criteria, the State Water Board included factors indicative of the potential to result in exceedances of water quality standards and other significant water quality impacts. The following criteria are used to designate Small MS4s outside of Urbanized Areas as Regulated Small MS4s in this Order.

   a. The Small MS4 has high population *and* high population density – High population means a population of 10,000 or more. High population density means a density of 1,000 residents per square mile or greater. Also, to be considered in this definition is a high density created by a non-residential population, such as tourists or commuters.

   b. The Small MS4 discharges to Areas of Special Biological Significance (ASBS) as defined in the California Ocean Plan.

24. Designation of additional Small MS4s as Regulated Small MS4s may be made by the Regional Water Boards on a case by case basis. Case by case determinations of designation shall be based on the potential of a Small MS4's discharges to result in exceedances of water quality standards, including impairment of designated uses, or other significant water quality impacts, including habitat and biological impacts. Where such case by case designations have been recommended by the Regional Water Boards prior to adoption of this Order, the designated Small MS4s are listed on the relevant Attachments to the Order and the reasons for designation are laid out in the Fact Sheet. The Regional Water Boards may continue to make case by case determinations of designation during the permit term. Such designations must be approved by the Regional Water Board after public review and comment.

25. 40 Code of Federal Regulations section 123.35(b)(4) requires designation as a Regulated Small MS4 of any Small MS4 outside an Urbanized Area that contributes substantially to the pollutant loadings of a physically interconnected MS4 regulated by the NPDES storm water program. A Small MS4 is interconnected with a separately permitted MS4 if storm water that has entered the Small MS4 is allowed to flow directly into a permitted MS4. In general, if the Small MS4 discharges more than ten percent of its storm water to the permitted MS4, or its discharge makes up more than ten percent of the permitted MS4's total storm water volume, it is a significant contributor of pollutants to the permitted MS4. In specific cases, the MS4s involved or third parties may show that the ten percent threshold is inappropriate for the MS4 in question.

26. Regulated Small MS4s may seek a waiver from Phase II requirements if they meet criteria specified in 40 Code of Federal Regulations sections 122.32(c)-(e).[3] The State Water

---

[3]  Waiver criteria also found at 40 C.F.R. 123.35(d).

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

Board has additionally provided for a waiver for those communities outside of urbanized areas with a population of 20,000 or less with an annual median household income (MHI) that is less than 80 percent of the statewide annual MHI. (Wat. Code, § 79505.5, subd. (a)).

27. Small MS4s face highly variable conditions both in terms of threats to water quality from their storm water discharges and resources available to manage those discharges. Therefore, one set of prescriptive requirements is not an appropriate regulatory approach for all Regulated Small MS4s. This Order distinguishes between New and Renewal Traditional Small MS4 Permittees. Additionally, this Order addresses differences between Traditional and Non-traditional Small MS4s by detailing Non- traditional Small MS4 specific provisions in Section F Non-Traditional Small MS4 Provisions. Provisions are tailored to address the diverse program structures of Non- traditional Small MS4s to allow for an appropriate regulatory approach.

28. There are variable levels of resources available to Regulated Small MS4s for public outreach and education and water quality monitoring. Recognizing this, the Order gives Permittees numerous compliance options in these two program areas. However, all Regulated Small MS4s that discharge to ASBS or impaired water bodies[4] must conduct monitoring as specified in Attachment C and Attachment G, respectively. All Regulated Small MS4s with a population of 50,000 or more must conduct monitoring specified in Sections E.13.d.1. or E.13.d.2. of the Order or as approved by the Executive Officer of the applicable Regional Board. Additionally, for the public outreach program, the Regional Water Boards may require the Regulated Small MS4s to utilize the approach of Community-Based Social Marketing.

29. Renewal Traditional Small MS4 Permittees shall comply with Section E.  Certain provisions within Section E contain compliance dates that are past the effective date of this Order, in these cases, the Permittee shall implement its existing program until that date.

30. This Order modifies the existing General Permit, Order 2003-0005-DWQ by establishing the storm water management program requirements in the Order and defining the minimum acceptable elements of the municipal storm water management program. Minimum permit requirements are known at the time of permit issuance and not left to be determined later through Regional Water Board review and approval of Storm Water Management Plans (SWMPs).

31. The State Water Board recognizes the necessity of a storm water program guidance document specific to each Permittee to provide planning and guidance for each program area and to identify responsible implementing parties. Permittees must develop and implement a storm water program guidance document and must submit the document during the application process.

---

[4]  A waterbody that has been determined under state policy and federal law to not meet water quality standards. An impaired water is a water that has been listed on the California 303(d) list or has not yet been listed but otherwise meets the criteria for listing. A water is a portion of a surface water of the state, including ocean, estuary, lake, river, creek, or wetland. The water currently may not be meeting state water quality standards or may be determined to be threatened and have the potential to not meet standards in the future. The State of California's 303(d) list can be found at http://www.swrcb.ca.gov/quality.html.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

32. The State Water Board recognizes that in some instances Renewal Permittees' SWMPs that were approved under the prior General Permit, Order 2003-0005-DWQ have incorporated BMPs designed to address locality-specific storm water issues and that in some cases these BMPs may, because of locality-specific factors, be more protective of water quality than the minimum requirements established by this Order. Renewal Permittees will additionally include in the guidance document the following: identification and brief description of each BMP and associated measurable goal included in the Permittee's previously approved SWMP under the prior General Permit, Order 2003-0005-DWQ, that constitutes a more specific local or tailored level of implementation that may be more protective of water quality than the minimum requirements of this Order; and identification of whether the Permittee proposes to maintain, reduce, or cease implementation for each more protective, locally- tailored BMP. In no instance may a BMP be reduced or ceased if it is required by the minimum standards set by this Order.

33. Minimum measures have been established in this Order to simplify assessment of compliance and allow the public to more easily assess each Permittee's compliance.

34. Each provision establishes the required task description, minimum implementation levels (i.e., escalating enforcement, reporting requirements for tracking projects, number of monitoring sites, etc.), and reporting elements to substantiate that the Permittee meets these implementation levels. Regional Water Board staff will be able to evaluate each individual Permittee's compliance through Annual Report review and the program evaluation (audit) process.

35. The provisions contained in this Order were derived from two main U.S. EPA documents: MS4 Program Evaluation Guide[5] and the MS4 Permit Improvement Guide[6] along with interviews and information gathered from a lengthy collaborative stakeholder process.

36. Consistent with Clean Water Act section 402(p)(3)(B)(iii), this Order requires controls to reduce pollutants from the MS4 to the maximum extent practicable (MEP). The MEP standard requires Permittees to apply Best Management Practices (BMPs) that are effective in reducing or eliminating the discharge of pollutants to the waters of the U.S. MEP emphasizes pollutant reduction and source control BMPs to prevent pollutants from entering storm water runoff. MEP may require treatment of the storm water runoff if it contains pollutants. The MEP standard is an ever-evolving, flexible, and advancing concept, which considers technical and economic feasibility. BMP development is a dynamic process and may require changes over time as the Permittees gain experience and/or the state of the science and art progresses. To do this, the Permittees must conduct and document evaluation and assessment of each relevant element of its program, and their program as a whole, and revise activities, control measures/BMPs, and measurable goals, as necessary to meet MEP. MEP is the cumulative result of implementing, evaluating, and creating corresponding changes to a variety of technically appropriate and economically feasible BMPs, ensuring that the most appropriate BMPs are implemented in the most effective manner.

37. The Order's Receiving Water Limitations language is consistent with State Water Board Order WQ 99-05 (*Orange County*) adopted by the State Water Board on June 17, 1999.

---

[5]  Municipal Separate Storm Sewer System (MS4) Program Evaluation Guidance, USEPA, EPA-833-R-07-003, January 1, 2007

[6]  MS4 Permit Improvement Guide, USEPA, April 1, 2010

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Receiving Water Limitations apply to all Permittees subject to this Order. The State Water Board held a workshop on November 20, 2012, to hear comments on the receiving water limitations provisions in MS4 permits. This Order has a reopener clause that will allow the State Water Board to reopen the Order if the Board directs changes to the Receiving Water Limitations language based on comments received. (State Water Board Order WQ 99-05 above is available at: http://www.waterboards.ca.gov/board_decisions/adopted_orders/water_quality/1999/wq1999_05.pdf).

38. Non-storm water discharges consist of all discharges from an MS4 that do not originate from precipitation events. This Order effectively prohibits non-storm water discharges through an MS4 into waters of the U.S. Certain categories of non-storm water discharges are conditionally exempt as specified at 40 Code of Federal Regulations section 122.26(d)(2)(iv)(B)(1). Non-storm water discharges that are regulated by a separate NPDES permit are not subject to the discharge prohibition. Prohibited non-storm water discharges include conditionally exempt discharges that are found to be a significant source of pollutants to waters of the U.S.

39. Non-storm water discharges to ASBS are prohibited except as specified in the General Exception. Certain enumerated non-storm water discharges are allowed under the General Exception if essential for emergency response purposes, structural stability, slope stability, or if occur naturally. In addition, an NPDES permitting authority may authorize non-storm water discharges to an MS4 with a direct discharge to an ASBS to the extent the NPDES permitting authority finds that the discharge does not alter natural ocean water quality in the ASBS. This Order allows utility vault discharges to an MS4 with a direct discharge to an ASBS, provided the discharge is authorized by the General NPDES Permit for Discharges from Utility Vaults and Underground Structures to Surface Water, NPDES No. CAG 990002. The State Water Board is in the process of reissuing the General NPDES Permit for Utility Vaults. As part of the renewal, the State Water Board will require a study to characterize representative utility vault discharges to an MS4 with a direct discharge to an ASBS and will impose conditions on such discharges to ensure the discharges do not alter natural ocean water quality in the ASBS. Given the limited number and intermittent nature of utility vault discharges to MS4s that discharge directly to an ASBS, the State Water Board finds that discharges from utility vaults and underground structures to an MS4 with a direct discharge to an ASBS are not expected to result in a substantial alteration of natural ocean water quality in the ASBS in the interim period while the General NPDES Permit for Discharges from Utility Vaults is renewed and the study is completed. Other short-duration, intermittent non-storm water discharges related to LUPs (e.g. groundwater dewatering, potable water system flushing, hydrotest discharges) are regulated under NPDES permits issued by the Regional Water Boards. Although such discharges are not specifically enumerated in the General Exception as essential for emergency response purposes, structural stability, or slope stability, they may be required to ensure the safety and stability of the utility systems or for operations and maintenance and for extending these essential services. For this reason, and because the short-duration and intermittent nature of these discharges renders them unlikely to result in substantial alteration of natural ocean water quality in the ASBS, this Order permits such discharges to a segment of the MS4 with a direct discharge to an ASBS provided they are authorized by an NPDES permit issued by the State Water Board or relevant Regional Water Board. However, if a Regional Water Board determines a specific discharge from a utility vault or underground

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

structure does alter the natural ocean water quality in an ASBS, the Regional Water Board may prohibit the discharge as specified in this Order.

40. Total Maximum Daily Loads (TMDL) are numerical calculations of the maximum amount of a pollutant that a water body can assimilate and still meet water quality standards. A TMDL is the sum of the allowable loads of a single pollutant from all contributing point sources (waste load allocations) and non-point sources (load allocations), background contribution, plus a margin of safety. Discharges from Small MS4s are point source discharges subject to TMDLs. TMDLs are a mechanism to achieve compliance with water quality standards (i.e. receiving water limitations in this Order) in impaired water bodies. Incorporation of TMDL-based requirements into the MS4 permit, consistent with applicable basin plans, allows the permittee greater flexibility in achieving the water quality standards in the receiving water by allowing additional time to meet the receiving water limitations. The TMDL-specific requirements of Attachment G are mandated by federal law and federal regulations.  Clean Water Act Section 303(d) states that each state "shall" identify impaired waterbodies, "shall" prioritize such waters/watersheds for future development of TMDLs, and "shall" develop TMDLs for the appropriate pollutants in accordance with the prioritization. (33 U.S.C. § 1313(d).)  The TMDLs must be approved by U.S. EPA.  (Id.)  The Code of Federal Regulations provides that, once U.S. EPA approves a TMDL for a waterbody, the effluent limitations in any NPDES permit "shall" be "consistent with the assumptions and requirements of any available wasteload allocations." (40 C.F.R. § 122.44(d)(1)(vii)(B).)  Specific to Phase II MS4 permits, the Code of Federal Regulations states that "the permit will include… [m]ore stringent terms and conditions… based on an approved total maximum daily load…" (40 C.F.R. § 122.34(c)(1).)  Federal law thus compels the State Water Board to include the TMDL-specific provisions of Attachment G in the Phase II MS4 Permit.

This Order requires Permittees to comply with all applicable TMDL-based requirements listed in Attachment G.  These requirements are consistent with the assumptions and requirements of the wasteload allocations established in the relevant TMDLs. (40 C.F.R. §122.44(d)(1)(vii)(B).)   The requirements were developed by the State Water Board and the Regional Water Boards, in consultation with the permittees.   The Fact Sheet incorporates a discussion establishing that the requirements are consistent with the assumptions and requirements of the wasteload allocations of the TMDLs.

Past final TMDL wasteload allocation attainment deadlines are enforceable on the effective date of this Order on January 1, 2019.  It is appropriate to set the effective date of the Order at January 1, 2019, one year following adoption, in order to allow permittees additional time to demonstrate attainment of the waste load allocations, request time schedule orders incorporating compliance schedules for the attainment of the waste load allocations, or request consideration by the Regional Water Board Executive Officer of whether the particular regulatory language of a given TMDL allows for an extension of a deadline for attainment of the wasteload allocation.  Attachment G specifies BMP-based WQBELs and other permit requirements for attainment of the wasteload allocations even in cases where the final wasteload allocation deadline is past.  These requirements are appropriate because the Order states that it is not the intention of the State Water Board or the Regional Water Boards to take enforcement action against a permittee where (1) a permittee has applied in good faith for a time schedule order and is implementing the requirements in Attachment G pending approval of the time schedule order or (2) the Regional Board has initiated proceedings to revise the implementation schedule or other

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

requirements of a TMDL and the permittee is implementing the requirements in Attachment G pending the outcome of the proceedings.

41. Degraded watershed processes lead to degraded water quality. To fully protect beneficial uses, post-construction runoff retention and hydromodification control criteria for individual projects must be derived with a knowledge of dominant watershed processes. Watershed management zones will be delineated by the State Board during this permit term. The Watershed management zones will be used to identify applicable areas and appropriate criteria for runoff retention and hydromodification control to be incorporated into the next permit. Regional Water Boards that approve watershed process-based criteria for post-construction during this permit term will be permitted to require Permittees to implement these criteria.

42. The post-construction requirements and design standards contained in this Order are consistent with State Water Board Order WQ 2000-11 (*Bellflower*). (Available at: http://www.waterboards.ca.gov/board_decisions/adopted_orders/water_quality/2000/wq2000_11.pdf).

43. State Water Board, California State Parks and the State Historic Preservation Officer may coordinate efforts to manage post-construction projects involving historic sites, structures or landscapes that cannot alter their original configuration in order to maintain their historic integrity.

44. Permittees will submit Annual Reports electronically using the State Water Board's Storm Water Multi-Application Reporting and Tracking System (SMARTS). The purpose of the Annual Report is to evaluate (1) the implementation of Permittees' storm water program; (2) the effectiveness of BMPs and Measurable Goals, (3) the Permittee's improvement opportunities to achieve MEP, and (4) any supplemental information required by a Regional Water Board in accordance with the Regional Water Board's specific requirements.

45. To apply for General Permit coverage authorizing storm water discharges to surface waters pursuant to this Order, the Permittees shall electronically file a Notice of Intent (NOI) using SMARTS and mail the appropriate permit fee to the State Water Board. The NOI represents the Permittee's commitment to comply with the BMPs specified in this Order to achieve compliance with the minimum control measures specified at 40 Code of Federal Regulations sections 122.34 (b)(1) through (b)(6).

46. Under 40 Code of Federal Regulations section 122.35, a Separate Implementing Entity (SIE) can implement a storm water management program for another entity such as a municipality, agency, or special district. The SIE implements parts or all of a storm water program for a Permittee. Permittees relying on a SIE to implement their entire program must electronically file an NOI using SMARTS and mail appropriate fee to the State Water Board.

47. Each Permittee is individually responsible for adoption and enforcement of ordinances and/or policies, implementation of identified control measures/BMPs needed to prevent or reduce pollutants in storm water and operation and maintenance (O&M). Enforcement actions concerning this Order will be pursued only against the individual Permittee responsible for specific violations of this Order.

48. In accordance with 40 Code of Federal Regulations section 122.28(b)(3), a Regional Water Board may issue an individual MS4 NPDES Permit to a Permittee otherwise subject to this

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Order, or adopt an alternative general permit that covers storm water discharges regulated by this Order. In accordance with Code of Federal Regulations section 122.34(b)(3), a Regulated Small MS4 in the same urbanized area as a medium or large MS4 may jointly with the medium or large MS4 seek a modification of the other MS4s permit to be added as a limited co-permittee. The applicability of this Order is automatically terminated on the effective date of the individual permit or joint permit or the date of approval for coverage under the alternative general permit.

49. Certain BMPs implemented or required by Permittees for urban runoff management may create a habitat for vectors (e.g., mosquitoes and rodents) if not properly designed or maintained. Close collaboration and cooperation among the Permittees, local vector control agencies, Regional Water Board staff, and the California Department of Public Health is necessary to identify and implement appropriate vector control measures that minimize potential nuisances and public health impacts resulting from vector breeding.

50. 40 Code of Federal Regulations section 131.12 requires that state water quality standards include an anti-degradation policy consistent with the federal policy. The State Water Board established California's anti-degradation policy in State Water Board Resolution No. 68-16. Resolution No. 68-16 incorporates the federal anti-degradation policy where the federal policy applies under federal law. Resolution No. 68-16 requires that existing quality of waters be maintained unless degradation is justified based on specific findings. The Regional Water Board's Water Quality Control Plans (Basin Plans) implement, and incorporate by reference, both the State and federal anti- degradation policies. (The above State Water Board Resolution No. 68-16 is available at: http://www.waterboards.ca.gov/board_decisions/adopted_orders/resolutions/1968/rs68_0 16.pdf).

51. This action to adopt an NPDES permit is exempt from the provisions of the California Environmental Quality Act (Public Resources Code § 21100, et seq.) in accordance with Water Code section13389. (*County of Los Angeles v. Cal. Water Boards*, (2006), 143 Cal.App.4th 985.)

52. Following public notice in accordance with State and federal laws and regulations, the State Water Board, in a public hearing on August 8, 2012, heard and considered all comments. The State Water Board has prepared written responses to all significant comments.

53. The State Water Board has considered the costs of complying with this Order and whether the required BMPs meet the minimum MEP Standard required by federal law. Further discussion of cost of compliance is included in the Fact Sheet.

54. This Order shall serve and become effective as an NPDES permit and the Permittees shall comply with all its requirements pursuant to the timeframes identified within the permit.

IT IS HEREBY ORDERED that operators of Small MS4s subject to this Order shall comply with the following:

## A. APPLICATION REQUIREMENTS FOR ALL SMALL MS4 PERMITTEES

Any Small MS4s designated under this Order that chooses to apply for an individual permit or request to join the permit of a Phase I Permittee must notify the Regional Water Board of its intent to do so by July 1, 2013. Census Designated Places (CDPs) listed on Attachment A that

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

are located within an existing NPDES permit area are not required to file for separate coverage and pay separate fees.

A.1.  Small MS4 Permittees (Except for Department of Defense and Department of Corrections and Rehabilitation Permittees)

   a.  New Permittees shall electronically file an NOI via SMARTS and mail the appropriate fee to the State Water Board by July 1, 2013.  Renewal Permittees shall electronically file an NOI via SMARTS and pay the appropriate application fee to the State Water Board. Any Renewal Permittees with paid 2013 application fee invoices shall receive a prorated refund. If the Permittee is designated as a Regulated Small MS4 by a Regional Water Board after adoption of this Order, the Permittee shall file the NOI and mail the appropriate fee within six months of the date of designation.

   b.  General Permit coverage will be in effect upon receipt of the following:

     1)  NOI via SMARTS
     2)  Appropriate Fee (in accordance with the most recent fee schedule[7])
     3)  Permit boundary map delineating permit jurisdiction: At a minimum the map shall include the following:

       (a) Phase II MS4 permit boundary based on 2010 Census data. For cities, the permit area boundary is the city boundary. For Counties, permit boundaries must include urbanized areas and places identified in Attachment A located within their jurisdictions. The boundaries must be proposed in the permit boundary map and may be developed in conjunction with the applicable Regional Water Board
       (b) City/County Boundaries
       (c) Main Arterial Streets
       (d) Highways
       (e) Waterways
       (f) Phase I MS4 Permit Boundary (if applicable)

     4)  Guidance document: The document shall at least include the following:

     New Permittees:
     (a) Overall program planning
     (b) Identification of all permit requirements and responsible implementing parties

     Renewal Permittees:
     (a) Overall program planning
     (b) Identification of all permit requirements and responsible implementing parties
     (c) Identification and brief description of each BMP and associated measurable goal included in the Permittee's most current SWMP that constitutes a more specific local or tailored level of implementation that may be more protective of water quality than the minimum requirements of this Order.
     (d) Identification of whether the Permittee will maintain, reduce, or cease

---

[7]  California Code of Regulations. Title 23. Division 3. Chapter 9 Waste Discharge Reports and Requirements. Article 1 Fees.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

implementation for each more protective, locally-tailored BMP.

(e) For any more protective, locally-tailored BMP and associated measurable goal for which the Renewal Permittee will reduce or cease implementation, the Renewal Permittee shall demonstrate to the Executive Officer of the relevant Regional Water Board that the reduction or cessation is in compliance with this Order and the maximum extent practicable standard, and will not result in increased pollutant discharges. The demonstration by the Permittee will be subject to public comment before any approval by the Executive Officer of reduction or cessation of BMPs In no instance may the Renewal Permittee reduce or cease a BMP if it is required by the minimum standards set by this Order.

The guidance document may be in spreadsheet, tabular or narrative format.

A.2.  Department of Defense and Department of Corrections and Rehabilitation Permittees

a.  Permittee shall electronically file an NOI via SMARTS and mail the appropriate fee to the State Water Board by July 1, 2013.  If the Permittee is designated as a Regulated Small MS4 by a Regional Water Board after adoption of this Order, the Permittee shall file the NOI and mail the appropriate fee within six months of the date of designation.

b.  General Permit coverage will be in effect upon receipt of the following:
1)  NOI via SMARTS
2)  Appropriate fee (in accordance with the most recent fee schedule[8])
3)  Permit boundary map as developed by the Permittee

Renewal MS4s must continue implementing their current storm water management programs until submittal of a NOI via SMARTS.

A.3.  Waiver Certification

Regulated Small MS4s may seek a waiver from the General Permit requirements if they meet criteria specified in 40 C.F.R. §122.32(c)-(e) or additional criteria specified in A.3.b.(3) below.

In order for a Regional Water Board to waive requirements for a Regulated Small MS4, (1) the Regulated Small MS4 must certify that its discharges do not cause or contribute to, or have the potential to cause or contribute to, a water quality impairment, and (2) the Regulated Small MS4 must meet one of the waiver options in Section b below:

a.  Waiver Certification Application Requirements - A Waiver Certification will only be in effect upon completion of the following:

1)  Annual Waiver Certification submitted via SMARTS.
2)  Annual Waiver Certification renewal fee of $200 plus any applicable surcharge.
3)  Letter via SMARTS from Regional Water Board or its Executive Officer waiving requirements.

---

[8]  California Code of Regulations. Title 23. Division 3. Chapter 9 Waste Discharge Reports and Requirements. Article 1 Fees.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Requirements are automatically waived if the Regional Water Board does not respond within six months.

b. Waiver Criteria

(1) Option 1

(a) The jurisdiction served by the system is less than 1,000 people;

(b) The system is not contributing substantially (as defined in Finding 25) to the pollutant loadings of a physically interconnected regulated MS4; and

(c) If the small MS4 discharges any pollutants identified as a cause of impairment of any water body to which it discharges, storm water controls are not needed based on WLAs that are part of a U.S. EPA approved or established TMDL that addresses the pollutant(s) of concern.

(2) Option 2

(a) The jurisdiction served by the system is less than 10,000 people;

(b) The Regional Water Board has evaluated all waters of the U.S. that receive a discharge from the system;

(c) The Regional Water Board has determined that storm water BMPs are not needed based on WLAs that are part of a U.S. EPA approved or established TMDL that addresses the pollutant(s) of concern or an equivalent analysis; and

(d) The Regional Water Board has determined that future discharges from the Regulated Small MS4 do not have the potential to result in exceedances of water quality standards.

(3) Option 3 (applicable to Small MS4s outside an Urbanized Area only)

Small Disadvantaged Community – The Regulated Small MS4 certifies that it is a community with a population of 20,000 or less with an annual median household income (MHI) that is less than 80 percent of the statewide annual MHI. (Wat. Code, § 79505.5, subd. (a)).

If the Waiver Certification Application Requirements or conditions of any waiver option are not met by the Regulated Small MS4, then the Regulated Small MS4 must submit a NOI via SMARTS and appropriate fee for coverage under this General Permit or apply for an individual NPDES permit.

The State Water Board or a Regional Water Board can, at any time, require a previously waived Regulated Small MS4 to comply with this General Permit or an individual NPDES permit if circumstances change so that the conditions of the waiver are no longer met. Changed circumstances can also allow a Regulated Small MS4 to request a waiver at any time.

## B. DISCHARGE PROHIBITIONS

1. Discharges of waste from the MS4 that are prohibited by Statewide Water Quality Control Plans or applicable Regional Water Quality Control Plans (Basin Plans) are prohibited.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

2. Discharges of storm water from the MS4 to waters of the U.S. in a manner causing or threatening to cause a condition of pollution or nuisance as defined in Water Code § 13050 are prohibited.

3. Discharges through the MS4 of material other than storm water to waters of the U.S. shall be effectively prohibited, except as allowed under this Provision or as otherwise authorized by a separate NPDES permit. The following non-storm water discharges are not prohibited provided any pollutant discharges are identified and appropriate control measures to minimize the impacts of such discharges, are developed and implemented under the Permittee's storm water program. This provision does not obviate the need to obtain any other appropriate permits for such discharges.

   a. water line flushing;
   b. individual residential car washing;
   c. diverted stream flows;
   d. rising ground waters;
   e. uncontaminated ground water infiltration (as defined at 40 C.F.R. §35.2005(20)) to separate storm sewers;
   f. uncontaminated pumped ground water;
   g. discharges from potable water sources;
   h. foundation drains;
   i. air conditioning condensation;
   j. springs;
   k. water from crawl space pumps;
   l. footing drains;
   m. flows from riparian habitats and wetlands;
   n. dechlorinated swimming pool discharges; and
   o. incidental runoff from landscaped areas (as defined and in accordance with Section B.4 of this Order).

   Discharges or flows from fire-fighting activities are excluded from the effective prohibition against non-storm water and need only be addressed where they are identified as significant sources of pollutants to waters of the U.S.

   If a Permittee or a Regional Water Board Executive Officer determines that any individual or class of non-storm water discharge(s) listed above may be a significant source of pollutants to waters of the U.S. or physically interconnected MS4, or poses a threat to water quality standards (beneficial uses), the Regional Water Board Executive Officer may require the appropriate Permittee to monitor and submit a report and to implement BMPs on the discharge.

4. Discharges in excess of an amount deemed to be incidental runoff shall be controlled. Regulated Small MS4s shall require parties responsible for such to implement Sections B.4.a-d above. Incidental runoff is defined as unintended amounts (volume) of runoff, such as unintended, minimal over-spray from sprinklers that escapes the area of intended use. Water leaving an intended use area is not considered incidental if it is part of the facility design, if it is due to excessive application, if it is due to intentional overflow or application, or if it is due to negligence.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Parties responsible for controlling runoff in excess of incidental runoff shall:

a. Detect leaks (for example, from broken sprinkler heads) and correct the leaks within 72 hours of learning of the leak;

b. Properly design and aim sprinkler heads;

c. Not irrigate during precipitation events; and

d. Manage pond containing recycled water such that no discharge occurs unless the discharge is a result of a 25-year, 24-hour storm event or greater, and the appropriate Regional Water Board is notified by email no later than 24 hours after the discharge. The notification is to include identifying information, including the Permittee's name and permit identification number.

Non-storm water runoff discharge that is not incidental is prohibited, unless otherwise specified in Section B.3 above.

Incidental runoff may be regulated by waste discharge requirements or, where necessary, waste discharge requirements that serve as a NPDES permit, including MS4 permits.

5. Discharge to Areas of Special Biological Significance (ASBS) is prohibited except in compliance with the ASBS Special Protection Provisions in Attachment C. Regulated Small MS4s that discharge to an ASBS are listed in Attachment D and are subject to the ASBS Special Protection Provisions.

## C. EFFLUENT LIMITATIONS

1. Permittees shall implement controls as required by this Order to reduce the discharge of pollutants from their MS4s to waters of the U. S. to the MEP. Permittees shall additionally reduce the discharge of pollutants (1) to achieve applicable TMDL waste load allocations in accordance with Sections E.15.a and F.5.i.1. of this Order and (2) to comply with the Special Protections for discharges to ASBS in accordance with Section E.4 of this Order.

2. Storm water discharges regulated by this Order shall not contain a hazardous substance in amounts equal to or in excess of a reportable quantity listed in 40 C.F.R. Part 117 or 40 C.F.R. Part 302.

## D. RECEIVING WATER LIMITATIONS

Discharges shall not cause or contribute to an exceedance of water quality standards contained in a Statewide Water Quality Control Plan, the California Toxics Rule (CTR), or in the applicable Regional Water Board Basin Plan.

The Permittee shall comply with Receiving Water Limitations through timely implementation of control measures/BMPs and other actions to reduce pollutants in the discharges and other requirements of this Order including any modifications. The storm water program shall be designed to achieve compliance with Receiving Water Limitations. If exceedance(s) of water quality objectives or water quality standards persist notwithstanding implementation of other storm water program requirements of this Order, the Permittee shall assure compliance with Receiving Water Limitations by complying with the following procedure:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

1. Upon a determination by either the Permittee or the Regional Water Board that MS4 discharges are causing or contributing to an exceedance of an applicable water quality standard, the Permittee shall promptly notify and thereafter submit a report to the Regional Water Board that describes BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce any pollutants that are causing or contributing to the exceedance of water quality standards. The report shall include an implementation schedule. The Regional Board may require modifications to the report;

2. Submit any modifications to the report required by the Regional Water Board within 30 days of notification;

3. Implement the actions specified in the report in accordance with the approved schedule;

4. So long as the Permittee has complied with the procedure set forth above and is implementing the actions, the Permittee does not have to repeat the same procedure for continuing or recurring exceedances of the same receiving water limitations unless directed by the State Water Board or the Regional Water Board to develop additional BMPs.

If a Permittee fully complies with the applicable requirements and deadlines in Attachment G for a specific pollutant and water body, including the requirement to demonstrate attainment of the applicable wasteload allocation in accordance with sections E.15.a or F.5.i.1 of this Order, the Permittee is deemed to be in compliance with this section's requirement that discharges not cause or contribute to an exceedance of water quality standards for that specific pollutant and water body.

# E. PROVISIONS FOR ALL TRADITIONAL SMALL MS4 PERMITTEES

## E.1. RENEWAL TRADITIONAL SMALL MS4 PERMITTEES

All Renewal Traditional Small MS4s Permittees shall comply with this Section. Where the requirements of a certain subsection provide a compliance date that is past the effective date of this Order, the Renewal Traditional Small MS4 shall implement its existing program until that date.

## E.2. NEW TRADITIONAL SMALL MS4 PERMITTEES

New Traditional Small MS4s shall comply with this Section.

## E.3. NON-TRADITIONAL SMALL MS4S PERMITTEES

**E.3.a.** All Renewal Non-Traditional Small MS4 Permittees shall comply with Section F of this Order. Where the requirements of a certain subsection provide a compliance date that is past the effective date of this Order, the Renewal Non-Traditional Small MS4 shall implement its existing program until that date.

**E.3.b.** New Non-Traditional Small MS4s Permittees shall comply with Section F of this Order.

## E.4. SMALL MS4 ASBS PERMITTEES

Both Traditional and Non-traditional Small MS4s Permittees that discharge to ASBS as listed on Attachment D shall comply with Attachment C in addition to all other applicable provisions of this Order.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**E.5.  SEPARATE IMPLEMENTING ENTITY (SIE)**

Permittees, both Traditional and Non-traditional Small MS4s, may rely on a SIE to satisfy one or more of the permit obligations, if the SIE can appropriately and adequately address the storm water issues of the Permittee. The SIE must agree to implement the BMPs, or components thereof, to achieve compliance with this Order. If the SIE fails to implement the BMPs, the Permittee remains responsible for compliance with this Order.

**E.6.  PROGRAM MANAGEMENT ELEMENT**

To effectively implement a coordinated storm water program, the Permittee shall have an overarching Program Management element in its storm water management program. The Program Management element shall include the following:

**E.6.a. Legal Authority**

(i)  **Task Description** – Within the second year of the effective date of the permit, the Permittee shall review and revise relevant ordinances or other regulatory mechanisms, or adopt any new ordinances or other regulatory mechanisms, to obtain adequate legal authority, to the extent allowable under state or local law, to control pollutant discharges into and from, as applicable, its MS4, and to meet the requirements of this Order.

(ii)  **Implementation Level** –At a minimum, the Permittee shall have adequate legal authority to:

(a)  Effectively prohibit non-storm water discharges through the MS4. Exceptions to this prohibition are NPDES-permitted discharges of non-storm water and non- storm water discharges in B.3 that are considered non-significant contributors of pollutants. Where the non-storm water discharge is to a segment of an MS4 that discharges directly to an ASBS, exceptions to the non-storm water prohibition are specified in Attachment C.

(b)  Detect and eliminate illicit discharges and illegal connections to the MS4. Illicit connections include pipes, drains, open channels, or other conveyances that have the potential to allow an illicit discharge to enter the MS4. Illicit discharges include all non-storm water discharges not otherwise authorized in this Order, including discharges from organized car washes, mobile cleaning and pressure wash operations,

(c)  Respond to the discharge of spills, and prohibit dumping or disposal of materials other than storm water into the MS4.

(d)  Require parties responsible for runoff in excess of incidental runoff to implement Discharge Prohibition B.4.a-e.

(e)  Require operators of construction sites, new or redeveloped land; and industrial and commercial facilities to minimize the discharge of pollutants to the MS4 through the installation, implementation, or maintenance of BMPs consistent with the California Storm Water Quality Association (CASQA) Best Management Practice Handbooks or equivalent.

(f)  Require information deemed necessary to assess compliance with this Order. The Permittee shall only require information in compliance with the Homeland Security Act or any other federal law that concerns security in the United States. The Permittee shall also have the authority to review designs and proposals for new development and redevelopment to determine whether adequate BMPs will be

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

installed, implemented, and maintained during construction and after final stabilization (post-construction).

(g) Enter private property for the purpose of inspecting, at reasonable times, any facilities, equipment, practices, or operations for active or potential storm water discharges, or non-compliance with local ordinances/standards or requirements in this Order, as consistent with any applicable state and federal laws.

(h) Require that dischargers promptly cease and desist discharging and/or cleanup and abate a discharge, including the ability to:

1) Effectively require the discharger to abate and clean up their discharge, spill, or pollutant release within 72 hours of notification; high risk spill should be cleaned up as soon as possible.

2) Require abatement within 30 days of notification, for uncontrolled sources of pollutants that could pose an environmental threat;

3) Perform the clean-up and abatement work and bill the responsible party, if necessary;

4) Provide the option to order the cessation of activities until such problems are adequately addressed if a situation persists where pollutant-causing sources or activities are not abated;

5) Require a new timeframe and notify the appropriate Regional Water Board when all parties agree that clean-up activities cannot be completed within the original timeframe and notify the appropriate Regional Water Board in writing within five business days of the determination that the timeframe requires revision.

(i) When warranted, have the ability to:

1) Levy citations or administrative fines against responsible parties either immediately at the site, or within a few days.

2) Require recovery and remediation costs from responsible parties.

(j) Impose more substantial civil or criminal sanctions (including referral to a city or district attorney) and escalate corrective response, consistent with its Enforcement Response Plan developed pursuant to Section E.6.c., for persistent non-compliance, repeat or escalating violations, or incidents of major environmental harm.

### E.6.b. Certification

(i) **Task Description –** Within the second year of the effective date of the permit, the Permittee shall certify by its Principal Executive Officer, Ranking Elected Official, or Duly Authorized Representative as described in 40 Code of Federal Regulations section 122.22(b) that the Permittee has and will maintain full legal authority to implement and enforce each of the requirements contained in this Order.

(ii) **Implementation Level** – The Permittee's certification statement shall include the following:

(a) Identification of all departments within the Permittee's jurisdiction that conduct storm water-related activities and their roles and responsibilities under this Order.

(b) Citation of storm water runoff related ordinances, identification of the topics each ordinance addresses;

Page 23

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(c) Identification of the local administrative and legal procedures and ordinances available to mandate compliance with storm water-related ordinances and therefore with the conditions of this Order.

(d) A description of how storm water related-ordinances are reviewed and implemented.

(e) A statement that the municipality will implement enforcement actions consistent with its Enforcement Response Plan developed pursuant to Section E.6.c.

(iii) **Reporting** – All Permittees shall submit in the second year online Annual Report, a statement signed by an authorized signatory certifying the Permittee has adequate legal authority to comply with all Order requirements.

### E.6.c.  Enforcement Measures and Tracking

(i) **Task Description** – Within the third year of the effective date of the permit, the Permittee shall develop and implement an Enforcement Response Plan.  The Enforcement Response Plan shall contain enforcement procedures and actions and identify the Permittee's responses to violations and describe how the Permittee will address repeat and continuing violations by implementing progressively stricter responses as needed to achieve compliance.

(ii) **Implementation Level -** The Enforcement Response Plan shall describe how the Permittee will use each of the following types of enforcement responses based on the type of violation:

(a) Verbal Warnings – Verbal warnings are primarily consultative in nature. At a minimum, verbal warnings shall specify the nature of the violation and required corrective action.

(b) Written Notices – Written notices shall include nature of the violation and the required corrective action, with deadlines for taking such action.

(c) Escalated Enforcement Measures – The Permittee shall establish legal authority to employ any combination of the enforcement actions below (or their functional equivalent), and to escalate enforcement responses where necessary to correct persistent non-compliance, repeat or escalating violations, or incidents of major environmental harm:

1) Citations (with Fines) – The Enforcement Response Plan shall describe when the Permittee will assess monetary fines, which may include civil and administrative penalties.

2) Stop Work Orders – The Enforcement Response Plan shall describe when the Permittee will issue stop work orders that require construction activities to be halted, except for those activities directed at cleaning up, abating discharge, and installing appropriate BMPs.

3) Withholding of Plan Approvals or Other Authorizations – Where a facility is in non-compliance, the Enforcement Response Plan shall describe how the Permittee's own approval or authorization processes that affect the facility's ability to discharge to the MS4 can be used to abate the violation.

4) Additional Measures – The Enforcement Response Plan may also describe other escalated measures the Permittee has under its local legal authorities. For example, the Permittee may need to improve erosion control measures and collect the funds to pay for work and materials from the responsible party by

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

either collecting against the project's bond or directly billing the responsible party.

(d) NPDES Permit Referrals–For those construction projects or industrial facilities subject to the State's Construction General Permit (CGP) or Industrial General Permit (IGP), the Permittee shall:

1) Refer non-filers (i.e., those facilities that cannot demonstrate that they obtained permit coverage) to the appropriate Regional Water Board within 30 days of making that determination, or file a complaint on the State Water Board's website: http://www.dtsc.ca.gov/database/CalEPA_Complaint/index.cfm.  In making such referrals, at a minimum include the following documentation:

   a) Construction project or industrial facility location.

   b) Name of owner or operator.

   c) Estimated construction project size or type of industrial activity (including the Standard Industrial or the North American Industry Classification, if known).

   d) Records of communication with the owner or operator regarding filing requirements.

2) Refer ongoing violations to the appropriate Regional Water Board provided that the Permittee has made a good faith effort of progressive enforcement to achieve compliance with its own ordinances. At a minimum, the Permittee's good faith effort shall include documentation of two follow-up inspections and two warning letters or notices of violation. In making such referrals, the Permittee shall include, at a minimum, the following information:

   a) Construction project or industrial facility location;

   b) Name of owner or operator;

   c) Estimated construction project size or type of industrial activity (including Standard Industrial Classification or North American Industry Classification System if known);

   d) Records of communication with the owner or operator regarding the violation, including at least two follow-up inspections, two warning letters or notices of violation, and any response from the owner or operator;

   e) Enforcement Tracking –Track instances of non-compliance via hard-copy files or electronically. The enforcement tracking documentation shall include, at a minimum, the following:

      (1) Name of owner/operator.

      (2) Location of construction project or industrial facility.

      (3) Description of violation.

      (4) Required schedule for returning to compliance.

      (5) Description of enforcement response used, including escalated responses if repeat violations occur or violations are not resolved within the time specified in the enforcement action.

      (6) Accompanying documentation of enforcement response (e.g., notices of noncompliance, notices of violations, etc.)

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(7) Any referrals to different departments or agencies; and

f) Recidivism Reduction – The Permittee shall identify chronic violators of any provision of this Order or of any related local ordinance or regulation and reduce the rate of noncompliance recidivism. The Permittee shall develop incentives, disincentives, or increase inspection frequency at the operator's sites to prevent chronic violations.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

## E.7. EDUCATION AND OUTREACH PROGRAM

Traditional Small MS4 Permittees may be required to implement Community-Based Social Marketing (CBSM) requirements as detailed in Attachment E upon determination by a Regional Board Executive Officer. The Regional Board Executive Officer shall notify Permittees within three months of the permit adoption date of their determination to require CBSM.[9] The notification shall include a statement of reasons why the Executive Officer finds that implementation of CBSM is appropriate. If the Permittee disagrees with the Executive Officer determination, the Permittee may bring the dispute to the State Water Board Executive Director or his designee as specified under the Dispute Resolution provision of this Order.

### E.7.a. Public Education and Outreach

Within the first year of the effective date of the permit, all Permittees shall comply with the requirements in this Section by selecting one or more of the following Public Education and Outreach options:

1) Contributing to a countywide storm water program, as determined appropriate by the Permittee members, so that the countywide storm water program conducts outreach and education on behalf of its members; or

2) Contributing to a regional outreach and education collaborative effort (a regional outreach and education collaborative effort occurs when all or a majority of the Permittees collaborate to conduct regional outreach and education. Regional outreach and education collaboration includes Permittees defining a uniform and consistent message, deciding how best to communicate the message, and how to facilitate behavioral changes, then collaboratively apply what is learned through local jurisdiction groups, pooling resources and skills.); or

3) Fulfilling outreach and education requirements within their jurisdictional boundaries on their own; or

---

[9] Getting in Step, A Guide to, Conducting Watershed Outreach Campaigns, 3rd Edition, November 2010, EPA 841-B-10-002, USEPA, Office of Water.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

4) A combination of the previous options, so that all requirements are fulfilled.

**Reporting** – By the first year Annual Report, the Permittee shall submit information indicating which Public Education and Outreach option(s) it will use to comply with this Section. For each option involving a contribution to a countywide storm water program or regional outreach and education collaborative effort, the Permittee shall complete and have available in the first year Annual Report documentation, such as a written agreement, letter or similar document, which confirms the collaboration with other MS4s.

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall develop and implement a comprehensive storm water public education and outreach program. The public education and outreach program shall be designed to reduce pollutant discharges in storm water runoff and non-storm water discharges to the MS4 through increased storm water knowledge and awareness in target communities. The Public Education and Outreach Program shall be designed to measurably increase the knowledge and awareness of targeted audience regarding the municipal storm drain system, impacts of urban runoff and non-storm water discharges on receiving waters, and potential BMP solutions for the target audiences, thereby reducing pollutant releases to the MS4 and the environment.

(ii) **Implementation Level** –The Permittee shall, at a minimum:
   (a) Develop and implement a public education strategy that establishes education tasks based on water quality problems, target audiences, and anticipated task effectiveness. The strategy must include identification of who is responsible for implementing specific tasks and a schedule for task implementation. The strategy must demonstrate how specific high priority storm water quality issues in the community or local pollutants of concern are addressed.

   (b) Implement surveys at least twice during the permit term to gauge the level of awareness in target audiences and effectiveness of education tasks.

   (c) Develop and convey a specific storm water message that focuses on the following:
      1) Local pollutants of concern
      2) Target audience
      3) Regional water quality issues

   (d) Develop and disseminate appropriate educational materials to target audiences and translate into applicable languages when appropriate (e.g. the materials can utilize various media such as printed materials, billboard and mass transit advertisements, signage at select locations, stenciling at storm drain inlets, radio advertisements, television advertisements, and websites);

   (e) Utilize public input (e.g., the opportunity for public comment, or public meetings) in the development of the program;

   (f) Distribute the educational materials, using whichever methods and procedures determined appropriate during development of the public education strategy;

   (g) Convey messages to explain the benefits of water-efficient and storm water-friendly landscaping[10], using existing information if available;

---

[10] For example, Surfrider's Ocean Friendly Garden Program (http://www.surfrider.org/programs/ocean-friendly-gardens) and the Water Efficient Landscape Ordinance (WELO)

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(h) Develop and convey messages specific to reducing illicit discharges with information about how the public can report incidents to the appropriate authorities. The Permittee must promote, publicize, and facilitate public reporting of illicit discharges or water quality impacts associated with discharges into or from MS4s through a central contact point, including phone numbers for complaints and spill reporting, and publicize to both internal Permittee staff and the public. If 911 is selected, the Permittee must also create, maintain, and publicize a staffed, nonemergency phone number with voicemail, which is checked daily;

(i) Develop and convey messages specific to proper application of pesticides, herbicides, and fertilizers;

(j) Within the Permittee's jurisdiction, provide independent, parochial, and public schools with materials to effectively educate school –age children about storm water runoff and how they can help protect water quality habitat in their local watershed (s). The Permittee is encouraged to use environmental and place-based, experiential learning materials that are integrated into school curricula and school facility management[11]. In the case that an environmental and place-based, experiential learning local program does not exist, the Permittee may use California's Education and Environment Initiative Curriculum[12] or equivalent.

(k) Develop (or coordinate with existing, effective programs) and convey messages specific to reducing discharges from organized car washes, mobile cleaning and pressure washing operations, and landscape irrigation.

(l) Conduct storm water-friendly education for organized car wash participants and provide information pertaining to car wash discharge reduction. The Permittee may use the Sacramento Stormwater Quality Partnership's River Friendly Carwash Program[13], or equivalent, for guidance.

(m) Develop and convey messages specific to mobile cleaning and pressure wash businesses.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a.for compliance directions.

**E.7.b.  Staff and Site Operator Training and Education**

**E.7.b.1.  Illicit Discharge Detection and Elimination Training**

(i) **Task Description** – Within the third year of the effective date of the permit, the Permittee shall develop and implement a training program for all Permittee staff who, as part of their normal job responsibilities, may be notified of, come into contact with,

---

[11] For example, Sacramento Splash Organization (www.sacsplash.org/), Effie Yeaw Nature Center (www.sacnaturecenter.net) or Yolo Basin Organization (yolobasin.org)

[12] http://www.californiaeei.org/

[13] http://www.beriverfriendly.net/riverfriendlycarwashing/

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

or otherwise observe an illicit discharge or illegal connection to the storm drain system.

(ii) **Implementation Level** – The training program shall include at a minimum:

    (a) Identification of an illicit discharge or illegal connection.

    (b) Proper procedures for reporting and responding to the illicit discharge or illegal connection.

    (c) Follow-up training shall be provided as needed to address changes in procedures, techniques, or staffing.

    (d) An annual assessment of their trained staff's knowledge of illicit discharge response and refresher training as needed.

    (e) Training for new staff who, as part of their normal job responsibilities may be notified of, come into contact with, or otherwise observe an illicit discharge or illegal connection shall be trained no later than six months after the start of employment.

    (f) Contact information, including the procedure for reporting an illicit discharge, shall be included in each of the Permittee's fleet vehicles that are used by field staff.

    (g) Focused education on identified illicit discharges and associated illicit discharge locations.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

**E.7.b.2.  Construction Outreach and Education**

**(a) Permittee Staff Training**

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall ensure that all staff implementing the construction site storm water runoff control program are adequately trained.

(ii) **Implementation Level** – The Permittee may conduct in-house training or contract with consultants. Training shall be provided to the following staff positions of the MS4:

    (a) Plan Reviewers and Permitting Staff - The Permittee shall ensure plan reviewers and permitting staff are qualified individuals, knowledgeable in the technical review of local erosion and sediment control plans, (including proper control measure selection, installation, implementation, and maintenance, as well as administrative requirements such as inspection reporting/tracking and the use of the Permittee's enforcement responses), and are certified pursuant to a State Water Board sponsored program as a Qualified Storm Water Pollution Prevention Plan (SWPPP) Developer (QSD), or a designated person on staff possesses the QSD credential.

    (b) Erosion Sediment Control/Storm Water Inspectors - The Permittee shall ensure inspectors are qualified individuals, knowledgeable in inspection procedures, and are certified pursuant to a State Water Board sponsored program as either (1) a Qualified SWPPP Developer (QSD); (2) a Qualified SWPPP Practitioner (QSP); or

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(3) a designated person on staff possesses each credential (QSD to supervise plan review, QSP to supervise inspection operations).

(c) Third-Party Plan Reviewers, Permitting Staff, and Inspectors - If the Permittee utilizes outside parties to review plans and/or conduct inspections, the Permittee shall ensure these staff are trained.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a.for compliance directions.

### (b) Construction Site Operator Education

(i) **Task Description** – Within the third year of the effective date of the permit, the Permittee shall develop and distribute educational materials to construction site operators.

(ii) **Implementation Level** – The Permittee shall do the following:

(a) Each year provide information on training opportunities for construction operators on BMP selection, installation, implementation, and maintenance as well as overall program compliance.

(b) Develop or utilize existing outreach tools (i.e. brochures, posters, etc.) aimed at educating construction operators on appropriate selection, installation, implementation, and maintenance of storm water BMPs, as well as overall program compliance.

(c) Distribute appropriate outreach materials to all construction operators who will be disturbing land within the MS4 boundary.  The Permittee's contact information and website shall be included in these materials.

(d) Update the existing storm water website, as necessary, to include information on appropriate selection, installation, implementation, and maintenance of BMPs.

(iii) **Reporting –** The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a.for compliance directions.

### E.7.b.3.  Pollution Prevention and Good Housekeeping Staff Training

The Permittee shall train employees on how to incorporate pollution prevention/good housekeeping techniques into Permittee operations.

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall develop a biennial employee training program for appropriate employees involved in implementing pollution prevention and good housekeeping practices as specified in Section E.11. Pollution Prevention/Good Housekeeping for Permittee Operations of this Order.  The Permittee shall determine the need for interim

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

training during alternate years when training is not conducted, through an evaluation of employee Pollution Prevention/Good Housekeeping knowledge. All new hires whose jobs include implementation of pollution prevention and good housekeeping practices must receive this training within the first year of their hire date.

(ii) **Implementation Level** – The training program shall include the following:

(a) Biennial training for all employees implementing this program element. This biennial training shall include a general storm water education component, any new technologies, operations, or responsibilities that arise during the year, and the permit requirements that apply to the staff being trained. Employees shall receive clear guidance on appropriate storm water BMPs to use at municipal facilities and during typical O&M activities.

(b) A biennial assessment of trained staff's knowledge of pollution prevention and good housekeeping and shall revise the training as needed.

(c) A requirement that any contractors hired by the Permittee to perform O&M activities shall be contractually required to comply with all of the storm water BMPs, good housekeeping practices, and standard operating procedures described above.

(d) The Permittee shall provide oversight of contractor activities to ensure that contractors are using appropriate BMPs, good housekeeping practices and following standard operating procedures.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

## E.8. PUBLIC INVOLVEMENT AND PARTICIPATION PROGRAM

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall involve the public in the development and implementation of activities related to the program. The public participation and involvement program shall encourage volunteerism, public comment and input on policy, and activism in the community. The Permittee shall also be involved in their Integrated Regional Water Management Plan (IRWMP) or other watershed-level planning effort, if applicable.

(ii) **Implementation Level** – At a minimum, the Permittee shall:

(a) Develop a public involvement and participation strategy that establishes who is responsible for specific tasks and goals.

(b) Consider development of a citizen advisory group (either a stand-alone group or utilize an existing group or process). The advisory group may consist of a balanced representation of all affected parties, including residents, business owners, and environmental organizations in the MS4 service area and/or affected watershed. The Permittee may invite the citizen advisory group to participate in the development and implementation of all parts of the community's storm water program.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(c) Create opportunities for citizens to participate in the implementation of BMPs through sponsoring activities (e.g., stream/beach/lake clean-ups, storm drain stenciling, volunteer monitoring and educational activities).

(d) Ensure the public can easily find information about the Permittee's storm water program.

(e) Actively engage in the Permittee's IRWMP or other watershed-level planning effort.

**(iii) Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long- term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

## E.9.  ILLICIT DISCHARGE DETECTION AND ELIMINATION

The Permittee shall develop an Illicit Discharge Detection and Elimination program to detect, investigate, and eliminate illicit discharges, including illegal dumping, into its system, to the extent allowable under law.[14] The Permittee may utilize the CWP's guide on Illicit Discharge Detection and Elimination as guidance.

### E.9.a.  Outfall Mapping

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall create and maintain an up-to-date and accurate outfall map[15]. The map may be in hard copy and/or electronic form or within a geographic information system (GIS) the development of the outfall map shall include a visual outfall inventory involving a site visit to each outfall. Renewal Permittees that have an existing up-to-date outfall map that includes the minimum requirements specified in Section E.9.a.(ii)(a-e) are not required to re-create the outfall map. This does not exempt Renewal Permittees with an existing outfall map from conducting the field sampling specified in Section E.9.c.

(ii) **Implementation Level** – The outfall map shall at a minimum show:
(a) The location of all outfalls[16] that are operated by the Permittee within the urbanized area, drainage areas, and land use(s) contributing to those outfalls that are

---

[14] The Permittee shall use the Center for Watershed Protection's (available at www.cwp.org) guide on Illicit Discharge Detection and Elimination (IDDE): A Guidance Manual for Program Development and Technical Assistance or equivalent when developing an IDDE program. IDDE program Guidance can also be found at: http://cfpub.epa.gov/npdes/stormwater/idde.cfm.

[15] The Permittee may utilize existing forms such as the CWP Outfall Reconnaissance Inventory/Sample Collection Field Sheet (http://cfpub.epa.gov/npdes/stormwater/idde.cfm) while conducting the mapping inventory and Field Sampling as specified below, in Section E.9.c.

[16] Submerged outfalls or other outfalls that may pose a threat to public safety and/or that are inaccessible are not required to be inventoried.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

operated by the Permittee, and that discharge within the Permittee's jurisdiction to a receiving water.  Each mapped outfall shall be located using coordinates obtained from a global positioning system (GPS) and given an individual alphanumeric identifier, which shall be noted on the map. Photographs or an electronic database shall be utilized to provide baseline information and track operation and maintenance needs over time.

(b) The location (and name, where known to the Permittee) of all water bodies receiving direct discharges from those outfall pipes.

(c) Priority areas, including, but not limited to the following:

1) Areas with older infrastructure that are more likely to have illegal connections and a history of sewer overflows or cross-connections
2) Industrial, commercial, or mixed use areas;
3) Areas with a history of past illicit discharges;
4) Areas with a history of illegal dumping;
5) Areas with onsite sewage disposal systems;
6) Areas upstream of sensitive water bodies;
7) Areas that drain to outfalls greater than 36 inches that directly discharge to the ocean; and
8) Other areas that are likely to have illicit discharges.

The priority area list shall be updated annually.

(d) Field sampling stations
(e) The permit boundary

Submerged outfalls or other outfalls that may pose a threat to public safety and/or that are inaccessible are not required to be inventoried.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a.for compliance directions.

### E.9.b. Illicit Discharge Source/Facility Inventory

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall maintain an inventory of all industrial/commercial facilities/sources within the Permittee's jurisdiction (regardless of ownership) that could discharge pollutants in storm water to the MS4. The Permittee shall utilize the inventory to identify facilities for inspections of potential illicit discharges.

(ii) **Implementation Level** - The inventory shall include the following:
(a) Minimum information for each industrial facility/source:
- Facility name;
- Address;
- Nature of business or activity;
- Physical location (decimal latitude-longitude) of storm drain receiving discharge;

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

- Name of receiving water and if the facility/source is tributary to a Clean Water Act Section 303(d) listed water body segment or water body segment subject to a TMDL;
- Incorporation of facility information into GIS is optional.

(b) At a minimum, the following industrial and commercial facilities/sources shall be included in the inventory.

- Vehicle salvage yards
- Metal and other recycled materials collection facilities
- Waste transfer facilities
- Vehicle mechanical repair, maintenance or cleaning
- Building trade central facilities or yards
- Corporation yards
- Landscape nurseries and greenhouses
- Building material retailers and storage
- Plastic manufacturers
- Other facilities designated by the Permittees or Regional Water Boards to have reasonable potential to contribute to pollution of storm water runoff

(c) The Permittee shall determine if the facilities that are required to be covered under the Statewide Industrial General Permit have done so. Upon discovering any facilities requiring permit coverage but are not yet permitted, the Permittee shall notify the appropriate Regional Water Board, and include copies of the notification in the online Annual Report.

(d) The Permittee shall update the inventory annually. The update shall be accomplished through collection of new information obtained during inspections and contacts with commercial and industrial facility operators and owners, or through other readily available intra-agency informational databases (e.g., business licenses, pretreatment permits, sanitary sewer hook-up permits, and SMARTS database.

(e) The Permittee shall develop and implement procedures to proactively identify illicit discharges originating from priority areas identified in Section E.9.a.(ii).(c). The Permittee shall implement the procedures to assess priority areas for the presence of illicit discharges at least once over the length of the permit term. The procedures shall include field observations, field screening, inspections, and any other appropriate and effective survey methods. Alternatively, Permittees may establish a self-certification program where Permittees require reports from authorized parties demonstrating the prevention and elimination of illicit discharges at their facilities in priority areas at least once over the length of the permit term.

(iii) **Reporting –** The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### E.9.c.  Field Sampling to Detect Illicit Discharges

(i) **Task Description** – Within the second year of the effective date of the permit (e.g. while conducting the outfall inventory under Section E.9.a.), the Permittee shall sample any outfalls that are flowing or ponding more than 72 hours after the last rain event. The Permittee shall also conduct dry weather sampling (more than 72 hours since the last rain event) of outfalls annually identified as priority areas.

(ii) **Implementation Level** – The Permittee shall:

(a) Conduct monitoring[17] for the following indicator parameters identified in Table 1 to help determine the source of the discharge. Alternatively, the Permittee may select parameters based on local knowledge of pollutants of concern in lieu of sampling for the parameters listed in Table 1. Modifications and associated justifications shall be identified within SMARTS prior to conducting field sampling as specified in Section E.9.c.(i).

---

[17] A description of indicator parameter sampling equipment is described in Chapter 12: Indicator Monitoring in the CWP IDDE: Guidance Manual found at: http://www.epa.gov/npdes/pubs/idde_manualwithappendices.pdf. Sampling may be conducted using field test kits.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Table 1. Indicator Parameters**

> **Note:**   > = greater than
> > 80% — Can almost always (>80% of samples) distinguish this discharge from clean flow
> types (e.g., tap water or natural water). For tap water, can distinguish from
> natural water.
> > 50% — Can sometimes (>50% of samples) distinguish this discharge from clean flow
> types depending on regional characteristics, or can be helpful in combination with
> another parameter.
>
> Poor — Poor indicator. Cannot reliably detect illicit discharges, or cannot detect tap water
> Data sources: Pitt (
>
> * Fluoride is a poor indicator when used as a single parameter, but when combined with
> additional parameters (such as detergents, ammonia and potassium), it can almost
> always distinguish between sewage and wash water.

| Parameter | Discharge Types It Can Detect | | | | Laboratory/Analytical Challenges |
|---|---|---|---|---|---|
| | Sewage | Washwater | Tap Water | Industrial or Commercial Liquid Wastes | |
| Ammonia | > 80% | > 50% | Poor | > 50% | Can change into other nitrogen forms as the flow travels to the outfall |
| Color | > 50% | > 50% | Poor | > 50% | |
| Conductivity | > 50% | > 50% | Poor | > 50% | Ineffective in saline waters |
| Detergents – Surfactants | > 80% | > 80% | Poor | > 50% | Reagent is a hazardous waste |
| Fluoride* | Poor | Poor | >80% | > 50% | Reagent is a hazardous waste Exception for communities that do not fluoridate their tap water |
| Hardness | > 50% | > 50% | >50% | > 50% | |
| pH | Poor | > 50% | Poor | > 50% | |
| Potassium | > 50% | Poor | Poor | > 80% | May need to use two separate analytical techniques, depending on the concentration |
| Turbidity | > 50% | >50% | Poor | > 50% | |

(b) Verify that indicator parameters, as specified in Table 2. Action Level
Concentrations for Indicator Parameters are not exceeded. Alternatively, the
Permittee may tailor Table 2 to align with parameters based on local knowledge
of pollutants of concern. Modifications and associated justifications shall be

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-
0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

identified within SMARTS prior to conducting field sampling as specified in Section E.9.c.(i).

### Table 2. Action Level Concentrations for Indicator Parameters

| Indicator Parameter | Action Level Concentration |
|---|---|
| Ammonia | ≥ 50 milligram per liter |
| Color | ≥ 500 units |
| Conductivity | ≥ 2,000 microsiemens per centimeter |
| Hardness | ≤ 10 milligram per liter as $CaCO_3$ or ≥ 2,000 milligram per liter as $CaCO_3$ |
| pH | ≤ 5  or  ≥ 9 |
| Potassium | ≥ 20 milligram per liter |
| Turbidity | ≥ 1,000 Nephelometric Turbidity Units |

(c) Conduct follow up investigations per Section E.9.d. if the action level concentrations are exceeded.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

**E.9.d.  Illicit Discharge Detection and Elimination Source Investigations and Corrective Actions**

(i)  **Task Description** – Within the second year of the effective date of the permit, the Permittee shall develop written procedures for conducting investigations into the source of all non-storm water discharges suspected to be illicit discharges, including approaches to requiring such discharges to be eliminated, and procedures to implement corrective actions (e.g., BMPs). These procedures shall be included as part of the Illicit Discharge Detection and Elimination program. The Permittee may leverage existing inspection procedures and personnel to conduct illicit discharge detection and elimination source investigations and corrective actions.

(ii) **Implementation Level -** At a minimum, the Permittee shall conduct an investigation(s) to identify and locate the source of any suspected illicit discharge within 72 hours of becoming aware of the suspected illicit discharge. For investigations that require more than 72 hours, the Permittee shall identify the actions being taken to identify and locate the source of the suspected illicit discharge.

(a) Non-storm water discharges suspected of being sanitary sewage and/or significantly contaminated shall be investigated within 24 hours.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(b) The Permittee shall prioritize investigations of suspected sanitary sewage and/or significantly contaminated discharges over investigations of non-storm water discharges suspected of being cooling water, wash water, or natural flows.

(c) Report immediately the occurrence of any flows believed to be an immediate threat to human health or the environment to local Health Department.

(d) Determine and document through its investigations the source of all non-storm water discharges. If the source of the non-storm water discharge is found to be a discharge authorized under this General Permit, or authorized under another NPDES permit, no further action is required.

(e) Corrective Action to Eliminate Illicit Discharge – Once the source of the illicit discharge has been determined, the Permittee shall immediately notify the responsible party of the problem, and require the responsible party to conduct all necessary corrective actions to eliminate the non- storm water discharge within 72 hours of notification. Upon being notified that the discharge has been eliminated, conduct a follow-up investigation and field screening to verify that the discharge has been eliminated using BMPs or some other corrective action. The Permittee shall document its follow-up investigation. The Permittee may seek recovery and remediation costs from responsible parties or require compensation for the cost of field screening and investigations. Resulting enforcement actions shall follow the program's Enforcement Response Plan as specified in E.6.c.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

### E.9.e.  Spill Response Plan

(i) **Task Description** – Within the first year of the effective date of the permit, the Permittee shall develop and implement a spill response plan.

(ii) **Implementation Level** - At a minimum, the spill response plan will incorporate the information from Section E.9.c. and outline the following:
   (a) Agency roles and responsibilities (e.g. County Department of Environmental Health, local police department, local fire department, etc.)
   (b) The procedures for responding to complaints
   (c) How investigations are to be conducted
   (d) How clean up is initiated or conducted
   (e) How reporting is completed and what information is required

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## E.10.  CONSTRUCTION SITE STORM WATER RUNOFF CONTROL PROGRAM

The Permittee shall develop, implement, and enforce a program to prevent construction site discharges of pollutants and impacts on beneficial uses of receiving waters. The program shall include the development of an enforceable construction site storm water runoff control ordinance for all projects that disturb less than one acre of soil. The construction site storm water runoff control ordinance shall include, at a minimum, requirements for erosion and sediment controls, soil stabilization, dewatering, source controls, pollution prevention measures and prohibited discharges.

Projects that disturb one acre or more of soil or disturb less than one acre but are part of a larger common plan or development or sale are subject to the CGP in addition to the construction site storm water runoff control ordinance.

### E.10.a.  Construction Site Inventory

(i) **Task Description -** Within the first year of the effective date of the permit, the Permittee shall maintain an inventory of all projects subject to the local construction site storm water runoff control ordinance within its jurisdiction.

(ii) **Implementation Level** –The Permittee shall maintain an inventory of all construction projects and continuously update as new projects are permitted and projects are completed. The inventory shall address all projects subject to the local construction site storm water runoff control ordinance. For projects subject to the CGP the Permittee may obtain the inventory from the SMARTS database and shall supplement as needed by the Permittee.

The inventory shall contain, at a minimum:
(a) Relevant contact information for each project (e.g., name, address, phone, email, etc. for the owner and contractor);
(b) The basic site information including location, status, size of the project and area of disturbance;
(c) The location of the project with respect to all waterbodies, waterbodies listed as impaired by sediment-related pollutants, and waterbodies listed as impaired for sediment or turbidity under the CWA Section 303(d) and approved by U.S. EPA;
(d) Project threat to water quality;
(e) Current construction phase;
(f)  The required inspection frequency per the local construction site storm water runoff control ordinance;
(g) The project start and anticipated completion dates; and
(h) The date the Permittee approved the erosion and sediment control plan in accordance with this Section.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### E.10.b.  Construction Plan Review and Approval Procedures

(i) **Task Description** – Within the first year of the effective date of the permit, the Permittee shall develop procedures to review and approve relevant construction plan documents.

(ii) **Implementation Level** – The review procedures shall meet the following minimum requirements:

(a) Prior to issuing a grading or building permit, the Permittee shall require each operator of a construction activity within its jurisdiction to prepare and submit an erosion and sediment control plan for the Permittee's review and written approval. The Permittee shall not approve any erosion and sediment control plan unless it contains appropriate site-specific construction site BMPs that meet the minimum requirements of the Permittee's construction site storm water runoff control ordinance. If the erosion and sediment control plan is revised, the Permittee shall review and approve those revisions.

(b) Require that the erosion and sediment control plan include the rationale used for selecting BMPs including supporting soil loss calculations, if necessary.

(c) Require that the erosion and sediment control plan list applicable permits directly associated with the grading activity, including, but not limited to the State Water Board's CGP, State Water Board 401 Water Quality Certification, U.S. Army Corps 404 permit, and California Department of Fish and Game 1600 Agreement. Include as a condition of the grading permit that the operator submit evidence to the MS4 that all permits directly associated with the grading activity have been obtained prior to commencing the soil disturbing activities authorized by the grading permit.

(d) Conduct and document review of each erosion and sediment control plan using a checklist or similar process.

(e) The SWPPP developed pursuant to the CGP may substitute for the erosion and sediment control plan for projects where a SWPPP is developed.  The Permittee is responsible for reviewing applicable portions of the SWPPP for compliance with the Permittee's construction site storm water runoff control ordinance and this Order.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

### E.10.c.  Construction Site Inspection and Enforcement

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall use legal authority to implement procedures for inspecting public and private construction projects and conduct enforcement if necessary. The Permittee may leverage existing inspection procedures and personnel to conduct construction site inspections and enforcement.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(ii) **Implementation Level –** The inspection procedures shall be implemented to verify compliance with the Permittee's construction site storm water control ordinance. At a minimum, inspections must be conducted at priority construction sites (defined below) prior to land disturbance (during the rainy season), during active construction and following active construction. Construction site inspections shall include assessment of compliance with the Permittee's construction site storm water runoff control ordinance, and other applicable ordinances. A Permittee may propose, for Regional Water Board Executive Officer approval, an alternative approach for construction site oversight, provided the Permittee demonstrates the approach will be equally effective at reducing the discharge of pollutants from construction sites to the maximum extent practicable.

Prior to allowing an operator to commence land disturbance during the rainy season, the Permittee must perform an inspection, to ensure all necessary sediment controls are in place. During active construction, the Permittee shall conduct inspections, based on prioritization of construction sites.  Active construction inspections shall include at a minimum: inspection of maintenance of BMPs, effectiveness of BMPs installed and verification that pollutants of concern are not discharged into receiving water bodies.

Prioritization criteria shall be based on project threat to water quality.  Project threat to water quality includes soil erosion potential, site slope, projects size and type, sensitivity of receiving water bodies, proximity to receiving water bodies, non-storm water discharges, projects more than one acre that are not subject to the CGP (sites that have obtained an Erosivity Waiver) and past record of non-compliance by the operator of the construction site.  Inspection frequencies shall be conducted based on the prioritization criteria described above.

At the conclusion of the project, the Permittee must inspect to ensure that all disturbed areas have been stabilized and that all temporary erosion and sediment control measures that are no longer needed have been removed as required by the local construction site storm water control ordinance.

(iii) **Reporting –** The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program.  If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.


**E.11.  POLLUTION PREVENTION/GOOD HOUSEKEEPING FOR PERMITTEE OPERATIONS PROGRAM**
The Permittee shall develop and implement a program to prevent or reduce the amount of pollutant runoff from Permittee operations. The Permittee shall implement appropriate BMPs for preventing or reducing the amount of storm water pollution generated by Permittee operations.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

### E.11.a.  Inventory of Permittee-Owned and Operated Facilities

(i) **Task Description** - Within the second year of the effective date of the permit, the Permittee shall develop and maintain an inventory of Permittee-owned or operated facilities within their jurisdiction that are a threat to water quality, if applicable.

(ii) **Implementation Level** - The inventory shall include all Permittee-owned or operated facilities within their jurisdiction that are potential significant sources of pollution in storm water, including the following if applicable:

- Airports
- Animal control facilities
- Chemical storage facilities
- Composting facilities
- Equipment storage and maintenance facilities (including landscape-related operations)
- Fuel farms
- Hazardous waste disposal facilities
- Hazardous waste handling and transfer facilities
- Incinerators
- Landfills
- Materials storage yards
- Pesticide storage facilities
- Public buildings, including schools, libraries, police stations, fire stations, Permittee (municipal) buildings, restrooms, and similar buildings (i.e., buildings with a similar potential to be sources of storm water pollution as the examples provided)
- Public parking lots
- Public golf courses
- Public swimming pools
- Public parks
- Public works yards
- Public marinas
- Recycling facilities
- Salt or de-icing storage facilities
- Solid waste handling and transfer facilities
- Transportation hubs (e.g. bus transfer stations)
- Vehicle storage and maintenance areas
- Vehicle fueling facilities
- Other (as directed by appropriate Regional Water Board)

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program.  If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

UNOFFICIAL DRAFT — Not Certified by Clerk

## E.11.b.  Map of Permittee-Owned or Operated Facilities

(i) **Task Description –** Within the second year of the effective date of the permit, submit a map of the area within the permit boundary and identify where the inventoried Permittee-owned or operated facilities are located.

(ii) **Implementation Level** - The map identifying the location of the inventoried Permittee-owned or operated facilities shall identify the storm water drainage system (e.g., storm water outfalls or other mechanisms in which storm water leaves the site) corresponding to each of the facilities as well as the receiving waters to which these facilities discharge. The map shall also show the facility and the manager of each facility, including contact information.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program.  If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a.for compliance directions.

## E.11.c.  Facility Assessment

(i) **Task Description** – Within the third year of the effective date of the permit, for all the inventoried Permittee-owned or operated facilities, the Permittee shall conduct a comprehensive inspection and assessment of pollutant discharge potential and identification of pollutant hotspots using the Center for Watershed Protection's (CWP) guide on Urban Subwatershed and Site Reconnaissance, or equivalent.[18]

(ii) **Implementation Levels** - Conduct an annual review and assessment of all municipally owned or operated facilities to determine their potential to impact surface waters. The assessment shall include the following:

(a) Identification of pollutant hotspots:

Based on the annual assessment, the Permittee shall identify those facilities that have a high potential to generate storm water and non- storm water pollutants as pollutant hotspots and assign them a high priority. Among the factors to be considered are the type and volume of pollutants stored at the site, the presence of improperly stored materials, activities that should not be performed outside (e.g., changing automotive fluids, vehicle washing), proximity to water bodies, poor housekeeping practices, and the discharge of pollutant(s) of concern to receiving water(s). Pollutant hotspots shall include, at a minimum, the Permittee's maintenance yards, hazardous waste facilities, fuel storage and/or dispensing locations, airports marinas, and any other facilities at which chemicals or other materials have a high potential to be discharged in storm water.

---

[18] The Permittee shall use the Center for Watershed Protection's Restoration Manual Series Guide on Urban Subwatershed and Site Reconnaissance: A User's Manual (available as a free download at www.cwp.org) or equivalent when identifying priority areas. Hotspots are specific operations in a subwatershed that may generate high storm water pollution.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(b) Documentation of the comprehensive assessment procedures and results:

The Permittee shall document the procedures it uses for conducting the comprehensive assessment along with a copy of any site evaluation checklists used to conduct the comprehensive assessment.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program.  If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

### E.11.d.  Storm Water Pollution Prevention Plans

(i) **Task Description** – Within the fourth year of the effective date of the permit, the Permittee shall develop and implement SWPPPs for pollutant hotspots. If a Permittee has an existing document such as Hazardous Materials Business Plan, Spill Prevention Plan, or other equivalent document the Permittee is not required to develop a SWPPP.

(ii) **Implementation Level** – The Permittee shall implement the following:
(a) The Permittee shall develop and implement a site-specific SWPPP that identifies existing storm water BMPs and a set of storm water BMPs to be installed, implemented, and maintained to minimize the discharge of pollutants to protect water quality. The Permittee may utilize the CWP guide on Urban Subwatershed and Site Reconnaissance, or equivalent, as guidance.
(b) The SWPPP(s) shall be kept on-site at each of the Permittee-owned or operated facilities' offices for which it was completed. The SWPPP shall be updated as necessary.
(c) At a minimum the SWPPP will address the following:
1) Facility specific information (location, owner, address, etc.)
2) Purpose of the document
3) Key staff/contacts at the facility
4) Site map with drainage identified
5) Identification of significant materials that are handled and stored at the facility that may be exposed to storm water
6) Description of potential pollutant sources
7) Facility BMPs
8) Spill control and cleanup – response to spills
9) Inspection schedule
10) Inspection procedures and checklist for inspections conducted to ensure proper selection, implementation, and maintenance of all BMPs

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### E.11.e.  Inspections, Visual Monitoring and Remedial Action

(i) **Task Description** – Within the fifth year of the effective date of the Permit, the Permittee shall conduct regular inspections of Permittee-owned and operated facilities.

(ii) **Implementation Level** – Inspections shall be conducted as follows:

(a) Quarterly visual hotspot inspections – Perform quarterly visual inspections, in accordance with the inspection procedures and inspection checklist developed for each Permittee-owned or operated hotspot, to ensure materials and equipment are clean and orderly; to minimize the potential for pollutant discharge; and to ensure effective selection, implementation, and maintenance of BMPs. The Permittee shall look for evidence of spills and immediately clean them up to prevent contact with precipitation or runoff. The quarterly inspections shall be tracked in a log for every facility, and records kept with the SWPPP (records may be kept electronically). The inspection report shall also include any identified deficiencies and the corrective actions taken to correct the deficiencies.

(b) Annual Hotspot comprehensive inspections – At least once per year, the Permittee shall conduct a comprehensive inspection of each hotspot facility, including all storm water BMPs, in accordance with the facility-specific inspection procedures and inspection checklist.  The Permittee shall pay specific attention, without limiting its attention, to: waste storage areas, dumpsters, vehicle and equipment maintenance/fueling areas, material handling areas, and similar potential pollutant-generating areas. The annual inspection results shall be documented and records kept with the SWPPP.  The inspection report shall also include any identified deficiencies and  the corrective actions taken to correct deficiencies.

(c) Quarterly Hotspot visual observation of storm water and non-storm water discharges – At least once per quarter visually observe discharge locations from hotspot facilities. Where discharges are observed identify any observed problems (e.g., color, foam, sheen, turbidity) associated with pollutant sources or BMPs shall be remedied as soon as practicable or before the next storm event, whichever is sooner. Visual observations shall be documented, and records kept with the SWPPP.  This inspection shall be done in accordance with the developed standard operating procedures. The inspection report shall also include any identified deficiencies and the corrective actions taken to correct the deficiencies.

(d) Non-Hotspot Inspection – At a minimum, inspect each inventoried municipal facility that is not a hotspot, once per permit term.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### E.11.f.  Storm Drain System Assessment and Prioritization

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall develop and implement procedures to assess and prioritize MS4 storm drain system maintenance, including but not limited to, catch basins, pipe and pump infrastructure, above-ground conveyances, including receiving water bodies within the Permittee's urbanized area and detention basins.

If flood conveyance maintenance is undertaken by another entity, the Permittee shall coordinate with the flood conveyance management entity by year three to assess and prioritize maintenance of the MS4 storm drain system.

(ii) **Implementation Level** – The Permittee shall:
Assess/prioritize storm drain system facilities for cleanout – Assign a priority to MS4 storm drain facilities within the Permittee's urbanized areas based on accumulation of sediment, trash and/or debris. In particular, assign high priority to catch basin meeting any of the following criteria:

1) Catch basins known to accumulate a significant amount of sediment, trash, and/or debris;

2) Catch basins collecting large volumes of runoff;

3) Catch basin collecting runoff from area that do not receive regular sweet sweeping;

4) Catch basins collecting runoff from drainage areas with exposed or disturbed soil; or

5) Catch basins that receive citizen complaints/reports.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

### E.11.g.  Maintenance of Storm Drain System

(i) **Task Description** – Within the third year of the effective date of the permit, the Permittee shall begin maintenance of all high priority storm drain systems on an ongoing schedule.

(ii) **Implementation Level** – The Permittee shall begin maintenance of storm drain systems according to the procedures and priorities developed according to this Section. At a minimum the Permittee shall:

(a) Inspect storm drain systems – Based on the priorities assigned above in Section E.11.f.(ii)(a), develop and implement a strategy to inspect storm drain systems within the Permittee's jurisdiction. At a minimum, inspect all high priority catch basins and systems annually.

(b) Clean storm drains – Develop and implement a schedule to clean high priority catch basins and other systems. Cleaning frequencies shall be based on priority areas, with higher priority areas receiving more frequent maintenance.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(c) Labeling catch basins – Ensure that each catch basin in high foot traffic areas includes a legible storm water awareness message (e.g., a label, stencil, marker, or pre-cast message such as "drains to the creek" or "only rain in the drain"). Catch basins with illegible or missing labels shall be recorded and re- labeled within one month of inspection.

(d) Maintain surface drainage structures – High priority facilities, such as those with recurrent illegal dumping, shall be reviewed and maintained annually as needed. Non-priority facilities shall be reviewed as needed. Removal of trash and debris from high priority areas shall occur annually prior to the rainy season.

(e) Dispose of waste materials – Develop and implement a procedure to dewater and dispose of materials extracted from catch basins. This procedure shall ensure that water removed during the catch basin cleaning process and waste material will not reenter the MS4.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

### E.11.h.  Permittee Operations and Maintenance Activities (O&M)

(i) **Task Description –** Within the third year of the effective date of the permit, the Permittee shall assess their O&M activities for potential to discharge pollutants in storm water and inspect all O&M BMPs on a quarterly basis.

(ii) **Implementation Level** - The Permittee shall:

(a) Develop and implement a program to assess O&M activities and subsequently develop applicable BMPs. The following Permittee O&M activities shall be included in the assessment for their potential to discharge pollutants in storm water:

    1)  Road and parking lot maintenance, including sidewalk repair, curb and gutter repair, pothole repair, pavement marking, sealing, and re-paving

    2)  Bridge maintenance, including re-chipping, grinding, saw cutting, and painting

    3)  Cold weather operations, including plowing, sanding, and application of deicing compounds and maintenance of snow disposal areas

    4)  Right-of-way maintenance, including mowing, herbicide and pesticide application, and planting vegetation

    5)  Storm water relevant Permittee-sponsored or sanctioned events such as large outdoor festivals, parades, or street fairs (e.g., Earth Day, Coastal Cleanup Day, Creek Week)

    6)  Green waste deposited in the street

    7)  Graffiti removal

    8)  Hydrant flushing

(b) Identify all materials that could be discharged from each of these O&M activities, and which materials contain pollutants. Typical pollutants associated with these activities include metals, chlorides, hydrocarbons (e.g. benzene, toluene,

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

ethylbenzene, and xylene), sediment, green waste, herbicide, pesticide, dried paint, and trash.

(c) Develop and implement a set of BMPs that, when applied during Permittee O&M activities, will reduce pollutants in storm water and non-storm water discharges. The Permittee shall use the CASQA Municipal Handbook or equivalent.

(d) Evaluate BMPs – All BMPs implemented during O&M activities shall be evaluated quarterly.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a.for compliance directions.

### E.11.i. Incorporation of Water Quality and Habitat Enhancement Features in New Flood Management Facilities

(i) **Task Description** – Within the third year of the effective date of the permit, the Permittee shall develop and implement a process for incorporating water quality and habitat enhancement features into new and rehabilitated flood management facilities.

(ii) **Implementation Level** – The Permittee shall develop and implement a process to incorporate water quality and habitat enhancement features in the design of all new and rehabilitated flood management projects that are associated with the MS4 or that discharge to the MS4.

(iii) **Reporting –** The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a.for compliance directions.

### E.11.j. Landscape Design and Maintenance

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall implement a landscape design and maintenance program to reduce the amount of water, pesticides, herbicides and fertilizers used during Permittee operations and activities[19].

(ii) **Implementation Tasks** – At a minimum, the Permittee shall:

(a) Evaluate pesticides, herbicides and fertilizers used and application activities performed and identify pollution prevention and source control opportunities.

(b) Implement practices that reduce the discharge of pesticides, herbicides and fertilizers. At a minimum the Permittee shall:

---

[19] Water Efficient Landscape Ordinance can be found at:
http://www.water.ca.gov/wateruseefficiency/docs/MWELO09-10-09.pdf

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

1) Implement educational activities for municipal applicators and distributors.
2) Implement landscape management measures that rely on non-chemical solutions, including:
    a) Create drought-resistant soils by amending soils with compost;
    b) Create soil microbial community through the use of compost, compost tea, or inoculation;
    c) Use native and/or climate appropriate plants to reduce the amount of water, pesticides, herbicides and fertilizers used;
    d) Practice grasscycling on decorative turf landscapes to reduce water use and the need for fertilizers;
    e) Keeping grass clippings and leaves away from waterways and out of the street using mulching, composting, or landfilling;
    f) Preventing application of pesticides, herbicides and fertilizers during irrigation or within 48 hours of predicted rainfall with greater than 50% probability as predicted by National Oceanic and Atmospheric Administration (NOAA)[20];
    g) Limiting or replacing herbicide and pesticide use (e.g., conducting manual weed and insect removal);
    h) Prohibiting application of pesticides, herbicides and fertilizers as required by the regulations DPR 11-004 Prevention of Surface Water Contamination by Pesticides enacted by the Department of Pesticide Regulation;
    i) Reducing mowing of grass to allow for greater pollutant removal, but not jeopardizing public safety.
3) Collect and properly dispose of unused pesticides, herbicides, and fertilizers.
4) Minimize irrigation run-off by using an evapotranspiration-based irrigation schedule and rain sensors.
(c) Record the types and amounts of pesticides, herbicides and fertilizers used in the permit area.

(iii) **Reporting** - The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a.for compliance directions.

## E.12.  POST CONSTRUCTION STORM WATER MANAGEMENT PROGRAM

### E.12.a.  Post-Construction Measures

Permittees shall regulate development to comply with the following Sections:

- E.12.b Site Design Measures
- E.12.c. Regulated Projects
- E.12.d. Source Control Measures

---

[20] https://www.weather.gov/forecast

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

- E.12.e. Low Impact Development (LID) Design Standards
- E.12.f. Hydromodification Measures
- E.12.g. Enforceable Mechanisms
- E.12.h. Operation and Maintenance of Storm Water Control Measures
- E.12.i. Post-Construction Best Management Practice Condition Assessment
- E.12.j. Planning and Development Review Process
- E.12.k. Post-Construction Storm Water Management Requirements Based on Assessment and Maintenance of Watershed Processes
- E.12.l. Alternative Post-Construction Storm Water Management Program

**E.12.b.  Site Design Measures**

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall require implementation of site design measures for all projects that create and/or replace (including projects with no net increase in impervious footprint) between 2,500 square feet and 5,000 square feet of impervious surface, including detached single family homes that create and/or replace 2,500 square feet or more of impervious surface and are not part of a larger plan of development. Site design measures as specified in this section are not applicable to linear underground/overhead projects (LUPs).

(ii) **Implementation Level** - Projects shall implement one or more of the following site design measures to reduce project site runoff:

(a) Stream Setbacks and Buffers — a vegetated area including trees, shrubs, and herbaceous vegetation, that exists or is established to protect a stream system, lake reservoir, or coastal estuarine area;

(b) Soil Quality Improvement and Maintenance — improvement and maintenance soil through soil amendments and creation of microbial community;

(c) Tree Planting and Preservation — planting and preservation of healthy, established trees that include both evergreens and deciduous, as applicable;

(d) Rooftop and Impervious Area Disconnection — rerouting of rooftop drainage pipes to drain rainwater to rain barrels, cisterns, or permeable areas instead of the storm sewer;

(e) Porous Pavement — pavement that allows runoff to pass through it, thereby reducing the runoff from a site and surrounding areas and filtering pollutants;

(f) Green Roofs — a vegetative layer grown on a roof (rooftop garden);

(g) Vegetated Swales — a vegetated, open-channel management practice designed specifically to treat and attenuate storm water runoff;

(h) Rain Barrels and Cisterns — system that collects and stores storm water runoff from a roof or other impervious surface.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Project proponents shall use the State Water Board SMARTS Post-Construction Calculator[21], or equivalent to quantify the runoff reduction resulting from implementation of site design measures.

(iii) **Reporting** - The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

**E.12.c.  Regulated Projects**

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall implement standards to effectively reduce runoff and pollutants associated with runoff from Regulated Projects as defined below.

(ii) **Implementation Level** - The Permittee shall regulate all projects that create and/or replace 5,000 square feet or more of impervious surface (Regulated Projects). The Permittee shall require these Regulated Projects to implement measures for site design, source control, runoff reduction, storm water treatment and baseline hydromodification management as defined in this Order.

Regulated Projects do not include:

- Detached single family home projects that are not part of a larger plan of development;
- Interior remodels;
- Routine maintenance or repair such as: exterior wall surface replacement, pavement resurfacing within the existing footprint.
- LUPs - Unless the LUP has a discrete location that has 5,000 square feet or more of newly constructed contiguous impervious surface. When the LUP has a discrete location that has 5,000 sq-ft or more of new contiguous impervious surface, only that specific discrete location is subject to Section E.12.c.

Regulated Projects include development projects. Development includes new and redevelopment projects on public or private land that fall under the planning and permitting authority of a Permittee. Redevelopment is any land-disturbing activity that results in the creation, addition, or replacement of exterior impervious surface area on a site on which some past development has occurred. Redevelopment does not include trenching, excavation and resurfacing associated with LUPs; pavement grinding and resurfacing of existing roadways; construction of new sidewalks, pedestrian ramps, or bike lanes on existing roadways; or routine replacement of damaged pavement such as pothole repair or replacement of short, non-contiguous sections of roadway. The following (a-c) describe specific Regulated Project requirements for redevelopment, road projects and LUPs:

---

[21] The State Water Board SMARTS Post-Construction Calculator can be found at: https://smarts.waterboards.ca.gov/smarts/faces/SwSmartsLogin.jsp

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(a) Where a redevelopment project results in an increase of more than 50 percent of the impervious surface of a previously existing development, runoff from the entire project, consisting of all existing, new, and/or replaced impervious surfaces, must be included to the extent feasible.

(b) Where a redevelopment project results in an increase of less than 50 percent of the impervious surface of a previously existing development, only runoff from the new and/or replaced impervious surface of the project must be included.

(c) Road Projects and LUPs - Any of the following types of road projects and LUPs that create 5,000 square feet or more of newly constructed contiguous impervious surface and that are public road projects and/or fall under the building and planning authority of a Permittee shall comply with Section E.12.e. Low Impact Development Standards except that treatment of runoff of the 85th percentile that cannot be infiltrated onsite shall follow U.S. EPA guidance regarding green infrastructure to the extent feasible. Types of projects include:

1) Construction of new streets or roads, including sidewalks and bicycle lanes built as part of the new streets or roads.

2) Widening of existing streets or roads with additional traffic lanes.
   a) Where the addition of traffic lanes results in an alteration of more than 50 percent of the impervious surface of an existing street or road, runoff from the entire project, consisting of all existing, new, and/or replaced impervious surfaces, must be included in the treatment system design.
   b) Where the addition of traffic lanes results in an alteration of less than 50 percent (but 5,000 square feet or more) of the impervious surface of an existing street or road, only the runoff from new and/or replaced impervious surface of the project must be included in the treatment system design.

3) Construction of linear underground/overhead projects (LUPs)

4) Specific exclusions are:
   a) Sidewalks built as part of new streets or roads and built to direct storm water runoff to adjacent vegetated areas.
   b) Bicycle lanes that are built as part of new streets or roads that direct storm water runoff to adjacent vegetated areas.
   c) Impervious trails built to direct storm water runoff to adjacent vegetated areas, or other non-erodible permeable areas, preferably away from creeks or towards the outboard side of levees.
   d) Sidewalks, bicycle lanes, or trails constructed with permeable surfaces.
   e) Trenching, excavation and resurfacing associated with LUPs; pavement grinding and resurfacing of existing roadways and parking lots; construction of new sidewalks, pedestrian ramps, or bike lanes on existing roadways; or routine replacement of damaged pavement such as pothole repair or replacement of short, non-contiguous sections of roadway.

Effective Date for Applicability of Low Impact Development Runoff Standards to Regulated Projects: By the second year of the effective date of the permit, the Permittee shall require these Post-Construction Standards be applied on applicable new and redevelopment Regulated Projects, both private development requiring municipal permits and public projects, to the extent allowable by applicable law. These include discretionary permit projects that have not been deemed complete for

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

processing and discretionary permit projects without vesting tentative maps that have not requested and received an extension of previously granted approvals. Discretionary projects that have been deemed complete prior to the second year of the effective date of this Order are not subject to the Post- Construction Standards herein. For the Permittee's Regulated Projects, the effective date shall be the date their governing body or designee approves initiation of the project design.

Permittee's Development Projects - The Permittee shall develop and implement an equivalent approach, to the approach used for private development projects, to apply the most current version of the low impact development runoff standards to applicable public development projects, to the extent allowable by applicable law.

**E.12.d. Source Control Measures**

(i) **Task Description** – Regulated Projects with pollutant-generating activities and sources shall be required to implement standard permanent and/or operation source control measures as applicable.

(ii) **Implementation Level** - Measures for the following pollutant generating activities and sources shall be designed consistent with recommendations from the CASQA Stormwater BMP Handbook for New Development and Redevelopment or equivalent manual, and include:

(a) Accidental spills or leaks
(b) Interior floor drains
(c) Parking/storage areas and maintenance
(d) Indoor and structural pest control
(e) Landscape/outdoor pesticide use
(f) Pools, spas, ponds, decorative fountains, and other water features
(g) Restaurants, grocery stores, and other food service operations
(h) Refuse areas
(i) Industrial processes
(j) Outdoor storage of equipment or materials
(k) Vehicle and equipment cleaning
(l) Vehicle and equipment repair and maintenance
(m) Fuel dispensing areas
(n) Loading docks
(o) Fire sprinkler test water
(p) Drain or wash water from boiler drain lines, condensate drain lines, rooftop equipment, drainage sumps, and other sources
(q) Unauthorized non-storm water discharges
(r) Building and grounds maintenance

**E.12.e. Low Impact Development (LID) Design Standards**

(i) **Task Description –** The Permittee shall require all Regulated Projects to implement low impact development (LID) standards designed to reduce runoff, treat storm water, and provide baseline hydromodification management to the extent feasible, to meet

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

the Numeric Sizing Criteria for Storm Water Retention and Treatment under Section E.12.e(ii)(c).

(ii) **Implementation Level –** The Permittee shall adopt and implement requirements and standards to ensure design and construction of development projects achieve the following LID Design Standards.

(a) **Site Assessment**

At the earliest planning stages, the Permittee shall require Regulated Projects to assess and evaluate how site conditions, such as soils, vegetation, and flow paths, will influence the placement of buildings and paved surfaces. The evaluation will be used to meet the goals of capturing and treating runoff and assuring these goals are incorporated into the project design. The Permittee may adopt or reference an existing LID site assessment methodology.[22] Permittees shall require Regulated Projects to consider optimizing the site layout through the following methods:

1) Define the development envelope and protected areas, identifying areas that are most suitable for development and areas to be left undisturbed.
2) Concentrate development on portions of the site with less permeable soils and preserve areas that can promote infiltration.
3) Limit overall impervious coverage of the site with paving and roofs.
4) Set back development from creeks, wetlands, and riparian habitats.
5) Preserve significant trees.
6) Conform the site layout along natural landforms.
7) Avoid excessive grading and disturbance of vegetation and soils.
8) Replicate the site's natural drainage patterns.
9) Detain and retain runoff throughout the site.

(b) **Drainage Management Areas**

The Permittee shall require each Regulated Project to provide a map or diagram dividing the developed portions of the project site into discrete Drainage Management Areas (DMAs), and to manage runoff from each DMA using Site Design Measures, Source Controls and/or Storm Water Treatment and Baseline Hydromodification Measures.

(c) **Numeric Sizing Criteria for Storm Water Retention and Treatment**

The Permittees shall require facilities designed to evapotranspire, infiltrate, harvest/use, and biotreat storm water to meet at least one of the following hydraulic sizing design criteria:

1) Volumetric Criteria:

a) The maximized capture storm water volume for the tributary area, on the basis of historical rainfall records, determined using the formula and volume capture coefficients in Urban Runoff Quality Management, WEF Manual of Practice No. 23/ASCE Manual of Practice No. 87 (1998) pages 175-178 (that is, approximately the 85th percentile 24-hour storm runoff event); or

---

[22] Low Impact Development Manual for Southern California (Low Impact Development Center – See CASQA's LID website at: https://www.casqa.org/resources/lid/socal-lid-manual.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

    b)  The volume of annual runoff required to achieve 80 percent or more capture, determined in accordance with the methodology in Section 5 of the CASQA's Stormwater Best Management Practice Handbook, New Development and Redevelopment (2003), using local rainfall data.

2)  Flow-based Criteria:

    a)  The flow of runoff produced from a rain event equal to at least 0.2 inches per hour intensity; or

    b)  The flow of runoff produced from a rain event equal to at least 2 times the 85th percentile hourly rainfall intensity as determined from local rainfall records.

(d) **Site Design Measures**

The Permittee shall implement Site Design Measures (as defined in Section E.12.b. Site Design Measures and Section E.12.e(ii)(a) Site Assessment), site layout and design measures, based on the objective of achieving infiltration, evapotranspiration and/or harvesting/reuse of the 85th percentile 24-hour storm runoff event. Site design measures shall be used to reduce the amount of runoff, to the extent technically feasible, for which retention and runoff is required. Any remaining runoff from impervious DMAs may then be directed to one or more bioretention facilities as specified in Section E.12.e.(ii)(f), below.

(e) **Source Controls**

The Permittee shall implement Source Controls as defined in Section E.12.d. Source Control Measures.

(f) **Storm Water Treatment Measures and Baseline Hydromodification Management Measures**

After implementation of Site Design Measures, remaining runoff from impervious DMAs must be directed to one or more facilities designed to infiltrate, evapotranspire, and/or bioretain the amount of runoff specified in Section E.12.e(ii)(c) Numeric Sizing Criteria for Storm Water Retention and Treatment. The facilities must be demonstrated to be at least as effective as a bioretention system with the following design parameters:

1)  Maximum surface loading rate of 5 inches per hour, based on the flow rates calculated. A sizing factor of 4% of tributary impervious area may be used.

2)  Minimum surface reservoir volume equal to surface area times a depth of 6 inches.

3)  Minimum planting medium depth of 18 inches. The planting medium must sustain a minimum infiltration rate of 5 inches per hour throughout the life of the project and must maximize runoff retention and pollutant removal. A mixture of sand (60%-70%) meeting the specifications of American Society for Testing and Materials (ASTM) C33 and compost (30%-40%) may be used.

4)  Subsurface drainage/storage (gravel) layer with an area equal to the surface area and having a minimum depth of 12 inches.

5)  Underdrain with discharge elevation at top of gravel layer.

6)  No compaction of soils beneath the facility, or ripping/loosening of soils if compacted.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

7) No liners or other barriers interfering with infiltration.

8) Appropriate plant palette for the specified soil mix and maximum available water use.

(g) **Alternative Designs —** Facilities, or a combination of facilities, of a different design than in Section E.12.e.(ii)(f) may be permitted if all of the following measures of equivalent effectiveness are demonstrated:

1) Equal or greater amount of runoff infiltrated or evapotranspired;

2) Equal or lower pollutant concentrations in runoff that is discharged after biotreatment;

3) Equal or greater protection against shock loadings and spills;

4) Equal or greater accessibility and ease of inspection and maintenance.

(h) **Allowed Variations for Special Site Conditions** - The bioretention system design parameters in Section E.12.e.(ii)(f) may be adjusted for the following special site conditions:

1) Facilities located within 10 feet of structures or other potential geotechnical hazards established by the geotechnical expert for the project may incorporate an impervious cutoff wall between the bioretention facility and the structure or other geotechnical hazard.

2) Facilities with documented high concentrations of pollutants in underlying soil or groundwater, facilities located where infiltration could contribute to a geotechnical hazard, and facilities located on elevated plazas or other structures may incorporate an impervious liner and may locate the underdrain discharge at the bottom of the subsurface drainage/storage layer (this configuration is commonly known as a "flow-through planter").

3) Facilities located in areas of high groundwater, highly infiltrative soils or where connection of underdrain to a surface drain or to a subsurface storm drain are infeasible, may omit the underdrain.

4) Facilities serving high-risk areas such as fueling stations, truck stops, auto repairs, and heavy industrial sites may be required to provide additional treatment to address pollutants of concern unless these high- risk areas are isolated from storm water runoff or bioretention areas with little chance of spill migration.

(i) **Exceptions to Requirements for Bioretention Facilities -** Contingent on a demonstration that use of bioretention or a facility of equivalent effectiveness is infeasible, other types of biotreatment or media filters (such as tree-box- type biofilters or in-vault media filters) may be used for the following categories of Regulated Projects:

1) Projects creating or replacing an acre or less of impervious area, and located in a designated pedestrian-oriented commercial district (i.e., smart growth projects), and having at least 85% of the entire project site covered by permanent structures;

2) Facilities receiving runoff solely from existing (pre-project) impervious areas; and

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

3) Historic sites, structures or landscapes that cannot alter their original configuration in order to maintain their historic integrity.

By the second year of the effective date of the permit, each Permittee shall adopt or reference appropriate performance criteria for such biotreatment and media filters.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

### E.12.f.  Hydromodification Management

(i) **Task Description** – Within the third year of the effective date of the permit, the Permittee shall develop and implement Hydromodification Management procedures. Hydromodification management projects are Regulated Projects that create and/or replace one acre or more of impervious surface. A project that does not increase impervious surface area over the pre-project condition is not a hydromodification management project.

(ii) **Implementation Level** - The Permittee shall implement the following Hydromodification Standard:

(a) Post-project runoff shall not exceed estimated pre-project flow rate for the 2-year, 24-hour storm in the following geomorphic provinces (Figure 1):

- Coast Ranges
- Klamath Mountains
- Cascade Range
- Modoc Plateau
- Basin and Range
- Sierra Nevada
- Great Valley

(b) Post-project runoff shall not exceed estimated pre-project flow rate for the 10-year, 24-hour storm in the following geomorphic provinces (Figure 1):

- Transverse Ranges
- Peninsular Ranges
- Mojave Desert
- Colorado Desert

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk



**Figure 1 — California Geomorphic Provinces**

Alternatively, the Permittee may use a geomorphically based hydromodification standard or set of standards and analysis procedures designed to ensure that Regulated Projects do not cause a decrease in lateral (bank) and vertical (channel bed) stability in receiving stream channels. The alternative hydromodification standard or set of standards and analysis procedures must be reviewed and approved by the Regional Board Executive Officer.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(iii) **Reporting** –The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long- term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

## E.12.g.  Enforceable Mechanisms

(i) **Task Description** - Within the third year of the effective date of the permit, the Permittee shall develop and/or modify enforceable mechanisms that will effectively implement the requirements in Section E.12.b through f (if necessary).

(ii) **Implementation Level** - The Permittee shall develop and/or modify enforceable mechanisms that will effectively implement the requirements in Section E.12.b through E.12.f and may include municipal codes, regulations, standards, and specifications. The Permittee shall:

(a) Conduct an analysis of all applicable codes, regulations, standards, and/or specifications to identify modifications and/or additions necessary to fill gaps and remove impediments to effective implementation of project-scale development requirements.

(b) Approve new and/or modified enforceable mechanisms that effectively resolve regulatory conflicts and implement the requirements in Sections E.12.b through E.12.f (if necessary)

(c) Apply new and/or modified enforceable mechanisms to all applicable new and redevelopment projects. Develop and make available specific guidance for LID BMP design

(d) Complete a Tracking Report indicating the Permittee's accomplishments in education and outreach supporting implementation of LID requirements for new and redevelopment projects.

## E.12.h.  Operation and Maintenance of Post-Construction Storm Water Management Measures

(i) **Task Description** –Within the second year of the effective date of the permit, the Permittee shall implement an O&M Verification Program for storm water treatment and baseline hydromodification management structural control measures defined in Section E.12.e(ii)(f). Storm Water Treatment Measures and Baseline Hydromodification Management Measures on all Regulated Projects.

(ii) **Implementation Level** – At a minimum, the O&M Verification Program shall include the following elements:

(a) All Regulated Projects shall at a minimum, require at least one of the following from all project proponents and their successors in control of the Project or successors in fee title:

1) The project proponent's signed statement accepting responsibility for the O&M of structural control measure(s) until such responsibility is legally transferred to another entity;

Page 59

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

2) Written conditions in the sales or lease agreements or deed for the project that requires the buyer or lessee to assume responsibility for the O&M of the installed treatment system(s) and hydromodification control(s) (if any) until such responsibility is legally transferred to another entity;

3) Written text in project deeds, or conditions, covenants and restrictions for multi-unit residential projects that require the homeowners association or, if there is no association, each individual owner to assume responsibility for the O&M of the installed treatment system(s) and hydromodification control(s) (if any) until such responsibility is legally transferred to another entity; or

4) Any other legally enforceable agreement or mechanism, such as recordation in the property deed, that assigns the O&M responsibility for the installed treatment system(s) and hydromodification control(s) (if any) to the project owner(s) or the Permittee.

(b) Coordination with the appropriate mosquito[23] and vector control agency with jurisdiction to establish a protocol for notification of installed treatment systems and hydromodification management controls. On an annual basis, before the wet season, prepare a list of newly installed (installed within the reporting period) storm water treatment systems and hydromodification management controls to the local mosquito and vector control agency and the appropriate Regional Water Board. The Permittee may submit the list of Regulated Projects as described in Section E.12.h.(ii)(e). This list shall include the facility locations and a description of the storm water treatment measures and hydromodification management controls installed.

(c) Conditions of approval or other legally enforceable agreements or mechanisms for all Regulated Projects that require the granting of site access to all representatives of the Permittee for the sole purpose of performing O&M inspections of the installed treatment system(s) and hydromodification control(s) (if any).

(d) A written implementation plan that describes O&M (including inspection) of all Regional Projects and regional controls that are Permittee-owned and/or operated.

(e) A database or equivalent tabular format of all Regulated Projects (public and private) that have installed treatment systems. This database or equivalent tabular format shall include the following information for each Regulated Project:

1) Name and address of the Regulated Project;

2) Specific description of the location (or a map showing the location) of the installed treatment system(s) and hydromodification control(s) (if any);

3) Date(s) that the treatment system(s) and hydromodification controls (if any) is/are installed;

4) Description of the type and size of the treatment system(s) and hydromodification control(s) (if any) installed;

5) Responsible operator(s) of each treatment system and hydromodification control (if any);

---

[23] California Department of Public Health. (2012). Best Management Practices for Mosquito Control in California. Retrieved on July 20, 2012 from http://www.westnile.ca.gov/resources.php

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

6) Dates and findings of inspections (routine and follow-up) of the treatment system(s) and hydromodification control(s) (if any) by the Permittee; and

7) Any problems and corrective or enforcement actions taken.

8) Maintenance Approvals: The Permittee shall ensure that systems and hydromodification controls installed at Regulated Projects are properly operated and maintained for the life of the projects. In cases where the responsible party for a treatment system or hydromodification control has worked diligently and in good faith with the appropriate state and federal agencies and the Permittee to obtain approvals necessary to complete maintenance activities for the treatment system or hydromodification management control, but these approvals are not granted, the Permittee shall be deemed to be in compliance with this Provision.

(iii) **Reporting –** The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long- term effectiveness of the storm water program.  If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a.for compliance directions.

### E.12.i.  Post-Construction Best Management Practice Condition Assessment

(i) **Task Description** – Within the third year of the effective date of the permit, the Permittee shall inventory and assess the maintenance condition of structural post-construction BMPs (including BMPs used for flood control) within the Permittee's jurisdiction.

(ii) **Implementation Level** – The Permittee shall develop and implement a plan to inventory, map, and determine the relative maintenance condition of structural post-construction BMPs. Maintenance condition shall be determined through a self-certification program where Permittees require annual reports from authorized parties demonstrating proper maintenance and operations. The plan shall include:

(a) An inventory and map of existing structural post-construction BMPs, in GIS if available.

(b) Assessments of the self-certification program annual reports.  Assessment shall include a ranking of structural BMPs and verification that BMPs are operating to remove pollutants as designed. Regional BMPs should receive higher priority than lot-scale BMPs, and BMPs designed to remove pollutants for which receiving water is impaired should receive priority attention over other BMPs.

(c) Appropriate escalating enforcement based on the Permittee Enforcement Response Plan to ensure proper maintenance of BMPs and submittal of self-certification annual reports.

(d) Self-Certification Annual Reports. At a minimum, the self-certification annual reports shall include:

1) Field observations to determine the effectiveness of the structural post construction BMPs in removing pollutants of concern from storm water runoff and/or reducing hydromodification impacts as designed.

Page 61

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

2) Long-term plan for conducting regular maintenance of BMPs, including the frequency of such maintenance.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long- term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section E.16.a. for compliance directions.

### E.12.j.  Planning and Development Review Process

(i) **Task Description** – The Permittee shall review their planning and permitting process to assess any gaps or impediments impacting effective implementation of these post-construction requirements specified in Section E.12, and where these are found to exist, seek solutions to promote implementation of these requirements within the context of public safety and community goals for land use. The Permittee shall prioritize review of the landscape code (code detailing landscaping requirements and considerations which should be implemented to protect environmental quality) to correct gaps and impediments impacting effective implementation of post-construction requirements.

(ii) **Implementation Level** – During years 1–3, the Permittee shall conduct the review using an existing guide or template already developed for MS4s (such as the Municipal Regulatory Update Assistance Program (MRUAP)[24] conducted by AHBL, Inc. for the Low Impact Development Initiative (LIDI) on the Central Coast). By the fourth year of the effective date of the permit, any changes to the planning and permitting process will be completed to effectively administer these provisions. Priority shall be placed on review of the landscape code, with the following implementation level.

(a) Within the first year of the effective date of this permit, the Permittee shall conduct an analysis of the landscape code to correct gaps and impediments impacting effective implementation of post-construction requirements.

(b) Within the second year of the effective date of the permit, the Permittee shall complete any changes to the landscape code to effectively administer post-construction requirements.

(iii) **Reporting** – By the second year Annual Report and annually thereafter, complete and have available a summary of the review process, and any proposed or completed changes to the Permittee's program.

### E.12.k.  Post-Construction Storm Water Management Requirements Based on Assessment and Maintenance of Watershed Processes

Small MS4s subject to Section E of this Order, in place of complying with the requirements set forth in Section E.12, except for Sections E.12.j. Planning and Development Review Process and E.12.e(ii)(e) Source Control Requirements, shall comply with post-construction storm water management requirements based on a

---

[24] http://www.casqa.org/LIDDemo/LIDTraining/tabid/246/Default.aspx

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

watershed-process approach developed by Regional Water Board that include the following:

- Completion of a comprehensive assessment of dominant watershed processes affected by urban storm water
- LID site design and runoff reduction measures, numeric runoff treatment and retention controls, and hydromodification controls that will maintain watershed processes and protect water quality and beneficial uses.
- A process by which Regional Board staff will actively engage Permittees to adaptively manage requirements as determined by the assessment of watershed processes.
- An annual reporting program that involves Regional Board staff and State Board staff to inform statewide watershed process based criteria.

The regional watershed-process based approach must be approved by the Regional Water Board following a public process.

### E.12.I. Alternative Post-Construction Storm Water Management Program

A Permittee may propose alternative post-construction measures in lieu of some or all of Section E.12. requirements for multiple benefit projects. Multiple-benefit projects include projects that may address any of the following, in addition to water quality: water supply, flood control, habitat enhancement, open space preservation, recreation, climate change. Multiple-benefit projects may be applied at various scales including project site, municipal or sub-watershed level. Multiple-benefit projects may include, but are not limited to, projects developed under Watershed Improvement Plans (Water Code §16100 et seq.), IRWMP implementation and green infrastructure projects. Multiple benefit projects must be equally or more protective of water quality than Section E.12. requirements.

The Regional Water Board or the Executive Officer, may approve alternative post-construction measures for multiple-benefit projects, as described above, after an opportunity for public comment, if the Regional Water Board or Executive Officer finds that the alternative measures are consistent with the MEP standard.

### E.13. WATER QUALITY MONITORING

Traditional Small MS4 Permittees that are required to conduct monitoring of discharges to ASBS, TMDL, or 303(d) impaired water bodies, as described in Sections E.13.(a)–(c), are not required to perform additional monitoring as specified in Sections E.13.d.1. and E.13.d.2.

Permittees are encouraged to participate in a regional monitoring program in order to cost- effectively combine resources and water quality information. Regional monitoring is the collaboration of local and regional monitoring programs that are designed to create a more comprehensive picture of water quality conditions within a watershed.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

The following management questions may be used to assist in guiding the development of a regional monitoring program, as applicable[25]:

1)  Are water quality standards being met in receiving waters?
2)  What is the extent and magnitude of the current or potential receiving water problems[26]?
3)  What is the relative urban runoff contribution to the receiving water problem(s)?
4)  What are the sources to urban runoff that contribute to the receiving water problem(s)?
5)  Are conditions in receiving waters getting better or worse?

Regional monitoring programs shall be reviewed and approved by the Executive Officer of the applicable Regional Water Board[27].

Where a regional monitoring group has initiated plans, before the effective date of this Order, to conduct monitoring that achieves Section E.13. compliance, the Permittee may request the Executive Officer of the applicable Regional Board tailor compliance dates to synchronize with such efforts. Additionally, existing regional water monitoring efforts shall be reviewed and approved by a Regional Water Board Executive Officer.

Where a Permittee receives grant funding to conduct monitoring that achieves Section E.13. compliance, the Permittee may request the Regional Water Board Executive Officer tailor compliance dates to synchronize with such efforts.

### E.13.a.  ASBS Monitoring

All Permittees that discharge to an ASBS and are covered by an Ocean Plan exception shall comply with the monitoring requirements described in the terms, prohibitions and special conditions in Attachment C.

### E.13.b.  TMDL Monitoring

Permittees shall implement any monitoring requirements assigned to them in Attachment G. The Regional Water Board Executive Officer may require additional monitoring, per Water Code § 13383.

---

[25] The five core management questions are based on the Stormwater Monitoring Coalition's Model Monitoring Technical Committee Technical Report # 419: Model Monitoring Program for Municipal Separate Storm Sewer Systems in Southern California.

[26] Water quality problems include exceedances of water quality standards, including impairment of designated uses, or other significant water quality impacts, including habitat and biological impacts.

[27] The regional monitoring programs may deviate from the specific requirements in Section E.13.a. to the extent approved by the Executive Officer, except that the regional monitoring program shall be SWAMP comparable and that all data shall be placed in the California Environmental Data Exchange Network (CEDEN).

### E.13.c.  303(d) Monitoring

All Permittees that discharge to <u>waterbodies listed as impaired on the 303(d) list</u>[28] where urban runoff is listed as the source, shall consult with the Regional Water Board within one year of the effective date of the permit to assess whether monitoring is necessary and if so, determine the monitoring study design and a monitoring implementation schedule. Permittees shall implement monitoring of 303(d) impaired water bodies as specified by the Regional Water Board Executive Officer.

### E.13.d.  Receiving Water Monitoring and Special Studies

Traditional Small MS4 Permittees with a population greater than 50,000 listed in Attachment A that are not already conducting ASBS, TMDL or 303(d) monitoring efforts shall participate in one of the following monitoring programs, subject to Regional Water Board Executive Officer approval:

E.13.d.1. Receiving Water Monitoring

E.13.d.2. Special Studies

### E.13.d.1.  Receiving Water Monitoring

(i)  **Task Description –** Within the second year of the effective date of the permit, the Permittee shall develop and implement a receiving water monitoring program to Monitor receiving water quality at upstream location in an area undergoing development and evaluate changes in receiving water quality over time, and Monitor receiving water quality at a downstream location in an urban area and evaluate changes in receiving water quality over time. Permittees may, to the extent allowed by law, establish a monitoring fund into which all new development contributes on a proportional basis (% development fee, size/number of lots, etc.). Monitoring funding may be overseen by municipalities or coalition of municipalities.

(ii)  **Implementation Level –** By the first year of the permit, the Permittee shall select one urban/rural interface monitoring site to monitor receiving water quality at an upstream location in an area undergoing development and evaluate changes in receiving water quality over time, and; one (1) urban area monitoring site to monitor receiving water quality at a downstream location in an urban area and evaluate changes in receiving water quality over time. Site selection shall include the following:

(a)  <u>Urban/Rural Interface</u>. Identify one characteristic waterway at the top, or upstream, of a HUC 12 level watershed planned for development in the near future that traverses an urban/rural interface, using the 2010 Census Data and urban area maps, and establish a permanent monitoring location at the identified urban/rural interface[29]. Monitoring at the urban/rural interface shall address the question: Does receiving water quality change as LID BMPs are integrated into new development?

(b)  <u>Urban Downstream</u>. Identify one characteristic waterway at the bottom, or downstream, of the same HUC 12 watershed as the urban/rural interface

---

[28] http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml.

[29] The urban/rural interface is identified as the geographical location at which urban land use and rural land use interact.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

monitoring location and within an urbanized area and establish a permanent monitoring location at the identified urbanized area waterway. Monitoring at the urban area site shall address the question: Does receiving water quality improve as a result of efforts to control the sources of pollution and educate the public?

By the second year of the permit term and after establishment of site selection, the Permittee shall monitor the urban/rural interface site to address the hypothesis that receiving water quality will remain the same as new development proceeds, and the urban area site to address the hypothesis that receiving water quality will improve over time as storm water and other water quality programmatic efforts are implemented. Monitoring shall be implemented in accordance with <u>Table 3: Receiving Water Monitoring Parameters and Protocols</u>.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## Table 3: Receiving Water Monitoring Parameters and Protocol

**Information on Receiving Water Monitoring Parameters and Protocol for Table 3 includes:**

**Urban/Rural Interface:**

<u>Objective</u>:  Monitor receiving water quality at upstream location in an area undergoing development. Evaluate changes in receiving water quality over time.

<u>Question</u>:  Does receiving water quality change as LID BMPs are integrated into new development?

<u>Hypothesis</u>:  Receiving water quality will remain the same as new development proceeds.

**Urban Downstream:**

<u>Objective</u>:  Monitor receiving water quality at a downstream location in an urban area. Evaluate changes in receiving water quality over time.

<u>Question</u>:  Does receiving water quality improve as a result of efforts to control the sources of pollution and educate the public?

<u>Hypothesis</u>:  Receiving water quality will improve over time as storm water and other water quality programmatic efforts are implemented.

\*  Pyrethroid monitoring is required at the urban/rural interface site only.

\*\* Currently, pyrethroids are the pesticide of greatest concern and abundance in urban/suburban waterways. However, new regulations enacted by the Dept. of Pesticide Regulation restrict how pyrethroids may be applied. Initial models by UC Davis researchers suggest that this could result in a runoff reduction of 80-90%, depending on the amount of impervious cover in the watershed. In the future, other pesticides may become more of a threat to aquatic life in urban waterways. One pesticide that is being used with greater frequency is fipronil, a phenylpyrazole insecticide, that is more water soluble than pyrethroids. In order to use the resources of the permittees most efficiently, the State Water Resource Control Board reserves the right to modify the terms and conditions of the permit based on new information on pesticide use and toxicity. This could include substituting another pesticide for monitoring or eliminating this endpoint.

| Parameter | Endpoint | Beneficial Used Protected | Justification | Protocol |
|---|---|---|---|---|
| **Water Quality** | Pyrethroids* (sediment) | Aquatic Life | Pyrethroids** among the most ubiquitous urban contaminant in storm water. Highly toxic to aquatic life. | Method with detection limit of 1 pptr (5 pptr for permethrin only) such as the GC-MS-MS method of Water Pollution Control Lab. Yearly in spring at urban/rural interface only. Refer to pending SWAMP guidelines. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Parameter | Endpoint | Beneficial Used Protected | Justification | Protocol |
|---|---|---|---|---|
| **Water Quality** | Dissolved oxygen (DO) | Aquatic life, recreation | DO reports on presence of excessive nutrients (Nitrogen, Phosphorus) and effects of organic matter loading into a waterbody. High DO during day, low DO at night suggests algae overgrowth. | Option 1: One week of evening grab samples (a minimum of 2 hours after dusk or 2 hours before sunrise) in spring (as soon as safe to get into waterway), summer, & fall. OR Option 2: Continuous sampling. 1 week in spring summer, fall. In rivers or lakes, 2 samplers to obtain depth-integrated values. |
| **Water Quality** | Temperature | Aquatic life | Aquatic life can survive within a temperature window, exceedances lethal. If loggers are deployed, DO probes often also measure temperature. | Option 1: Daytime measurement between noon – 5 pm, at the same time of day, for 2 weeks in the spring, summer, and fall. Option 2: Continuous sample. Same as for dissolved oxygen. |
| **Water Quality** | Bacteria | Recreation | Increase cell count linked to poor management practices, high bacteria levels limit recreational use of waterways. | Once yearly in later summer or fall. Collect 1 sample weekly x 4 weeks. Calculate geometric mean. Measure E. coli. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Parameter | Endpoint | Beneficial Used Protected | Justification | Protocol |
|---|---|---|---|---|
| **Water Quality** | Nutrients | Aquatic life Recreation Other | Excess nutrients can cause eutrophication of waterways leading to low dissolved oxygen which harms aquatic life. Algal overgrowth can also impair flows, adversely affect aesthetics, limiting recreation. | Benthic algal biomass and % cover (benthic chlorophyll a) from sediment in wadeable and non- wadeable streams or planktonic algal biomass (water column chlorophyll) from non-wadeable rivers and lakes. 3 times per year at beginning, middle, and end of growing season. Use SWAMP protocol. |
| **Physical Habitat** | PHAB assessment | Aquatic life | Expect to see few changes in habitat with effective LID implementation | Once yearly in spring. Use SWAMP protocol. |
| **Physical Habitat** | Channel cross sections | Aquatic life | Reports on stability of creek/river channel | Once yearly in spring. |
| **Physical Habitat** | Flow | Aquatic life | Expect minimal changes in flow rate if Low Impact Development practices minimizes changes in hydrograph usually seen with urbanization | Option 1: Pressure transducer. Use channel cross sections put in same time as DO probe. Measure spring, summer, and fall. Option 2: Install stage gage, develop rating curve. Evaluate spring, summer, and fall for 2 weeks. |
| **Physical Habitat** | Photo documentation | Overall conditions | Pictures and flood prone area will aid in the interpretation of the data | Once yearly in spring. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Parameter | Endpoint | Beneficial Used Protected | Justification | Protocol |
|-----------|----------|--------------------------|---------------|----------|
| **Aquatic Life** | Bioassessment | Aquatic life | Benthic macroinvertebrates (BMIs) integrate the sum of all conditions. Use early measurements as the baseline. In some cases, expect improved BMIs, depending on previous use of land. | In spring as soon as safe to enter water, use SWAMP protocol |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(iii) **Reporting –** By the second year Annual Report, the Permittee shall complete and have available a report (50 page maximum) that includes a summary of baseline data collections and discussion of monitoring program results;

By the fifth year Annual Report, the Permittee shall complete and have available a report (50 page maximum) that includes a comparison of data collection to baseline data, and discussion of monitoring program results.

At a minimum, the second and fifth year Annual Reports shall include the following information:

(a) The purpose of the monitoring, brief contextual background and a brief description of the study design and rationale.

(b) Sampling site(s) locations, including latitude and longitude coordinates, water body name and water body segment if applicable. Sampling design, including sampling protocol, time of year, sampling frequency and length of sampling.

(c) Methods used for sample collection: list methods used for sample collection, sample or data collection identification, collection date, and media if applicable.

(d) Results of data collection, including concentration detected, measurement units, and detection limits if applicable.

(e) Quantifiable assessment, analysis and interpretation of data for each monitoring parameter.

(f) Comparison to reference sites (if applicable), guidelines or targets

(g) Discussion of whether data collected addresses the objective(s) or question(s) of study design

(h) Quantifiable discussion of program/study pollutant reduction effectiveness.

Where applicable, the Permittee shall prepare, maintain, and implement a Quality Assurance Project Plan (QAPP) in accordance with the Surface Water Ambient Monitoring Program. All monitoring samples shall be collected and analyzed according to the Program QAPP developed for the purpose of compliance with this Order. SWAMP Quality Assurance Program Plan (2008) is available at: http://www.waterboards.ca.gov/water_issues/programs/swamp/docs/qapp/qaprp082209.pdf.

A formatted Microsoft Word document that includes guidelines and boilerplate language for developing the permit QAPP is available at: http://www.waterboards.ca.gov/water_issues/programs/swamp/tools.shtml#qa.

Water quality data shall be uploaded to SMARTS and must conform to California Environmental Data Exchange Network (CEDEN) Minimum Data Templates format. CEDEN Minimum Data Templates are also available at: http://ceden.org/.

### E.13.d.2. Special Studies

(i) **Task Description –** Within the first year of the effective date of the permit, the Permittee, as an alternative to Section E.13.d.1. Receiving Water Monitoring may develop and implement a special study monitoring program to assess and evaluate the effectiveness of water quality projects or storm water program elements designed to

Page 71

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

reduce specific water quality pollutants that are causing or contributing to beneficial use impairment. The special studies must demonstrate the nexus between storm water program implementation, water quality protection and pollutant reduction effectiveness and may include, but are not limited to:

(a) Assessment of effectiveness of habitat enhancement efforts and assessment of effectiveness of stream restoration projects (i.e., stream channel restoration as related to implementation of hydromodification standards);

(b) Assessment of effectiveness of low impact development pilot projects, and assessment of storm water program components through pollutant load reduction quantification and/or discharge water quality monitoring (i.e., reduction of impervious surface related to implementation of Post- Construction Storm Water Management Program).

(ii) **Implementation Level** – By the first year of the permit, the Permittee shall develop and implement a special study plan and shall submit to an applicable Regional Board for review and approval. Within the second year of the effective date of the permit, the Permittee shall begin implementation of the approved special study plan. The study plan shall include, at a minimum:

(a) Purpose/objective of the monitoring (sampling rationale), including reasoning to implement a special study in lieu of the Receiving Water Monitoring described in Section E.13.d.1.

(b) Brief project background information and overall study design (i.e., surrounding land uses, reference monitoring data, if applicable, and site conditions)

(c) Parameters that are being measured, how parameters are measured and rationale for parameter selection.

(d) Frequency that parameters are being measured (sampling frequency)

(e) Sampling site location

(f) Description of how the data will be managed, analyzed (including statistical analysis) and reported

(g) Expected results based on study plan design and hypothesis

(iii) **Reporting –** By the second year Annual Report, the Permittee shall complete and have available a report (50 pages maximum) that includes a summary of baseline data collections and discussion of monitoring program results.

By the fifth year Annual Report, the Permittee shall complete and have available a report (50 pages maximum) that includes a comparison of data collection to baseline data, and discussion of monitoring program results.

At a minimum, the second and fifth year Annual Reports shall include the following information:

(a) The purpose of the monitoring, contextual background and a description of the study design and rationale.

(b) Sampling site(s) locations, including latitude and longitude coordinates, water body name and water body segment if applicable. Sampling design, including sampling protocol, time of year, sampling frequency and length of sampling.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

    (c) Methods used for sample collection: list methods used for sample collection, sample or data collection identification, collection date, and media if applicable.

    (d) Results of data collection, including concentration detected, measurement units, and detection limits if applicable.

    (e) Quantifiable assessment analysis and interpretation of data for each monitoring parameter or other data type.

    (f) Comparison to reference sites (if applicable), guidelines or targets

    (g) Discussion of whether data collected addresses the objective(s) or question(s) in the study plan

    (h) Quantifiable discussion of program/study pollutant reduction effectiveness.

Where applicable, the Permittee shall prepare, maintain, and implement a QAPP in accordance with SWAMP. All monitoring samples shall be collected and analyzed according to the Program QAPP developed for the purpose of compliance with this Order. SWAMP Quality Assurance Program Plan (2008) is available at: http://www.waterboards.ca.gov/water_issues/programs/swamp/docs/qapp/qaprp082209.pdf.

A formatted Microsoft Word document that includes guidelines and boilerplate language for developing the permit QAPP is available at: http://www.waterboards.ca.gov/water_issues/programs/swamp/tools.shtml#qa.

Water quality data shall be uploaded to the Storm Water Multi-Application Reporting and Tracking System (SMARTS) and must conform to "CEDEN Minimum Data Templates" format. CEDEN Minimum Data Templates are also available at: http://ceden.org/

## E.14. PROGRAM EFFECTIVENESS ASSESSMENT AND IMPROVEMENT

### E.14.a. Program Effectiveness Assessment and improvement Plan

(i) **Task Description -** The Permittee shall develop and implement a Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. The Program Effectiveness Assessment and Improvement Plan will assist the Permittee to document compliance with permit conditions and to adaptively manage its storm water program and make necessary modifications to the program to improve program effectiveness at reducing pollutants of concern, achieving the MEP standard, and protecting water quality. The Program Effectiveness Assessment and Improvement Plan shall identify the strategy used to gauge the effectiveness of prioritized BMPs and program implementation as a whole. Prioritized BMPs include BMPs implemented based on pollutants of concern. Where pollutants of concern are unidentified, prioritized BMPs are based on common urban pollutants (i.e., sediment, bacteria, trash, nutrients). The annual effectiveness assessments will help identify potential modifications to the program to ensure long-term effectiveness.

(ii) **Implementation Level** - The Program Effectiveness Assessment and Improvement Plan may be modeled upon the most recent version (if applicable) Municipal Storm Water Program Effectiveness Assessment Guidance (CASQA, May 2007) or equivalent.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

(a) The Program Effectiveness Assessment and Improvement Plan shall include the following elements, at a minimum as applicable:

1) Identification of overall program goals including pollutants of concern and prioritized BMPs
2) Documentation of the level of implementation of storm water program elements
3) Identification and targeting of target audience(s)
4) Assessment of BMP performance at achieving outcome levels
5) Assessment of pollutant source reductions achieved by individual BMPs
6) Quantification of pollutant loads and pollutant load reductions achieved by the program as a whole
7) MS4 discharge quality, where available, including analysis of the data
8) Receiving water quality data, including analysis of the data
9) Identification of long-term effectiveness assessment, to be implemented beyond the permit term

(b) The Program Effectiveness Assessment and Improvement Plan shall assess BMP and program effectiveness in terms of the following Outcome Levels:

1) Storm water program activities
2) Awareness
3) Behavior
4) Pollutant load reductions
5) MS4 discharge quality (where assessment is supported by MS4 discharge quality data)
6) Receiving water conditions

(c) The Program Effectiveness Assessment and Improvement Plan shall identify assessment methods for privately owned BMPs.

(d) The Program Effectiveness Assessment and Improvement Plan shall identify assessment methods the Permittee will use to quantitatively assess BMP performance at reducing pollutant loads wherever feasible, using the following or equivalent methods:

1) Direct quantitative measurement of pollutant load removal for BMPs that lend themselves to such measurement (e.g., measuring sediment collected through street-sweeping activities);
2) Science-based estimates of pollutant load removal for BMPs where direct measurement of pollutant removal is overly challenging (e.g., removal of heavy metals through a bioswale);
3) Direct quantitative measurement of behaviors that serve as proxies of pollutant removal or reduction (e.g., the percentage of construction sites demonstrated by inspection to be in compliance with permit conditions); or
4) Visual comparison (e.g., using photographs to compare the amount of trash in a creek between one year and the next).

(e) The Program Effectiveness Assessment and Improvement Plan shall ask and answer the following Management Questions for prioritized BMPs for which answers to management questions can be based on quantitative data appropriate to the question being answered.

1) Were prioritized BMPs or group of BMPs implemented in accordance with the permit requirements? The Permittee shall develop quantitative data using the following or equivalent methods:

   a) Confirmation – Documenting whether an activity or task has been completed, expressed as positive or negative outcome (i.e., yes or no)

   b) Tabulation – Simple accounting expressed in absolute (e.g., number of people participating), or relative terms (e.g. percent increase in recycled household hazardous waste)

2) To what extent did prioritized BMPs or group of BMPs change the target audience's behavior? The Permittee shall develop quantitative data using the following or equivalent methods:

   a) Surveys or interviews to discern knowledge, attitudes, awareness, behavior of specific population, etc.

   b) Interviews of site personnel to discern awareness and behavior

   c) Inspections or site visits to directly observe or assess a practice.

3) To what extent did prioritized BMPs or group of BMPs reduce pollutant loads from their sources to the storm drain system?

(f) The Program Effectiveness Assessment and Improvement Plan shall include water quality monitoring data, where available, to answer the following long-term management questions, effectiveness of BMPs and the overall storm water program will be assessed in future permit terms.

1) To what extent did implementation of the BMP, group of BMPs, or storm water program enhance or change the urban runoff and discharge quality?

2) To what extent did implementation of the BMP, group of BMPs, or storm water program enhance or change receiving water quality?

3) Did exceedance(s) of water quality objectives or water quality standards persist notwithstanding implementation of the storm water program?
The Program Effectiveness Assessment and Improvement Plan shall include documentation of the effectiveness of BMPs implemented to reduce the discharge of pollutants to the MS4 to the MEP and protect water quality.

(iii) **Reporting** – By the second year Annual Report complete and submit the Program Effectiveness Assessment and Improvement Plan. The Plan shall include the strategy the Permittee will use to assess the effectiveness of the program, the specific measures the Permittee will use to assess the effectiveness of BMPs and/or groups of BMPs, and how the Permittee will use the information obtained through effectiveness assessment to modify individual BMPs and the program as a whole to increase short and long-term effectiveness. In subsequent Annual Reports, describe implementation of the Program Effectiveness Assessment and Improvement Plan, summarize data obtained through effectiveness assessment measures and the short and long-term progress of the storm water program, and provide an analysis of the data to improve program effectiveness, to achieve the MEP standard, protect water quality, and to document the Permittee's compliance with permit conditions. Permittees that have a Program Effectiveness Assessment and Improvement Plans, or equivalent, approved by the applicable Regional Board, or that have a schedule approved by the applicable Regional Board to develop and implement such a Plan, shall adhere to the Plan and/or

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

schedule approved by the Regional Board unless otherwise directed by the Regional Board. By the fifth-year annual report, complete and submit an analysis of the effectiveness of modifications made at improving BMP and/or program effectiveness.

### E.14.b.  Storm Water Program Modifications

(i) **Task Description** –The Permittee shall modify BMPs and/or the program as a whole to improve compliance with permit conditions and improve program effectiveness at reducing pollutant loads, achieving the MEP standard, and protecting water quality. The Permittee shall use information gained through effectiveness assessment and MS4 discharge and receiving water monitoring to identify priority areas for program improvement. In addition, the Permittee shall identify and make modifications to BMPs, including new BMPs or modification to existing BMPs, to improve effectiveness in each priority area. The Permittee shall consult with the applicable Regional Water Board in setting expectations for the scope, timing, and frequency of BMP modifications.

(ii) **Implementation Level** – Within the fifth year of the effective date of the permit, the Permittee shall identify and summarize BMP and/or program modifications identified in priority program areas. Modifications shall include:

(a) Improving upon BMPs that are underperforming

(b) Continuing and expanding upon BMPs that proved to be effective, including identifying new BMPs or modifications to existing BMPs designed to increase pollutant load reductions;

(c) Discontinuing BMPs that may no longer be productive and replacing with more effective BMPs; and

(d) Shifting priorities to make more effective use of resources

(iii) **Reporting –** By the fifth year Annual Report, complete and submit the list of BMP and/or program modifications, as specified in E.14.c(ii), the Permittee will make for priority program areas, including identification of priority program areas and the schedule the Permittee will follow to complete identified modifications during the next permit term. The modifications shall be aimed at the goal of reducing pollutant loads, achieving the MEP standard and protecting water quality.


### E.15. TOTAL MAXIMUM DAILY LOADS COMPLIANCE REQUIREMENTS

Attachment G contains a list of TMDL-specific, BMP-based water quality based effluent limitations (WQBELs) and other permit requirements, applicable to identified permittees, consistent with the assumptions and requirements of the applicable wasteload allocations of the TMDLs.

**E.15.a.**  Permittees shall comply with the requirement in Section C.1 to reduce the discharge of pollutants to achieve applicable TMDL wasteload allocations as follows:

(i) Prior to the deadline to attain the final wasteload allocation, a permittee is deemed in compliance with the requirement in Section C.1 to *reduce the discharge of pollutants to achieve applicable TMDL wasteload allocations*, if the permittee is timely implementing all BMP-based WQBELs and other requirements specified in

Page 76

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Attachment G for that TMDL.  The permittee may alternatively make a demonstration in accordance with section E.15.a.ii. below.

(ii) On or after the deadline to attain the final wasteload allocation, a permittee is deemed in compliance with the requirement in Section C.1 to *reduce the discharge of pollutants to achieve applicable TMDL wasteload allocations* if the permittee meets one or more of the criteria in subsections (a)-(g) below.  For purposes of this section only, the wasteload allocations specified in the applicable TMDLs (as identified in the Fact Sheet) are incorporated by reference.

(a) Receiving water monitoring and analysis by the permittee or other responsible parties under the TMDL, as approved by the Regional Water Board or its designee, demonstrates attainment of the applicable receiving water limitation in the waterbody as determined at the TMDL monitoring attainment locations or as determined at or immediately downstream of the permittee's discharge; or

(b) Receiving water monitoring does not demonstrate attainment of the applicable receiving water limitation in the waterbody, but the permittee demonstrates, through an approach approved by the Regional Water Board or its designee, that exceedances of the receiving water limitations for the receiving water are due to loads from other sources and pollutant loads from the permittee are not causing or contributing to the exceedances; or

(c) Where the wasteload allocation is expressed as a concentration, sampling of the permittee's discharge, as approved by the Regional Water Board or its designee, indicates that the discharge has attained the applicable wasteload; or

(d) Where a mass-based wasteload has been allocated to an individual or jointly to a group or is expressed as a percent reduction in load, the permittee demonstrates, through an approach approved by the Regional Water Board or its designee, that the permittee's discharge is attaining the individual or joint allocation or the percent reduction; or

(e) Where a wasteload allocation is expressed as the number of allowable exceedance days, the permittee demonstrates, through an approach approved by the Regional Water Board or its designee, that the permittee's discharge conforms to the allowable exceedance days; or

(f) The permittee demonstrates, in a manner approved by the Regional Water Board or its designee, that no discharges, either directly or indirectly, from the permittee's MS4 to the applicable water body occurred during the relevant time period; or

(g) The permittee demonstrates the attainment of the wasteload allocation through other factors as described by the specific TMDL(s)[30] and as approved by the Regional Water Board or its designee.

---

[30] As an example, the TMDL for Sacramento and San Joaquin Delta - Diazinon and Chlorpyrifos states "In determining compliance with the wasteload allocations, the Regional Water Board will consider any data or information submitted by the discharger regarding diazinon and chlorpyrifos inputs from sources outside of the jurisdiction of the permitted discharger, including any diazinon and chlorpyrifos present in precipitation and other available relevant information, and any applicable provisions In the discharger's NPDES

Page 77

(iii) Pursuant to Section D, a permittee deemed in compliance with Section C.1 in accordance with subsections i) and ii) of this section is also deemed in compliance with the Section D requirement to *not cause or contribute to an exceedance of water quality standards* for the specific pollutants and water bodies addressed.

**E.15.b.** In some cases, Attachment G includes dates that fall outside the term of this Order. Attainment dates for BMP-based WQBELs and other permit requirements that exceed the term of this Order are included for reference, and become enforceable in the event that this Order is administratively extended.

Wasteload allocation attainment dates that have already passed are enforceable on the effective date of this Order and have been assigned a due date of January 1, 2019.

(i) If the Regional Water Board Executive Officer makes a determination, on a case by case basis, that the language of a particular TMDL allows flexibility to extend a final deadline to attain a wasteload allocation, the State Water Board Executive Director may amend Attachment G to provide an extended deadline following public notice and comment.

Where a final deadline to attain a wasteload allocation is past and the permittee has not demonstrated compliance as specified in Section E.15.a.(ii) above, the permittee may seek a time schedule order pursuant to Water Code section 13300 from the Regional Water Board.  Permittees may either individually request a time schedule order or may jointly request a time schedule order with all Permittees subject to the TMDL in Attachment G. Permittees may also request time schedule orders where the permittee has not timely complied with a BMP-based WQBEL or other permit requirement in Attachment G.
A request to the applicable Regional Water Board for a time schedule order shall include the following information:

(a) Any available data demonstrating the current quality of the MS4 discharge(s) in terms of the applicable wasteload allocation units (i.e. concentration and/or load) of the target pollutant(s) to the receiving waters subject to the TMDL;

(b) A description and chronology of structural controls and source control efforts carried out by the permittee since the effective date of the TMDL to reduce the pollutant load in the MS4 discharges to the receiving waters subject to the TMDL;

(c) Justification of the need for additional time to achieve the requirements;

(d) The specific actions the Permittee will take in order to meet the TMDL requirements and a time schedule of interim and final deadlines proposed to implement those actions.  The actions will reflect the requirements specified for the TMDL in Attachment G; and

(e) A demonstration that the time schedule requested is as short as possible, taking into account the technological, operational, and economic factors that affect the design, development, and implementation of the control measures that are necessary to comply with the TMDL requirements.

---

permit requiring the discharger to reduce the discharge of pollutants to the maximum extent possible." Resolution No. R5-2006-0061, Attachment 1, #11 Page 4.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(ii) It is not the intention of the State Water Board or the Regional Water Boards to bring an enforcement action for non-attainment of the wasteload allocation where:

(a) A permittee is in compliance with a time schedule order's implementation requirements and compliance schedule;

(b) A permittee has in good faith requested a time schedule order from the Regional Water Board and is in compliance with all BMP-based WQBELs and other permit requirements of Attachment G, except the requirement to attain the applicable wasteload allocation by the final attainment deadline; or

(c) A Regional Water Board has initiated proceedings to revise the TMDL to provide additional time for attainment or to modify TMDL wasteload allocations and the permittee is in compliance with all BMP-based WQBELs and other permit requirements in Attachment G, except the requirement to attain the applicable wasteload allocation by the final attainment deadline.

**E.15.c.** The State Water Board may revise this Order through a reopener to incorporate any modifications or revisions to the TMDLs in Attachment G, or to incorporate any new TMDLs adopted during the term of this Order that assign a wasteload allocation to a Regulated Small MS4 or that identify a Regulated Small MS4 as a responsible party. In revising Attachment G, the State Water Board will allow adequate notice and public review.

**E.15.d.** The Permittee shall complete and report the status of their implementation of the specific TMDL implementation requirements that have been incorporated into the permit with each Annual Report via SMARTS. Reporting on TMDL implementation shall include the following information:

(i) A description of BMPs implemented, including types, number, and locations; and

(ii) All supplemental information and reports required under the specific TMDL implementation requirements in Attachment G; and

(iii) An assessment of the effectiveness of implemented BMPs in progressing towards attainment of wasteload allocations within the TMDLs' specified timeframes; and

(iv) All monitoring data, including a statistical analysis of the data to assess progress towards attainment of wasteload allocations within the TMDLs' specified timeframes; and

(v) Based on results of the effectiveness assessment and monitoring, a description of the additional BMPs that will be implemented to attain wasteload allocations within the TMDLs specified timeframes.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**E.15.e.**  The Permittee shall comply with implementation requirements specified in Category 4b demonstrations associated with Clean Water Act Sections 303d, 306b, and 314 Integrated Reporting and Listing Decisions.  Implementation requirements described in Category 4b demonstrations are effective upon Regional Water Board approval of that region's Integrated Reporting and Listing Decisions and associated Category 4b demonstrations. The most recent Integrated Reporting and Listing Decisions and associated Category 4b demonstrations are available at: http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml

## E.16.  ANNUAL REPORTING PROGRAM

**E.16.a.**  **By October 15 of each year**, the Permittee shall use State Water Board SMARTS to submit a summary of the past year activities for each program element and certify compliance with all requirements of this permit. If a Permittee is unable to certify compliance with a requirement, the Permittee must submit in SMARTS the reason for failure to comply, a description and schedule of tasks necessary to achieve compliance, and an estimated date for achieving full compliance.

**E.16.b.**  Permittees shall complete and retain all Annual Report information on the previous fiscal year beginning July 1 and ending June 30. The Annual Reporting requirements are set forth in Provisions E. The Permittee shall retain documentation as necessary to support their Annual Report.  The Permittee shall make this supporting information available during normal business hours, unless agreed to by the applicable Regional Water Board's Executive Officer.

**E.16.c.**  The Permittee shall submit when requested by the Executive Officer of the applicable Regional Water Board a detailed written online annual report or in-person presentation of the annual report that addresses the activities described in Provision E. The detailed Annual Report must clearly refer to the permit requirements and describe in quantifiable terms, the status of activities undertaken to comply with each requirement.

**E.16.d.**  Permittees involved in regional programs may coordinate with the members to identify reporting responsibility. The one report submitted on behalf of Permittees involved in a regional program must include a summary of the past year activities for each program element and certification of compliance with all requirements of this Order for each of the Permittees in the regional program.

## F.  NON-TRADITIONAL SMALL MS4 PERMITTEE PROVISIONS

## F.1.  Non-Traditional Small MS4 Categories

The Non-Traditional Small MS4s identified in Attachment B or by a Regional Water Board Executive Officer shall comply with the specific provisions in this Section. For military installations, this permit applies to areas, where the activities and population density resemble that of a traditional small MS4, as defined in the permit boundary map in Section A.2.b.(3). For Department of Corrections and Rehabilitation Permittees, this permit

Page 80

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

applies to facilities that are in active operation (i.e., does not apply to closed facilities lacking management oversight).

## F.2. Security Concerns

Department of Defense, Department of Corrections and Rehabilitation Permittees, ports and transportation agencies are exempt from Annual Reporting of any provision in this section that could pose a security risk and/or compromise facility security.

## F.3. Maximize Efficiency

Permittees may incorporate the required storm water provisions into already existing programs and leverage existing staff to implement BMPs during its day to day business and operations.

## F.4. Equivalent or Existing Document

A Permittee may utilize an equivalent or existing document such as a Standard Operations and Procedures manual, Operation and Maintenance Plan, or Spill Response Plan if that document includes the necessary information required to comply with the provisions of this section.

## F.5. PROVISIONS

### F.5.a. PROGRAM MANAGEMENT ELEMENT

### F.5.a.1. Legal Authority

(i) **Task Description** - Permittee shall have adequate legal authority to meet the requirements of this Order

(ii) **Implementation Level** – Within the second year of the effective date of the permit, the Permittee shall review, revise or adopt new relevant policies, contractual provisions, base orders, resolutions or other regulatory mechanisms, to the extent allowable under state or local law, to ensure it has at a minimum the legal authority to:

   (a) Effectively prohibit non-storm water discharges through the MS4. Exceptions to this prohibition are NPDES-permitted discharges of non-storm water and non- storm water discharges from B.3 that are considered non-significant contributors of pollutants. Where the non-storm water discharge is to a segment of an MS4 that discharges directly to an ASBS, exceptions to the non-storm water prohibition are specified in Attachment C.

   (b) Detect and eliminate illicit discharges and illegal connections to the MS4. Illicit connections include pipes, drains, open channels, or other conveyances that have the potential to allow an illicit discharge to enter the MS4. Illicit discharges include all non-storm water discharges not otherwise authorized in this Order, including, but not limited to discharges from mobile cleaning and pressure washing operations.

   (c) Respond to spills, and prohibit dumping or disposal of materials other than storm water into the MS4.

   (d) Require vendors, contractors and operators of commercial facilities to minimize the discharge of pollutants to the MS4 through the installation, implementation, and maintenance of BMPs consistent with the CASQA Best Management Practice Handbooks or equivalent.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

   (e) Ensure construction site or industrial facility operators provide a Waste Discharge Identification Number for coverage under the CGP and IGP and comply with the appropriate permit.

   (f) Review designs and proposals for new development and redevelopment to determine whether adequate BMPs will be installed, implemented, and maintained during construction and after final stabilization (post-construction).

   (g) Promptly cease and desist discharges and/or cleanup and abate a discharge, including the ability to:

      1) Effectively require the discharger to abate and clean up their discharge, spill, or pollutant release within 72 hours of notification;

      2) Require abatement, within 30 days of notification, for uncontrolled sources of pollutants that could pose an environmental threat;

      3) Perform the cleanup and abatement work and bill the responsible party, if necessary;

      4) Provide the option to order the cessation of activities until such problems are adequately addressed if a situation persists where pollutant-causing sources or activities are not abated;

      5) Require a new timeframe and notify the appropriate Regional Water Board when all parties agree that clean-up activities cannot be completed within the original timeframe and notify the appropriate Regional Water Board in writing within five business days of the determination that the timeframe requires revision.

(iii) **Reporting** – All Permittees shall submit by the second year online Annual Report, a statement signed by both the Permittee's legal counsel and an authorized signatory certifying the Permittee has adequate legal authority to comply with all Order requirements.

### F.5.b.  EDUCATION AND OUTREACH PROGRAM

### F.5.b.1. Compliance Participation Options

All Permittees shall comply with the requirements in this Section by participating in one or more of the following:

   (a) Contributing to a countywide storm water program, as determined appropriate by the Permittee members, so that the countywide storm water program conducts education and outreach on behalf of its members; or

   (b) Contributing to a regional education and outreach collaborative effort (a regional education and outreach collaborative effort occurs when all or a majority of the Permittees collaborate to conduct regional education and outreach. Regional education and outreach collaboration includes Permittees defining a uniform and consistent message, deciding how best to communicate the message, and how to facilitate behavioral changes. Then collaboratively apply what is learned through local jurisdiction groups, pooling resources and skills.); or

   (c) Fulfilling education and outreach requirements within their jurisdictional boundaries on their own. Some level of coordination of education and outreach efforts with an adjacent Phase I MS4 Permittee is recommended/anticipated for watershed/region-wide consistency.; or

   (d) A combination of the previous options, so that all requirements are fulfilled.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Reporting** – By the first year online Annual Report, the Permittee shall submit information indicating which compliance participation option it will use to comply with the public education and outreach requirements in this Section. For each public education and outreach requirement in this Section that the Permittee will comply with through contribution to a countywide storm water program or regional education and outreach collaborative effort, the Permittee shall include in the first year online Annual Report documentation, such as a written agreement, letter or similar document, which confirms the collaboration with other MS4s.

### F.5.b.2. Public Education and Outreach

The public for a Non-traditional MS4 Permittee is considered the following, if applicable:

- Faculty
- Inmates
- Military personnel
- Residents
- Students
- Staff
- Visitors

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall develop and implement a comprehensive storm water public education and outreach program. The public education and outreach program shall be designed to inform the public about storm water pollution and steps that can be taken to reduce storm water pollution. The Public Education and Outreach Program shall measurably increase the public's knowledge regarding the storm drain system, impacts of urban runoff and illicit discharges on receiving waters, and potential BMP solutions for the target audiences.

(ii) **Implementation Level** –The Permittee shall, at a minimum:

(a) Develop and implement a public education strategy that establishes education tasks based on water quality problems, target audiences, and anticipated task effectiveness. The strategy must include identification of who is responsible for implementing specific tasks and a schedule for task implementation. The strategy must demonstrate how specific high priority storm water quality issues in their jurisdiction or local pollutants of concern are addressed.

(b) Implement BMPs that gauge level of awareness in target audiences and effectiveness of education tasks.

(c) Develop and convey a specific storm water message that focuses on the following:

1) Local pollutants of concern
2) Target audience
3) Regional water quality issues

(d) Develop and disseminate appropriate educational materials to target audiences and translate into applicable languages when appropriate (e.g. the materials can utilize various media such as printed materials, billboard and mass transit advertisements, signage at select locations, stenciling at storm drain inlets, radio advertisements, television advertisements, and websites);

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(e) Distribute educational materials, using whichever methods and procedures determined appropriate during development of the public education strategy;

(f) Develop and convey messages to explain the benefits of water-efficient landscaping (if appropriate);

(g) Utilize information from storm water-friendly landscaping[31] programs (if appropriate);

(h) Develop and convey messages specific to reducing illicit discharges with information about how the public can report incidents to the appropriate authorities;

(i) Develop and convey of messages specific to proper application of pesticides, herbicides, and fertilizers;

(j) Within the Permittee's jurisdiction, provide independent, parochial and public schools with materials to effectively educate school-age children, if applicable, about storm water and how they can help to protect water quality habitat in their local watersheds. The Permittee is encouraged to use environmental and place-based, experiential learning materials that are integrated into school curricula and school facility management[32]. In the case that a local program does not exist, the Permittee may use California's Education and Environment Initiative Curriculum[33] or equivalent;

(k) Develop (or coordinate with existing effective programs) and convey messages specific to reducing discharges from pressure washing operations and landscape irrigation;

(l) If applicable, utilize storm water-friendly education for organized car wash participants and provide information pertaining to car wash discharge reduction. The Permittee may use the Sacramento Stormwater Quality Partnership's River Friendly Carwash Program[34], or equivalent, for guidance;

(m) The Permittee shall conduct focused education in identified illicit discharge flow areas based on identified illicit discharge(s).

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance directions.

---

[31] For example, Surfrider's Ocean Friendly Garden Program (www.surfrider.org/programs/ocean-friendly-gardens)

[32] For example, Sacramento Splash Organization (www.sacsplash.org/), Effie Yeaw Nature Center (www.sacnaturecenter.net) or Yolo Basin Organization (yolobasin.org)

[33] http://www.californiaeei.org/

[34] http://www.beriverfriendly.net/riverfriendlycarwashing/

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### F.5.b.3. Staff and Site Operator Training and Education: Illicit Discharge Detection and Elimination Training

(i) **Task Description** – Permittees shall develop and implement a training program for all Permittee staff, who, as part of their normal job responsibilities, may be notified of, come into contact with, or otherwise observe an illicit discharge or illegal connection to the storm drain system.

(ii) **Implementation Level** – Within the third year of the effective date of the permit, the Permittee shall develop the training program.  The training program shall include at a minimum:

  (a) Identification of an illicit discharge or illegal connection;

  (b) Proper procedures for reporting and responding to the illicit discharge or illegal connection;

  (c) Follow-up training provided as needed to address changes in procedures, techniques, or staffing;

  (d) Annual assessment of their trained staff's knowledge of illicit discharge response and shall provide refresher training as needed;

  (e) Training of new staff who, as part of their normal job responsibilities may be notified of, come into contact with, or otherwise observe an illicit discharge or illegal connection;

  (f) Contact information, including the procedure for reporting an illicit discharge, shall be included in each of the Permittee's fleet vehicles that are used by field staff.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2. for compliance directions.

### F.5.b.4.  Staff Pollution Prevention and Good Housekeeping

The Permittee shall train employees on how to incorporate pollution prevention/good housekeeping techniques into Permittee operations.

(i) **Task Description** – The Permittee shall provide a biennial training program for appropriate employees involved in implementing pollution prevention and good housekeeping practices in the Pollution Prevention/Good Housekeeping for Permittee Operations sections of this permit. The Permittee shall determine the need for interim training during alternate years when training is not conducted, through an evaluation of employee Pollution Prevention/Good Housekeeping knowledge.

(ii) **Implementation Level** – The biennial training program shall include the following:

  (a) General storm water education component, any new technologies, operations, or responsibilities that arise during the year and the permit requirements which apply to the staff being trained.  Clear guidance on appropriate storm water BMPs to use at Permittee owned facilities and during typical Operation and Maintenance activities.

Page 85

(b) An assessment of trained staff's knowledge of pollution prevention and good housekeeping and shall revise the training as needed.

(c) A requirement that any contractors hired by the Permittee to perform Operation and Maintenance activities shall be contractually required to comply with all of the storm water BMPs, good housekeeping practices, and standard operating procedures described above.

(d) The Permittee shall provide oversight of contractor activities to ensure that contractors are using appropriate BMPs, good housekeeping practices and following standard operating procedures.

(iii) **Reporting –** The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance directions.

## F.5.c.  PUBLIC INVOLVEMENT AND PARTICIPATION PROGRAM

(i) **Task Description -** Within the third year of the effective date of the permit, the Permittee shall involve its public in the development and implementation of activities related to the program. The public participation and involvement program shall encourage volunteerism, public comment and input on policy, and activism in the community.

(ii) **Implementation Level** – The Permittee shall, at a minimum:

(a) Ensure that high priority storm drain inlets include a labeled, stenciled or other effective method (e.g., clearly visible sign strategically placed in area of high pedestrian activity) of communicating a storm water awareness message such as "drains to creek" or "only rain in the drain".

(b) Integrate storm water awareness messages and information on a publicly accessible website

(iii) **Reporting –** The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance

## F.5.d.  ILLICIT DISCHARGE DETECTION AND ELIMINATION PROGRAM

The Permittee shall develop an Illicit Discharge Detection and Elimination program to detect, investigate, and eliminate illicit discharges, including illegal dumping, into its system or coordinate with an adjacent Phase I MS4 Permittees existing program.  The existing program, at a minimum, must include the provisions in this section.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### F.5.d.1.  Outfall Mapping

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall maintain an up-to-date and accurate outfall map. The map may be in hard copy and/or electronic form or within a geographic information system (GIS). The development of the outfall map shall include a visual outfall inventory involving a site visit to each outfall. It is recommended the Permittee coordinate with an adjacent Phase I MS4 Permittee to collect outfall data for which they may discharge to. Renewal Permittees that have an existing and up-to-date outfall map that includes the minimum requirements specified in Section F.5.d.1.(ii)(a-b) are not required to re-create the outfall map. This does not exempt renewal Permittees with an existing outfall map from conducting the field sampling specified in Section F.5.d.2.

(ii) **Implementation Level** - The outfall map shall at a minimum show:

(a) The location of all outfalls and drainage areas within the urbanized area, contributing to those outfalls that are operated by the Permittee, and that directly discharge within the Permittee's jurisdiction to a receiving water. Each mapped outfall shall be given an individual alphanumeric identifier, which shall be noted on the map. Photographs shall be taken or an electronic database shall be utilized to provide baseline information and track operation and maintenance needs over time.

(b) The location (and name, where known to the Permittee) of all water bodies receiving direct discharges from those outfall pipes.

Submerged outfalls or other outfalls that may pose a threat to public safety are not required to be inventoried.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance.

### F.5.d.2.  Field Sampling to Detect Illicit Discharges

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall conduct field sampling to detect potential illicit discharges while conducting the outfall inventory specified in Section F.5.d. Outfall Inventory. If while conducting the outfall inventory specified in Section F.5.d., an outfall is flowing or ponding and it has been more than 72 hours since the last rain event, then the Permittee shall sample the discharge.

(ii) **Implementation Level** – If an outfall is flowing or ponding and it has been more than 72 hours since the last rain event, the Permittee shall:

(a) Conduct monitoring for the following indicator parameters identified in Table 1. Field Sampling Indicator Parameters (following page) to help determine the source and identification of the discharge. Alternatively, the Permittee may select parameters based on local knowledge of pollutants of concern in lieu of sampling for the parameters listed in Table 1. Modifications and associated justifications

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

shall be identified within SMARTS prior to conducting field sampling as specified in Section F.5.d.2.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Table 1. Field Sampling Indicator Parameters**

> **Note:** > = greater than
> > 80% — Can almost always (>80% of samples) distinguish this discharge from clean flow types (e.g., tap water or natural water). For tap water, can distinguish from natural water.
> > 50% — Can sometimes (>50% of samples) distinguish this discharge from clean flow types depending on regional characteristics, or can be helpful in combination with another parameter.
> Poor — Poor indicator. Cannot reliably detect illicit discharges, or cannot detect tap water
> Data sources: Pitt (this study)
>
> * Fluoride is a poor indicator when used as a single parameter, but when combined with additional parameters (such as detergents, ammonia and potassium), it can almost always distinguish between sewage and wash water.

| Parameter | Discharge Types It Can Detect | | | | Laboratory/Analytical Challenges |
|---|---|---|---|---|---|
| | Sewage | Washwater | Tap Water | Industrial or Commercial Liquid Wastes | |
| Ammonia | > 80% | > 50% | Poor | > 50% | Can change into other nitrogen forms as the flow travels to the outfall |
| Color | > 50% | > 50% | Poor | > 50% | |
| Conductivity | > 50% | > 50% | Poor | > 50% | Ineffective in saline waters |
| Detergents – Surfactants | > 80% | > 80% | Poor | > 50% | Reagent is a hazardous waste |
| Fluoride* | Poor | Poor | >80% | > 50% | Reagent is a hazardous waste Exception for communities that do not fluoridate their tap water |
| Hardness | > 50% | > 50% | >50% | > 50% | |
| pH | Poor | > 50% | Poor | > 50% | |
| Potassium | > 50% | Poor | Poor | > 80% | May need to use two separate analytical techniques, depending on the concentration |
| Turbidity | > 50% | >50% | Poor | > 50% | |

(c) Verify that indicator parameters with the following action level concentrations specified in Table 2. Action Level Concentrations for Indicator Parameters are not exceeded. Alternatively, the Permittee may tailor Table 2 to align with parameters based on local knowledge of pollutants of concern. Modifications and associated

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

justifications shall be identified within SMARTS prior to conducting field sampling as specified in Section F.5.d.2.

**Table 2. Action Level Concentrations for Indicator Parameters**

| Indicator Parameter | Action Level Concentration |
|---|---|
| Ammonia | > = 50 milligram per liter |
| Color | >= 500 units |
| Conductivity | > = 2,000 microsiemens per centimeter |
| Hardness | < = 10 milligram per liter as $CaCO_3$ or > = 2,000 milligram per liter as $CaCO_3$ |
| pH | < = 5   or  > = 9 |
| Potassium | > = 20 milligram per liter |
| Turbidity | > = 1,000 Nephelometric Turbidity Units |

(d) Conduct follow up investigations per Section F.5.d.3. if the action level concentrations are exceeded.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance

### F.5.d.3. Illicit Discharge Detection and Elimination Source Investigations and Corrective Actions

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall develop written procedures for conducting investigations into the source of all non-storm water discharges suspected to be illicit discharges, including approaches to requiring such discharges to be eliminated, and procedures to implement corrective actions (e.g., BMPs). These procedures shall be included as part of the Illicit Discharge Detection and Elimination program.

(ii) **Implementation Level -** At a minimum, the Permittee shall conduct an investigation(s) to identify and locate the source of any suspected illicit discharge within 72 hours of becoming aware of the suspected illicit discharge.  For investigations that require more than 72 hours, the Permittee shall identify the actions being taken to identify and locate the source of the suspected  illicit discharge. The Permittee shall prioritize investigations of suspected sanitary sewage and/or significant contributors over investigations of non-storm water discharges suspected of being cooling water, wash water, or natural flows.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(a) Report immediately the occurrence of any dry weather flows believed to be an immediate threat to human health or the environment to local Health Department.

(b) Determine and document through its investigations the source of all non-storm water discharges.  If the source of the non-storm water discharge is found to be a discharge authorized under this permit, or authorized under another NPDES permit, no further action is required.

(c) Corrective Action to Eliminate Illicit Discharge – Once the source of the illicit discharge has been determined, the Permittee shall immediately notify the responsible party of the problem.

(d) Report immediately to the owners/operators of the downstream MS4 a non-storm water discharge suspected of being sanitary sewage and/or significantly contaminated.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance

## F.5.e.  CONSTRUCTION SITE RUNOFF CONTROL PROGRAM

The Permittee shall develop, implement, and enforce a program to prevent Construction site discharges of pollutants and impacts on beneficial uses of receiving waters. The program shall include the development of contract language ensuring the Permittee's in-house construction operators or outside contractors comply with the CGP.

(i) **Task Description –** Within the first year of the effective date of the permit, each Permittee shall develop and implement contract language ensuring all outside contractors comply with the CGP and implement appropriate BMPs.  Contract language shall apply to all projects that result in a total land disturbance of either one acre or more or that result in a total land disturbance of less than one acre if part of a larger common plan or development or sale.

(ii) **Implementation Level** – The Permittee shall include CGP compliance requirements in construction contract language for all projects one acre or more or that result in a total land disturbance of less than one acre if part of a larger common plan or development or sale.

(iii) **Reporting –** The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

### F.5.f. POLLUTION PREVENTION/GOOD HOUSEKEEPING FOR PERMITTEE OPERATIONS PROGRAM

The Permittee shall develop and implement a program to prevent or reduce the amount of pollutant runoff from Permittee operations. The Permittee shall train employees on how to incorporate pollution prevention/good housekeeping techniques into Permittee operations. Permittee shall implement appropriate BMPs for preventing or reducing the amount of storm water pollution generated by Permittee operations.

### F.5.f.1. Inventory of Permittee-Owned or Operated Facilities

(i) **Task Description** - Prepare an inventory of Permittee-owned or operated facilities within their jurisdiction that are a threat to water quality, and are not covered by another storm water General Permit.

(i) **Implementation Level** - Within the second year of the effective date of the permit, the Permittee shall develop and maintain an inventory that shall include facilities that may impact storm water.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2. for compliance.

### F.5.f.2. Map of Permittee-Owned or Operated Facilities

(i) **Task Description –** Within the second year of the effective date of the permit, prepare and submit a map of the urban area covered by the MS4 permit and identify where the Permittee-owned or operated facilities are located.

(ii) **Implementation Level** - The Permittee shall complete and have available a map that identifies the storm water drainage system corresponding to each of the facilities as well as the receiving waters to which these facilities discharge. The map shall also show the facility and the manager of each facility, including contact information. Historic storm water collection facilities, conveyances and drainages located at historic places that are being operated for public interpretation and education shall be noted on this map so that the Regional Water Board can differentiate between modern and historic during site reviews or audits.

(iii) **Reporting** - The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2. for compliance.

### F.5.f.3. Facility Assessment

(i) **Task Description** –Within the third year of the effective date of the permit, conduct an inspection and assessment of pollutant discharge potential and pollutant hotspots.

(ii) **Implementation Levels** - The Permittee shall conduct an annual review and assessment of all Permittee-owned or operated facilities to determine their potential to impact surface waters. The assessment shall include the following:

(a) Identification of pollutant hotspots based on the assessment, the Permittee shall identify as pollutant hotspots those facilities that have a high potential to generate storm water and non-storm water pollutants. Among the factors to be considered are the type and volume of pollutants stored at the site, the presence of improperly stored materials, activities that should not be performed outside (e.g., changing automotive fluids, vehicle washing), proximity to water bodies, poor housekeeping practices, and the discharge of pollutant(s) of concern to receiving water(s). Pollutant hotspots shall include, at a minimum, the Permittee's maintenance yards, hazardous waste facilities, fuel storage locations, and any other facilities at which chemicals or other materials have a high potential to be discharged in storm water.

(b) Documentation of the assessment procedures and results. The Permittee shall document the procedures it uses for conducting the assessment along with a copy of any site evaluation checklists used to conduct the assessment.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2. for compliance.

### F.5.f.4. Storm Water Pollution Prevention Plans

(i) **Task Description** – the Permittee shall develop and implement SWPPPs for pollutant hotspots at high priority sites. If a Permittee has an existing or equivalent document such as Hazardous Materials Business Plan or Spill Prevention Plan, the Permittee is not required to develop a SWPPP if that document includes the necessary information required within a SWPPP.

(ii) **Implementation Level** – Within the fourth year of the effective date of this permit, the Permittee shall implement the following:

(a) The Permittee shall develop and implement a site-specific SWPPP that identifies a set of storm water BMPs to be installed, implemented, and maintained to minimize the discharge of pollutants in storm water.

(b) The SWPPP(s) shall be kept on-site at each of the Permittee-owned or operated facilities' offices for which it was completed. The SWPPP shall be updated as necessary.

(c) At a minimum the SWPPP will address the following:
1) Facility specific information (location, owner, address, etc.)
2) Purpose of the document
3) Key staff/contacts at the facility
4) Site map with drainage identified
5) Identification of significant materials that are handled and stored at the facility that may be exposed to storm water
6) Description of potential pollutant sources

7) BMPs employed at facility

8) Spill control and cleanup – response to spills

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance.

### F.5.f.5.  Inspections, Visual Monitoring and Remedial Action

(i) **Task Description** –Within the fifth year of the effective date of the permit, the Permittee shall conduct regular inspections of Permittee-owned and operated facilities not covered by another storm water General Permit.  The Permittee may incorporate storm water inspections into existing, routine facility inspections.

(ii) **Implementation Level** – The Permittee shall conduct inspections as follows:

(a) Quarterly hotspot visual inspections – Perform quarterly visual inspections in accordance with the developed standing operating procedures of all hotspot Permittee-owned or operated facilities to ensure materials and equipment are clean and orderly, to minimize the potential for pollutant discharge, and to ensure implementation of BMPs. The Permittee shall look for evidence of spills and immediately clean them up to prevent contact with precipitation or runoff.  The quarterly inspections shall be tracked in a log for every facility, and records kept with the SWPPP. The inspection report shall also include any identified deficiencies and the corrective actions taken to correct the deficiencies.

(b) Quarterly Hotspot comprehensive inspections – At least once per quarter, a comprehensive inspection of hotspot facilities, including all storm water BMPs, shall be performed, with specific attention paid to the following, but not limited to waste storage areas, dumpsters, vehicle and equipment maintenance/fueling areas, material handling areas, and similar potential pollutant-generating areas. The quarterly inspection results shall be documented and records kept with the SWPPP. This inspection shall be performed in accordance with the developed standard operating procedures. The inspection report shall also include any identified deficiencies and the corrective actions taken to correct deficiencies.

(c) Quarterly Hotspot visual observation of storm water and non-storm water discharges – At least once per quarter, visually observe discharge location from hotspot facilities. Where discharges are observed identify any observed problems (e.g., color, foam, sheen, turbidity) associated with pollutant sources or BMPs shall be remedied within seven days or before the next storm event, whichever is sooner. Visual observations shall be documented, and records kept with the SWPPP. This inspection shall be done in accordance with the developed standard operating procedures. The inspection report shall also include any identified deficiencies and the corrective actions taken to correct the deficiencies.

(d) Non-Hotspot Inspection – At a minimum, inspect each inventoried facility that is not a hotspot, once per permit term. The inspection shall investigate and assess each of the items identified above.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance.

### F.5.f.6.  Storm Drain System Assessment and Prioritization

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall develop and implement procedures to assess and prioritize the MS4 storm drain system, including but not limited to catch basins, pipe and pump infrastructure, above-ground conveyances, including receiving waterbodies within the Permittee's urbanized area and detention basins.

(ii) **Implementation Level** – The Permittee shall:
Assess/prioritize storm drain system facilities for cleanout– Assign a priority to all storm drain system facilities within the Permittee's urbanized areas based on accumulation of sediment, trash and/or debris. In particular, assign high priority to catch basins meeting the following criteria:

1) Catch basins known to accumulate a significant amount of sediment, trash, and/or debris;
2) Catch basins collecting large volumes of runoff;
3) Catch basin collecting runoff from area that do not receive regular sweet sweeping;
4) Catch basins collecting runoff from drainage areas with exposed or disturbed soil; and
5) Catch basins that receive citizen complaints/reports.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance.

### F.5.f.7.  Maintenance of Storm Drain System

(i) **Task Description** –The Permittee shall begin maintenance of all high priority storm drain systems at least annually prior to the rainy season.

(ii) **Implementation Level** – Within the third year of the effective date of the permit, the Permittee shall begin a maintenance program of high priority storm drain systems that, at a minimum includes:

(a) Storm drain systems inspection – Based on the priorities assigned above, in Section F.5.f.6, develop a strategy to inspect storm drain systems within the Permittee's jurisdiction. At a minimum, inspect all catch basins of high priority systems annually, prior to the rainy season.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(b) Storm drain cleaning – Develop and implement a schedule to clean high priority catch basins and other systems. Cleaning frequencies shall be based on priority areas, with higher priority areas receiving more frequent maintenance.

(c) Maintenance of surface drainage structures –Visually monitor all Permittee- owned open channels, detention basins, and other drainage structures for debris at least once per year and identify and prioritize problem areas. At a minimum, removal of trash and debris from open channels and other drainage structures shall occur annually.

(d) Disposal of waste materials - Develop a procedure to dewater and dispose of materials extracted from catch basins. This procedure shall ensure that water removed during the catch basin cleaning process and waste material will not reenter the MS4.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance.

### F.5.f.8.  Permittee Operations and Maintenance Activities (O&M)

(i) **Task Description –**The Permittee shall assess their O&M activities for potential to discharge pollutants in storm water and inspect all BMPs on a quarterly basis.

(ii) **Implementation Level** - Within the third year of the effective date of the permit, the Permittee shall:

(a) Develop and implement O&M activity assessment. The O&M activities assessment shall include, but not be limited to, the potential to discharge pollutants in storm water.

(b) Identify all materials that could be discharged from each of these O&M activities.

(c) Develop and implement a set of BMPs that, when applied during Permittee O&M activities, will reduce the discharge of pollutants in storm water. The Permittee shall use the CASQA Municipal Handbook or equivalent.

(d) Evaluate annually all BMPs implemented during O&M activities.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the stormwater program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance.

### F.5.f.9.  Pesticide, Herbicide, and Fertilizer Application and New Landscape Design and Maintenance Management

(i) **Task Description** –The Permittee shall implement a program which focuses on pollution prevention, source control BMPs, and landscape design and maintenance to reduce the amount of pesticides, herbicides and fertilizers used during their Permittee

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

operations and activities. The Permittee shall implement the landscape design and maintenance on new or decorative landscapes.

(ii) **Implementation Tasks** – Within the second year of the effective date of the permit, the Permittee shall implement the following:

(a) Evaluate pesticides, herbicides and fertilizers used and application activities performed to identify pollution prevention and source control opportunities.

(b) Implement practices that reduce the discharge of pesticides, herbicides and fertilizers. At a minimum the Permittee shall do the following, but not limited to:

   1) Educate applicators and distributors of storm water issues.

   2) Implement integrated pest management measures that rely on non- chemical solutions, including:

      a) Use of native and climate appropriate plants (reduces water usage and fertilization) for decorative landscape applications
      b) Keeping clippings and leaves away from waterways and out of the street using mulching, composting, or landfilling
      c) Preventing application of pesticides and fertilizers when two or more consecutive days with greater than 50% chance of rainfall are predicted by NOAA[35]
      d) Limiting or replacing herbicide and pesticide use (e.g., conducting manual weed and insect removal)
      e) Limiting or eliminating the use of fertilizers, including prohibiting application within five feet of pavement, 25 feet of a storm drain inlet, or 50 feet of a water body
      f) Reducing mowing of grass to allow for greater pollutant removal, but not jeopardizing public safety

   3) Collect and properly dispose of unused pesticides, herbicides, and fertilizers.

   4) Minimize irrigation run-off.

(iii) **Reporting** - The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2. for compliance.

### F.5.g.  POST CONSTRUCTION STORM WATER MANAGEMENT PROGRAM

Permittees shall regulate development to comply with the following Sections:

• Site Design Measures

• Low Impact Development Design Standards

• Alternative Post-Construction Storm Water Management Program

• Operation and Maintenance of Post Construction Storm Water Management Measures

---

[35] www.srh.noaa.gov/forecast

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Non-traditional Permittees with Regional Water Board approved post-construction storm water management requirements based on a watershed process approach, as described in Section E.12.j. Post-Construction Storm Water Management Requirements Based on Assessment and Maintenance of Watershed Processes, shall implement those post-construction requirements in lieu of Section F.5.g. Post Construction Storm Water Management Program.

**F.5.g.1. Site Design Measures**

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall require implementation of site design measures for all projects that create and/or replace (including projects with no net increase in impervious footprint) between 2,500 square feet and 5,000 square feet of impervious surface, including detached single family homes that are not part of a larger plan of development.

(ii) **Implementation Level** - Projects shall implement one or more of the following site design measures to reduce project site runoff:

(a) Stream Setbacks and Buffers – a vegetated area including trees, shrubs, and herbaceous vegetation, that exists or is established to protect a stream system, lake reservoir, or coastal estuarine area;

(b) Soil Quality Improvement and Maintenance - improvement and maintenance soil through soil amendments and creation of microbial community;

(c) Tree planting and preservation – planting and preservation of healthy, established trees that include both evergreens and deciduous, as applicable;

(d) Rooftop and Impervious Area Disconnection - rerouting of rooftop drainage pipes to drain rainwater to rain barrels, cisterns, or permeable areas instead of the storm sewer;

(e) Porous Pavement - pavement that allows runoff to pass through it, thereby reducing the runoff from a site and surrounding areas and filtering pollutants;

(f) Green Roofs – a vegetative layer grown on a roof (rooftop garden);

(g) Vegetated Swales - a vegetated, open-channel management practice designed specifically to treat and attenuate storm water runoff;

(h) Rain Barrels and Cisterns - system that collects and stores storm water runoff from a roof or other impervious surface.

Project proponents shall use the State Water Board SMARTS Post-Construction Calculator[36], or equivalent to quantify the runoff reduction resulting from implementation of site design measures.

(iii) **Reporting** - The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm

---

[36] The State Water Board SMARTS Post-Construction Calculator can be found at: https://smarts.waterboards.ca.gov/smarts/faces/SwSmartsLogin.jsp

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance.

### F.5.g.2.  Low Impact Development (LID) Design Standards

(i)  **Task Description** – Within the second year of the effective date of the permit, the Permittee shall implement standards to effectively reduce runoff and pollutants associated with runoff from development projects.

(ii)  **Implementation Level** - The Permittee shall regulate all development projects that create and/or replace 5,000 square feet or more of impervious surface (Regulated Projects). The Permittee shall require these Regulated Projects to implement measures for site design, source control, runoff reduction, storm water treatment and baseline hydromodification management as defined in this Order.

Regulated Projects do not include:

(a)  Interior remodels;
(b)  Routine maintenance or repair such as: exterior wall surface replacement, roof replacement or pavement resurfacing within the existing footprint.

Regulated Projects include development projects. Development includes new and redevelopment projects on public or private land that fall under the planning and permitting authority of a Permittee. Redevelopment is any land-disturbing activity that results in the creation, addition, or replacement of exterior impervious surface area on a site on which some past development has occurred. The following (a-c) describe specific Regulated Project requirements for redevelopment and road projects:

(a)  Where a redevelopment project results in an increase of more than 50 percent of the impervious surface of a previously existing development, runoff from the entire project, consisting of all existing, new, and/or replaced impervious surfaces, must be included to the extent feasible.

(b)  Where a redevelopment project results in an increase of less than 50 percent of the impervious surface of a previously existing development, only runoff from the new and/or replaced impervious surface of the project must be included.

(c)  Road Projects - Any of the following types of road projects that create 5,000 square feet or more of newly constructed contiguous impervious surface and that are public road projects and/or fall under the building and planning authority of a Permittee shall comply with Low Impact Development Standards except that treatment of runoff of the 85th percentile 24-hour storm runoff event) that cannot be infiltrated onsite shall follow U.S. EPA guidance regarding green infrastructure to the extent feasible. Types of projects include:

1)  Construction of new streets or roads, including sidewalks and bicycle lanes built as part of the new streets or roads which create 5,000 square feet or more of impervious surface.

2)  Widening of existing streets or roads with additional traffic lanes.

a)  Where the addition of traffic lanes results in an alteration of more than 50 percent of the impervious surface (5,000 square feet or more) of an existing street or road, runoff from the entire project, consisting of all

existing, new, and/or replaced impervious surfaces, must be included in the treatment system design.

b) Where the addition of traffic lanes results in an alteration of less than 50 percent (but 5,000 square feet or more) of the impervious surface of an existing street or road, only the runoff equivalent from new and/or replaced impervious surface of the project must be included in the treatment system design.

3) Specific exclusions are:

a) Sidewalks built as part of new streets or roads and built to direct storm water runoff to adjacent vegetated areas.

b) Bicycle lanes that are built as part of new streets or roads that direct storm water runoff to adjacent vegetated areas.

c) Impervious trails built to direct storm water runoff to adjacent vegetated areas, or other non-erodible permeable areas, preferably away from creeks or towards the outboard side of levees.

d) Sidewalks, bicycle lanes, or trails constructed with permeable surfaces.

Effective Date for Applicability of Low Impact Development Runoff Standards to Regulated Projects: By the second year of the effective date of the permit, the Permittee shall require these Post-Construction Standards be applied on applicable new and redevelopment Regulated Projects. These include Regulated Projects that have not been deemed complete for processing, Regulated Projects without vesting tentative maps that have not requested and received an extension of previously granted approvals, and Regulated Projects that have received Project Planning Guide funding. Discretionary projects that have been deemed complete prior to the second year of the effective date of this permit are not subject to the Post-Construction Standards herein. For the Permittee's Regulated Projects, the effective date shall be the date their governing body or designee approves initiation of the project design.

Permittee's Development Projects - The Permittee shall develop and implement an equivalent approach, to the approach used for private development projects, to apply the most current version of the low impact development runoff standards to applicable public development projects.

Where Project Planning Guide funding is applicable, Permittees shall ensure that adequate funding is available to implement post-construction treatment measures for Regulated Projects approved after the effective date of this permit.

Where State of California project approvals are applicable, Permittees shall implement post-construction treatment measures for Regulated Projects approved after the effective date of this permit.

### F.5.g.2.a.  Source Control Measures

(i) **Task Description** – Regulated Projects with pollutant-generating activities and sources shall be required to implement standard permanent and/or operational source control measures as applicable.

(ii) **Implementation Level** - Measures for the following pollutant-generating activities and sources shall be designed consistent with recommendations from the CASQA

Page 100

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Stormwater BMP Handbook for New Development and Redevelopment or equivalent manual, and include:

(a) Accidental spills or leaks

(b) Interior floor drains

(c) Parking/Storage area maintenance

(d) Indoor and structural pest control

(e) Landscape/outdoor pesticide use

(f) Pools, spas, ponds, decorative fountains, and other water features

(g) Restaurants, grocery stores, and other food service operations

(h) Storage and handling of solid waste

(i) Outdoor storage of equipment or materials

(j) Vehicle and equipment cleaning

(k) Vehicle and equipment repair and maintenance

(l) Fuel dispensing areas

(m) Loading docks

(n) Fire sprinkler test water

(o) Drain or wash water from boiler drain lines, condensate drain lines, rooftop equipment, drainage sumps, and other sources

(p) Unauthorized non-storm water discharges

(q) Building and grounds maintenance

**F.5.g.2.b.  Numeric Sizing Criteria for Storm Water Retention and Treatment**
The Permittees shall require facilities designed to evapotranspire, infiltrate, harvest/use, and biotreat storm water to meet at least one of the following hydraulic sizing design criteria:

(1) Volumetric Criteria:
    a) The maximized capture storm water volume for the tributary area, on the basis of historical rainfall records, determined using the formula and volume capture coefficients in Urban Runoff Quality Management, WEF Manual of Practice No. 23/ASCE Manual of Practice No. 87 (1998) pages 175-178 (that is, approximately the 85th percentile 24-hour storm runoff event); or
    b) The volume of annual runoff required to achieve 80 percent or more capture, determined in accordance with the methodology in Section 5 of CASQA's Stormwater Best Management Practice Handbook, New Development and Redevelopment (2003), using local rainfall data.

(2) Flow-based Criteria
    a) The flow of runoff produced from a rain event equal to at least 0.2 inches per hour intensity; or
    b) The flow of runoff produced from a rain event equal to at least 2 times the 85th percentile hourly rainfall intensity as determined from local rainfall records.

**F.5.g.2.c.  Site Design Measures** as defined in Section F.5.g.1. shall be based on the objective of achieving infiltration, evapotranspiration and/or harvesting/reuse of the 85th percentile rainfall event, to the extent feasible, to meet Section F.5.g.2.b. Numeric

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Sizing Criteria for Storm Water Retention and Treatment. Site design measures shall be used to reduce the amount of runoff, to the extent technically feasible, for which retention and runoff is required. Any remaining runoff from impervious DMAs may then be directed to one or bioretention facility as specified in Section F.5.g.2.d. Storm Water Treatment Measures and Baseline Hydromodification Management Measures, described below.

**F.5.g.2.d. Storm Water Treatment Measures and Baseline Hydromodification Management Measures** After implementation of Site Design Measures in F.5.g.2.c., runoff from remaining impervious DMAs must be directed to one or more facilities designed to infiltrate, evapotranspire, and/or biotreat the amount of runoff specified in Section F.5.g.2.b. Numeric Sizing Criteria for Storm Water Retention and Treatment. The facilities must be demonstrated to be at least as effective as a bioretention system with the following design parameters.

(1) Maximum surface loading rate of 5 inches per hour, based on the flow rates calculated. A sizing factor of 4% of tributary impervious area may be used.

(2) Minimum surface reservoir volume equal to surface area times a depth of 6 inches.

(3) Minimum planting medium depth of 18 inches. The planting medium must sustain a minimum infiltration rate of 5 inches per hour throughout the life of the project and must maximize runoff retention and pollutant removal. A mixture of sand (60%-70%) meeting the specifications of American Society for Testing and Materials (ASTM) C33 and compost (30%-40%) may be used.

(4) Subsurface drainage/storage (gravel) layer with an area equal to the surface area and having a minimum depth of 12 inches.

(5) Underdrain with discharge elevation at top of gravel layer.

(6) No compaction of soils beneath the facility, or ripping/loosening of soils if compacted.

(7) No liners or other barriers interfering with infiltration.

(8) Appropriate plant palette for the specified soil mix and maximum available water use.

a) **Alternative Designs for Bioretention Facilities —** Facilities, or a combination of facilities, of a different design than in Section F.5.g.2.d. may be permitted if the following measures of equivalent effectiveness are demonstrated:

(1) Equal or greater amount of runoff infiltrated or evapotranspired

(2) Equal or lower pollutant concentrations in runoff that is discharged after bioretention

(3) Equal or greater protection against shock loadings and spills

(4) Equal or greater accessibility and ease of inspection and maintenance

b) **Allowed Adjustments for Bioretention Facilities for Special Site Conditions -** The bioretention design parameters as specified in Section F.5.g.2.d. may be adjusted for the following special site conditions:

(1) Facilities located within 10 feet of structures or other potential geotechnical hazards established by the geotechnical expert for the project may incorporate

Page 102

an impervious cutoff wall between the bioretention facility and the structure or other geotechnical hazard.

(2) Facilities in areas with documented high concentrations of pollutants in underlying soil or groundwater, facilities located where infiltration could contribute to a geotechnical hazard, and facilities located on elevated plazas or other structures may incorporate an impervious liner and may locate the underdrain discharge at the bottom of the subsurface drainage/storage layer (this configuration is commonly known as a "flow-through planter").

(3) Facilities located in areas of highly infiltrative soils or high groundwater, or where connection of underdrain to a surface drain or to a subsurface storm drain are infeasible, may omit the underdrain.

c) **Exceptions to Requirements for Bioretention Facilities** - Contingent on a demonstration that use of bioretention or a facility of equivalent effectiveness is infeasible, other types of biotreatment or media filters (such as tree-box-type biofilters or in-vault media filters) may be used for the following:

(1) Projects creating or replacing an acre or less of impervious area, and located in a designated pedestrian-oriented commercial district (i.e., smart growth projects), and having at least 85% of the entire project site covered by permanent structures;

(2) Facilities receiving runoff solely from existing (pre-project) impervious areas;

(3) Historic sites, structures, or landscapes that cannot alter their original configuration in order to maintain their historic integrity.

(iii) **Reporting** – The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2.for compliance.

### F.5.g.3. Alternative Post-Construction Storm Water Management Program

A Permittee may propose alternative post-construction measures in lieu of some or all of Section F.5.g. requirements for multiple benefit projects. Multiple-benefit projects include projects that may address any of the following, in addition to water quality: water supply, flood control, habitat enhancement, open space preservation, recreation, climate change. Multiple-benefit projects may be applied at various scales including project site, municipal or sub-watershed level. Multiple-benefit projects may include, but are not limited to, projects developed under Watershed Improvement Plans (Water Code §16100 et seq.), IRWMP implementation and green infrastructure projects. Multiple benefit projects must be equally or more protective of water quality than Section E.12. requirements.

The Regional Water Board or the Executive Officer may approve alternative post-construction measures for multiple-benefit projects, as described above, after an opportunity for public comment, if the Regional Water Board or Executive Officer finds that the alternative measures are consistent with the MEP standard.

Page 103

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### F.5.g.4. Operation and Maintenance (O&M) of Post-Construction Storm Water Management Measures

(i) **Task Description** –Within the third year of the effective date of the permit, the Permittee shall implement an O&M Verification Program for new development projects regulated under this Order.

(ii) **Implementation Level** – At a minimum, the O&M Verification Program shall include the following elements:

(a) Projects shall at a minimum, require at least one of the following from all project proponents and their successors in control of the Project or successors in fee title:

    (1) Written conditions in the sales or lease agreements or deed for the project that requires the buyer or lessee to assume responsibility for the O&M of the installed treatment system(s) and hydromodification control(s) (if any) until such responsibility is legally transferred to another entity;

    (2) Any other legally enforceable agreement or mechanism, such as recordation in the property deed, that assigns the O&M responsibility for the installed treatment system(s) and hydromodification control(s) (if any) to the project owner(s) or the Permittee.

(b) Coordination with the appropriate mosquito[37] and vector control agency with jurisdiction to establish a protocol for notification of installed treatment systems and hydromodification management controls. On an annual basis, before the wet season, prepare a list of newly installed (installed within the reporting period) storm water treatment systems and hydromodification management controls to the local mosquito and vector control agency and the appropriate Regional Water Board. This list shall include the facility locations and a description of the storm water treatment measures and hydromodification management controls installed.

(c) A database or equivalent tabular format of all projects that have installed treatment systems. This database or equivalent tabular format shall include the following information for each project:

    (1) Name and address of the project;

    (2) Specific description of the location (or a map showing the location) of the installed treatment system(s) and hydromodification control(s) (if any);

    (3) Date(s) that the treatment system(s) and hydromodification controls (if any) is/are installed;

    (4) Description of the type and size of the treatment system(s) and hydromodification control(s) (if any) installed;

    (5) Responsible operator(s) of each treatment system and hydromodification control (if any);

---

[37] "Best Management Practices for Mosquito Control on California State Properties" are available from the California West Nile virus website at http://www.westnile.ca.gov/resources.php. Please see Table 1, page 22, for a list of California mosquito control agencies or visit the Mosquito and Vector Control Association of California at: http://mvcac.org

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(6) Dates and findings of inspections (routine and follow-up) of the treatment system(s) and hydromodification control(s) (if any) by the Permittee; and

(7) Any problems and corrective or enforcement actions taken.

(d) Maintenance Approvals: The Permittee shall ensure that systems and hydromodification controls installed at projects are properly operated and maintained for the life of the projects. In cases where the responsible party for a treatment system or hydromodification control has worked diligently and in good faith with the appropriate State and federal agencies and the Permittee to obtain approvals necessary to complete maintenance activities for the treatment system or hydromodification management control, but these approvals are not granted, the Permittee shall be deemed to be in compliance with this Provision.

(iii) **Reporting -** The Permittee shall use State Water Board SMARTS to submit a summary of the past year activities and certify compliance with all requirements of this program element. The summary shall also address the relationship between the program element activities and the Permittee's Program Effectiveness Assessment and Improvement Plan that tracks annual and long-term effectiveness of the storm water program. If a Permittee is unable to certify compliance with a requirement in this program element see Section F.5.j.2. for compliance.

## F.5.h.  PROGRAM EFFECTIVENESS ASSESSMENT AND IMPROVEMENT

### F.5.h.1.  Program Effectiveness Assessment and Improvement Plan

(i) **Task Description -** The Permittee shall develop and implement a Program Effectiveness Assessment and Improvement Plan that tracks short and long-term progress of the storm water program. The Program Effectiveness Assessment and Improvement Plan will assist the Permittee to adaptively manage its storm water program and make necessary modifications to the program to improve program effectiveness, reduce pollutants of concern, achieve the MEP standard, and protect water quality, and to document the Permittee's compliance with permit conditions. The Program Effectiveness Assessment and Improvement Plan shall identify the strategy used to gauge the effectiveness of prioritized BMPs and program implementation as a whole. Prioritized BMPs include BMPs implemented based on pollutants of concern. Where pollutants of concern are unidentified, prioritized BMPs are based on common pollutants of concern (i.e., sediment, bacteria, trash, nutrients). The effectiveness assessments will build upon each other from one year to the next and shall identify modifications to the program the Permittee must undertake to improve effectiveness.

(ii) **Implementation Level** - The Program Effectiveness Assessment and Improvement Plan may be modeled upon the most recent version (if applicable) Municipal Storm Water Program Effectiveness Assessment Guidance (CASQA, May 2007) or equivalent.

(a) The Program Effectiveness Assessment and Improvement Plan shall include the following minimum elements:

(1) Implementation of storm water program elements

(2) Identification and targeting of Target Audience(s)

Page 105

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(iii) **Reporting -** By the second year Annual Report complete and submit the Program Effectiveness Assessment and Improvement Plan. At a minimum, the Plan shall include implementation of storm water program elements and identification of the Targeted Audience(s).

### F.5.h.2.  Storm Water Program Modifications

(i)   **Task Description** – Within the fifth year of the effective date of the permit, based on the information gained from the effectiveness assessment, the Permittee shall identify modifications to control measures/significant activities, including new BMPs or modification to existing BMPs. The Permittee shall consult with the Regional Water Board in setting expectations for the scope, timing, and frequency of BMP modifications for the next permit cycle.

(ii)  **Implementation Level** –The Permittee shall identify program modifications to include:

   (a) Improving upon BMPs that did not accomplish goals;

   (b) Continuing and expanding upon BMPs that proved to be effective, including identifying new BMPs or modifications to existing BMPs designed to increase pollutant load reductions;

   (c) Discontinuing BMPs that may no longer be productive and replacing with more effective BMPs; and

   (d) Shifting priorities to make more effective use of resources

(ii)  **Reporting** – By the fifth year Annual Report complete and have available a list of maintenance activities of highest priority BMPs. By the fifth year Annual Report, complete and have available a summary of proposed modifications to the storm water program to improve program effectiveness, to achieve the MEP standard, and to protect water quality.

### F.5.i.  TOTAL MAXIMUM DAILY LOADS COMPLIANCE REQUIREMENTS

**F.5.i.1.** Attachment G contains a list of TMDL-specific, BMP-based water quality based effluent limitations (WQBELs) and other permit requirements, applicable to identified permittees, consistent with the assumptions and requirements of the applicable wasteload allocations of the TMDLs.

Permittees shall comply with the requirement in Section C.1. to reduce the discharge of pollutants to achieve applicable TMDL wasteload allocations as follows:

(i)   Prior to the deadline to attain the final wasteload allocation, a permittee is deemed in compliance with the requirement in Section C.1 *to reduce the discharge of pollutants to achieve applicable TMDL wasteload allocations* if the permittee is timely implementing all BMP-based WQBELs and other requirements specified in Attachment G for that TMDL. The permittee may alternatively make a demonstration in accordance with section F.5.i.1.(ii) below.

(ii)  On or after the deadline to attain the final wasteload allocation, a permittee is deemed in compliance with the requirement in Section C.1 *to reduce the discharge of pollutants to achieve applicable TMDL wasteload allocations* if the permittee meets one or more of the criteria in subsections (a)-(g) below.  For purposes of this section only, the wasteload allocations specified in the applicable TMDLs (as identified in the Fact Sheet) are incorporated by reference.

Page 106

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(a) Receiving water monitoring and analysis by the permittee or other responsible parties under the TMDL, as approved by the Regional Water Board or its designee, demonstrates attainment of the applicable receiving water limitation in the waterbody as determined at the TMDL monitoring attainment locations or as determined at or immediately downstream of the permittee's discharge; or

(b) Receiving water monitoring does not demonstrate attainment of the applicable receiving water limitation in the waterbody, but the permittee demonstrates, through an approach approved by the Regional Water Board or its designee, that exceedances of the receiving water limitations for the receiving water are due to loads from other sources and pollutant loads from the permittee are not causing or contributing to the exceedances; or

(c) Where the wasteload allocation is expressed as a concentration, sampling of the permittee's discharge, as approved by the Regional Water Board or its designee, indicates that the discharge has attained the applicable wasteload; or

(d) Where a mass-based wasteload has been allocated to an individual or jointly to a group or is expressed as a percent reduction in load, the permittee demonstrates, through an approach approved by the Regional Water Board or its designee, that the permittee's discharge is attaining the individual or joint allocation or the percent reduction; or

(e) Where a wasteload allocation is expressed as the number of allowable exceedance days, the permittee demonstrates, through an approach approved by the Regional Water Board or its designee, that the permittee's discharge conforms to the allowable exceedance days; or

(f) The permittee demonstrates, in a manner approved by the Regional Water Board or its designee, that no discharges, either directly or indirectly, from the permittee's MS4 to the applicable water body occurred during the relevant time period; or

(g) The permittee demonstrates the attainment of the wasteload allocation through other factors as described by the specific TMDL(s)[38] and as approved by the Regional Water Board or its designee.

(iii) Pursuant to Section D, a permittee deemed in compliance with Section C.1 in accordance with subsections i) and ii) of this section is also deemed in compliance with the Section D requirement to *not cause or contribute to an exceedance of water quality standards* for the specific pollutants and water bodies addressed.

**F.5.i.2.**  In some cases, Attachment G includes dates that fall outside the term of this Order. Attainment dates for BMP-based WQBELs and other permit requirements that

---

[38] As an example, the TMDL for Sacramento and San Joaquin Delta – Diazinon and Chlorpyrifos states "In determining compliance with the wasteload allocations, the Regional Water Board will consider any data or information submitted by the discharger regarding diazinon and chlorpyrifos inputs from sources outside of the jurisdiction of the permitted discharger, including any diazinon and chlorpyrifos present in precipitation and other available relevant information, and any applicable provisions In the discharger's NPDES permit requiring the discharger to reduce the discharge of pollutants to the maximum extent possible.", Resolution No. R5-2006-0061, Attachment 1, #11, Page 4.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

exceed the term of this Order are included for reference, and become enforceable in the event that this Order is administratively extended.

Wasteload allocation attainment dates that have already passed are enforceable on the effective date of this Order and have been assigned a due date of January 1, 2019.

(i)  If the Regional Water Board Executive Officer makes a determination, on a case by case basis, that the language of a particular TMDL allows flexibility to extend a final deadline to attain a wasteload allocation, the State Water Board Executive Director may amend Attachment G to provide an extended deadline following public notice and comment.

Where a final deadline to attain a wasteload allocation is past and the permittee has not demonstrated compliance as specified in Section F.5.i.1.(ii) above, the permittee may seek a time schedule order pursuant to Water Code section 13300 from the Regional Water Board.   Permittees may either individually request a time schedule order or may jointly request a time schedule order with all Permittees subject to the TMDL in Attachment G.  Permittees may also request time schedule orders where the permittee has not timely complied with a BMP-based WQBEL or other permit requirement in Attachment G.

A request to the applicable Regional Water Board for a time schedule order shall include the following information:

(a)  Any available data demonstrating the current quality of the MS4 discharge(s) in terms of concentration and/or load of the target pollutant(s) to the receiving waters subject to the TMDL;

(b)  A description and chronology of structural controls and source control efforts carried out by the permittee since the effective date of the TMDL to reduce the pollutant load in the MS4 discharges to the receiving waters subject to the TMDL;

(c)  Justification of the need for additional time to achieve the requirements;

(d)  The specific actions the Permittee will take in order to meet the TMDL requirements and a time schedule of interim and final deadlines proposed to implement those actions.  The actions will reflect the requirements specified for the TMDL in Attachment G; and

(e)  A demonstration that the time schedule requested is as short as possible, taking into account the technological, operational, and economic factors that affect the design, development, and implementation of the control measures that are necessary to comply with the TMDL requirements.

(ii)  It is not the intention of the State Water Board or the Regional Water Boards to bring an enforcement action for non-attainment of the wasteload allocation where:

(a)  A permittee is in compliance with a time schedule order's implementation requirements and compliance schedule;

(b)  A permittee has in good faith requested a time schedule order from the Regional Water Board and is in compliance with all BMP-based WQBELs and other permit requirements of Attachment G, except the requirement to attain the applicable wasteload allocation by the final attainment deadline;

(c)  A Regional Water Board has initiated proceedings to revise the TMDL to provide additional time for attainment or to modify TMDL wasteload allocations and the

Page 108

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

permittee is in compliance with all BMP-based WQBELs and other permit requirements in Attachment G, except the requirement to attain the applicable wasteload allocation by the final attainment deadline.

**F.5.i.3.** The State Water Board may revise this Order through a reopener to incorporate any modifications or revisions to the TMDLs in Attachment G, or to incorporate any new TMDLs adopted during the term of this Order that assign a wasteload allocation to the Permittee or that identify the Permittee as a responsible party. In revising Attachment G, the State Water Board will allow adequate notice and public review.

**F.5.i.4.** The Permittee shall complete and have available a report that includes the status of their implementation of the specific TMDL implementation requirements that have been incorporated into the Order with each Annual Report. The TMDL implementation report shall include the following information:

(i)   A description of BMPs implemented, including types, number, and locations;

(ii)  All supplemental information and reports required under the specific TMDL implementation requirements in Attachment G;

(iii) An assessment of the effectiveness of implemented BMPs in progressing towards attainment of wasteload allocations within the TMDLs' specified timeframes;

(iv) All monitoring data, including a statistical analysis of the data to assess progress towards attainment of wasteload allocations within the TMDLs' specified timeframes;

(v)  Based on results of the effectiveness assessment and monitoring, a description of the additional BMPs that will be implemented to attain wasteload allocations within the TMDLs' specified timeframes.

**F.5.i.5.** The Permittee shall comply with implementation requirements specified in Category 4b demonstrations associated with Clean Water Act Sections 303d, 306b, and 314 Integrated Reporting and Listing Decisions. Implementation requirements described in Category 4b demonstrations are effective upon Regional Water Board approval of that region's Integrated Reporting and Listing Decisions and associated Category 4b demonstrations.

## F.5.j. ONLINE ANNUAL REPORTING

**F.5.j.1.** Department of Defense and Department of Corrections, ports, transportation agencies and Rehabilitation Permittees are exempt from Annual Reporting of any provision that could pose a security risk and compromise facility security. Any requested information to determine compliance with this Order [40 C.F.R. 122.41(h)] by the Water Boards or U.S. EPA shall be furnished during normal business hours.

**F.5.j.2. By October 15 of each year,** the Permittee shall use State Water Board's SMARTS to submit a summary of the past year activities for each program element and certify compliance with all requirements of this permit. If a Permittee is unable to certify compliance with a requirement, it must submit in SMARTS the reason for failure to comply, a description and schedule of tasks necessary to achieve compliance, and an estimated date for achieving full compliance.

Page 109

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**F.5.j.3.**   Permittees shall complete and retain all Annual Report information on the previous fiscal year beginning July 1 and ending June 30.  The Annual Reporting requirements are set forth in Provisions E. The Permittee shall retain documentation as necessary to support their Annual Report.  The Permittee shall make this supporting information available during normal business hours, unless agreed to by the Regional Water Board's Executive Officer.

**F.5.j.4.**   The Permittee shall submit when requested by the Executive Officer of the applicable Regional Water Board a detailed written online annual report or in-person presentation of the annual report that addresses the activities described in Provision F. The detailed Annual Report must clearly refer to the permit requirements and describe in quantifiable terms, the status of activities undertaken to comply with each requirement.

**F.5.j.5.**   Permittees involved in regional programs may coordinate with the members to identify reporting responsibility. The one report submitted on behalf of Permittees involved in a regional program must include a summary of the past year activities implemented for each program element and certification of compliance for each of the Permittees in the regional program.

## G.   REGIONAL WATER BOARD AUTHORITIES

Regional Water Boards are responsible for overseeing compliance with this Order. Oversight may include, but is not limited to, reviewing reports, requiring modification to storm water program components and various submissions, imposing region-specific monitoring requirements, conducting inspections and program evaluations (audits), taking enforcement actions against violators of this Order. Permittees shall modify and implement their storm water management programs and monitoring as required by the Regional Water Board Executive Officer. The Regional Water Board may designate additional Small MS4s as Regulated Small MS4s under this Order consistent with the criteria articulated in Finding 24 of this Order. Such designations must be approved by the Regional Water Board following public review and comment. The Executive Director of the State Water Board may amend Attachments A and B to add Regional Water Board designations. The Regional Water Boards may also issue individual permits to Regulated Small MS4s, and alternative general permits to categories of Regulated Small MS4s. Upon issuance of such permits by a Regional Water Board, this Order shall no longer regulate the affected Small MS4(s).

## H.   DISPUTE RESOLUTION

In the event of a disagreement between a Permittee or other interested party and a Regional Water Board over the interpretation or implementation of any provision of this Order, a Permittee or interested party shall first attempt to resolve the issue with the Executive Officer of the Regional Water Board.  If a satisfactory resolution is not obtained at the Regional Water Board level, a Permittee or interested party may submit the issue in writing to the Executive Director of the State Water Board or his designee for resolution, with a copy to the Executive Officer of the Regional Water Board. The issue must be submitted to the Executive Director within thirty days of any final determination by the Executive Officer of the Regional Water Board; after thirty days the Permittee or

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

interested party will be deemed to have accepted the Regional Water Board Executive Officer's determination. The Executive Officer of the Regional Water Board will be provided an opportunity to respond. The Executive Director or his/her designee shall make a determination on the request within 60 days. Determinations of the Regional Water Board Executive Officers in interpreting and implementing this permit are considered actions of the State Water Board except where the Regional Water Board itself acts or the Executive Officer acts under Water Code Sections 13300, 13304, or 13383.

## I.   PERMIT RE-OPENER

This Order may be modified, revoked and reissued, or terminated for cause due to promulgation of amended regulations, receipt of U.S. EPA guidance concerning regulated activities, judicial decision, or in accordance with 40 Code of Federal Regulations 122.62, 122.63, 122.64, and 124.5. The State Board may additionally reopen and modify this Order at any time prior to its expiration under any of the following circumstances:

1. Present or future investigations demonstrate that the discharge(s) regulated by this Order may have the potential to cause or contribute to adverse impacts on water quality and/or beneficial uses.
2. New or revised Water Quality Objectives come into effect, or any TMDL is adopted or revised that is applicable to the Permittees
3. TMDL-specific permit requirements for adopted TMDLs are developed or revised by a Regional Water Board for incorporation into this Order.
4. The State Water Board determines, after opportunity for public comment and a public workshop, that revisions are warranted to those provisions of the Order addressing compliance with water quality standards in the receiving water or those provisions of the Order laying out an iterative process for implementation of management practices to achieve compliance with water quality standards in the receiving water.
5. The State Board completes the delineation of statewide watershed management zones based on watershed processes and the development of watershed based criteria for hydromodification measures.
6. The State Water Board completes the statewide policy for trash control in California's waterways.

## J.   PERMIT EXPIRATION

This Order expires on June 30, 2018. If this Order is not reissued or replaced prior to the expiration date, it will be administratively continued in accordance with 40 Code of Federal Regulations section 122.6 and remain in full force and effect. If you wish to continue an activity regulated by this Order after the expiration date of this Order, you must apply for and obtain authorization as required by the new permit once it is issued.

Page 111

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

## CERTIFICATION

The undersigned, Clerk to the Board, does hereby certify that the foregoing is a full, true, and correct copy of an order duly and regularly adopted at a meeting of State Water Board held on February 5, 2013.

AYE:        Chairman Charles R. Hoppin Vice
                Chair Frances Spivy-Weber
                Board Member Tam M. Doduc
                Board Member Steven Moore
                Board Member Felicia Marcus

NAY:        None

ABSENT:   None

ABSTAIN:  None

_Jeanine Townsend_

Jeanine Townsend
Clerk to the Board

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**CALIFORNIA STATE WATER RESOURCES CONTROL BOARD**
**1001 I Street**
**Sacramento, CA 95814**

**FACT SHEET FOR**

**NPDES GENERAL PERMIT and WASTE DISCHARGE REQUIREMENTS FOR**
**STORM WATER DISCHARGES FROM SMALL MUNICIPAL SEPARATE STORM SEWER**
**SYSTEMS (ORDER)**

**ORDER No. 2013-0001-DWQ**

**As Amended by Order 2017-XXXX-DWQ**

This Fact Sheet describes the factual, legal, and methodological basis for the General Permit, provides supporting documentation, and explains the rationale and assumptions used in deriving the limits and requirements.

## I. BACKGROUND

**History**

A 1972 amendment to the federal Water Pollution Control Act (also referred to as the Clean Water Act) provides that the discharge of pollutants to waters of the United States from any point source is unlawful unless the discharge is in compliance with a National Pollutant Discharge Elimination System (NPDES) permit. The 1987 amendments to the Clean Water Act added section 402(p), which established a framework for regulating storm water discharges under the NPDES Program. Subsequently, in 1990, the U.S. Environmental Protection Agency (U.S. EPA) promulgated regulations for permitting storm water discharges from industrial sites (including construction sites that disturb five acres or more) and from municipal separate storm sewer systems (MS4s) serving a population of 100,000 people or more. These regulations, known as the Phase I regulations, require operators of medium and large MS4s to obtain storm water permits. On December 8, 1999, U.S. EPA promulgated regulations, known as Phase II regulations, requiring permits for storm water discharges from Small MS4s and from construction sites disturbing between one and five acres of land. The Order accompanying this Fact Sheet regulates storm water discharges from Small MS4s.

A municipal separate storm sewer is a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains): (i) "owned or operated by the United States, a State, city, town, borough, county, parish, district, association, or other public body (created by or pursuant to State law) having jurisdiction over disposal of sewage, industrial wastes, storm water, or other wastes, including special districts under State law such as a sewer district, flood control district or drainage district, or similar entity…." (ii) designed or used for collecting or conveying storm water; (iii) which is not a combined sewer; and (iv) which is not part of a Publicly Owned Treatment Works (POTW). [See Title 40, Code of Federal Regulations (40 C.F.R.) §122.26(b)(8).]

A Small MS4 is an MS4 that is not permitted under the municipal Phase I regulations. (40 C.F.R. §122.26(b)(16)). Small MS4s include systems similar to separate storm sewer systems in municipalities, such as systems at military bases, large hospital or prison complexes, and highways and other thoroughfares, but do not include separate storm sewers in very discrete areas, such as individual buildings. (40 C.F.R. §122.26(b)(16(iii).) This permit refers to MS4s that operate throughout a community as "Traditional MS4s" and MS4s that are similar to traditional MS4s but operate at a separate campus or facility as "Non-traditional MS4s."

Federal regulations allow two permitting options for storm water discharges: individual permits and general permits. The State Water Resources Control Board (State Water Board) elected to adopt a statewide general permit for Small MS4s in order to efficiently regulate numerous storm water discharges under a single permit. In certain situations a storm water discharge may be more appropriately and effectively regulated by an individual permit, a region-specific general permit, or by inclusion in an existing Phase I MS4 permit. In these situations, the Regional Water Quality Control Board (Regional Water Board) Executive Officer will direct the Small MS4 operator to submit the appropriate application, in lieu of a Notice of Intent (NOI), to comply with the terms of this Order. In these situations, the individual or regional permits will govern, rather than this Order.

This Order regulates storm water runoff from small municipalities and other facilities, including federal and State operated facilities that can include universities, prisons, hospitals, military

bases (e.g. State Army National Guard barracks, parks and office building complexes.) Regulating many storm water discharges under one permit greatly reduces the administrative burden associated with permitting individual storm water discharges. Permittees obtain coverage under this Order by filing an electronic NOI through the State Water Board's Stormwater Multiple Application and Report Tracking System (SMARTS) and by mailing the appropriate permit fee to the State Water Board.

**Order Goals**

The goals for the Order included:

1. Ensure statewide consistency for Regulated Small MS4s.
2. Include more specificity in Order language and requirements to streamline implementation of storm water programs.
3. Implement and enhance actions to control 303(d) listed pollutants, pollutants of concern, achieve Wasteload Allocations adopted under Total Maximum Daily Loads, and protect Areas of Special Biological Significance.
4. Implement more specific and comprehensive storm water monitoring, including monitoring for 303(d) listed pollutants.
5. Incorporate emerging technologies, especially those that are being increasingly utilized by municipalities (e.g., low impact development).
6. Include program elements that address Program Management Effectiveness Assessments.
7. Implement a step-wise stakeholder collaborative approach.

**Stakeholder Collaborative Process**

State Water Board staff conducted a series of stakeholder meetings with Permittees and other interested parties over a five year period, from 2007- 2012. These meetings included the California Stormwater Quality Association (CASQA) Phase II Small MS4 Subcommittee, representatives of non-governmental organizations, Non-traditional Small MS4s and Regional Water Board staff. The following is a summary of the stakeholder process.

State Water Board staff completed an administrative draft Order and submitted it to CASQA, U.S. EPA, Natural Resources Defense Council, Coast/Bay Keepers, and Heal the Bay for informal stakeholder review in February 2011. Each of the nine Regional Water Boards provided comments. Staff revised the draft Order to address the informal comments received and released it for 60-day public review in June 2011.

Approximately 151 comments were received and several workshops were held throughout California to meet Stakeholders, answer questions and discuss the development process.

On May 4, 2012 a second administrative draft was completed and submitted for informal stakeholder review. On May 18, 2012 the second draft Order was released for 60-day public review. Approximately 110 comments were received and a public hearing was held on August 8, 2012 to hear oral comments on the second administrative draft.

On November 16, 2012 a third draft was completed and submitted for 30-day public review period. The comment deadline was set for noon on December 17, 2012. Approximately 55 comments were received and a board workshop was held on January 8, 2013 to hear comments on the revisions made to the second administrative draft.

On January 23, 2013, a final draft was completed and proposed for State Water Board adoption.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

In 2015, State Water Board staff conducted a series of stakeholder meetings with Permittees and other interested parties over several months to discuss proposed changes to the Order, specifically revising and Attachment G with updated TMDL requirements. These meetings included the CASQA Phase II Small MS4 Subcommittee, representatives of non-governmental organizations, Non-traditional Small MS4s and Regional Water Board staff. On June 5, 2017 a draft amendment to this Order was issued for a 45-day public review period. The public review period was extended by request and the due date for public comments became August 21, 2017.

## II. PERMITTING APPROACH

### Existing General Permit Approach

U.S. EPA storm water regulations for Phase II storm water permits envision a process in which entities subject to regulation develop a Storm Water Management Plan (SWMP). The SWMP contains detailed Best Management Practices (BMPs) and specific level-of- implementation information reviewed and approved by the permitting agency before the Permittee obtains coverage under the storm water permit. The existing General Permit followed this approach as suggested by U.S. EPA and simply identified goals and objectives for each of the six Minimum Control Measures.

The existing General Permit approach provides the flexibility to target an MS4's problem areas while working within the existing organizational structure. However, audits of Permittees and information gained from interviews with Regional Water Board staff revealed that many of these storm water programs lacked a baseline program and specific details in the SWMP to implement an adequate program for protection from the impacts of storm water runoff. Regional Water Board staff found it difficult to determine Permittees' compliance with the existing General Permit, due to the lack of specific requirements. The permit language did not contain specific deadlines for compliance, did not incorporate clear performance standards, and did not include measurable goals or quantifiable targets for implementation.[1]

The Regional Water Boards conducted approximately 36 on-site audits of MS4 programs[2] in the state that addressed 122 Permittees, including some Phase II Small MS4s. They found that programs with more specific permit requirements generally resulted in more comprehensive and progressive storm water management programs. For example, the more prescriptive permit requirements in the Los Angeles and San Diego MS4 permits require Permittees to be specific in how they implement their storm water program. The auditors concluded that the specificity of the provisions enabled the permitting authorities to enforce the MS4 permits and improve the quality of MS4 discharges. In addition, U.S. EPA on-site audits of MS4s throughout the nation have

Given this information, State Water Board staff aimed to write permit language clear enough to set appropriate standards and establish required outcomes.

---

[1] Storm Water Phase I MS4 Permitting: Writing more effective, measurable permits, EPA, Kosco. repeatedly shown the need for clear, measurable requirements in MS4 permits to ensure an effective and enforceable program.

[2] Assessment Report on Tetra Tech's Support of California's MS4 Storm Water Program, July 2006

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**Current Order Approach**

The current approach simplifies assessment of Permittee compliance and allows the public to more easily access measurable results. The Order provisions establish compliance implementation levels such as escalating enforcement and requirements for tracking projects. Required actions include specific reporting elements to substantiate compliance with implementation levels. Regional Water Board staff will be able to evaluate each individual Permittee's compliance through an online Annual Report review and the program evaluation (audit) process.

Federal regulations and State law require that the implementation specifics of Municipal Storm Water NPDES permits be adopted after adequate public review and comment.[3] This Order's approach satisfies the public involvement requirements of both the federal Clean Water Act and the California Water Code. Permit details are known at the time of adoption of the Order. Substantive information as to how the discharger will reduce pollutants to the Maximum Extent Practicable (MEP) is not left to the details of the SWMP. The public need not guess program details until Regional Water Board review and approval of a SWMP, as was the case in the existing General Permit.

This Order specifies the actions necessary to reduce the discharge of pollutants in storm water to the MEP in a manner designed to achieve compliance with water quality standards and objectives. This set of specific actions is equivalent to the requirements that were included in a separate SWMP for each Permittee in the existing General Permit.

This order effectively prohibits non-storm water discharges into municipal storm drain systems and watercourses within the Permittees' jurisdictions.

The State Board has also identified the most critical water quality problems as priorities in this Order. The priorities include (1) discharges to Areas of Special Biological Significance (2) discharges to water bodies listed as impaired on the 303[d] list (3) Post- Construction Requirements and (4) Water Quality Monitoring Requirements. A majority of the Permittees' implementation efforts focus on the four priority areas as identified by the State Water Board.

*Permittee Diversity*

In California, Permittees face highly variable conditions both in terms of threats to water quality from their storm water discharges and resources available to manage those discharges. Consequently, making one set of prescriptive requirements work for all of them is inherently difficult. This Order contains separate provisions for Traditional and Non-traditional MS4s. The

---

[3] On January 14, 2003, the U.S. Ninth Circuit Court issued a decision in *Environmental Defense Center v. EPA* ((9th Cir. 2003) 344 F.3d 832.) This ruling upheld the Phase II regulations on all but three of the 20 issues contested. The court determined that applications for general permit coverage (including the NOI and any Storm Water Management Program [SWMP]) must be made available to the public, the applications must be reviewed and determined to meet the Maximum Extent Practicable (MEP) standard by the permitting authority before coverage commences, and there must be a process to accommodate public hearings. Regarding the issue of public participation, the Ninth Circuit noted that such participation was required because the "substantive information about how the operator of a small MS4 will reduce discharges to the maximum extent practicable" was found in the storm water management plan rather than the permit itself" (344 F3d at 857).

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

requirements for the Non-traditional MS4s are tailored specifically to the Non-traditional management structure. Additionally, this permit introduces the concept of compliance tiers in particular sections, designed to relieve the Regional Water Board burden of reviewing and approving individual SWMPs while preserving the ability of the Permittees to tailor requirements that address their unique circumstances.

*Non-traditional MS4 Categories and Provisions*
This Order identifies specific provisions Non-traditional MS4 Permittees must comply with in Section F and considers the following categories to be Non-traditional MS4s, but not limited to:

- Community Services Districts
- Fairgrounds
- Higher Education Institutions (Community Colleges and Universities)
- Military Bases
- Ports
- State Parks/Beaches/Historical Areas
- School Districts K-12
- State and Federal Prisons/Health Institutions
- State Vehicle Recreation Areas
- Water Agencies
- Transit Agencies

The regulations direct that the term Small MS4s includes "large hospitals" and "prison complexes." (40 C.F.R. §122.26(b)(16)(iii).) For purposes of State Water Board designation of state and federal hospitals and prisons, the Board interprets the terms "large hospital" and "prison complex" to mean health institutions and prison facilities with a resident and staff population of 5,000 or more. However, Regional Water Boards may designate smaller facilities on a case by case basis.

*Guidance Document*
The case for eliminating a SWMP for this second permit term has been clearly addressed, however, the latent advantages of having some form of a storm water management document has not.

First, a storm water management document assists Permittees in managing their storm water program. Such a document serves as guidance to (1) identify different staff involved in storm water compliance over multiple departments within the Permittee agency and, (2) provide those staff with a simple narrative connecting all the detailed, specific BMPs in relation to multiple Permittee departments. Simply put, the document provides the Permittee with a map to the compliance process.

Second, the storm water management document is an essential tool for Regional Water Board audits. During MS4 audits, the Regional Water Board typically requests and reviews a SWMP to understand the Permittee's storm water program and management structure. Although the Order contains specific details on each program requirement, it lacks the simple narrative nexus that a storm water management document can provide on how the storm water program is implemented by a specific Permittee. The guidance document may be in spreadsheet form, as a flowchart, or as a written narrative. In other words, the structure is left up to the Permittee as to the way in which they want to demonstrate or illustrate the relationship between their

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

storm water program and their management structure. To that end, the guidance document will provide the Permittee with a clear map to the compliance process. Therefore, although the draft Order eliminates the submittal for review and approval of a SWMP, the requirement to develop a planning/guidance document has been retained for new Permittees.

New Permittees are allowed six months to develop and upload the guidance document to SMARTS along with the NOI and appropriate fee. The document is open for public viewing, but will not be reviewed and approved by the relevant Regional Water Board.

Renewal Permittees will also submit a guidance document and are allowed six months to develop and upload the guidance document to SMARTS along with the NOI and appropriate fee.

The State Water Board recognizes that in some instances Renewal Permittees' existing SWMPs have incorporated BMPs designed to address locality-specific storm water issues and that in some cases these BMPs may, because of locality-specific factors, be more protective of water quality than the minimum requirements established by this Order. Renewal Permittees will additionally include in the guidance document the following: identification and brief description of each BMP and associated measurable goal included in the Permittee's most current SWMP that constitutes a more specific local or tailored level of implementation that may be more protective of water quality than the minimum requirements of this Order; and identification of whether the Permittee proposes to maintain, reduce, or cease implementation for each more protective, locally-tailored BMP. In no instance may a BMP be reduced or ceased if it is required by the minimum standards set by this Order. Further, for each more protective, locally-tailored BMP and associated measurable goal for which the Renewal Permittee proposes to reduce or cease implementation, the Renewal Permittee may do so only if the Permittee can demonstrate, to the Regional Water Board Executive Officer, that the reduction or cessation is in compliance with this Order and the maximum extent practicable standard, and will not result in increased pollutant discharges. This process is designed to direct Renewal Permittees, where appropriate, to continue to implement more protective, locally-tailored BMPs and measurable goals developed in the previous permit term that were specifically designed to address local storm water priorities.

### Summary of Significant Changes in this Order
This Order significantly differs from the previous order (Order 2003-0005-DWQ) by including the following:

- Specific BMP and Management Measure Requirements
- Elimination of submission of a SWMP for review and approval by the Regional Water Boards
- Electronic filing of NOIs and Annual Reports
- Waiver Certification
- New State Water Board and Regional Water Board designation criteria
- Separate requirements for Traditional and Non-traditional MS4s
- New program management requirements
- Post-construction storm water management requirements
- TMDL implementation requirements
- Requirements for ASBS discharges
- Water quality monitoring and BMP assessment
- Program effectiveness assessment

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

## III. ECONOMIC CONSIDERATIONS

In 2000, the State Water Board issued a precedential order (Order WQ 2000-11 (Cities of Bellflower, et al.)) stating that cost of compliance with the programs and requirements of a municipal storm water permit is a relevant factor in determining MEP. The Order also explicitly stated that a cost benefit analysis is not required. The State Water Board discussed costs as follows:

While the standard of MEP is not defined in the storm water regulations or the Clean Water Act, the term has been defined in other federal rules...

These definitions focus mostly on technical feasibility, but cost is also a relevant factor. There must be a serious attempt to comply, and practical solutions may not be lightly rejected. If, from the list of BMPs, a permittee chooses only a few of the least expensive methods, it is likely that MEP has not been met. On the other hand, if a permittee employs all applicable BMPs except those where it can show that they are not technically feasible in the locality, or whose cost would exceed any benefit to be derived, it would have met the standard. MEP requires permittees to choose effective BMPs, and to reject applicable BMPs only where other effective BMPs will serve the same purpose, the BMPs would not be technically feasible, or the cost would be prohibitive. Thus while cost is a factor, the Regional Water Board is not required to perform a cost-benefit analysis.

(State Water Board Order WQ 2000-11, supra, p.20.) The State Water Board received extensive comments addressing the costs associated with compliance with the first publicly released Phase II small MS4 draft Order in June 2011. The depressed economic conditions in California challenge Permittees' ability to fully implement the requirements of the first draft permit. The State Water Board recognizes that many Permittees currently have limited staff and resources to implement storm water provisions. State Water Board staff carefully considered comments received regarding economic feasibility while revising the June 2011 draft Order. The Order continues to address critical water quality priorities, namely discharges to ASBS, TMDLs, and waterbodies listed as impaired on the 303(d) list, but aims to do so in a focused and cost-effective manner.

*Brief History*

State Water Board staff completed an administrative draft Order and submitted it to CASQA, U.S. EPA, Natural Resources Defense Council, Water Keepers, and Heal the Bay for informal stakeholder review in February 2011. Each of the nine Regional Water Boards also provided comments. Staff revised the draft Order to address the informal comments received and released it for 60-day public review in June 2011. Approximately 151 comments were received and several workshops were held throughout California to meet Stakeholders, answer questions and discuss the development process.

On October 6, 2011, the California Senate Select Committee on California Job Creation and Retention held a hearing on the economic impacts of the State Water Board's three general or statewide storm water permits that were under renewal: the Phase II Small MS4 permit, the Industrial General Permit, and the Caltrans statewide MS4 permit. The Executive Director of the State Water Board testified at the hearing that the comments regarding cost of compliance with the permits were being considered carefully and that the three permits required substantial revision to address the comments. Following the hearing, State Water Board staff launched Stakeholder meetings beginning in November 2011 to April 2012. The meetings were held with CASQA, National Resources Defense Council, Water Keepers, Heal the Bay

and each category of Non- traditional Small MS4 proposed for designation in the draft permit. The meetings were designed to discuss implementation challenges and solutions for each section of this Order, given the issues raised at the Senate hearing and the written comments from the June 2011 draft Order. Substantial revisions were then made and were reflected in the May 2012 draft Order. State Water Board staff attempted to reduce costs while maintaining the level of water quality protection mandated by CWA, CWC and other applicable requirements.

*Approach to Cost of Compliance*

This section is a general discussion of the more significant changes between the June 2011 and the May 2012 draft Order, including cost of compliance. It is not possible to accurately predict the cost impact of requirements that involve an unknown level of implementation or that depend on environmental variables that are as yet undefined. Only general conclusions can be drawn from this information.

It is extremely important to note that many storm water program components and their associated costs existed before any MS4 permits were issued. For example, storm drain maintenance, street sweeping and trash/litter collection costs cannot be solely or even principally attributed to MS4 permit compliance since these long-standing practices preceded the adoption of the earliest storm water permit in 1990. Even many structural BMPs (erosion protection, energy dissipation devices, detention basins etc.) are standard engineering practice for many projects and are not implemented solely to comply with permit provisions. Therefore, the true cost resulting from MS4 permit requirements is some fraction of the total storm water program costs.

The California State University, Sacramento study found that only 38% of program costs are new costs fully attributable to MS4 permits. The remainder of program costs was either pre-existing or resulted from enhancement of pre-existing programs.[4] The County of Orange found that even lesser amounts of program costs are solely attributable to MS4 permit compliance, reporting that the amount attributable to implement its Drainage Area Management Plan is less than 20% of the total budget. The remaining 80% is attributable to pre-existing programs.[5] Any increase in cost to the Permittees by the requirements of this Order will be incremental in nature.

Testimony from the California Senate Select Committee on California Job Creation and Retention hearing and comment letters on the June 2011 draft Order asserted numerous estimates of compliance costs. Generally, the estimates are based on worst-case scenarios or the most restrictive interpretation of the June 2011 draft Order. A worst-case scenario would come about, for example, if a new Traditional MS4 Permittee fails to leverage existing resources and maximize efficiencies, and does not segregate pre-existing program expenditures and new costs to implement the storm water program when considering cost of compliance. Furthermore, the assertions do not take into consideration the phased-in nature of many of the June 2011 draft Order requirements. Finally, the cost estimate assertions did not address the diversity among Permittees, specifically the different levels of compliance from a

---

[4] Ibid. p. 58

[5] County of Orange, 2000. A NPDES Annual Progress Report. P. 60. More current data from the County of Orange is not used in this discussion because the County of Orange no longer reports such information.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

new vs. renewal Traditional MS4 Permittee expenditure and new vs. renewal Non-traditional MS4 expenditure and funding sources.

State Water Board staff estimated the cost of compliance in two ways. First, staff utilized cost data from the California State University (CSUS) NPDES Stormwater Cost Survey[6]. The rationale for using this document is that it's very difficult to precisely determine the true cost of implementation of the Permittees' storm water management program as affected by this Order. Reported costs of compliance for the same program element vary widely from city to city and by a very great margin that cannot be explained. However, economies of scale play a great role for the great margin of compliance costs. Some Permittees storm water programs are general funded while others utilize a service/user/utility fees to support the program. Unfortunately, those Permittees with general funded programs must compete for dollars in a dwindling economic climate. Furthermore, a study by the Los Angeles Regional Water Board reported wide variability in the cost of compliance among municipal permit holders, which was not easily explained.[7] Due to the wide diversity among the Permittees, Traditional and Non-traditional and new and renewal Permittees, the uncertainty of the extent of needed improvements, and the difficulty in isolating program costs attributable to permit compliance, the true cost of implementation can only be discussed in a general way.

Second, staff considered comparisons between the June 2011 draft Order and first term Phase I MS4 permits. The municipalities chosen in the CSUS survey were smaller Phase I cities, were early in the first permit term, and had reported cost in their annual reports. In addition, the cost categories correspond to the federal Phase II Small MS4 six minimum control measures. Given these factors, State Water Board staff estimated the worst-case scenario example to be a $32 median annual cost per household to implement the June 2011 draft Order. The CSUS survey estimated the annual cost per household for the six storm water programs ranged from $18 to $46.

Of the 100 new Traditional Small MS4s proposed to be designated, 20,000 is the average population with an average of 2.8 individuals per household, therefore the average annual cost to implement the June 2011 draft Order is approximately $229,000.

The average population of a renewal Traditional MS4 Permittee identified in the June 2011 draft Order is 27,353 with an average of 2.8 individuals per household. Therefore, the average annual cost to implement the June 2011 draft Order is approximately $313,000.

As discussed previously, the May 2012 draft Order has undergone substantial edits and no requirements have been added to the draft Order that would materially increase the cost of compliance. State Water Board staff carefully evaluated comments from Stakeholder meetings, written public comments, and testimony from the Senate Select Committee hearing. And, although the May 2012 draft Order contains these substantial revisions, the draft Order continues to protect storm water quality without overburdening Permittees and Businesses. Below is a list of some of the more significant changes to reduce costs.

1. Deleted annual cost analysis
2. Deleted Industrial/Commercial Inspection Program
3. Deleted mandatory construction inspection frequency

---

[6] California State University, NPDES Stormwater Cost Survey, 2005

[7] LARWQCB, 2003. Review and Analysis of Budget Data Submitted by the Permittees for Fiscal Years 2000-2003. p.2

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

4.  Deleted Trash Reduction Program
5.  Modified post-construction standard requirements
6.  Modified Community-Based Social Marketing provision
7.  Modified Non-traditional MS4 provisions
8.  Extended compliance deadlines
9.  Eliminated redundancy with construction inventory and tracking requirements
10. Deleted mandatory development of a citizen advisory group
11. Deleted costly IDDE monitoring, complaint response based
12. Made spatial data in a Geographic Information System (GIS) optional
13. Deleted requirement to identify 20% of storm drain system as high priority
14. Included Water Quality Monitoring Tiers

Though no firm conclusions or precise estimates can be drawn from this analysis, it is expected that the revisions to the May 2012 draft Order will significantly reduce the cost of compliance of the average annual cost per household from the estimated $32 to substantially lower.

*TMDLs*

The cost of complying with TMDL waste load allocations is not considered since TMDLs are not subject to the MEP standard. Federal law requires that NPDES permits contain effluent limitations consistent with the assumptions of any applicable wasteload allocation in a TMDL. (40 C.F.R. §122.44(d)(1)(vii)(B).)

*Benefits of Permit Costs*

The State Water Board further found in adopting Order WQ-2000-11 that in considering the cost of compliance, it is also important to consider the costs of impairment; that is, the negative impact of pollution on the economy and the positive impact of improved water quality. For example, economic benefits may result through program implementation, and alternative costs (as well as environmental impacts) may be incurred by not fully implementing the program.

Storm water management programs cannot be considered solely in terms of their costs. The programs must also be viewed in terms of their value to the public. For example, household willingness to pay for improvements in fresh water quality for fishing and boating has been estimated by U.S. EPA to be $158-210.[8] This estimate can be considered conservative, since it does not include important considerations such as marine waters benefits, wildlife benefits, or flood control benefits. The California State University, Sacramento study corroborates U.S. EPA's estimates, reporting annual household willingness to pay for statewide clean water to be $180.[9] Though these costs may be assessed differently at the state level than at the municipal level, the results indicate that there is public support for storm water management programs and that costs incurred by the Permittees to implement its storm water management program remain reasonable.

It is also important to consider the cost of not implementing a storm water management program. Urban runoff in southern California has been found to cause illness in people bathing

---

[8] Federal Register / Vol. 64, No. 235 / Wednesday, December 8, 1999 / Rules and Regulations. P. 68793.

[9] State Water Board, 2005. NPDES Storm water Cost Survey. P. iv.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

near storm drains.[10] A study of south Huntington Beach and north Newport Beach found that an illness rate of about 0.8% among bathers at those beaches resulted in about $3 million annually in health-related expenses.[11] Extrapolation of such illness rates and associated health expenses to the beaches and other water contact recreation areas in the state would increase these costs significantly.

Storm water runoff and its impact on receiving waters also negatively affects the tourism industry. The California Travel and Tourism Commission estimated that out-of-state visitors spent $168 per person per day (including transportation) in California in 2007. The Commission estimated total direct travel spending in California was $97.6 billion, directly supporting 924,000 jobs, with earnings of $30.6 billion. Effects on tourism from storm water runoff (e.g. beach closures) can have a significant impact on the economy. The experience of Huntington Beach provides an example of the potential economic impact of poor water quality. Approximately eight miles of Huntington Beach were closed for two months in the middle of summer of 1999, impacting beach visitation and the local economy.

Finally, the benefits of storm water management programs must be considered in conjunction with their costs. A study conducted by University of Southern California and the University of California, Los Angeles assessed the costs and benefits of implementing various approaches for achieving compliance with the MS4 permits in the Los Angeles Region. The study found that non-structural systems would cost $2.8 billion but provide $5.6 billion in benefit. If structural systems were necessary, the study found that total costs would range from $5.7 to $7.4 billion, while benefits could reach

$18 billion.[12] Costs are anticipated to be borne over many years, approximately a ten year minimum. That the benefits of the programs would considerably exceed their costs is a view corroborated by U.S. EPA, which also found that the benefits of implementation of its Phase II storm water rule would outweigh the costs.[13]

## IV.  UNFUNDED MANDATES

Article XIII B, Section 6(a) of the California Constitution provides that whenever "any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service." The requirements of this Order do not constitute state mandates that are subject to a subvention of funds.

First, the requirements of this Order do not constitute a new program or a higher level of service as compared to the requirements of the Existing Order. The overarching requirement to impose controls to reduce the pollutants in municipal storm water is dictated by the Clean Water Act and is not new to this permit cycle. (33 U.S.C. §1342(p)(3)(B).) The inclusion of new and advanced measures as the storm water programs evolve and mature over time is

---

[10] Haile, R.W., et al, 1996. An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay. Santa Monica Bay Restoration Project.

[11] Los Angeles Times, May 2, 2005. Here's What Ocean Germs Cost You: A UC Irvine Study Tallies the Cost of Treatment and Lost Wages for Beachgoers Who Get Sick.

[12] LARWQCB, 2004. Alternative Approaches to Storm water Control.

[13] Federal Register / Vol. 64, No. 235 / Wednesday, December 8, 1999 / Rules and Regulations. P. 68791.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

anticipated under the Clean Water Act (55 Fed. Reg. 48052), and these new and advanced measures do not constitute a new program or higher level of service. Further, this Order sets out a more detailed set of requirements compared to the 2003 Order in large part because, unlike the 2003 Order, this Order does not require submission of SWMPs. Specifics concerning how the minimum measures will be implemented, which would have been proposed in the SWMP under the 2003 Order, are now incorporated into the Order itself.

Second, and more broadly, mandates imposed by federal law, rather than by a state agency, are exempt from the requirement that the local agency's expenditures be reimbursed. (Cal. Const., art. XIII B, §9, subd. (b).) The Draft Order implements federally mandated requirements under the Clean Water Act and its requirements are therefore not subject to subvention of funds. This includes federal requirements to effectively prohibit non-storm water discharges, to reduce the discharge of pollutants to the maximum extent practicable, and to include such other provisions as the Administrator or the State determines appropriate for the control of such pollutants. (30 U.S.C. §1342(p)(3)(B).) The authority exercised under this Order is not reserved state authority under the Clean Water Act's savings clause (cf. *Burbank v. State Water Resources Control Bd*. (2005) 35 Cal.4th 613, 627-628), but instead is part of a federal mandate to develop pollutant reduction requirements for municipal separate storm sewer systems. To this extent, it is entirely federal authority that forms the legal basis to establish the permit provisions. (See, *City of Rancho Cucamonga v. Regional Water Quality Control Bd.- Santa Ana Region* (2006) 135 Cal.App.4th 1377, 1389; *Building Industry Ass'n of San Diego County v. State Water Resources Control Bd*. (2004) 124 Cal.App.4th 866, 882-883.)

Further, the maximum extent practicable standard is a flexible standard that balances a number of considerations, including technical feasibility, cost, public acceptance, regulatory compliance, and effectiveness. (*Building Ind. Asso., supra*, 124 Cal. App.4th at pp. 873, 874, 889.) Such considerations change over time with advances in technology and with experience gained in storm water management. (55 Fed.Reg. 48052.) Accordingly, the determination of whether the Draft Order conditions exceed the requirements of federal law cannot be based on a point by point comparison of the permit conditions and the six minimum measures that are required "at a minimum" to reduce pollutants to the maximum extent practicable and to protect water quality (40 C.F.R. §122.34). Likewise, individual permit provisions cannot be considered in isolation. When implementing the federal requirement to reduce pollutants to the maximum extent practicable, the entire permit must be evaluated as a whole. This is so because the permitting agency may decide that it is more practicable to expend limited municipal resources on one aspect of the permit rather than another. In other words, requirements in one area may be relaxed to account for greater expenditures in another that will reduce pollutants to the maximum extent practicable

In recent months, the County of Los Angeles and County of Sacramento Superior Courts have granted writs setting aside decisions of the Commission on State Mandates that held that certain requirements in Phase I permits constituted unfunded mandates.

In both cases, the courts found that the correct analysis in determining whether a municipal storm water permit constituted a state mandate was to evaluate whether the permit conditions were expressly specified in federal statute or regulation but whether the permit conditions exceeded the maximum extent practicable standard. *(State of Cal. v. Comm. On State Mandates* (Super. Ct. Sacramento County, 2012, No. 34-2010- 80000604), *State of Cal. v. County of Los Angeles* (Super. Ct. Los Angeles County, 2011, No. BS130730.) It should be noted that USEPA has issued an online MS4 Permit Improvement Guide (April 2010, available

at: http://www.epa.gov/npdes/pubs/ms4permit_improvement_guide.pdf) that recommends many provisions for Phase II MS4 permits not explicitly specified in the six minimum measures established at Code of Federal Regulations, title 40, section 122.34.

As laid out in this Fact Sheet and as supported by the record of this permitting action, the requirements of the Draft Order, taken as a whole rather than individually, are necessary to reduce the discharge of pollutants to the maximum extent practicable, to effectively prohibit non-storm water discharges, and to protect water quality. The findings as to implementing these federal requirements are the expert conclusions of the principal state agency charged with implementing the NPDES program in California. (Wat. Code, §§13001.) The requirements of the Draft Order do not constitute an unfunded mandate.

It should be noted that the Draft Order provisions to effectively prohibit non-storm water discharges are also mandated by the Clean Water Act. (33 U.S.C. §1342(p)(3)(B)(ii).) Likewise, the provisions of this Draft Order to implement total maximum daily loads (TMDLs) are federal mandates. Federal law requires that permits must contain effluent limitations consistent with the assumptions of any applicable wasteload allocation in a TMDL. (40 C.F.R. §122.44(d)(1)(vii)(B).)

Finally, even if any of the permit provisions could be considered unfunded mandates, under Government Code section 17556, subdivision (d), a state mandate is not subject to reimbursement if the local agency has the authority to charge a fee. The local agency permittees have the authority to levy service charges, fees, or assessments sufficient to pay for compliance with this Order. (See, e.g., *Apartment Ass'n of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 842.) The authority of a local agency to defray the cost of a program without raising taxes indicates that a program does not entail a cost subject to subvention. (*Clovis Unified School Dist. v. Chiang* (2010) 188 Cal. App.4th 794, 812, quoting *Connell v. Superior court* (1997) 59 Cal.App.4th 382, 401; *County of Fresno v. State of California* (1991) 53 Cal.3d 482, 487–488.)

## V.  ROLE OF THE REGIONAL WATER BOARDS

Under the Water Code, either the State Water Board or the regional boards have authority to issue NPDES permits (Wat. Code, §13377.) The State Water Board is issuing this Order; however Regional Water Board staff will continue to have the authority to evaluate each individual Permittee's compliance through online Annual Report review and by requesting a detailed annual report from Permittees anytime during the permit term. In addition, Regional Board staff can conduct program evaluations (audits). These evaluations can either be targeted or comprehensive evaluations. Responsibilities of Regional Water Board staff also include oversight of implementation and compliance with this Order. As appropriate, they can require modification to programs and other submissions, impose region-specific monitoring requirements, conduct inspections, take enforcement actions, and make additional designations of Regulated Small MS4s. The Regional Water Boards also have a role in approving water quality monitoring efforts and may also direct that dischargers carry out a particular type of education and outreach program (see discussion under Section XII).

Regional Water Boards may also issue individual permits to Regulated Small MS4s, and alternative general permits to categories of Regulated Small MS4s. In addition, Regional Water Boards may allow Phase II Permittees the ability to become Phase I Permittees within the same urbanized area. Upon issuance of such permits by a Regional Water Board, this Order shall no longer regulate the affected MS4s.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

The Permittees and Regional Water Boards are encouraged to work together to accomplish the goals of the storm water program, specifically, by coordinating the oversight of construction and industrial sites. For example, certain Permittees are required to implement a construction program that must include procedures for construction site inspection and enforcement. Construction sites disturbing an acre of land or more are also subject to inspections by the Regional Water Board under the State Water Board's Construction General Permit for Storm Water Discharges associated with Construction and Land Disturbance Activities (CGP). U.S. EPA intended to provide a structure that requires permitting through the federal Clean Water Act while at the same time achieving local oversight of construction projects. A structured plan review process and field enforcement at the local level, which is also required by this Order, were cited in the preamble to the Phase II regulations as the most effective components of a construction program.

The Permittees and Regional Water Boards are encouraged to coordinate efforts and use each of their enforcement tools in the most effective manner. However, in order to further ensure coordination, this Order requires Permittees to include procedures for referring non-filers as identified in the Program Management section and violations of the storm water general permits to the Regional Water Board when observed.

*Dispute Resolution*
As discussed, several areas of the permit will be mandated at the discretion of the Regional Board Executive Officer after permit adoption. In this function, the Regional Water Board Executive Officers are in essence acting as agents of the State Water Board. Therefore, determinations of the Regional Water Board Executive Officers in interpreting and implementing this permit are considered actions of the State Water Board (and accordingly not actions of the Regional Water Board subject to the petition process under Water Code section 13320) except where the Regional Water Board itself acts or the Executive Officer acts under Water Code Sections 13300, 13304, or 13383. However, recognizing the need for some level of statewide consistency in interpretation and implementation of Order provisions, the Order includes a dispute resolution process where there is disagreement between a Permittee and a Regional Water Board Executive Officer. The Permittee should first attempt to resolve the issue with the Executive Officer of the Regional Water Board. If a satisfactory resolution is not obtained at the Regional Water Board level, the Permittee may submit the issue in writing to the Executive Director of the State Water Board or his designee for resolution, with a copy to the Executive Officer of the Regional Water Board. The issue must be submitted to the Executive Director within thirty days of any final determination by the Executive Officer of the Regional Water Board; after thirty days the Permittee will be deemed to have accepted the Regional Water Board Executive Officer's determination. The Executive Officer of the Regional Water Board will be provided an opportunity to respond.

## VI.  ENTITIES SUBJECT TO THIS ORDER

This Order regulates discharges of storm water from Regulated Small MS4s. A Regulated Small MS4 is a Small MS4 that has been designated as regulated in accordance with criteria described in 40 C.F.R. 122.32.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

a. **Renewal Permittee - Traditional and Non-traditional MS4s**

All Traditional and Non-traditional MS4s currently covered under the existing General Permit are covered under this Order and must implement the requirements of this Order.

b. **New Traditional MS4 Permittee or New Urbanized Areas**

In some cases, the urbanized boundaries and/or infrastructure of previously permitted Traditional MS4 Permittees may expand to include new areas designated as urbanized under the 2010 U.S. Decennial Census (e.g., when new areas are annexed within the urbanized area). Permittees must identify and include these new urbanized areas as part of their existing storm water program. Any new urbanized areas must be indicated on Permittees permit boundary map. For cities, the permit area boundary is the city boundary. For counties, permit boundaries must include urbanized areas and places identified in Attachment A located within their jurisdictions. The boundaries must be proposed in the permit boundary map and may be developed in conjunction with the applicable Regional Water Board.

New Traditional MS4 Permittees that are outside of Urbanized Areas have been designated as Regulated Small MS4s based on one or more of the following criteria developed by the State Water Board:

1) High population and population density – High population means a population of 10,000 or more. High population density means a density greater than 1,000 residents per square mile. Also considered in this definition is high density created by a non-residential population, such as tourists or commuters.

2) Discharge to Areas of Special Biological Significance (ASBS) as defined in the California Ocean Plan.

The above factors were considered when evaluating whether an MS4 outside an Urbanized Area should be regulated pursuant to this Order. An MS4 and the population that it serves need not meet all of the factors to be designated. The criteria selected to designate MS4s to be regulated are based on the potential impact to water quality due to conditions influencing discharges into their system or due to their discharge location(s).

On a case by case basis, the Regional Water Boards may designate Small MS4s outside of Urbanized Areas as Regulated Small MS4s. Case by case determinations of designation shall be based on the potential of a Small MS4's discharges to result in exceedances of water quality standards, including impairment of designated uses, or other significant water quality impacts, including habitat and biological impacts. Where such case by case designations have been recommended by the Regional Water Boards prior to adoption of this Order, the designated Small MS4s are listed on the relevant Attachments to the Order and the reasons for designation are laid out in the Fact Sheet. The Regional Water Boards may continue to make case by case determinations of designation during the permit term by notification to the discharger, which shall include a statement of reasons for the designation.

Finally, any Small MS4 that contributes substantially to the pollutant loadings of a physically interconnected municipal separate storm sewer that is regulated by the NPDES storm water program must be designated as Regulated Small MS4s. An MS4 is

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

interconnected with a separately permitted MS4 if storm water that has entered the MS4 is discharged to another permitted MS4. In general, if the MS4 discharges more than 10 percent of its storm water to the permitted MS4, or its discharge makes up more than 10 percent of the other permitted MS4's total storm water volume, it is a significant contributor of pollutants to the permitted MS4. In specific cases, the MS4s involved or third parties may show that the 10 percent threshold is inappropriate for the MS4 in question. The definition for significant contributor of pollutants to an interconnected permitted MS4 uses a volume of 10 percent, with the assumption that storm water contains pollutants. This is meant to capture flows that may affect water quality or the permit compliance status of another MS4, but exclude incidental flows between communities.

c. **New Non-traditional MS4 Permittees**

Non-traditional MS4s include, but are not limited to, universities, prisons, large hospitals, military bases (e.g., State Army National Guard barracks), and State parks.

The previous General Permit, Water Quality Order 2003-0005-DWQ, Attachment 3 listed Non-traditional MS4s anticipated to be designated by the end of the permit term, either by the State or Regional Water Boards. However, some Non- traditional MS4s were not designated. All Non-traditional MS4s, except K-12 School Districts, Offices of Education and Community Colleges, not yet designated are now subject to this Order. These entities are listed in Attachment B.

Additional Non-traditional MS4 Permittees have been designated as Regulated Small MS4s in accordance with the same criteria described in b above.

## VII.  APPLICATION REQUIREMENTS

All Regulated Small MS4s listed in Attachments A and B are automatically designated upon adoption of this Order and must file for coverage. To file for coverage, Permittees must electronically file an NOI on the State Water Board's SMARTS website (https://smarts.waterboards.ca.gov/smarts/faces/SwSmartsLogin.jsp) and mail the appropriate permit fee to the State Water Board:

The NOI will include a statement that the discharger intends to comply with the BMP requirements of the Order in lieu of proposing BMP practices. Permittees must file the NOI by July 1, 2013.

Joint Phase II Co-Permittees or Permittees relying on Separate Implementing Entities must also electronically file an NOI via SMARTS and mail the appropriate fee to the State Water Board, by July 1, 2013.

Census Designated Places (CDPs) are included in Attachment A to clearly show that they are designated Phase II entities. However, CDPs that are located within an urbanized area and within an existing NPDES permit area do not have a government entity and as such, are not required to file separately and pay fees. The Permittee (i.e. a designated county) will name the CDPs within their jurisdiction when they file their NOI via SMARTS.

For fee purposes, in determining the total population served by the MS4, both resident and commuter populations are to be included. For example, publicly operated school complexes including universities and colleges, the total population served would include the sum of the average annual student enrollment plus staff.

For community services districts, the total population served would include the resident population and any non-residents regularly employed in the areas served by the district.

Regulated Small MS4s that fail to obtain coverage under this Order or other NPDES permit for storm water discharges will be in violation of the Clean Water Act and the California Water Code.

The Order includes State and Regional Water Board contact information for questions and submittals.

*Waiver Certification*

This Order allows Regulated Small MS4s to request a waiver of requirements. Regulated Small MS4 must certify (1) their discharges do not cause or contribute to, or have the potential to cause or contribute to a water quality impairment, and (2) they meet one of the following three waiver options:

a. Option 1

   (1) The jurisdiction served by the system is less than 1,000 people;
   (2) The system is not contributing substantially to the pollutant loadings of a physically interconnected regulated MS4; and
   (3) If the small MS4 discharges any pollutants identified as a cause of impairment of any water body to which it discharges, storm water controls are not needed based on waste load allocations that are part of an EPA approved or established TMDL that addresses the pollutant(s) of concern.

b. Option 2

   (1) The jurisdiction served by the system is less than 10,000 people;
   (2) The Regional Water Board has evaluated all waters of the U.S. that receive a discharge from the system;
   (3) The Regional Water Board has determined that storm water BMPs are not needed based on wasteload allocations that are part of an EPA approved or established TMDL that addresses the pollutant(s) of concern or an equivalent analysis; and
   (4) The Regional Water Board has determined that future discharges from the Regulated Small MS4 do not have the potential to result in exceedances of water quality standards.

c. Option 3 (applicable to Small MS4s outside an Urbanized Area only)

   (1) Small Disadvantaged Community – a community with a population of 20,000 or less with an annual median household income (MHI) that is less than 80 percent of the statewide annual MHI (CWC § 79505.5 (a)).

## VIII. POST-CONSTRUCTION STORMWATER MANAGEMENT CRITERIA FOR NEW DEVELOPMENT AND REDEVELOPMENT

This Order incorporates Site Design and Low Impact Development (LID) Runoff requirements for new development and redevelopment. The Order will incorporate runoff retention and hydromodification control criteria in the next permit term that will be keyed to specific watershed processes as identified by the State Water Board within specific Watershed

Management Zones (WMZs). The WMZs will be used to identify applicable areas and appropriate criteria for runoff retention and hydromodification control.

## IX. DISCHARGE PROHIBITIONS

### Storm Water Discharges

This Order authorizes storm water and conditionally exempt non-storm water discharges[14] from the Permittees' MS4s subject to effluent and receiving water limitations. This Order prohibits the discharge of material other than storm water, unless specifically authorized in this Order.

### Non-Storm Water Discharges

Section 402(p)(3)(B)(ii) of the Clean Water Act requires that MS4 permits include a requirement to effectively prohibit non-storm water discharges into the storm sewers. Prohibition B.3 of the Order implements this requirement. Although the Clean Water Act phrases the non-storm water discharge prohibition as a prohibition of discharges "into the storm sewers," this Order states that "discharges *through the MS4* of material other than storm water to waters of the U.S. shall be effectively prohibited." There is no meaningful distinction between the two language iterations as both prohibit discharges from reaching receiving waters and are consistent with the intent of the Clean Water Act. When discussing the effective prohibition of non-storm water discharger, U.S. EPA's preamble to its Phase I regulations uses the term "through" interchangeably with the term "into." (55 Fed. Reg. 47995.) Staff believes that the use of the phrasing "through the MS4 . . . to waters of the U.S." allows the Permittees greater flexibility with regard to utilizing dry weather diversions.

The Phase I regulations at 40 C.F.R. §122.34(b)(3)(iii). specify certain categories of non- storm water discharges that are conditionally exempt from the prohibition and the Order follows this approach. Unless authorized by a separate NPDES permit, non-storm water discharges that are not specifically exempted by this Order are prohibited. Certain enumerated conditionally exempt non-storm water discharges are allowed provided they are not found to be significant source of pollution If a discharger or a Regional Water Board Executive Officer determines that any individual or class of conditionally exempt non-storm water discharge may be a significant source of pollutants, the Regional Water Board may require the discharger to monitor and submit a report and impose BMPs to control the discharge.

### Areas of Special Biological Significance

The State Water Board adopted the California Ocean Plan (Ocean Plan) on July 6, 1972 and revised the Ocean Plan in 1978, 1983, 1988, 1990, 1997, 2000, 2005 and 2009. The Ocean Plan prohibits the discharge of waste to Areas of Special Biological Significance (ASBS). The State Water Board designates ASBS as ocean areas requiring protection of species or biological communities to the extent that alteration of natural water quality is undesirable.

The Ocean Plan states that the State Water Board may grant an exception to Ocean Plan provisions where the State Water Board determines that the exception will not compromise protection of ocean waters for beneficial uses and the public interest will be served.

---

[14] Conditionally exempt non-storm water also refers to authorized non-storm water.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

On October 18, 2004, the State Water Board directed several dischargers to cease the discharge of storm water and nonpoint source waste into ASBS, or request an exception to the Ocean Plan. Several of these dischargers are designated as Regulated Small MS4s.

On March 20, 2012, the State Water Board adopted Resolution 2012-0012 granting an exception from the Ocean Plan prohibition to 13 parties (Attachment D) designated as Regulated Small MS4s under this Order. In order to legally discharge into an ASBS, the parties must comply with the terms of the exception and have an appropriate authorization to discharge. Authorization for point source discharges to ASBS consists of coverage under this NPDES Order.

The parties authorized to discharge under the general exception are listed in Attachment D. The general exception contains "Special Protections" to protect beneficial uses and maintain natural water quality in ASBS. Limited by the special conditions in the resolution, parties listed in Attachment D can legally discharge waste into ASBS as long as the discharges are also regulated under this Order.

This Order incorporates the terms of the exception and includes the monitoring requirements the 13 parties identified as Regulated Small MS4s must comply with.

## X.  EFFLUENT LIMITATIONS

Consistent with Clean Water Act section 402(p)(3)(B)(iii), this Order requires that Permittees implement controls to reduce the discharge of pollutants from their MS4s to waters of the U. S. to the Maximum Extent Practicable (MEP). The MEP standard requires Permittees to apply Best Management Practices (BMPs) that are effective in reducing or eliminating the discharge of pollutants to the waters of the U.S. MEP emphasizes pollutant reduction and source control BMPs to prevent pollutants from entering storm water runoff. MEP may require treatment of the storm water runoff if it contains pollutants. The MEP standard is an ever-evolving, flexible, and advancing concept, which considers technical and economic feasibility. As knowledge about controlling urban runoff continues to evolve, so does that which constitutes MEP. BMP development is a dynamic process and may require changes over time as the Permittees gain experience and/or the state of the science and art progresses. Permittees must conduct and document evaluation and assessment of each relevant element of the program, and of the program as a whole, and revise activities, control measures/BMPs, and measurable goals, as necessary to meet MEP. MEP requires Permittees to choose effective BMPs, and to reject applicable BMPs only where other effective BMPs will serve the same purpose, the BMPs are not technically feasible, or the cost is prohibitive. Further, because local conditions vary, some BMPs may be more effective in one community than in another. MEP is the cumulative result of implementing, evaluating, and creating corresponding changes to a variety of technically appropriate and economically feasible BMPs, ensuring that the most appropriate BMPs are implemented in the most effective manner. Under 40 Code of Federal Regulations section 122.44(k)(2) & (3), the State Water Board may impose BMPs for control of storm water discharges in lieu of numeric effluent limitations.[15]

---

[15] On November 12, 2010, U.S. EPA issued a revision to a November 22, 2002, memorandum in which it had "affirm[ed] the appropriateness of an iterative, adaptive management best management practices (BMP) approach" for improving storm water management over time. In the revisions, U.S. EPA recommended that, in the case the permitting authority

Page 20

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

In 2004, the State Water Board assembled a blue ribbon panel to address the feasibility of including numeric effluent limits as part of NPDES municipal, industrial, and construction storm water permits. The panel issued a report dated June 19, 2006, which included recommendations as to the feasibility of including numeric limits in storm water permits, how such limits should be established, and what data should be required.

The report concluded that "It is not feasible at this time to set enforceable numeric effluent criteria for municipal BMPs and in particular urban discharges. However, it is possible to select and design them much more rigorously with respect to the physical, chemical and/or biological processes that take place within them, providing more confidence that the estimated mean concentrations of constituents in the effluents will be close to the design target."

Consistent with the federal regulations, the findings of the Blue Ribbon Panel, and precedential State Water Board orders (State Water Board Orders Nos. WQ 91-03 and WQ 91-04), this Order allows the Permittees to implement BMPs to comply with the requirements of the Order.

## XI.  RECEIVING WATER LIMITATIONS

Under federal law, an MS4 permit must include "controls to reduce the discharge of pollutants to the maximum extent practicable . . . and such other provisions as . . . the State determines appropriate for the control of such pollutants." (Clean Water Act §402(p)(3)(B)(iii).) Consistent with this provision, requirements to meet water quality standards are at the discretion of the permitting agency. (*Defenders of Wildlife v. Browner* (9th Cir. 1999) 191 F3d 1159.)

The State Water Board has previously determined that limitations necessary to meet water quality standards are appropriate for the control of pollutants discharged by MS4s and must be included in MS4 permits. (State Water Board Orders WQ 91-03, 98-01, 99- 05, 2001-15).). This Order accordingly prohibits discharges that cause or contribute to violations of water quality standards. Consistent with federal law, the State Water Board has also found it appropriate to require implementation of BMPs in lieu of numeric water quality-based effluent limitations and further, in lieu of "strict compliance" with water quality standards, has prescribed an iterative process of BMP improvement to achieve water quality standards. (State Water Board Orders WQ 91-03, 98-01, 2001-15; 40 C.F.R. §122.44(k).) As a result, this Order further sets out that, upon determination that a Permittee is causing or contributing to an exceedance of applicable water quality standards, the Permittee must engage in an iterative process of proposing and implementing additional control measures to prevent or reduce the pollutants causing or contributing to the exceedance. This iterative process is modeled on receiving water limitations set out in State Water Board precedential Order WQ 99-05 and required by that Order to be included in all municipal storm water permits.

---

determines that MS4 discharges have the reasonable potential to cause or contribute to a water quality excursion, the permitting authority, where feasible, include numeric effluent limitations as necessary to meet water quality standards. However, the revisions recognized that the permitting authority's decision as to how to express water quality based effluent limitations (WQBELs), i.e. as numeric effluent limitations or BMPs, would be based on an analysis of the specific facts and circumstances surrounding the permit. U.S. EPA has since invited comment on the 2010 memorandum and will be making a determination as to whether to "either retain the memorandum without change, to reissue it with revisions, or to withdraw it." http://www.epa.gov/npdes/pubs/sw_tmdlwla_comments_pdf

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The Water Boards have generally directed dischargers to achieve compliance with water quality standards by improving control measures through the iterative process and, as a matter of practice, have generally declined to initiate enforcement actions against MS4 permittees who have been actively engaged in the iterative process. At the same time, however, the Water Boards have maintained that the iterative process does not provide a "safe harbor" to MS4 permittees:[16] that is, when a discharger is shown to be causing or contributing to an exceedance of water quality standards, that discharger is in violation of the relevant discharge prohibitions and receiving water limitations of the permit and potentially subject to enforcement by the Water Boards or through a citizen suit, even if the discharger is actively engaged in the iterative process.

The question of the "safe harbor" became a priority concern for storm water dischargers following the Ninth Circuit's holding in *Natural Resources Defense Council, Inc. v. County of Los Angeles* (2011) 673 F.3d 880 that engagement in the iterative process does not provide a safe harbor from liability for violations of permit terms prohibiting exceedances of water quality standards. Although the U.S. Supreme Court has reversed the judgment of the Ninth Circuit and remanded (on grounds unrelated to the "safe harbor" holding), *LA County Flood Control District v. NRDC* (2013) 568 U.S., the receiving water limitations provisions is expected to remain a significant issue for dischargers based on the position, to date, of the Water Boards that the iterative process does not provide a "safe harbor" from violations. The State Water Board has received multiple comments, from dischargers and from other interested parties, expressing confusion and concern about the Order provisions regarding receiving water limitations and the iterative process. Many commenters have stated that the provisions as currently written do not provide the dischargers with a viable path to compliance with the proposed Order. Other commenters, including environmental parties, support the current language.

As stated above, the provisions in this Order regarding receiving water limitations and the iterative process are based on precedential Board orders. Accordingly, substantially identical provisions are found in the adopted Caltrans MS4 NPDES permit, as well as the Phase I NPDES permits issued by the Regional Water Boards. Because of the broad applicability of any policy decisions regarding the receiving water limitations and iterative process provisions, the State Water Board held a public workshop on November 20, 2012, to consider this issue and seek public input.

Rather than delay consideration of adoption of the tentative Order in anticipation of any future changes to the receiving water limitations and iterative process provisions that may result from the public workshop and deliberation, the Board has added a specific reopener clause at Section H to facilitate any future revisions as necessary.

## XII.  STORM WATER MANAGEMENT PROGRAM FOR TRADITIONAL MS4S PROGRAM ELEMENTS

### Program Management

This component is essential to ensure timely implementation of all elements of the storm water program and consistency with the Order requirements. Lessons learned in California from

---

[16] *Building Industry Assn. of San Diego County v. State Water Resources Control Bd*. (2004) 124 Cal.App.4th 866; *City of Rancho Cucamonga v. Regional Water Quality Control Bd*. (2006) 135 Cal.App.4th 1377.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Phase I Permittees and various municipal audits are that a Program Management element can:

1. Identify departments that assist with the implementation of the program as well as their roles and responsibilities; and
2. Maintain and enforce adequate legal authority to control pollutant discharges.

*Adequate Legal Authority and Certification*

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. §§ 122.22(b), 122.34(b)(3)(ii)(B), (b)(4)(ii)(A), and (b)(5)(ii)(B); 122.41(k). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA, EPA-833-R-07-003

Adequate legal authority is required for Permittees to implement and enforce their storm water programs. Without adequate legal authority, Permittees would be unable to perform many vital program elements such as performing inspections and requiring installation of control measures. In addition, Permittees would not be able to conduct enforcement activities, assess penalties and/or recover costs of remediation.

*Enforcement Response Plan*

Legal Authority: Clean Water Act §402(p)(3)(b); MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA, EPA-833-R-07-003

In ordinances or other regulatory mechanisms, Permittees are required to include penalty provisions to (1) ensure compliance with construction and industrial requirements, (2) to require the removal of illicit discharges, and (3) to address noncompliance with post-construction requirements. To meet these requirements, this Order requires enforcement responses that vary with the type of permit violation, and escalate if violations are repeated or not corrected. The Permittee must develop and implement an Enforcement Response Plan (ERP), which clearly describes the action to be taken for common violations associated with the construction program, illicit discharge detection and elimination, or other program elements. A well-written ERP provides guidance to inspectors on the different enforcement responses available, actions to address general permit non-filers, when and how to refer violators to the State, and how to track enforcement actions.

**Education and Outreach on Storm Water Impacts**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(1); MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA , EPA-833-R-07-003; U.S. EPA Stormwater Phase II Final Rule Fact Sheet Series, U.S. EPA Stormwater Phase II Final Rule (64 FR 68722), EPA National Menu of Best Management Practices for Stormwater Phase II[17]; Measurable Goals Guidance for Phase II Small MS4s; U.S. EPA Getting In Step

Without a focused and comprehensive program, outreach and education efforts will be poorly coordinated and ineffective. This Order requires Permittees to develop an education and outreach program that is tailored and targeted to specific water quality issues of concern in the community. These community-wide and targeted issues should then guide the development of the comprehensive outreach program, including the creation of appropriate messages and

---

[17] http://cfpub.epa.gov/npdes/stormwater/menuofbmps/

educational materials. Outreach and education not only includes the public as the target audience, but includes Permittee staff and construction site operators as well.

This Order includes a different compliance path that, upon determination by a Regional Board Executive Officer, requires the possible implementation of Community-Based Social Marketing (CBSM). CBSM is a systematic way to change the behavior of communities to reduce their impact on the environment. Simply providing information is usually not sufficient to initiate behavior change. CBSM uses tools and findings from social psychology to discover the perceived barriers to behavior change and ways of overcoming these barriers.[18]

CBSM is also cited in EPA's Getting in Step[19] outreach guide which includes successful CBSM case studies. The CBSM path is included in Attachment E.

To ensure effective implementation of CBSM principles, Regional Water Boards who have invoked Attachment E, CBSM Requirements, are encouraged to consult with Permittees to ensure CBSM principles are implemented adequately. Regional Board staff should use the first year annual report and effectiveness assessment information during the consultation. The information gained from the consultation should assist the Regional Water Board's evaluation of program effectiveness and whether a Permittee should continue implementation of Attachment E.

In addition to external public outreach, outreach and education efforts should also be directed internally at Permittee staff who, as part of their normal job responsibilities, participate in storm water program operations such as illicit discharge detection and elimination, construction, and pollution prevention and good housekeeping. The training program will ensure proper illicit discharge and illicit connection identification, reporting and response. The construction training program will ensure that Permittee staff who is responsible for construction storm water program implementation receive adequate training. Additionally, the Permittee must develop educational materials and training for construction site operators to ensure program compliance. Construction operators must be educated about site requirements for control measures, local storm water requirements, enforcement activities, and penalties for non-compliance. Permittee staff training in pollution prevention/good housekeeping will ensure the incorporation of pollution prevention/good housekeeping techniques into Permittee operations.

A comprehensive and cohesive outreach and education program will likely be effective and well-coordinated if it involves the public, storm water program staff, and construction site operators.

This Order includes a list of potential residential and commercial pollution sources, but the Permittee may also identify other sources that contribute significant pollutant loads to the MS4. The Order identifies specific pollutant generating activities that must be addressed, including organized car washes, mobile cleaning and power washing operations, and landscape over-irrigation.

---

[18] A variation of social marketing, referred to as CBSM by Canadian environmental psychologist Doug McKenzie- Mohr

[19] Getting in Step, 3rd Edition, A Guide to Watershed Outreach Campaigns, November 2010 EPA 841-B-10-002

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The Permittee is encouraged to use existing public educational materials in its program. The Permittee is also encouraged to leverage resources with other agencies and municipalities with similar public education goals.

In addition, this Order requires storm water education for school-age children. The United States suffers from a "nature deficit disorder" as discussed in popular literature (e.g., "Last Child in the Woods" by Richard Louv) and elsewhere (American Fisheries Society "Fisheries" magazine, available online at www.fisheries.org). As discussed in the "America's Great Outdoors: A Promise to Future Generations" report, in order to make environmental stewardship and conservation relevant to young Americans, environmental and place-based, experiential learning must be integrated into school curricula and school facility management across the country.[20] If a program such as Splash (www.sacsplash.org/ ),Effie Yeaw Nature Center (www.sacnature.net) or Yolo Basin (www. Yolobasin.org) does not exist, Permittees are encouraged to use California's Education and Environment Initiative Curriculum (EEI)[21] or equivalent. California's landmark EEI Curriculum is a national model designed to help prepare today's students to become future scientists, economists, and green technology leaders.

The K-12th grade curriculum is comprised of 85 units teaching select Science and History-Social Science academic standards. Each EEI Curriculum unit teaches these standards to mastery using a unique set of California Environmental Principles and Concepts. The EEI curriculum was created to bring education about the environment into the primary and secondary classrooms of more than 1,000 school districts serving over 6 million students throughout California.

Classroom education plays an integral role in any storm water pollution outreach program. Providing storm water education through schools conveys the message not only to students but to their parents. Permittees should partner with educators and experts to develop storm water-related programs for the classroom. These lessons need not be elaborate or expensive to be effective.

The Permittees' role is to support a school district's storm water education efforts, not to dictate what programs and materials the school should use. Permittees should work with school officials to identify their needs. For example, if the schools request storm water outreach materials, Permittees can provide a range of educational aids, from simple photocopied handouts, overheads, posters and slide shows, to more costly and elaborate working models and displays.

The principal goal of any public education and outreach effort is to change awareness and knowledge. The advanced level public education and outreach effort goes a step further in pursuit of changing behavior. The Permittee should develop a process to assess its public education and outreach programs and to determine necessary improvements to raise public awareness and knowledge. The Permittee is encouraged to use a variety of assessment methods to evaluate the effectiveness of different public education activities. The first evaluation assessment must be conducted before the final year of the Permittee's coverage under this permit, before the next permit is issued. Permittees should coordinate their evaluation assessment with other Permittees on a regional level to determine how best to get

---

[20] http://americasgreatoutdoors.gov/files/2011/02/AGO-Report-With-All-Appendices-3-1-11.pdf
[21] http://www.californiaeei.org/

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

the regional message out and how to facilitate awareness, knowledge and ultimately, behavior changes.

**Public Involvement/Participation**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(2). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Storm water management programs can be greatly improved by involving the community throughout the entire process of developing and implementing the program. Involving the public benefits both the Permittee as well as the community. By listening to public concerns and coming up with solutions together, the Permittee stands to gain public support and the community should become invested in the program. The Permittees will likewise gain more insight into the most effective ways to communicate their messages.

This Order requires the development of a public involvement strategy, which may include a citizen advisory group or process to solicit feedback on the storm water program, and opportunities for citizens to participate in implementation of the storm water program. If a citizen advisory group is developed, the group should meet with the local land use planners and provide input on land use code or ordinance updates so that land use requirements incorporate provisions for better management of storm water runoff and watershed protection. Public participation in implementation of the storm water program can include many different activities such as stream clean-ups, storm drain markings, volunteer monitoring, and participation in integrated regional water management and watershed planning efforts.

Permittees are encouraged to work together with other entities that have an impact on storm water (for example, schools, homeowner associations, Department of Transportation agencies, other MS4s). Permittees are also encouraged to work through existing advisory groups, community groups or processes in order to implement these public involvement requirements.

**Illicit Discharge Detection and Elimination**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(3). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Studies have shown that dry weather flows from the storm drain system may contribute a larger amount of some pollutants than wet weather storm water flows.[22] Detecting and eliminating these illicit discharges involves complex detective work, which makes it hard

to establish a rigid prescription to identify and correct all illicit connections. There is no single approach to take, but rather a variety of ways to get from detection to elimination. Local knowledge and available resources can play significant roles in determining which path to take. At the very least, communities need to systematically understand and characterize their stream, conveyance, and storm sewer infrastructure systems. Illicit discharges need to be identified and eliminated. The process is ongoing and the effectiveness of a program should improve with time. A well-coordinated IDDE programs can benefit from and contribute to other

---

[22] Evaluation of Non-Storm water Discharges to California Storm Drains and Potential Policies for Effective Prohibition. California Regional Water Quality Control Board. Los Angeles, CA., Duke, L.R. 1997., Results of the Nationwide Urban Runoff Program. Water Planning Division, PB 84-185552, Washington, D.C. U.S. EPA. 1983.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

community-wide water resources- based programs such as public education, storm water management, stream restoration, and pollution prevention.[23]

This Order requires the Permittees to address illicit discharges into the MS4. An illicit discharge is defined as any discharge to a municipal separate storm sewer system that is not composed entirely of storm water, except allowable discharges pursuant to an NPDES permit (40 C.F.R. 122.34(b)(3)).[24] This Order includes requirements that the Permittee have the legal authority to effectively prohibit non-storm water discharges from entering storm sewers as well as provisions requiring the development of a comprehensive, proactive IDDE program.

Specifically, this Order requires the development of a map that includes outfalls operated by the Permittee within the urbanized area. The map will also include identification of receiving water bodies, priority areas (i.e. areas with a history of past illicit discharges), and the permit boundary.

It is essential for Permittees to understand their stream and storm sewer systems and how illicit discharge sources are connected to outfalls that discharge to their system. To that end, this Order requires the development of an inventory that identifies potential illicit discharge sources and facilities. To proactively identify illicit discharges originating from priority inventoried sources, it is essential that an assessment is conducted at least once over the permit term. The assessment may include field observations, field screening, inspections and any other appropriate and effective survey methods that proactively identify potential illicit discharges. As an alternative, the Permittee may require a self-certification program that all appropriate BMPs are in place to prevent illicit discharges from the inventoried source or facility.

Further, a once per permit term survey of outfalls will identify outfalls needing sampling and possible follow-up actions[25]. The outfall inventory will also assist Permittees in the identification of "problem" outfalls, or those outfalls that may have a history of past illicit discharges. The inventory can be utilized to conduct source investigations and corrective actions for potential illicit discharges into their system.

Additionally, dry weather sampling must be conducted in each subsequent year of the permit term for outfalls identified as priority areas. While the Order specifies indicator parameters used to detect illicit discharges, the Permittee may select alternative parameters to sample that are based on local pollutants of concern. Similarly, the action level concentrations for the indicator parameters may also be tailored to match the parameters selected based on local knowledge. Finally, the outfall inventory will assist Permittees in clearly understanding the stream system and the storm sewer system within their jurisdiction.

The Permittee shall provide a mechanism for public reporting of illicit discharges and spills.

---

[23] Illicit Discharge Detection and Elimination A Guidance Manual for Program Development and Technical Assessments, CWP and Pitt, 2006

[24] Non-point source return flows from irrigated agriculture are not considered illicit discharges.

[25] The Permittee may utilize existing forms such as the CWP Outfall Reconnaissance Inventory/Sample Collection Field Sheet (http://cfpub.epa.gov/npdes/stormwater/idde.cfm) while conducting the mapping inventory and Field Sampling as specified below, in Section E.9.c.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Construction Site Storm Water Runoff Control**
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(4). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Permittees must implement a construction site storm water runoff management program that includes an enforceable ordinance or other regulatory mechanism with commonly understood and legally binding definitions. These terms should be defined consistently across other related guidance and regulatory documents. The construction site storm water runoff management program is designed to prevent pollutants associated with construction activity from entering receiving water bodies (i.e. sediment, fertilizers, pesticides, paints, solvents and/or fuels).

The Permittee must ensure that construction site operators select and implement appropriate construction site storm water runoff management measures to reduce or eliminate impacts to receiving waters. The Permittee is required to utilize California Stormwater Quality Association's (CASQA) Construction BMP handbook or equivalent to help guide their Construction Program). In the case that a project proponent is not implementing appropriate measures to reduce or eliminate impacts to receiving waters (i.e. ineffective BMPs installed), the Permittee must take appropriate enforcement action to address the problem. Enforcement may include verbal warnings, written notices and escalated enforcement measures as described in the Enforcement Response Plan (Section E.6.c. of the Order).

While the construction site storm water runoff management program focuses the Permittee's detailed inspections on projects less than one acre, Permittees must use their discretion to provide oversight to projects that are subject to the CGP that pose a threat to water quality. For example, in the case that a Permittee identifies a project subject to the CGP that has BMPs that have not been maintained, the Permittee should notify the local Regional Water Board. Priority project sites include: sites with 5 acres or more of soil disturbance, sites with one acre or more soil disturbance that discharge to a tributary listed as impaired water for sediment or turbidity under the CWA Section 303(d), and other sites with one acre or more of soil disturbance determined by the Permittee or State or Regional Water Quality Control Board to be a significant threat to water quality.

**Pollution Prevention/Good Housekeeping for Permittee Operations**
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(6)

Permittees are required to develop a program to:

a. Prevent or reduce the amount of storm water pollution generated by permittee operations.
b. Train employees on how to incorporate pollution prevention/good housekeeping techniques into permittee operations.
c. Identify appropriate control measures and measurable goals for preventing or reducing the amount of storm water pollution generated by permittee operations.

Permittees must first assess the areas and municipal facilities that it controls, determine which activities may currently have a negative impact on water quality, and find solutions for any problems. The simplest solution is to limit the number of activities that are conducted outside and exposed to storm water.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## Storm Drain System Maintenance

Storm drain systems need maintenance to ensure that structures within the storm drain system that are meant to reduce pollutants do not become sources of pollution. Maintenance of catch basins and storm sewers will prevent the accumulation of pollutants that are later released during rain events as well as blockages, backups, and flooding. Most Permittees have an existing program to maintain the storm sewer infrastructure. Some of these programs have tended to focus on flood control and complaint response rather than reducing water quality impacts from storm water discharges.

This Order requires that the system be maintained to prevent the discharge of pollutants into receiving waters. To achieve this, the storm sewer system must be mapped and a program of regular maintenance established. The Permittee must establish a tiered maintenance schedule for the entire storm sewer system area, with the highest priority areas being maintained at the greatest frequency. Priorities are driven by water quality concerns and can be based on the land use within the watershed, the condition of the receiving water, the amount and type of material that typically accumulates in an area, or other location-specific factors. The Permittee also must use spill and illicit discharge data to track areas that may require immediate sewer infrastructure maintenance. Any waste that is collected must be disposed of in a responsible manner.

All storm sewer system maintenance procedures should be documented in the Permittee's standard operating procedures (SOPs) or similar type of documents. All staff should be trained on these SOPs. Maintenance activities should be documented and, where possible, quantified (e.g., number and location of inspections and clean- outs, type and quantity of materials removed). Characterization of the quantity, location, and composition of pollutants removed from catch basins can be used to assess the program's overall effectiveness, identify illicit discharges, and help the Permittee better prioritize implementation activities in the future.

## Pollutant Generating Activities

This Order contains specific requirements and recommendations related to pollutant-generating activities such as discouraging conventional landscaping practices (including the application of pesticides, herbicides, and fertilizer) and operating and maintaining public streets.

Resource-sensitive landscaping practices such as integrated pest management (IPM), climate appropriate plant selection and irrigation, and mechanical (non-chemical) removal of unwanted plants are required under this Order. The use of other landscaping practices, such as mulch and compost, minimizing chemical inputs (pesticides, herbicides, and fertilizer), emphasis on maintaining and enhancing soil quality, and erosion control is required. The Order recognizes the storm water quality benefits that will likely result from implementation of the Water Efficient Landscape Ordinance required under AB 1881.

## Flood Management Projects

The Order requires that water quality be considered when designing new and upgraded flood management projects. The focus of storm water management in the past has been to control flooding and mitigate property damage, with less emphasis on water quality protection. These structures may handle a significant amount of storm water and therefore offer an opportunity to modify their design to include water quality features for less than the cost of building new controls. This requirement applies to new and upgraded flood control projects.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

*Municipally-owned or operated facilities*

Municipally-owned or operated facilities often serve as the focal point of activity for municipal staff from different departments. Some municipalities have one facility at which all activities take place (e.g., the municipal maintenance yard), while others may have several specialized facilities. A comprehensive inventory and map of facilities will help Permittee staff build a better awareness of facility locations within the MS4 and their potential to contribute storm water pollutants. The facility inventory will also serve as a basis for scheduling periodic facility assessments and developing, where necessary, facility storm water pollution prevention plans.

The best way to avoid pollutant discharges is to keep precipitation and runoff from coming into contact with potential pollutants. For example, the Permittee should cover or build berms around stockpiles, create dedicated structures for stored materials, and maintain a minimum distance between stockpiles and storm water infrastructure and receiving waters.

*Inspections*

This Order requires comprehensive quarterly site inspections which is an appropriate frequency to ensure that material stockpiles that might be moved or utilized on a seasonal basis are protected from precipitation and runoff. Also, quarterly inspections will allow inspectors to observe different types of operations that occur at different times of the year (e.g., landscape maintenance crews are less active in the winter). Quarterly visual observations are required so that inspectors can see in real time the qualitative nature of the storm water discharge so that corrective action can be taken where necessary to improve on-site storm water controls.

This Order also specifies documentation requirements of inspection procedures and results, including inspection logs for each facility to ensure that the site inspections are consistent and that maintenance of storm water controls remains part of the municipality's standard operating procedures. The requirement for an inspection log will allow the Regional Water Boards to verify that periodic site inspections have been performed.

*Storm Sewer System Maintenance*

Fine particles and pollutants from run-off, run-on, atmospheric deposition, vehicle emissions, breakup of street surface materials, littering, and sanding (for improving traction in snow and ice) can accumulate in the gutters between rainfall events. Storm drain maintenance is often the last opportunity to remove pollutants before they enter the environment. Because storm drain systems effectively trap solids, they need to be cleaned periodically to prevent those materials from being picked up during high flow storm events.

Some catch basins will accumulate pollutants faster than others due to the nature of the drainage area and whether controls are present upstream of the catch basin. A priority ranking system is required for catch basins so that municipal resources are directed to the areas and structures that generate the most pollutants. Catch basins with the highest accumulations will need to be cleaned more frequently than those with low accumulations. The Order also includes a requirement that triggers catch basin cleaning when a catch basin is one-third full.[26]

Proper storm drain system cleanout includes vacuuming or manually removing debris from catch basins; vacuuming or flushing pipes to increase capacity and remove clogs; removing

---

[26] Note: This requirement was eliminated from the Final Order as adopted on February 5, 2013.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

sediment, debris, and overgrown vegetation from open channels; and repairing structures to ensure the integrity of the drainage system. It is important to conduct regular inspections of all storm sewer infrastructure and perform maintenance as necessary. Though these activities are intended to ensure that the storm drain system is properly maintained and that any accumulated pollutants are removed prior to discharge, if not properly executed, cleanout activities can result in pollutant discharges. The Permittee should carefully evaluate maintenance practices to minimize unintended pollutant discharges, such as flushing storm drains without capturing the discharge.

Materials removed from catch basins must not be allowed to reenter the MS4. If necessary, the material can be dewatered in a contained area and the water treated with an appropriate and approved control measure or discharged to the sanitary sewer. The solid material must be disposed of properly to avoid discharge during a storm event. Some materials removed from storm drains and open channels may require special handling and disposal, and may not be suitable for disposal in a landfill.

*Green waste on the streets*[27]
For some Traditional MS4 Permittees, residents are allowed to deposit non- containerized green waste (lawn and garden clippings) onto the street for weekly collection by the municipal staff. Permittees instruct residents to put the green waste out right before collection and to avoid putting it in gutters or near storm drains. However, green waste on the street is a potential illicit discharge and maintenance concern.[28] This Order prohibits green waste on the streets. Permittees must find additional ways to educate residents on the potential problems this practice can cause or to find alternatives to the current practice.

*Street Sweeping and Cleaning Streets*
Street sweeping and cleaning streets and parking lots is a practice that most municipalities initially conducted for aesthetic purposes or air quality benefit. However, the water quality benefits are now widely recognized. As a result, many California MS4 permits require some sort of street sweeping provision that require the MS4 to prioritize streets as high, medium, and low pollutant-generators and base the cleaning schedule appropriately.

This Order does not include street sweeping and cleaning streets as a permit requirement because MS4s already conduct these activities for aesthetics and air quality benefit. Permittees should count street sweeping not as a storm water compliance cost, but an aesthetic and air quality cost.

*Third-party contractors*
Third-party contractors conducting municipal maintenance activities must be held to the same standards as the Permittee. These expectations are required to be defined in contracts between the Permittee and its contractors; however, the Permittee is responsible for ensuring, through contractually-required documentation or periodic site visits, that contractors are using storm water controls and following standard operating procedures.

---

[27] Note: This requirement was eliminated form the Final Order as adopted on February 5, 2013.
[28] Program Evaluation Report, Sacramento Area Stormwater Program, NPDES Permit No. CA0082597, May 21, 2002, USEPA and Tetra Tech Inc.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Post Construction Storm Water Management for New Development and Re-development**
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(5). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; U.S. EPA Incorporating Environmentally Sensitive Development into Municipal Stormwater Programs, EPA 833-F-07-011

In California, urban storm water is listed as the primary source of impairment for ten percent of all rivers, ten percent of all lakes and reservoirs, and 17 percent of all estuaries (2010 Integrated Report). Although these numbers may seem low, urban areas cover just six percent of the land mass of California[29], and so their influence is disproportionately large. Urbanization causes a number of changes in the landscape, including increased loads of chemical pollutants; increased toxicity; changes to flow magnitude, frequency, and seasonality of various discharges; physical changes to stream, lake, or wetland habitats; changes in the energy dynamics of food webs, sunlight, and temperature; and biotic interactions between native and exotic species.[30] These impacts are also referred to as "urban stream syndrome [31]. In addition to surface water impacts, urbanization can alter the amount and quality of storm water that infiltrates and recharges groundwater aquifers. In essence, once watershed processes are disturbed, receiving water conditions also become disturbed, (Figure 1)

In California and the rest of the United States, the challenge to storm water managers and regulators has been to establish goals and performance standards that account for the highly variable nature of urban flow and pollutant inputs while ensuring that the ultimate biological response is within "acceptable" limits. The Surface Water Ambient Monitoring Program (SWAMP) is attempting to define biological responses through their Biological Objectives Development Process. Although final results and policy recommendations from this effort are not yet available, linking urbanization drivers to biological response represents the next phase in storm water management and cannot be delayed.[32]

---

[29] U.S. Department of Agriculture, 2009

[30] Urban Storm Water Management in the United States, National Research Council, 2008.

[31] Walsh, C.J., A.H.Roy, J.W. Feminella, P.D. Cottingham, P.M. Groffman, and R.P. Morgan. 2005. The urban stream syndrome: current knowledge and the search for a cure. J. N. Am. Benthol. Soc. 24(3):706–723.

[32] Urban Storm Water Management in the United States, National Research Council, 2008.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Figure 1 – Relationship between Physical Landscape, Watershed Processes, and Receiving Water Condition**



IN AN UNDISTURBED ("INTACT") LANDSCAPE:

The Physical Landscape →
            Watershed Processes →
                        Receiving Water Conditions


IN A DISTURBED (SPECIFICALLY, URBANIZED) LANDSCAPE:

The Physical Landscape →
            Disturbance →
                        Disturbed Watershed Processes →
                                    Disturbed Receiving Water Conditions

The Water Boards have historically derived site design, runoff reduction and hydromodification control criteria without identifying the dominant watershed processes and the sensitivity of receiving waterbodies to degradation of those processes. In most MS4 permits, projects are subject to the same set of criteria regardless of the dominant watershed processes and the sensitivity of receiving waters to degradation of those processes. In reality, every location on the landscape does not require the same set of control criteria because of intrinsic differences in the dominant watershed processes at each location and sensitivity of receiving waters to degradation of those processes. In recognizing this, the State Water Board is developing criteria that are more protective of receiving water quality.

The existing General Permit requires post-construction controls for areas of high growth or areas with a population greater than 50,000. These requirements are contained in Attachment 4 of Order 2003-0005-DWQ and include matching pre-development peak discharge rates, conserving natural areas, minimizing storm water pollutants of concern, protecting slopes and channels, and designing volumetric and flow through treatment measures to handle a specific volume or flow rate. These requirements represented an initial attempt at establishing performance standards that account for hydrological and geomorphological processes (Figure 1). Recent research has yielded new information on complex watershed process interactions. For example, storm water management techniques that are intended to mimic natural hydrologic functions (e.g., low impact development) can protect key hydrologic processes such as surface and base flow, and groundwater recharge. Additionally, there is increasing awareness that, while site- based requirements are important to reduce impacts from urbanization, a site-based approach alone is unable to achieve a broader set of watershed goals, especially given the State Water Board's interest in regional issues such as water reuse, groundwater management, and maintaining instream flows. Consequently, a better understanding of watershed conditions and processes has become increasingly important in the development of MS4 permits.

This Order has specific site design and LID requirements for all projects. The LID requirements emphasize landscape-based site design features that are already required elsewhere (e.g., the Water Efficient Landscape Ordinance required under AB 1881).

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

_Hydromodification Requirements_

This Order also incorporates a baseline peak flow matching requirement for hydromodification control. During this permit term, the State Board will work towards developing runoff retention and hydromodification control criteria that are keyed to watershed processes (See discussion in Section VIII.) Watershed management zones[33] will be delineated by the State Board during this permit term. The watershed management zones will be used to identify applicable areas and to determine appropriate criteria for runoff retention and hydromodification control. Watershed process based runoff retention and hydromodification criteria will be incorporated into the next permit. Through the development of hydromodification measures based on watershed management zones, key watershed processes will be protected, and where degraded, restored. As a result of restored and maintained watersheds, key relationships between hydrology, channel geomorphology and biological health will be created and maintained and water quality/beneficial uses protected.

The State Water Board's efforts in developing runoff retention and hydromodification control criteria keyed to watershed processes can be significantly informed by similar efforts carried out regionally under the Regional Water Boards. This Order provides at Provision E.12.k (also referenced in F.5.g.) that Small MS4s shall comply with any post- construction storm water management requirements based on a watershed process approach developed by Regional Water Boards in lieu of the post-construction requirements of E.12 (also referenced in F.5.g.). The regional watershed process- based approach must be approved by the Regional Water Board following a public process and must include the following:

- Completion of a comprehensive assessment of dominant watershed processes affected by urban storm water
- LID site design and runoff reduction measures, numeric runoff treatment and retention controls, and hydromodification controls that will maintain watershed processes and protect water quality and beneficial uses.
- A process by which Regional Board staff will actively engage Permittees to adaptively manage requirements as determined by the assessment of watershed processes.
- An annual reporting program that involves Regional Board staff and State Board staff to inform statewide watershed process based criteria.

A watershed process-based approach is already being used for Phase II MS4s that participated in the Central Coast Joint Effort for developing hydromodification control criteria. By Resolution No. R3-2012-0025 dated September 6, 2012, the Central Coast Water Board approved modifications to the SWMPs of MS4s participating in the Joint Effort. These modifications would incorporate the Central Coast-Specific Post- Construction Requirements into the SWMPs. Several petitions are currently pending before the State Water Board challenging the Resolution. In the November 16, 2012, draft of this Order, the requirements developed in the Joint Effort were proposed to be adopted into the Order as Attachment J. After receiving extensive public comment on Attachment J, the State Water Board determined that, while the Board continues to support a watershed process-based approach to hydromodification requirements, the Joint Effort process should be allowed to evolve and

[33] A Watershed Management Zone (WMZ) is a combination of a Physical Landscape Zone (PLZ, based on surficial geology and slope) and direct receiving water type. Key watershed processes potentially impacted by urbanization (e.g., infiltration and groundwater recharge) are derived from each PLZ-receiving water combination.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

proceed, without incorporation into this Order, to address several unresolved issues acknowledged by the parties to that process, including the Regional Water Board.

Under Provisions E.12.k (also referenced in F.5.g), the Central Coast Region Small MS4s will be required to implement watershed process-based requirements developed through the Joint Effort only after those requirements have been reconsidered and approved by the Central Coast Water Board. Because the requirements cannot be imposed through existing Resolution No. R3-2012- 0025 (which operated as an update to SWMPs that are no longer required under this Order), the State Water Board expects the pending petitions on that Resolution to be moot as of adoption of this Order. As part of the petition process, the State Water Board will evaluate whether the entirety of the petitions are moot following adoption of the Order. However, any future action by a Regional Water Board, including the Central Coast Water Board, to adopt a regional watershed process-based approach would be subject to petitions for review by the State Water Board.

*Multiple-benefits Projects*

This Order encourages and allows for multiple-benefits projects at various scales. At the development site scale, multiple-benefit site design measures are required for all projects that create and/or replace more than 2,500 square feet of impervious surface. Designers are able to quantify runoff reduction using a site design runoff calculator in SMARTS for site design measures (e.g., trees, stream setbacks and buffers, and soil quality improvement). The site design measures in this Order all have multiple benefits (e.g., shading from trees, wildlife habitat from stream setbacks and buffers, less need for pesticides and irrigation from soil quality improvement) in addition to storm water runoff and pollutant load reduction. At the site and local scale, smart growth projects that utilize density, design and land use strategically to achieve multiple benefits including environmental, economic and social benefits are encouraged. For example, high density development contributes to less impervious surface than low density development, generally resulting in less vehicle-related emissions and pollutants (e.g., heavy metals, oil and grease, fine sediment), improved water and air quality results, thus, achieving environmental benefits. The clustering of populations through high density development essentially substitutes evaluation of individual site design criteria for evaluation of per capita loading (Jacob and Lopez 2009[34]). As such, Permittees may implement an alternative approach to requirements for bioretention measures if they can effectively demonstrate a reduction in runoff volume per capita. In other words, alternative compliance may be achieved through the implementation of high density development, or smart growth projects.

Section E.12.l gives "credit" and creates incentive for Permittees to identify and implement watershed scale projects that achieve multiple-benefits. When evaluating watershed-scale, multiple-benefits projects, environmental, social, technical, economic, and political considerations can become intertwined to the point of intractability. These criteria need to be systematically examined through an organizing framework for rational analysis and alternative comparison. A Multi-Criterion Decision Analysis (MCDA) approach provides a flexible, rational, and transparent means to establish decision- making criteria and prioritize alternatives, assuring that projects achieve the desired multiple-benefit outcomes. Watershed scale

---

[34] Jacob, John S. and Lopez, Ricardo. Is Denser Greener? An Evaluation of Higher Density Development as an Urban Stormwater-Quality Best Management Practice. Journal of the American Water Resources Association. June 2009: 45:3: 687 – 701.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

multiple-benefit projects include projects that address water quality, water supply, flood control, habitat enhancement, open space preservation, recreation, and climate change.

Once these projects are identified under Watershed Improvement Plans (Water Code §16100 et seq.), through an IRWMP process, or as part of an overall green infrastructure effort, the Permittee may impose requirements and create incentives on the site, local, and watershed scale to ensure project success.

*Post-Construction BMP Condition Assessment*
Permittees must understand how their actions reduce the discharge of pollutants to receiving waters. This is accomplished through an assessment of the performance of the Permittees BMPs, especially structural practices designed for specific pollutant/flow reductions. Only Renewal Permittees were required to install structural post- construction BMPs in the existing permit term. However, during MS4 audits by State and Regional Water Board staff, many of those BMP locations were unknown and not maintained causing water quality threats. In this Order, only Renewal Permittees are asked to implement a plan that contains simple and repeatable field observation and data management tools that can assist them in determining the relative condition of BMPs. The primary purpose is to inform Permittees of: 1) where the BMPs are located, 2) the relative urgency of water quality maintenance and, 3) provide a practical, consistent and reliable tool to track the condition of BMPs relative to observed condition at time of installation or immediately following complete maintenance. Permittees may implement this plan themselves or may be determined through a Self-Certification Annual Report submitted annually by an authorized party demonstrating proper maintenance and operations. Allowing an authorized party to conduct the BMP condition assessment offsets program costs and shifts responsibility to the party that should be maintaining the BMP they initially installed.

*Applicability*
Renewal Permittees currently listed in Attachment 4 to WQO 2003-0005-DWQ (Attachment 4) must continue to implement Attachment 4 Post-Construction Requirements up until the date when Section E.12 requirements of this Order are effective (the second year of the effective date of the Permit). All Permittees that are not subject to Attachment 4 must implement the CGP Post-Construction Requirements up until the second year of the effective date of the Permit. In the second year of the effective date of the permit, all Permittees, New and Renewal, must implement Section E.12. Post-Construction Requirements contained within this Order.

Lastly, extensive monitoring studies conducted by the California Department of Public Health (CDPH) have documented that mosquitoes opportunistically breed in structural storm water Best Management Practices (BMPs), particularly those that hold standing water for over 96 hours. Certain Low Impact Development (LID) site design measures that hold standing water such as rainwater capture systems may similarly produce mosquitoes. These structures create a potential public health concern and increase the burden on local vector control agencies that are mandated to inspect for and abate mosquitoes and other vectors within their jurisdictional boundaries. These unintended consequences can be lessened when structures incorporate design, construction, and maintenance principles developed specifically to minimize standing water available to mosquitoes1 while having negligible effects on the capacity of the structures to provide water quality improvements as intended. The California Health and Safety Code prohibits landowners from knowingly providing habitat for or allowing the production of

mosquitoes and other vectors, and gives local vector control agencies broad inspection and abatement powers. This Order requires regulated MS4s to comply with applicable provisions of the Health and Safety Code and to cooperate and coordinate with CDPH and local mosquito and vector control agencies on vector-related issues.

**Water Quality Monitoring Requirements**

Legal Authority: Clean Water Act §§308(a), 402(p)(3)(b); 40 C.F.R. §§122.44(i), 122.48(b); MS4Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; W[35]; Ecological Condition Assessments of California's Perennial Wadeable Streams: Highlights from the Surface Water Ambient Monitoring Program's Perennial Streams Assessment (PSA ) (2000-2007)[36]; National Research Council Report on Urban Storm Water in the United States, 2008[37]

The existing General Permit included requirements meant to eliminate or reduce the discharge of pollutants to receiving waters. Improved knowledge of the water quality impacts and management practices, obtained either as part of the permit requirements or from outside sources (e.g., scientific literature, studies, and expert panels), is intended to be used in an adaptive management fashion to inform requirements in subsequent permits. As such, monitoring and assessment represents a critical component in understanding the link between permit requirements, the benefits achieved due to those requirements, and the condition of receiving waters. Aside from general knowledge that storm water discharges from urbanized watersheds contribute pollutants to receiving waters, little is known about the specific conditions in such receiving waters outside of major metropolitan areas. The effectiveness of almost a decade of storm water management in Phase I MS4s has not been systematically evaluated through receiving water monitoring.

Nationwide, there are few of analyses of available data and guidance on how Permittees should be using the data to inform their storm water management decisions.

This Order prioritizes monitoring for ASBS, TMDLs, and 303d listed waterbodies. Permittees that have a population of 50,000 or greater and are part of an urbanized area are required to choose from a number of monitoring options. These larger Permittees are assumed to have the resources to undertake monitoring. For the majority of Phase II Permittees, this permit term will be the first time a monitoring program has been implemented. As such, prioritization of monitoring allows for a firm foundation from which Phase II Permittees may initiate and develop monitoring programs that will result in improvement of local knowledge of water quality impacts and implementation of storm water management practices. Any of the monitoring requirements may be conducted through participation in a regional monitoring group. Regional

---

[35] 2010 Integrated Report can be found at:
http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml

[36] Ode, P.R.1, T.M. Kincaid2, T. Fleming3 and A.C. Rehn 9. 2011. Ecological Condition Assessments of California's Perennial Wadeable Streams: Highlights from the Surface Water Ambient Monitoring Program's Perennial Streams Assessment (PSA) (2000-2007). A collaboration between the State Water Resources Control Board's Non-Point Source Pollution Control Program (NPS Program), Surface Water Ambient Monitoring Program (SWAMP), California Department of Fish and Game Aquatic Bioassessment Laboratory, and the U.S. Environmental Protection Agency.

[37] Urban Storm Water in the United States, National Research Council, 2008 can be found at:
http://www.epa.gov/npdes/pubs/nrc_stormwaterreport.pdf

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

monitoring not only allows Permittees to share costs but also facilitates monitoring data and information sharing across local regions. In effect, regional programs provide a broad-scale picture of water quality condition within a watershed.

**Program Effectiveness Assessment**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R.C.F.R. § 122.34(g) 40 CFR 122.34(g)(3), CASQA Effectiveness Assessment Guide[38]; Evaluating the Effectiveness of Municipal Stormwater Programs, U.S. EPA, EPA 833-F-07-010, MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

A key requirement in the storm water Phase II rule is a report that includes "the status of compliance with permit conditions, an assessment of the appropriateness of identified [control measures] and progress towards achieving identified measurable goals for each of the minimum control measures." This assessment is critical to the storm water program framework which uses the iterative approach of implementing controls, conducting assessments, and designating refocused controls leading toward attainment of water quality standards. As a result, this Order requires a quantitative evaluation of the Permittees MS4 programs. Measurable program evaluations are critical to the development, implementation, and adaptation of effective local storm water management programs.

To date, only a small number of Phase I MS4s have provided measurable outcomes with regard to aggregate pollutant reduction achieved by their municipal storm water programs. Most Permittees, both Phase I and II, are struggling simply to organize or document their program activities and few have provided a quantitative link between program activities and water quality improvements. The few that have determined whether or not water quality is improving as a result of storm water program implementation took many years. Despite these past obstacles, the process of evaluating and understanding the relationship between the storm water program implementation and water quality needs to begin now.

Building on the monitoring and assessment program, the Permittee must conduct an annual effectiveness assessment to assess the effectiveness of prioritized BMPs, program elements and the storm water program as a whole. Prioritized BMPs include BMPs implemented based on pollutants of concern. Where pollutants of concern are unidentified, prioritized BMPs are based on common urban pollutants (i.e., sediment, bacteria, trash, nutrients). The California Stormwater Quality Association's (CASQA) Municipal Stormwater Program Effectiveness Guidance describes strategies and methods for assessing effectiveness, including examples of effectiveness assessment for each program component. The CASQA Effectiveness Guidance is available at www.casqa.org for purchase. A two-hour EPA webcast focusing on the CASQA Guide is also available (available at www.epa.gov/npdes/training under "Assessing the Effectiveness of Your Municipal Stormwater Program"). A resources document from the webcast includes a 10 page summary of the CASQA Guide and example pages from the municipal chapter:
(www.epa.gov/npdes/outreach_files/webcast/jun0408/110961/municipal_resources.pdf)

The Municipal Stormwater Program Effectiveness Assessment Guidance synthesizes information on designing and conducting program effectiveness assessments. The document also explains how to select certain methods based on programmatic outcomes and goals. The

---

[38] https://www.casqa.org/casqastore/products/tabid/154/p-7-effectiveness-assessment-guide.aspx

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

reader is led through a series of questions and case studies to demonstrate how proper assessments are selected. Techniques are related to different level of outcomes: level one – documenting activities, level two – raising awareness, level 3 – changing behavior, level 4 – reducing loads from sources, level 5 – improving runoff quality, and level 6 – protecting receiving water quality. The Guide includes fact sheets for all six NPDES program elements, outlining methods and techniques for assessing effectiveness of each program.

**Annual Reporting**
In general, an annual report must document and summarize implementation of the storm water program during the previous year, evaluate program results and describe planned changes towards continuous improvement. The annual report also can serve as a "state of the storm water program" report for the general public or other stakeholders in the community serving as an excellent summary document to provide about the status of storm water program.

However, lessons learned from Phase I MS4 annual reports demonstrate that many Permittees tend to submit too much information, and, as a result, Regional Water Boards receive large binders full of materials that do not provide useful information to assess compliance. As a result, this Order requires Permittees to annually submit a summary of the past year activities. For example, the Permittees should not only address "bean counting" of required task, but address such questions as:

- For illicit discharge data, what are the most prevalent sources and pollutants in the illicit discharge data, and where are these illicit discharges occurring?
- How many illicit discharges have been identified, and how many of those have been resolved?
- How many outfalls or screening points were visually screened, how many had dry weather discharges or flows, at how many were field analyses completed and for what parameters, and at how many were samples collected and analyzed?
- Does the MS4 need to conduct more inspections in these areas, or develop more specific outreach targeting these sources and pollutants?

In addition, Permittees use SMARTS to certify Annual Reports which verifies compliance with all requirements of this Order.

*Nexus Between Annual Reporting and Program Effectiveness Assessment*
In addition to submitting program element summaries, Permittee must analyze their yearly activities and link it to their Program Effectiveness Assessment and Improvement Plan which tracks and documents their annual and long-term effectiveness of the storm water program. For example:

- Planned Activities and Changes. The annual report should describe activities planned for the next year highlighting any changes made to improve control measures or program effectiveness.

*Detailed Annual Report*
Most major areas of this Order require Permittees to submit, via SMARTS, a summary annual report for the past year's activities. For certain program elements such as Water Quality Monitoring, Program Effectiveness Assessment, and TMDLs, more detailed annual report information is required to be tracked and submitted via SMARTS.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

Additionally, at any time during the permit term, the Executive Officer of the applicable Regional Water Board can request a more detailed annual report. This information may be required to determine compliance or prior to targeted or comprehensive storm water program audit. The table below shows detailed annual reporting information an Executive Officer of the applicable Regional Water Board may require:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.6.c. | By the third year Annual Report and annually thereafter, report on the Enforcement Response Plan summarizing all enforcement activities including inspections of chronic violators and the incentives, disincentives, or escalated enforcement responses at each site. Summarizations of enforcement activities shall include, at a minimum, the following information for each type of site or facility:<br>(a) Number of violations, including a listing of sites or facilities with identified violations<br>(b) Number of enforcement actions, including types<br>(c) Other follow-up actions taken<br>(d) Demonstration that compliance has been achieved for all violations, or a description of actions that are being taken to achieve compliance |
| E.7.a. | By the third year Annual Report, and annually thereafter, submit a report on the implementation and progress of the public education strategy and general program development and progress. Report on the development of education materials, methods for educational material distribution, public input, landscaping outreach, reporting of illicit discharges, proper application of pesticides, herbicides, and fertilizers, elementary school education, reduction of discharges from organized car washes, mobile cleaning and pressure washing operations, and landscape irrigation efforts. By the fifth year Annual Report, submit a report summarizing changes in public awareness and knowledge resulting from the implementation of the program and any modifications to the public outreach and education program. |
| E.7.b.1. | By the third year Annual Report, document and maintain records of the training provided and the staff trained annually. The annual report shall include the number and percentage of Permittee's applicable staff that were trained and summarize the knowledge assessment as specified in E.7.b.1.(ii)(d). |
| E.7.b.2. Permittee Staff | By the second year of the permit and annually thereafter, submit the following information:<br>a. Training topics covered<br>b. Dates of training<br>c. Number and percentage of Permittees' staff, as identified in Sections E.7.b.2. possessing the specified credentials. |
| E.7.b.2. Construction Site Operator Education | By the third year Annual Report and annually thereafter, submit a report including the following information:<br>(a) Training topics covered;<br>(b) Dates of training;<br>(c) Number and percentage of Permittee's operators and number of contractors attending each training;<br>(d) Results of any surveys conducted to demonstrate the awareness and potential behavioral changes in the attendees. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.7.b.3. | By the second year Annual Report and annually thereafter, submit a summary that includes oversight procedures and identifies and tracks all personnel requiring training and assessment and records. The annual report shall include the number and percentage of Permittee's applicable staff that were trained during the year and summarize the knowledge assessment as specified in E.7.b.3(ii)(b). |
| E.8. | By the second year Annual Report and annually thereafter, submit a description of the public involvement program and summary of the MS4s efforts related to facilitating public involvement, including efforts to engage citizen advisory groups, increase citizen participation, and involvement with the IRWMP or other watershed-level planning effort. |
| E.9.a. | Submit a map by the second year Annual Report, and annually thereafter submit either (a) a current updated outfall map, or (b) verification that no changes or additions were made to the Permittee's MS4. |
| E.9.b. | By the second year online Annual Report, submit inventory and annually thereafter an updated inventory. By the second year online Annual Report, identify the illicit discharge procedures implemented and the locations of the implementation.  Also identify in each online Annual Report the remaining inventoried facilities and priority areas still requiring illicit discharge assessment over the permit term. |
| E.9.c. | By the second year Annual Report, submit a report summarizing the field investigation results and areas of follow up actions, including the following information:<br>(a) The number of outfalls found to be flowing or ponding more than 72 hours after the last rain event;<br>(b) The number of such outfalls sampled in accordance with permit conditions;<br>(c) Sampling result in tabular form; and<br>(d) The number of outfalls found to be in exceedance of action levels |
| E.9.d. | By the second year Annual Report, submit all source investigations and corrective actions.  At a minimum the report shall include:<br>(a) Brief description of each non-stormwater discharge reported or observed;<br>(b) Date(s) the non-storm water discharge was reported or observed;<br>(c) Brief description of any actual or potential water quality impact resulting from the discharge;<br>(d) Description and results of steps taken to investigate the source of the discharge;<br>(e) Description and results of all follow-up or enforcement actions taken as a result of the investigation;<br>(f) Date the investigation was closed, and whether the discharge was eliminated. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.9.e. | Within the first year of the effective date of the permit, submit a spill response plan that contains the items specified in Section E.9.e. In subsequent Annual Reports summarize any spill response activities, and any follow-up actions, as specified in the spill response plan. |
| E.10.a. | Submit an up to date construction site inventory enumerating items listed in this Section with each Annual Report. |
| E.10.b. | By the first year Annual Report, submit a summary of review procedures. The summary should clearly indicate how the procedures will achieve compliance with all requirements of this Section, and clearly delineate responsibilities for implementing, and ensuring implementation of each aspect of the procedures. |
| E.10.c. | By the second year Annual Report and annually thereafter, submit the following information:<br>(a) Total number of active sites disturbing less than one acre of soil requiring inspection;<br>(b) Number and percentage of each type of enforcement action taken as listed in each Permittee's Enforcement Response Plan;<br>(c) Number of sites with discharges of sediment or other construction related materials, both actual and those inferred through evidence.;<br>(d) Number and percentage of violations fully corrected prior to the next rain event but no longer than 10 business days after the violations are discovered or otherwise considered corrected in a Permittee-defined timely period.<br>(e) Number and percentage of violations not fully corrected 30 days after the violations are discovered.<br>(f) Number of follow-up inspections that demonstrated the operator continued to implement BMPs according to plan and the number of follow-up inspections that required further enforcement. |
| E.11.a. | By the second year Annual Report submit the inventory and submit annual updates thereafter. |
| E.11.b. | By the second year Annual Report, submit the completed map and update annually thereafter if any of the information indicated on the map has changed. |
| E.11.c. | By the third year Annual Report, submit the results of the Permittee's annual assessment, including the list of identified hotspots and any identified deficiencies and corrective actions taken. The Permittee shall identify designated hotspots on the facility inventory updated and submitted in each subsequent year annual report. |
| E.11.d. | By the fourth year Annual Report, submit a summary of SWPPPs developed for pollutant hotspots.  In subsequent Annual Reports, submit a summary of SWPPPs updated. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.11.e. | By the fifth year Annual Report and annually thereafter, submit the following information:<br>(a) Total number of facilities required to be inspected.<br>(b) Verification that all inspections were conducted at all facilities in accordance with the requirements of this Section<br>(c) Summary of spills and corrective actions<br>(d) Summary of the results of inspections, including a summary of deficiencies noted and corrective actions taken<br>(e) Results of the quarterly visual observations of storm water discharges<br>(f) Total number of facilities inspected (visual and comprehensive inspections) and frequency of inspections<br>(g) All inspection records, reports, and logs<br>(h) Records of corrective actions taken and the results of corrective actions |
| E.11.f. | By the second year Annual Report, submit the assessment procedures and maintenance prioritization list, including a description of the method used to identify high priority storm drain system features and catch basins and number of catch basins identified as high priority. If flood conveyance maintenance is undertaken by another entity, submit a summary report of coordination by the first year Annual Report. |
| E.11.g. | By the third year Annual Report, submit a summary of the following information:<br>(a) Storm sewer maintenance schedule<br>(b) List of storm sewer systems and the maintenance priority assigned<br>(c) Documentation of all required storm sewer systems maintenance logs<br>(d) Documentation of waste material disposal procedure<br>By the third Annual Report and annually thereafter, the Permittee shall submit verification that all storm drain facilities were maintained according to the priorities, procedures, and schedules developed according to this Section. The report shall include a summary of the results of inspections, deficiencies found, corrective actions taken, and the results of corrective actions. |
| E.11.h. | By the third year Annual Report, submit the following:<br>(a) List of BMPs and associated pollutants with each O&M activity<br>(b) BMPs applied during Permittee O&M activities<br>(c) Log of quarterly BMP evaluations.<br>By the third Annual Report and annually thereafter, the Permittee shall submit verification that identified BMPs were effectively implemented for all O&M activities. |
| E.11.i. | By the third year Annual Report, submit a summary of the development and implementation process to incorporate water quality and habitat enhancement design into new or upgraded flood management projects. By the fourth year Annual Report and annually thereafter, submit a list of new or upgraded flood management projects, including a summary of water quality and habitat enhancement features incorporated into their design. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.11.j. | By the second year Annual Report, submit an evaluation of materials used and activities performed for pollution prevention and source control opportunities and a list of practices implemented to minimize the use of herbicide, pesticide, and fertilizers. By the second year Annual Report and annually thereafter, submit verification that identified BMPs were effectively implemented for all landscaping design and maintenance activities. By the second year Annual Report, submit a summary identifying the measures that the Permittee will use to demonstrate reductions in the application of pesticides, herbicides, and fertilizers.  In subsequent annual reports, verify implementation of this measure, and describe reductions in pesticide, herbicide, and fertilizer application. |
| E.12.b | By the second year Annual Report and annually thereafter, the Permittee shall submit the following information:<br>(a) A list of all project creating or replacing 2,500 square feet or more of impervious surface, as described above; and<br>(b) A brief description of site design measures applied to each project. |
| E.12.c. | For each Regulated Project approved, the following information shall be submitted by the third year Annual Report:<br>(a) Project Name, Number, Location (cross streets), and Street Address;<br>(b) Name of Developer, Phase No. (if project is being constructed in phases, each phase shall have a separate entry), Project Type (e.g., commercial, industrial, multiunit residential, mixed-use, public), and description;<br>(c) Project watershed(s);<br>(d) Total project site area and total area of land disturbed;<br>(e) Total new impervious surface area and/or total replaced impervious surface area;<br>(f) For a redevelopment or road widening project: total pre-project impervious surface area and total post-project impervious surface area;<br>(g) Status of project (e.g., application date, application deemed complete date, project approval date);<br>(h) Source control measures;<br>(i) Site design measures;<br>(j) All post-construction storm water treatment systems installed onsite, at a joint storm water treatment facility, and/or at an offsite location;<br>(k) O&M responsibility mechanism for the life of the project.<br>(l) Water quality treatment calculations used;<br>(m) Off-site compliance measures for Regulated Project (if applicable); Additional (watershed-specific) hydromodification standards used. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.12.h. | By the second year Annual Report and annually thereafter, for each Regulated Project inspected during the reporting period the following information shall be submitted in tabular form:<br>(1) Name of facility/site inspected.<br>(2) Location (street address) of facility/site inspected.<br>(3) Name of responsible operator for installed storm water treatment systems and hydromodification management controls.<br>(4) Inspection details including: date of inspection, type of inspection (e.g., initial, annual, follow-up, spot), type(s) of storm water treatment systems inspected (e.g., swale, bioretention unit, tree well, etc.) and an indication of whether the treatment system is an onsite, joint, or offsite system.<br>(5) Type of hydromodification management controls inspected.<br>(6) Inspection findings or results (e.g., proper installation, proper O&M, system not operating properly because of plugging, bypass of storm water because of improper installation, maintenance required immediately, etc.).<br>(7) Enforcement action(s) taken, if any (e.g., verbal warning, notice of violation, administrative citation, administrative order).<br>(8) A discussion of the inspection findings for the year and any common problems encountered with various types of treatment systems and/or hydromodification management controls. This discussion shall include a general comparison to the inspection findings from the previous year.<br>(9) A discussion of the effectiveness of the Permittee's O&M Program and any proposed changes to improve the O&M Program (e.g., changes in prioritization plan or frequency of O&M inspections, other changes to improve effectiveness of O & M program).<br>On an annual basis, before the wet season, provide a list of newly installed (installed within the reporting period) storm water treatment systems and hydromodification management controls to the local mosquito and vector control agency and the appropriate Regional Water Board. This list shall include the facility locations and a description of the storm water treatment measures and hydromodification management controls installed. |
| E.12.i. | By the third year Annual Report and subsequently thereafter, submit the post-construction best management practice condition assessment plan as required in E.12.i.(ii)a-d. |
| F.5.b.2. | By the third year Annual Report and annually thereafter, submit the public education strategy and general program development and progress. By the fifth year Annual Report, summarize changes in public awareness and knowledge resulting from the implementation of the program and any modifications to the public education and outreach program. If applicable, submit a report on development of education materials, methods for educational material distribution, public input, Water Efficient Landscape Ordinance, elementary school education, reduction of discharges from mobile cleaning and pressure washing operations, and landscape irrigation efforts. |

Page 46

*UNOFFICIAL DRAFT — Not Certified by Clerk*

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| F.5.b.3. | By the third year Annual Report, submit records of the training provided and the staff trained annually. |
| F.5.b.4. | By the second year Annual Report and annually thereafter, submit a summary of oversight procedures and identify and track all personnel requiring training and assessment and records. |
| F.5.c. | By the third year Annual Report and annually thereafter, submit a description of the public involvement program and summary of the MS4s efforts related to facilitating public involvement. |
| F.5.d. | By second year Annual Report submit the outfall inventory map, and annually thereafter submit either (a) a current updated outfall map, or (b) verification that no changes or additions were made to the Permittee's MS4. |
| F.5.d.1. | By the second year Annual Report, submit a report summarizing the field investigation results and areas of follow up investigations. The report shall summarize all applicable observations.<br>By the second year of the permit term and annually thereafter, submit all source investigations and corrective actions.  At a minimum the report shall include:<br>(a) Date(s) the non-storm water discharge was observed;<br>(b) Results of the investigation;<br>(c) Date the investigation was closed.<br>(d) A summary of all non-storm water discharges that were found. |
| F.5.e. | By the second year Annual Report, the Permittee submit an updated contract language that includes CGP compliance requirements for all projects subject to the CGP. |
| F.5.f.1. | By the second year Annual Report submit and annually thereafter an updated inventory. |
| F.5.f.2. | By the second year Annual Report and annually thereafter, submit the map. |
| F.5.f.3. | By the third year Annual Report, submit the results of the Permittee's annual assessment, any identified deficiencies and corrective actions taken, list of the pollutant hotspots. |
| F.5.f.4. | By the fourth year Annual Report and annually thereafter, submit a summary of SWPPPs developed and updated for pollutant hotspots. |
| F.5.f.5. | By the fifth year Annual Report and annually thereafter, the following information shall be submitted:<br>(a) Total number of facilities required to be inspected.<br>(b) Total number of facilities inspected (visual and comprehensive inspections) and frequency of inspections<br>(c) Summary of spills and corrective actions<br>(d) Results of the quarterly visual observations of storm water discharges |
| F.5.f.6 | By the second year Annual Report, submit the assessment procedures and maintenance prioritization list. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| F.5.f.7 | By the third year Annual Report, submit a summary of the following information: <br> (a) Storm sewer maintenance schedule <br> (b) List of storm sewer systems and the priority assigned <br> (c) Documentation of all required storm sewer systems maintenance logs <br> (d) Documentation of waste material disposal procedure |
| F.5.f.8. | By the third year Annual Report, submit the following: <br> (a) List of BMPs and associated pollutants with each O&M activity <br> (b) BMPs applied during Permittee O&M activities <br> (c) Log of annual BMP evaluations. |
| F.5.f.9 | By the second year Annual Report, submit an evaluation of materials used and activities performed for pollution prevention and source control opportunities and a list of practices implemented to minimize the use of herbicide, pesticide, and fertilizers. By the second year Annual Report, submit a document identifying the measures that the Permittee will use to demonstrate reductions in the application of pesticides, herbicides, and fertilizers. In subsequent annual reports, use this measure to demonstrate reductions in pesticide, herbicide, and fertilizer application. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| | |
|---|---|
| | By the second year Annual Report and annually thereafter, the Permittee shall submit the following information:<br>  (a)  A list of all project creating or replacing 2,500 square feet or more of impervious surface, as described above; and<br>A brief description of site design measures applied to each project.<br>For each project approved, the following information shall be submitted by the second year Annual Report:<br>  (a) Project Name, Number, Location (cross streets), and Street Address;<br>  (b) Name of Developer, Phase No. (if project is being constructed in phases, each phase shall have a separate entry), Project Type (e.g., commercial, industrial, multiunit residential, mixed-use, public), and description;<br>  (c) Project watershed(s);<br>  (d) Total project site area and total area of land disturbed;<br>  (e) Total new impervious surface area and/or total replaced impervious surface area;<br>  (f) If a redevelopment or road widening project, total pre-project impervious surface area and total post-project impervious surface area;<br>  (g) Status of project (e.g., application date, application deemed complete date, project approval date);<br>  (h) Source control measures;<br>  (i) Site design measures;<br>  (j) All post-construction storm water treatment systems installed onsite, at a joint storm water treatment facility, and/or at an offsite location;<br>  (k) O&M responsibility mechanism for the life of the project.<br>  (l) Water quality treatment calculations used;<br>  (m) Off-site compliance measures (if applicable)<br>  (n) Additional (watershed-specific) hydromodification standards used<br>    (a) For each project inspected during the reporting period the following information shall be submitted in tabular form as part of each year's Annual Report:<br>    (1) Name of facility/site inspected.<br>    (2) Location (street address) of facility/site inspected.<br>    (3) Name of responsible operator for installed storm water treatment systems and hydromodification management controls.<br>    (4) Inspection details including: Date of inspection, type of inspection (e.g., initial, annual, follow-up, spot), type(s) of storm water treatment systems inspected (e.g., swale, bioretention unit, tree well, etc.) and an indication of whether the treatment system is an onsite, joint, or offsite system.<br>    (5) Type of hydromodification management controls inspected.<br>    (6) Inspection findings or results (e.g., proper installation, proper O&M, system not operating properly because of plugging, bypass of storm water because of improper installation, maintenance required immediately, etc.).<br>    (7) Enforcement action(s) taken, if any (e.g., verbal warning, notice of violation, administrative citation, administrative order).<br>    (8) A discussion of the inspection findings for the year and any common problems encountered with various types of treatment |

The cell label on the left reads: F.5.g.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| | systems and/or hydromodification management controls. This discussion shall include a general comparison to the inspection findings from the previous year.<br>(9) A discussion of the effectiveness of the Permittee's O&M Program and any proposed changes to improve the O&M Program (e.g., changes in prioritization plan or frequency of O&M inspections, other changes to improve effectiveness of program).<br>(b) On an annual basis, before the wet season, provide a list of newly installed (installed within the reporting period) storm water treatment systems and hydromodification management controls to the local mosquito and vector control agency and the appropriate Regional Water Board. This list shall include the facility locations and a description of the storm water treatment measures and hydromodification management controls installed. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Program Management
Without the requirement of a SWMP, this section serves as the framework/backbone for the storm water program. This section is a consolidation of all of the Permittee's relevant ordinances or other regulatory requirements, the description of all programs and procedures (including standard forms to be used for reports and inspections) that will be implemented and enforced to comply with the permit and to document the selection, design, and installation of all storm water control measures.

Legal Authority
Without adequate legal authority the MS4 would be unable to perform many vital program functions such as performing inspections and requiring installation of control measures. In addition, the Permittee would not be able to penalize and/or attain remediation costs from violators.

Certification
Submittal and signature certifies Permittee will comply with this Order.

Enforcement Response Plan (ERP)
This Order requires Permittees to have an established, escalating enforcement policy identified in the ERP that clearly describes the action to be taken for common violations. The plan must describe the procedures to ensure compliance with local ordinances and standards, including the sanctions and enforcement mechanisms that will be used to ensure compliance. (See 40 CFR 122.26(d)(2)(i)). It is critical that the Permittee have the authority to initiate a range of enforcement actions to address the variability and severity of noncompliance.

IDDE and Good Housekeeping
Both these programs pose potential immediate threat to water quality without quick access to information submitted in SMARTS. For example, in order to respond to discharges, an effective IDDE program responds to complaints about illicit discharges or spills such as illegal connections to the storm sewer system, improper disposal of wastes, or dumping of used motor oil or other chemicals. In order to trace the origin of a suspected illicit discharge or connection, the Permittee must have an updated map of the storm drain system and a formal plan of how to locate illicit discharges and how to respond to them once they are located or reported.

Construction Inventory
To effectively conduct inspections, the Permittee must know where construction activity is occurring. A construction site inventory tracks information such as project size, disturbed area, distance to any waterbody or flow channel, when the erosion and sediment control/stormwater plan was approved by the Permittee, and whether the project is covered by the CGP. This inventory will allow the Permittee to track and target its inspections.

Effectiveness Assessment
Without assessing the effectiveness of the stormwater management program the Permittee will not know which parts of the program need to be modified to protect and/or improve water quality and instead will essentially be operating blindly.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## XIII.  TOTAL MAXIMUM DAILY LOAD (TMDL)

Section 303(d) of the Clean Water Act requires States to identify waters that do not meet water quality standards after applying certain required technology-based effluent limitations ("impaired" waterbodies). States are required to compile this information in a list and submit the list to the U.S. EPA for review and approval. This list is known as the Section 303(d) list of impaired waters, which is incorporated into the Integrated Report.

This listing process requires States to prioritize waters/watersheds for future development of TMDLs. A TMDL is defined as the sum of the individual waste load allocations for point sources of pollution, plus the load allocations for nonpoint sources of pollution, plus the contribution from background sources of pollution. The Water Boards have ongoing efforts to monitor and assess water quality, to prepare the Section 303(d) list, and to subsequently develop TMDLs. The 2010 California 303(d) List identifies impaired receiving water bodies and their watersheds within the state.

TMDLs are developed by either the Regional Water Boards or U.S. EPA in response to Section 303(d) listings. Regional Water Board-developed TMDLs are subject to approval by the State Water Board, approval by the Office of Administrative Law, and ultimately approval by U.S. EPA. TMDLs developed by Regional Water Boards are incorporated as Basin Plan amendments and include implementation provisions.

TMDLs developed by U.S. EPA typically contain the total load and waste load allocations required by Section 303(d), but do not contain comprehensive implementation provisions.

TMDLs are not self-implementing but rely on other regulatory mechanisms for implementation and enforcement. Urbanized areas typically utilize municipal storm water permits as the implementation tool. Incorporation of TMDL implementation requirements into general permits (as opposed to individual MS4 permits) is difficult. First, there are numerous Traditional MS4s (municipalities) and Non-traditional MS4s such as military bases, public campuses, prison and hospital complexes covered under this Order. Second, the waste load allocations for many TMDLs are shared among several dischargers; that is, a single waste load allocation may be assigned to multiple dischargers, making it difficult to assign responsibility. Further, individual dischargers may not be explicitly identified. For example, "urban runoff" may be listed as a source of impairment, but the individual MS4s responsible for the impairment may not be identified. Third, the implementation plans adopted by the Regional Water Boards often provide for phased compliance with multiple milestones and deliverables, with optional and alternative means of compliance depending on the results of monitoring and special studies.

Section C.1 of this Order requires that permittees "shall . . . reduce the discharge of pollutants . . .to achieve TMDL wasteload allocations established for discharges by the MS4s." The variance in the level of detail of TMDLs necessitates the development of TMDL-specific permit requirements to provide clarity on the Permittees' compliance responsibilities.

The Regional Water Boards submitted proposed TMDL-specific permit requirements to the State Water Board for applicable TMDLs, with statements explaining how these requirements are designed to implement the TMDLs and the corresponding wasteload allocations. (40 C.F.R. §122.44(d)(1)(vii)(B)) Sections E.15 and F.5 of this Order require permittees to comply with all applicable TMDL-based requirements listed in Attachment G; the requirements are directly enforceable through this Order. Attachment G does not restate the final applicable wasteload allocations for each TMDL; however, those wasteload allocations are specified in the Fact Sheet and this Order incorporates them by reference as appropriate.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

In a few cases, the TMDL-specific requirements of Attachment G are based on a load allocation, rather than a wasteload allocation. Several TMDLs incorporated into this Order assign load allocations to storm water that may not have been regulated as NPDES discharges at the time of the TMDL adoption, but have now been determined to be subject to this Order. USEPA has issued guidance providing that in such circumstances, the "NPDES permit authority could identify an appropriate allocation share and include a corresponding limitation specific to the newly permitted stormwater source."[39]

Some TMDLs do not name specific Permittees but name a category of discharges such as "urban runoff." This Order identifies the Permittees subject to the TMDL. In most cases, the permittees subject to the TMDLs are Traditional MS4s. For some TMDLs the State Water Board has determined that the TMDL requirements are also applicable to specific Non-traditional MS4s. Attachment G specifically names such permittees and sets out how the permittees will implement the TMDL. The State Water Board or the applicable Regional Water Board may, in the future, designate additional Traditional or Non-traditional MS4s based on further determination of TMDL applicability.

Attachment G assigns monitoring requirements to certain Permittees and section E.13.b. of this Order states that "Permittees shall implement any monitoring requirements assigned in Attachment G." Section E.13. also states, in part, "Traditional Small MS4 Permittees that are required to conduct monitoring of discharges to … TMDL… waterbodies… are not required to perform additional monitoring as specified in Sections E.13.d.1 and E.13.d.2." Therefore, a Permittee that is assigned TMDL-related monitoring in Attachment G is not required to implement monitoring in accordance with Sections E.13.d.1. or E.13.d.2.

Permittees will report compliance with TMDL permit requirements in the Annual Report required to be submitted electronically via SMARTS.

The previous General Permit, Water Quality Order 2003-0005-DWQ, relied in part on the preparation, approval, and implementation of a Storm Water Management Program to incorporate TMDL-specific requirements for Permittees. This Order does not rely on preparation of a Storm Water Management Program, but rather incorporates programmatic requirements, including the TMDL-specific requirements in Attachment G, in the Order itself. In some cases, as noted in the discussion below, this Order directs the Permittee to continue implementing requirements specified in the Storm Water Management Plan required by the previous 2003 Permit. In those cases, Attachment G incorporates those specific requirements by reference.

In sum, Attachment G contains specific management practice-based planning and implementation requirements that act as BMP-based WQBELs. Attachment G also contains monitoring and other requirements. These requirements are referred to in the Order as "BMP-based WQBELs and other permit requirements," and are expected to achieve the water quality results specified by the wasteload allocations. Because the ultimate purpose of TMDL implementation is to reach the water quality results specified in the TMDL wasteload allocations in order to attain water quality standards in receiving waters that are currently impaired, Attachment G requires a demonstration of attainment of the waste load allocation at the final compliance deadline. This demonstration ensures that Attachment G incorporates

---

[39] Revisions to the November 22, 2002 Memorandum 'Establishing Total Maximum Daily Load (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on Those WLAs,'" issued by USEPA, November 26, 2014.

BMP-based WQBELs and other permit requirements that are consistent with the assumptions and requirements of the applicable waste load allocations (40 C.F.R. § 122.44(d)(1)(vii)(B)) and implements the basin plans into which the TMDL implementation plans are incorporated (Wat. Code, §§13263, subd. (a), 13377.) Permittees are to make this demonstration consistent with criteria articulated in sections E.15.b. and F.5.i.2 of the Order.

This Order implements TMDLs with either past deadlines or soon approaching deadlines. In precedential Order WQ 2015-0075, the State Water Board found that final TMDL attainment deadlines should not be extended through permitting actions. The State Water Board stated as follows:

> *Final TMDL deadlines are established and incorporated into the Basin Plans during the TMDL development process. That process invites stakeholder participation and the proposed schedule is subject to public review and comment and approval by the relevant regional water board, the State Water Board, and USEPA. The deadlines are established with consideration of the time needed for compliance for all dischargers contributing to an impairment, including industrial and construction storm water dischargers and traditional NPDES dischargers. Although we recognize that it may not always be feasible for municipal storm water dischargers to meet final TMDL deadlines, short of amending the Basin Plan to modify the deadlines (see California Association of Sanitation Agencies v. State Water Resources Control Board (2012) 208 Cal.App.4th 1438), we find it appropriate for the dischargers to request time schedule orders rather than be granted an extension within the provisions of the [regional water board permits].*
> (State Water Board Order WQ 2015-0075, p. 37, fn. 110.)

Attachment G incorporates the final attainment deadlines for each TMDL; some TMDL attainment deadlines are now past. In these instances, the associated wasteload allocations are effective on the effective date of the Order, i.e. January 1, 2019. Where appropriate, the State Water Board will work with the Regional Water Boards to determine if there is any regulatory flexibility for extension of final attainment dates consistent with any particular TMDL. The State Water Board and the Regional Water Boards additionally have discretion with regard to enforcement actions and will exercise that discretion on a case-by-case basis based on all the facts underlying a violation, including how recently the Permittee was assigned TMDL-specific requirements in the permit and the Permittee's efforts, to date, to meet the TMDL-specific requirements. A permittee with a past or imminent TMDL attainment deadline may request a Time Schedule Order (TSO) from the applicable Regional Water Board in accordance with criteria established in the Order. A Regional Water Board's issuance of a TSO will establish an implementation schedule for the Permittee to comply with the TMDL requirements.

The State Water Board delayed the effective date of the Order to January 1, 2019, one year following adoption, to allow permittees additional time to demonstrate attainment of the wasteload allocations, request time schedule orders incorporating compliance schedules for the attainment of the wasteload allocations, or request consideration by the Regional Water Board Executive Officer of whether the particular regulatory language of a given TMDL allows for an extension of a deadline for attainment of the wasteload allocation.

Attachment G specifies BMP-based WQBELs and other permit requirements for attainment of the wasteload allocations even in cases where the final wasteload allocation deadline is past. These requirements are included because the Order states that it is not the intention of the State Water Board or the Regional Water Boards to take enforcement action against a

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

permittee where (1) a permittee has applied in good faith for a time schedule order and is implementing the requirements in Attachment G pending approval of the time schedule order or (2) the Regional Board has initiated proceedings to revise the implementation schedule or other requirements of a TMDL and the permittee is implementing the requirements in Attachment G pending the outcome of the proceedings.

**Unfunded Mandates Considerations Specific to TMDL Requirements in the Order**
The TMDL requirements of this Order do not constitute unfunded state mandates requiring reimbursement.

*The TMDL-specific requirements do not constitute a new program or higher level of service:*

When a state agency requires a local government to provide "a new program or higher level of service," the state must "reimburse that local government for the costs of the program or increased level of service." (Cal. Const., art. XIII B, §6, subd. (a).) The TMDL-specific requirements of this Order, as amended on December 19, 2017, do not constitute a new program or higher level of service for two reasons.

First, the Order, as adopted on February 5, 2013 (effective July 1, 2013), requires permittees to "reduce the discharge of pollutants . . . to achieve TMDL wasteload allocations . . . established for discharges by the MS4s." (Section C.1.) Attachment G listed the applicable TMDLs and specified requirements for implementation of the wasteload allocations. The 2017 amendments to the Order revise or clarify TMDL implementation requirements where requirements in the 2013 Order were unclear or too general. The amendments do not change the baseline requirement in Section C.1 that permittees reduce discharges of pollutants to achieve the wasteload allocations, but simply provide more clarity to the permittees in how to implement that ongoing requirement. Thus, the amendments do not constitute a new program, and do not constitute an increased level of service as permittees were already required to meet TMDL wasteload allocations by implementation of appropriate actions. Refinements of existing requirements do not constitute a higher level of service, even where there may be an increase in costs. (See *County of Los Angeles v. Comm'n on State Mandates*, 110 Cal.App.4th 1176, 1189-1195 [discussing case law on "new program" and "higher level of service"].)

Second, even where the 2013 Order has been amended to include requirements for TMDLs adopted since 2013, the TMDL-specific requirements are not a new program or higher level of service because the TMDLs are simply the mechanism to achieve compliance with water quality standards. The Order, as adopted in 2013, included receiving water limitations stating that "discharges shall not cause or contribute to an exceedance of water quality standards contained in a Statewide Water Quality Control Plan, the California Toxics Rule (CTR), or in the applicable Regional Water Board Basin Plan." (Section D.) TMDLs are the means to implement water quality standards in impaired water bodies. Incorporation of TMDL-based requirements into the MS4 permit, consistent with applicable basin plans, allows the permittee greater flexibility in achieving the water quality standards in the receiving water by allowing additional time to meet the receiving water limitations or, in some cases, permitting interim compliance through management practice implementation rather than immediate compliance with numeric limitations. The TMDL-specific requirements accordingly do not constitute a new program or higher level of service as compared with the baseline requirement of the receiving water limitations.

Page 55

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*The TMDL-specific requirements impose requirements that are mandated by federal law:*

The TMDL-specific requirements of this Order also fit under exceptions to the requirement to reimburse local government for a new program or higher level of service. Most significantly, one exception exists if "[t]he statute or executive order imposes a requirement that is mandated by a federal law or regulation and results in costs mandated by the federal government, unless the statute or executive order mandates costs that exceed the mandate in that federal law or regulation." (Gov. Code, §17556, subd.(c).)

The TMDL-specific requirements of Attachment G are mandated by federal law and federal regulations. Clean Water Act Section 303(d) requires that each state "shall" identify impaired waterbodies, "shall" prioritize such waters/watersheds for future development of TMDLs, and "shall" develop TMDLs for the appropriate pollutants in accordance with the prioritization. (33 U.S.C. § 1313(d).) The TMDLs must be approved by U.S. EPA. (Id.) The Code of Federal Regulations provides that once U.S. EPA approves a TMDL for a waterbody, the effluent limitations in any NPDES permit "shall" be "consistent with the assumptions and requirements of any available wasteload allocations." (40 C.F.R. § 122.44(d)(1)(vii)(B).) Specific to Phase II MS4 permits, the Code of Federal Regulations states that "the permit will include… [m]ore stringent terms and conditions… based on an approved total maximum daily load…" (40 C.F.R. § 122.34(c)(1).)

Federal law thus compels the State Water Board to include the TMDL-specific provisions of Attachment G in the Phase II MS4 Permit.[40]

The California Supreme Court's 2016 decision in *Department of Finance v. Comm'n on State Mandates* (2016) 1 Cal.5[th] 749, *as modified on denial of rehearing* (Nov. 16, 2016) (*Department of Finance*) established a new framework for analyzing the federal mandates exception to article XIII B, section 6 of the Constitution. An agency order is not a federal mandate if (1) federal law gives the State discretion to impose the particular implementing requirement, and (2) the State exercises that discretion in imposing the requirement by virtue of a "true choice." (*Department of Finance*, *supra*, 1 Cal.5th at 765.) That case concerned the discretion of the Los Angeles Water Board under the MEP standard and the court held that the Board had exercised a true choice in imposing certain requirements on the permittees. Here, the discretion exercised by the State Water Board in complying with section 122.44, subdivision (d)(1)(vii)(B) of Title 40 of the federal regulations is different and more limited than under the MEP standard. Title 40, Section 122.44, subdivision (d)(1)(vii)(B) specifically directs the Board to include effluent limitations which are consistent with the assumptions of any applicable wasteload allocations. The State Water Board had no choice but to include the TMDL-specific provisions in this Order that would result in attainment of the wasteload allocation within the timeframe established in the TMDL. The only discretion the Board employed when complying with section 122.44, subdivision (d)(1)(vii)(B) was crafting

---

[40] USEPA has similarly required attainment of applicable wasteload allocations in MS4 permits. (See, e.g., sections 1.4.2 and 4.10 of Modified NPDES Permit No. DC0000022 for the MS4 for the District of Columbia, issued October 7, 2011, modified November 9, 2012, available at https://www3.epa.gov/reg3wapd/pdf/pdf_npdes/stormwater/DCMS4/MS4FinalLimitedModDocument/FinalModifiedPermit_10-25-12.pdf and section 2.1.1 and Appendix F of the General Permit for Small MS4s in Massachusetts, issued April 4, 2016, available at https://www3.epa.gov/region1/npdes/stormwater/ma/2016fpd/final-2016-ma-sms4-gp.pdf)

provisions which were consistent with the assumptions and requirements of the applicable wasteload allocations. In exercising this limited discretion, the Board simply translated the wasteload allocations directly into effluent limitations in the form of required control actions. This involved significantly less discretion than did the provisions at issue in *Department of Finance*. Further, in instances where the State Water Board and the appropriate regional water board determined that a choice of actions is available to the permittee to achieve the wasteload allocations in the required timeframe, Attachment G provides that the permittee may propose a set of actions for approval by the relevant regional water board.

Additional federal laws and regulations mandate inclusion of portions of the TMDL-specific requirements of this Order. Under Clean Water Act section 402, subdivision (p)(3)(B)(ii), MS4 permits must effectively prohibit non-storm water discharges into MS4s. (33 U.S.C. §1342(p)(3)(B)(ii); see also 40 C.F.R. § 122.34(b)(3).) Several TMDLs implemented through this Order apply to dry weather discharges, i.e. non-storm water discharges, and require illicit discharge detection and elimination efforts to address non-storm water discharges. The federal regulations also require Phase II permits to incorporate an evaluation of "compliance with the terms and conditions of the permit, including the effectiveness of the components of [ ] storm water management program[s] and the status of achieving the measurable requirements in the permit" (40 C.F.R. §122.34(d)(1).) The TMDL requirements include monitoring and reporting to determine that the TMDL-specific requirements are leading to appropriate progress toward achievement of the wasteload allocations.

*The MS4s have authority to levy service charges, fees, and assessments:*

Another exception applies where "the local agency . . . has the authority to levy service charges, fees, or assessments sufficient to pay for the mandated program or increased level of service." (Gov't Code, § 17556, subd. (d).) The MS4 permittees have the ability to charge fees, such as inspection fees or storm water fees, to cover the cost of the TMDL-specific requirements.

*The TMDL-specific requirements are requirements of general applicability:*

Finally, reimbursement to local agencies is required only for the costs involved in carrying out functions peculiar to government, not for expenses incurred by local agencies as an incidental impact of laws that apply generally to all state residents and entities. (*City of Richmond v. Comm'n on State Mandates* (1998) 64 Cal.App.4th 1190, 1199.) The Clean Water Act and the federal regulations' TMDL requirements are laws of general applicability, uniformly imposed on all NPDES permittees, including not just MS4s, but also industrial and construction storm water dischargers, as well as traditional NPDES permittees such as wastewater treatment plants.

For the foregoing reasons, the TMDL requirements of this Order do not constitute unfunded mandates requiring reimbursement.

## Basis of TMDL-Related Permit Requirements
The following discussion provides the basis for the TMDL-related requirements in Attachment G of this Order.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## NORTH COAST REGIONAL WATER BOARD TMDLs

### *Laguna de Santa Rosa Ammonia & Dissolved Oxygen TMDL*

The Laguna de Santa Rosa Ammonia and Dissolved Oxygen TMDL was approved by U.S. EPA as the Waste Reduction Strategy for the Laguna de Santa Rosa, dated March 1, 1995. The Waste Reduction Strategy provided the assumptions and goals used to determine the best option to reduce impacts to the Laguna de Santa Rosa, and attain water quality goals and objectives. The Regional Water Board, however, found the Waste Reduction Strategy to be unenforceable and inadequate to address the declining dissolved oxygen issues in Laguna de Santa Rosa. In 2002, the Regional Water Board determined that dissolved oxygen objectives were being violated and that nutrient loads were on the rise. The Regional Water Board is in the process of developing a TMDL for the Laguna de Santa Rosa for nitrogen, phosphorus, dissolved oxygen, temperature and sediment. Due to the above findings and TMDL development efforts, the State Water Board has removed the Waste Reduction Strategy requirements in this Order.

### *Shasta River Watershed Temperature & Dissolved Oxygen TMDL*

The Shasta River watershed includes all tributaries and Lake Shastina in Siskiyou County. The Shasta River Watershed Temperature and Dissolved Oxygen TMDL and Action Plan was adopted by the North Coast Regional Water Board on June 28, 2006. The Shasta River Watershed Temperature and Dissolved Oxygen TMDL was approved by U.S. EPA and became effective on January 26, 2007. The Shasta River TMDL Action Plan contains the goals and assumptions used to develop the wasteload allocations and conditions to be considered in conducting actions (in this case, storm water management) in the Shasta River watershed.

The North Coast Regional Water Board has determined that the City of Yreka, a Traditional Small MS4 permittee, is a source of "human activity" subject to this TMDL and must comply with the TMDL-requirements of this Order. The TMDL does not specify wasteload allocations for the City of Yreka, but does require the City of Yreka to develop and implement a plan to minimize and control pollutants of concern in urban storm water runoff. That plan was developed and submitted on June 24, 2013, as part of the City's Notice of Intent for this Order. Attachment G of this Order requires the City to implement this plan no later than January 1, 2019. Therefore, the City will be required to implement the plan immediately. There are no current monitoring requirements for the City related to TMDL implementation.

## *SAN FRANCISCO BAY REGIONAL WATER BOARD TMDLs*

### *Napa River Sediment TMDL*

The Napa River and its tributaries are listed as impaired due to excessive sediment. The river was listed on the Clean Water Act section 303(d) in response to concerns regarding adverse impacts to habitat for steelhead trout, chinook salmon, and other threatened species whose populations have declined substantially in recent decades. The Napa River Sediment TMDL and Habitat Enhancement Plan identify pollutant sources of concern, and specify actions to restore a healthy fishery in the watershed.

The Napa River Sediment TMDL identifies urban storm water runoff, specifically storm water runoff from State highways, and industrial and construction sites as a source of impairment. The Napa River Sediment TMDL names parties that should implement measures to control and/or prevent sediment discharges associated with urban storm water runoff (hereinafter

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

referred to as Implementing Parties). Attachment G of this Order assigns requirements to the Traditional Small MS4 designees identified as Implementing Parties within the Napa River Sediment TMDL.

*Wasteload Allocations (WLA):* The Napa River Sediment TMDL includes a WLA of 800 metric tons/year for storm water runoff discharges from stream crossings and storm water runoff discharges associated with operation of public and private roads, paved and unpaved within the watershed not otherwise covered by NPDES permits issued to Napa County and municipalities including the City of Napa, Town of Yountville, City of St. Helena, City of Calistoga, and City of American Canyon.

*Load Allocations (LA):* The Napa River Sediment TMDL also includes an LA of 27,000 metric tons/year that applies to a roads and streams crossings source category that Napa County and the City of Napa, Town of Yountville, City of St. Helena, City of Calistoga, and City of American Canyon share with Caltrans. Caltrans is responsible for runoff from State highways and associated construction activities. Discharges from State highways are regulated by the State Water Board's statewide municipal storm water permit issued to Caltrans; discharges of storm water from construction activities are regulated by the State Water Board's Statewide Storm Water Permit for Discharges Associated with Construction and Land Disturbance Activity.

Deliverables/Actions Required:
The TMDL-related requirements in this Order are based on the TMDL Implementation Plan. To implement the roads and stream crossings allocation, the TMDL Implementation Plan establishes a performance standard for roads as follows: road-related sediment delivery to channels should be ≤ 500 cubic yards per mile per 20 year period. The TMDL Implementation Plan also calls on entities responsible for paved roads to conduct a survey of stream-crossings associated with paved public roadways and develop a prioritized implementation plan for repair and/or replacement of high priority crossings/culverts to reduce road related erosion and protect stream-riparian habitat conditions. Napa County was timely in submitting an implementation plan by October 2014.

Attainment of water quality objectives will be evaluated at the confluence of Napa River with Soda Creek, which includes the downstream boundary of freshwater habitat for salmon and steelhead. Attainment of the water quality objectives will be evaluated over a 5-to-10-year averaging period.

### *Sonoma Creek Sediment TMDL*

The Sonoma Creek Sediment TMDL includes a wasteload allocation that applies to storm water runoff discharges from stream crossings and public and private roads (paved and unpaved) within the watershed that are not otherwise covered by a Phase 1 NPDES MS4 permit issued to the County and/or City of Sonoma.

The Sonoma County Water Agency has been a voluntary participant with proactive storm water control efforts, including enrollment under the previous 2003 Small MS4 permit (Order 2003-0005-DWQ). The Sonoma County Water Agency owns and operates approximately 2,000 linear feet of stream channel within the Sonoma Creek watershed. Therefore, the Agency is subject to the TMDL, as expressed by the requirements in Attachment G.

Phase II Entities:
The Sonoma Creek Sediment TMDL identifies urban storm water runoff from Phase II entities, State highways, and industrial and construction storm water discharges, as a source of

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

impairment. The TMDL names parties that should implement measures to control and/or prevent sediment discharges associated with urban storm water runoff (hereinafter referred to as Implementing Parties). Attachment G of this Order assigns requirements to the designees identified as Implementing Parties within the TMDL.

Wasteload and Load Allocations:

The Sonoma Creek sediment TMDL assigns a wasteload allocation to municipal storm water and a load allocation for the roads source category. The sediment wasteload allocation is 600 tons/year and applies to storm water runoff discharges from Phase II permittees. The load allocation of 2,100 tons/year of sediment is for the road and stream crossings category and applies to stream crossings and storm water runoff discharges associated with operation of public and private roads (paved and unpaved) within the watershed not otherwise covered by an NPDES storm water permit.

Municipalities share the wasteload allocation with another entity (i.e., Caltrans). Caltrans is responsible for runoff from State highways and associated construction activities. Discharges from State highways are regulated by the State Water Board statewide municipal storm water permit issued to Caltrans; discharges of storm water from construction activities are regulated by the State Water Board Statewide Storm Water Permit for Discharges Associated with Construction and Land Disturbance Activity.

Deliverables/Actions Required:

The TMDL-related requirements in this Order are based on the TMDL Implementation Plan. To implement the roads and stream crossings allocation, the TMDL Implementation Plan establishes a performance standard for the design, construction, and maintenance of rural roads to minimize road-related sediment delivery to streams. The Implementation Plan also requires entities responsible for paved roads, such as the City and County of Sonoma, to: (1) adopt and implement best management practices for maintenance of unimproved (dirt/gravel) roads, (2) conduct a survey of stream-crossings associated with paved public roadways, (3) develop a prioritized implementation plan for repair and/or replacement of high priority crossings/culverts to reduce road related erosion, and (4) protect stream-riparian habitat conditions.

TMDL compliance, and water body attainment with the sediment water quality objectives, will be evaluated at the limit of tidal influence in the Sonoma Creek watershed, which approximates the downstream boundary of freshwater habitat for steelhead. Sonoma Creek has several tributaries that join the main stem below the tidal limit; therefore, several locations will be used to evaluate water body attainment. These locations are: (1) the main stem Sonoma Creek immediately downstream of the Fowler/Carriger Creek confluence, and (2) the freshwater portions (above tidal influence) of Schell, Ramos, Carneros, and Merazo Creeks. Attainment of the sediment water quality objectives will be evaluated over a 5-to-10-year averaging period.

This Order does not directly require the preparation and implementation of Storm Water Management Plans as required in the previous 2003 Storm Water Permit (Order 2003-0005-DWQ). However, the specific implementation actions for attenuation of peak flows and durations from new and redevelopment projects that were proposed by Permittees in the Storm Water Management Plans approved under the previous 2003 Storm Water Permit are incorporated herein by reference. The municipalities identified in this TMDL section shall continue to implement those specific actions to attenuate peak flows and durations from new

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

and redevelopment projects as stated in Attachment G. Municipalities may propose amendments to those actions by submitting an updated proposal for attenuation of peak flows and durations to the San Francisco Bay Regional Water Board.

### Napa River Pathogens TMDL
The Napa River Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The San Francisco Water Board has determined that the Cities of American Canyon, Calistoga, St. Helena and Napa, the Town of Yountville and the County of Napa, Traditional Small MS4s, are sources of "municipal runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

Load Allocations:
The Napa River pathogens TMDL assigns a load allocation to municipal storm water as follows:

[All are in units of CFU per 100 milliliters]

| E.coli Geometric Mean | E.coli 90th percentile | Fecal coliform Geometric Mean | Fecal coliform 90th percentile | Total coliform Median | Total coliform Single Sample Max |
|---|---|---|---|---|---|
| <113 | <368 | <180 | <360 | <216 | 9,000 |

These allocations are applicable year-round and apply to any sources (existing or future) subject to regulation by NPDES permit.

Deliverables/Actions Required:
The TMDL-related requirements in this Order are derived from the TMDL Implementation Plan that was adopted with the TMDL. The Implementation Plan for the pathogen TMDL requires parties responsible for municipal runoff (i.e., Napa County and municipalities including the City of Napa, Town of Yountville, City of St. Helena, City of Calistoga, and City of American Canyon) to comply with storm water management plans previously developed. The municipalities' management plans must be updated and/or amended as necessary to include actions that will lead to compliance with the requirements of this Order. The management plans must address:(1) public participation and outreach, (2) pet waste management, (3) illicit sewage discharge detection and elimination to reduce and eliminate fecal coliform discharges to Sonoma Creek, and (4) pollution prevention strategies. The Implementation Plan also requires these municipalities to participate in evaluation of E. coli concentration trends in the Napa River and its tributaries and to report annually on water quality monitoring results and progress made on implementation of human and animal runoff reduction measures. The implementation actions are expected to build on existing programs. The Permittee must report on its implementation actions in the Annual Report.

### Sonoma Creek Pathogens TMDL
The Sonoma Creek Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The Sonoma County Water Agency has been a voluntary participant with early storm water control efforts, including enrollment under the previous Small MS4 permit (Order 2003-0005-DWQ). The Sonoma County Water Agency owns and operates approximately 2,000 linear feet of stream channel within its service area. The Agency is also enrolled under this Order and, as such, is subject to the TMDL, expressed as requirements in Attachment G.

Phase II Entities:
The San Francisco Water Board has determined that the City of Sonoma, the County of Sonoma, and the Sonoma County Water Agency, Traditional Small MS4 permittees, are sources of "municipal runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The Sonoma Creek pathogens TMDL assigns a wasteload allocation to municipal storm water as follows:

[Units: CFU/100 milliliters]

| *E.coli* | *E.coli* | Fecal coliform | Fecal coliform | Total coliform | Total coliform |
|---|---|---|---|---|---|
| Geometric Mean | 90th percentile | Geometric Mean | 90th percentile | Median | Single Sample Max |
| <113 | <368 | <180 | <360 | <216 | 9,000 |

These allocations are applicable year-round and apply to any sources (existing or future) subject to regulation by NPDES permit.

Deliverables/Actions Required:
The TMDL-related requirements in this Order are derived from the TMDL Implementation Plan that was adopted with the TMDL. The Implementation Plan for the pathogen TMDL requires parties responsible for municipal runoff (i.e., City and County of Sonoma) to comply with storm water management plans previously developed. The municipalities' management plans must be updated and/or amended as necessary to include actions that will lead to compliance with the requirements of this Order. The management plans must address: (1) public participation and outreach, (2) pet waste management, (3) illicit sewage discharge detection and elimination to reduce and eliminate fecal coliform discharges to Sonoma Creek, and (4) pollution prevention strategies. The Implementation Plan also requires the City and County of Sonoma to participate in evaluation of E. coli concentration trends in Sonoma Creek and its tributaries and to report annually on water quality monitoring results and progress made on implementation of human and animal runoff reduction measures. The implementation actions are expected to build on existing programs. The Permittee must report on its implementation actions in the Annual Report.

For the Sonoma County Water Agency, the TMDL implementation requirements of this Order are incorporated by reference to the Storm Water Management Plan approved under the previous 2003 Storm Water Permit (Order 2003-0005-DWQ). The Sonoma County Water Agency must comply with the compliance dates established in its previously approved Storm Water Management Plans.

## *Tomales Bay Pathogens TMDL*
The Tomales Bay Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The San Francisco Water Board has determined that the County of Marin is a source of municipal runoff subject to this Order and that the County is responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The Tomales Bay Pathogens TMDL assigns a wasteload allocation to municipal storm water as follows:

  Note a: These allocations are applicable year-round and apply to any sources (existing or future) subject to regulation by NPDES permit.

  Note b: Based on a minimum of five consecutive samples equally spaced over a 30-day period.

  Note c: No more than 10% of total samples during any 30-day period may exceed this number.

### Fecal Coliform [a] (Most Probable Number per 100 milliliters)
*For Direct Discharges to Tomales Bay*
  Median [b]: <14
  90th percentile [c]: <43

*For Discharges to Major Tomales Bay Tributaries*
  Log Mean [b]: <200

Deliverables/Actions Required:
The TMDL-related requirements in this Order are derived from the TMDL Implementation Plan that was adopted with the TMDL. The Implementation Plan for the Pathogen TMDL requires parties responsible for municipal runoff (i.e., Marin County) to comply with storm water management plans previously developed. The municipalities' management plans must be updated and/or amended as necessary to include actions that will lead to compliance with the requirements of this Order. The management plans must address:(1) public participation and outreach, (2) pet waste management, (3) illicit sewage discharge detection and elimination to reduce and eliminate fecal coliform discharges to Tomales Bay and its tributaries including Olema, Lagunitas, and Walker Creeks, and (4) pollution prevention strategies. The Implementation Plan also requires these municipalities to participate in evaluation of E. coli concentration trends in Tomales Bay and its tributaries and to report annually on water quality monitoring results and progress made on implementation of human and animal runoff reduction measures. The Implementation Plan anticipates that dischargers (including Marin County) and stakeholders, in collaboration with the Water Board will conduct water quality monitoring to evaluate fecal coliform concentration trends in Tomales Bay and its tributaries.

The implementation actions are expected to build on existing local storm water management programs and ongoing efforts to reduce pathogen loads to Tomales Bay and its tributaries. The Permittee must report on its implementation actions in the Annual Report.

### Richardson Bay Pathogens TMDL

The Richardson Bay Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The San Francisco Water Board has determined that the Cities of Belvedere, Mill Valley, Sausalito, Tiburon and the County of Marin, Traditional Small MS4s, are a source of "municipal runoff" subject to this TMDL and must comply with the requirements of the Richardson Bay Pathogens TMDL in this Order.

Wasteload Allocations:

The Richardson Bay Pathogens TMDL assigns a wasteload allocation to municipal storm water as follows:

Note a: These allocations are applicable year-round.
Note b: Based on a minimum of five consecutive samples equally spaced over a 30-day period.
Note c: No more than 10% of total samples during any 30-day period may exceed this number.

**Fecal Coliform [note a], (Most Probable Number per 100 milliliters)**

Median [note b]: <14
90th percentile [note c]: <43

Deliverables/Actions Required:

The requirements in this Order are derived from the TMDL Implementation Plan that was adopted with the TMDL. The Implementation Plan for the pathogen TMDL requires parties responsible for municipal runoff (i.e., Marin County, City of Mill Valley, City of Tiburon, City of Belvedere, and City of Sausalito) to comply with storm water management plans previously developed. The municipalities' management plans must be updated and/or amended as necessary, to include actions that will lead to compliance with the requirements of this Order. The management plans must address: (1) public participation and outreach, (2) pet waste management, (3) illicit sewage discharge detection and elimination to reduce and eliminate fecal coliform discharges to Sonoma Creek, and (4) pollution prevention strategies. The Implementation Plan also requires these parties responsible for municipal runoff to report annually on progress made on implementation of human and animal runoff reduction measures.

The implementation actions are expected to build on existing local storm water management programs. The Permittee must report on its implementation actions in the Annual Report.

### Urban Creeks Diazinon and Pesticide Toxicity TMDL

The Urban Creeks Diazinon and Pesticide TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below. This provision implements requirements of the TMDL for Diazinon and pesticide-related toxicity for Urban Creeks in the San Francisco Bay Region. Pesticides of concern include: organophosphorus pesticides (chlorpyrifos, diazinon, and malathion); pyrethroids (bifenthrin, cyfluthrin, beta-cyfluthrin, cypermethrin, deltamethrin, esfenvalerate, lambda-cyhalothrin, permethrin, and tralomethrin); carbamates (e.g., carbaryl); and fipronil.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

Phase II Entities:

The San Francisco Water Board has determined that the following municipalities are a source of "urban runoff" subject to this TMDL and must comply with the TMDL-related requirements of this Order: (1) the Cities of Belvedere, Larkspur, Mill Valley, Novato, Petaluma, San Rafael, Sausalito, and Sonoma, (2) the Towns of Corte Madera, Fairfax, Ross, San Anselmo, and Tiburon, and (3) the Counties of Marin and Sonoma, Traditional Small MS4 permittees.

Wasteload Allocations:

　　Diazinon: 100 nanograms/liter (ng/l) (one-hour average)

　　Toxicity: 1.0 Acute Toxicity Unit (TUa) and 1.0 Chronic Toxicity Unit (TUc)

Deliverables/Actions Required:

The requirements in this Order are derived from the TMDL Implementation Plan that was adopted with the TMDL. The Implementation Plan for the Urban Creeks and Diazinon and Pesticide Toxicity TMDL requires parties responsible for municipal runoff (i.e., Marin County, City of Belvedere, Town of Corte Madera, Town of Fairfax, City of Larkspur, City of Mill Valley, City of Novato, Town of Ross, Town of San Anselmo, City of San Rafael, City of Sausalito, Town of Tiburon, County of Sonoma, City of Sonoma, and City of Petaluma) to adopt an Integrated Pest Management Policy (IPM) or ordinance, as the basis of a Pesticide-Related Toxicity Program. Implementation actions of the Pesticide-Related Toxicity Program must include: a) training of all municipal employees who use or apply pesticides in the IPM practices and policy/ordinance, b) requiring contractors to implement IPM, c) keeping County Agricultural Commissioners informed of water quality issues related to pesticides, d) conducting outreach to residents and pest control applicators on less toxic methods for pest control, e) keeping records on pesticide use, and f) monitoring water and sediment for pesticides and associated toxicity in urban creeks via an individual or regional monitoring program.

The term "integrated pest management," as used for the purpose of this Order, refers to a process that includes setting action thresholds, monitoring and identifying pests, preventing pests, and controlling pests when necessary. Integrated pest management meets the following conditions:

- Pest control practices that focus on long-term pest prevention through a combination of techniques, such as biological control, habitat manipulation, and modification of cultural practices;

- Pesticides are used in response to monitoring indicating that pesticides are needed; Pesticide applications with the goal of removing only the target pest; and

- Pesticides are selected to minimize risks to human health, beneficial and non-target organisms, and the environment, including risks to aquatic habitats.

The term "less toxic pest control," as used for the purpose of this Order, refers to the use of pest control strategies selected to minimize the potential for pesticide-related toxicity in water and sediment.

Permittees are required to reduce discharges of pollutants, including pesticides, to the maximum extent practicable as required by this Order.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## CENTRAL COAST REGIONAL WATER BOARD TMDLs

For All TMDLs Requiring Wasteload Allocation Attainment Programs

For TMDLs that identify municipal storm water as a contributor to water body impairment, MS4s must reduce their wasteload discharges in accordance with TMDLs. The Central Coast Regional Water Board requires MS4s to develop Wasteload Allocation Attainment Programs to achieve compliance with the TMDL. The TMDLs set forth the expectation that the MS4s achieve their wasteload allocations within specified timeframes. The Wasteload Allocation Attainment Program approach differs from the typical regulatory requirements applied to municipal storm water (BMP implementation per an iterative process of continual improvement for achieving water quality standards). The MS4s' contribution to the impairment of water bodies, combined with the TMDL expectation that municipalities achieve their wasteload allocations within specified timeframes, necessitates a systematic approach to program implementation as it relates to the discharge of pollutants associated with impairments.

Federal regulations indicate that such an approach is appropriate. The Preamble to the Phase II federal storm water regulations states: "Small MS4 permittees should modify their programs if and when available information indicates that water quality considerations warrant greater attention or prescriptiveness in specific components of the municipal program."[41]

The Central Coast Water Board developed the Wasteload Allocation Attainment Program approach as a means to systematically guide municipalities towards attainment of their wasteload allocations. Without a systematic approach of this type, attainment of wasteload allocations within an identified time period is unlikely. Local municipal storm water management programs typically include basic or minimum BMPs to be implemented to attain water quality objectives. While some BMPs provide effective treatment and management of urban runoff, the connection between BMP effectiveness and attainment of wasteload reductions is unclear. Municipalities have implemented BMPs, yet water body impairment continue due to the inability for BMPs implemented by MS4s to address all the water quality issues identified in TMDLs. The demonstration of BMP implementation in a non-systematic approach failing to address impairments indicates that a systematic approach, as represented by the Wasteload Allocation Attainment Programs, is warranted.

On a broader scale, existing storm water programs often do not provide and/or exhibit the rationale used for BMP selection, or draw connections between those BMPs selected and attainment of wasteload allocations. Without a programmatic level of planning and design, attainment of wasteload allocations within specified timeframes may not take place. The Wasteload Allocation Attainment Program requirements are expressly designed to ensure adequate planning is conducted so that MS4s' TMDL implementation efforts are effective to achieve regulatory compliance. Wasteload Allocation Attainment Program development and implementation include the following items on a TMDL-specific basis: (1) An implementation and assessment strategy; (2) source identification and prioritization; (3) BMP identification, prioritization, implementation (including schedule), analysis[42], and assessment; (4) monitoring

---

[41] 64 FR 68753

[42] This analysis must be a quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation achieved the MS4's wasteload allocation. This analysis will most likely incorporate modeling efforts.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

program development and implementation (including schedule); (5) reporting and evaluation of progress towards complying with wasteload allocations; and (6) coordination with stakeholders. The United States Environmental Protection Agency (U.S. EPA) forwards similar approaches for TMDL implementation in its Draft TMDLs to Storm Water Permits Handbook, which discusses BMP review and selection, establishing linkages between BMP implementation and load reductions, effectiveness assessment, and BMP/outfall/receiving water monitoring.[43]

Ultimately, the Wasteload Allocation Attainment Programs place the responsibility for program development, assessment, improvement, and success on the municipalities since municipal storm water has been identified as contributing to the water quality impairment. The Regional Water Board will collectively assess the progress of the various pollutant sources towards achieving receiving water quality standards as part of its triennial Basin Planning review, but each source must be responsible for assessing its own progress towards achieving its wasteload allocation. The process of planning, assessment, and refinement outlined by the Wasteload Allocation Attainment Programs helps ensure continual improvement and ultimate attainment of water quality standards at impaired receiving waters.

This Order implements TMDLs that have either a past-due or upcoming attainment date. In such instances, the Regional Water Board may determine, based upon past and proposed future actions, that the method for a permittee to attain the wasteload allocations will include further assessment and improvement upon implementation of the Wasteload Allocation Attainment Plans. The Permittee may request a Time Schedule Order from its Regional Water Board to allow additional time for compliance with the TMDL requirements.

View Central Coast TMDLs online at: http://www.waterboards.ca.gov/centralcoast/water_issues/programs/tmdl/303d_and_tmdl_projects.shtml

### *Morro Bay and Chorro and Los Osos Creeks Pathogens TMDL*
The Morro Bay and Chorro and Los Osos Creeks Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below. Pennington Creek and Warden Creek are tributaries of Los Osos Creek, and are therefore included in the TMDL.

Although several waterbodies were named in the Attachment G of this Order, as adopted by the State Water Board on February 5, 2013, three waterbodies (San Bernardo, San Luisito, and Walters Creeks) have been removed (by this amendment) due to these waterbodies (and their watersheds) being outside the permitting boundary areas of the Phase II entities below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the City of Morro Bay and the County of San Luis Obispo, Traditional Small MS4 permittees, are a source of "urban runoff" subject to this TMDL, and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
The City of Morro Bay and County of San Luis Obispo are assigned the following wasteload allocations:

---

[43] U.S. EPA. 2008. Draft TMDLs to Stormwater Permits Handbook. Chapters 5 and 6.

For discharges to Los Osos Creek, Chorro Creek, and their tributaries:

1) The fecal coliform geometric mean concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed 200 Most Probable Number/100 milliliters, and

2) The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number/100 milliliters.

For discharges to Morro Bay:

1) The fecal coliform geometric mean concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed 14 Most Probable Number/100 milliliters, and

2) The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 43 Most Probable Number/100 milliliters.[44]

Deliverables/Actions Required:
The numeric targets approved in the TMDL are expressed in terms of receiving water indicators, e.g. fecal coliform density measurements. Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program, per the requirements in Attachment G of this Order. By February 5, 2014 the City of Morro Bay and County of San Luis Obispo were required to develop, submit, and begin implementation of a Wasteload Allocation Attainment Program that identifies the actions they will take to attain their wasteload allocations. Therefore, effective immediately, the MS4 shall implement the Wasteload Allocation Attainment Program.

The TMDL specifies that all wasteload allocations must be achieved by November 19, 2013. Since the deadline is past, the wasteload allocations are effective immediately. The Permittee may request a Time Schedule Order from its Regional Water Board to allow additional time for compliance with the TMDL requirements.

### *Watsonville Slough Pathogens TMDL*
The Watsonville Slough Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the City of Watsonville and the County of Santa Cruz, Traditional Small MS4 permittees, are a source of "urban storm water" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
The City of Watsonville and the County of Santa Cruz are assigned the following concentration-based wasteload allocations:

---

[44] For all Central Coast Water Board fecal indicator bacteria and pathogens TMDLs, E. coli concentrations may be used as a surrogate for fecal coliform concentrations.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

1) The fecal coliform log mean concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed 200 Most Probable Number/100 milliliters, and

2) The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number/100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The City of Watsonville is assigned the above wasteload allocations in the following water bodies: Watsonville, Struve, Harkins, Gallighan and Hanson Sloughs.

The County of Santa Cruz is assigned the above wasteload allocation in the following water bodies: Watsonville, Struve and Harkins Sloughs.

<u>Deliverables/Actions Required:</u>
Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program, as required in Attachment G of this Order.

The TMDL specifies that all allocation must be achieved by November 20, 2016. The Permittee may request a Time Schedule Order from its Regional Water Board to allow additional time for compliance with the TMDL requirements.

***<u>Pajaro River, San Benito River, Llagas Creek, Tequesquita Slough, San Juan Creek, Carnadero/Uvas Creek, Bird Creek, Pescadero Creek, Tres Pinos Creek, Furlong (Jones) Creek, Santa Ana Creek, and Pachecho Creek Fecal Coliform TMDL</u>***
The above-named Fecal Coliform TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

<u>Phase II Entities:</u>
The Central Coast Regional Water Board has determined that the Cities of Gilroy, Hollister, Morgan Hill, Watsonville, and the Counties of Monterey, Santa Clara, and Santa Cruz, Traditional MS4 permittees, are a source of "MS4 discharges" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

<u>Wasteload Allocations:</u>
The Cities of Hollister, Morgan Hill, Gilroy and Watsonville and the Counties of Monterey, Santa Clara and Santa Cruz are assigned the following concentration based wasteload allocations:

The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharges shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The Cities of Hollister, Morgan Hill, Gilroy and Watsonville and the Counties of Santa Cruz, Santa Clara and Monterey are assigned the above wasteload allocations in the following water bodies: Pajaro River, San Benito River, Llagas Creek and Tequesquita Slough.

<u>Deliverables/Actions Required:</u>
Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program, as required in Attachment G of this Order. The TMDL specifies that all allocations must be achieved by July 12, 2023.

### *Morro Bay Sediment TMDL*
The Morro Bay Sediment TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Although San Bernardo and San Luisito Creeks were named in Attachment G of this Order as adopted by the State Water Board on February 5, 2013, the requirements of this Order are not applicable to these water bodies because the water bodies (and their watersheds) are outside the permit boundary areas of the Phase II entities, below.

<u>Phase II Entities:</u>
The Central Coast Regional Water Board has determined that the County of San Luis Obispo, a Traditional MS4 permittee, is a source of "urban land use" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

<u>Wasteload Allocations:</u>
The numeric targets approved in the TMDL are expressed in terms of receiving water indicators, e.g. pool residual volume, median diameter of spawning gravel, etc. The TMDL also expressed the sediment assimilative capacity and allocations required to achieve the numeric targets. The allocations require a 50% reduction of current loading (estimated in 2003) to achieve the numeric targets. The wasteload allocations assigned to the responsible parties in this permit represent a 50% reduction from 2003 loading estimates.

The County of San Luis Obispo is assigned a wasteload allocation of 5,137 tons/year of sediment. The aggregated sediment discharge from all storm water outfalls into Morro Bay, or any tributary that has the potential to discharge sediment to Morro Bay, shall not exceed the allocation.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The County of San Luis Obispo is assigned allocations in the following water bodies: Morro Bay, Los Osos Creek, Chorro Creek, Dairy Creek, Pennington Creek, and Warden Creek.

<u>Deliverables/Actions Required:</u>
Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program, laid out in detail in Attachment G of this Order.

The allocations shall be achieved by December 3, 2053.

### *San Lorenzo River Sediment TMDL*
The San Lorenzo River Sediment TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Phase II Entities:
The Central Coast Regional Water Board has determined that the Cities of Santa Cruz, Scotts Valley and the County of Santa Cruz, Traditional MS4 permittees, are a source of "Other Urban and Rural Land" and "Public and Private Roads" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
The numeric targets approved in the TMDL are expressed in terms of receiving water indicators, e.g. pool residual volume, median diameter of spawning gravel, etc. The TMDL also expressed the sediment assimilative capacity and allocations required to achieve the numeric targets. The allocations require reductions of 24-27 percent of current sediment loading (estimated in 2002) to achieve the numeric targets. The wasteload allocations assigned to the responsible parties in this permit represent a 24-27 percent reduction from the 2003 loading estimates.

The County of Santa Cruz, City of Santa Cruz, and City of Scotts Valley are assigned the following wasteload allocations:

- The sediment discharge loading from public roads to the San Lorenzo River shall be reduced by 27%,

- The sediment discharge loading from public roads to Lompico Creek shall be reduced by 24%,

- The sediment discharge loading from public roads to Carbonera Creek shall be reduced by 27%,

- The sediment discharge loading from public roads to Shingle Mill Creek shall be reduced by 27%.

Deliverables/Actions Required:
Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program as required in Attachment G of this Order. The allocations shall be achieved by December 18, 2028.

### ***Pajaro River (including Llagas Creek, Rider Creek and San Benito River) Sediment TMDL***

The Pajaro River (including Llagas Creek, Rider Creek and San Benito River) Sediment TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below. The TMDL names "urban lands within NPDES Phase II urban boundaries" as a Land Use Source Category of sediment loading to the Corralitos Creek subbasin and assigns a wasteload allocation to this category.

Phase II Entities:
The Central Coast Water Board has determined that the Cities of Gilroy, Hollister, Morgan Hill and Watsonville, Traditional MS4 permittees, are sources of "municipal runoff" and must comply with the TMDL-related requirements of this Order.

The Santa Cruz County Fairgrounds is located within the Corralitos Creek subbasin (subbasin number 4) and constitutes "urban lands within NPDES Phase II urban boundaries." The Central Coast Water Board has additionally determined that the Santa Cruz County

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Fairgrounds, a Non-Traditional MS4 permittee, must incorporate provisions for complying with the wasteload allocations described in the TMDL as part of its compliance with this Order.

Wasteload Allocations:

The numeric targets approved in the TMDL are expressed in terms of receiving water indicators, e.g. pool residual volume, median diameter of spawning gravel, etc. The TMDL also provides the sediment assimilative capacity and allocations required to achieve the numeric targets. The allocations require reductions of 90 percent from current sediment loading (estimated in 2005) to achieve the numeric targets. The wasteload allocations assigned to the responsible parties in this permit represent a 90 percent reduction of the 2005 loading estimate.

The City of Morgan Hill, City of Gilroy, City of Hollister, Santa Cruz County Fairgrounds, and the City of Watsonville shall not discharge sediment to the following water bodies in excess of the values shown:

| Major Subwatershed | Metric tons per year |
|---|---|
| Tres Pinos | 1 |
| San Benito River | 100 |
| Llagas Creek | 787 |
| Uvas Creek | 139 |
| Upper Pajaro River | 161 |
| Corralitos (including Rider Creek) | 284 |
| Mouth of Pajaro River | 191 |

Deliverables/Actions Required:

The Central Coast Water Board has determined that compliance with Phase II MS4 permit requirements tailored to focus on reduction of sediment discharges to the affected waterbodies is sufficient to achieve the wasteload allocations. The allocations shall be achieved by November 27, 2051.

### *San Luis Obispo Creek Pathogens TMDL*

The San Luis Obispo Creek Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Central Coast Regional Water Board has determined that the City of San Luis Obispo and the County of San Luis Obispo, Traditional MS4 permittees, and the California Polytechnic (Cal Poly) State University, a Non-Traditional MS4 permittee, are a source of "Urban" and "Human" sources subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:

The City of San Luis Obispo, the County of San Luis Obispo, and the Cal Poly State University-San Luis Obispo, are assigned the following concentration-based wasteload allocation for fecal coliform:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The City of San Luis Obispo is assigned these allocations in San Luis Obispo Creek and Stenner Creek.

The County of San Luis Obispo is assigned these allocations in the San Luis Obispo Creek.

Cal Poly State University-San Luis Obispo is assigned these allocations in Stenner Creek and Brizziola Creek.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

Deliverables/Actions Required:
Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program per requirements in Attachment G of this Order. The TMDL specifies that all allocations shall be achieved no later than July 25, 2015. The allocations are therefore effective immediately. A permittee with a past deadline may request a Time Schedule Order from the applicable Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the permittee to comply with the TMDL requirements that will supersede the deadlines referenced in this Order.

### ***San Luis Obispo Creek Nitrate-Nitrogen TMDL***
The San Luis Obispo Creek Nitrate-Nitrogen TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the City of San Luis Obispo and the County of San Luis Obispo, Traditional MS4 permittees, and Cal Poly State University, a Non-Traditional MS4 permittee, are a source of "Residential areas" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
Urban storm water from the City of San Luis Obispo, County of San Luis Obispo, and Cal Poly State University shall not cause an increase in the receiving water nitrate concentration greater than the increase in nitrate concentration resulting from their discharge in 2006 (when the TMDL became effective). In 2006, the nitrate concentration of storm water discharge was 0.3 mg/L-N.

The City of San Luis Obispo, County of San Luis Obispo, and Cal Poly State University were achieving their allocations at the time the TMDL became effective; these municipalities shall implement measures to assure continued attainment of their allocations.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Deliverables/Actions Required:
The Central Coast Water Board has determined that compliance with the requirements of this Phase II MS4 permit, tailored to focus on reduction of nutrient discharges to the affected water bodies, is sufficient to achieve the wasteload allocations.

The TMDL specifies that the target date to achieve the TMDL is during or before year 2012. The allocations are therefore effective immediately. A permittee is not in need of a Time Schedule Order from the applicable Regional Water Board since these permittees were achieving their allocations at the time the TMDL became effective, and are expected to continue implementing measures to assure continued attainment of their allocations.

### *Corralitos and Salsipuedes Creeks Fecal Coliform TMDL*
The Corralitos and Salsipuedes Creeks Fecal Coliform TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below. The TMDL also names "Owners of private sewer laterals (Private sewer laterals connected to municipal sanitary sewer collection system)" as a responsible party and assigns a wasteload allocation.

Phase II Entities:
The Central Coast Regional Water Board has determined that the City of Watsonville and the County of Santa Cruz, Traditional MS4 permittees, and the Santa Cruz County Fairgrounds, a Non-Traditional MS4 permittee, are a source of "Storm drain discharges" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
The County of Santa Cruz and the City of Watsonville, and the Santa Cruz County Fairgrounds are assigned the following concentration-based wasteload allocation:

> The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

> The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The County of Santa Cruz and the City of Watsonville and the Santa Cruz County Fairgrounds, are assigned the above allocations in the following water bodies: Corralitos Creek and Salsipuedes Creek.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on developing and implementing a Wasteload Allocation Attainment Program, discussed in detail in Attachment G of this Order. All allocations shall be achieved no later than September 8, 2024.

### *Lower Salinas River Watershed Fecal Coliform TMDL*
The Lower Salinas River Watershed Fecal Coliform TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

<u>Phase II Entities:</u>
The Central Coast Regional Water Board has determined that the County of Monterey, a Traditional MS4 permittee, is a source of "Discharges from MS4s" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

The County of Monterey is assigned allocations in the following water bodies:

The Lower Salinas River, the Old Salinas River Estuary, the Tembladero Slough, the Salinas Reclamation Canal, the Alisal Creek, the Gabilan Creek, the Salinas River Lagoon (North), and the Santa Rita Creek.

<u>Wasteload Allocations:</u>
The County of Monterey is assigned the following concentration based wasteload allocation for fecal coliform:

The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

<u>Deliverables/Actions Required:</u>
Compliance with this TMDL is dependent on developing and implementing a Wasteload Allocation Attainment Program per the requirements in Attachment G of this Order. All allocations shall be achieved no later than December 20, 2024.

### ***San Lorenzo River Estuary, San Lorenzo River, Branciforte Creek, Camp Evers Creek, Carbonera Creek and Lompico Creek Pathogens TMDL***

The San Lorenzo River Estuary, San Lorenzo River, Branciforte Creek, Camp Evers Creek, Carbonera Creek and Lompico Creek Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

<u>Phase II Entities:</u>
The Central Coast Regional Water Board has determined that the Cities of Santa Cruz and Scotts Valley and the County of Santa Cruz, Traditional MS4 permittees, are a source of "Discharges from MS4s" subject to this TMDL and must comply with the TMDL-related requirements in this Order.

<u>Wasteload Allocations:</u>
The City of Santa Cruz, County of Santa Cruz and the City of Scotts Valley are assigned the following concentration based wasteload allocation for fecal coliform:

The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The City of Santa Cruz is assigned the above allocations in the San Lorenzo River Estuary, the San Lorenzo River, the Branciforte Creek, and the Carbonera Creek.

The County of Santa Cruz is assigned the above allocations in the San Lorenzo River, the Branciforte Creek, the Lompico Creek, and the Carbonera Creek,

The City of Scotts Valley is assigned above allocations in the Camp Evers Creek and the Carbonera Creek.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on developing and implementing a Wasteload Allocation Attainment Program as required in detail in Attachment G of this Order. All allocations shall be achieved no later than June 8, 2024.

### ***Soquel Lagoon, Soquel Creek and Noble Gulch Pathogens TMDL***
The Soquel Lagoon, Soquel Creek and Noble Gulch Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the City of Capitola and the County of Santa Cruz, Traditional MS4 permittees, are a source of "Discharges from MS4s" subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations:
The City of Capitola and the County of Santa Cruz are assigned the following concentration-based wasteload allocation for fecal coliform:

The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The City of Capitola is assigned the above allocations in Soquel Lagoon.

The County of Santa Cruz is assigned the above allocations in Soquel Creek and Noble Gulch.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on developing and implementing a Wasteload Allocation Attainment Program per the requirements in Attachment G of this Order. All allocations shall be achieved by September 15, 2023.

### *Aptos Creek, Valencia Creek and Trout Gulch Pathogens TMDL*

The Aptos Creek, Valencia Creek and Trout Gulch Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Central Coast Regional Water Board has determined that the County of Santa Cruz, a Traditional MS4 permittee, is a source of "Discharges from MS4s" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:

The County of Santa Cruz is assigned the following concentration based wasteload allocation for fecal coliform:

> The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

> The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The County of Santa Cruz is assigned the above allocations in Aptos Creek, Valencia Creek, and Trout Gulch.

Deliverables/Actions Required:

Compliance with this TMDL is dependent on developing and implementing a Wasteload Allocation Attainment Program per the requirements in Attachment G of this Order. All allocations shall be achieved October 29, 2023.

### *Santa Maria River Watershed Fecal Indicator Bacteria TMDL*

The Santa Maria River Watershed Fecal Indicator Bacteria TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Cities of Guadalupe and Santa Maria and the Counties of Santa Barbara and San Luis Obispo, Traditional MS4 permittees, and the Santa Maria Fairpark, a Non-Traditional MS4 permittee, are sources of "Discharges from MS4s" subject to this TMDL and must comply with the TMDL-related requirements in this Order. The Santa Maria Fairpark is assigned wasteload allocation in the Main Street Canal; however the Central Coast Water Board has determined that the Santa Maria Fairpark's BMPs and monitoring effectively implement a Wasteload Allocation Attainment Program; therefore no further TMDL-related requirements in this Order are needed for the Santa Maria Fairpark.

Wasteload Allocations:

The Central Coast Water Board has determined that the City of Santa Maria, the City of Guadalupe, the County of Santa Barbara, and the County of San Luis Obispo are assigned the following concentration-based wasteload allocation:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(1) The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

(2) Based on a statistically sufficient number of samples (generally not less than five samples equally spaced over a 30-day period), the geometric mean of E. coli densities shall not exceed 126 Most Probable Number per 100 milliliters, and no sample shall exceed a one-sided confidence limit (C.L.) for contact recreation (90% C.L.) = 409 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The City of Santa Maria is assigned the above wasteload allocations in the following water bodies: the Santa Maria River, the Main Street Canal, the Blosser Channel, and the Bradley Channel.

The County of Santa Barbara is assigned the above wasteload allocations in Orcutt Creek.

The County of San Luis Obispo is assigned the above wasteload allocations in Nipomo Creek.

The City of Guadalupe is assigned the above wasteload allocations in the Santa Maria River and Estuary.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on the development and implementation of a Wasteload Allocation Attainment Program, or other integrated plan, per the requirements in Attachment G of this Order.

These wasteload allocations are receiving water allocations that must be attained by February 21, 2028 in accordance with a Wasteload Allocation Attainment Plan or other integrated plan. All wasteload allocations shall be achieved by February 21, 2028.

## *Lower Santa Maria River Watershed and Tributaries to Oso Flaco Lake Nitrogen Compounds and Orthophosphate TMDL*

The Lower Santa Maria River Watershed and Tributaries to Oso Flaco Lake Nitrogen Compounds and Orthophosphate TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the Cities of Guadalupe and Santa Maria, and the Counties of Santa Barbara and San Luis Obispo, Traditional MS4 permittees, are sources of "Urban runoff" subject to this TMDL and must comply with the TMDL-related requirements of this TMDL.

Wasteload Allocations:
The City of Santa Maria, County of Santa Barbara, County of San Luis Obispo, and City of Guadalupe are assigned the following concentration-based wasteload allocations:

*(Continued on Next Page)*

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Lower Santa Maria River Watershed Final Wasteload Allocations (WLAs) Table**

| Waterbody the Responsible Party is Discharging to 1, 2 | Party Responsible for Allocation & NPDES/WDR number | Receiving Water Nitrate as N WLA (mg/L) | Receiving Water Orthophosphate as P WLA (mg/L) | Receiving Water Unionized Ammonia as N WLA (mg/L) |
|---|---|---|---|---|
| Santa Maria River (upstream from Highway 1), Blosser Channel, Bradley Channel, Main Street Canal, North Main Street Channel | City of Santa Maria (Storm drain discharges to MS4s) NPDES No. CAS000004 City of Guadalupe (Storm drain discharges to MS4s) (NPDES No. CAS000004) | Allocation-4 (see descriptions of allocations at bottom of this table) | Not Applicable | Allocation-3 |
| Santa Maria River (downstream from Highway 1) | City of Guadalupe (Storm drain discharges to MS4s) (NPDES No. CAS000004) | Allocation-1 | Allocation-2 | Allocation-3 |
| Nipomo Creek | County of San Luis Obispo (Storm drain discharges to MS4s) (NPDES No. CAS000004) | Allocation-4 | Not Applicable | Allocation-3 |
| Orcutt Creek | County of Santa Barbara (Storm drain discharges to MS4s) (NPDES No. CAS000004) | Allocation-1 | Allocation-2 | Allocation-3 |

**Lower Santa Maria River Watershed Description of Allocations Table**

Note A: Federal and State anti-degradation requirements apply to all wasteload and load allocations.

Note B: Achievement of final wasteload and load allocations to be determined on the basis of the number of measured exceedances and/or other criteria set forth in Section 4 of the *Water Quality Control Policy for Developing California's Clean Water Act Section 303(d) List* (Listing Policy - State Water Resources Control Board, Resolution No. 2004-0063,

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

adopted September 2004) or as consistent with any relevant revisions of the Listing Policy promulgated in the future.

| Allocation [Note A] | Compound | Concentration (mg/L) [Note B] |
|---|---|---|
| **Allocation 1** | Nitrate as N | Dry Season (May 1 – Oct. 31): **4.3** <br> Wet Season (Nov 1 – Apr 30):  **8.0** |
| **Allocation 2** | Orthophosphate as P | Dry Season (May 1 – Oct 31):  **0.19** <br> Wet Season (Nov 1 – Apr 30):  **0.3** |
| **Allocation 3** | Unionized Ammonia as N | Year-round: **0.025** |
| **Allocation 4** | Nitrate as N | Year-round: **10** |

1 Responsible parties shall meet allocations in all receiving surface waterbodies of the responsible parties' discharges.

2 All reaches and tributaries unless otherwise noted.


**Lower Santa Maria River Watershed Interim Wasteload Allocations (WLAs) Table**
    * Responsible parties shall meet allocations in all receiving surface waterbodies of the responsible parties' discharges.

| Waterbody the Responsible Party is Discharging to | Party Responsible for Allocation (Source) | First Interim WLA | Second Interim WLA |
|---|---|---|---|
| All waterbodies the responsible party is assigned wasteload allocations (WLAs) in Table IX R-1 | City of Santa Maria (Storm drain discharges to MS4s) Storm Water Permit NPDES No. CA00049981 <br><br> City of Guadalupe (Storm drain discharges to MS4s) (NPDES Permit Pending) <br><br> County of San Luis Obispo (Storm drain discharges to MS4s) (NPDES No. CAS000004) <br><br> County of Santa Barbara (Storm drain discharges to MS4s) (NPDES No. CAS000004) | Achieve MUN standard-based and Unionized Ammonia objective-based allocations: <br><br> Allocation-3 <br><br> Allocation-4 <br><br> By May 22, 2026 | Achieve Wet Season (Nov. 1 to Apr. 30) Biostimulatory target-based TMDL allocations: <br><br> Allocation-1 <br><br> Allocation-2 <br><br> By May 22, 2034 |

The above wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The TMDL includes WLAs for Permittees for controllable sources. The TMDL also includes WLAs for non-controllable sources, but are not assigned to Permittees. Therefore, the parties responsible for the allocation to controllable sources are not responsible for the allocation to natural sources. Allocations to non-controllable sources are not included in this Order.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on the development and implementation of a Wasteload Allocation Attainment Program, or other integrated plan, per the requirements in Attachment G of this Order. All wasteload allocations shall be achieved by May 22, 2044.

### *Lower Salinas River and Reclamation Canal Basin and the Moro Cojo Slough Subwatershed Nitrogen Compounds and Orthophosphate TMDL*
The Lower Salinas River and Reclamation Canal Basin and the Moro Cojo Slough Subwatershed Nitrogen Compounds and Orthophosphate TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the County of Monterey, a Traditional MS4 permittee, is a source of "Urban runoff" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
The County of Monterey is assigned the following interim and final wasteload allocations:

**County of Monterey Final Wasteload Allocations (WLAs) Table**
Note A: Lower Salinas River: all reaches from downstream of Spreckels (downstream of monitoring site 309SSP) to the confluence with the Pacific Ocean including Salinas River Lagoon (North)
Note B: Santa Rita Creek: all reaches and tributaries, from the confluence with the Reclamation Canal to the uppermost reach of the waterbody.
Note C: Reclamation Canal: all reaches and tributaries, which includes from confluence with Tembladero Slough, to upstream confluence with Alisal Creek.
Note D: Gabilan Creek: all reaches and tributaries downstream of Crazy Horse Rd.
Note E: Natividad Creek: all reaches and tributaries, from the confluence with Carr Lake to the uppermost reach of the waterbody.
Note F: Alisal Creek: all reaches and tributaries from the confluence with the Reclamation Canal to the uppermost reach of the waterbody.

| Waterbody the responsible party is discharging to | Receiving Water Nitrate as N WLA (mg/L) | Receiving Water Orthophosphate as P WLA (mg/L) | Receiving Water Unionized Ammonia as N WLA (mg/L) |
|---|---|---|---|
| Lower Salinas River downstream of Spreckels, CA Note A | Allocation-1 *(see description of allocations below)* | Allocation-2 | Allocation-5 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Waterbody the responsible party is discharging to | Receiving Water Nitrate as N WLA (mg/L) | Receiving Water Orthophosphate as P WLA (mg/L) | Receiving Water Unionized Ammonia as N WLA (mg/L) |
|---|---|---|---|
| Santa Rita Creek [Note B], Reclamation Canal [Note C] | Allocation-3 | Allocation-4 | Allocation-5 |
| Gabilan Creek [Note D] | Allocation-6 | Allocation-2 | Allocation-5 |
| Natividad Creek [Note E] Alisal Creek [Note F] | Allocation-6 | Allocation-2 | Allocation-5 |

**County of Monterey Description of Allocations Table**

Note A: Federal and state anti-degradation requirements apply to all wasteload and load allocations.

Note B: Achievement of final wasteload and load allocations to be determined on the basis of the number of measured exceedances and/or other criteria set forth in Section 4 of the Water Quality Control Policy for Developing California's Clean Water Act Section 303(d) List (Listing Policy - State Water Resources Control Board, Resolution No. 2004-0063, adopted September 2004), or as consistent with any relevant revisions of the Listing Policy promulgated in the future pursuant to Government Code section 11353.

| Allocation [Note A] | Compound | Concentration (milligrams per liter) [Note B] |
|---|---|---|
| Allocation 1 | Nitrate as N | Dry Season (May 1 – Oct 31): 1.4 Wet Season (Nov 1 – Apr 30): 8.0 |
| Allocation 2 | Orthophosphate as P | Dry Season (May 1 – Oct 31): 0.07 Wet Season (Nov 1 – Apr 30): 0.3 |
| Allocation 3 | Nitrate as N | Dry Season (May 1 – Oct 31): 6.4 Wet Season (Nov 1 – Apr 30): 8.0 |
| Allocation 4 | Orthophosphate as P | Dry Season (May 1 – Oct 31): 0.13 Wet Season (Nov 1 – Apr 30): 0.3 |
| Allocation 5 | Unionized Ammonia as N | Year-round: 0.025 |
| Allocation 6 | Nitrate as N | Dry Season (May 1 – Oct 31): 2.0 Wet Season (Nov 1 – Apr 30): 8.0 |
| Allocation 7 | Nitrate as N | Dry Season (May 1 – Oct 31): 3.1 Wet Season (Nov 1 – Apr 30): 8.0 |
| Allocation 8 | Total Nitrogen as N | Dry Season (May 1 – Oct 31): 1.7 Wet Season (Nov 1 – Apr 30): 8.0 |
| Allocation 9 | Nitrate as N | Year-round: 10 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**County of Monterey Interim Wasteload Allocations (WLAs) Table**

| Waterbody | First Interim WLA | Second Interim WLA |
|---|---|---|
| All waterbodies given wasteload allocations (WLAs) as identified in Final Wasteload Allocations Table | Achieve MUN standard-based and Unionized Ammonia objective-based allocations:<br><br>Allocation-5; Allocation-9<br><br>12 years after effective date of the TMDL (June 7, 2026) | Achieve Wet Season (Nov. 1 to Apr. 30) Biostimulatory target-based TMDL allocations:<br><br>Wet Season Allocation/Waterbody combinations as identified in Final Wasteload Allocations Table<br><br>20 years after effective date of the TMDL (June 7, 2034) |

The County of Monterey shall meet the above wasteload allocations in all the receiving surface waterbodies receiving the County's municipal storm water discharges.

The TMDL includes WLAs for Permittees for controllable sources. The TMDL also includes WLAs for non-controllable sources, but are not assigned to Permittees. Therefore, the parties responsible for the allocation to controllable sources are not responsible for the allocation to natural sources. Allocations to non-controllable sources are not included in this Order.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on the development and implementation of a Wasteload Allocation Attainment Program as required in Attachment G of this Order. All wasteload allocations shall be achieved by May 7, 2044.

### _Santa Maria River Watershed Toxicity and Pesticides TMDL_

Municipalities throughout the state are challenged with controlling pesticides in their urban storm water. Urban pesticide use is regulated by the California Department of Pesticide Regulation (DPR) and U.S. EPA. MS4 permittees have minimal to no authority over commercial and residential pesticide applications. The TMDL-related requirements in Attachment G of this Order reflect this constraint.

Phase II Entities:
The Central Coast Regional Water Board has determined that the Cities of Guadalupe and Santa Maria, and the County of Santa Barbara, Traditional MS4 permittees, are sources of "Urban storm water" subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations:
The City of Santa Maria, County of Santa Barbara, and City of Guadalupe are assigned the following wasteload allocations:

**Santa Maria River Watershed Wasteload Allocations Table**

| Responsible Parties | Source | Allocation |
|---|---|---|
| City of Santa Maria — NPDES No. CAS000004<br>County of Santa Barbara — NPDES No. CAS000004<br>City of Guadalupe | Urban Storm Water | 3, 4 & 5 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Allocation-3: Additive Toxicity TMDL for Pyrethroid Pesticides:**

Pyrethroid pesticides contribute to additive toxicity in aquatic sediments; The numeric target for additive toxicity for pyrethroid pesticides is:

$$\frac{C\ (Pyrethroid\ 1)}{NLC(Pyrethroid\ 1)} + \frac{C\ (Pyrethroid\ 2)}{NLC\ (Pyrethroid\ 2)} = S;\ where\ S \leq 1$$

Where:
    C = the concentration of a pesticide measured in sediment.
    NLC = the numeric LC50 for each pesticide present (Table 1).
    S = the sum; a sum exceeding one (1.0) indicates that beneficial uses may be adversely affected.

The additive toxicity numeric target formula shall be applied when pyrethroid pesticides are present in the sediment.

**Table 1: Pyrethroid Sediment LC50s[45]**
*Median lethal concentration (LC50) for amphipods (Hyalella azteca)
organic carbon normalized concentrations (micrograms per gram OC)

| Chemical | LC50 ng/g (ppb) | LC50 µg/g OC*(ppm) |
|---|---|---|
| Bifenthrin | 12.9 | 0.52 |
| Cyfluthrin | 13.7 | 1.08 |
| Cypermethrin | 14.87 | 0.38 |
| Esfenvalerate | 41.8 | 1.54 |
| Lambda-Cyhalothrin | 5.6 | 0.45 |
| Permethrin | 200.7 | 10.83 |

**Allocation-4: Aquatic Toxicity TMDLs (refer to Table 2)**

**Table 2: Standard Aquatic Toxicity Tests**

| Parameter | Test | Biological Endpoint Assessed |
|---|---|---|
| Water Column Toxicity | Water Flea – Ceriodaphnia (6-8 day chronic) | Survival and Reproduction |
| Sediment Toxicity | Hyalella Azteca (10-day chronic) | Survival |

---

[45] LC50 = a measure of toxicity representing the concentration that will kill 50 percent of the sample population of a test species.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Allocation-5:** Organochlorine Pesticide TMDLs (refer to Table 3, Table 4, Table 5)

## Table 3: DDT Sediment Chemistry TMDLs

Note A: All reaches of all surface waters in the Santa Maria River watershed, including those listed.

Note B: All values are organic carbon normalized concentrations.

[All values are in units of microgram per kilogram]

| Waterbodies Assigned TMDLs Note A | DDD, 4,4-(p,p-DDD) | DDE, 4,4-(p,p-DDE) | DDT, 4,4-(p,p-DDT) | Total DDT |
|---|---|---|---|---|
| Blosser Channel | 9.1 | 5.5 | 6.5 | 10 |
| Bradley Channel | 9.1 | 5.5 | 6.5 | 10 |
| Greene Valley Creek | 9.1 | 5.5 | 6.5 | 10 |
| Little Oso Flaco Creek | 9.1 | 5.5 | 6.5 | 10 |
| Main Street Canal | 9.1 | 5.5 | 6.5 | 10 |
| Orcutt Creek | 9.1 | 5.5 | 6.5 | 10 |
| Oso Flaco Creek | 9.1 | 5.5 | 6.5 | 10 |
| Oso Flaco Lake | 9.1 | 5.5 | 6.5 | 10 |
| Santa Maria River | 9.1 | 5.5 | 6.5 | 10 |

## Table 4: Santa Maria River Watershed Additional Organochlorine Pesticide Sediment Chemistry TMDLs (all units in micrograms per kilogram)

Note A: All reaches of all surface waters in the Santa Maria River watershed, including those listed.

Note B: All organochlorine pesticides by organic carbon normalized concentrations

Note C: Waterbody is currently achieving the TMDL.

| Waterbodies Assigned TMDLs Note A | Chlordane | Dieldrin | Endrin | Toxaphene |
|---|---|---|---|---|
| Oso Flaco Lake | 1.7 | 0.14 | 550 | 20 |
| Santa Maria River | 1.7 | 0.14 | 550 | 20 |
| Orcutt Creek | 1.7 | 0.14 | 550 | 20 |

## Table 5: Santa Maria River Watershed Fish Tissue TMDLs for Organochlorine Pesticides

*ng/g: i.e., nanograms of pollutant per grams of fish tissue (e.g., a fillet).

(ppb stands for parts per billion)

| Waterbodies Assigned TMDLs | Chlordane ng/g* (ppb) | DDTs ng/g* (ppb) | Dieldrin ng/g* (ppb) | Toxaphene ng/g* (ppb) |
|---|---|---|---|---|
| Oso Flaco Lake | 5.6 | 21 | | |
| Oso Flaco Creek | 5.6 | 21 | | |
| Santa Maria River | 5.6 | 21 | 0.46 | 6.1 |
| Orcutt Creek | 5.6 | 21 | 0.46 | 6.1 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

Deliverables/Actions Required:
Central Coast Water Board staff recognizes that attainment of the TMDL wasteload allocations will depend on the effectiveness of statewide pesticide programs and regulations by DPR and U.S. EPA to control pesticides. The statewide program described in the California Pesticide Management Plan for Water Quality, February 1997 (California Pesticide Plan) is an implementation plan of the Management Agency Agreement between DPR and the California Water Boards. The Cities of Guadalupe and Santa Maria, and the County of Santa Barbara should describe in the Wasteload Allocation Attainment Program or integrated plan how they plan to support and engage in the statewide efforts. The Cities of Guadalupe and Santa Maria, and the County of Santa Barbara are encouraged to use mitigation measures developed in the DPR surface water regulations as storm water Best Management Practices in the Wasteload Allocation Attainment Program or integrated plan.

The target date to achieve the TMDLs for pyrethroids is November 1, 2029. This estimate is based on the widespread availability of pyrethroids, including consumer usage, and current limited regulatory oversight. The target date to achieve the TMDLs for organochlorine pesticides (DDT, DDD, DDE, chlordane, eldrin, toxaphene, dieldrin) is November 1, 2044.

## *LOS ANGELES REGIONAL WATER BOARD TMDLs*

The Los Angeles Regional Water Board has adopted two Phase I MS4 permits regulating discharges within the coastal watersheds of Los Angeles County, including 85 municipalities, Los Angeles County, and the Los Angeles Flood Control District (Order No. R4-2012-0175 as amended by State Water Board Order No. 2015-0075 and Order No. R4-2014-0024). Additionally, the Los Angeles Regional Water Board is in the process of reissuing the Phase I permit that regulates municipal storm water discharges within the coastal watersheds of Ventura County including 10 municipalities, Ventura County, and the Ventura County Watershed Protection District.

These Phase I MS4 permits regulate all traditional Small MS4 permittees within the Los Angeles Region with the exception of the City of Avalon, located on Catalina Island. The Phase I MS4 permits contain TMDL-related requirements for applicable Small MS4 permittees. Therefore, with the exception of the City of Avalon, the only permittees in the jurisdiction of the Los Angeles Regional Water Board regulated under this Order are Non-traditional MS4 permittees.

To simplify this Order, TMDLs (and corresponding water bodies) that do not have Non-traditional MS4 permittee within the watershed, were removed from Attachment G. These TMDLs include the Upper Santa Clara River Chloride TMDL, the Santa Clara River Nitrogen Compounds TMDL, the Malibu Creek Bacteria TMDL, the Santa Clara River Estuary and Reaches 3, 5, 6, and 7 Bacteria TMDL, the Santa Clara Reach 3 Chloride TMDL, the Malibu Creek Nutrients TMDL, the Ballona Creek Wetlands TMDL, and the Malibu Creek Trash TMDL.

The Los Angeles Regional Water Board has determined that the stormwater and non-stormwater discharges from MS4 permittees, including those from small MS4 permittees listed in the Los Angeles Regional Water Board TMDLs below, contribute to the impairment of the

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

water bodies subject to the TMDLs. Therefore, the designated entities listed below (and in Appendix G) are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to one of the Los Angeles Region's Phase I MS4 permits.

The Regional Water Board determined that since these TMDL requirements, with the notable exception of the Avalon Beach TMDL, are new to the non-traditional entities, they should be given time to evaluate their programs and be allowed to make the choice of the two options presented. Therefore, a one-year timeframe was proposed to either: 1) develop and start implementing a plan; or 2) to enter into a cooperative agreement.

### ***Avalon Beach Bacteria TMDL***
This Order incorporates the MS4-specific requirements established by Cease and Desist Order R4-2012-0077, which includes implementation requirements and timelines for the City of Avalon to comply with the TMDL established for Avalon Beach.

<u>Phase II Entities:</u>
Through the adoption of Cease and Desist Order R4-2012-0077, the Los Angeles Regional Water Board has determined that MS4 discharges from the City of Avalon, a Traditional MS4, are a source of impairment to surface water bodies in its watershed, and must comply with the following wasteload allocations:

<u>Wasteload Allocations:</u>
The following WLAs are receiving water allocations. Geometric mean values shall be calculated based on a minimum of 5 samples during any 30 day period. When repeat sampling is required because of an exceedance of any one single sample limit, values from all samples collected during that 30-day period shall be used to calculate the geometric mean.

*Geometric Mean Limits*
    Total coliform concentration shall not exceed 1,000/100 ml
    Fecal coliform density shall not exceed 200/100 ml
    Enterococcus density shall not exceed 35/100 ml

*Single Sample Limits*
    Total coliform density shall not exceed 10,000/100 ml
    Fecal coliform density shall not exceed 400/100 ml
    Enterococcus density shall not exceed 104/100 ml
    Total coliform density shall not exceed 1,000/100 ml, if the ratio of fecal to total coliform exceeds 0.1

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

*Single Sample Allowable Exceedances*
    Summer Dry Weather shall not exceed 0 Allowable Exceedance Days*
    Winter Dry Weather shall not exceed 9 Allowable Exceedance Days*

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Wet Weather shall not exceed 17 Allowable Exceedance Days*

*= The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample targets.

A storm year is defined as the period from November 1 through October 31. The geometric mean limits may not be exceeded.

Deliverables/Actions Required:
This Order implements some of the requirements that are stipulated in Cease and Desist Order R4-2012-0077. Cease and Desist Order R4-2012-077 is enforceable through this Order by reference, including timelines for the City of Avalon to achieve compliance with this TMDL. The Los Angeles Regional Water Board has determined that the City of Avalon's compliance with the permit requirements of this Order and compliance with the MS4-specific requirements of Cease and Desist Order R4-2012-0077 is consistent with the assumptions, and will satisfy the requirements, of the MS4-specific provisions of the TMDL.

**_Santa Monica Bay Beaches Bacteria TMDL_**
The Santa Monica Bay Beaches Bacteria TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the State Department of Parks and Recreation (Point Dume State Beach, Leo Carrillo State Beach, and Robert H Meyer Memorial State Beach), a Non-traditional MS4 permittee, is a source of "Storm water" and "Non-storm water discharges" subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations:
The following WLAs are receiving water allocations. Geometric mean values shall be calculated based on a minimum of 5 samples during any 30 day period. When repeat sampling is required because of an exceedance of any one single sample limit, values from all samples collected during that 30-day period shall be used to calculate the geometric mean.

_Geometric Mean Limits_
    _The rolling 30-day geometric mean_ of the total coliform concentration shall not exceed 1,000/100 ml;
    _The rolling 30-day geometric mean_ of the Fecal coliform density shall not exceed 200/100 ml;
    _The rolling 30-day geometric mean_ of the Enterococcus density shall not exceed 35/100 ml;

_Single Sample Limits_
    The total coliform density of a single sample shall not exceed 10,000/100 ml;
    The fecal coliform concentration of a single sample shall not exceed 400/100 ml;
    The enterococcus concentration of a single sample shall not exceed 104/100 ml;
    The total coliform concentration of a single sample shall not exceed 1,000/100 ml, if the ratio of fecal to total coliform exceeds 0.1;

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

_Single Sample Allowable Exceedances* Wasteload Allocations in the Receiving Water:_
Point Dume State Beach:
Dry weather: 0 days (based on both daily and weekly sampling),
Wet Weather: 3 days (daily sampling) or 1 day (weekly sampling).
Robert H Meyer Memorial State Beach:
Dry weather: 0 days (based on both daily and weekly sampling),
Wet Weather: 3 days (daily sampling) or 1 day (weekly sampling).

*= The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample targets.

A storm year is defined as the period from November 1 through October 31. The geometric mean limits may not be exceeded.

Deliverables/Actions Required:
The State Department of Parks and Recreation is required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the target dates to achieve the wasteload allocations are July 15, 2006 (to achieve dry weather WLAs during the summer period from April 1 – October 31); November 1, 2009 (to achieve dry weather WLAs during the winter period from November 1 – March 31); and July 15, 2021 (to achieve the wet weather WLAs). The dry weather allocations are therefore effective immediately. The State Department of Parks and Recreation may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

**_Los Angeles River Nitrogen and Related Effects TMDL_**
The Los Angeles River Nitrogen and Related Effects TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State University Los Angeles and California State University Northridge, Non-traditional MS4 permittees, are dischargers of storm water and non-storm water subject to this TMDL and must comply with the TMDL-related requirements of this Order.

The California State University Los Angeles and California State University Northridge are assigned the following Wasteload Allocations (WLAs):

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## WLAs for CSU Los Angeles and CSU Northridge Table

[All units are in milligrams per liter]

| Waterbodies Assigned TMDLs | Ammonia 1-hr average | Ammonia 30-day average | Nitrate 30-day average | Nitrate 30-day average | Nitrate + Nitrite 30-day average |
|---|---|---|---|---|---|
| LA River above Los Angeles-Glendale Water Reclamation Plant (LAG) | 4.7 | 1.6 | 8.0 | 1.0 | 8.0 |
| LA River below LAG | 8.7 | 2.4 | 8.0 | 1.0 | 8.0 |
| LA River Tributaries | 10.1 | 2.3 | 8.0 | 1.0 | 8.0 |

Deliverables/Actions Required:
The California State University Los Angeles and California State University Northridge are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the target date to achieve the wasteload allocations assigned to MS4 permittees is March 23, 2004. The allocations are therefore effective immediately. The California State University Los Angeles and/or California State University Northridge may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### ***Los Angeles Harbor (including Cabrillo Beach and Main Shop Channel) Bacteria TMDL***

The Los Angeles Harbor (including Cabrillo Beach and Main Shop Channel) Bacteria TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Federal Correctional Institution Terminal Island and California State University Dominguez Hills, Non-traditional MS4 permittees, are sources of storm water and non-storm water subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations (WLAs):
The following WLAs are receiving water allocations. Geometric mean values shall be calculated based on a minimum of 5 samples during any 30 day period. When repeat sampling is required because of an exceedance of any one single sample limit, values from all samples collected during that 30-day period shall be used to calculate the geometric mean.

*Rolling 30 day Geometric Mean Limits*
    Total coliform density shall not exceed 1,000/100 ml

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Fecal coliform density shall not exceed 200/100 ml
Enterococcus density shall not exceed 35/100 ml

*Single Sample Limits*
Total coliform density shall not exceed 10,000/100 ml
Fecal coliform density shall not exceed 400/100 ml
Enterococcus density shall not exceed 104/100 ml
Total coliform density shall not exceed 1,000/100 ml, if the ratio of fecal to total coliform exceeds 0.1

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

*Single Sample Allowable Exceedances\* Wasteload Allocations in the Receiving Water:*
Summer Dry Weather: 0 days (based on both daily and weekly sampling)
Winter Dry Weather: 8 days (daily sampling) or 1 day (weekly sampling)
Wet Weather: 15 days (daily sampling) or 3 days (weekly sampling)

\*= The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample targets.

A storm year is defined as the period from November 1 through October 31. The geometric mean limits may not be exceeded.

Deliverables/Actions Required:
The Federal Correctional Institution Terminal Island and California State University Dominguez Hills are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the target date to achieve the wasteload allocations is March 10, 2010. The allocations are therefore effective immediately. The Federal Correctional Institution Terminal Island and/or California State University Dominguez Hills may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### **Calleguas Creek Watershed Toxicity TMDL**
The Calleguas Creek Watershed Toxicity TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Naval Base Ventura County (Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park), Non-traditional MS4 permittees, are sources of stormwater and non-stormwater discharges subject to this Order and must comply with the TMDL-related requirements in this Order.

Page 91

Wasteload Allocations (WLA):
The Calleguas Creek Watershed Toxicity TMDL assigns the following WLAs as receiving water allocations.

Toxicity: 1.0 TUc
Chlorpyrifos (Final WLA, µg/L): 0.014
Diazinon (Final WLA, µg/L): 0.10

Deliverables/Actions Required:
The Naval Base Ventura County (including Port Hueneme and Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park) are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved by March 24, 2008. The allocations are therefore effective immediately. The Naval Base Ventura County (including Port Hueneme and Point Mugu), California State University Channel Islands, and/or Department of Parks and Recreation (Point Mugu State Park) may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### ***Calleguas Creek Organochlorine Pesticides, Polychlorinated Biphenyls, and Siltation TMDL***

The Calleguas Creek Organochlorine Pesticides, Polychlorinated Biphenyls, and Siltation TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Naval Base Ventura County (Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park), Non-traditional MS4 permittees, are sources of storm water and non-storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations (WLA):
The Calleguas Creek Organochlorine Pesticides, Polychlorinated Biphenyls and Siltation TMDL assigns the following interim and final WLAs as receiving water allocations.

Interim WLAs (ng/g), in-stream annual average at base of watershed:

| | |
|---|---|
| Chlordane: | 17.0 |
| 4,4-DDD: | 66.0 |
| 4,4-DDE: | 470.0 |
| 4,4-DDT: | 110.0 |
| Dieldrin: | 3.0 |
| PCBs: | 3800.0 |

Toxaphene:          260.0

Final WLAs (ng/g), in-stream annual average at base of watershed:

Chlordane:          3.3
4,4-DDD:            2.0
4,4-DDE:            1.4
4,4-DDT:            0.3
Dieldrin:            0.2
PCBs:              120.0
Toxaphene:          0.6

Siltation WLA:  2,496 tons/year reduction in yield to Mugu Lagoon.

Deliverables/Actions Required:
The Naval Base Ventura County (including Port Hueneme and Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park) are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved 20 years after the effective date of the TMDL (March 24, 2006). Therefore, the final WLAs shall be achieved by March 24, 2026.

***Calleguas Creek Metals and Selenium TMDL***
The Calleguas Creek Metals and Selenium TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Naval Base Ventura County (Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park), Non-traditional MS4 permittees, are sources of storm water and non-storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations (WLA):
The Calleguas Creek Metals and Selenium TMDL assigns the following interim and final WLAs as receiving water allocations.

Interim WLAs:
Where Dry CMC/Dry CCC/ Wet CMC stands for, respectively:

Dry Weather Criterion Maximum Concentrations (Acute criteria),
Dry Weather Criterion Continuous Concentrations (Chronic criteria), and
Wet Weather Criterion Maximum Concentrations (Acute criteria).

***Calleguas and Conejo Creeks (micrograms per liter) Table***

| Total Recoverable | Dry CMC | Dry CCC | Wet CMC |
|---|---|---|---|
| Copper | 23 | 19 | 204 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Total Recoverable | Dry CMC | Dry CCC | Wet CMC |
|---|---|---|---|
| Nickel | 15 | 13 | |
| Selenium | | | |

### *Revolon Slough (micrograms per liter) Table*

| Total Recoverable | Dry CMC | Dry CCC | Wet CMC |
|---|---|---|---|
| Copper | 23 | 19 | 204 |
| Nickel | 15 | 13 | |
| Selenium | 14 | 13 | |

Final WLAs:

> Where:   Q = Daily Storm volume
> WER = Water Effects Ratio

### *Calleguas and Conejo Creeks*

*Dry Weather; Total Recoverable (pounds per day)*

| Metal | Low Flow | Average Flow | Elevated Flow |
|---|---|---|---|
| Copper | 0.04×WER -0.02 | 0.12×WER -0.02 | 0.18×WER -0.03 |
| Nickel | 0.100 | 0.120 | 0.440 |
| Selenium | | | |

### *Revolon Slough*

*Dry Weather; Total Recoverable (pounds per day)*

| Metal | Low Flow | Average Flow | Elevated Flow |
|---|---|---|---|
| Copper | 0.03×WER -0.01 | 0.06×WER -0.03 | 0.13×WER -0.02 |
| Nickel | 0.050 | 0.069 | 0.116 |
| Selenium | 0.004 | 0.003 | 0.004 |

### *Calleguas and Conejo Creeks*

| Metal | Wet Weather Final WLA; Total Recoverable (lbs/day) |
|---|---|
| Copper | $(0.00054 \times Q^2 \times 0.032 - 0.17) \times WER - 0.06$ |
| Nickel | $0.014 \times Q^2 + 0.82 \times Q$ |
| Selenium | |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### Revolon Slough

| Metal | Wet Weather Final WLA; Total Recoverable (lbs/day) |
|-------|-----------------------------------------------------|
| Copper | $(0.0002 \times Q^2 \times 0.0005 \times Q) \times WER$ |
| Nickel | $0.027 \times Q^2 + 0.47 \times Q$ |
| Selenium | $0.027 \times Q^2 + 0.47 \times Q$ |

<u>Interim Limits and Final WLAs for Mercury in Suspended Sediment</u>
Final WLAs are set at 80% reduction of hydrologic simulation program – FORTRAN (HSPF) load estimates. Interim limits for mercury in suspended sediment are set equal to the highest annual load within each flow category, based on HSPF output for the years 1993-2003.

### WLAs for Mercury (pounds per year) in Suspended Sediment Table

| Flow Range | Calleguas Creek Interim | Calleguas Creek Final | Revolon Slough Interim | Revolon Slough Final |
|------------|------------------------|----------------------|-----------------------|---------------------|
| 0 – 15,000 million gallons per year (MG/yr) | 3.3 | 0.4 | 1.7 | 0.1 |
| 15,000 – 25,000 MG/yr | 10.5 | 1.6 | 4 | 0.7 |
| Above 25,000 MG/yr | 64.6 | 9.3 | 10.2 | 1.8 |

<u>Deliverables/Actions Required:</u>
The Naval Base Ventura County (including Port Hueneme and Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park) are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved 15 years after the effective date of the TMDL (March 26, 2007). Therefore, the final WLAs shall be achieved by March 26, 2022.

### Ballona Creek Bacteria TMDL
The Ballona Creek Bacteria TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

<u>Phase II Entities:</u>
The Los Angeles Regional Water Board has determined that the University of California Los Angeles and Veteran Affairs of the Greater Los Angeles Healthcare System, Non-traditional MS4 permittees, are sources of non-storm water and storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Wasteload Allocations (WLAs):

The following WLAs are receiving water allocations. Geometric mean values shall be calculated based on a minimum of 5 samples during any 30 day period. When repeat sampling is required because of an exceedance of any one single sample limit, values from all samples collected during that 30-day period shall be used to calculate the geometric mean.

*Rolling 30-day Geometric Mean Limits*

   Total coliform density shall not exceed 1,000/100 ml
   Fecal coliform density shall not exceed 200/100 ml
   Enterococcus density shall not exceed 35/100 ml

*Single Sample Limits*

   Total coliform density shall not exceed 10,000/100 ml
   Fecal coliform density shall not exceed 400/100 ml
   Enterococcus density shall not exceed 104/100 ml
   Total coliform density shall not exceed 1,000/100 ml, if the ratio of fecal to total coliform exceeds 0.1

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

*Single Sample Allowable Exceedances\* Wasteload Allocations in the Receiving Water:*

   Dry weather: 5 days (based on daily sampling) or 1 day (based on weekly sampling)
   Wet Weather: 15 days (based on daily sampling) or 2 days (based on weekly sampling)

\*= The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample targets.

A storm year is defined as the period from November 1 through October 31. The geometric mean limits may not be exceeded

Deliverables/Actions Required:

The University of California Los Angeles and Veteran Affairs of the Greater Los Angeles Healthcare System are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved during dry weather by April 27, 2013, while the final WLAs during wet weather are to be achieved by July 15, 2021. Therefore, the final WLAs for dry weather are effective immediately. The University of California Los Angeles and/or Veteran Affairs of the Greater Los Angeles Healthcare System may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

### *Santa Monica Bay Marine Debris TMDL*
The Santa Monica Bay Marine Debris TMDL assigns a load allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Department of Parks and Recreation (Point Dume State Beach and Robert H. Meyer Memorial State Beach), a Non-traditional MS4 permittee, is a source of storm water and non-storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Load Allocations (LA):
The following LA is a receiving water allocation.

   Trash = 0

Zero trash is defined as no trash (debris greater than 5mm in size) discharged into waterbodies within the Santa Monica Bay Watershed Management Area (WMA) and then into Santa Monica Bay or on the shoreline of Santa Monica Bay.

Deliverables/Actions Required:
The Los Angeles Regional Board has determined that dischargers may achieve the Load Allocations by implementing a Minimum Frequency of Assessment and Collection Program (MFAC)/BMP program approved by the Executive Officer. Responsible entities will be deemed in compliance with the LAs if an MFAC/BMP program, approved by the Executive Officer, demonstrates that there is no accumulation of trash, as defined by the LA.

The Department of Parks and Recreation (Point Dume State Beach and Robert H. Meyer Memorial State Beach) shall develop a Trash Monitoring and Reporting Plan (TMRP) for Executive Officer approval that describes the methodologies that will be used to assess and monitor trash in their responsible areas within the Santa Monica Bay WMA or along Santa Monica Bay.

The TMDL specifies that the final LAs are to be achieved 5 years after the effective date of the TMDL (March 20, 2012). Therefore, the final LAs shall be achieved by March 20, 2017. The Department of Parks and Recreation (Point Dume State Beach and Robert H. Meyer Memorial State Beach) may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### *Los Angeles and Long Beach Harbors Toxics and Metals TMDL*
The Los Angeles and Long Beach Harbors Toxics and Metals TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Federal Correctional Institution Terminal Island, Community Corrections Management Long Beach, and California State University Dominguez Hills, Non-traditional MS4 permittees, are sources of storm water and non-storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations (WLA):

The Federal Correctional Institution Terminal Island, Community Corrections Management Long Beach, and California State University Dominguez Hills are assigned the following (receiving water) wasteload allocations:

Toxicity WLA: 1 $TU_c$

*Metals WLAs for Dominguez Channel (wet weather only) (grams per day):*

    Mass-based WLA is shared and divided between MS4 permittees and Caltrans.

| | |
|---|---|
| Total Copper: | 1485.1 |
| Total Lead: | 6548.8 |
| Total Zinc: | 10685.5 |

## Metals and PAH Compounds WLAs for Greater Harbor Waters Table

TMDL values are in units of kilogram per year

| Waterbodies Assigned TMDLs | Total Copper TMDL | Total Lead TMDL | Total Zinc TMDL | Total PAHs TMDL |
|---|---|---|---|---|
| Dominguez Channel Estuary | 22.4 | 54.2 | 271.8 | 0.134 |
| Consolidated Slip | 2.73 | 3.63 | 28.7 | 0.0058 |
| Inner Harbor | 1.7 | 34.0 | 115.9 | 0.088 |
| Outer Harbor | 0.91 | 26.1 | 81.5 | 0.105 |
| Fish Harbor | 0.00017 | 0.54 | 1.62 | 0.007 |
| Cabrillo Marina | 0.0196 | 0.289 | 0.74 | 0.00016 |
| San Pedro Bay | 20.3 | 54.7 | 213.1 | 1.76 |
| LA River Estuary | 35.3 | 65.7 | 242.0 | 2.31 |

*Sediment Wasteload Allocations for Dominguez Channel Estuary, Consolidated Slip and Fish Harbor (mg/kg dry sediment):*

| | |
|---|---|
| Cadmium: | 1.2 |
| Chromium: | 81 |
| Mercury: | 0.15 |

## Bioaccumulative Compounds Wasteload Allocations Table

TMDL values are in units of gram per year

| Waterbodies Assigned TMDLs | DDT Total TMDL | PCBs Total TMDL |
|---|---|---|
| Dominguez Channel Estuary | 0.250 | 0.207 |
| Consolidated Slip | 0.009 | 0.004 |
| Inner Harbor | 0.051 | 0.059 |
| Outer Harbor | 0.005 | 0.020 |
| Fish Harbor | 0.0003 | 0.0019 |
| Cabrillo Marina | 0.000028 | 0.000025 |
| Inner Cabrillo Beach | 0.0001 | 0.0003 |
| San Pedro Bay | 0.049 | 0.44 |
| LA River Estuary | 0.100 | 0.324 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

Deliverables/Actions Required:
The Federal Correctional Institution Terminal Island, Community Corrections Management Long Beach, and California State University Dominguez Hills are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved 20 years after the effective date of the TMDL (March 23, 2012). Therefore, the final WLAs shall be achieved by March 23, 2032.

### ***Los Angeles River Bacteria TMDL***
The Los Angeles Regional Board has determined that the Los Angeles River Bacteria TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State University Los Angeles and California State University Northridge, Non-traditional MS4 permittees, are sources of storm water and non-storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations (WLA):
The following WLAs are receiving water allocations. Geometric mean values shall be calculated based on a minimum of 5 samples during any 30 day period. When repeat sampling is required because of an exceedance of any one single sample limit, values from all samples collected during that 30-day period shall be used to calculate the geometric mean.

*Geometric Mean Limits*
    E. coli density shall not exceed 126/100 ml

*Single Sample Limits*
    E. coli density shall not exceed 235/100 ml

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

### *Single Sample Allowable Exceedances\* Wasteload Allocations in the Receiving Water:*
    Summer Dry Weather: 5 days (based on daily sampling), or 1 day (based on weekly sampling)
    Waters not subject to the High Flow Suspension:
        Wet Weather: 15 days (daily sampling), or 2 days (weekly sampling)
    Waters subject to the High Flow Suspension:
        Wet Weather: 10 days (daily sampling), or 2 (weekly sampling)

\* = The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample targets.

A storm year is defined as the period from November 1 through October 31. The geometric mean limits may not be exceeded

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Deliverables/Actions Required:
The California State University Los Angeles and California State University Northridge are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final wet-weather WLAs are to be achieved 25 years after the effective date of the TMDL. Therefore, the final wet weather WLAs are to be achieved by March 23, 2037. The TMDL also specifies several final dry weather achievement dates based upon where in the watershed the discharge(s) occur. Therefore, the final dry weather WLAs are to be achieved according to the table below.

| Waterbody Segment | Achieve Final dry weather WLA by: |
|---|---|
| Segment B (upper and middle Reach 2) | March 23, 2022 |
| Segment B Tributaries (Rio Hondo & Arroyo Seco) | September 23, 2023 |
| Segment A (lower Reach 2 and Reach 1) | March 23, 2024 |
| Segment A Tributaries (Compton Creek) | September 23, 2025 |
| Segment E (Reach 6) | March 23, 2025 |
| Segment E Tributaries (Dry Canyon, McCoy and Bell Creeks, and Aliso Canyon Wash) | March 23, 2029 |
| Segment C (lower Reach 4 and Reach 3) | September 23, 2030 |
| Segment C Tributaries (Tujunga Wash, Burbank Western Channel and Verdugo Wash) | September 23, 2030 |
| Segment D (Reach 5 and upper Reach 4) | September 23, 2030 |
| Segment D Tributaries (Bull Creek) | September 23, 2030 |

### *Los Angeles River and Tributaries Metals TMDL*
The Los Angeles River and Tributaries Metals TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State University Los Angeles and California State University Northridge, Non-traditional MS4 permittees, are sources of storm water and non-storm subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations (WLA):
Dry-Weather WLAs (total recoverable metals)

## Dry-Weather WLAs (Total recoverable metals) Table
All values are in units of micrograms per liter

| Waterbodies Assigned TMDLs | Copper TMDL | Lead TMDL | Zinc TMDL | Selenium TMDL |
|---|---|---|---|---|
| LA River Reach 5,6 and Bell Creek | 30 | 170 | | 5 |
| LA River Reach 4 | 103 | 83 | | |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Waterbodies Assigned TMDLs | Copper TMDL | Lead TMDL | Zinc TMDL | Selenium TMDL |
|---|---|---|---|---|
| Tujunga Wash | 166 | 83 | | |
| LA River Reach 3 above LA-Glendale WRP | 91 | 102 | | |
| Verdugo Wash | 50 | 102 | | |
| LA River Reach 3 below LA-Glendale WRP | 103 | 100 | | |
| Burbank Western Channel (above WRP) | 124 | 126 | | |
| Burbank Western Channel (below WRP) | 90 | 75 | | |
| LA River Reach 2 | 87 | 94 | | |
| Arroyo Seco | 29 | 94 | | |
| LA River Reach 1 | 91 | 102 | | |
| Compton Creek | 64 | 73 | | |
| Rio Hondo Reach 1 | 126 | 37 | 131 | |
| Monrovia Canyon | | | 66 | |

*Wet-Weather WLAs (total recoverable metals) (micrograms per liter)*

    Cadmium =      3.1
    Copper =      67.5
    Lead =      94
    Zinc =      159

Deliverables/Actions Required:
The California State University Los Angeles and California State University Northridge are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final dry weather WLAs shall be achieved by January 11, 2024, and the final wet weather WLAs shall be achieved by January 11, 2028.

### ***Ballona Creek Metals TMDL***
The Ballona Creek Metals TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System, Non-traditional MS4s, are sources of storm water and non-storm discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
*Dry-Weather WLAs (total recoverable metals) (shared) (grams per day):*
    Ballona Creek:      Copper: 1,457.6     Lead: 805.0     Zinc: 18,302.1
    Sepulveda Channel:   Copper:   540.6     Lead: 298.7     Zinc:  6,790.8

*Wet-Weather WLAs (total recoverable metals) (shared) (grams per day):*

Copper:     $1.297 \times 10^{-5} \times L$
Lead:       $7.265 \times 10^{-5} \times L$
Zinc:       $9.917 \times 10^{-5} \times L$

Where L = daily storm volume (liters)

Deliverables/Actions Required:
The University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs during dry weather are to be achieved by January 11, 2016. The final WLAs during wet weather shall be achieved by January 11, 2021. The final WLAs during dry weather are therefore effective immediately. The University of California Los Angeles and/or the Veteran Affairs of the Greater Los Angeles Healthcare System may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### ***San Gabriel River Metals and Selenium TMDL***
The San Gabriel River Metals and Selenium TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State Polytechnic University, Pomona, a Non-traditional MS4, is a source of urban runoff subject to this Order and is responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
The San Gabriel River Metals and Selenium TMDL assigns WLAs to urban runoff in Walnut and San Jose Creeks, tributaries to the San Gabriel River for entities within the city of Pomona, which includes California State Polytechnic University, Pomona. Therefore, only WLAs assigned to Walnut and San Jose Creeks will be included in this Order.

Selenium allocation for San Jose Creek Reach 1 and Reach 2 (total recoverable metals):

Point Sources:       Municipal Stormwater
Waste Load Allocation: 5 micrograms per liter

Deliverables/Actions Required:
The California State Polytechnic University, Pomona is required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA; or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL does not specify a final attainment date.

### *San Gabriel River Indicator Bacteria TMDL*
The San Gabriel River Indicator Bacteria TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State Polytechnic University, Pomona, a Non-traditional MS4, is a source of wet- and dry-weather discharges from MS4s subject to this Order and is responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
The San Gabriel River Indicator Bacteria TMDL assigns WLAs to urban runoff in the San Gabriel River and its tributaries.

The following WLAs are receiving water allocations. Geometric mean values shall be calculated weekly as a rolling geometric mean using a minimum of 5 samples, for six week periods starting all calculation weeks on Sunday. Geometric mean limits may not be exceeded at any time.

*Geometric Mean Limits*
   E. coli density shall not exceed 126/100 ml

*Single Sample Limits*
   E. coli density shall not exceed 235/100 ml

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

### *Single Sample Allowable Exceedances\* Wasteload Allocations in the Receiving Water:*
   Summer Dry Weather: 5 days (based on daily sampling), or 1 day (based on weekly sampling)
   Waters not subject to the High Flow Suspension:
      Wet Weather: 17 days (daily sampling), or 3 days (weekly sampling)
   Waters subject to the High Flow Suspension:
      Wet Weather: 11 days (daily sampling), or 2 (weekly sampling)

\* = The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample limits.

A storm year is defined as the period from November 1 through October 31.

Deliverables/Actions Required:
The California State Polytechnic University, Pomona is required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA; or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved for single sample objectives and during dry weather by June 14, 2026, while the final WLAs during wet weather are to be achieved by June 14, 2036.

### *Los Cerritos Channel Metals TMDL*
The Los Cerritos Channel Metals TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State University Long Beach and Long Beach Veterans' Affairs Medical Center, Non-traditional MS4s, are sources of storm water and non-storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
*Dry-Weather WLA (total recoverable metals) (shared) (g/day):*
    Copper:   67.2

*Wet-Weather WLAs (total recoverable metals) (shared) (g/day based on flow of 40 cfs):*
    Copper:   461.4
    Lead:    2,631.5
    Zinc:    4,510.7

Deliverables/Actions Required:
The California State University Long Beach and Long Beach Veterans' Affairs Medical Center are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs during dry weather shall be achieved by September 30, 2023. The final WLAs during wet weather shall be achieved by September 30, 2026.

### *Ballona Creek Estuary Toxic Pollutants TMDL*
The Ballona Creek Estuary Toxic Pollutants TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System, Non-traditional MS4s, are sources of storm water and non-storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

Wasteload Allocations (WLA):

WLAs are expressed as shared allocations amongst the MS4 permittees in the Ballona Creek watershed.

| | | |
|---|---|---|
| Cadmium: | 8.0 | kg/yr |
| Copper: | 227.3 | kg/yr |
| Lead: | 312.3 | kg/yr |
| Silver: | 6.69 | kg/yr |
| Zinc: | 1003 | kg/yr |
| Chlordane: | 8.69 | g/yr |
| DDTs: | 12.70 | g/yr |
| Total PCBs: | 21.40 | g/yr |

Deliverables/Actions Required:
The University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs shall be achieved by January 11, 2021.

### *Ballona Creek Trash TMDL*
The Ballona Creek Trash TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System, Non-traditional MS4s, are sources of storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
Final WLA is zero trash.

Deliverables/Actions Required:
The Los Angeles Regional Water Board has determined that the contribution by these non-traditional MS4s is significant. In order for the permittees to meet their obligation to ensure that the WLA is met, the permittees will be required to implement either 1) Full Capture Systems, 2) partial capture devices and the application of institutional controls, or 3) a scientifically based alternative attainment approach.

1) A Full Capture System is any device or series of devices that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a one-year, one hour, storm in the subdrainage area. The Rational Equation is used to compute the peak flow rate:

$$Q = C * I * A$$

Where:

Q = design flow rate (cubic foot per second)
C = runoff coefficient
I = design rainfall intensity (inches per hour)
A = subdrainage area (acres)

2) Permittees employing partial capture devices or institutional controls shall use a mass balance approach based on the trash daily generation rate (DGR)[46], to demonstrate compliance.

The DGR shall be reassessed annually. Permittees may request a less frequent assessment of its DGR when the final WLA has been met (as described below) and the responsible jurisdiction continues to implement at the same level of effort partial capture devices and institutional controls for Executive Officer approval. A return to annual DGR calculation shall be required for a period of years to be determined by the Executive Officer after significant land use changes.

Permittees employing institutional controls or a combination of full capture systems, partial capture devices, and institutional controls shall be deemed in attainment of the final WLAs when the reduction of trash from the jurisdiction's baseline load, is between 99% and 100% as calculated using a mass balance approach, and the full capture systems and partial capture devices are properly sized, operated, and maintained.

Alternatively, permittees may request that the Executive Officer make a determination that a 97% to 98% reduction of the baseline load as calculated using a mass balance approach, constitutes full attainment of the final WLA if all of the following criteria are met:

a. The agency submits to the Regional Board a report for Executive Officer approval, including, two or more consecutive years of data showing that the Permittee's attainment was at or above a 97% reduction in its baseline trash load;

b. An evaluation of institutional controls in the jurisdiction demonstrating continued effectiveness and any potential enhancements; and

c. Demonstration that opportunities to implement partial capture devices have been fully exploited.

3) Permittees employing an alternative attainment approach shall conduct studies of institutional controls and partial capture devices for their particular subwatershed(s) or demonstrate that existing studies are representative and transferable to the implementing area for Executive Officer approval. Permittees shall also provide a schedule for periodic, compliance effectiveness demonstration and evaluation. Full capture systems and partial capture devices shall be properly sized, operated, and maintained consistent with sizing, operation, and maintenance schedules used to determine their effectiveness.

The TMDL specifies that the final WLA (0% of the baseload discharged) is to be achieved by September 30, 2015. The WLA is therefore effective immediately.

---

[46] The DGR is the average amount of trash deposited during a 24-hour period, as measured in a specified drainage area.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### *Los Angeles River Trash TMDL*

The Los Angeles River Trash TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Los Angeles Regional Water Board has determined that the California State University Los Angeles and California State University Northridge, Non-traditional MS4s, are sources of storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):

Final WLA is zero trash.

Deliverables/Actions Required:

The Los Angeles Regional Water Board has determined that the contribution by these non-traditional MS4s is significant. In order for the permittees to meet their obligation to ensure that the WLA is met, the permittees will be required to implement either 1) Full Capture Systems, 2) partial capture devices and the application of institutional controls, or 3) a scientifically based alternative attainment approach.

1) A Full Capture device is any device that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a one-year, one hour, storm in the subdrainage area. The Rational Equation is used to compute the peak flow rate:

$$Q = C * I * A$$

Where:

        Q = design flow rate (cubic foot per second)
        C = runoff coefficient
        I = design rainfall intensity (inches per hour)
        A = subdrainage area (acres)

2) Permittees employing partial capture devices or institutional controls shall use a mass balance approach based on the trash daily generation rate (DGR)[47], to demonstrate compliance.

The DGR shall be reassessed annually. Permittees may request a less frequent assessment of its DGR when the final WLA has been met (as described below) and the responsible jurisdiction continues to implement at the same level of effort partial capture devices and institutional controls for Executive Officer approval. A return to annual DGR calculation shall be required for a period of years to be determined by the Executive Officer after significant land use changes.

Permittees employing institutional controls or a combination of full capture systems, partial capture devices, and institutional controls shall be deemed in attainment of the final WLAs when the reduction of trash from the jurisdiction's baseline load, is between 99% and

---

[47] The DGR is the average amount of trash deposited during a 24-hour period, as measured in a specified drainage area.

100% as calculated using a mass balance approach, and the full capture systems and partial capture devices are properly sized, operated, and maintained.

Alternatively, permittees may request that the Executive Officer make a determination that a 97% to 98% reduction of the baseline load as calculated using a mass balance approach, constitutes full attainment of the final WLA if all of the following criteria are met:

a. The agency submits to the Regional Board a report for Executive Officer approval, including, two or more consecutive years of data showing that the Permittee's attainment was at or above a 97% reduction in its baseline trash load;

b. An evaluation of institutional controls in the jurisdiction demonstrating continued effectiveness and any potential enhancements; and

c. Demonstration that opportunities to implement partial capture devices have been fully exploited.

3) Permittees employing an alternative attainment approach shall conduct studies of institutional controls and partial capture devices for their particular subwatershed(s) or demonstrate that existing studies are representative and transferable to the implementing area for Executive Officer approval. Permittees shall also provide a schedule for periodic, compliance effectiveness demonstration and evaluation. Full capture systems and partial capture devices shall be properly sized, operated, and maintained consistent with sizing, operation, and maintenance schedules used to determine their effectiveness.

The TMDL specifies that the final WLA (0% of the baseload discharged) is to be achieved by September 30, 2016. The WLA is therefore effective immediately.

### *Ventura River Estuary Trash TMDL*
The Ventura River Estuary Trash TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

<u>Phase II Entities:</u>
The Los Angeles Regional Water Board has determined that the Ventura County Fairgrounds (Seaside Park and Ventura County Fairgrounds), a Non-traditional MS4, is a source of storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

<u>Wasteload Allocations (WLA):</u>
Final WLA is zero trash.

<u>Deliverables/Actions Required:</u>
The Los Angeles Regional Water Board has determined that the contribution by these non-traditional MS4s is significant. In order for the permittees to meet their obligation to ensure that the WLA is met, the permittees will be required to implement one of two options for the control of trash. The TMDL allows permittees to meet the WLA by either: 1) installing and maintaining Full Capture Systems, or 2) with Regional Water Board Executive Officer approval, implement a program for minimum frequency of assessment and collection (MFAC) in conjunction with BMPs.

1) A Full Capture device is any device that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

one-year, one hour, storm in the subdrainage area. The Rational Equation is used to compute the peak flow rate:

$$Q = C * I * A$$

Where:

        Q = design flow rate (cubic foot per second)
        C = runoff coefficient
        I = design rainfall intensity (inches per hour)
        A = subdrainage area (acres)

2) Attainment of the WLA through the MFAC program in conjunction with BMPs may be proposed to the Regional Water Board's Executive Officer for approval. The MFAC program must include requirements equivalent to those described in the Conditional Waiver set forth in the TMDL. The due date for submittal of the required information to select this option was October 2008. Therefore, this option is no longer available for permittees under this Order and was included only for completeness.

The TMDL specifies that the final WLA is to be achieved by March 6, 2016. The final WLA therefore is effective immediately.

## *CENTRAL VALLEY REGIONAL WATER BOARD TMDLS*

### *Lower San Joaquin River Diazinon & Chlorpyrifos TMDL*
The Lower San Joaquin River Diazinon & Chlorpyrifos TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Valley Regional Water Board has determined that the City of Patterson, a Traditional MS4, is a source of "NPDES permitted discharges" subject to this Order and is responsible for implementing the requirements of this TMDL.

Many of the permittees listed in Attachment G of the permit adopted on February 5, 2013, have been removed. These permittees are not specifically assigned allocations in the TMDL adopted by the Central Valley Regional Water Board. The removed permittees do not discharge directly to the San Joaquin River. An impaired water body segment must have TMDL-specific requirements under the TMDL. Through development of this Amendment the Central Valley Water Board has determined that only the City of Patterson, which discharges directly to the San Joaquin River, is responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The wasteload allocations for NPDES permitted municipal storm water Permittees shall not exceed the sum (S) of one (1) as defined below:

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \le 1.0$$

Where:
    $C_D$ = diazinon concentration in micrograms per liter of point source discharge

$C_C$ = chlorpyrifos concentration in micrograms per liter of point source discharge

$WQO_D$ = acute or chronic diazinon water quality objective (0.160 and 0.100 micrograms per liter, respectively)

$WQO_C$ = acute or chronic chlorpyrifos water quality objective. (0.025 and 0.015 micrograms per liter, respectively)

For the purpose of calculating the sum (S) above, non-detectable concentrations are considered to be zero. In determining compliance with the effluent limitations in Section C.1 of this Order related to the attainment of these wasteload allocations, the Central Valley Regional Water Board will consider data or information submitted by the Permittee regarding diazinon and chlorpyrifos inputs from sources that are outside of the jurisdiction of the permitted discharge, and any applicable provisions in this Order requiring the Permittee to reduce the discharge of pollutants to the maximum extent practicable.

Deliverables/Actions Required:
To create a path towards compliance with this TMDL, the permittees are being directed to conduct an assessment of the waterbody. The assessment will be used to ascertain the loads from urban runoff, whether the waterbody is meeting its objectives, whether or not an alternative constituent is the cause of impairment and whether a synergistic effect is present. As an alternative, the permittees may participate in the Bay Delta Regional Monitoring Program, upon the Central Valley Regional Water Board Executive Officer approval.

The deadline for attainment of WLAs was December 1, 2010. Therefore, the WLA is to be achieved immediately.

### ***Sacramento and San Joaquin Delta Diazinon & Chlorpyrifos TMDL***
The Sacramento and San Joaquin Delta Diazinon & Chlorpyrifos TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Valley Regional Water Board has determined that the Cities of Lathrop, Lodi, Manteca, Rio Vista, Tracy, and West Sacramento and the County of San Joaquin, Traditional MS4s, are sources of "NPDES permitted dischargers" subject to this Order and are responsible for implementing the requirements of this TMDL.

The Cities of Davis, Dixon, French Camp, Morada, Vacaville, and Woodland, listed in the original permit adopted on February 5, 2013, have been removed from this TMDL. These permittees are not specifically assigned allocations in the TMDL adopted by the Central Valley Regional Water Board. The Central Valley Water Board determined that they were erroneously listed since they do not discharge directly to the Sacramento and San Joaquin Delta. The Cities of Lathrop, Lodi, Manteca, Rio Vista, Tracy and West Sacramento and the County of San Joaquin discharge directly to the Sacramento and San Joaquin Delta.

Wasteload Allocations:
The wasteload allocations for NPDES permitted municipal storm water Permittees shall not exceed the sum (S) of one (1) as defined below:

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \leq 1.0$$

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

Where:

$C_D$ = diazinon concentration in micrograms per liter of point source discharge

$C_C$ = chlorpyrifos concentration in micrograms per liter of point source discharge

$WQO_D$ = acute or chronic diazinon water quality objective (0.160 and 0.100 micrograms per liter, respectively)

$WQO_C$ = acute or chronic chlorpyrifos water quality objective. (0.025 and 0.015 micrograms per liter, respectively)

For the purpose of calculating the sum (S) above, non-detectable concentrations are considered to be zero. In determining compliance with the effluent limitations in Section C.1 of this Order related to the attainment of these wasteload allocations, the Central Valley Regional Water Board will consider data or information submitted by the Permittee regarding diazinon and chlorpyrifos inputs from sources that are outside of the jurisdiction of the permitted discharge, and any applicable provisions in this Order requiring the Permittee to reduce the discharge of pollutants to the maximum extent practicable.

Deliverables/Actions Required:

To create a path towards compliance with this TMDL, the permittees are being directed to conduct an assessment of the waterbody. The assessment will be used to ascertain the loads from urban runoff, whether the waterbody is meeting its objectives, whether or not an alternative constituent is the cause of impairment and whether a synergistic effect is present. As an alternative, the permittees may participate in the Bay Delta Regional Monitoring Program, upon Executive Officer approval.

The deadline for attainment of WLAs was December 1, 2011. Therefore, the WLA is to be achieved immediately.

### ***Sacramento and Feather Rivers Diazinon & Chlorpyrifos TMDL***

The Sacramento and Feather Rivers Diazinon & Chlorpyrifos TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Central Valley Regional Water Board has determined that the Cities of Anderson, Marysville, Red Bluff, Redding and Yuba City, the Counties of Colusa, Shasta, Sutter and Yuba, Traditional MS4s, are sources of "Urban storm water runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

The Cities of Chico, Live Oak, Lincoln, Loomis, Roseville and Rocklin and the County of Butte, listed in the original permit adopted on February 5, 2013, have been removed from this TMDL. These permittees are not specifically assigned allocations in the TMDL adopted by the Central Valley Regional Water Board. The Central Valley Water Board determined that they were erroneously listed since they do not discharge directly to the Sacramento and/or Feather rivers. The Cities of Anderson, Colusa, Marysville, Red Bluff, Redding and Yuba City, and the Counties of Colusa, Shasta and Sutter discharge directly to the Sacramento and/or Feather rivers.

Wasteload Allocations:

The wasteload allocations for NPDES permitted municipal storm water Permittees shall not exceed the sum (S) of one (1) as defined below:

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \leq 1.0$$

Where:

C_D = diazinon concentration in micrograms per liter of point source discharge

C_C = chlorpyrifos concentration in micrograms per liter of point source discharge

WQO_D = acute or chronic diazinon water quality objective (0.160 and 0.100 micrograms per liter, respectively)

WQO_C = acute or chronic chlorpyrifos water quality objective. (0.025 and 0.015 micrograms per liter, respectively)

For the purpose of calculating the sum (S) above, non-detectable concentrations are considered to be zero. In determining compliance with the effluent limitations in Section C.1 of this Order related to the attainment of these wasteload allocations, the Central Valley Regional Water Board will consider data or information submitted by the Permittee regarding diazinon and chlorpyrifos inputs from sources that are outside of the jurisdiction of the permitted discharge, and any applicable provisions in this Order requiring the Permittee to reduce the discharge of pollutants to the maximum extent practicable.

Deliverables/Actions Required:

To create a path towards compliance with this TMDL, the permittees are being directed to conduct an assessment of the waterbody. The assessment will be used to ascertain the loads from urban runoff, whether the waterbody is meeting its objectives, whether or not an alternative constituent is the cause of impairment and whether a synergistic effect is present. As an alternative, the permittees may participate in the Bay Delta Regional Monitoring Program, upon Executive Officer approval.

The deadline for attainment of WLAs was August 11, 2008. Therefore, the WLA is to be achieved immediately. The Cities of Anderson, Marysville, Red Bluff, Redding and Yuba City, the Counties of Colusa, Shasta, Sutter and Yuba may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

*Demonstration of Attainment of Diazinon and Chlorpyrifos Wasteload Allocations for ALL Diazinon and Chlorpyrifos TMDLs*

Attainment of the diazinon and chlorpyrifos wasteload allocations may be demonstrated by any one of the following methods:

a. Submission of receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.

b. Attainment of WLAs within the discharge (monitoring representative of the MS4 discharge may be used with Executive Officer approval).

c. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

For those Permittees that have not demonstrated achievement of WLA by the attainment date (shown above), implementation of BMPs consistent with an Executive Officer-approved Management Plan that outlines BMPs and a schedule to reduce discharges of diazinon and

Page 112

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

chlorpyrifos and that are capable of ultimately attaining the WLA is required. Management Plans shall be developed pursuant to the implementation schedules stated in Attachment G.

### *Lower San Joaquin River, San Joaquin River and Stockton Deep Water Ship Channel (DWSC) Organic Enrichment and Low Dissolved Oxygen TMDL*

The Lower San Joaquin River, San Joaquin River and Stockton DWSC Organic Enrichment and Low Dissolved Oxygen TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:[48]
The Central Valley Regional Water Board has determined that the Cities of Atwater, Ceres, Delhi, Hughson, Lathrop, Livingston, Los Banos, Manteca, Merced, Oakdale, Patterson, Ripon, Riverbank and Turlock, the Counties of Merced, San Joaquin and Stanislaus, Traditional MS4s, are sources of "Storm water discharges" subject to this Order and are responsible for implementing the requirements of this TMDL.

The CDPs of French Camp and Winton, listed in the originally adopted permit, have been removed from this TMDL. These permittees were removed because they exist within existing MS4 areas subject to this permit (i.e. the counties they are located in). Therefore, it was determined that these permittees should not have been included in Appendix G under this TMDL and thus have been removed.

Wasteload Allocations:
The San Joaquin River Dissolved Oxygen Control Program set the wasteload allocations for NPDES-permitted discharges of oxygen demanding substances and their precursors as the effluent limitations that were applicable on 28 January 2005. On 28 January 2005, the 2003 Phase II MS4 permit stated the following for effluent limitations in section C.1. Effluent Limitations: Permittees must implement BMPs that reduce pollutants in storm water to the technology-based standard of MEP. This Order applies these limitations to discharges from MS4s maintained by the Phase II Entities listed above. In determining compliance with permit requirements related to attainment of these wasteload allocations, credit will be given for control measures implemented after 12 July 2004.

The San Joaquin River Dissolved Oxygen Control Program defines oxygen demanding substances and their precursors as any substance or substances that consume, have the potential to consume, or contribute to the growth or formation of substances that consume or have the potential to consume oxygen from the water column.

Deliverables/Actions Required:
To comply with the WLAs established in this TMDL, the Phase II entities shall comply with the provisions of this Order. Specific actions taken to comply with this TMDL will be documented in the Annual Report along with a discussion on the effectiveness of the BMPs implemented and actions taken to improve the effectiveness in meeting the WLAs.

The permittees will also conduct monitoring to show compliance with the TMDL based upon a submitted Monitoring Plan. As an alternative, the permittees may participate in the Bay Delta

---

[48] The Fact Sheet is not consistent with the final amendment adopted by the State Water Board. (See Attachment G) The cities of Escalon and Newman should have been named here and the city of Delhi should have been removed.

Page 113

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Regional Monitoring Program, upon Central Valley Regional Water Board Executive Officer approval.

The deadline for attainment of WLAs was December 31, 2011. Therefore, the WLA is to be achieved immediately. The Cities of Atwater, Ceres, Escalon, Hughson, Lathrop, Livingston, Los Banos, Manteca, Merced, Newman, Oakdale, Patterson, Ripon, Riverbank and Turlock, the Counties of Merced, San Joaquin and Stanislaus may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

_Demonstration of Compliance with Effluent Limitations Associated with Wasteload Allocations for Oxygen Demanding Substances and Their Precursors_
Compliance with the effluent limitations in Section C.1 of this permit associated with the wasteload allocations for oxygen demanding substances and their precursors may be demonstrated by any one of the following methods:

a. Receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.
b. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

For those Permittees that have not demonstrated achievement of WLA by the attainment date (shown above), implementation of BMPs consistent with an Executive Officer-approved Management Plan that outlines BMPs and a schedule to reduce discharges of oxygen demanding substances and their precursors to attain the WLA is required. Management Plans shall be developed within twelve months after adoption of this Attachment G. It is not the intention of the State Water Board or the Central Valley Water Board to take enforcement action against Permittees for violation of Section C.1 effluent limitations related to the WLA while the Plan is being developed and implemented, provided the Permittee develops the Plan in accordance with applicable implementation schedules. The Permittee may also request a time schedule order incorporating the implementation measures and compliance schedule of the Management Plan.

### Delta Methylmercury TMDL
On April 22, 2010, the Central Valley Regional Water Board adopted Resolution No. R5-2010-0043 to amend the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins (Basin Plan) to include a methylmercury TMDL and an implementation plan for the control of methylmercury and total mercury in the Sacramento-San Joaquin Delta Estuary (Delta Mercury Control Program). The Basin Plan amendment includes the addition of: (1) site-specific numeric fish tissue objectives for methylmercury; (2) the commercial and sport fishing (COMM) beneficial use designation for the Delta and Yolo Bypass; (3) methylmercury load allocations for non-point sources and wasteload allocations for point sources; and (4) an implementation plan that includes adaptive management to address mercury and methylmercury in the Delta and Yolo Bypass.

The Delta TMDL covers the Counties of Alameda, Contra Costa, Sacramento, San Joaquin, Solano and Yolo both within legal Delta boundary defined by California Water Code Section 12220 and the Yolo Bypass, a 73,300-acre floodplain on the west side of the lower Sacramento River.

The Delta is on the Clean Water Act Section 303(d) List of Impaired Water Bodies because of elevated levels of mercury in fish. Beneficial uses of the Delta that are impaired due to the elevated methylmercury levels in fish are wildlife habitat (WILD) and human consumption of aquatic organisms. The Delta provides habitat for warm and cold-water species of fish and their associated aquatic communities. Additionally, the Delta and its riparian areas provide valuable wildlife habitat. There is significant use of the Delta for fishing and collection of aquatic organisms for human consumption. Further, water is diverted from the Delta for statewide municipal (MUN) and agricultural (AGR) use.

Mercury in the Central Valley comes primarily from historic mercury and gold mines and from resuspension of contaminated material in stream beds and banks downstream of the mines, as well as from modern sources such as atmospheric deposition from local and global sources, waste water treatment plants, and urban runoff. Methylmercury, the most toxic form of mercury, forms primarily by sulfate reducing bacteria methylating inorganic mercury. Sources of methylmercury include methylmercury flux from sediment in open water and wetland habitats, urban runoff, irrigated agriculture, and waste water treatment plants. Water management activities, including water storage, conveyance, and flood control, can affect the transport of mercury and the production and transport of methylmercury.

Phase II Entities:
The Delta Mercury Control Program assigns mass-based methylmercury TMDL allocations to all sources of methylmercury in the Delta and Yolo Bypass, including urban runoff from Phase I and Phase II MS4s. In the Delta and Yolo Bypass, the TMDL assigns individual methylmercury wasteload allocations to the following small urban runoff agencies:

   City of Lathrop
   City of Lodi
   City of Rio Vista
   County of San Joaquin
   City of West Sacramento
   County of Yolo
   City of Tracy

The County of Solano is being removed from this TMDL. The Delta TMDL was based on information available at the time of its development. The Delta Methylmercury TMDL Staff Report calculated urban runoff methylmercury allocations using the Department of Water Resources' land use designations for urban and other land uses within the legal Delta boundary. A recent review of Solano County's 2003 Storm Water Management Plan, which is relevant because this plan was in effect when the Delta TMDL was developed, revealed a discrepancy between the acreages used to assess urban areas. The County's Storm Water Management Plan indicated that the MS4 permit jurisdiction only applied to the County's urbanized areas defined by the 2000 Census. The County's maps indicate there are no urbanized areas within the legal Delta boundaries.

While methylmercury from urbanized areas covered by the County's Phase II MS4 program does discharge to the Delta, the methylmercury allocations included in the TMDL should have been assigned only to the County's MS4 urbanized areas within the Delta and Yolo Bypass. Based on the 2003 Storm Water Management Plan, the urban acreage is zero and subsequently there should not be an allocation assigned to this area. This discrepancy will be

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

corrected when the Central Valley Regional Water Board conducts a full review of the TMDL in 2020.

Therefore, at this time the Solano County MS4 program is not subject to the Delta Mercury Control Program requirements, including attainment of the allocations or compliance with mercury exposure reduction program (MERP) requirements.

Wasteload Allocations:
The methylmercury wasteload allocations are as follows:

## Methylmercury Wasteload Allocations Table

| Municipality | Wasteload Allocations, Methylmercury (grams per year) |
|---|---|
| City of Lathrop | 0.097 |
| City of Lodi | 0.053 |
| City of Rio Vista | 0.0078 |
| City of Tracy | 0.65 |
| City of West Sacramento (Sacramento River subarea) | 0.36 |
| City of West Sacramento (Yolo Bypass subarea) | 0.28 |
| County of San Joaquin (Central Delta subarea) | 0.57 |
| County of San Joaquin (Mokelumne River subarea) | 0.016 |
| County of San Joaquin (Sacramento River subarea) | 0.11 |
| County of San Joaquin (San Joaquin River subarea) | 0.79 |
| County of Yolo (Sacramento River subarea) | 0.041 |
| County of Yolo (Yolo Bypass subarea) | 0.083 |

Deliverables/Actions Required:
Mercury is often attached to sediment, and the formation of methylmercury is linked in part to the concentration of mercury concentrations in sediment. Reductions in mercury concentrations will result in methylmercury reductions and subsequently methylmercury levels in fish. To comply with the TMDL, the agencies are required to implement best management practices to control erosion and sediment discharges with the goal of reducing mercury discharges. Methylmercury wasteload allocations for MS4 dischargers in the Delta and Yolo Bypass shall be met as soon as possible, but no later than December 31, 2030, unless the Central Valley Regional Water Board modifies the implementation schedule and final attainment date. Compliance will be determined by the method(s) described further in this document.

*Demonstration of Attainment of Methylmercury Wasteload Allocations:*
Compliance with the effluent limitations in Section C.1 of this permit associated with methylmercury wasteload allocations may be demonstrated by any one of the following methods:

a. Management Plans shall be developed within one year after the Central Valley Regional Water Board's review of the Delta Mercury Control Program or October 20, 2022, whichever date occurs first. For those MS4 Permittees that have not demonstrated achievement of WLA by December 31, 2030, the MS4s shall implement BMPs consistent with an approved updated Management Plan that shall outline BMPs and schedule to reduce discharges of methylmercury to ultimately attain the WLA.
b. Receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.
c. Attainment of WLAs within the discharge (monitoring representative of the MS4 discharge may be used with Executive Officer approval).
d. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

### *Clear Lake Nutrients TMDL*
The Clear Lake Nutrients TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Valley Regional Water Board has determined that the Cities of Clearlake and Lakeport, and the County of Lake, Traditional MS4s, are sources of "storm water" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The County of Lake, City of Clearlake and City of Lakeport have a combined wasteload allocation of 2,000 kg phosphorus/yr, as an average annual load (five year rolling average).

Deliverables/Actions Required:
To comply with the WLAs established in this TMDL, the Phase II entities shall comply with the provisions of this Order. Specific actions taken to comply with this TMDL will be documented in the Annual Report along with a discussion on the effectiveness of the BMPs implemented and actions taken to improve the effectiveness in meeting the WLAs.

The permittees will also conduct monitoring to show compliance with the TMDL based upon a submitted Monitoring Plan. As an alternative, the permittees may participate in a regional monitoring program, upon Executive Officer approval.

The deadline for attainment of WLAs is June 19, 2017. Therefore, the WLA are effective immediately. The Cities of Clearlake and Lakeport, and the County of Lake may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### *Demonstration of Compliance with Effluent Limitations Associated with Phosphorus Wasteload Allocations*
Compliance with the effluent limitations in Section C.1 of this permit associated with the phosphorus wasteload allocation may be demonstrated by any one of the following methods:

a. Receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.
b. Attainment of WLA within the discharge (monitoring representative of the MS4 discharge may be used with Executive Officer approval).
c. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

d. For those Permittees that have not demonstrated achievement of WLA by the attainment date (shown above), implementation of BMPs consistent with an Executive Officer-approved Management Plan that outlines BMPs and a schedule to reduce discharges of phosphorus to ultimately attain the WLA is required. Management Plans shall be developed by [Hard Date: 12 months from Adoption]. The Central Valley Regional Water Board Executive Officer may require revisions to the Management Plan if the Management Plan is not likely to attain the waste load allocations.

## *LAHONTAN REGIONAL WATER BOARD TMDLs*

### *Middle Truckee River Watershed and Placer, Nevada and Sierra Counties Sediment TMDL*

The Middle Truckee River Watershed and Placer, Nevada and Sierra Counties Sediment TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Lahontan Regional Water Board has determined that the City of Truckee and the County of Placer, Traditional MS4s, are sources of "Urban areas" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The following wasteload allocations are applicable:

*Urban Areas Wasteload Allocations:*
    4,936 tons per year of total suspended sediment load.

*Non-urban Wasteload Allocations:*
    35,392 tons per year of total suspended sediment load.

Deliverables/Actions Required:
To comply with the WLAs of this TMDL, the permittees will be required to track and report on the amount of road sand, used for de-icing, used and recovered. The permittees will also rehabilitate old dirt roads to control erosion and to prevent erosion from legacy sites. They will also implement an Education and Outreach program for ski areas within their jurisdiction for sediment and erosion control. They will also be required to continue implementation of their municipal monitoring program.

Attainment of wasteload allocations will be determined based on a target of 25 milligrams per liter, or less, of suspended sediment. The estimated time frame for meeting the numeric targets and achieving the TMDL is 20 years (i.e. 2028).

## *SANTA ANA REGIONAL WATER BOARD TMDLs*

### *San Diego Creek, Upper and Lower Newport Bay Organochlorine Compounds TMDL*

The Newport Bay watershed is a highly urbanized watershed. The two nontraditional MS4s in this watershed, Orange County Fairgrounds and University of California - Irvine, are both tributary to traditional MS4s that discharge to the Santa Ana Delhi Channel and San Diego Creek Reach 1, respectively. The implementation requirements and wasteload allocations assigned to the traditional MS4s in the TMDLs that have been established for the Newport Bay

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

watershed, including both Regional Board adopted and USEPA promulgated TMDLs that are still in effect, therefore apply to these two nontraditional MS4s.

Phase II Entities:

The Santa Ana Regional Water Board has determined that the University of California, Irvine and the Orange County Fairgrounds, Non-Traditional MS4s, are sources of "Urban runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:

Not Applicable

Deliverables/Actions Required:
The Santa Ana Regional Board has determined that the contribution by these non-traditional MS4s into the MS4 systems currently owned and operated by agencies implementing storm water programs regulated by Phase I permits are minimal in comparison. Therefore, the Santa Ana Regional Water Board has determined that for these non-traditional entities, consultation with Regional Water Board staff is needed to determine proposed actions and evaluations that will satisfy the goals and assumptions of the TMDL.

The TMDL specifies that the final WLAs are to be achieved by December 31, 2020.

### *Lake Elsinore and Canyon Lake Nutrients TMDL*
The former March Air Reserve Base was downsized and became known as March ARB. March ARB is an active military base that covers 2,300 acres. Activities in the base proper includes military activities such as air refueling, air cargo, air reconnaissance, military interceptors, military housing, recreational and dining facilities, commercial air cargo, training facilities, schools, operations centers for troop transport and industrial, including airport operations. Land use activities are under Base commander authority. The Base is currently covered under an individual industrial storm water permit for their industrial operations and is a stakeholder under the Lake Elsinore/Canyon Lake TMDL. In addition to industrial permit monitoring, the Base monitors their compliance with the TMDL. Regional Water Board staff determined that Phase II permit coverage is an appropriate permit to address the pollutants and flows generated from Base operations. Development and redevelopment post construction controls are of particular importance to be incorporated into the base's storm water program through Phase II permit coverage.

Phase II Entities:

The Santa Ana Regional Water Board has determined that the March ARB, a Non-Traditional MS4, is a source of "Urban discharges" subject to this Order and is responsible for implementing the requirements of this TMDL.

Wasteload Allocations: (shared for all Urban discharges)
Final WLA for Total Phosphorus (expressed as 10 year rolling average):
    124 kilograms per year

Final WLA for Total Nitrogen (expressed as 10 year rolling average):
    349 kilograms per year

Deliverables/Actions Required:
March ARB has already committed to cooperative implementation actions, monitoring actions, special studies and implementation actions jointly with other responsible agencies as an active

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

paying member of the Lake Elsinore/Canyon Lake TMDL Task Force. Therefore, continuation of this commitment will be required as part of this TMDL.

The TMDL specifies that the final WLAs are to be achieved by December 31, 2020.

### _Middle Santa Ana River Bacterial Indicator TMDL_

The Middle Santa Ana River Bacterial Indicator TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

The University of California, Riverside, the California Institute for Women and the California Institute for Men are nontraditional MS4s that are tributary to traditional MS4s that discharge to the Middle Santa Ana River (MSAR). The Regional Board adopted a Total Maximum Daily Load for bacterial indicators (E. coli) in 2005 that requires the Cities' and Counties' MS4 systems tributary to the MSAR to develop and implement Comprehensive Bacterial Reduction Plans (CBRP) to achieve attainment of the Wasteload allocations contained in the TMDL. A wide variety of entities, from traditional MS4s, to dairies, Caltrans and water and wastewater agencies have formed a stakeholder group that conduct the Regional TMDL compliance monitoring and conduct studies on the effectiveness of the BMPs implemented through the CBRP.

Phase II Entities:
The Santa Ana Regional Water Board has determined that the California State Polytechnic University, Pomona[49], the University of California, Riverside, the California Institute for Men, the California Institute for Women, and the California Rehab Center, Non-Traditional MS4s, are sources of "Urban runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The following are receiving water allocations. Logarithmic mean values shall be calculated based on a minimum of 5 samples during any 30 day period.

Dry Season (April 1 through October 31) to be achieved by December 31, 2015:
  _E. coli_
  5–sample/30–day Logarithmic Mean less than 113 organisms per 100 milliliters, and not more than 10% of the samples exceed 212 organisms per 100 milliliters for any 30–day period.

Wet Season (November 1 through March 31) to be achieved by December 31, 2025:
  _E. coli_
  5–sample/30–day Logarithmic Mean less than 113 organisms per 100 milliliters, and not more than 10% of the samples exceed 212 organisms per 100 milliliters for any 30–day period.

Deliverables/Actions Required:
In order to meet the goals and assumptions of this TMDL, Regional Water Board staff has determined that the entities listed may either: 1) develop and implement a facility-specific

---

[49] The Fact Sheet is not consistent with the final amendment adopted by the State Water Board. (See Attachment G) California State Polytechnic, Pomona should have been removed.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

CBRP or 2) participate in an updated watershed-based CBRP. The CBRP will discuss the various BMPs that will be employed and whether or not they are effective in meeting the WLA for both the dry and wet seasons.

The implementation of a Regional Water Board approved facility-specific or watershed-based CBRP will constitute compliance with the TMDL.

## *SAN DIEGO REGIONAL WATER BOARD TMDLs*

Attachment G provides specific provisions for implementing the load allocations (LAs) and wasteload allocations (WLAs) of Total Maximum Daily Loads (TMDLs) adopted by the San Diego Water Board and approved by OAL and USEPA in which Phase II dischargers are identified as responsible for discharges and subject to the requirements of the TMDLs. Each TMDL for which Phase II dischargers are identified as responsible for discharges was publicly noticed as part of the TMDL development and adoption. Additionally, San Diego Water Board staff met with each enrolled Phase II discharger to discuss the requirements of the Phase II permit and their responsibilities for compliance with the TMDLs. Therefore, Phase II dischargers were informed that their responsibilities for compliance with the TMDL will be implemented through their enrollment in the Phase II Permit.

The following requirements for implementing the TMDLs in this Order are based on and consistent with the assumptions and requirements of any available adopted and approved TMDLs that have been incorporated into the San Diego Regional Water Board's Basin Plan.

A modification to a TMDL in the Basin Plan requires a Basin Plan amendment, which includes a separate public process. If and when the TMDLs are modified in the Basin Plan, the San Diego Regional Water Board will notify the State Water Board of the need to revise the requirements of Order 2013-0001-DWQ in accordance with the Basin Plan amendment as soon as possible.

The Chollas Creek Dissolved Metals TMDL was removed from this Order because all named entities in Attachment G, as adopted, were Phase I entities and thus not subject to the requirements of this Order.

### *Bacteria Project I TMDL – Twenty Beaches and Creeks in the San Diego Region (Including Tecolote Creek)*

The Bacteria Project I Total Maximum Daily Load (Bacteria I TMDL) addresses the Clean Water Act section 303(d) bacteria impairment listings for 20 impaired water quality limited segments within the following watersheds or portions of watersheds: Laguna/San Joaquin, San Juan, San Clemente, San Luis Rey, San Marcos, San Dieguito River, Miramar Creek, Scripps HA, Tecolate HA, San Diego River, and Chollas Creek.

The greatest causes of waterbody impairments in the San Diego Region in 2002 were elevated bacteria levels and subsequent beach closures. The presence of pathogens and the probability of disease are directly correlated with the presence of human waste sources and currently measured by the density of indicator bacteria (fecal coliform, total coliform, and enterococcus) in waters used for recreation. When the Bacteria I TMDL wasteload allocations (WLAs) are achieved, health risks associated with pathogens are expected to be minimal.

Phase I and Phase II municipal dischargers are the most significant controllable sources of bacteria. With respect to Phase II dischargers, the Bacteria I TMDL is "implemented primarily

Page 121

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

by requiring compliance with the existing general WDRs and NPDES requirements that have been issued for Phase II MS4 discharges." Section F.5 of this Order requires dischargers within the impaired water quality segments identified in the Bacteria I TMDL to develop and/or implement a Storm Water Pollution Prevention Plans (SWPPP). This Order also requires enrolled Phase II dischargers to identify all potential bacteria contributions from their site and implement pollutant control strategies and BMPs to reduce bacteria. Non-storm water discharges are not authorized unless they meet the requirements as set forth in section B of this Order.

Because Phase II dischargers are required to develop SWPPPs with BMP implementation strategies to reduce the bacteria loads in accordance with the TMDL implementation schedule, Phase II MS4 dischargers that are enrolled and in compliance with the provisions of this Order are deemed in compliance with the Bacteria I TMDL unless they are identified as a significant source of bacteria as discussed below. The legally responsible parties (LRPs) must demonstrate that the discharges from the Phase II facility do not contribute to the bacteria wet and dry mass load impairments through monitoring data. The Regional Water Boards retain the authority to require Phase II MS4 dischargers to revise their SWPPPs, EPA Reports, or monitoring programs as well as to direct a discharger to obtain an individual NPDES permit if additional controls are necessary.

Phase II Entities:

The Bacteria Project I TMDL identifies responsible dischargers contributing to indicator bacteria exceedances in REC-1 designated receiving waters for 20 listings of beaches and inland water bodies. The specific Phase II entities within the impaired water quality segments identified in the Bacteria I TMDL are: the United States Marine Corps Base Camp Pendleton, the University of California, San Diego, San Diego State University, California State University, San Marcos, the 22nd Agricultural Association, the Marine Corps Air Station Miramar, the North County Transit District and the San Diego Veterans Administration Medical Center, all Non-Traditional MS4s.

Wasteload Allocations:

The Bacteria Project I TMDL basin plan amendment assigned the total WLA for each indicator bacteria for wet and dry mass loading to receiving waters to all identified Phase II dischargers.

The allowable load consists of two parts: 1) the bacteria load that is calculated based on the San Diego Regional Water Board's REC-1 WQOs and, 2) the bacteria load that is associated with the allowable exceedance frequency (i.e. allowable exceedance days). Allowable exceedance days are calculated based on the allowable exceedance frequency and total number of wet days in a year.

Dry Weather WLA

The Bacteria I TMDL assumes no discharge of surface runoff or bacteria from agricultural, open space, and CalTrans land uses. As such, the dry weather WLA was assigned entirely to the Municipal MS4s (Phase I and Phase II). Table, below, excerpts the dry weather WLAs assigned for Municipal MS4s (Phase I and Phase II) within the impaired water quality segments identified in the Bacteria I TMDL.

Wet Weather WLA

The Wet Weather TMDL discharges of surface runoff and bacteria was assigned to all land use allocations. The WLAs for Caltrans, agricultural, and open space were set to the existing

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

bacteria loads predicted for wet weather. The remainder of the wasteload allocation was assigned to Municipal MS4s (Phase I and Phase II). Table, below, excerpts the wet weather WLAs assigned for Municipal MS4s (Phase I and Phase II) within the impaired water quality segments identified in the Bacteria I TMDL.

## Table 1: Excerpts of Wasteload Allocations (WLAs)
[All units are Billion Most Probable Number/year]

| Watershed | Fecal Coliform Wet Weather | Fecal Coliform Dry Weather | Enterococcus Wet Weather | Enterococcus Dry Weather | Total Coliform Wet Weather | Total Coliform Dry Weather |
|---|---|---|---|---|---|---|
| San Joaquin Hills /Laguna Beach HSAs (901.11 and 901.12) | 37,167 | 227 | 66,417 | 40 | 880,652 | 1,134 |
| Aliso HSA (901.13) | 477,069 | 242 | 735,490 | 40 | 8,923,264 | 1,208 |
| Dana Point HSA (901.14) | 152,446 | 92 | 219,528 | 16 | 3,404,008 | 462 |
| Lower San Juan HSA (901.27) | 1,156,419 | 1,665 | 1,385,094 | 275 | 16,093,160 | 8,342 |
| San Clemente HA (901.30) | 192,653 | 192 | 295,668 | 33 | 3,477,739 | 958 |
| San Luis Rey HU (903.00) | 914,026 | 1,058 | 1,300,235 | 185 | 14,373,954 | 5,289 |
| San Marcos HA (904.50) | 6,558 | 26 | 23,771 | 5 | 298,430 | 129 |
| San Dieguito HU (905.50) | 798,175 | 1,293 | 1,763,603 | 226 | 16,660,538 | 6,468 |
| Miramar Reservoir HA (906.10) | 6,703 | 7 | 8,109 | 1 | 171,436 | 36 |
| Scripps HA (906.30) | 101,253 | 119 | 232,035 | 21 | 3,447,764 | 594 |
| Tecolote HA (906.5) | 126,806 | 234 | 471,211 | 39 | 5,136,598 | 1,171 |
| Mission San Diego/Sante e HSAs (907.11 and 907.12) | 221,117 | 1,506 | 890,617 | 248 | 10,790,520 | 7,529 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Watershed | Fecal Coliform Wet Weather | Fecal Coliform Dry Weather | Enterococcus Wet Weather | Enterococcus Dry Weather | Total Coliform Wet Weather | Total Coliform Dry Weather |
|---|---|---|---|---|---|---|
| Chollas HSA (908.22) | 252,479 | 398 | 802,918 | 66 | 9,880,784 | 1,991 |

Deliverables/Actions Required:
Implementation actions applicable to Phase II dischargers and the relevant attainment deadlines set forth in the TMDL are provided below.

**Bacteria Project I TMDL Actions and Deadlines Table**

Note A: Wet: single sample maximum REC-1 WQOs Dry: 30-day geometric mean REC-1 WQOs. The percent reduction for each compliance year applies to the total number of samples taken that comply with Resolution No. R9-2010-0001. The maximum allowable percent exceedance frequency for the single sample maximum (wet weather days only) is 22% (Resolution No. R9-2010-0001, Finding 10). For dry weather days, there is no maximum allowable exceedance and it is set at 0%. The Compliance Year percent reductions are based on the total number of samples taken. For Example: If in Year 5 of the compliance schedule, 100 samples are taken, only 50% of those samples can exceed the single sample maximum for wet weather by 22% of the maximum allowable percent exceedance frequency for the single sample maximum. By Year 10+, no samples can exceed the Exceedance Frequency. Baseline years for wet and dry days shall be as identified in Order No R9 2015-0001 Attachment E for the Bacteria I TMDL.
Note B: Priorities are defined in Resolution No. R9-2010-0001, Attachment A, pg. 63-65.
Note C: Phase II MS4 enrolled under the State General Permit for Small MS4s or issued an individual NPDES permit, are considered a Municipal Discharger along with Phase I MS4s in this Implementation Milestone item.

| Implementation Action | Responsible Party | Date |
|---|---|---|
| Submit annual progress reports or Update SWPPPs/SWMPS/LRPS in accordance with RB Accepted LRPs | Phase II Permittees | Upon Enrollment in General Permit |
| Meet Wet and Dry Weather Frequency Exceedance Milestones | Phase II MS4s | |
| 50% Reductions [Notes A, C] – Priority [Note B] 1 | Phase II MS4s | April 4, 2016 |
| 50% Reductions [Notes A, C] – Priority [Note B] 2 | Phase II MS4s | April 4, 2017 |
| 50% Reductions [Notes A, C] – Priority [Note B] 3 | Phase II MS4s | April 4, 2018 |
| 100% Reductions [Notes A, C] – Priority [Note B] 1,2,3 | Phase II MS4s | April 2, 2021+ |

The Bacteria I TMDL also requires Phase II dischargers to take other actions to control their risk of bacteria discharges such as monitoring. Because Phase I MS4s often discharge directly into the receiving waters addressed by the TMDL, the Bacteria I TMDL states that Phase I MS4s are primarily responsible for conducting the TMDL compliance monitoring. However, Phase II MS4s are also responsible for monitoring to identify sources that may need additional controls to reduce bacteria loads. Enrollment in this Order satisfies these monitoring obligations because all Phase II MS4 dischargers assigned a WLA in a TMDL are required to conduct the monitoring in Attachment G pursuant to section F.5.i.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The Phase II Entities, listed above, must be in compliance with the final TMDL requirements according to the following attainment dates:

*The Wet Weather TMDL Attainment Date in parenthesis in the table below applies if the applicable Storm Water Pollution Prevention Plan does not include load reduction programs for other constituents (e.g. metals, pesticides, trash, nutrients, sediment, etc.) together with bacteria load reduction requirements of this TMDL.

| Constituent | Dry Weather TMDL Attainment Date | Wet Weather TMDL Attainment Date* |
|---|---|---|
| Total Coliform; Fecal Coliform; *Enterococcus* | April 4, 2021 | April 4, 2031 (April 4, 2021) |

A Storm Water Pollution Prevention Plan that includes a bacteria load reduction program is expected to include information similar to what is described in the section called Bacteria Load Reduction Plan Outline in Appendix P of the Final Technical Report to Order No. 2010-0001. A Storm Water Pollution Prevention Plan that includes a load reduction program for multiple constituents together with bacteria load controls is expected to include information similar to what is described in the section called Comprehensive Load Reduction Plan Outline in Appendix P of the Final Technical Report to Order No. 2010-0001. Some of the components described in both outlines may be satisfied through collaboration with the Phase I MS4 dischargers, as their efforts to comply with the Bacteria TMDL include implementing controls, monitoring, and reporting.

### *Los Peñasquitos Lagoon Sediment TMDL*

The Los Peñasquitos watershed area (Hydrologic Unit (HU) 906.00) includes the Los Peñasquitos Lagoon, the Carroll Canyon Creek, Los Peñasquitos Creek, and Carmel Creek. The Los Peñasquitos Lagoon Sediment TMDL addresses the Clean Water Act section 303(d) sediment impairment for the lagoon for impacts resulting from rapid sedimentation and habitat loss.

Sediment is particulate organic and inorganic matter that is mobilized by erosion due to wind, precipitation or anthropogenic causes and carried by water. Sediment is a natural occurrence found in runoff from all locations in the watershed in varying concentrations. Concentrated flow with intensified velocities or volumes has the capability to magnify erosion rates resulting in rill erosion, gully erosion, and channel incision which correlates to an increased sediment supply into the Lagoon. Impacts from sediment in the Lagoon include reduced tidal mixing in lagoon channels, degraded and/or net loss of salt marsh vegetation, increased potential for flooding surrounding areas, increased turbidity, and constricted wildlife corridors.

Reducing erosion and concentrated flows by utilizing Best Management Practices (BMPs) that stabilize loose soil sources and/or retaining storm water onsite will decrease the impacts from excessive and rapid sediment transport into the lagoon.

Phase II Entities:
The San Diego Regional Water Board has determined that the Marine Corps Air Station, Miramar, the North County Transit District, the San Diego Veterans Administration Medical Center and the University of California, San Diego, Non-Traditional MS4s, are "Phase II MS4 permittees" subject to this Order and are responsible for implementing the requirements of this TMDL.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Wasteload Allocations:
The Los Peñasquitos Lagoon TMDL basin plan amendment assigned interim and final WLAs to all identified responsible parties. WLAs are expressed in effluent limitations. Interim effluent limitations are described in **Error! Reference source not found.** with a final effluent limitation of 2,580 tons/year assigned to all identified responsible parties. Responsible parties are jointly responsible for meeting these wasteload reduction allocations. As such, Phase II dischargers within the Los Peñasquitos watershed are required to either reduce site sediment loads to the receiving water body or demonstrating that the site discharges are not causing exceedances of the water quality based effluent limitations in **Error! Reference source not found.** (interim WQBELs) and the final WQBEL of 2,580 tons/year. Phase II dischargers are also required to sample for total suspended solids (TSS) concentrations and representative, or estimated, flow rates from discharge locations in addition to quantify contributions of sediment loads from their sites that cause or threaten to cause an exceedance of the effluent limitations in **Error! Reference source not found.** or the final WLA.

*Interim WLAs:*

**Interim Water Quality Based Effluent Sediment Limitations Expressed as a Wet Season Load in MS4 Discharges from the Watershed to Los Peñasquitos Lagoon Table**

*Phase I MS4s, Phase II MS4s, Caltrans, and general construction and industrial permit dischargers are jointly responsible for achieving the interim and final effluent limitations.*

| Interim Effluent Limitation #1 | 6,691 tons/wet season |
|---|---|
| Interim Effluent Limitation #2 | 5,663 tons/wet season |
| Interim Effluent Limitation #3 | 4,636 tons/wet season |
| Interim Effluent Limitation #4 | 3,608 tons/wet season |

*Final WLAs:*
The final Watershed Wasteload Allocation (Watershed WLA) of 2,580 tons/year is assigned collectively to all of the responsible parties identified in the TMDL and represents all current point and nonpoint sources of sediment from the watershed to the Lagoon. Attainment of the Final Watershed WLA requires a 67% total load reduction of sediment from the watershed.

Deliverables/Actions Required:
The implementation actions applicable to Phase II dischargers and the relevant compliance deadlines set forth in the TMDL are provided below.

| Implementation Action | Responsible Party | Date |
|---|---|---|
| Revision of SWPPPs | Construction, Industrial, and Phase II Permittees | July 14, 2015 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Implementation Action | Responsible Party | Date |
|---|---|---|
| Meet Additional Monitoring Requirements:<br>• Provide total suspended solids (TSS) concentrations and estimate of a representative flow rate from their facility discharge points during each wet season for one storm event of 0.5 inches or greater | Phase II MS4s, and general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | July 14, 2015 |
| Meet Additional Reporting Requirements:<br>• Submit TSS concentrations and the representative flow estimate as a PDF attachment to SMARTS entitled *Los Peñasquitos Lagoon Sediment TMDL Monitoring* annually on July 14 | All Phase II MS4s, general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | July 14, 2015 |
| Meet Interim Milestones:<br>• 6,691 tons/wet season<br>• 5,663 tons/wet season<br>• 4,636 tons/wet season<br>• 3,608 tons/wet season | All Phase I, Phase II MS4s, Caltrans, and general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | December 31, 2019<br>December 31, 2023<br>December 31, 2027<br>December 31, 2029 |
| Meet Final Milestone:<br>• 2,580 tons/wet season | All Phase I, Phase II MS4s, Caltrans, and general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | July 14, 2034 |

The Los Peñasquitos Lagoon Sediment TMDL requires all responsible parties to submit a Load Reduction Plan. All enrolled dischargers must identify all potential sediment contributions from their site, implement BMPs to reduce sediment and erosion, and sample discharges for flow rate and total suspended solids (TSS) to assess the facility's effect on the receiving water body and to inform the Phase I Watershed Management Area Water Quality Improvement Plan. A discharger's development or an update of a SWPPP in accordance with section F.5.f.4 satisfies the TMDL requirement to prepare a Load Reduction Plan because this Order requires enrolled dischargers to take actions to control their risk of sediment discharges. Additionally, non-storm water discharges are not authorized unless they meet the requirements as set forth in section B of this Order.

In addition to the monitoring requirements in sections E.13 (b) and E.15 (d) of the Order, Phase II dischargers are required to provide TSS concentrations and an estimate of a representative flow rate from their facility during each wet season for one storm event of 0.5 inches or greater. The Phase II discharger shall submit the TSS concentrations and representative flow estimates as a PDF attachment to SMARTS entitled Los Peñasquitos Lagoon Sediment TMDL Monitoring annually on July 14.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Monitoring and Reporting

The Los Peñasquitos Lagoon Sediment TMDL requires all Responsible Parties to contribute information regarding the amount of sediment discharged from their facilities[50]. This monitoring must address, at a minimum, representative flow rates and TSS concentrations whenever long-term discharges[51] occur. The monitoring program set forth in sections E.13 (b) and E.15 (d) of the General Permit only partially meets these requirements because the General Permit does not require dischargers to monitor for representative flow rates. Therefore, dischargers must conduct additional monitoring to that required in sections E.13 (b) and E.15 (d) of the General Permit to be in compliance with the Los Peñasquitos Lagoon Sediment TMDL.

Representative flow rate can be determined by using one of the following methods: 1) flow meter or 2) the float method. The float method is a field calculated estimate in accordance with the US EPA's NPDES Storm Water Sampling Guidance Document[52] for estimating flow rates[53]. To conduct the float method, the Discharger determines the cross sectional area of the representative discharge by estimating the flow depth and flow width in feet. The flow path must be a minimum of five feet in length. For ponded or no flow, a discharger shall record a flow rate of zero. The velocity[54] is estimated by measuring the time it takes the float (e.g. a floatable object, such as an orange peel or similar object), to float between point A and point B[55]. The flow rate shall be estimated for two 15 minute intervals.

The purpose of determining the flow rate is to calculate[56] the amount (i.e. load) of sediment being discharged from the site and informing a discharger as to whether their discharge is in compliance with the watershed WQBEL. Determination of the TSS concentrations and flow rate shall be conducted at a discharger's site during the wet season (October 1 through April 30) during one storm event of 0.5 inches or greater. Regardless of the method used to

---

[50] Resolution No. R9-2012-0033, Technical Report, p. A-9

[51] The TMDL does not define the duration of a rainfall event that would result in a "long term discharge" that is required to be monitored. Based on the TMDL's findings and source identification, increased flow and sedimentation impact the lagoon primarily during wet weather rainfall events.  The San Diego Water Board has determined that the definition of "a long term discharge" is equivalent to a storm event that is 0.5 inches or greater because this size of a rain event is likely to result in the type of discharge that impacts the lagoon.

[52] USEPA. NPDES Storm Water Sampling Guidance Document, http://www3.epa.gov/npdes/pubs/owm0093.pdf, EPA 833-8-92-001, July 1992,  pp.49-50, sections 3.2.2 - 3.2.4, Estimating Total Flow Volumes for the Sampled Rain Event, exhibits 3-8,3-9, Estimating Flow Rates – Float Method

[53] Flow rate (cubic foot per second) = velocity (foot per second) x Area (square foot); cubic foot per second = cubic foot per second; Area = flow depth (foot) by flow width (foot).

[54] Velocity = length from point A to point B divided by time of travel

[55] Example: flow length = 5 foot; time of travel from point A to point B = 30 seconds. Flow depth is equal to 0.5 foot. Flow width = 1 foot. V= 5 foot per 30 seconds = 0.17 foot per second. Area=0.5 foot times 1.0 foot = .5 square foot. Flow rate = Q = 0.17 foot per second x 0.5 square foot = 0.085 cubic foot per second

[56] Load, or mass of a pollutant, is calculated by multiplying flow (Q) cubic foot per second times pollutant concentration (milligram per liter); US EPA NPDES Permit Writer's Manual, pp. 6.24 -6.25

determine a representative flow rate, flow rates shall be completed concurrently with the TMDL's required TSS sampling.

Dischargers shall report results of all required monitoring annually as part of their Annual Report. Specifically, flow and TSS data shall be reported as a PDF attachment to SMARTS with the Annual Report entitled Los Peñasquitos Lagoon Sediment TMDL Monitoring. Pursuant to section E.16, as amended, of this General Permit, Annual Reports are due on or before October 15. Submittal of the General Permit Annual Report meets the TMDL requirement to inform the Phase I MS4s in the Los Peñasquitos Watershed Management Area their efforts to achieve attainment of the watershed WLA and support restoration of the Lagoon salt marsh.

<u>Compliance Determination</u>
The Los Peñasquitos Lagoon Sediment TMDL includes interim attainment milestones for Phase II dischargers, in addition to the final attainment milestone date of July 14, 2034. The Los Peñasquitos Lagoon TMDL staff report states that "it is the responsibility of the Phase I MS4 Copermittees to assume the lead role in coordinating and carrying out the necessary actions, compliance monitoring requirements, and successful implementation of the adaptive management framework required as part of this TMDL." Therefore, Phase II MS4 dischargers in the Los Peñasquitos watershed "are assumed to be in compliance with the TMDL and their contribution to the total WLA if they:

1) Are enrolled in this Order; and
2) Have updated their SWPPP to include the BMPS to be implemented with monitoring required to assess the facility or property effects on the WLA; and
3) Are in compliance with this Order, and
4) Are conducting facility and monitoring assessments as required by this Order and that monitoring shows the Phase II MS4 responsible party discharges are not contributing to the sediment impairment in the Lagoon.

Phase II dischargers are encouraged to coordinate with Phase I Copermittees to meet the applicable TMDL load reduction requirements in Attachment G using an adaptive framework approach. Phase I Copermittees described the adaptive framework approach for each Watershed Management Area in the San Diego Region in a watershed specific Water Quality Improvement Plan. Coordinated efforts by both Phase I and Phase II dischargers will accomplish the wasteload reductions required in the TMDLs faster and achieve the ultimate goal of improving water quality as soon as possible.

Moreover, the San Diego Regional Water Board retains the authority to require Phase II dischargers within the Los Peñasquitos watershed to revise their SWPPPs, ERA Reports, or monitoring programs as well as to direct a discharger to obtain an individual NPDES permit if additional controls are necessary to meet the requirements of this TMDL.

## XIV.  STORM WATER MANAGEMENT PROGRAM FOR NON-TRADITIONAL MS4

*Differences between Traditional and Non-traditional MS4s*
Because of the differences between Traditional and Non-traditional MS4s this Order includes Section F to address their specific management structure.

Non-Traditional Small MS4s required to comply with this Order are identified in Attachment B.

Non-traditional MS4s differ from cities and counties, because most potential sources of illicit discharges and storm water pollution are associated with activities under their direct operational control.

Some Non-traditional MS4s may also lack the legal authority or employ a different type of enforcement mechanism than a city/county government to implement their storm water program.

Certain Non-traditional Small MS4s such as Department of Defense and Department of Corrections and Rehabilitation Permittees required exemption from certain provisions due to security risks and/or compromised facility security.

**Program Management – Applicable to all Non-traditional MS4 Categories** Legal Authority: Clean Water Act § 40 CFR 122.26(d)(2)(i) and 40 CFR 122.34(b)(3)(ii)(B), (b)(4)(ii)(A), and (b)(5)(ii)(B).
MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA, EPA-833-R-07-003

*Program Management*
Program Management is essential to ensure that all elements of the storm water program are implemented on schedule and consistent with the Order requirements.

See Online Annual Reporting for further discussion later in this section.

*Legal Authority*
Legal authority to control discharges into a Permittee's storm sewer system is critical for compliance. Most Non-traditional MS4s lack the legal authority or employ a different type of enforcement mechanism than a city or county government to implement its storm water program. To the extent allowable under State and federal law, this Order requires each Non-traditional MS4 to operate with sufficient legal authority to control discharges into and from its MS4. The legal authority may be demonstrated by a combination of statutes, permits, contracts, orders, and interagency agreements. Non- traditional MS4 Permittees also do not generally have the authority to impose a monetary penalty. Although these differences exist, just like Traditional MS4s, Non- traditional MS4s must have the legal authority to develop, implement, and enforce the program.

*Coordination*
This Order allows Non-traditional MS4s to coordinate their storm water programs with other entities within or adjacent to their MS4 and allows the concept of a Separate Implementing Entity. A Separate Implementing Entity allows Permittees to leverage resources and skills. Additional information regarding SIEs is discussed later in this section.

**Education and Outreach Program**
Legal Authority: Clean Water Act § 40 CFR 122.34(b)(1).

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Because the population served by most Non-traditional MS4s will generally be served by the public education and outreach efforts of the local jurisdiction, the most useful supplement to those education and outreach efforts would be to label the Non-traditional MS4 catch basins. However, some Non-traditional MS4s such as universities have tenants and residents that may not be as effectively served by the local jurisdiction's public education and outreach program,

UNOFFICIAL DRAFT — Not Certified by Clerk

therefore a separate education and outreach program may be needed. Where the local jurisdiction's public education and outreach efforts do effectively target and reach these tenant and resident populations, the Non- traditional MS4s are not expected to duplicate those efforts.

Some Non-traditional MS4s are well suited for regional education and outreach. For example, school districts often have several schools located with a watershed or regional boundary. This Order allows Non-traditional MS4s to comply with the Education and Outreach provisions through a regional collaborative effort.

Regional outreach and collaboration requires the Permittees to define a uniform and consistent message, deciding how best to communicate the message, and how to facilitate behavioral changes.

### Public Involvement and Participation
Legal Authority: Clean Water Act § 40 CFR 122.34(b)(2)).

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Non-traditional MS4s have the same responsibilities as Traditional MS4s to ensure the storm water program is publicized and must involve the population they serve in the development of the program. However, the most effective BMP for Non-traditional MS4s is to provide up-to-date information about the storm water program online if the Non-traditional MS4 maintains a website, or the Non-traditional MS4 Permittee may choose to post information about their program on the local jurisdiction's website.

### Illicit Discharge Detection and Elimination Program
Legal Authority: Clean Water Act § 40 CFR 122.26(d)(2)(iv)(B)

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

The federal Phase II regulations require all MS4s to develop a process to trace the source of illicit discharges and eliminate them. The regulations also state that appropriate enforcement procedures and actions must be included in this process.

Unlike Traditional MS4s, Non-traditional MS4s have direct control of their own staff and contractors. Therefore, the enforcement provisions identified in the Illicit Discharge Detection and Elimination program are often not applicable to Non-traditional MS4 Permittees. Non-traditional MS4 Permittees should address illicit non-storm water discharges through the implementation of a Spill Response Plan However, Non- traditional MS4 Permittees often comply with existing state/federal regulations that required a Spill Response Plan or Hazardous Materials plan that identifies notification procedures for other operators or local agencies and includes details that are similar if not the same as a Spill Response Plan. Therefore, to leverage resources and maximize efficiencies the requirements in this Order recommend utilizing existing documents if that document contains the same information.

### Construction Site Storm Water Runoff Control and Outreach Program
The purpose of this program component is to prevent sediment and other pollutants from entering the Non-traditional MS4 during the construction phase of development projects. In general, Non-traditional MS4 Permittees will obtain coverage under, and comply with, the CGP for their own construction projects. To the extent that they have the legal authority, Non-traditional MS4s must also require other entities discharging to their MS4 to obtain coverage under and comply with the CGP during the construction phase of their projects.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

This Order relieves Non-traditional MS4 Permittees from development and implementation of a complete construction storm water runoff control program. This Order does require education and outreach to staff, construction site operators and contractors on how to control construction storm water runoff.

The CGP is inherently a robust permit with stringent reporting requirement for any construction project disturbing one acre or more in California. Often, Non-traditional MS4s have a few construction projects occurring at once such as those in a City or County. There are, however, very few Non-traditional MS4s that have dozens of active construction sites. Further, Non-traditional MS4 Permittees are often both the owner and contractor of a construction project. Finally, municipal governments must review and approve erosion and sediment control plans prior to the issuance of grading permits. Most all Non-traditional MS4s do not require approval from local municipalities prior to construction activity. Conditioning of a construction project is usually conducted in-house by Non-traditional MS4 Permittee staff. If contractors are brought in to conduct construction activity, this Order requires Non-traditional MS4 Permittees to include "bullet proof" contract language ensuring construction operators or contractors comply with the CGP and implement appropriate BMPs.

**Pollution Prevention and Good Housekeeping Program**
Legal Authority: Clean Water Act § 40 CFR 122.34(b)(6)

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Non-traditional MS4s have the same responsibilities as Traditional MS4s to prevent or reduce storm water pollution generated by their own operations, to train employees about pollution prevention/good housekeeping practices, and to identify appropriate measures to prevent or reduce the amount of storm water generated by their operations.

**Post-Construction Storm Water Management Program**
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(5).

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; U.S. EPA Incorporating Environmentally Sensitive Development into Municipal Stormwater Programs, EPA 833-F-07-011

This Order has specific site design and LID requirements for all projects. The LID requirements emphasize landscape-based site design features that are already required elsewhere (e.g., the California Water Efficient Landscape Ordinance). The goal during this permit term is to develop runoff retention and hydromodification control criteria that are keyed to watershed processes. Watershed management zones will be delineated by the State Board during this permit term. The Watershed management zones will be used to identify applicable areas and appropriate criteria for runoff retention and hydromodification control. Regional Boards that have approved watershed process- based criteria for post-construction will be permitted to continue requiring Permittees to implement these criteria.

**Total Maximum Daily Load (TMDL)**
The Order includes Attachment G, which identifies only those approved TMDLs in which storm water or urban run-off is listed as a source. In addition, Attachment G identifies Permittees subject to TMDLs or assigned waste load allocation. If Non-traditional MS4 Permittees have been identified in Attachment G, they must implement the specific TMDL permit requirements.

**Program Effectiveness Assessment**

Non-traditional MS4s have the same responsibilities as Traditional MS4s to conduct quantitative evaluation of their storm water program.

**Online Annual Reporting**

Non-traditional MS4s have the same responsibilities as Traditional MS4s to submit online Annual Reports via SMARTS.

**Separate Implementing Entity**

Legal Authority: Clean Water Act § 40 CFR 122.35

This Order allows a Regulated MS4s to rely on a Separate Implementing Entity to meet permit requirements, as allowed by U.S. EPA in the Phase II regulations. Reliance on Separate Implementing Entity may be particularly beneficial for Non-Traditional MS4s. An example is a community service district that is charged with creating and implementing a municipal storm water program.

Co-application and cooperative implementation of the storm water program by any Permittee with another Permittee can maximize efficiency and reduce overall costs. Non-traditional MS4s are encouraged to co-apply with local jurisdictions and utilize shared resources to implement the storm water program. Additionally, co-application and cooperative storm water program implementation can achieve watershed-wide consistency.

A Permittee may rely on a Separate Implementing Entity to implement one or more program elements, if the Separate Implementing Entity can appropriately and adequately address the storm water issues of the Permittee. To do this, both entities must agree to the arrangement, and the Permittee must comply with the applicable parts of the Separate Implementing Entity's program.

In accordance with 40 Code of Federal Regulations, section 122.35(a)(3), the Permittee remains responsible for compliance with its permit obligations if the Separate Implementing Entity fails to implement the control measure(s) or any component thereof. Therefore, the entities are encouraged to enter into a legally binding agreement to minimize any uncertainty about compliance with the permit.

If the Non-traditional MS4 Permittee relies on a Separate Implementing Entity to implement all program elements and the Separate Implementing Entity also has a storm water permit, the Permittee relying on Separate Implementing Entity must still file an NOI via SMARTS, submit the appropriate fee and file online Annual Reports. Both parties must also submit to the appropriate Regional Water Board a certification of the arrangement. The arrangement is subject to the approval of the Regional Water Board Executive Officer prior to filing an electronic NOI via SMARTS.

School districts present an example of where a Separate Implementing Entity arrangement may be appropriate, either by forming an agreement with a city or with an umbrella agency, such as the County Office of Education. Because schools provide a large audience for storm water education the two entities may coordinate an education program. An individual school or a school district may agree to provide a one-hour slot for all second and fifth grade classes during which the city would make its own storm water presentation. Alternatively, the school could agree to teach a lesson in conjunction with an outdoor education science project, which may also incorporate a public involvement component. Additionally, the school and the city or

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Office of Education may arrange to have the school's maintenance staff attend the other entity's training sessions.

## XV.  RELATIONSHIP BETWEEN THE ORDER AND THE STATEWIDE GENERAL PERMIT FOR DISCHARGES OF STORM WATER ASSOCIATED WITH INDUSTRIAL ACTIVITY

In some cases, certain Non-traditional MS4s will be subject to both this Order and the IGP. The intent of both of these permits is to reduce pollutants in storm water, but neither permit's requirements totally encompass the other. This Order requires that Non- traditional MS4 operators address storm water program elements, while the IGP requires the development and implementation of a SWPPP for certain "industrial" activities as well as requiring specific visual and chemical monitoring.

In the Preamble to the Phase II regulations, U.S. EPA notes that for a combination permit to be acceptable, it must contain all of the requirements for each permit. Further, "when viewed in its entirety, a combination permit, which by necessity would need to contain all elements of otherwise separate industrial and MS4 permit requirements, and require NOI information for each separate industrial activity, may have few advantages when compared to obtaining separate MS4 and industrial general permit coverage." (64 Fed. Reg. 68781.) Where the permits do overlap, one program may reference the other. More specifically, the Good Housekeeping for Permittee Operations program element requires evaluation of Permittee operations, some of which may be covered under the IGP. The development and implementation of the SWPPP under the IGP will likely satisfy the Good Housekeeping requirements for those industrial activities. The Non-traditional MS4 storm water program may incorporate by reference the appropriate SWPPP.

There may be instances where a Non-traditional MS4 has, under the IGP, obtained coverage for the entire facility (rather than only those areas where industrial activities occur) and has developed a SWPPP that addresses all the program elements required by this Order. In these instances, the Non-traditional MS4 is not required to obtain coverage under this Order. The entity should, in such cases, provide to the appropriate Regional Water Board documentation that its SWPPP addresses all program elements.

## XVI.  USE OF PARTNERSHIPS IN MS4 PERMITS

Since the Phase II Rule applies to all small MS4s within an urbanized area regardless of political boundaries it is very likely that multiple governments and agencies within a single geographic area are subject to NPDES permitting requirements. For example, a city government that operates a small MS4 within an urbanized area may obtain permit coverage under this Order while other MS4s in the same vicinity (such as a County, other cities, public university, or military facility) may also be covered under this Order. All MS4s are responsible for permit compliance within their jurisdiction.

Given the potential for overlapping activities in close proximity, the State Water Board encourages MS4s in a geographic area to establish cooperative agreements in implementing their storm water programs, especially with receiving water monitoring. Partnerships and agreements between Permittees and/or other agencies can minimize unnecessary duplication of effort and result in efficient use of available resources.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

Sharing resources can allow MS4s to focus their efforts on high priority program components. By forming partnerships, water quality can be examined and improved on a consolidated, efficient, watershed-wide scale rather than on a piece-meal, site-by-site basis.

## XVII. REGIONAL BOARD DESIGNATIONS

Designation of additional Small MS4s outside of Urbanized Areas as Regulated Small MS4s may be made by the Regional Water Boards on a case by case basis. Case by case determinations of designation are based on the potential of a Small MS4's discharges to result in exceedances of water quality standards, including impairment of designated uses, or other significant water quality impacts, including habitat and biological impacts. The tables below includes designations recommend by the Regional Water Boards prior to adoption of this Order. The Regional Water Boards may continue to make case by case determinations of designation during the permit term by notification to the discharger (which shall include a statement of reasons for the designation) and following an opportunity for public review and comment.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**Traditional Small MS4s**

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Crescent City | Del Norte | 1 | 7500 population and in urbanized area |
| Bayview CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of these areas is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Cutten CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Humboldt Hill CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Myrtletown CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Pine Hills CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Ridgewood Heights USSA | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of these areas is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Rosewood USSA | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Cloverdale CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Forestville CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Guerneville CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Monte Rio | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Occidental CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Yreka City | Siskiyou | 1 | Discharges to a TMDL listed waterbody and identified on Attachment G |
| Gonzalez City | Monterey | 3 | Greater than 5,000 population |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Moss Landing CDP | Monterey | 3 | Proximity to ocean areas (Monterey Bay National Marine Sanctuary, including Elkhorn slough) |
| Blacklake CDP | San Luis Obispo | 3 | Proximity to urbanized area (Oceano, Arroyo Grande, Grover Beach and Nipomo) |
| Cayucos CDP | San Luis Obispo | 3 | Greater than 2,000 population and proximity to Pacific Ocean |
| Lake Nacimiento CDP | San Luis Obispo | 3 | Greater than 2,000 population and proximity to Lake Nacimiento (drinking water source) |
| San Miguel | San Luis Obispo | 3 | Greater than 2,000 population High Growth Rate (16.8%) |
| Shandon CDP | San Luis Obispo | 3 | High Growth Rate (31.3%) |
| Guadalupe City | Santa Barbara | 3 | Incorporated area exceeding 5,000 population |
| Hope Ranch CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Mission Canyon CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Mission Hills CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Toro Canyon CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Live Oak CDP | Santa Cruz | 3 | Greater than 5,000 population Discharges to a TMDL listed waterbody and identified on Attachment G |
| City of Avalon | Los Angeles | 4 | Proximity to sensitive water body |
| Colusa County | Colusa | 5S | Discharges to a TMDL listed waterbody and identified on Attachment G |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Amador County | Amador | 5S | Currently, there is only limited storm water management in this area, allowing discharge of pollutants to waters of the State already impacted with multiple constituents and parameters.  Storm water management is needed in these areas to reduce the pollutant loads prior to adoption of any TMDLs, which are typically not estimated to be completed until 2020 or thereafter in many cases.<br>Additionally, several waterbodies or waterbody segments within or bounding Amador County are 303(d) listed for invasive species (Cosumnes River, above Michigan Bar), mercury (Pardee Reservoir, Camanche Reservoir), pH - High (Amador Lake, Bear River from Allen to Upper Bear River Reservoir), copper (Camanche Reservoir), and zinc (Camanche Reservoir) according to the 2010 CWA 303(d) list. Camanche Reservoir drains to Lower Mokelumne River. The Lower Mokelumne River (in Delta Waterways, eastern portion) is 303(d)  listed for chlorpyrifos, copper, mercury, dissolved oxygen, unknown toxicity, and zinc. Both the Cosumnes and Mokelumne Rivers drain to the San Joaquin River, which is 303(d) listed for these same constituents and parameters. Many of these constituents are known to bind to various size sediment particles migrating into surface waters. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

**Non-Traditional Small MS4s**

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| Petaluma Coast Guard Training Center | Defense, Department of | 1 | Activities that could impact water quality, fueling, maintenance. Personnel that should be educated on how their activities effect water quality. |
| Alameda-Contra Costa Transit District (AC Transit) | Special District | 2 | The Alameda-Contra Costa Transit District (AC Transit) is a large special transit district like the Valley Transit Authority (VTA) and BART which are both already designated. In order to fully regulate both large bus storage and maintenance facilities and new development related to bus stops and plazas they need to be fully regulated under the Phase II stormwater permit, as they do not fall under the local city regulatory jurisdiction for all aspects of their operations. |
| AMTRAK | Special District | 2 | Within urbanized area |
| Bay Area Rapid Transit | Special District | 2 | Within urbanized area |
| CalTrain | Special District | 2 | Within urbanized area |
| Golden Gate Bridge, Highway and Transportation District | Special District | 2 | Within urbanized area |
| Valley Transit Authority | Special District | 2 | Within urbanized area |
| Port of Oakland | Port | 2 | Within urbanized area |
| Port of Redwood City | Port | 2 | Within urbanized area |
| San Jose Airport | Airport | 2 | Within urbanized area |
| Oceano Community Services District | Community Services District | 3 | Within urbanized area |
| Fort Ord Reuse Authority | Local Agency | 3 | Adjacent to urbanized area, Planned annexation into urbanized area |
| Fort Hunter Ligget, Army Garrison | Defense, Department of | 3 | Within urbanized area |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place name | Category | Regional Board | Justification |
|------------|----------|----------------|---------------|
| March Air Reserve Base | Defense, Department of | 8 | The former March Air Reserve Base was downsized and became known as March ARB. March ARB is an active military base that covers 2,300 acres. Activities in the base proper includes military activities such as air refueling, air cargo, air reconnaissance, military interceptors, military housing, recreational and dining facilities, commercial air cargo, training facilities, schools, operations centers for troop transport and industrial, including airport operations. Land use activities are under Base commander authority. The base is currently covered under an individual industrial storm water permit for their industrial operations and is a stakeholder under the Lake Elsinore/Canyon Lake TMDL. In addition to industrial permit monitoring, the Base monitors their compliance with the TMDL. We believe Phase II permit coverage is an appropriate permit to address the pollutants and flows generated from Base operations. Development and redevelopment post construction controls are of particular importance to be incorporated into the base's storm water program through Phase II permit coverage. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| March Joint Powers Authority[1] | March Joint Powers Commission | 8 | The March JPA is a federally recognized reuse authority for the former March Air Force base. It encompasses most of the 6, 500 acres of the former active duty March Air Force Base area and approximately 450 acres adjacent to the base in the industrial area of the City of Moreno Valley. March JPA also assumed the following authorities:<br>1 - Land Use Authority - Land use authority was transferred to March JPA from the County of Riverside, City of Riverside, and City of Moreno Valley. The March JPA has adopted development and building codes and standards. The March JPA General Plan has been developed by the March JPA in accordance with state statutes, as well as the associated Master Environmental Impact Report. The March JPA General Plan is designed to implement the March Final Reuse Plan and related activities.<br>2 - Airport Authority - March Inland Port Airport Authority (MIPAA), is a governing body under the governance umbrella of the March JPA. MIPAA is responsible for the development and operation of the March Inland Port (MIP), a joint use aviation facility targeted for air cargo operations.<br>The developments approved by the March JPA to date included residential, commercial and industrial sources of pollutants. About 1/8th of the area has been developed. March JPA has the authority to develop its own MS4s within their jurisdiction and connect to MS4s owned/operated by Phase 1 permittees. Many of the functions resemble that of a local agency. Therefore, March JPA should be subject to the Phase II (or they can join our Phase 1). |

---

[1]  Note: This discharger was not designated in the final version of Attachment B of the Order adopted by the Board on February 5, 2013.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| Miramar Marine Corps Air Station | Defense, Department of | 9 | Within urbanized area |
| General Services Administration Facilities (GSA)[2] | Federal Facility | 9 | The site is the General Services Administration Facilities (GSA), located at 801 E. San Ysidro Blvd., San Ysidro, CA 92173 and is a federal facility. They are the owner and operator of a series of lateral drains which tie into a main open- trunk running and discharging along the border fence. They are responsible for the storm drains, including the new trunk slated for construction, and the entire system acts as a MS4. Additionally, GSA is the landlord of the world's busiest Land Port of Entry (LPOE). Located between San Diego and Tijuana, the San Ysidro LPOE supports 24 northbound vehicle lanes into the United States and six southbound lanes into Mexico. Every day, this land port serves over 50,000 northbound vehicles and 25,000 northbound pedestrians. GSA  maintains border crossing services, as well as increasing efficiency, security, and safety for federal agencies and the traveling public. Looking to the future, the San Ysidro LPOE is undergoing a major expansion that will include a new northbound inspection facility, primary vehicle inspection booths, secondary inspection area, administration space, and a pedestrian processing facility. A new southbound inspection facility will also be developed, and Interstate 5 will be shifted to the west to align with Mexico's planned use of a reconstructed entry facility at the vacant Virginia Avenue/El Chaparral commercial facility. |

---

[2]  Note: This discharger was not designated in the final version of Attachment B of the Order adopted by the Board on February 5, 2013.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| Metropolitan Transit System (MTS) | Transportation Agency | 9 | The Metropolitan Transit Development Board (MTDB) was created in 1975 by the passage of California Senate Bill 101 and came into existence on January 1, 1976. In 2005, MTDB changed its name to the Metropolitan Transit System (MTS). MTS licenses and regulates taxicabs, jitneys, and other private for-hire passenger transportation services by contract with the cities of San Diego, El Cajon, Imperial Beach, La Mesa, Lemon Grove, Poway, and Santee.MTS provides bus and rail services directly or by contract with public or private operators. MTS determines the routing, stops, frequency of service, and hours of operation for its existing services. MTS does a significant amount of their vehicles' maintenance. |
| North County Transit District (NCTD) | Transportation Agency | 9 | North county Transit district (NCTD) owns and operates the Sprinter Rail located along 22 miles of the rail corridor (see attached file) and adjacent staging areas within the Cities of Oceanside, Vista, San Marcos and Escondido and within the County of San Diego. The project's totaldisturbed acreage is approximately 280 acres. Storm water runoff from the project discharges directly into Waters of the State, the Municipal Separate Storm Sewer System (MS4) and, ultimately discharging to Loma Alta Creek, Buena Vista Creek, Buena Creek, San Marcos Creek, Escondido Creek and unmanned tributaries. Beginning October 2007, during construction, the San Diego Water Board hadidentified significant violations of the Stormwater Permit (99-08- DWQ). NCTD threatens to continue to discharge waste (e.g. sediment and sediment-laden water) in violation of the Basin Plan Prohibitions. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

# Attachment A

*Additional monitoring may be required if permittee discharges to a 303(d) listed waterbody
**The list of Regulated MS4s may be amended by the Executive Director consistent with the designation criteria list in the Order
***CDPs located within an existing NPDES permit area within an urbanized area are not required to file for separate coverage and pay separate fees
Monitoring Types:   Ω = Water Quality Monitoring Options,   λ = TMDL Attachment G Requirements,   Δ = ASBS Special Protections

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Amador County | Amador | 5S | New | | | | Regional Board Designation |
| Butte County | Butte | 5R | Renewal | | λ | | Renewal |
| Chico City | Butte | 5R | Renewal | 86,187 | λ | Chico, CA Urbanized Area | Renewal |
| Oroville City | Butte | 5R | New | 15,546 | | Oroville, CA Urban Cluster | High Population/Density |
| Paradise Town | Butte | | New | 26,218 | | Paradise, CA Urban Cluster | High Population/Density |
| Calaveras County | Calaveras | 5S | Renewal | | | | Renewal |
| Colusa County | Colusa | 5S | New | | λ | | TMDL |
| Crescent City | Del Norte | 1 | New | 7,643 | | Crescent City, CA Urban Cluster | Regional Board Designation |
| Cameron Park CDP | El Dorado | 5S | New | 18,228 | | Sacramento, CA Urbanized Area | Within Urbanized Area |
| Diamond Springs CDP | El Dorado | 5S | New | 11,037 | | Sacramento, CA Urbanized Area | Within Urbanized Area |
| El Dorado County | El Dorado | 5S | Renewal | | | | Renewal |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| El Dorado Hills CDP | El Dorado | 5S | Renewal | 42,108 | | Sacramento, CA Urbanized Area | Renewal |
| Placerville City | El Dorado | 5S | Renewal | 10,389 | | Placerville--Diamond Springs, CA Urban Cluster | Renewal |
| Kingsburg City | Fresno | 5F | Renewal | 11,382 | | Selma, CA Urban Cluster | Renewal |
| Reedley City | Fresno | 5F | Renewal | 24,194 | | Reedley--Dinuba, CA Urban Cluster | Renewal |
| Selma City | Fresno | 5F | Renewal | 23,219 | | Selma, CA Urban Cluster | Renewal |
| Coalinga City | Fresno | 5F | New | 13,380 | | Coalinga, CA Urban Cluster | High Population/Density |
| Mendota City | Fresno | 5F | New | 11,014 | | Mendota, CA Urban Cluster | High Population/Density |
| Parlier City | Fresno | 5F | New | 14,494 | | Parlier, CA Urban Cluster | High Population/Density |
| Sanger City | Fresno | 5F | New | 24,270 | | Sanger, CA Urban Cluster | High Population/Density |
| Arcata City | Humboldt | 1 | Renewal | 17,231 | | Arcata-McKinleyville, CA Urban Cluster | Renewal |
| Bayview CDP | Humboldt | 1 | New | 2,510 | | Eureka, CA Urban Cluster | Regional Board Designation |
| Cutten CDP | Humboldt | 1 | New | 3,108 | | Eureka, CA Urban Cluster | Regional Board Designation |
| Eureka City | Humboldt | 1 | Renewal | 27,191 | | Eureka, CA Urban Cluster | Renewal |
| Fortuna City | Humboldt | 1 | Renewal | 11,926 | | Fortuna, CA Urban Cluster | Renewal |
| Humboldt Hill CDP | Humboldt | 1 | New | 3,414 | | Eureka, CA Urban Cluster | Regional Board Designation |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Humboldt County | Humboldt | 1 | New | | Δ | | ASBS |
| McKinleyville CDP | Humboldt | 1 | Renewal | 15,177 | | Arcata-McKinleyville, CA Urban Cluster | Renewal |
| Myrtletown CDP | Humboldt | 1 | New | 4,675 | | Eureka, CA Urban Cluster | Regional Board Designation |
| Pine Hills CDP | Humboldt | 1 | New | 3,108 | | Eureka, CA Urban Cluster | Regional Board Designation |
| Ridgewood Heights USSA | Humboldt | 1 | New | | | | Regional Board Designation |
| Rosewood USSA | Humboldt | 1 | New | | | | Regional Board Designation |
| Trinidad City | Humboldt | 1 | New | 367 | Δ | | ASBS |
| Brawley City | Imperial | 7 | Renewal | 24,953 | | Brawley, CA Urban Cluster | Renewal |
| Calexico City | Imperial | 7 | Renewal | 38,572 | | El Centro--Calexico, CA Urbanized Area | Renewal |
| El Centro City | Imperial | 7 | Renewal | 42,598 | | El Centro--Calexico, CA Urbanized Area | Renewal |
| Imperial City | Imperial | 7 | Renewal | 14,758 | | El Centro--Calexico, CA Urbanized Area | Renewal |
| Imperial County | Imperial | 7 | Renewal | | | | Renewal |
| Delano City | Kern | 5F | New | 38,824 | | Delano, CA Urbanized Area | Within Urbanized Area |
| Tehachapi City | Kern | 5F | New | 14,414 | | Tehachapi--Golden Hills, CA Urban Cluster | High Population/Density |
| Wasco City | Kern | 5F | New | 25,545 | | Wasco, CA Urban Cluster | High Population/Density |
| Hanford City | Kings | 5F | Renewal | 53,967 | Ω | Hanford, CA Urbanized Area | Renewal |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Kings County | Kings | 5F | Renewal | | | | Renewal |
| Lemoore City | Kings | 5F | Renewal | 24,531 | | Hanford, CA Urbanized Area | Renewal |
| Clearlake City | Lake | 5S | Renewal | 15,250 | λ | Clearlake, CA Urban Cluster | Renewal |
| Lakeport City | Lake | 5S | Renewal | 4,753 | | Clearlake, CA Urban Cluster | Renewal |
| Lake County | Lake | 5S | Renewal | | λ | | Renewal |
| Susanville City | Lassen | 6SLT | New | 17,947 | | Susanville, CA Urban Cluster | High Population/Density |
| Avalon City | Los Angeles | 4 | New | 3,728 | | Avalon, CA Urban Cluster | Regional Board Designation |
| Bonadelle Ranchos-Madera Ranchos CDP | Madera | 5F | New | 8,569 | λ | Bonadelle Ranchos-Madera Ranchos, CA Urban Cluster | Within Urbanized Area |
| Madera Acres CDP | Madera | 5F | New | 9,163 | | Madera, CA Urbanized Area | Within Urbanized Area |
| Madera City | Madera | 5F | Renewal | 61,416 | λ | Madera, CA Urbanized Area | Renewal |
| Madera County | Madera | 5F | Renewal | | λ | | Renewal |
| Chowchilla City | Madera | 5F | New | 18,720 | | Chowchilla, CA Urban Cluster | High Population/Density |
| Belvedere City | Marin | 2 | Renewal | 2,068 | λ | San Francisco--Oakland, CA Urbanized Area | Renewal |
| Black Point-Green Point CDP | Marin | 2 | Renewal | 1,306 | | San Francisco--Oakland, CA Urbanized Area | Renewal |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Corte Madera Town | Marin | 2 | Renewal | 9,253 | | San Francisco-- Oakland, CA Urbanized Area | Renewal |
| Fairfax Town | Marin | 2 | Renewal | 7,441 | | San Francisco-- Oakland, CA Urbanized Area | Renewal |
| Kentfield CDP | Marin | 2 | New | 6,485 | | San Francisco-- Oakland, CA Urbanized Area | Within Urbanized Area |
| Larkspur City | Marin | 2 | Renewal | 11,926 | | San Francisco-- Oakland, CA Urbanized Area | Renewal |
| Lucas Valley- Marinwood CDP | Marin | 2 | Renewal | 6,094 | | San Francisco-- Oakland, CA Urbanized Area | Renewal |
| Marin County | Marin | 2 | Renewal | | Δ λ | | Renewal |
| Mill Valley City | Marin | 2 | Renewal | 13,903 | λ | San Francisco-- Oakland, CA Urbanized Area | Renewal |
| Novato City | Marin | 2 | Renewal | 51,904 | λ | San Francisco-- Oakland, CA Urbanized Area | Renewal |
| Ross Town | Marin | 2 | Renewal | 2,415 | | San Francisco-- Oakland, CA Urbanized Area | Renewal |
| San Anselmo Town | Marin | 2 | Renewal | 12,336 | | San Francisco-- Oakland, CA Urbanized Area | Renewal |
| San Rafael City | Marin | 2 | Renewal | 57,713 | λ | San Francisco-- Oakland, CA Urbanized Area | Renewal |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Sausalito City | Marin | 2 | Renewal | 7,061 | λ | San Francisco--Oakland, CA Urbanized Area | Renewal |
| Strawberry CDP | Marin | 2 | New | 5,393 | | San Francisco--Oakland, CA Urbanized Area | Within Urbanized Area |
| Tamalpais-Homestead Valley CDP | Marin | 2 | Renewal | 10,735 | | San Francisco--Oakland, CA Urbanized Area | Renewal |
| Tiburon Town | Marin | 2 | Renewal | 8,962 | λ | San Francisco--Oakland, CA Urbanized Area | Renewal |
| Woodacre CDP | Marin | 2 | Renewal | 1,348 | | San Francisco--Oakland, CA Urbanized Area | Renewal |
| Fort Bragg City | Mendocino | 1 | Renewal | 7,273 | | Fort Bragg, CA Urban Cluster | Renewal |
| Mendocino County | Mendocino | 1 | Renewal | | | | Renewal |
| Atwater City | Merced | 5F | Renewal | 28,168 | λ | Merced, CA Urbanized Area | Renewal |
| Delhi CDP | Merced | 5F | Renewal | 10,755 | λ | Turlock, CA Urbanized Area | Renewal |
| Franklin CDP | Merced | 5F | New | 6,149 | | Merced, CA Urbanized Area | Within Urbanized Area |
| Livingston City | Merced | 5F | Renewal | 13,058 | λ | Turlock, CA Urbanized Area | Renewal |
| Los Banos City | Merced | 5F | Renewal | 35,972 | λ | Los Banos, CA Urban Cluster | Renewal |
| Merced City | Merced | 5F | Renewal | 78,958 | λ | Merced, CA Urbanized Area | Renewal |

*UNOFFICIAL DRAFT — Not Certified by Clerk*

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Merced County | Merced | 5F | Renewal | | λ | | Renewal |
| Winton CDP | Merced | 5F | Renewal | 10,613 | λ | Merced, CA Urbanized Area | Renewal |
| Carmel Valley Village CDP | Monterey | 3 | Renewal | 4,407 | | Carmel Valley Village, CA Urban Cluster | Renewal |
| Carmel-by-the-Sea City | Monterey | 3 | Renewal | 3,722 | ∆ | Seaside--Monterey, CA Urbanized Area | Renewal |
| Castroville CDP | Monterey | 3 | Renewal | 6,481 | | Salinas, CA Urbanized Area | Renewal |
| Del Rey Oaks City | Monterey | 3 | Renewal | 1,624 | | Seaside--Monterey, CA Urbanized Area | Renewal |
| Elkhorn CDP | Monterey | 3 | New | 12,723 | | Salinas, CA Urbanized Area | Within Urbanized Area |
| Gonzalez City | Monterey | 3 | New | 8,187 | | | Regional Board Designation |
| King City City | Monterey | 3 | Renewal | 12,874 | | King City, CA Urban Cluster | Renewal |
| Las Lomas CDP | Monterey | 3 | Renewal | 3,024 | | Watsonville, CA Urbanized Area | Renewal |
| Marina City | Monterey | 3 | Renewal | 19,718 | | Seaside--Monterey, CA Urbanized Area | Renewal |
| Monterey City | Monterey | 3 | Renewal | 27,810 | ∆ | Seaside--Monterey, CA Urbanized Area | Renewal |
| Monterey County | Monterey | 3 | Renewal | | ∆λ | | Renewal |
| Moss Landing CDP | Monterey | 3 | Renewal | 204 | | | Regional Board Designation |
| Pacific Grove City | Monterey | 3 | Renewal | 15,041 | ∆ | Seaside--Monterey, CA Urbanized Area | Renewal |
| Pajaro CDP | Monterey | 3 | Renewal | 3,070 | | Watsonville, CA Urbanized Area | Renewal |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Prunedale CDP | Monterey | 3 | Renewal | 17,560 | | Salinas, CA Urbanized Area | Renewal |
| Sand City City | Monterey | 3 | Renewal | 334 | | Seaside--Monterey, CA Urbanized Area | Renewal |
| Seaside City | Monterey | 3 | Renewal | 33,025 | | Seaside--Monterey, CA Urbanized Area | Renewal |
| Soledad City | Monterey | 3 | Renewal | 25,738 | | Soledad, CA Urban Cluster | Renewal |
| Greenfield City | Monterey | 3 | New | 16,330 | | Greenfield, CA Urban Cluster | High Population/Density |
| American Canyon City | Napa | 2 | Renewal | 19,454 | λ | Vallejo, CA Urbanized Area | Renewal |
| Calistoga City | Napa | 2 | Renewal | 5,155 | λ | Calistoga, CA Urban Cluster | Renewal |
| Napa City | Napa | 2 | Renewal | 76,915 | λ | Napa, CA Urbanized Area | Renewal |
| Napa County | Napa | 2 | Renewal | | λ | | Renewal |
| St. Helena City | Napa | 2 | Renewal | 5,814 | λ | St. Helena, CA Urban Cluster | Renewal |
| Yountville City | Napa | 2 | Renewal | 2,933 | λ | Yountville, CA Urban Cluster | Renewal |
| Grass Valley City | Nevada | 5S | Renewal | 12,860 | | Grass Valley, CA Urban Cluster | Renewal |
| Truckee Town | Nevada | 5S | Renewal | 16,180 | λ | Truckee, CA Urban Cluster | Renewal |
| Placer County (Region 6) | Placer | 6 | Renewal | | λ | | Renewal |
| Auburn City | Placer | 5S | Renewal | 13,330 | | Auburn--North Auburn, CA Urban Cluster | Renewal |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Granite Bay CDP | Placer | 5S | Renewal | 20,402 | | Sacramento, CA Urbanized Area | Renewal |
| Lincoln City | Placer | 5S | Renewal | 42,819 | λ | Sacramento, CA Urbanized Area | Renewal |
| Loomis Town | Placer | 5S | Renewal | 6,430 | λ | Sacramento, CA Urbanized Area | Renewal |
| North Auburn CDP | Placer | 5S | Renewal | 13,022 | | Auburn--North Auburn, CA Urban Cluster | Renewal |
| Placer County (Region 5S) | Placer | 5S | Renewal | | | | Renewal |
| Rocklin City | Placer | 5S | Renewal | 56,974 | λ | Sacramento, CA Urbanized Area | Renewal |
| Roseville City | Placer | 5S | Renewal | 118,788 | λ | Sacramento, CA Urbanized Area | Renewal |
| Hollister City | San Benito | 3 | Renewal | 34,928 | λ | Hollister, CA Urban Cluster | Renewal |
| Apple Valley Town | San Bernardino | 6V | Renewal | 69,135 | Ω | Victorville--Hesperia, CA Urbanized Area | Renewal |
| Barstow City | San Bernardino | 6V | New | 22, 639 | | Riverside--San Bernardino, CA Urbanized Area | Within Urbanized Area |
| Hesperia City | San Bernardino | 6V | Renewal | 90,173 | | Victorville--Hesperia, CA Urbanized Area | Renewal |
| Oak Hills CDP | San Bernardino | 6V | New | 8,879 | | Victorville--Hesperia, CA Urbanized Area | Within Urbanized Area |
| Phelan CDP | San Bernardino | 6V | New | 14,304 | | Victorville--Hesperia, CA Urbanized Area | Within Urbanized Area |
| Spring Valley Lake CDP | San Bernardino | 6V | New | 8,220 | | Victorville--Hesperia, CA Urbanized Area | Within Urbanized Area |
| Victorville City | San Bernardino | 6V | Renewal | 115,903 | Ω | Victorville--Hesperia, CA Urbanized Area | Renewal |

*UNOFFICIAL DRAFT — Not Certified by Clerk*

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| San Bernardino County | San Bernardino | 6V | Renewal | | | | Renewal |
| San Francisco City (San Francisco Public Utilities Commission) | San Francisco | 2 | Renewal | | | San Francisco-- Oakland, CA Urbanized Area | Renewal |
| San Francisco City (Port of San Francisco) | San Francisco | 2 | Renewal | | | San Francisco-- Oakland, CA Urbanized Area | Renewal |
| Escalon City | San Joaquin | 5S | New | 7, 132 | | Stockton, CA Urbanized Area | New |
| Lathrop City | San Joaquin | 5S | Renewal | 18,023 | λ | Manteca, CA Urbanized Area | Renewal |
| Lathrop City | San Joaquin | 5S | Renewal | 18,023 | λ | Stockton, CA Urbanized Area | Renewal |
| Lodi City | San Joaquin | 5S | Renewal | 62,134 | λ | Lodi, CA Urbanized Area | Renewal |
| Manteca City | San Joaquin | 5S | Renewal | 347 | λ | Stockton, CA Urbanized Area | Renewal |
| Manteca City | San Joaquin | 5S | Renewal | 67,096 | Ω | Manteca, CA Urbanized Area | Renewal |
| Ripon City | San Joaquin | 5S | Renewal | 14,297 | λ | Manteca, CA Urbanized Area | Renewal |
| San Joaquin County | San Joaquin | 5S | Renewal | | λ | | Renewal |
| Tracy City | San Joaquin | 5S | Renewal | 82,922 | λ | Tracy, CA Urbanized Area | Renewal |
| Woodbridge CDP | San Joaquin | 5S | Renewal | 3,984 | | Lodi, CA Urbanized Area | Renewal |
| Arroyo Grande City | San Luis Obispo | 3 | Renewal | 17,252 | | Arroyo Grande--Grover Beach, CA Urbanized Area | Renewal |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Atascadero City | San Luis Obispo | 3 | Renewal | 28,310 | | El Paso de Robles (Paso Robles)-- Atascadero, CA Urbanized Area | Renewal |
| Blacklake CDP | San Luis Obispo | 3 | New | 930 | | Nipomo, CA Urban Cluster | Regional Board Designation |
| Cambria | San Luis Obispo | 3 | Renewal | 6,032 | | Cambria, CA Urban Cluster | Renewal |
| Cayucos CDP | San Luis Obispo | 3 | New | 2,592 | | Morro Bay--Los Osos, CA Urban Cluster | Regional Board Designation |
| El Paso de Robles (Paso Robles) City | San Luis Obispo | 3 | Renewal | 29,793 | | El Paso de Robles (Paso Robles)-- Atascadero, CA Urbanized Area | Renewal |
| Grover Beach City | San Luis Obispo | 3 | Renewal | 13,156 | | Arroyo Grande--Grover Beach, CA Urbanized Area | Renewal |
| Lake Nacimiento CDP | San Luis Obispo | 3 | New | 2,411 | | | Regional Board Designation |
| Morro Bay City | San Luis Obispo | 3 | Renewal | 10,234 | λ | Morro Bay--Los Osos, CA Urban Cluster | Renewal |
| Nipomo CDP | San Luis Obispo | 3 | Renewal | 16,714 | | Nipomo, CA Urban Cluster | Renewal |
| Pismo Beach City | San Luis Obispo | 3 | Renewal | 7,655 | | Arroyo Grande--Grover Beach, CA Urbanized Area | Renewal |
| San Luis Obispo City | San Luis Obispo | 3 | Renewal | 45,119 | λ | San Luis Obispo, CA Urbanized Area | Renewal |
| San Luis Obispo County | San Luis Obispo | 3 | Renewal | | λ | | Renewal |
| San Miguel | San Luis Obispo | 3 | New | 2,336 | | | Regional Board Designation |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Shandon CDP | San Luis Obispo | 3 | New | 1,295 | | | Regional Board Designation |
| Buellton City | Santa Barbara | 3 | Renewal | 4,828 | | Solvang--Buellton--Santa Ynez, CA Urban Cluster | Renewal |
| Carpinteria City | Santa Barbara | 3 | New | 13,040 | | Santa Barbara, CA Urbanized Area | Within Urbanized Area |
| Goleta City | Santa Barbara | 3 | Renewal | 29,888 | | Santa Barbara, CA Urbanized Area | Renewal |
| Guadalupe City | Santa Barbara | 3 | New | 7,080 | | Guadalupe, CA Urban Cluster | Regional Board Designation |
| Hope Ranch CDP | Santa Barbara | 3 | New | | | | Regional Board Designation |
| Isla Vista CDP | Santa Barbara | 3 | Renewal | 23,096 | | Santa Barbara, CA Urbanized Area | Renewal |
| Lompoc City | Santa Barbara | 3 | Renewal | 42,434 | | Lompoc, CA Urbanized Area | Renewal |
| Los Olivos CDP | Santa Barbara | 3 | Renewal | 1,132 | | Solvang--Buellton--Santa Ynez, CA Urban Cluster | Renewal |
| Mission Canyon CDP | Santa Barbara | 3 | New | 2,381 | | | Regional Board Designation |
| Mission Hills CDP | Santa Barbara | 3 | New | 3,576 | | | Regional Board Designation |
| Montecito CDP | Santa Barbara | 3 | New | 8,965 | | Santa Barbara, CA Urbanized Area | Within Urbanized Area |
| Orcutt CDP | Santa Barbara | 3 | Renewal | 28,905 | | Santa Maria, CA Urbanized Area | Renewal |
| Santa Barbara City | Santa Barbara | 3 | Renewal | 88,410 | Ω | Santa Barbara, CA Urbanized Area | Renewal |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Santa Barbara County | Santa Barbara | 3 | Renewal | | | | Renewal |
| Santa Maria City | Santa Barbara | 3 | Renewal | 99,553 | Ω | Santa Maria, CA Urbanized Area | Renewal |
| Santa Ynez CDP | Santa Barbara | 3 | Renewal | 4,418 | | Solvang--Buellton--Santa Ynez, CA Urban Cluster | Renewal |
| Solvang City | Santa Barbara | 3 | Renewal | 5,245 | | Solvang--Buellton--Santa Ynez, CA Urban Cluster | Renewal |
| Summerland CDP | Santa Barbara | 3 | Renewal | 1,448 | | Santa Barbara, CA Urbanized Area | Renewal |
| Toro Canyon CDP | Santa Barbara | 3 | New | 1,508 | | | Regional Board Designation |
| Vandenberg Village CDP | Santa Barbara | 3 | Renewal | 6,497 | | Lompoc, CA Urbanized Area | Renewal |
| Gilroy City | Santa Clara | 3 | Renewal | 48,821 | λ | Gilroy--Morgan Hill, CA Urbanized Area | Renewal |
| Morgan Hill City | Santa Clara | 3 | Renewal | 37,882 | λ | Gilroy--Morgan Hill, CA Urbanized Area | Renewal |
| San Martin CDP | Santa Clara | 3 | Renewal | 7,027 | | Gilroy--Morgan Hill, CA Urbanized Area | Renewal |
| Santa Clara County | Santa Clara | 3 | Renewal | | λ | | Renewal |
| Aptos CDP | Santa Cruz | 3 | Renewal | 6,220 | | Santa Cruz, CA Urbanized Area | Renewal |
| Ben Lomond CDP | Santa Cruz | 3 | New | 6,234 | | Santa Cruz, CA Urbanized Area | Within Urbanized Area |
| Capitola City | Santa Cruz | 3 | Renewal | 9,918 | | Santa Cruz, CA Urbanized Area | Renewal |
| Interlaken CDP | Santa Cruz | 3 | New | 7,321 | | Watsonville, CA Urbanized Area | Within Urbanized Area |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Live Oak CDP | Santa Cruz | 3 | New | 17,158 | | Santa Cruz, CA Urbanized Area | Regional Board Designation |
| Pleasure Point CDP | Santa Cruz | 3 | New | 5846 | | Santa Cruz, CA Urbanized Area | Within Urbanized Area |
| Rio del Mar CDP | Santa Cruz | 3 | New | 9,216 | | Santa Cruz, CA Urbanized Area | Within Urbanized Area |
| Santa Cruz City | Santa Cruz | 3 | Renewal | 59,946 | λ | Santa Cruz, CA Urbanized Area | Renewal |
| Santa Cruz County | Santa Cruz | 3 | Renewal | | λ | | Renewal |
| Scotts Valley City | Santa Cruz | 3 | Renewal | 11,580 | λ | Santa Cruz, CA Urbanized Area | Renewal |
| Soquel CDP | Santa Cruz | 3 | New | 9,644 | | Santa Cruz, CA Urbanized Area | Within Urbanized Area |
| Watsonville City | Santa Cruz | 3 | Renewal | 51,199 | λ | Watsonville, CA Urbanized Area | Renewal |
| Anderson City | Shasta | 5R | New | 9,932 | λ | Redding, CA Urbanized Area | Renewal |
| Redding City | Shasta | 5R | New | 89,861 | λ | Redding, CA Urbanized Area | Renewal |
| Shasta County | Shasta | 5R | New | | λ | | Renewal |
| Shasta Lake City | Shasta | 5R | New | 10,164 | | Redding, CA Urbanized Area | Renewal |
| Yreka City | Siskiyou | 1 | New | 7,765 | λ | Yreka, CA Urban Cluster | TMDL |
| Benicia City | Solano | 2 | Renewal | 26,997 | | Vallejo, CA Urbanized Area | Renewal |
| Solano County (Region 2) | Solano | 2 | Renewal | | λ | | Renewal |
| Dixon City | Solano | 5S | Renewal | 18,351 | λ | Dixon, CA Urban Cluster | Renewal |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Rio Vista City | Solano | 5S | Renewal | 7,360 | λ | Rio Vista, CA Urban Cluster | Renewal |
| Solano County (Region 5S) | Solano | 5S | Renewal | | λ | | Renewal |
| Vacaville City | Solano | 5S | Renewal | 92,428 | λ | Fairfield, CA Urbanized Area | Renewal |
| Vacaville City | Solano | 5S | Renewal | 92,428 | Ω | Vacaville, CA Urbanized Area | Renewal |
| Petaluma City | Sonoma | 2 | Renewal | 57,941 | λ | Petaluma, CA Urbanized Area | Renewal |
| Sonoma City | Sonoma | 2 | Renewal | 10,648 | λ | Sonoma, CA Urban Cluster | Renewal |
| Sonoma County | Sonoma | 2 | Renewal | | λ | | Renewal |
| Sonoma County Water Agency | Sonoma | 2 | Renewal | | λ | | Renewal |
| Bret Harte CDP | Stanislaus | 5S | New | 5,152 | | Modesto, CA Urbanized Area | Within Urbanized Area |
| Ceres City | Stanislaus | 5S | Renewal | 45,417 | λ | Modesto, CA Urbanized Area | Renewal |
| Empire CDP | Stanislaus | 5S | Renewal | 4,189 | λ | Modesto, CA Urbanized Area | Renewal |
| Hughson City | Stanislaus | 5S | Renewal | 6,640 | λ | Modesto, CA Urbanized Area | Renewal |
| Keyes CDP | Stanislaus | 5S | Renewal | 5,601 | λ | Modesto, CA Urbanized Area | Renewal |
| Oakdale City | Stanislaus | 5S | Renewal | 20,675 | λ | Modesto, CA Urbanized Area | Renewal |
| Patterson City | Stanislaus | 5S | Renewal | 20,413 | λ | Patterson, CA Urban Cluster | Renewal |
| Riverbank City | Stanislaus | 5S | Renewal | 22,678 | λ | Modesto, CA Urbanized Area | Renewal |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Salida CDP | Stanislaus | 5S | Renewal | 13,722 | λ | Modesto, CA Urbanized Area | Renewal |
| Stanislaus County | Stanislaus | 5S | Renewal | | λ | | Renewal |
| Turlock City | Stanislaus | 5S | Renewal | 68,549 | λ | Turlock, CA Urbanized Area | Renewal |
| West Modesto CDP | Stanislaus | 5S | New | 5,682 | | Modesto, CA Urbanized Area | Within Urbanized Area |
| Newman City | Stanislaus | 5S | New | 10,224 | | Newman, CA Urban Cluster | High Population/Density |
| Live Oak | Sutter | 5S | New | 8,392 | λ | Live Oak (Sutter County), CA Urban Cluster | TMDL |
| Sutter County | Sutter | 5S | Renewal | | λ | | Renewal |
| Yuba City City | Sutter | 5S | Renewal | 64,925 | λ | Yuba City, CA Urbanized Area | Renewal |
| Red Bluff City | Tehama | 5R | New | 14,076 | λ | Red Bluff, CA Urban Cluster | High Population/Density |
| East Porterville CDP | Tulare | 5F | New | 6,767 | | Porterville, CA Urbanized Area | Within Urbanized Area |
| Exeter City | Tulare | 5F | Renewal | 10,334 | | Visalia, CA Urbanized Area | Renewal |
| Farmersville City | Tulare | 5F | Renewal | 10,588 | | Visalia, CA Urbanized Area | Renewal |
| Goshen CDP | Tulare | 5F | Renewal | 3,006 | | Visalia, CA Urbanized Area | Renewal |
| Porterville City | Tulare | 5F | Renewal | 54,165 | Ω | Porterville, CA Urbanized Area | Renewal |
| Strathmore CDP | Tulare | 5F | Renewal | 2,819 | | Porterville, CA Urbanized Area | Renewal |
| Tulare City | Tulare | 5F | Renewal | 59,278 | Ω | Visalia, CA Urbanized Area | Renewal |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place Name | County | RB | Permittee Type | Population 2010 | Monitoring Type | Urbanized Area/ Urban Cluster Name | Designation Criteria |
|---|---|---|---|---|---|---|---|
| Tulare County | Tulare | 5F | Renewal | | λ | | Renewal |
| Visalia City | Tulare | 5F | Renewal | 124,442 | Ω | Visalia, CA Urbanized Area | Renewal |
| Dinuba City | Tulare | 5F | New | 21,453 | | Reedley--Dinuba, CA Urban Cluster | High Population/Density |
| Davis City | Yolo | 5S | Renewal | 65,622 | λ | Davis, CA Urbanized Area | Renewal |
| UC Davis CDP | Yolo | 5S | New | 5,786 | | Davis, CA Urbanized Area | Within Urbanized Area |
| West Sacramento City | Yolo | 5S | Renewal | 48,744 | λ | Sacramento, CA Urbanized Area | Renewal |
| Woodland City | Yolo | 5S | Renewal | 55,468 | λ | Woodland, CA Urbanized Area | Renewal |
| Yolo County | Yolo | 5S | Renewal | | λ | | Renewal |
| Linda CDP | Yuba | 5S | Renewal | 17,773 | λ | Yuba City, CA Urbanized Area | Renewal |
| Marysville City | Yuba | 5S | Renewal | 12,072 | λ | Yuba City, CA Urbanized Area | Renewal |
| Olivehurst CDP | Yuba | 5S | Renewal | 13,656 | λ | Yuba City, CA Urbanized Area | Renewal |
| Yuba County | Yuba | 5S | Renewal | | λ | | Renewal |

Phase II Small MS4 General Permit                                                                    NPDES No. CAS000004
Order No. 2013-0001-DWQ — Attachment B
As amended by Orders WQ 2015-0133-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 276 of 1006

# Attachment B — Non-Traditional Small MS4 Permittees

Monitoring Type:  Δ = Areas of Special Biological Significance Special Protections

*The list of Regulated MS4s in this Attachment may be amended by the Executive Director consistent with the designation criteria listed in the Order. Revised 2/19/13 to change Agency to Department of Homeland Security for Petaluma Coast Guard Training Center and Alameda Coast Guard Integrated Support Command, removed VA Northern CA Healthcare Systems and Martinez Center for Rehab and Extended. Amended on September 2, 2015 to remove Tracy Unified School District. Amended on January 24, 2018 to remove Amtrak and to add California High Speed Rail Authority.  Amended on March 13, 2018 to add San Diego Metropolitan Transit System and Marine Corps Recruit Depot San Diego.

| Region | Permittee Name | Agency | Designation Criteria | Permittee Type | Monitoring Type |
|--------|----------------|--------|----------------------|----------------|-----------------|
| colspan | North Coast Regional Water Board | | | | |
| 1 | Sonoma State University | California State University | Within Urbanized Area | New | |
| 1 | Caspar Headlands SB | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Caspar Headlands SR | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Del Norte Coast Redwoods SP | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Humboldt Lagoons SP | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Jug Handle SR | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Mendocino Headlands SP | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Mill Creek Property | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Patrick's Point SP | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Pelican SB | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Point Cabrillo Light Station Property | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Prairie Creek Redwoods SP | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Sinkyone Wilderness SP | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Tolowa Dunes SP | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 1 | Trinidad SB | Parks and Recreation, Dept. of | ASBS | New | Δ |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Region | Permittee Name | Agency | Designation Criteria | Permittee Type | Monitoring Type |
|--------|----------------|--------|----------------------|----------------|-----------------|
| 1 | Petaluma Coast Guard Training Center | Homeland Security, Department of | Regional Board Designation | New | |
| **San Francisco Regional Water Board** | | | | | |
| 2 | San Jose Airport | Airport | Regional Board Designation | New | |
| 2 | FCI Dublin | Bureau of Prisons | Within Urbanized Area | New | |
| 2 | California State University Maritime | California State University | Within Urbanized Area | New | |
| 2 | California State University East Bay - Hayward Campus | California State University | Within Urbanized Area | New | |
| 2 | California State University East Bay - Concord Campus | California State University | Within Urbanized Area | New | |
| 2 | San Jose State University | California State University | Within Urbanized Area | New | |
| 2 | San Quentin State Prison | Corrections and Rehabilitation, Dept of | Within Urbanized Area | New | |
| 2 | Travis Air Force Base | Defense, Department of | Within Urbanized Area | New | |
| 2 | Agnews Developmental Center East & West | Developmental Services, Dept of | Within Urbanized Area | New | |
| 2 | Sonoma Development Center | Developmental Services, Dept of. | Renewal | Renewal | |
| 2 | Sonoma-Marin Fair | District Agricultural Association | Within Urbanized Area | New | |
| 2 | Napa County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 2 | Montara SB | Parks and Recreation, Dept. of | ASBS | New | |
| 2 | Port of Oakland | Port | Regional Board Designation | New | |
| 2 | Port of Redwood City | Port | Regional Board Designation | New | |
| 2 | California High Speed Rail Authority | Special District | State Board Designation | New | |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Region | Permittee Name | Agency | Designation Criteria | Permittee Type | Monitoring Type |
|--------|----------------|--------|----------------------|----------------|-----------------|
| 2 | Bay Area Rapid Transit | Special District | Regional Board Designation | New | |
| 2 | CalTrain | Special District | Regional Board Designation | New | |
| 2 | Golden Gate Bridge, Highway and Transportation District | Special District | Regional Board Designation | New | |
| 2 | Valley Transit Authority (VTA) | Special District | Regional Board Designation | New | |
| 2 | Alameda Coast Guard Integrated Support Command | Homeland Security, Department of | Regional Board Designation | New | |
| 2 | University of California Berkeley | University of California | Within Urbanized Area | New | |
| 2 | The University of California, San Francisco | University of California | Within Urbanized Area | New | |
| **Central Coast Regional Water Board** | | | | | |
| 3 | USP Lompoc | Bureau of Prisons | Within Urbanized Area | New | |
| 3 | FCI Lompoc | Bureau of Prisons | Within Urbanized Area | New | |
| 3 | California Polytechnic State University | California State University | Within Urbanized Area | New | |
| 3 | California State University Monterey Bay | California State University | Within Urbanized Area | New | |
| 3 | Los Osos Community Services District | Community Services District | Renewal | Renewal | |
| 3 | Oceano Community Services District | Community Services District | Renewal | Renewal | |
| 3 | Templeton Community Services District | Community Services District | Renewal | Renewal | |
| 3 | California Men's Colony | Corrections and Rehabilitation, Dept of | Within Urbanized Area | New | |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Region | Permittee Name | Agency | Designation Criteria | Permittee Type | Monitoring Type |
|--------|----------------|--------|----------------------|----------------|-----------------|
| 3 | Fort Hunter Ligget, Army Garrison | Defense, Department of | Regional Board Designation | New | |
| 3 | US Army Presidio of Monterey; includes Defense Language Institute | Defense, Department of | Within Urbanized Area | New | |
| 3 | Vandenberg AFB | Defense, Department of | Renewal | Renewal | |
| 3 | Monterey County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 3 | Santa Maria Fairpark | District Agricultural Association | Within Urbanized Area | New | |
| 3 | Santa Cruz County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 3 | Earl Warren Showgrounds (National Horse Show) | District Agricultural Association | Within Urbanized Area | New | |
| 3 | San Luis Obispo County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 3 | Fort Ord Reuse Authority | Local Agency | Regional Board Designation | New | |
| 3 | Ano Nuevo SP | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 3 | Ano Nuevo SR | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 3 | Carmel River SB | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 3 | Julia Pfeiffer Burns SP | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 3 | Oceano Dunes SVRA | Parks and Recreation, Dept. of | Within Urbanized Area | New | |
| 3 | Pismo SB | Parks and Recreation, Dept. of | Within Urbanized Area | New | |
| 3 | Point Lobos SR | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 3 | Carpinteria Unified School District | School District, Carpinteria Unified | Renewal | Renewal | |
| 3 | University of California, Santa Barbara | University of California | Renewal | Renewal | |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Region | Permittee Name | Agency | Designation Criteria | Permittee Type | Monitoring Type |
|--------|----------------|--------|----------------------|----------------|-----------------|
| 3 | University of California, Santa Cruz | University of California | Renewal | Renewal | |
| **Los Angeles Regional Water Board** | | | | | |
| 4 | FCI Terminal Island | Bureau of Prisons | Within Urbanized Area | New | |
| 4 | CCM Long Beach | Bureau of Prisons | Within Urbanized Area | New | |
| 4 | California State University Los Angeles | California State University | Within Urbanized Area | New | |
| 4 | California State University Northridge | California State University | Within Urbanized Area | New | |
| 4 | California State University Channel Islands | California State University | Within Urbanized Area | New | |
| 4 | California State University Long Beach | California State University | Within Urbanized Area | New | |
| 4 | California State Polytechnic University, Pomona | California State University | Within Urbanized Area | New | |
| 4 | California State University Dominguez Hills | California State University | Within Urbanized Area | New | |
| 4 | Naval Base Ventura County; includes Port Hueneme and Point Mugu | Defense, Department of | Within Urbanized Area | New | |
| 4 | Lanterman Developmental Center | Developmental Services, Dept of | Within Urbanized Area | New | |
| 4 | Ventura County Fairgrounds (Seaside Park and Ventura County Fairgrounds) | District Agricultural Association | Within Urbanized Area | New | |
| 4 | Point Dume SB | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 4 | Point Mugu SP | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 4 | Robert H. Meyer Memorial SB | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 4 | UCLA | University of California | Within Urbanized Area | New | |
| 4 | Long Beach VA Medical Center | Veteran Affairs | Within Urbanized Area | New | |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Region | Permittee Name | Agency | Designation Criteria | Permittee Type | Monitoring Type |
|---|---|---|---|---|---|
| 4 | VA Greater Los Angeles Healthcare System (GLA) | Veteran Affairs | Within Urbanized Area | New | |
| **Central Valley Regional Water Board** | | | | | |
| 5F | USP Atwater | Bureau of Prisons | Within Urbanized Area | New | |
| 5F | California State University Bakersfield | California State University | Within Urbanized Area | New | |
| 5F | Porterville Developmental Center | Developmental Services, Dept of | Within Urbanized Area | New | |
| 5F | Madera County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5F | Kern County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5F | Tulare County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5F | Kings County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5F | The Big Fresno Fair | District Agricultural Association | Within Urbanized Area | New | |
| 5F | Merced County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5F | University of California, Merced | University of California | Within Urbanized Area | New | |
| 5F | Lemoore NAS | Defense, Department of | Within Urbanized Area | New | |
| 5R | California State University Chico | California State University | Within Urbanized Area | New | |
| 5R | Silver Dollar Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5R | Shasta County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5R | Carnegie State Vehicular Recreation Area | Parks and Recreation, Dept. of | Within Urbanized Area | New | |
| 5S | California State University Sacramento | California State University | Renewal | Renewal | |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Region | Permittee Name | Agency | Designation Criteria | Permittee Type | Monitoring Type |
|--------|----------------|--------|----------------------|----------------|-----------------|
| 5S | California State University Stanislaus | California State University | Within Urbanized Area | New | |
| 5S | Rancho Murieta Community Services District | Community Services District | Renewal | Renewal | |
| 5S | Mountain House Community Services District | Community Services District | Renewal | Renewal | |
| 5S | Cosumnes Community Services District | Community Services District | Renewal | Renewal | |
| 5S | CSP, Solano County | Corrections and Rehabilitation, Dept of | Within Urbanized Area | New | |
| 5S | Deuel Vocational Institution | Corrections and Rehabilitation, Dept of | Within Urbanized Area | New | |
| 5S | Folsom State Prison | Corrections and Rehabilitation, Dept of | Within Urbanized Area | New | |
| 5S | CSP, Sacramento | Corrections and Rehabilitation, Dept of | Within Urbanized Area | New | |
| 5S | California Medical Facility | Corrections and Rehabilitation, Dept of | Within Urbanized Area | New | |
| 5S | Contra Costa County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5S | Sutter County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5S | Yolo County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5S | Stanislaus County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5S | San Joaquin County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 5S | California Exposition & State Fair | Exposition & State Fair, California | Renewal | Renewal | |
| 5S | Elk Grove Unified School District | School District, Elk Grove Unified | Renewal | Renewal | |

| Region | Permittee Name | Agency | Designation Criteria | Permittee Type | Monitoring Type |
|--------|----------------|--------|----------------------|----------------|-----------------|
| 5S | The University of California, Davis | University of California | Renewal | Renewal | |
| 5S | Sacramento Medical Center at Mather | Veteran Affairs | Within Urbanized Area | New | |
| **Lahontan Regional Water Board** | | | | | |
| 6V | FCI Victorville | Bureau of Prisons | Within Urbanized Area | New | |
| 6V | San Bernardino County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| **Santa Ana Regional Water Board** | | | | | |
| 8 | Los Alamitos AFRC | California Army National Guard | Within Urbanized Area | New | |
| 8 | California State University Fullerton | California State University | Within Urbanized Area | New | |
| 8 | California State University San Bernardino | California State University | Within Urbanized Area | New | |
| 8 | California Institution for Men | Corrections and Rehabilitation, Dept of | Within Urbanized Area | New | |
| 8 | California Institution for Women | Corrections and Rehabilitation, Dept of | Within Urbanized Area | New | |
| 8 | California Rehabilitation Center | Corrections and Rehabilitation, Dept of | Within Urbanized Area | New | |
| 8 | Fairview Developmental Center | Developmental Services, Dept of. | Within Urbanized Area | New | |
| 8 | March Air Force Base | Department of Defense | Regional Board Designation | New | |
| 8 | Orange County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 8 | Crystal Cove SP | Parks and Recreation, Dept. of | ASBS | New | Δ |
| 8 | University of California, Irvine | University of California | Within Urbanized Area | New | |

UNOFFICIAL DRAFT — Not Certified by Clerk

| Region | Permittee Name | Agency | Designation Criteria | Permittee Type | Monitoring Type |
|---|---|---|---|---|---|
| 8 | University of California, Riverside | University of California | Within Urbanized Area | New | |
| 8 | Jerry L. Pettis Memorial VA Medical Center | Veteran Affairs | Within Urbanized Area | New | |
| **San Diego Regional Water Board** | | | | | |
| 9 | MCC San Diego | Bureau of Prisons | Within Urbanized Area | New | |
| 9 | San Diego State University | California State University | Within Urbanized Area | New | |
| 9 | California State University San Marcos | California State University | Within Urbanized Area | New | |
| 9 | R J Donovan Correctional Facility at Rock Mountain | Corrections and Rehabilitation, Dept of | Within Urbanized Area | New | |
| 9 | Miramar Marine Corps Air Station | Defense, Department of | Regional Board Designation | New | |
| 9 | Camp Pendleton | Defense, Department of | Within Urbanized Area | New | |
| 9 | Del Mar Fairgrounds | District Agricultural Association | Renewal | Renewal | |
| 9 | San Diego County Fairgrounds | District Agricultural Association | Within Urbanized Area | New | |
| 9 | North County Transit District (NCTD) | Transportation Agency | Regional Board Designation | New | |
| 9 | University of California, San Diego | University of California | Within Urbanized Area | New | |
| 9 | VA San Diego Healthcare System | Veteran Affairs | Within Urbanized Area | New | |
| 9 | San Diego Metropolitan Transit System | Special District | Regional Board Designation | New | |
| 9 | Marine Corps Recruit Depot San Diego | Department of Defense | Regional Board Designation | New | |

*UNOFFICIAL DRAFT — Not Certified by Clerk*

# Attachment C

# Special Conditions (Specific Provisions) for Traditional and Non-Traditional Small MS4 ASBS Discharges

All Traditional and Non-traditional Small MS4 Permittees that discharge to ASBS as listed in Attachment D have been granted an exception to the Ocean Plan and shall comply with the following Special Protections requirements. Special Protections for Areas of Special Biological Significance, Governing Point Source Discharges of Storm Water and Nonpoint Source Waste Discharges (Attachment B to State Water Board Resolution 2012-0001) (Special Protections).

The Special Protections for Areas of Special Biological Significance require submittal of Compliance Plans to be included in a SWMP. However, SWMPs are no longer required for submittal by this Order. As such, Permittees shall submit a stand-alone Compliance Plan document for ASBS discharges and submit per the Special Conditions compliance schedule, through their online Annual Report.

## I. PROVISIONS FOR POINT SOURCE DISCHARGES OF STORM WATER

The following terms, prohibitions, and special conditions (hereafter collectively referred to as special conditions) are established as limitations on point source storm water. These special conditions provide Special Protections for marine aquatic life and natural water quality in Areas of Special Biological Significance (ASBS), as required for State Water Quality Protection Areas pursuant to California Public Resources Code Sections 36700(f) and 36710(f). These Special Protections are adopted by the State Water Board as part of the California Ocean Plan (Ocean Plan) General Exception.

## A. PERMITTED POINT SOURCE DISCHARGES OF STORM WATER

1. General Provisions for Permitted Point Source Discharges of Storm Water

   a. Existing storm water discharges into an ASBS are allowed only under the following conditions:

      (1) The discharges are authorized by this Order;

      (2) The discharges comply with all of the applicable terms, prohibitions, and special conditions contained in the Special Protections as laid out in this Attachment; and

      (3) The discharges:

         (i)   Are essential for flood control or slope stability, including roof, landscape, road, and parking lot drainage;

         (ii)  Are designed to prevent soil erosion;

         (iii) Occur only during wet weather;

         (iv)  Are composed of only storm water runoff.

   b. Discharges composed of storm water runoff shall not alter natural ocean water quality in an ASBS.

   c. The discharge of trash is prohibited.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

d.  Only discharges from existing storm water outfalls are allowed. Any proposed or new storm water runoff discharge shall be routed to existing storm water discharge outfalls and shall not result in any new contribution of waste to an ASBS (i.e., no additional pollutant loading). "Existing storm water outfalls" are those that were constructed or under construction prior to January 1, 2005. "New contribution of waste" is defined as any addition of waste beyond what would have occurred as of January 1, 2005. A change to an existing storm water outfall, in terms of re-location or alteration, in order to comply with these special conditions, is allowed and does not constitute a new discharge.

e.  Non-storm water discharges are prohibited except as provided below:

(1) The term "non-storm water discharges" means any waste discharges from a municipal separate storm sewer system (MS4) or other NPDES permitted storm drain system to an ASBS that are not composed entirely of storm water.

(2) The following non-storm water discharges are allowed, provided that the discharges are essential for emergency response purposes, structural stability, slope stability or occur naturally:

(i)   Discharges associated with emergency firefighting operations.
(ii)  Foundation and footing drains.
(iii) Water from crawl space or basement pumps.
(iv) Hillside dewatering.
(v)  Naturally occurring groundwater seepage via a storm drain.
(vi) Non-anthropogenic flows from a naturally occurring stream via a culvert or storm drain, as long as there are no contributions of anthropogenic runoff.

(3) Discharges from utility vaults and underground structures to a segment of the MS4 with a direct discharge to an ASBS are permitted if such discharges are authorized by the General NPDES Permit for Discharges from Utility Vaults and Underground Structures to Surface Water, NPDES No. CAG 990002. Other short-duration, intermittent non-storm water discharges related to utilities (e.g. groundwater dewatering, potable water system flushing, hydrotest discharges) to a segment of the MS4 with a direct discharge to an ASBS are permitted if such discharges are authorized by an NPDES permit issued by the relevant Regional Water Board. A Regional Water Board may nonetheless prohibit a specific discharge from a utility vault or underground structure or other specific utility-related discharge if it determines that the discharge is causing the MS4 discharge to the ASBS to alter natural ocean water quality in the ASBS. Additional non-storm water discharges to a segment of the MS4 with a direct discharge to an ASBS are allowed only to the extent the relevant Regional Water Board finds that the discharge does not alter natural ocean water quality in the ASBS.

This provision does not supersede the authority of the MS4 to effectively prohibit a non-storm water discharge that has been found to alter natural ocean water quality in the ASBS.

(4) Authorized non-storm water discharges shall not cause or contribute to a violation of the water quality objectives in Chapter II of the Ocean Plan nor alter natural ocean water quality in an ASBS.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

2. Compliance Plans for Inclusion in Storm Water Management Plans (SWMP) and Storm Water Pollution Prevention Plans (SWPPP)

The Permittee shall specifically address the prohibition of non-storm water runoff and the requirement to maintain natural water quality for storm water discharges to an ASBS in an ASBS Compliance Plan to be submitted to the appropriate Regional Water Board. The ASBS Compliance Plan is subject to approval by the Executive Director of the State Water Board.

a. The Compliance Plan shall include a map of surface drainage of storm water runoff, showing areas of sheet runoff, prioritize discharges, and describe any structural Best Management Practices (BMPs) already employed and/or BMPs to be employed in the future. Priority discharges are those that pose the greatest water quality threat and which are identified to require installation of structural BMPs. The map shall also show the storm water conveyances in relation to other features such as service areas, sewage conveyances and treatment facilities, landslides, areas prone to erosion and waste and hazardous material storage areas, if applicable. The SWMP or SWPPP shall also include a procedure for updating the map and plan when changes are made to the storm water conveyance facilities.

b. The ASBS Compliance Plan shall describe the measures by which all non-authorized non-storm water runoff (e.g., dry weather flows) has been eliminated, how these measures will be maintained over time, and how these measures are monitored and documented.

c. The ASBS Compliance Plan shall require minimum inspection frequencies as follows:
(1) The minimum inspection frequency for construction sites shall be weekly during rainy season;
(2) The minimum inspection frequency for industrial facilities shall be monthly during the rainy season;
(3) The minimum inspection frequency for commercial facilities (e.g., restaurants) shall be twice during the rainy season;
(4) Storm water outfall drains equal to or greater than 18 inches (457 mm) in diameter or width shall be inspected once prior to the beginning of the rainy season and once during the rainy season and maintained to remove trash and other anthropogenic debris.

d. The ASBS Compliance Plan shall address storm water discharges (wet weather flows) and, in particular, describe how pollutant reductions in storm water runoff, that are necessary to comply with these special conditions, will be achieved through BMPs. Structural BMPs need not be installed if the Permittee can document to the satisfaction of the State Water Board Executive Director that such installation would pose a threat to health or safety. BMPs to control storm water runoff discharges (at the end-of-pipe) during a design storm shall be designed to achieve on average the following target levels:

(1) Table B Instantaneous Maximum Water Quality Objectives in Chapter II of the Ocean Plan; or
(2) A 90% reduction in pollutant loading during storm events, for the Permittee's total discharges. The baseline for the reduction is the effective date of the Exception.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 288 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

The baseline for these determinations is the effective date of the Exception, and the reductions must be achieved and documented within six (6) years of the effective date.

e. The ASBS Compliance Plan shall address erosion control and the prevention of anthropogenic sedimentation in ASBS. The natural habitat conditions in the ASBS shall not be altered as a result of anthropogenic sedimentation.

f. The ASBS Compliance Plan shall describe the non-structural BMPs currently employed and planned in the future (including those for construction activities) and include an implementation schedule. The ASBS Compliance Plan shall include non-structural BMPs that address public education and outreach. Education and outreach efforts must adequately inform the public that direct discharges of pollutants from private property not entering an MS4 are prohibited. The ASBS Compliance Plan shall also describe the structural BMPs, including any low impact development (LID) measures, currently employed and planned for higher threat discharges and include an implementation schedule. To control storm water runoff discharges (at the end-of-pipe) during a design storm, permittees must first consider using LID practices to infiltrate, use, or evapotranspire storm water runoff on-site.

g. The BMPs and implementation schedule shall be designed to ensure that natural water quality conditions in the receiving water are achieved and maintained by either reducing flows from impervious surfaces or reducing pollutant loading, or some combination thereof.

h. If the results of the receiving water monitoring described in Section IV. B. below indicate that the storm water runoff is causing or contributing to an alteration of natural ocean water quality in the ASBS, the Permittee shall submit a report to the State Water Board and Regional Water Board within 30 days of receiving the results.

(1) The report shall identify the constituents in storm water runoff that alter natural ocean water quality and the sources of these constituents.

(2) The report shall describe BMPs that are currently being implemented, BMPs that are identified in the ASBS Compliance Plan for future implementation, and any additional BMPs that may be added to the ASBS Compliance Plan to address the alteration of natural water quality. The report shall include a new or modified implementation schedule for the BMPs.

(3) Within 30 days of the approval of the report by the State Water Board Executive Director, the Permittee shall revise its ASBS Compliance Plan to incorporate any new or modified BMPs that have been or will be implemented, the implementation schedule, and any additional monitoring required.

(4) As long as the Permittee has complied with the procedures described above and is implementing the revised ASBS Compliance Plan, the Permittee does not have to repeat the same procedure for continuing or recurring exceedances of natural ocean water quality conditions due to the same constituent.

(5) Compliance with this section does not excuse violations of any term, prohibition, or condition contained in the Special Protections.

3. Compliance Schedule
a. On the effective date of the Exception, all non-authorized non-storm water discharges (e.g., dry weather flow) are effectively prohibited.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

b. Within 18 months from the effective date of the Exception, the Permittee shall submit a written ASBS Compliance Plan to the State Water Board Executive Director that describes its strategy to comply with these special conditions, including the requirement to maintain natural water quality in the affected ASBS. The ASBS Compliance Plan shall include a time schedule to implement appropriate non-structural and structural controls (implementation schedule) to comply with these special conditions.

c. Within 18 months of the effective date of the Exception, any non-structural controls that are necessary to comply with these special conditions shall be implemented.

d. Within six (6) years of the effective date of the Exception, any structural controls identified in the ASBS Compliance Plan that are necessary to comply with these special conditions shall be operational.

e. Within six (6) years of the effective date of the Exception, all Permittees must comply with the requirement that their discharges into the affected ASBS maintain natural ocean water quality. If the initial results of post-storm receiving water quality testing indicate levels higher than the 85th percentile threshold of reference water quality data and the pre-storm receiving water levels, then the Permittee must re-sample the receiving water, pre- and post-storm. If after re-sampling the post-storm levels are still higher than the 85th percentile threshold of reference water quality data, and the pre-storm receiving water levels, for any constituent, then natural ocean water quality is exceeded. See attached Flowchart Section C.

f. The Executive Director of the State Water Board may only authorize additional time to comply with the special conditions d. and e., above if good cause exists to do so. Good cause means a physical impossibility or lack of funding.

If a Permittee claims physical impossibility, it shall notify the Board in writing within thirty (30) days of the date that the Permittee first knew of the event or circumstance that caused or would cause it to fail to meet the deadline in d. or e. The notice shall describe the reason for the noncompliance or anticipated noncompliance and specifically refer to this Section of this Exception. It shall describe the anticipated length of time the delay in compliance may persist, the cause or causes of the delay as well as measures to minimize the impact of the delay on water quality, the measures taken or to be taken by the Permittee to prevent or minimize the delay, the schedule by which the measures will be implemented, and the anticipated date of compliance. The Permittee shall adopt all reasonable measures to avoid and minimize such delays and their impact on water quality.

The Permittee may request an extension of time for compliance based on lack of funding. The request for an extension shall require:

1. for Traditional Small MS4s, a demonstration of significant hardship to Permittee ratepayers, by showing the relationship of storm water fees to annual household income for residents within the Permittee's jurisdictional area, and the Permittee has made timely and complete applications for all available bond and grant funding, and either no bond or grant funding is available, or bond and/or grant funding is inadequate; or

*UNOFFICIAL DRAFT — Not Certified by Clerk*

2. for Non-Traditional Small MS4s, a demonstration and documentation of a good faith effort to acquire funding through that agency's budgetary process.

## II. ADDITIONAL REQUIREMENTS FOR PARKS AND RECREATION FACILITIES

In addition to the provisions in Section I (A) a Permittee with parks and recreation facilities shall comply with the following:

A. The Permittee shall include a section in an ASBS Compliance Plan to address storm water runoff from parks and recreation facilities.

1. The Section shall identify all pollutant sources, including sediment sources, which may result in waste entering storm water runoff. Pollutant sources include, but are not limited to, roadside rest areas and vistas, picnic areas, campgrounds, trash receptacles, maintenance facilities, park personnel housing, portable toilets, leach fields, fuel tanks, roads, piers, and boat launch facilities.

2. The Section shall describe BMPs or Management Measures/Practices that will be implemented to control soil erosion (both temporary and permanent erosion controls) and reduce or eliminate pollutants in storm water runoff in order to achieve and maintain natural water quality conditions in the affected ASBS. The plan shall include BMPs or Management Measures/Practices to ensure that trails and culverts are maintained to prevent erosion and minimize waste discharges to ASBS.

3. The Section shall include BMPs or Management Measures/Practices to prevent the discharge of pesticides or other chemicals, including agricultural chemicals, in storm water runoff to the affected ASBS.

4. The Section shall include BMPs or Management Measures/Practices that address public education and outreach. The goal of these BMPs or Management Measures/Practices is to ensure that the public is adequately informed that waste discharges to the affected ASBS are prohibited or limited by special conditions in in the Special Protections as laid out in this Attachment. The BMPs or Management Measures/Practices shall include signage at camping, picnicking, beach and roadside parking areas, and visitor centers, or other appropriate measures, which notify the public of any applicable requirements of the Special Protections as laid out in this Attachment and identify the ASBS boundaries.

5. The Section shall include BMPs or Management Measures/Practices that address the prohibition against the discharge of trash to ASBS. The BMPs or Management Measures/Practices shall include measures to ensure that adequate trash receptacles are available for public use at visitor facilities, including parking areas, and that the receptacles are adequately maintained to prevent trash discharges into the ASBS. Appropriate measures include covering trash receptacles to prevent trash from being windblown and periodically emptying the receptacles to prevent overflows.

6. The Section shall include BMPs or Management Measures/Practices to address runoff from parking areas and other developed features to ensure that the runoff does not alter natural water quality in the affected ASBS. BMPs or Management Measures/Practices shall include measures to reduce pollutant loading in runoff to the ASBS through installation of natural area buffers (LID), treatment, or other appropriate measures.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 291 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

B. Maintenance and repair of park and recreation facilities must not result in waste discharges to the ASBS. The practice of road oiling must be minimized or eliminated, and must not result in waste discharges to the ASBS.

## III. ADDITIONAL REQUIREMENTS – WATERFRONT AND MARINE OPERATIONS

In addition to the provisions in Section I (A), a Permittee with waterfront and marine operations shall comply with the following:

A. For discharges related to waterfront and marine operations, the Permittee shall develop a Waterfront and Marine Operations Management Section (Waterfront Section) for its ASBS Compliance Plan. The Waterfront Section shall contain appropriate Best Management Practices (BMPs) to address pollutant discharges to the affected ASBS.

   1. The Waterfront Section shall contain appropriate BMPs for any waste discharges associated with the operation and maintenance of vessels, moorings, piers, launch ramps, and cleaning stations in order to ensure that beneficial uses are protected and natural water quality is maintained in the affected ASBS.

   2. For discharges from marinas and recreational boating activities, the Waterfront Section shall include appropriate Management Measures, described in The Plan for California's Nonpoint Source Pollution Control Program, for marinas and recreational boating, or equivalent practices, to ensure that nonpoint source pollutant discharges do not alter natural water quality in the affected ASBS.

   3. The Waterfront Section shall include BMPs to address public education and outreach to ensure that the public is adequately informed that waste discharges to the affected ASBS are prohibited or limited by special conditions in the Special Protections as laid out in this Attachment. The BMPs shall include appropriate signage, or similar measures, to inform the public of the ASBS restrictions and to identify the ASBS boundaries.

   4. The Waterfront Section shall include BMPs to address the prohibition against trash discharges to ASBS. The BMPs shall include the provision of adequate trash receptacles for marine recreation areas, including parking areas, launch ramps, and docks. The plan shall also include appropriate BMPs to ensure that the receptacles are adequately maintained and secured in order to prevent trash discharges into the ASBS. Appropriate BMPs include covering the trash receptacles to prevent trash from being windblown, staking or securing the trash receptacles so they don't tip over, and periodically emptying the receptacles to prevent overflow.

   5. The Permittee shall submit the Waterfront Plan to the Executive Director of the State Water Board within six months of the effective date of these special conditions. The Waterfront Plan is subject to approval by the State Water Board Executive Director. The plan must be fully implemented within 18 months of the effective date of the Exception.

B. The discharge of chlorine, soaps, petroleum, other chemical contaminants, trash, fish offal, or human sewage to ASBS is prohibited. Sinks and fish cleaning stations are point source discharges of wastes and are prohibited from discharging into ASBS. Anthropogenic accumulations of discarded fouling organisms on the sea floor must be minimized.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

C. Limited-term activities, such as the repair, renovation, or maintenance of waterfront facilities, including, but not limited to, piers, docks, moorings, and breakwaters, are authorized only in accordance with Chapter III.E.2 of the Ocean Plan.

D. If the Permittee anticipates that it will fail to fully implement the approved Waterfront Plan within the 18 month deadline, the Permittee shall submit a technical report as soon as practicable to the State Water Board Executive Director. The technical report shall contain reasons for failing to meet the deadline and propose a revised schedule to fully implement the plan.

E. The State Water Board Executive Director may, for good cause, authorize additional time to comply with the Waterfront Plan. Good cause means a physical impossibility or lack of funding.

If a Permittee claims physical impossibility, it shall notify the Board in writing within thirty (30) days of the date that the Permittee first knew of the event or circumstance that caused or would cause it to fail to meet the deadline in Section III.A.5. The notice shall describe the reason for the noncompliance or anticipated noncompliance and specifically refer to this Section of the Special Protections as laid out in this Attachment. It shall describe the anticipated length of time the delay in compliance may persist, the cause or causes of the delay as well as measures to minimize the impact of the delay on water quality, the measures taken or to be taken by the Permittee to prevent or minimize the delay, the schedule by which the measures will be implemented, and the anticipated date of compliance. The Permittee shall adopt all reasonable measures to avoid and minimize such delays and their impact on water quality. The Permittee may request an extension of time for compliance based on lack of funding. The request for an extension shall require:

1. a demonstration of significant hardship by showing that the Permittee has made timely and complete applications for all available bond and grant funding, and either no bond or grant funding is available, or bond and/or grant funding is inadequate.
2. for governmental agencies, a demonstration and documentation of a good faith effort to acquire funding through that agency's budgetary process, and a demonstration that funding was unavailable or inadequate.

## IV. MONITORING REQUIREMENTS

Monitoring is mandatory for all Permittees to assure compliance with the Ocean Plan. Monitoring requirements include both: (A) core discharge monitoring, and (B) ocean receiving water monitoring. The State and Regional Water Boards must approve sampling site locations and any adjustments to the monitoring programs. All ocean receiving water and reference area monitoring must be comparable with the Water Boards' Surface Water Ambient Monitoring Program (SWAMP).

Safety concerns: Sample locations and sampling periods must be determined considering safety issues. Sampling may be postponed upon notification to the State and Regional Water Boards if hazardous conditions prevail.

Analytical Chemistry Methods: All constituents must be analyzed using the lowest minimum detection limits comparable to the Ocean Plan water quality objectives. For metal analysis, all samples, including storm water effluent, reference samples, and ocean receiving water samples, must be analyzed by the approved analytical method with the lowest minimum

*UNOFFICIAL DRAFT — Not Certified by Clerk*

detection limits (currently Inductively Coupled Plasma/Mass Spectrometry) described in the Ocean Plan.

## A. CORE DISCHARGE MONITORING PROGRAM

1. General sampling requirements for timing and storm size:
   Runoff must be collected during a storm event that is greater than 0.1 inch and generates runoff, and at least 72 hours from the previously measurable storm event. Runoff samples shall be collected when post-storm receiving water is sampled, and analyzed for the same constituents as receiving water and reference site samples (see section IV B) as described below.

2. Runoff flow measurements
   a. For municipal/industrial storm water outfalls in existence as of December 31, 2007, 18 inches (457mm) or greater in diameter/width (including multiple outfall pipes in combination having a width of 18 inches, runoff flows must be measured or calculated, using a method acceptable to and approved by the State and Regional Water Boards.
   b. This will be reported annually for each precipitation season to the State and Regional Water Boards.

3. Runoff samples – storm events
   a. For outfalls equal to or greater than 18 inches (0.46m) in diameter or width:
      (1) samples of storm water runoff shall be analyzed during the same storm as receiving water samples for oil and grease, total suspended solids, and, within the range of the southern sea otter indicator bacteria or some other measure of fecal contamination, and
      (2) samples of storm water runoff shall be analyzed for critical life stage chronic toxicity (one invertebrate or algal species) at least once during each storm season when receiving water is sampled in the ASBS
      (3) If a Permittee has no outfall greater than 36 inches, then storm water runoff from the Permittee's largest outfall shall be further analyzed during the same storm as receiving water samples for Ocean Plan Table B metals for protection of marine life, Ocean Plan polynuclear aromatic hydrocarbons (PAHs), current use pesticides (pyrethroids and OP pesticides), and nutrients (ammonia, nitrate and phosphates).
   b. For outfalls equal to or greater than 36 inches (0.91m) in diameter or width:
      (1) samples of storm water runoff shall be analyzed during the same storm as receiving water samples for oil and grease, total suspended solids, and, within the range of the southern sea otter indicator bacteria or some other measure of fecal contamination; and
      (2) samples of storm water runoff shall be further analyzed during the same storm as receiving water samples for Ocean Plan Table B metals for protection of marine life, Ocean Plan polynuclear aromatic hydrocarbons (PAHs), current use pesticides (pyrethroids and OP pesticides), and nutrients (ammonia, nitrate and phosphates) and
      (3) samples of storm water runoff shall be analyzed for critical stage chronic toxicity (one invertebrate or algal species) at least once during each storm season when receiving water is sampled in the ASBS.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

    c. For a Permittee not participating in a regional monitoring program [see below in Section IV (B)] in addition to (a.) and (b.) above, a minimum of the two largest outfalls or 20 percent of the larger outfalls, whichever is greater, shall be sampled (flow weighted composite samples) at least three times annually during wet weather (storm event) and analyzed for all Ocean Plan Table A constituents, Table B constituents for marine aquatic life protection (except for toxicity, only chronic toxicity for three species shall be required), DDT, PCBs, Ocean Plan PAHs, OP pesticides, pyrethroids, nitrates, phosphates, and Ocean Plan indicator bacteria. For parties discharging to ASBS in more than one Regional Water Board region, at a minimum, one (the largest) such discharge shall be sampled annually in each Region.

    4. The Executive Director of the State Water Board may reduce or suspend core monitoring once the storm runoff is fully characterized. This determination may be made at any point after the discharge is fully characterized, but is best made after the monitoring results from the first permit cycle are assessed.

## B. OCEAN RECEIVING WATER AND REFERENCE AREA MONITORING PROGRAM

In addition to performing the Core Discharge Monitoring Program in Section IV.A above, all applicants having authorized discharges must perform ocean receiving water monitoring. In order to fulfill the requirements for monitoring the physical, chemical, and biological characteristics of the ocean receiving waters within their ASBS, Permittees may choose either (1) an individual monitoring program, or (2) participation in a regional integrated monitoring program.

    1. Individual Monitoring Program: The requirements listed below are for those Permittees who elect to perform an individual monitoring program to fulfill the requirements for monitoring the physical, chemical, and biological characteristics of the ocean receiving waters within the affected ASBS. In addition to Core Discharge Monitoring, the following additional monitoring requirements shall be met:

    a. Three times annually, during wet weather (storm events), the receiving water at the point of discharge from the outfalls described in section (IV)(A)(3)(c) above shall be sampled and analyzed for Ocean Plan Table A constituents, Table B constituents for marine aquatic life, DDT, PCBs, Ocean Plan PAHs, OP pesticides, pyrethroids, nitrates, phosphates, salinity, chronic toxicity (three species), and Ocean Plan indicator bacteria.

    The sample location for the ocean receiving water shall be in the surf zone at the point of discharges; this must be at the same location where storm water runoff is sampled. Receiving water shall be sampled at approximately the same time prior to (pre-storm) and during (or immediately after) the same storm (post storm). Reference water quality shall also be sampled and analyzed for the same constituents pre-storm and post-storm, during the same storms when receiving water is sampled. Reference stations will be determined by the State Water Board's Division of Water Quality and the applicable Regional Water Board(s).

    b. Sediment sampling shall occur at least three times during every five (5) year period. The subtidal sediment (sand or finer, if present) at the discharge shall be sampled and analyzed for Ocean Plan Table B constituents for marine aquatic life, DDT, PCBs,

*UNOFFICIAL DRAFT — Not Certified by Clerk*

PAHs, pyrethroids, and OP pesticides. For sediment toxicity testing, only an acute toxicity test using the amphipod *Eohaustorius estuarius* must be performed.

c.  A quantitative survey of intertidal benthic marine life shall be performed at the discharge and at a reference site. The survey shall be performed at least once every five (5) year period. The survey design is subject to approval by the Regional Water Board and the State Water Board's Division of Water Quality. The results of the survey shall be completed and submitted to the State Water Board and Regional Water Board at least six months prior to the end of the permit cycle.

d.  Once during each five (5) year period, a bioaccumulation study shall be conducted to determine the concentrations of metals and synthetic organic pollutants at representative discharge sites and at representative reference sites. The study design is subject to approval by the Regional Water Board and the State Water Board's Division of Water Quality. The bioaccumulation study may include California mussels (*Mytilus californianus*) and/or sand crabs (*Emerita analoga* or *Blepharipoda occidentalis*). Based on the study results, the Regional Water Board and the State Water Board's Division of Water Quality, may adjust the study design in subsequent permits, or add or modify additional test organisms (such as shore crabs or fish), or modify the study design appropriate for the area and best available sensitive measures of contaminant exposure.

e.  Marine Debris: Representative quantitative observations for trash by type and source shall be performed along the coast of the ASBS within the influence of the Permittee's outfalls. The design, including locations and frequency, of the marine debris observations is subject to approval by the Regional Water Board and State Water Board's Division of Water Quality.

f.  The monitoring requirements of the Individual Monitoring Program in this section are minimum requirements. After a minimum of one (1) year of continuous water quality monitoring of the discharges and ocean receiving waters, the Executive Director of the State Water Board (may require additional monitoring, or adjust, reduce or suspend receiving water and reference station monitoring. This determination may be made at any point after the discharge and receiving water is fully characterized, but is best made after the monitoring results from the first permit cycle are assessed.

2.  Regional Integrated Monitoring Program: Permittees may elect to participate in a regional integrated monitoring program, in lieu of an individual monitoring program, to fulfill the requirements for monitoring the physical, chemical, and biological characteristics of the ocean receiving waters within their ASBS. This regional approach shall characterize natural water quality, pre- and post-storm, in ocean reference areas near the mouths of identified open space watersheds and the effects of the discharges on natural water quality (physical, chemical, and toxicity) in the ASBS receiving waters, and should include benthic marine aquatic life and bioaccumulation components. The design of the ASBS stratum of a regional integrated monitoring program may deviate from the otherwise prescribed individual monitoring approach (in Section IV.B.1) if approved by the State Water Board's Division of Water Quality and the Regional Water Boards.

a.  Ocean reference areas shall be located at the drainages of flowing watersheds with minimal development (in no instance more than 10% development), and shall not be

*UNOFFICIAL DRAFT — Not Certified by Clerk*

located in CWA Section 303(d) listed waterbodies or have tributaries that are 303(d) listed. Reference areas shall be free of wastewater discharges and anthropogenic non- storm water runoff. A minimum of low threat storm runoff discharges (e.g. stream highway overpasses and campgrounds) may be allowed on a case-by-case basis. Reference areas shall be located in the same region as the ASBS receiving water monitoring occurs. The reference areas for each Region are subject to approval by the participants in the regional monitoring program and the State Water Board's Division of Water Quality and the applicable Regional Water Board(s). A minimum of three ocean reference water samples must be collected from each station, each from a separate storm. A minimum of one reference location shall be sampled for each ASBS receiving water site sampled per responsible party. For parties discharging to ASBS in more than one Regional Water Board region, at a minimum, one reference station and one receiving water station shall be sampled in each region.

b. ASBS ocean receiving water must be sampled in the surf zone at the location where the runoff makes contact with ocean water (i.e. at "point zero"). Ocean receiving water stations must be representative of worst-case discharge conditions (i.e. co-located at a large drain greater than 36 inches, or if drains greater than 36 inches are not present in the ASBS then the largest drain greater than18 inches.) Ocean receiving water stations are subject to approval by the participants in the regional monitoring program and the State Water Board's Division of Water Quality and the applicable Regional Water Board(s). A minimum of three ocean receiving water samples must be collected during each storm season from each station, each from a separate storm. A minimum of one receiving water location shall be sampled in each ASBS per responsible party in that ASBS. For parties discharging to ASBS in more than one Regional Water Board region, at a minimum, one reference station and one receiving water station shall be sampled in each region.

c. Reference and receiving water sampling shall commence during the first full storm season following the adoption of these special conditions, and post-storm samples shall be collected when annual storm water runoff is sampled. Sampling shall occur in a minimum of two storm seasons. For those ASBS Permittees that have already participated in the Southern California Bight 2008 ASBS regional monitoring effort, sampling may be limited to only one storm season.

d. Receiving water and reference samples shall be analyzed for the same constituents as storm water runoff samples. At a minimum, constituents to be sampled and analyzed in reference and discharge receiving waters must include oil and grease, total suspended solids, Ocean Plan Table B metals for protection of marine life, Ocean Plan PAHs, pyrethroids, OP pesticides, ammonia, nitrate, phosphates, and critical life stage chronic toxicity for three species. In addition, within the range of the southern sea otter, indicator bacteria or some other measure of fecal contamination shall be analyzed.

3. Waterfront and Marine Operations: In addition to the above requirements for ocean receiving water monitoring, additional monitoring must be performed for marinas and boat launch and pier facilities:

a. For all marina or mooring field operators, in mooring fields with 10 or more occupied moorings, the ocean receiving water must be sampled for Ocean Plan indicator

*UNOFFICIAL DRAFT — Not Certified by Clerk*

bacteria, residual chlorine, copper, zinc, grease and oil, methylene blue active substances (MBAS), and ammonia nitrogen.

(1) For mooring field operators opting for an individual monitoring program (Section IV.B.1 above), this sampling must occur weekly (on the weekend) from May through October.

(2) For mooring field operators opting to participate in a regional integrated monitoring program (Section IV.B.2 above), this sampling must occur from May through October on a high weekend in each month. The Water Boards may allow a reduction in the frequency of sampling, through the regional monitoring program, after the first year of monitoring.

b. For all mooring field operators, the subtidal sediment (sand or finer, if present) within the mooring fields and below piers shall be sampled and analyzed for Ocean Plan Table B metals (for marine aquatic life beneficial use), acute toxicity, PAHs, and tributyltin. For sediment toxicity testing, only an acute toxicity test using the amphipod *Eohaustorius estuarius* must be performed. This sampling shall occur at least three times during a five (5) year period. For mooring field operators opting to participate in a regional integrated monitoring program, the Water Boards may allow a reduction in the frequency of sampling after the first sampling effort's results are assessed.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## C. ASBS Flow Chart

**Figure 2**
**ASBS Special Protections**
**Flowchart to Determine Compliance with Natural Water Quality**



\* When an exceedance of natural water quality occurs, the Department must comply with section I.A.2.h of the Special Protections as well as the requirements of this Order. Note, when sampling data is available, end-of-pipe effluent concentrations will be considered by the Water Boards in making this determination.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## D. ASBS Monitoring Constituents

**Table A: Monitoring Constituent List**
**(excerpted from California Ocean Plan dated 2009)**

| Constituent | Units |
|---|---|
| Grease and Oil | mg/L |
| Suspended Solids | mg/L |
| Settleable Solids | mL/L |
| Turbidity | NTU |
| pH | |

**Table B: Monitoring Constituent List**
**(excerpted from California Ocean Plan dated 2009)**

| Constituent | Units |
|---|---|
| Arsenic | ìg/L |
| Cadmium | ìg/L |
| Chromium | ìg/L |
| Copper | ìg/L |
| Lead | ìg/L |
| Mercury | ìg/L |
| Nickel | ìg/L |
| Selenium | ìg/L |
| Silver | ìg/L |
| Zinc | ìg/L |
| Cyanide | ìg/L |
| Total Chlorine Residual | ìg/L |
| Ammonia (as N) | ìg/L |
| Acute Toxicity | TUa |
| Chronic Toxicity | TUc |
| Phenolic Compounds (non-chlorinated) | ìg/L |
| Chlorinated Phenolics | ìg/L |
| Endosulfan | ìg/L |
| Endrin | ìg/L |
| HCH | μg/L |

*UNOFFICIAL DRAFT — Not Certified by Clerk*

# Attachment D

## Phase II Small MS4 Entities Authorized to
## Discharge to Areas of Special Biological Significance (ASBS)

| Regional Board | Applicant | ASBS |
|---|---|---|
| North Coast | City of Trinidad | Trinidad Head |
| North Coast | County of Humboldt | King Range |
| North Coast | Humboldt Bay Harbor District | King Range |
| North Coast | Department of Parks and Recreation | Gerstle Cove |
| North Coast | Department of Parks and Recreation | Jughandle Cove |
| North Coast | Department of Parks and Recreation | King Range |
| North Coast | Department of Parks and Recreation | Trinidad Head |
| North Coast | Department of Parks and Recreation | Redwoods State and National Park |
| San Francisco | County of Marin | Duxbury Reef |
| San Francisco | Defense, Department of (Vandenberg Air Force Base) | James V. Fitzgerald |
| San Francisco | National Park Service | Point Reyes National Seashore |
| Central Coast | City of Monterey | Pacific Grove |
| Central Coast | City of Pacific Grove | Pacific Grove |
| Central Coast | City of Carmel by The Sea | Carmel Bay |
| Central Coast | County of Monterey | Carmel Bay |
| Central Coast | Department of Parks and Recreation | Año Nuevo |
| Central Coast | Department of Parks and Recreation | Carmel Bay |
| Central Coast | Department of Parks and Recreation | Julia Pfeiffer Burns |
| Central Coast | Department of Parks and Recreation | Point Lobos |
| Los Angeles | Department of Parks and Recreation | Laguna Point to Latigo Point |
| Santa Ana | Department of Parks and Recreation | Irvine Coast |

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 301 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

# Attachment E - Community-Based Social Marketing (CBSM) Education and Outreach Requirements

## A. Public Education and Outreach Program

### A.1. Compliance Participation Options

Within the first year of the effective date of the permit, all Permittees shall comply with the requirements in this Section by participating in one or more of the following:

(i) Contributing to a countywide storm water program, as determined appropriate by the Permittee members, so that the countywide storm water program conducts education and outreach on behalf of its members; or

(ii) Contributing to a regional education and outreach collaborative effort (a regional outreach and education collaborative effort occurs when all or a majority of the Permittees collaborate to conduct regional outreach and education. Regional education and outreach collaboration includes Permittees defining a uniform and consistent message, deciding how best to communicate the message, and how to facilitate behavioral changes. Then collaboratively apply what is learned through local jurisdiction groups, pooling resources and skills.); or

(iii) Fulfilling education and outreach requirements within their jurisdictional boundaries on their own; or

(iv) A combination of the previous options, so that all requirements are fulfilled.

**Reporting** – By the first year online Annual Report, the Permittee shall identify which compliance participation option it will use to comply with the public education and outreach requirements in this Section. For each public education and outreach requirement in this Section that the Permittee will comply with through contribution to a countywide storm water program or regional education and outreach collaborative effort, the Permittee shall include in the first year online Annual Report documentation, such as a written agreement, letter or similar document, which confirms the collaboration with other MS4s.

### A.2. Public Education and Outreach

#### A.2.a. Public Education and Outreach

(i) Task Description – Within the second year of the effective date of the permit, the Permittee shall develop and implement a comprehensive storm water public education and outreach program. The public education and outreach program shall be designed to reduce pollutant discharges in storm water runoff and non-storm water discharges to the MS4 through behavior changes in target communities. The Public Education and Outreach Program shall (1) measurably increase the knowledge of targeted communities regarding the municipal storm drain system, impacts of urban runoff and non-storm water discharges on receiving waters, and potential BMP solutions for the target audiences and (2) measurably change the behavior of target audiences, thereby reducing pollutant releases to the MS4 and the environment.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

(ii) Implementation Level –The Permittee shall, at a minimum:

(a) Develop and implement a public education strategy that establishes education tasks based on water quality problems, target audiences, and anticipated task effectiveness. The strategy must include identification of who is responsible for implementing specific tasks, a schedule for task implementation, and a budget for implementing the tasks. The strategy must demonstrate how specific high priority storm water quality issues in the community or local pollutants of concern are addressed. The Permittee shall use CBSM[1] strategies or equivalent.

(b) Implement surveys at least twice during the five year permit term to gauge the level of awareness and behavior change in target audiences and effectiveness of education tasks.

(c) Use of CBSM strategies or equivalent. The Public Education strategy shall at a minimum include the following Permittee actions:

(1) Research on barriers to desired behaviors and benefits of desired behaviors (ex. Literature review, observation, focus groups).
(2) Elicit commitment to implement desired behavior from target audience.
(3) Provide prompts reminding target audience of desired behavior.
(4) Use the concept of social norms/modeling of desired behavior.
(5) Use education messages that are specific, easy to remember, from a credible source, and appropriate for the target audience.
(6) Create incentives for the desired behavior.
(7) Remove barriers to the desired behavior.

(d) Development and conveyance of a specific storm water message that focuses on the following:

(1) Local pollutants of concern
(2) Target audience
(3) Behavior of concern
(4) Regional water quality issues

(e) Development and disseminate appropriate educational materials to target audiences and translate into applicable languages when appropriate (e.g. the materials can utilize various media such as printed materials, billboard and mass transit advertisements, signage at select locations, stenciling at storm drain inlets, radio advertisements, television advertisements, and websites);

(f) Utilization of public input (e.g., the opportunity for public comment, or public meetings) in the development of the program;

(g) Distribution of the educational materials, using whichever methods and procedures determined appropriate during development of the public education strategy, in such a way that is designed to convey the program's message to 20% of the target audience each year;

---

[1] CBSM: A systematic way to change the behavior of communities to reduce their impact on the environment. Realizing that simply providing information is usually not sufficient to initiate behavior change, CBSM uses tools and findings from social psychology to discover the perceived barriers to behavior change and ways of overcoming these barriers.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 303 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

(h) Coordination with outreach programs for the Water Efficient Landscape Ordinance to explain the benefits of storm water-friendly landscaping;

(i) Technical and financial assistance and implementation guidance related to storm water-friendly landscaping;

(j) Development and conveyance of messages specific to reducing illicit discharges with information about how the public can report incidents to the appropriate authorities;

(k) Development and conveyance of messages specific to proper application of pesticides, herbicides, and fertilizers;

(l) Storm water education for school-age children. The Permittee may use California's Education and Environment Initiative Curriculum or equivalent.

(m) Reducing discharges from charity car washes, mobile cleaning and pressure washing operations, and landscape irrigation.

**(iii) Reporting** – By the second year online Annual Report and annually thereafter, report on the public education strategy and general program development and progress. By the fifth year online Annual Report, summarize changes in public awareness and behavior resulting from the implementation of the program and any modifications to the public outreach and education program. Report on the public education and CBSM strategies such as pilot programs, survey results, research on barriers to desired behaviors and benefits of desired behaviors, commitments from target audience to implement desired behavior, prompts, implementation of the social norms/modeling, education messages, incentives for desired behaviors, methods for removing barriers to behavior change, development of education materials, methods for educational material distribution, public input, Water Efficient Landscape Ordinance, technical and financial assistance for storm water friendly landscaping, reporting of illicit discharges, proper application of pesticides, herbicides, and fertilizers, elementary school education, reduction of discharges from charity car washes, mobile cleaning and pressure washing operations, and landscape irrigation efforts. Annually report number of trainings, describe the technical and financial program and implementation, and the study and results to date. For each whole five years of the permit life, submit the online Annual Report summarizing the changes in public awareness and behavior.

## A.2.b. Construction Education and Outreach Program

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall develop and implement a construction outreach and education program for construction sites smaller than one acre. The construction outreach and education program shall be designed to reduce pollutant discharges in storm water runoff and non-storm water discharges to the MS4 through behavior changes in target communities. The multi-media program shall (1) measurably increases the knowledge of the construction community regarding the municipal storm drain system, impacts of urban runoff and non-storm water discharges on receiving waters, and potential BMP solutions for the target audiences and (2) measurably changes the behavior of the construction community, thereby reducing pollutant releases to the MS4 and the environment.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

  (ii)  **Implementation Level** –The program shall include, at a minimum:

      (a) Development of a watershed-based inventory of the high priority residential and commercial construction sites within the Permittee's jurisdiction.

      (b) Development and implementation of a construction outreach and education strategy that establishes measurable goals and prioritizes education tasks based on water quality problems, target audiences, and anticipated task effectiveness. The strategy must include identification of who is responsible for implementing specific tasks and attaining measurable goals, a schedule for task implementation, and a budget for implementing the tasks and meeting the measurable goals. The strategy must include measurable goals designed to demonstrate how specific high priority storm water quality issues in the community or local pollutants of concern are addressed. Establish who is responsible for specific tasks and goals and a budget for meeting the tasks and goals.

      (c) Implementation of CBSM to address the MS4's highest priority water quality problems. For each high priority water quality problem, implementation of CBSM shall first be conducted on a pilot project level. CBSM techniques found to be effective at the pilot project level shall be implemented jurisdiction-wide by permit year four. Pilot project and jurisdiction level CBSM shall include the following Permittee actions:

        (1) Research on barriers to desired behaviors and benefits of desired behaviors (ex. Literature review, observation, focus groups).

        (2) Elicit commitment to implement desired behavior from construction community.

        (3) Provide prompts reminding construction community of desired behavior.

        (4) Use the concept of social norms/modeling of desired behavior.

        (5) Use education messages that are specific, easy to remember, from a credible source, and appropriate for the target audience.

        (6) Create incentives for the desired behavior.

        (7) Remove barriers to the desired behavior.

  (iii)  **Reporting** – By the second year online Annual Report and annually thereafter, report program progress and mechanisms used for outreach and education including measurable increases in the knowledge of the construction community and measurable changes in the construction community's behavior. This includes a watershed-based inventory of high priority residential and commercial construction sites, outreach and education strategy and implementation, implementation of CBSM, pilot project, research on barriers to desired behaviors and benefits of desired behaviors, commitments from target audience to implement desired behavior, prompts, implementation of the social norms/modeling, education messages, incentives for desired behaviors, methods for removing barriers to behavior change.

## A.3.  STAFF AND SITE OPERATOR TRAINING AND EDUCATION

### A.3.a. Illicit Discharge Detection and Elimination Training

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 305 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

(i)   **Task Description** – Within the third year of the effective date of the permit, the Permittee shall develop and implement a training program for all Permittee staff who, as part of their normal job responsibilities, may be notified of, come into contact with, or otherwise observe an illicit discharge or illegal connection to the storm drain system.

(ii)  **Implementation Level** – The training program shall include at a minimum:
  (a) Identification of an illicit discharge or illegal connection.
  (b) Proper procedures for reporting and responding to the illicit discharge or illegal connection.
  (c) Follow-up training shall be provided as needed to address changes in procedures, techniques, or staffing.
  (d) The Permittee shall annually perform an assessment of their trained staff's knowledge of illicit discharge response and shall provide refresher training as needed.
  (e) New staff that, as part of their normal job responsibilities may be notified of, come into contact with, or otherwise observe an illicit discharge or illegal connection shall be trained no later than six months after the start of employment.
  (f) Contact information, including the procedure for reporting an illicit discharge, shall be included in each of the Permittee's fleet vehicles that are used by field staff.
  (g) The Permittee shall conduct focused education in identified illicit discharge flow areas based on identified illicit discharge(s).

(iii) **Reporting** - The Permittee shall document and maintain records of the training provided and the staff trained annually in the online Annual Report.

**A.3.b. Construction Outreach and Education**

### 1.  Permittee Staff Training

(i)   **Task Description** – Within the second year of the effective date of the permit, the Permittee shall ensure that all staff implementing the construction storm water program are adequately trained.

(ii)  **Implementation Level** – The Permittee may conduct in-house training or contract with consultants. Training shall be provided to the following staff positions of the MS4:

  (a) Plan Reviewers and Permitting Staff - Ensure staff and consultants are qualified individuals, knowledgeable in the technical review of local erosion and sediment control plans, and are certified pursuant to a State Water Board sponsored program as a Qualified SWPPP Developer (QSD), or a designated person on staff possesses the QSD credential.
  (b) Erosion Sediment Control/Storm Water Inspectors - The Permittee shall ensure inspectors are qualified individuals, knowledgeable in inspection procedures, and are certified pursuant to a State Water Board sponsored program as either (1) a Qualified SWPPP Developer (QSD) (2) a Qualified SWPPP Practitioner (QSP) or (3) a designated person on staff possesses

Case 2:20-cv-02482-WBS-AC   Document 95-7   Filed 11/28/22   Page 306 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

each credential (QSD to supervise plan review, QSP to supervise inspection operations).

(c) Third-Party Plan Reviewers, Permitting Staff, and Inspectors - If the Permittee utilizes outside parties to conduct inspections and/or review plans, the Permittee shall ensure these staff are trained.

(iii) **Reporting** – By the second year of the permit term and annually thereafter, submit the following information:

(a) Training topics covered.

(b) Dates of training.

(c) Number and percentage of Permittee's staff, as identified in Sections a-c above, attending each training.

(d) Results of any surveys conducted to demonstrate the awareness and potential behavioral changes in the attendees.

### 2. Construction Site Operator Education

(i) **Task Description** – Within the third year of the effective date of the permit, the Permittee shall develop and distribute educational materials to construction site operators.

(ii) **Implementation Level** – The Permittee shall do the following:

(a) Each year provide information on training opportunities for construction operators on BMP selection, installation, implementation, and maintenance as well as overall program compliance.

(b) Develop or utilize existing outreach tools (i.e. brochures, posters, etc.) aimed at educating construction operators on appropriate selection, installation, implementation, and maintenance of storm water BMPs, as well as overall program compliance.

(c) Distribute appropriate outreach materials to all construction operators who will be disturbing land within the MS4 boundary. The Permittee's contact information and website shall be included in these materials.

(d) Update the existing storm water website to include information on appropriate selection, installation, implementation, and maintenance of BMPs.

(iii) **Reporting** – By the third year online Annual Report and annually thereafter, include the following information:

(a) Training topics covered;

(b) Dates of training;

(c) Number and percentage of Permittee's operators, inspectors, and number of Contractors attending each training;

(d) Results of any surveys conducted to demonstrate the awareness and potential behavioral changes in the attendees.

### A.3.c. Pollution Prevention and Good Housekeeping Staff Training

The Permittee shall train employees on how to incorporate pollution prevention/good housekeeping techniques into Permittee operations.

(i) **Task Description** – Within the second year of the effective date of the permit, the Permittee shall develop a bi-annual employee training program for appropriate employees involved in implementing pollution prevention and good

*UNOFFICIAL DRAFT — Not Certified by Clerk*

housekeeping practices in the Pollution Prevention/Good Housekeeping for Permittee Operations sections of this General Permit. The Permittee shall determine the need for interim training during alternate years when training is not conducted, through an evaluation of employee Pollution Prevention/Good Housekeeping knowledge. All new hires whose jobs include implementation of pollution prevention and good housekeeping practices must receive this training within the first year of their hire date.

(ii) **Implementation Level** – The training program shall include the following:

(a) Bi-annual training for all employees implementing this program element. This bi-annual training shall include a general storm water education component, any new technologies, operations, or responsibilities that arise during the year, and the permit requirements that apply to the staff being trained. Employees shall receive clear guidance on appropriate storm water BMPs to use at municipal facilities and during typical O&M activities.

(b) A bi-annual assessment, occurring on alternate years between training, of trained staff's knowledge of pollution prevention and good housekeeping and shall revise the training as needed.

(c) A requirement that any contractors hired by the Permittee to perform O&M activities shall be contractually required to comply with all of the storm water BMPs, good housekeeping practices, and standard operating procedures described above.

(d) The Permittee shall provide oversight of contractor activities to ensure that contractors are using appropriate BMPs, good housekeeping practices and following standard operating procedures.

(iii) **Reporting** – By the second year online Annual Report and annually thereafter, summarize oversight procedures and identify and track all personnel requiring training and assessment and records.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 308 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

# Attachment F - Standard Provisions

1. General Authority

   Various storm water program components (e.g. IDDE) require enforceable controls on third party activities to ensure successful implementation of the program. Some non-traditional operators, however, may not have the necessary legal or regulatory authority to adopt enforceable controls. As with local governments that lack such authority, NTMS4s shall utilize the authority they do possess and seek cooperative agreements with local municipalities to implement enforceable controls.

2. Duty to Comply

   The Permittee shall comply with all conditions of this Permit. Any Permit noncompliance constitutes a violation of the CWA and the Porter-Cologne Water Quality Control Act, which may be grounds for enforcement action or denial of General Permit coverage. [40 CFR 122.41(a)]
   The Permittee shall comply with effluent standards or prohibitions established under Section 307(a) of the CWA for toxic pollutants within the time provided in the regulations that establish these standards or prohibitions, even if this Permit has not yet been modified to incorporate the requirement.
   In the event that the Permittee is removed from coverage under the General Permit, the Permittee will be required to seek coverage under an individual or alternative general permit.

3. General Permit Actions

   This General Permit may be modified, revoked and reissued, or terminated for cause. The filing of a request by the Permittee for a General Permit modification, revocation and reissuance, or termination, or a notification of planned changes or anticipated noncompliance does not nullify any General Permit condition.
   If any toxic effluent standard or prohibition (including any schedule of compliance specified in such effluent standard or prohibition) is promulgated under §307(a) of CWA for a toxic pollutant which is present in the discharge and that standard or prohibition is more stringent than any limitation on the pollutant in this General Permit, this General Permit shall be modified or revoked and reissued to conform to the toxic effluent standard or prohibition and Permittee will be so notified.

4. Enforcement

   a. The enforcement provisions contained in this section shall not act as a limitation on the statutory or regulatory authority of the State and Regional Water Board.

   b. Any violation of the permit constitutes violation of the California Water Code and regulations adopted hereunder and the provisions of the Clean Water Act, and is the basis for enforcement, permit termination, permit revocation and reissuance, denial of an application for permit reissuance; or a combination thereof.

   c. The State Water Board has authority to regulate discharges from a MS4 on a system-wide or jurisdiction-wide basis. [CWA Section 402(p) & 40 CFR 122.26(a)(v)]

*UNOFFICIAL DRAFT — Not Certified by Clerk*

d. The State and Regional Boards may impose administrative civil liability, may refer a discharger to the State Attorney General to seek civil monetary penalties, may seek injunctive relief or take other appropriate enforcement action as provided in the California Water Code or federal law for violation of Board orders.

e. It shall not be a defense for the Permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this order and permit.

f. Significant penalties may be imposed for violation of this General Permit, pursuant to CWC section 13385 and other State and federal statutes. Court- imposed liability may exceed $25,000 per day, and Regional Water Board's may impose administrative fines exceeding $10,000 per day [40 CFR 122.41(a)(2) & (3)].

g. The Clean Water Act provides that any person who knowingly makes any false statement, representation, or certification in any record or other document submitted or required to be maintained under this permit including monitoring reports or reports of compliance or noncompliance shall, upon conviction, be punished by a fine of not more than $10,000 per violation, or by imprisonment for not more than six months per violation, or by both [40 CFR 122.41(k)(2)].

h. The Clean Water Act provides that any person who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under this permit shall, upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or both. Higher penalties may be imposed for repeat offenders [40 CFR 122.41(j)(5)].

5. Noncompliance Reporting

Permittees who cannot certify compliance and/or who have had other instances of noncompliance shall notify the appropriate Regional Water Board within 30 days. Instances of noncompliance resulting in emergencies (i.e., that endanger human health or the environment) shall be reported orally to the Regional Water Board within 24 hours from the time the discharger becomes aware of the circumstance and in writing to the Regional Water Board within five days of the occurrence. The notification shall identify the noncompliance event and an initial assessment of any impact caused by the event, describe the actions necessary to achieve compliance, and include a time schedule indicating when compliance will be achieved. The time schedule and corrective measures are subject to modification by the Regional Water Board Executive Officer.

6. Duty to Mitigate

The Permittee shall take all responsible steps to minimize or prevent any discharge in violation of this General Permit that has a reasonable likelihood of adversely affecting human health or the environment. [40 CFR 122.41(d)]

7. Proper Operation and Maintenance

The Permittee shall at all times properly operate and maintain any facilities and systems of treatment and control (and related appurtenances) which are installed or used by the Permittee to achieve compliance with the conditions of this General Permit and with the requirements of the storm water program. Proper operation and maintenance also includes

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 310 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

adequate laboratory controls and appropriate quality assurance procedures. Proper operation and maintenance may require the operation of backup or auxiliary facilities or similar systems installed by the Permittee when necessary to achieve compliance with the conditions of this General Permit. [40 CFR 122.41(e)]

8. Property Rights

   This General Permit does not convey any property rights of any sort or any exclusive privileges, nor does it authorize any injury to private property or any invasion of personal rights, nor does it authorize any infringement of federal, State, or local laws or regulations.[40 CFR 122.41(g)]

9. Duty to Provide Information

   The Permittee shall furnish Regional Water Boards or U.S. EPA, during normal business hours, any requested information to determine compliance with this General Permit. The Permittee shall also furnish, upon request, copies of records required to be kept by this General Permit. [40 CFR 122.41(h)]

10. Inspection and Entry

    Upon the presentation of credentials and other documents as may be required by law, the Permittee shall allow the State and Regional Water Boards, U.S. EPA, or municipal storm water management agency to enter upon the Permittee premises where a regulated facility or activity is located or conducted or where records are required to be kept under the conditions of this General Permit to [40 CFR 122.41(i)]:

    a. Have access to and copy at reasonable times any records that are required to be kept under the conditions of this Permit;

    b. Inspect at reasonable times any facilities or equipment (including monitoring and control equipment) that are related to or may impact any storm water or non-storm water discharge; and

    c. Conduct monitoring activities at reasonable times to ensure Permit compliance.

    d. Photograph or videotape outdoor areas of the facility to document compliance or non-compliance with this Permit.

11. Signatory Requirements

    All NOIs, certifications, reports, or other information prepared in accordance with this General Permit that are submitted to State or Regional Water Boards shall be signed by either a principal executive officer, ranking elected official, or duly authorized representative. The principal executive officer of a Federal agency includes the chief executive officer of the agency or the senior executive officer having responsibility for the overall operations of a principal geographic unit of the agency (e.g., Regional Administrator of U.S. EPA). For the military: any military officer or Department of Defense civilian, acting in an equivalent capacity to a military officer, who has been designated.

12. Certification

    Any person signing documents under this General Permit shall make the following certification:

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 311 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

*I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is true, accurate, and complete.*

*I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.*

13. Anticipated Noncompliance

    The Permittee will give advance notice to the Regional Water Board of any planned changes in the regulated Small MS4 activity that may result in noncompliance with General Permit requirements.

14. Penalties for Falsification of Reports

    Section 309(c)(4) of CWA provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance, shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both.

15. Penalties for Violations of Permit Conditions

    a. Part 309 of CWA provides significant penalties for any person who violates a permit condition implementing Parts 301, 302, 306, 307, 308, 318, or 405 of CWA or any permit condition or limitation implementing any such section in a permit issued under Part 402. Any person who violates any permit condition of this General Permit is subject to a civil penalty not to exceed $27,500 per calendar day of such violation, as well as any other appropriate sanction provided by Part 309 of CWA.

    b. The California Water Code also provides for administrative, civil, and criminal penalties, which in some cases are greater than those under CWA.

16. Oil and Hazardous Substance Liability

    Nothing in this General Permit shall be construed to preclude the institution of any legal action against the Permittee or relieve the Permittee from any responsibilities, liabilities, or penalties to which the Permittee is or may be subject to under Part 311 of CWA.

17. Severability

    The provisions of this General Permit are severable; and, if any provision of this General Permit or the application of any provision of this General Permit to any circumstance is held invalid, the application of such provision to other circumstances and the remainder of this General Permit shall not be affected thereby.

18. Reopener Clause

    This General Permit may be modified, revoked and reissued, or terminated for cause due to promulgation of amended regulations, or otherwise in accordance with 40 CFR sections 122.62, 122.63, 122.64, and 124.5.

Case 2:20-cv-02482-WBS-AC     Document 95-7     Filed 11/28/22     Page 312 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

19. Availability

A copy of this General Permit and Annual Reports shall be made available for public review, program evaluation (audit) and inspection.

20. Transfers

This General Permit is not transferable. A Permittee shall submit written notification to the appropriate Regional Water Board to terminate coverage of this General Permit.

21. Continuation of Expired Permit

This General Permit expires five years from the date of adoption.  This General Permit continues in force and in effect until a new General Permit is issued or the State Water Board rescinds this General Permit. Only those Small MS4s authorized to discharge under the expired General Permit are covered by the continued General Permit.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

# ATTACHMENT G - Region-Specific Requirements

## Regional Water Board-Approved TMDLs
## with urban runoff listed as a source

## Region 1: North Coast Regional Water Board

### *Temperature & Dissolved Oxygen*

**TMDL for Shasta River Watershed** – *Temperature & Dissolved Oxygen*

Effective Date: January 26, 2007
BPA: Action Plan for the Shasta River Watershed Temperature and Dissolved Oxygen Total Maximum Daily Loads
Resolution R1-2006-0052
Phase II Entities: City of Yreka
Impaired Water Body: Shasta River

**Requirements for Implementing the TMDL**

The City of Yreka developed a Plan to minimize, control, and preferably prevent discharges of fine sediment, nutrients and other oxygen-consuming materials, and elevated water temperature waste discharge from affecting waters of the Shasta River and its tributaries. The Regional Water Board Executive Officer approved the City of Yreka's Plan. No later than January 1, 2019, the City of Yreka shall begin implementing the Plan.

The TMDL does not specify a wasteload or load allocation for the City of Yreka.

Order 2013-0001-DWQ as amended by Order 2017-XXXX-DWQ

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## Region 2: San Francisco Regional Water Board

### *Diazinon & Pesticide Toxicity*

**TMDL for Urban Creeks** – *Diazinon & Pesticide Toxicity*

Effective Date: May 16, 2007
BPA: BPA – Chapter 3, Toxicity
Resolution No. R2-2005-0063
Phase II Entities: City of Belvedere, Town of Corte Madera, Town of Fairfax, City of Larkspur, Marin County, City of Mill Valley, City of Novato, City of Petaluma, Town of Ross, Town of San Anselmo, City of San Rafael, City of Sausalito, City of Sonoma, County of Sonoma, Town of Tiburon
Impaired Water Body: Arroyo Corte Madera del Presidio, Corte Madera Creek, Coyote Creek (Marin Co.), Gallinas Creek, Miller Creek, Novato Creek, San Antonio Creek, San Rafael Creek, Petaluma River, Calabazas Creek

**Requirements for Implementing the TMDL**

Urban runoff management agencies' responsibilities for addressing the allocations set in the TMDL will be satisfied by complying with the requirements set forth below. Permittees identified in this TMDL section may coordinate with the Bay Area Storm Water Management Agencies Association, the Urban Pesticide Pollution Prevention Project, the Urban Pesticide Committee, and other agencies and organizations in carrying out these activities.

**A. Implement the Pesticide-Related Toxicity Control Program**

To prevent the impairment of urban streams by pesticide-related toxicity, the Phase II entities identified in this TMDL section shall implement an Integrated Pest Management Policy (IPM) or Ordinance, applicable to all the permittees' operations and property, as described in the Fact Sheet of this Order.

Implementation actions shall include:

- Ensure all municipal employees who apply or use pesticides within the scope of their duties are trained in the IPM practices and policy/ordinance.
- Require all contractors to implement the IPM policy/ordinance.
- Keep the County Agricultural Commissioners informed of water quality issues related to pesticides and of violations of pesticides regulations (e.g., illegal handling) associated with storm water management.
- Conduct outreach to residents and pest control applicators on less toxic methods of pest control.
- Keep records of the permittees' own use of pesticides of concern and the pesticide use by the permittees' hired contractors. Report on pesticide use when requested by the Regional Water Board.
- Monitor water and sediment for pesticides and associated toxicity in urban creeks via an individual or regional program designed to answer the following questions:

  o Are the TMDL toxicity targets being met?
  o Is toxicity observed in urban creeks caused by a pesticide?
  o Is urban runoff the source of any observed toxicity in urban creeks?

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 315 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

○ How does observed pesticide-related toxicity in urban creeks (or pesticide concentrations contributing to such toxicity) vary in time and magnitude across urban creek watersheds, and what types of pest control practices contribute to such toxicity?
○ Are actions already being taken to reduce pesticide discharges sufficient to meet the targets, and if not, what should be done differently?

A final deadline for attainment of the WLA is not specified in the TMDL. Therefore, municipalities identified in this TMDL section shall propose a timeline to meet the WLA in the shortest practicable time, subject to Regional Water Board Executive Officer approval. Attainment of the WLA shall be demonstrated as specified in Section E.15.a.(ii)/Section F.5.i.1.(ii) of this Order.

## *Pathogens*

**TMDL for Napa River** – *Pathogens*

Effective Date: February 29, 2008
BPA: Chapter 7, Water Quality Attainment Strategies including TMDLs
Resolution No. R2-2006-0079
Phase II Entities: City of American Canyon, City of Calistoga, City of St. Helena, City of Napa, Napa County, Town of Yountville
Impaired Water Body: Napa River

**Requirements for Implementing the TMDL**

The Phase II entities identified in this TMDL section shall implement the following actions by January 1, 2019:

i.    Public Participation and Outreach. Educate the public regarding sources of fecal coliform and associated health risks of fecal coliform in surface waters. Educate the public regarding actions that individuals can take to reduce pathogen loading.
ii.   Pet Waste Management. Implement enforceable means of reducing/eliminating fecal coliform loading from pet waste.
iii.  Illicit Discharge Detection and Elimination. Implement strategies to detect and eliminate illicit discharges (whether mistaken or deliberate) of sewage to the Napa River.
iv.   Pollution Prevention and Good Housekeeping. Implement strategies to reduce/eliminate fecal coliform loading from streets, parking lots, sidewalks, and other urban areas that potentially collect and discharge fecal coliform to the Napa River.
v.    As indicated in the TMDL, participate in the Regional Water Board's stakeholder effort to conduct water quality monitoring at baseline monitoring sites.
vi.   Conduct baseline water quality monitoring to evaluate E. coli concentration trends in the Napa River and its tributaries. Table 7-g in Chapter 7, Water Quality Attainment Strategies, presents locations and frequency for the required baseline water quality monitoring.
vii.  Report yearly, in the Annual Report, (on participation in the stakeholder group and progress made on implementation of human and animal runoff reduction measures.

A final deadline for attainment of the LA is not specified in the TMDL. Therefore, municipalities identified in this TMDL section shall propose a timeline to attain the LA in the shortest

*UNOFFICIAL DRAFT — Not Certified by Clerk*

practicable time, subject to Regional Water Board Executive Officer approval. Attainment of the LA shall be demonstrated as specified in Section E.15.a.(ii)/Section F.5.i.1.(ii) of this Order.

**TMDL for Richardson Bay** – *Pathogens*

Effective Date: December 18, 2009
BPA: Chapter 7, Water Quality Attainment Strategies including TMDLs
Resolution No. R2-2008-0061
Phase II Entities: City of Belvedere, Marin County, City of Mill Valley, City of Sausalito, City of Tiburon
Impaired Water Body: Richardson Bay

**Requirements for Implementing the TMDL**

The Phase II entities identified in this TMDL section shall implement the following actions by January 1, 2019:

   i. Public Participation and Outreach. Educate the public regarding sources of fecal coliform and associated health risks of fecal coliform in surface waters. Educate the public regarding actions that individuals can take to reduce pathogen loading.
   ii. Pet Waste Management. Implement enforceable means of reducing/eliminating fecal coliform loading from pet waste.
   iii. Illicit Discharge Detection and Elimination. Implement strategies to detect and eliminate illicit discharges (whether mistaken or deliberate) of sewage to Richardson Bay.
   iv. Pollution Prevention and Good Housekeeping. Implement strategies to reduce/eliminate fecal coliform loading from streets, parking lots, sidewalks, and other urban areas that potentially collect and discharge fecal coliform to Richardson Bay.
   v. Report yearly in the Annual Report on progress made on implementation of pathogen reduction measures.

A final deadline for attainment of the WLA is not specified in the TMDL. Therefore, municipalities identified in this TMDL section shall propose a timeline to attain the WLA in the shortest practicable time, subject to Regional Water Board Executive Officer approval. Attainment of the WLA shall be demonstrated as specified in Section E.15.a.(ii)/Section F.5.i.1.(ii) of this Order.

**TMDL for Sonoma Creek** – *Pathogens*

Effective Date: February 29, 2008
BPA: Chapter 7, Water Quality Attainment Strategies including TMDLs
Resolution No. R2-2006-0042
Phase II Entities: City of Sonoma, County of Sonoma
Impaired Water Body: Sonoma Creek

**Requirements for Implementing the TMDL**

The Phase II entities identified in this TMDL section shall implement the following actions by January 1, 2019:

   i. Public Participation and Outreach. Educate the public regarding sources of fecal coliform and associated health risks of fecal coliform in surface waters. Educate the public regarding actions that individuals can take to reduce pathogen loading.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

ii.   Pet Waste Management. Implement enforceable means of reducing/eliminating fecal coliform loading from pet waste.

iii.  Illicit Discharge Detection and Elimination. Implement strategies to detect and eliminate illicit discharges (whether mistaken or deliberate) of sewage to Sonoma Creek.

iv.   Pollution Prevention and Good Housekeeping. Implement strategies to reduce/eliminate fecal coliform loading from streets, parking lots, sidewalks, and other urban areas that potentially collect and discharge fecal coliform to Sonoma Creek.

v.    Conduct baseline water quality monitoring to evaluate E. coli concentration trends in Sonoma Creek and its tributaries. Table 7-n in Chapter 7, Water Quality Attainment Strategies, presents locations and frequency for the required baseline water quality monitoring.

vi.   Report yearly in the Annual Report on water quality monitoring results and progress made on implementation of human and animal runoff reduction measures.

A final deadline for attainment of the WLA is not specified in the TMDL. Therefore, municipalities identified in this TMDL section shall propose a timeline to attain the WLA in the shortest practicable time, subject to Regional Water Board Executive Officer approval. Attainment of the WLA shall be demonstrated as specified in Section E.15.a.(ii)/Section F.5.i.1.(ii) of this Order.

**TMDL for Sonoma Creek** – *Pathogens* (Continued)
Phase II Entities: Sonoma County Water Agency
Impaired Water Body: Sonoma Creek

**Requirements for Sonoma County Water Agency for Implementing TMDL**

The Sonoma County Water Agency shall:

1. Continue to implement actions as specified in the Storm Water Management Plan approved under the 2003 General Permit (State Water Board Order 2003-0005-DWQ).
2. Review annually and update the TMDL attainment actions, as necessary.
3. Report progress on TMDL implementation measures in the Annual Report.

A final deadline for attainment of the WLA is not specified in the TMDL. Therefore, Sonoma County Water Agency shall propose a timeline to attain the WLA in the shortest practicable time, subject to Regional Water Board Executive Officer approval. Attainment of the WLA shall be demonstrated as specified in Section E.15.a.(ii)/Section F.5.i.1.(ii) of this Order.

**TMDL for Tomales Bay** – *Pathogens*

Effective Date: February 8, 2007
BPA: Chapter 4, Surface Water Protection and Management, Nonpoint Source Control
Resolution No. R2-2005-0046
Phase II Entities: Marin County
Impaired Water Body: Tomales Bay, Lagunitas Creek, Walker Creek, Olema Creek

**Requirements for Implementing the TMDL**

The Phase II entities identified in this TMDL section shall implement the following actions by January 1, 2019:

i.  Public Participation and Outreach. Educate the public regarding sources of fecal coliform and associated health risks of fecal coliform in surface waters. Educate the public regarding actions that individuals can take to reduce pathogen loading.

ii.  Pet Waste Management. Implement enforceable means of reducing/eliminating fecal coliform loading from pet waste.

iii.  Illicit Discharge Detection and Elimination. Implement strategies to detect and eliminate illicit discharges (whether mistaken or deliberate) of sewage to Tomales Bay.

iv.  Pollution Prevention and Good Housekeeping. Implement strategies to reduce/eliminate fecal coliform loading from streets, parking lots, sidewalks, and other urban areas that potentially collect and discharge fecal coliform to Tomales Bay.

v.  Report yearly in the Annual Report on water quality monitoring results and progress made on implementation of human and animal runoff reduction measures.

A final deadline for attainment of the WLA is not specified in the TMDL. Therefore, municipalities identified in this TMDL section shall propose a timeline to attain the WLA in the shortest practicable time, subject to Regional Water Board Executive Officer approval. Attainment of the WLA shall be demonstrated as specified in Section E.15.a.(ii)/Section F.5.i.1.(ii) of this Order.

## *Sediment*

### TMDL for Napa River *– Sediment*

Effective Date: January 20, 2011
BPA: Chapter 7, Water Quality Attainment Strategies including TMDLs
Resolution R2-2009-0064
Phase II Entities: City of American Canyon, City of Calistoga, City of St. Helens, City of Napa, Napa County, and Town of Yountville
Impaired Water Body: Napa River

### Requirements for Implementing the TMDL

### A. Implementation of Sediment Wasteload Allocations (WLAs)

i.  To attain the wasteload allocation, municipalities identified in this TMDL section shall comply with the requirements in this TMDL section and the Order.

### B. Implementation of Sediment Load Allocations (LAs)

i.  To attain the shared load allocation of 27,000 metric tons/year, Napa County shall implement measures to repair and/or reconstruct road crossings to minimize road-related sediment delivery (≤500 cubic yards/mile per 20-year period) to stream channels. Specifically, to reduce road-related erosion and protect stream-riparian habitat conditions, Napa County shall by January 1, 2019:

- Update best management practices for maintenance of unimproved (dirt/gravel) roads to ensure that the LA will be met, and implement these best management practices,
- Finalize a survey of stream-crossings associated with paved public roadways, and
- By July 1, 2019 submit a schedule for the maintenance of unpaved roads and implementation of BMPs to ensure attainment of the LA and the repair and/or

*UNOFFICIAL DRAFT — Not Certified by Clerk*

replacement of high priority crossings/culverts identified in the survey, to the Regional Water Board Executive Officer for approval.

For paved roads, erosion and sediment control actions shall primarily focus on road crossings to meet the sediment load allocation.

The final deadline for attainment of the WLA and LA is not specified in the TMDL. Therefore, municipalities identified in this TMDL section shall propose a timeline to attain the WLAs and LAs in the shortest practicable time, subject to Regional Water Board Executive Officer approval. Attainment of the WLA and LA shall be demonstrated as specified in Section E.15.a.(ii)/Section F.5.i.1.(ii). of this Order.

**TMDL for Sonoma Creek** – *Sediment*

Effective Date: September 8, 2010
BPA: Chapter 7, Water Quality Attainment Strategies including TMDLs
Resolution R2-2008-0103
Phase II Entities: City of Sonoma, County of Sonoma
Impaired Water Body: Sonoma Creek

**Requirements for Implementing the TMDL**

**A. Implementation of Sediment Wasteload Allocations**

i.    To attain the wasteload allocation, Phase II entities identified in this TMDL section shall comply with the construction and maintenance requirements, sections E.10 and E.11, of this Order.

ii.   The municipalities identified in this TMDL section shall continue to implement actions proposed in their Storm Water Management Plans approved under the 2003 Permit (State Water Board Order 2003-0005-DWQ) to attenuate peak flows and durations from new and redevelopment projects. Implementation requirements for implementation actions are incorporated herein by reference. Municipalities may propose amendments to those Implementation Actions by submitting an updated Storm Water Management Plan to the Regional Water Board.

**B. Implementation of Sediment Load Allocations**

i.    To attain the shared load allocation of 2,100 tons/year, municipalities identified in this TMDL section shall implement opportunities to retrofit and/or reconstruct road crossings to minimize road-related sediment delivery to stream channels. To reduce road-related erosion and protect stream-riparian habitat conditions, the municipalities shall implement by January 1, 2019 the following actions:

- Continue to Implement best management practices for maintenance of unimproved (dirt/gravel) roads,
- Finalize a survey of stream-crossings associated with paved public roadways, and
- By July 1, 2019, submit a schedule for the retrofit and/or replacement of high priority crossings/culverts to the Regional Water Board Executive Officer for approval.

For paved roads, erosion and sediment control actions shall primarily focus on road crossings to meet the sediment load allocation.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

The final deadline for attainment of the wasteload allocations and load allocations is not specified in the TMDL. Therefore, municipalities identified in this TMDL section shall propose a timeline to attain the WLAs and LAs in the shortest practicable time, subject to Regional Water Board Executive Officer approval. Attainment of the WLA and LA shall be demonstrated as specified in Section E.15.a.(ii)/Section F.5.i.1.(ii) of this Order.

Municipalities identified in this section shall attenuate peak flows and durations from new and redevelopment projects by January 1, 2019.

**TMDL for Sonoma Creek** – *Sediment* (Continued)
Phase II Entities: Sonoma County Water Agency
Impaired Water Body: Sonoma Creek

**Requirements for Sonoma County Water Agency for Implementing TMDL**

1. The Sonoma County Water Agency shall continue to implement actions as specified in the Storm Water Management Plan approved under the prior 2003 General Permit (State Water Board Order 2003-0005-DWQ). Implementation requirements for implementation actions are incorporated herein by reference. The Sonoma County Water Agency may propose amendments to those Implementation Actions by submitting an updated Storm Water Management Plan to the Regional Water Board.

2. Report progress on TMDL implementation measures in the Annual Report.

The final deadline for attainment of the WLA and LA is not specified in the TMDL. Therefore, Sonoma County Water Agency shall propose a timeline to attain the WLAs and LAs in the shortest practicable time, subject to Regional Water Board Executive Officer approval. Attainment of the WLA and LA shall be demonstrated as specified in Section E.15.a.(ii)/Section F.5.i.1.(ii) of this Order.

Order 2013-0001-DWQ as amended by Order 2017-XXXX-DWQ

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## Region 3: Central Coast Regional Water Board

### *Fecal Coliform*

**TMDL for Corralitos and Salsipuedes Creeks** *– Fecal Coliform*

Effective Date: 9/8/2011
BPA: Chapter 4
Resolution No. R3-2009-0009
Phase II Entities: County of Santa Cruz, Santa Cruz County Fairgrounds, City of Watsonville
Impaired Water Bodies: Corralitos Creek, Salsipuedes Creek

**Requirements for Implementing the TMDL**

By January 1, 2019, the County of Santa Cruz and the City of Watsonville (hereafter referred to in this TMDL section as MS4) shall each implement a Wasteload Allocation Attainment Program that identifies the actions they will take to attain their wasteload allocations. By January 1, 2019 the Santa Cruz County Fairgrounds (hereafter referred to in this TMDL section as "the MS4") shall develop, submit, and begin implementation of a Wasteload Allocation Attainment Program that identifies the actions they will take to attain their waste load allocations. The Wasteload Allocation Attainment Programs shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once

*UNOFFICIAL DRAFT — Not Certified by Clerk*

the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocation. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim targets and wasteload allocations.

9. If the approved TMDL does not explicitly include interim targets, the MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. At least one interim target and date must occur during the first five years commencing on January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not achieve its interim target by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment.

By September 8, 2024, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL for the Lower Salinas River Watershed** – *Fecal Coliform*

Effective Date: 12/20/2011
BPA: Chapter 4
Resolution No. R3-2010-0017
Phase II Entities: County of Monterey
Impaired Water Body: Lower Salinas River, Old Salinas River Estuary, Tembladero Slough, Salinas Reclamation Canal, Alisal Creek, Gabilan Creek, Salinas River Lagoon (North), Santa Rita Creek

Order 2013-0001-DWQ as amended by Order 2017-XXXX-DWQ

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 323 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**Requirements for Implementing the TMDL**

By January 1, 2019, the County of Monterey (hereafter referred to in this TMDL section as "the MS4") shall implement a Wasteload Allocation Attainment Program that identifies the actions it will take to attain its wasteload allocation. The Wasteload Allocation Attainment Program shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocation. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim targets and wasteload allocations.

9. If the approved TMDL does not explicitly include interim targets, the MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. At least one interim target and date must occur during the first five years commencing on

Order 2013-0001-DWQ as amended by Order 2017-XXXX-DWQ

*UNOFFICIAL DRAFT — Not Certified by Clerk*

January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not achieve its interim target by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment.

By December 20, 2024, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL for Pajaro River, San Benito River, Llagas Creek, Tequesquita Slough, San Juan Creek, Carnadero/Uvas Creek, Bird Creek, Pescadero Creek, Tres Pinos Creek, Furlong (Jones) Creek, Santa Ana Creek, Pachecho Creek** – *Fecal Coliform*

Effective Date: 07/12/2010
BPA: Chapter 4
Resolution No. RB3-2009-0008
Phase II Entities: City of Gilroy, City of Hollister, County of Monterey, City of Morgan Hill, County of Santa Clara, County of Santa Cruz, City of Watsonville
Impaired Water Body: Pajaro River, San Benito River, Llagas Creek, Tequesquita Slough, San Juan Creek, Carnadero/Uvas Creek, Bird Creek, Pescadero Creek, Tres Pinos Creek, Furlong (Jones) Creek, Santa Ana Creek, Pachecho Creek

**Requirements for Implementing the TMDL**

By January 1, 2019, the Phase II entities identified in this TMDL section (hereafter referred to in this TMDL section as "the MS4") shall each implement a Wasteload Allocation Attainment Program that identifies the actions they will take to attain their wasteload allocations. The Wasteload Allocation Attainment Programs shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocation. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim targets and wasteload allocations.

9. If the approved TMDL does not explicitly include interim targets, the MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. At least one interim target and date must occur during the first five years commencing on January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not achieve its interim target by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment.

By July 12, 2023, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

## *Fecal Indicator Bacteria*

**TMDLs for the Santa Maria River Watershed** – *Fecal Indicator Bacteria*

Effective Date: 2/21/2013
BPA: Chapter 4
Resolution No. R3-2012-0055
Phase II Entities: City of Guadalupe, County of San Luis Obispo, County of Santa Barbara, City of Santa Maria
Impaired Water Body: Water Bodies in the Santa Maria River Watershed, including: Blosser Channel, Bradley Channel, Main Street Canal, Nipomo Creek, Orcutt Creek, Santa Maria River Estuary, Santa Maria River

**Requirements for Implementing the TMDL**

By January 1, 2019, the Phase II entities identified in this TMDL section (hereafter referred to in this TMDL section as "the MS4") shall each develop, submit, and begin implementation of a Wasteload Allocation Attainment Program, or an integrated plan, that identifies the actions they will take to attain their wasteload allocations. The Wasteload Allocation Attainment Programs or integrated plans shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocations. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim targets and wasteload allocations.

9. The MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. At least one interim target and date must occur during the first five years commencing on January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not specify interim targets as described above in its Wasteload Allocation Attainment Program, the interim targets identified in the TMDL apply. If the MS4 does not achieve any interim target by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

11. A detailed description of how the MS4 proposes to assess its attainment of interim targets and the final wasteload allocation.

12. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

13. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

14. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program or integrated plan.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

15. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment, including public education and participation items identified above.

By February 21, 2028, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

## Nitrate Nitrogen

**TMDL and Implementation Plan for San Luis Obispo Creek** – *Nitrate-Nitrogen*

Effective Date: 8/04/2006
BPA: Chapter 4
Resolution No. R3-2005-0106
Phase II Entities: Cal Poly State University, City of San Luis Obispo, County of San Luis Obispo
Impaired Water Body: San Luis Obispo Creek

**Requirements for Implementing the TMDL**

By January 1, 2019, the Phase II entities identified in this TMDL section shall implement best management practices that specifically address the reduction or elimination of nutrient loading.

The Phase II entities identified in this TMDL section shall submit reports required by this Order and in those reports outline best management practices implemented to assure ongoing attainment of their allocation.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

## Nitrogen Compounds and Orthophosphate

**TMDL for the Lower Salinas River and Reclamation Canal Basin and the Moro Cojo Slough Subwatershed** – *Nitrogen Compounds and Orthophosphate*

Effective Date: 6/7/2014
BPA: Chapter 4
Resolution No. R3-2013-0008
Phase II Entities: County of Monterey
Impaired Water Body: Lower Salinas River, Santa Rita Creek, Reclamation Canal, Gabilan Creek, Natividad Creek, Alisal Creek

**Requirements for Implementing the TMDL**

By January 1, 2019, the County of Monterey (hereafter referred to in this TMDL section as "the MS4") shall develop, submit, and begin implementation of a Wasteload Allocation Attainment Program that identifies the actions it will take to attain its wasteload allocations. The Wasteload Allocation Attainment Program shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at

*UNOFFICIAL DRAFT — Not Certified by Clerk*

abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocations. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim and final wasteload allocations.

9. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

10. A detailed description of how the MS4 proposes to assess its attainment of interim targets and the final wasteload allocation.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 330 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program or integrated plan.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment.

The MS4 shall achieve its interim wasteload allocations as specified in the Fact Sheet. If the MS4 does not achieve any interim wasteload allocation by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim or final wasteload allocations.

By May 7, 2044, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDLs for the Lower Santa Maria River Watershed and Tributaries to Oso Flaco Lake** – *Nitrogen Compounds and Orthophosphate*

Effective Date: 5/22/2014
BPA: Chapter 4
Resolution No. R3-2013-0013
Phase II Entities: City of Guadalupe, County of San Luis Obispo, County of Santa Barbara, City of Santa Maria
Impaired Water Body: Water Bodies in the Lower Santa Maria River Watershed and Tributaries to Oso Flaco Lake, including: Blosser Channel, Bradley Channel, Greene Valley Creek, Main Street Canal, North Main Street Channel, Orcutt Creek, Nipomo Creek, Santa Maria River, Santa Maria River Estuary

**Requirements for Implementing the TMDL**

By January 1, 2019, the Phase II entities identified in this TMDL section (hereafter referred to in this TMDL section as "the MS4") shall each develop, submit, and begin implementation of a Wasteload Allocation Attainment Program, or an integrated plan, that identifies the actions they will take to attain their wasteload allocations. The Wasteload Allocation Attainment Programs or integrated plans shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocations. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim and final wasteload allocations.

9. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

10. A detailed description of how the MS4 proposes to assess its attainment of interim targets and the final wasteload allocation.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program or integrated plan.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment, including public education and participation items identified above.

Waste load allocations will be achieved through implementation of management practices and strategies to reduce Nitrogen compound and Orthophosphate loading. Implementation can be conducted by MS4s specifically and/or through statewide programs addressing urban water pollution.

The MS4 shall achieve its interim wasteload allocations as specified in the Fact Sheet. If the MS4 does not achieve any interim wasteload allocation by the date specified, the MS4 shall

develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim or final wasteload allocations.

By May 22, 2044, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

## *Pathogens*

**TMDL for Aptos Creek, Valencia Creek, and Trout Gulch** – *Pathogens*

Effective Date: 10/29/2010
BPA: Chapter 4
Resolution No. R3-2009-0025
Phase II Entities: County of Santa Cruz
Impaired Water Body: Aptos Creek, Valencia Creek, Trout Gulch

**Requirements for Implementing the TMDL**

By January 1, 2019, the County of Santa Cruz (hereafter referred to in this TMDL section as "the MS4") shall implement a Wasteload Allocation Attainment Program that identifies the actions it will take to attain its wasteload allocation. The Wasteload Allocation Attainment Program shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once

*UNOFFICIAL DRAFT — Not Certified by Clerk*

the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocation. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim targets and wasteload allocations.

9. If the approved TMDL does not explicitly include interim targets, the MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. At least one interim target and date must occur during the first five years commencing on January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not achieve its interim target by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment.

By October 29, 2023, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL and Implementation Plan for Morro Bay and Chorro and Los Osos Creeks** – *Pathogens*

Effective Date: 11/19/2003
BPA: Chapter 4
Resolution No. R3-2003-0060
Phase II Entities: City of Morro Bay, County of San Luis Obispo
Impaired Water Body: Morro Bay, Chorro Creek, Los Osos Creek, Pennington Creek, Warden Creek

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**Requirements for Implementing the TMDL**

By January 1, 2019, the Phase II entities identified in this TMDL section (hereafter referred to in this TMDL section as "the MS4") shall each implement a Wasteload Allocation Attainment Program that identifies the actions they will take to attain their wasteload allocations. The Wasteload Allocation Attainment Programs shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation achieved the MS4's wasteload allocation. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4's wasteload allocation. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment interim targets and wasteload allocations.

9. If the approved TMDL does not explicitly include interim targets, the MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. Where TMDL attainment schedules have passed, but Wasteload Allocations have not

*UNOFFICIAL DRAFT — Not Certified by Clerk*

been achieved by January 1, 2019, the MS4 shall consult with the Regional Water Board to establish dates to meet new interim targets and to achieve wasteload allocations. At least one interim target and date must occur during the five years commencing on January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not achieve its interim target by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL and Implementation Plan for San Luis Obispo Creek** –*Pathogens*

Effective Date: 7/25/2005
BPA: Chapter 4
Resolution No. R3-2004-0142
Phase II Entities: Cal Poly State University, City of San Luis Obispo, County of San Luis Obispo
Impaired Water Body: San Luis Obispo Creek, Stenner Creek, Brizziolari Creek

**Requirements for Implementing the TMDL**

The Phase II entities identified in this TMDL section are required to implement best management practices specifically targeting fecal coliform loading. Required actions include development and implementation of: public education regarding fecal coliform sources and associated health risk, enforceable means of addressing pet waste and wild animals that are attracted to storm water infrastructure, and elimination of illicit discharges.

By January 1, 2019, the Phase II entities identified in this TMDL section (hereafter referred to in this TMDL section as "the MS4") shall each implement a Wasteload Allocation Attainment Program that identifies the actions they will take to attain their wasteload allocations. The Wasteload Allocation Attainment Programs shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at

*UNOFFICIAL DRAFT — Not Certified by Clerk*

abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocation. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim targets and wasteload allocations.

9. If the approved TMDL does not explicitly include interim targets, the MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. Where TMDL attainment schedules have passed, but Wasteload Allocations have not been achieved by January 1, 2019, the MS4 shall consult with the Regional Water Board to establish dates to meet new interim targets and to achieve wasteload allocations. At least one interim target and date must occur during the five years commencing on January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not achieve its interim target by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL Schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.


**TMDL for the San Lorenzo River Estuary, San Lorenzo River, Branciforte Creek, Camp Evers Creek, Carbonera Creek, and Lompico Creek** – *Pathogens*

Effective Date: 6/8/2011
BPA: Chapter 4
Resolution No. R3-2009-0023
Phase II Entities: City of Santa Cruz, County of Santa Cruz, City of Scotts Valley
Impaired Water Body: San Lorenzo River Estuary, San Lorenzo River, Branciforte Creek,
    Camp Evers Creek, Carbonera Creek, Lompico Creek


**Requirements for Implementing the TMDL**

By January 1, 2019, the Phase II entities identified in this TMDL section (hereafter referred to in this TMDL section as "the MS4") shall each implement a Wasteload Allocation Attainment Program that identifies the actions they will take to attain their wasteload allocations. The Wasteload Allocation Attainment Programs shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocation. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim targets and wasteload allocations.

9. If the approved TMDL does not explicitly include interim targets, the MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. At least one interim target and date must occur during the first five years commencing on January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not achieve its interim target by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

By June 8, 2024, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL for Soquel Lagoon, Soquel Creek, and Noble Gulch** – *Pathogens*

Effective Date: 9/15/2010
BPA: Chapter 4
Resolution No. R3-2009-0024
Phase II Entities: City of Capitola, County of Santa Cruz
Impaired Water Body: Soquel Lagoon, Soquel Creek, Noble Gulch

**Requirements for Implementing the TMDL**

By January 1, 2019, the Phase II entities identified in this TMDL section (hereafter referred to in this TMDL section as "the MS4") shall each implement a Wasteload Allocation Attainment Program that identifies the actions they will take to attain their wasteload allocations. The Wasteload Allocation Attainment Programs shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL Schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 340 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocation. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim targets and wasteload allocations.

9. If the approved TMDL does not explicitly include interim targets, the MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. At least one interim target and date must occur during the first five years commencing on January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not achieve its interim target by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment.

By September 15, 2023, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL and Implementation Plan for Watsonville Slough** – *Pathogens*

Effective Date: 11/20/2006
BPA: Chapter 4
Resolution No. R3-2006-0025
Phase II Entities: County of Santa Cruz, City of Watsonville
Impaired Water Body: Watsonville Slough, Struve Slough, Harkins Slough, Gallighan Slough, Hanson Slough

**Requirements for Implementing the TMDL**

By January 1, 2019, the Phase II entities identified in this TMDL section shall implement practices that will assure their allocation is achieved. The Phase II entities identified in this TMDL section (hereafter referred to in this TMDL section as "the MS4") shall each implement a Wasteload Allocation Attainment Program that identifies the actions they will take to attain their wasteload allocations. The Wasteload Allocation Attainment Programs shall include:

*UNOFFICIAL DRAFT — Not Certified by Clerk*

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocation. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim targets and wasteload allocations.

9. If the approved TMDL does not explicitly include interim targets, the MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. Where TMDL attainment schedules have passed, but Wasteload Allocations have not been achieved by January 1, 2019, the MS4 shall consult with the Regional Water Board to establish dates to meet new interim targets and to achieve wasteload allocations. At least one interim target and date must occur during the five years commencing on January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not achieve its interim target

*UNOFFICIAL DRAFT — Not Certified by Clerk*

by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment, including public education and participation. The MS4 public participation and outreach efforts must include the following tasks: a) Educating the public about sources of fecal coliform and its associated health risks in surface waters; and b) Identifying and promoting specific actions that responsible parties can implement to reduce pathogen loading from sources such as homeless encampments, agricultural field workers, and homeowners who contribute waste from domestic pets.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

## *Sediment*

### TMDL for Morro Bay (including Chorro Creek, Los Osos Creek, and the Morro Bay Estuary) – *Sediment*

Effective Date: 12/3/2003
BPA: Chapter 4
Resolution No. R3-2002-0051
Phase II Entities: County of San Luis Obispo
Impaired Water Body: Morro Bay, Los Osos Creek, Chorro Creek, Dairy Creek, Pennington Creek, Warden Creek

### Requirements for Implementing the TMDL

By January 1, 2019, the County of San Luis Obispo shall implement practices that will assure their allocation is achieved, including implementing specific road sediment control measures. The County of San Luis Obispo (hereafter referred to in this TMDL section as "the MS4") shall implement a Wasteload Allocation Attainment Program that identifies the actions it will take to attain its wasteload allocation. The Wasteload Allocation Attainment Program shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 343 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocation. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim targets and wasteload allocations.

9. If the approved TMDL does not explicitly include interim targets, the MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. At least one interim target and date must occur during the first five years commencing on January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not achieve its interim target by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment.

By December 3, 2053, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL and Implementation Plan for Pajaro River including Llagas Creek, Rider Creek, and San Benito River** – *Sediment*

Effective Date: 11/27/2006
BPA: Chapter 4
Resolution No. R3-2005-0132
Phase II Entities: City of Gilroy, City of Hollister, City of Morgan Hill, Santa Cruz County Fairgrounds, City of Watsonville
Impaired Water Body: Tres Pinos, San Benito River, Llagas Creek, Uvas Creek, Upper Pajaro River, Corralitos Creek (including Rider Creek), Mouth of Pajaro River

### Requirements for Implementing the TMDL

The Phase II entities identified in this TMDL section shall implement the practices specified in this Order, tailored to focus on reduction of sediment discharges to the affected waterbodies, to ensure achievement of the wasteload allocations.

By November 27, 2051, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

### TMDL for San Lorenzo River (Including Carbonera Creek, Lompico Creek, and Shingle Mill Creek) – *Sediment*

Effective Date: 12/18/2003
BPA: Chapter 4
Resolution No. R3-2002-0063
Phase II Entities: City of Santa Cruz, County of Santa Cruz, City of Scotts Valley
Impaired Water Body: San Lorenzo River, Carbonera Creek, Lompico Creek, Shingle Mill Creek

### Requirements for Implementing the TMDL

By January 1, 2019, the Phase II entities identified in this TMDL section shall implement practices that will assure their allocation is achieved, including identifying and implementing specific road sediment control measures. The Phase II entities identified in this TMDL section (hereafter referred to in this TMDL section as "the MS4") shall each implement a Wasteload

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 345 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

Allocation Attainment Program that identifies the actions they will take to attain their wasteload allocations. The Wasteload Allocation Attainment Programs shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

4. Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5. Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6. Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7. A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis will most likely incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8. A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocation. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim targets and wasteload allocations.

9. If the approved TMDL does not explicitly include interim targets, the MS4 shall establish interim targets (and dates when stormwater discharge conditions will be evaluated) that are equally spaced in time over the TMDL attainment schedule and represent measurable, continually decreasing MS4 discharge concentrations or other appropriate interim measures of pollution reduction and progress towards the wasteload allocation. At least one interim target and date must occur during the first five years commencing on January 1, 2019. The MS4 shall achieve its interim targets by the date it specifies in the Wasteload Allocation Attainment Program. If the MS4 does not achieve its interim target

*UNOFFICIAL DRAFT — Not Certified by Clerk*

by the date specified, the MS4 shall develop and implement more effective BMPs that it can quantitatively demonstrate will achieve the next interim target.

10. A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment.

By December 18, 2028, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

## *Toxicity and Pesticides*

**TMDL for the Santa Maria River Watershed** – *Toxicity and Pesticides*

Effective Date: 10/29/2014
BPA: Chapter 4
Resolution No. R3-2014-0009
Phase II Entities: City of Guadalupe, City of Santa Maria, County of Santa Barbara
Impaired Water Body: Blosser Channel, Bradley Channel, Greene Valley Creek, Main Street Canal, Orcutt Creek, Santa Maria River

**Requirements for Implementing the TMDL**

By January 1, 2019, the Phase II entities identified in this TMDL section (hereafter referred to in this TMDL section as "the MS4") shall each develop, submit, and begin implementation of a Wasteload Allocation Attainment Program, or an integrated plan, that identifies the actions they will take to attain their wasteload allocations. The Wasteload Allocation Attainment Programs or integrated plans shall include:

1. A detailed description of the strategy the MS4 will use to guide BMP selection, assessment, and implementation, to ensure that BMPs implemented will be effective at abating pollutant sources, reducing pollutant discharges, and achieving wasteload allocations according to the TMDL schedule.

2. Identification of sources of the impairment within the MS4's jurisdiction, including specific information on various source locations and their magnitude within the jurisdiction.

3. Prioritization of sources within the MS4's jurisdiction, based on suspected contribution to the impairment, ability to control the source, and other pertinent factors.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

4.  Identification of BMPs that will address the sources of impairing pollutants and reduce the discharge of impairing pollutants.

5.  Prioritization of BMPs, based on suspected effectiveness at abating sources and reducing impairing pollutant discharges, as well as other pertinent factors.

6.  Identification of BMPs the MS4 will implement, including a detailed implementation schedule. For each BMP, identify milestones the MS4 will use for tracking implementation, measurable goals the MS4 will use to assess implementation efforts, and measures and targets the MS4 will use to assess effectiveness. MS4s shall include expected BMP implementation for future implementation years, with the understanding that future BMP implementation plans may change as new information is obtained.

7.  A quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation will likely achieve the MS4's wasteload allocation by the schedule identified in the TMDL. This analysis may incorporate modeling efforts. The MS4 shall conduct repeat numeric analyses as the BMP implementation plans evolve and information on BMP effectiveness is generated. Once the MS4 has water quality data from its monitoring program, the MS4 shall incorporate water quality data into the numeric analyses to validate BMP implementation plans.

8.  A detailed description, including a schedule, of a monitoring program the MS4 will implement to assess discharge and receiving water quality, BMP effectiveness, and progress towards any interim targets and ultimate attainment of the MS4s' wasteload allocations. The monitoring program shall be designed to validate BMP implementation efforts and quantitatively demonstrate attainment of interim and final wasteload allocations. The Central Coast Water Board may approve participation in statewide or regional monitoring programs as meeting all, or a portion of monitoring requirements.

9.  A detailed description of how the MS4 will assess BMP and program effectiveness. The description shall incorporate the assessment methods described in the CASQA Municipal Storm Water Program Effectiveness Assessment Guide.

10. A detailed description of how the MS4 proposes to assess its attainment of interim targets and the final wasteload allocation.

11. A detailed description of how the MS4 will modify the program to improve upon BMPs determined to be ineffective during the effectiveness assessment.

12. A detailed description of information the MS4 will include in annual reports to demonstrate adequate progress towards attainment of wasteload allocations according to the TMDL schedule.

13. A detailed description of how the MS4 will collaborate with other agencies, stakeholders, and the public to develop and implement the Wasteload Allocation Attainment Program or integrated plan.

14. Any other items identified by Integrated Report fact sheets, TMDL Project Reports, TMDL Resolutions, or that are currently being implemented by the MS4 to control its contribution to the impairment, including public education and participation items identified above.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 348 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

Waste load allocations will be achieved through implementation of management practices and strategies to reduce pesticide loading, and wasteload allocation attainment will be demonstrated through water quality monitoring. Implementation can be conducted by MS4s specifically and/or through statewide programs addressing urban pesticide water pollution. The Wasteload Allocation Attainment Program may include participation in statewide efforts, by organizations such as California Stormwater Quality Association (CASQA), that coordinate with Department of Pesticide Regulation and other organizations taking actions to protect water quality from the use of pesticides in the urban environment.

By November 1, 2029, the permittees shall demonstrate attainment of the pyrethroids WLA as specified in Section E.15.a.(ii). or F.5.i.1. (ii). of this Order. This estimate is based on the widespread availability of pyrethroids, including consumer usage, and current limited regulatory oversight. By November 1, 2044, the permittees shall demonstrate attainment of the organochlorine pesticides (DDT, DDD, DDE, chlordane, eldrin, toxaphene, dieldrin) WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## Region 4: Los Angeles Regional Water Board

### *Bacteria*

**TMDL for Avalon Beach** – *Bacteria*

Effective Date: April 5, 2012
BPA: N/A (Issued through R4-2012-0077)
Phase II Entities: City of Avalon
Impaired Water Body: Avalon Beach

**Requirements for Implementing the TMDL**

City of Avalon's compliance with the MS4-specific provisions of Cease and Desist Order No. R4-2012-0077 and the applicable implementation requirements and timelines therein, in addition to compliance with all requirements of this Order, shall constitute compliance with the requirements of this Attachment.

**TMDL for Ballona Creek** – *Bacteria*

Effective Date: April 27, 2007
BPA Chapter 7-21
Resolution Nos.: 2006-11, R12-008 revision
Phase II Entities: University of California Los Angeles, Veteran Affairs, Greater Los Angeles
        Healthcare System
Impaired Water Body: Ballona Creek

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019, and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the

*UNOFFICIAL DRAFT — Not Certified by Clerk*

Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By January 1, 2019, the permittees shall demonstrate attainment of the Dry Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order. By July 15, 2021, the permittees shall demonstrate attainment of the Wet Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL for Los Angeles Harbor (Inner Cabrillo Beach and Main Ship Channel)** – *Bacteria*

Effective Date: March 10, 2005
BPA Chapter 7-11
Resolution No.: 2004-011; R12-007 (revised)
Phase II Entities: Federal Correctional Institution (FCI), Terminal Island, California State University Dominguez Hills
Impaired Water Body: Dominguez Channel Watershed Management Area

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019, and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The

*UNOFFICIAL DRAFT — Not Certified by Clerk*

Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL for Los Angeles River** – *Bacteria*

Effective Date: March 23, 2012
BPA Chapter 7-39
Resolution No.: R10-007
Phase II Entities: California State University Los Angeles, California State University Northridge
Impaired Water Body: Los Angeles River

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019, and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 352 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By March 23, 2037, the permittees shall demonstrate attainment of the Wet Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order. By March 23, 2022 to September 23, 2030, according to the following table, the permittees shall demonstrate attainment of the Dry Weather WLA, for the indicated waterbody segment, as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

| Waterbody Segment | Achieve Final dry weather WLA by: |
|---|---|
| Segment B (upper and middle Reach 2) | March 23, 2022 |
| Segment B Tributaries (Rio Hondo & Arroyo Seco) | September 23, 2023 |
| Segment A (lower Reach 2 and Reach 1) | March 23, 2024 |
| Segment A Tributaries (Compton Creek) | September 23, 2025 |
| Segment E (Reach 6) | March 23, 2025 |
| Segment E Tributaries (Dry Canyon, McCoy and Bell Creeks, and Aliso Canyon Wash) | March 23, 2029 |
| Segment C (lower Reach 4 and Reach 3) | September 23, 2030 |
| Segment C Tributaries (Tujunga Wash, Burbank Western Channel and Verdugo Wash) | September 23, 2030 |
| Segment D (Reach 5 and upper Reach 4) | September 23, 2030 |
| Segment D Tributaries (Bull Creek) | September 23, 2030 |

**TMDL for Santa Monica Bay Beaches** – *Bacteria*

Effective Date: July 15, 2003
BPA: Chapter 7-4
Resolution Nos.: 2002-04 (dry weather), 2002-022 (wet weather), R12-007 revision
Phase II Entities: Department of Parks and Recreation (Point Dume State Beach, Leo Carrillo State Beach, Robert H Meyer Memorial State Beach)
Impaired Water Body: Santa Monica Bay

**Requirements for Implementing the TMDL:**

The Department of Parks and Recreation (specifically, Point Dume State Beach, Leo Carrillo State Beach, and Robert H Meyer Memorial State Beach) must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019, and shall be submitted to the Executive Officer upon finalization.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

Or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By January 1, 2019, the permittees shall demonstrate attainment of the summer period Dry Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order. By January 1, 2019, the permittees shall demonstrate attainment of the winter period Dry Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order. By July 15, 2021, the permittees shall demonstrate attainment of the Wet Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.


## *Indicator Bacteria*

**TMDL for San Gabriel River and Impaired Tributaries** – *Indicator Bacteria*

Effective Date: June 14, 2016
BPA: Chapter 7-41
Resolution No.: R15-005
Phase II Entities: California State Polytechnic University, Pomona
Impaired Water Body: San Gabriel River and Tributaries

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be

*UNOFFICIAL DRAFT — Not Certified by Clerk*

finalized by July 1, 2019, and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By June 14, 2026, the permittees shall demonstrate attainment of the Dry Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order. By June 14, 2036, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

## *Marine Debris*

**TMDL for Santa Monica Bay** – *Marine Debris*

Effective Date: March 20, 2012
BPA Chapter 7-34
Resolution No.: 2010-010
Phase II Entities: Department of Parks and Recreation (Point Dume State Beach, Robert H Meyer Memorial State Beach)
Impaired Water Body: Santa Monica Bay Watershed Management Area

**Requirements for Implementing the TMDL:**

By January 1, 2019, the Department of Parks and Recreation (at Point Dume State Beach and Robert H. Meyer Memorial State Beach) must submit for Los Angeles Regional Water Board Executive Officer approval, a Minimum Frequency of Assessment and Collection Program (MFAC)/BMP Program that meets the following criteria:

a) The MFAC/BMP Program includes an initial minimum frequency of trash assessment and collection and suite of structural and/or nonstructural BMPs. The MFAC/BMP Program shall include collection and disposal of all trash found in the source areas and along the shoreline. Responsible jurisdictions shall implement an initial suite of BMPs based on current trash management practices in land areas that are found to be sources

*UNOFFICIAL DRAFT — Not Certified by Clerk*

of trash to waterbodies within the Santa Monica Bay Watershed Management Area and to Santa Monica Bay.

<u>Beaches and Harbors along Santa Monica Bay</u>

For beaches and harbors along Santa Monica Bay, the initial minimum frequency shall be set as follows:

1. The trash source areas of beaches and harbors shall be cleaned on a daily basis year-round.
2. Trash on Santa Monica Bay shorelines shall be collected daily. An assessment shall immediately follow at the frequency specified in the Trash Monitoring and Reporting Plan (TMRP).
3. The assessment performed immediately after the collection events shall focus on the shorelines or interface along Santa Monica Bay.
4. The protocol for conducting the assessment immediately after the collection event shall include methods and frequencies of assessment, specific locations on the beaches and harbors, in the TMRP.
5. Responsible jurisdictions for beaches and harbors shall conduct routine trash generation rate evaluation on the nonpoint source areas at selected beaches or harbors under their management. Protocols, as specified in the TMRP, for this evaluation include:

    i) The evaluation shall be performed in the late afternoon before dusk. Data collected may represent the daily trash quantity littered or deposited on the nonpoint source areas.
    ii) Methods, locations and frequencies of evaluation on the beaches and harbors shall be included in the TMRP.

6. Water in harbors shall be inspected and all trash found on the water shall be removed at a frequency and during critical conditions as defined in the approved TMRP.
7. Compliance for jurisdictions responsible for nonpoint source trash at areas where daily cleanup is implemented, is determined by the following conditions:

    i) The assessment conducted immediately after cleanup shall demonstrate that all trash on the shoreline or harbor is 100% removed and no trash remains.
    ii) Responsible jurisdictions for beaches and harbors where daily cleanup is performed, shall demonstrate that the trash generation rate of the source areas does not show an increasing trend and does not exceed the benchmark of 310 pounds (lbs) per mile of beach/harbor per day, or 113,150 lbs/mile/year.

8. Should trash amounts collected during evaluation at the source areas exceed 113,150 lbs/mile/year, or not indicate a decreasing trend, the responsible jurisdictions shall immediately initiate additional BMPs as specified in the TMRP,
9. By January 1, 2019, responsible agencies and jurisdictions shall also develop a Trash Monitoring and Reporting Plan (TMRP) for Los Angeles Regional Water Board Executive Officer approval that describes the methodologies that will be used to assess and monitor trash in their responsible areas within the Santa Monica Bay Watershed Management Area or along Santa Monica Bay.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

Case 2:20-cv-02482-WBS-AC   Document 95-7   Filed 11/28/22   Page 356 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## Metals

**TMDL for Ballona Creek** – *Metals*

Effective Date: October 29, 2008
BPA: Chapter 7-12
Resolution No.: 2007-015; R13-010 (revised)
Phase II Entities: Veteran Affairs, Greater Los Angeles Healthcare System, University of California Los Angeles
Impaired Water Body: Ballona Creek

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019, and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By January 1, 2019, the permittees shall demonstrate attainment of the Dry Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order. By January 11, 2021, the permittees shall demonstrate attainment of the Wet Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**TMDL for Los Angeles River and Tributaries** – *Metals*

Effective Date: November 3, 2011
BPA: Chapter 7-13
Resolution No.: R07-014; R10-003 (revised); R15-004 (revised)
Phase II Entities: California State University Los Angeles, California State University
    Northridge
Impaired Water Body: Los Angeles River

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019, and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By January 11, 2024, the permittees shall demonstrate attainment of the Dry Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order. By January 11, 2028, the permittees shall demonstrate attainment of the Wet Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**TMDL for Los Cerritos Channel** – *Metals*

Effective Date: March 17, 2010
USEPA Established
Phase II Entities: California State University Long Beach, Long Beach Veterans Affairs Medical
    Center
Impaired Water Body: Los Cerritos Channel

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019, and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By September 30, 2023, the permittees shall demonstrate attainment of the Dry Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order. By September 30, 2026, the permittees shall demonstrate attainment of the Wet Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 359 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## Metals and Selenium

**TMDL for Calleguas Creek** *– Metals and Selenium*

Effective Date: March 26, 2007
BPA Chapter 7-19
Resolution No.: 2006-012
Phase II Entities: Naval Base Ventura County (Point Mugu), Department of Parks and
    Recreation (Point Mugu State Park), California State University, Channel Islands
Impaired Water Body: Calleguas Creek

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019, and shall be submitted to the Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By March 26, 2022, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 360 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**TMDL for San Gabriel River and Impaired Tributaries** – *Metals and Selenium*

Effective Date: March 26, 2007
USEPA Established
Phase II Entities: California State Polytechnic University, Pomona
Impaired Water Body: San Gabriel River and Tributaries

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019, and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

The final deadline for attainment of the WLA is not specified in the TMDL. Therefore, municipalities identified in this TMDL section shall propose a timeline to attain the WLA in the shortest practicable time, subject to Regional Water Board Executive Officer approval. Attainment of the WLA shall be demonstrated as specified in Section E.15.a.(ii)/Section F.5.i.1.(ii) of this Order.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 361 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

*Nitrogen and Related Effects*

**TMDL for Los Angeles River** – *Nitrogen and Related Effects*

Effective Date: March 23, 2004
BPA Chapter 7-8
Resolution Nos.: R03-009 (amended by R03-016, R05-014, R07-005, & R12-010)
Phase II Entities: California State University Los Angeles, California State University Northridge
Impaired Water Body: Los Angeles River

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019 and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## *Organochlorine Pesticides, Polychlorinated Biphenyls, and Siltation*

**TMDL for Calleguas Creek** – *Organochlorine Pesticides, Polychlorinated Biphenyls, and Siltation*

Effective Date: March 24, 2006
BPA Chapter 7-16
Resolution No.: 2005-009
Phase II Entities: Naval Base Ventura County (Point Mugu), Department of Parks and
  Recreation (Point Mugu State Park), California State University, Channel Islands
Impaired Water Body: Calleguas Creek

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019 and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By March 24, 2026, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## *Toxic Pollutants*

**TMDL for Ballona Creek Estuary** – *Toxic Pollutants*

Effective Date: January 11, 2006
BPA: Chapter 7-14
Resolution No.: 2005-008; R13-010 (revised)
Phase II Entities: Veteran Affairs, Greater Los Angeles Healthcare System, University of California Los Angeles
Impaired Water Body: Ballona Creek

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019 and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019 and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By January 11, 2021, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 364 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## _Toxics and Metals_

**TMDL for Los Angeles and Long Beach Harbors** – *Toxics and Metals*

Effective Date: March 23, 2012
BPA Chapter 7-40
Resolution No.:2011-008
Phase II Entities: Federal Correction Institution (FCI), Terminal Island, Community Corrections
    Management (CCM), Long Beach, California State University Dominguez Hills
Impaired Water Body: Dominguez Channel Watershed

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1.  Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019 and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

    or alternatively,

2.  Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By March 23, 2032, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## *Toxicity*

**TMDL for Calleguas Creek Watershed** – *Toxicity*

Effective Date: March 24, 2006
BPA Chapter 7-17
Resolution No.: 2005-010
Phase II Entities: Naval Base Ventura County (Point Mugu), Department of Parks and
    Recreation (Point Mugu State Park), California State University, Channel Islands
Impaired Water Body: Calleguas Creek

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section must take either of the following actions to meet the requirements of this TMDL:

1. Enter in a cooperative agreement with Phase I MS4 Permittees, in the watershed or subwatershed of the impaired water body of this Section, to participate in a Watershed Management Program (WMP) or Enhanced Watershed Management Program (EWMP) developed and approved pursuant to one of the Los Angeles Region's Phase I MS4 permits. A Permittee shall notify the Regional Water Board of its intent to enter into a cooperative agreement with Phase I MS4 Permittees. Such notification shall be provided by January 1, 2019, and shall identify the Phase I MS4 Permittee(s) and the WMP or EWMP that the Permittee intends to participate in. The cooperative agreement shall be finalized by July 1, 2019 and shall be submitted to the Los Angeles Regional Water Board Executive Officer upon finalization.

   or alternatively,

2. Propose a program plan for attaining the wasteload allocation(s). The Program Plan must identify the currently used and planned BMPs and any other planned actions to attain the wasteload allocation(s), which may include, but is not limited to, retaining the volume of runoff associated with the 85th percentile, 24-hour storm event on-site. The Program Plan must provide a technical demonstration (using modeling and/or empirical data) that there is a reasonable assurance that by implementing the BMPs and other planned actions in the Program Plan, the Permittee's MS4 discharges will achieve the wasteload allocation(s) by the attainment schedule deadline(s) identified within this specific TMDL section. The Program Plan must also include monitoring of the Permittee's MS4 discharges to track progress toward achieving the wasteload allocation(s) and validate the reasonable assurance demonstration. The Program Plan is subject to approval by the Los Angeles Regional Water Board Executive Officer. The Program Plan must be submitted for Los Angeles Regional Water Board Executive Officer approval by July 1, 2019. Once approved, the Permittees must implement the Program Plan and are responsible for attaining applicable wasteload allocations and demonstrating such attainment with monitoring data.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## *Trash*

**TMDL for Ballona Creek** – *Trash*
Effective Date: August 28, 2002

BPA: Chapter 7.3
Resolution No.: 2001-014 2004-023 (revision), R15-006 (revision)
Phase II Entities: Veteran Affairs, Greater Los Angeles Healthcare System, University of
    California Los Angeles
Impaired Water Body: Ballona Creek

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section shall implement either 1) Full Capture Systems, 2) partial capture devices and the application of institutional controls, or 3) a scientifically based alternative attainment approach.

A Full Capture System is any device or series of devices that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a one year, one hour, storm event. The Rational Equation is used to compute the peak flow rate (See Fact Sheet for Rational Equation).

A partial capture device does not meet the definition of a Full Capture System; a partial capture device may not trap all particles 5 mm or greater or may not have the minimum design treatment capacity of a one year, one hour, storm event. Thus, a MS4 Permittee must implement institutional controls in combination with the partial capture device to comply with the wasteload allocations. MS4 Permittees employing partial capture devices and institutional controls shall use a mass balance approach based on the trash daily generation rate, assessed annually, to demonstrate attainment. (See Fact Sheet for attainment determination information)

An alternative attainment approach to implementing either 1) a Full Capture System or 2) partial capture devices and the application of institutional controls must be submitted for approval by the Los Angeles Regional Water Board Executive Officer. By July 1, 2019, MS4 Permittees seeking approval of an alternative attainment approach, shall include in their submittal any proposed studies of institutional controls and partial capture devices for their particular subwatershed(s) or demonstrate that existing studies are representative and transferable to the implementing area. Permittees shall also provide a schedule for periodic, attainment effectiveness demonstration and evaluation.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL for Los Angeles River** – *Trash*

Effective Date: September 23, 2008
BPA Chapter 7-2
Resolution No.:07-012, R15-006 (revision)
Phase II Entities: California State University Los Angeles, California State University
    Northridge
Impaired Water Body: Los Angeles River

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section shall implement either 1) Full Capture Systems, 2) partial capture devices and the application of institutional controls, or 3) a scientifically based alternative attainment approach.

A Full Capture System is any device or series of devices that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a one year, one hour, storm event. The Rational Equation is used to compute the peak flow rate (See Fact Sheet for Rational Equation).

A partial capture device does not meet the definition of a Full Capture System; a partial capture device may not trap all particles 5 mm or greater or may not have the minimum design treatment capacity of a one year, one hour, storm event. Thus, a MS4 Permittee must implement institutional controls in combination with the partial capture device to comply with the wasteload allocations. MS4 Permittees employing partial capture devices or institutional controls shall use a mass balance approach based on the trash daily generation rate, assessed annually, to demonstrate attainment. (See Fact Sheet for attainment determination information)

An alternative attainment approach to implementing either 1) a Full Capture System or 2) partial capture devices and the application of institutional controls must be submitted for approval by the Los Angeles Regional Water Board Executive Officer. By July 1, 2019, MS4 Permittees seeking approval of an alternative attainment approach, shall include in their submittal any proposed studies of institutional controls and partial capture devices for their particular subwatershed(s) or demonstrate that existing studies are representative and transferable to the implementing area. Permittees shall also provide a schedule for periodic, attainment effectiveness demonstration and evaluation.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL for Ventura River Estuary** – *Trash*

Effective Date: March 6, 2008
BPA Chapter 7-25
Resolution No.:07-008
Phase II Entities: Ventura County Fairgrounds (Seaside Park and Ventura County Fairgrounds)
Impaired Water Body: Ventura River

**Requirements for Implementing the TMDL:**

The Ventura County Fairgrounds (including Seaside Park and Ventura County Fairgrounds) shall implement Full Capture Systems. A Full Capture System is any device or series of devices that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a one year, one hour, storm event. The Rational Equation is used to compute the peak flow rate (See Fact Sheet for Rational Equation).

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## Region 5: Central Valley Regional Water Board

### *Diazinon & Chlorpyrifos*

**TMDL for Lower San Joaquin River** *– Diazinon & Chlorpyrifos*

Effective Date: December 20,2006
BPA: Chapter 3
Resolution No.: R5-2005-0138
Phase II Entities: City of Patterson
Impaired Water Body: San Joaquin River from Mendota Dam to Vernalis

**Requirements for Implementing the TMDL and Monitoring Requirements:**

The Phase II entities identified in this TMDL section (hereinafter referred to as Permittees in this TMDL section) shall implement the following actions by January 1, 2019:

1. a. Conduct an assessment: By July 1, 2020, the Permittees shall complete and submit to the Central Valley Regional Water Board Executive Officer an assessment to, at a minimum: determine the diazinon and chlorpyrifos levels and attainment of waste load allocations in urban discharge; and evaluate attainment of established water quality objectives applicable to diazinon and chlorpyrifos for the receiving water. Assessment monitoring may be done in coordination or conjunction with other municipalities and/or Permittees. The Permittees are responsible for providing the assessment and necessary information related to the assessment to the Central Valley Regional Water Board Executive Officer for review and approval. The assessment information may come from the Permittee's monitoring efforts; monitoring programs conducted by State or federal agencies or collaborative watershed efforts; or from special studies that evaluate the effectiveness of management practices.

   b. With Central Valley Regional Water Board Executive Officer approval, the Permittees may participate in the Delta Regional Monitoring Program or other collective monitoring efforts in lieu of some or all of the individual monitoring requirements required by this section.

   c. Permittees that implement individual water quality monitoring pursuant to 1.a., above, must submit a Monitoring Plan and Quality Assurance Project Plan (QAPP) to the Executive Officer for review and approval.

      i) Monitoring Plan – at a minimum, the Monitoring Plan must include the following information:

         1) Management questions to be answered by the Monitoring Plan,
         2) Constituents to be monitored, analytical methods, and reporting limits,
         3) Sampling site(s) locations, including latitude and longitude coordinates, water body name and water body segment if applicable,
         4) Other monitoring efforts that will provide supplemental data for the local water quality monitoring program and assessment (if any),
         5) Proposed schedule and level of detail for monitoring reports. If a more comprehensive report is necessary every few years, the Monitoring Plan shall

*UNOFFICIAL DRAFT — Not Certified by Clerk*

propose a schedule and description of the level of detail (consistent with the information described below) that will be included within the Annual Reports.

ii) Quality Assurance Project Plan (QAPP) consistent with Surface Water Ambient Monitoring Program (SWAMP). All samples shall be collected and analyzed according to the QAPP. Monitoring Reports shall be submitted with the Annual Report and include the following information (consistent with the approved Monitoring Plan):

1) The purpose of the monitoring, brief contextual background, and a brief description of the study design and rationale;
2) Methods used for sample collection: list methods used for sample collection, sample or data collection identification, collection date, and media if applicable;
3) Identification of and rationale for any deviations from the QAPP;
4) Results of data collection, including concentration detected, measurement units, reporting limits, and detection limits, if applicable;
5) Quantifiable assessment, analysis and interpretation of data for each monitoring parameter;
6) Comparison to reference sites (if applicable), guidelines or targets;
7) Discussion of whether data collected addresses the objective(s) or question(s) of study design;
8) Quantifiable discussion of program/study pollutant reduction effectiveness.

2. Pesticide Management Plans: Unless the Permittees can demonstrate attainment of the waste load allocations, the Permittee shall prepare a Pesticide Management Plan which includes a description of actions that will be taken to reduce diazinon and chlorpyrifos discharges to meet the applicable allocations. Pesticide Management Plan provisions addressing diazinon and chlorpyrifos can be included in the pesticide management plans covering current use pesticides with the goal of reducing the discharge of pesticides from municipal storm water to receiving water. Pesticide Management Plans shall address the Permittee's own use of pesticides, and to the extent authorized by law, the use of such pesticides by other sources within their jurisdictions. Pesticide Management Plans shall include identifying and promoting, within the context of integrated pest management (IPM) programs, the use of pest management practices that minimize the risk of pesticide impacts on surface water quality resulting from urban runoff discharges. Additionally, the plan shall include the integration of IPM into the Permittee's municipal operations and be promoted to residents, businesses, and public agencies within each Permittee's jurisdiction through public outreach.

The Central Valley Regional Water Board Executive Officer may require revisions to the Pest Management Plans if the Central Valley Regional Water Board Executive Officer determines that the Pest Management Plan is not likely to attain the waste load allocations. Pest Management Plans may be submitted by individual Permittee or Permittee groups and may refer to actions required by other agencies or actions required elsewhere in this permit. Pest Management Plans may include actions to reduce MS4 pesticide discharges through participation or support of a regional or statewide pesticide reduction program. To receive credit toward compliance for such participation, the Permittees must demonstrate that they have participated in the implementation of the program (i.e., contributing materially and in proportion in the size of a Permittee's service area, including, but not limited to, implementation of reduction program measures, membership, contribution of resources,

*UNOFFICIAL DRAFT — Not Certified by Clerk*

etc.). Examples of programs that could be eligible include Our Water Our World (outreach), a recognized regional monitoring program, and California Stormwater Quality Association's (CASQA) pesticide regulatory initiative. In developing the monitoring and reporting programs for the Permittee, the Central Valley Water Board will, in coordination with the DPR, assist the Permittee in identifying diazinon and chlorpyrifos alternatives for which monitoring may be necessary.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL for Sacramento and Feather Rivers** – *Diazinon & Chlorpyrifos*

Effective Date: May 3, 2007
BPA: Attachment 1
Resolution No.: R5-2007-0034
Phase II Entities: City of Anderson, County of Colusa, City of Marysville, City of Red Bluff, City of Redding, County of Shasta, County of Sutter, City of Yuba City, County of Yuba
Impaired Water Body: Sacramento River from Shasta Dam to I Street Bridge, Feather River from Fish Barrier Dam to Sacramento River

**Requirements for Monitoring and Implementing the TMDL:**

The Phase II entities identified in this TMDL section (hereinafter referred to as Permittees in this TMDL section) shall implement the following actions by January 1, 2019:

1. a. Conduct an assessment: By July 1, 2020, the Permittees shall complete and submit to the Central Valley Regional Water Board Executive Officer an assessment to, at a minimum: determine the diazinon and chlorpyrifos levels and attainment of waste load allocations in urban discharge; and evaluate attainment of established water quality objectives applicable to diazinon and chlorpyrifos for the receiving water. Assessment monitoring may be done in coordination or conjunction with other municipalities and/or Permittees. Permittees are responsible for providing the assessment and necessary information related to the assessment to the Central Valley Regional Water Board Executive Officer for review and approval. The assessment information may come from the Permittee's monitoring efforts; monitoring programs conducted by State or federal agencies or collaborative watershed efforts; or from special studies that evaluate the effectiveness of management practices.

   b. With Central Valley Regional Water Board Executive Officer approval, the Permittees may participate in the Delta Regional Monitoring Program or other collective monitoring efforts in lieu of some or all of the individual monitoring requirements required by this section.

   c. Permittees that implement individual water quality monitoring pursuant to 1.a., above, must submit a Monitoring Plan and Quality Assurance Project Plan (QAPP) to the Executive Officer for review and approval.

      i) Monitoring Plan – at a minimum, the Monitoring Plan must include the following information:

         1) Management questions to be answered by the Monitoring Plan,
         2) Constituents to be monitored, analytical methods, and reporting limits,

*UNOFFICIAL DRAFT — Not Certified by Clerk*

3) Sampling site(s) locations, including latitude and longitude coordinates, water body name and water body segment if applicable,

4) Other monitoring efforts that will provide supplemental data for the local water quality monitoring program and assessment (if any),

5) Proposed schedule and level of detail for monitoring reports. If a more comprehensive report is necessary every few years, the Monitoring Plan shall propose a schedule and description of the level of detail (consistent with the information described below) that will be included within the Annual Reports.

ii) Quality Assurance Project Plan (QAPP) consistent with Surface Water Ambient Monitoring Program (SWAMP). All samples shall be collected and analyzed according to the QAPP. Monitoring Reports shall be submitted with the Annual Report and include the following information (consistent with the approved Monitoring Plan):

i) The purpose of the monitoring, brief contextual background, and a brief description of the study design and rationale;

ii) Methods used for sample collection: list methods used for sample collection, sample or data collection identification, collection date, and media if applicable;

iii) Identification of and rationale for any deviations from the QAPP;

iv) Results of data collection, including concentration detected, measurement units, reporting limits, and detection limits, if applicable;

v) Quantifiable assessment, analysis and interpretation of data for each monitoring parameter;

vi) Comparison to reference sites (if applicable), guidelines or targets;

vii) Discussion of whether data collected addresses the objective(s) or question(s) of study design;

viii) Quantifiable discussion of program/study pollutant reduction effectiveness.

2. Pesticide Management Plans: Unless Permittees can demonstrate attainment of the waste load allocations, Permittees shall prepare a Pesticide Management Plan which include a description of actions that will be taken to reduce diazinon and chlorpyrifos discharges to meet the applicable allocations. Pesticide Management Plan provisions addressing diazinon and chlorpyrifos can be included in pesticide management plans covering current use pesticides with the goal of reducing the discharge of pesticides from municipal storm water to receiving water. Pesticide Management Plans shall address the Permittee's own use of pesticides, and to the extent authorized by law, the use of such pesticides by other sources within their jurisdictions. Pesticide Management Plans shall include identifying and promoting, within the context of integrated pest management (IPM) programs, the use of pest management practices that minimize the risk of pesticide impacts on surface water quality resulting from urban runoff discharges. Additionally, the plan shall include the integration of IPM into the Permittee's municipal operations and be promoted to residents, businesses, and public agencies within each Permittee's jurisdiction through public outreach.

The Central Valley Regional Water Board Executive Officer may require revisions to the Pesticide Management Plans if the management plan is not likely to attain the waste load allocations. Pesticide Management Plans may be submitted by individual Permittee or Permittee groups and may refer to actions required by other agencies or actions required elsewhere in this permit. Management plans for pesticides may include actions to reduce

*UNOFFICIAL DRAFT — Not Certified by Clerk*

MS4 pesticide discharges through participation or support of a regional or statewide pesticide reduction program. To receive credit toward compliance for such participation, the Permittees must demonstrate that they have participated in the implementation of the program (i.e., contributing materially and in proportion in the size of a Permittee's service area, including, but not limited to, implementation of reduction program measures, membership, contribution of resources, etc.). Examples of programs that could be eligible include Our Water Our World (outreach), a recognized regional monitoring program, and California Stormwater Quality Association's (CASQA) pesticide regulatory initiative. In developing the monitoring and reporting programs for Permittees, the Central Valley Water Board will, in coordination with the DPR, assist the Permittee in identifying diazinon and chlorpyrifos alternatives for which monitoring may be necessary.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

**TMDL for Sacramento and San Joaquin Delta** – *Diazinon & Chlorpyrifos*

Effective Date: October 10, 2006
BPA: Chapter 31
Resolution No.: R5-2006-0061
Phase II Entities: City of Lathrop, City of Lodi, City of Manteca, City of Rio Vista, County of San Joaquin, City of Tracy, City of West Sacramento
Impaired Water Body: Sacramento-San Joaquin Delta Waterways

**Requirements for Monitoring and Implementing the TMDL:**

The Phase II entities identified in this TMDL section (hereinafter referred to as Permittees in this TMDL section) shall implement the following actions by January 1, 2019:

1. a. Conduct an assessment: By July 1, 2020, the Permittees shall complete and submit to the Central Valley Regional Water Board Executive Officer an assessment to, at a minimum: determine the diazinon and chlorpyrifos levels and attainment of waste load allocations in urban discharge; and evaluate attainment of established water quality objectives applicable to diazinon and chlorpyrifos for the receiving water. Assessment monitoring may be done in coordination or conjunction with other municipalities and/or Permittees. Permittees are responsible for providing the assessment and necessary information related to the assessment to the Central Valley Regional Water Board Executive Officer for review and approval. The assessment information may come from the Permittee's monitoring efforts; monitoring programs conducted by State or federal agencies or collaborative watershed efforts; or from special studies that evaluate the effectiveness of management practices.

   b. With Central Valley Regional Water Board Executive Officer approval, the Permittees may participate in the Delta Regional Monitoring Program or other collective monitoring efforts in lieu of some or all of the individual monitoring requirements required by this section.

   c. Permittees that implement individual water quality monitoring pursuant to 1.a., above, must submit a Monitoring Plan and Quality Assurance Project Plan (QAPP) to the Executive Officer for review and approval.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 373 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

i) Monitoring Plan – at a minimum, the Monitoring Plan must include the following information:

1) Management questions to be answered by the Monitoring Plan,

2) Constituents to be monitored, analytical methods, and reporting limits,

3) Sampling site(s) locations, including latitude and longitude coordinates, water body name and water body segment if applicable,

4) Other monitoring efforts that will provide supplemental data for the local water quality monitoring program and assessment (if any),

5) Proposed schedule and level of detail for monitoring reports. If a more comprehensive report is necessary every few years, the Monitoring Plan shall propose a schedule and description of the level of detail (consistent with the information described below) that will be included within the Annual Reports.

ii) Quality Assurance Project Plan (QAPP) consistent with Surface Water Ambient Monitoring Program (SWAMP). All samples shall be collected and analyzed according to the QAPP. Monitoring Reports shall be submitted with the Annual Report and include the following information (consistent with the approved Monitoring Plan):

1) The purpose of the monitoring, brief contextual background, and a brief description of the study design and rationale;

2) Methods used for sample collection: list methods used for sample collection, sample or data collection identification, collection date, and media if applicable;

3) Identification of and rationale for any deviations from the QAPP;

4) Results of data collection, including concentration detected, measurement units, reporting limits, and detection limits, if applicable;

5) Quantifiable assessment, analysis and interpretation of data for each monitoring parameter;

6) Comparison to reference sites (if applicable), guidelines or targets;

7) Discussion of whether data collected addresses the objective(s) or question(s) of study design;

8) Quantifiable discussion of program/study pollutant reduction effectiveness.

2. Pesticide Management Plans: Unless Permittees can demonstrate attainment of the waste load allocations, Permittees shall prepare a Pesticide Management Plan which include a description of actions that will be taken to reduce diazinon and chlorpyrifos discharges to meet the applicable allocations. Pesticide Management Plan provisions addressing diazinon and chlorpyrifos can be included in pesticide management plans covering current use pesticides with the goal of reducing the discharge of pesticides from municipal storm water to receiving water. Pesticide Management Plans shall address the Permittee's own use of pesticides, and to the extent authorized by law, the use of such pesticides by other sources within their jurisdictions. Pesticide Management Plans shall include identifying and promoting, within the context of integrated pest management (IPM) programs, the use of pest management practices that minimize the risk of pesticide impacts on surface water quality resulting from urban runoff discharges. Additionally, the Pesticide Management Plan shall include the integration of IPM into the Permittee's municipal operations and be

*UNOFFICIAL DRAFT — Not Certified by Clerk*

promoted to residents, businesses, and public agencies within each Permittee's jurisdiction through public outreach.

The Central Valley Regional Water Board Executive Officer may require revisions to the Pesticide Management Plans if the plan is not likely to attain the waste load allocations. Pesticide Management Plans may be submitted by individual Permittee or Permittee groups and may refer to actions required by other agencies or actions required elsewhere in this permit. Pesticide Management Plans may include actions to reduce MS4 pesticide discharges through participation or support of a regional or statewide pesticide reduction programs. To receive credit toward compliance for such participation, the Permittees must demonstrate that they have participated in the implementation of the program (i.e., contributing materially and in proportion in the size of a Permittee's service area, including, but not limited to, implementation of reduction program measures, membership, contribution of resources, etc.). Examples of programs that could be eligible include Our Water Our World (outreach), a recognized regional monitoring program, and California Stormwater Quality Association's (CASQA's) pesticide regulatory initiative. In developing the monitoring and reporting programs for specific Permittees, the Central Valley Water Board will, in coordination with DPR, assist the Permittee in identifying diazinon and chlorpyrifos alternatives for which monitoring may be necessary.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

## *Methylmercury*

**TMDL for the Delta** – *Methylmercury*

Effective Date: October 20, 2011
Resolution No.: R5-2010-0043
Phase II Entities: City of Lathrop, City of Lodi, City of Rio Vista, City of Tracy, City of West Sacramento, County of San Joaquin, County of Yolo
Impaired Water Body: Sacramento-San Joaquin Delta and Yolo Bypass waterways listed in Appendix 43 of the Basin Plan – Table A43-1

**Requirements for Implementing the TMDL:**

1. The Phase II entities identified in this TMDL section (hereinafter referred to as Permittees in this TMDL section) shall implement best management practices (BMPs) to control erosion and sediment discharges with the goal of reducing mercury discharges. This will be implemented through compliance with the following Small MS4 Permit requirements:

   - Discharge Prohibitions B.4
   - Section E.6.a Legal Authority
   - Section E.9 Illicit Discharge Detection and Elimination
   - Section E.10 Construction Site Storm Water Runoff Control Program
   - Section E.11 Pollution Prevention/Good Housekeeping
   - Section E.12 Post-Construction
   - Section E.13 Monitoring
   - Section E.14 Program Effectiveness

Order 2013-0001-DWQ as amended by Order 2017-XXXX-DWQ

*UNOFFICIAL DRAFT — Not Certified by Clerk*

- Section E.15 Compliance with Implementation Provisions

2. Between 2014 and 2020 (Phase 1 of the Delta Mercury Control Program), the large MS4 permittees (not part of this permit) in the Delta are developing and evaluating BMPs to control methylmercury discharges in storm water. During this period, the Permittees should implement methylmercury management practices identified by the large MS4 permittees or other management practices identified by the Delta Mercury Control Program studies that are reasonable and feasible.

3. The Permittees shall implement the Delta Mercury Exposure Reduction Program (see Water Quality Control Plan for the Sacramento River and San Joaquin River Basins, Chapter IV). This requirement may be met by ongoing participation in the collective Mercury Exposure Reduction Program work plan, dated October 2013 (https://www.waterboards.ca.gov/centralvalley/water_issues/tmdl/central_valley_projects/delta_hg/hg_exposure_reduction/2013oct_merp_wrkpln.pdf). Participation can include financial contributions and in-kind services that directly support exposure reduction activities.

4. The Permittees shall document in their annual report, compliance with erosion and sediment control requirements in this Order, including a discussion of effectiveness of BMPs. The Permittees shall submit a Program Effectiveness Assessment as specified in Section E.14. of the Permit.

5. As specified in section E.15.d, the Permittees shall document implementation of any methylmercury controls or best management practices in their Annual Reports.

**Monitoring Provisions:**

The following monitoring requirements apply after the Central Valley Water Board's review of Delta Mercury Control Program, (see the Delta Mercury Control Program in the Basin Plan) or 20 October 2022, whichever date occurs first.

1. a. The Permittees shall begin monitoring methylmercury loads and concentrations in storm water discharges to assess attainment with the TMDL allocations. Within one year of the Delta Mercury Control Program review, (or 20 October 2022, whichever date occurs first), the Permittees shall submit a plan, for Central Valley Regional Water Board Executive Officer approval, describing the locations and frequency of methylmercury monitoring. The Plan shall be representative of the MS4 service area. The sampling locations, frequencies, and reporting may be the same as the requirements in this Order. The Permittees shall implement the monitoring plan within six (6) months of Central Valley Regional Water Board Executive Officer approval.

   b. With Central Valley Regional Water Board Executive Officer approval, the Permittees may participate in the Delta Regional Monitoring Program or other collective monitoring efforts in lieu of some or all of the individual monitoring requirements required by this section.

   c. Permittees that implement individual water quality monitoring pursuant to 1.a., above, must submit a Monitoring Plan and Quality Assurance Project Plan (QAPP) to the Executive Officer for review and approval.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 376 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

i) Monitoring Plan – at a minimum, the Monitoring Plan must include the following information:

1) Management questions to be answered by the Monitoring Plan,
2) Constituents to be monitored, analytical methods, and reporting limits,
3) Sampling site(s) locations, including latitude and longitude coordinates, water body name and water body segment if applicable,
4) Other monitoring efforts that will provide supplemental data for the local water quality monitoring program and assessment (if any),
5) Proposed schedule and level of detail for monitoring reports. If a more comprehensive report is necessary every few years, the Monitoring Plan shall propose a schedule and description of the level of detail (consistent with the information described below) that will be included within the Annual Reports.

ii) Quality Assurance Project Plan (QAPP) consistent with Surface Water Ambient Monitoring Program (SWAMP). All samples shall be collected and analyzed according to the QAPP. Monitoring Reports shall be submitted with the Annual Report and include the following information (consistent with the approved Monitoring Plan):

a. The purpose of the monitoring, brief contextual background, and a brief description of the study design and rationale;
b. Methods used for sample collection: list methods used for sample collection, sample or data collection identification, collection date, and media if applicable;
c. Identification of and rationale for any deviations from the QAPP;
d. Results of data collection, including concentration detected, measurement units, reporting limits, and detection limits, if applicable;
e. Quantifiable assessment, analysis and interpretation of data for each monitoring parameter;
f. Comparison to reference sites (if applicable), guidelines or targets;
g. Discussion of whether data collected addresses the objective(s) or question(s) of study design;
h. Quantifiable discussion of program/study pollutant reduction effectiveness.

2. Progress toward attainment of the waste load allocations (WLA) shall be documented in the Annual Report by monitoring methylmercury loads from the MS4 or by quantifying the annual average methylmercury load reduced by implementing pollution prevention activities and source and treatment controls. The Delta Mercury Control Program (see Water Quality Control Plan for the Sacramento River and San Joaquin River Basins, Chapter IV) provides guidance for the calculation of methylmercury loading from urban areas and determination of attainment. The assessment information may come from the Permittee's monitoring efforts, monitoring programs conducted by State or federal agencies or collaborative watershed efforts, or from special studies that evaluate the effectiveness of management practices, as approved by the Central Valley Regional Water Board Executive Officer.

By December 31, 2030, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## Nutrients

**TMDL for Clear Lake** – *Nutrients*

Effective Date: September 21, 2007
BPA: Chapter IV-37.04
Resolution No.: R5-2006-0060
Phase II Entities: City of Clearlake, County of Lake, City of Lakeport
Impaired Water Body: Clear Lake

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section (hereinafter referred to as Permittees in this TMDL section) shall implement best management practices (BMPs) to control erosion and sediment discharges as a means of controlling phosphorous. These will be implemented through compliance with the following Small MS4 Permit requirements:

- Discharge Prohibitions B.4
- Section E.6.a. Legal Authority
- Section E.9. Illicit Discharge Detection and Elimination
- Section E.10. Construction Site Storm Water Runoff Control Program
- Section E.11. Pollution Prevention/Good Housekeeping
- Section E.12. Post-Construction
- Section E.13. Monitoring
- Section E.14. Program Effectiveness
- Section E.15 Compliance with Implementation Provisions

The Permittees shall document implementation of erosion and sediment BMPs in their Annual Reports as specified in Section E.15.d of this Order. Each Annual Report shall include documentation of compliance with the above Permit requirements. Permittees shall complete and submit Program Effectiveness Assessments as specified in Section E.14 of this Order. The Permittees shall use the information gained from the Program Effectiveness Assessments to improve their program and identify new BMPs or modifications of existing BMPs.

**Monitoring Provisions:**

1. By July 1, 2019, each Permittee shall incorporate individual monitoring and reporting plans, or the Permittees can collectively incorporate a single monitoring plan, into their respective Storm Water Management Plans approved under the previous 2003 Permit (State Water Board Order 2003-0005-DWQ). The monitoring plans shall enable the Central Valley Water Board to evaluate the MS4 Permittee's progress toward attainment of the WLAs and shall be representative of the respective MS4 service area.

2. With Central Valley Regional Water Board Executive Officer approval, the Permittees may participate in a regional monitoring program or other collective monitoring efforts in lieu of some or all of the individual monitoring requirements required by this section.

3. Permittees that implement individual water quality monitoring pursuant to this provision must submit a Monitoring Plan and Quality Assurance Project Plan (QAPP) to the Executive Officer for review and approval.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

a) Monitoring Plan – at a minimum, the Monitoring Plan must include the following information:

   i)   Management questions to be answered by the Monitoring Plan,
   ii)  Constituents to be monitored, analytical methods, and reporting limits,
   iii) Sampling site(s) locations, including latitude and longitude coordinates, water body name and water body segment if applicable,
   iv)  Other monitoring efforts that will provide supplemental data for the local water quality monitoring program and assessment (if any),
   v)   Proposed schedule and level of detail for monitoring reports. If a more comprehensive report is necessary every few years, the Monitoring Plan shall propose a schedule and description of the level of detail (consistent with the information described below) that will be included within the Annual Reports.

b) Quality Assurance Project Plan (QAPP) consistent with Surface Water Ambient Monitoring Program (SWAMP). All samples shall be collected and analyzed according to the QAPP. Monitoring Reports shall be submitted with the Annual Report and include the following information (consistent with the approved Monitoring Plan):

   i)    The purpose of the monitoring, brief contextual background, and a brief description of the study design and rationale;
   ii)   Methods used for sample collection: list methods used for sample collection, sample or data collection identification, collection date, and media if applicable;
   iii)  Identification of and rationale for any deviations from the QAPP;
   iv)   Results of data collection, including concentration detected, measurement units, reporting limits, and detection limits, if applicable;
   v)    Quantifiable assessment, analysis and interpretation of data for each monitoring parameter;
   vi)   Comparison to reference sites (if applicable), guidelines or targets;
   vii)  Discussion of whether data collected addresses the objective(s) or question(s) of study design;
   viii) Quantifiable discussion of program/study pollutant reduction effectiveness

4. Progress toward attainment of the WLA shall be documented in the Annual Report.

Permittees may work with Central Valley Regional Water Board staff to estimate nutrient loadings from activities in the watershed. Loading estimates can be conducted using either water quality monitoring or computer modeling or a combination of the two.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

## *Organic Enrichment and Low Dissolved Oxygen*

**TMDL for Lower San Joaquin River, San Joaquin River, Stockton Deep Water Ship Channel TMDL** – *Organic Enrichment and Low Dissolved Oxygen*

Effective Date: February 27, 2007
BPA: Chapter IV-37.01

*UNOFFICIAL DRAFT — Not Certified by Clerk*

Resolution No.: R5-2005-005

Phase II Entities: Atwater City, Ceres City, Escalon City, Hughson City, Lathrop City, Livingston City, Los Banos City, Manteca City, Merced City, Merced County, Newman City, Oakdale City, Patterson City, Ripon City, Riverbank City, San Joaquin County, Stanislaus County, Turlock City

Impaired Water Body: Lower San Joaquin River (Stockton Deep Water Ship Channel, DWSC)

**Requirements for Implementing the TMDL:**

The Phase II Entities identified within this TMDL section (hereinafter referred to as Permittees in this TMDL section) shall implement best management practices (BMPs) to control the discharge of oxygen demanding substances and their precursors in their urban discharge. This will be implemented through compliance with the following Small MS4 Permit requirements:

- Discharge Prohibitions B.4
- Section E.6.a. Legal Authority
- Section E.9. Illicit Discharge Detection and Elimination
- Section E.10. Construction Site Storm Water Runoff Control Program
- Section E.11. Pollution Prevention/Good Housekeeping
- Section E.12. Post-Construction
- Section E.13. Monitoring
- Section E.14. Program Effectiveness
- Section E.15 Compliance with Implementation Process

In measuring compliance with permit requirements related to attainment of these wasteload allocations (WLAs), credit will be given for control measures implemented after July 12, 2004.

The Permittees shall document, in their Annual Reports, the implementation of BMPs to control the discharge of oxygen demanding substances and precursors in their urban discharge. Each Annual Report shall include documentation of compliance with the Permit requirements and a discussion of the effectiveness of the BMPs. The Permittees shall use the information gained from the Program Effectiveness Assessments to improve their program and identify new BMPs or modifications of existing BMPs to ensure that they are meeting applicable WLAs. The Program Effectiveness Assessment information may come from the Permittees' monitoring efforts; monitoring programs conducted by State or federal agencies or collaborative watershed efforts; or from special studies that evaluate the effectiveness of management practices.

**Monitoring Provisions:**

1. By January 1, 2020, Permittees shall submit the Monitoring and Reporting Plan consistent with E.13 for Central Valley Regional Water Board Executive Officer approval;

2. With Central Valley Regional Water Board Executive Officer approval, the Permittees may participate in the Delta Regional Monitoring Program or other collective monitoring efforts in lieu of some or all of the individual monitoring requirements required by this section.

3. Permittees that implement individual water quality monitoring pursuant to this provision must submit a Monitoring Plan and Quality Assurance Project Plan (QAPP) to the Executive Officer for review and approval.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

a) Monitoring Plan – at a minimum, the Monitoring Plan must include the following information:

i) Management questions to be answered by the Monitoring Plan,

ii) Constituents to be monitored, analytical methods, and reporting limits,

iii) Sampling site(s) locations, including latitude and longitude coordinates, water body name and water body segment if applicable,

iv) Other monitoring efforts that will provide supplemental data for the local water quality monitoring program and assessment (if any),

v) Proposed schedule and level of detail for monitoring reports. If a more comprehensive report is necessary every few years, the Monitoring Plan shall propose a schedule and description of the level of detail (consistent with the information described below) that will be included within the Annual Reports.

b) Quality Assurance Project Plan (QAPP) consistent with Surface Water Ambient Monitoring Program (SWAMP). All samples shall be collected and analyzed according to the QAPP. Monitoring Reports shall be submitted with the Annual Report and include the following information (consistent with the approved Monitoring Plan):

i) The purpose of the monitoring, brief contextual background, and a brief description of the study design and rationale;

ii) Methods used for sample collection: list methods used for sample collection, sample or data collection identification, collection date, and media if applicable;

iii) Identification of and rationale for any deviations from the QAPP;

iv) Results of data collection, including concentration detected, measurement units, reporting limits, and detection limits, if applicable;

v) Quantifiable assessment, analysis and interpretation of data for each monitoring parameter;

vi) Comparison to reference sites (if applicable), guidelines or targets;

vii) Discussion of whether data collected addresses the objective(s) or question(s) of study design;

viii) Quantifiable discussion of program/study pollutant reduction effectiveness.

4. Progress toward attainment of the WLA shall be documented in the Annual Report.

By January 1, 2019, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## Region 6: Lahontan Regional Water Board

### *Sediment*

**TMDL for Middle Truckee River Watershed, Placer, Nevada and Sierra Counties** – *Sediment*

Effective Date: May 14, 2008
BPA: Section 4.13
Resolution No.: R6T-2008-0019
Phase II Entities: County of Placer, City of Truckee
Impaired Water Body: Truckee River

**Requirements for Implementing the TMDL:**

The Phase II entities identified in this TMDL section (hereinafter referred to as Permittees in this TMDL section) shall develop, implement, and report best management practices (BMPs) as follows:

1. Road sand application BMPs and recovery tracking - Road sand shall be applied using BMPs and recovered to the maximum extent practicable. Amounts of road abrasives and de-icing agents applied and recovered must be monitored and reported annually.

2. Dirt roads maintained or decommissioned - Identified dirt roads with inadequate erosion control structures shall be rehabilitated and maintained, or decommissioned. Permittees shall focus on dirt roads with high potential for sediment delivery to surface waters (e.g., within 200 feet of watercourse).

3. Legacy sites restoration and best management practices implementation - Identified legacy sites shall be restored or storm water BMPs shall be implemented to prevent erosion and sedimentation to surface waters.

4. Implement an Education and Outreach program, consistent with Section E.7. of the Order, for the targeted audience of ski areas within the jurisdictional boundaries of the permittees, focusing on sediment and erosion control for those facilities.

5. Continue to implement the most recent municipal monitoring program as approved by the Regional Water Board or it's designee.

By May 14, 2028, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## Region 8: Santa Ana Regional Water Board

### *Bacterial Indicator*

**TMDL for Middle Santa Ana River** – *Bacterial Indicator*

Effective date: September 1, 2006
Resolution No.: R8-2005-0001
Phase II Entities: CA Institute for Men, CA Institute for Women, CA Rehab Center, University of California, Riverside
Impaired Water Body: Santa Ana River, Reach 3, Chino Creek, Mill Creek, Prado Park Lake

**Requirements for Implementing the TMDL**

The Phase II entities identified in this TMDL section (hereinafter referred to as Permittees in this TMDL section) shall:

1. Monitoring Program: By January 1, 2019, submit for approval by the Regional Water Board or its designee a watershed-wide attainment monitoring and facility specific bacterial indicator monitoring program that is adequate to determine attainment with the dry and wet season waste load allocation. The Permittees may alternatively participate in a stakeholder group monitoring program for the same purpose. The monitoring program must be consistent with the existing Santa Ana River Watershed Bacteria Monitoring Program – Monitoring Plan, approved by the Regional Water Board on March 11, 2016 (or the most current, Regional Water Board approved revision).

2. By January 1, 2019, either a) develop a facility-specific Bacterial Indicator Reduction Plan or b) join an updated watershed-based Bacterial Indicator Reduction Plan (within the Santa Ana River watershed).

For those entities that choose to develop facility-specific Bacterial Indicator Reduction Plans, the following applies:

1. Dry Season Bacterial Indicator Reduction Plan - Develop a facility specific Bacterial Reduction Plan that details the plan and schedule for achieving the Dry Season Bacterial Indicator WLA as soon as feasible.
2. Wet Season Bacterial Indicator Reduction Plan – Develop a facility specific Bacterial Reduction Plan that details the plan and schedule for achieving the Wet Season Bacterial Indicator WLA by December 31, 2025.

The Dry Season and Wet Season Bacterial Indicator Reduction Plans should include the following:

1. The specific Best Management Practices (BMPs) implemented to reduce the concentration of indicator bacteria from the facility and the water quality improvements expected to result from these BMPs.

2. Any specific regional treatment facilities and the locations where such facilities will be built to reduce the concentration of indicator bacteria discharged from the facility and the expected water quality improvements to result when complete.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

3. The technical documentation used to conclude that the Bacterial Indicator Reduction Plan, once fully implemented, is expected to achieve attainment of either the dry season or wet season urban wasteload allocation for indicator bacteria by the specified attainment date.

4. A detailed schedule for implementing the Bacterial Indicator Reduction Plan. The schedule must identify measurable and verifiable milestones to assess satisfactory progress toward meeting the dry and wet season wasteload allocations.

5. The specific metric(s) that will be established to demonstrate the effectiveness of the Bacterial Indicator Reduction Plan.

6. Detailed descriptions of any additional BMPs planned, and the time required to implement those BMPs, in the event that data from the watershed-wide water quality monitoring program indicate that water quality objectives for indicator bacteria are still being exceeded after the Bacterial Indicator Reduction Plan is fully implemented.

By January 1, 2019, the permittees shall demonstrate attainment of the Dry Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order. By December 31, 2025, the permittees shall demonstrate attainment of the Wet Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

## *Nutrients*

**TMDL for Lake Elsinore/Canyon Lake** – *Nutrients*

Resolution No.: R8-2004-0037
Effective date: July 26, 2005
Phase II Entities: March Air Reserve Base (ARB)
Impaired Water Body: Lake Elsinore, Canyon Lake

**Lake Elsinore/Canyon Lake Nutrient TMDL Joint Responsibility Option**
March ARB shall implement the following actions:

a. March ARB has already committed to cooperative implementation actions, monitoring actions, special studies and implementation actions jointly with other responsible agencies as an active paying member of the Lake Elsinore/Canyon Lake TMDL Task Force. March ARB shall continue with those actions in accordance with paragraph I.H. of the Agreement to Form the Lake Elsinore and Canyon Lake TMDL Task Force, dated June 18, 2012.

b. If the Regional Water Board is notified that March ARB is not fulfilling its Lake Elsinore/Canyon Lake Task Force obligations or if March ARB chooses to opt out of the cooperative approach with the TMDL Task Force for implementation actions, monitoring actions, and/or special studies, March ARB shall provide formal notification to the Regional Water Board. March ARB will then be required to conduct the following activities:

1. Within 30 days of such notification, submit a proposed update of the March ARB SWPPP to address nutrient discharges;
2. Within 30 days of such notification, submit a proposed March ARB specific nutrient monitoring program. This monitoring program must be prepared and executed in a manner that attainment of waste load allocations will be determined. The monitoring

*UNOFFICIAL DRAFT — Not Certified by Clerk*

program must be consistent with the most current, Regional Water Board approved, Lake Elsinore/Canyon Lake TMDL Task Force monitoring plan;

3. Within 60 days of such notification, submit a proposed water quality monitoring program to evaluate the impairment status of Lake Elsinore and Canyon Lake.

4. Submit an annual report by August 15th of each year.

By December 31, 2020, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.


## *Organochlorine Compounds*

**TMDL for San Diego Creek, Upper and Lower Newport Bay** – *Organochlorine Compounds*

Effective date: July 2013
Resolution No.: 2011-0037
Phase II Entities: Orange County Fairgrounds, University of California, Irvine
Impaired Water Body: San Diego Creek, Upper Newport Bay, Lower Newport Bay

**Requirements for Implementing the TMDL:** The Orange County Fairgrounds and the University of California, Irvine shall:

1. Per the Small MS4 Monitoring Flow Chart in this Order, the Permittees are:

   a. Not covered under an Ocean Plan Exception;
   b. Are identified in Attachment G (as noted under Phase II Entities here);
   c. Are not required to conduct Water Quality Monitoring; and
   d. Do discharge to a waterbody/waterbodies impaired (on 303(d) list for organochlorine compounds) by urban runoff.

   Therefore, the Permittees must initiate consultation with Regional Water Board staff by February 1, 2019 to determine the implementation and monitoring requirements (contained in a TMDL Attainment Plan) for San Diego Creek, Upper Newport Bay, and Lower Newport Bay.

3. As a result of the consultation with Regional Water Board staff, the Permittees shall submit their final TMDL Attainment Plan by February 1, 2020 to the Regional Water Board's Executive Officer. The Permittees shall implement the TMDL Attainment Plan immediately upon submittal.

By December 31, 2020, the permittees shall demonstrate attainment of the TMDL WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## Region 9: San Diego Regional Water Board

### *Indicator Bacteria*

**Bacteria Project I – Twenty Beaches and Creeks in the San Diego Region (Including Tecolote Creek)** – *Indicator Bacteria*

Effective Date: April 4, 2011
Resolution No.: R9-2010-0001
Phase II Entities: 22nd District Agricultural Association, California State University at San Marcos, Marine Corps Air Station Miramar, Marine Corps Base Camp Pendleton, North County Transit District, San Diego State University, San Diego Veterans Administration Medical Center, University of California San Diego
Impaired Water Body: 20 impaired water quality limited segments within the following watersheds or portions of watersheds: Laguna/San Joaquin, San Juan, San Clemente, San Luis Rey, San Marcos, San Dieguito River, Miramar Creek, Scripps HA, Tecolate HA, San Diego River, and Chollas Creek

**Requirements for Implementing the Bacteria Project I – Twenty Beaches and Creeks TMDL**

The Phase II entities identified in this TMDL section (hereinafter referred to as Permittees in this TMDL section) must take the following actions to meet the requirements of this TMDL:

1. Develop and implement the Storm Water Pollution Prevention Plan (SWPPP) as required by section F.5.f.4 of this Order including additional measures necessary to achieve reductions in fecal coliform, enterococcus, and total coliform by the final attainment dates as required by the TMDL. The SWPPP must include short term and long-term Best Management Practices (BMPs) strategies appropriate for the prioritization schedule in Attachment A, pages A-63 through A-65 of Resolution No. R9-2010-0001.

2. By July 1, 2019, monitor discharges from their facilities including MS4 discharge locations to demonstrate progress towards attainment with final waste load allocations. The monitoring and assessment results must be submitted as part of the Annual Reports required under section F.5.j. of this Order.

3. The Permittees are encouraged to collaborate and coordinate with Phase I MS4s and other responsible parties to the Bacteria I TMDL using an adaptive framework approach as part of the waste load reduction planning and implementation strategies in the required SWPPP pursuant to section F of this Order and monitoring required pursuant to section F.5.i.4. Coordinated efforts by all responsible parties will accomplish the waste load reductions required in the TMDLs faster and achieve the ultimate goal of improving water quality as soon as possible.

By April 4, 2021, the permittees shall demonstrate attainment of the Dry Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order. By April 4, 2031 (or April 4, 2021 if SWPPP does not contain load reduction programs for other pollutants), the permittees shall demonstrate attainment of the Wet Weather WLA as specified in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

## Sediment

**TMDL for Los Peñasquitos Lagoon** – *Sediment*

Effective Date: July 14, 2014
Resolution No. R9-2012-0033
Phase II Entities: Marine Corps Air Station Miramar, San Diego Veterans Administration
    Medical Center, University of California San Diego, North County Transit District
Impaired Water Body: Los Peñasquitos Lagoon

**Requirements for Implementing the TMDL**

The Phase II entities identified in this TMDL section (hereinafter referred to as Permittees in
this TMDL section) must take the following actions to meet the requirements of this TMDL:

1. Develop and implement the Storm Water Pollution Prevention Plan (SWPPP) required by
   Provision F.5.f.4 of this Order to achieve reductions in sediment by the final TMDL
   attainment date. The development of a SWPPP to address the TMDL fulfills the
   responsibility for Phase II Copermittees to prepare a Load Reduction Plan (LRP). The
   SWPPP must be updated by July 1, 2019 with any additional BMPs, monitoring, or other
   measures needed to account for the Phase II site's potential to impact the receiving water
   body with respect to sediment. Permittees are responsible for reducing their sediment
   loads to the receiving water body or demonstrate that their discharges are not causing
   exceedances of the wasteload allocation.
2. By March 1, 2019 monitor sediment discharges from their facilities including MS4
   discharge locations to demonstrate progress towards attainment of final waste load
   allocations. The monitoring, at a minimum, shall include representative flow rates and total
   suspended solids concentrations from individual discharger's facilities. The monitoring
   and assessment results must be submitted as part of the Annual Reports required under
   section E.16 of this Order.
3. The Permittees are encouraged to collaborate and coordinate with Phase I MS4s and
   other responsible parties to the Los Peñasquitos Lagoon Sediment TMDL using an
   adaptive framework approach as part of the waste load reduction planning and
   implementation strategies in the required SWPPP pursuant to section F of this Order.
   Coordinated efforts by all responsible parties will accomplish the waste load reductions
   required in the TMDLs faster and achieve the ultimate goal of improving water quality as
   soon as possible.

By July 14, 2034, the permittees shall demonstrate attainment of the TMDL WLA as specified
in Section E.15.a.(ii). or F.5.i.1.(ii). of this Order.

Case 2:20-cv-02482-WBS-AC     Document 95-7     Filed 11/28/22     Page 387 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

# Attachment H — Acronyms & Abbreviations

## Acronyms and Abbreviations

| | |
|---|---|
| ASBS | Area of Special Biological Significance |
| BMP | Best Management Practices |
| CASQA | California Stormwater Quality Association |
| CEDEN | California Environmental Data Exchange Network |
| CFR | Code of Federal Regulations |
| CGP | Construction General Permit |
| CWA | Clean Water Act |
| DEM | Digital Elevation Model |
| DMA | Drainage Management Area |
| GIS | Geographic Information System |
| GPS | Global Positioning System |
| IGP | Industrial General Permit |
| LID | Low Impact Development |
| LUP | Linear Utility Project |
| MEP | Maximum Extent Practicable |
| MS4 | Municipal Separate Storm Sewer System |
| NOI | Notice of Intent |
| NPDES | National Pollutant Discharge Elimination System |
| O&M | Operation and Maintenance |
| PAH | Polycyclic Aromatic Hydrocarbon |
| SMARTS | Storm Water Multi-Application, Reporting, and Tracking System |
| SWMP | Storm Water Management Plan |
| SWPPP | Storm Water Pollution Prevention Plan |
| TMDL | Total Maximum Daily Load |
| QAPP | Quality Assurance Project Plan |
| QSD | Qualified SWPPP Developer |
| QSP | Qualified SWPPP Preparer |
| USEPA | United States Environmental Protection Agency |

*UNOFFICIAL DRAFT — Not Certified by Clerk*

# Attachment I — GLOSSARY

**Activism** – is the practice of action or involvement as a means of achieving goals.

**At the Point of Discharge(s)** – Means in the surf zone immediately where runoff from an outfall meets the ocean water (a.k.a., at point zero).

**Beneficial Uses** – The Uses of water of the state protected against degradation, such as domestic, municipal, agricultural and industrial supply; power generation; recreation; aesthetic enjoyment; navigation and preservation of fish and wildlife, and other aquatic resources or preserves.

**Catch Basin** – A catch basin (a.k.a, storm drain inlet) is an inlet to the storm drain system that typically includes a grate or curb inlet where storm water enters the catch basin and a sump to capture sediment, debris and associated pollutants. Catch basins act as pretreatment for other treatment practices by capturing large sediments. The performance of catch basins at removing sediment and other pollutants depends on the design of the catch basin (e.g., the size of the sump), and routine maintenance to retain the storage available in the sump to capture sediment.

**Common Plan or Development or Sale** – U.S. EPA regulations include the term "common plan of development or sale" to ensure that acreage within a common project does not artificially escape the permit requirements because construction activities are phased, split among smaller parcels, or completed by different owners/developers. In the absence of an exact definition of "common plan of development or sale," the State Water Board is required to exercise its regulatory discretion in providing a commonsense interpretation of the term as it applies to construction projects and permit coverage. The common plan of development is generally a contiguous area where multiple, distinct construction activities may be taking place at different times under one plan. A plan is generally defined as any piece of documentation or physical demarcation that indicates that construction activities may occur on a common plot. Such documentation could consist of a tract map, parcel map, demolition plans, grading plans, or contract documents. Any of these documents could delineate the boundaries of a common plan area. However, broad planning documents, such as land use master plans, conceptual master plans, or broad-based CEQA or NEPA documents that identify potential projects for an agency or facility are not considered common plans of development. An overbroad interpretation of the term would render meaningless the clear "one acre" federal permitting threshold and would potentially trigger permitting of almost any construction activity that occurs within an area that had previously received area-wide utility or road improvements.

**Community Based Social Marketing (CBSM)** – A systematic way to change the behavior of communities to reduce their impact on the environment. Realizing that simply providing information is usually not sufficient to initiate behavior change, CBSM uses tools and findings from social psychology to discover the perceived barriers to behavior change and ways of overcoming these barriers.

**Construction Site** – Any project, including projects requiring coverage under the General Construction Permit, that involves soil disturbing activities including, but not limited to, clearing, grading, paving, disturbances to ground such as stockpiling, and excavation.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**Design Storm** – For purposes of these Special Protections, a design storm is defined as the volume of runoff produced from one inch of precipitation per day or, if this definition is inconsistent with the discharger's applicable storm water permit, then the design storm shall be the definition included in the discharger's applicable storm water permit.

**Direct Discharge** – A discharge that is routed directly to waters of the United States by means of a pipe, channel, or ditch (including a municipal storm sewer system), or through surface runoff.

**Discharge of a Pollutant** – The addition of any pollutant or combination of pollutants to waters of the United States from any point source, or any addition of any pollutant or combination of pollutants to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft which is being used as a means of transportation. The term includes additions of pollutants to waters of the United States from: surface runoff which is collected or channeled by man; discharges through pipes, sewers, or other conveyances owned by a State, municipality, or other person which do not lead to a treatment works; and discharges through pipes, sewers, or other conveyances, leading into privately owned treatment works.

**Discharger** – Any responsible party or site owner or operator within the Permittees' jurisdiction whose site discharges storm water runoff, or a non-storm water discharge.

**Detached Single-family Home Project** – The building of one single new house or the addition and/or replacement of impervious surface associated with one single existing house, which is not part of a larger plan of development.

**Dry Weather** – Refers to season where prolonged dry periods occur; in California's Mediterranean climate, it usually corresponds to the period between May and September.

**Erosion** – The physical detachment of soil due to wind or water. Often the detached fine soil fraction becomes a pollutant transported storm water runoff. Erosion occurs naturally, but can be accelerated by land disturbance and grading activities such as farming, development, road building, and timber harvesting.

**Erosion Control Measures** – Measures used to minimize soil detachment. These may include: Vegetation, either undisturbed or planted (e.g., grasses, wildflowers), and other materials, such as straw (applied over bare soil, crimped into soil); protective erosion control blankets; fiber (applied as mulch or hydromulch); and mulch (avoid plastics if possible).

**Sediment Control Measures** – Measures used to trap and/or retain detached soil before discharging to receiving waters. These may include: fiber rolls (e.g., keyed-in straw wattles, compost rolls); silt fence; retention basins; and active treatment systems.

**Flood Management Facilities** – Facilities or structures designed for the explicit purpose of controlling flood waters safely in or around populated areas. (e.g., dams, levees, bypass areas). Facilities or structures designed for the explicit purpose of controlling flood waters safely in or around populated areas (e.g., dams, levees, bypass areas). Flood management facilities do not include traditional stormwater conveyance structures (e.g. stormwater sewerage, pump stations, catch basins, etc.)

**Grading** – The cutting and/or filling of the land surface to a desired slope or elevation.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**Healthy Watershed** – Healthy watersheds are watersheds that function well ecologically and are sustainable. They support healthy, diverse aquatic habitat, have healthy riparian areas and corridors with sufficient vegetative buffer area to minimize land pollutant runoff into surfaces waters, sufficient cover and canopy to maintain healthy habitat, and have near natural levels of sediment transport. Surface waters meet water quality objectives, and sediments are sufficiently low in pollutants to provide for healthy habitat. Groundwaters are near natural levels in quantity and quality, for water supply purposes and for base flow for sustaining creek habitat and migratory fish routes. A Healthy Watershed sustains these characteristics through measures that ensure the dynamics that provide these healthy factors and functions are protected. For example, watersheds must be protected, through low impact development or other forms of protection, from hydromodification that adversely affects recharge areas' function or creeks' bed or bank stability. Creek buffer/riparian areas must be protected from land disturbance activities. Healthy sustainable watersheds use less energy for imported water, have fewer greenhouse gas emissions, and a lesser carbon footprint than unhealthy watersheds.

**Hotspot** – Hotspots are specific operations and areas in a sub watershed that may generate high storm water pollution. Hotspots are high priority sites.

**Hydromodification** – Modification of hydrologic pathways (precipitation, surface runoff, infiltration, groundwater flow, return flow, surface-water storage, groundwater storage, evaporation and transpiration) that results in negative impacts to watershed health and functions.

**HUC 12 Watershed** – The hydrologic unit code (HUC) is the "address" of the watershed. The HUC is the numerical code of the USGS watershed classification system used to identify the watersheds, or drainage basins, at various scales. The HUC organizes watersheds by a nested size hierarchy, so large scale watershed boundaries for an entire region may be assigned a two- digit HUC, while small scale, local watershed boundaries (within the larger regional watershed) may be assigned a 12-digit HUC. A HUC-12 watershed averages 22 square miles in size.

**Illicit Discharge** – Any discharge to a municipal separate storm sewer (storm drain) system (MS4) that is prohibited under local, state, or federal statutes, ordinances, codes, or regulations. The term illicit discharge includes all non-storm water discharges not composed entirely of storm water and discharges that are identified under the Discharge Prohibitions section of this General Permit. The term illicit discharge does not include discharges that are regulated by an NPDES permit (other than the NPDES permit for discharges from the MS4).

**Impaired Waterbody** – A waterbody (i.e., stream reaches, lakes, waterbody segments) with chronic or recurring monitored violations of the applicable numeric and/or narrative water quality criteria. An impaired water is a water that has been listed on the California 303(d) list or has not yet been listed but otherwise meets the criteria for listing. A water is a portion of a surface water of the state, including ocean, estuary, lake, river, creek, or wetland. The water currently  may not be meeting state water quality standards or may be determined to be threatened and have the potential to not meet standards in the future. The State of California's 303(d) list can be found at http://www.swrcb.ca.gov/quality.html.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 391 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**Impervious Surface** – A surface covering or pavement of a developed parcel of land that prevents the land's natural ability to absorb and infiltrate rainfall/storm water. Impervious surfaces include, but are not limited to; roof tops, walkways, patios, driveways, parking lots, storage areas, impervious concrete and asphalt, and any other continuous watertight pavement or covering. Landscaped soil and pervious pavement, including pavers with pervious openings and seams, underlain with pervious soil or pervious storage material, such as a gravel layer sufficient to hold the specified volume of rainfall runoff are not impervious surfaces.

**Industrial Development** – Development or redevelopment of property to be used for industrial purposes, such as factories, manufacturing buildings, and research and development parks.

**Infill Site** – A site in an urbanized area where the immediately adjacent parcels are developed with one or more qualified urban uses or at least 75% of the perimeter of the site adjoins parcels that are developed with qualified urban uses and the remaining 25% of the site adjoins parcels that have previously been developed for qualified urban uses and no parcel within the site has been created within the past 10 years.

**Joint Storm Water Treatment Facility** – A storm water treatment facility built to treat the combined runoff from two or more Regulated Projects.

**Linear Underground/Overhead Projects (LUPs)** – Include, but are not limited to, any conveyance, pipe, or pipeline for the transportation of any gaseous, liquid (including water and wastewater for domestic municipal services), liquiescent, or slurry substance; any cable line or wire for the transmission of electrical energy; any cable line or wire for communications (e.g., telephone, telegraph, radio, or television messages); and associated ancillary facilities. Construction activities associated with LUPs include, but are not limited to, (a) those activities necessary for the installation of underground and overhead linear facilities (e.g., conduits, substructures, pipelines, towers, poles, cables, wires, connectors, switching, regulating and transforming equipment, and associated ancillary facilities); and include, but are not limited to, (b) underground utility mark-out, potholing, concrete and asphalt cutting and removal, trenching, excavation, boring and drilling, access road and pole/tower pad and cable/wire pull station, substation construction, substructure installation, construction of tower footings and/or foundations, pole and tower installations, pipeline installations, welding, concrete and/ or pavement repair or replacement, and stockpile/borrow locations.

**Low Impact Development** – A sustainable practice that benefits water supply and contributes to water quality protection. Unlike traditional storm water management, which collects and conveys storm water runoff through storm drains, pipes, or other conveyances to a centralized storm water facility, Low Impact Development (LID) takes a different approach by using site design and storm water management to maintain the site's pre-development runoff rates and volumes. The goal of LID is to mimic a site's predevelopment hydrology by using design techniques that infiltrate, filter, store, evaporate, and detain runoff close to the source of rainfall. LID has been a proven approach in other parts of the country and is seen in California as an alternative to conventional storm water management.

**Marine Operations** – Marinas or mooring fields that contain slips or mooring locations for 10 or more vessels.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 392 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**Maximum Extent Practicable (MEP)** – The minimum required performance standard for implementation of municipal storm water management programs to reduce pollutants in storm water. Clean Water Act § 402(p)(3)(B)(iii) requires that municipal permits "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants." MEP is the cumulative effect of implementing, evaluating, and making corresponding changes to a variety of technically appropriate and economically feasible BMPs, ensuring that the most appropriate controls are implemented in the most effective manner. This process of implementing, evaluating, revising, or adding new BMPs is commonly referred to as the iterative process.

**Mixed-use Development or Redevelopment** – Development or redevelopment of property to be used for two or more different uses, all intended to be harmonious and complementary. An example is a high-rise building with retail shops on the first 2 floors, office space on floors 3 through 10, apartments on the next 10 floors, and a restaurant on the top floor.

**Municipal Separate Storm Sewer System (MS4)** – The regulatory definition of an MS4 (40 CFR 122.26(b)(8)) is "a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains): (i) Owned or operated by a state, city, town, borough, county, parish, district, association, or other public body (created to or pursuant to state law) including special districts under state law such as a sewer district, flood control district or drainage district, or similar entity, or an Indian tribe or an authorized Indian tribal organization, or a designated and approved management agency under section 208 of the Clean Water Act that discharges into waters of the United States. (ii) Designed or used for collecting or conveying storm water;(iii) Which is not a combined sewer; and (iv) Which is not part of a Publicly Owned Treatment Works (POTW) as defined at 40 CFR 122.2."In practical terms, operators of MS4s can include municipalities and local sewer districts, state and federal departments of transportation, public universities, public hospitals, military bases, and correctional facilities. The Storm water Phase II Rule added federal systems, such as military bases and correctional facilities by including them in the definition of small MS4s.

**National Pollutant Discharge Elimination System (NPDES)** – A national program for issuing, modifying, revoking and reissuing, terminating, monitoring and enforcing permits, and imposing and enforcing pretreatment requirements, under sections 307, 402, 318, and 405 of the CWA.

**Natural Ocean Water Quality** – The water quality (based on selected physical, chemical and biological characteristics) that is required to sustain marine ecosystems, and which is without apparent human influence, *i.e.*, an absence of significant amounts of: (a) man-made constituents (*e.g.,* DDT); (b) other chemical (*e.g.,* trace metals), physical (temperature/thermal pollution, sediment burial), and biological (*e.g.*, bacteria) constituents at concentrations that have been elevated due to man's activities above those resulting from the naturally occurring processes that affect the area in question; and (c) non-indigenous biota (*e.g.*, invasive algal bloom species) that have been introduced either deliberately or accidentally by man. Discharges "*shall not alter natural ocean water quality*" as determined by a comparison to the range of constituent concentrations in reference

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 393 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

areas agreed upon via the regional monitoring program(s). If monitoring information indicates that *natural ocean water quality* is not maintained, but there is sufficient evidence that a discharge is not contributing to the alteration of natural water quality, then the Regional Water Board may make that determination. In this case, sufficient information must include runoff sample data that has equal or lower concentrations for the range of constituents at the applicable reference area(s).

**New Development** – New Development means land disturbing activities; structural development, including construction or installation of a building or structure, creation of impervious surfaces; and land subdivision on an area that has not been previously developed.

**Non-Traditional Small MS4** – Federal and State operated facilities that can include universities, prisons, hospitals, military bases (e.g. State Army National Guard barracks, parks and office building complexes.)

**Notice of Intent (NOI)** – The application form by which dischargers seek coverage under General Permits, unless the General Permit requires otherwise.

**Nuisance** – Anything that meets all of the following requirements: (1) is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; (2) affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal; (3) occurs during, or as a result of, the treatment or disposal of wastes.

**Open Channel** – Flow within a distinct natural or modified channel, calculated as flow velocity times channel cross-sectional area.

**Outfall** – A point source as defined by 40 CFR 122.2 at the point where a municipal separate storm sewer discharges to waters of the United States and does not include open conveyances connecting two municipal separate storm sewers, or pipes, tunnels or other conveyances which connect segments of the same stream or other waters of the United States and are used to convey waters of the United States. Specific to Ocean Plan monitoring, outfalls include those measuring 18 inches or more in diameter.

**Parking Lot** – Land area or facility for the parking or storage of motor vehicles used for business, commerce, industry, or personal use.

**Permittee/Permittees** – Municipal agency/agencies and Non-traditional Small MS4s that are named in and subject to the requirements of this General Permit.

**Permit Effective Date** – July 1, 2013. The date at least 100 days after General Permit adoption, provided the Regional Administrator of U.S. EPA Region 9 has no objection.

**Pervious Pavement** – Pavement that stores and infiltrates rainfall at a rate that exceeds conventional pavement.

**Point Source** – Any discernible, confined, and discrete conveyance including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operations, landfill leachate collection systems, vessel, or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated      agriculture or agricultural storm water runoff.

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 394 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**Pollutant** – Dredged spoil, solid waste, incinerator residue, filter backwash, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials (except those regulated under the Atomic Energy Act of 1954, as amended (42 U.S.C. 2011 *et seq.*)), heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

**Pollutants of Concern** – Pollutants of concern found in urban runoff include sediments, non-sediment solids, nutrients, pathogens, oxygen-demanding substances, petroleum hydrocarbons, heavy metals, floatables, polycyclic aromatic hydrocarbons (PAHs), trash, and pesticides and herbicides.

**Pollution** – An alteration of the quality of the waters of the state by waste to a degree which unreasonably affects the beneficial uses of the water or facilities which serve those beneficial uses.

**Potable Water** – Water that is safe for domestic use, drinking, and cooking.

**Prioritized BMPs** – BMPs installed and/or implemented to address pollutants of concern. Where pollutant(s) of concern are undocumented or unidentified, prioritized BMPs are defined as BMPs installed and/or implemented to address common pollutants of concern (see pollutants of concern definition).

**Priority Storm Drain Inlets** – Storm drain inlets that drain to sensitive receiving water bodies or water bodies with history of illegal dumping. Storm drain inlets that are located in areas where the maximum number of citizens are exposed (this may include areas of high foot traffic).

**QAPrP** – Quality Assurance Project Plan

**Receiving Water** – Surface water that receives regulated and unregulated discharges from activities on land.

**Redevelopment** – Land-disturbing activity that results in the creation, addition, or replacement of exterior impervious surface area on a site on which some past development has occurred. Redevelopment does not include trenching, excavation and resurfacing associated with LUPs; pavement grinding and resurfacing of existing roadways; construction of new sidewalks, pedestrian ramps, or bike lanes on existing roadways; or routine replacement of damaged pavement such as pothole repair or replacement of short, non-contiguous sections of roadway.

**Regulated Project** – Refers to projects subject to the new and redevelopment standards in Section E.11 in this Order.

**Regulated Small MS4** – A Small MS4 that discharges to a water of the United States (U.S.) or to another MS4 regulated by an NPDES permit and has been designated as regulated by the State Water Board or Regional Water Board under criteria provided in this Order.

**Residential Housing Subdivision** – Any property development of multiple single-family homes or of dwelling units intended for multiple families/households (e.g., apartments, condominiums, and town homes).

**Retrofitting** – Improving pollution and/or flow control at existing developments and facilities to protect or restore beneficial uses and watershed functions.

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**Riparian Areas** – Plant communities contiguous to and affected by surface and subsurface hydrologic features of perennial or intermittent waterbodies. Riparian areas have one or both of the following characteristics: 1) distinctively different vegetative species than adjacent areas, and 2) species similar to adjacent areas but exhibiting more vigorous or robust growth forms. Riparian areas are usually transitional between wetland and upland.

**Rural Area** – Encompasses all population, housing, and territory not included within an urban area.

**Sediments** – Solid particulate matter, both mineral and organic, that is in suspension, is being transported, or has been moved from its site of origin by air, water, gravity, or ice and has come to rest on the earth's surface either above or below sea level.

**Sensitive Waterbody** – Receiving waters which are a priority to protect. They include: 1) Areas of Special Biological Significance (ASBS), 2) areas providing or known to provide habitat for chinook and coho salmon and steelhead, and 3) beaches that serve more than 50,000 people between April 1 and October 31 and are adjacent to flowing storm drains or creeks.

**Separate Implementing Entity (SIE)** – An entity that a permittee may utilize to satisfy one or more of the permit obligations. SIE may include a flood control agency, a Phase I permittee, a storm water consulting firm, etc.

**Small MS4** – An MS4 that is not permitted under the municipal Phase I regulations, and which is "owned or operated by the United States, a State, city, town, borough, county, parish, district, association, or other public body (created by or pursuant to State law) having jurisdiction over disposal of sewage, industrial wastes, storm water, or other wastes, including special districts under State law such as a sewer district, flood control district or drainage district, or similar entity…." (40 CFR §122.26(b)(16)).

**Smart Growth Projects** – Projects that produce multiple-benefits such as economic, social and environmental benefits. Smart growth projects commonly include high density development projects that result in a reduction of runoff volume per capita as a result of reduced impervious surface.

**Solid Waste** – All putrecible and nonputrecible solid, semisolid, and liquid wastes as defined by California Government Code Section 68055.1(h).

**Source Control** – Land use or site planning practices, or structural or nonstructural measures, that aim to prevent runoff pollution by reducing the potential for contact with rainfall runoff at the source of pollution. Source control BMPs minimize the contact between pollutants and urban runoff.

**Surface Drainage** – Any above-ground runoff (sheet, shallow concentrated, and open channel) that flows into the storm drain system.

**Standard Industrial Classification (SIC)** – A federal system for classifying establishments by the type of activity, in which they are engaged, using a four-digit code.

**Storm Drain System** – The basic infrastructure in a municipal separate storm sewer system that collects and conveys storm water runoff to a treatment facility or receiving water body.

**Storm Water** – Storm water is generated when precipitation from rain and snowmelt events flows over land or impervious surfaces and does not percolate into the ground. As storm

*UNOFFICIAL DRAFT — Not Certified by Clerk*

water flows over the land or impervious surfaces, it accumulates debris, chemicals, sediment or other pollutants that could adversely affect water quality if the storm water is discharged untreated.

**Storm Water Treatment System** – Any engineered system designed to remove pollutants from storm water runoff by settling, filtration, biological degradation, plant uptake, media absorption/adsorption or other physical, biological, or chemical process. This includes landscape-based systems such as grassy swales and bioretention units as well as proprietary systems.

**Structural Controls** – Any structural facility designed and constructed to mitigate the adverse impacts of storm water and urban runoff pollution.

**Subwatershed** – An area approximately 10,000 to 40,000 acres in area identified by Hydrologic Unit Code 12 in the federal Watershed Boundary Dataset.

**Surface Water Ambient Monitoring Program (SWAMP)** – The State Water Board's program to monitor surface water quality; coordinate consistent scientific methods; and design strategies for improving water quality monitoring, assessment, and reporting.

**Time of Concentration** – The time it takes the most hydraulically-remote drop of water to travel through the watershed to a specific point of interest.

**Total Maximum Daily Loads (TMDLs)** – The maximum amount of a pollutant that can be discharged into a waterbody from all sources (point and nonpoint) and still maintain water quality standards. Under CWA section 303(d), TMDLs must be developed for all waterbodies that do not meet water quality standards even after application of technology-based controls, more stringent effluent limitations required by a state or local authority, and other pollution control requirements such as BMPs.

**Targeted Audience** – Group(s) of people the Permittee has targeted to receive educational message.

**Trash and Debris** – Trash consists of litter and particles of litter. California Government Code Section 68055.1 (g) defines litter as all improperly discarded waste material, including, but not limited to, convenience food, beverage, and other product packages or containers constructed of steel, aluminum, glass, paper, plastic and other natural and synthetic materials, thrown or deposited on the lands and waters of the state, but not including the properly discarded waste of the primary processing of agriculture, mining, logging, sawmilling, or manufacturing.

**Treatment** – Any method, technique, or process designed to remove pollutants and/or solids from polluted storm water runoff, wastewater, or effluent.

**Urban Rural Interface** – The urban/rural interface is identified as the geographical location at which urban land use and rural land use interact.

**Urbanized Area** – A densely settled core of census tracts and/or census blocks that have population of at least 50,000, along with adjacent territory containing non-residential urban land uses as well as territory with low population density included to link outlying densely settled territory with the densely settled core. It is a calculation used by the Bureau of the Census to determine the geographic boundaries of the most heavily developed and dense urban areas. From the Phase II Final Rule (Revised June 2012)

Case 2:20-cv-02482-WBS-AC    Document 95-7    Filed 11/28/22    Page 397 of 1006

*UNOFFICIAL DRAFT — Not Certified by Clerk*

http://www.epa.gov/npdes/pubs/fact2-2.pdf Data utilized in this Order was derived from 2010 U.S. Census Data.

**Waste** – Includes sewage and any and all other waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation, including waste placed within containers of whatever nature prior to, and for purposes of, disposal.

**Waste Load Allocation** – The portion of a receiving water's total maximum daily load that is allocated to one of its existing or future point sources of pollution. Waste load allocations constitute a type of water quality-based effluent limitation.

**Water Efficient Landscape Ordinance** – The Model Water Efficient Landscape Ordinance (Title 23, Division 2, Chapter 2.7 of the California Code of Regulations) took effect January 1 2010 and is designed to: (1) promote the values and benefits of landscapes while recognizing the need to invest water and other resources as efficiently as possible; (2) establish a structure for planning, designing, installing, maintaining and managing water efficient landscapes in new construction and rehabilitated projects; (3) establish provisions for water management practices and water waste prevention for existing landscapes; (4) use water efficiently without waste by setting a Maximum Applied Water Allowance as an upper limit for water use and reduce water use to the lowest practical amount; (5) promote the benefits of consistent landscape ordinances with neighboring local and regional agencies; (6) encourage local agencies and water purveyors to use economic incentives that promote the efficient use of water, such as implementing a tiered-rate structure; and (7) encourage local agencies to designate the necessary authority that implements and enforces the provisions of the Model Water Efficient Landscape Ordinance or its local landscape ordinance.

**Water Quality Control Plan (Basin Plan)** –The Regional Water Board's master water quality control planning document. It designates beneficial uses and water quality objectives for waters of the State within each Region, including surface waters and groundwater. It also includes programs of implementation to achieve water quality objectives and discharge prohibitions. Basin Plans are adopted and approved by the State Water Board, U.S. EPA, and the Office of Administrative Law where required.

**Water Quality Objectives** – The limits or levels of water quality elements or biological characteristics established to reasonably protect the beneficial uses of water or to prevent pollution problems within a specific area. Water quality objectives may be numeric or narrative.

**Water Quality Standards** – State-adopted and U.S. EPA-approved water quality standards for waterbodies. The standards prescribe the use of the waterbody and establish the water quality criteria that must be met to protect designated uses. Water quality standards also include the federal and state anti-degradation policy.

**Watershed Management Zone** – Post-construction management zones based on common key watershed processes and receiving water type (creek, marine nearshore waters, lake, etc.).

**Watershed Processes** – Functions that are provided by watersheds, including but not limited to, groundwater recharge, sediment supply and delivery, streamflow, and aquatic habitat.

*UNOFFICIAL DRAFT — Not Certified by Clerk*



**Small MS4 General Permit Designation Flow Chart**
February 5, 2013

*Current designation based on U.S. Decennial Census Date 2010.
**Assumes MS4 population greater than 5000.

UNOFFICIAL DRAFT — Not Certified by Clerk



# EXHIBIT B

*UNOFFICIAL DRAFT — Not Certified by Clerk*

**CALIFORNIA STATE WATER RESOURCES CONTROL BOARD**
**1001 I Street**
**Sacramento, CA 95814**

**FACT SHEET FOR**

**NPDES GENERAL PERMIT and WASTE DISCHARGE REQUIREMENTS FOR STORM WATER DISCHARGES FROM SMALL MUNICIPAL SEPARATE STORM SEWER SYSTEMS (ORDER)**

**ORDER No. 2013-0001-DWQ**

**As Amended by Order 2017-XXXX-DWQ**

This Fact Sheet describes the factual, legal, and methodological basis for the General Permit, provides supporting documentation, and explains the rationale and assumptions used in deriving the limits and requirements.

## I.  BACKGROUND

**History**

A 1972 amendment to the federal Water Pollution Control Act (also referred to as the Clean Water Act) provides that the discharge of pollutants to waters of the United States from any point source is unlawful unless the discharge is in compliance with a National Pollutant Discharge Elimination System (NPDES) permit. The 1987 amendments to the Clean Water Act added section 402(p), which established a framework for regulating storm water discharges under the NPDES Program. Subsequently, in 1990, the U.S. Environmental Protection Agency (U.S. EPA) promulgated regulations for permitting storm water discharges from industrial sites (including construction sites that disturb five acres or more) and from municipal separate storm sewer systems (MS4s) serving a population of 100,000 people or more. These regulations, known as the Phase I regulations, require operators of medium and large MS4s to obtain storm water permits. On December 8, 1999, U.S. EPA promulgated regulations, known as Phase II regulations, requiring permits for storm water discharges from Small MS4s and from construction sites disturbing between one and five acres of land. The Order accompanying this Fact Sheet regulates storm water discharges from Small MS4s.

A municipal separate storm sewer is a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains): (i) "owned or operated by the United States, a State, city, town, borough, county, parish, district, association, or other public body (created by or pursuant to State law) having jurisdiction over disposal of sewage, industrial wastes, storm water, or other wastes, including special districts under State law such as a sewer district, flood control district or drainage district, or similar entity…." (ii) designed or used for collecting or conveying storm water; (iii) which is not a combined sewer; and (iv) which is not part of a Publicly Owned Treatment Works (POTW). [See Title 40, Code of Federal Regulations (40 C.F.R.) §122.26(b)(8).]

A Small MS4 is an MS4 that is not permitted under the municipal Phase I regulations. (40 C.F.R. §122.26(b)(16)). Small MS4s include systems similar to separate storm sewer systems in municipalities, such as systems at military bases, large hospital or prison complexes, and highways and other thoroughfares, but do not include separate storm sewers in very discrete areas, such as individual buildings. (40 C.F.R. §122.26(b)(16(iii).) This permit refers to MS4s that operate throughout a community as "Traditional MS4s" and MS4s that are similar to traditional MS4s but operate at a separate campus or facility as "Non-traditional MS4s."

Federal regulations allow two permitting options for storm water discharges: individual permits and general permits. The State Water Resources Control Board (State Water Board) elected to adopt a statewide general permit for Small MS4s in order to efficiently regulate numerous storm water discharges under a single permit. In certain situations a storm water discharge may be more appropriately and effectively regulated by an individual permit, a region-specific general permit, or by inclusion in an existing Phase I MS4 permit. In these situations, the Regional Water Quality Control Board (Regional Water Board) Executive Officer will direct the Small MS4 operator to submit the appropriate application, in lieu of a Notice of Intent (NOI), to comply with the terms of this Order. In these situations, the individual or regional permits will govern, rather than this Order.

This Order regulates storm water runoff from small municipalities and other facilities, including federal and State operated facilities that can include universities, prisons, hospitals, military

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

bases (e.g. State Army National Guard barracks, parks and office building complexes.) Regulating many storm water discharges under one permit greatly reduces the administrative burden associated with permitting individual storm water discharges. Permittees obtain coverage under this Order by filing an electronic NOI through the State Water Board's Stormwater Multiple Application and Report Tracking System (SMARTS) and by mailing the appropriate permit fee to the State Water Board.

**Order Goals**

The goals for the Order included:

1. Ensure statewide consistency for Regulated Small MS4s.
2. Include more specificity in Order language and requirements to streamline implementation of storm water programs.
3. Implement and enhance actions to control 303(d) listed pollutants, pollutants of concern, achieve Wasteload Allocations adopted under Total Maximum Daily Loads, and protect Areas of Special Biological Significance.
4. Implement more specific and comprehensive storm water monitoring, including monitoring for 303(d) listed pollutants.
5. Incorporate emerging technologies, especially those that are being increasingly utilized by municipalities (e.g., low impact development).
6. Include program elements that address Program Management Effectiveness Assessments.
7. Implement a step-wise stakeholder collaborative approach.

**Stakeholder Collaborative Process**

State Water Board staff conducted a series of stakeholder meetings with Permittees and other interested parties over a five year period, from 2007- 2012. These meetings included the California Stormwater Quality Association (CASQA) Phase II Small MS4 Subcommittee, representatives of non-governmental organizations, Non-traditional Small MS4s and Regional Water Board staff. The following is a summary of the stakeholder process.

State Water Board staff completed an administrative draft Order and submitted it to CASQA, U.S. EPA, Natural Resources Defense Council, Coast/Bay Keepers, and Heal the Bay for informal stakeholder review in February 2011. Each of the nine Regional Water Boards provided comments. Staff revised the draft Order to address the informal comments received and released it for 60-day public review in June 2011.

Approximately 151 comments were received and several workshops were held throughout California to meet Stakeholders, answer questions and discuss the development process.

On May 4, 2012 a second administrative draft was completed and submitted for informal stakeholder review. On May 18, 2012 the second draft Order was released for 60-day public review. Approximately 110 comments were received and a public hearing was held on August 8, 2012 to hear oral comments on the second administrative draft.

On November 16, 2012 a third draft was completed and submitted for 30-day public review period. The comment deadline was set for noon on December 17, 2012. Approximately 55 comments were received and a board workshop was held on January 8, 2013 to hear comments on the revisions made to the second administrative draft.

On January 23, 2013, a final draft was completed and proposed for State Water Board adoption.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

In 2015, State Water Board staff conducted a series of stakeholder meetings with Permittees and other interested parties over several months to discuss proposed changes to the Order, specifically revising and Attachment G with updated TMDL requirements. These meetings included the CASQA Phase II Small MS4 Subcommittee, representatives of non-governmental organizations, Non-traditional Small MS4s and Regional Water Board staff. On June 5, 2017 a draft amendment to this Order was issued for a 45-day public review period. The public review period was extended by request and the due date for public comments became August 21, 2017.

## II. PERMITTING APPROACH

### Existing General Permit Approach

U.S. EPA storm water regulations for Phase II storm water permits envision a process in which entities subject to regulation develop a Storm Water Management Plan (SWMP). The SWMP contains detailed Best Management Practices (BMPs) and specific level-of- implementation information reviewed and approved by the permitting agency before the Permittee obtains coverage under the storm water permit. The existing General Permit followed this approach as suggested by U.S. EPA and simply identified goals and objectives for each of the six Minimum Control Measures.

The existing General Permit approach provides the flexibility to target an MS4's problem areas while working within the existing organizational structure. However, audits of Permittees and information gained from interviews with Regional Water Board staff revealed that many of these storm water programs lacked a baseline program and specific details in the SWMP to implement an adequate program for protection from the impacts of storm water runoff. Regional Water Board staff found it difficult to determine Permittees' compliance with the existing General Permit, due to the lack of specific requirements. The permit language did not contain specific deadlines for compliance, did not incorporate clear performance standards, and did not include measurable goals or quantifiable targets for implementation.[1]

The Regional Water Boards conducted approximately 36 on-site audits of MS4 programs[2] in the state that addressed 122 Permittees, including some Phase II Small MS4s. They found that programs with more specific permit requirements generally resulted in more comprehensive and progressive storm water management programs. For example, the more prescriptive permit requirements in the Los Angeles and San Diego MS4 permits require Permittees to be specific in how they implement their storm water program. The auditors concluded that the specificity of the provisions enabled the permitting authorities to enforce the MS4 permits and improve the quality of MS4 discharges. In addition, U.S. EPA on-site audits of MS4s throughout the nation have

Given this information, State Water Board staff aimed to write permit language clear enough to set appropriate standards and establish required outcomes.

---

[1] Storm Water Phase I MS4 Permitting: Writing more effective, measurable permits, EPA, Kosco. repeatedly shown the need for clear, measurable requirements in MS4 permits to ensure an effective and enforceable program.

[2] Assessment Report on Tetra Tech's Support of California's MS4 Storm Water Program, July 2006

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Current Order Approach**

The current approach simplifies assessment of Permittee compliance and allows the public to more easily access measurable results. The Order provisions establish compliance implementation levels such as escalating enforcement and requirements for tracking projects. Required actions include specific reporting elements to substantiate compliance with implementation levels. Regional Water Board staff will be able to evaluate each individual Permittee's compliance through an online Annual Report review and the program evaluation (audit) process.

Federal regulations and State law require that the implementation specifics of Municipal Storm Water NPDES permits be adopted after adequate public review and comment.[3] This Order's approach satisfies the public involvement requirements of both the federal Clean Water Act and the California Water Code. Permit details are known at the time of adoption of the Order. Substantive information as to how the discharger will reduce pollutants to the Maximum Extent Practicable (MEP) is not left to the details of the SWMP. The public need not guess program details until Regional Water Board review and approval of a SWMP, as was the case in the existing General Permit.

This Order specifies the actions necessary to reduce the discharge of pollutants in storm water to the MEP in a manner designed to achieve compliance with water quality standards and objectives. This set of specific actions is equivalent to the requirements that were included in a separate SWMP for each Permittee in the existing General Permit.

This order effectively prohibits non-storm water discharges into municipal storm drain systems and watercourses within the Permittees' jurisdictions.

The State Board has also identified the most critical water quality problems as priorities in this Order. The priorities include (1) discharges to Areas of Special Biological Significance (2) discharges to water bodies listed as impaired on the 303[d] list (3) Post- Construction Requirements and (4) Water Quality Monitoring Requirements. A majority of the Permittees' implementation efforts focus on the four priority areas as identified by the State Water Board.

*Permittee Diversity*

In California, Permittees face highly variable conditions both in terms of threats to water quality from their storm water discharges and resources available to manage those discharges. Consequently, making one set of prescriptive requirements work for all of them is inherently difficult. This Order contains separate provisions for Traditional and Non-traditional MS4s. The

---

[3] On January 14, 2003, the U.S. Ninth Circuit Court issued a decision in *Environmental Defense Center v. EPA* ((9th Cir. 2003) 344 F.3d 832.) This ruling upheld the Phase II regulations on all but three of the 20 issues contested. The court determined that applications for general permit coverage (including the NOI and any Storm Water Management Program [SWMP]) must be made available to the public, the applications must be reviewed and determined to meet the Maximum Extent Practicable (MEP) standard by the permitting authority before coverage commences, and there must be a process to accommodate public hearings. Regarding the issue of public participation, the Ninth Circuit noted that such participation was required because the "substantive information about how the operator of a small MS4 will reduce discharges to the maximum extent practicable" was found in the storm water management plan rather than the permit itself" (344 F3d at 857).

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

requirements for the Non-traditional MS4s are tailored specifically to the Non-traditional management structure. Additionally, this permit introduces the concept of compliance tiers in particular sections, designed to relieve the Regional Water Board burden of reviewing and approving individual SWMPs while preserving the ability of the Permittees to tailor requirements that address their unique circumstances.

*Non-traditional MS4 Categories and Provisions*
This Order identifies specific provisions Non-traditional MS4 Permittees must comply with in Section F and considers the following categories to be Non-traditional MS4s, but not limited to:

- Community Services Districts
- Fairgrounds
- Higher Education Institutions (Community Colleges and Universities)
- Military Bases
- Ports
- State Parks/Beaches/Historical Areas
- School Districts K-12
- State and Federal Prisons/Health Institutions
- State Vehicle Recreation Areas
- Water Agencies
- Transit Agencies

The regulations direct that the term Small MS4s includes "large hospitals" and "prison complexes." (40 C.F.R. §122.26(b)(16)(iii).) For purposes of State Water Board designation of state and federal hospitals and prisons, the Board interprets the terms "large hospital" and "prison complex" to mean health institutions and prison facilities with a resident and staff population of 5,000 or more. However, Regional Water Boards may designate smaller facilities on a case by case basis.

*Guidance Document*
The case for eliminating a SWMP for this second permit term has been clearly addressed, however, the latent advantages of having some form of a storm water management document has not.

First, a storm water management document assists Permittees in managing their storm water program. Such a document serves as guidance to (1) identify different staff involved in storm water compliance over multiple departments within the Permittee agency and, (2) provide those staff with a simple narrative connecting all the detailed, specific BMPs in relation to multiple Permittee departments. Simply put, the document provides the Permittee with a map to the compliance process.

Second, the storm water management document is an essential tool for Regional Water Board audits. During MS4 audits, the Regional Water Board typically requests and reviews a SWMP to understand the Permittee's storm water program and management structure. Although the Order contains specific details on each program requirement, it lacks the simple narrative nexus that a storm water management document can provide on how the storm water program is implemented by a specific Permittee. The guidance document may be in spreadsheet form, as a flowchart, or as a written narrative. In other words, the structure is left up to the Permittee as to the way in which they want to demonstrate or illustrate the relationship between their

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

storm water program and their management structure. To that end, the guidance document will provide the Permittee with a clear map to the compliance process. Therefore, although the draft Order eliminates the submittal for review and approval of a SWMP, the requirement to develop a planning/guidance document has been retained for new Permittees.

New Permittees are allowed six months to develop and upload the guidance document to SMARTS along with the NOI and appropriate fee. The document is open for public viewing, but will not be reviewed and approved by the relevant Regional Water Board.

Renewal Permittees will also submit a guidance document and are allowed six months to develop and upload the guidance document to SMARTS along with the NOI and appropriate fee.

The State Water Board recognizes that in some instances Renewal Permittees' existing SWMPs have incorporated BMPs designed to address locality-specific storm water issues and that in some cases these BMPs may, because of locality-specific factors, be more protective of water quality than the minimum requirements established by this Order. Renewal Permittees will additionally include in the guidance document the following: identification and brief description of each BMP and associated measurable goal included in the Permittee's most current SWMP that constitutes a more specific local or tailored level of implementation that may be more protective of water quality than the minimum requirements of this Order; and identification of whether the Permittee proposes to maintain, reduce, or cease implementation for each more protective, locally-tailored BMP. In no instance may a BMP be reduced or ceased if it is required by the minimum standards set by this Order. Further, for each more protective, locally-tailored BMP and associated measurable goal for which the Renewal Permittee proposes to reduce or cease implementation, the Renewal Permittee may do so only if the Permittee can demonstrate, to the Regional Water Board Executive Officer, that the reduction or cessation is in compliance with this Order and the maximum extent practicable standard, and will not result in increased pollutant discharges. This process is designed to direct Renewal Permittees, where appropriate, to continue to implement more protective, locally-tailored BMPs and measurable goals developed in the previous permit term that were specifically designed to address local storm water priorities.

**Summary of Significant Changes in this Order**
This Order significantly differs from the previous order (Order 2003-0005-DWQ) by including the following:

- Specific BMP and Management Measure Requirements
- Elimination of submission of a SWMP for review and approval by the Regional Water Boards
- Electronic filing of NOIs and Annual Reports
- Waiver Certification
- New State Water Board and Regional Water Board designation criteria
- Separate requirements for Traditional and Non-traditional MS4s
- New program management requirements
- Post-construction storm water management requirements
- TMDL implementation requirements
- Requirements for ASBS discharges
- Water quality monitoring and BMP assessment
- Program effectiveness assessment

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## III. ECONOMIC CONSIDERATIONS

In 2000, the State Water Board issued a precedential order (Order WQ 2000-11 (Cities of Bellflower, et al.)) stating that cost of compliance with the programs and requirements of a municipal storm water permit is a relevant factor in determining MEP. The Order also explicitly stated that a cost benefit analysis is not required. The State Water Board discussed costs as follows:

While the standard of MEP is not defined in the storm water regulations or the Clean Water Act, the term has been defined in other federal rules...

These definitions focus mostly on technical feasibility, but cost is also a relevant factor. There must be a serious attempt to comply, and practical solutions may not be lightly rejected. If, from the list of BMPs, a permittee chooses only a few of the least expensive methods, it is likely that MEP has not been met. On the other hand, if a permittee employs all applicable BMPs except those where it can show that they are not technically feasible in the locality, or whose cost would exceed any benefit to be derived, it would have met the standard. MEP requires permittees to choose effective BMPs, and to reject applicable BMPs only where other effective BMPs will serve the same purpose, the BMPs would not be technically feasible, or the cost would be prohibitive. Thus while cost is a factor, the Regional Water Board is not required to perform a cost-benefit analysis.

(State Water Board Order WQ 2000-11, supra, p.20.) The State Water Board received extensive comments addressing the costs associated with compliance with the first publicly released Phase II small MS4 draft Order in June 2011. The depressed economic conditions in California challenge Permittees' ability to fully implement the requirements of the first draft permit. The State Water Board recognizes that many Permittees currently have limited staff and resources to implement storm water provisions. State Water Board staff carefully considered comments received regarding economic feasibility while revising the June 2011 draft Order. The Order continues to address critical water quality priorities, namely discharges to ASBS, TMDLs, and waterbodies listed as impaired on the 303(d) list, but aims to do so in a focused and cost-effective manner.

*Brief History*
State Water Board staff completed an administrative draft Order and submitted it to CASQA, U.S. EPA, Natural Resources Defense Council, Water Keepers, and Heal the Bay for informal stakeholder review in February 2011. Each of the nine Regional Water Boards also provided comments. Staff revised the draft Order to address the informal comments received and released it for 60-day public review in June 2011. Approximately 151 comments were received and several workshops were held throughout California to meet Stakeholders, answer questions and discuss the development process.

On October 6, 2011, the California Senate Select Committee on California Job Creation and Retention held a hearing on the economic impacts of the State Water Board's three general or statewide storm water permits that were under renewal: the Phase II Small MS4 permit, the Industrial General Permit, and the Caltrans statewide MS4 permit. The Executive Director of the State Water Board testified at the hearing that the comments regarding cost of compliance with the permits were being considered carefully and that the three permits required substantial revision to address the comments. Following the hearing, State Water Board staff launched Stakeholder meetings beginning in November 2011 to April 2012. The meetings were held with CASQA, National Resources Defense Council, Water Keepers, Heal the Bay

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

and each category of Non- traditional Small MS4 proposed for designation in the draft permit. The meetings were designed to discuss implementation challenges and solutions for each section of this Order, given the issues raised at the Senate hearing and the written comments from the June 2011 draft Order. Substantial revisions were then made and were reflected in the May 2012 draft Order. State Water Board staff attempted to reduce costs while maintaining the level of water quality protection mandated by CWA, CWC and other applicable requirements.

*Approach to Cost of Compliance*

This section is a general discussion of the more significant changes between the June 2011 and the May 2012 draft Order, including cost of compliance. It is not possible to accurately predict the cost impact of requirements that involve an unknown level of implementation or that depend on environmental variables that are as yet undefined. Only general conclusions can be drawn from this information.

It is extremely important to note that many storm water program components and their associated costs existed before any MS4 permits were issued. For example, storm drain maintenance, street sweeping and trash/litter collection costs cannot be solely or even principally attributed to MS4 permit compliance since these long-standing practices preceded the adoption of the earliest storm water permit in 1990. Even many structural BMPs (erosion protection, energy dissipation devices, detention basins etc.) are standard engineering practice for many projects and are not implemented solely to comply with permit provisions. Therefore, the true cost resulting from MS4 permit requirements is some fraction of the total storm water program costs.

The California State University, Sacramento study found that only 38% of program costs are new costs fully attributable to MS4 permits. The remainder of program costs was either pre-existing or resulted from enhancement of pre-existing programs.[4] The County of Orange found that even lesser amounts of program costs are solely attributable to MS4 permit compliance, reporting that the amount attributable to implement its Drainage Area Management Plan is less than 20% of the total budget. The remaining 80% is attributable to pre-existing programs.[5] Any increase in cost to the Permittees by the requirements of this Order will be incremental in nature.

Testimony from the California Senate Select Committee on California Job Creation and Retention hearing and comment letters on the June 2011 draft Order asserted numerous estimates of compliance costs. Generally, the estimates are based on worst-case scenarios or the most restrictive interpretation of the June 2011 draft Order. A worst-case scenario would come about, for example, if a new Traditional MS4 Permittee fails to leverage existing resources and maximize efficiencies, and does not segregate pre-existing program expenditures and new costs to implement the storm water program when considering cost of compliance. Furthermore, the assertions do not take into consideration the phased-in nature of many of the June 2011 draft Order requirements. Finally, the cost estimate assertions did not address the diversity among Permittees, specifically the different levels of compliance from a

---

[4] Ibid. p. 58

[5] County of Orange, 2000. A NPDES Annual Progress Report. P. 60. More current data from the County of Orange is not used in this discussion because the County of Orange no longer reports such information.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

new vs. renewal Traditional MS4 Permittee expenditure and new vs. renewal Non-traditional MS4 expenditure and funding sources.

State Water Board staff estimated the cost of compliance in two ways. First, staff utilized cost data from the California State University (CSUS) NPDES Stormwater Cost Survey[6]. The rationale for using this document is that it's very difficult to precisely determine the true cost of implementation of the Permittees' storm water management program as affected by this Order. Reported costs of compliance for the same program element vary widely from city to city and by a very great margin that cannot be explained. However, economies of scale play a great role for the great margin of compliance costs. Some Permittees storm water programs are general funded while others utilize a service/user/utility fees to support the program. Unfortunately, those Permittees with general funded programs must compete for dollars in a dwindling economic climate. Furthermore, a study by the Los Angeles Regional Water Board reported wide variability in the cost of compliance among municipal permit holders, which was not easily explained.[7] Due to the wide diversity among the Permittees, Traditional and Non-traditional and new and renewal Permittees, the uncertainty of the extent of needed improvements, and the difficulty in isolating program costs attributable to permit compliance, the true cost of implementation can only be discussed in a general way.

Second, staff considered comparisons between the June 2011 draft Order and first term Phase I MS4 permits. The municipalities chosen in the CSUS survey were smaller Phase I cities, were early in the first permit term, and had reported cost in their annual reports. In addition, the cost categories correspond to the federal Phase II Small MS4 six minimum control measures. Given these factors, State Water Board staff estimated the worst-case scenario example to be a $32 median annual cost per household to implement the June 2011 draft Order. The CSUS survey estimated the annual cost per household for the six storm water programs ranged from $18 to $46.

Of the 100 new Traditional Small MS4s proposed to be designated, 20,000 is the average population with an average of 2.8 individuals per household, therefore the average annual cost to implement the June 2011 draft Order is approximately $229,000.

The average population of a renewal Traditional MS4 Permittee identified in the June 2011 draft Order is 27,353 with an average of 2.8 individuals per household. Therefore, the average annual cost to implement the June 2011 draft Order is approximately $313,000.

As discussed previously, the May 2012 draft Order has undergone substantial edits and no requirements have been added to the draft Order that would materially increase the cost of compliance. State Water Board staff carefully evaluated comments from Stakeholder meetings, written public comments, and testimony from the Senate Select Committee hearing. And, although the May 2012 draft Order contains these substantial revisions, the draft Order continues to protect storm water quality without overburdening Permittees and Businesses. Below is a list of some of the more significant changes to reduce costs.

1. Deleted annual cost analysis
2. Deleted Industrial/Commercial Inspection Program
3. Deleted mandatory construction inspection frequency

---

[6] California State University, NPDES Stormwater Cost Survey, 2005

[7] LARWQCB, 2003. Review and Analysis of Budget Data Submitted by the Permittees for Fiscal Years 2000-2003. p.2

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

4. Deleted Trash Reduction Program
5. Modified post-construction standard requirements
6. Modified Community-Based Social Marketing provision
7. Modified Non-traditional MS4 provisions
8. Extended compliance deadlines
9. Eliminated redundancy with construction inventory and tracking requirements
10. Deleted mandatory development of a citizen advisory group
11. Deleted costly IDDE monitoring, complaint response based
12. Made spatial data in a Geographic Information System (GIS) optional
13. Deleted requirement to identify 20% of storm drain system as high priority
14. Included Water Quality Monitoring Tiers

Though no firm conclusions or precise estimates can be drawn from this analysis, it is expected that the revisions to the May 2012 draft Order will significantly reduce the cost of compliance of the average annual cost per household from the estimated $32 to substantially lower.

*TMDLs*
The cost of complying with TMDL waste load allocations is not considered since TMDLs are not subject to the MEP standard. Federal law requires that NPDES permits contain effluent limitations consistent with the assumptions of any applicable wasteload allocation in a TMDL. (40 C.F.R. §122.44(d)(1)(vii)(B).)

*Benefits of Permit Costs*
The State Water Board further found in adopting Order WQ-2000-11 that in considering the cost of compliance, it is also important to consider the costs of impairment; that is, the negative impact of pollution on the economy and the positive impact of improved water quality. For example, economic benefits may result through program implementation, and alternative costs (as well as environmental impacts) may be incurred by not fully implementing the program.

Storm water management programs cannot be considered solely in terms of their costs. The programs must also be viewed in terms of their value to the public. For example, household willingness to pay for improvements in fresh water quality for fishing and boating has been estimated by U.S. EPA to be $158-210.[8] This estimate can be considered conservative, since it does not include important considerations such as marine waters benefits, wildlife benefits, or flood control benefits. The California State University, Sacramento study corroborates U.S. EPA's estimates, reporting annual household willingness to pay for statewide clean water to be $180.[9] Though these costs may be assessed differently at the state level than at the municipal level, the results indicate that there is public support for storm water management programs and that costs incurred by the Permittees to implement its storm water management program remain reasonable.

It is also important to consider the cost of not implementing a storm water management program. Urban runoff in southern California has been found to cause illness in people bathing

---

[8] Federal Register / Vol. 64, No. 235 / Wednesday, December 8, 1999 / Rules and Regulations. P. 68793.

[9] State Water Board, 2005. NPDES Storm water Cost Survey. P. iv.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

near storm drains.[10] A study of south Huntington Beach and north Newport Beach found that an illness rate of about 0.8% among bathers at those beaches resulted in about $3 million annually in health-related expenses.[11] Extrapolation of such illness rates and associated health expenses to the beaches and other water contact recreation areas in the state would increase these costs significantly.

Storm water runoff and its impact on receiving waters also negatively affects the tourism industry. The California Travel and Tourism Commission estimated that out-of-state visitors spent $168 per person per day (including transportation) in California in 2007. The Commission estimated total direct travel spending in California was $97.6 billion, directly supporting 924,000 jobs, with earnings of $30.6 billion. Effects on tourism from storm water runoff (e.g. beach closures) can have a significant impact on the economy. The experience of Huntington Beach provides an example of the potential economic impact of poor water quality. Approximately eight miles of Huntington Beach were closed for two months in the middle of summer of 1999, impacting beach visitation and the local economy.

Finally, the benefits of storm water management programs must be considered in conjunction with their costs. A study conducted by University of Southern California and the University of California, Los Angeles assessed the costs and benefits of implementing various approaches for achieving compliance with the MS4 permits in the Los Angeles Region. The study found that non-structural systems would cost $2.8 billion but provide $5.6 billion in benefit. If structural systems were necessary, the study found that total costs would range from $5.7 to $7.4 billion, while benefits could reach

$18 billion.[12] Costs are anticipated to be borne over many years, approximately a ten year minimum. That the benefits of the programs would considerably exceed their costs is a view corroborated by U.S. EPA, which also found that the benefits of implementation of its Phase II storm water rule would outweigh the costs.[13]

## IV. UNFUNDED MANDATES

Article XIII B, Section 6(a) of the California Constitution provides that whenever "any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service." The requirements of this Order do not constitute state mandates that are subject to a subvention of funds.

First, the requirements of this Order do not constitute a new program or a higher level of service as compared to the requirements of the Existing Order. The overarching requirement to impose controls to reduce the pollutants in municipal storm water is dictated by the Clean Water Act and is not new to this permit cycle. (33 U.S.C. §1342(p)(3)(B).) The inclusion of new and advanced measures as the storm water programs evolve and mature over time is

---

[10] Haile, R.W., et al, 1996. An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay. Santa Monica Bay Restoration Project.

[11] Los Angeles Times, May 2, 2005. Here's What Ocean Germs Cost You: A UC Irvine Study Tallies the Cost of Treatment and Lost Wages for Beachgoers Who Get Sick.

[12] LARWQCB, 2004. Alternative Approaches to Storm water Control.

[13] Federal Register / Vol. 64, No. 235 / Wednesday, December 8, 1999 / Rules and Regulations. P. 68791.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

anticipated under the Clean Water Act (55 Fed. Reg. 48052), and these new and advanced measures do not constitute a new program or higher level of service. Further, this Order sets out a more detailed set of requirements compared to the 2003 Order in large part because, unlike the 2003 Order, this Order does not require submission of SWMPs. Specifics concerning how the minimum measures will be implemented, which would have been proposed in the SWMP under the 2003 Order, are now incorporated into the Order itself.

Second, and more broadly, mandates imposed by federal law, rather than by a state agency, are exempt from the requirement that the local agency's expenditures be reimbursed. (Cal. Const., art. XIII B, §9, subd. (b).) The Draft Order implements federally mandated requirements under the Clean Water Act and its requirements are therefore not subject to subvention of funds. This includes federal requirements to effectively prohibit non-storm water discharges, to reduce the discharge of pollutants to the maximum extent practicable, and to include such other provisions as the Administrator or the State determines appropriate for the control of such pollutants. (30 U.S.C. §1342(p)(3)(B).) The authority exercised under this Order is not reserved state authority under the Clean Water Act's savings clause (cf. *Burbank v. State Water Resources Control Bd*. (2005) 35 Cal.4th 613, 627-628), but instead is part of a federal mandate to develop pollutant reduction requirements for municipal separate storm sewer systems. To this extent, it is entirely federal authority that forms the legal basis to establish the permit provisions. (See, *City of Rancho Cucamonga v. Regional Water Quality Control Bd.- Santa Ana Region* (2006) 135 Cal.App.4th 1377, 1389; *Building Industry Ass'n of San Diego County v. State Water Resources Control Bd*. (2004) 124 Cal.App.4th 866, 882-883.)

Further, the maximum extent practicable standard is a flexible standard that balances a number of considerations, including technical feasibility, cost, public acceptance, regulatory compliance, and effectiveness. (*Building Ind. Asso., supra*, 124 Cal. App.4th at pp. 873, 874, 889.) Such considerations change over time with advances in technology and with experience gained in storm water management. (55 Fed.Reg. 48052.) Accordingly, the determination of whether the Draft Order conditions exceed the requirements of federal law cannot be based on a point by point comparison of the permit conditions and the six minimum measures that are required "at a minimum" to reduce pollutants to the maximum extent practicable and to protect water quality (40 C.F.R. §122.34). Likewise, individual permit provisions cannot be considered in isolation. When implementing the federal requirement to reduce pollutants to the maximum extent practicable, the entire permit must be evaluated as a whole. This is so because the permitting agency may decide that it is more practicable to expend limited municipal resources on one aspect of the permit rather than another. In other words, requirements in one area may be relaxed to account for greater expenditures in another that will reduce pollutants to the maximum extent practicable

In recent months, the County of Los Angeles and County of Sacramento Superior Courts have granted writs setting aside decisions of the Commission on State Mandates that held that certain requirements in Phase I permits constituted unfunded mandates.

In both cases, the courts found that the correct analysis in determining whether a municipal storm water permit constituted a state mandate was to evaluate whether the permit conditions were expressly specified in federal statute or regulation or whether the permit conditions exceeded the maximum extent practicable standard. *(State of Cal. v. Comm. On State Mandates* (Super. Ct. Sacramento County, 2012, No. 34-2010- 80000604), *State of Cal. v. County of Los Angeles* (Super. Ct. Los Angeles County, 2011, No. BS130730.) It should be noted that USEPA has issued an online MS4 Permit Improvement Guide (April 2010, available

Page 13

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

at: http://www.epa.gov/npdes/pubs/ms4permit_improvement_guide.pdf) that recommends many provisions for Phase II MS4 permits not explicitly specified in the six minimum measures established at Code of Federal Regulations, title 40, section 122.34.

As laid out in this Fact Sheet and as supported by the record of this permitting action, the requirements of the Draft Order, taken as a whole rather than individually, are necessary to reduce the discharge of pollutants to the maximum extent practicable, to effectively prohibit non-storm water discharges, and to protect water quality. The findings as to implementing these federal requirements are the expert conclusions of the principal state agency charged with implementing the NPDES program in California. (Wat. Code, §§13001.) The requirements of the Draft Order do not constitute an unfunded mandate.

It should be noted that the Draft Order provisions to effectively prohibit non-storm water discharges are also mandated by the Clean Water Act. (33 U.S.C. §1342(p)(3)(B)(ii).) Likewise, the provisions of this Draft Order to implement total maximum daily loads (TMDLs) are federal mandates. Federal law requires that permits must contain effluent limitations consistent with the assumptions of any applicable wasteload allocation in a TMDL. (40 C.F.R. §122.44(d)(1)(vii)(B).)

Finally, even if any of the permit provisions could be considered unfunded mandates, under Government Code section 17556, subdivision (d), a state mandate is not subject to reimbursement if the local agency has the authority to charge a fee. The local agency permittees have the authority to levy service charges, fees, or assessments sufficient to pay for compliance with this Order. (See, e.g., *Apartment Ass'n of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 842.) The authority of a local agency to defray the cost of a program without raising taxes indicates that a program does not entail a cost subject to subvention. (*Clovis Unified School Dist. v. Chiang* (2010) 188 Cal. App.4th 794, 812, quoting *Connell v. Superior court* (1997) 59 Cal.App.4th 382, 401; *County of Fresno v. State of California* (1991) 53 Cal.3d 482, 487–488.)

## V.  ROLE OF THE REGIONAL WATER BOARDS

Under the Water Code, either the State Water Board or the regional boards have authority to issue NPDES permits (Wat. Code, §13377.) The State Water Board is issuing this Order; however Regional Water Board staff will continue to have the authority to evaluate each individual Permittee's compliance through online Annual Report review and by requesting a detailed annual report from Permittees anytime during the permit term. In addition, Regional Board staff can conduct program evaluations (audits). These evaluations can either be targeted or comprehensive evaluations. Responsibilities of Regional Water Board staff also include oversight of implementation and compliance with this Order. As appropriate, they can require modification to programs and other submissions, impose region-specific monitoring requirements, conduct inspections, take enforcement actions, and make additional designations of Regulated Small MS4s. The Regional Water Boards also have a role in approving water quality monitoring efforts and may also direct that dischargers carry out a particular type of education and outreach program (see discussion under Section XII).

Regional Water Boards may also issue individual permits to Regulated Small MS4s, and alternative general permits to categories of Regulated Small MS4s. In addition, Regional Water Boards may allow Phase II Permittees the ability to become Phase I Permittees within the same urbanized area. Upon issuance of such permits by a Regional Water Board, this Order shall no longer regulate the affected MS4s.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The Permittees and Regional Water Boards are encouraged to work together to accomplish the goals of the storm water program, specifically, by coordinating the oversight of construction and industrial sites. For example, certain Permittees are required to implement a construction program that must include procedures for construction site inspection and enforcement. Construction sites disturbing an acre of land or more are also subject to inspections by the Regional Water Board under the State Water Board's Construction General Permit for Storm Water Discharges associated with Construction and Land Disturbance Activities (CGP). U.S. EPA intended to provide a structure that requires permitting through the federal Clean Water Act while at the same time achieving local oversight of construction projects. A structured plan review process and field enforcement at the local level, which is also required by this Order, were cited in the preamble to the Phase II regulations as the most effective components of a construction program.

The Permittees and Regional Water Boards are encouraged to coordinate efforts and use each of their enforcement tools in the most effective manner. However, in order to further ensure coordination, this Order requires Permittees to include procedures for referring non-filers as identified in the Program Management section and violations of the storm water general permits to the Regional Water Board when observed.

*Dispute Resolution*
As discussed, several areas of the permit will be mandated at the discretion of the Regional Board Executive Officer after permit adoption. In this function, the Regional Water Board Executive Officers are in essence acting as agents of the State Water Board. Therefore, determinations of the Regional Water Board Executive Officers in interpreting and implementing this permit are considered actions of the State Water Board (and accordingly not actions of the Regional Water Board subject to the petition process under Water Code section 13320) except where the Regional Water Board itself acts or the Executive Officer acts under Water Code Sections 13300, 13304, or 13383. However, recognizing the need for some level of statewide consistency in interpretation and implementation of Order provisions, the Order includes a dispute resolution process where there is disagreement between a Permittee and a Regional Water Board Executive Officer. The Permittee should first attempt to resolve the issue with the Executive Officer of the Regional Water Board. If a satisfactory resolution is not obtained at the Regional Water Board level, the Permittee may submit the issue in writing to the Executive Director of the State Water Board or his designee for resolution, with a copy to the Executive Officer of the Regional Water Board. The issue must be submitted to the Executive Director within thirty days of any final determination by the Executive Officer of the Regional Water Board; after thirty days the Permittee will be deemed to have accepted the Regional Water Board Executive Officer's determination. The Executive Officer of the Regional Water Board will be provided an opportunity to respond.

## VI.  ENTITIES SUBJECT TO THIS ORDER

This Order regulates discharges of storm water from Regulated Small MS4s. A Regulated Small MS4 is a Small MS4 that has been designated as regulated in accordance with criteria described in 40 C.F.R. 122.32.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

a. **Renewal Permittee - Traditional and Non-traditional MS4s**

All Traditional and Non-traditional MS4s currently covered under the existing General Permit are covered under this Order and must implement the requirements of this Order.

b. **New Traditional MS4 Permittee or New Urbanized Areas**

In some cases, the urbanized boundaries and/or infrastructure of previously permitted Traditional MS4 Permittees may expand to include new areas designated as urbanized under the 2010 U.S. Decennial Census (e.g., when new areas are annexed within the urbanized area). Permittees must identify and include these new urbanized areas as part of their existing storm water program. Any new urbanized areas must be indicated on Permittees permit boundary map. For cities, the permit area boundary is the city boundary. For counties, permit boundaries must include urbanized areas and places identified in Attachment A located within their jurisdictions. The boundaries must be proposed in the permit boundary map and may be developed in conjunction with the applicable Regional Water Board.

New Traditional MS4 Permittees that are outside of Urbanized Areas have been designated as Regulated Small MS4s based on one or more of the following criteria developed by the State Water Board:

1) High population and population density – High population means a population of 10,000 or more. High population density means a density greater than 1,000 residents per square mile. Also considered in this definition is high density created by a non-residential population, such as tourists or commuters.

2) Discharge to Areas of Special Biological Significance (ASBS) as defined in the California Ocean Plan.

The above factors were considered when evaluating whether an MS4 outside an Urbanized Area should be regulated pursuant to this Order. An MS4 and the population that it serves need not meet all of the factors to be designated. The criteria selected to designate MS4s to be regulated are based on the potential impact to water quality due to conditions influencing discharges into their system or due to their discharge location(s).

On a case by case basis, the Regional Water Boards may designate Small MS4s outside of Urbanized Areas as Regulated Small MS4s. Case by case determinations of designation shall be based on the potential of a Small MS4's discharges to result in exceedances of water quality standards, including impairment of designated uses, or other significant water quality impacts, including habitat and biological impacts. Where such case by case designations have been recommended by the Regional Water Boards prior to adoption of this Order, the designated Small MS4s are listed on the relevant Attachments to the Order and the reasons for designation are laid out in the Fact Sheet. The Regional Water Boards may continue to make case by case determinations of designation during the permit term by notification to the discharger, which shall include a statement of reasons for the designation.

Finally, any Small MS4 that contributes substantially to the pollutant loadings of a physically interconnected municipal separate storm sewer that is regulated by the NPDES storm water program must be designated as Regulated Small MS4s. An MS4 is

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

interconnected with a separately permitted MS4 if storm water that has entered the MS4 is discharged to another permitted MS4. In general, if the MS4 discharges more than 10 percent of its storm water to the permitted MS4, or its discharge makes up more than 10 percent of the other permitted MS4's total storm water volume, it is a significant contributor of pollutants to the permitted MS4. In specific cases, the MS4s involved or third parties may show that the 10 percent threshold is inappropriate for the MS4 in question. The definition for significant contributor of pollutants to an interconnected permitted MS4 uses a volume of 10 percent, with the assumption that storm water contains pollutants. This is meant to capture flows that may affect water quality or the permit compliance status of another MS4, but exclude incidental flows between communities.

c. **New Non-traditional MS4 Permittees**

Non-traditional MS4s include, but are not limited to, universities, prisons, large hospitals, military bases (e.g., State Army National Guard barracks), and State parks.

The previous General Permit, Water Quality Order 2003-0005-DWQ, Attachment 3 listed Non-traditional MS4s anticipated to be designated by the end of the permit term, either by the State or Regional Water Boards. However, some Non- traditional MS4s were not designated. All Non-traditional MS4s, except K-12 School Districts, Offices of Education and Community Colleges, not yet designated are now subject to this Order. These entities are listed in Attachment B.

Additional Non-traditional MS4 Permittees have been designated as Regulated Small MS4s in accordance with the same criteria described in b above.

## VII. APPLICATION REQUIREMENTS

All Regulated Small MS4s listed in Attachments A and B are automatically designated upon adoption of this Order and must file for coverage. To file for coverage, Permittees must electronically file an NOI on the State Water Board's SMARTS website (https://smarts.waterboards.ca.gov/smarts/faces/SwSmartsLogin.jsp) and mail the appropriate permit fee to the State Water Board:

The NOI will include a statement that the discharger intends to comply with the BMP requirements of the Order in lieu of proposing BMP practices. Permittees must file the NOI by July 1, 2013.

Joint Phase II Co-Permittees or Permittees relying on Separate Implementing Entities must also electronically file an NOI via SMARTS and mail the appropriate fee to the State Water Board, by July 1, 2013.

Census Designated Places (CDPs) are included in Attachment A to clearly show that they are designated Phase II entities. However, CDPs that are located within an urbanized area and within an existing NPDES permit area do not have a government entity and as such, are not required to file separately and pay fees. The Permittee (i.e. a designated county) will name the CDPs within their jurisdiction when they file their NOI via SMARTS.

For fee purposes, in determining the total population served by the MS4, both resident and commuter populations are to be included. For example, publicly operated school complexes including universities and colleges, the total population served would include the sum of the average annual student enrollment plus staff.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

For community services districts, the total population served would include the resident population and any non-residents regularly employed in the areas served by the district.

Regulated Small MS4s that fail to obtain coverage under this Order or other NPDES permit for storm water discharges will be in violation of the Clean Water Act and the California Water Code.

The Order includes State and Regional Water Board contact information for questions and submittals.

*Waiver Certification*

This Order allows Regulated Small MS4s to request a waiver of requirements. Regulated Small MS4 must certify (1) their discharges do not cause or contribute to, or have the potential to cause or contribute to a water quality impairment, and (2) they meet one of the following three waiver options:

a.  Option 1

    (1) The jurisdiction served by the system is less than 1,000 people;
    (2) The system is not contributing substantially to the pollutant loadings of a physically interconnected regulated MS4; and
    (3) If the small MS4 discharges any pollutants identified as a cause of impairment of any water body to which it discharges, storm water controls are not needed based on waste load allocations that are part of an EPA approved or established TMDL that addresses the pollutant(s) of concern.

b.  Option 2

    (1) The jurisdiction served by the system is less than 10,000 people;
    (2) The Regional Water Board has evaluated all waters of the U.S. that receive a discharge from the system;
    (3) The Regional Water Board has determined that storm water BMPs are not needed based on wasteload allocations that are part of an EPA approved or established TMDL that addresses the pollutant(s) of concern or an equivalent analysis; and
    (4) The Regional Water Board has determined that future discharges from the Regulated Small MS4 do not have the potential to result in exceedances of water quality standards.

c.  Option 3 (applicable to Small MS4s outside an Urbanized Area only)

    (1) Small Disadvantaged Community – a community with a population of 20,000 or less with an annual median household income (MHI) that is less than 80 percent of the statewide annual MHI (CWC § 79505.5 (a)).

## VIII.  POST-CONSTRUCTION STORMWATER MANAGEMENT CRITERIA FOR NEW DEVELOPMENT AND REDEVELOPMENT

This Order incorporates Site Design and Low Impact Development (LID) Runoff requirements for new development and redevelopment. The Order will incorporate runoff retention and hydromodification control criteria in the next permit term that will be keyed to specific watershed processes as identified by the State Water Board within specific Watershed

Management Zones (WMZs). The WMZs will be used to identify applicable areas and appropriate criteria for runoff retention and hydromodification control.

## IX. DISCHARGE PROHIBITIONS

### Storm Water Discharges

This Order authorizes storm water and conditionally exempt non-storm water discharges[14] from the Permittees' MS4s subject to effluent and receiving water limitations. This Order prohibits the discharge of material other than storm water, unless specifically authorized in this Order.

### Non-Storm Water Discharges

Section 402(p)(3)(B)(ii) of the Clean Water Act requires that MS4 permits include a requirement to effectively prohibit non-storm water discharges into the storm sewers. Prohibition B.3 of the Order implements this requirement. Although the Clean Water Act phrases the non-storm water discharge prohibition as a prohibition of discharges "into the storm sewers," this Order states that "discharges *through the MS4* of material other than storm water to waters of the U.S. shall be effectively prohibited." There is no meaningful distinction between the two language iterations as both prohibit discharges from reaching receiving waters and are consistent with the intent of the Clean Water Act. When discussing the effective prohibition of non-storm water discharger, U.S. EPA's preamble to its Phase I regulations uses the term "through" interchangeably with the term "into." (55 Fed. Reg. 47995.) Staff believes that the use of the phrasing "through the MS4 . . . to waters of the U.S." allows the Permittees greater flexibility with regard to utilizing dry weather diversions.

The Phase I regulations at 40 C.F.R. §122.34(b)(3)(iii). specify certain categories of non- storm water discharges that are conditionally exempt from the prohibition and the Order follows this approach. Unless authorized by a separate NPDES permit, non-storm water discharges that are not specifically exempted by this Order are prohibited. Certain enumerated conditionally exempt non-storm water discharges are allowed provided they are not found to be significant source of pollution If a discharger or a Regional Water Board Executive Officer determines that any individual or class of conditionally exempt non-storm water discharge may be a significant source of pollutants, the Regional Water Board may require the discharger to monitor and submit a report and impose BMPs to control the discharge.

### Areas of Special Biological Significance

The State Water Board adopted the California Ocean Plan (Ocean Plan) on July 6, 1972 and revised the Ocean Plan in 1978, 1983, 1988, 1990, 1997, 2000, 2005 and 2009. The Ocean Plan prohibits the discharge of waste to Areas of Special Biological Significance (ASBS). The State Water Board designates ASBS as ocean areas requiring protection of species or biological communities to the extent that alteration of natural water quality is undesirable.

The Ocean Plan states that the State Water Board may grant an exception to Ocean Plan provisions where the State Water Board determines that the exception will not compromise protection of ocean waters for beneficial uses and the public interest will be served.

---

[14] Conditionally exempt non-storm water also refers to authorized non-storm water.

Page 19

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

On October 18, 2004, the State Water Board directed several dischargers to cease the discharge of storm water and nonpoint source waste into ASBS, or request an exception to the Ocean Plan. Several of these dischargers are designated as Regulated Small MS4s.

On March 20, 2012, the State Water Board adopted Resolution 2012-0012 granting an exception from the Ocean Plan prohibition to 13 parties (Attachment D) designated as Regulated Small MS4s under this Order. In order to legally discharge into an ASBS, the parties must comply with the terms of the exception and have an appropriate authorization to discharge. Authorization for point source discharges to ASBS consists of coverage under this NPDES Order.

The parties authorized to discharge under the general exception are listed in Attachment D. The general exception contains "Special Protections" to protect beneficial uses and maintain natural water quality in ASBS. Limited by the special conditions in the resolution, parties listed in Attachment D can legally discharge waste into ASBS as long as the discharges are also regulated under this Order.

This Order incorporates the terms of the exception and includes the monitoring requirements the 13 parties identified as Regulated Small MS4s must comply with.

## X.  EFFLUENT LIMITATIONS

Consistent with Clean Water Act section 402(p)(3)(B)(iii), this Order requires that Permittees implement controls to reduce the discharge of pollutants from their MS4s to waters of the U. S. to the Maximum Extent Practicable (MEP). The MEP standard requires Permittees to apply Best Management Practices (BMPs) that are effective in reducing or eliminating the discharge of pollutants to the waters of the U.S. MEP emphasizes pollutant reduction and source control BMPs to prevent pollutants from entering storm water runoff. MEP may require treatment of the storm water runoff if it contains pollutants. The MEP standard is an ever-evolving, flexible, and advancing concept, which considers technical and economic feasibility. As knowledge about controlling urban runoff continues to evolve, so does that which constitutes MEP. BMP development is a dynamic process and may require changes over time as the Permittees gain experience and/or the state of the science and art progresses. Permittees must conduct and document evaluation and assessment of each relevant element of the program, and of the program as a whole, and revise activities, control measures/BMPs, and measurable goals, as necessary to meet MEP. MEP requires Permittees to choose effective BMPs, and to reject applicable BMPs only where other effective BMPs will serve the same purpose, the BMPs are not technically feasible, or the cost is prohibitive. Further, because local conditions vary, some BMPs may be more effective in one community than in another. MEP is the cumulative result of implementing, evaluating, and creating corresponding changes to a variety of technically appropriate and economically feasible BMPs, ensuring that the most appropriate BMPs are implemented in the most effective manner. Under 40 Code of Federal Regulations section 122.44(k)(2) & (3), the State Water Board may impose BMPs for control of storm water discharges in lieu of numeric effluent limitations.[15]

---

[15] On November 12, 2010, U.S. EPA issued a revision to a November 22, 2002, memorandum in which it had "affirm[ed] the appropriateness of an iterative, adaptive management best management practices (BMP) approach" for improving storm water management over time. In the revisions, U.S. EPA recommended that, in the case the permitting authority

In 2004, the State Water Board assembled a blue ribbon panel to address the feasibility of including numeric effluent limits as part of NPDES municipal, industrial, and construction storm water permits. The panel issued a report dated June 19, 2006, which included recommendations as to the feasibility of including numeric limits in storm water permits, how such limits should be established, and what data should be required.

The report concluded that "It is not feasible at this time to set enforceable numeric effluent criteria for municipal BMPs and in particular urban discharges. However, it is possible to select and design them much more rigorously with respect to the physical, chemical and/or biological processes that take place within them, providing more confidence that the estimated mean concentrations of constituents in the effluents will be close to the design target."

Consistent with the federal regulations, the findings of the Blue Ribbon Panel, and precedential State Water Board orders (State Water Board Orders Nos. WQ 91-03 and WQ 91-04), this Order allows the Permittees to implement BMPs to comply with the requirements of the Order.

## XI. RECEIVING WATER LIMITATIONS

Under federal law, an MS4 permit must include "controls to reduce the discharge of pollutants to the maximum extent practicable . . . and such other provisions as . . . the State determines appropriate for the control of such pollutants." (Clean Water Act §402(p)(3)(B)(iii).) Consistent with this provision, requirements to meet water quality standards are at the discretion of the permitting agency. (*Defenders of Wildlife v. Browner* (9th Cir. 1999) 191 F3d 1159.)

The State Water Board has previously determined that limitations necessary to meet water quality standards are appropriate for the control of pollutants discharged by MS4s and must be included in MS4 permits. (State Water Board Orders WQ 91-03, 98-01, 99- 05, 2001-15).). This Order accordingly prohibits discharges that cause or contribute to violations of water quality standards. Consistent with federal law, the State Water Board has also found it appropriate to require implementation of BMPs in lieu of numeric water quality-based effluent limitations and further, in lieu of "strict compliance" with water quality standards, has prescribed an iterative process of BMP improvement to achieve water quality standards. (State Water Board Orders WQ 91-03, 98-01, 2001-15; 40 C.F.R. §122.44(k).) As a result, this Order further sets out that, upon determination that a Permittee is causing or contributing to an exceedance of applicable water quality standards, the Permittee must engage in an iterative process of proposing and implementing additional control measures to prevent or reduce the pollutants causing or contributing to the exceedance. This iterative process is modeled on receiving water limitations set out in State Water Board precedential Order WQ 99-05 and required by that Order to be included in all municipal storm water permits.

---

determines that MS4 discharges have the reasonable potential to cause or contribute to a water quality excursion, the permitting authority, where feasible, include numeric effluent limitations as necessary to meet water quality standards. However, the revisions recognized that the permitting authority's decision as to how to express water quality based effluent limitations (WQBELs), i.e. as numeric effluent limitations or BMPs, would be based on an analysis of the specific facts and circumstances surrounding the permit. U.S. EPA has since invited comment on the 2010 memorandum and will be making a determination as to whether to "either retain the memorandum without change, to reissue it with revisions, or to withdraw it." http://www.epa.gov/npdes/pubs/sw_tmdlwla_comments_pdf

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The Water Boards have generally directed dischargers to achieve compliance with water quality standards by improving control measures through the iterative process and, as a matter of practice, have generally declined to initiate enforcement actions against MS4 permittees who have been actively engaged in the iterative process. At the same time, however, the Water Boards have maintained that the iterative process does not provide a "safe harbor" to MS4 permittees:[16] that is, when a discharger is shown to be causing or contributing to an exceedance of water quality standards, that discharger is in violation of the relevant discharge prohibitions and receiving water limitations of the permit and potentially subject to enforcement by the Water Boards or through a citizen suit, even if the discharger is actively engaged in the iterative process.

The question of the "safe harbor" became a priority concern for storm water dischargers following the Ninth Circuit's holding in *Natural Resources Defense Council, Inc. v. County of Los Angeles* (2011) 673 F.3d 880 that engagement in the iterative process does not provide a safe harbor from liability for violations of permit terms prohibiting exceedances of water quality standards. Although the U.S. Supreme Court has reversed the judgment of the Ninth Circuit and remanded (on grounds unrelated to the "safe harbor" holding), *LA County Flood Control District v. NRDC* (2013) 568 U.S., the receiving water limitations provisions is expected to remain a significant issue for dischargers based on the position, to date, of the Water Boards that the iterative process does not provide a "safe harbor" from violations. The State Water Board has received multiple comments, from dischargers and from other interested parties, expressing confusion and concern about the Order provisions regarding receiving water limitations and the iterative process. Many commenters have stated that the provisions as currently written do not provide the dischargers with a viable path to compliance with the proposed Order. Other commenters, including environmental parties, support the current language.

As stated above, the provisions in this Order regarding receiving water limitations and the iterative process are based on precedential Board orders. Accordingly, substantially identical provisions are found in the adopted Caltrans MS4 NPDES permit, as well as the Phase I NPDES permits issued by the Regional Water Boards. Because of the broad applicability of any policy decisions regarding the receiving water limitations and iterative process provisions, the State Water Board held a public workshop on November 20, 2012, to consider this issue and seek public input.

Rather than delay consideration of adoption of the tentative Order in anticipation of any future changes to the receiving water limitations and iterative process provisions that may result from the public workshop and deliberation, the Board has added a specific reopener clause at Section H to facilitate any future revisions as necessary.

## XII. STORM WATER MANAGEMENT PROGRAM FOR TRADITIONAL MS4S PROGRAM ELEMENTS

### Program Management

This component is essential to ensure timely implementation of all elements of the storm water program and consistency with the Order requirements. Lessons learned in California from

---

[16] *Building Industry Assn. of San Diego County v. State Water Resources Control Bd*. (2004) 124 Cal.App.4th 866; *City of Rancho Cucamonga v. Regional Water Quality Control Bd*. (2006) 135 Cal.App.4th 1377.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Phase I Permittees and various municipal audits are that a Program Management element can:

1. Identify departments that assist with the implementation of the program as well as their roles and responsibilities; and
2. Maintain and enforce adequate legal authority to control pollutant discharges.

*Adequate Legal Authority and Certification*
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. §§ 122.22(b), 122.34(b)(3)(ii)(B), (b)(4)(ii)(A), and (b)(5)(ii)(B); 122.41(k). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA, EPA-833-R-07-003

Adequate legal authority is required for Permittees to implement and enforce their storm water programs. Without adequate legal authority, Permittees would be unable to perform many vital program elements such as performing inspections and requiring installation of control measures. In addition, Permittees would not be able to conduct enforcement activities, assess penalties and/or recover costs of remediation.

*Enforcement Response Plan*
Legal Authority: Clean Water Act §402(p)(3)(b); MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA, EPA-833-R-07-003

In ordinances or other regulatory mechanisms, Permittees are required to include penalty provisions to (1) ensure compliance with construction and industrial requirements, (2) to require the removal of illicit discharges, and (3) to address noncompliance with post-construction requirements. To meet these requirements, this Order requires enforcement responses that vary with the type of permit violation, and escalate if violations are repeated or not corrected. The Permittee must develop and implement an Enforcement Response Plan (ERP), which clearly describes the action to be taken for common violations associated with the construction program, illicit discharge detection and elimination, or other program elements. A well-written ERP provides guidance to inspectors on the different enforcement responses available, actions to address general permit non-filers, when and how to refer violators to the State, and how to track enforcement actions.

**Education and Outreach on Storm Water Impacts**
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(1); MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA , EPA-833-R-07-003; U.S. EPA Stormwater Phase II Final Rule Fact Sheet Series, U.S. EPA Stormwater Phase II Final Rule (64 FR 68722), EPA National Menu of Best Management Practices for Stormwater Phase II[17]; Measurable Goals Guidance for Phase II Small MS4s; U.S. EPA Getting In Step

Without a focused and comprehensive program, outreach and education efforts will be poorly coordinated and ineffective. This Order requires Permittees to develop an education and outreach program that is tailored and targeted to specific water quality issues of concern in the community. These community-wide and targeted issues should then guide the development of the comprehensive outreach program, including the creation of appropriate messages and

---

[17] http://cfpub.epa.gov/npdes/stormwater/menuofbmps/

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

educational materials. Outreach and education not only includes the public as the target audience, but includes Permittee staff and construction site operators as well.

This Order includes a different compliance path that, upon determination by a Regional Board Executive Officer, requires the possible implementation of Community-Based Social Marketing (CBSM). CBSM is a systematic way to change the behavior of communities to reduce their impact on the environment. Simply providing information is usually not sufficient to initiate behavior change. CBSM uses tools and findings from social psychology to discover the perceived barriers to behavior change and ways of overcoming these barriers.[18]

CBSM is also cited in EPA's Getting in Step[19] outreach guide which includes successful CBSM case studies. The CBSM path is included in Attachment E.

To ensure effective implementation of CBSM principles, Regional Water Boards who have invoked Attachment E, CBSM Requirements, are encouraged to consult with Permittees to ensure CBSM principles are implemented adequately. Regional Board staff should use the first year annual report and effectiveness assessment information during the consultation. The information gained from the consultation should assist the Regional Water Board's evaluation of program effectiveness and whether a Permittee should continue implementation of Attachment E.

In addition to external public outreach, outreach and education efforts should also be directed internally at Permittee staff who, as part of their normal job responsibilities, participate in storm water program operations such as illicit discharge detection and elimination, construction, and pollution prevention and good housekeeping. The training program will ensure proper illicit discharge and illicit connection identification, reporting and response. The construction training program will ensure that Permittee staff who is responsible for construction storm water program implementation receive adequate training. Additionally, the Permittee must develop educational materials and training for construction site operators to ensure program compliance. Construction operators must be educated about site requirements for control measures, local storm water requirements, enforcement activities, and penalties for non-compliance. Permittee staff training in pollution prevention/good housekeeping will ensure the incorporation of pollution prevention/good housekeeping techniques into Permittee operations.

A comprehensive and cohesive outreach and education program will likely be effective and well-coordinated if it involves the public, storm water program staff, and construction site operators.

This Order includes a list of potential residential and commercial pollution sources, but the Permittee may also identify other sources that contribute significant pollutant loads to the MS4. The Order identifies specific pollutant generating activities that must be addressed, including organized car washes, mobile cleaning and power washing operations, and landscape over-irrigation.

---

[18] A variation of social marketing, referred to as CBSM by Canadian environmental psychologist Doug McKenzie- Mohr

[19] Getting in Step, 3rd Edition, A Guide to Watershed Outreach Campaigns, November 2010 EPA 841-B-10-002

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The Permittee is encouraged to use existing public educational materials in its program. The Permittee is also encouraged to leverage resources with other agencies and municipalities with similar public education goals.

In addition, this Order requires storm water education for school-age children. The United States suffers from a "nature deficit disorder" as discussed in popular literature (e.g., "Last Child in the Woods" by Richard Louv) and elsewhere (American Fisheries Society "Fisheries" magazine, available online at www.fisheries.org). As discussed in the "America's Great Outdoors: A Promise to Future Generations" report, in order to make environmental stewardship and conservation relevant to young Americans, environmental and place-based, experiential learning must be integrated into school curricula and school facility management across the country.[20] If a program such as Splash (www.sacsplash.org/ ),Effie Yeaw Nature Center (www.sacnature.net) or Yolo Basin (www. Yolobasin.org) does not exist, Permittees are encouraged to use California's Education and Environment Initiative Curriculum (EEI)[21] or equivalent. California's landmark EEI Curriculum is a national model designed to help prepare today's students to become future scientists, economists, and green technology leaders.

The K-12th grade curriculum is comprised of 85 units teaching select Science and History-Social Science academic standards. Each EEI Curriculum unit teaches these standards to mastery using a unique set of California Environmental Principles and Concepts. The EEI curriculum was created to bring education about the environment into the primary and secondary classrooms of more than 1,000 school districts serving over 6 million students throughout California.

Classroom education plays an integral role in any storm water pollution outreach program. Providing storm water education through schools conveys the message not only to students but to their parents. Permittees should partner with educators and experts to develop storm water-related programs for the classroom. These lessons need not be elaborate or expensive to be effective.

The Permittees' role is to support a school district's storm water education efforts, not to dictate what programs and materials the school should use. Permittees should work with school officials to identify their needs. For example, if the schools request storm water outreach materials, Permittees can provide a range of educational aids, from simple photocopied handouts, overheads, posters and slide shows, to more costly and elaborate working models and displays.

The principal goal of any public education and outreach effort is to change awareness and knowledge. The advanced level public education and outreach effort goes a step further in pursuit of changing behavior. The Permittee should develop a process to assess its public education and outreach programs and to determine necessary improvements to raise public awareness and knowledge. The Permittee is encouraged to use a variety of assessment methods to evaluate the effectiveness of different public education activities. The first evaluation assessment must be conducted before the final year of the Permittee's coverage under this permit, before the next permit is issued. Permittees should coordinate their evaluation assessment with other Permittees on a regional level to determine how best to get

---

[20] http://americasgreatoutdoors.gov/files/2011/02/AGO-Report-With-All-Appendices-3-1-11.pdf
[21] http://www.californiaeei.org/

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

the regional message out and how to facilitate awareness, knowledge and ultimately, behavior changes.

**Public Involvement/Participation**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(2). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Storm water management programs can be greatly improved by involving the community throughout the entire process of developing and implementing the program. Involving the public benefits both the Permittee as well as the community. By listening to public concerns and coming up with solutions together, the Permittee stands to gain public support and the community should become invested in the program. The Permittees will likewise gain more insight into the most effective ways to communicate their messages.

This Order requires the development of a public involvement strategy, which may include a citizen advisory group or process to solicit feedback on the storm water program, and opportunities for citizens to participate in implementation of the storm water program. If a citizen advisory group is developed, the group should meet with the local land use planners and provide input on land use code or ordinance updates so that land use requirements incorporate provisions for better management of storm water runoff and watershed protection. Public participation in implementation of the storm water program can include many different activities such as stream clean-ups, storm drain markings, volunteer monitoring, and participation in integrated regional water management and watershed planning efforts.

Permittees are encouraged to work together with other entities that have an impact on storm water (for example, schools, homeowner associations, Department of Transportation agencies, other MS4s). Permittees are also encouraged to work through existing advisory groups, community groups or processes in order to implement these public involvement requirements.

**Illicit Discharge Detection and Elimination**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(3). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Studies have shown that dry weather flows from the storm drain system may contribute a larger amount of some pollutants than wet weather storm water flows.[22] Detecting and eliminating these illicit discharges involves complex detective work, which makes it hard

to establish a rigid prescription to identify and correct all illicit connections. There is no single approach to take, but rather a variety of ways to get from detection to elimination. Local knowledge and available resources can play significant roles in determining which path to take. At the very least, communities need to systematically understand and characterize their stream, conveyance, and storm sewer infrastructure systems. Illicit discharges need to be identified and eliminated. The process is ongoing and the effectiveness of a program should improve with time. A well-coordinated IDDE programs can benefit from and contribute to other

---

[22] Evaluation of Non-Storm water Discharges to California Storm Drains and Potential Policies for Effective Prohibition. California Regional Water Quality Control Board. Los Angeles, CA., Duke, L.R. 1997., Results of the Nationwide Urban Runoff Program. Water Planning Division, PB 84-185552, Washington, D.C. U.S. EPA. 1983.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

community-wide water resources- based programs such as public education, storm water management, stream restoration, and pollution prevention.[23]

This Order requires the Permittees to address illicit discharges into the MS4. An illicit discharge is defined as any discharge to a municipal separate storm sewer system that is not composed entirely of storm water, except allowable discharges pursuant to an NPDES permit (40 C.F.R. 122.34(b)(3)).[24] This Order includes requirements that the Permittee have the legal authority to effectively prohibit non-storm water discharges from entering storm sewers as well as provisions requiring the development of a comprehensive, proactive IDDE program.

Specifically, this Order requires the development of a map that includes outfalls operated by the Permittee within the urbanized area. The map will also include identification of receiving water bodies, priority areas (i.e. areas with a history of past illicit discharges), and the permit boundary.

It is essential for Permittees to understand their stream and storm sewer systems and how illicit discharge sources are connected to outfalls that discharge to their system. To that end, this Order requires the development of an inventory that identifies potential illicit discharge sources and facilities. To proactively identify illicit discharges originating from priority inventoried sources, it is essential that an assessment is conducted at least once over the permit term. The assessment may include field observations, field screening, inspections and any other appropriate and effective survey methods that proactively identify potential illicit discharges. As an alternative, the Permittee may require a self-certification program that all appropriate BMPs are in place to prevent illicit discharges from the inventoried source or facility.

Further, a once per permit term survey of outfalls will identify outfalls needing sampling and possible follow-up actions[25]. The outfall inventory will also assist Permittees in the identification of "problem" outfalls, or those outfalls that may have a history of past illicit discharges. The inventory can be utilized to conduct source investigations and corrective actions for potential illicit discharges into their system.

Additionally, dry weather sampling must be conducted in each subsequent year of the permit term for outfalls identified as priority areas. While the Order specifies indicator parameters used to detect illicit discharges, the Permittee may select alternative parameters to sample that are based on local pollutants of concern. Similarly, the action level concentrations for the indicator parameters may also be tailored to match the parameters selected based on local knowledge. Finally, the outfall inventory will assist Permittees in clearly understanding the stream system and the storm sewer system within their jurisdiction.

The Permittee shall provide a mechanism for public reporting of illicit discharges and spills.

---

[23] Illicit Discharge Detection and Elimination A Guidance Manual for Program Development and Technical Assessments, CWP and Pitt, 2006

[24] Non-point source return flows from irrigated agriculture are not considered illicit discharges.

[25] The Permittee may utilize existing forms such as the CWP Outfall Reconnaissance Inventory/Sample Collection Field Sheet (http://cfpub.epa.gov/npdes/stormwater/idde.cfm) while conducting the mapping inventory and Field Sampling as specified below, in Section E.9.c.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Construction Site Storm Water Runoff Control**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(4). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Permittees must implement a construction site storm water runoff management program that includes an enforceable ordinance or other regulatory mechanism with commonly understood and legally binding definitions. These terms should be defined consistently across other related guidance and regulatory documents. The construction site storm water runoff management program is designed to prevent pollutants associated with construction activity from entering receiving water bodies (i.e. sediment, fertilizers, pesticides, paints, solvents and/or fuels).

The Permittee must ensure that construction site operators select and implement appropriate construction site storm water runoff management measures to reduce or eliminate impacts to receiving waters. The Permittee is required to utilize California Stormwater Quality Association's (CASQA) Construction BMP handbook or equivalent to help guide their Construction Program). In the case that a project proponent is not implementing appropriate measures to reduce or eliminate impacts to receiving waters (i.e. ineffective BMPs installed), the Permittee must take appropriate enforcement action to address the problem. Enforcement may include verbal warnings, written notices and escalated enforcement measures as described in the Enforcement Response Plan (Section E.6.c. of the Order).

While the construction site storm water runoff management program focuses the Permittee's detailed inspections on projects less than one acre, Permittees must use their discretion to provide oversight to projects that are subject to the CGP that pose a threat to water quality. For example, in the case that a Permittee identifies a project subject to the CGP that has BMPs that have not been maintained, the Permittee should notify the local Regional Water Board. Priority project sites include: sites with 5 acres or more of soil disturbance, sites with one acre or more soil disturbance that discharge to a tributary listed as impaired water for sediment or turbidity under the CWA Section 303(d), and other sites with one acre or more of soil disturbance determined by the Permittee or State or Regional Water Quality Control Board to be a significant threat to water quality.

**Pollution Prevention/Good Housekeeping for Permittee Operations**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(6)

Permittees are required to develop a program to:

a. Prevent or reduce the amount of storm water pollution generated by permittee operations.
b. Train employees on how to incorporate pollution prevention/good housekeeping techniques into permittee operations.
c. Identify appropriate control measures and measurable goals for preventing or reducing the amount of storm water pollution generated by permittee operations.

Permittees must first assess the areas and municipal facilities that it controls, determine which activities may currently have a negative impact on water quality, and find solutions for any problems. The simplest solution is to limit the number of activities that are conducted outside and exposed to storm water.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*Storm Drain System Maintenance*

Storm drain systems need maintenance to ensure that structures within the storm drain system that are meant to reduce pollutants do not become sources of pollution. Maintenance of catch basins and storm sewers will prevent the accumulation of pollutants that are later released during rain events as well as blockages, backups, and flooding. Most Permittees have an existing program to maintain the storm sewer infrastructure. Some of these programs have tended to focus on flood control and complaint response rather than reducing water quality impacts from storm water discharges.

This Order requires that the system be maintained to prevent the discharge of pollutants into receiving waters. To achieve this, the storm sewer system must be mapped and a program of regular maintenance established. The Permittee must establish a tiered maintenance schedule for the entire storm sewer system area, with the highest priority areas being maintained at the greatest frequency. Priorities are driven by water quality concerns and can be based on the land use within the watershed, the condition of the receiving water, the amount and type of material that typically accumulates in an area, or other location-specific factors. The Permittee also must use spill and illicit discharge data to track areas that may require immediate sewer infrastructure maintenance. Any waste that is collected must be disposed of in a responsible manner.

All storm sewer system maintenance procedures should be documented in the Permittee's standard operating procedures (SOPs) or similar type of documents. All staff should be trained on these SOPs. Maintenance activities should be documented and, where possible, quantified (e.g., number and location of inspections and clean- outs, type and quantity of materials removed). Characterization of the quantity, location, and composition of pollutants removed from catch basins can be used to assess the program's overall effectiveness, identify illicit discharges, and help the Permittee better prioritize implementation activities in the future.

*Pollutant Generating Activities*

This Order contains specific requirements and recommendations related to pollutant-generating activities such as discouraging conventional landscaping practices (including the application of pesticides, herbicides, and fertilizer) and operating and maintaining public streets.

Resource-sensitive landscaping practices such as integrated pest management (IPM), climate appropriate plant selection and irrigation, and mechanical (non-chemical) removal of unwanted plants are required under this Order. The use of other landscaping practices, such as mulch and compost, minimizing chemical inputs (pesticides, herbicides, and fertilizer), emphasis on maintaining and enhancing soil quality, and erosion control is required. The Order recognizes the storm water quality benefits that will likely result from implementation of the Water Efficient Landscape Ordinance required under AB 1881.

*Flood Management Projects*

The Order requires that water quality be considered when designing new and upgraded flood management projects. The focus of storm water management in the past has been to control flooding and mitigate property damage, with less emphasis on water quality protection. These structures may handle a significant amount of storm water and therefore offer an opportunity to modify their design to include water quality features for less than the cost of building new controls. This requirement applies to new and upgraded flood control projects.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*Municipally-owned or operated facilities*

Municipally-owned or operated facilities often serve as the focal point of activity for municipal staff from different departments. Some municipalities have one facility at which all activities take place (e.g., the municipal maintenance yard), while others may have several specialized facilities. A comprehensive inventory and map of facilities will help Permittee staff build a better awareness of facility locations within the MS4 and their potential to contribute storm water pollutants. The facility inventory will also serve as a basis for scheduling periodic facility assessments and developing, where necessary, facility storm water pollution prevention plans.

The best way to avoid pollutant discharges is to keep precipitation and runoff from coming into contact with potential pollutants. For example, the Permittee should cover or build berms around stockpiles, create dedicated structures for stored materials, and maintain a minimum distance between stockpiles and storm water infrastructure and receiving waters.

*Inspections*

This Order requires comprehensive quarterly site inspections which is an appropriate frequency to ensure that material stockpiles that might be moved or utilized on a seasonal basis are protected from precipitation and runoff. Also, quarterly inspections will allow inspectors to observe different types of operations that occur at different times of the year (e.g., landscape maintenance crews are less active in the winter). Quarterly visual observations are required so that inspectors can see in real time the qualitative nature of the storm water discharge so that corrective action can be taken where necessary to improve on-site storm water controls.

This Order also specifies documentation requirements of inspection procedures and results, including inspection logs for each facility to ensure that the site inspections are consistent and that maintenance of storm water controls remains part of the municipality's standard operating procedures. The requirement for an inspection log will allow the Regional Water Boards to verify that periodic site inspections have been performed.

*Storm Sewer System Maintenance*

Fine particles and pollutants from run-off, run-on, atmospheric deposition, vehicle emissions, breakup of street surface materials, littering, and sanding (for improving traction in snow and ice) can accumulate in the gutters between rainfall events. Storm drain maintenance is often the last opportunity to remove pollutants before they enter the environment. Because storm drain systems effectively trap solids, they need to be cleaned periodically to prevent those materials from being picked up during high flow storm events.

Some catch basins will accumulate pollutants faster than others due to the nature of the drainage area and whether controls are present upstream of the catch basin. A priority ranking system is required for catch basins so that municipal resources are directed to the areas and structures that generate the most pollutants. Catch basins with the highest accumulations will need to be cleaned more frequently than those with low accumulations. The Order also includes a requirement that triggers catch basin cleaning when a catch basin is one-third full.[26]

Proper storm drain system cleanout includes vacuuming or manually removing debris from catch basins; vacuuming or flushing pipes to increase capacity and remove clogs; removing

---

[26] Note: This requirement was eliminated from the Final Order as adopted on February 5, 2013.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

sediment, debris, and overgrown vegetation from open channels; and repairing structures to ensure the integrity of the drainage system. It is important to conduct regular inspections of all storm sewer infrastructure and perform maintenance as necessary. Though these activities are intended to ensure that the storm drain system is properly maintained and that any accumulated pollutants are removed prior to discharge, if not properly executed, cleanout activities can result in pollutant discharges. The Permittee should carefully evaluate maintenance practices to minimize unintended pollutant discharges, such as flushing storm drains without capturing the discharge.

Materials removed from catch basins must not be allowed to reenter the MS4. If necessary, the material can be dewatered in a contained area and the water treated with an appropriate and approved control measure or discharged to the sanitary sewer. The solid material must be disposed of properly to avoid discharge during a storm event. Some materials removed from storm drains and open channels may require special handling and disposal, and may not be suitable for disposal in a landfill.

*Green waste on the streets*[27]
For some Traditional MS4 Permittees, residents are allowed to deposit non- containerized green waste (lawn and garden clippings) onto the street for weekly collection by the municipal staff. Permittees instruct residents to put the green waste out right before collection and to avoid putting it in gutters or near storm drains. However, green waste on the street is a potential illicit discharge and maintenance concern.[28] This Order prohibits green waste on the streets. Permittees must find additional ways to educate residents on the potential problems this practice can cause or to find alternatives to the current practice.

*Street Sweeping and Cleaning Streets*
Street sweeping and cleaning streets and parking lots is a practice that most municipalities initially conducted for aesthetic purposes or air quality benefit. However, the water quality benefits are now widely recognized. As a result, many California MS4 permits require some sort of street sweeping provision that require the MS4 to prioritize streets as high, medium, and low pollutant-generators and base the cleaning schedule appropriately.

This Order does not include street sweeping and cleaning streets as a permit requirement because MS4s already conduct these activities for aesthetics and air quality benefit. Permittees should count street sweeping not as a storm water compliance cost, but an aesthetic and air quality cost.

*Third-party contractors*
Third-party contractors conducting municipal maintenance activities must be held to the same standards as the Permittee. These expectations are required to be defined in contracts between the Permittee and its contractors; however, the Permittee is responsible for ensuring, through contractually-required documentation or periodic site visits, that contractors are using storm water controls and following standard operating procedures.

---

[27] Note: This requirement was eliminated form the Final Order as adopted on February 5, 2013.

[28] Program Evaluation Report, Sacramento Area Stormwater Program, NPDES Permit No. CA0082597, May 21, 2002, USEPA and Tetra Tech Inc.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

**Post Construction Storm Water Management for New Development and Re-development**
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(5). MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; U.S. EPA Incorporating Environmentally Sensitive Development into Municipal Stormwater Programs, EPA 833-F-07-011

In California, urban storm water is listed as the primary source of impairment for ten percent of all rivers, ten percent of all lakes and reservoirs, and 17 percent of all estuaries (2010 Integrated Report). Although these numbers may seem low, urban areas cover just six percent of the land mass of California[29], and so their influence is disproportionately large. Urbanization causes a number of changes in the landscape, including increased loads of chemical pollutants; increased toxicity; changes to flow magnitude, frequency, and seasonality of various discharges; physical changes to stream, lake, or wetland habitats; changes in the energy dynamics of food webs, sunlight, and temperature; and biotic interactions between native and exotic species.[30] These impacts are also referred to as "urban stream syndrome [31]. In addition to surface water impacts, urbanization can alter the amount and quality of storm water that infiltrates and recharges groundwater aquifers. In essence, once watershed processes are disturbed, receiving water conditions also become disturbed, (Figure 1)

In California and the rest of the United States, the challenge to storm water managers and regulators has been to establish goals and performance standards that account for the highly variable nature of urban flow and pollutant inputs while ensuring that the ultimate biological response is within "acceptable" limits. The Surface Water Ambient Monitoring Program (SWAMP) is attempting to define biological responses through their Biological Objectives Development Process. Although final results and policy recommendations from this effort are not yet available, linking urbanization drivers to biological response represents the next phase in storm water management and cannot be delayed.[32]

---

[29] U.S. Department of Agriculture, 2009

[30] Urban Storm Water Management in the United States, National Research Council, 2008.

[31] Walsh, C.J., A.H.Roy, J.W. Feminella, P.D. Cottingham, P.M. Groffman, and R.P. Morgan. 2005. The urban stream syndrome: current knowledge and the search for a cure. J. N. Am. Benthol. Soc. 24(3):706–723.

[32] Urban Storm Water Management in the United States, National Research Council, 2008.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Figure 1 – Relationship between Physical Landscape, Watershed Processes, and Receiving Water Condition**



IN AN UNDISTURBED ("INTACT") LANDSCAPE:

The Physical Landscape →
         Watershed Processes →
                  Receiving Water Conditions


IN A DISTURBED (SPECIFICALLY, URBANIZED) LANDSCAPE:

The Physical Landscape →
         Disturbance →
                  Disturbed Watershed Processes →
                           Disturbed Receiving Water Conditions

The Water Boards have historically derived site design, runoff reduction and hydromodification control criteria without identifying the dominant watershed processes and the sensitivity of receiving waterbodies to degradation of those processes. In most MS4 permits, projects are subject to the same set of criteria regardless of the dominant watershed processes and the sensitivity of receiving waters to degradation of those processes. In reality, every location on the landscape does not require the same set of control criteria because of intrinsic differences in the dominant watershed processes at each location and sensitivity of receiving waters to degradation of those processes. In recognizing this, the State Water Board is developing criteria that are more protective of receiving water quality.

The existing General Permit requires post-construction controls for areas of high growth or areas with a population greater than 50,000. These requirements are contained in Attachment 4 of Order 2003-0005-DWQ and include matching pre-development peak discharge rates, conserving natural areas, minimizing storm water pollutants of concern, protecting slopes and channels, and designing volumetric and flow through treatment measures to handle a specific volume or flow rate. These requirements represented an initial attempt at establishing performance standards that account for hydrological and geomorphological processes (Figure 1). Recent research has yielded new information on complex watershed process interactions. For example, storm water management techniques that are intended to mimic natural hydrologic functions (e.g., low impact development) can protect key hydrologic processes such as surface and base flow, and groundwater recharge. Additionally, there is increasing awareness that, while site- based requirements are important to reduce impacts from urbanization, a site-based approach alone is unable to achieve a broader set of watershed goals, especially given the State Water Board's interest in regional issues such as water reuse, groundwater management, and maintaining instream flows. Consequently, a better understanding of watershed conditions and processes has become increasingly important in the development of MS4 permits.

This Order has specific site design and LID requirements for all projects. The LID requirements emphasize landscape-based site design features that are already required elsewhere (e.g., the Water Efficient Landscape Ordinance required under AB 1881).

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

_Hydromodification Requirements_

This Order also incorporates a baseline peak flow matching requirement for hydromodification control. During this permit term, the State Board will work towards developing runoff retention and hydromodification control criteria that are keyed to watershed processes (See discussion in Section VIII.) Watershed management zones[33] will be delineated by the State Board during this permit term. The watershed management zones will be used to identify applicable areas and to determine appropriate criteria for runoff retention and hydromodification control. Watershed process based runoff retention and hydromodification criteria will be incorporated into the next permit. Through the development of hydromodification measures based on watershed management zones, key watershed processes will be protected, and where degraded, restored. As a result of restored and maintained watersheds, key relationships between hydrology, channel geomorphology and biological health will be created and maintained and water quality/beneficial uses protected.

The State Water Board's efforts in developing runoff retention and hydromodification control criteria keyed to watershed processes can be significantly informed by similar efforts carried out regionally under the Regional Water Boards. This Order provides at Provision E.12.k (also referenced in F.5.g.) that Small MS4s shall comply with any post- construction storm water management requirements based on a watershed process approach developed by Regional Water Boards in lieu of the post-construction requirements of E.12 (also referenced in F.5.g.). The regional watershed process- based approach must be approved by the Regional Water Board following a public process and must include the following:

- Completion of a comprehensive assessment of dominant watershed processes affected by urban storm water
- LID site design and runoff reduction measures, numeric runoff treatment and retention controls, and hydromodification controls that will maintain watershed processes and protect water quality and beneficial uses.
- A process by which Regional Board staff will actively engage Permittees to adaptively manage requirements as determined by the assessment of watershed processes.
- An annual reporting program that involves Regional Board staff and State Board staff to inform statewide watershed process based criteria.

A watershed process-based approach is already being used for Phase II MS4s that participated in the Central Coast Joint Effort for developing hydromodification control criteria. By Resolution No. R3-2012-0025 dated September 6, 2012, the Central Coast Water Board approved modifications to the SWMPs of MS4s participating in the Joint Effort. These modifications would incorporate the Central Coast-Specific Post- Construction Requirements into the SWMPs. Several petitions are currently pending before the State Water Board challenging the Resolution. In the November 16, 2012, draft of this Order, the requirements developed in the Joint Effort were proposed to be adopted into the Order as Attachment J. After receiving extensive public comment on Attachment J, the State Water Board determined that, while the Board continues to support a watershed process-based approach to hydromodification requirements, the Joint Effort process should be allowed to evolve and

---

[33] A Watershed Management Zone (WMZ) is a combination of a Physical Landscape Zone (PLZ, based on surficial geology and slope) and direct receiving water type. Key watershed processes potentially impacted by urbanization (e.g., infiltration and groundwater recharge) are derived from each PLZ-receiving water combination.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

proceed, without incorporation into this Order, to address several unresolved issues acknowledged by the parties to that process, including the Regional Water Board.

Under Provisions E.12.k (also referenced in F.5.g), the Central Coast Region Small MS4s will be required to implement watershed process-based requirements developed through the Joint Effort only after those requirements have been reconsidered and approved by the Central Coast Water Board. Because the requirements cannot be imposed through existing Resolution No. R3-2012- 0025 (which operated as an update to SWMPs that are no longer required under this Order), the State Water Board expects the pending petitions on that Resolution to be moot as of adoption of this Order. As part of the petition process, the State Water Board will evaluate whether the entirety of the petitions are moot following adoption of the Order. However, any future action by a Regional Water Board, including the Central Coast Water Board, to adopt a regional watershed process-based approach would be subject to petitions for review by the State Water Board.

*Multiple-benefits Projects*
This Order encourages and allows for multiple-benefits projects at various scales. At the development site scale, multiple-benefit site design measures are required for all projects that create and/or replace more than 2,500 square feet of impervious surface. Designers are able to quantify runoff reduction using a site design runoff calculator in SMARTS for site design measures (e.g., trees, stream setbacks and buffers, and soil quality improvement). The site design measures in this Order all have multiple benefits (e.g., shading from trees, wildlife habitat from stream setbacks and buffers, less need for pesticides and irrigation from soil quality improvement) in addition to storm water runoff and pollutant load reduction. At the site and local scale, smart growth projects that utilize density, design and land use strategically to achieve multiple benefits including environmental, economic and social benefits are encouraged. For example, high density development contributes to less impervious surface than low density development, generally resulting in less vehicle-related emissions and pollutants (e.g., heavy metals, oil and grease, fine sediment), improved water and air quality results, thus, achieving environmental benefits. The clustering of populations through high density development essentially substitutes evaluation of individual site design criteria for evaluation of per capita loading (Jacob and Lopez 2009[34]). As such, Permittees may implement an alternative approach to requirements for bioretention measures if they can effectively demonstrate a reduction in runoff volume per capita. In other words, alternative compliance may be achieved through the implementation of high density development, or smart growth projects.

Section E.12.l gives "credit" and creates incentive for Permittees to identify and implement watershed scale projects that achieve multiple-benefits. When evaluating watershed-scale, multiple-benefits projects, environmental, social, technical, economic, and political considerations can become intertwined to the point of intractability. These criteria need to be systematically examined through an organizing framework for rational analysis and alternative comparison. A Multi-Criterion Decision Analysis (MCDA) approach provides a flexible, rational, and transparent means to establish decision- making criteria and prioritize alternatives, assuring that projects achieve the desired multiple-benefit outcomes. Watershed scale

---

[34] Jacob, John S. and Lopez, Ricardo. Is Denser Greener? An Evaluation of Higher Density Development as an Urban Stormwater-Quality Best Management Practice. Journal of the American Water Resources Association. June 2009: 45:3: 687 – 701.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

multiple-benefit projects include projects that address water quality, water supply, flood control, habitat enhancement, open space preservation, recreation, and climate change.

Once these projects are identified under Watershed Improvement Plans (Water Code §16100 et seq.), through an IRWMP process, or as part of an overall green infrastructure effort, the Permittee may impose requirements and create incentives on the site, local, and watershed scale to ensure project success.

*Post-Construction BMP Condition Assessment*

Permittees must understand how their actions reduce the discharge of pollutants to receiving waters. This is accomplished through an assessment of the performance of the Permittees BMPs, especially structural practices designed for specific pollutant/flow reductions. Only Renewal Permittees were required to install structural post- construction BMPs in the existing permit term. However, during MS4 audits by State and Regional Water Board staff, many of those BMP locations were unknown and not maintained causing water quality threats. In this Order, only Renewal Permittees are asked to implement a plan that contains simple and repeatable field observation and data management tools that can assist them in determining the relative condition of BMPs. The primary purpose is to inform Permittees of: 1) where the BMPs are located, 2) the relative urgency of water quality maintenance and, 3) provide a practical, consistent and reliable tool to track the condition of BMPs relative to observed condition at time of installation or immediately following complete maintenance. Permittees may implement this plan themselves or may be determined through a Self-Certification Annual Report submitted annually by an authorized party demonstrating proper maintenance and operations. Allowing an authorized party to conduct the BMP condition assessment offsets program costs and shifts responsibility to the party that should be maintaining the BMP they initially installed.

*Applicability*

Renewal Permittees currently listed in Attachment 4 to WQO 2003-0005-DWQ (Attachment 4) must continue to implement Attachment 4 Post-Construction Requirements up until the date when Section E.12 requirements of this Order are effective (the second year of the effective date of the Permit). All Permittees that are not subject to Attachment 4 must implement the CGP Post-Construction Requirements up until the second year of the effective date of the Permit. In the second year of the effective date of the permit, all Permittees, New and Renewal, must implement Section E.12. Post-Construction Requirements contained within this Order.

Lastly, extensive monitoring studies conducted by the California Department of Public Health (CDPH) have documented that mosquitoes opportunistically breed in structural storm water Best Management Practices (BMPs), particularly those that hold standing water for over 96 hours. Certain Low Impact Development (LID) site design measures that hold standing water such as rainwater capture systems may similarly produce mosquitoes. These structures create a potential public health concern and increase the burden on local vector control agencies that are mandated to inspect for and abate mosquitoes and other vectors within their jurisdictional boundaries. These unintended consequences can be lessened when structures incorporate design, construction, and maintenance principles developed specifically to minimize standing water available to mosquitoes1 while having negligible effects on the capacity of the structures to provide water quality improvements as intended. The California Health and Safety Code prohibits landowners from knowingly providing habitat for or allowing the production of

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

mosquitoes and other vectors, and gives local vector control agencies broad inspection and abatement powers. This Order requires regulated MS4s to comply with applicable provisions of the Health and Safety Code and to cooperate and coordinate with CDPH and local mosquito and vector control agencies on vector-related issues.

**Water Quality Monitoring Requirements**

Legal Authority: Clean Water Act §§308(a), 402(p)(3)(b); 40 C.F.R. §§122.44(i), 122.48(b); MS4Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; W[35]; Ecological Condition Assessments of California's Perennial Wadeable Streams: Highlights from the Surface Water Ambient Monitoring Program's Perennial Streams Assessment (PSA ) (2000-2007)[36]; National Research Council Report on Urban Storm Water in the United States, 2008[37]

The existing General Permit included requirements meant to eliminate or reduce the discharge of pollutants to receiving waters. Improved knowledge of the water quality impacts and management practices, obtained either as part of the permit requirements or from outside sources (e.g., scientific literature, studies, and expert panels), is intended to be used in an adaptive management fashion to inform requirements in subsequent permits. As such, monitoring and assessment represents a critical component in understanding the link between permit requirements, the benefits achieved due to those requirements, and the condition of receiving waters. Aside from general knowledge that storm water discharges from urbanized watersheds contribute pollutants to receiving waters, little is known about the specific conditions in such receiving waters outside of major metropolitan areas. The effectiveness of almost a decade of storm water management in Phase I MS4s has not been systematically evaluated through receiving water monitoring.

Nationwide, there are few of analyses of available data and guidance on how Permittees should be using the data to inform their storm water management decisions.

This Order prioritizes monitoring for ASBS, TMDLs, and 303d listed waterbodies. Permittees that have a population of 50,000 or greater and are part of an urbanized area are required to choose from a number of monitoring options. These larger Permittees are assumed to have the resources to undertake monitoring. For the majority of Phase II Permittees, this permit term will be the first time a monitoring program has been implemented. As such, prioritization of monitoring allows for a firm foundation from which Phase II Permittees may initiate and develop monitoring programs that will result in improvement of local knowledge of water quality impacts and implementation of storm water management practices. Any of the monitoring requirements may be conducted through participation in a regional monitoring group. Regional

---

[35] 2010 Integrated Report can be found at:
http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml

[36] Ode, P.R.1, T.M. Kincaid2, T. Fleming3 and A.C. Rehn 9. 2011. Ecological Condition Assessments of California's Perennial Wadeable Streams: Highlights from the Surface Water Ambient Monitoring Program's Perennial Streams Assessment (PSA) (2000-2007). A collaboration between the State Water Resources Control Board's Non-Point Source Pollution Control Program (NPS Program), Surface Water Ambient Monitoring Program (SWAMP), California Department of Fish and Game Aquatic Bioassessment Laboratory, and the U.S. Environmental Protection Agency.

[37] Urban Storm Water in the United States, National Research Council, 2008 can be found at:
http://www.epa.gov/npdes/pubs/nrc_stormwaterreport.pdf

monitoring not only allows Permittees to share costs but also facilitates monitoring data and information sharing across local regions. In effect, regional programs provide a broad-scale picture of water quality condition within a watershed.

**Program Effectiveness Assessment**

Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R.C.F.R. § 122.34(g) 40 CFR 122.34(g)(3), CASQA Effectiveness Assessment Guide[38]; Evaluating the Effectiveness of Municipal Stormwater Programs, U.S. EPA, EPA 833-F-07-010, MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

A key requirement in the storm water Phase II rule is a report that includes "the status of compliance with permit conditions, an assessment of the appropriateness of identified [control measures] and progress towards achieving identified measurable goals for each of the minimum control measures." This assessment is critical to the storm water program framework which uses the iterative approach of implementing controls, conducting assessments, and designating refocused controls leading toward attainment of water quality standards. As a result, this Order requires a quantitative evaluation of the Permittees MS4 programs. Measurable program evaluations are critical to the development, implementation, and adaptation of effective local storm water management programs.

To date, only a small number of Phase I MS4s have provided measurable outcomes with regard to aggregate pollutant reduction achieved by their municipal storm water programs. Most Permittees, both Phase I and II, are struggling simply to organize or document their program activities and few have provided a quantitative link between program activities and water quality improvements. The few that have determined whether or not water quality is improving as a result of storm water program implementation took many years. Despite these past obstacles, the process of evaluating and understanding the relationship between the storm water program implementation and water quality needs to begin now.

Building on the monitoring and assessment program, the Permittee must conduct an annual effectiveness assessment to assess the effectiveness of prioritized BMPs, program elements and the storm water program as a whole. Prioritized BMPs include BMPs implemented based on pollutants of concern. Where pollutants of concern are unidentified, prioritized BMPs are based on common urban pollutants (i.e., sediment, bacteria, trash, nutrients). The California Stormwater Quality Association's (CASQA) Municipal Stormwater Program Effectiveness Guidance describes strategies and methods for assessing effectiveness, including examples of effectiveness assessment for each program component. The CASQA Effectiveness Guidance is available at www.casqa.org for purchase. A two-hour EPA webcast focusing on the CASQA Guide is also available (available at www.epa.gov/npdes/training under "Assessing the Effectiveness of Your Municipal Stormwater Program"). A resources document from the webcast includes a 10 page summary of the CASQA Guide and example pages from the municipal chapter:
(www.epa.gov/npdes/outreach_files/webcast/jun0408/110961/municipal_resources.pdf)

The Municipal Stormwater Program Effectiveness Assessment Guidance synthesizes information on designing and conducting program effectiveness assessments. The document also explains how to select certain methods based on programmatic outcomes and goals. The

---

[38] https://www.casqa.org/casqastore/products/tabid/154/p-7-effectiveness-assessment-guide.aspx

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

reader is led through a series of questions and case studies to demonstrate how proper assessments are selected. Techniques are related to different level of outcomes: level one – documenting activities, level two – raising awareness, level 3 – changing behavior, level 4 – reducing loads from sources, level 5 – improving runoff quality, and level 6 – protecting receiving water quality. The Guide includes fact sheets for all six NPDES program elements, outlining methods and techniques for assessing effectiveness of each program.

**Annual Reporting**

In general, an annual report must document and summarize implementation of the storm water program during the previous year, evaluate program results and describe planned changes towards continuous improvement. The annual report also can serve as a "state of the storm water program" report for the general public or other stakeholders in the community serving as an excellent summary document to provide about the status of storm water program.

However, lessons learned from Phase I MS4 annual reports demonstrate that many Permittees tend to submit too much information, and, as a result, Regional Water Boards receive large binders full of materials that do not provide useful information to assess compliance. As a result, this Order requires Permittees to annually submit a summary of the past year activities. For example, the Permittees should not only address "bean counting" of required task, but address such questions as:

- For illicit discharge data, what are the most prevalent sources and pollutants in the illicit discharge data, and where are these illicit discharges occurring?
- How many illicit discharges have been identified, and how many of those have been resolved?
- How many outfalls or screening points were visually screened, how many had dry weather discharges or flows, at how many were field analyses completed and for what parameters, and at how many were samples collected and analyzed?
- Does the MS4 need to conduct more inspections in these areas, or develop more specific outreach targeting these sources and pollutants?

In addition, Permittees use SMARTS to certify Annual Reports which verifies compliance with all requirements of this Order.

*Nexus Between Annual Reporting and Program Effectiveness Assessment*
In addition to submitting program element summaries, Permittee must analyze their yearly activities and link it to their Program Effectiveness Assessment and Improvement Plan which tracks and documents their annual and long-term effectiveness of the storm water program. For example:

- Planned Activities and Changes. The annual report should describe activities planned for the next year highlighting any changes made to improve control measures or program effectiveness.

*Detailed Annual Report*
Most major areas of this Order require Permittees to submit, via SMARTS, a summary annual report for the past year's activities. For certain program elements such as Water Quality Monitoring, Program Effectiveness Assessment, and TMDLs, more detailed annual report information is required to be tracked and submitted via SMARTS.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

Additionally, at any time during the permit term, the Executive Officer of the applicable Regional Water Board can request a more detailed annual report. This information may be required to determine compliance or prior to targeted or comprehensive storm water program audit. The table below shows detailed annual reporting information an Executive Officer of the applicable Regional Water Board may require:

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.6.c. | By the third year Annual Report and annually thereafter, report on the Enforcement Response Plan summarizing all enforcement activities including inspections of chronic violators and the incentives, disincentives, or escalated enforcement responses at each site. Summarizations of enforcement activities shall include, at a minimum, the following information for each type of site or facility:<br>(a) Number of violations, including a listing of sites or facilities with identified violations<br>(b) Number of enforcement actions, including types<br>(c) Other follow-up actions taken<br>(d) Demonstration that compliance has been achieved for all violations, or a description of actions that are being taken to achieve compliance |
| E.7.a. | By the third year Annual Report, and annually thereafter, submit a report on the implementation and progress of the public education strategy and general program development and progress. Report on the development of education materials, methods for educational material distribution, public input, landscaping outreach, reporting of illicit discharges, proper application of pesticides, herbicides, and fertilizers, elementary school education, reduction of discharges from organized car washes, mobile cleaning and pressure washing operations, and landscape irrigation efforts. By the fifth year Annual Report, submit a report summarizing changes in public awareness and knowledge resulting from the implementation of the program and any modifications to the public outreach and education program. |
| E.7.b.1. | By the third year Annual Report, document and maintain records of the training provided and the staff trained annually. The annual report shall include the number and percentage of Permittee's applicable staff that were trained and summarize the knowledge assessment as specified in E.7.b.1.(ii)(d). |
| E.7.b.2. Permittee Staff | By the second year of the permit and annually thereafter, submit the following information:<br>a. Training topics covered<br>b. Dates of training<br>c. Number and percentage of Permittees' staff, as identified in Sections E.7.b.2. possessing the specified credentials. |
| E.7.b.2. Construction Site Operator Education | By the third year Annual Report and annually thereafter, submit a report including the following information:<br>(a) Training topics covered;<br>(b) Dates of training;<br>(c) Number and percentage of Permittee's operators and number of contractors attending each training;<br>(d) Results of any surveys conducted to demonstrate the awareness and potential behavioral changes in the attendees. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.7.b.3. | By the second year Annual Report and annually thereafter, submit a summary that includes oversight procedures and identifies and tracks all personnel requiring training and assessment and records. The annual report shall include the number and percentage of Permittee's applicable staff that were trained during the year and summarize the knowledge assessment as specified in E.7.b.3(ii)(b). |
| E.8. | By the second year Annual Report and annually thereafter, submit a description of the public involvement program and summary of the MS4s efforts related to facilitating public involvement, including efforts to engage citizen advisory groups, increase citizen participation, and involvement with the IRWMP or other watershed-level planning effort. |
| E.9.a. | Submit a map by the second year Annual Report, and annually thereafter submit either (a) a current updated outfall map, or (b) verification that no changes or additions were made to the Permittee's MS4. |
| E.9.b. | By the second year online Annual Report, submit inventory and annually thereafter an updated inventory. By the second year online Annual Report, identify the illicit discharge procedures implemented and the locations of the implementation.  Also identify in each online Annual Report the remaining inventoried facilities and priority areas still requiring illicit discharge assessment over the permit term. |
| E.9.c. | By the second year Annual Report, submit a report summarizing the field investigation results and areas of follow up actions, including the following information:<br>(a) The number of outfalls found to be flowing or ponding more than 72 hours after the last rain event;<br>(b) The number of such outfalls sampled in accordance with permit conditions;<br>(c) Sampling result in tabular form; and<br>(d) The number of outfalls found to be in exceedance of action levels |
| E.9.d. | By the second year Annual Report, submit all source investigations and corrective actions.  At a minimum the report shall include:<br>(a) Brief description of each non-stormwater discharge reported or observed;<br>(b) Date(s) the non-storm water discharge was reported or observed;<br>(c) Brief description of any actual or potential water quality impact resulting from the discharge;<br>(d) Description and results of steps taken to investigate the source of the discharge;<br>(e) Description and results of all follow-up or enforcement actions taken as a result of the investigation;<br>(f) Date the investigation was closed, and whether the discharge was eliminated. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.9.e. | Within the first year of the effective date of the permit, submit a spill response plan that contains the items specified in Section E.9.e. In subsequent Annual Reports summarize any spill response activities, and any follow-up actions, as specified in the spill response plan. |
| E.10.a. | Submit an up to date construction site inventory enumerating items listed in this Section with each Annual Report. |
| E.10.b. | By the first year Annual Report, submit a summary of review procedures. The summary should clearly indicate how the procedures will achieve compliance with all requirements of this Section, and clearly delineate responsibilities for implementing, and ensuring implementation of each aspect of the procedures. |
| E.10.c. | By the second year Annual Report and annually thereafter, submit the following information:<br>(a) Total number of active sites disturbing less than one acre of soil requiring inspection;<br>(b) Number and percentage of each type of enforcement action taken as listed in each Permittee's Enforcement Response Plan;<br>(c) Number of sites with discharges of sediment or other construction related materials, both actual and those inferred through evidence.;<br>(d) Number and percentage of violations fully corrected prior to the next rain event but no longer than 10 business days after the violations are discovered or otherwise considered corrected in a Permittee-defined timely period.<br>(e) Number and percentage of violations not fully corrected 30 days after the violations are discovered.<br>(f) Number of follow-up inspections that demonstrated the operator continued to implement BMPs according to plan and the number of follow-up inspections that required further enforcement. |
| E.11.a. | By the second year Annual Report submit the inventory and submit annual updates thereafter. |
| E.11.b. | By the second year Annual Report, submit the completed map and update annually thereafter if any of the information indicated on the map has changed. |
| E.11.c. | By the third year Annual Report, submit the results of the Permittee's annual assessment, including the list of identified hotspots and any identified deficiencies and corrective actions taken. The Permittee shall identify designated hotspots on the facility inventory updated and submitted in each subsequent year annual report. |
| E.11.d. | By the fourth year Annual Report, submit a summary of SWPPPs developed for pollutant hotspots.  In subsequent Annual Reports, submit a summary of SWPPPs updated. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.11.e. | By the fifth year Annual Report and annually thereafter, submit the following information:<br>(a) Total number of facilities required to be inspected.<br>(b) Verification that all inspections were conducted at all facilities in accordance with the requirements of this Section<br>(c) Summary of spills and corrective actions<br>(d) Summary of the results of inspections, including a summary of deficiencies noted and corrective actions taken<br>(e) Results of the quarterly visual observations of storm water discharges<br>(f) Total number of facilities inspected (visual and comprehensive inspections) and frequency of inspections<br>(g) All inspection records, reports, and logs<br>(h) Records of corrective actions taken and the results of corrective actions |
| E.11.f. | By the second year Annual Report, submit the assessment procedures and maintenance prioritization list, including a description of the method used to identify high priority storm drain system features and catch basins and number of catch basins identified as high priority. If flood conveyance maintenance is undertaken by another entity, submit a summary report of coordination by the first year Annual Report. |
| E.11.g. | By the third year Annual Report, submit a summary of the following information:<br>(a) Storm sewer maintenance schedule<br>(b) List of storm sewer systems and the maintenance priority assigned<br>(c) Documentation of all required storm sewer systems maintenance logs<br>(d) Documentation of waste material disposal procedure<br>By the third Annual Report and annually thereafter, the Permittee shall submit verification that all storm drain facilities were maintained according to the priorities, procedures, and schedules developed according to this Section. The report shall include a summary of the results of inspections, deficiencies found, corrective actions taken, and the results of corrective actions. |
| E.11.h. | By the third year Annual Report, submit the following:<br>(a) List of BMPs and associated pollutants with each O&M activity<br>(b) BMPs applied during Permittee O&M activities<br>(c) Log of quarterly BMP evaluations.<br>By the third Annual Report and annually thereafter, the Permittee shall submit verification that identified BMPs were effectively implemented for all O&M activities. |
| E.11.i. | By the third year Annual Report, submit a summary of the development and implementation process to incorporate water quality and habitat enhancement design into new or upgraded flood management projects. By the fourth year Annual Report and annually thereafter, submit a list of new or upgraded flood management projects, including a summary of water quality and habitat enhancement features incorporated into their design. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.11.j. | By the second year Annual Report, submit an evaluation of materials used and activities performed for pollution prevention and source control opportunities and a list of practices implemented to minimize the use of herbicide, pesticide, and fertilizers. By the second year Annual Report and annually thereafter, submit verification that identified BMPs were effectively implemented for all landscaping design and maintenance activities. By the second year Annual Report, submit a summary identifying the measures that the Permittee will use to demonstrate reductions in the application of pesticides, herbicides, and fertilizers.  In subsequent annual reports, verify implementation of this measure, and describe reductions in pesticide, herbicide, and fertilizer application. |
| E.12.b | By the second year Annual Report and annually thereafter, the Permittee shall submit the following information:<br>(a) A list of all project creating or replacing 2,500 square feet or more of impervious surface, as described above; and<br>(b) A brief description of site design measures applied to each project. |
| E.12.c. | For each Regulated Project approved, the following information shall be submitted by the third year Annual Report:<br>(a) Project Name, Number, Location (cross streets), and Street Address;<br>(b) Name of Developer, Phase No. (if project is being constructed in phases, each phase shall have a separate entry), Project Type (e.g., commercial, industrial, multiunit residential, mixed-use, public), and description;<br>(c) Project watershed(s);<br>(d) Total project site area and total area of land disturbed;<br>(e) Total new impervious surface area and/or total replaced impervious surface area;<br>(f) For a redevelopment or road widening project: total pre-project impervious surface area and total post-project impervious surface area;<br>(g) Status of project (e.g., application date, application deemed complete date, project approval date);<br>(h) Source control measures;<br>(i) Site design measures;<br>(j) All post-construction storm water treatment systems installed onsite, at a joint storm water treatment facility, and/or at an offsite location;<br>(k) O&M responsibility mechanism for the life of the project.<br>(l) Water quality treatment calculations used;<br>(m) Off-site compliance measures for Regulated Project (if applicable); Additional (watershed-specific) hydromodification standards used. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| E.12.h. | By the second year Annual Report and annually thereafter, for each Regulated Project inspected during the reporting period the following information shall be submitted in tabular form:<br>(1) Name of facility/site inspected.<br>(2) Location (street address) of facility/site inspected.<br>(3) Name of responsible operator for installed storm water treatment systems and hydromodification management controls.<br>(4) Inspection details including: date of inspection, type of inspection (e.g., initial, annual, follow-up, spot), type(s) of storm water treatment systems inspected (e.g., swale, bioretention unit, tree well, etc.) and an indication of whether the treatment system is an onsite, joint, or offsite system.<br>(5) Type of hydromodification management controls inspected.<br>(6) Inspection findings or results (e.g., proper installation, proper O&M, system not operating properly because of plugging, bypass of storm water because of improper installation, maintenance required immediately, etc.).<br>(7) Enforcement action(s) taken, if any (e.g., verbal warning, notice of violation, administrative citation, administrative order).<br>(8) A discussion of the inspection findings for the year and any common problems encountered with various types of treatment systems and/or hydromodification management controls. This discussion shall include a general comparison to the inspection findings from the previous year.<br>(9) A discussion of the effectiveness of the Permittee's O&M Program and any proposed changes to improve the O&M Program (e.g., changes in prioritization plan or frequency of O&M inspections, other changes to improve effectiveness of O & M program).<br>On an annual basis, before the wet season, provide a list of newly installed (installed within the reporting period) storm water treatment systems and hydromodification management controls to the local mosquito and vector control agency and the appropriate Regional Water Board. This list shall include the facility locations and a description of the storm water treatment measures and hydromodification management controls installed. |
| E.12.i. | By the third year Annual Report and subsequently thereafter, submit the post-construction best management practice condition assessment plan as required in E.12.i.(ii)a-d. |
| F.5.b.2. | By the third year Annual Report and annually thereafter, submit the public education strategy and general program development and progress. By the fifth year Annual Report, summarize changes in public awareness and knowledge resulting from the implementation of the program and any modifications to the public education and outreach program. If applicable, submit a report on development of education materials, methods for educational material distribution, public input, Water Efficient Landscape Ordinance, elementary school education, reduction of discharges from mobile cleaning and pressure washing operations, and landscape irrigation efforts. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| F.5.b.3. | By the third year Annual Report, submit records of the training provided and the staff trained annually. |
| F.5.b.4. | By the second year Annual Report and annually thereafter, submit a summary of oversight procedures and identify and track all personnel requiring training and assessment and records. |
| F.5.c. | By the third year Annual Report and annually thereafter, submit a description of the public involvement program and summary of the MS4s efforts related to facilitating public involvement. |
| F.5.d. | By second year Annual Report submit the outfall inventory map, and annually thereafter submit either (a) a current updated outfall map, or (b) verification that no changes or additions were made to the Permittee's MS4. |
| F.5.d.1. | By the second year Annual Report, submit a report summarizing the field investigation results and areas of follow up investigations. The report shall summarize all applicable observations.<br>By the second year of the permit term and annually thereafter, submit all source investigations and corrective actions.  At a minimum the report shall include:<br>(a) Date(s) the non-storm water discharge was observed;<br>(b) Results of the investigation;<br>(c) Date the investigation was closed.<br>(d) A summary of all non-storm water discharges that were found. |
| F.5.e. | By the second year Annual Report, the Permittee submit an updated contract language that includes CGP compliance requirements for all projects subject to the CGP. |
| F.5.f.1. | By the second year Annual Report submit and annually thereafter an updated inventory. |
| F.5.f.2. | By the second year Annual Report and annually thereafter, submit the map. |
| F.5.f.3. | By the third year Annual Report, submit the results of the Permittee's annual assessment, any identified deficiencies and corrective actions taken, list of the pollutant hotspots. |
| F.5.f.4. | By the fourth year Annual Report and annually thereafter, submit a summary of SWPPPs developed and updated for pollutant hotspots. |
| F.5.f.5. | By the fifth year Annual Report and annually thereafter, the following information shall be submitted:<br>(a) Total number of facilities required to be inspected.<br>(b) Total number of facilities inspected (visual and comprehensive inspections) and frequency of inspections<br>(c) Summary of spills and corrective actions<br>(d) Results of the quarterly visual observations of storm water discharges |
| F.5.f.6 | By the second year Annual Report, submit the assessment procedures and maintenance prioritization list. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| F.5.f.7 | By the third year Annual Report, submit a summary of the following information:<br>(a) Storm sewer maintenance schedule<br>(b) List of storm sewer systems and the priority assigned<br>(c) Documentation of all required storm sewer systems maintenance logs<br>(d) Documentation of waste material disposal procedure |
| F.5.f.8. | By the third year Annual Report, submit the following:<br>(a) List of BMPs and associated pollutants with each O&M activity<br>(b) BMPs applied during Permittee O&M activities<br>(c) Log of annual BMP evaluations. |
| F.5.f.9 | By the second year Annual Report, submit an evaluation of materials used and activities performed for pollution prevention and source control opportunities and a list of practices implemented to minimize the use of herbicide, pesticide, and fertilizers. By the second year Annual Report, submit a document identifying the measures that the Permittee will use to demonstrate reductions in the application of pesticides, herbicides, and fertilizers. In subsequent annual reports, use this measure to demonstrate reductions in pesticide, herbicide, and fertilizer application. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| F.5.g. | By the second year Annual Report and annually thereafter, the Permittee shall submit the following information:<br>(a)  A list of all project creating or replacing 2,500 square feet or more of impervious surface, as described above; and<br>A brief description of site design measures applied to each project.<br>For each project approved, the following information shall be submitted by the second year Annual Report:<br>(a) Project Name, Number, Location (cross streets), and Street Address;<br>(b) Name of Developer, Phase No. (if project is being constructed in phases, each phase shall have a separate entry), Project Type (e.g., commercial, industrial, multiunit residential, mixed-use, public), and description;<br>(c) Project watershed(s);<br>(d) Total project site area and total area of land disturbed;<br>(e) Total new impervious surface area and/or total replaced impervious surface area;<br>(f) If a redevelopment or road widening project, total pre-project impervious surface area and total post-project impervious surface area;<br>(g) Status of project (e.g., application date, application deemed complete date, project approval date);<br>(h) Source control measures;<br>(i) Site design measures;<br>(j) All post-construction storm water treatment systems installed onsite, at a joint storm water treatment facility, and/or at an offsite location;<br>(k) O&M responsibility mechanism for the life of the project.<br>(l) Water quality treatment calculations used;<br>(m) Off-site compliance measures (if applicable)<br>(n) Additional (watershed-specific) hydromodification standards used<br>(a) For each project inspected during the reporting period the following information shall be submitted in tabular form as part of each year's Annual Report:<br>(1) Name of facility/site inspected.<br>(2) Location (street address) of facility/site inspected.<br>(3) Name of responsible operator for installed storm water treatment systems and hydromodification management controls.<br>(4) Inspection details including: Date of inspection, type of inspection (e.g., initial, annual, follow-up, spot), type(s) of storm water treatment systems inspected (e.g., swale, bioretention unit, tree well, etc.) and an indication of whether the treatment system is an onsite, joint, or offsite system.<br>(5) Type of hydromodification management controls inspected.<br>(6) Inspection findings or results (e.g., proper installation, proper O&M, system not operating properly because of plugging, bypass of storm water because of improper installation, maintenance required immediately, etc.).<br>(7) Enforcement action(s) taken, if any (e.g., verbal warning, notice of violation, administrative citation, administrative order).<br>(8) A discussion of the inspection findings for the year and any common problems encountered with various types of treatment |
|---|---|

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Permit Provision | Detailed Annual Reporting Information |
|---|---|
| | systems and/or hydromodification management controls. This discussion shall include a general comparison to the inspection findings from the previous year.<br>(9) A discussion of the effectiveness of the Permittee's O&M Program and any proposed changes to improve the O&M Program (e.g., changes in prioritization plan or frequency of O&M inspections, other changes to improve effectiveness of program).<br>(b) On an annual basis, before the wet season, provide a list of newly installed (installed within the reporting period) storm water treatment systems and hydromodification management controls to the local mosquito and vector control agency and the appropriate Regional Water Board. This list shall include the facility locations and a description of the storm water treatment measures and hydromodification management controls installed. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Program Management
Without the requirement of a SWMP, this section serves as the framework/backbone for the storm water program. This section is a consolidation of all of the Permittee's relevant ordinances or other regulatory requirements, the description of all programs and procedures (including standard forms to be used for reports and inspections) that will be implemented and enforced to comply with the permit and to document the selection, design, and installation of all storm water control measures.

Legal Authority
Without adequate legal authority the MS4 would be unable to perform many vital program functions such as performing inspections and requiring installation of control measures. In addition, the Permittee would not be able to penalize and/or attain remediation costs from violators.

Certification
Submittal and signature certifies Permittee will comply with this Order.

Enforcement Response Plan (ERP)
This Order requires Permittees to have an established, escalating enforcement policy identified in the ERP that clearly describes the action to be taken for common violations. The plan must describe the procedures to ensure compliance with local ordinances and standards, including the sanctions and enforcement mechanisms that will be used to ensure compliance. (See 40 CFR 122.26(d)(2)(i)). It is critical that the Permittee have the authority to initiate a range of enforcement actions to address the variability and severity of noncompliance.

IDDE and Good Housekeeping
Both these programs pose potential immediate threat to water quality without quick access to information submitted in SMARTS. For example, in order to respond to discharges, an effective IDDE program responds to complaints about illicit discharges or spills such as illegal connections to the storm sewer system, improper disposal of wastes, or dumping of used motor oil or other chemicals. In order to trace the origin of a suspected illicit discharge or connection, the Permittee must have an updated map of the storm drain system and a formal plan of how to locate illicit discharges and how to respond to them once they are located or reported.

Construction Inventory
To effectively conduct inspections, the Permittee must know where construction activity is occurring. A construction site inventory tracks information such as project size, disturbed area, distance to any waterbody or flow channel, when the erosion and sediment control/stormwater plan was approved by the Permittee, and whether the project is covered by the CGP. This inventory will allow the Permittee to track and target its inspections.

Effectiveness Assessment
Without assessing the effectiveness of the stormwater management program the Permittee will not know which parts of the program need to be modified to protect and/or improve water quality and instead will essentially be operating blindly.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## XIII. TOTAL MAXIMUM DAILY LOAD (TMDL)

Section 303(d) of the Clean Water Act requires States to identify waters that do not meet water quality standards after applying certain required technology-based effluent limitations ("impaired" waterbodies). States are required to compile this information in a list and submit the list to the U.S. EPA for review and approval. This list is known as the Section 303(d) list of impaired waters, which is incorporated into the Integrated Report.

This listing process requires States to prioritize waters/watersheds for future development of TMDLs. A TMDL is defined as the sum of the individual waste load allocations for point sources of pollution, plus the load allocations for nonpoint sources of pollution, plus the contribution from background sources of pollution. The Water Boards have ongoing efforts to monitor and assess water quality, to prepare the Section 303(d) list, and to subsequently develop TMDLs. The 2010 California 303(d) List identifies impaired receiving water bodies and their watersheds within the state.

TMDLs are developed by either the Regional Water Boards or U.S. EPA in response to Section 303(d) listings. Regional Water Board-developed TMDLs are subject to approval by the State Water Board, approval by the Office of Administrative Law, and ultimately approval by U.S. EPA. TMDLs developed by Regional Water Boards are incorporated as Basin Plan amendments and include implementation provisions.

TMDLs developed by U.S. EPA typically contain the total load and waste load allocations required by Section 303(d), but do not contain comprehensive implementation provisions.

TMDLs are not self-implementing but rely on other regulatory mechanisms for implementation and enforcement. Urbanized areas typically utilize municipal storm water permits as the implementation tool. Incorporation of TMDL implementation requirements into general permits (as opposed to individual MS4 permits) is difficult. First, there are numerous Traditional MS4s (municipalities) and Non-traditional MS4s such as military bases, public campuses, prison and hospital complexes covered under this Order. Second, the waste load allocations for many TMDLs are shared among several dischargers; that is, a single waste load allocation may be assigned to multiple dischargers, making it difficult to assign responsibility. Further, individual dischargers may not be explicitly identified. For example, "urban runoff" may be listed as a source of impairment, but the individual MS4s responsible for the impairment may not be identified. Third, the implementation plans adopted by the Regional Water Boards often provide for phased compliance with multiple milestones and deliverables, with optional and alternative means of compliance depending on the results of monitoring and special studies.

Section C.1 of this Order requires that permittees "shall . . . reduce the discharge of pollutants . . .to achieve TMDL wasteload allocations established for discharges by the MS4s." The variance in the level of detail of TMDLs necessitates the development of TMDL-specific permit requirements to provide clarity on the Permittees' compliance responsibilities.

The Regional Water Boards submitted proposed TMDL-specific permit requirements to the State Water Board for applicable TMDLs, with statements explaining how these requirements are designed to implement the TMDLs and the corresponding wasteload allocations. (40 C.F.R. §122.44(d)(1)(vii)(B)) Sections E.15 and F.5 of this Order require permittees to comply with all applicable TMDL-based requirements listed in Attachment G; the requirements are directly enforceable through this Order. Attachment G does not restate the final applicable wasteload allocations for each TMDL; however, those wasteload allocations are specified in the Fact Sheet and this Order incorporates them by reference as appropriate.

In a few cases, the TMDL-specific requirements of Attachment G are based on a load allocation, rather than a wasteload allocation. Several TMDLs incorporated into this Order assign load allocations to storm water that may not have been regulated as NPDES discharges at the time of the TMDL adoption, but have now been determined to be subject to this Order. USEPA has issued guidance providing that in such circumstances, the "NPDES permit authority could identify an appropriate allocation share and include a corresponding limitation specific to the newly permitted stormwater source."[39]

Some TMDLs do not name specific Permittees but name a category of discharges such as "urban runoff." This Order identifies the Permittees subject to the TMDL. In most cases, the permittees subject to the TMDLs are Traditional MS4s. For some TMDLs the State Water Board has determined that the TMDL requirements are also applicable to specific Non-traditional MS4s. Attachment G specifically names such permittees and sets out how the permittees will implement the TMDL. The State Water Board or the applicable Regional Water Board may, in the future, designate additional Traditional or Non-traditional MS4s based on further determination of TMDL applicability.

Attachment G assigns monitoring requirements to certain Permittees and section E.13.b. of this Order states that "Permittees shall implement any monitoring requirements assigned in Attachment G." Section E.13. also states, in part, "Traditional Small MS4 Permittees that are required to conduct monitoring of discharges to … TMDL… waterbodies… are not required to perform additional monitoring as specified in Sections E.13.d.1 and E.13.d.2." Therefore, a Permittee that is assigned TMDL-related monitoring in Attachment G is not required to implement monitoring in accordance with Sections E.13.d.1. or E.13.d.2.

Permittees will report compliance with TMDL permit requirements in the Annual Report required to be submitted electronically via SMARTS.

The previous General Permit, Water Quality Order 2003-0005-DWQ, relied in part on the preparation, approval, and implementation of a Storm Water Management Program to incorporate TMDL-specific requirements for Permittees. This Order does not rely on preparation of a Storm Water Management Program, but rather incorporates programmatic requirements, including the TMDL-specific requirements in Attachment G, in the Order itself. In some cases, as noted in the discussion below, this Order directs the Permittee to continue implementing requirements specified in the Storm Water Management Plan required by the previous 2003 Permit. In those cases, Attachment G incorporates those specific requirements by reference.

In sum, Attachment G contains specific management practice-based planning and implementation requirements that act as BMP-based WQBELs. Attachment G also contains monitoring and other requirements. These requirements are referred to in the Order as "BMP-based WQBELs and other permit requirements," and are expected to achieve the water quality results specified by the wasteload allocations. Because the ultimate purpose of TMDL implementation is to reach the water quality results specified in the TMDL wasteload allocations in order to attain water quality standards in receiving waters that are currently impaired, Attachment G requires a demonstration of attainment of the waste load allocation at the final compliance deadline. This demonstration ensures that Attachment G incorporates

---

[39] Revisions to the November 22, 2002 Memorandum 'Establishing Total Maximum Daily Load (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on Those WLAs,'" issued by USEPA, November 26, 2014.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

BMP-based WQBELs and other permit requirements that are consistent with the assumptions and requirements of the applicable waste load allocations (40 C.F.R. § 122.44(d)(1)(vii)(B)) and implements the basin plans into which the TMDL implementation plans are incorporated (Wat. Code, §§13263, subd. (a), 13377.) Permittees are to make this demonstration consistent with criteria articulated in sections E.15.b. and F.5.i.2 of the Order.

This Order implements TMDLs with either past deadlines or soon approaching deadlines. In precedential Order WQ 2015-0075, the State Water Board found that final TMDL attainment deadlines should not be extended through permitting actions. The State Water Board stated as follows:

*Final TMDL deadlines are established and incorporated into the Basin Plans during the TMDL development process. That process invites stakeholder participation and the proposed schedule is subject to public review and comment and approval by the relevant regional water board, the State Water Board, and USEPA. The deadlines are established with consideration of the time needed for compliance for all dischargers contributing to an impairment, including industrial and construction storm water dischargers and traditional NPDES dischargers. Although we recognize that it may not always be feasible for municipal storm water dischargers to meet final TMDL deadlines, short of amending the Basin Plan to modify the deadlines (see California Association of Sanitation Agencies v. State Water Resources Control Board (2012) 208 Cal.App.4th 1438), we find it appropriate for the dischargers to request time schedule orders rather than be granted an extension within the provisions of the [regional water board permits].*
(State Water Board Order WQ 2015-0075, p. 37, fn. 110.)

Attachment G incorporates the final attainment deadlines for each TMDL; some TMDL attainment deadlines are now past. In these instances, the associated wasteload allocations are effective on the effective date of the Order, i.e. January 1, 2019. Where appropriate, the State Water Board will work with the Regional Water Boards to determine if there is any regulatory flexibility for extension of final attainment dates consistent with any particular TMDL. The State Water Board and the Regional Water Boards additionally have discretion with regard to enforcement actions and will exercise that discretion on a case-by-case basis based on all the facts underlying a violation, including how recently the Permittee was assigned TMDL-specific requirements in the permit and the Permittee's efforts, to date, to meet the TMDL-specific requirements. A permittee with a past or imminent TMDL attainment deadline may request a Time Schedule Order (TSO) from the applicable Regional Water Board in accordance with criteria established in the Order. A Regional Water Board's issuance of a TSO will establish an implementation schedule for the Permittee to comply with the TMDL requirements.

The State Water Board delayed the effective date of the Order to January 1, 2019, one year following adoption, to allow permittees additional time to demonstrate attainment of the wasteload allocations, request time schedule orders incorporating compliance schedules for the attainment of the wasteload allocations, or request consideration by the Regional Water Board Executive Officer of whether the particular regulatory language of a given TMDL allows for an extension of a deadline for attainment of the wasteload allocation.

Attachment G specifies BMP-based WQBELs and other permit requirements for attainment of the wasteload allocations even in cases where the final wasteload allocation deadline is past. These requirements are included because the Order states that it is not the intention of the State Water Board or the Regional Water Boards to take enforcement action against a

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

permittee where (1) a permittee has applied in good faith for a time schedule order and is implementing the requirements in Attachment G pending approval of the time schedule order or (2) the Regional Board has initiated proceedings to revise the implementation schedule or other requirements of a TMDL and the permittee is implementing the requirements in Attachment G pending the outcome of the proceedings.

**Unfunded Mandates Considerations Specific to TMDL Requirements in the Order**
The TMDL requirements of this Order do not constitute unfunded state mandates requiring reimbursement.

*The TMDL-specific requirements do not constitute a new program or higher level of service:*

When a state agency requires a local government to provide "a new program or higher level of service," the state must "reimburse that local government for the costs of the program or increased level of service." (Cal. Const., art. XIII B, §6, subd. (a).) The TMDL-specific requirements of this Order, as amended on December 19, 2017, do not constitute a new program or higher level of service for two reasons.

First, the Order, as adopted on February 5, 2013 (effective July 1, 2013), requires permittees to "reduce the discharge of pollutants . . . to achieve TMDL wasteload allocations . . . established for discharges by the MS4s." (Section C.1.) Attachment G listed the applicable TMDLs and specified requirements for implementation of the wasteload allocations. The 2017 amendments to the Order revise or clarify TMDL implementation requirements where requirements in the 2013 Order were unclear or too general. The amendments do not change the baseline requirement in Section C.1 that permittees reduce discharges of pollutants to achieve the wasteload allocations, but simply provide more clarity to the permittees in how to implement that ongoing requirement. Thus, the amendments do not constitute a new program, and do not constitute an increased level of service as permittees were already required to meet TMDL wasteload allocations by implementation of appropriate actions. Refinements of existing requirements do not constitute a higher level of service, even where there may be an increase in costs. (See *County of Los Angeles v. Comm'n on State Mandates*, 110 Cal.App.4th 1176, 1189-1195 [discussing case law on "new program" and "higher level of service"].)

Second, even where the 2013 Order has been amended to include requirements for TMDLs adopted since 2013, the TMDL-specific requirements are not a new program or higher level of service because the TMDLs are simply the mechanism to achieve compliance with water quality standards. The Order, as adopted in 2013, included receiving water limitations stating that "discharges shall not cause or contribute to an exceedance of water quality standards contained in a Statewide Water Quality Control Plan, the California Toxics Rule (CTR), or in the applicable Regional Water Board Basin Plan." (Section D.) TMDLs are the means to implement water quality standards in impaired water bodies. Incorporation of TMDL-based requirements into the MS4 permit, consistent with applicable basin plans, allows the permittee greater flexibility in achieving the water quality standards in the receiving water by allowing additional time to meet the receiving water limitations or, in some cases, permitting interim compliance through management practice implementation rather than immediate compliance with numeric limitations. The TMDL-specific requirements accordingly do not constitute a new program or higher level of service as compared with the baseline requirement of the receiving water limitations.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*The TMDL-specific requirements impose requirements that are mandated by federal law:*

The TMDL-specific requirements of this Order also fit under exceptions to the requirement to reimburse local government for a new program or higher level of service. Most significantly, one exception exists if "[t]he statute or executive order imposes a requirement that is mandated by a federal law or regulation and results in costs mandated by the federal government, unless the statute or executive order mandates costs that exceed the mandate in that federal law or regulation." (Gov. Code, §17556, subd.(c).)

The TMDL-specific requirements of Attachment G are mandated by federal law and federal regulations. Clean Water Act Section 303(d) requires that each state "shall" identify impaired waterbodies, "shall" prioritize such waters/watersheds for future development of TMDLs, and "shall" develop TMDLs for the appropriate pollutants in accordance with the prioritization. (33 U.S.C. § 1313(d).) The TMDLs must be approved by U.S. EPA. (Id.) The Code of Federal Regulations provides that once U.S. EPA approves a TMDL for a waterbody, the effluent limitations in any NPDES permit "shall" be "consistent with the assumptions and requirements of any available wasteload allocations." (40 C.F.R. § 122.44(d)(1)(vii)(B).) Specific to Phase II MS4 permits, the Code of Federal Regulations states that "the permit will include… [m]ore stringent terms and conditions… based on an approved total maximum daily load…" (40 C.F.R. § 122.34(c)(1).)

Federal law thus compels the State Water Board to include the TMDL-specific provisions of Attachment G in the Phase II MS4 Permit.[40]

The California Supreme Court's 2016 decision in *Department of Finance v. Comm'n on State Mandates* (2016) 1 Cal.5th 749, *as modified on denial of rehearing* (Nov. 16, 2016) (*Department of Finance*) established a new framework for analyzing the federal mandates exception to article XIII B, section 6 of the Constitution. An agency order is not a federal mandate if (1) federal law gives the State discretion to impose the particular implementing requirement, and (2) the State exercises that discretion in imposing the requirement by virtue of a "true choice." (*Department of Finance*, *supra*, 1 Cal.5th at 765.) That case concerned the discretion of the Los Angeles Water Board under the MEP standard and the court held that the Board had exercised a true choice in imposing certain requirements on the permittees. Here, the discretion exercised by the State Water Board in complying with section 122.44, subdivision (d)(1)(vii)(B) of Title 40 of the federal regulations is different and more limited than under the MEP standard. Title 40, Section 122.44, subdivision (d)(1)(vii)(B) specifically directs the Board to include effluent limitations which are consistent with the assumptions of any applicable wasteload allocations. The State Water Board had no choice but to include the TMDL-specific provisions in this Order that would result in attainment of the wasteload allocation within the timeframe established in the TMDL. The only discretion the Board employed when complying with section 122.44, subdivision (d)(1)(vii)(B) was crafting

---

[40] USEPA has similarly required attainment of applicable wasteload allocations in MS4 permits. (See, e.g., sections 1.4.2 and 4.10 of Modified NPDES Permit No. DC0000022 for the MS4 for the District of Columbia, issued October 7, 2011, modified November 9, 2012, available at https://www3.epa.gov/reg3wapd/pdf/pdf_npdes/stormwater/DCMS4/MS4FinalLimitedModDocument/FinalModifiedPermit_10-25-12.pdf and section 2.1.1 and Appendix F of the General Permit for Small MS4s in Massachusetts, issued April 4, 2016, available at https://www3.epa.gov/region1/npdes/stormwater/ma/2016fpd/final-2016-ma-sms4-gp.pdf)

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

provisions which were consistent with the assumptions and requirements of the applicable wasteload allocations. In exercising this limited discretion, the Board simply translated the wasteload allocations directly into effluent limitations in the form of required control actions. This involved significantly less discretion than did the provisions at issue in *Department of Finance*. Further, in instances where the State Water Board and the appropriate regional water board determined that a choice of actions is available to the permittee to achieve the wasteload allocations in the required timeframe, Attachment G provides that the permittee may propose a set of actions for approval by the relevant regional water board.

Additional federal laws and regulations mandate inclusion of portions of the TMDL-specific requirements of this Order. Under Clean Water Act section 402, subdivision (p)(3)(B)(ii), MS4 permits must effectively prohibit non-storm water discharges into MS4s. (33 U.S.C. §1342(p)(3)(B)(ii); see also 40 C.F.R. § 122.34(b)(3).) Several TMDLs implemented through this Order apply to dry weather discharges, i.e. non-storm water discharges, and require illicit discharge detection and elimination efforts to address non-storm water discharges. The federal regulations also require Phase II permits to incorporate an evaluation of "compliance with the terms and conditions of the permit, including the effectiveness of the components of [ ] storm water management program[s] and the status of achieving the measurable requirements in the permit" (40 C.F.R. §122.34(d)(1).) The TMDL requirements include monitoring and reporting to determine that the TMDL-specific requirements are leading to appropriate progress toward achievement of the wasteload allocations.

*The MS4s have authority to levy service charges, fees, and assessments:*

Another exception applies where "the local agency . . . has the authority to levy service charges, fees, or assessments sufficient to pay for the mandated program or increased level of service." (Gov't Code, § 17556, subd. (d).) The MS4 permittees have the ability to charge fees, such as inspection fees or storm water fees, to cover the cost of the TMDL-specific requirements.

*The TMDL-specific requirements are requirements of general applicability:*

Finally, reimbursement to local agencies is required only for the costs involved in carrying out functions peculiar to government, not for expenses incurred by local agencies as an incidental impact of laws that apply generally to all state residents and entities. (*City of Richmond v. Comm'n on State Mandates* (1998) 64 Cal.App.4th 1190, 1199.) The Clean Water Act and the federal regulations' TMDL requirements are laws of general applicability, uniformly imposed on all NPDES permittees, including not just MS4s, but also industrial and construction storm water dischargers, as well as traditional NPDES permittees such as wastewater treatment plants.

For the foregoing reasons, the TMDL requirements of this Order do not constitute unfunded mandates requiring reimbursement.

## Basis of TMDL-Related Permit Requirements

The following discussion provides the basis for the TMDL-related requirements in Attachment G of this Order.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## NORTH COAST REGIONAL WATER BOARD TMDLs

### *Laguna de Santa Rosa Ammonia & Dissolved Oxygen TMDL*

The Laguna de Santa Rosa Ammonia and Dissolved Oxygen TMDL was approved by U.S. EPA as the Waste Reduction Strategy for the Laguna de Santa Rosa, dated March 1, 1995. The Waste Reduction Strategy provided the assumptions and goals used to determine the best option to reduce impacts to the Laguna de Santa Rosa, and attain water quality goals and objectives. The Regional Water Board, however, found the Waste Reduction Strategy to be unenforceable and inadequate to address the declining dissolved oxygen issues in Laguna de Santa Rosa. In 2002, the Regional Water Board determined that dissolved oxygen objectives were being violated and that nutrient loads were on the rise. The Regional Water Board is in the process of developing a TMDL for the Laguna de Santa Rosa for nitrogen, phosphorus, dissolved oxygen, temperature and sediment. Due to the above findings and TMDL development efforts, the State Water Board has removed the Waste Reduction Strategy requirements in this Order.

### *Shasta River Watershed Temperature & Dissolved Oxygen TMDL*

The Shasta River watershed includes all tributaries and Lake Shastina in Siskiyou County. The Shasta River Watershed Temperature and Dissolved Oxygen TMDL and Action Plan was adopted by the North Coast Regional Water Board on June 28, 2006. The Shasta River Watershed Temperature and Dissolved Oxygen TMDL was approved by U.S. EPA and became effective on January 26, 2007. The Shasta River TMDL Action Plan contains the goals and assumptions used to develop the wasteload allocations and conditions to be considered in conducting actions (in this case, storm water management) in the Shasta River watershed.

The North Coast Regional Water Board has determined that the City of Yreka, a Traditional Small MS4 permittee, is a source of "human activity" subject to this TMDL and must comply with the TMDL-requirements of this Order. The TMDL does not specify wasteload allocations for the City of Yreka, but does require the City of Yreka to develop and implement a plan to minimize and control pollutants of concern in urban storm water runoff. That plan was developed and submitted on June 24, 2013, as part of the City's Notice of Intent for this Order. Attachment G of this Order requires the City to implement this plan no later than January 1, 2019. Therefore, the City will be required to implement the plan immediately. There are no current monitoring requirements for the City related to TMDL implementation.

## *SAN FRANCISCO BAY REGIONAL WATER BOARD TMDLs*

### *Napa River Sediment TMDL*

The Napa River and its tributaries are listed as impaired due to excessive sediment. The river was listed on the Clean Water Act section 303(d) in response to concerns regarding adverse impacts to habitat for steelhead trout, chinook salmon, and other threatened species whose populations have declined substantially in recent decades. The Napa River Sediment TMDL and Habitat Enhancement Plan identify pollutant sources of concern, and specify actions to restore a healthy fishery in the watershed.

The Napa River Sediment TMDL identifies urban storm water runoff, specifically storm water runoff from State highways, and industrial and construction sites as a source of impairment. The Napa River Sediment TMDL names parties that should implement measures to control and/or prevent sediment discharges associated with urban storm water runoff (hereinafter

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

referred to as Implementing Parties). Attachment G of this Order assigns requirements to the Traditional Small MS4 designees identified as Implementing Parties within the Napa River Sediment TMDL.

*Wasteload Allocations (WLA):* The Napa River Sediment TMDL includes a WLA of 800 metric tons/year for storm water runoff discharges from stream crossings and storm water runoff discharges associated with operation of public and private roads, paved and unpaved within the watershed not otherwise covered by NPDES permits issued to Napa County and municipalities including the City of Napa, Town of Yountville, City of St. Helena, City of Calistoga, and City of American Canyon.

*Load Allocations (LA):* The Napa River Sediment TMDL also includes an LA of 27,000 metric tons/year that applies to a roads and streams crossings source category that Napa County and the City of Napa, Town of Yountville, City of St. Helena, City of Calistoga, and City of American Canyon share with Caltrans. Caltrans is responsible for runoff from State highways and associated construction activities. Discharges from State highways are regulated by the State Water Board's statewide municipal storm water permit issued to Caltrans; discharges of storm water from construction activities are regulated by the State Water Board's Statewide Storm Water Permit for Discharges Associated with Construction and Land Disturbance Activity.

Deliverables/Actions Required:
The TMDL-related requirements in this Order are based on the TMDL Implementation Plan. To implement the roads and stream crossings allocation, the TMDL Implementation Plan establishes a performance standard for roads as follows: road-related sediment delivery to channels should be ≤ 500 cubic yards per mile per 20 year period. The TMDL Implementation Plan also calls on entities responsible for paved roads to conduct a survey of stream-crossings associated with paved public roadways and develop a prioritized implementation plan for repair and/or replacement of high priority crossings/culverts to reduce road related erosion and protect stream-riparian habitat conditions. Napa County was timely in submitting an implementation plan by October 2014.

Attainment of water quality objectives will be evaluated at the confluence of Napa River with Soda Creek, which includes the downstream boundary of freshwater habitat for salmon and steelhead. Attainment of the water quality objectives will be evaluated over a 5-to-10-year averaging period.

### ***Sonoma Creek Sediment TMDL***
The Sonoma Creek Sediment TMDL includes a wasteload allocation that applies to storm water runoff discharges from stream crossings and public and private roads (paved and unpaved) within the watershed that are not otherwise covered by a Phase 1 NPDES MS4 permit issued to the County and/or City of Sonoma.

The Sonoma County Water Agency has been a voluntary participant with proactive storm water control efforts, including enrollment under the previous 2003 Small MS4 permit (Order 2003-0005-DWQ). The Sonoma County Water Agency owns and operates approximately 2,000 linear feet of stream channel within the Sonoma Creek watershed. Therefore, the Agency is subject to the TMDL, as expressed by the requirements in Attachment G.

Phase II Entities:
The Sonoma Creek Sediment TMDL identifies urban storm water runoff from Phase II entities, State highways, and industrial and construction storm water discharges, as a source of

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

impairment. The TMDL names parties that should implement measures to control and/or prevent sediment discharges associated with urban storm water runoff (hereinafter referred to as Implementing Parties). Attachment G of this Order assigns requirements to the designees identified as Implementing Parties within the TMDL.

Wasteload and Load Allocations:

The Sonoma Creek sediment TMDL assigns a wasteload allocation to municipal storm water and a load allocation for the roads source category. The sediment wasteload allocation is 600 tons/year and applies to storm water runoff discharges from Phase II permittees. The load allocation of 2,100 tons/year of sediment is for the road and stream crossings category and applies to stream crossings and storm water runoff discharges associated with operation of public and private roads (paved and unpaved) within the watershed not otherwise covered by an NPDES storm water permit.

Municipalities share the wasteload allocation with another entity (i.e., Caltrans). Caltrans is responsible for runoff from State highways and associated construction activities. Discharges from State highways are regulated by the State Water Board statewide municipal storm water permit issued to Caltrans; discharges of storm water from construction activities are regulated by the State Water Board Statewide Storm Water Permit for Discharges Associated with Construction and Land Disturbance Activity.

Deliverables/Actions Required:

The TMDL-related requirements in this Order are based on the TMDL Implementation Plan. To implement the roads and stream crossings allocation, the TMDL Implementation Plan establishes a performance standard for the design, construction, and maintenance of rural roads to minimize road-related sediment delivery to streams. The Implementation Plan also requires entities responsible for paved roads, such as the City and County of Sonoma, to: (1) adopt and implement best management practices for maintenance of unimproved (dirt/gravel) roads, (2) conduct a survey of stream-crossings associated with paved public roadways, (3) develop a prioritized implementation plan for repair and/or replacement of high priority crossings/culverts to reduce road related erosion, and (4) protect stream-riparian habitat conditions.

TMDL compliance, and water body attainment with the sediment water quality objectives, will be evaluated at the limit of tidal influence in the Sonoma Creek watershed, which approximates the downstream boundary of freshwater habitat for steelhead. Sonoma Creek has several tributaries that join the main stem below the tidal limit; therefore, several locations will be used to evaluate water body attainment. These locations are: (1) the main stem Sonoma Creek immediately downstream of the Fowler/Carriger Creek confluence, and (2) the freshwater portions (above tidal influence) of Schell, Ramos, Carneros, and Merazo Creeks. Attainment of the sediment water quality objectives will be evaluated over a 5-to-10-year averaging period.

This Order does not directly require the preparation and implementation of Storm Water Management Plans as required in the previous 2003 Storm Water Permit (Order 2003-0005-DWQ). However, the specific implementation actions for attenuation of peak flows and durations from new and redevelopment projects that were proposed by Permittees in the Storm Water Management Plans approved under the previous 2003 Storm Water Permit are incorporated herein by reference. The municipalities identified in this TMDL section shall continue to implement those specific actions to attenuate peak flows and durations from new

and redevelopment projects as stated in Attachment G. Municipalities may propose amendments to those actions by submitting an updated proposal for attenuation of peak flows and durations to the San Francisco Bay Regional Water Board.

## Napa River Pathogens TMDL

The Napa River Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The San Francisco Water Board has determined that the Cities of American Canyon, Calistoga, St. Helena and Napa, the Town of Yountville and the County of Napa, Traditional Small MS4s, are sources of "municipal runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

Load Allocations:

The Napa River pathogens TMDL assigns a load allocation to municipal storm water as follows:

[All are in units of CFU per 100 milliliters]

| E.coli Geometric Mean | E.coli 90th percentile | Fecal coliform Geometric Mean | Fecal coliform 90th percentile | Total coliform Median | Total coliform Single Sample Max |
|---|---|---|---|---|---|
| <113 | <368 | <180 | <360 | <216 | 9,000 |

These allocations are applicable year-round and apply to any sources (existing or future) subject to regulation by NPDES permit.

Deliverables/Actions Required:

The TMDL-related requirements in this Order are derived from the TMDL Implementation Plan that was adopted with the TMDL. The Implementation Plan for the pathogen TMDL requires parties responsible for municipal runoff (i.e., Napa County and municipalities including the City of Napa, Town of Yountville, City of St. Helena, City of Calistoga, and City of American Canyon) to comply with storm water management plans previously developed. The municipalities' management plans must be updated and/or amended as necessary to include actions that will lead to compliance with the requirements of this Order. The management plans must address:(1) public participation and outreach, (2) pet waste management, (3) illicit sewage discharge detection and elimination to reduce and eliminate fecal coliform discharges to Sonoma Creek, and (4) pollution prevention strategies. The Implementation Plan also requires these municipalities to participate in evaluation of E. coli concentration trends in the Napa River and its tributaries and to report annually on water quality monitoring results and progress made on implementation of human and animal runoff reduction measures. The implementation actions are expected to build on existing programs. The Permittee must report on its implementation actions in the Annual Report.

## Sonoma Creek Pathogens TMDL

The Sonoma Creek Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The Sonoma County Water Agency has been a voluntary participant with early storm water control efforts, including enrollment under the previous Small MS4 permit (Order 2003-0005-DWQ). The Sonoma County Water Agency owns and operates approximately 2,000 linear feet of stream channel within its service area. The Agency is also enrolled under this Order and as, such, is subject to the TMDL, expressed as requirements in Attachment G.

Phase II Entities:
The San Francisco Water Board has determined that the City of Sonoma, the County of Sonoma, and the Sonoma County Water Agency, Traditional Small MS4 permittees, are sources of "municipal runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The Sonoma Creek pathogens TMDL assigns a wasteload allocation to municipal storm water as follows:

[Units: CFU/100 milliliters]

| _E.coli_ Geometric Mean | _E.coli_ 90th percentile | Fecal coliform Geometric Mean | Fecal coliform 90th percentile | Total coliform Median | Total coliform Single Sample Max |
|---|---|---|---|---|---|
| <113 | <368 | <180 | <360 | <216 | 9,000 |

These allocations are applicable year-round and apply to any sources (existing or future) subject to regulation by NPDES permit.

Deliverables/Actions Required:
The TMDL-related requirements in this Order are derived from the TMDL Implementation Plan that was adopted with the TMDL. The Implementation Plan for the pathogen TMDL requires parties responsible for municipal runoff (i.e., City and County of Sonoma) to comply with storm water management plans previously developed. The municipalities' management plans must be updated and/or amended as necessary to include actions that will lead to compliance with the requirements of this Order. The management plans must address: (1) public participation and outreach, (2) pet waste management, (3) illicit sewage discharge detection and elimination to reduce and eliminate fecal coliform discharges to Sonoma Creek, and (4) pollution prevention strategies. The Implementation Plan also requires the City and County of Sonoma to participate in evaluation of E. coli concentration trends in Sonoma Creek and its tributaries and to report annually on water quality monitoring results and progress made on implementation of human and animal runoff reduction measures. The implementation actions are expected to build on existing programs. The Permittee must report on its implementation actions in the Annual Report.

For the Sonoma County Water Agency, the TMDL implementation requirements of this Order are incorporated by reference to the Storm Water Management Plan approved under the previous 2003 Storm Water Permit (Order 2003-0005-DWQ). The Sonoma County Water Agency must comply with the compliance dates established in its previously approved Storm Water Management Plans.

***Tomales Bay Pathogens TMDL***
The Tomales Bay Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The San Francisco Water Board has determined that the County of Marin is a source of municipal runoff subject to this Order and that the County is responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The Tomales Bay Pathogens TMDL assigns a wasteload allocation to municipal storm water as follows:

  Note a: These allocations are applicable year-round and apply to any sources (existing or future) subject to regulation by NPDES permit.

  Note b: Based on a minimum of five consecutive samples equally spaced over a 30-day period.

  Note c: No more than 10% of total samples during any 30-day period may exceed this number.

**Fecal Coliform [Note a] (Most Probable Number per 100 milliliters)**

*For Direct Discharges to Tomales Bay*
  Median [Note b]: <14
  90th percentile [Note c]: <43

*For Discharges to Major Tomales Bay Tributaries*
  Log Mean [Note b]: <200

Deliverables/Actions Required:
The TMDL-related requirements in this Order are derived from the TMDL Implementation Plan that was adopted with the TMDL. The Implementation Plan for the Pathogen TMDL requires parties responsible for municipal runoff (i.e., Marin County) to comply with storm water management plans previously developed. The municipalities' management plans must be updated and/or amended as necessary to include actions that will lead to compliance with the requirements of this Order. The management plans must address:(1) public participation and outreach, (2) pet waste management, (3) illicit sewage discharge detection and elimination to reduce and eliminate fecal coliform discharges to Tomales Bay and its tributaries including Olema, Lagunitas, and Walker Creeks, and (4) pollution prevention strategies. The Implementation Plan also requires these municipalities to participate in evaluation of E. coli concentration trends in Tomales Bay and its tributaries and to report annually on water quality monitoring results and progress made on implementation of human and animal runoff reduction measures. The Implementation Plan anticipates that dischargers (including Marin County) and stakeholders, in collaboration with the Water Board will conduct water quality monitoring to evaluate fecal coliform concentration trends in Tomales Bay and its tributaries.

The implementation actions are expected to build on existing local storm water management programs and ongoing efforts to reduce pathogen loads to Tomales Bay and its tributaries. The Permittee must report on its implementation actions in the Annual Report.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### *Richardson Bay Pathogens TMDL*

The Richardson Bay Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The San Francisco Water Board has determined that the Cities of Belvedere, Mill Valley, Sausalito, Tiburon and the County of Marin, Traditional Small MS4s, are a source of "municipal runoff" subject to this TMDL and must comply with the requirements of the Richardson Bay Pathogens TMDL in this Order.

Wasteload Allocations:

The Richardson Bay Pathogens TMDL assigns a wasteload allocation to municipal storm water as follows:

  Note a: These allocations are applicable year-round.
  Note b: Based on a minimum of five consecutive samples equally spaced over a 30-day period.
  Note c: No more than 10% of total samples during any 30-day period may exceed this number.

**Fecal Coliform [note a], (Most Probable Number per 100 milliliters)**
    Median [note b]: <14
    90th percentile [note c]: <43

Deliverables/Actions Required:

The requirements in this Order are derived from the TMDL Implementation Plan that was adopted with the TMDL. The Implementation Plan for the pathogen TMDL requires parties responsible for municipal runoff (i.e., Marin County, City of Mill Valley, City of Tiburon, City of Belvedere, and City of Sausalito) to comply with storm water management plans previously developed. The municipalities' management plans must be updated and/or amended as necessary, to include actions that will lead to compliance with the requirements of this Order. The management plans must address: (1) public participation and outreach, (2) pet waste management, (3) illicit sewage discharge detection and elimination to reduce and eliminate fecal coliform discharges to Sonoma Creek, and (4) pollution prevention strategies. The Implementation Plan also requires these parties responsible for municipal runoff to report annually on progress made on implementation of human and animal runoff reduction measures.

The implementation actions are expected to build on existing local storm water management programs. The Permittee must report on its implementation actions in the Annual Report.

### *Urban Creeks Diazinon and Pesticide Toxicity TMDL*

The Urban Creeks Diazinon and Pesticide TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below. This provision implements requirements of the TMDL for Diazinon and pesticide-related toxicity for Urban Creeks in the San Francisco Bay Region. Pesticides of concern include: organophosphorus pesticides (chlorpyrifos, diazinon, and malathion); pyrethroids (bifenthrin, cyfluthrin, beta-cyfluthrin, cypermethrin, deltamethrin, esfenvalerate, lambda-cyhalothrin, permethrin, and tralomethrin); carbamates (e.g., carbaryl); and fipronil.

Phase II Entities:

The San Francisco Water Board has determined that the following municipalities are a source of "urban runoff" subject to this TMDL and must comply with the TMDL-related requirements of this Order: (1) the Cities of Belvedere, Larkspur, Mill Valley, Novato, Petaluma, San Rafael, Sausalito, and Sonoma, (2) the Towns of Corte Madera, Fairfax, Ross, San Anselmo, and Tiburon, and (3) the Counties of Marin and Sonoma, Traditional Small MS4 permittees.

Wasteload Allocations:

    Diazinon: 100 nanograms/liter (ng/l) (one-hour average)

    Toxicity: 1.0 Acute Toxicity Unit (TUa) and 1.0 Chronic Toxicity Unit (TUc)

Deliverables/Actions Required:

The requirements in this Order are derived from the TMDL Implementation Plan that was adopted with the TMDL. The Implementation Plan for the Urban Creeks and Diazinon and Pesticide Toxicity TMDL requires parties responsible for municipal runoff (i.e., Marin County, City of Belvedere, Town of Corte Madera, Town of Fairfax, City of Larkspur, City of Mill Valley, City of Novato, Town of Ross, Town of San Anselmo, City of San Rafael, City of Sausalito, Town of Tiburon, County of Sonoma, City of Sonoma, and City of Petaluma) to adopt an Integrated Pest Management Policy (IPM) or ordinance, as the basis of a Pesticide-Related Toxicity Program. Implementation actions of the Pesticide-Related Toxicity Program must include: a) training of all municipal employees who use or apply pesticides in the IPM practices and policy/ordinance, b) requiring contractors to implement IPM, c) keeping County Agricultural Commissioners informed of water quality issues related to pesticides, d) conducting outreach to residents and pest control applicators on less toxic methods for pest control, e) keeping records on pesticide use, and f) monitoring water and sediment for pesticides and associated toxicity in urban creeks via an individual or regional monitoring program.

The term "integrated pest management," as used for the purpose of this Order, refers to a process that includes setting action thresholds, monitoring and identifying pests, preventing pests, and controlling pests when necessary. Integrated pest management meets the following conditions:

- Pest control practices that focus on long-term pest prevention through a combination of techniques, such as biological control, habitat manipulation, and modification of cultural practices;

- Pesticides are used in response to monitoring indicating that pesticides are needed; Pesticide applications with the goal of removing only the target pest; and

- Pesticides are selected to minimize risks to human health, beneficial and non-target organisms, and the environment, including risks to aquatic habitats.

The term "less toxic pest control," as used for the purpose of this Order, refers to the use of pest control strategies selected to minimize the potential for pesticide-related toxicity in water and sediment.

Permittees are required to reduce discharges of pollutants, including pesticides, to the maximum extent practicable as required by this Order.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## CENTRAL COAST REGIONAL WATER BOARD TMDLs

For All TMDLs Requiring Wasteload Allocation Attainment Programs

For TMDLs that identify municipal storm water as a contributor to water body impairment, MS4s must reduce their wasteload discharges in accordance with TMDLs. The Central Coast Regional Water Board requires MS4s to develop Wasteload Allocation Attainment Programs to achieve compliance with the TMDL. The TMDLs set forth the expectation that the MS4s achieve their wasteload allocations within specified timeframes. The Wasteload Allocation Attainment Program approach differs from the typical regulatory requirements applied to municipal storm water (BMP implementation per an iterative process of continual improvement for achieving water quality standards). The MS4s' contribution to the impairment of water bodies, combined with the TMDL expectation that municipalities achieve their wasteload allocations within specified timeframes, necessitates a systematic approach to program implementation as it relates to the discharge of pollutants associated with impairments.

Federal regulations indicate that such an approach is appropriate. The Preamble to the Phase II federal storm water regulations states: "Small MS4 permittees should modify their programs if and when available information indicates that water quality considerations warrant greater attention or prescriptiveness in specific components of the municipal program."[41]

The Central Coast Water Board developed the Wasteload Allocation Attainment Program approach as a means to systematically guide municipalities towards attainment of their wasteload allocations. Without a systematic approach of this type, attainment of wasteload allocations within an identified time period is unlikely. Local municipal storm water management programs typically include basic or minimum BMPs to be implemented to attain water quality objectives. While some BMPs provide effective treatment and management of urban runoff, the connection between BMP effectiveness and attainment of wasteload reductions is unclear. Municipalities have implemented BMPs, yet water body impairment continue due to the inability for BMPs implemented by MS4s to address all the water quality issues identified in TMDLs. The demonstration of BMP implementation in a non-systematic approach failing to address impairments indicates that a systematic approach, as represented by the Wasteload Allocation Attainment Programs, is warranted.

On a broader scale, existing storm water programs often do not provide and/or exhibit the rationale used for BMP selection, or draw connections between those BMPs selected and attainment of wasteload allocations. Without a programmatic level of planning and design, attainment of wasteload allocations within specified timeframes may not take place. The Wasteload Allocation Attainment Program requirements are expressly designed to ensure adequate planning is conducted so that MS4s' TMDL implementation efforts are effective to achieve regulatory compliance. Wasteload Allocation Attainment Program development and implementation include the following items on a TMDL-specific basis: (1) An implementation and assessment strategy; (2) source identification and prioritization; (3) BMP identification, prioritization, implementation (including schedule), analysis[42], and assessment; (4) monitoring

---

[41] 64 FR 68753

[42] This analysis must be a quantifiable numeric analysis that uses published BMP pollutant removal estimates, performance estimates, modeling, best professional judgment, and/or other available tools to demonstrate that the BMP selected for implementation achieved the MS4's wasteload allocation. This analysis will most likely incorporate modeling efforts.

program development and implementation (including schedule); (5) reporting and evaluation of progress towards complying with wasteload allocations; and (6) coordination with stakeholders. The United States Environmental Protection Agency (U.S. EPA) forwards similar approaches for TMDL implementation in its Draft TMDLs to Storm Water Permits Handbook, which discusses BMP review and selection, establishing linkages between BMP implementation and load reductions, effectiveness assessment, and BMP/outfall/receiving water monitoring.[43]

Ultimately, the Wasteload Allocation Attainment Programs place the responsibility for program development, assessment, improvement, and success on the municipalities since municipal storm water has been identified as contributing to the water quality impairment. The Regional Water Board will collectively assess the progress of the various pollutant sources towards achieving receiving water quality standards as part of its triennial Basin Planning review, but each source must be responsible for assessing its own progress towards achieving its wasteload allocation. The process of planning, assessment, and refinement outlined by the Wasteload Allocation Attainment Programs helps ensure continual improvement and ultimate attainment of water quality standards at impaired receiving waters.

This Order implements TMDLs that have either a past-due or upcoming attainment date. In such instances, the Regional Water Board may determine, based upon past and proposed future actions, that the method for a permittee to attain the wasteload allocations will include further assessment and improvement upon implementation of the Wasteload Allocation Attainment Plans. The Permittee may request a Time Schedule Order from its Regional Water Board to allow additional time for compliance with the TMDL requirements.

View Central Coast TMDLs online at: http://www.waterboards.ca.gov/centralcoast/water_issues/programs/tmdl/303d_and_tmdl_proj ects.shtml

### _Morro Bay and Chorro and Los Osos Creeks Pathogens TMDL_

The Morro Bay and Chorro and Los Osos Creeks Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below. Pennington Creek and Warden Creek are tributaries of Los Osos Creek, and are therefore included in the TMDL.

Although several waterbodies were named in the Attachment G of this Order, as adopted by the State Water Board on February 5, 2013, three waterbodies (San Bernardo, San Luisito, and Walters Creeks) have been removed (by this amendment) due to these waterbodies (and their watersheds) being outside the permitting boundary areas of the Phase II entities below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the City of Morro Bay and the County of San Luis Obispo, Traditional Small MS4 permittees, are a source of "urban runoff" subject to this TMDL, and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
The City of Morro Bay and County of San Luis Obispo are assigned the following wasteload allocations:

---

[43] U.S. EPA. 2008. Draft TMDLs to Stormwater Permits Handbook. Chapters 5 and 6.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

For discharges to Los Osos Creek, Chorro Creek, and their tributaries:

1) The fecal coliform geometric mean concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed 200 Most Probable Number/100 milliliters, and

2) The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number/100 milliliters.

For discharges to Morro Bay:

1) The fecal coliform geometric mean concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed 14 Most Probable Number/100 milliliters, and

2) The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 43 Most Probable Number/100 milliliters.[44]

Deliverables/Actions Required:

The numeric targets approved in the TMDL are expressed in terms of receiving water indicators, e.g. fecal coliform density measurements. Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program, per the requirements in Attachment G of this Order. By February 5, 2014 the City of Morro Bay and County of San Luis Obispo were required to develop, submit, and begin implementation of a Wasteload Allocation Attainment Program that identifies the actions they will take to attain their wasteload allocations. Therefore, effective immediately, the MS4 shall implement the Wasteload Allocation Attainment Program.

The TMDL specifies that all wasteload allocations must be achieved by November 19, 2013. Since the deadline is past, the wasteload allocations are effective immediately. The Permittee may request a Time Schedule Order from its Regional Water Board to allow additional time for compliance with the TMDL requirements.

### ***Watsonville Slough Pathogens TMDL***

The Watsonville Slough Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Central Coast Regional Water Board has determined that the City of Watsonville and the County of Santa Cruz, Traditional Small MS4 permittees, are a source of "urban storm water" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:

The City of Watsonville and the County of Santa Cruz are assigned the following concentration-based wasteload allocations:

---

[44] For all Central Coast Water Board fecal indicator bacteria and pathogens TMDLs, E. coli concentrations may be used as a surrogate for fecal coliform concentrations.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

1) The fecal coliform log mean concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed 200 Most Probable Number/100 milliliters, and

2) The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number/100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The City of Watsonville is assigned the above wasteload allocations in the following water bodies: Watsonville, Struve, Harkins, Gallighan and Hanson Sloughs.

The County of Santa Cruz is assigned the above wasteload allocation in the following water bodies: Watsonville, Struve and Harkins Sloughs.

Deliverables/Actions Required:
Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program, as required in Attachment G of this Order.

The TMDL specifies that all allocation must be achieved by November 20, 2016. The Permittee may request a Time Schedule Order from its Regional Water Board to allow additional time for compliance with the TMDL requirements.

### ***Pajaro River, San Benito River, Llagas Creek, Tequesquita Slough, San Juan Creek, Carnadero/Uvas Creek, Bird Creek, Pescadero Creek, Tres Pinos Creek, Furlong (Jones) Creek, Santa Ana Creek, and Pachecho Creek Fecal Coliform TMDL***

The above-named Fecal Coliform TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the Cities of Gilroy, Hollister, Morgan Hill, Watsonville, and the Counties of Monterey, Santa Clara, and Santa Cruz, Traditional MS4 permittees, are a source of "MS4 discharges" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
The Cities of Hollister, Morgan Hill, Gilroy and Watsonville and the Counties of Monterey, Santa Clara and Santa Cruz are assigned the following concentration based wasteload allocations:

The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharges shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The Cities of Hollister, Morgan Hill, Gilroy and Watsonville and the Counties of Santa Cruz, Santa Clara and Monterey are assigned the above wasteload allocations in the following water bodies: Pajaro River, San Benito River, Llagas Creek and Tequesquita Slough.

Deliverables/Actions Required:
Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program, as required in Attachment G of this Order. The TMDL specifies that all allocations must be achieved by July 12, 2023.

### *Morro Bay Sediment TMDL*
The Morro Bay Sediment TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Although San Bernardo and San Luisito Creeks were named in Attachment G of this Order as adopted by the State Water Board on February 5, 2013, the requirements of this Order are not applicable to these water bodies because the water bodies (and their watersheds) are outside the permit boundary areas of the Phase II entities, below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the County of San Luis Obispo, a Traditional MS4 permittee, is a source of "urban land use" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
The numeric targets approved in the TMDL are expressed in terms of receiving water indicators, e.g. pool residual volume, median diameter of spawning gravel, etc. The TMDL also expressed the sediment assimilative capacity and allocations required to achieve the numeric targets. The allocations require a 50% reduction of current loading (estimated in 2003) to achieve the numeric targets. The wasteload allocations assigned to the responsible parties in this permit represent a 50% reduction from 2003 loading estimates.

The County of San Luis Obispo is assigned a wasteload allocation of 5,137 tons/year of sediment. The aggregated sediment discharge from all storm water outfalls into Morro Bay, or any tributary that has the potential to discharge sediment to Morro Bay, shall not exceed the allocation.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The County of San Luis Obispo is assigned allocations in the following water bodies: Morro Bay, Los Osos Creek, Chorro Creek, Dairy Creek, Pennington Creek, and Warden Creek.

Deliverables/Actions Required:
Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program, laid out in detail in Attachment G of this Order.

The allocations shall be achieved by December 3, 2053.

### *San Lorenzo River Sediment TMDL*
The San Lorenzo River Sediment TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Phase II Entities:
The Central Coast Regional Water Board has determined that the Cities of Santa Cruz, Scotts Valley and the County of Santa Cruz, Traditional MS4 permittees, are a source of "Other Urban and Rural Land" and "Public and Private Roads" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
The numeric targets approved in the TMDL are expressed in terms of receiving water indicators, e.g. pool residual volume, median diameter of spawning gravel, etc. The TMDL also expressed the sediment assimilative capacity and allocations required to achieve the numeric targets. The allocations require reductions of 24-27 percent of current sediment loading (estimated in 2002) to achieve the numeric targets. The wasteload allocations assigned to the responsible parties in this permit represent a 24-27 percent reduction from the 2003 loading estimates.

The County of Santa Cruz, City of Santa Cruz, and City of Scotts Valley are assigned the following wasteload allocations:

- The sediment discharge loading from public roads to the San Lorenzo River shall be reduced by 27%,

- The sediment discharge loading from public roads to Lompico Creek shall be reduced by 24%,

- The sediment discharge loading from public roads to Carbonera Creek shall be reduced by 27%,

- The sediment discharge loading from public roads to Shingle Mill Creek shall be reduced by 27%.

Deliverables/Actions Required:
Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program as required in Attachment G of this Order. The allocations shall be achieved by December 18, 2028.

***Pajaro River (including Llagas Creek, Rider Creek and San Benito River) Sediment TMDL***
The Pajaro River (including Llagas Creek, Rider Creek and San Benito River) Sediment TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below. The TMDL names "urban lands within NPDES Phase II urban boundaries" as a Land Use Source Category of sediment loading to the Corralitos Creek subbasin and assigns a wasteload allocation to this category.

Phase II Entities:
The Central Coast Water Board has determined that the Cities of Gilroy, Hollister, Morgan Hill and Watsonville, Traditional MS4 permittees, are sources of "municipal runoff" and must comply with the TMDL-related requirements of this Order.

The Santa Cruz County Fairgrounds is located within the Corralitos Creek subbasin (subbasin number 4) and constitutes "urban lands within NPDES Phase II urban boundaries." The Central Coast Water Board has additionally determined that the Santa Cruz County

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Fairgrounds, a Non-Traditional MS4 permittee, must incorporate provisions for complying with the wasteload allocations described in the TMDL as part of its compliance with this Order.

Wasteload Allocations:

The numeric targets approved in the TMDL are expressed in terms of receiving water indicators, e.g. pool residual volume, median diameter of spawning gravel, etc. The TMDL also provides the sediment assimilative capacity and allocations required to achieve the numeric targets. The allocations require reductions of 90 percent from current sediment loading (estimated in 2005) to achieve the numeric targets. The wasteload allocations assigned to the responsible parties in this permit represent a 90 percent reduction of the 2005 loading estimate.

The City of Morgan Hill, City of Gilroy, City of Hollister, Santa Cruz County Fairgrounds, and the City of Watsonville shall not discharge sediment to the following water bodies in excess of the values shown:

| Major Subwatershed | Metric tons per year |
|---|---|
| Tres Pinos | 1 |
| San Benito River | 100 |
| Llagas Creek | 787 |
| Uvas Creek | 139 |
| Upper Pajaro River | 161 |
| Corralitos (including Rider Creek) | 284 |
| Mouth of Pajaro River | 191 |

Deliverables/Actions Required:

The Central Coast Water Board has determined that compliance with Phase II MS4 permit requirements tailored to focus on reduction of sediment discharges to the affected waterbodies is sufficient to achieve the wasteload allocations. The allocations shall be achieved by November 27, 2051.

### *San Luis Obispo Creek Pathogens TMDL*

The San Luis Obispo Creek Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Central Coast Regional Water Board has determined that the City of San Luis Obispo and the County of San Luis Obispo, Traditional MS4 permittees, and the California Polytechnic (Cal Poly) State University, a Non-Traditional MS4 permittee, are a source of "Urban" and "Human" sources subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:

The City of San Luis Obispo, the County of San Luis Obispo, and the Cal Poly State University-San Luis Obispo, are assigned the following concentration-based wasteload allocation for fecal coliform:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The City of San Luis Obispo is assigned these allocations in San Luis Obispo Creek and Stenner Creek.

The County of San Luis Obispo is assigned these allocations in the San Luis Obispo Creek.

Cal Poly State University-San Luis Obispo is assigned these allocations in Stenner Creek and Brizziola Creek.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

Deliverables/Actions Required:
Compliance with this TMDL is achieved through development and implementation of a Wasteload Allocation Attainment Program per requirements in Attachment G of this Order. The TMDL specifies that all allocations shall be achieved no later than July 25, 2015. The allocations are therefore effective immediately. A permittee with a past deadline may request a Time Schedule Order from the applicable Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the permittee to comply with the TMDL requirements that will supersede the deadlines referenced in this Order.

### ***San Luis Obispo Creek Nitrate-Nitrogen TMDL***
The San Luis Obispo Creek Nitrate-Nitrogen TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the City of San Luis Obispo and the County of San Luis Obispo, Traditional MS4 permittees, and Cal Poly State University, a Non-Traditional MS4 permittee, are a source of "Residential areas" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
Urban storm water from the City of San Luis Obispo, County of San Luis Obispo, and Cal Poly State University shall not cause an increase in the receiving water nitrate concentration greater than the increase in nitrate concentration resulting from their discharge in 2006 (when the TMDL became effective). In 2006, the nitrate concentration of storm water discharge was 0.3 mg/L-N.

The City of San Luis Obispo, County of San Luis Obispo, and Cal Poly State University were achieving their allocations at the time the TMDL became effective; these municipalities shall implement measures to assure continued attainment of their allocations.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Deliverables/Actions Required:
The Central Coast Water Board has determined that compliance with the requirements of this Phase II MS4 permit, tailored to focus on reduction of nutrient discharges to the affected water bodies, is sufficient to achieve the wasteload allocations.

The TMDL specifies that the target date to achieve the TMDL is during or before year 2012. The allocations are therefore effective immediately. A permittee is not in need of a Time Schedule Order from the applicable Regional Water Board since these permittees were achieving their allocations at the time the TMDL became effective, and are expected to continue implementing measures to assure continued attainment of their allocations.

### *Corralitos and Salsipuedes Creeks Fecal Coliform TMDL*
The Corralitos and Salsipuedes Creeks Fecal Coliform TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below. The TMDL also names "Owners of private sewer laterals (Private sewer laterals connected to municipal sanitary sewer collection system)" as a responsible party and assigns a wasteload allocation.

Phase II Entities:
The Central Coast Regional Water Board has determined that the City of Watsonville and the County of Santa Cruz, Traditional MS4 permittees, and the Santa Cruz County Fairgrounds, a Non-Traditional MS4 permittee, are a source of "Storm drain discharges" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
The County of Santa Cruz and the City of Watsonville, and the Santa Cruz County Fairgrounds are assigned the following concentration-based wasteload allocation:

The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The County of Santa Cruz and the City of Watsonville and the Santa Cruz County Fairgrounds, are assigned the above allocations in the following water bodies: Corralitos Creek and Salsipuedes Creek.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on developing and implementing a Wasteload Allocation Attainment Program, discussed in detail in Attachment G of this Order. All allocations shall be achieved no later than September 8, 2024.

### *Lower Salinas River Watershed Fecal Coliform TMDL*
The Lower Salinas River Watershed Fecal Coliform TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Phase II Entities:
The Central Coast Regional Water Board has determined that the County of Monterey, a Traditional MS4 permittee, is a source of "Discharges from MS4s" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

The County of Monterey is assigned allocations in the following water bodies:

The Lower Salinas River, the Old Salinas River Estuary, the Tembladero Slough, the Salinas Reclamation Canal, the Alisal Creek, the Gabilan Creek, the Salinas River Lagoon (North), and the Santa Rita Creek.

Wasteload Allocations:
The County of Monterey is assigned the following concentration based wasteload allocation for fecal coliform:

The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on developing and implementing a Wasteload Allocation Attainment Program per the requirements in Attachment G of this Order. All allocations shall be achieved no later than December 20, 2024.

### *San Lorenzo River Estuary, San Lorenzo River, Branciforte Creek, Camp Evers Creek, Carbonera Creek and Lompico Creek Pathogens TMDL*
The San Lorenzo River Estuary, San Lorenzo River, Branciforte Creek, Camp Evers Creek, Carbonera Creek and Lompico Creek Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the Cities of Santa Cruz and Scotts Valley and the County of Santa Cruz, Traditional MS4 permittees, are a source of "Discharges from MS4s" subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations:
The City of Santa Cruz, County of Santa Cruz and the City of Scotts Valley are assigned the following concentration based wasteload allocation for fecal coliform:

The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The City of Santa Cruz is assigned the above allocations in the San Lorenzo River Estuary, the San Lorenzo River, the Branciforte Creek, and the Carbonera Creek.

The County of Santa Cruz is assigned the above allocations in the San Lorenzo River, the Branciforte Creek, the Lompico Creek, and the Carbonera Creek,

The City of Scotts Valley is assigned above allocations in the Camp Evers Creek and the Carbonera Creek.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on developing and implementing a Wasteload Allocation Attainment Program as required in detail in Attachment G of this Order. All allocations shall be achieved no later than June 8, 2024.

### ***Soquel Lagoon, Soquel Creek and Noble Gulch Pathogens TMDL***
The Soquel Lagoon, Soquel Creek and Noble Gulch Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the City of Capitola and the County of Santa Cruz, Traditional MS4 permittees, are a source of "Discharges from MS4s" subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations:
The City of Capitola and the County of Santa Cruz are assigned the following concentration-based wasteload allocation for fecal coliform:

The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The City of Capitola is assigned the above allocations in Soquel Lagoon.

The County of Santa Cruz is assigned the above allocations in Soquel Creek and Noble Gulch.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on developing and implementing a Wasteload Allocation Attainment Program per the requirements in Attachment G of this Order. All allocations shall be achieved by September 15, 2023.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### *Aptos Creek, Valencia Creek and Trout Gulch Pathogens TMDL*

The Aptos Creek, Valencia Creek and Trout Gulch Pathogens TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

<u>Phase II Entities:</u>

The Central Coast Regional Water Board has determined that the County of Santa Cruz, a Traditional MS4 permittee, is a source of "Discharges from MS4s" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

<u>Wasteload Allocations:</u>

The County of Santa Cruz is assigned the following concentration based wasteload allocation for fecal coliform:

> The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

> The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The County of Santa Cruz is assigned the above allocations in Aptos Creek, Valencia Creek, and Trout Gulch.

<u>Deliverables/Actions Required:</u>

Compliance with this TMDL is dependent on developing and implementing a Wasteload Allocation Attainment Program per the requirements in Attachment G of this Order. All allocations shall be achieved October 29, 2023.

### *Santa Maria River Watershed Fecal Indicator Bacteria TMDL*

The Santa Maria River Watershed Fecal Indicator Bacteria TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

<u>Phase II Entities:</u>

The Cities of Guadalupe and Santa Maria and the Counties of Santa Barbara and San Luis Obispo, Traditional MS4 permittees, and the Santa Maria Fairpark, a Non-Traditional MS4 permittee, are sources of "Discharges from MS4s" subject to this TMDL and must comply with the TMDL-related requirements in this Order. The Santa Maria Fairpark is assigned wasteload allocation in the Main Street Canal; however the Central Coast Water Board has determined that the Santa Maria Fairpark's BMPs and monitoring effectively implement a Wasteload Allocation Attainment Program; therefore no further TMDL-related requirements in this Order are needed for the Santa Maria Fairpark.

<u>Wasteload Allocations:</u>

The Central Coast Water Board has determined that the City of Santa Maria, the City of Guadalupe, the County of Santa Barbara, and the County of San Luis Obispo are assigned the following concentration-based wasteload allocation:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

(1) The fecal coliform concentration in the receiving water (based on a minimum of five samples) for any consecutive 30-day period shall not exceed a log mean of 200 Most Probable Number per 100 milliliters, and

The fecal coliform concentration (of each individual sample) of more than ten percent of the total samples collected during the same 30-day period, as above, shall not exceed 400 Most Probable Number per 100 milliliters.

(2) Based on a statistically sufficient number of samples (generally not less than five samples equally spaced over a 30-day period), the geometric mean of E. coli densities shall not exceed 126 Most Probable Number per 100 milliliters, and no sample shall exceed a one-sided confidence limit (C.L.) for contact recreation (90% C.L.) = 409 Most Probable Number per 100 milliliters.

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

The City of Santa Maria is assigned the above wasteload allocations in the following water bodies: the Santa Maria River, the Main Street Canal, the Blosser Channel, and the Bradley Channel.

The County of Santa Barbara is assigned the above wasteload allocations in Orcutt Creek.

The County of San Luis Obispo is assigned the above wasteload allocations in Nipomo Creek.

The City of Guadalupe is assigned the above wasteload allocations in the Santa Maria River and Estuary.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on the development and implementation of a Wasteload Allocation Attainment Program, or other integrated plan, per the requirements in Attachment G of this Order.

These wasteload allocations are receiving water allocations that must be attained by February 21, 2028 in accordance with a Wasteload Allocation Attainment Plan or other integrated plan. All wasteload allocations shall be achieved by February 21, 2028.

### *Lower Santa Maria River Watershed and Tributaries to Oso Flaco Lake Nitrogen Compounds and Orthophosphate TMDL*

The Lower Santa Maria River Watershed and Tributaries to Oso Flaco Lake Nitrogen Compounds and Orthophosphate TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the Cities of Guadalupe and Santa Maria, and the Counties of Santa Barbara and San Luis Obispo, Traditional MS4 permittees, are sources of "Urban runoff" subject to this TMDL and must comply with the TMDL-related requirements of this TMDL.

Wasteload Allocations:
The City of Santa Maria, County of Santa Barbara, County of San Luis Obispo, and City of Guadalupe are assigned the following concentration-based wasteload allocations:

*(Continued on Next Page)*

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Lower Santa Maria River Watershed Final Wasteload Allocations (WLAs) Table**

| Waterbody the Responsible Party is Discharging to 1, 2 | Party Responsible for Allocation & NPDES/WDR number | Receiving Water Nitrate as N WLA (mg/L) | Receiving Water Orthophosphate as P WLA (mg/L) | Receiving Water Unionized Ammonia as N WLA (mg/L) |
|---|---|---|---|---|
| Santa Maria River (upstream from Highway 1), Blosser Channel, Bradley Channel, Main Street Canal, North Main Street Channel | City of Santa Maria (Storm drain discharges to MS4s) NPDES No. CAS000004 City of Guadalupe (Storm drain discharges to MS4s) (NPDES No. CAS000004) | Allocation-4 (see descriptions of allocations at bottom of this table) | Not Applicable | Allocation-3 |
| Santa Maria River (downstream from Highway 1) | City of Guadalupe (Storm drain discharges to MS4s) (NPDES No. CAS000004) | Allocation-1 | Allocation-2 | Allocation-3 |
| Nipomo Creek | County of San Luis Obispo (Storm drain discharges to MS4s) (NPDES No. CAS000004) | Allocation-4 | Not Applicable | Allocation-3 |
| Orcutt Creek | County of Santa Barbara (Storm drain discharges to MS4s) (NPDES No. CAS000004) | Allocation-1 | Allocation-2 | Allocation-3 |

**Lower Santa Maria River Watershed Description of Allocations Table**

Note A: Federal and State anti-degradation requirements apply to all wasteload and load allocations.

Note B: Achievement of final wasteload and load allocations to be determined on the basis of the number of measured exceedances and/or other criteria set forth in Section 4 of the *Water Quality Control Policy for Developing California's Clean Water Act Section 303(d) List* (Listing Policy - State Water Resources Control Board, Resolution No. 2004-0063,

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

adopted September 2004) or as consistent with any relevant revisions of the Listing Policy promulgated in the future.

| Allocation Note A | Compound | Concentration (mg/L) Note B |
|---|---|---|
| Allocation 1 | Nitrate as N | Dry Season (May 1 – Oct. 31): **4.3** Wet Season (Nov 1 – Apr 30): **8.0** |
| Allocation 2 | Orthophosphate as P | Dry Season (May 1 – Oct 31): **0.19** Wet Season (Nov 1 – Apr 30): **0.3** |
| Allocation 3 | Unionized Ammonia as N | Year-round: **0.025** |
| Allocation 4 | Nitrate as N | Year-round: **10** |

1 Responsible parties shall meet allocations in all receiving surface waterbodies of the responsible parties' discharges.
2 All reaches and tributaries unless otherwise noted.


**Lower Santa Maria River Watershed Interim Wasteload Allocations (WLAs) Table**
* Responsible parties shall meet allocations in all receiving surface waterbodies of the responsible parties' discharges.

| Waterbody the Responsible Party is Discharging to | Party Responsible for Allocation (Source) | First Interim WLA | Second Interim WLA |
|---|---|---|---|
| All waterbodies the responsible party is assigned wasteload allocations (WLAs) in Table IX R-1 | City of Santa Maria (Storm drain discharges to MS4s) Storm Water Permit NPDES No. CA00049981  City of Guadalupe (Storm drain discharges to MS4s) (NPDES Permit Pending)  County of San Luis Obispo (Storm drain discharges to MS4s) (NPDES No. CAS000004)  County of Santa Barbara (Storm drain discharges to MS4s) (NPDES No. CAS000004) | Achieve MUN standard-based and Unionized Ammonia objective-based allocations:  Allocation-3  Allocation-4  By May 22, 2026 | Achieve Wet Season (Nov. 1 to Apr. 30) Biostimulatory target-based TMDL allocations:  Allocation-1  Allocation-2  By May 22, 2034 |

The above wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The TMDL includes WLAs for Permittees for controllable sources. The TMDL also includes WLAs for non-controllable sources, but are not assigned to Permittees. Therefore, the parties responsible for the allocation to controllable sources are not responsible for the allocation to natural sources. Allocations to non-controllable sources are not included in this Order.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on the development and implementation of a Wasteload Allocation Attainment Program, or other integrated plan, per the requirements in Attachment G of this Order. All wasteload allocations shall be achieved by May 22, 2044.

### ***Lower Salinas River and Reclamation Canal Basin and the Moro Cojo Slough Subwatershed Nitrogen Compounds and Orthophosphate TMDL***

The Lower Salinas River and Reclamation Canal Basin and the Moro Cojo Slough Subwatershed Nitrogen Compounds and Orthophosphate TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Coast Regional Water Board has determined that the County of Monterey, a Traditional MS4 permittee, is a source of "Urban runoff" subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations:
The County of Monterey is assigned the following interim and final wasteload allocations:

**County of Monterey Final Wasteload Allocations (WLAs) Table**

Note A: Lower Salinas River: all reaches from downstream of Spreckels (downstream of monitoring site 309SSP) to the confluence with the Pacific Ocean including Salinas River Lagoon (North)

Note B: Santa Rita Creek: all reaches and tributaries, from the confluence with the Reclamation Canal to the uppermost reach of the waterbody.

Note C: Reclamation Canal: all reaches and tributaries, which includes from confluence with Tembladero Slough, to upstream confluence with Alisal Creek.

Note D: Gabilan Creek: all reaches and tributaries downstream of Crazy Horse Rd.

Note E: Natividad Creek: all reaches and tributaries, from the confluence with Carr Lake to the uppermost reach of the waterbody.

Note F: Alisal Creek: all reaches and tributaries from the confluence with the Reclamation Canal to the uppermost reach of the waterbody.

| Waterbody the responsible party is discharging to | Receiving Water Nitrate as N WLA (mg/L) | Receiving Water Orthophosphate as P WLA (mg/L) | Receiving Water Unionized Ammonia as N WLA (mg/L) |
|---|---|---|---|
| Lower Salinas River downstream of Spreckels, CA Note A | Allocation-1 *(see description of allocations below)* | Allocation-2 | Allocation-5 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Waterbody the responsible party is discharging to | Receiving Water Nitrate as N WLA (mg/L) | Receiving Water Orthophosphate as P WLA (mg/L) | Receiving Water Unionized Ammonia as N WLA (mg/L) |
|---|---|---|---|
| Santa Rita Creek [Note B], Reclamation Canal [Note C] | Allocation-3 | Allocation-4 | Allocation-5 |
| Gabilan Creek [Note D] | Allocation-6 | Allocation-2 | Allocation-5 |
| Natividad Creek [Note E] Alisal Creek [Note F] | Allocation-6 | Allocation-2 | Allocation-5 |

**County of Monterey Description of Allocations Table**

Note A: Federal and state anti-degradation requirements apply to all wasteload and load allocations.

Note B: Achievement of final wasteload and load allocations to be determined on the basis of the number of measured exceedances and/or other criteria set forth in Section 4 of the Water Quality Control Policy for Developing California's Clean Water Act Section 303(d) List (Listing Policy - State Water Resources Control Board, Resolution No. 2004-0063, adopted September 2004), or as consistent with any relevant revisions of the Listing Policy promulgated in the future pursuant to Government Code section 11353.

| Allocation [Note A] | Compound | Concentration (milligrams per liter) [Note B] |
|---|---|---|
| Allocation 1 | Nitrate as N | Dry Season (May 1 – Oct 31): 1.4 Wet Season (Nov 1 – Apr 30): 8.0 |
| Allocation 2 | Orthophosphate as P | Dry Season (May 1 – Oct 31): 0.07 Wet Season (Nov 1 – Apr 30): 0.3 |
| Allocation 3 | Nitrate as N | Dry Season (May 1 – Oct 31): 6.4 Wet Season (Nov 1 – Apr 30): 8.0 |
| Allocation 4 | Orthophosphate as P | Dry Season (May 1 – Oct 31): 0.13 Wet Season (Nov 1 – Apr 30): 0.3 |
| Allocation 5 | Unionized Ammonia as N | Year-round: 0.025 |
| Allocation 6 | Nitrate as N | Dry Season (May 1 – Oct 31): 2.0 Wet Season (Nov 1 – Apr 30): 8.0 |
| Allocation 7 | Nitrate as N | Dry Season (May 1 – Oct 31): 3.1 Wet Season (Nov 1 – Apr 30): 8.0 |
| Allocation 8 | Total Nitrogen as N | Dry Season (May 1 – Oct 31): 1.7 Wet Season (Nov 1 – Apr 30): 8.0 |
| Allocation 9 | Nitrate as N | Year-round: 10 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**County of Monterey Interim Wasteload Allocations (WLAs) Table**

| Waterbody | First Interim WLA | Second Interim WLA |
|---|---|---|
| All waterbodies given wasteload allocations (WLAs) as identified in Final Wasteload Allocations Table | Achieve MUN standard-based and Unionized Ammonia objective-based allocations:<br><br>Allocation-5; Allocation-9<br><br>12 years after effective date of the TMDL (June 7, 2026) | Achieve Wet Season (Nov. 1 to Apr. 30) Biostimulatory target-based TMDL allocations:<br><br>Wet Season Allocation/Waterbody combinations as identified in Final Wasteload Allocations Table<br><br>20 years after effective date of the TMDL (June 7, 2034) |

The County of Monterey shall meet the above wasteload allocations in all the receiving surface waterbodies receiving the County's municipal storm water discharges.

The TMDL includes WLAs for Permittees for controllable sources. The TMDL also includes WLAs for non-controllable sources, but are not assigned to Permittees. Therefore, the parties responsible for the allocation to controllable sources are not responsible for the allocation to natural sources. Allocations to non-controllable sources are not included in this Order.

Deliverables/Actions Required:
Compliance with this TMDL is dependent on the development and implementation of a Wasteload Allocation Attainment Program as required in Attachment G of this Order. All wasteload allocations shall be achieved by May 7, 2044.

## *Santa Maria River Watershed Toxicity and Pesticides TMDL*

Municipalities throughout the state are challenged with controlling pesticides in their urban storm water. Urban pesticide use is regulated by the California Department of Pesticide Regulation (DPR) and U.S. EPA. MS4 permittees have minimal to no authority over commercial and residential pesticide applications. The TMDL-related requirements in Attachment G of this Order reflect this constraint.

Phase II Entities:
The Central Coast Regional Water Board has determined that the Cities of Guadalupe and Santa Maria, and the County of Santa Barbara, Traditional MS4 permittees, are sources of "Urban storm water" subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations:
The City of Santa Maria, County of Santa Barbara, and City of Guadalupe are assigned the following wasteload allocations:

**Santa Maria River Watershed Wasteload Allocations Table**

| Responsible Parties | Source | Allocation |
|---|---|---|
| City of Santa Maria — NPDES No. CAS000004<br>County of Santa Barbara — NPDES No. CAS000004<br>City of Guadalupe | Urban Storm Water | 3, 4 & 5 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Allocation-3:** Additive Toxicity TMDL for Pyrethroid Pesticides:

Pyrethroid pesticides contribute to additive toxicity in aquatic sediments; The numeric target for additive toxicity for pyrethroid pesticides is:

$$\frac{C\ (Pyrethroid\ 1)}{NLC(Pyrethroid\ 1)} + \frac{C\ (Pyrethroid\ 2)}{NLC\ (Pyrethroid\ 2)} = S;\ where\ S \leq 1$$

Where:
    C = the concentration of a pesticide measured in sediment.
    NLC = the numeric LC50 for each pesticide present (Table 1).
    S = the sum; a sum exceeding one (1.0) indicates that beneficial uses may be adversely affected.

The additive toxicity numeric target formula shall be applied when pyrethroid pesticides are present in the sediment.

### Table 1: Pyrethroid Sediment LC50s[45]
*Median lethal concentration (LC50) for amphipods (Hyalella azteca) organic carbon normalized concentrations (micrograms per gram OC)

| Chemical | LC50 ng/g (ppb) | LC50 µg/g OC*(ppm) |
|---|---|---|
| Bifenthrin | 12.9 | 0.52 |
| Cyfluthrin | 13.7 | 1.08 |
| Cypermethrin | 14.87 | 0.38 |
| Esfenvalerate | 41.8 | 1.54 |
| Lambda-Cyhalothrin | 5.6 | 0.45 |
| Permethrin | 200.7 | 10.83 |

**Allocation-4:** Aquatic Toxicity TMDLs (refer to Table 2)

### Table 2: Standard Aquatic Toxicity Tests

| Parameter | Test | Biological Endpoint Assessed |
|---|---|---|
| Water Column Toxicity | Water Flea – Ceriodaphnia (6-8 day chronic) | Survival and Reproduction |
| Sediment Toxicity | Hyalella Azteca (10-day chronic) | Survival |

---

[45] LC50 = a measure of toxicity representing the concentration that will kill 50 percent of the sample population of a test species.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Allocation-5**: Organochlorine Pesticide TMDLs (refer to Table 3, Table 4, Table 5)

## Table 3: DDT Sediment Chemistry TMDLs

Note A: All reaches of all surface waters in the Santa Maria River watershed, including those listed.

Note B: All values are organic carbon normalized concentrations.

[All values are in units of microgram per kilogram]

| Waterbodies Assigned TMDLs Note A | DDD, 4,4- (p,p-DDD) | DDE, 4,4- (p,p-DDE) | DDT, 4,4- (p,p-DDT) | Total DDT |
|---|---|---|---|---|
| Blosser Channel | 9.1 | 5.5 | 6.5 | 10 |
| Bradley Channel | 9.1 | 5.5 | 6.5 | 10 |
| Greene Valley Creek | 9.1 | 5.5 | 6.5 | 10 |
| Little Oso Flaco Creek | 9.1 | 5.5 | 6.5 | 10 |
| Main Street Canal | 9.1 | 5.5 | 6.5 | 10 |
| Orcutt Creek | 9.1 | 5.5 | 6.5 | 10 |
| Oso Flaco Creek | 9.1 | 5.5 | 6.5 | 10 |
| Oso Flaco Lake | 9.1 | 5.5 | 6.5 | 10 |
| Santa Maria River | 9.1 | 5.5 | 6.5 | 10 |

## Table 4: Santa Maria River Watershed Additional Organochlorine Pesticide Sediment Chemistry TMDLs (all units in micrograms per kilogram)

Note A: All reaches of all surface waters in the Santa Maria River watershed, including those listed.

Note B: All organochlorine pesticides by organic carbon normalized concentrations

Note C: Waterbody is currently achieving the TMDL.

| Waterbodies Assigned TMDLs Note A | Chlordane | Dieldrin | Endrin | Toxaphene |
|---|---|---|---|---|
| Oso Flaco Lake | 1.7 | 0.14 | 550 | 20 |
| Santa Maria River | 1.7 | 0.14 | 550 | 20 |
| Orcutt Creek | 1.7 | 0.14 | 550 | 20 |

## Table 5: Santa Maria River Watershed Fish Tissue TMDLs for Organochlorine Pesticides

*ng/g: i.e., nanograms of pollutant per grams of fish tissue (e.g., a fillet).

(ppb stands for parts per billion)

| Waterbodies Assigned TMDLs | Chlordane ng/g* (ppb) | DDTs ng/g* (ppb) | Dieldrin ng/g* (ppb) | Toxaphene ng/g* (ppb) |
|---|---|---|---|---|
| Oso Flaco Lake | 5.6 | 21 | | |
| Oso Flaco Creek | 5.6 | 21 | | |
| Santa Maria River | 5.6 | 21 | 0.46 | 6.1 |
| Orcutt Creek | 5.6 | 21 | 0.46 | 6.1 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The wasteload allocations are receiving water allocations, and therefore storm water discharge shall not cause or contribute to exceedance of the allocations as measured in receiving water.

Deliverables/Actions Required:
Central Coast Water Board staff recognizes that attainment of the TMDL wasteload allocations will depend on the effectiveness of statewide pesticide programs and regulations by DPR and U.S. EPA to control pesticides. The statewide program described in the California Pesticide Management Plan for Water Quality, February 1997 (California Pesticide Plan) is an implementation plan of the Management Agency Agreement between DPR and the California Water Boards. The Cities of Guadalupe and Santa Maria, and the County of Santa Barbara should describe in the Wasteload Allocation Attainment Program or integrated plan how they plan to support and engage in the statewide efforts. The Cities of Guadalupe and Santa Maria, and the County of Santa Barbara are encouraged to use mitigation measures developed in the DPR surface water regulations as storm water Best Management Practices in the Wasteload Allocation Attainment Program or integrated plan.

The target date to achieve the TMDLs for pyrethroids is November 1, 2029. This estimate is based on the widespread availability of pyrethroids, including consumer usage, and current limited regulatory oversight. The target date to achieve the TMDLs for organochlorine pesticides (DDT, DDD, DDE, chlordane, eldrin, toxaphene, dieldrin) is November 1, 2044.

## *LOS ANGELES REGIONAL WATER BOARD TMDLs*

The Los Angeles Regional Water Board has adopted two Phase I MS4 permits regulating discharges within the coastal watersheds of Los Angeles County, including 85 municipalities, Los Angeles County, and the Los Angeles Flood Control District (Order No. R4-2012-0175 as amended by State Water Board Order No. 2015-0075 and Order No. R4-2014-0024). Additionally, the Los Angeles Regional Water Board is in the process of reissuing the Phase I permit that regulates municipal storm water discharges within the coastal watersheds of Ventura County including 10 municipalities, Ventura County, and the Ventura County Watershed Protection District.

These Phase I MS4 permits regulate all traditional Small MS4 permittees within the Los Angeles Region with the exception of the City of Avalon, located on Catalina Island. The Phase I MS4 permits contain TMDL-related requirements for applicable Small MS4 permittees. Therefore, with the exception of the City of Avalon, the only permittees in the jurisdiction of the Los Angeles Regional Water Board regulated under this Order are Non-traditional MS4 permittees.

To simplify this Order, TMDLs (and corresponding water bodies) that do not have Non-traditional MS4 permittee within the watershed, were removed from Attachment G. These TMDLs include the Upper Santa Clara River Chloride TMDL, the Santa Clara River Nitrogen Compounds TMDL, the Malibu Creek Bacteria TMDL, the Santa Clara River Estuary and Reaches 3, 5, 6, and 7 Bacteria TMDL, the Santa Clara Reach 3 Chloride TMDL, the Malibu Creek Nutrients TMDL, the Ballona Creek Wetlands TMDL, and the Malibu Creek Trash TMDL.

The Los Angeles Regional Water Board has determined that the stormwater and non-stormwater discharges from MS4 permittees, including those from small MS4 permittees listed in the Los Angeles Regional Water Board TMDLs below, contribute to the impairment of the

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

water bodies subject to the TMDLs. Therefore, the designated entities listed below (and in Appendix G) are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to one of the Los Angeles Region's Phase I MS4 permits.

The Regional Water Board determined that since these TMDL requirements, with the notable exception of the Avalon Beach TMDL, are new to the non-traditional entities, they should be given time to evaluate their programs and be allowed to make the choice of the two options presented. Therefore, a one-year timeframe was proposed to either: 1) develop and start implementing a plan; or 2) to enter into a cooperative agreement.

### *Avalon Beach Bacteria TMDL*
This Order incorporates the MS4-specific requirements established by Cease and Desist Order R4-2012-0077, which includes implementation requirements and timelines for the City of Avalon to comply with the TMDL established for Avalon Beach.

Phase II Entities:
Through the adoption of Cease and Desist Order R4-2012-0077, the Los Angeles Regional Water Board has determined that MS4 discharges from the City of Avalon, a Traditional MS4, are a source of impairment to surface water bodies in its watershed, and must comply with the following wasteload allocations:

Wasteload Allocations:
The following WLAs are receiving water allocations. Geometric mean values shall be calculated based on a minimum of 5 samples during any 30 day period. When repeat sampling is required because of an exceedance of any one single sample limit, values from all samples collected during that 30-day period shall be used to calculate the geometric mean.

*Geometric Mean Limits*
    Total coliform concentration shall not exceed 1,000/100 ml
    Fecal coliform density shall not exceed 200/100 ml
    Enterococcus density shall not exceed 35/100 ml

*Single Sample Limits*
    Total coliform density shall not exceed 10,000/100 ml
    Fecal coliform density shall not exceed 400/100 ml
    Enterococcus density shall not exceed 104/100 ml
    Total coliform density shall not exceed 1,000/100 ml, if the ratio of fecal to total coliform exceeds 0.1

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

*Single Sample Allowable Exceedances*
    Summer Dry Weather shall not exceed 0 Allowable Exceedance Days*
    Winter Dry Weather shall not exceed 9 Allowable Exceedance Days*

Wet Weather shall not exceed 17 Allowable Exceedance Days*

*= The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample targets.

A storm year is defined as the period from November 1 through October 31. The geometric mean limits may not be exceeded.

Deliverables/Actions Required:
This Order implements some of the requirements that are stipulated in Cease and Desist Order R4-2012-0077. Cease and Desist Order R4-2012-077 is enforceable through this Order by reference, including timelines for the City of Avalon to achieve compliance with this TMDL. The Los Angeles Regional Water Board has determined that the City of Avalon's compliance with the permit requirements of this Order and compliance with the MS4-specific requirements of Cease and Desist Order R4-2012-0077 is consistent with the assumptions, and will satisfy the requirements, of the MS4-specific provisions of the TMDL.

**_Santa Monica Bay Beaches Bacteria TMDL_**
The Santa Monica Bay Beaches Bacteria TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the State Department of Parks and Recreation (Point Dume State Beach, Leo Carrillo State Beach, and Robert H Meyer Memorial State Beach), a Non-traditional MS4 permittee, is a source of "Storm water" and "Non-storm water discharges" subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations:
The following WLAs are receiving water allocations. Geometric mean values shall be calculated based on a minimum of 5 samples during any 30 day period. When repeat sampling is required because of an exceedance of any one single sample limit, values from all samples collected during that 30-day period shall be used to calculate the geometric mean.

*Geometric Mean Limits*
   *The rolling 30-day geometric mean* of the total coliform concentration shall not exceed 1,000/100 ml;
   *The rolling 30-day geometric mean* of the Fecal coliform density shall not exceed 200/100 ml;
   *The rolling 30-day geometric mean* of the Enterococcus density shall not exceed 35/100 ml;

*Single Sample Limits*
   The total coliform density of a single sample shall not exceed 10,000/100 ml;
   The fecal coliform concentration of a single sample shall not exceed 400/100 ml;
   The enterococcus concentration of a single sample shall not exceed 104/100 ml;
   The total coliform concentration of a single sample shall not exceed 1,000/100 ml, if the ratio of fecal to total coliform exceeds 0.1;

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

<u>Single Sample Allowable Exceedances* Wasteload Allocations in the Receiving Water:</u>

Point Dume State Beach:
Dry weather: 0 days (based on both daily and weekly sampling),
Wet Weather: 3 days (daily sampling) or 1 day (weekly sampling).
Robert H Meyer Memorial State Beach:
   Dry weather: 0 days (based on both daily and weekly sampling),
   Wet Weather: 3 days (daily sampling) or 1 day (weekly sampling).

*= The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample targets.

A storm year is defined as the period from November 1 through October 31. The geometric mean limits may not be exceeded.

<u>Deliverables/Actions Required:</u>
The State Department of Parks and Recreation is required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the target dates to achieve the wasteload allocations are July 15, 2006 (to achieve dry weather WLAs during the summer period from April 1 – October 31); November 1, 2009 (to achieve dry weather WLAs during the winter period from November 1 – March 31); and July 15, 2021 (to achieve the wet weather WLAs). The dry weather allocations are therefore effective immediately. The State Department of Parks and Recreation may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### ***Los Angeles River Nitrogen and Related Effects TMDL***
The Los Angeles River Nitrogen and Related Effects TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

<u>Phase II Entities:</u>
The Los Angeles Regional Water Board has determined that the California State University Los Angeles and California State University Northridge, Non-traditional MS4 permittees, are dischargers of storm water and non-storm water subject to this TMDL and must comply with the TMDL-related requirements of this Order.

The California State University Los Angeles and California State University Northridge are assigned the following Wasteload Allocations (WLAs):

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

## WLAs for CSU Los Angeles and CSU Northridge Table
[All units are in milligrams per liter]

| Waterbodies Assigned TMDLs | Ammonia 1-hr average | Ammonia 30-day average | Nitrate 30-day average | Nitrate 30-day average | Nitrate + Nitrite 30-day average |
|---|---|---|---|---|---|
| LA River above Los Angeles-Glendale Water Reclamation Plant (LAG) | 4.7 | 1.6 | 8.0 | 1.0 | 8.0 |
| LA River below LAG | 8.7 | 2.4 | 8.0 | 1.0 | 8.0 |
| LA River Tributaries | 10.1 | 2.3 | 8.0 | 1.0 | 8.0 |

Deliverables/Actions Required:
The California State University Los Angeles and California State University Northridge are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the target date to achieve the wasteload allocations assigned to MS4 permittees is March 23, 2004. The allocations are therefore effective immediately. The California State University Los Angeles and/or California State University Northridge may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### ***Los Angeles Harbor (including Cabrillo Beach and Main Shop Channel) Bacteria TMDL***
The Los Angeles Harbor (including Cabrillo Beach and Main Shop Channel) Bacteria TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Federal Correctional Institution Terminal Island and California State University Dominguez Hills, Non-traditional MS4 permittees, are sources of storm water and non-storm water subject to this TMDL and must comply with the TMDL-related requirements of this Order.

Wasteload Allocations (WLAs):
The following WLAs are receiving water allocations. Geometric mean values shall be calculated based on a minimum of 5 samples during any 30 day period. When repeat sampling is required because of an exceedance of any one single sample limit, values from all samples collected during that 30-day period shall be used to calculate the geometric mean.

*Rolling 30 day Geometric Mean Limits*
    Total coliform density shall not exceed 1,000/100 ml

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Fecal coliform density shall not exceed 200/100 ml
Enterococcus density shall not exceed 35/100 ml

*Single Sample Limits*
    Total coliform density shall not exceed 10,000/100 ml
    Fecal coliform density shall not exceed 400/100 ml
    Enterococcus density shall not exceed 104/100 ml
    Total coliform density shall not exceed 1,000/100 ml, if the ratio of fecal to total coliform exceeds 0.1

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

*Single Sample Allowable Exceedances\* Wasteload Allocations in the Receiving Water:*
    Summer Dry Weather: 0 days (based on both daily and weekly sampling)
    Winter Dry Weather: 8 days (daily sampling) or 1 day (weekly sampling)
    Wet Weather: 15 days (daily sampling) or 3 days (weekly sampling)

\*= The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample targets.

A storm year is defined as the period from November 1 through October 31. The geometric mean limits may not be exceeded.

Deliverables/Actions Required:
The Federal Correctional Institution Terminal Island and California State University Dominguez Hills are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the target date to achieve the wasteload allocations is March 10, 2010. The allocations are therefore effective immediately. The Federal Correctional Institution Terminal Island and/or California State University Dominguez Hills may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### **Calleguas Creek Watershed Toxicity TMDL**
The Calleguas Creek Watershed Toxicity TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Naval Base Ventura County (Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park), Non-traditional MS4 permittees, are sources of stormwater and non-stormwater discharges subject to this Order and must comply with the TMDL-related requirements in this Order.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

Wasteload Allocations (WLA):
The Calleguas Creek Watershed Toxicity TMDL assigns the following WLAs as receiving water allocations.

> Toxicity: 1.0 TUc
> Chlorpyrifos (Final WLA, µg/L): 0.014
> Diazinon (Final WLA, µg/L): 0.10

Deliverables/Actions Required:
The Naval Base Ventura County (including Port Hueneme and Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park) are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved by March 24, 2008. The allocations are therefore effective immediately. The Naval Base Ventura County (including Port Hueneme and Point Mugu), California State University Channel Islands, and/or Department of Parks and Recreation (Point Mugu State Park) may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### ***Calleguas Creek Organochlorine Pesticides, Polychlorinated Biphenyls, and Siltation TMDL***

The Calleguas Creek Organochlorine Pesticides, Polychlorinated Biphenyls, and Siltation TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Naval Base Ventura County (Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park), Non-traditional MS4 permittees, are sources of storm water and non-storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations (WLA):
The Calleguas Creek Organochlorine Pesticides, Polychlorinated Biphenyls and Siltation TMDL assigns the following interim and final WLAs as receiving water allocations.

Interim WLAs (ng/g), in-stream annual average at base of watershed:

| | |
|---|---|
| Chlordane: | 17.0 |
| 4,4-DDD: | 66.0 |
| 4,4-DDE: | 470.0 |
| 4,4-DDT: | 110.0 |
| Dieldrin: | 3.0 |
| PCBs: | 3800.0 |

Toxaphene:          260.0

Final WLAs (ng/g), in-stream annual average at base of watershed:

Chlordane:          3.3
4,4-DDD:            2.0
4,4-DDE:            1.4
4,4-DDT:            0.3
Dieldrin:            0.2
PCBs:              120.0
Toxaphene:          0.6

Siltation WLA:  2,496 tons/year reduction in yield to Mugu Lagoon.

Deliverables/Actions Required:
The Naval Base Ventura County (including Port Hueneme and Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park) are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved 20 years after the effective date of the TMDL (March 24, 2006). Therefore, the final WLAs shall be achieved by March 24, 2026.

### ***Calleguas Creek Metals and Selenium TMDL***
The Calleguas Creek Metals and Selenium TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Naval Base Ventura County (Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park), Non-traditional MS4 permittees, are sources of storm water and non-storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations (WLA):
The Calleguas Creek Metals and Selenium TMDL assigns the following interim and final WLAs as receiving water allocations.

Interim WLAs:
Where Dry CMC/Dry CCC/ Wet CMC stands for, respectively:

Dry Weather Criterion Maximum Concentrations (Acute criteria),
Dry Weather Criterion Continuous Concentrations (Chronic criteria), and
Wet Weather Criterion Maximum Concentrations (Acute criteria).

### ***Calleguas and Conejo Creeks (micrograms per liter) Table***

| Total Recoverable | Dry CMC | Dry CCC | Wet CMC |
|---|---|---|---|
| Copper | 23 | 19 | 204 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Total Recoverable | Dry CMC | Dry CCC | Wet CMC |
|---|---|---|---|
| Nickel | 15 | 13 | |
| Selenium | | | |

### *Revolon Slough (micrograms per liter) Table*

| Total Recoverable | Dry CMC | Dry CCC | Wet CMC |
|---|---|---|---|
| Copper | 23 | 19 | 204 |
| Nickel | 15 | 13 | |
| Selenium | 14 | 13 | |

Final WLAs:

> Where:    Q = Daily Storm volume
> WER = Water Effects Ratio

### *Calleguas and Conejo Creeks*

*Dry Weather; Total Recoverable (pounds per day)*

| Metal | Low Flow | Average Flow | Elevated Flow |
|---|---|---|---|
| Copper | 0.04×WER -0.02 | 0.12×WER -0.02 | 0.18×WER -0.03 |
| Nickel | 0.100 | 0.120 | 0.440 |
| Selenium | | | |

### *Revolon Slough*

*Dry Weather; Total Recoverable (pounds per day)*

| Metal | Low Flow | Average Flow | Elevated Flow |
|---|---|---|---|
| Copper | 0.03×WER -0.01 | 0.06×WER -0.03 | 0.13×WER -0.02 |
| Nickel | 0.050 | 0.069 | 0.116 |
| Selenium | 0.004 | 0.003 | 0.004 |

### *Calleguas and Conejo Creeks*

| Metal | Wet Weather Final WLA; Total Recoverable (lbs/day) |
|---|---|
| Copper | $(0.00054 \times Q^2 \times 0.032 - 0.17) \times WER - 0.06$ |
| Nickel | $0.014 \times Q^2 + 0.82 \times Q$ |
| Selenium | |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### Revolon Slough

| Metal | Wet Weather Final WLA; Total Recoverable (lbs/day) |
|---|---|
| Copper | $(0.0002 \times Q^2 \times 0.0005 \times Q) \times WER$ |
| Nickel | $0.027 \times Q^2 + 0.47 \times Q$ |
| Selenium | $0.027 \times Q^2 + 0.47 \times Q$ |

*Interim Limits and Final WLAs for Mercury in Suspended Sediment*
Final WLAs are set at 80% reduction of hydrologic simulation program – FORTRAN (HSPF) load estimates. Interim limits for mercury in suspended sediment are set equal to the highest annual load within each flow category, based on HSPF output for the years 1993-2003.

### WLAs for Mercury (pounds per year) in Suspended Sediment Table

| Flow Range | Calleguas Creek Interim | Calleguas Creek Final | Revolon Slough Interim | Revolon Slough Final |
|---|---|---|---|---|
| 0 – 15,000 million gallons per year (MG/yr) | 3.3 | 0.4 | 1.7 | 0.1 |
| 15,000 – 25,000 MG/yr | 10.5 | 1.6 | 4 | 0.7 |
| Above 25,000 MG/yr | 64.6 | 9.3 | 10.2 | 1.8 |

Deliverables/Actions Required:
The Naval Base Ventura County (including Port Hueneme and Point Mugu), California State University Channel Islands, and Department of Parks and Recreation (Point Mugu State Park) are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved 15 years after the effective date of the TMDL (March 26, 2007). Therefore, the final WLAs shall be achieved by March 26, 2022.

### Ballona Creek Bacteria TMDL
The Ballona Creek Bacteria TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the University of California Los Angeles and Veteran Affairs of the Greater Los Angeles Healthcare System, Non-traditional MS4 permittees, are sources of non-storm water and storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Wasteload Allocations (WLAs):

The following WLAs are receiving water allocations. Geometric mean values shall be calculated based on a minimum of 5 samples during any 30 day period. When repeat sampling is required because of an exceedance of any one single sample limit, values from all samples collected during that 30-day period shall be used to calculate the geometric mean.

*Rolling 30-day Geometric Mean Limits*

Total coliform density shall not exceed 1,000/100 ml
Fecal coliform density shall not exceed 200/100 ml
Enterococcus density shall not exceed 35/100 ml

*Single Sample Limits*

Total coliform density shall not exceed 10,000/100 ml
Fecal coliform density shall not exceed 400/100 ml
Enterococcus density shall not exceed 104/100 ml
Total coliform density shall not exceed 1,000/100 ml, if the ratio of fecal to total coliform exceeds 0.1

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

*Single Sample Allowable Exceedances\* Wasteload Allocations in the Receiving Water:*

Dry weather: 5 days (based on daily sampling) or 1 day (based on weekly sampling)
Wet Weather: 15 days (based on daily sampling) or 2 days (based on weekly sampling)

\*= The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample targets.

A storm year is defined as the period from November 1 through October 31. The geometric mean limits may not be exceeded

Deliverables/Actions Required:

The University of California Los Angeles and Veteran Affairs of the Greater Los Angeles Healthcare System are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved during dry weather by April 27, 2013, while the final WLAs during wet weather are to be achieved by July 15, 2021. Therefore, the final WLAs for dry weather are effective immediately. The University of California Los Angeles and/or Veteran Affairs of the Greater Los Angeles Healthcare System may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

### *Santa Monica Bay Marine Debris TMDL*
The Santa Monica Bay Marine Debris TMDL assigns a load allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Department of Parks and Recreation (Point Dume State Beach and Robert H. Meyer Memorial State Beach), a Non-traditional MS4 permittee, is a source of storm water and non-storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Load Allocations (LA):
The following LA is a receiving water allocation.

Trash = 0

Zero trash is defined as no trash (debris greater than 5mm in size) discharged into waterbodies within the Santa Monica Bay Watershed Management Area (WMA) and then into Santa Monica Bay or on the shoreline of Santa Monica Bay.

Deliverables/Actions Required:
The Los Angeles Regional Board has determined that dischargers may achieve the Load Allocations by implementing a Minimum Frequency of Assessment and Collection Program (MFAC)/BMP program approved by the Executive Officer. Responsible entities will be deemed in compliance with the LAs if an MFAC/BMP program, approved by the Executive Officer, demonstrates that there is no accumulation of trash, as defined by the LA.

The Department of Parks and Recreation (Point Dume State Beach and Robert H. Meyer Memorial State Beach) shall develop a Trash Monitoring and Reporting Plan (TMRP) for Executive Officer approval that describes the methodologies that will be used to assess and monitor trash in their responsible areas within the Santa Monica Bay WMA or along Santa Monica Bay.

The TMDL specifies that the final LAs are to be achieved 5 years after the effective date of the TMDL (March 20, 2012). Therefore, the final LAs shall be achieved by March 20, 2017. The Department of Parks and Recreation (Point Dume State Beach and Robert H. Meyer Memorial State Beach) may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### *Los Angeles and Long Beach Harbors Toxics and Metals TMDL*
The Los Angeles and Long Beach Harbors Toxics and Metals TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Federal Correctional Institution Terminal Island, Community Corrections Management Long Beach, and California State University Dominguez Hills, Non-traditional MS4 permittees, are sources of storm water and non-storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Wasteload Allocations (WLA):
The Federal Correctional Institution Terminal Island, Community Corrections Management Long Beach, and California State University Dominguez Hills are assigned the following (receiving water) wasteload allocations:

Toxicity WLA: 1 $TU_c$

*Metals WLAs for Dominguez Channel (wet weather only) (grams per day):*
　　Mass-based WLA is shared and divided between MS4 permittees and Caltrans.
　　Total Copper:　　1485.1
　　Total Lead:　　6548.8
　　Total Zinc:　　10685.5

## Metals and PAH Compounds WLAs for Greater Harbor Waters Table
TMDL values are in units of kilogram per year

| Waterbodies Assigned TMDLs | Total Copper TMDL | Total Lead TMDL | Total Zinc TMDL | Total PAHs TMDL |
|---|---|---|---|---|
| Dominguez Channel Estuary | 22.4 | 54.2 | 271.8 | 0.134 |
| Consolidated Slip | 2.73 | 3.63 | 28.7 | 0.0058 |
| Inner Harbor | 1.7 | 34.0 | 115.9 | 0.088 |
| Outer Harbor | 0.91 | 26.1 | 81.5 | 0.105 |
| Fish Harbor | 0.00017 | 0.54 | 1.62 | 0.007 |
| Cabrillo Marina | 0.0196 | 0.289 | 0.74 | 0.00016 |
| San Pedro Bay | 20.3 | 54.7 | 213.1 | 1.76 |
| LA River Estuary | 35.3 | 65.7 | 242.0 | 2.31 |

*Sediment Wasteload Allocations for Dominguez Channel Estuary, Consolidated Slip and Fish Harbor (mg/kg dry sediment):*
　　Cadmium:　　1.2
　　Chromium:　　81
　　Mercury:　　0.15

## Bioaccumulative Compounds Wasteload Allocations Table
TMDL values are in units of gram per year

| Waterbodies Assigned TMDLs | DDT Total TMDL | PCBs Total TMDL |
|---|---|---|
| Dominguez Channel Estuary | 0.250 | 0.207 |
| Consolidated Slip | 0.009 | 0.004 |
| Inner Harbor | 0.051 | 0.059 |
| Outer Harbor | 0.005 | 0.020 |
| Fish Harbor | 0.0003 | 0.0019 |
| Cabrillo Marina | 0.000028 | 0.000025 |
| Inner Cabrillo Beach | 0.0001 | 0.0003 |
| San Pedro Bay | 0.049 | 0.44 |
| LA River Estuary | 0.100 | 0.324 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Deliverables/Actions Required:
The Federal Correctional Institution Terminal Island, Community Corrections Management Long Beach, and California State University Dominguez Hills are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved 20 years after the effective date of the TMDL (March 23, 2012). Therefore, the final WLAs shall be achieved by March 23, 2032.

### *Los Angeles River Bacteria TMDL*
The Los Angeles Regional Board has determined that the Los Angeles River Bacteria TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State University Los Angeles and California State University Northridge, Non-traditional MS4 permittees, are sources of storm water and non-storm water discharges subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations (WLA):
The following WLAs are receiving water allocations. Geometric mean values shall be calculated based on a minimum of 5 samples during any 30 day period. When repeat sampling is required because of an exceedance of any one single sample limit, values from all samples collected during that 30-day period shall be used to calculate the geometric mean.

*Geometric Mean Limits*
    E. coli density shall not exceed 126/100 ml

*Single Sample Limits*
    E. coli density shall not exceed 235/100 ml

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

### *Single Sample Allowable Exceedances\* Wasteload Allocations in the Receiving Water:*
    Summer Dry Weather: 5 days (based on daily sampling), or 1 day (based on weekly sampling)
    Waters not subject to the High Flow Suspension:
        Wet Weather: 15 days (daily sampling), or 2 days (weekly sampling)
    Waters subject to the High Flow Suspension:
        Wet Weather: 10 days (daily sampling), or 2 (weekly sampling)

\* = The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample targets.

A storm year is defined as the period from November 1 through October 31. The geometric mean limits may not be exceeded

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Deliverables/Actions Required:
The California State University Los Angeles and California State University Northridge are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final wet-weather WLAs are to be achieved 25 years after the effective date of the TMDL. Therefore, the final wet weather WLAs are to be achieved by March 23, 2037. The TMDL also specifies several final dry weather achievement dates based upon where in the watershed the discharge(s) occur. Therefore, the final dry weather WLAs are to be achieved according to the table below.

| Waterbody Segment | Achieve Final dry weather WLA by: |
|---|---|
| Segment B (upper and middle Reach 2) | March 23, 2022 |
| Segment B Tributaries (Rio Hondo & Arroyo Seco) | September 23, 2023 |
| Segment A (lower Reach 2 and Reach 1) | March 23, 2024 |
| Segment A Tributaries (Compton Creek) | September 23, 2025 |
| Segment E (Reach 6) | March 23, 2025 |
| Segment E Tributaries (Dry Canyon, McCoy and Bell Creeks, and Aliso Canyon Wash) | March 23, 2029 |
| Segment C (lower Reach 4 and Reach 3) | September 23, 2030 |
| Segment C Tributaries (Tujunga Wash, Burbank Western Channel and Verdugo Wash) | September 23, 2030 |
| Segment D (Reach 5 and upper Reach 4) | September 23, 2030 |
| Segment D Tributaries (Bull Creek) | September 23, 2030 |

### *Los Angeles River and Tributaries Metals TMDL*
The Los Angeles River and Tributaries Metals TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State University Los Angeles and California State University Northridge, Non-traditional MS4 permittees, are sources of storm water and non-storm subject to this TMDL and must comply with the TMDL-related requirements in this Order.

Wasteload Allocations (WLA):
Dry-Weather WLAs (total recoverable metals)

## Dry-Weather WLAs (Total recoverable metals) Table
All values are in units of micrograms per liter

| Waterbodies Assigned TMDLs | Copper TMDL | Lead TMDL | Zinc TMDL | Selenium TMDL |
|---|---|---|---|---|
| LA River Reach 5,6 and Bell Creek | 30 | 170 | | 5 |
| LA River Reach 4 | 103 | 83 | | |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Waterbodies Assigned TMDLs | Copper TMDL | Lead TMDL | Zinc TMDL | Selenium TMDL |
|---|---|---|---|---|
| Tujunga Wash | 166 | 83 | | |
| LA River Reach 3 above LA-Glendale WRP | 91 | 102 | | |
| Verdugo Wash | 50 | 102 | | |
| LA River Reach 3 below LA-Glendale WRP | 103 | 100 | | |
| Burbank Western Channel (above WRP) | 124 | 126 | | |
| Burbank Western Channel (below WRP) | 90 | 75 | | |
| LA River Reach 2 | 87 | 94 | | |
| Arroyo Seco | 29 | 94 | | |
| LA River Reach 1 | 91 | 102 | | |
| Compton Creek | 64 | 73 | | |
| Rio Hondo Reach 1 | 126 | 37 | 131 | |
| Monrovia Canyon | | | 66 | |

*Wet-Weather WLAs (total recoverable metals) (micrograms per liter)*

    Cadmium =        3.1
    Copper =        67.5
    Lead =            94
    Zinc =          159

Deliverables/Actions Required:
The California State University Los Angeles and California State University Northridge are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final dry weather WLAs shall be achieved by January 11, 2024, and the final wet weather WLAs shall be achieved by January 11, 2028.

***Ballona Creek Metals TMDL***
The Ballona Creek Metals TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System, Non-traditional MS4s, are sources of storm water and non-storm discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
*Dry-Weather WLAs (total recoverable metals) (shared) (grams per day):*
    Ballona Creek:        Copper: 1,457.6        Lead: 805.0        Zinc: 18,302.1
    Sepulveda Channel:    Copper:    540.6       Lead: 298.7        Zinc:  6,790.8

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*Wet-Weather WLAs (total recoverable metals) (shared) (grams per day):*

Copper:  $1.297 \times 10^{-5} \times L$
Lead:  $7.265 \times 10^{-5} \times L$
Zinc:  $9.917 \times 10^{-5} \times L$

Where L = daily storm volume (liters)

Deliverables/Actions Required:

The University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs during dry weather are to be achieved by January 11, 2016. The final WLAs during wet weather shall be achieved by January 11, 2021. The final WLAs during dry weather are therefore effective immediately. The University of California Los Angeles and/or the Veteran Affairs of the Greater Los Angeles Healthcare System may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### ***San Gabriel River Metals and Selenium TMDL***

The San Gabriel River Metals and Selenium TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:

The Los Angeles Regional Water Board has determined that the California State Polytechnic University, Pomona, a Non-traditional MS4, is a source of urban runoff subject to this Order and is responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):

The San Gabriel River Metals and Selenium TMDL assigns WLAs to urban runoff in Walnut and San Jose Creeks, tributaries to the San Gabriel River for entities within the city of Pomona, which includes California State Polytechnic University, Pomona. Therefore, only WLAs assigned to Walnut and San Jose Creeks will be included in this Order.

Selenium allocation for San Jose Creek Reach 1 and Reach 2 (total recoverable metals):

Point Sources:          Municipal Stormwater
Waste Load Allocation: 5 micrograms per liter

Deliverables/Actions Required:

The California State Polytechnic University, Pomona is required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA; or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL does not specify a final attainment date.

### *San Gabriel River Indicator Bacteria TMDL*
The San Gabriel River Indicator Bacteria TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State Polytechnic University, Pomona, a Non-traditional MS4, is a source of wet- and dry-weather discharges from MS4s subject to this Order and is responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
The San Gabriel River Indicator Bacteria TMDL assigns WLAs to urban runoff in the San Gabriel River and its tributaries.

The following WLAs are receiving water allocations. Geometric mean values shall be calculated weekly as a rolling geometric mean using a minimum of 5 samples, for six week periods starting all calculation weeks on Sunday. Geometric mean limits may not be exceeded at any time.

*Geometric Mean Limits*
   E. coli density shall not exceed 126/100 ml

*Single Sample Limits*
   E. coli density shall not exceed 235/100 ml

For the Single Sample Limits, TMDL compliance focuses on the number of days that any single sample exceeds the limits set forth above, based on the time of year. This focus is expressed as Single Sample Allowable Exceedances, shown below.

### *Single Sample Allowable Exceedances\* Wasteload Allocations in the Receiving Water:*
   Summer Dry Weather: 5 days (based on daily sampling), or 1 day (based on weekly sampling)
   Waters not subject to the High Flow Suspension:
      Wet Weather: 17 days (daily sampling), or 3 days (weekly sampling)
   Waters subject to the High Flow Suspension:
      Wet Weather: 11 days (daily sampling), or 2 (weekly sampling)

\* = The Allowable Exceedance Day is defined as the number of days (per year) a monitoring location is allowed to exceed any of the single sample limits.

A storm year is defined as the period from November 1 through October 31.

Deliverables/Actions Required:
The California State Polytechnic University, Pomona is required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA; or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs are to be achieved for single sample objectives and during dry weather by June 14, 2026, while the final WLAs during wet weather are to be achieved by June 14, 2036.

### *Los Cerritos Channel Metals TMDL*
The Los Cerritos Channel Metals TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State University Long Beach and Long Beach Veterans' Affairs Medical Center, Non-traditional MS4s, are sources of storm water and non-storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
*Dry-Weather WLA (total recoverable metals) (shared) (g/day):*
    Copper:  67.2

*Wet-Weather WLAs (total recoverable metals) (shared) (g/day based on flow of 40 cfs):*
    Copper:  461.4
    Lead:    2,631.5
    Zinc:    4,510.7

Deliverables/Actions Required:
The California State University Long Beach and Long Beach Veterans' Affairs Medical Center are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs during dry weather shall be achieved by September 30, 2023. The final WLAs during wet weather shall be achieved by September 30, 2026.

### *Ballona Creek Estuary Toxic Pollutants TMDL*
The Ballona Creek Estuary Toxic Pollutants TMDL assigns wasteload allocations appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System, Non-traditional MS4s, are sources of storm water and non-storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Wasteload Allocations (WLA):

WLAs are expressed as shared allocations amongst the MS4 permittees in the Ballona Creek watershed.

| | | |
|---|---|---|
| Cadmium: | 8.0 | kg/yr |
| Copper: | 227.3 | kg/yr |
| Lead: | 312.3 | kg/yr |
| Silver: | 6.69 | kg/yr |
| Zinc: | 1003 | kg/yr |
| Chlordane: | 8.69 | g/yr |
| DDTs: | 12.70 | g/yr |
| Total PCBs: | 21.40 | g/yr |

Deliverables/Actions Required:
The University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System are required to either: 1) develop and implement a program plan, for Regional Water Board Executive Officer approval, to reduce pollutants in its MS4 discharges to meet the WLA(s); or 2) enter into a cooperative agreement with Phase I MS4 Permittees in the watershed or subwatershed that are implementing an approved Watershed Management Program/Enhanced Watershed Management Program pursuant to corresponding Phase I MS4 permit.

The TMDL specifies that the final WLAs shall be achieved by January 11, 2021.

### ***Ballona Creek Trash TMDL***
The Ballona Creek Trash TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the University of California Los Angeles and the Veteran Affairs of the Greater Los Angeles Healthcare System, Non-traditional MS4s, are sources of storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
Final WLA is zero trash.

Deliverables/Actions Required:
The Los Angeles Regional Water Board has determined that the contribution by these non-traditional MS4s is significant. In order for the permittees to meet their obligation to ensure that the WLA is met, the permittees will be required to implement either 1) Full Capture Systems, 2) partial capture devices and the application of institutional controls, or 3) a scientifically based alternative attainment approach.

1) A Full Capture System is any device or series of devices that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a one-year, one hour, storm in the subdrainage area. The Rational Equation is used to compute the peak flow rate:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

$$Q = C * I * A$$

Where:

        Q = design flow rate (cubic foot per second)
        C = runoff coefficient
        I = design rainfall intensity (inches per hour)
        A = subdrainage area (acres)

2) Permittees employing partial capture devices or institutional controls shall use a mass balance approach based on the trash daily generation rate (DGR)[46], to demonstrate compliance.

The DGR shall be reassessed annually. Permittees may request a less frequent assessment of its DGR when the final WLA has been met (as described below) and the responsible jurisdiction continues to implement at the same level of effort partial capture devices and institutional controls for Executive Officer approval. A return to annual DGR calculation shall be required for a period of years to be determined by the Executive Officer after significant land use changes.

Permittees employing institutional controls or a combination of full capture systems, partial capture devices, and institutional controls shall be deemed in attainment of the final WLAs when the reduction of trash from the jurisdiction's baseline load, is between 99% and 100% as calculated using a mass balance approach, and the full capture systems and partial capture devices are properly sized, operated, and maintained.

Alternatively, permittees may request that the Executive Officer make a determination that a 97% to 98% reduction of the baseline load as calculated using a mass balance approach, constitutes full attainment of the final WLA if all of the following criteria are met:

a. The agency submits to the Regional Board a report for Executive Officer approval, including, two or more consecutive years of data showing that the Permittee's attainment was at or above a 97% reduction in its baseline trash load;

b. An evaluation of institutional controls in the jurisdiction demonstrating continued effectiveness and any potential enhancements; and

c. Demonstration that opportunities to implement partial capture devices have been fully exploited.

3) Permittees employing an alternative attainment approach shall conduct studies of institutional controls and partial capture devices for their particular subwatershed(s) or demonstrate that existing studies are representative and transferable to the implementing area for Executive Officer approval. Permittees shall also provide a schedule for periodic, compliance effectiveness demonstration and evaluation. Full capture systems and partial capture devices shall be properly sized, operated, and maintained consistent with sizing, operation, and maintenance schedules used to determine their effectiveness.

The TMDL specifies that the final WLA (0% of the baseload discharged) is to be achieved by September 30, 2015. The WLA is therefore effective immediately.

---

[46] The DGR is the average amount of trash deposited during a 24-hour period, as measured in a specified drainage area.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

### _Los Angeles River Trash TMDL_
The Los Angeles River Trash TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the California State University Los Angeles and California State University Northridge, Non-traditional MS4s, are sources of storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
Final WLA is zero trash.

Deliverables/Actions Required:
The Los Angeles Regional Water Board has determined that the contribution by these non-traditional MS4s is significant. In order for the permittees to meet their obligation to ensure that the WLA is met, the permittees will be required to implement either 1) Full Capture Systems, 2) partial capture devices and the application of institutional controls, or 3) a scientifically based alternative attainment approach.

1) A Full Capture device is any device that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a one-year, one hour, storm in the subdrainage area. The Rational Equation is used to compute the peak flow rate:

$$Q = C * I * A$$

Where:

   Q = design flow rate (cubic foot per second)
   C = runoff coefficient
   I = design rainfall intensity (inches per hour)
   A = subdrainage area (acres)

2) Permittees employing partial capture devices or institutional controls shall use a mass balance approach based on the trash daily generation rate (DGR)[47], to demonstrate compliance.

   The DGR shall be reassessed annually. Permittees may request a less frequent assessment of its DGR when the final WLA has been met (as described below) and the responsible jurisdiction continues to implement at the same level of effort partial capture devices and institutional controls for Executive Officer approval. A return to annual DGR calculation shall be required for a period of years to be determined by the Executive Officer after significant land use changes.

   Permittees employing institutional controls or a combination of full capture systems, partial capture devices, and institutional controls shall be deemed in attainment of the final WLAs when the reduction of trash from the jurisdiction's baseline load, is between 99% and

---

[47] The DGR is the average amount of trash deposited during a 24-hour period, as measured in a specified drainage area.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

100% as calculated using a mass balance approach, and the full capture systems and partial capture devices are properly sized, operated, and maintained.

Alternatively, permittees may request that the Executive Officer make a determination that a 97% to 98% reduction of the baseline load as calculated using a mass balance approach, constitutes full attainment of the final WLA if all of the following criteria are met:

a.  The agency submits to the Regional Board a report for Executive Officer approval, including, two or more consecutive years of data showing that the Permittee's attainment was at or above a 97% reduction in its baseline trash load;

b.  An evaluation of institutional controls in the jurisdiction demonstrating continued effectiveness and any potential enhancements; and

c.  Demonstration that opportunities to implement partial capture devices have been fully exploited.

3)  Permittees employing an alternative attainment approach shall conduct studies of institutional controls and partial capture devices for their particular subwatershed(s) or demonstrate that existing studies are representative and transferable to the implementing area for Executive Officer approval. Permittees shall also provide a schedule for periodic, compliance effectiveness demonstration and evaluation. Full capture systems and partial capture devices shall be properly sized, operated, and maintained consistent with sizing, operation, and maintenance schedules used to determine their effectiveness.

The TMDL specifies that the final WLA (0% of the baseload discharged) is to be achieved by September 30, 2016. The WLA is therefore effective immediately.

### *Ventura River Estuary Trash TMDL*
The Ventura River Estuary Trash TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Los Angeles Regional Water Board has determined that the Ventura County Fairgrounds (Seaside Park and Ventura County Fairgrounds), a Non-traditional MS4, is a source of storm water discharges subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations (WLA):
Final WLA is zero trash.

Deliverables/Actions Required:
The Los Angeles Regional Water Board has determined that the contribution by these non-traditional MS4s is significant. In order for the permittees to meet their obligation to ensure that the WLA is met, the permittees will be required to implement one of two options for the control of trash. The TMDL allows permittees to meet the WLA by either: 1) installing and maintaining Full Capture Systems, or 2) with Regional Water Board Executive Officer approval, implement a program for minimum frequency of assessment and collection (MFAC) in conjunction with BMPs.

1)  A Full Capture device is any device that traps all particles retained by a 5 mm mesh screen and has a design treatment capacity of not less than the peak flow rate (Q) resulting from a

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

one-year, one hour, storm in the subdrainage area. The Rational Equation is used to compute the peak flow rate:

$$Q = C * I * A$$

Where:

    Q = design flow rate (cubic foot per second)
    C = runoff coefficient
    I = design rainfall intensity (inches per hour)
    A = subdrainage area (acres)

2)  Attainment of the WLA through the MFAC program in conjunction with BMPs may be proposed to the Regional Water Board's Executive Officer for approval. The MFAC program must include requirements equivalent to those described in the Conditional Waiver set forth in the TMDL. The due date for submittal of the required information to select this option was October 2008. Therefore, this option is no longer available for permittees under this Order and was included only for completeness.

The TMDL specifies that the final WLA is to be achieved by March 6, 2016. The final WLA therefore is effective immediately.

## *CENTRAL VALLEY REGIONAL WATER BOARD TMDLS*

### ***Lower San Joaquin River Diazinon & Chlorpyrifos TMDL***
The Lower San Joaquin River Diazinon & Chlorpyrifos TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Valley Regional Water Board has determined that the City of Patterson, a Traditional MS4, is a source of "NPDES permitted discharges" subject to this Order and is responsible for implementing the requirements of this TMDL.

Many of the permittees listed in Attachment G of the permit adopted on February 5, 2013, have been removed. These permittees are not specifically assigned allocations in the TMDL adopted by the Central Valley Regional Water Board. The removed permittees do not discharge directly to the San Joaquin River. An impaired water body segment must have TMDL-specific requirements under the TMDL. Through development of this Amendment the Central Valley Water Board has determined that only the City of Patterson, which discharges directly to the San Joaquin River, is responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The wasteload allocations for NPDES permitted municipal storm water Permittees shall not exceed the sum (S) of one (1) as defined below:

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \leq 1.0$$

Where:
   $C_D$ = diazinon concentration in micrograms per liter of point source discharge

Page 109

$C_C$ = chlorpyrifos concentration in micrograms per liter of point source discharge

$WQO_D$ = acute or chronic diazinon water quality objective (0.160 and 0.100 micrograms per liter, respectively)

$WQO_C$ = acute or chronic chlorpyrifos water quality objective. (0.025 and 0.015 micrograms per liter, respectively)

For the purpose of calculating the sum (S) above, non-detectable concentrations are considered to be zero. In determining compliance with the effluent limitations in Section C.1 of this Order related to the attainment of these wasteload allocations, the Central Valley Regional Water Board will consider data or information submitted by the Permittee regarding diazinon and chlorpyrifos inputs from sources that are outside of the jurisdiction of the permitted discharge, and any applicable provisions in this Order requiring the Permittee to reduce the discharge of pollutants to the maximum extent practicable.

Deliverables/Actions Required:
To create a path towards compliance with this TMDL, the permittees are being directed to conduct an assessment of the waterbody. The assessment will be used to ascertain the loads from urban runoff, whether the waterbody is meeting its objectives, whether or not an alternative constituent is the cause of impairment and whether a synergistic effect is present. As an alternative, the permittees may participate in the Bay Delta Regional Monitoring Program, upon the Central Valley Regional Water Board Executive Officer approval.

The deadline for attainment of WLAs was December 1, 2010. Therefore, the WLA is to be achieved immediately.

### ***Sacramento and San Joaquin Delta Diazinon & Chlorpyrifos TMDL***
The Sacramento and San Joaquin Delta Diazinon & Chlorpyrifos TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Valley Regional Water Board has determined that the Cities of Lathrop, Lodi, Manteca, Rio Vista, Tracy, and West Sacramento and the County of San Joaquin, Traditional MS4s, are sources of "NPDES permitted dischargers" subject to this Order and are responsible for implementing the requirements of this TMDL.

The Cities of Davis, Dixon, French Camp, Morada, Vacaville, and Woodland, listed in the original permit adopted on February 5, 2013, have been removed from this TMDL. These permittees are not specifically assigned allocations in the TMDL adopted by the Central Valley Regional Water Board. The Central Valley Water Board determined that they were erroneously listed since they do not discharge directly to the Sacramento and San Joaquin Delta. The Cities of Lathrop, Lodi, Manteca, Rio Vista, Tracy and West Sacramento and the County of San Joaquin discharge directly to the Sacramento and San Joaquin Delta.

Wasteload Allocations:
The wasteload allocations for NPDES permitted municipal storm water Permittees shall not exceed the sum (S) of one (1) as defined below:

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \leq 1.0$$

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Where:

$C_D$ = diazinon concentration in micrograms per liter of point source discharge

$C_C$ = chlorpyrifos concentration in micrograms per liter of point source discharge

$WQO_D$ = acute or chronic diazinon water quality objective (0.160 and 0.100 micrograms per liter, respectively)

$WQO_C$ = acute or chronic chlorpyrifos water quality objective. (0.025 and 0.015 micrograms per liter, respectively)

For the purpose of calculating the sum (S) above, non-detectable concentrations are considered to be zero. In determining compliance with the effluent limitations in Section C.1 of this Order related to the attainment of these wasteload allocations, the Central Valley Regional Water Board will consider data or information submitted by the Permittee regarding diazinon and chlorpyrifos inputs from sources that are outside of the jurisdiction of the permitted discharge, and any applicable provisions in this Order requiring the Permittee to reduce the discharge of pollutants to the maximum extent practicable.

Deliverables/Actions Required:
To create a path towards compliance with this TMDL, the permittees are being directed to conduct an assessment of the waterbody. The assessment will be used to ascertain the loads from urban runoff, whether the waterbody is meeting its objectives, whether or not an alternative constituent is the cause of impairment and whether a synergistic effect is present. As an alternative, the permittees may participate in the Bay Delta Regional Monitoring Program, upon Executive Officer approval.

The deadline for attainment of WLAs was December 1, 2011. Therefore, the WLA is to be achieved immediately.

### ***Sacramento and Feather Rivers Diazinon & Chlorpyrifos TMDL***
The Sacramento and Feather Rivers Diazinon & Chlorpyrifos TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Valley Regional Water Board has determined that the Cities of Anderson, Marysville, Red Bluff, Redding and Yuba City, the Counties of Colusa, Shasta, Sutter and Yuba, Traditional MS4s, are sources of "Urban storm water runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

The Cities of Chico, Live Oak, Lincoln, Loomis, Roseville and Rocklin and the County of Butte, listed in the original permit adopted on February 5, 2013, have been removed from this TMDL. These permittees are not specifically assigned allocations in the TMDL adopted by the Central Valley Regional Water Board. The Central Valley Water Board determined that they were erroneously listed since they do not discharge directly to the Sacramento and/or Feather rivers. The Cities of Anderson, Colusa, Marysville, Red Bluff, Redding and Yuba City, and the Counties of Colusa, Shasta and Sutter discharge directly to the Sacramento and/or Feather rivers.

Wasteload Allocations:
The wasteload allocations for NPDES permitted municipal storm water Permittees shall not exceed the sum (S) of one (1) as defined below:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \leq 1.0$$

Where:

$C_D$ = diazinon concentration in micrograms per liter of point source discharge

$C_C$ = chlorpyrifos concentration in micrograms per liter of point source discharge

$WQO_D$ = acute or chronic diazinon water quality objective (0.160 and 0.100 micrograms per liter, respectively)

$WQO_C$ = acute or chronic chlorpyrifos water quality objective. (0.025 and 0.015 micrograms per liter, respectively)

For the purpose of calculating the sum (S) above, non-detectable concentrations are considered to be zero. In determining compliance with the effluent limitations in Section C.1 of this Order related to the attainment of these wasteload allocations, the Central Valley Regional Water Board will consider data or information submitted by the Permittee regarding diazinon and chlorpyrifos inputs from sources that are outside of the jurisdiction of the permitted discharge, and any applicable provisions in this Order requiring the Permittee to reduce the discharge of pollutants to the maximum extent practicable.

Deliverables/Actions Required:

To create a path towards compliance with this TMDL, the permittees are being directed to conduct an assessment of the waterbody. The assessment will be used to ascertain the loads from urban runoff, whether the waterbody is meeting its objectives, whether or not an alternative constituent is the cause of impairment and whether a synergistic effect is present. As an alternative, the permittees may participate in the Bay Delta Regional Monitoring Program, upon Executive Officer approval.

The deadline for attainment of WLAs was August 11, 2008. Therefore, the WLA is to be achieved immediately. The Cities of Anderson, Marysville, Red Bluff, Redding and Yuba City, the Counties of Colusa, Shasta, Sutter and Yuba may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

_Demonstration of Attainment of Diazinon and Chlorpyrifos Wasteload Allocations for ALL Diazinon and Chlorpyrifos TMDLs_

Attainment of the diazinon and chlorpyrifos wasteload allocations may be demonstrated by any one of the following methods:

a. Submission of receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.

b. Attainment of WLAs within the discharge (monitoring representative of the MS4 discharge may be used with Executive Officer approval).

c. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

For those Permittees that have not demonstrated achievement of WLA by the attainment date (shown above), implementation of BMPs consistent with an Executive Officer-approved Management Plan that outlines BMPs and a schedule to reduce discharges of diazinon and

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

chlorpyrifos and that are capable of ultimately attaining the WLA is required. Management Plans shall be developed pursuant to the implementation schedules stated in Attachment G.

### *Lower San Joaquin River, San Joaquin River and Stockton Deep Water Ship Channel (DWSC) Organic Enrichment and Low Dissolved Oxygen TMDL*

The Lower San Joaquin River, San Joaquin River and Stockton DWSC Organic Enrichment and Low Dissolved Oxygen TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:[48]
The Central Valley Regional Water Board has determined that the Cities of Atwater, Ceres, Delhi, Hughson, Lathrop, Livingston, Los Banos, Manteca, Merced, Oakdale, Patterson, Ripon, Riverbank and Turlock, the Counties of Merced, San Joaquin and Stanislaus, Traditional MS4s, are sources of "Storm water discharges" subject to this Order and are responsible for implementing the requirements of this TMDL.

The CDPs of French Camp and Winton, listed in the originally adopted permit, have been removed from this TMDL. These permittees were removed because they exist within existing MS4 areas subject to this permit (i.e. the counties they are located in). Therefore, it was determined that these permittees should not have been included in Appendix G under this TMDL and thus have been removed.

Wasteload Allocations:
The San Joaquin River Dissolved Oxygen Control Program set the wasteload allocations for NPDES-permitted discharges of oxygen demanding substances and their precursors as the effluent limitations that were applicable on 28 January 2005. On 28 January 2005, the 2003 Phase II MS4 permit stated the following for effluent limitations in section C.1. Effluent Limitations: Permittees must implement BMPs that reduce pollutants in storm water to the technology-based standard of MEP. This Order applies these limitations to discharges from MS4s maintained by the Phase II Entities listed above. In determining compliance with permit requirements related to attainment of these wasteload allocations, credit will be given for control measures implemented after 12 July 2004.

The San Joaquin River Dissolved Oxygen Control Program defines oxygen demanding substances and their precursors as any substance or substances that consume, have the potential to consume, or contribute to the growth or formation of substances that consume or have the potential to consume oxygen from the water column.

Deliverables/Actions Required:
To comply with the WLAs established in this TMDL, the Phase II entities shall comply with the provisions of this Order. Specific actions taken to comply with this TMDL will be documented in the Annual Report along with a discussion on the effectiveness of the BMPs implemented and actions taken to improve the effectiveness in meeting the WLAs.

The permittees will also conduct monitoring to show compliance with the TMDL based upon a submitted Monitoring Plan. As an alternative, the permittees may participate in the Bay Delta

---

[48] The Fact Sheet is not consistent with the final amendment adopted by the State Water Board. (See Attachment G) The cities of Escalon and Newman should have been named here and the city of Delhi should have been removed.

Page 113

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

Regional Monitoring Program, upon Central Valley Regional Water Board Executive Officer approval.

The deadline for attainment of WLAs was December 31, 2011. Therefore, the WLA is to be achieved immediately. The Cities of Atwater, Ceres, Escalon, Hughson, Lathrop, Livingston, Los Banos, Manteca, Merced, Newman, Oakdale, Patterson, Ripon, Riverbank and Turlock, the Counties of Merced, San Joaquin and Stanislaus may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

*Demonstration of Compliance with Effluent Limitations Associated with Wasteload Allocations for Oxygen Demanding Substances and Their Precursors*
Compliance with the effluent limitations in Section C.1 of this permit associated with the wasteload allocations for oxygen demanding substances and their precursors may be demonstrated by any one of the following methods:

a. Receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.
b. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

For those Permittees that have not demonstrated achievement of WLA by the attainment date (shown above), implementation of BMPs consistent with an Executive Officer-approved Management Plan that outlines BMPs and a schedule to reduce discharges of oxygen demanding substances and their precursors to attain the WLA is required. Management Plans shall be developed within twelve months after adoption of this Attachment G. It is not the intention of the State Water Board or the Central Valley Water Board to take enforcement action against Permittees for violation of Section C.1 effluent limitations related to the WLA while the Plan is being developed and implemented, provided the Permittee develops the Plan in accordance with applicable implementation schedules. The Permittee may also request a time schedule order incorporating the implementation measures and compliance schedule of the Management Plan.

### *Delta Methylmercury TMDL*
On April 22, 2010, the Central Valley Regional Water Board adopted Resolution No. R5-2010-0043 to amend the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins (Basin Plan) to include a methylmercury TMDL and an implementation plan for the control of methylmercury and total mercury in the Sacramento-San Joaquin Delta Estuary (Delta Mercury Control Program). The Basin Plan amendment includes the addition of: (1) site-specific numeric fish tissue objectives for methylmercury; (2) the commercial and sport fishing (COMM) beneficial use designation for the Delta and Yolo Bypass; (3) methylmercury load allocations for non-point sources and wasteload allocations for point sources; and (4) an implementation plan that includes adaptive management to address mercury and methylmercury in the Delta and Yolo Bypass.

The Delta TMDL covers the Counties of Alameda, Contra Costa, Sacramento, San Joaquin, Solano and Yolo both within legal Delta boundary defined by California Water Code Section 12220 and the Yolo Bypass, a 73,300-acre floodplain on the west side of the lower Sacramento River.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The Delta is on the Clean Water Act Section 303(d) List of Impaired Water Bodies because of elevated levels of mercury in fish. Beneficial uses of the Delta that are impaired due to the elevated methylmercury levels in fish are wildlife habitat (WILD) and human consumption of aquatic organisms. The Delta provides habitat for warm and cold-water species of fish and their associated aquatic communities. Additionally, the Delta and its riparian areas provide valuable wildlife habitat. There is significant use of the Delta for fishing and collection of aquatic organisms for human consumption. Further, water is diverted from the Delta for statewide municipal (MUN) and agricultural (AGR) use.

Mercury in the Central Valley comes primarily from historic mercury and gold mines and from resuspension of contaminated material in stream beds and banks downstream of the mines, as well as from modern sources such as atmospheric deposition from local and global sources, waste water treatment plants, and urban runoff. Methylmercury, the most toxic form of mercury, forms primarily by sulfate reducing bacteria methylating inorganic mercury. Sources of methylmercury include methylmercury flux from sediment in open water and wetland habitats, urban runoff, irrigated agriculture, and waste water treatment plants. Water management activities, including water storage, conveyance, and flood control, can affect the transport of mercury and the production and transport of methylmercury.

Phase II Entities:
The Delta Mercury Control Program assigns mass-based methylmercury TMDL allocations to all sources of methylmercury in the Delta and Yolo Bypass, including urban runoff from Phase I and Phase II MS4s. In the Delta and Yolo Bypass, the TMDL assigns individual methylmercury wasteload allocations to the following small urban runoff agencies:

      City of Lathrop
      City of Lodi
      City of Rio Vista
      County of San Joaquin
      City of West Sacramento
      County of Yolo
      City of Tracy

The County of Solano is being removed from this TMDL. The Delta TMDL was based on information available at the time of its development. The Delta Methylmercury TMDL Staff Report calculated urban runoff methylmercury allocations using the Department of Water Resources' land use designations for urban and other land uses within the legal Delta boundary. A recent review of Solano County's 2003 Storm Water Management Plan, which is relevant because this plan was in effect when the Delta TMDL was developed, revealed a discrepancy between the acreages used to assess urban areas. The County's Storm Water Management Plan indicated that the MS4 permit jurisdiction only applied to the County's urbanized areas defined by the 2000 Census. The County's maps indicate there are no urbanized areas within the legal Delta boundaries.

While methylmercury from urbanized areas covered by the County's Phase II MS4 program does discharge to the Delta, the methylmercury allocations included in the TMDL should have been assigned only to the County's MS4 urbanized areas within the Delta and Yolo Bypass. Based on the 2003 Storm Water Management Plan, the urban acreage is zero and subsequently there should not be an allocation assigned to this area. This discrepancy will be

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

corrected when the Central Valley Regional Water Board conducts a full review of the TMDL in 2020.

Therefore, at this time the Solano County MS4 program is not subject to the Delta Mercury Control Program requirements, including attainment of the allocations or compliance with mercury exposure reduction program (MERP) requirements.

Wasteload Allocations:
The methylmercury wasteload allocations are as follows:

## Methylmercury Wasteload Allocations Table

| Municipality | Wasteload Allocations, Methylmercury (grams per year) |
|---|---|
| City of Lathrop | 0.097 |
| City of Lodi | 0.053 |
| City of Rio Vista | 0.0078 |
| City of Tracy | 0.65 |
| City of West Sacramento (Sacramento River subarea) | 0.36 |
| City of West Sacramento (Yolo Bypass subarea) | 0.28 |
| County of San Joaquin (Central Delta subarea) | 0.57 |
| County of San Joaquin (Mokelumne River subarea) | 0.016 |
| County of San Joaquin (Sacramento River subarea) | 0.11 |
| County of San Joaquin (San Joaquin River subarea) | 0.79 |
| County of Yolo (Sacramento River subarea) | 0.041 |
| County of Yolo (Yolo Bypass subarea) | 0.083 |

Deliverables/Actions Required:
Mercury is often attached to sediment, and the formation of methylmercury is linked in part to the concentration of mercury concentrations in sediment. Reductions in mercury concentrations will result in methylmercury reductions and subsequently methylmercury levels in fish. To comply with the TMDL, the agencies are required to implement best management practices to control erosion and sediment discharges with the goal of reducing mercury discharges. Methylmercury wasteload allocations for MS4 dischargers in the Delta and Yolo Bypass shall be met as soon as possible, but no later than December 31, 2030, unless the Central Valley Regional Water Board modifies the implementation schedule and final attainment date. Compliance will be determined by the method(s) described further in this document.

*Demonstration of Attainment of Methylmercury Wasteload Allocations:*
Compliance with the effluent limitations in Section C.1 of this permit associated with methylmercury wasteload allocations may be demonstrated by any one of the following methods:

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

a. Management Plans shall be developed within one year after the Central Valley Regional Water Board's review of the Delta Mercury Control Program or October 20, 2022, whichever date occurs first. For those MS4 Permittees that have not demonstrated achievement of WLA by December 31, 2030, the MS4s shall implement BMPs consistent with an approved updated Management Plan that shall outline BMPs and schedule to reduce discharges of methylmercury to ultimately attain the WLA.
b. Receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.
c. Attainment of WLAs within the discharge (monitoring representative of the MS4 discharge may be used with Executive Officer approval).
d. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

### *Clear Lake Nutrients TMDL*

The Clear Lake Nutrients TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Central Valley Regional Water Board has determined that the Cities of Clearlake and Lakeport, and the County of Lake, Traditional MS4s, are sources of "storm water" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The County of Lake, City of Clearlake and City of Lakeport have a combined wasteload allocation of 2,000 kg phosphorus/yr, as an average annual load (five year rolling average).

Deliverables/Actions Required:
To comply with the WLAs established in this TMDL, the Phase II entities shall comply with the provisions of this Order. Specific actions taken to comply with this TMDL will be documented in the Annual Report along with a discussion on the effectiveness of the BMPs implemented and actions taken to improve the effectiveness in meeting the WLAs.

The permittees will also conduct monitoring to show compliance with the TMDL based upon a submitted Monitoring Plan. As an alternative, the permittees may participate in a regional monitoring program, upon Executive Officer approval.

The deadline for attainment of WLAs is June 19, 2017. Therefore, the WLA are effective immediately. The Cities of Clearlake and Lakeport, and the County of Lake may request a Time Schedule Order from the Regional Water Board. A Regional Water Board's issuance of a Time Schedule Order will establish an implementation schedule for the Permittee to comply with the TMDL requirements, and will supersede the deadlines referenced in this Order.

### *Demonstration of Compliance with Effluent Limitations Associated with Phosphorus Wasteload Allocations*

Compliance with the effluent limitations in Section C.1 of this permit associated with the phosphorus wasteload allocation may be demonstrated by any one of the following methods:

a. Receiving water monitoring and/or other information, as authorized by the Executive Officer, that reasonably demonstrates attainment with the WLA.
b. Attainment of WLA within the discharge (monitoring representative of the MS4 discharge may be used with Executive Officer approval).
c. Permanent cessation of discharges from the Permittee's MS4 to receiving waters.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

d.  For those Permittees that have not demonstrated achievement of WLA by the attainment date (shown above), implementation of BMPs consistent with an Executive Officer-approved Management Plan that outlines BMPs and a schedule to reduce discharges of phosphorus to ultimately attain the WLA is required. Management Plans shall be developed by [Hard Date: 12 months from Adoption]. The Central Valley Regional Water Board Executive Officer may require revisions to the Management Plan if the Management Plan is not likely to attain the waste load allocations.

## *LAHONTAN REGIONAL WATER BOARD TMDLs*

### *Middle Truckee River Watershed and Placer, Nevada and Sierra Counties Sediment TMDL*

The Middle Truckee River Watershed and Placer, Nevada and Sierra Counties Sediment TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

Phase II Entities:
The Lahontan Regional Water Board has determined that the City of Truckee and the County of Placer, Traditional MS4s, are sources of "Urban areas" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The following wasteload allocations are applicable:

*Urban Areas Wasteload Allocations:*
    4,936 tons per year of total suspended sediment load.

*Non-urban Wasteload Allocations:*
    35,392 tons per year of total suspended sediment load.

Deliverables/Actions Required:
To comply with the WLAs of this TMDL, the permittees will be required to track and report on the amount of road sand, used for de-icing, used and recovered. The permittees will also rehabilitate old dirt roads to control erosion and to prevent erosion from legacy sites. They will also implement an Education and Outreach program for ski areas within their jurisdiction for sediment and erosion control. They will also be required to continue implementation of their municipal monitoring program.

Attainment of wasteload allocations will be determined based on a target of 25 milligrams per liter, or less, of suspended sediment. The estimated time frame for meeting the numeric targets and achieving the TMDL is 20 years (i.e. 2028).

## *SANTA ANA REGIONAL WATER BOARD TMDLs*

### *San Diego Creek, Upper and Lower Newport Bay Organochlorine Compounds TMDL*

The Newport Bay watershed is a highly urbanized watershed. The two nontraditional MS4s in this watershed, Orange County Fairgrounds and University of California - Irvine, are both tributary to traditional MS4s that discharge to the Santa Ana Delhi Channel and San Diego Creek Reach 1, respectively. The implementation requirements and wasteload allocations assigned to the traditional MS4s in the TMDLs that have been established for the Newport Bay

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

watershed, including both Regional Board adopted and USEPA promulgated TMDLs that are still in effect, therefore apply to these two nontraditional MS4s.

<u>Phase II Entities:</u>

The Santa Ana Regional Water Board has determined that the University of California, Irvine and the Orange County Fairgrounds, Non-Traditional MS4s, are sources of "Urban runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

<u>Wasteload Allocations:</u>

Not Applicable

<u>Deliverables/Actions Required:</u>
The Santa Ana Regional Board has determined that the contribution by these non-traditional MS4s into the MS4 systems currently owned and operated by agencies implementing storm water programs regulated by Phase I permits are minimal in comparison. Therefore, the Santa Ana Regional Water Board has determined that for these non-traditional entities, consultation with Regional Water Board staff is needed to determine proposed actions and evaluations that will satisfy the goals and assumptions of the TMDL.

The TMDL specifies that the final WLAs are to be achieved by December 31, 2020.

### *Lake Elsinore and Canyon Lake Nutrients TMDL*
The former March Air Reserve Base was downsized and became known as March ARB. March ARB is an active military base that covers 2,300 acres. Activities in the base proper includes military activities such as air refueling, air cargo, air reconnaissance, military interceptors, military housing, recreational and dining facilities, commercial air cargo, training facilities, schools, operations centers for troop transport and industrial, including airport operations. Land use activities are under Base commander authority. The Base is currently covered under an individual industrial storm water permit for their industrial operations and is a stakeholder under the Lake Elsinore/Canyon Lake TMDL. In addition to industrial permit monitoring, the Base monitors their compliance with the TMDL. Regional Water Board staff determined that Phase II permit coverage is an appropriate permit to address the pollutants and flows generated from Base operations. Development and redevelopment post construction controls are of particular importance to be incorporated into the base's storm water program through Phase II permit coverage.

<u>Phase II Entities:</u>

The Santa Ana Regional Water Board has determined that the March ARB, a Non-Traditional MS4, is a source of "Urban discharges" subject to this Order and is responsible for implementing the requirements of this TMDL.

<u>Wasteload Allocations: (shared for all Urban discharges)</u>
Final WLA for Total Phosphorus (expressed as 10 year rolling average):
    124 kilograms per year

Final WLA for Total Nitrogen (expressed as 10 year rolling average):
    349 kilograms per year

<u>Deliverables/Actions Required:</u>
March ARB has already committed to cooperative implementation actions, monitoring actions, special studies and implementation actions jointly with other responsible agencies as an active

paying member of the Lake Elsinore/Canyon Lake TMDL Task Force. Therefore, continuation of this commitment will be required as part of this TMDL.

The TMDL specifies that the final WLAs are to be achieved by December 31, 2020.

### *Middle Santa Ana River Bacterial Indicator TMDL*

The Middle Santa Ana River Bacterial Indicator TMDL assigns a wasteload allocation appropriate for implementation through this Order as specified below.

The University of California, Riverside, the California Institute for Women and the California Institute for Men are nontraditional MS4s that are tributary to traditional MS4s that discharge to the Middle Santa Ana River (MSAR). The Regional Board adopted a Total Maximum Daily Load for bacterial indicators (E. coli) in 2005 that requires the Cities' and Counties' MS4 systems tributary to the MSAR to develop and implement Comprehensive Bacterial Reduction Plans (CBRP) to achieve attainment of the Wasteload allocations contained in the TMDL. A wide variety of entities, from traditional MS4s, to dairies, Caltrans and water and wastewater agencies have formed a stakeholder group that conduct the Regional TMDL compliance monitoring and conduct studies on the effectiveness of the BMPs implemented through the CBRP.

Phase II Entities:
The Santa Ana Regional Water Board has determined that the California State Polytechnic University, Pomona[49], the University of California, Riverside, the California Institute for Men, the California Institute for Women, and the California Rehab Center, Non-Traditional MS4s, are sources of "Urban runoff" subject to this Order and are responsible for implementing the requirements of this TMDL.

Wasteload Allocations:
The following are receiving water allocations. Logarithmic mean values shall be calculated based on a minimum of 5 samples during any 30 day period.

Dry Season (April 1 through October 31) to be achieved by December 31, 2015:
 *E. coli*
 5–sample/30–day Logarithmic Mean less than 113 organisms per 100 milliliters, and not more than 10% of the samples exceed 212 organisms per 100 milliliters for any 30–day period.

Wet Season (November 1 through March 31) to be achieved by December 31, 2025:
 *E. coli*
 5–sample/30–day Logarithmic Mean less than 113 organisms per 100 milliliters, and not more than 10% of the samples exceed 212 organisms per 100 milliliters for any 30–day period.

Deliverables/Actions Required:
In order to meet the goals and assumptions of this TMDL, Regional Water Board staff has determined that the entities listed may either: 1) develop and implement a facility-specific

---

[49] The Fact Sheet is not consistent with the final amendment adopted by the State Water Board. (See Attachment G) California State Polytechnic, Pomona should have been removed.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

CBRP or 2) participate in an updated watershed-based CBRP. The CBRP will discuss the various BMPs that will be employed and whether or not they are effective in meeting the WLA for both the dry and wet seasons.

The implementation of a Regional Water Board approved facility-specific or watershed-based CBRP will constitute compliance with the TMDL.

## *SAN DIEGO REGIONAL WATER BOARD TMDLs*

Attachment G provides specific provisions for implementing the load allocations (LAs) and wasteload allocations (WLAs) of Total Maximum Daily Loads (TMDLs) adopted by the San Diego Water Board and approved by OAL and USEPA in which Phase II dischargers are identified as responsible for discharges and subject to the requirements of the TMDLs. Each TMDL for which Phase II dischargers are identified as responsible for discharges was publicly noticed as part of the TMDL development and adoption. Additionally, San Diego Water Board staff met with each enrolled Phase II discharger to discuss the requirements of the Phase II permit and their responsibilities for compliance with the TMDLs. Therefore, Phase II dischargers were informed that their responsibilities for compliance with the TMDL will be implemented through their enrollment in the Phase II Permit.

The following requirements for implementing the TMDLs in this Order are based on and consistent with the assumptions and requirements of any available adopted and approved TMDLs that have been incorporated into the San Diego Regional Water Board's Basin Plan.

A modification to a TMDL in the Basin Plan requires a Basin Plan amendment, which includes a separate public process. If and when the TMDLs are modified in the Basin Plan, the San Diego Regional Water Board will notify the State Water Board of the need to revise the requirements of Order 2013-0001-DWQ in accordance with the Basin Plan amendment as soon as possible.

The Chollas Creek Dissolved Metals TMDL was removed from this Order because all named entities in Attachment G, as adopted, were Phase I entities and thus not subject to the requirements of this Order.

### *Bacteria Project I TMDL – Twenty Beaches and Creeks in the San Diego Region (Including Tecolote Creek)*
The Bacteria Project I Total Maximum Daily Load (Bacteria I TMDL) addresses the Clean Water Act section 303(d) bacteria impairment listings for 20 impaired water quality limited segments within the following watersheds or portions of watersheds: Laguna/San Joaquin, San Juan, San Clemente, San Luis Rey, San Marcos, San Dieguito River, Miramar Creek, Scripps HA, Tecolate HA, San Diego River, and Chollas Creek.

The greatest causes of waterbody impairments in the San Diego Region in 2002 were elevated bacteria levels and subsequent beach closures. The presence of pathogens and the probability of disease are directly correlated with the presence of human waste sources and currently measured by the density of indicator bacteria (fecal coliform, total coliform, and enterococcus) in waters used for recreation. When the Bacteria I TMDL wasteload allocations (WLAs) are achieved, health risks associated with pathogens are expected to be minimal.

Phase I and Phase II municipal dischargers are the most significant controllable sources of bacteria. With respect to Phase II dischargers, the Bacteria I TMDL is "implemented primarily

Page 121

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

by requiring compliance with the existing general WDRs and NPDES requirements that have been issued for Phase II MS4 discharges." Section F.5 of this Order requires dischargers within the impaired water quality segments identified in the Bacteria I TMDL to develop and/or implement a Storm Water Pollution Prevention Plans (SWPPP). This Order also requires enrolled Phase II dischargers to identify all potential bacteria contributions from their site and implement pollutant control strategies and BMPs to reduce bacteria. Non-storm water discharges are not authorized unless they meet the requirements as set forth in section B of this Order.

Because Phase II dischargers are required to develop SWPPPs with BMP implementation strategies to reduce the bacteria loads in accordance with the TMDL implementation schedule, Phase II MS4 dischargers that are enrolled and in compliance with the provisions of this Order are deemed in compliance with the Bacteria I TMDL unless they are identified as a significant source of bacteria as discussed below. The legally responsible parties (LRPs) must demonstrate that the discharges from the Phase II facility do not contribute to the bacteria wet and dry mass load impairments through monitoring data. The Regional Water Boards retain the authority to require Phase II MS4 dischargers to revise their SWPPPs, EPA Reports, or monitoring programs as well as to direct a discharger to obtain an individual NPDES permit if additional controls are necessary.

Phase II Entities:

The Bacteria Project I TMDL identifies responsible dischargers contributing to indicator bacteria exceedances in REC-1 designated receiving waters for 20 listings of beaches and inland water bodies. The specific Phase II entities within the impaired water quality segments identified in the Bacteria I TMDL are: the United States Marine Corps Base Camp Pendleton, the University of California, San Diego, San Diego State University, California State University, San Marcos, the 22nd Agricultural Association, the Marine Corps Air Station Miramar, the North County Transit District and the San Diego Veterans Administration Medical Center, all Non-Traditional MS4s.

Wasteload Allocations:

The Bacteria Project I TMDL basin plan amendment assigned the total WLA for each indicator bacteria for wet and dry mass loading to receiving waters to all identified Phase II dischargers.

The allowable load consists of two parts: 1) the bacteria load that is calculated based on the San Diego Regional Water Board's REC-1 WQOs and, 2) the bacteria load that is associated with the allowable exceedance frequency (i.e. allowable exceedance days). Allowable exceedance days are calculated based on the allowable exceedance frequency and total number of wet days in a year.

Dry Weather WLA

The Bacteria I TMDL assumes no discharge of surface runoff or bacteria from agricultural, open space, and CalTrans land uses. As such, the dry weather WLA was assigned entirely to the Municipal MS4s (Phase I and Phase II). Table, below, excerpts the dry weather WLAs assigned for Municipal MS4s (Phase I and Phase II) within the impaired water quality segments identified in the Bacteria I TMDL.

Wet Weather WLA

The Wet Weather TMDL discharges of surface runoff and bacteria was assigned to all land use allocations. The WLAs for Caltrans, agricultural, and open space were set to the existing

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

bacteria loads predicted for wet weather. The remainder of the wasteload allocation was assigned to Municipal MS4s (Phase I and Phase II). Table, below, excerpts the wet weather WLAs assigned for Municipal MS4s (Phase I and Phase II) within the impaired water quality segments identified in the Bacteria I TMDL.

## Table 1: Excerpts of Wasteload Allocations (WLAs)

[All units are Billion Most Probable Number/year]

| Watershed | Fecal Coliform Wet Weather | Fecal Coliform Dry Weather | Enterococcus Wet Weather | Enterococcus Dry Weather | Total Coliform Wet Weather | Total Coliform Dry Weather |
|---|---|---|---|---|---|---|
| San Joaquin Hills /Laguna Beach HSAs (901.11 and 901.12) | 37,167 | 227 | 66,417 | 40 | 880,652 | 1,134 |
| Aliso HSA (901.13) | 477,069 | 242 | 735,490 | 40 | 8,923,264 | 1,208 |
| Dana Point HSA (901.14) | 152,446 | 92 | 219,528 | 16 | 3,404,008 | 462 |
| Lower San Juan HSA (901.27) | 1,156,419 | 1,665 | 1,385,094 | 275 | 16,093,160 | 8,342 |
| San Clemente HA (901.30) | 192,653 | 192 | 295,668 | 33 | 3,477,739 | 958 |
| San Luis Rey HU (903.00) | 914,026 | 1,058 | 1,300,235 | 185 | 14,373,954 | 5,289 |
| San Marcos HA (904.50) | 6,558 | 26 | 23,771 | 5 | 298,430 | 129 |
| San Dieguito HU (905.50) | 798,175 | 1,293 | 1,763,603 | 226 | 16,660,538 | 6,468 |
| Miramar Reservoir HA (906.10) | 6,703 | 7 | 8,109 | 1 | 171,436 | 36 |
| Scripps HA (906.30) | 101,253 | 119 | 232,035 | 21 | 3,447,764 | 594 |
| Tecolote HA (906.5) | 126,806 | 234 | 471,211 | 39 | 5,136,598 | 1,171 |
| Mission San Diego/Sante e HSAs (907.11 and 907.12) | 221,117 | 1,506 | 890,617 | 248 | 10,790,520 | 7,529 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Watershed | Fecal Coliform Wet Weather | Fecal Coliform Dry Weather | Enterococcus Wet Weather | Enterococcus Dry Weather | Total Coliform Wet Weather | Total Coliform Dry Weather |
|---|---|---|---|---|---|---|
| Chollas HSA (908.22) | 252,479 | 398 | 802,918 | 66 | 9,880,784 | 1,991 |

Deliverables/Actions Required:
Implementation actions applicable to Phase II dischargers and the relevant attainment deadlines set forth in the TMDL are provided below.

## Bacteria Project I TMDL Actions and Deadlines Table

Note A: Wet: single sample maximum REC-1 WQOs Dry: 30-day geometric mean REC-1 WQOs. The percent reduction for each compliance year applies to the total number of samples taken that comply with Resolution No. R9-2010-0001. The maximum allowable percent exceedance frequency for the single sample maximum (wet weather days only) is 22% (Resolution No. R9-2010-0001, Finding 10). For dry weather days, there is no maximum allowable exceedance and it is set at 0%. The Compliance Year percent reductions are based on the total number of samples taken. For Example: If in Year 5 of the compliance schedule, 100 samples are taken, only 50% of those samples can exceed the single sample maximum for wet weather by 22% of the maximum allowable percent exceedance frequency for the single sample maximum. By Year 10+, no samples can exceed the Exceedance Frequency. Baseline years for wet and dry days shall be as identified in Order No R9 2015-0001 Attachment E for the Bacteria I TMDL.

Note B: Priorities are defined in Resolution No. R9-2010-0001, Attachment A, pg. 63-65.

Note C: Phase II MS4 enrolled under the State General Permit for Small MS4s or issued an individual NPDES permit, are considered a Municipal Discharger along with Phase I MS4s in this Implementation Milestone item.

| Implementation Action | Responsible Party | Date |
|---|---|---|
| Submit annual progress reports or Update SWPPPs/SWMPS/LRPS in accordance with RB Accepted LRPs | Phase II Permittees | Upon Enrollment in General Permit |
| Meet Wet and Dry Weather Frequency Exceedance Milestones | Phase II MS4s | |
| 50% Reductions [Notes A, C] – Priority [Note B] 1 | Phase II MS4s | April 4, 2016 |
| 50% Reductions [Notes A, C] – Priority [Note B] 2 | Phase II MS4s | April 4, 2017 |
| 50% Reductions [Notes A, C] – Priority [Note B] 3 | Phase II MS4s | April 4, 2018 |
| 100% Reductions [Notes A, C] – Priority [Note B] 1,2,3 | Phase II MS4s | April 2, 2021+ |

The Bacteria I TMDL also requires Phase II dischargers to take other actions to control their risk of bacteria discharges such as monitoring. Because Phase I MS4s often discharge directly into the receiving waters addressed by the TMDL, the Bacteria I TMDL states that Phase I MS4s are primarily responsible for conducting the TMDL compliance monitoring. However, Phase II MS4s are also responsible for monitoring to identify sources that may need additional controls to reduce bacteria loads. Enrollment in this Order satisfies these monitoring obligations because all Phase II MS4 dischargers assigned a WLA in a TMDL are required to conduct the monitoring in Attachment G pursuant to section F.5.i.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

The Phase II Entities, listed above, must be in compliance with the final TMDL requirements according to the following attainment dates:

*The Wet Weather TMDL Attainment Date in parenthesis in the table below applies if the applicable Storm Water Pollution Prevention Plan does not include load reduction programs for other constituents (e.g. metals, pesticides, trash, nutrients, sediment, etc.) together with bacteria load reduction requirements of this TMDL.

| Constituent | Dry Weather TMDL Attainment Date | Wet Weather TMDL Attainment Date* |
|---|---|---|
| Total Coliform; Fecal Coliform; *Enterococcus* | April 4, 2021 | April 4, 2031 (April 4, 2021) |

A Storm Water Pollution Prevention Plan that includes a bacteria load reduction program is expected to include information similar to what is described in the section called Bacteria Load Reduction Plan Outline in Appendix P of the Final Technical Report to Order No. 2010-0001. A Storm Water Pollution Prevention Plan that includes a load reduction program for multiple constituents together with bacteria load controls is expected to include information similar to what is described in the section called Comprehensive Load Reduction Plan Outline in Appendix P of the Final Technical Report to Order No. 2010-0001. Some of the components described in both outlines may be satisfied through collaboration with the Phase I MS4 dischargers, as their efforts to comply with the Bacteria TMDL include implementing controls, monitoring, and reporting.

### *Los Peñasquitos Lagoon Sediment TMDL*

The Los Peñasquitos watershed area (Hydrologic Unit (HU) 906.00) includes the Los Peñasquitos Lagoon, the Carroll Canyon Creek, Los Peñasquitos Creek, and Carmel Creek. The Los Peñasquitos Lagoon Sediment TMDL addresses the Clean Water Act section 303(d) sediment impairment for the lagoon for impacts resulting from rapid sedimentation and habitat loss.

Sediment is particulate organic and inorganic matter that is mobilized by erosion due to wind, precipitation or anthropogenic causes and carried by water. Sediment is a natural occurrence found in runoff from all locations in the watershed in varying concentrations. Concentrated flow with intensified velocities or volumes has the capability to magnify erosion rates resulting in rill erosion, gully erosion, and channel incision which correlates to an increased sediment supply into the Lagoon. Impacts from sediment in the Lagoon include reduced tidal mixing in lagoon channels, degraded and/or net loss of salt marsh vegetation, increased potential for flooding surrounding areas, increased turbidity, and constricted wildlife corridors.

Reducing erosion and concentrated flows by utilizing Best Management Practices (BMPs) that stabilize loose soil sources and/or retaining storm water onsite will decrease the impacts from excessive and rapid sediment transport into the lagoon.

Phase II Entities:
The San Diego Regional Water Board has determined that the Marine Corps Air Station, Miramar, the North County Transit District, the San Diego Veterans Administration Medical Center and the University of California, San Diego, Non-Traditional MS4s, are "Phase II MS4 permittees" subject to this Order and are responsible for implementing the requirements of this TMDL.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Wasteload Allocations:
The Los Peñasquitos Lagoon TMDL basin plan amendment assigned interim and final WLAs to all identified responsible parties. WLAs are expressed in effluent limitations. Interim effluent limitations are described in **Error! Reference source not found.** with a final effluent limitation of 2,580 tons/year assigned to all identified responsible parties. Responsible parties are jointly responsible for meeting these wasteload reduction allocations. As such, Phase II dischargers within the Los Peñasquitos watershed are required to either reduce site sediment loads to the receiving water body or demonstrating that the site discharges are not causing exceedances of the water quality based effluent limitations in **Error! Reference source not found.** (interim WQBELs) and the final WQBEL of 2,580 tons/year. Phase II dischargers are also required to sample for total suspended solids (TSS) concentrations and representative, or estimated, flow rates from discharge locations in addition to quantify contributions of sediment loads from their sites that cause or threaten to cause an exceedance of the effluent limitations in **Error! Reference source not found.** or the final WLA.

*Interim WLAs:*

**Interim Water Quality Based Effluent Sediment Limitations Expressed as a Wet Season Load in MS4 Discharges from the Watershed to Los Peñasquitos Lagoon Table**

*Phase I MS4s, Phase II MS4s, Caltrans, and general construction and industrial permit dischargers are jointly responsible for achieving the interim and final effluent limitations.*

| Interim Effluent Limitation #1 | 6,691 tons/wet season |
|---|---|
| Interim Effluent Limitation #2 | 5,663 tons/wet season |
| Interim Effluent Limitation #3 | 4,636 tons/wet season |
| Interim Effluent Limitation #4 | 3,608 tons/wet season |

*Final WLAs:*
The final Watershed Wasteload Allocation (Watershed WLA) of 2,580 tons/year is assigned collectively to all of the responsible parties identified in the TMDL and represents all current point and nonpoint sources of sediment from the watershed to the Lagoon. Attainment of the Final Watershed WLA requires a 67% total load reduction of sediment from the watershed.

Deliverables/Actions Required:
The implementation actions applicable to Phase II dischargers and the relevant compliance deadlines set forth in the TMDL are provided below.

| Implementation Action | Responsible Party | Date |
|---|---|---|
| Revision of SWPPPs | Construction, Industrial, and Phase II Permittees | July 14, 2015 |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Implementation Action | Responsible Party | Date |
|---|---|---|
| Meet Additional Monitoring Requirements:<br>• Provide total suspended solids (TSS) concentrations and estimate of a representative flow rate from their facility discharge points during each wet season for one storm event of 0.5 inches or greater | Phase II MS4s, and general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | July 14, 2015 |
| Meet Additional Reporting Requirements:<br>• Submit TSS concentrations and the representative flow estimate as a PDF attachment to SMARTS entitled *Los Peñasquitos Lagoon Sediment TMDL Monitoring* annually on July 14 | All Phase II MS4s, general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | July 14, 2015 |
| Meet Interim Milestones:<br>• 6,691 tons/wet season<br>• 5,663 tons/wet season<br>• 4,636 tons/wet season<br>• 3,608 tons/wet season | All Phase I, Phase II MS4s, Caltrans, and general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | December 31, 2019<br>December 31, 2023<br>December 31, 2027<br>December 31, 2029 |
| Meet Final Milestone:<br>• 2,580 tons/wet season | All Phase I, Phase II MS4s, Caltrans, and general construction and industrial NPDES enrollees, and other WDR and NPDES permittees in the watershed. | July 14, 2034 |

The Los Peñasquitos Lagoon Sediment TMDL requires all responsible parties to submit a Load Reduction Plan. All enrolled dischargers must identify all potential sediment contributions from their site, implement BMPs to reduce sediment and erosion, and sample discharges for flow rate and total suspended solids (TSS) to assess the facility's effect on the receiving water body and to inform the Phase I Watershed Management Area Water Quality Improvement Plan. A discharger's development or an update of a SWPPP in accordance with section F.5.f.4 satisfies the TMDL requirement to prepare a Load Reduction Plan because this Order requires enrolled dischargers to take actions to control their risk of sediment discharges. Additionally, non-storm water discharges are not authorized unless they meet the requirements as set forth in section B of this Order.

In addition to the monitoring requirements in sections E.13 (b) and E.15 (d) of the Order, Phase II dischargers are required to provide TSS concentrations and an estimate of a representative flow rate from their facility during each wet season for one storm event of 0.5 inches or greater. The Phase II discharger shall submit the TSS concentrations and representative flow estimates as a PDF attachment to SMARTS entitled Los Peñasquitos Lagoon Sediment TMDL Monitoring annually on July 14.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

<u>Monitoring and Reporting</u>

The Los Peñasquitos Lagoon Sediment TMDL requires all Responsible Parties to contribute information regarding the amount of sediment discharged from their facilities[50]. This monitoring must address, at a minimum, representative flow rates and TSS concentrations whenever long-term discharges[51] occur. The monitoring program set forth in sections E.13 (b) and E.15 (d) of the General Permit only partially meets these requirements because the General Permit does not require dischargers to monitor for representative flow rates. Therefore, dischargers must conduct additional monitoring to that required in sections E.13 (b) and E.15 (d) of the General Permit to be in compliance with the Los Peñasquitos Lagoon Sediment TMDL.

Representative flow rate can be determined by using one of the following methods: 1) flow meter or 2) the float method. The float method is a field calculated estimate in accordance with the US EPA's NPDES Storm Water Sampling Guidance Document[52] for estimating flow rates[53]. To conduct the float method, the Discharger determines the cross sectional area of the representative discharge by estimating the flow depth and flow width in feet. The flow path must be a minimum of five feet in length. For ponded or no flow, a discharger shall record a flow rate of zero. The velocity[54] is estimated by measuring the time it takes the float (e.g. a floatable object, such as an orange peel or similar object), to float between point A and point B[55]. The flow rate shall be estimated for two 15 minute intervals.

The purpose of determining the flow rate is to calculate[56] the amount (i.e. load) of sediment being discharged from the site and informing a discharger as to whether their discharge is in compliance with the watershed WQBEL. Determination of the TSS concentrations and flow rate shall be conducted at a discharger's site during the wet season (October 1 through April 30) during one storm event of 0.5 inches or greater. Regardless of the method used to

---

[50] Resolution No. R9-2012-0033, Technical Report, p. A-9

[51] The TMDL does not define the duration of a rainfall event that would result in a "long term discharge" that is required to be monitored. Based on the TMDL's findings and source identification, increased flow and sedimentation impact the lagoon primarily during wet weather rainfall events.  The San Diego Water Board has determined that the definition of "a long term discharge" is equivalent to a storm event that is 0.5 inches or greater because this size of a rain event is likely to result in the type of discharge that impacts the lagoon.

[52] USEPA. NPDES Storm Water Sampling Guidance Document, http://www3.epa.gov/npdes/pubs/owm0093.pdf, EPA 833-8-92-001, July 1992,  pp.49-50, sections 3.2.2 - 3.2.4, Estimating Total Flow Volumes for the Sampled Rain Event, exhibits 3-8,3-9, Estimating Flow Rates – Float Method

[53] Flow rate (cubic foot per second) = velocity (foot per second) x Area (square foot); cubic foot per second = cubic foot per second; Area = flow depth (foot) by flow width (foot).

[54] Velocity = length from point A to point B divided by time of travel

[55] Example: flow length = 5 foot; time of travel from point A to point B = 30 seconds. Flow depth is equal to 0.5 foot. Flow width = 1 foot. V= 5 foot per 30 seconds = 0.17 foot per second. Area=0.5 foot times 1.0 foot = .5 square foot. Flow rate = Q = 0.17 foot per second x 0.5 square foot = 0.085 cubic foot per second

[56] Load, or mass of a pollutant, is calculated by multiplying flow (Q) cubic foot per second times pollutant concentration (milligram per liter); US EPA NPDES Permit Writer's Manual, pp. 6.24 -6.25

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

determine a representative flow rate, flow rates shall be completed concurrently with the TMDL's required TSS sampling.

Dischargers shall report results of all required monitoring annually as part of their Annual Report. Specifically, flow and TSS data shall be reported as a PDF attachment to SMARTS with the Annual Report entitled Los Peñasquitos Lagoon Sediment TMDL Monitoring. Pursuant to section E.16, as amended, of this General Permit, Annual Reports are due on or before October 15. Submittal of the General Permit Annual Report meets the TMDL requirement to inform the Phase I MS4s in the Los Peñasquitos Watershed Management Area their efforts to achieve attainment of the watershed WLA and support restoration of the Lagoon salt marsh.

Compliance Determination

The Los Peñasquitos Lagoon Sediment TMDL includes interim attainment milestones for Phase II dischargers, in addition to the final attainment milestone date of July 14, 2034. The Los Peñasquitos Lagoon TMDL staff report states that "it is the responsibility of the Phase I MS4 Copermittees to assume the lead role in coordinating and carrying out the necessary actions, compliance monitoring requirements, and successful implementation of the adaptive management framework required as part of this TMDL." Therefore, Phase II MS4 dischargers in the Los Peñasquitos watershed "are assumed to be in compliance with the TMDL and their contribution to the total WLA if they:

1) Are enrolled in this Order; and
2) Have updated their SWPPP to include the BMPS to be implemented with monitoring required to assess the facility or property effects on the WLA; and
3) Are in compliance with this Order, and
4) Are conducting facility and monitoring assessments as required by this Order and that monitoring shows the Phase II MS4 responsible party discharges are not contributing to the sediment impairment in the Lagoon.

Phase II dischargers are encouraged to coordinate with Phase I Copermittees to meet the applicable TMDL load reduction requirements in Attachment G using an adaptive framework approach. Phase I Copermittees described the adaptive framework approach for each Watershed Management Area in the San Diego Region in a watershed specific Water Quality Improvement Plan. Coordinated efforts by both Phase I and Phase II dischargers will accomplish the wasteload reductions required in the TMDLs faster and achieve the ultimate goal of improving water quality as soon as possible.

Moreover, the San Diego Regional Water Board retains the authority to require Phase II dischargers within the Los Peñasquitos watershed to revise their SWPPPs, ERA Reports, or monitoring programs as well as to direct a discharger to obtain an individual NPDES permit if additional controls are necessary to meet the requirements of this TMDL.

## XIV.  STORM WATER MANAGEMENT PROGRAM FOR NON-TRADITIONAL MS4

*Differences between Traditional and Non-traditional MS4s*
Because of the differences between Traditional and Non-traditional MS4s this Order includes Section F to address their specific management structure.

Non-Traditional Small MS4s required to comply with this Order are identified in Attachment B.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Non-traditional MS4s differ from cities and counties, because most potential sources of illicit discharges and storm water pollution are associated with activities under their direct operational control.

Some Non-traditional MS4s may also lack the legal authority or employ a different type of enforcement mechanism than a city/county government to implement their storm water program.

Certain Non-traditional Small MS4s such as Department of Defense and Department of Corrections and Rehabilitation Permittees required exemption from certain provisions due to security risks and/or compromised facility security.

**Program Management – Applicable to all Non-traditional MS4 Categories** Legal Authority: Clean Water Act § 40 CFR 122.26(d)(2)(i) and 40 CFR 122.34(b)(3)(ii)(B), (b)(4)(ii)(A), and (b)(5)(ii)(B).
MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; MS4 Program Evaluation Guidance, U.S. EPA, EPA-833-R-07-003

*Program Management*
Program Management is essential to ensure that all elements of the storm water program are implemented on schedule and consistent with the Order requirements.

See Online Annual Reporting for further discussion later in this section.

*Legal Authority*
Legal authority to control discharges into a Permittee's storm sewer system is critical for compliance. Most Non-traditional MS4s lack the legal authority or employ a different type of enforcement mechanism than a city or county government to implement its storm water program. To the extent allowable under State and federal law, this Order requires each Non-traditional MS4 to operate with sufficient legal authority to control discharges into and from its MS4. The legal authority may be demonstrated by a combination of statutes, permits, contracts, orders, and interagency agreements. Non- traditional MS4 Permittees also do not generally have the authority to impose a monetary penalty. Although these differences exist, just like Traditional MS4s, Non- traditional MS4s must have the legal authority to develop, implement, and enforce the program.

*Coordination*
This Order allows Non-traditional MS4s to coordinate their storm water programs with other entities within or adjacent to their MS4 and allows the concept of a Separate Implementing Entity. A Separate Implementing Entity allows Permittees to leverage resources and skills. Additional information regarding SIEs is discussed later in this section.

**Education and Outreach Program**
Legal Authority: Clean Water Act § 40 CFR 122.34(b)(1).

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Because the population served by most Non-traditional MS4s will generally be served by the public education and outreach efforts of the local jurisdiction, the most useful supplement to those education and outreach efforts would be to label the Non-traditional MS4 catch basins. However, some Non-traditional MS4s such as universities have tenants and residents that may not be as effectively served by the local jurisdiction's public education and outreach program,

therefore a separate education and outreach program may be needed. Where the local jurisdiction's public education and outreach efforts do effectively target and reach these tenant and resident populations, the Non- traditional MS4s are not expected to duplicate those efforts.

Some Non-traditional MS4s are well suited for regional education and outreach. For example, school districts often have several schools located with a watershed or regional boundary. This Order allows Non-traditional MS4s to comply with the Education and Outreach provisions through a regional collaborative effort.

Regional outreach and collaboration requires the Permittees to define a uniform and consistent message, deciding how best to communicate the message, and how to facilitate behavioral changes.

**Public Involvement and Participation**
Legal Authority: Clean Water Act § 40 CFR 122.34(b)(2)).

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Non-traditional MS4s have the same responsibilities as Traditional MS4s to ensure the storm water program is publicized and must involve the population they serve in the development of the program. However, the most effective BMP for Non-traditional MS4s is to provide up-to-date information about the storm water program online if the Non-traditional MS4 maintains a website, or the Non-traditional MS4 Permittee may choose to post information about their program on the local jurisdiction's website.

**Illicit Discharge Detection and Elimination Program**
Legal Authority: Clean Water Act § 40 CFR 122.26(d)(2)(iv)(B)

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

The federal Phase II regulations require all MS4s to develop a process to trace the source of illicit discharges and eliminate them. The regulations also state that appropriate enforcement procedures and actions must be included in this process.

Unlike Traditional MS4s, Non-traditional MS4s have direct control of their own staff and contractors. Therefore, the enforcement provisions identified in the Illicit Discharge Detection and Elimination program are often not applicable to Non-traditional MS4 Permittees. Non-traditional MS4 Permittees should address illicit non-storm water discharges through the implementation of a Spill Response Plan However, Non- traditional MS4 Permittees often comply with existing state/federal regulations that required a Spill Response Plan or Hazardous Materials plan that identifies notification procedures for other operators or local agencies and includes details that are similar if not the same as a Spill Response Plan. Therefore, to leverage resources and maximize efficiencies the requirements in this Order recommend utilizing existing documents if that document contains the same information.

**Construction Site Storm Water Runoff Control and Outreach Program**
The purpose of this program component is to prevent sediment and other pollutants from entering the Non-traditional MS4 during the construction phase of development projects. In general, Non-traditional MS4 Permittees will obtain coverage under, and comply with, the CGP for their own construction projects. To the extent that they have the legal authority, Non-traditional MS4s must also require other entities discharging to their MS4 to obtain coverage under and comply with the CGP during the construction phase of their projects.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

This Order relieves Non-traditional MS4 Permittees from development and implementation of a complete construction storm water runoff control program. This Order does require education and outreach to staff, construction site operators and contractors on how to control construction storm water runoff.

The CGP is inherently a robust permit with stringent reporting requirement for any construction project disturbing one acre or more in California. Often, Non-traditional MS4s have a few construction projects occurring at once such as those in a City or County. There are, however, very few Non-traditional MS4s that have dozens of active construction sites. Further, Non-traditional MS4 Permittees are often both the owner and contractor of a construction project. Finally, municipal governments must review and approve erosion and sediment control plans prior to the issuance of grading permits. Most all Non-traditional MS4s do not require approval from local municipalities prior to construction activity. Conditioning of a construction project is usually conducted in-house by Non-traditional MS4 Permittee staff. If contractors are brought in to conduct construction activity, this Order requires Non-traditional MS4 Permittees to include "bullet proof" contract language ensuring construction operators or contractors comply with the CGP and implement appropriate BMPs.

**Pollution Prevention and Good Housekeeping Program**
Legal Authority: Clean Water Act § 40 CFR 122.34(b)(6)

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001

Non-traditional MS4s have the same responsibilities as Traditional MS4s to prevent or reduce storm water pollution generated by their own operations, to train employees about pollution prevention/good housekeeping practices, and to identify appropriate measures to prevent or reduce the amount of storm water generated by their operations.

**Post-Construction Storm Water Management Program**
Legal Authority: Clean Water Act § 402(p)(3)(b); 40 C.F.R. § 122.34(b)(5).

MS4 Permit Improvement Guide, U.S. EPA, April 2010, EPA 833-R-10-001; U.S. EPA Incorporating Environmentally Sensitive Development into Municipal Stormwater Programs, EPA 833-F-07-011

This Order has specific site design and LID requirements for all projects. The LID requirements emphasize landscape-based site design features that are already required elsewhere (e.g., the California Water Efficient Landscape Ordinance). The goal during this permit term is to develop runoff retention and hydromodification control criteria that are keyed to watershed processes. Watershed management zones will be delineated by the State Board during this permit term. The Watershed management zones will be used to identify applicable areas and appropriate criteria for runoff retention and hydromodification control. Regional Boards that have approved watershed process- based criteria for post-construction will be permitted to continue requiring Permittees to implement these criteria.

**Total Maximum Daily Load (TMDL)**
The Order includes Attachment G, which identifies only those approved TMDLs in which storm water or urban run-off is listed as a source. In addition, Attachment G identifies Permittees subject to TMDLs or assigned waste load allocation. If Non-traditional MS4 Permittees have been identified in Attachment G, they must implement the specific TMDL permit requirements.

**Program Effectiveness Assessment**
Non-traditional MS4s have the same responsibilities as Traditional MS4s to conduct quantitative evaluation of their storm water program.

**Online Annual Reporting**
Non-traditional MS4s have the same responsibilities as Traditional MS4s to submit online Annual Reports via SMARTS.

**Separate Implementing Entity**
Legal Authority: Clean Water Act § 40 CFR 122.35

This Order allows a Regulated MS4s to rely on a Separate Implementing Entity to meet permit requirements, as allowed by U.S. EPA in the Phase II regulations. Reliance on Separate Implementing Entity may be particularly beneficial for Non-Traditional MS4s. An example is a community service district that is charged with creating and implementing a municipal storm water program.

Co-application and cooperative implementation of the storm water program by any Permittee with another Permittee can maximize efficiency and reduce overall costs. Non-traditional MS4s are encouraged to co-apply with local jurisdictions and utilize shared resources to implement the storm water program. Additionally, co-application and cooperative storm water program implementation can achieve watershed-wide consistency.

A Permittee may rely on a Separate Implementing Entity to implement one or more program elements, if the Separate Implementing Entity can appropriately and adequately address the storm water issues of the Permittee. To do this, both entities must agree to the arrangement, and the Permittee must comply with the applicable parts of the Separate Implementing Entity's program.

In accordance with 40 Code of Federal Regulations, section 122.35(a)(3), the Permittee remains responsible for compliance with its permit obligations if the Separate Implementing Entity fails to implement the control measure(s) or any component thereof. Therefore, the entities are encouraged to enter into a legally binding agreement to minimize any uncertainty about compliance with the permit.

If the Non-traditional MS4 Permittee relies on a Separate Implementing Entity to implement all program elements and the Separate Implementing Entity also has a storm water permit, the Permittee relying on Separate Implementing Entity must still file an NOI via SMARTS, submit the appropriate fee and file online Annual Reports. Both parties must also submit to the appropriate Regional Water Board a certification of the arrangement. The arrangement is subject to the approval of the Regional Water Board Executive Officer prior to filing an electronic NOI via SMARTS.

School districts present an example of where a Separate Implementing Entity arrangement may be appropriate, either by forming an agreement with a city or with an umbrella agency, such as the County Office of Education. Because schools provide a large audience for storm water education the two entities may coordinate an education program. An individual school or a school district may agree to provide a one-hour slot for all second and fifth grade classes during which the city would make its own storm water presentation. Alternatively, the school could agree to teach a lesson in conjunction with an outdoor education science project, which may also incorporate a public involvement component. Additionally, the school and the city or

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

Office of Education may arrange to have the school's maintenance staff attend the other entity's training sessions.

## XV.  RELATIONSHIP BETWEEN THE ORDER AND THE STATEWIDE GENERAL PERMIT FOR DISCHARGES OF STORM WATER ASSOCIATED WITH INDUSTRIAL ACTIVITY

In some cases, certain Non-traditional MS4s will be subject to both this Order and the IGP. The intent of both of these permits is to reduce pollutants in storm water, but neither permit's requirements totally encompass the other. This Order requires that Non- traditional MS4 operators address storm water program elements, while the IGP requires the development and implementation of a SWPPP for certain "industrial" activities as well as requiring specific visual and chemical monitoring.

In the Preamble to the Phase II regulations, U.S. EPA notes that for a combination permit to be acceptable, it must contain all of the requirements for each permit. Further, "when viewed in its entirety, a combination permit, which by necessity would need to contain all elements of otherwise separate industrial and MS4 permit requirements, and require NOI information for each separate industrial activity, may have few advantages when compared to obtaining separate MS4 and industrial general permit coverage." (64 Fed. Reg. 68781.) Where the permits do overlap, one program may reference the other. More specifically, the Good Housekeeping for Permittee Operations program element requires evaluation of Permittee operations, some of which may be covered under the IGP. The development and implementation of the SWPPP under the IGP will likely satisfy the Good Housekeeping requirements for those industrial activities. The Non-traditional MS4 storm water program may incorporate by reference the appropriate SWPPP.

There may be instances where a Non-traditional MS4 has, under the IGP, obtained coverage for the entire facility (rather than only those areas where industrial activities occur) and has developed a SWPPP that addresses all the program elements required by this Order. In these instances, the Non-traditional MS4 is not required to obtain coverage under this Order. The entity should, in such cases, provide to the appropriate Regional Water Board documentation that its SWPPP addresses all program elements.

## XVI.  USE OF PARTNERSHIPS IN MS4 PERMITS

Since the Phase II Rule applies to all small MS4s within an urbanized area regardless of political boundaries it is very likely that multiple governments and agencies within a single geographic area are subject to NPDES permitting requirements. For example, a city government that operates a small MS4 within an urbanized area may obtain permit coverage under this Order while other MS4s in the same vicinity (such as a County, other cities, public university, or military facility) may also be covered under this Order. All MS4s are responsible for permit compliance within their jurisdiction.

Given the potential for overlapping activities in close proximity, the State Water Board encourages MS4s in a geographic area to establish cooperative agreements in implementing their storm water programs, especially with receiving water monitoring. Partnerships and agreements between Permittees and/or other agencies can minimize unnecessary duplication of effort and result in efficient use of available resources.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

*UNOFFICIAL DRAFT — Not Certified by Clerk*

Sharing resources can allow MS4s to focus their efforts on high priority program components. By forming partnerships, water quality can be examined and improved on a consolidated, efficient, watershed-wide scale rather than on a piece-meal, site-by-site basis.

## XVII.  REGIONAL BOARD DESIGNATIONS

Designation of additional Small MS4s outside of Urbanized Areas as Regulated Small MS4s may be made by the Regional Water Boards on a case by case basis. Case by case determinations of designation are based on the potential of a Small MS4's discharges to result in exceedances of water quality standards, including impairment of designated uses, or other significant water quality impacts, including habitat and biological impacts. The tables below includes designations recommend by the Regional Water Boards prior to adoption of this Order. The Regional Water Boards may continue to make case by case determinations of designation during the permit term by notification to the discharger (which shall include a statement of reasons for the designation) and following an opportunity for public review and comment.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

**Traditional Small MS4s**

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Crescent City | Del Norte | 1 | 7500 population and in urbanized area |
| Bayview CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of these areas is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Cutten CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Humboldt Hill CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Myrtletown CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Pine Hills CDP | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Ridgewood Heights USSA | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of these areas is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |
| Rosewood USSA | Humboldt | 1 | Adjacent to, but outside of Eureka city limits located in southern Humboldt Bay, in unincorporated Humboldt County. Designation of this area is needed to address pollutant sources of urbanized and urbanizing areas within 303(d) listed watersheds |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Cloverdale CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Forestville CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Guerneville CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Monte Rio | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Occidental CDP | Sonoma | 1 | There are urbanized areas within the County of Sonoma not covered under the Phase I Permit. These areas are located within the Russian River watershed, a 303(d) listed watershed.  Currently, there is only limited storm water management in these areas, allowing the discharge of pollutants to the impacted water body. Storm water management is needed in these areas to reduce the pollutant loads and for early TMDL implementation |
| Yreka City | Siskiyou | 1 | Discharges to a TMDL listed waterbody and identified on Attachment G |
| Gonzalez City | Monterey | 3 | Greater than 5,000 population |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Moss Landing CDP | Monterey | 3 | Proximity to ocean areas (Monterey Bay National Marine Sanctuary, including Elkhorn slough) |
| Blacklake CDP | San Luis Obispo | 3 | Proximity to urbanized area (Oceano, Arroyo Grande, Grover Beach and Nipomo) |
| Cayucos CDP | San Luis Obispo | 3 | Greater than 2,000 population and proximity to Pacific Ocean |
| Lake Nacimiento CDP | San Luis Obispo | 3 | Greater than 2,000 population and proximity to Lake Nacimiento (drinking water source) |
| San Miguel | San Luis Obispo | 3 | Greater than 2,000 population High Growth Rate (16.8%) |
| Shandon CDP | San Luis Obispo | 3 | High Growth Rate (31.3%) |
| Guadalupe City | Santa Barbara | 3 | Incorporated area exceeding 5,000 population |
| Hope Ranch CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Mission Canyon CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Mission Hills CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Toro Canyon CDP | Santa Barbara | 3 | Proximity to urbanized area |
| Live Oak CDP | Santa Cruz | 3 | Greater than 5,000 population Discharges to a TMDL listed waterbody and identified on Attachment G |
| City of Avalon | Los Angeles | 4 | Proximity to sensitive water body |
| Colusa County | Colusa | 5S | Discharges to a TMDL listed waterbody and identified on Attachment G |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place name | County | Regional Board | Justification |
|---|---|---|---|
| Amador County | Amador | 5S | Currently, there is only limited storm water management in this area, allowing discharge of pollutants to waters of the State already impacted with multiple constituents and parameters.  Storm water management is needed in these areas to reduce the pollutant loads prior to adoption of any TMDLs, which are typically not estimated to be completed until 2020 or thereafter in many cases. <br><br> Additionally, several waterbodies or waterbody segments within or bounding Amador County are 303(d) listed for invasive species (Cosumnes River, above Michigan Bar), mercury (Pardee Reservoir, Camanche Reservoir), pH - High (Amador Lake, Bear River from Allen to Upper Bear River Reservoir), copper (Camanche Reservoir), and zinc (Camanche Reservoir) according to the 2010 CWA 303(d) list. Camanche Reservoir drains to Lower Mokelumne River. The Lower Mokelumne River (in Delta Waterways, eastern portion) is 303(d)  listed for chlorpyrifos, copper, mercury, dissolved oxygen, unknown toxicity, and zinc. Both the Cosumnes and Mokelumne Rivers drain to the San Joaquin River, which is 303(d) listed for these same constituents and parameters. Many of these constituents are known to bind to various size sediment particles migrating into surface waters. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

**Non-Traditional Small MS4s**

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| Petaluma Coast Guard Training Center | Defense, Department of | 1 | Activities that could impact water quality, fueling, maintenance. Personnel that should be educated on how their activities effect water quality. |
| Alameda-Contra Costa Transit District (AC Transit) | Special District | 2 | The Alameda-Contra Costa Transit District (AC Transit) is a large special transit district like the Valley Transit Authority (VTA) and BART which are both already designated. In order to fully regulate both large bus storage and maintenance facilities and new development related to bus stops and plazas they need to be fully regulated under the Phase II stormwater permit, as they do not fall under the local city regulatory jurisdiction for all aspects of their operations. |
| AMTRAK | Special District | 2 | Within urbanized area |
| Bay Area Rapid Transit | Special District | 2 | Within urbanized area |
| CalTrain | Special District | 2 | Within urbanized area |
| Golden Gate Bridge, Highway and Transportation District | Special District | 2 | Within urbanized area |
| Valley Transit Authority | Special District | 2 | Within urbanized area |
| Port of Oakland | Port | 2 | Within urbanized area |
| Port of Redwood City | Port | 2 | Within urbanized area |
| San Jose Airport | Airport | 2 | Within urbanized area |
| Oceano Community Services District | Community Services District | 3 | Within urbanized area |
| Fort Ord Reuse Authority | Local Agency | 3 | Adjacent to urbanized area, Planned annexation into urbanized area |
| Fort Hunter Ligget, Army Garrison | Defense, Department of | 3 | Within urbanized area |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| March Air Reserve Base | Defense, Department of | 8 | The former March Air Reserve Base was downsized and became known as March ARB. March ARB is an active military base that covers 2,300 acres. Activities in the base proper includes military activities such as air refueling, air cargo, air reconnaissance, military interceptors, military housing, recreational and dining facilities, commercial air cargo, training facilities, schools, operations centers for troop transport and industrial, including airport operations. Land use activities are under Base commander authority. The base is currently covered under an individual industrial storm water permit for their industrial operations and is a stakeholder under the Lake Elsinore/Canyon Lake TMDL. In addition to industrial permit monitoring, the Base monitors their compliance with the TMDL. We believe Phase II permit coverage is an appropriate permit to address the pollutants and flows generated from Base operations. Development and redevelopment post construction controls are of particular importance to be incorporated into the base's storm water program through Phase II permit coverage. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| March Joint Powers Authority[1] | March Joint Powers Commission | 8 | The March JPA is a federally recognized reuse authority for the former March Air Force base. It encompasses most of the 6, 500 acres of the former active duty March Air Force Base area and approximately 450 acres adjacent to the base in the industrial area of the City of Moreno Valley. March JPA also assumed the following authorities: <br> 1 - Land Use Authority - Land use authority was transferred to March JPA from the County of Riverside, City of Riverside, and City of Moreno Valley. The March JPA has adopted development and building codes and standards. The March JPA General Plan has been developed by the March JPA in accordance with state statutes, as well as the associated Master Environmental Impact Report. The March JPA General Plan is designed to implement the March Final Reuse Plan and related activities. <br> 2 - Airport Authority - March Inland Port Airport Authority (MIPAA), is a governing body under the governance umbrella of the March JPA. MIPAA is responsible for the development and operation of the March Inland Port (MIP), a joint use aviation facility targeted for air cargo operations. <br> The developments approved by the March JPA to date included residential, commercial and industrial sources of pollutants. About 1/8th of the area has been developed. March JPA has the authority to develop its own MS4s within their jurisdiction and connect to MS4s owned/operated by Phase 1 permittees. Many of the functions resemble that of a local agency. Therefore, March JPA should be subject to the Phase II (or they can join our Phase 1). |

---

[1]  Note: This discharger was not designated in the final version of Attachment B of the Order adopted by the Board on February 5, 2013.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| Miramar Marine Corps Air Station | Defense, Department of | 9 | Within urbanized area |
| General Services Administration Facilities (GSA)[2] | Federal Facility | 9 | The site is the General Services Administration Facilities (GSA), located at 801 E. San Ysidro Blvd., San Ysidro, CA 92173 and is a federal facility. They are the owner and operator of a series of lateral drains which tie into a main open- trunk running and discharging along the border fence. They are responsible for the storm drains, including the new trunk slated for construction, and the entire system acts as a MS4. Additionally, GSA is the landlord of the world's busiest Land Port of Entry (LPOE). Located between San Diego and Tijuana, the San Ysidro LPOE supports 24 northbound vehicle lanes into the United States and six southbound lanes into Mexico. Every day, this land port serves over 50,000 northbound vehicles and 25,000 northbound pedestrians. GSA maintains border crossing services, as well as increasing efficiency, security, and safety for federal agencies and the traveling public. Looking to the future, the San Ysidro LPOE is undergoing a major expansion that will include a new northbound inspection facility, primary vehicle inspection booths, secondary inspection area, administration space, and a pedestrian processing facility. A new southbound inspection facility will also be developed, and Interstate 5 will be shifted to the west to align with Mexico's planned use of a reconstructed entry facility at the vacant Virginia Avenue/El Chaparral commercial facility. |

---

[2] Note: This discharger was not designated in the final version of Attachment B of the Order adopted by the Board on February 5, 2013.

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

UNOFFICIAL DRAFT — Not Certified by Clerk

| Place name | Category | Regional Board | Justification |
|---|---|---|---|
| Metropolitan Transit System (MTS) | Transportation Agency | 9 | The Metropolitan Transit Development Board (MTDB) was created in 1975 by the passage of California Senate Bill 101 and came into existence on January 1, 1976. In 2005, MTDB changed its name to the Metropolitan Transit System (MTS). MTS licenses and regulates taxicabs, jitneys, and other private for-hire passenger transportation services by contract with the cities of San Diego, El Cajon, Imperial Beach, La Mesa, Lemon Grove, Poway, and Santee.MTS provides bus and rail services directly or by contract with public or private operators. MTS determines the routing, stops, frequency of service, and hours of operation for its existing services. MTS does a significant amount of their vehicles' maintenance. |
| North County Transit District (NCTD) | Transportation Agency | 9 | North county Transit district (NCTD) owns and operates the Sprinter Rail located along 22 miles of the rail corridor (see attached file) and adjacent staging areas within the Cities of Oceanside, Vista, San Marcos and Escondido and within the County of San Diego. The project's totaldisturbed acreage is approximately 280 acres. Storm water runoff from the project discharges directly into Waters of the State, the Municipal Separate Storm Sewer System (MS4) and, ultimately discharging to Loma Alta Creek, Buena Vista Creek, Buena Creek, San Marcos Creek, Escondido Creek and unmanned tributaries. Beginning October 2007, during construction, the San Diego Water Board hadidentified significant violations of the Stormwater Permit (99-08- DWQ). NCTD threatens to continue to discharge waste (e.g. sediment and sediment-laden water) in violation of the Basin Plan Prohibitions. |

Small MS4 General Permit WQ Order 2013-0001-DWQ as amended by Orders
WQ 2015-0133-EXEC, WQ 2016-0069-EXEC, WQ 2018-0001-EXEC, and WQ 2018-0007-EXEC

EXHIBIT C

# THE WATER QUALITY CONTROL PLAN (BASIN PLAN)

## FOR THE

## CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD

## CENTRAL VALLEY REGION

### FIFTH EDITION
Revised February 2019 (with Approved Amendments)

### THE SACRAMENTO RIVER BASIN AND
### THE SAN JOAQUIN RIVER BASIN



## CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
## CENTRAL VALLEY REGION

Karl E. Longley, Chair
Denise Kadara, Vice-Chair
Mark Bradford, Member
Raji Brar, Member
Daniel B. Marcum, Member
Carmen L. Ramirez, Member

Patrick Pulupa, Executive Officer

COVER PHOTO ACKNOWLEDGMENTS:
Rafting the American River: Rapid Shooters, Lotus CA          Sunset Waterfowl: David Rosen/ Ducks Unlimited
Yosemite: David Rosen/ Ducks Unlimited          Sugar Beets: Brenda Grewell/ Dept. of Water Resource

Basin plan amendments adopted by the Regional Central Valley Water Board must be approved by the State Water Board and the Office of Administrative Law before becoming effective. If the amendment involves adopting or revising a standard which relates to surface waters it must also be approved by the U.S. Environmental Protection Agency (USEPA) before becoming effective. However, standards revisions disapproved by USEPA prior to 30 May 2000 remain in effect until they are revised by the basin planning process, or USEPA promulgates its own rule to supersede the standard revision [40 CFR Section 131.21(c)]

Each version of the Basin Plan includes all amendments that are in effect as of the date of the version. It is the intent of the Central Valley Water Board to release updated editions of the Basin Plan as soon as adopted amendments are approved and in effect

The following are all the amendments adopted by the Regional Water Board since 1975, that are now in effect:

| | Subject | Date Adopted By Reg. Bd. | Regional Board Resolution No. | Date in Effect |
|---|---|---|---|---|
| 1. | Adopting Water Quality Control Plans for Sacramento River Basin, Sacramento-San Joaquin Delta Basin, San Joaquin River Basin and Tulare Lake Basin | 7/25/1975 | R5-1975-0185 | 8/21/1975 |
| 2. | Revision and Amendment of the Water Quality Control Plan, Sacramento River Basin, by the Addition of a Prohibition of Waste Discharge from Leaching and Percolation Systems within the Adin Community Services District, Modoc County | 11/21/1975 | R5-1975-0272 | 1/22/1976 |
| 3. | Revision and Amendment of the Water Quality Control Plan, Sacramento River Basin, by the Addition of a Prohibition of Waste Discharge from Leaching and Percolation Systems within the Community of Fall River Mills, a portion of the Fall River Mills Community Services District, Shasta County | 11/21/1975 | R5-1975-0273 | 1/22/1976 |
| 4. | Revision and Amendment of the Water Quality Control Plan, Sacramento River Basin, by the Addition of a Prohibition of Waste Discharge from Leaching and Percolation Systems within the Bell Road Community (including Panorama and Pearl Subdivisions) Auburn, Placer County | 11/21/1975 | R5-1975-0274 | 1/22/1976 |

| Subject | Date Adopted By Reg. Bd. | Regional Board Resolution No. | Date in Effect |
|---|---|---|---|
| 5. Revision and Amendment of the Water Quality Control Plan, Sacramento River Basin, by the Addition of a Prohibition of Waste Discharge from Leaching and Percolation Systems within the Communities of Nice and Lucerne, Lake County | 2/27/1976 | R5-1976-0058 | 4/15/1976 |
| 6. Revision and Amendment of the Water Quality Control Plan, Sacramento-San Joaquin Delta Basin, by the Addition of a Prohibition of Waste Discharge from Leaching and Percolation Systems within the Courtland Sanitation District, Sacramento County | 2/27/1976 | R5-1976-0059 | 4/15/1976 |
| 7. Revision and Amendment of the Water Quality Control Plan, San Joaquin River Basin, by the Addition of a Prohibition of Waste Discharge from Leaching and Percolation Systems within Six-Mile Village, Calaveras County | 2/27/1976 | R5-1976-0060 | 4/15/1976 |
| 8. Revision and Amendment of the Water Quality Control Plan, Sacramento River Basin, by the Addition of a Prohibition of Waste Discharge from Leaching and Percolation Systems within the Communities of Clearlake Highlands and Clearlake Park, Lake County | 3/26/1976 | R5-1976-0089 | 5/20/1976 |
| 9. Revision and Amendment of the Water Quality Control Plan, Sacramento River Basin, by the Addition of a Prohibition of Waste Discharge from Leaching and Percolation Systems within the Taylorville County Service Area, Plumas County | 5/28/1976 | R5-1976-0129 | 8/19/1976 |
| 10. Revision and Amendment of the Water Quality Control Plan, Sacramento River Basin, by the Addition of a Prohibition of Waste Discharge from Leaching and Percolation Systems within the Community of South Lakeshore Assessment District, Lake County | 9/24/1976 | R5-1976-0215 | 4/21/1977 |

| Subject | Date Adopted By Reg. Bd. | Regional Board Resolution No. | Date in Effect |
|---|---|---|---|
| 11. Revision and Amendment of the Water Quality Control Plan, Sacramento River Basin, by the Addition of a Prohibition of Waste Discharge from Leaching and Percolation Systems within the Anderson-Cottonwood Irrigation District, Community of Cottonwood, Shasta County | 10/22/1976 | R5-1976-0230 | 1/20/1977 |
| 12. Revision and Amendment of the Water Quality Control Plan, Sacramento River Basin, by the Addition of a Prohibition of Waste Discharge from Leaching and Percolation Systems within the Daphnedale Area, Modoc County | 10/22/1976 | R5-1976-0231 | 1/20/1977 |
| 13. Amending the Water Quality Control Plan for Sacramento River Basin, Sacramento-San Joaquin Delta Basin, and San Joaquin River Basin | 12/17/1976 | R5-1976-0262 | 2/17/1977 |
| 14. Amending the Water Quality Control Plan for Removal of Waste Discharge Prohibition for Woods Creek, Tuolumne County | 5/27/1977 | R5-1977-0097 | 7/21/1977 |
| 15. Adoption of Amendments to the Water Quality Control Plan | 6/22/1979 | R5-1979-0149 | 8/16/1979 |
| 16. Adoption of Amendments to the Water Quality Control Plan | 7/27/1979 | R5-1979-0180 | 8/16/1979 |
| 17. Adoption of Amendments to the Water Quality Control Plan for Groundwater Management in N.E. Fresno County and Surface Water Runoff Management in Solano County | 9/28/1979 | R5-1979-0220 | 10/18/1979 |

| Subject | Date Adopted By Reg. Bd. | Regional Board Resolution No. | Date in Effect |
|---|---|---|---|
| 18. Adoption of Amendments to the Water Quality Control Plan for Wastewater Management in the Communities of Paradise and Magalia in Butte County and Erosion Control and Creek Bed Management in Lake County and Wastewater Management in the Lake Yosemite Area of Merced County and Erosion Control and Wastewater Management in Mariposa County | 12/14/1979 | R5-1979-0255 | 2/21/1980 |
| 19. Adoption of Amendments to the Water Quality Control Plan for Best Management Practices for Control of Erosion from Land Development Activities in Shasta County and Best Management Practices for Control of Erosion and Use of Individual Wastewater Disposal Systems in Nevada County | 12/5/1980 | R5-1980-0219 | 2/19/1981 |
| 20. Amending the Water Quality Control Plan for Removal of Waste Discharge Prohibition for Jackson Creek above Jackson Creek Reservoir, Amador County | 1/28/1983 | R5-1983-0018 | 4/21/1983 |
| 21. Adoption of an Amendment to Part I of the Water Quality Control Plans for the Sacramento River, Sacramento-San Joaquin Delta, San Joaquin River, and Tulare Lake Basins for Land Disposal of Stillage Waste from Wineries | 8/12/1983 | R5-1983-0105 | 12/15/1983 |
| 22. Amending the Water Quality Control Plan for Guidelines for Protection of Water Quality During Construction and Operation of Small Hydro Projects | 10/28/1983 | R5-1983-0135 | 3/15/1984 |
| 23. Amending the Water Quality Control Plan for Water Quality Objectives for Copper (Cu), Zinc (Zn) and Cadmium (Cd) in the Upper Sacramento River Basin | 4/27/1984 | R5-1984-0054 | 8/16/1984 |

| Subject | Date Adopted By Reg. Bd. | Regional Board Resolution No. | Date in Effect |
|---|---|---|---|
| 24. Revision and Amendment of the Water Quality Control Plan, Sacramento River Basin, by the Addition of Prohibition of Waste Discharge from Individual Disposal Systems in the Chico Urban Area, Butte County | 10/27/1988 | R5-1988-0177 | 10/19/1989 |
| 25. Adoption of Amendments to the Water Quality Control Plan for the San Joaquin River Basin | 12/8/1988 | R5-1988-0195 | 9/21/1989 |
| 26. Amendment of the Water Quality Control Plan for the Sacramento River, Sacramento-San Joaquin Delta, and San Joaquin Basins | 3/31/1989 | R5-1989-0056 | 3/22/1990 |
| 27. Amendment of the Water Quality Control Plan for the Sacramento River, Sacramento-San Joaquin Delta, and San Joaquin Basins | 1/26/1990 | R5-1990-0028 | 2/15/1990 |
| 28. Revision of the Water Quality Control Plan, Sacramento River Basin, by the Addition of Prohibition of Waste Discharge from Individual Disposal Systems in the Chico Urban Area, Butte County | 4/27/1990 | R5-1990-0126 | 7/19/1990 |
| 29. Water Quality Control Plan Amendment for City of West Sacramento Wet Weather Municipal Waste Discharge, Yolo County | 11/22/1991 | R5-1991-0207 | 5/18/1992 |
| 30. Amendment of the Water Quality Control Plan for the Sacramento River, Sacramento-San Joaquin Delta, and San Joaquin Basins | 12/9/1994 | R5-1994-0380 | 5/9/1995 |
| 31. Amending the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins to include Compliance Schedules | 5/26/1995 | R5-1995-0142 | 9/25/1995 |
| 32. Amending the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins to Address the Control of Agricultural Subsurface Drainage | 5/3/1996 | R5-1996-0147 | 1/10/1997 |

| Subject | Date Adopted By Reg. Bd. | Regional Board Resolution No. | Date in Effect |
|---|---|---|---|
| 33. Adoption of Site Specific Water Quality Objectives for pH and Turbidity for Deer Creek in El Dorado County | 7/19/2002 | R5-2002-0127 | 10/21/2003 |
| 34. Adoption of Corrective Language Adoption of a Control Program for Mercury in Clear Lake, including COMM use for Clear Lake and Mercury Objectives for Fish Tissue | 9/6/2002 | R5-2002-0151 | 1/27/2004 |
| 35. Adoption of a Control Program for Mercury in Clear Lake, including COMM use for Clear Lake and Mercury Objectives for Fish Tissue | 12/6/2002 | R5-2002-0207 | 10/2/2003 |
| 36. Adoption of a Control Program for Orchard Pesticide Runoff and Diazinon Runoff into the Sacramento and Feather Rivers, including Site-Specific Water Quality Objectives for Diazinon | 10/16/2003 | R5-2003-0148 | 8/11/2004 |
| 37. Adoption of Site-specific Temperature Objectives for Deer Creek in El Dorado and Sacramento Counties | 1/31/2003 9/16/2005 | R5-2003-0006 R5-2005-0119 | 5/17/2006 |
| 38. Amendment for the Control of Salt and Boron Discharges into the Lower San Joaquin River | 9/10/2004 | R5-2004-0108 | 7/28/2006 |
| 39. Amendment to De-Designate Four Beneficial Uses of Old Alamo Creek, Solano County | 4/28/2005 | R5-2005-0053 | 8/7/2006 |
| 40. Amendment for the Control Program for Factors Contributing to the Dissolved Oxygen Impairment in the Stockton Deep Water Ship Channel | 1/27/2005 | R5-2005-0005 | 8/23/2006 |
| 41. Amendment for the Control of Diazinon and Chlorpyrifos Runoff into the San Joaquin River | 10/21/2005 | R5-2005-0138 | 12/20/2006 |
| 42. Amendment for the Control of Mercury in Cache creek, Bear Creek, Sulphur Creek and Harley Gulch | 10/21/2005 | R5-2005-0146 | 2/6/2007 |

| Subject | Date Adopted By Reg. Bd. | Regional Board Resolution No. | Date in Effect |
|---|---|---|---|
| 43. Amendment for the Control of Nutrients in Clear Lake | 6/23/2006 | R5-2006-0060 | 7/12/2007 |
| 44. Amendment for the Control of Diazinon and Chlorpyrifos Runoff into the Sacramento-San Joaquin Delta | 6/23/2006 | R5-2006-0061 | 10/10/2007 |
| 45. Amendment for the Control of Diazinon and Chlorpyrifos Runoff into the Sacramento and Feather Rivers | 5/3/2007 | R5-2007-0034 | 8/11/2008 |
| 46. Amendment to Revise Water Quality Objectives for pH and Turbidity | 10/25/2007 | R5-2007-0136 | 7/7/2009 |
| 47. Amendment to Determine Certain Beneficial Uses are not Applicable and Establish Water Quality Objectives in Sulphur Creek, Colusa County | 3/16/2007 | R5-2007-0021 | 9/4/2009 |
| 48. Non-Regulatory Amendments to Correct Editing Errors and Update Language | 8/13/2009 | R5-2009-0069 | 5/18/2011 |
| 49. Amendments to Control Methylmercury and Total Mercury in the Sacramento-San Joaquin Delta Estuary | 4/22/2010 | R5-2010-0043 | 10/20/2011 |
| 50. Non-Regulatory Amendments to Provide a Cost Estimate and Potential Sources of Financing for a Long-Term Irrigated Lands Program | 10/13/2011 | R5-2011-0075 | 12/14/2012 |
| 51. Amendments to Establish Site-Specific Water Quality Objectives for Chloroform, Chlorodibromomethane, and Dichlorobromomethane for New Alamo and Ulatis Creeks, Solano County, and Permit Implementation Provisions | 5/27/2010 | R5-2010-0047 | 4/9/2013 [*] |
| 52. Amendments for the Control of Selenium in the Lower San Joaquin River Basin | 5/27/2010 | R5-2010-0046 | 11/7/2013 |

---

[*] For R5-2010-0047, U.S. Environmental Protection Agency specifically did not approve the implementation provisions.

| Subject | Date Adopted By Reg. Bd. | Regional Board Resolution No. | Date in Effect |
| --- | --- | --- | --- |
| 53. Amendment to Establish a Drinking Water Policy for Surface Waters of the Delta and Its Upstream Tributaries | 7/26/2013 | R5-2013-0098 | 11/20/2014 |
| 54. Amendments to the Water Quality Control Plans for the Sacramento River and San Joaquin River Basins and the Tulare Lake Basin Regarding Onsite Wastewater System Implementation Program | 3/27/2014 | R5-2014-0036 | 1/26/2015 |
| 55. Amendments to Edit and Update Language | 3/27/2014 | R5-2014-0037 | 1/26/2015 |
| 56. Amendment to Provide a Groundwater Regulatory Framework Towards Closure of the Royal Mountain King Mine Site, Calaveras County | 3/28/2014 | R5-2014-0047 | 6/17/2015 |
| 57. Amendment to Remove the Municipal and Domestic Supply (MUN) Beneficial Use in Twelve Constructed and/or Modified Water Bodies in the Sacramento River Basin that Receive Treated Municipal Wastewater from the Cities of Biggs, Colusa, Live Oak or Willows | 4/16/2015 | R5-2015-0022 | 4/21/2016 |
| 58. Amendments to the Water Quality Control Plans for the Sacramento River and San Joaquin River Basins and the Tulare Lake Basin to Add Policies for Variances from Surface Water Quality Standards for Point Source Dischargers, Variance Program for Salinity, and Exception from Implementation of Water Quality Objectives for Salinity | 6/6/2014 | R5-2014-0074 | 7/8/2016 |
| 59. Amendment to the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins for the Control of Diazinon and Chlorpyrifos Discharges | 3/28/2014 | R5-2014-0041 | 8/16/2017 |

| Subject | Date Adopted By Reg. Bd. | Regional Board Resolution No. | Date in Effect |
|---|---|---|---|
| 60. Amendment to the Water Quality Control Plan for the Sacramento River Basin and the San Joaquin River Basin to Add Electrical Conductivity Water Quality Objectives in the San Joaquin River Between the Mouth of the Merced River and the Airport Way Bridge Near Vernalis | 6/9/2017 | R5-2017-0062 | 4/19/2018 |
| 61. Amendments to Reformat the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins and Water Quality Control Plan for the Tulare Lake Basin | 10/20/2017 | R5-2017-0106 | 5/24/2018 |
| 62. Amendment to the Water Quality Control Plans for the Sacramento River and San Joaquin River Basins for the Control of Pyrethroid Pesticide Discharges | 6/8/2017 | R5-2017-0057 | 2/19/2019 |

# Table of Contents

i    Foreword to the Fourth Edition (1998) ...........................................................i
1    Introduction .........................................................................1-1
  1.1    Basin Description ..............................................................1-1
    1.1.1    Sacramento River Basin ..............................................1-1
    1.1.2    San Joaquin River Basin .............................................1-2
2    Existing and Potential Beneficial Uses .......................................2-1
  2.1    Surface Waters ................................................................2-3
  2.2    Ground Waters ................................................................2-3
    2.2.1    Beneficial Use De-designations ...................................2-4
3    Water Quality Objectives .......................................................3-1
  3.1    Water Quality Objectives for Inland Surface Waters ...........3-3
    3.1.1    Bacteria ....................................................................3-3
    3.1.2    Biostimulatory Substances .........................................3-3
    3.1.3    Chemical Constituents ...............................................3-3
    3.1.4    *Cryptosporidium* and *Giardia* ......................................3-6
    3.1.5    Color ........................................................................3-6
    3.1.6    Dissolved Oxygen .....................................................3-6
    3.1.7    Floating Material .......................................................3-7
    3.1.8    Mercury ....................................................................3-7
    3.1.9    Methylmercury ..........................................................3-7
    3.1.10   Oil and Grease .........................................................3-8
    3.1.11   pH ...........................................................................3-8
    3.1.12   Pesticides ................................................................3-8
    3.1.13   Radioactivity ............................................................3-11
    3.1.14   Salinity ....................................................................3-12
    3.1.15   Sediment .................................................................3-13
    3.1.16   Settleable Material ....................................................3-13
    3.1.17   Suspended Material ..................................................3-13
    3.1.18   Tastes and Odors .....................................................3-13
    3.1.19   Temperature ............................................................3-14
    3.1.20   Toxicity ....................................................................3-15
    3.1.21   Turbidity ..................................................................3-15
  3.2    Water Quality Objectives for Ground Waters ..................3-16
    3.2.1    Bacteria ....................................................................3-16
    3.2.2    Chemical Constituents ...............................................3-17
    3.2.3    Radioactivity ............................................................3-17
    3.2.4    Tastes and Odors .....................................................3-17
    3.2.5    Toxicity ....................................................................3-17

4      Implementation ................................................................................................ 4-1

  4.1    Water Quality Concerns .............................................................................. 4-1

    4.1.1   Agriculture ..................................................................................... 4-2

    4.1.2   Silviculture ..................................................................................... 4-4

    4.1.3   Municipalities and Industries ........................................................ 4-4

    4.1.4   Storm Water .................................................................................. 4-5

    4.1.5   Mineral Exploration and Extraction ............................................... 4-5

    4.1.6   Hazardous and Non-Hazardous Waste Disposal .......................... 4-6

    4.1.7   Contaminated Sites Threatening Ground Water Quality ................ 4-7

    4.1.8   Drinking Water Policy .................................................................... 4-7

    4.1.9   Other Discharge Activities ............................................................ 4-9

    4.1.10  Water Bodies with Special Water Quality Problems .................... 4-10

  4.2    The Nature of Control Actions Implemented by The Regional Water Board ........... 4-10

    4.2.1   Control Action Considerations of the State Water Board ............. 4-11

    4.2.2   Control Action Considerations of the Central Valley Regional Water Board ........ 4-21

  4.3    Actions Recommended for Implementation by Other Entities ................................. 4-56

    4.3.1   Recommended for Implementation by the State Water Board ............ 4-57

    4.3.2   Recommended for Implementation by Other Agencies ................. 4-59

  4.4    Continuous Planning for Implementation of Water Quality Control ........................ 4-63

  4.5    Actions and Schedule to Achieve Water Quality Objectives ............................... 4-63

    4.5.1   Agricultural Drainage Discharges in the San Joaquin River Basin ...................... 4-64

    4.5.2   Assessment of Biotoxicity of Major Point and Nonpoint Source Discharges in the Sacramento River and San Joaquin River Basins ................................................. 4-77

    4.5.3   Heavy Metals From Point and Nonpoint Sources ................................................. 4-78

    4.5.4   Mercury Discharges in the Sacramento River and San Joaquin River Basins ..... 4-79

    4.5.5   Pesticide Discharges ........................................................................................... 4-118

    4.5.6   Dredging in the Sacramento River and San Joaquin River Basins .................... 4-136

    4.5.7   Nitrate Pollution of Ground Water in the Sacramento and San Joaquin River Basins 4-137

    4.5.8   Temperature and Turbidity Increases Below Large Water Storage and Diversion Projects in the Sacramento River Basin ............................................................. 4-137

    4.5.9   Control Program for Factors Contributing to the Dissolved Oxygen Impairment in the Stockton Deep Water Ship Channel (DWSC) (Regional Water Board Resolution No. R5-2005-0005) .................................................................................................. 4-137

    4.5.10  Clear Lake Nutrients ........................................................................................ 4-140

    4.5.11  Point Source Discharges Containing Trihalomethanes Lower New Alamo and Ulatis Creeks ............................................................................................................... 4-142

  4.6    Estimated Costs of Agricultural Water Quality Control Programs and Potential Sources of Financing ............................................................................................................ 4-143

    4.6.1   San Joaquin River Subsurface Agricultural Drainage Control Program ............. 4-143

    4.6.2   Lower San Joaquin River Salt and Boron Control Program ............................... 4-144

    4.6.3   Pesticide Control Program ................................................................................ 4-144

4.6.4    Sacramento and Feather Rivers Diazinon and Chlorpyrifos Runoff Control Program 4-144

4.6.5    San Joaquin River Dissolved Oxygen Control Program ..................................... 4-145

4.6.6    Diazinon and Chlorpyrifos Runoff into the San Joaquin River Control Program. 4-145

4.6.7    Diazinon and Chlorpyrifos Runoff into the Sacramento-San Joaquin Delta Waterways ........................................................................................................... 4-145

4.6.8    Clear Lake Nutrient Control Program ................................................................. 4-146

4.6.9    Delta Mercury Control Program.......................................................................... 4-146

4.6.10  Long-Term Irrigated Lands Regulatory Program ............................................... 4-146

4.6.11  Drinking Water Policy ......................................................................................... 4-147

4.6.12  Diazinon and Chlorpyrifos Discharges .............................................................. 4-147

4.6.13  Pyrethroid Pesticides Discharges into Sacramento River and San Joaquin River Basin Waters .................................................................................................... 4-147

5        Surveillance and Monitoring ...................................................................................... 5-1

5.1      Data Collected by Other Agencies................................................................................ 5-1

5.2      Regional Water Board and State Water Board Monitoring Programs ....................... 5-2

5.3      Special Studies .......................................................................................................... 5-2

5.4      Aerial Surveillance .................................................................................................... 5-3

5.5      Self-Monitoring .......................................................................................................... 5-3

5.6      Compliance Monitoring............................................................................................... 5-3

5.7      Complaint Investigation ............................................................................................. 5-3

5.8      Mercury and Methylmercury ..................................................................................... 5-3

5.8.1    Clear Lake ...................................................................................................... 5-4

5.8.2    Cache Creek, Bear Creek, Harley Gulch, and Sulphur Creek ...................... 5-4

5.8.3    Delta ............................................................................................................... 5-5

5.9      Diazinon and Chlorpyrifos Runoff into the Sacramento and Feather Rivers ............. 5-7

5.10     Diazinon and Chlorpyrifos Runoff in the San Joaquin River Basin........................... 5-7

5.11     Diazinon and Chlorpyrifos Runoff into the Sacramento-San Joaquin Delta Waterways ................................................................................................................. 5-8

5.12     Clear Lake Nutrients................................................................................................. 5-9

5.13     Drinking Water Policy ............................................................................................... 5-9

5.13.1  *Cryptosporidium* and *Giardia* Monitoring ..................................................... 5-9

5.13.2  Organic carbon, salinity, and nutrients ........................................................ 5-10

5.14     Diazinon and Chlorpyrifos Discharges..................................................................... 5-10

5.14.1  Agricultural Discharge Monitoring ................................................................. 5-10

5.14.2  Municipal Storm Water and Municipal and Domestic Wastewater Monitoring ..... 5-11

5.15     Salt and Boron Discharges into the Lower San Joaquin River................................. 5-11

5.16     Pyrethroid pesticides discharges .............................................................................. 5-12

5.16.1  Municipal Storm Water ................................................................................. 5-13

5.16.2  Discharges from Agricultural Operations ...................................................... 5-14

5.16.3  Municipal and Domestic Wastewater ............................................................ 5-15

6    Glossary ................................................................................................. 6-1

Regional Water Board: California Regional Water Quality Control Board, Central Valley
       Region (Wat. Code, § 13203) ............................................................ 6-1

State Water Board: State Water Resources Control Board ............................... 6-1

# I    Foreword to the Fourth Edition (1998)

The preparation and adoption of water quality control plans (Basin Plans) is required by the California Water Code (Section 13240) and supported by the Federal Clean Water Act. Section 303 of the Clean Water Act requires states to adopt water quality standards which "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." According to Section 13050 of the California Water Code, Basin Plans consist of a designation or establishment for the waters within a specified area of beneficial uses to be protected, water quality objectives to protect those uses, and a program of implementation needed for achieving the objectives. State law also requires that Basin Plans conform to the policies set forth in the Water Code beginning with Section 13000 and any state policy for water quality control. Since beneficial uses, together with their corresponding water quality objectives, can be defined per federal regulations as water quality standards, the Basin Plans are regulatory references for meeting the state and federal requirements for water quality control (40 CFR 131.20). One significant difference between the state and federal programs is that California's basin plans establish standards for ground waters in addition to surface waters.

Basin Plans are adopted and amended by Regional Water Boards under a structured process involving full public participation and state environmental review. Basin Plans and amendments thereto, do not become effective until approved by the State Water Resources Control Board (State Water Board). Regulatory provisions must be approved by the Office of Administrative Law. Adoption or revision of surface water standards are subject to the approval of the U.S. Environmental Protection Agency.

Basin Plans complement water quality control plans adopted by the State Water Board, such as the Water Quality Control Plans for Temperature Control and Ocean Waters. It is the intent of the State and Regional Water Boards to maintain the Basin Plans in an updated and readily available edition that reflects the current water quality control program.

This Basin Plan covers the entire Sacramento and San Joaquin River Basins. A separate Basin Plan covers the Tulare Lake Basin. The Basin Plan was first adopted in 1975. In 1989, a second edition was published. The second edition incorporated all the amendments which were adopted and approved since 1975, updated the Basin Plan to include new state policies and programs, restructured and edited the Basin Plan for clarity, and incorporated the results of triennial reviews conducted in 1984 and 1987. The Third Edition - 1994 incorporated all amendments approved between 1989 and 1994, included new state policies and programs, edited and restructured the Basin Plan to make it consistent with other regional and state plans, and substantively amended sections dealing with beneficial uses, objectives, and implementation programs. The current edition (Fourth Edition - 1998) incorporates two new amendments approved since 1994. One amendment deals with compliance schedules in permits and the other addresses agricultural subsurface drainage discharges.

In this Basin Plan, "Regional Water Board" refers to the Central Valley Regional Water Quality Control Board and "State Water Board" refers to the State Water Resources Control Board.

# 1  INTRODUCTION

## 1.1  BASIN DESCRIPTION

This Basin Plan covers the entire area included in the Sacramento and San Joaquin River drainage basins (see maps in pocket* and Figure 2-1). The basins are bound by the crests of the Sierra Nevada on the east and the Coast Range and Klamath Mountains on the west. They extend some 400 miles from the California - Oregon border southward to the headwaters of the San Joaquin River.

*NOTE: The planning boundary between the San Joaquin River Basin and the Tulare Lake Basin follows the southern watershed boundaries of the Little Panoche Creek, Moreno Gulch, and Capita Canyon to boundary of the Westlands Water District. From here, the boundary follows the northern edge of the Westlands Water District until its intersection with the Firebaugh Canal Company's Main Lift Canal. The basin boundary then follows the Main Lift Canal to the Mendota Pool and continues eastward along the channel of the San Joaquin River to the southern boundary of the Little Dry Creek watershed (Hydrologic Subareas No. 540.70 and 545.30) and then follows along the southern boundary of the San Joaquin River drainage basin.

The Sacramento River and San Joaquin River Basins cover about one fourth of the total area of the State and over 30% of the State's irrigable land. The Sacramento and San Joaquin Rivers furnish roughly 51% of the State's water supply. Surface water from the two drainage basins meet and form the Delta, which ultimately drains to San Francisco Bay. Two major water projects, the Federal Central Valley Project and the State Water Project, deliver water from the Delta to Southern California, the San Joaquin Valley, Tulare Lake Basin, the San Francisco Bay area, as well as within the Delta boundaries.

The Delta is a maze of river channels and diked islands covering roughly 1,150 square miles, including 78 square miles of water area. The legal boundary of the Delta is described in Section 12220 of the Water Code (also see Figure 3-1 of this Basin Plan).

Ground water is defined as subsurface water that occurs beneath the ground surface in fully saturated zones within soils and other geologic formations. Where ground water occurs in a saturated geologic unit that contains sufficient permeability and thickness to yield significant quantities of water to wells or springs, it can be defined as an aquifer (USGS, Water Supply Paper 1988, 1972). A ground water basin is defined as a hydrogeologic unit containing one large aquifer or several connected and interrelated aquifers (Todd, *Groundwater Hydrology*, 1980).

Major ground water basins underlie both valley floors, and there are scattered smaller basins in the foothill areas and mountain valleys. In many parts of the Region, usable ground waters occur outside of these currently identified basins. There are water-bearing geologic units within ground water basins in the Region that do not meet the definition of an aquifer. Therefore, for basin planning and regulatory purposes, the term "ground water" includes all subsurface waters that occur in fully saturated zones and fractures within soils and other geologic formations, whether or not these waters meet the definition of an aquifer or occur within identified ground water basins.

## 1.1.1  Sacramento River Basin

The Sacramento River Basin covers 27,210 square miles and includes the entire area drained by the Sacramento River. For planning purposes, this includes all watersheds tributary to the Sacramento River that are north of the Cosumnes River watershed. It also includes the closed basin of Goose Lake and drainage sub-basins of Cache and Putah Creeks.

The principal streams are the Sacramento River and its larger tributaries: the Pit, Feather, Yuba, Bear, and American Rivers to the east; and Cottonwood, Stony, Cache, and Putah Creeks to the west. Major reservoirs and lakes include Shasta, Oroville, Folsom, Clear Lake, and Lake Berryessa.

DWR Bulletin 118-80 identifies 63 ground water basins in the Sacramento watershed area. The Sacramento Valley floor is divided into 2 ground water basins. Other basins are in the foothills or mountain valleys. There are areas other than those identified in the DWR Bulletin with ground waters that have beneficial uses.

## 1.1.2    San Joaquin River Basin

The San Joaquin River Basin covers 15,880 square miles and includes the entire area drained by the San Joaquin River. It includes all watersheds tributary to the San Joaquin River and the Delta south of the Sacramento River and south of the American River watershed. The southern planning boundary is described in the first paragraph of the previous page.

The principal streams in the basin are the San Joaquin River and its larger tributaries: the Cosumnes, Mokelumne, Calaveras, Stanislaus, Tuolumne, Merced, Chowchilla, and Fresno Rivers. Major reservoirs and lakes include Pardee, New Hogan, Millerton, McClure, Don Pedro, and New Melones.

DWR Bulletin 118-80 identifies 39 ground water basins in the San Joaquin watershed area. The San Joaquin Valley floor is divided into 15 separate ground water basins, largely based on political considerations. Other basins are in the foothills or mountain valleys. There are areas other than those identified in the DWR Bulletin with ground waters that have beneficial uses.

### 1.1.2.1    Grassland Watershed

The Grassland watershed is a valley floor sub-basin of the San Joaquin River Basin. The portion of the watershed for which agricultural subsurface drainage policies and regulations apply covers an area of approximately 370,000 acres and is bounded on the north by the alluvial fan of Orestimba Creek and by the Tulare Lake Basin to the south. The San Joaquin River forms the eastern boundary and Interstate Highway 5 forms the approximate western boundary. The San Joaquin River forms a wide flood plain in the region of the Grassland watershed.

The hydrology of the watershed has been irreversibly altered due to water projects and is presently governed by land uses. These uses are primarily, managed wetlands and agriculture. The wetlands form important waterfowl habitat for migratory waterfowl using the Pacific Flyway. The alluvial fans of the western and southern portions of the watershed contain salts and selenium which can be mobilized through irrigation practices and can impact beneficial uses of surface waters and wetlands if not properly regulated.

### 1.1.2.2    Lower San Joaquin River Watershed and Subareas

Technical descriptions of the Lower San Joaquin River (LSJR) and its component subareas are contained in Appendix 41. General descriptions follow: The LSJR watershed encompasses approximately 4,580 square miles in Merced County and portions of Fresno, Madera, San Joaquin, and Stanislaus counties. For planning purposes, the LSJR watershed is defined as the area draining to the San Joaquin River downstream of the Mendota Dam and upstream of the Airport Way Bridge near Vernalis, excluding the areas upstream of dams on the major Eastside reservoirs: New Don Pedro, New Melones, Lake McClure, and similar Eastside reservoirs in the LSJR system. The LSJR watershed excludes all lands within Calaveras, Tuolumne, San Benito,

and Mariposa Counties. The LSJR watershed has been subdivided into seven major sub areas. In some cases major subareas have been further subdivided into minor subareas to facilitate more effective and focused water quality planning (Table 1-1).

### TABLE 1-1 LOWER SAN JOAQUIN RIVER SUBAREAS

| Major Subareas | | Minor Subareas | |
|---|---|---|---|
| 1 | LSJR upstream of Salt Slough | 1a | Bear Creek |
| | | 1b | Fresno-Chowchilla |
| 2 | Grasslands | -- -- | |
| 3 | East Valley Floor | 3a | Northeast Bank |
| | | 3b | North Stanislaus |
| | | 3c | Stevinson |
| | | 3d | Turlock Area |
| 4 | Northwest Side | 4a | Greater Orestimba |
| | | 4b | Westside Creeks |
| | | 4c | Vernalis North |
| 5 | Merced River | -- -- | |
| 6 | Tuolumne River | -- -- | |
| 7 | Stanislaus River | -- -- | |

1. Lower San Joaquin River upstream of Salt Slough
This subarea drains approximately 1,480 square miles on the east side of the LSJR upstream of the Salt Slough confluence. The subarea includes the portions of the Bear Creek, Chowchilla River and Fresno River watersheds that are contained within Merced and Madera Counties. The northern boundary of the subarea generally abuts the Merced River Watershed. The western and southern boundaries follow the San Joaquin River from the Lander Avenue Bridge to Friant, except for the lands within the Columbia Canal Company, which are excluded. Columbia Canal Company lands are included in the Grassland Subarea. This subarea is composed of the following drainage areas:

1a. Bear Creek (effective drainage area)
This minor subarea is a 620 square mile subset of lands within the LSJR upstream of Salt Slough Subarea. The Bear Creek Minor Subarea is predominantly comprised of the portion of the Bear Creek Watershed that is contained within Merced County.

1b. Fresno-Chowchilla
The Fresno-Chowchilla Minor Subarea is comprised of approximately 860 square miles of land within the southern portion of the LSJR upstream of Salt Slough Subarea. This minor subarea is located in southeastern Merced County and western Madera County and contains the land area that drains into the LSJR between Sack Dam and the Bear Creek confluence, including the drainages of the Fresno and Chowchilla Rivers.

2. Grassland
The Grassland Subarea drains approximately 1,370 square miles on the west side of the LSJR in portions of Merced, Stanislaus, and Fresno Counties. This subarea includes the Mud Slough, Salt Slough, and Los Banos Creek watersheds. The eastern boundary of this subarea is generally formed by the LSJR between the Merced River confluence and the Mendota Dam. The Grassland Subarea extends across the LSJR, into the east side of the San Joaquin Valley, to include the lands within the Columbia Canal Company. The western boundary of the subarea

generally follows the crest of the Coast Range with the exception of lands within San Benito County, which are excluded.

3. East Valley Floor

This subarea includes approximately 413 square miles of land on the east side of the LSJR that drains directly to the LSJR between the Airport Way Bridge near Vernalis and the Salt Slough confluence. The subarea is largely comprised of the land between the major east-side drainages of the Tuolumne, Stanislaus, and Merced Rivers. This subarea lies within central Stanislaus County and north-central Merced County. Numerous drainage canals and natural drainages occur in this subarea. The subarea is comprised of the following minor subareas:

3a. Northeast Bank

This minor subarea of the East Valley Floor contains all of the land draining the east side of the San Joaquin River between the Maze Boulevard Bridge and the Crows Landing Road Bridge, except for the Tuolumne River subarea. The Northeast Bank covers approximately 123 square miles in central Stanislaus County.

3b. North Stanislaus

The North Stanislaus minor subarea is a subset of lands within the East Valley Floor Subarea. This minor subarea drains approximately 68 square miles of land between the Stanislaus and Tuolumne River watersheds that flows into the San Joaquin River between the Airport Way Bridge near Vernalis and the Maze Boulevard Bridge.

3c. Stevinson

This minor subarea of the East Valley Floor contains all of the land draining to the LSJR between the Merced River confluence and the Lander Avenue (Highway 165) Bridge. The Stevinson Minor Subarea occupies approximately 44 square miles in north-central Merced County.

3d. Turlock Area

This minor subarea of the East Valley Floor contains all of the land draining to the LSJR between the Crows Landing Road Bridge and the Merced River confluence. The Turlock Area Minor Subarea occupies approximately 178 square miles in south-central Stanislaus County and northern Merced County.

4. Northwest Side

This 574 square mile area generally includes the lands on the West side of the LSJR between the Airport Way Bridge near Vernalis and the Newman Waste way confluence. This subarea includes the entire drainage area of Orestimba, Del Puerto, and Hospital/Ingram Creeks. The subarea is primarily located in Western Stanislaus County except for a small area that extends into Merced County near the town of Newman and the Central California Irrigation District Main Canal.

4a. Greater Orestimba

The Greater Orestimba Minor Subarea is a 285 square mile subset of the Northwest Side Subarea located in southwest Stanislaus County and a small portion of western Merced County. It contains the entire Orestimba Creek watershed and the remaining area that drains into the LSJR from the west between the Crows Landing Road Bridge and the confluence of the Merced River, including Little Salad and Crow Creeks.

4b. Westside Creeks

This Minor Subarea is comprised of 277 square miles of the Northwest Side Subarea in western Stanislaus County. It consists of the areas that drain into the west side of the San

Joaquin River between Maze Boulevard and Crows Landing Road, including the drainages of Del Puerto, Hospital, and Ingram Creeks.

4c. Vernalis North

The Vernalis North Minor Subarea is a 12 square mile subset of land within the most northern portion of the Northwest Side Subarea. It contains the land draining to the San Joaquin River from the west between the Maze Boulevard Bridge and the Airport Way Bridge near Vernalis.

5. Merced River

This 294 square mile subarea is comprised of the Merced River watershed downstream of the Merced-Mariposa county line and upstream of the River Road Bridge. The Merced River subarea includes a 13-square-mile "island" of land (located between the East Valley Floor and the Tuolumne River Subareas) that is hydrologically connected to the Merced River by the Highline Canal.

6. Tuolumne River

This 294 square mile subarea is comprised of the Tuolumne River watershed downstream of the Stanislaus-Tuolumne county line, including the drainage of Turlock Lake, and upstream of the Shiloh Road Bridge.

7. Stanislaus River

This 157 square mile subarea is comprised of the Stanislaus River watershed downstream of the Stanislaus-Calaveras county line and upstream of Caswell State Park.

## 2  EXISTING AND POTENTIAL BENEFICIAL USES

Beneficial uses are critical to water quality management in California. State law defines beneficial uses of California's waters that may be protected against quality degradation to include (and not be limited to) "...domestic; municipal; agricultural and industrial supply; power generation; recreation; aesthetic enjoyment; navigation; and preservation and enhancement of fish, wildlife, and other aquatic resources or preserves" (Water Code Section 13050(f)). Protection and enhancement of existing and potential beneficial uses are primary goals of water quality planning.

Significant points concerning the concept of beneficial uses are:

1.    All water quality problems can be stated in terms of whether there is water of sufficient quantity or quality to protect or enhance beneficial uses.

2.    Beneficial uses do not include all of the reasonable uses of water. For example, disposal of wastewaters is not included as a beneficial use. This is not to say that disposal of wastewaters is a prohibited use of waters of the State; it is merely a use which cannot be satisfied to the detriment of beneficial uses. Similarly, the use of water for the dilution of salts is not a beneficial use although it may, in some cases, be a reasonable and desirable use of water.

3.    The protection and enhancement of beneficial uses require that certain quality and quantity objectives be met for surface and ground waters.

4.    Fish, plants, and other wildlife, as well as humans, use water beneficially.

Beneficial use designation (and water quality objectives, see Chapter 3, or variance of a water quality standard, see Chapter 4) must be reviewed at least once during each three-year period for the purpose of modification as appropriate (40 CFR 131.20).

The beneficial uses, and abbreviations, listed below are standard basin plan designations.

**Municipal and Domestic Supply (MUN)** - Uses of water for community, military, or individual water supply systems including, but not limited to, drinking water supply.

**Agricultural Supply (AGR)** - Uses of water for farming, horticulture, or ranching including, but not limited to, irrigation (including leaching of salts), stock watering, or support of vegetation for range grazing.

**Industrial Service Supply (IND)** - Uses of water for industrial activities that do not depend primarily on water quality including, but not limited to, mining, cooling water supply, hydraulic conveyance, gravel washing, fire protection, or oil well repressurization.

**Industrial Process Supply (PRO)** - Uses of water for industrial activities that depend primarily on water quality.

**Ground Water Recharge (GWR)** - Uses of water for natural or artificial recharge of ground water for purposes of future extraction, maintenance of water quality, or halting of saltwater intrusion into freshwater aquifers.

**Freshwater Replenishment (FRSH)** - Uses of water for natural or artificial maintenance of surface water quantity or quality.

**Navigation (NAV)** - Uses of water for shipping, travel, or other transportation by private, military, or commercial vessels.

**Hydropower Generation (POW)** - Uses of water for hydropower generation.

**Water Contact Recreation (REC-1)** - Uses of water for recreational activities involving body contact with water, where ingestion of water is reasonably possible. These uses include, but are not limited to, swimming, wading, water-skiing, skin and scuba diving, surfing, white water activities, fishing, or use of natural hot springs.

**Non-contact Water Recreation (REC-2)** - Uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities.

**Commercial and Sport Fishing (COMM)** - Uses of water for commercial or recreational collection of fish, shellfish, or other organisms including, but not limited to, uses involving organisms intended for human consumption or bait purposes.

**Aquaculture (AQUA)** - Uses of water for aquaculture or mariculture operations including, but not limited to, propagation, cultivation, maintenance, or harvesting of aquatic plants and animals for human consumption or bait purposes.

**Warm Freshwater Habitat (WARM)** - Uses of water that support warm water ecosystems including, but not limited to, preservation or enhancement of aquatic habitats, vegetation, fish, or wildlife, including invertebrates.

**Cold Freshwater Habitat (COLD)** - Uses of water that support cold water ecosystems including, but not limited to, preservation or enhancement of aquatic habitats, vegetation, fish, or wildlife, including invertebrates.

**Estuarine Habitat (EST)** - Uses of water that support estuarine ecosystems including, but not limited to, preservation or enhancement of estuarine habitats, vegetation, fish, shellfish, or wildlife (e.g., estuarine mammals, waterfowl, shorebirds).

**Wildlife Habitat (WILD)** - Uses of water that support terrestrial or wetland ecosystems including, but not limited to, preservation and enhancement of terrestrial habitats or wetlands, vegetation, wildlife (e.g., mammals, birds, reptiles, amphibians, invertebrates), or wildlife water and food sources.

**Preservation of Biological Habitats of Special Significance (BIOL)** - Uses of water that support designated areas or habitats, such as established refuges, parks, sanctuaries, ecological reserves, or Areas of Special Biological Significance (ASBS), where the preservation or enhancement of natural resources requires special protection.

**Rare, Threatened, or Endangered Species (RARE)** - Uses of water that support aquatic habitats necessary, at least in part, for the survival and successful maintenance of plant or animal species established under state or federal law as rare, threatened or endangered.

**Migration of Aquatic Organisms (MIGR)** - Uses of water that support habitats necessary for migration or other temporary activities by aquatic organisms, such as anadromous fish.

**Spawning, Reproduction, and/or Early Development (SPWN)** - Uses of water that support high quality aquatic habitats suitable for reproduction and early development of fish.

**Shellfish Harvesting (SHELL)** - Uses of water that support habitats suitable for the collection of filter-feeding shellfish (e.g., clams, oysters, and mussels) for human consumption, commercial, or sports purposes.

## 2.1   SURFACE WATERS

Existing and potential beneficial uses which currently apply to surface waters of the basins are presented in Figure 2-1 and Table 2-1. The beneficial uses of any specifically identified water body generally apply to its tributary streams, except as provided below:

- MUN, COLD, MIGR and SPWN do not apply to Old Alamo Creek (Solano County) from its headwaters to the confluence with New Alamo Creek

- MUN and the human consumption of aquatic organisms do not apply to Sulphur Creek (Colusa County) from Schoolhouse Canyon to the confluence with Bear Creek

In some cases a beneficial use may not be applicable to the entire body of water. In these cases the Regional Water Board's judgment will be applied.

It should be noted that it is impractical to list every surface water body in the Region. For unidentified water bodies, the beneficial uses will be evaluated on a case-by-case basis.

Water Bodies within the basins that do not have beneficial uses designated in Table 2-1 are assigned MUN designations in accordance with the provisions of State Water Board Resolution No. 88-63 which is, by reference, a part of this Basin Plan, except as provided below:

- Old Alamo Creek (Solano County) from its headwaters to the confluence with New Alamo Creek

- Water bodies listed in Appendix 44, Water Bodies That Meet One or More Sources of Drinking Water Policy (Resolution 88-63) Exceptions

These MUN designations in no way affect the presence or absence of other beneficial use designations in these water bodies.

In making any exemptions to the beneficial use designation of MUN, the Regional Board will apply the exceptions listed in Resolution 88-63 (Appendix Item 8) and the excepted water bodies will be listed in Appendix 44.

## 2.2   GROUND WATERS

Beneficial uses of ground waters of the basins are presented below. For the purposes of assigning beneficial uses, the term ground water is defined in Chapter 1.

Unless otherwise designated by the Regional Water Board, all ground waters in the Region are considered as suitable or potentially suitable, at a minimum, for municipal and domestic water supply (MUN), agricultural supply (AGR), industrial service supply (IND), and industrial process supply (PRO).

## 2.2.1    Beneficial Use De-designations

Ground waters at the Royal Mountain King Mine Site are de-designated for MUN and AGR in the de-designation area shown in Figure 2-2.

In making any exceptions to the beneficial use designation of municipal and domestic supply (MUN), the Regional Water Board will apply the criteria in State Water Board Resolution No. 88-63, 'Sources of Drinking Water Policy'. The criteria for exceptions are:

- "The total dissolved solids (TDS) exceed 3,000 mg/l (5,000 &mhos/cm, electrical conductivity) and it is not reasonably expected by the Regional Water Board [for the ground water] to supply a public water system, or

- "There is contamination, either by natural processes or by human activity (unrelated to a specific pollution incident), that cannot reasonably be treated for domestic use using either Best Management Practices or best economically achievable treatment practices, or

- "The water source does not provide sufficient water to supply a single well capable of producing an average, sustained yield of 200 gallons per day, or

- "The aquifer is regulated as a geothermal energy producing source or has been exempted administratively pursuant to 40 CFR, Section 146.4 for the purpose of underground injection of fluids associated with the production of hydrocarbon or geothermal energy, provided that these fluids do not constitute a hazardous waste under 40 CFR Section 261.3."

To be consistent with State Water Board Resolution No. 88-63 in making exceptions to beneficial use designations other than municipal and domestic supply (MUN), the Regional Water Board will consider criteria for exceptions, parallel to Resolution No. 88-63 exception criteria, which would indicate limitations on those other beneficial uses as follows:

In making any exceptions to the beneficial use designation of agricultural supply (AGR), the Regional Water Board will consider the following criteria:

- There is pollution, either by natural processes or by human activity (unrelated to a specific pollution incident), that cannot reasonably be treated for agricultural use using either Best Management Practices or best economically achievable treatment practices, or

- The water source does not provide sufficient water to supply a single well capable of producing an average, sustained yield of 200 gallons per day, or

- The aquifer is regulated as a geothermal energy producing source or has been exempted administratively pursuant to 40 CFR, Section 146.4 for the purpose of underground injection of fluids associated with the production of hydrocarbon or geothermal energy, provided that these fluids do not constitute a hazardous waste under 40 CFR Section 261.3.

In making any exceptions to the beneficial use designation of industrial supply (IND or PRO), the Regional Water Board will consider the following criteria:

- There is pollution, either by natural processes or by human activity (unrelated to a specific pollution incident), that cannot reasonably be treated for industrial use using either Best Management Practices or best economically achievable treatment practices, or

- The water source does not provide sufficient water to supply a single well capable of producing an average, sustained yield of 200 gallons per day.

**FIGURE 2-1: SURFACE WATER BODIES AND BENEFICIAL USES**



TABLE 2-1

**SURFACE WATER BODIES AND BENEFICIAL USES**

| | SURFACE WATER BODIES | HYDRO UNIT NUMBER | MUN (MUNICIPAL AND DOMESTIC SUPPLY) | AGR — IRRIGATION | AGR — STOCK WATERING | PROC (PROCESS) | IND (SERVICE SUPPLY) | POW (POWER) | REC-1 CONTACT | REC-1 CANOEING AND RAFTING (1) | REC-2 OTHER NONCONTACT | WARM | COLD | MIGR WARM (3) | MIGR COLD (4) | SPWN WARM (3) | SPWN COLD (4) | WILD (WILDLIFE HABITAT) | NAV (NAVIGATION) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | McCLOUD RIVER | 505. | E | | | | | E | E | P | E | | E | | | | E | E | |
| 2 | GOOSE LAKE | 527.2 | | E | E | | | | E | | E | E | E | | | | | E | |
| | PIT RIVER | | | | | | | | | | | | | | | | | | |
| 3 | NORTH FORK, SOUTH FORK, PIT RIVER | 526.00 | E | E | E | | | | E | P | E | E | E | | | E | E | E | |
| 4 | CONFLUENCE OF FORKS TO HAT CREEK | 526.35 | E | E | E | | | E | E | E | E | E | E | | | E | | E | |
| 5 | FALL RIVER | 526.41 | E | E | E | | | E | E | E | E | E | E | | | | | E | |
| 6 | HAT CREEK | 526.30 | | E | | | | E | E | | E | E | E | | | | E | E | |
| 7 | BAUM LAKE | 526.34 | | | | | | E | E | | E | | E | | | | P | E | |
| 8 | MOUTH OF HAT CREEK TO SHASTA LAKE | 526. | E | E | E | | | E | E | E | E | P | | | | E | E | E | |
| | SACRAMENTO RIVER | | | | | | | | | | | | | | | | | | |
| 9 | SOURCE TO BOX CANYON RESERVOIR | 525.22 | | E | E | | | | E | | E | | E | | | | | E | |
| 10 | LAKE SISKIYOU | 525.22 | | | | | | | E | | E | E | E | | | | P | E | |
| 11 | BOX CANYON DAM TO SHASTA LAKE | 525.2 | | E | E | | | | E | E | E | | E | | | | E | E | |
| 12 | SHASTA LAKE | 506.10 | E | | | | | E | E | | E | E | E | | | E | E | E | |
| 13 | SHASTA DAM TO COLUSA BASIN DRAIN | | | E | E | E | | E | E | E | E | E | E | E | E | E | E | E | E |

Notes are located after the table.

**SURFACE WATER BODIES AND BENEFICIAL USES**

| | SURFACE WATER BODIES | HYDRO UNIT NUMBER | MUN — MUNICIPAL AND DOMESTIC SUPPLY | AGR — IRRIGATION | AGR — STOCK WATERING | PROC — PROCESS | IND — SERVICE SUPPLY | POW — POWER | REC-1 — CONTACT | REC-1 — CANOEING AND RAFTING (1) | REC-2 — OTHER NONCONTACT | WARM — WARM | COLD — COLD | MIGR — WARM (3) | MIGR — COLD (4) | SPWN — WARM (3) | SPWN — COLD (4) | WILD — WILDLIFE HABITAT | NAV — NAVIGATION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | WHISKEY TOWN RESERVOIR | 524.61 | E | E | E | | | E | E | | E | E | E | | | E | | E | |
| 15 | CLEAR CREEK BELOW WHISKEYTOWN RESERVOIR | 524.62 | E | E | E | | | | E | E | E | E | E | | E | E | E | E | |
| 16 | COW CREEK | 507.3 | P | E | E | | | E | E | P | E | | E | | E | E | E | E | |
| 17 | BATTLE CREEK | 507.12 | | E | E | | | E | E | E | E | E | E | | E | E | E | E | |
| 18 | COTTONWOOD CREEK | 524.3 | E | E | E | P | P | P | E | E | E | E | E | | E | E | E | E | |
| 19 | ANTELOPE CREEK | 509.63 | E | E | E | | | | E | | E | E | E | | E | E | E | E | |
| 20 | MILL CREEK | 509.42 | E | E | E | | | | E | | E | E | E | | E | E | E | E | |
| 21 | THOMES CREEK | 523.10 | | E | E | | | P | E | | E | E | E | | E | E | E | E | |
| 22 | DEER CREEK | 509.20 | E | E | E | | | | E | E | E | E | E | | E | E | E | E | |
| 23 | BIG CHICO CREEK | 509.14 | | E | E | | | | E | E | E | E | E | | E | E | E | E | |
| 24 | STONY CREEK | 522.00 | | E | E | | | | E | E | E | E | P | | E | E | E | E | |
| 25 | EAST PARK RESERVOIR | 522.33 | | | | | | | E | | E | E | P | | | E | | E | |
| 26 | BLACK BUTTE RESERVOIR | 522.12 | | E | E | | | | E | | E | E | | | | E | | E | |
| | BUTTE CREEK | | | | | | | | | | | | | | | | | | |
| 27 | SOURCES TO CHICO | 521.30 | E | E | E | | | E | E | | E | E | E | | E | E | E | E | |
| 28 | BELOW CHICO, INCLUDING BUTTE SLOUGH | 520.40 | | E | E | | | | E | E | E | E | E | | E | E | | E | |
| 29 | COLUSA BASIN DRAIN | 520.21 | | E | E | | | | E | E | E | E | P | E | | E | | E | |

Notes are located after the table.

**SURFACE WATER BODIES AND BENEFICIAL USES**

| | SURFACE WATER BODIES | HYDRO UNIT NUMBER | MUN | AGR | | PROC | IND | POW | REC-1 | | REC-2 | WARM | COLD | MIGR | | SPWN | | WILD | NAV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MUNICIPAL AND DOMESTIC SUPPLY | IRRIGATION | STOCK WATERING | PROCESS | SERVICE SUPPLY | POWER | CONTACT | CANOEING AND RAFTING (1) | OTHER NONCONTACT | WARM | COLD | WARM (3) | COLD (4) | WARM (3) | COLD (4) | WILDLIFE HABITAT | NAVIGATION |
| 30 | COLUSA BASIN DRAIN TO EYE ("I") STREET BRIDGE | 520.00 | E | E | | | | | E | E | E | E | E | E | E | E | E | E | E |
| 31 | SUTTER BYPASS | 520.3 | | E | | | | | E | | | E | | | E | | E | E | |
| | FEATHER RIVER | | | | | | | | | | | | | | | | | | |
| 32 | LAKE ALMANOR | 518.41 | | | | | | E | E | | | E | E | | | E | | E | |
| 33 | NORTH FORK, FEATHER RIVER | 518.4 | E | | | | | E | E | E | E | | E | | | | E | E | |
| | MIDDLE FORK, FEATHER RIVER | | | | | | | | | | | | | | | | | | |
| 34 | SOURCE TO LITTLE LAST CHANCE CREEK | 518.35 | | E | E | | | | E | E | E | E | E | | | | E | E | |
| 35 | FRENCHMAN RESERVOIR | 518.36 | | | | | | | E | | E | P | E | | | | E | E | |
| 36 | LITTLE LAST CHANCE CREEK TO LAKE OROVILLE | 518.3 | E | | | | | | E | E | E | E | E | | | | E | E | |
| 37 | LAKE DAVIS | 518.34 | | | | | | | E | | E | P | E | | | | E | E | |
| 38 | LAKES BASIN LAKES | 518.5 | | | | | | | E | | E | | E | | | | E | E | |
| 39 | LAKE OROVILLE | 518.12 | E | E | | | | E | E | | E | E | E | | | E | E | E | |
| 40 | FISH BARRIER DAM TO SACRAMENTO RIVER | 515. | E | E | | | | | E | E | E | E | E | E | E | E | E | E | |
| | YUBA RIVER | | | | | | | | | | | | | | | | | | |
| 41 | SOURCES TO ENGLEBRIGHT RESERVOIR | 517 | E | E | E | | | E | E | E | E | | E | | | | E | E | |
| 42 | ENCLEBRIGHT DAM TO FEATHER RIVER | 515.3 | | E | E | | | E | E | E | E | E | E | E | E | E | E | E | |

Notes are located after the table.

**SURFACE WATER BODIES AND BENEFICIAL USES**

| # | SURFACE WATER BODIES | HYDRO UNIT NUMBER | MUN | AGR | | PROC | IND | POW | REC-1 | | REC-2 | WARM | COLD | MIGR | | SPWN | | WILD | NAV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MUNICIPAL AND DOMESTIC SUPPLY | IRRIGATION | STOCK WATERING | PROCESS | SERVICE SUPPLY | POWER | CONTACT | CANOEING AND RAFTING (1) | OTHER NONCONTACT | WARM | COLD | WARM (3) | COLD (4) | WARM (3) | COLD (4) | WILDLIFE HABITAT | NAVIGATION |
| 43 | BEAR RIVER | 515.1 | E | E | E | | | E | E | E | E | E | E | P | P | P | P | E | |
| | AMERICAN RIVER | | | | | | | | | | | | | | | | | | |
| 44 | NORTH FORK, SOURCE TO FOLSOM LAKE | 514.5 | E | E | | | | | E | E | E | P | E | | | | E | E | |
| 45 | MIDDLE FORK, SOURCE TO FOLSOM LAKE | 514.4 | E | E | E | | | E | E | E | E | P | E | | | | E | E | |
| 46 | DESOLATION VALLEY LAKES | 514.4 | | | | | | | E | | E | | E | | | | E | E | |
| | SOUTH FORK | | | | | | | | | | | | | | | | | | |
| 48 | SOURCE TO PLACERVILLE | 514.3 | E | | | | | E | E | E | E | P | E | | | | E | E | |
| 49 | PLACERVILLE TO FOLSOM LAKE | 514.32 | E | E | | | | E | E | E | E | E | E | | | | | E | |
| 50 | FOLSOM LAKE | 514.23 | E | E | | | P | E | E | | E | E | E | | | E | | E | |
| 51 | FOLSOM DAM TO SACRAMENTO RIVER | 519.21 | E | E | | | E | E | E | E | E | E | E | E | E | E | E | E | |
| 52 | YOLO BYPASS (7) | 510. | | E | E | | | | E | | E | E | P | E | E | E | | E | |
| | CACHE CREEK | | | | | | | | | | | | | | | | | | |
| 53 | CLEAR LAKE (a) | 513.52 | E | E | E | | | | E | | E | E | P | | | E | | E | |
| 54 | CLEAR LAKE TO YOLO BYPASS (d) | 511/ 513 | E | E | E | E | E | | E | E | E | E | P | | | E | E | E | |
| | PUTAH CREEK | | | | | | | | | | | | | | | | | | |
| 55 | LAKE BERRYESSA | 512.21 | E | E | E | | | P | E | | E | E | E | | | E | | E | |
| 56 | LAKE BERRYESSA TO YOLO BYPASS | 510/ 511 | E | E | E | | | | E | E | E | E | P | | | E | | E | |

Notes are located after the table.

## SURFACE WATER BODIES AND BENEFICIAL USES

| SURFACE WATER BODIES | HYDRO UNIT NUMBER | MUN (MUNICIPAL AND DOMESTIC SUPPLY) | AGR (IRRIGATION) | STOCK WATERING | PROC (PROCESS) | IND (SERVICE SUPPLY) | POW (POWER) | REC-1 CONTACT | REC-1 CANOEING AND RAFTING (1) | REC-2 OTHER NONCONTACT | WARM | COLD | MIGR WARM (3) | MIGR COLD (4) | SPWN WARM (3) | SPWN COLD (4) | WILD (WILDLIFE HABITAT) | NAV (NAVIGATION) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OTHER LAKES AND RESERVOIRS IN SACRAMENTO R. BASIN 5A (5) |  | E | E | E | E |  | E | E |  | E | E | E |  |  |  | E | E |  |
| **COSUMNES RIVER** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 57 SOURCES TO NASHVILLE RESERVOIR (PROPOSED) | 532. | E | E |  |  |  |  | E |  | E |  | E |  |  |  | E | E |  |
| 58 NASHVILLE RESERVOIR (PROPOSED) | 532. | P |  |  |  |  | P | P |  | P | P | P | P |  | P | P | P |  |
| 59 SOURCE TO DELTA | 531/ 532 | E | E | E |  |  |  | E | E | E | E | E | E | E | E | E | E |  |
| **MOKELUMNE RIVER** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 60 SOURCES TO PARDEE RESERVOIR | 532.6 | E |  |  |  |  | E | E | E | E | E | E | E |  | E | E | E |  |
| 61 PARDEE RESERVOIR (6) | 532.6 |  |  |  |  |  | E | E | E | E | E | E | E |  | E | E | E |  |
| 62 CAMANCHE RESERVOIR | 531.2 | E | E | E |  |  |  | E | E | E | E | E | E |  | E | E | E |  |
| 63 CAMANCHE RESERVOIR TO DELTA | 531.2 |  | E | E |  |  |  | E | E | E | E | E | E | E | E | E | E |  |
| **CALAVERAS RIVER** |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 64 SOURCE TO NEW HOGAN RESERVOIR | 533. |  |  |  |  |  |  | E | E | E | E | E | E |  | E | E | E |  |
| 65 NEW HOGAN RESERVOIR | 533.1 |  |  |  |  |  |  | E |  | E | E | E | E |  | E | E | E |  |
| 66 NEW HOGAN RESERVOIR TO DELTA | 531.3 | E | E | E | P | P |  | E | E | E | E | E | E | E | E | E | E |  |
| OTHER LAKES AND RESERVOIRS IN HYDRO UNIT NOS.531, 532, 533, 543, 544 (5) |  | E | E | E | E |  | E | E |  | E | E | E |  |  |  | E | E |  |

Notes are located after the table.

**SURFACE WATER BODIES AND BENEFICIAL USES**

| | SURFACE WATER BODIES | HYDRO UNIT NUMBER | MUN | AGR | | PROC | IND | POW | REC-1 | | REC-2 | WARM | COLD | MIGR | | SPWN | | WILD | NAV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MUNICIPAL AND DOMESTIC SUPPLY | IRRIGATION | STOCK WATERING | PROCESS | SERVICE SUPPLY | POWER | CONTACT | CANOEING AND RAFTING (1) | OTHER NONCONTACT | WARM | COLD | WARM (3) | COLD (4) | WARM (3) | COLD (4) | WILDLIFE HABITAT | NAVIGATION |
| | SAN JOAQUIN RIVER | | | | | | | | | | | | | | | | | | |
| 67 | SOURCES TO MILLERTON LAKE | 540. | E | E | E | | | E | E | E | E | E | E | | | | | E | |
| 68 | MILLERTON LAKE | 540.12 | P | E | E | | | | E | | E | E | P | | | | | E | |
| 69 | FRIANT DAM TO MENDOTA POOL | 545. | E | E | E | E | | | E | E | E | E | E | E | E | E | P | E | |
| 70 | MENDOTA DAM TO SACK DAM | 545.1 | P | E | E | E | | | E | E | E | E | | E | E | E | P | E | |
| 71 | SACK DAM TO MOUTH OF MERCED RIVER | 535.7 | P | E | E | E | | | E | E | E | E | | E | E | E | P | E | |
| | FRESNO RIVER | | | | | | | | | | | | | | | | | | |
| 72 | SOURCE TO HIDDEN RESERVOIR A/ | 539.31 | E | E | E | | | | E | | E | E | E | | | | | E | |
| 73 | HIDDEN RESERVOIR A/ | 539.32 | E | | E | | | | E | | E | E | | | | | | E | |
| 74 | HIDDEN RESERVOIR TO SAN JOAQUIN RIVER | 545. | P | E | E | | | | E | P | E | E | | | | | | E | |
| | CHOWCHILLA RIVER | | | | | | | | | | | | | | | | | | |
| 75 | SOURCE TO BUCHANAN RESERVOIR B/ | 539.11 | | | | | | | E | | E | E | E | | | | | E | |
| 76 | BUCHANAN RESERVOIR B/ | 539.12 | E | E | E | | | | E | | E | E | | | | | | E | |
| 77 | BUCHANAN RESERVOIR TO SAN JOAQUIN RIVER | 535/545 | P | E | | | | E | E | P | E | E | | | | | | E | |
| | MERCED RIVER | | | | | | | | | | | | | | | | | | |
| 78 | SOURCE TO McCLURE LAKE | 537. | P | E | | | | E | E | E | E | E | E | | | | | E | |
| 79 | McCLURE LAKE | 537.22 | P | E | | | | E | E | | E | E | E | | | | | E | |

Notes are located after the table.

**TABLE 2-1 (cont'd)**

**SURFACE WATER BODIES AND BENEFICIAL USES**

| | SURFACE WATER BODIES | HYDRO UNIT NUMBER | MUN | AGR | | PROC | IND | POW | REC-1 | REC-1 | REC-2 | WARM | COLD | MIGR | MIGR | SPWN | SPWN | WILD | NAV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | MUNICIPAL AND DOMESTIC SUPPLY | IRRIGATION | STOCK WATERING | PROCESS | SERVICE SUPPLY | POWER | CONTACT | CANOEING AND RAFTING (1) | OTHER NONCONTACT | WARM | COLD | WARM (3) | COLD (4) | WARM (3) | COLD (4) | WILDLIFE HABITAT | NAVIGATION |
| 80 | McSWAIN RESERVOIR | 537.1 | P | E | | | | E | E | | E | E | E | | | | | E | |
| 81 | McSWAIN RESERVOIR TO SAN JOAQUIN RIVER | 535. | E | | E | E | E | E | E | E | E | E | E | E | E | E | E | E | |
| 82 | YOSEMITE LAKE | 535.9 | | | | | | | E | | E | E | E | | | | | E | |
| 83 | MOUTH OF MERCED RIVER TO VERNALIS | 535/541 | P | E | E | E | | | E | E | E | E | | E | E | | | E | |
| | TUOLUMNE RIVER | | | | | | | | | | | | | | | | | | |
| 84 | SOURCE TO (NEW) DON PEDRO RESERVOIR | 536. | E | E | E | | | E | E | E | E | E | E | | | | | E | |
| 85 | NEW DON PEDRO RESERVOIR | 536.32 | P | | | | | E | E | | E | E | E | | | | | E | |
| 86 | NEW DON PEDRO RESERVOIR TO SAN JOAQUIN RIVER | 535. | P | E | E | | | | E | E | E | E | E | | E | E | E | E | |
| | STANISLAUS RIVER | | | | | | | | | | | | | | | | | | |
| 87 | SOURCE TO NEW MELONES RESERVOIR (PROPOSED) | 534. | E | E | E | | | E | E | E | E | E | E | | | | | E | |
| 88 | NEW MELONES RESERVOIR | 534.21 | E | E | E | | | E | E | | E | | E | | | | | E | |
| 89 | TULLOCH RESERVOIR | 534.22 | P | E | E | | | E | E | | E | E | | | | | | E | |
| 90 | GOODWIN DAM TO SAN JOAQUIN RIVER | 535. | P | E | E | E | E | E | E | E | E | E | E | | E | E | E | E | |
| 91 | SAN LUIS RESERVOIR | 542.32 | E | E | E | | E | E | E | | E | E | | | | | | E | |
| 92 | O'NEILL RESERVOIR | 541.2 | E | E | E | | | | E | | E | E | | | | | | | |

Notes are located after the table.

**SURFACE WATER BODIES AND BENEFICIAL USES**

| | SURFACE WATER BODIES | HYDRO UNIT NUMBER | AGRICULTURE MUN (MUNICIPAL AND DOMESTIC SUPPLY) | AGR (IRRIGATION) | (STOCK WATERING) | INDUSTRY PROC (PROCESS) | IND (SERVICE SUPPLY) | POW (POWER) | RECREATION REC-1 (CONTACT) | (CANOEING AND RAFTING (1)) | REC-2 (OTHER NONCONTACT) | FRESH-WATER HABITAT (2) WARM | COLD | MIGRATION MIGR WARM (3) | COLD (4) | SPAWNING SPWN WARM (3) | COLD (4) | WILD (WILDLIFE HABITAT) | NAV (NAVIGATION) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 93 | OTHER LAKES AND RESERVOIRS IN SAN JOAQUIN R. BASIN (EXCLUDING HYDRO UNIT NOS. 531-533, 543, 544) (5) | | E | | | | | E | E | | E | E | E | | | | E | E | |
| 94 | CALIFORNIA AQUEDUCT | 541. | E | E | E | E | E | E | E | | E | | | | | | | E | |
| 95 | DELTA-MENDOTA CANAL | 541/ 543 | E | E | E | | | | E | | E | E | | | | | | E | |
| | GRASSLAND WATERSHED (a) | 541.2 | | | | | | | | | | | | | | | | | |
| 96 | MUD SLOUGH (NORTH) | | | L (b) | E | | | | E | | E | E | | | | E | | E | |
| 97 | SALT SLOUGH | | | E | E | | | | E | | E | E | | | | E | | E | |
| 98 | WETLAND WATER SUPPLY CHANNELS (9) | | | L (b) | E | | | | | | | L (c) | | | | | | E | |
| C | SACRAMENTO SAN JOAQUIN DELTA (7, 8) | 544. | E | E | E | E | E | | E | | E | E | E | E | E | E | | E | E |

Notes are located after the table.

**SURFACE WATER BODIES AND BENEFICIAL USES**

LEGEND

E = EXISTING BENEFICIAL USES

P = POTENTIAL BENEFICIAL USES

L = EXISTING LIMITED BENEFICIAL USE

NOTE:

Surface waters with the beneficial uses of Groundwater Recharge (GWR), Freshwater Replenishment (FRSH), and Preservation of Rare and Endangered Species (RARE) have not been identified in this plan. Surface waters of the Sacramento and San Joaquin River Basins falling within these beneficial use categories will be identified in the future as part of the continuous planning process to be conducted by the State Water Resources Control Board.

(1)     Shown for streams and rivers only with the implication that certain flows are required for this beneficial use.

(2)     Resident does not include anadromous. Any Segments with both COLD and WARM beneficial use designations will be considered COLD water bodies for the application of water quality objectives.

(3)     Striped bass, sturgeon, and shad.

(4)     Salmon and steelhead

(5)     The indicated beneficial uses are to be protected for all waters except in specific cases where evidence indicates the appropriateness of additional or alternative beneficial use designations.

(6)     Sport fishing is the only recreation activity permitted.

(7)     Beneficial uses vary throughout the Delta and will be evaluated on a case-by-case basis. COMM is a designated beneficial use for the Sacramento San Joaquin Delta and Yolo Bypass waterways listed in Appendix 43 and not any tributaries to the listed waterways or portions of the listed waterways outside of the legal Delta boundary unless specifically designated.

(8)     Per State Water Board Resolution No. 90-28, Marsh Creek and Marsh Creek Reservoir in Contra Costa County are assigned the following beneficial uses: REC1 and REC2 (potential uses), WARM, WILD and RARE. COMM is a designated beneficial use for Marsh Creek and its tributaries listed in Appendix 43 within the legal Delta boundary.

(9)     Wetland water supply channels for which beneficial uses are designated are defined in Appendix 40

A/ Hidden Reservoir = Hensley Lake

B/ Buchanan Reservoir = Eastman Lake

(a)     The following beneficial uses EXIST in addition to those noted in Table 2-1

                Mud Slough (north): COMM and SHELL
                Salt Slough: COMM, BIOL, and SHELL
                Wetland Water Supply Channels: BIOL
                Clear Lake: COMM

(b)     Elevated natural salt and boron concentrations may limit this use to irrigation of salt and boron tolerant crops. Intermittent low flow conditions may also limit this use.

(c)     Wetland channels can sustain aquatic life, but due to fluctuating flow regimes and habitat limitations, may not be suitable for nesting and/or propagation.

(d)     In addition to the beneficial uses noted in Table 2-1, COMM exists for Cache Creek from Clear Lake to Yolo Bypass and in the following tributaries only: North Fork Cache Creek and Bear Creek.



**FIGURE 2-2: ROYAL MOUNTAIN KING MINE SITE GROUNDWATER DE-DESIGNATION AND VARIANCE AREA**

# 3    WATER QUALITY OBJECTIVES

The Porter-Cologne Water Quality Control Act defines water quality objectives as "...the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area" [Water Code Section 13050(h)]. It also requires the Regional Water Board to establish water quality objectives, while acknowledging that it is possible for water quality to be changed to some degree without unreasonably affecting beneficial uses. In establishing water quality objectives, the Regional Water Board must consider, among other things, the following factors:

- Past, present, and probable future beneficial uses;

- Environmental characteristics of the hydrographic unit under consideration, including the quality of water available thereto;

- Water quality conditions that could reasonably be achieved through the coordinated control of all factors which affect water quality in the area;

- Economic considerations;

- The need for developing housing within the region;

- The need to develop and use recycled water. (Water Code Section 13241)

The Federal Clean Water Act requires a state to submit for approval of the Administrator of the U.S. Environmental Protection Agency (USEPA) all new or revised water quality standards which are established for surface and ocean waters. As noted earlier, California water quality standards consist of both beneficial uses (identified in Chapter 2) and the water quality objectives based on those uses.

There are **seven important points** that apply to water quality objectives.

The **first point** is that water quality objectives can be revised through the basin plan amendment process. Objectives may apply region-wide or be specific to individual water bodies or parts of water bodies. Site-specific objectives may be developed whenever the Regional Water Board believes they are appropriate. As indicated previously, federal regulations call for each state to review its water quality standards at least every three years. These Triennial Reviews provide one opportunity to evaluate changing water quality objectives, because they begin with an identification of potential and actual water quality problems, i.e., beneficial use impairments. Since impairments may be associated with water quality objectives being exceeded, the Regional Water Board uses the results of the Triennial Review to implement actions to assess, remedy, monitor, or otherwise address the impairments, as appropriate, in order to achieve objectives and protect beneficial uses. If a problem is found to occur because, for example, a water quality objective is too weak to protect beneficial uses, the Basin Plan should be amended to make the objective more stringent. (Better enforcement of the water quality objectives or adoption of certain policies or redirection of staff and resources may also be proper responses to water quality problems. See the Implementation chapter for further discussion.)

Changes to the objectives can also occur because of new scientific information on the effects of specific constituents. A major source of information is the USEPA which develops data on the effects of chemical and other constituent concentrations on particular aquatic species and human health. Other information sources for data on protection of beneficial uses include the National Academy of Science which has published data on bioaccumulation and the Federal

Food and Drug Administration which has issued criteria for unacceptable levels of chemicals in fish and shellfish used for human consumption. The Regional Water Board may make use of those and other state or federal agency information sources in assessing the need for new water quality objectives.

The **second point** is that achievement of the objectives depends on applying them to controllable water quality factors. Controllable water quality factors are those actions, conditions, or circumstances resulting from human activities that may influence the quality of the waters of the State, that are subject to the authority of the State Water Board or the Regional Water Board, and that may be reasonably controlled. Controllable factors are not allowed to cause further degradation of water quality in instances where uncontrollable factors have already resulted in water quality objectives being exceeded. The Regional Water Board recognizes that man made changes that alter flow regimes can affect water quality and impact beneficial uses.

The **third point** is that objectives are to be achieved primarily through the adoption of waste discharge requirements (including permits) and cleanup and abatement orders. When adopting requirements and ordering actions, the Regional Water Board considers the potential impact on beneficial uses within the area of influence of the discharge, the existing quality of receiving waters, and the appropriate water quality objectives. It can then make a finding as to the beneficial uses to be protected within the area of influence of the discharge and establish waste discharge requirements to protect those uses and to meet water quality objectives. The objectives contained in this plan, and any State or Federally promulgated objectives applicable to the basins covered by the plan, are intended to govern the levels of constituents and characteristics in the main water mass unless otherwise designated. They may not apply at or in the immediate vicinity of effluent discharges, but at the edge of the mixing zone if areas of dilution or criteria for diffusion or dispersion are defined in the waste discharge specifications.

The **fourth point** is that the Regional Water Board recognizes that immediate compliance with water quality objectives adopted by the Regional Water Board or the State Water Board, or with water quality criteria adopted by the USEPA, may not be feasible in all circumstances. Where the Regional Water Board determines it is infeasible for a discharger to comply immediately with such objectives or criteria, compliance shall be achieved in the shortest practicable period of time (determined by the Regional Water Board), not to exceed ten years after the adoption of applicable objectives or criteria. This policy shall apply to water quality objectives and water quality criteria adopted after the effective date of this amendment to the Basin Plan [25 September 1995]. The Regional Water Board will establish compliance schedules in NPDES permits consistent with the provisions of the State Water Board's Compliance Schedule Policy (Resolution 2008-0025). Time schedules in waste discharge requirements are established consistent with Water Code Section 13263.

The **fifth point** is that in cases where water quality objectives are formulated to preserve historic conditions, there may be insufficient data to determine completely the temporal and hydrologic variability representative of historic water quality. When violations of such objectives occur, the Regional Water Board judges the reasonableness of achieving those objectives through regulation of the controllable factors in the areas of concern.

The **sixth point** is that the State Water Board adopts policies and plans for water quality control which can specify water quality objectives or affect their implementation. Chief among the State Water Board's policies for water quality control is State Water Board Resolution No. 68-16 (Statement of Policy with Respect to Maintaining High Quality of Waters in California). It requires that wherever the existing quality of surface or ground waters is better than the objectives established for those waters in a basin plan, the existing quality will be maintained unless as otherwise provided by Resolution No. 68- 16 or any revisions thereto. This policy and others establish general objectives. The State Water Board's water quality control plans applicable to the Sacramento and San Joaquin River Basins are the Thermal Plan and Water

Quality Control Plan for Salinity. The Thermal Plan and its water quality objectives are in the Appendix. The State Water Board's plans and policies that the Basin Plan must conform to are addressed in Chapter 4, Implementation.

The **seventh point** is that water quality objectives may be in numerical or narrative form. The enumerated milligram-per-liter (mg/l) limit for copper is an example of a numerical objective; the objective for color is an example of a narrative form.

Information on the application of water quality objectives is contained in the section, *Policy for Application of Water Quality Objectives*, in Chapter 4.

## 3.1    WATER QUALITY OBJECTIVES FOR INLAND SURFACE WATERS

The objectives below are presented by categories which, like the Beneficial Uses of Chapter 2, were standardized for uniformity among the Regional Water Boards. The water quality objectives apply to all surface waters in the Sacramento and San Joaquin River Basins, including the Delta, or as noted. *(The legal boundary of the Delta is contained in Section 12220 of the Water Code and identified in* Figure 2-1*.)* The numbers in parentheses following specific water bodies are keyed to Figure 2-1.

### 3.1.1    Bacteria

In waters designated for contact recreation (REC-1), the fecal coliform concentration based on a minimum of not less than five samples for any 30-day period shall not exceed a geometric mean of 200/100 ml, nor shall more than ten percent of the total number of samples taken during any 30-day period exceed 400/100 ml.

For Folsom Lake (50), the fecal coliform concentration based on a minimum of not less than five samples for any 30-day period, shall not exceed a geometric mean of 100/100 ml, nor shall more than ten percent of the total number of samples taken during any 30-day period exceed 200/100 ml.

### 3.1.2    Biostimulatory Substances

Water shall not contain biostimulatory substances which promote aquatic growths in concentrations that cause nuisance or adversely affect beneficial uses.

### 3.1.3    Chemical Constituents

Waters shall not contain chemical constituents in concentrations that adversely affect beneficial uses.*

The chemical constituent objectives in Tables 3-1 and 3-2 apply to the water bodies specified. Metal objectives in the table are dissolved concentrations.

Selenium, molybdenum, and boron objectives are total concentrations. Water quality objectives are also contained in the Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta, adopted by the State Water Board in May 1995 and revised in 2006.

At a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and

64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449. This incorporation-by-reference is prospective, including future changes to the incorporated provisions as the changes take effect. At a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain lead in excess of 0.015 mg/l. The Regional Water Board acknowledges that specific treatment requirements are imposed by state and federal drinking water regulations on the consumption of surface waters under specific circumstances. To protect all beneficial uses the Regional Water Board may apply limits more stringent than MCLs.

*This includes drinking water chemical constituents of concern, such as organic carbon.*

### TABLE 3-1
### TRACE ELEMENT WATER QUALITY OBJECTIVES

| CONSTITUENT | MAXIMUM CONCENTRATION[a] (mg/l) | APPLICABLE WATER BODIES |
|---|---|---|
| Arsenic | 0.01 | Sacramento River from Keswick Dam to the I Street Bridge at City of Sacramento (13, 30); American River from Folsom Dam to the Sacramento River (51); Folsom Lake (50); and the Sacramento-San Joaquin Delta. |
| Barium | 0.1 | As noted above for Arsenic. |
| Boron | 2.0 (15 March through 15 September) 0.8 (monthly mean, 15 March through 15 September) | San Joaquin River, mouth of the Merced River to Vernalis |
| | 2.6 (16 September through 14 March) 1.0 (monthly mean, 16 September through 14 March) | |
| | 1.3 (monthly mean, critical year[b]) | |
| | 5.8 2.0 (monthly mean, 15 March through 15 September) | Salt Slough, Mud Slough (north), San Joaquin River from Sack Dam to the mouth of Merced River |
| Cadmium | 0.00022 [c] | Sacramento River and its tributaries above State Hwy 32 bridge at Hamilton City |
| Copper | 0.0056 [c] | As noted above for Cadmium. |
| | 0.01 [d] | As noted above for Arsenic. [d] |
| Cyanide | 0.01 | As noted above for Arsenic. |

**TABLE 3-1**
**TRACE ELEMENT WATER QUALITY OBJECTIVES**

| CONSTITUENT | MAXIMUM CONCENTRATION[a] (mg/l) | APPLICABLE WATER BODIES |
|---|---|---|
| Iron | 0.3 | As noted above for Arsenic. |
| Manganese | 0.05 | As noted above for Arsenic. |
| Molybdenum | 0.015 0.010 (monthly mean) | San Joaquin River, mouth of the Merced River to Vernalis |
|  | 0.050 0.019 (monthly mean) | Salt Slough, Mud Slough (north), San Joaquin River from Sack Dam to the mouth of Merced River |
| Selenium | 0.012 0.005 (4-day average) | San Joaquin River, mouth of the Merced River to Vernalis |
|  | 0.020 0.005 (4-day average) | Mud Slough (north), and the San Joaquin River from Sack Dam to the mouth of Merced River |
|  | 0.020 0.002 (monthly mean) | Salt Slough and constructed and re-constructed water supply channels in the Grassland watershed listed in Appendix 40. |
| Silver | 0.01 | As noted above for Arsenic |
| Zinc | 0.1 [d] | As noted above for Arsenic. [d] |
|  | 0.016 [c] | As noted above for Cadmium. |

a    Metal objectives in this table are dissolved concentrations. Selenium, molybdenum, and boron objectives are total concentrations.

b    See Table 4-4.

c    The effects of these concentrations were measured by exposing test organisms to dissolved aqueous solutions of 40 mg/l hardness that had been filtered through a 0.45 micron membrane filter. Where deviations from 40 mg/l of water hardness occur, the objectives, in mg/l, shall be determined using the following formulas:

$$Cu = e^{(0.905)(\ln hardness) - 1.612} \times 10^{-3}$$

$$Zn = e^{(0.830)(\ln hardness) - 0.289} \times 10^{-3}$$

$$Cd = e^{(1.160)(\ln hardness) - 5.777} \times 10^{-3}$$

d    Does not apply to Sacramento River above State Hwy. 32 bridge at Hamilton City. See relevant objectives (c) above.

**TABLE 3-2**
**ORGANIC CHEMICAL WATER QUALITY OBJECTIVES**

| CONSTITUENT | MAXIMUM CONCENTRATION (µg/l) | APPLICABLE WATER BODIES |
|---|---|---|
| Chlorodibromomethane (DBCM) | 4.9 | New Alamo Creek, from Old Alamo Creek to Ulatis Creek; Ulatis Creek, from New Alamo Creek to Cache Slough |
| Dichlorobromomethane (DCBM) | 16 | New Alamo Creek, from Old Alamo Creek to Ulatis Creek; Ulatis Creek, from New Alamo Creek to Cache Slough |
| Chloroform | 46 | New Alamo Creek, from Old Alamo Creek to Ulatis Creek; Ulatis Creek, from New Alamo Creek to Cache Slough |

## 3.1.4    *Cryptosporidium* and *Giardia*

Waters shall not contain *Cryptosporidium* and *Giardia* in concentrations that adversely affect the public water system component[1] of the MUN beneficial use. This narrative water quality objective for *Cryptosporidium* and *Giardia* shall be applied within the Sacramento-San Joaquin Delta and its tributaries below the first major dams (shown in Figure A44-1) and should be implemented as specified in Chapter 4 of the Basin Plan. Compliance with this objective will be assessed at existing and new public water system intakes.

[1] Public water system as defined in Health and Safety Code, section 116275, subdivision (h)

## 3.1.5    **Color**

Water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

## 3.1.6    **Dissolved Oxygen**

Within the legal boundaries of the Delta, the dissolved oxygen concentration shall not be reduced below:

> 7.0 mg/l in the Sacramento River (below the I Street Bridge) and in all Delta waters west of the Antioch Bridge; 6.0 mg/l in the San Joaquin River (between Turner Cut and Stockton, 1 September through 30 November); and 5.0 mg/l in all other Delta waters except for those bodies of water which are constructed for special purposes and from which fish have been excluded or where the fishery is not important as a beneficial use.

For surface water bodies outside the legal boundaries of the Delta, the monthly median of the mean daily dissolved oxygen (DO) concentration shall not fall below 85 percent of saturation in the main water mass, and the 95 percentile concentration shall not fall below 75 percent of saturation. The dissolved oxygen concentrations shall not be reduced below the following minimum levels at any time:

> Waters designated WARM 5.0 mg/l
> Waters designated COLD 7.0 mg/l
> Waters designated SPWN 7.0 mg/l

The more stringent objectives in Table 3-3 apply to specific water bodies in the Sacramento and San Joaquin River Basins:

**TABLE 3-3**
**SPECIFIC DISSOLVED OXYGEN WATER QUALITY OBJECTIVES**

| AMOUNT | TIME | PLACE |
|---|---|---|
| 9.0 mg/l ∗ | 1 June to 31 August | Sacramento River from Keswick Dam to Hamilton City (13) |
| 8.0 mg/l | 1 September to 31 May | Feather River from Fish Barrier Dam at Oroville to Honcut Creek (40) |
| 8.0 mg/l | all year | Merced River from Cressy to New Exchequer Dam (78) |
| 8.0 mg/l | 15 October to 15 June | Tuolumne River from Waterford to La Grange (86) |

∗     When natural conditions lower dissolved oxygen below this level, the concentrations shall be maintained at or above 95 percent of saturation.

## 3.1.7    Floating Material

Water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

## 3.1.8    Mercury

For Sulphur Creek (Colusa County), waters shall be maintained free of mercury from anthropogenic sources such that beneficial uses are not adversely affected. During low flow conditions, defined as flows less than 3 cfs, the instantaneous maximum total mercury concentration shall not exceed 1,800 ng/l. During high flow conditions, defined as flows greater than 3 cfs, the instantaneous maximum ratio of mercury to total suspended solids shall not exceed 35 mg/kg. Both objectives apply at the mouth of Sulphur Creek.

## 3.1.9    Methylmercury

For Clear Lake (53), the methylmercury concentration in fish tissue shall not exceed 0.09 and 0.19 mg methylmercury/kg wet weight of tissue in trophic level 3 and 4 fish, respectively.

For Cache Creek (Clear Lake to Yolo Bypass) (54), North Fork Cache Creek, and Bear Creek (tributary to Cache Creek), the average methylmercury concentration shall not exceed 0.12 and 0.23 mg methylmercury/ kg wet weight of muscle tissue in trophic level 3 and 4 fish, respectively. For Harley Gulch (tributary to Cache Creek), the average methylmercury concentration shall not exceed 0.05 mg methylmercury/ kg wet weight in whole, trophic level 2 and 3 fish.

For the Sacramento-San Joaquin Delta and Yolo Bypass waterways listed in Appendix 43, the average methylmercury concentrations shall not exceed 0.08 and 0.24 mg methylmercury/kg, wet weight, in muscle tissue of trophic level 3 and 4 fish, respectively (150-500 mm total length). The average methylmercury concentrations shall not exceed 0.03 mg methylmercury/kg, wet weight, in whole fish less than 50 mm in length.

Compliance with the methylmercury fish tissue objectives shall be determined by analysis of fish tissue as described in Chapter 5, Surveillance and Monitoring.

## 3.1.10    Oil and Grease

Waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

## 3.1.11    pH

The pH shall not be depressed below 6.5 nor raised above 8.5.

The following site-specific objectives replace the general pH objective, above, in its entirety for the listed water bodies.

For Goose Lake (2), pH shall be less than 9.5 and greater than 7.5 at all times.

## 3.1.12    Pesticides

- No individual pesticide or combination of pesticides shall be present in concentrations that adversely affect beneficial uses.

- Discharges shall not result in pesticide concentrations in bottom sediments or aquatic life that adversely affect beneficial uses.

- Total identifiable persistent chlorinated hydrocarbon pesticides shall not be present in the water column at concentrations detectable within the accuracy of analytical methods approved by the Environmental Protection Agency or the Executive Officer.

- Pesticide concentrations shall not exceed those allowable by applicable antidegradation policies (see State Water Resources Control Board Resolution No. 68-16 and 40 C.F.R. Section 131.12.).

- Pesticide concentrations shall not exceed the lowest levels technically and economically achievable.

- Waters designated for use as domestic or municipal supply (MUN) shall not contain concentrations of pesticides in excess of the Maximum Contaminant Levels set forth in California Code of Regulations, Title 22, Division 4, Chapter 15.

- Waters designated for use as domestic or municipal supply (MUN) shall not contain concentrations of thiobencarb in excess of 1.0 µg/l.

Pesticide concentrations shall not exceed the levels identified in Table 3-4. Where more than one objective may be applicable, the most stringent objective applies.

For the purposes of this objective, the term pesticide shall include: (1) any substance, or mixture of substances which is intended to be used for defoliating plants, regulating plant growth, or for preventing, destroying, repelling, or mitigating any pest, which may infest or be detrimental to vegetation, man, animals, or households, or be present in any agricultural or nonagricultural environment whatsoever, or (2) any spray adjuvant, or (3) any breakdown products of these materials that threaten beneficial uses. Note that discharges of "inert" ingredients included in pesticide formulations must comply with all applicable water quality objectives.

**TABLE 3-4**
**SPECIFIC PESTICIDE OBJECTIVES**

| PESTICIDE | MAXIMUM CONCENTRATION AND AVERAGING PERIOD | APPLICABLE WATER BODIES |
|---|---|---|
| Chlorpyrifos | 0.025 µ g/L ; 1-hour average (acute) 0.015 µ g/L ; 4-day average (chronic) Not to be exceeded more than once in a three year period. | San Joaquin River from Mendota Dam to Vernalis (Reaches include Mendota Dam to Sack Dam (70), Sack Dam to Mouth of Merced River (71), Mouth of Merced River to Vernalis (83)), Delta Waterways listed in Appendix 42. Sacramento River from Shasta Dam to Colusa Basin Drain (13) and the Sacramento River from the Colusa Basin Drain to I Street Bridge (30). Feather River from Fish Barrier Dam to Sacramento River (40). Bear Creek (San Joaquin and Calaveras Counties), Bear River (43), Lower (below Camp Far West Reservoir), Berenda Creek (Madera County), Berenda Slough (Madera County), Colusa Basin Drain (29), Coon Creek, Lower (Sutter County), Deadman Creek (Merced County), Del Puerto Creek, Dry Creek (tributary to Tuolumne River at Modesto, E Stanislaus County), Duck Creek (San Joaquin County), French Camp Slough, Gilsizer Slough , Ingram Creek, Jack Slough, Live Oak Slough, Lone Tree Creek, Main Drainage Canal (Butte County), Merced River, Lower (McSwain Reservoir to San Joaquin River) (81), Mormon Slough (from Stockton Diverting Canal to Bellota Weir), Morrison Slough (Sutter County), Orestimba Creek, Pixley Slough (San Joaquin County ), Salt Slough, Spring Creek (Colusa County), Stanislaus River, Lower (Goodwin Dam to San Joaquin River) (90), Tuolumne River, Lower (Don Pedro Dam to San Joaquin River) (86), Ulatis Creek (Solano County), Wadsworth Canal, Westley Wasteway (Stanislaus County), Winters Canal (Yolo County), Yankee Slough (Placer and Sutter Counties) Waters with designated or existing[2] WARM and/or COLD beneficial uses that are not upstream of the major dams in Table 3-5. |
| Diazinon | 0.16 µ g/L; 1-hour average (acute) 0.10 µ g/L; 4-day average (chronic) Not to be exceeded more than once in a three year period. | As noted above for chlorpyrifos |

[2] Existing as defined in Title 40 of the Code of Federal Regulations, section 131.3(e)

**TABLE 3-5**
**MAJOR DAMS DEMARKING THE UPSTREAM EXTENT OF THE WATER BODIES WITH DIAZINON AND CHLORPYRIFOS WATER QUALITY OBJECTIVES**

| Dam | Associated Reservoir | River System |
|---|---|---|
| Monticello Dam | Lake Berryessa (55) | Putah Creek |
| Black Butte Dam | Black Butte Reservoir (26) | Stony Creek |
| Camanche Dam | Camanche Reservoir (62) | Mokelumne River |
| Camp Far West Dam | Camp Far West Reservoir | Bear River |
| Cache Creek Dam | Clear Lake (53) | Cache Creek |
| New Don Pedro Dam | Don Pedro Reservoir (85) | Tuolumne River |
| Buchanan Dam | Eastman Lake (Buchanan Reservoir) (76) | Chowchilla River |
| Folsom Dam | Folsom Lake (50) | American River |
| Englebright Dam | Harry L. Englebright Reservoir | Yuba River |
| Hidden Dam | Hensley Lake (Hidden Reservoir) (73) | Fresno River |
| Keswick Dam | Keswick Reservoir | Sacramento River |
| New Exchequer Dam | McClure Lake (Exchequer Reservoir) (79) | Merced River |
| Friant Dam | Millerton Lake (68) | San Joaquin River |
| New Hogan Dam | New Hogan Reservoir (65) | Calaveras River |
| Oroville Dam | Lake Oroville (39) | Feather River |
| San Luis Dam | San Luis Reservoir (91) | - |
| Scotts Flat Dam | Scotts Flat Reservoir | Deer Creek |
| Goodwin Dam | Tulloch Reservoir (89) | Stanislaus River |
| Whiskeytown Dam | Whiskeytown Reservoir (14) | Clear Creek |

## 3.1.13  Radioactivity

Radionuclides shall not be present in concentrations that are harmful to human, plant, animal or aquatic life nor that result in the accumulation of radionuclides in the food web to an extent that presents a hazard to human, plant, animal or aquatic life.

At a minimum, waters designated for use as domestic or municipal supply (MUN) shall not contain concentrations of radionuclides in excess of the maximum contaminant levels (MCLs) specified in Table 64442 of Section 64442 and Table 64443 of Section 64443 of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan. This incorporation-by-reference is prospective, including future changes to the incorporated provisions as the changes take effect.

## 3.1.14   Salinity

### 3.1.14.1   Electrical Conductivity and Total Dissolved Solids--Special Cases in the Sacramento and San Joaquin River Basins Other Than the Delta

The objectives for electrical conductivity and total dissolved solids in Table 3-6 apply to the water bodies specified. To the extent of any conflict with the general Chemical Constituents water quality objectives, the more stringent shall apply, with the exception of the electrical conductivity water quality objectives for Reach 83 of the San Joaquin River, which the Board has determined to be protective of all beneficial uses within Reach 83.

---

**TABLE 3-6**
**ELECTRICAL CONDUCTIVITY AND TOTAL DISSOLVED SOLIDS**

| PARAMETER | WATER QUALITY OBJECTIVES | APPLICABLE WATER BODIES |
|---|---|---|
| Electrical Conductivity (at 25°C) | Shall not exceed 230 micromhos/cm (50 percentile) or 235 micromhos/cm (90 percentile) at Knights Landing above Colusa Basin Drain; or 240 micromhos/cm (50 percentile) or 340 micromhos/cm (90 percentile) at I Street Bridge, based upon previous 10 years of record. | Sacramento River (13, 30) |
| | Shall not exceed 150 micromhos/cm (90 percentile) in well-mixed waters of the Feather River. | North Fork of the Feather River (33); Middle Fork of the Feather River from Little Last Chance Creek to Lake Oroville (36); Feather River from the Fish Barrier Dam at Oroville to Sacramento River (40) |
| | Shall not exceed 150 micromhos/cm from Friant Dam to Gravelly Ford (90 percentile). | San Joaquin River, Friant Dam to Mendota Pool (69) |
| | Shall not exceed 1550 micromhos/cm (as a 30-day running average), except during Extended Dry Periods[3], when concentrations shall not exceed 2470 micromhos/cm (as a 30-day running average) and 2200 micromhos/cm (as an annual average using at a minimum the previous four quarterly samples) | San Joaquin River between the Mouth of Merced River and the Airport Way Bridge near Vernalis (83) |

---

[3] See Page 4-70 for definition of an Extended Dry Period

**TABLE 3-6**
**ELECTRICAL CONDUCTIVITY AND TOTAL DISSOLVED SOLIDS**

| PARAMETER | WATER QUALITY OBJECTIVES | APPLICABLE WATER BODIES |
|---|---|---|
| Total Dissolved Solids | Shall not exceed 125 mg/l (90 percentile) | North Fork of the American River from the source to Folsom Lake (44); Middle Fork of the American River from the source to Folsom Lake (45); South Fork of the American River from the source to Folsom Lake (48, 49); American River from Folsom Dam to Sacramento River (51) |
| | Shall not exceed 100 mg/l (90 percentile) | Folsom Lake (50) |
| | Shall not exceed 1,300,000 tons | Goose Lake (2) |

### 3.1.14.2    Electrical Conductivity, Total Dissolved Solids, and Chloride--Delta Waters

See the Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary, 2006, for salinity objectives applicable in the Delta.

## 3.1.15    Sediment

The suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses.

## 3.1.16    Settleable Material

Waters shall not contain substances in concentrations that result in the deposition of material that causes nuisance or adversely affects beneficial uses.

## 3.1.17    Suspended Material

Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

## 3.1.18    Tastes and Odors

Water shall not contain taste- or odor-producing substances in concentrations that impart undesirable tastes or odors to domestic or municipal water supplies or to fish flesh or other edible products of aquatic origin, or that cause nuisance, or otherwise adversely affect beneficial uses.

## 3.1.19   Temperature

The natural receiving water temperature of intrastate waters shall not be altered unless it can be demonstrated to the satisfaction of the Regional Water Board that such alteration in temperature does not adversely affect beneficial uses.

Temperature objectives for COLD interstate waters, WARM interstate waters, and Enclosed Bays and Estuaries are as specified in the *Water Quality Control Plan for Control of Temperature in the Coastal and Interstate Waters and Enclosed Bays of California* including any revisions. There are also temperature objectives for the Delta in the State Water Board's *2006 Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary*.

At no time or place shall the temperature of COLD or WARM intrastate waters be increased more than 5°F above natural receiving water temperature. Temperature changes due to controllable factors shall be limited for the water bodies specified as described in Table 3-7. To the extent of any conflict with the above, the more stringent objective applies.

In determining compliance with the water quality objectives for temperature, appropriate averaging periods may be applied provided that beneficial uses will be fully protected.

### TABLE 3-7
### SPECIFIC TEMPERATURE OBJECTIVES

| DATES | APPLICABLE WATER BODY |
|---|---|
| From 1 December to 15 March, the maximum temperature shall be 55°F. | Sacramento River from its source to Box Canyon Reservoir (9); Sacramento River from Box Canyon Dam to Shasta Lake (11) |
| From 16 March to 15 April, the maximum temperature shall be 60°F. | |
| From 16 April to 15 May, the maximum temperature shall be 65°F. | |
| From 16 May to 15 October, the maximum temperature shall be 70°F. | |
| From 16 October to 15 November, the maximum temperature shall be 65°F. | |
| From 16 November to 30 November, the maximum temperature shall be 60°F. | |
| The temperature in the epilimnion shall be less than or equal to 75°F or mean daily ambient air temperature, whichever is greater. | Lake Siskiyou (10) |
| The temperature shall not be elevated above 56°F in the reach from Keswick Dam to Hamilton City nor above 68°F in the reach from Hamilton City to the I Street Bridge during periods when temperature increases will be detrimental to the fishery. | Sacramento River from Shasta Dam to I Street Bridge (13, 30) |

The following site-specific objective replaces the general temperature objective, above, in its entirety for the listed water body:

For Deer Creek, source to Cosumnes River, temperature changes due to controllable factors shall not cause creek temperatures to exceed the objectives specified in Table 3-8.

**TABLE 3-8**
**DEER CREEK TEMPERATURE OBJECTIVES**

| Date | Daily Maximum (°F)[a] | Monthly Average (°F)[b] |
|------|----------------------|------------------------|
| January and February | 63 | 58 |
| March | 65 | 60 |
| April | 71 | 64 |
| May | 77 | 69 |
| June | 81 | 74 |
| July through Sept. | 81 | 77 |
| October | 77 | 72 |
| November | 73 | 65 |
| December | 65 | 58 |

a Maximum not to be exceeded.
b Defined as a calendar month average

## 3.1.20  Toxicity

All waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life. This objective applies regardless of whether the toxicity is caused by a single substance or the interactive effect of multiple substances. Compliance with this objective will be determined by analyses of indicator organisms, species diversity, population density, growth anomalies, and biotoxicity tests of appropriate duration or other methods as specified by the Regional Water Board.

The Regional Water Board will also consider all material and relevant information submitted by the discharger and other interested parties and numerical criteria and guidelines for toxic substances developed by the State Water Board, the California Office of Environmental Health Hazard Assessment, the State Water Board Division of Drinking Water Programs, the U.S. Food and Drug Administration, the National Academy of Sciences, the U.S. Environmental Protection Agency, and other appropriate organizations to evaluate compliance with this objective.

The survival of aquatic life in surface waters subjected to a waste discharge or other controllable water quality factors shall not be less than that for the same water body in areas unaffected by the waste discharge, or, when necessary, for other control water that is consistent with the requirements for "experimental water" as described in *Standard Methods for the Examination of Water and Wastewater*, latest edition. As a minimum, compliance with this objective as stated in the previous sentence shall be evaluated with a 96-hour bioassay.

In addition, effluent limits based upon acute biotoxicity tests of effluents will be prescribed where appropriate; additional numerical receiving water quality objectives for specific toxicants will be established as sufficient data become available; and source control of toxic substances will be encouraged.

## 3.1.21  Turbidity

Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses. Increases in turbidity attributable to controllable water quality factors shall not exceed the following limits:

- Where natural turbidity is less than 1 Nephelometric Turbidity Unit (NTU), controllable factors shall not cause downstream turbidity to exceed 2

- Where natural turbidity is between 1 and 5 NTUs, increases shall not exceed 1 NTU.

- Where natural turbidity is between 5 and 50 NTUs, increases shall not exceed 20 percent.

- Where natural turbidity is between 50 and 100 NTUs, increases shall not exceed 10 NTUs.

- Where natural turbidity is greater than 100 NTUs, increases shall not exceed 10 percent.

In determining compliance with the above limits, appropriate averaging periods may be applied provided that beneficial uses will be fully protected.

Exceptions to the above limits will be considered when a dredging operation can cause an increase in turbidity. In those cases, an allowable zone of dilution within which turbidity in excess of the limits may be tolerated will be defined for the operation and prescribed in a discharge permit.

For Folsom Lake (50) and American River (Folsom Dam to Sacramento River) (51), except for periods of storm runoff, the turbidity shall be less than or equal 10 NTUs. To the extent of any conflict with the general turbidity objective, the more stringent applies.

For Delta waters, the general objectives for turbidity apply subject to the following: except for periods of storm runoff, the turbidity of Delta waters shall not exceed 50 NTUs in the waters of the Central Delta and 150 NTUs in other Delta waters. Exceptions to the Delta specific objectives will be considered when a dredging operation can cause an increase in turbidity. In this case, an allowable zone of dilution within which turbidity in excess of limits can be tolerated will be defined for the operation and prescribed in a discharge permit.

For Deer Creek, source to Cosumnes River:

- When the dilution ratio for discharges is less than 20:1 and where natural turbidity is less than 1 Nephelometric Turbidity Unit (NTU), discharges shall not cause the receiving water daily average turbidity to exceed 2 NTUs or daily maximum turbidity to exceed 5 NTUs. Where natural turbidity is between 1 and 5 NTUs, dischargers shall not cause receiving water daily average turbidity to increase more than 1 NTU or daily maximum turbidity to exceed 5 NTUs

- Where discharge dilution ratio is 20:1 or greater, or where natural turbidity is greater than 5 NTUs, the general turbidity objectives shall apply.

## 3.2    WATER QUALITY OBJECTIVES FOR GROUND WATERS

The following objectives apply to all ground waters of the Sacramento and San Joaquin River Basins, as the objectives are relevant to the protection of designated beneficial uses. These objectives do not require improvement over naturally occurring background concentrations. The ground water objectives contained in this plan are not required by the federal Clean Water Act.

## 3.2.1    Bacteria

In ground waters used for domestic or municipal supply (MUN) the most probable number of coliform organisms over any seven-day period shall be less than 2.2/100 ml.

## 3.2.2    Chemical Constituents

Ground waters shall not contain chemical constituents in concentrations that adversely affect beneficial uses.

At a minimum, ground waters designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels- Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449. This incorporation-by-reference is prospective, including future changes to the incorporated provisions as the changes take effect. At a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain lead in excess of 0.015 mg/l. To protect all beneficial uses, the Regional Water Board may apply limits more stringent than MCLs.

## 3.2.3    Radioactivity

At a minimum, ground waters designated for use as domestic or municipal supply (MUN) shall not contain concentrations of radionuclides in excess of the maximum contaminant levels (MCLs) specified in Table 4 (MCL Radioactivity) of Section 64443 of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan. This incorporation-by-reference is prospective, including future changes to the incorporated provisions as the changes take effect.

## 3.2.4    Tastes and Odors

Ground waters shall not contain taste- or odor-producing substances in concentrations that cause nuisance or adversely affect beneficial uses.

## 3.2.5    Toxicity

Ground waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life associated with designated beneficial use(s). This objective applies regardless of whether the toxicity is caused by a single substance or the interactive effect of multiple substances.

# 4  IMPLEMENTATION

The Porter-Cologne Water Quality Control Act states that basin plans consist of beneficial uses, water quality objectives and a program of implementation for achieving their water quality objectives [Water Code Section 13050(j)]. The implementation program shall include, but not be limited to:

(1)    A description of the nature of actions which are necessary to achieve the objectives, including recommendations for appropriate action by any entity, public or private;

(2)    A time schedule for the actions to be taken; and,

(3)    A description of surveillance to be undertaken to determine compliance with the objectives (Water Code Section 13242).

In addition, State law requires that basin plans indicate estimates of the total cost and identify potential sources of funding of any agricultural water quality control program prior to its implementation. (Water Code Section 13141). This chapter of the Basin Plan responds to all but the surveillance requirement. That is described in Chapter 5.

This chapter is organized as follows: The first section contains a general description of water quality concerns. These are organized by discharger type (e.g., agriculture, silviculture, mines, etc.). The second section lists programs, plans and policies which should result in the achievement of most of the water quality objectives in this plan. This section includes descriptions of State Water Board policies, statewide plans, statewide programs dealing with specific waste discharge problems (e.g., underground tanks, storm water, solid waste disposal sites, etc.), memoranda of understanding, management agency agreements, memoranda of agreement, Regional Water Board policies, a listing of Regional Water Board prohibition areas, and Regional Water Board guidelines addressing specific water quality problems. The third section contains recommendations for appropriate action by entities other than the Regional Water Board. The fourth section describes how; within the framework of the programs, plans and policies discussed in the second section; the Regional Water Board integrates water quality control activities into a continuing planning process. The fifth section identifies the current actions and the time schedule for future actions of the Regional Water Board to achieve compliance with water quality objectives where the programs, plans and policies in the second section are not adequate. The last section lists the estimated costs and funding sources for agricultural water quality control programs that are implemented by the Regional Water Board.

## 4.1   WATER QUALITY CONCERNS

Water quality concerns are existing or potential water quality problems, i.e., impairments of beneficial uses or degradations of water quality. At any given time, water quality problems generally reflect the intensity of activities of key discharge sources and the volume, quality, and uses of the receiving waters affected by the discharges.

Historic and ongoing point and nonpoint source discharges impact surface waters. Significant portions of major rivers and the Delta are impaired, to some degree, by discharges from agriculture, mines, urban areas and industries. Upstream, small streams and tributaries to the Rivers are impaired or threatened because of discharges from mines, silviculture activities, and urban development activities. Control approaches may differ depending on the source of the problem.

A variety of historic and ongoing point and non-point industrial, urban, and agricultural activities degrade the quality of ground water. Discharges to ground water associated with these activities include industrial and agricultural chemical use and spills; underground and above ground tank and sump leaks; landfill leachate and gas releases; septic tank failures; improper animal waste management; and chemical seepage via shallow drainage wells and abandoned wells. The resulting impacts on ground water quality from these discharges are often long-term and costly to treat or remediate. Consequently, as discharges are identified, containment and cleanup of source areas and plumes must be undertaken as quickly as possible. Furthermore, activities that may potentially impact ground water must be managed to ensure that ground water quality is protected.

Improper management of waste materials and spillage of industrial fluids have degraded or polluted ground water resources beneath military bases, rail yards, wood treating facilities, aerospace manufacturing and testing operations, municipal gas plants, fuel tank farms, pesticide formulators, dry cleaners, and other industrial facilities. Many of the sites contain high concentrations of contaminants in soils, which continue to be sources of ground water degradation and pollution, until remediated.

Our knowledge of amounts and types of problems associated with discharge activities change over time. Early federal and state control efforts tended to focus on the most understood or visible problems such as the discharge of raw sewage to rivers and streams. As these problems were controlled and as pollutant detection and measurement methods improved, regulatory emphasis shifted. For example, control of toxic discharges is now a major concern. Toxicity can be associated with many discharge activities. Its effects may be first expressed as acute or chronic reductions in the number of organisms in receiving waters. Minute amounts of toxic materials may also impair beneficial uses from accumulation in tissues or sediments.

Discharges are sometimes sorted into point source and nonpoint source categories. A point source discharge usually refers to waste emanating from a single, identifiable place. A nonpoint source discharge usually refers to waste emanating from diffused locations. The Regional Water Board may control either type of discharge, but the control approaches may differ.

Salt management is becoming increasingly important in the San Joaquin Valley for urban and agricultural interests. If current practices for discharging waters containing elevated levels of salt continue unabated, the San Joaquin Valley can have a large portion of its ground water severely degraded within a few decades. Therefore, the Regional Water Board will pursue strategies that will achieve the availability of a valley-wide drain for the discharge of agricultural wastewaters and drain waters degraded by elevated levels of salt and in which nutrient and toxic material concentrations meet applicable standards.

Following is a brief description of the water quality impacts associated with basin discharge activities along with some general control considerations.

## 4.1.1    Agriculture

Agricultural activities affect water quality in a number of ways. There are unique problems associated with irrigated agriculture, agricultural support activities, and animal confinement operations because of the volume of water used and the diffused nature of many of the discharges.

#### 4.1.1.1    Irrigated Agriculture

Irrigated agriculture accounts for most water use in the two sub-basins. Both the San Joaquin and the Sacramento Rivers carry substantial amounts of agricultural return water or drainage. Agricultural drainage contributes salts, nutrients, pesticides, trace elements, sediments, and other by-products that affect the water quality of the rivers and the Delta.

There is a Memorandum of Understanding between the State Water Board and Department of Pesticide Regulation describing the role of each agency with regard to pesticide regulation.

Salt management is critical to agriculture in the Central Valley. Evaporation and crop transpiration remove water from soils which can result in an accumulation of salts in the root zone of the soils at levels that retard or inhibit plant growth. Additional amounts of water often are applied to leach the salts below the root zones. The leached salts can reach ground or surface water. The movement of the salts to surface waters may be a natural occurrence of subsurface flows or it can result from the surface water discharge of subsurface collection systems (often called tile drains) which are routinely employed in areas of the Central Valley where farm lands have poor drainage capabilities. The tile drainage practice consists of installing collection systems below the root zone of the crops to drain soils that would otherwise stay saturated because of subsurface conditions that restrict drainage. Tile drain installation may result in TDS concentrations in drainage water many times greater than in the irrigation water that was applied to the crops. Tile drain water can also contain pesticides, trace elements, and nutrients.

Pesticides and nutrients are also major ingredients of surface agricultural drainage. They have found their way to ground and surface waters in many areas of the basins. Fish and aquatic wildlife deaths attributable to pesticide contamination of surface water occur periodically.

Nitrate and DBCP (1,2-Dibromo-3-chloropropane) levels exceeding the State drinking water standards occur extensively in ground water in the basins and public and domestic supply wells have been closed because of DBCP, EDB, nitrates, and other contaminants in several locations.

Discharge of sediment is another problem encountered with agriculture. Sedimentation impairs fisheries and, by virtue of the characteristics of many organic and inorganic compounds to bind to soil particles, it serves to distribute and circulate toxic substances through the riparian, estuarine, and marine systems. Sedimentation also increases the costs of pumping and treating water for municipal and industrial use. An additional significant impact of sediment in runoff is the sediment's direct smothering effect on bottom dwelling communities.

The Regional Water Board approaches problems related to irrigated agriculture as it does other categories of problems. Staff are assigned to identify and evaluate beneficial use impairments associated with agricultural discharges. Control actions are developed and implemented as appropriate per the schedules identified through the continuous planning process (see section titled, "ACTIONS AND SCHEDULE TO ACHIEVE WATER QUALITY OBJECTIVES").

#### 4.1.1.2    Agricultural Support Activities

These are the activities associated with the application of pesticides, disposal of pesticide rinse waters, and formulation of pesticides and fertilizers. Major water quality problems connected with all of these operations stem from the discharge of waters used to clean equipment or work areas. The Region has confirmed cases of ground water contamination as a result of improper containment and disposal of rinse water.

Many of the application facilities fall under Regional Water Board regulatory programs. When appropriate, best management practices are recommended. Regional Water Board staff also inspects high risk sites to evaluate compliance. Enforcement strategies are implemented as warranted.

### 4.1.1.3    Animal Confinement Operations

Runoff from animal confinement facilities (e.g., stockyards, dairies, poultry ranches) can impair both surface and ground water beneficial uses. The animal wastes may produce significant amounts of coliform, ammonia, nitrate, and TDS contamination. The greatest potential for water quality problems has historically stemmed from the overloading of the facilities' waste containment and treatment ponds during the rainy season and inappropriate application of wastewater and manure. Most of these facilities are not operating under waste discharge requirements (WDRs). However, waste management at all confined animal facilities must comply with specific regulations and large facilities must obtain an NPDES storm water permit.

## 4.1.2    Silviculture

Forest management activities, principally timber harvesting and application of herbicides, have the potential to impact beneficial uses. Timber harvest activities annually take place on tens of thousands of acres of private and federal land in the Central Valley Region and they may affect water quality throughout the area being harvested. Erosion can result from road construction, logging, and post-logging operations. Logging debris may be deposited in streams. Landslides and other mass soil movements can also occur as a result of timber operations.

Herbicides may be used in silviculture to reduce commercial timber competition from weeds, grasses, and other plants or to prepare a site for planting of commercial species by eliminating existing vegetation. Use of herbicides has caused concern among regulatory agencies and the public because of the possibility of transport from target sites to streams by wind and water runoff.

The State and Regional Water Boards entered into agreements with both the U.S. Forest Service and the California Department of Forestry and Fire Protection which require these agencies to control nonpoint source discharges by implementing control actions certified by the State Water Board as best management practices (BMPs). The Regional Water Board enforces compliance with BMP implementation and may impose control actions above and beyond what is specified in the agreements if the practices are not applied correctly or do not protect water quality. Point source discharges on federal and state and private forest lands are regulated through waste discharge limits.

## 4.1.3    Municipalities and Industries

Municipal and industrial point source discharges to surface waters are generally controlled through National Pollutant Discharge Elimination System (NPDES) permits. Although the NPDES program was established by the Clean Water Act, the permits are prepared and enforced by the Regional Water Boards per California's authority for the Act. The number of cases of ground water pollution attributable to industrial or municipal sources has increased steadily. For example, the Region's inventory of underground storage tanks indicates the number of leaking tanks is high. Ground water contamination from other industrial sources generally occurs from practices of disposing of fluids or other materials used in production processes. Waste compounds have been discharged directly to unlined sumps, pits, or depressions and spread on soils. In some cases, these disposal practices went on many years before they were discovered or discontinued. Leaking municipal or industrial sewer lines also contribute to ground water pollution.

The promulgation of EPA sludge regulations under section 503 of the Clean Water Act and the adoption of water quality objectives for toxic pollutants pursuant to section 303(c)(2)(B) will require that NPDES permits, upon renewal, be updated to reflect these new regulations. Once effluent limitations sufficient to comply with sludge requirements and water quality objectives for toxic pollutants have been placed into NPDES permits, POTWs subject to pretreatment program requirements will be required to update their local limits consistent with EPA pretreatment program regulations and guidance.

## 4.1.4    Storm Water

Runoff from residential and industrial areas also contributes to water quality degradation. Urban storm water runoff contains pesticides, oil, grease, heavy metals, polynuclear aromatic hydrocarbons, other organics, and nutrients. Because these pollutants accumulate during the dry summer months, the first major autumn storm can flush a highly concentrated load to receiving waters and catch basins. Combined storm and sanitary systems may result in some runoff to sewage treatment plants. In other cases, storm water collection wells can produce direct discharges to ground water. Impacts of storm water contaminants on surface and ground waters are an important concern.

The "Control Action Considerations of the State Water Board" section in Chapter 4 provides more detail on how the Regional Water Board regulates storm water.

## 4.1.5    Mineral Exploration and Extraction

Mineral exploration and extraction discharges are associated with several ore, geothermal, and petroleum/natural gas activities. The discharge of greatest concern in the Sacramento and San Joaquin River Basins is the result of ore exploration and extraction.

Drainage and runoff from mines and various operations associated with mining can result in serious impacts to ground and surface water beneficial uses, if not properly managed. Along much of the east side of the Coast Range, runoff, drainage, and erosion from old mercury mines is a problem that has resulted in high levels of mercury in aquatic environments and fish tissue. There are also major metal and acid discharges associated with abandoned copper mines in the Sierra/ Cascades drainages. Sedimentation can be a problem in the construction and operation of many mines.

Within the past decade there has been a significant increase in the amount of gold extraction and processing in the Sierra foothills and in the Coast Ranges. Most of these operations have been made possible by advances in technology, permitting the economical extraction of minute quantities of gold from large volumes of ore with the use of cyanide and other reagents by heap and vat leach methods, and by the current high price of gold on world markets. Advances in ore and waste rock handling techniques have made open pit mining more profitable and common. These mining operations involve the handling and management of large quantities of ore, potentially-toxic chemical reagents, tailings, waste rock, and spent leaching solutions in piles, tailings ponds, and impoundments. If not carefully managed, these operations have the potential to leach toxic reagents, heavy metals, salts, and acidic drainage waters into surface and ground water resources. Mining waste management facilities and associated mining operations are regulated through the issuance of waste discharger requirements under the State and Regional Water Boards' hazardous and solid waste regulatory program (Title 23, California Code of Regulations (CCR), Division 3, Chapter 15 and Title 27, CCR, Division 2, Subdivision 1).

Efforts to control drainage have gradually expanded over the years. Staff assessments of mine water quality problems done in 1979 and 1992 helped direct the Regional Water Board's approach to the problems. When other options were exhausted, the Regional Water Board has used public funds to abate pollution from these mines.

Geothermal operations in the basins are centered in the Geysers Area of Lake County. Potential impacts to water quality are caused by soil erosion from road construction and site preparation, high pressure steam blowouts, and accidental spills of materials from drilling operations, power plants, steam condensate lines, and waste transport accidents. Bentonite clay, boron, ammonia, sodium hydroxide, sulfur compounds, heavy metals, and petroleum products are found in various concentrations in mud sumps, steam condensate lines, and sulfide abatement sludge. Operational failures can release these substances into waterways.

## 4.1.6    Hazardous and Non-Hazardous Waste Disposal

Discharges of solid, semi-solid, and liquid wastes to landfills, waste piles, surface impoundments, pits, trenches, tailings ponds, natural depressions and land treatment facilities (collectively called "waste management units") have the potential to create sources of pollution affecting the quality of waters of the State. Unlike surface waters which often have the capacity to assimilate discharged waste constituents, ground waters have little or no assimilative capacity, due to their slow migration rate, lack of aeration, lower biological activity, and laminar flow patterns. If the concentrations of constituents in the land-discharged waste are sufficiently high to prevent the waste from being classified as "inert waste" under 27 CCR, Section 20230, discharges of such wastes to waste management units require long term containment or active treatment following the discharge in order to prevent waste or waste constituents from migrating to and impairing the beneficial uses of waters of the State. Pollutants from such discharges may continue to affect water quality long after the discharge of new waste to the unit has ceased, either because of continued leachate or gas discharges from the unit, or because pollutants have accumulated in underlying soils from which they are gradually released to ground water.

Landfills for disposal of municipal or industrial solid waste (solid waste disposal sites) are the major categories of waste management units in the region, but there are also surface impoundments used for storage or evaporative treatment of liquid wastes, waste piles for the storage of solid wastes, and land treatment units for the biological treatment of semi-solid sludges from wastewater treatment facilities and liquid wastes from cannery and other industrial operations. Sumps, trenches, and soil depressions have been used in the past for liquid waste disposal. Mining waste management units (tailings ponds, surface impoundments, and waste piles) also represent a significant portion of the waste management units in the Region. The Regional Water Board issues waste discharge requirements to ensure that these discharges are properly contained to protect the Region's water resources from degradation, and to ensure that dischargers undertake effective monitoring to verify continued compliance with requirements.

These discharges, and the waste management units at which the wastes are discharged, are subject to concurrent regulation by other State and local agencies responsible for land use planning, solid waste management, and hazardous waste management. "Local Enforcement Agencies" (mainly cities and counties) implement the State's solid waste management laws and local ordinances governing the siting, design, and operation of solid waste disposal facilities (usually landfills) with the concurrence of the California Integrated Waste Management Board (CIWMB). The CIWMB also has direct responsibility for review and approval of plans for closure and post-closure maintenance of solid waste landfills. The Department of Toxic Substance Control (DTSC) issues permits for all hazardous waste treatment, storage, and disposal facilities (which include hazardous waste incinerators, tanks, and warehouses where hazardous wastes are stored in drums as well as landfills, waste piles, surface impoundments, and land treatment units). The State Water Board, Regional Water Boards, CIWMB, and DTSC have entered into a Memoranda of Understanding to coordinate their respective roles in the concurrent regulation of these discharges. In addition, the Toxic Pits Cleanup Act of 1984 precludes the storage or disposal of liquid hazardous wastes or hazardous wastes containing free liquids. The Regional Water Board is responsible for enforcing this Act under the authority of the Health and Safety Code, Section 25208 et seq. (See section 4.2.1.2.3 for further description).

The statutes and regulations governing the discharges of both hazardous and non-hazardous wastes have been revised and strengthened in the last few years. The discharge of municipal solid wastes to land are closely regulated and monitored; however, some water quality problems have been detected and are being addressed. Recent monitoring efforts under the State and Regional Water Boards' Title 23, CCR Division 3, Chapter 15; Title 27 CCR, Division 2, Subdivision 1; and SWAT programs have revealed that discharges of municipal solid wastes to unlined and single clay lined landfills have resulted in ground water degradation and pollution by volatile organic constituents (VOCs) and other waste constituents. VOCs are components of many household hazardous wastes and certain industrial wastes that are present within municipal solid waste streams. VOCs can easily migrate from landfills either in leachate or by vapor-phase transport. Clay liners and natural clay formations between discharged wastes and ground waters are largely ineffective in preventing water quality impacts from municipal solid waste constituents. In a recently adopted policy for water quality control, the State Water Board found that "[r]esearch on liner systems for landfills indicates that (a) single clay liners will only delay, rather than preclude, the onset of leachate leakage, and (b) the use of composite liners represents the most effective approach for reliably containing leachate and landfill gas" (State Water Board Resolution No. 93-62, *Policy for Regulation of Discharges of Municipal Solid Waste*).

As a result of similar information on a national scale, the U.S. Environmental Protection Agency (USEPA) has adopted new regulations under Subtitle D of the Resource Conservation and Recovery Act (RCRA) which require the containment of municipal solid wastes by composite liners and leachate collection systems. Composite liners consist of a flexible synthetic membrane component placed above and in intimate contact with a compacted low-permeability soil component. This liner system enhances the effectiveness of the leachate collection and removal system and provides a barrier to vapor-phase transport of VOCs from the unit. Regional Water Boards and the CIWMB are implementing these new regulations in California under a policy for water quality control from the State Water Board (Resolution No. 93-62, discussed above) and new regulations from CIWMB. While a single composite liner of the type that can be approved under Subtitle D regulations is a significant improvement over past municipal solid waste containment systems, it should be noted, however, that single composite liners will not necessarily provide complete protection for ground water resources.

## 4.1.7    Contaminated Sites Threatening Ground Water Quality

The Regional Water Board has identified over 7000 sites with confirmed releases of constituents of concern which have adversely impacted or threaten to impact the quality of ground water resources. Sources of pollution at these sites include: leaking underground storage tanks and sumps; leaking above ground tanks; leaking pipelines; leaking waste management units, such as landfills, disposal pits, trenches and ponds; surface spills from chemical handling, transfer or storage; poor housekeeping; and illegal disposal. A policy for investigation and cleanup of such sites is contained in the section of this chapter titled "Policy for Investigation and Cleanup of Contaminated Sites."

## 4.1.8    Drinking Water Policy

The Regional Water Board supports protection of the MUN beneficial use in surface waters of the Sacramento-San Joaquin Delta and its tributaries. The Delta provides drinking water to over 25 million people in the Southern California, Central Valley, Central Coast, and San Francisco Bay regions, and several million people obtain their water supply from the tributaries of the Delta. The tributaries of the Sacramento and San Joaquin Rivers that originate in the Cascades and Sierra Nevada Mountains generally have high water quality. However, as the tributaries flow into lower elevations, they are affected by natural processes, urban, industrial, and agricultural land uses, and a highly managed water supply system. This Policy pertains to the

following drinking water constituents of concern: organic carbon, *Cryptosporidium*, *Giardia*, salt and nutrients. Work on the Policy was initiated in 2000 in response to concerns that these constituents might pose significant drinking water risks and result in significant additional treatment costs for water agencies due to the potential increased loading as a result of population growth in the watershed. Source control evaluations conducted in 2011 show that the load of organic carbon and nutrients will not likely increase in the future as a result of current regulatory actions. Monitoring of *Cryptosporidium* at public water system intakes from 2006 to 2011, as required by USEPA regulations, has not resulted in additional treatment requirements for public water systems treating water from the Delta and its tributaries. The *Cryptosporidium* and *Giardia* narrative objective and associated implementation program are to maintain existing conditions for public water systems, to comply with the Policy with Respect to Maintaining High Quality of Water in California and the Antidegradation Implementation Policy.

Other elements of the Drinking Water Policy include the following:

- The Basin Plan contains the following elements that address the protection of the MUN beneficial use:

  - All water quality objectives are developed to protect the MUN beneficial use unless otherwise stated. The Basin Plan also includes specific narrative and numeric objectives to protect the MUN beneficial use.
  - The existing narrative water quality objective for chemical constituents includes drinking water chemical constituents of concern, such as organic carbon.
  - The Implementation Chapter of the Basin Plan contains the following Policies relevant to the protection of the MUN beneficial use:

    - Resolution No. 68-16, Policy with Respect to Maintaining High Quality of Water in California (Section 4.2.1.1.2).
    - Resolution No. 88-63, Sources of Drinking Water Policy (Section 4.2.1.1.8).
    - Antidegradation Implementation Policy (Section 4.2.2.1.7).
    - Policy for Application of Water Quality Objectives (Section 4.2.2.1.9).
    - Policy for Implementation of Toxics Standards for Inland Surface Waters, Enclosed Bays, and Estuaries of California; a.k.a. State Implementation Plan or SIP (Section 4.2.1.1.15)

  - Continued coordinated monitoring and modeling of the identified drinking water constituents of concern is necessary to confirm that concentrations will not likely increase to levels that adversely affect beneficial uses. Monitoring completed to support the implementation of the Drinking Water Policy shall be coordinated with other monitoring programs already in place as well as the Delta Regional Monitoring Program. The Delta Regional Monitoring Program is a Regional Water Board initiated stakeholder effort to address the need for a comprehensive monitoring, assessment and reporting program.

- To further protect the public health, drinking water utilities employ a multibarrier approach to control contaminants that includes source water protection, water treatment, and protection of distribution system water quality.

- Source evaluations based on 2011 permit conditions for publically owned treatment works, urban runoff, and irrigated agriculture, indicate that concentrations of organic carbon at public water system intakes are not expected to increase over time.

- Drinking water constituents of concern shall continue to be considered when NPDES facilities conduct their Antidegradation analysis.

- If there are significant changes to the characteristics of the project area, drinking water treatment standards based on source water quality, or knowledge regarding drinking water constituents of concern, the Central Valley Water Board may consider the need to reevaluate the Drinking Water Policy. The Drinking Water Policy will be reviewed by the Regional Water Board in 2023 to determine if the provisions should be revised.

- The Regional Water Board supports and recognizes the importance of USEPA's efforts to refine analytical methods to measure *Cryptosporidium* and *Giardia* in water.

- The Regional Water Board supports refinement of analytical modeling efforts to improve understanding of the fate and transport of drinking water constituents of concern.

- It is appropriate to use *Cryptosporidium* concentrations as an indicator of compliance with the *Cryptosporidium* and *Giardia* objective since *Cryptosporidium* is not as readily treated as *Giardia* when conventional drinking water treatment processes are employed, and USEPA promulgated new drinking water requirements specifically to address *Cryptosporidium*.

## 4.1.9    Other Discharge Activities

Some remaining discharges of major concern include sedimentation from land development activities in the foothills and mountains, leachate from septic tank/individual wastewater disposal systems, and dredging and dredging spoils runoff.

Many of the foothill/mountain counties in the sub-basins face high growth rates. Sedimentation from the land disturbances associated with residential and commercial development is an increasing problem that, when added to the sedimentation resulting from farming and silvicultural operation, may require establishment of a region-wide erosion control program. The Regional Water Board's current practice is to emphasize local government control of erosion caused by residential development. Erosion control guidelines are included in the erosion/sedimentation action plan which is in the Appendix.

Improperly located, designed, constructed and/or maintained on-site wastewater treatment and disposal systems can result in ground and surface water degradation and public health hazards. The Regional Water Board's approach is that the control of individual wastewater treatment and disposal systems is best accomplished by local environmental health departments enforcing county ordinances designed to provide protection to ground and surface waters. Consistent with this approach, the Regional Water Board implements the State Water Board's *Water Quality Control Policy for Siting, Design, Operation, and Maintenance of Onsite Wastewater Treatment Systems* (OWTS Policy).

The energy crisis of the 1970s resulted in a surge of small hydroelectric facility development in the mountains and foothills. Impairments to beneficial uses may occur because of erosion from construction and changes in water temperature. The Regional Water Board has published guidelines for small hydro-electric facilities (see Guidelines section of this chapter and Appendix) to help address some of the problems associated with small hydroelectric plants.

Dredging is a problem because the process can result in turbidity and the reintroduction and resuspension of harmful metal or organic materials. This latter effect occurs directly as a result of the displacement of sediment at the dredging site and indirectly as a result of erosion of dredge spoil to surface waters at the deposition site. Another major concern is water quality problems associated with the dredge spoils disposal site. There is much dredging of the Sacramento and San Joaquin Rivers and the Delta because of the need to maintain the ship channels to the Ports of Sacramento and Stockton. The Regional Water Board regulates

dredging operations on a case-by-case basis. Operational criteria may result from permits or the water quality certification requirements stemming from Section 401(a) of the Clean Water Act.

In addition to the problems described above, the Regional Water Board responds to spontaneous discharges such as spills, leaks and overflows. These can have cumulatively or individually significant effects on beneficial uses of ground and surface waters.

## 4.1.10   Water Bodies with Special Water Quality Problems

Water quality management may require the identification and ranking of water bodies with regard to certain quality parameters. Water Quality Limited Segments (WQLSs) are one example of expressing water quality problems by water bodies. WQLSs are those sections of lakes, streams, rivers or other fresh water bodies where water quality does not meet (or is not expected to meet) water quality standards even after the application of appropriate effluent limitations for point sources (40 CFR 130, et seq.).

Additional treatment beyond minimum federal requirements will be imposed on dischargers to WQLSs. Dischargers will be assigned or allocated a maximum allowable load of critical pollutants so that water quality objectives can be met in the segment.

The Regional Water Board's list of WQLSs is updated biennially as required by Clean Water Act Section 303(d). The current list may be obtained by contacting the Regional Water Board office.

## 4.2   THE NATURE OF CONTROL ACTIONS IMPLEMENTED BY THE REGIONAL WATER BOARD

The nature of actions to achieve water quality objectives consists of Regional Water Board efforts:

(1)     to identify potential water quality problems;

(2)     to confirm and characterize water quality problems through assessments for source, frequency, duration, extent, fate, and severity;

(3)     to remedy water quality problems through imposing or enforcing appropriate measures; and

(4)     to monitor problem areas to assess effectiveness of the remedial measures.

Generally, the actions associated with the first step consist of surveys or reviews of survey information and other data sources to isolate possible impairments of beneficial uses or water quality.

The characterization step usually involves studies that attempt to answer questions about a water quality problem's source, extent, duration, frequency, and severity. Information on these parameters is essential to confirm a problem and prepare for remedy. The Regional Water Board may gain this information through its own work or through data submittals requested of actual or potential dischargers under Section 13267 of the California Water Code.

Problem remedy calls for the Regional Water Board to prevent or clean up problems. A common means of prevention is through the issuance of National Pollutant Discharge Elimination System (NPDES) permits, waste discharge requirements (WDRs), discharge prohibitions, and other discharge restrictions. Cleanup is implemented through enforcement measures such as Cease and Desist (C&D) and Cleanup and Abatement (C&A) orders. The NPDES is a requirement of

the Federal Clean Water Act (Section 402) and California has implementing responsibility. The national permit system only applies to certain surface water discharges. WDRs, which encompass permits, are called for by State law, Water Code Section 13260, et seq. The WDRs system is not as restricted as the Federal NPDES. As practical, WDRs may be used to control any type of discharge to ground or surface waters. C&D and C&A orders are two of the enforcement tools available to the Regional Water Board to correct actual or potential violations of WDRs, NPDES permits, prohibitions, and other water quality control obligations.

The details of the monitoring step are explained in Chapter 5. In general, the Regional Water Board has wide latitude to require actual and potential dischargers to submit monitoring and surveillance information, in addition to using State Water Board data or collecting its own.

Whatever actions the Regional Water Board implements must be consistent with the Basin Plan's beneficial uses and water quality objectives, as well as certain State and Regional Water Boards' policies, plans, agreements, prohibitions, guidance, and other restrictions or requirements. These considerations are described below and included in the Appendix when noted.

# 4.2.1    Control Action Considerations of the State Water Board

## 4.2.1.1    Policies and Plans

The State Water Board adopts water quality control policies and water quality control plans to which Regional Water Board actions must conform. Sections 13146 and 13247 of the California Water Code generally require that, in carrying out activities which affect water quality, all state agencies, departments, boards and offices must comply with all policies for water quality control and with applicable water quality control plans approved or adopted by the State Water Board. Two of the plans, the Ocean Plan and the Tahoe Plan, do not affect the Sacramento and San Joaquin River Basins. The policies and plans that are applicable are described below.

### 4.2.1.1.1    *The State Policy for Water Quality Control*

This policy declares the State Water Board's intent to protect water quality through the implementation of water resources management programs and serves as the general basis for subsequent water quality control policies. The policy was adopted by the State Water Board in 1972. See Appendix Item 1.

### 4.2.1.1.2    *State Water Board Resolution No. 68-16, Statement of Policy with Respect to Maintaining High Quality of Water in California*

The State Water Board adopted this policy on 28 October 1968. The policy generally restricts the Regional Water Board and dischargers from reducing the water quality of surface or ground waters even though such a reduction in water quality might still allow the protection of the beneficial uses associated with the water prior to the quality reduction. The goal of the policy is to maintain high quality waters.

Changes in water quality are allowed only if the change is consistent with maximum benefit to the people of the State; does not unreasonably affect present and anticipated beneficial uses; and, does not result in water quality less than that prescribed in water quality control plans or policies.

USEPA water quality standards regulations require each state to adopt an "antidegradation" policy and specify the minimum requirements for the policy (40 CFR 131.12). The State Water Board has interpreted State Water Board Resolution No. 68-16 to incorporate the federal

antidegradation policy. The Regional Water Board implements Resolution No. 68-16 consistent with the federal antidegradation policy where the federal regulations apply. Resolution No. 68-16 applies to both ground and surface waters of the state. Resolution No. 68-16 is Appendix Item 2; the federal policy is Appendix Item 39.

### 4.2.1.1.3   State Water Board Resolution No. 74-43, The Water Quality Control Policy for the Enclosed Bays and Estuaries of California

This policy was adopted by the State Water Board on 16 May 1974 and provides water quality principles and guidelines for the prevention of water quality degradation in enclosed bays and estuaries to protect the beneficial uses of such waters. The Regional Water Board must enforce the policy and take actions consistent with its provisions. (This policy does not apply to wastes from boats or land runoff except as specifically indicated for siltation and combined sewer flows.) See Appendix Item 3.

### 4.2.1.1.4   State Water Board Resolution No. 75-58, Water Quality Control Policy on the Use and Disposal of Inland Waters Used for Powerplant Cooling

This policy was adopted by the State Water Board in June 1975. Its purpose is to provide consistent principles and guidance for supplementary waste discharge requirements or other water quality control actions for thermal powerplants using inland waters for cooling. The Regional Water Board is responsible for its enforcement. See Appendix Item 4.

### 4.2.1.1.5   State Water Board Resolution No. 77-1, Policy and Action Plan for Water Reclamation in California

The policy was adopted 6 January 1977. Among other things, the policy requires the Regional Water Boards to conduct reclamation surveys and specifies reclamation actions to be implemented by the State and Regional Water Boards and other agencies. The policy and action plan are contained in the State Water Board report titled, *Policy and Action Plan for Water Reclamation in California*. See Appendix Item 5.

### 4.2.1.1.6   State Water Board Resolution No. 87-22, Policy on the Disposal of Shredder Waste

This State Water Board Resolution, adopted 19 March 1987, permits the disposal into certain landfills of wastes, produced by the mechanical destruction of car bodies, old appliances and similar castoffs, under specific conditions designated and enforced by the Regional Water Boards. See Appendix Item 6.

### 4.2.1.1.7   State Water Board Resolution No. 88-23, Policy Regarding the Underground Storage Tanks Pilot Program

The State Water Board adopted this policy on 18 February 1988. The policy implements a pilot program to fund oversight of remedial action at leaking underground storage tank sites, in cooperation with the California Department of Public Health (formerly the California Department of Health Services). Oversight may be deferred to the Regional Water Boards. See Appendix Item 7.

### 4.2.1.1.8   State Water Board Resolution No. 88-63, Sources of Drinking Water Policy

This policy for water quality control, adopted on 19 May 1988, is essential to the designation of beneficial uses. The policy specifies that, except under specifically defined exceptions, all surface and ground waters of the state are to be protected as existing or potential sources of

municipal and domestic supply. The specific exceptions include waters with existing high total dissolved solids concentrations (greater than 3000 mg/l), low sustainable yield (less than 200 gallons per day for a single well), waters with contamination that cannot be treated for domestic use using best management practices or best economically achievable treatment practices, waters within particular municipal, industrial and agricultural wastewater conveyance and holding facilities, and regulated geothermal ground waters. Where the Regional Water Board finds that one of the exceptions applies, it may remove the municipal and domestic supply beneficial use designation for the particular body of water through a formal Basin Plan amendment and a public hearing, followed by approval of such an amendment by the State Water Board and the Office of Administrative Law. See Appendix Item 8 for Resolution 88-63 exceptions and Appendix 44 for water bodies that meet one or more of the exceptions.

### 4.2.1.1.9   State Water Board Resolution No. 90-67, Pollutant Policy Document (PPD)

The PPD was adopted by the State Water Board in 1990, as part of their overall Delta water rights proceedings. The PPD establishes state policy for water quality control to be used by the San Francisco Bay Regional Water Board and the Central Valley Regional Water Board in updating basin plans. The PPD requires the Central Valley Regional Water Board to develop a mass emission strategy for limiting loads of heavy metals, PAHs and selenium entering the Delta. It also requires that specific actions be taken to eliminate the discharge of chlorinated dibenzodioxins and dibenzofurans to the Delta. The PPD describes other actions for controlling antifouling compounds used on boats and for regulating dredging.

### 4.2.1.1.10  State Water Board Resolution No. 92-49, Policies and Procedures for Investigation and Cleanup and Abatement of Discharges Under Water Code Section 13304

This resolution contains policies and procedures for Regional Water Boards to follow for the oversight and regulation of investigations and cleanup and abatement activities from all types of discharge or threat of discharge subject to Section 13304 of the Water Code. It directs Regional Water Boards to ensure that dischargers are required to cleanup and to abate the effect of discharges. This cleanup and abatement shall be done in a manner that promotes attainment of background water quality, or the highest water quality which is reasonable if background levels of water quality cannot be restored. Any cleanup less stringent than background water quality shall be consistent with maximum benefit to the people of the state and not unreasonably affect present and anticipated beneficial uses of such water. See Appendix Item 9.

### 4.2.1.1.11  State Water Board Resolution No. 93-62, Policy for Regulation of Discharges of Municipal Solid Waste

The policy for water quality control, adopted by State Water Board on 17 June 1993, directs Regional Water Boards to amend waste discharge requirements for municipal solid waste landfills to incorporate pertinent provisions of the federal "Subtitle D" regulations under the Resource Conservation and Recovery Act (40 CFR Parts 257 & 258). The majority of the provisions of the Subtitle D regulations become effective on 9 October 1993. Landfills which are subject to the Subtitle D regulations and the Policy are those which have accepted municipal solid waste on or after 9 October 1991. See Appendix Item 10.

### 4.2.1.1.12  The Thermal Plan

The Water Quality Control Plan for the Control of Temperature in the Coastal and Interstate Waters and Enclosed Bays and Estuaries of California was adopted by the State Water Board on 18 May 1972 and amended 18 September 1975. The plan specifies water quality objectives, effluent quality limits, and discharge prohibitions related to thermal characteristics of interstate

waters and waste discharges. See Appendix Item 11. (Note: the State Water Board adopted Resolution No. 92-82 on 22 October 1992, approving an exception to the Thermal Plan for Sacramento Regional County Sanitation District. See Appendix Item 12.)

### 4.2.1.1.13 The Delta Plan, Water Right Decision 1485, and the Water Quality Control Plan for Salinity

In August 1978, the State Water Board adopted the Delta Plan and Water Right Decision 1485 (D-1485). The Delta Plan contained water quality standards, Delta outflow requirements and export constraints for the Delta. These standards, requirements, and constraints were then implemented in D-1485 by making them conditions of the water right permits for the Central Valley Project and the State Water Project.

When the Delta Plan and accompanying D-1485 were originally issued, the State Water Board committed itself to review the Delta Plan in about ten years. In 1986, the State Court of Appeal issued a decision addressing legal challenges to the Delta Plan and D-1485. The Court directed the State Water Board to take a global view toward its dual responsibilities (water quality and water rights) to the State's water resources.

In response to the Court's decision, the State Water Board adopted the Water Quality Control Plan for Salinity in May 1991. The May 1991 Plan was superceded in May 1995 when the State Water Board adopted the Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary. This Plan was revised in 2006. The State Water Board's Plan includes water quality objectives for salinity, temperature and dissolved oxygen that are applicable in the Delta.

In December 1999 the State Water Board adopted, and in March 2000 per Order WR 2000-02 revised, Water Right Decisions 1641. This decision amended certain water rights by assigning responsibilities to water right holders to help meet flow objectives intended to implement certain water quality objectives contained in the 1995 Bay-Delta Plan.

Rather than taking any water right action to meet the dissolved oxygen objectives in the 1995 Bay-Delta Plan, the State Water Board directed the Regional Water Board to first prepare a TMDL to achieve the dissolved oxygen objectives and implement it.

### 4.2.1.1.14 Nonpoint Source Management Plan and the Nonpoint Source Implementation and Enforcement Policy

In December 1999, the State Water Board, in its continuing efforts to control nonpoint source (NPS) pollution in California, adopted the Plan for California's Nonpoint Source Pollution Control Program (NPS Program Plan). The NPS Program Plan upgraded the State's first Nonpoint Source Management Plan adopted by the State Water Board in 1988 (1988 Plan). Upgrading the 1988 Plan with the NPS Program Plan brought the State into compliance with the requirements of Section 319 of the Clean Water Act and Section 6217 of the Coastal Zone Act Reauthorization Amendments of 1990.

The NPS Implementation and Enforcement Policy, adopted by the State Water Board on 20 May 2004 (State Water Board Resolution No. 2004-0030), explains how the Porter-Cologne Act mandates and authorities, delegated to the State Water Board and Regional Water Boards by the California Legislature, will be used to implement and enforce the NPS Program Plan. The policy also provides a bridge between the NPS Program Plan and the SWRCB Water Quality Enforcement Policy.

*4.2.1.1.15 Policy for Implementation of Toxics Standards for Inland Surface Waters, Enclosed Bays, and Estuaries of California" (a.k.a. State Implementation Policy or SIP)*

The State Water Board adopted a policy that establishes:

(1)     Implementation provisions for priority pollutant criteria promulgated by the U.S. Environmental Protection Agency (U.S. EPA) through the National Toxics Rule (40 CFR 131.36) (promulgated on 22 December 1992 and amended on 4 May 1995) and through the California Toxics Rule (40 CFR 131.38) (promulgated on 18 May 2000 and amended on 13 February 2001), and for priority pollutant objectives established by Regional Water Boards in their basin plans; and

(2)     Monitoring requirements for 2,3,7,8-TCDD equivalents; and

(3)     Chronic toxicity control provisions.

In addition, the SIP includes special provisions for certain types of discharges and factors that could affect the application of other provisions in the SIP. The SIP, including future revisions, is incorporated into this Basin Plan and shall be implemented according to the policy's provisions.

*4.2.1.1.16 Water Quality Enforcement Policy (Enforcement Policy) and Policy on Supplemental Environmental Projects (SEP Policy)*

The State Water Board adopted the Enforcement Policy to create a framework for identifying and investigating instances of noncompliance, for taking enforcement actions that are appropriate in relation to the nature and severity of the violation, and for prioritizing enforcement resources to achieve maximum environmental benefits. The State Water Board adopted the SEP Policy as an adjunct to the Water Boards' enforcement program and allows for the inclusion of a supplemental environmental project in administrative civil liability actions as long as certain criteria are met to ensure that such a project has environmental value, furthers the goals of the State Water Board and Regional Water Boards, and are subject to appropriate input and oversight by the Water Boards. Both the Enforcement Policy and the SEP Policy, including future revisions, are incorporated into this Basin Plan and shall be implemented according to the policies' provisions.

*4.2.1.1.17 Water Quality Control Policy for Developing California's Clean Water Act Section 303(d) List*

Pursuant to California Water Code section 13191.3(a), this State policy for water quality control describes the process by which the State Water Board and the regional water boards will comply with the listing requirements of section 303(d) of the federal Clean Water Act. The objective of this policy is to establish a standardized approach for developing California's section 303(d) list in order to achieve the overall goal of achieving water quality standards and maintaining beneficial uses in all of California's surface waters.

*4.2.1.1.18 Water Quality Control Policy for Addressing Impaired Waters: Regulatory Structure and Options*

Section 303(d) of the Clean Water Act requires states to identify waters within their borders that are not attaining water quality standards. This State policy for water quality control describes the existing tools and mechanisms that the regional water boards will use to address the water bodies listed as impaired under section 303(d) of the federal Clean Water Act.

*4.2.1.1.19  Policy for Compliance Schedules in National Pollutant Discharge Elimination System Permits*

The Policy authorizes the Regional Water Board to include a compliance schedule in a permit for an existing discharger to implement a new, revised, or newly interpreted water quality objective or criterion in a water quality standard that results in a permit limitation more stringent than the limitation previously imposed.

*4.2.1.1.20  Water Quality Control Policy for Siting, Design, Operation, and Maintenance of Onsite Wastewater Treatment Systems (OWTS Policy)*

This Policy implements Water Code, Chapter 4.5, Division 7, sections 13290 through 13291.7 by establishing statewide regulations and standards for permitting onsite wastewater systems. The OWTS Policy specifies criteria for existing, replacement, and new onsite systems and establishes a conditional waiver of waste discharge requirements for onsite systems that comply with the policy. The OWTS Policy, including future revisions, is incorporated into this Basin Plan and shall be implemented according to the policy's provisions.

*4.2.1.1.21  Policy for Water Quality Control for Recycled Water (Recycled Water Policy)*

The Recycled Water Policy establishes requirements to increase the use of recycled water in California. These requirements include the development and adoption of salt/nutrient management plans, regulation of incidental runoff from landscape irrigation with recycled water, criteria and procedures for streamlined permitting of recycled water landscape irrigation projects, procedures for permitting groundwater recharge projects including procedures for demonstrating compliance with the Resolution No, 68-16 (the State Antidegradation Policy), and provisions for addressing constituents of emerging concern. The Recycled Water Policy, including future revisions, is incorporated into this Basin Plan and shall be implemented according to the policy's provisions.

## 4.2.1.2    Programs

*4.2.1.2.1  Discharges of Hazardous Waste to Land, California Code of Regulations Title 23, Division 3, Chapter 15 and Consolidated Regulations for Treatment, Storage, Processing or Disposal of Solid Waste, California Code of Regulations Title 27, Division 2, Subdivision*

Title 23, CCR, Division 3 Chapter 15 and Title 27 CCR, Division 2, Subdivision 1 includes regulations governing discharges of hazardous and solid waste to land for treatment, storage, or disposal. The regulations cover landfills, surface impoundments, waste piles, land treatment units, mining waste management units and confined animal facilities. In addition, actions to clean up and abate conditions of pollution or nuisance at contaminated sites are covered by relevant portions of the regulations where contaminated materials are taken off-site for treatment, storage, or disposal and, as feasible, where wastes are contained or remain on-site at the completion of cleanup actions. The regulations classify wastes according to their threat to water quality, classify waste management units according to the degree of protection that they provide for water quality, and provide siting, construction, monitoring, corrective action, closure and post closure maintenance criteria. Chapter 15 requirements are minimum standards for proper management of each waste category. These regulations require the complete containment of wastes which, if discharged to land for treatment, storage or disposal, have the potential to degrade the quality of water resources. Regional Water Boards may impose more stringent requirements to accommodate regional and site-specific conditions.

#### 4.2.1.2.2    Solid Waste Assessment Test (SWAT)

Section 13273, added to the Water Code in 1985 (Assembly Bill 3525), required all owners of both active and inactive nonhazardous landfills to complete a Solid Waste Assessment (SWAT) to determine if hazardous waste constituents have migrated from the landfill into ground water. Pursuant to a list adopted by the State Water Board, 150 site owners statewide per year would complete this evaluation by 2001.

The Regional Water Board must review the SWAT report to determine whether any hazardous waste has migrated into ground water. If so, the Regional Water Board must notify the Department of Toxic Substances Control and the Integrated Waste Management Board, and take appropriate remedial action [CA Water Code Section 13273(e)].

#### 4.2.1.2.3    Toxic Pits Cleanup Act (TPCA)

The Toxic Pits Cleanup Act of 1984 (Section 25208 et seq. of the Health and Safety Code) established a program to ensure that existing surface impoundments are either made safe or closed so that they do not pollute the waters of the state. The Act requires that all impoundments containing liquid hazardous wastes or hazardous wastes containing free liquids be retrofitted with a liner/leachate collection system, or closed by 1 July 1988. Surface impoundments containing hazardous wastes are prohibited within one-half mile upgradient from a potential source of drinking water. The law provided for certain exemptions.

#### 4.2.1.2.4    Underground Storage Tank (UST) Program

The Central Valley UST Program is implemented under Division 20, Chapters 6.7 and 6.75 of the California Health and Safety Code and Title 23, Division 3, Chapter 16 of the California Code of Regulations. The program has two elements: leak prevention, which is implemented statewide by Local Implementing Agencies in 58 counties and 49 cities; and leak investigation and cleanup which is implemented by the Regional Water Board with assistance from the Local Implementing Agencies. Some Counties in the Central Valley Region are under contract with the State Water Board to provide investigation and cleanup oversight on some sites. These Counties are required to implement the requirements of the Basin Plan.

#### 4.2.1.2.5    Aboveground Petroleum Storage Act

The Aboveground Petroleum Storage Act (Chapter 6.67, Division 20, Health and Safety Code) requires owners or operators of aboveground petroleum storage tanks to file a storage statement and pay a fee every two years (beginning 1 July 1990), to take specific actions to prevent spills, and, in certain instances, to implement a ground water monitoring program. Fees are used by staff to inspect facilities and review spill prevention plans. If a site is contaminated, staff oversee cleanup and the tank owner or operator is required to reimburse the Regional Water Board for reasonable costs for that oversight. There are approximately 8000 tank facilities in the region which have filed storage statements.

#### 4.2.1.2.6    Storm Water Regulations

The 1987 Clean Water Act amendments required the USEPA to establish regulations to control storm water discharges associated with industrial activity; discharges from large (serving a population of 250,000 or more) and medium (serving a population of greater than 100,000 but less than 250,000) municipal separate storm sewer systems; and discharges from construction sites.

Federal regulations for storm water discharges were promulgated by the USEPA on 16 November 1990 (40 CFR Parts 122, 123, and 124). The regulations require large and medium size municipalities and specific categories of facilities, which discharge storm water associated with industrial activity, to obtain NPDES permits and to implement Best Available Technology Economically Achievable (BAT) and Best Conventional Pollutant Control Technology (BCT) to reduce or eliminate industrial storm water pollution. Municipal permits establish controls to reduce/eliminate pollutants to the maximum extent possible (MEP) and to effectively prohibit illicit discharges to storm sewer systems.

In 1991 (amended in 1992), the State Water Board adopted a statewide general NPDES permit (Order No. 91-13-DWQ, General Permit No. CAS000001) for storm water discharges associated with industrial activities. The Order applies to facilities which discharge storm water to surface waters, either directly or through a storm drain system, excluding construction activities.

The State Water Board also adopted a statewide general NPDES permit (Order No. 92-08-DWQ, General Permit No. CAS000002) in 1992, which applies to construction projects resulting in land disturbance of five acres or greater.

### 4.2.1.2.7   U.S. Department of Defense (DOD) Program

The State and Regional Water Board's DOD Program provides regulatory oversight for the restoration and protection of surface and ground water quality during environmental cleanup of military facilities listed in the DOD/State Memorandum of Agreement (DSMOA). The State Water Board will enter into an interagency agreement with the Department of Toxic Substances Control (DTSC) which, in turn, will enter into the DSMOA with DOD for cleanup oversight reimbursement. The State and Regional Water Boards provide regulatory oversight by their authority pursuant to Division 7 of the Water Code and Section 120(f) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), Title 42, U.S.C., Section 9620 (f). The DOD enters into a two-year cooperative agreement with DTSC to support DTSC's mandated mission to protect public health and the environment. The DOD Program should continue until DSMOA facility cleanups are completed (20 to 30 years) or Congress decides to terminate State oversight funding.

The cleanup of military facilities is required to be consistent with the applicable provisions of CERCLA (Section 120 relating to Federal Facilities), the Superfund Amendments and Reauthorization Act of 1986 (SARA), the National Contingency Plan, and State laws.

### 4.2.1.3   State Water Board Management Agency Agreements (MAAs), Memorandum of Agreement (MOA), and Memoranda of Understanding (MOUs)

The Regional Water Board abides by State Water Board agreements with federal and State agencies which have been formalized with either an MAA, MOA, or an MOU signed by the State Water Board.

### 4.2.1.3.1   U.S. Forest Service Agreement

On 26 February 1981 the State Water Board Executive Director signed an MAA with the U.S. Forest Service (USFS) which waives discharge requirements for certain USFS nonpoint source discharges provided that the Forest Service implements State Water Board approved best management practices (BMPs) and procedures and the provisions of the MAA. The MAA covers all USFS lands in California. Implementation of the BMPs, in conjunction with monitoring and performance review requirements approved by the State and Regional Water Boards, is the

primary method of meeting the Basin Plan's water quality objectives for the activities to which the BMPs apply. The MAA does not include USFS point source discharges and in no way limits the authority of the Regional Water Board to carry out its legal responsibilities for management or regulation of water quality. See Appendix Item 13.

### 4.2.1.3.2   Department of Toxic Substances Control

On 27 January 1986, the State Water Board Chairperson signed an MOA with the Department of Health Services (later renamed to the Department of Toxic Substances Control) regarding the implementation of the hazardous waste program. The agreement covers surveillance and enforcement related to water quality at landfills, surface impoundments, waste piles, and land treatment facilities that treat, store, or dispose of hazardous waste. It also covers the issuance, modification, or denial of permits to facilities, including the revision of the water quality aspects of hazardous waste management facility siting, design, closure, post-closure, and surface and ground water monitoring and protection. See Appendix Item 14.

### 4.2.1.3.3   State Water Board Division of Drinking Water Programs

In 1988, the Chairman of the State Water Board signed an MOA with the Department of Health Services (later named the State Water Board Division of Drinking Water Programs) regarding the use of reclaimed water.

The MOA outlines the basic activities of the agencies, allocates primary areas of responsibility and authority between these agencies, and provides for methods and mechanisms to assure coordination for activities related to the use of reclaimed water. See Appendix Item 15.

### 4.2.1.3.4   California Department of Forestry Agreement

In February 1988, the State Water Board signed an MAA with the California Department of Forestry and Fire Protection (CDFFP) and the California Board of Forestry (BOF), for the purpose of carrying out, pursuant to Section 208 of the Federal Clean Water Act, those portions of the State's Water Quality Management Plan (WQMP) related to controlling water quality impacts caused by silvicultural activities on nonfederal forest lands. As with the USFS MAA, the CDFFP agreement requires the Department to implement certain BMPs to protect water quality from timber harvest and associated activities. Approval of the MAA as a WQMP component by the USEPA results in the Regional Water Boards relinquishing some authority to issue WDRs for State timber operations (Public Resources Code Section 4514.3). However, CDF and the Regional and State Water Boards must still ensure that the operations incorporate BMPs and comply with applicable water quality standards. Appendix F of the MAA also calls for the preparation of a Memorandum of Understanding (MOU) for the Regional Water Boards, the State Water Board, and the CDFFP to prescribe interagency procedures for implementing BMPs. See Appendix Item 16.

### 4.2.1.3.5   Department of Conservation Agreement

In March 1988, the State Water Board amended a February 1982 MOA with the State Department of Conservation, Division of Oil and Gas (CDOG), to regulate oil, gas, and geothermal fields' discharges. The agreement requires CDOG to notify the Regional Water Boards of all new operators, all pollution problems associated with operators, and proposed discharges. CDOG and Regional Water Boards must also work together, within certain time-lines, to review and prepare discharge permits. See Appendix Item 17.

### 4.2.1.3.6    Department of Toxic Substances Control

In July 1990, the State Water Board and the Department of Health Services, Toxic Substances Control Program (later reorganized into the Department of Toxic Substances Control) signed an MOU which explains the roles of the agencies (and of the Regional Water Boards) in the cleanup of hazardous waste sites. The MOU describes the protocol the agencies will follow to determine which agency will act as lead and which will act as support, the responsibilities of the agencies in their respective roles, the procedures the agencies will follow to ensure coordinated action, the technical and procedural requirements which each agency must satisfy, the procedures for enforcement and settlement, and the mechanism for dispute resolution. This MOU does not alter the Board's responsibilities with respect to water quality protection. See Appendix Item 18.

### 4.2.1.3.7    Soil Conservation Service, U.S. Department of Agriculture

On 31 July 1990, the State Water Board Executive Director signed an MOU with Soil Conservation Service (SCS), a technical agency for the U.S. Department of Agriculture. Through this MOU, State Water Board seeks to utilize the personnel and expertise of SCS in the development and implementation of water quality programs and projects. The goal is to accelerate implementation of best management practices and other nonpoint source pollution prevention measures. See Appendix Item 19.

### 4.2.1.3.8    Environmental Affairs Agency, Air Resources Board, and California Integrated Waste Management Board

On 27 August 1990, the State Water Board Executive Director signed an MOU with the Environmental Affairs Agency, Air Resources Board, and California Integrated Waste Management Board to enhance program coordination and reduce duplication of effort. This MOU consists of provisions describing the scope of the agreement (including definitions of the parties and issues to which the MOU applies), the principles which will govern the conduct of the parties, and the existing statutory framework. See Appendix Item 20.

### 4.2.1.3.9    California Department of Pesticide Regulation

On 23 December 1991, the State Water Board Chairman signed a MOU with the California Department of Pesticide Regulation (DPR) to ensure that pesticides registered in California are used in a manner that protects water quality and the beneficial uses of water while recognizing the need for pest control.

The State Water Board and nine Regional Water Boards are responsible for protecting the beneficial use of water in California and for controlling all discharges of waste into waters of the state while DPR is the lead agency for pesticide regulation in California.

This will be accomplished by implementing Best Management Practices (BMPs) initially upon voluntary compliance to be followed by regulatory-based encouragement of BMPs as circumstances dictate. Mandatory compliance will be based, whenever possible, on DPR's implementation of regulations and/or pesticide use permit requirements. However, the State Water Board and Regional Water Boards retain ultimate responsibility for compliance with water quality objectives. The agreement was revised on 19 January 1993 to facilitate implementation of the original agreement. See Appendix Item 21.

*4.2.1.3.10  Implementation of the San Joaquin Valley Drainage Program's Recommended Plan*

In January 1992, the State Water Board Chairman signed a MOU with the U.S. Bureau of Reclamation, the U.S. Fish and Wildlife Service, the U.S. Soil Conservation Service, the U.S. Geological Survey, the California Department of Fish and Game (later renamed the California Department of Fish and Wildlife), and the Department of Food and Agriculture. The MOU is an agreement by the agencies to use the management plan described in the September 1990 final report of the San Joaquin Valley Drainage Program as a guide for remedying subsurface drainage and related problems. See Appendix Item 22.

*4.2.1.3.11  California Integrated Waste Management Board*

On 16 December 1992, the State Water Board Executive Director signed a MOU to address the Regional Water Board's review of Solid Waste Assessment Test reports. See Appendix Item 23.

*4.2.1.3.12  Bureau of Land Management*

On 27 January 1993, the State Water Board Vice Chairman signed a MOU to address nonpoint source water quality issues on public lands managed by the Bureau. See Appendix Item 24.

## 4.2.2    Control Action Considerations of the Central Valley Regional Water Board

### 4.2.2.1    Policies and Plans

The following are the Regional Water Board's policies to protect water quality in the Central Valley:

*4.2.2.1.1  Urban Runoff Policy*

(1)    Subregional municipal and industrial plans are required to assess the impact of urban runoff on receiving water quality and consider abatement measures if a problem exists.

(2)    Effluent limitations for storm water runoff are to be included in NPDES permits where it results in water quality problems.

*4.2.2.1.2  Wastewater Reuse Policy*

The Regional Water Board encourages the reclamation and reuse of wastewater, including treated ground water resulting from a cleanup action, where practicable and requires as part of a Report of Waste Discharge an evaluation of reuse and land disposal options as alternative disposal methods. Reuse options should include consideration of the following, where appropriate, based on the quality of the wastewater and the required quality for the specific reuses: industrial and municipal supply, crop irrigation, landscape irrigation, ground water recharge, and wetland restoration. Where studies show that Year-round or continuous reuse or land disposal of all of the wastewater is not practicable, the Regional Water Board will require dischargers to evaluate how reuse or land disposal can be optimized, such as consideration of reuse/disposal for part of the flow and seasonal reuse/disposal options (e.g., dry season land disposal).

### 4.2.2.1.3   Controllable Factors Policy

Controllable water quality factors are not allowed to cause further degradation of water quality in instances where other factors have already resulted in water quality objectives being exceeded. Controllable water quality factors are those actions, conditions, or circumstances resulting from human activities that may influence the quality of the waters of the State, that are subject to the authority of the State Water Board or Regional Water Board, and that may be reasonably controlled.

### 4.2.2.1.4   The Water Quality Limited Segment Policy

Additional treatment beyond minimum federal requirements will be imposed on dischargers to Water Quality Limited Segments. Dischargers will be assigned or allocated a maximum allowable load of critical pollutants so that water quality objectives can be met in the segment.

To determine an allowable load for dischargers, the "Loading Capacity" must be determined. The "Loading Capacity" is the maximum amount of pollution that can be present in a water body without violating water quality objectives. The Loading Capacity can be established to address multiple pollutants or a single pollutant. The Loading Capacity can be allocated to NPDES permitted sources (point sources) as waste load allocations and to non-NPDES permitted sources (nonpoint sources) and background as load allocations. Part of the Loading Capacity may also be set aside or not assigned to account for any uncertainty in the Loading Capacity calculation.

The Loading Capacity and allocations are established to meet Clean Water Act Section 303(d) requirements. In addition, the Loading Capacity and allocations can provide a framework for actions to be taken by the Regional Water Board for achieving pollutant reductions and attaining water quality objectives.

### 4.2.2.1.5   Regional Water Board Resolution No. 70-118, Delegation of Duties and Powers to the Regional Water Board's Executive Officer

In January 1970, the Regional Water Board adopted Resolution No. 70-118 which delegates certain duties and powers of the Board to its Executive Officer pursuant to Section 13223 of the California Water Code. See Appendix Item 25.

### 4.2.2.1.6   Regional Water Board Resolution No. 96-147, San Joaquin River Agricultural Subsurface Drainage Policy

(1)     The control of toxic trace elements in agriculture subsurface drainage, especially selenium, is the first priority.

(2)     The control of agricultural subsurface drainage will be pursued on a regional basis.

(3)     The reuse of agricultural subsurface drainage will be encouraged, and actions that would limit or prohibit reuse discouraged.

(4)     Of the two major options for disposal of salts produced by agricultural irrigation, export out of the basin has less potential for environmental impacts and, therefore, is the favored option. The San Joaquin River may continue to be used to remove salts from the basin so long as water quality objectives are met.

(5)     The valley-wide drain to carry the salts by agricultural irrigation out of the valley remains the best technical solution to the water quality problems of the San Joaquin River and Tulare Lake Basin. The Regional Water Board, at this time, feels that a valley-wide drain will be the only feasible, long-range solution for achieving a salt balance in the Central Valley. The Regional Water Board favors the construction of a valley-wide drain under the following conditions:

•       All toxicants would be reduced to a level which would not harm beneficial uses of receiving waters.

•       The discharge would be governed by specific discharge and receiving water limits in an NPDES permit.

•       Long-term, continuous biological monitoring would be required.

(6)     Optimizing protection of beneficial uses on a watershed basis will guide the development of actions to regulate agricultural subsurface drainage discharges.

(7)     For regulation of selenium discharges, actions need to be focused on selenium load reductions.

### 4.2.2.1.7   Antidegradation Implementation Policy

The antidegradation directives of Section 13000 of the Water Code and State Water Board Resolution No. 68-16 ("Statement of Policy With Respect to Maintaining High Quality Waters in California") require that high quality waters of the State shall be maintained "consistent with the maximum benefit to the people of the State." The Regional Water Board applies these directives when issuing a permit, or in an equivalent process, regarding any discharge of waste which may affect the quality of surface or ground waters in the region.

Implementation of this policy to prevent or minimize surface and ground water degradation is a high priority for the Board. In nearly all cases, preventing pollution before it happens is much more cost-effective than cleaning up pollution after it has occurred. Once degraded, surface water is often difficult to clean up when it has passed downstream. Likewise, cleanup of ground water is costly and lengthy due, in part, to its relatively low assimilative capacity and inaccessibility. The prevention of degradation is, therefore, an important strategy to meet the policy's objectives.

The Regional Water Board will apply 68-16 in considering whether to allow a certain degree of degradation to occur or remain. In conducting this type of analysis, the Regional Water Board will evaluate the nature of any proposed discharge, existing discharge, or material change therein, that could affect the quality of waters within the region. Any discharge of waste to high quality waters must apply best practicable treatment or control not only to prevent a condition of pollution or nuisance from occurring, but also to maintain the highest water quality possible consistent with the maximum benefit to the people of the State.

Pursuant to this policy, a Report of Waste Discharge, or any other similar technical report required by the Board pursuant to Water Code Section 13267, must include information regarding the nature and extent of the discharge and the potential for the discharge to affect surface or ground water quality in the region. This information must be presented as an analysis of the impacts and potential impacts of the discharge on water quality, as measured by background concentrations and applicable water quality objectives. The extent of information necessary will depend on the specific conditions of the discharge. For example, use of best

professional judgment and limited available information may be sufficient to determine that ground or surface water will not be degraded. In addition, the discharger must identify treatment or control measures to be taken to minimize or prevent water quality degradation.

### 4.2.2.1.8   Drinking Water Policy Implementation

As a part of the Drinking Water Policy, a narrative objective has been established for *Cryptosporidium* and *Giardia* to protect the public water system component of the MUN beneficial use. Although it is unclear what levels of *Cryptosporidium* and *Giardia* will impair this use, the goal of implementation is to maintain existing levels of pathogens at public water system intakes. This will be achieved by addressing controllable sources that are shown to cause or substantially contribute to *Cryptosporidium* levels increasing to the trigger level of the next highest bin classification. In accordance with the USEPA Long Term 2 Enhanced Surface Water Treatment Rule (LT2ESWTR), public water systems are required to monitor for *Cryptosporidium* at their intakes; the monitoring results are used to establish the bin classification for the water system. To assure that *Cryptosporidium* levels at public water systems stay within the range of their existing bin classifications, triggers at public water system intakes are included below based on USEPA LT2ESWTR bin classifications. The triggers and the changes to LT2ESWTR bin levels do not indicate a violation of the narrative water quality objective for *Cryptosporidium* and *Giardia* nor are the triggers and the LT2ESWTR bin levels to be used for numeric effluent limits. Instead, the proposed numeric triggers may prompt action by the Regional Water Board.

#### 4.2.2.1.8.1     *Cryptosporidium* Ambient Trigger Exceedance

If *Cryptosporidium* monitoring data from an existing public water system intake indicate that the maximum running annual average[1] has reached 80 percent of the next highest bin, as existed in 2013, the affected public water system may request that the Regional Water Board initiate the investigation described below and shown in Figure 4-1. Table 4-1 shows the 2013 LT2ESWTR bin classifications and the 80 percent trigger levels.

| TABLE 4-1. BIN LEVELS AND 80 PERCENT TRIGGERS | | |
|---|---|---|
| Bin Classification | Maximum Running Annual Average (oocysts/L) | 80 Percent Trigger (oocysts/L) |
| 1 | < 0.075 | 0.06 |
| 2 | 0.075 to < 1.0 | 0.8 |
| 3 | 1.0 to < 3.0 | 2.4 |

If the affected public water system requests assistance, the Regional Water Board should coordinate with CDPH, the affected public water system and potential sources (e.g., storm water management entities, wastewater treatment or wetland managers, etc.) to assess the data and evaluate the need to conduct source evaluations and implement control options. The affected public water system may decline assistance from the Regional Water Board in addressing their compliance with the LT2ESWTR. The coordination and investigation effort should include the steps represented by the schematic overview in Figure 4-1.

---

[1] *Maximum Running Annual Average as defined in USEPA Long Term 2 Enhanced Surface Water Treatment Rule*

4.2.2.1.8.2    Antidegradation Analysis

In addressing *Cryptosporidium* and *Giardia* in an antidegradation analysis for evaluating the public water system component of the MUN beneficial use, the monitoring results of the nearest impacted public water system intake shall be considered. In cases where a trigger (Section 4.2.2.1.8.1) at the nearest public water system intake has not been exceeded, the analysis should be simplified and may be curtailed, depending on the magnitude of the discharge in question and the likelihood of potential impact at public water system intakes. If a trigger has been exceeded, information from the resulting investigation should be considered in the antidegradation analysis.

4.2.2.1.8.3    Reasonable Potential

The Regional Water Board evaluated data representing 2013 conditions. An evaluation of this data indicates that the narrative water quality objective for *Cryptosporidium* and *Giardia* is being attained in surface waters at all public water system intakes in the Delta and its tributaries. The triggers and the changes between LT2ESWTR bin levels do not indicate a violation of the narrative water quality objective for *Cryptosporidium* and *Giardia* nor are the triggers and the LT2ESWTR bin levels to be used for numeric effluent limits.

The Regional Water Board will determine reasonable potential in accordance with the applicable state and federal regulatory requirements. For NPDES permittees, the numeric triggers as applied at the public water system intakes are part of the Regional Water Board's procedures under 40 CFR § 122.44(d)(1)(ii) for determining whether a discharge has reasonable potential. At the request of an affected public water system, implementation of the trigger provisions described in (Figure 4-1, flowchart) will help to ensure that management measures prevent violations of the narrative objective. As a result, NPDES dischargers are not expected to have a reasonable potential to cause or contribute to an excursion above the narrative objective, and NPDES permits are not expected to include effluent limitations to implement the narrative objective.



**FIGURE 4-1: SCHEMATIC OVERVIEW OF ACTIONS PROMPTED BY CRYPTOSPORIDIUM TRIGGER EXCEEDANCE**

*4.2.2.1.9   Policy for Application of Water Quality Objectives*

Water quality objectives are defined in the Water Code as "the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area". (see Chapter 3). Water quality objectives may be stated in either numerical or narrative form. Water quality objectives apply to all waters within a surface water or ground water resource for which beneficial uses have been designated, rather than at an intake, wellhead or other point of consumption.

In conjunction with the issuance of NPDES and storm water permits, the Regional Water Board may designate mixing zones within which water quality objectives will not apply provided the discharger has demonstrated to the satisfaction of the Regional Water Board that the mixing zone will not adversely impact beneficial uses. If allowed, different mixing zones may be designated for different types of objectives, including, but not limited to, acute aquatic life objectives, chronic aquatic life objectives, human health objectives, and acute and chronic whole effluent toxicity objectives, depending in part on the averaging period over which the objectives apply. In determining the size of such mixing zones, the Regional Water Board will consider the applicable procedures and guidelines in EPA's Water Quality Standards Handbook and the Technical Support Document for Water Quality-based Toxics Control. Pursuant to EPA guidelines, mixing zones designated for acute aquatic life objectives will generally be limited to a small zone of initial dilution in the immediate vicinity of the discharge.

Where the Regional Water Board determines it is infeasible to achieve immediate compliance with water quality objectives adopted by the Regional Water Board or the State Water Board, or with water quality criteria adopted by the USEPA, or with an effluent limitation based on these objectives or criteria, the Regional Water Board may establish in NPDES permits a schedule of compliance. The schedule of compliance shall include a time schedule for completing specific actions that demonstrate reasonable progress toward the attainment of the objectives or criteria and shall contain a final compliance date, based on the shortest practicable time (determined by the Regional Water Board) required to achieve compliance. In no event shall an NPDES permit include a schedule of compliance that allows more than ten years (from the date of adoption of the objective or criteria) for compliance with water quality objectives, criteria or effluent limitations based on the objectives or criteria. Schedules of compliance are authorized by this provision only for those water quality objectives or criteria adopted after the effective date of this provision [25 September 1995]. The Regional Water Board will establish compliance schedules in NPDES permits consistent with the provisions of the State Water Board's Compliance Schedule Policy (Resolution 2008-0025). Time schedules in waste discharge requirements are established consistent with Water Code Section 13263.

State Water Board Resolution No. 68-16 requires the maintenance of the existing high quality of water (i.e., "background") unless a change in water quality "will be consistent with maximum benefit to the people of the State....". This policy explains how the Regional Water Board applies numerical and narrative water quality objectives to ensure the reasonable protection of beneficial uses of water and how the Regional Water Board applies Resolution No. 68-16 to promote the maintenance of existing high quality waters.

The numerical and narrative water quality objectives define the least stringent standards that the Regional Water board will apply to regional waters in order to protect beneficial uses. Numerical receiving water limitations will be established in Board orders for constituents and parameters which will, at a minimum, meet all applicable water quality objectives. However, the water quality objectives do not require improvement over naturally occurring background concentrations. In cases where the natural background concentration of a particular constituent exceeds an applicable water quality objective, the natural background concentration will be

considered to comply with the objective. Consistent with Resolution No. 68-16, the Regional Water Board will impose more stringent numerical limitations (or prohibitions) which will maintain the existing quality of the receiving water, unless, pursuant to Resolution No. 68-16, some adverse change in water quality is allowed. Maintenance of the existing high quality of water means maintenance of "background" water quality conditions, i.e., the water quality found upstream or upgradient of the discharge, unaffected by other discharges. Therefore, the water quality objectives will define the least stringent limits which will be imposed and background defines the most stringent limits which will be imposed on ambient water quality.

This Basin Plan contains numerical water quality objectives for various constituents and parameters in Chapter 3. Where numerical water quality objectives are listed, these are the limits necessary for the reasonable protection of beneficial uses of the water. In many instances, the Regional Water Board has not been able to adopt numerical water quality objectives for constituents or parameters, and instead has adopted narrative water quality objectives (e.g., for bacteria, chemical constituents, taste and odor, and toxicity). Where compliance with these narrative objectives is required (i.e., where the objectives are applicable to protect specified beneficial uses), the Regional Water Board will, on a case-by-case basis, adopt numerical limitations in orders which will implement the narrative objectives.

To evaluate compliance with the narrative water quality objectives, the Regional Water Board considers, on a case-by-case basis, direct evidence of beneficial use impacts, all material and relevant information submitted by the discharger and other interested parties, and relevant numerical criteria and guidelines developed and/or published by other agencies and organizations (e.g., State Water Board, State Water Board Division of Drinking Water Programs, California Office of Environmental Health Hazard Assessment, California Department of Toxic Substances Control, University of California Cooperative Extension, California Department of Fish and Wildlife, USEPA, U.S. Food and Drug Administration, National Academy of Sciences, U.S. Fish and Wildlife Service, Food and Agricultural Organization of the United Nations). In considering such criteria, the Board evaluates whether the specific numerical criteria, which are available through these sources and through other information supplied to the Board, are relevant and appropriate to the situation at hand and, therefore, should be used in determining compliance with the narrative objective. For example, compliance with the narrative objective for taste and odor may be evaluated by comparing concentrations of pollutants in water with numerical taste and odor thresholds that have been published by other agencies. This technique provides relevant numerical limits for constituents and parameters which lack numerical water quality objectives. To assist dischargers and other interested parties, the Regional Water Board staff has compiled many of these numerical water quality criteria from other appropriate agencies and organizations in the Central Valley Regional Water Board's staff report, *A Compilation of Water Quality Goals*. This staff report is updated regularly to reflect changes in these numerical criteria.

Where multiple toxic pollutants exist together in water, the potential for toxicologic interactions exists. On a case by case basis, the Regional Water Board will evaluate available receiving water and effluent data to determine whether there is a reasonable potential for interactive toxicity. Pollutants which are carcinogens or which manifest their toxic effects on the same organ systems or through similar mechanisms will generally be considered to have potentially additive toxicity. The following formula will be used to assist the Regional Water Board in making determinations:

$$\sum_{i=1}^{n} \frac{[\text{Concentration of Toxic Substances}]_i}{[\text{Toxicological Limit for Substances in Water}]_i} < 1.0$$

The concentration of each toxic substance is divided by its toxicologic limit. The resulting ratios are added for substances having similar toxicologic effects and, separately, for carcinogens. If such a sum of ratios is less than one, an additive toxicity problem is assumed not to exist. If the summation is equal to or greater than one, the combination of chemicals is assumed to present an unacceptable level of toxicologic risk. For example, monitoring shows that ground water beneath a site has been degraded by three volatile organic chemicals, A, B, and C, in concentrations of 0.3, 0.4, and 0.04 µg/l, respectively. Toxicologic limits for these chemicals are 0.7, 3, and 0.06 µg/l, respectively. Individually, no chemical exceeds its toxicologic limit. However, an additive toxicity calculation shows:

$$\frac{0.3}{0.7} + \frac{0.4}{3} + \frac{0.04}{0.06} = 1.2$$

The sum of the ratios is greater than unity (>1.0); therefore, the additive toxicity criterion has been violated. The concentrations of chemicals A, B, and C together present a potentially unacceptable level of toxicity.

For permitting purposes, it is important to clearly define how compliance with the narrative toxicity objectives will be measured. Staff is currently working with the State Water Board to develop guidance on this issue.

#### 4.2.2.1.10 *Policy for Investigation and Cleanup of Contaminated Sites*

The Regional Water Board's strategy for managing contaminated sites is guided by several important principles, which are based on Water Code Sections 13000 and 13304, the Title 23, CCR, Division 3, Chapter 15 and Title 27, CCR, Division 2, Subdivision 1 regulations and State Water Board Resolution Nos. 68-16 and 92-49:

(1)     State Water Board Policy & Regulation

The Regional Water Board will require conformance with the provisions of State Water Board Resolution No. 68-16 in all cases and will require conformance with applicable or relevant provisions of 23 CCR, Division 3, Chapter 15 and 27 CCR, Division 2, Subdivision 1 to the extent feasible. These provisions direct the Regional Water Board to ensure that dischargers are required to clean up and abate the effect of discharges in a manner that promotes attainment of background water quality, or the highest water quality which is reasonable and protective of beneficial uses if background levels of water quality cannot be restored.

(2)     Site Investigation

An investigation of soil and ground water to determine full horizontal and vertical extent of pollution is necessary to ensure that cleanup plans are protective of water quality. The goal of the investigation shall be to determine where concentrations of constituents of concern exceed beneficial use protective levels (water quality objectives) and, additionally, where constituents of concern exceed background levels (the zero-impact line). Investigations shall extend off-site as necessary to determine the full extent of the impact.

(3)    Source Removal/Containment

Immediate removal or containment of the source, to the extent practicable, should be implemented where necessary to prevent further spread of pollution as well as being among the most cost-effective remediation actions. The effectiveness of ground water cleanup techniques often depends largely on the completeness of source removal or containment efforts (e.g., removal of significantly contaminated soil or pockets of dense non-aqueous phase liquids).

(4)    Cleanup Level Approval

Ground water and soil cleanup levels are approved by the Regional Water Board. The Executive Officer may approve cleanup levels as appropriately delegated by the Board.

(5)    Site Specificity

Given the extreme variability of hydrogeologic conditions in the Region, cleanup levels must reflect site-specific factors.

(6)    Discharger Submittals

The discharger must submit the following information for consideration by the Regional Water Board in establishing cleanup levels which meet the criteria contained in 23 CCR Section 2550.4(c) through (g):

(a)    water quality assessment to determine impacts and threats to the quality of water resources;

(b)    risk assessment to determine impacts and threats to human health and the environment; and

(c)    feasibility study of cleanup alternatives which compare effectiveness, cost, and time to achieve cleanup levels. Cleanup levels covered by this study shall include, at a minimum, background levels, levels which meet all applicable water quality objectives and which do not pose significant risks to health or the environment, and an alternate cleanup level which is above background levels and which also meets the requirements as specified in paragraphs (7)(e) and (f) below.

(7)    Ground Water Cleanup Levels

Ground water cleanup levels shall be established based on:

(a)    background concentrations of individual pollutants;

(b)    applicable water quality objectives to protect designated beneficial uses of the water body, as listed in Chapters 2 and 3;

(c)    concentrations which do not pose a significant risk to human health or the environment, considering risks from toxic constituents to be additive across all media of exposure and, in the absence of scientifically valid data to the contrary, additive for all constituents having similar toxicologic effects or having carcinogenic effects; and

(d)    technologic and economic feasibility of attaining background concentrations and of attaining concentrations lower than defined by (b) and (c) above.

Factors in (a) through (d) above are used to establish ground water cleanup levels according to the following principles:

(e)    Pursuant to 23 CCR Section 2550.4, the Regional Water Board establishes cleanup levels that are protective of human health, the environment and beneficial uses of waters of the state, as measured by compliance with (b) and (c) above, and are equal to background concentrations if background levels are technologically and economically feasible to achieve. If background levels are infeasible to achieve, cleanup levels are set between background concentrations and concentrations that meet all criteria in (b) and (c) above. Within this concentration range, cleanup levels must be set at the lowest concentrations that are technologically and economically achievable. In no case are cleanup levels established below natural background concentrations.

(f)    Technologic feasibility is determined by assessing the availability of technologies which have been shown to be effective in reducing the concentrations of the constituents of concern to the established cleanup levels. Bench-scale and/or pilot-scale studies may be necessary to make this feasibility assessment in the context of constituent, hydrogeologic, and other site-specific factors. Economic feasibility does not refer to the subjective measurement of the ability of the discharger to pay the costs of cleanup, but rather to the objective balancing of the incremental benefit of attaining more stringent levels of constituents of concern as compared with the incremental cost of achieving those levels. Factors to be considered in the establishment of cleanup levels greater than background are listed in 23 CCR, Section 2550.4(d). The discharger's ability to pay is one factor to be considered in determining whether the cleanup level is reasonable. However, availability of economic resources to the discharger is primarily considered in establishing reasonable schedules for compliance with cleanup levels.

(g)    Compliance with (c) above shall be determined through risk assessments performed by the discharger, using the most current procedures authorized by the Department of Toxic Substances Control, the Office of Environmental Health Hazard Assessment, or the USEPA. The Regional Water Board is not the lead agency for specifying risk assessment procedures or for reviewing risk assessments. The Board will assist the discharger, as necessary, in obtaining the appropriate, most current procedures from the above listed agencies. To prevent duplication of effort, the Board will rely on the Department of Toxic Substances Control, the Office of Environmental Health Hazard Assessment, or appropriately designated local health agencies to review and evaluate the adequacy of health and environmental risk assessments. The Board will assist the discharger, as necessary, in determining which of these agencies will review the risk assessments for a particular site. Priority will be given to those agencies that are already involved with the assessment and cleanup of the site.

(8)    Compliance with Ground Water Cleanup Levels

To protect potential beneficial uses of the water resource as required by Water Code Sections 13000 and 13241, compliance with ground water cleanup levels must occur throughout the pollutant plume.

(9)    Modifying Ground Water Cleanup Levels

The Regional Water Board may consider modifying site-specific ground water cleanup levels (that have been determined pursuant to subsection (7) above) that are more stringent than applicable water quality objectives, only when a final remedial action plan has been pursued in good faith, and all of the following conditions are met:

(a)    Modified cleanup levels meet the conditions listed in (7)(b) and (c) above

(b)    An approved cleanup program has been fully implemented and operated for a period of time which is adequate to understand the hydrogeology of the site, pollutant dynamics, and the effectiveness of available cleanup technologies;

(c)    Adequate source removal and/or isolation is undertaken to eliminate or significantly reduce future migration of constituents of concern to ground water;

(d)    The discharger has demonstrated that no significant pollutant migration will occur to other underlying or adjacent aquifers;

(e)    Ground water pollutant concentrations have reached asymptotic levels using appropriate technology;

(f)    Optimization of the existing technology has occurred and new technologies have been evaluated and applied where economically and technologically feasible; and

(g)    Alternative technologies for achieving lower constituent levels have been evaluated and are inappropriate or not economically feasible.

(10)    Soil Cleanup Levels

For soils which threaten the quality of water resources, soil cleanup levels should be equal to background concentrations of the individual leachable/mobile constituents, unless background levels are technologically or economically infeasible to achieve. Where background levels are infeasible to achieve, soil cleanup levels are established to ensure that remaining leachable/mobile constituents of concern will not threaten to cause ground water to exceed applicable ground water cleanup levels, and that remaining constituents do not pose significant risks to health or the environment. The Regional Water Board will consider water quality, health, and environmental risk assessment methods, as long as such methods are based on site-specific field data, are technically sound, and promote attainment of all of the above principles.

(11)    Verification of Soil Cleanup

Verification of soil cleanup generally requires verification sampling and follow-up ground water monitoring. The degree of required monitoring will reflect the amount of uncertainty associated with the soil cleanup level selection process. Follow-up ground water monitoring may be limited where residual concentrations of leachable/mobile constituents in soils are not expected to impact ground water quality.

(12)    Remaining Constituents

Where leachable/mobile concentrations of constituents of concern remain on-site in concentrations which threaten water quality, the Regional Water Board will require implementation of applicable provisions of Title 23, CCR, Division 3 Chapter 15 and Title 27, CCR, Division 2, Subdivision 1. Relevant provisions of Title 23, CCR, Division 3 Chapter 15 and Title 27, CCR, Division 2, Subdivision 1 which may not be directly applicable, but which address situations similar to those addressed at the cleanup site will be implemented to the extent feasible, in conformance with Title 23, CCR, Section 2511(d)/27 CCR, Section 20090(d). This may include, but is not limited to, surface or subsurface barriers or other containment systems, waste immobilization, toxicity reduction, and financial assurances.

*4.2.2.1.11  Policy for Obtaining Salt Balance in the San Joaquin Valley*

It is the policy of the Regional Water Board to encourage construction of facilities to convey agricultural drain water from the San Joaquin and Tulare Basins. A valley-wide conveyance facility for agricultural drain waters impaired by high levels of salt is the only feasible, long-range solution for achieving a salt balance in the Central Valley.

*4.2.2.1.12  Watershed Policy*

The Regional Water Board supports implementing a watershed based approach to addressing water quality problems. The State and Regional Water Boards are in the process of developing a proposal for integrating a watershed approach into the Board's programs. The benefits to implementing a watershed based program would include gaining participation of stakeholders and focusing efforts on the most important problems and those sources contributing most significantly to those problems.

*4.2.2.1.13  Policy for the Royal Mountain King Mine Site in Calaveras County*

(1)    Groundwater Management Strategy at the Royal Mountain King Mine Site, in Calaveras County

The owner of the Royal Mountain King Mine Site shall continue to implement a groundwater management strategy to manage poor-quality groundwater at the Site and to protect good-quality groundwater. The strategy is to maintain the lowest practicable level of water in Skyrocket Pit Lake and prevent any measurably significant degradation of current water quality in groundwater downgradient of the MUN and AGR de-designation area shown in Figure 2-2. In addition, saline leachate that emerges as springs at the base of the Gold Knoll Overburden Disposal Site and the West Overburden Disposal Site, as well as the Flotation Tailings Reservoir leachate collection and recovery system, shall be collected in sumps and transferred by pumping to Skyrocket Pit Lake or regulated with an NPDES permit or WDRs.

(2)    Variance for IND and PRO Uses in Groundwaters at the Royal Mountain King Mine site, in Calaveras County

Groundwaters within the area shown in Figure 2-2 at the Royal Mountain King Mine Site are subject to a variance for the IND and PRO uses based on high background levels of total dissolved solids. The variance exempts the constituents listed in the table, below, from regulatory limits that would otherwise be determined from the IND and PRO beneficial uses.

| Constituents in groundwater subject to the variance for IND and PRO include: |
|---|
| Total Dissolved Solids |
| Arsenic |
| Chloride |
| Nitrate |
| Selenium |
| Sulfate |

*4.2.2.1.14 Variance Policy for Surface Waters*

As part of its state water quality standards program, states have the discretion to include variance policies. (40 C.F.R., §131.13.) This policy provides the Regional Water Board with the authority to grant a variance from application of water quality standards under certain circumstances.

4.2.2.1.14.1    Variances from Surface Water Quality Standards for Point Source Dischargers

(1)    A permit applicant or permittee subject to an NPDES permit may apply to the Regional Water Board for a variance from a surface water quality standard for a specific constituent(s), as long as the constituent is not a priority toxic pollutant identified in 40 C.F.R., §131.38(b)(1). A permit applicant or permittee may not apply to the Regional Water Board for a variance from a surface water quality standard for temperature. The application for such a variance shall be submitted in accordance with the requirements specified in section 4.2.2.1.14.2. The Central Valley Water Board may adopt variance programs that provide streamlined approval procedures for multiple dischargers that share the same challenges in achieving their water quality based effluent limitation(s) (WQBELs) for the same pollutant(s). The *Variance Program for Salinity Water Quality Standards* in section 4.2.2.1.14.3, below, is a multiple discharger variance program. Permittees that qualify for the *Variance Program for Salinity Water Quality Standards* by meeting the criteria in section 4.2.2.1.14.3(1). may submit a salinity variance application in accordance with the requirements specified in section 4.2.2.1.14.3 of this Policy.

(2)    The Regional Water Board may not grant a variance if:

(a)    Water quality standards addressed by the variance will be achieved by implementing technology-based effluent limitations required under sections 301(b) and 306 of the Clean Water Act, or

(b)    The variance would likely jeopardize the continued existence of any endangered species under section 4 of the Endangered Species Act or result in the destruction or adverse modification of such species' critical habitat.

(3)    The Regional Water Board may approve all or part of a requested variance, or modify and approve a requested variance, if the permit applicant demonstrates a variance is appropriate based on at least one of the six following factors:

    (a)    Naturally occurring pollutant concentrations prevent the attainment of the surface water quality standard; or

    (b)    Natural, ephemeral, intermittent, or low flow conditions or water levels prevent the attainment of the surface water quality standard, unless these conditions may be compensated for by the discharge of sufficient volume of effluent discharges without violating state water conservation requirements to enable surface water quality standards to be met; or

    (c)    Human caused conditions or sources of pollution prevent the attainment of the surface water quality standard and cannot be remedied or would cause more environmental damage to correct than to leave in place; or

    (d)    Dams, diversions, or other types of hydrologic modifications preclude the attainment of the surface water quality standard, and it is not feasible to restore the waterbody to its original condition or to operate such modification in a way that would result in the attainment of the surface water quality standard; or

    (e)    Physical conditions related to the natural features of the waterbody, such as the lack of a proper substrate, cover, flow, depth, pools, riffles, and the like, unrelated to water quality preclude attainment of aquatic life protection of surface water quality standards; or

    (f)    Controls more stringent than those required by sections 301(b) and 306 of the Clean Water Act would result in substantial and widespread economic and social impact.

(4)    In making a determination on a variance application that is based on factor (c) in paragraph (3), above, the Regional Water Board may consider the following:

    (a)    Information on the type and magnitude of adverse or beneficial environmental impacts, including the net impact on the receiving water, resulting from the proposed methodologies capable of attaining the adopted or proposed WQBEL.

    (b)    Other relevant information requested by the Regional Water Board or supplied by the applicant or the public.

(5)    In making a determination on a variance application that is based on factor (f) in paragraph (3), above, the Regional Water Board may consider the following:

    (a)    The cost and cost-effectiveness of pollutant removal by implementing the methodology capable of attaining the adopted or proposed WQBEL for the specific constituent(s) for which a variance is being requested.

    (b)    The reduction in concentrations and loadings of the pollutant(s) in question that is attainable by source control and pollution prevention efforts as compared to the reduction attainable by use of the methodology capable of attaining the adopted or proposed WQBEL.

    (c)    The overall impact of attaining the adopted or proposed WQBEL and implementing the methodologies capable of attaining the adopted or proposed WQBEL.

    (d)    The technical feasibility of installing or operating any of the available methodologies capable of attaining the WQBEL for which a variance is sought.

    (e)    Other relevant information requested by the Regional Water Board or supplied by the applicant or the public.

(6)     A determination to grant or deny a requested variance shall be made in accordance with the procedures specified in section 4.2.2.1.14.2, below. Procedures specified in section 4.2.2.1.14.3, below, will be used for applicants that qualify for the *Variance Program for Salinity Water Quality Standards*.

(7)     A variance applies only to the permit applicant requesting the variance and only to the constituent(s) specified in the variance application.

(8)     A variance or any renewal thereof shall be for a time as short as feasible and shall not be granted for a term greater than ten years.

(9)     Neither the filing of a variance application nor the granting of a variance shall be grounds for the staying or dismissing of, or a defense in, a pending enforcement action. A variance shall be prospective only from the date the variance becomes effective.

(10)    A variance shall conform to the requirements of the State Water Board's Antidegradation Policy (State Water Board Resolution 68-16).

4.2.2.1.14.2    <u>Variance Application Requirements and Processes</u>

(1)     An application for a variance from a surface water quality standard for a specific constituent(s) subject to this Policy may be submitted at any time after the permittee determines that it is unable to meet a WQBEL or proposed WQBEL based on a surface water quality standard, and/or an adopted wasteload allocation. The variance application may be submitted with the renewal application (i.e., report of waste discharge) for a NPDES permit. If the permittee is seeking to obtain a variance after a WQBEL has been adopted into a NPDES permit, the WQBEL shall remain in effect until such time that the Regional Water Board makes a determination on the variance application.

(2)     The granting of a variance by the Regional Water Board is a discretionary action subject to the requirements of the California Environmental Quality Act. As such, the Regional Water Board may require the variance applicant to prepare such documents as are necessary so that the Regional Water Board can ensure that its action complies with the requirements set forth in the California Environmental Quality Act, or the Regional Water Board may use any such documents that have been prepared and certified by another state or local agency that address the potential environmental impacts associated with the project and the granting of a variance.

(3)     A complete variance application must contain the following:

    (a)     Identification of the specific constituent(s) and water quality standard(s) for which a variance is sought;

    (b)     Identification of the receiving surface water, and any available information with respect to receiving water quality and downstream beneficial uses for the specific constituent;

    (c)     Identification of the WQBEL(s) that is being considered for adoption, or has been adopted in the NPDES permit;

    (d)     List of methods for removing or reducing the concentrations and loadings of the pollutants with an assessment of technical effectiveness and the costs and cost effectiveness of these methods. At a minimum, and to the extent feasible, the methods must include source control measures, pollution prevention measures, facility upgrades and end-of-pipe treatment technology. From this list, the

applicant must identify the method(s) that will consistently attain the WQBELs and provide a detailed discussion of such methodologies;

(e)    Documentation of at least one of the following over the next ten years. Documentation that covers less than ten years will limit the maximum term that the Regional Water Board can consider for the variance:

    (i)    That naturally occurring pollutant concentrations prevent the attainment of the surface water quality standard or

    (ii)    That natural, ephemeral, intermittent, or low flow conditions or water levels prevent the attainment of the surface water quality standard, unless these conditions may be compensated for by the discharge of sufficient volume of effluent discharges to enable surface water quality standards to be met; or

    (iii)    That human caused conditions or sources of pollution prevent the attainment of the surface water quality standard from which the WQBEL is based, and it is not feasible to remedy the conditions or sources of pollution; or

    (iv)    That dams, diversions, or other types of hydrologic modifications preclude the attainment of the surface water quality standard from which the WQBEL is based, and it is not feasible to restore the water body to its original condition or to operate such modification in a way that would result in attainment of the surface water quality standard; or

    (v)    Physical conditions related to the natural features of the water body, such as the lack of a proper substrate, cover, flow, depth, pools, riffles, and the like, unrelated to water quality, preclude attainment of aquatic life protection of surface water quality standards from which the WQBEL is based; or

    (vi)    That installation and operation of each of the available methodologies capable of attaining the WQBEL would result in substantial and widespread economic and social impact.

(f)    Documentation that the permittee has reduced, or is in the process of reducing, to the maximum extent practicable, the discharge of the pollutant(s) for which a variance is sought through implementation of local pretreatment, source control, and pollution prevention efforts; and,

(g)    A detailed discussion of a proposed interim discharge limitation(s) that represents the highest level of treatment that the permittee can consistently achieve during the term of the variance. Such discussion shall also identify and discuss any drought, water conservation, and/or water recycling efforts that may cause certain constituents in the effluent to increase, or efforts that will cause certain constituents in the effluent to decrease with a sufficient amount of certainty. When the permittee proposes an interim discharge limitation(s) that is higher than the current level of the constituent(s) in the effluent due to the need to account for drought, water conservation or water recycling efforts, the permittee must provide appropriate information to show that the increase in the level for the proposed interim discharge limitation(s) will not adversely affect beneficial uses, is consistent with state and federal antidegradation policies (State Water Board Resolution No. 68-16 and 40 C.F.R., § 131.12.), and is consistent with anti-backsliding provisions specified in section 402(o) of the Clean Water Act. If the permittee indicates that certain constituents in the effluent are likely to decrease during the term of the variance due to recycling efforts or management measures, then the proposed interim discharge limitation(s) shall account for such decreases.

(h) Copies of any documents prepared and certified by another state or local agency pursuant to Public Resources Code section 21080 et seq.; or, such documents as are necessary for the Regional Water Board to make its decision in compliance with Public Resources Code section 21080 et seq.

(4) Within 60 days of the receipt of a variance application, the Regional Water Board shall determine that the variance application is complete, or specify in writing any additional relevant information, which is deemed necessary to make a determination on the variance request. Such additional information shall be submitted by the applicant within a time period agreed upon by the applicant and the Regional Water Board Executive Officer. Failure of an applicant to submit any additional relevant information requested by the Regional Water Board Executive Officer within the agreed upon time period may result in the denial of the variance application.

(5) The Regional Water Board shall provide a copy of the variance application to USEPA Region 9 within 30 days of finding that the variance application is complete.

(6) Within a reasonable time period after finding that the variance application is complete, the Regional Water Board shall provide public notice, request comment, and schedule and hold a public hearing on the variance application. When the variance application is submitted with the NPDES permit renewal application (i.e., report of waste discharge), the notice, request for comment and public hearing requirement on the variance application may be conducted in conjunction with the Regional Water Board's process for the renewal of the NPDES permit.

(7) The Regional Water Board may approve the variance, either as requested, or as modified by the Regional Water Board. The Regional Water Board may take action to approve a variance and renew and/or modify an existing NPDES permit as part of the same Board meeting. The permit shall contain all conditions needed to implement the variance, including, at a minimum, all of the following:

 (a) An interim effluent limitation for the constituent(s) for which the variance is sought. The interim effluent limitation(s) must be consistent with the current level of the constituent(s) in the effluent and may be lower based on anticipated improvement in effluent quality. The Regional Water Board may consider granting an interim effluent limitation(s) that is higher than the current level if the permittee has demonstrated that drought, water conservation, and/or water recycling efforts will cause the quality of the effluent to be higher than the current level and that the higher interim effluent limitation will not adversely affect beneficial uses. When the duration of the variance is shorter than the duration of the permit, compliance with effluent limitations sufficient to meet the water quality criterion upon the expiration of the variance shall be required;

 (b) A requirement to prepare and implement a pollution prevention plan pursuant to Water Code section 13263.3 to address the constituent(s) for which the variance is sought;

 (c) Any additional monitoring that is determined to be necessary by the Regional Water Board to evaluate the effects on the receiving water body of the variance from water quality standards;

 (d) A provision allowing the Regional Water Board to reopen and modify the permit based on any revision to the variance made by the Regional Water Board during the next revision of the water quality standards or by EPA upon review of the variance; and

(e)     Other conditions that the Regional Water Board determines to be necessary to implement the terms of the variance.

(8)     The variance, as adopted by the Regional Water Board in section (7), is not in effect until it is approved by U.S. EPA.

(9)     Permit limitations for a constituent(s) contained in the applicant's permit that are in effect at the time of the variance application shall remain in effect during the consideration of a variance application for that particular constituent(s).

(10)    The permittee may request a renewal of a variance in accordance with the provisions contained in paragraphs (1), (2) and (3) and this section. For variances with terms greater than the term of the permit, an application for renewal of the variance may be submitted with the renewal application for the NPDES permit in order to have the term of the variance begin concurrent with the term of the permit. The renewal application shall also contain information concerning its compliance with the conditions incorporated into its permit as part of the original variance and shall include information to explain why a renewal of the variance is necessary. As part of its renewal application, a permittee shall also identify all efforts the permittee has made, and/or intends to make, towards meeting the standard(s). Renewal of a variance may be denied if the permittee did not comply with any of the conditions of the original variance.

(11)    All variances and supporting information shall be submitted by the Regional Water Board to the U.S. EPA Regional Administrator within 30 days of the date of the Regional Water Board's final variance decision for approval and shall include the following:

(a)     The variance application and any additional information submitted to the Regional Water Board;
(b)     Any public notices, public comments, and records of any public hearings held in conjunction with the request for the variance;
(c)     The Regional Water Board's final decision; and
(d)     Any changes to NPDES permits to include the variance.

(12)    All variances shall be reviewed during the Regional Water Board's triennial review process of this Basin Plan. For variances with terms that are greater than the term of the permit, the Regional Water Board may also review the variance upon consideration of the permit renewal.

### 4.2.2.1.14.3    Variance Program for Salinity Water Quality Standards

The State Water Board and the Regional Water Board recognize that salt is impacting beneficial uses in the Central Valley and management of salinity in surface and ground waters is a major challenge for dischargers. In response, the Water Boards initiated the Central Valley Salinity Alternatives for Long-Term Sustainability (CV-SALTS) in 2006. The State Water Board *Recycled Water Policy* requires the development of salt and nutrient management plans protective of ground water and submittal of these plans to the Regional Water Board by May 2016. These plans are to become the basis of basin plan amendments to be considered by the Regional Water Board by May 2017. CV-SALTS is the stakeholder effort working to develop comprehensive salt and nitrate management plans (SNMPs) that will satisfy the *Recycled Water Policy*'s salt and nutrient management plans. CV-SALTS is undertaking technical work to analyze salt and nitrate conditions in surface and ground water in the Central Valley, identify implementation measures, and develop monitoring strategies to ensure environmental and economic sustainability. The technical work under development includes developing the models

for loading and transport of salt, development and evaluation of effective management practices, and implementing activities to ensure beneficial uses are protected. Participation by all stakeholders is necessary to assure that the work is scientifically justified, supported by broad stakeholder representation, and completed in a timely fashion. The Regional Water Board has indicated its support for the comprehensive effort through CV-SALTS in Resolutions R5-2006-0024, R5-2010-0024, and R5-2013-0149 and the March 2010 Memorandum of Agreement between the Regional Water Board, the Central Valley Salinity Coalition and the State Water Board.

(1)     During the development and initial implementation of the SNMPs by CV-SALTS, permittees who qualify may apply for a variance from salinity water quality standards if they have or will have WQBELs for salinity that they are unable to meet by submitting a salinity variance application. The *Salinity Variance Program* as described specifically herein is for municipal and domestic wastewater dischargers that have or will implement local pretreatment, source control, and pollution prevention efforts to reduce the effluent concentrations of salinity constituents and are now faced with replacing the municipal water supply with a better quality water or installing costly improvements, such as membrane filtration treatment technology, such that widespread social and economic impacts are expected consistent with the justification provided for the case study cities in the *Staff Report for the Amendments to the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins and the Water Quality Control Plan for the Tulare Lake Basin to add Policies for Variances from Surface Water Quality Standards for Point Source Dischargers, Variance Program for Salinity, and Exception from Implementation of Water Quality Objectives for Salinity, June 2014*. Consistent with the planned development and implementation of the SNMPs, no salinity variance under this section shall be approved after 30 June 2019. For the purposes of the Salinity Variance Program, salinity water quality standards are defined to only include water quality standards for the following constituents: electrical conductivity, total dissolved solids, chloride, sulfate and sodium.

(2)     An application for a variance for a specific salinity water quality standard may be submitted at any time after the permittee determines that it is unable to meet a WQBEL or proposed WQBEL based on a salinity water quality standard. Preferably, the salinity variance application should be submitted with the renewal application (i.e., report of waste discharge) for a NPDES permit. If the permittee is seeking to obtain a variance after a WQBEL has been adopted into a NPDES permit, the WQBEL shall remain in effect until such time that the Regional Water Board makes a determination on the variance application.

(3)     An application for variance from WQBELs based on a salinity water quality standard must contain the following:

(a)     Identification of the salinity constituents for which the variance is sought;

(b)     Identification of the receiving surface water, and any available information with respect to receiving water quality and downstream beneficial uses for the specific constituent;

(c)     Identification of the WQBEL that is being considered for adoption, or has been adopted in the NPDES permit;

(d)     A description of salinity reduction/elimination measures that have been undertaken as of the application date, if any;

(e)     A Salinity Reduction Study Work Plan, which at a minimum must include the following:

(i)     Data on current influent and effluent salinity concentrations,

(ii)    Identification of known salinity sources,

(iii)   Description of current plans to reduce/eliminate known salinity sources,

(iv)    Preliminary identification of other potential sources,

(v)     A proposed schedule for evaluating sources,

(vi)    A proposed schedule for identifying and evaluating potential reduction, elimination, and prevention methods.

(f)   An explanation of the basis for concluding that there are no readily available or cost-effective methodologies available to consistently attain the WQBELs for salinity.

(g)   A detailed discussion explaining why the permittee's situation is similar to or comparable with the case studies supporting the Salinity Variance Program identified in the *Staff Report for the Amendments to the Water Quality Control Plan for the Sacramento River and San Joaquin River Basins and the Water Quality Control Plan for the Tulare Lake Basin to add Policies for Variances from Surface Water Quality Standards for Point Source Dischargers, Variance Program for Salinity, and Exception from Implementation of Water Quality Objectives for Salinity, June 2014.*

(h)   A detailed discussion of proposed interim discharge limitation(s) that represents the highest level of treatment that the permittee can consistently achieve during the term of the variance. If the permittee indicates that certain constituents in the effluent are likely to decrease during the term of the variance due to efforts, then the proposed interim discharge limitation(s) shall account for such decreases.

(i)   Documentation of the applicant's active participation in CV-SALTS as indicated by a letter of support from CV-SALTS.

(j)   A detailed plan of how the applicant will continue to participate in CV-SALTS and how the applicant will contribute to the development and implementation of the SNMPs.

(4)   After the receipt of a variance application for salinity, the Regional Water Board shall determine whether the variance application is complete and whether the permittee qualifies for consideration of the variance, or specify in writing any additional relevant information that is deemed necessary to make a determination on the salinity variance request. Such additional information shall be submitted by the applicant within a time period agreed upon by the applicant and the Regional Water Board Executive Officer. Failure of an applicant to submit any additional relevant information requested by the Regional Water Board Executive Officer within the time period specified by the Executive Officer may result in the denial of the variance application for salinity.

(5)   After determining that the variance application for salinity is complete, the Regional Water Board shall provide notice, request comment, and schedule and hold a public hearing on the variance application for salinity. When the variance application is submitted with the NPDES permit renewal application (i.e., report of waste discharge), the notice, request for comment and public hearing requirement on the variance application may be conducted in conjunction with the Regional Water Board's process for the renewal of the NPDES permit.

(6)   The Regional Water Board may approve a salinity variance, either as requested, or as modified by the Regional Water Board, after finding that the permittee qualifies for the salinity variance, the attainment of the WQBEL is not feasible, the permittee has implemented or will implement feasible salinity reduction/elimination measures and the permittee continues to participate in CV-SALTS consistent with the demonstrations based on the case studies identified in the Staff Report for the Amendments to the Water

Quality Control Plan for the Sacramento River and San Joaquin River Basins and the Water Quality Control Plan for the Tulare Lake Basin to add Policies for Variances from Surface Water Quality Standards for Point Source Dischargers, Variance Program for Salinity, and Exception from Implementation of Water Quality Objectives for Salinity, June 2014. The Regional Water Board may take action to approve a variance and issue a new, or reissue or modify an existing NPDES permit as part of the same Board meeting. The permit shall contain all conditions needed to implement the variance, including, at a minimum, all of the following:

    (a)    The interim effluent limitation(s) that are determined to be attainable during the term of the variance. When the duration of the variance is shorter than the duration of the permit, compliance with effluent limitations sufficient to meet the water quality criterion upon the expiration of the variance shall be required;

    (b)    A requirement to implement the Salinity Reduction Study Work Plan submitted with the variance application as required by paragraph (3)(e), above;

    (c)    A requirement to participate in CV-SALTS and contribute to the development and implementation of the SNMPs in accordance with the plan required by paragraph (3)(j), above.

    (d)    Any additional monitoring that is determined to be necessary to evaluate the effects on the receiving water body of the variance from water quality standards;

    (e)    A provision allowing the Regional Water Board to reopen and modify the permit based on any revision to the variance made by the Regional Water Board during the next revision of the water quality standards;

    (f)    Other conditions that the Regional Water Board determines to be necessary to implement the terms of the variance.

(7)    Permit limitations for a substance contained in the applicant's permit that are in effect at the time of the variance application shall remain in effect during the consideration of the variance application for that particular substance.

(8)    The permittee may request a renewal of a salinity variance in accordance with the provisions contained in paragraphs (2) and (3) of this section. For variances with terms greater than the term of the permit, an application for renewal of the salinity variance may be submitted with the renewal application for the NPDES permit in order to have the term of the variance begin concurrent with the term of the permit. The renewal application shall also contain information concerning its compliance with the conditions incorporated into its permit as part of the original variance, and shall include information to explain why a renewal of the variance is necessary. As part of its renewal application, a permittee shall also identify all efforts the permittee has made, and/or intends to make, towards meeting the standard. Renewal of a variance may be denied if the permittee did not comply with the conditions of the original variance.

(9)    All variances shall be reviewed during the Regional Water Board's triennial review process of this Basin Plan. For variances with terms that are greater than the term of the permit, the Regional Water Board may also review the variance upon consideration of the permit renewal.

### 4.2.2.1.15 *Limited-Term Exceptions from Basin Plan Provisions and Water Quality Objectives for Groundwater and for non-NPDES Dischargers to Surface Waters*

Pursuant to Water Code sections 13050 and 13240 et seq., the Regional Water Board has adopted beneficial use designations and water quality objectives that apply to surface and ground waters in the basins covered by this Basin Plan as well as programs of implementation.

The Central Valley Salinity Alternatives for Long-Term Sustainability (CV-SALTS) is a stakeholder effort to develop comprehensive salt and nitrate management plans (SNMPs) by May 2016 that is expected to result in basin plan amendments that will be considered by the Regional Water Board by May 2017. CV-SALTS is undertaking technical work to analyze salt and nitrate conditions in surface and ground water in the Central Valley, identify implementation measures, and develop monitoring strategies to ensure environmental and economic sustainability. The technical work under development includes developing the models for loading and transport of salt, development and evaluation of effective management practices, and implementing activities to ensure beneficial uses are protected. Participation by all stakeholders is necessary to ensure that the work is scientifically justified, supported by broad stakeholder representation, and completed in a timely fashion. The Regional Water Board has indicated its support for the comprehensive effort through CV-SALTS in Resolutions R5-2006-0024, R5-2010-0024, and R5-2013-0149 and the March 2010 Memorandum of Agreement between the Regional Water Board, the Central Valley Salinity Coalition and the State Water Board. The Regional Water Board finds that it is reasonable to grant exceptions to the discharge requirements related to the implementation of water quality objectives for salinity for non-NPDES dischargers to surface water, and for discharges to groundwater in order to allow for development and implementation of the SNMPs.

4.2.2.1.15.1    <u>Exception to Discharge Requirements Related to the Implementation of Water Quality Objectives for Salinity</u>

(1)    Any person[2] subject to waste discharge requirements and/or conditional waivers issued pursuant to Water Code 13269 that are not also NPDES permits may apply to the Regional Water Board for an exception to discharge requirements from the implementation of water quality objectives for salinity. The exception may apply to the issuance of effluent limitations and/or groundwater limitations that implement water quality objectives for salinity in groundwater, or to effluent limitations and/or surface water limitations that implement water quality objectives for salinity in surface water. For the purposes of this Program, salinity and its constituents include, and are limited to, the following: electrical conductivity, total dissolved solids, chloride, sulfate and sodium. The application for such an exception(s) shall be submitted in accordance with the requirements specified in paragraph (8), below.

(2)    An exception to discharge requirements from the implementation of water quality objectives for salinity imposed as limitations in either waste discharge requirements and/or conditional waivers that are not also NPDES permits shall be set for a term not to exceed ten years. For exception terms greater than five years, the Regional Water Board will review the exception five years after approval to confirm that the exception should proceed for the full term. The Regional Water Board review will be conducted during a public hearing. An exception may be renewed beyond the initial term if the SNMPs are still under development, and if a renewal application is submitted in accordance with the requirements specified in paragraph (8), below. A renewal must be considered during a public hearing held in accordance with paragraph 10, below.

(3)    The Regional Water Board will consider granting an exception to the implementation of water quality objectives for salinity under this Program if the applicant is actively participating in CV-SALTS as indicated by the letter required under paragraph (8)(e)., below.

---

[2] The term "person" includes, but is not limited to, "any city, county, district, the state, and the United States, to the extent authorized by federal law." (Wat. Code, § 13050, subd. (c).)

(4)     When granting an exception to the implementation of water quality objectives for salinity under this Program, the Regional Water Board shall consider including an interim performance-based effluent limitation and/or groundwater limitation that provides reasonable protection of the groundwater or the receiving water, where appropriate. When establishing such a limitation, the Regional Water Board shall take into consideration increases in salinity concentrations due to drought, water conservation, and/or water recycling efforts that may occur during the term of the exception granted.

(5)     When granting an exception to the implementation of water quality objectives for salinity under this Program, the Regional Water Board shall require the discharger to prepare and implement a Salinity Reduction Study Work Plan, or a salinity-based watershed management plan. A Salinity Reduction Study Work Plan shall at a minimum include the following:

        (a)     Data on current influent and effluent salinity concentrations;
        (b)     Identification of known salinity sources;
        (c)     Description of current plans to reduce/eliminate known salinity sources;
        (d)     Preliminary identification of other potential sources;
        (e)     A proposed schedule for evaluating sources; and
        (f)     A proposed schedule for identifying and evaluating potential reduction, elimination, and prevention methods.

        A salinity-based watershed management plan shall at a minimum include the following[3]:

        (a)     A discussion of the physical conditions that affect surface water or groundwater in the management plan area, including land use maps, identification of potential sources of salinity, baseline inventory of identified existing management practices in use, and a summary of available surface and/or groundwater quality data;
        (b)     A management plan strategy that includes a description of current management practices being used to reduce or control known salinity sources;
        (c)     Monitoring methods;
        (d)     Data evaluation; and,
        (e)     A schedule for reporting management plan progress.

(6)     When granting an exception to the implementation of water quality objectives under this Program, the Regional Water Board will include a requirement to participate in CV-SALTS and contribute to the development and implementation of the SNMPs in accordance with the plan submitted under paragraph (8)(f), below.

(7)     The granting of an exception to the implementation of water quality objectives for salinity under this Program by the Regional Water Board is a discretionary action subject to the requirements of the California Environmental Quality Act. As such, the Regional Water Board may require the applicant for the exception to prepare such documents as are necessary so that the Regional Water Board can ensure that its action complies with the requirements set forth in the California Environmental Quality Act or the Regional Water Board may use any such documents that have been prepared and certified by another state or local agency that address the potential environmental impacts associated with

---

[3] A salinity-based watershed management plan prepared to meet requirements contained within adopted waste discharge requirements, such as those contained in MRP Order R5-2012-0116, Appendix MRP-1, and that is approved by the Executive Officer of the Regional Water Board may be used in lieu of new requirements identified here.

the project and the granting of an exception from implementation of water quality objectives for salinity in groundwater and/or surface water.

(8)    A person seeking an exception to the implementation of water quality objectives for salinity under this Program must submit an application to the Regional Water Board. The person's request shall include the following:

(a)    An explanation/justification as to why the exception is necessary, and why the discharger is unable to ensure consistent compliance with existing effluent and/or groundwater/surface water limitations associated with salinity constituents at this time;

(b)    A description of salinity reduction/elimination measures that the discharger has undertaken as of the date of application, or a description of a salinity-based watershed management plan and progress of its implementation;

(c)    A description of any drought impacts, irrigation, water conservation and/or water recycling efforts that may be causing or cause the concentration of salinity to increase in the effluent, discharges to receiving waters, or in receiving waters;

(d)    Copies of any documents prepared and certified by another state or local agency pursuant to Public Resources Code section 21080 et seq.; or, such documents as are necessary for the Regional Water Board to make its decision in compliance with Public Resources Code section 21080 et seq.

(e)    Documentation of the applicant's active participation in CV-SALTS as indicated by a letter of support from CV-SALTS.

(f)    A detailed plan of how the applicant will continue to participate in CV-SALTS and how the applicant will contribute to the development and implementation of the SNMPs.

(9)    Upon receipt of an application for an exception to the implementation of water quality objectives for salinity under this Program, the Regional Water Board shall determine that the exception application is complete, or specify in writing any additional relevant information, which is deemed necessary to make a determination on the exception request. Failure of an applicant to submit any additional relevant information requested by the Regional Water Board Executive Officer within the applicable time period may result in the denial of the exception application.

(10)    Within a reasonable time period after determining that the exception application is complete, the Regional Water Board shall provide notice, request comment, and schedule and hold a public hearing on the application within a timely manner. The notice and hearing requirements shall comply with those set forth in Water Code section 13167.5. The exception shall be issued through a resolution or special order that amends applicable waste discharge requirements and/or conditional waiver requirements.

(11)    There will be no new salinity exceptions and salinity exceptions will not be renewed after 30 June 2019.

### 4.2.2.2    Regional Water Board Memoranda of Understanding (MOU) and Memoranda of Agreement (MOA)

#### 4.2.2.2.1    U.S. Bureau of Land Management

In September 1985, the Regional Water Board Executive Officer signed MOUs with the three U.S. Bureau of Land Management Districts in the Central Valley (i.e., the Ukiah District, the

Susanville District, and the Bakersfield District). The MOUs, which are identical for each District, aim at improving coordination between the two agencies for the control of water quality problems resulting from mineral extraction activities on BLM administered lands. See Appendix Items 26 through 28.

#### 4.2.2.2.2   U.S. Bureau of Reclamation Agreement

On 2 July 1969, the Regional Water Board signed an MOA with the Bureau of Reclamation to schedule water releases from the New Melones Unit of the Central Valley Project to maintain an oxygen level at or above 5 mg/l in the Stanislaus River downstream of the unit and to not exceed a mean monthly TDS concentration of 500 mg/l in the San Joaquin River immediately below the mouth of the Stanislaus River. The MOA's water quality requirements are subject to some conditions. See Appendix Item 29.

#### 4.2.2.2.3   California Department of Fish and Wildlife and Mosquito Abatement and Vector Control Districts of the South San Joaquin Valley

On 25 February 1993, the Regional Water Board Executive Officer signed an MOU with the California Department of Fish and Game (later renamed to the California Department of Fish and Wildlife) and 11 mosquito abatement and vector control districts of the south San Joaquin valley regarding vegetation management in wastewater treatment facilities. The MOU designates the Districts as lead agencies in determining the adequacy of vegetation management operations in abating mosquito breeding sources. Included in the MOU are the definition of vegetative management operations and conditions to protect nesting birds, eggs, and nests. See Appendix Item 30.

### 4.2.2.3    Regional Water Board Waivers

State law allows Regional Water Boards to conditionally waive WDRs for a specific discharge or types of discharges where the waiver is consistent with any applicable state or regional water quality control plan and it is in the public interest. A waiver may not exceed five years in duration, but may be renewed by a Regional Water Board. Waiver conditions must include monitoring requirements unless the Regional Water Board determines that the discharge does not pose a significant threat to water quality. Prior to renewing any waiver for a specific type of discharge, the Regional Water Board shall review the terms of the waiver policy at a public hearing. At the hearing, the Regional Water Board shall determine whether the discharge for which the waiver policy was established should be subject to general or individual waste discharge requirements. (Water Code Section 13269)

The Regional Water Board may, after compliance with the California Environmental Quality Act (CEQA), allow short-term variances from Basin Plan provisions, if determined to be necessary to implement control measures for vector and weed control, pest eradication, or fishery management which are being conducted to fulfill statutory requirements under California's Fish and Game, Food and Agriculture, or Health and Safety Codes. In order for the Regional Water Board to determine if a variance is appropriate, agencies proposing such activities must submit to the Regional Water Board project-specific information, including measures to mitigate adverse impacts.

### 4.2.2.4    Regional Water Board Prohibitions

The Porter-Cologne Water Quality Control Act allows the Regional Water Board to prohibit certain discharges (Water Code Section 13243). Prohibitions may be revised, rescinded, or

adopted as necessary. The prohibitions applicable to the Sacramento and San Joaquin River Basins are identified and described below.

[NOTE: Costs incurred by any unit of local government for a new program or increased level of service for compliance with discharge prohibitions in the Basin Plan do not require reimbursement by the State per Section 2231 of the Revenue and Taxation Code, because the Basin Plan implements a mandate previously enacted by statute, Chapter 482, Statutes of 1969.]

### 4.2.2.4.1  Water Bodies

Water bodies for which the Regional Water Board has held that the direct discharge of wastes is inappropriate as a permanent disposal method include sloughs and streams with intermittent flow or limited dilution capacity.
The direct discharge of municipal and industrial wastes (excluding storm water discharges) into the following specific water bodies has been prohibited, as noted:

- American River, including Lake Natoma (from Folsom Dam to mouth)
- Clear Lake
- Folsom Lake
- Fourteen Mile Slough at Stockton N.W. and Lincoln Village
- Lake Berryessa
- Middle Fork, Feather River (from Dellecker to Lake Oroville)
- Lake Oroville
- Sacramento River (from confluence with the Feather River to the Freeport Bridge). [Note: There are two exceptions, (1) discharges of combined municipal waste and storm runoff flow from the City of Sacramento, and (2) discharges of treated/disinfected municipal waste from the City of West Sacramento when the City's Clarksburg outfall line is at its maximum hydraulic capacity and when Sacramento River flow is greater than 80,000 cfs, are not subject to the prohibition. The discharges are to be controlled through waste discharge requirements.]
- Sacramento Ship Channel and Turning Basin
- Shasta Lake
- Sugar Cut at Tracy
- Thermalito Forebay and Afterbay
- Tulloch Reservoir
- Whiskeytown Reservoir
- Willow Creek-Bass Lake in Madera County (the prohibition is for sewage effluent only)

### 4.2.2.4.2  Leaching Systems

Discharge of wastes from new and existing leaching and percolation systems has been prohibited by the Regional Water Board in the following areas:

- Amador City, Amador County (Adopted by Regional Water Board Order No. 73-129; effective as of 12/15/72)
- Martell Area, Amador County (73-129; 12/15/72)
- Shasta Dam Area Public Utilities District, Shasta County (73-129; 12/15/72)
- Vallecito Area, Calaveras County (73-129; 12/15/72)
- West Point Area, Calaveras County (73-129; 12/15/72)
- Celeste Subdivision Area, Merced County (73-129; 12/15/72)
- Snelling Area, Merced County (73-129; 12/15/72, and amended 74-126; 12/14/73)
- North San Juan, Nevada County (74-123; 12/14/73)

- Arnold Area, Calaveras County (74-124, 75-180; 12/14/73, 6/25/75)
- Contra Costa County Sanitation District No. 15, Contra Costa County (74-125; 12/14/73)
- Madera County Service Area No. 2, Bass Lake (74-127; 12/14/73)
- Madera County Service Area No. 3, Parksdale (74-128; 12/14/73)
- Coulterville County Service Area No. 1, Mariposa County (75-070; 3/21/75)
- Midway Community Services District, Merced County (75-072; 3/21/75)
- Adin Community Services District, Modoc County (75-272 11/21/75)
- Fall River Mills, Community Services District, Shasta County (75-273; 11/21/75)
- Bell Road Community, including Panorama and Pearl, Placer County (75-274; 11/21/75)
- Nice and Lucerne, Lake County (76-58; 2/27/76)
- Courtland Sanitation District, Sacramento County (76-59; 2/27/76)
- Six-Mile Village, Calaveras County (76-60; 2/27/76)
- Communities of Clearlake Highlands and Clearlake Park, Lake County (76-89; 3/26/76)
- Taylorsville County Service Area, Plumas County (76-129; 5/28/76)
- Community of South Lakeshore Assessment District, Lake County (76-215; 9/24/76)
- Anderson-Cottonwood Irrigation District, Community of Cottonwood, Shasta County (76-230; 10/22/76)
- Daphnedale Area, Modoc County (76-231; 10/22/76)
- Chico Urban Area, Butte County (90-126; 4/27/90)

### 4.2.2.4.3   Petroleum

The Regional Water Board has prohibited the discharge of oil or any residuary product of petroleum to the waters of the State, except in accordance with waste discharge requirements or other provisions of Division 7, California Water Code.

### 4.2.2.4.4   Vessel Wastes

The Regional Water Board has prohibited the discharge of toilet wastes from the vessels of all houseboat rental businesses on Shasta Lake, Clear Lake, and the Delta.

### 4.2.2.4.5   Pesticides

Effective immediately for molinate and thiobencarb and on 1 January 1991 for carbofuran, malathion and methyl parathion, the discharge of irrigation return flows containing these pesticides is prohibited unless the discharger is following a management practice approved by the Board. Proposed management practices for these pesticides will not be approved unless they are expected to meet the performance goals contained in the following table. Also, the management practices must ensure that discharges of thiobencarb to waters designated as municipal or domestic water supplies will comply with the 1.0 µg/l water quality objective for this pesticide. It is important to note that the performance goals in this timetable are interim in nature and while they are based on the best available information, they are not to be equated with concentrations that meet the water quality objectives. The intent of the performance goals is to bring concentrations being found in surface waters down to levels that approach compliance with the objectives. Future performance goals and numerical objectives will be set using the results of ongoing evaluations of the risks posed by these pesticides. Future performance goals may also be site-specific to take into consideration the additive impacts of more than one pesticide being present in a water body at the same time. The Board will reexamine the progress of the control effort for these pesticides in 1993 and will set performance goals intended to bring concentrations of these five pesticides into full compliance with all objectives by 1995.

| Performance Goals[1] for Management Practices in µg/l | | | | |
|---|---|---|---|---|
| | | YEAR | | |
| Pesticide | 1990 | 1991 | 1992 | 1993 |
| Carbofuran | D | 0.4 | 0.4 | R |
| Malathion | I | 0.1 | R | R |
| Molinate | 30.0 | 20.0 | 10.0 | R |
| Methyl parathion | D | 0.26 | 0.13 | R |
| Thiobencarb | 3.0 | 1.5 | R | R |

[1] Performance goals are daily maxima and apply to all waters designated as freshwater habitat.

D = No numerical goal - control practices under development

I = No numerical goal - sources of discharge to be identified by special study

R = The Regional Board will review the latest technical and economic information determine if the performance goal should be adjusted

### 4.2.2.4.6   San Joaquin River Subsurface Agricultural Drainage

(1) The discharge of agricultural subsurface drainage from the Grassland watershed to the San Joaquin River or its tributaries from any on-farm subsurface drain, open drain, or similar drain system is prohibited, unless such discharge began prior to the effective date of this amendment (10 January 1997) or unless such discharge is governed by waste discharge requirements.

(2) The discharge of agricultural subsurface drainage water to Salt Slough and wetland water supply channels identified in Appendix 40 is prohibited after 10 January 1997, unless water quality objectives for selenium are being met.

(3) The discharge of agricultural subsurface drainage water to the San Joaquin River from Sack Dam to Mud Slough (north) is prohibited after 1 October 2010, unless water quality objectives for selenium are being met. The discharge of agricultural subsurface drainage water to Mud Slough (north) and the San Joaquin River from the Mud Slough confluence to the Merced River is prohibited after 31 December 2019 unless water quality objectives for selenium are being met. The prohibition becomes effective immediately upon Board determination that timely and adequate mitigation, as outlined in the 2010-2019 *Agreement for Continued Use of the San Luis Drain*[4]  has not been provided.

(4) The discharge of selenium from agricultural subsurface drainage systems in the Grassland watershed to the San Joaquin River is prohibited in amounts exceeding 8,000 lbs/year for all water year types beginning 10 January 1997.

---

[4] United States Department of the Interior, Bureau of Reclamation, Central Valley Project, California and San Luis & Delta-Mendota Water Authority, Los Banos, CA, *Agreement for Continued Use of the San Luis Drain for the period January 1 2010, through December 31, 2019.*

(5)     Activities that increase the discharge of poor quality agricultural subsurface drainage are prohibited.

### 4.2.2.4.7   *Diazinon and Chlorpyrifos Discharges into the Sacramento and Feather Rivers*

Beginning August 11, 2008, the direct or indirect discharge of diazinon or chlorpyrifos into the Sacramento and Feather Rivers is prohibited if, in the previous year (July-June), any exceedance of the diazinon or chlorpyrifos water quality objectives, or diazinon and chlorpyrifos loading capacity occurred.

These prohibitions do not apply if the discharge of diazinon or chlorpyrifos is subject to a waiver of waste discharge requirements implementing the diazinon and chlorpyrifos water quality objectives and load allocations for diazinon and chlorpyrifos for the Sacramento and Feather Rivers, or governed by individual or general waste discharge requirements.

These prohibitions apply only to dischargers causing or contributing to the exceedance of the water quality objective or loading capacity.

### 4.2.2.4.8   *Dissolved Oxygen in the Stockton Deep Water Ship Channel (DWSC)*

The discharge of oxygen demanding substances or their precursors into waters tributary to the DWSC portion of the San Joaquin River is prohibited after 31 December 2011 when net daily flow in the DWSC portion of the San Joaquin River in the vicinity of Stockton is less than 3,000 cubic feet per second, unless dissolved oxygen objectives in the DWSC are being met.

Any increase in the discharge of oxygen demanding substances or their precursors into waters tributary to the DWSC portion of the San Joaquin River is prohibited after 23 August 2006.

These prohibitions do not apply if the discharge is regulated by a waiver of waste discharge requirements, or individual or general waste discharge requirements or NPDES permits, which implement the *Control Program for Factors Contributing to the Dissolved Oxygen Impairment in the Stockton Deep Water Ship Channel* or which include a finding that the discharge will have no reasonable potential to cause or contribute to a negative impact on the dissolved oxygen impairment in the DWSC. These prohibitions will be reconsidered by the Regional Water Board by December 2009 based on:

(1)     the results of the oxygen demand and precursor studies required in the *Control Program for Factors Contributing to the Dissolved Oxygen Impairment in the Stockton Deep Water Ship Channel*

(2)     the prevailing dissolved oxygen conditions in the DWSC

### 4.2.2.4.9   *Control of Diazinon and Chlorpyrifos Runoff into the San Joaquin River*

Beginning 1 December 2010, the direct or indirect discharge of diazinon or chlorpyrifos into the San Joaquin River is prohibited during the dormant season (1 December through 1 March) if any exceedance of the chlorpyrifos or diazinon water quality objectives, or diazinon and chlorpyrifos loading capacity occurred during the previous dormant season.

Beginning 2 March 2011, the direct or indirect discharge of diazinon or chlorpyrifos into the San Joaquin River is prohibited during the irrigation season (2 March through 30 November) if any exceedance of the chlorpyrifos or diazinon water quality objectives, or diazinon and chlorpyrifos loading capacity occurred during the previous irrigation season.

These prohibitions apply only to i) dischargers who discharge the pollutant causing or contributing to the exceedance of the water quality objective or loading capacity; and ii) dischargers located in those subareas not meeting their load allocations.

These prohibitions do not apply if the discharge of diazinon or chlorpyrifos is subject to a waiver of waste discharge requirements implementing the diazinon and chlorpyrifos water quality objectives and load allocations for diazinon and chlorpyrifos for the San Joaquin River, or governed by individual or general waste discharge requirements.

### 4.2.2.4.10  Control of Diazinon and Chlorpyrifos Runoff into Delta Waterways (as identified in Appendix 42)

Beginning December 1, 2011, the direct or indirect discharge of diazinon or chlorpyrifos into Delta Waterways is prohibited during the dormant season (1 December through 1 March) if any exceedance of the chlorpyrifos or diazinon water quality objectives, or diazinon and chlorpyrifos loading capacity occurred during the previous dormant season.

Beginning March 2, 2012, the direct or indirect discharge of diazinon or chlorpyrifos into Delta Waterways is prohibited during the irrigation season (2 March through 30 November) if any exceedance of the chlorpyrifos or diazinon water quality objectives, or diazinon and chlorpyrifos loading capacity occurred during the previous irrigation season.

These prohibitions do not apply if the discharge of diazinon or chlorpyrifos is subject to a waiver of waste discharge requirements implementing the diazinon and chlorpyrifos water quality objectives and load allocations for diazinon and chlorpyrifos for the Delta Waterways, or governed by individual or general waste discharge requirements.

These prohibitions apply only to dischargers causing or contributing to the exceedance of the water quality objective or loading capacity.

These prohibitions do not apply to direct or indirect discharges to the Sacramento or San Joaquin Rivers upstream of the legal boundary of the Delta (as defined in Section 12220 of the California Water Code).

### 4.2.2.4.11  Diazinon and Chlorpyrifos Discharges

Dischargers are prohibited from discharging chlorpyrifos and/or diazinon at concentrations that exceed water quality objectives to waters with designated or existing[5] WARM and/or COLD beneficial uses unless:

- The discharge is regulated under a waiver of waste discharge requirements or individual or general waste discharge requirements, or
- The discharge is upstream of one of the dams listed in Table 3-5.

### 4.2.2.4.12  Pyrethroid Pesticides Discharges

Beginning 19 February 2022, discharges of pyrethroid pesticides at concentrations that exceed pyrethroid triggers (Table 4-2) to water bodies with designated or existing[5] WARM and/or COLD beneficial uses are prohibited unless a discharger is implementing a pyrethroid management plan to reduce pyrethroid levels in their discharges. Pyrethroid management plans must identify

---

[5]  Existing as defined in Title 40 of the Code of Federal Regulations, section 131.3(e)

specific management practices for controlling pyrethroid pesticides that will be implemented and are subject to approval processes within the Boards' applicable regulatory programs. In reviewing the pyrethroid management plans, the Executive Officer or designee shall consider the potential impact of the pyrethroid discharge and whether the actions proposed are commensurate with the potential impact. Draft pyrethroid management plans must be submitted at least 6 months prior to 19 February 2022. Dischargers shall begin implementing their pyrethroid management plans within 30 days after receipt of written approval of their management plan. For municipal storm water and municipal and domestic wastewater dischargers, management plans are deemed approved and ready to implement if no written approval is provided after 9 months, unless the Executive Officer provides written notification to extend the approval process. Multiple dischargers that are subject to the above requirements may elect to develop and submit a joint pyrethroid management plan. Such a joint pyrethroid management plan must clearly identify the management practices or actions for which each individual discharger is responsible. If concentrations in a discharge not covered under a pyrethroid management plan are found to exceed the pyrethroid triggers after 19 February 2022, the discharger must submit a draft pyrethroid management plan for approval within 1 year of identifying the exceedance, during which time they are not considered out of compliance, and begin implementing the pyrethroid management plan within 30 days after receipt of written approval of the pyrethroid management plan. Further implementation provisions relating to the conditional prohibition of pyrethroid pesticide discharges are given in the Implementation chapter under the header Pyrethroid Pesticides Control Program (p. 4-121) and monitoring requirements are described in the Surveillance and Monitoring chapter under the header Pyrethroid Pesticides Discharges (p. 5-12).

The pyrethroid triggers are intended to be used to indicate when pyrethroid management plans need to be developed and management practices are to be implemented by the discharger. When the triggers are exceeded in monitoring or as part of a toxicity evaluation, the discharger may be required to initiate trend monitoring. These actions will provide information on achievability and costs to the Board to inform future evaluation of potential water quality objectives. The pyrethroid triggers are not for use as numeric water quality-based effluent limitations or for reasonable potential analysis.

Discharges of pyrethroids that are subject to pyrethroid TMDL requirements are not subject to the conditional prohibition.

### TABLE 4-2: NUMERIC TRIGGERS FOR PYRETHROID PESTICIDES
### *(including all stereoisomers)*

<table>
<tr><td>

**Pyrethroid Concentration Calculation**

Concentrations of pyrethroid pesticides must be above reporting limits (limits of quantitation) to be included; concentrations reported as not-detected or as below the limit of quantitation will be considered as zero (0) in the below formulas. Guidance on acceptable analytical methods is given in the Surveillance and Monitoring chapter under the header Pyrethroid Pesticides Discharges (p. 5-12).

**Freely dissolved pyrethroid concentrations** may be used in the below formulas to determine the sum of acute and chronic additive concentration goal units (CGUs). The freely dissolved concentration of each quantified pyrethroid pesticide in a sample may be directly measured or estimated using partition coefficients. Methods for direct measurement must be approved by the Executive Officer before they are used to determine the freely dissolved pyrethroid concentrations that are used for determining exceedances of the pyrethroid pesticides numeric triggers. To estimate the freely dissolved concentration of a pyrethroid pesticide with partition coefficients, the following equation shall be used:

</td></tr>
</table>

**TABLE 4-2: NUMERIC TRIGGERS FOR PYRETHROID PESTICIDES (continued)**

$$C_{dissolved} = \frac{C_{total}}{1 + (K_{OC} \times [POC]) + (K_{DOC} \times [DOC])}$$

Where:

$C_{dissolved}$ = concentration of a an individual pyrethroid pesticide that is in the freely dissolved phase (ng/L),

$C_{total}$ = total concentration of an individual pyrethroid pesticide in water (ng/L),

$K_{OC}$ = organic carbon-water partition coefficient for the individual pyrethroid pesticide (L/kg),

$[POC]$ = concentration of particulate organic carbon in the water sample (kg/L),which can be calculated as [POC]=[TOC]-[DOC],

$K_{DOC}$ = dissolved organic carbon-water partition coefficient (L/kg),

$[DOC]$ = concentration of dissolved organic carbon in the sample (kg/L).

Site-specific or alternative study-based partition coefficients approved by the Executive Officer may be used in the above equation. If site-specific or alternative study-based partition coefficients are not available or have not been approved, the following partition coefficients shall be used in the above equation:

| Pyrethroid Pesticide | *Ambient Waters* | | *Wastewater Effluents* | |
| --- | --- | --- | --- | --- |
| | $K_{OC}$ (L/kg) | $K_{DOC}$ (L/kg) | $K_{OC}$ (L/kg) | $K_{DOC}$ (L/kg) |
| Bifenthrin | 4,228,000 | 1,737,127 | 15,848,932 | 800,000 |
| Cyfluthrin | 3,870,000 | 2,432,071 | 3,870,000 | 2,432,071 |
| Cypermethrin | 3,105,000 | 762,765 | 6,309,573 | 200,000 |
| Esfenvalerate | 7,220,000 | 1,733,158 | 7,220,000 | 1,733,158 |
| Lambda-cyhalothrin | 2,056,000 | 952,809 | 7,126,428 | 200,000 |
| Permethrin | 6,075,000 | 957,703 | 10,000,000 | 200,000 |

**Acute Pyrethroid Trigger**

The acute additive pyrethroid pesticides numeric trigger is equal to one (1) acute additive concentration goal unit (CGU) not to be exceeded more than once in a three year period. The CGUs are calculated as the sum of individual measured pyrethroid concentration-to-acute concentration goal ratios, as defined in the following formula. For calculation of CGUs, available samples collected within the applicable averaging period for the numeric trigger will be used to determine exceedances of the trigger. Freely dissolved pyrethroid concentrations may be used in the numerator of each ratio if appropriate data are available, as described in the equation to calculate freely dissolved concentrations given above.

$$CGU_{acute} = \frac{C_{bif}}{ACG_{bif}} + \frac{C_{cyf}}{ACG_{cyf}} + \frac{C_{cyp}}{ACG_{cyp}} + \frac{C_{esf}}{ACG_{esf}} + \frac{C_{lcy}}{ACG_{lcy}} + \frac{C_{per}}{ACG_{per}}$$

Where:

$C_{bif}$ = Average concentration of bifenthrin in ng/L from a 1-hour averaging period,

$C_{cyf}$ = Average concentration of cyfluthrin in ng/L from a 1-hour averaging period,

$C_{cyp}$ = Average concentration of cypermethrin in ng/L from a 1-hour averaging period,

$C_{esf}$ = Average concentration of esfenvalerate in ng/L from a 1-hour averaging period,

$C_{lcy}$ = Average concentration of lambda-cyhalothrin in ng/L from a 1-hour averaging period,

$C_{per}$ = Average concentration of permethrin in ng/L from a 1-hour averaging period,

$ACG_{bif}$ = Bifenthrin acute concentration goal of 0.8 ng/L,

$ACG_{cyf}$ = Cyfluthrin acute concentration goal of 0.8 ng/L,

$ACG_{cyp}$ = Cypermethrin acute concentration goal of 1 ng/L,

$ACG_{esf}$ = Esfenvalerate acute concentration goal of 2 ng/L,

$ACG_{lcy}$ = Lambda-cyhalothrin acute concentration goal of 0.7 ng/L,

$ACG_{per}$ = Permethrin acute concentration goal of 6 ng/L,

$CGU_{acute}$ = The sum of measured pyrethroid concentration-to-acute concentration goal ratios, rounded to one significant figure. A sum exceeding one (1) indicates an exceedance of the acute additive pyrethroid pesticides numeric trigger.

**TABLE 4-2: NUMERIC TRIGGERS FOR PYRETHROID PESTICIDES (continued)**

---

**Chronic Pyrethroid Trigger**

The chronic additive pyrethroid pesticides numeric trigger is equal to one (1) chronic additive concentration goal unit not to be exceeded more than once in a three year period. The chronic CGUs are calculated as the sum of individual measured pyrethroid concentration-to-chronic concentration goal ratios, as defined in the following formula. For calculation of CGUs, available samples collected within the applicable averaging period for the numeric trigger will be used to determine exceedances of the trigger. Freely dissolved pyrethroid concentrations may be used in the numerator of each ratio if appropriate data are available, as described in the equation to calculate freely dissolved concentrations given above.

$$CGU_{chronic} = \frac{C_{bif}}{CCG_{bif}} + \frac{C_{cyf}}{CCG_{cyf}} + \frac{C_{cyp}}{CCG_{cyp}} + \frac{C_{esf}}{CCG_{esf}} + \frac{C_{lcy}}{CCG_{lcy}} + \frac{C_{per}}{CCG_{per}}$$

Where:

$C_{bif}$ = Average concentration of bifenthrin in ng/L from a 4-day averaging period,
$C_{cyf}$ = Average concentration of cyfluthrin in ng/L from a 4-day averaging period,
$C_{cyp}$ = Average concentration of cypermethrin in ng/L from a 4-day averaging period,
$C_{esf}$ = Average concentration of esfenvalerate in ng/L from a 4-day averaging period,
$C_{lcy}$ = Average concentration of lambda-cyhalothrin in ng/L from a 4-day averaging period,
$C_{per}$ = Average concentration of permethrin in ng/L from a 4-day averaging period,
$CCG_{bif}$ = Bifenthrin chronic concentration goal of 0.1 ng/L,
$CCG_{cyf}$ = Cyfluthrin chronic concentration goal of 0.2 ng/L,
$CCG_{cyp}$ = Cypermethrin chronic concentration goal of 0.3 ng/L,
$CCG_{esf}$ = Esfenvalerate chronic concentration goal of 0.3 ng/L,
$CCG_{lcy}$ = Lambda-cyhalothrin chronic concentration goal of 0.3 ng/L,
$CCG_{per}$ = Permethrin chronic concentration goal of 1 ng/L,
$CGU_{chronic}$ = The sum of measured pyrethroid concentration-to-chronic concentration goal ratios, rounded to one significant figure. A sum exceeding one (1) indicates an exceedance of the chronic additive pyrethroid pesticides numeric trigger.

---

### 4.2.2.5    Regional Water Board Guidelines

The Regional Water Board has adopted guidance for certain types of dischargers which is designed to reduce the possibility that water quality will be impaired. The Regional Water Board may still impose discharge requirements. All of the Guidelines are contained in the Appendix (Items 33 through 37). Currently, the following Guidelines apply to the Sacramento and San Joaquin River Basins:

#### 4.2.2.5.1    Wineries

This Guideline contains criteria for protecting beneficial uses and preventing nuisance from the disposal to land of stillage wastes.

#### 4.2.2.5.2    Erosion and Sedimentation

This Guideline identifies practices to be implemented by local government to reduce erosion and sedimentation from construction activities.

#### 4.2.2.5.3    Small Hydroelectric Facilities

This Guideline specifies measures to protect water quality from temperature, turbidity, and dissolved oxygen effects from the construction and operation of small hydroelectric Facilities.

*4.2.2.5.4   Mining*

This Guideline identifies actions that the Regional Water Board takes to address the water quality problems associated with mining. It requires owners and operators of active mines to prepare plans for closure and reclamation, but it does not specify any practices or criteria for mine operators.

### 4.2.2.6    Nonpoint Source Action Plans

Section 208 of the 1972 Amendments to the Federal Clean Water Act resulted in monies being made available to states to address nonpoint source problems. The Regional Water Board used 208 grant funds to develop its mining and erosion/sedimentation guidelines, among other things. It also encouraged local governments to make use of the 208 program. As a result, several counties in the sub-basins developed action plans to control nonpoint source problems which affected them. The Regional Water Board action plans are described in Table 4-3.

**TABLE 4-3**
**NONPOINT SOURCE ACTION PLANS**

| LOCATION | RECOMMENDED ACTION |
| --- | --- |
| Shasta County | Best Management Practices (BMPs) for control of erosion from land development (adopted 1980) |
| Nevada County | BMPs for erosion and individual wastewater disposal systems (adopted 1980) |
| Placer County | BMPs for erosion and installation of individual wastewater disposal systems (adopted 1980) |
| Lake County | BMPs for erosion and creek bed management (adopted 1979) |
| Communities of Paradise and Magalia (Butte County) | BMPs for wastewater management (adopted 1979) |
| Solano County | BMPs for surface water runoff (adopted 1979) |
| Upper Putah Creek Watershed (Lake, Napa Counties) | Strategies and recommendations for addressing problems from geothermal development, abandoned mines, and individual wastewater disposal systems (adopted 1981) |
| Fall River (Shasta County) | BMPs for livestock grazing and individual wastewater disposal systems (adopted 1982) |
| Plumas County | BMPs for erosion control (adopted 1980) |
| Mariposa County | BMPs for individual wastewater disposal systems for area north of the community of Mariposa; BMPs for erosion and sedimentation in the Stockton Creek Watershed (adopted 1979) |
| Merced County | Lake Yosemite Area -- BMPs for individual wastewater disposal systems (adopted 1979) |

## 4.3   ACTIONS RECOMMENDED FOR IMPLEMENTATION BY OTHER ENTITIES

Consistent with the Porter-Cologne Water Quality Control Act, the Basin Plan may identify control actions recommended for implementation by agencies other than the Regional Water Board [Water Code Section 13242(a)].

# 4.3.1    Recommended for Implementation by the State Water Board

### 4.3.1.1    Interbasin Transfer of Water

Before granting new permits for water storage or diversion which involves interbasin transfer of water, the State Water Board should require the applicant to evaluate the alternatives listed below. Permits should not be approved unless the alternatives have been thoroughly investigated and ruled out for social, environmental, or economic reasons.

(1)     In situations where wastewater is discharged to marine waters without intervening beneficial use (for example, the San Francisco Bay Area and most of Southern California), increase the efficiency of municipal, industrial, and agricultural water use.

(2)     Make optimum use of existing water resource facilities.

(3)     Store what would otherwise be surplus wet-weather Delta outflows in off-stream reservoirs.

(4)     Conjunctively use surface and ground waters.

(5)     Give careful consideration to the impact on basin water quality of inland siting of power plants.

(6)     Make maximum use of reclaimed water while protecting public health and avoiding severe economic penalties to a particular user or class of users.

### 4.3.1.2    Trans-Delta Water Conveyance

The State Water Board should adopt the position that those proposing trans-Delta water conveyance facilities must clearly demonstrate the following, if such a facility is constructed:

(1)     Protection of all beneficial uses in the Delta that may be affected by such a facility;

(2)     Protection of all established water quality objectives that may be affected by such a facility; and,

(3)     Adherence to the six alternatives previously identified for Interbasin Transfer of Water.

### 4.3.1.3    Water Quality Planning

A core planning group has been established within the staff of the State Water Board, which has the responsibility to integrate the statewide planning of water quality and water resources management.

### 4.3.1.4    Water Intake Studies

The State Water Board should coordinate studies to assess the costs and benefits of moving planned diversions from the eastern side of the Central Valley to points further west, probably to the Delta, to allow east side waters to flow downstream for uses of fishery enhancement, recreation, and quality control. Specific study items should include:

(1)     Possible intake relocations;

(2)     Conveyance and treatment required to accommodate such relocations;

(3)     Direct and indirect (including consumer and environmental) costs and benefits of relocation; and,

(4)     Institutional problems.

The State Water Board should request voluntary participation in the studies by agencies planning diversions, but should take appropriate action through its water rights authority if such participation cannot be obtained. At a minimum, participation would be required of the San Francisco Water Department and East Bay Municipal Utility District.

### 4.3.1.5     Subsurface Agricultural Drainage

(1)     The Regional Board will request that the State Water Board use its water rights authority to preclude the supplying of water to specific lands, if water quality objectives are not met by the specified compliance dates and Regional Board administrative remedies fail to achieve compliance.

(2)     The State Water Board should work jointly with the Regional Water Board in securing compliance with the 2 µg/l selenium objective for managed- wetlands in the Grassland area.

(3)     The State Water Board should also consider grant funds to implement a cost share program to install a number of flow monitoring stations within the Grassland area to assist in better defining the movement of pollutants through the area.

(4)     The State Water Board should continue to consider the Drainage Problem Area in the San Joaquin Basin and the upper Panoche watershed (in the Tulare Basin) as priority nonpoint source problems in order to make USEPA nonpoint source control funding available to the area.

(5)     The State Water Board should seek funding for research and demonstration of advanced technology that will be needed to achieve final selenium loads necessary to meet selenium water quality objectives.

### 4.3.1.6     Salt and Boron in the Lower San Joaquin River

(1)     The State Water Board should consider the continued use of its water rights authority to prohibit water transfers if the transfer contributes to low flows and related salinity water quality impairment in the Lower San Joaquin River.

(2)     The State Water Board should consider the continued conditioning of water rights on the attainment of existing and new water quality objectives for salinity in the Lower San Joaquin River, when these objectives cannot be met through discharge controls alone.

### 4.3.1.7     Dissolved Oxygen in the Stockton Deep Water Ship Channel (DWSC)

(1)     The State Water Board should consider amending water right permits for existing activities that reduce flow through the DWSC to require that the associated impacts on excess net oxygen demand conditions in the DWSC be evaluated and their impacts reduced in accordance with the *Control Program for Factors Contributing to the Dissolved Oxygen Impairment in the DWSC*.

(2)    The State Water Board should consider requiring evaluation and full mitigation of the potential impacts of future water right permits or water transfer applications on reduced flow and excess net oxygen demand conditions in the DWSC.

### 4.3.1.8    Delta Mercury

(1)    The State Water Board should consider requiring methylmercury controls for new water management activities that have the potential to increase ambient methylmercury levels as a condition of approval of any water right action required to implement the project. The State Water Board Division of Water Rights should consider requiring the evaluation and implementation of feasible management practices to reduce or, at a minimum, prevent methylmercury ambient levels from increasing from those changes in water management activities and flood conveyance projects that have the potential to increase methylmercury levels. The State Water Board should consider funding or conducting studies to develop and evaluate management practices to reduce methylmercury production resulting from existing water management activities or flood conveyance projects.

(2)    During future reviews of the salinity objectives contained in the Bay-Delta Plan, the State Water Board Division of Water Rights should consider conducting studies to determine whether proposed changes to salinity objectives could affect methylmercury production and should consider the results of these studies in evaluating changes to the salinity objectives.

## 4.3.2    Recommended for Implementation by Other Agencies

### 4.3.2.1    Water Resources Facilities

(1)    Consideration should be given to the construction of a storage facility to store surplus wet-weather Delta outflows. Construction should be contingent on studies demonstrating that some portion of wet-weather Delta outflow is truly surplus to the Bay-Delta system.

(2)    Consideration should be given to the use of excess capacity in west San Joaquin Valley conveyances, or of using a new east valley conveyance to:

    (a)    Augment flows and improve water quality in the San Joaquin River and southern Delta with the goal of achieving water quality as described in Table 4-4.

TABLE 4-4

| TYPE PF YEAR[1] | | | | |
|---|---|---|---|---|
| TDS MG/L | CRITICAL[2] | DRY[3] | NORMAL | WET[4] |
| Max. 3-day (arith. avg.) | 500 | 500 | 500 | 500 |
| Maximum (annual avg.) | 385 | 385 | 385 | 285 |
| Max. May-Sep (arith. avg.) | 300 | 250 | 250 | 250 |
| Max. 3-Day May-Sep (arith Avg.) | 450 | 350 | 350 | 350 |

_____

[1] Relative to unimpaired runoff to Delta Based on 1922 -1971 period. See definitions in Figure 2 of the 2006 Bay-Delta Plan

[2] Less than 57%, or less than 70% when preceding year critical

[3] Less than 70%, or less than 90% when preceding year critical

[4] Greater than 125%

(b)     Prevent further ground water overdrafts and associated quality problems.

(3)     Agencies responsible for existing water resources facilities that reduce flow through the Stockton Deep Water Ship Channel (DWSC) should evaluate and reduce their impacts on excess net oxygen demand conditions in the DWSC in accordance with the *Control Program for Factors Contributing to the Dissolved Oxygen Impairment in the DWSC*.

(4)     Agencies responsible for future water resources facilities projects, which potentially reduce flow through the DWSC, should evaluate and fully mitigate the potential negative impacts on excess net oxygen demand conditions in the DWSC.

### 4.3.2.2     Agricultural Drainage Facilities

Facilities should be constructed to convey agricultural drain water from the San Joaquin and Tulare Basins. It is the policy of the Regional Water Board to encourage construction. The discharge must comply with water quality objectives of the receiving water body.

### 4.3.2.3     Subsurface Agricultural Drainage

(1)     The entire drainage issue is being handled as a watershed management issue. The entities in the Drainage Problem Area and entities within the remainder of the Grassland watershed need to establish a regional entity with authority and responsibility for drain water management.

(2)     The regional drainage entity and agricultural water districts should consider adopting economic incentive programs as a component of their plans to reduce pollutant loads. Economic incentives can be an effective institutional means of promoting on-farm changes in drainage and water management.

(3)     If fragmentation of the parties that generate, handle and discharge agricultural subsurface drainage jeopardizes the achievement of water quality objectives, the Regional Water Board will consider petitioning the Legislature for the formation of a regional drainage district.

(4)     The Legislature should consider putting additional bond issues before the voters to provide low interest loans for agricultural water conservation and water quality projects

and incorporating provisions that would allow recipients to be private landowners, and that would allow irrigation efficiency improvement projects that reduce drainage discharges to be eligible for both water conservation funds and water quality facilities funds.

(5)    The San Joaquin Valley Drainage Implementation Program or other appropriate agencies should continue to investigate the alternative of a San Joaquin River Basin drain to move the existing discharge point for poor quality agricultural subsurface drainage to a location where its impact on water quality is less.

(6)    The selenium water quality objective for the wetland channels can not be achieved without removal of drainage water from these channels. The present use of the Grassland channels has developed over a 30-year period through agreements between the dischargers, water and irrigation districts, the U.S. Bureau of Reclamation, the California Department of Water Resources, the U.S. Fish and Wildlife Service, the California Department of Fish and Game (now the Department of Fish and Wildlife), the Grassland Water District and the Grassland Resource Conservation District. Because each entity shared in the development of the present drainage routing system, each shares the responsibility for implementation of a wetlands bypass.

### 4.3.2.4    Stockton Deep Water Ship Channel (DWSC)

(1)    The U.S. Army Corps of Engineers should reduce the impacts of the existing DWSC geometry on excess net oxygen demand conditions in accordance with the *Control Program for Factors Contributing to the Dissolved Oxygen Impairment in the DWSC*.

### 4.3.2.5    Delta Mercury

(1)    USEPA and the California Air Resources Board should work with the State Water Board and develop a memorandum of understanding to evaluate local and statewide mercury air emissions and deposition patterns and to develop a load reduction program(s).

(2)    The State of California should establish the means to fund a portion of the mercury control projects in the Delta and upstream watersheds.

(3)    Watershed stakeholders are encouraged to identify total mercury and methylmercury reduction projects and propose and conduct projects to reduce upstream non-point sources of methylmercury and total mercury. The Regional Water Board recommends that state and federal grant programs give priority to projects that reduce upstream non-point sources of methylmercury and total mercury.

(4)    Dischargers may evaluate imposed administrative civil liabilities projects for total mercury and methylmercury discharge and exposure reduction projects, consistent with Supplemental Environmental Project policies.

### 4.3.2.6    Pyrethroid Pesticides Control Program

#### 4.3.2.6.1   *California Department of Pesticide Regulation (DPR)*

Like the Regional Water Board, DPR is part of the California Environmental Protection Agency. It regulates pesticide product sales and use within California pursuant to the California Food and Agricultural Code. When DPR evaluates whether to register a pesticide product, one consideration is the potential for environmental damage. As a part of the pesticide registration

process DPR seeks to identify pesticide products whose use or runoff may result in adverse environmental impacts and condition or deny product registration accordingly. DPR is mandated to protect water quality from environmentally harmful pesticide materials and can implement mitigation measures when monitoring data provides evidence of adverse environmental impacts.

Consistent with its authorities, DPR should continue to implement the following actions:

(1)     Conduct statewide urban and agricultural monitoring program to identify pesticides applied in such a manner that runoff does or could cause or contribute to water quality concerns;

(2)     Deny registration to pesticide products during registration evaluation process that present an unacceptable risk to surface water;

(3)     Require registrants to provide information necessary to assess potential water quality impacts as a condition of registration, including, when necessary, development of analytical methods with adequately low limits of quantification in appropriate matrices;

(4)     Continue and enhance efforts to evaluate the potential for registered pesticide products to cause or contribute to water quality concerns, including consideration of fate and transport of pesticide discharges from wastewater treatment plants, urban runoff, and agricultural sources. Continuous evaluation efforts include monitoring, assessment, and special studies to address identified data gaps;

(5)     Notify USEPA of potential deficiencies in product labels for products that threaten water quality;

(6)     Work directly with registrants to address product uses specific to California environmental concerns;

(7)     Where necessary, develop and modify pesticide use regulations to address pesticide uses that are causing unacceptable water quality impacts;

(8)     Continue and enhance education and outreach programs to encourage integrated pest management and less toxic pest control (work with County Agricultural Commissioners, urban runoff management agencies, and the University of California Statewide Integrated Pest Management Program to coordinate activities);

(9)     Continue and enhance, in coordination with county agricultural commissioners, implementation and enforcement of water quality protection regulations and label requirements, including urban surface water protection regulations;

(10)    Continue and enhance reporting on progress and challenges in implementing water quality protection-related efforts for pesticides with concentrations of concern.

### 4.3.2.6.2   U. S. Environmental Protection Agency (USEPA) Office of Pesticide Programs

USEPA is responsible for implementing the Federal Insecticide, Fungicide, and Rodenticide Act and the Clean Water Act. USEPA is therefore responsible for ensuring that both federal pesticide laws and water quality laws are implemented. USEPA should exercise its authorities to ensure that foreseeable pesticide applications do not cause or contribute to water column or

sediment toxicity in the Region's waters. Because some pesticides pose water quality risks, USEPA should implement the following actions:

(1)     Continue to improve the pesticide registration and registration review processes to ensure that pesticide applications and resulting discharges are protective of water quality and do not cause water quality impairments (i.e., restrict uses or application practices to manage risks). This should include consideration of fate and transport of pesticide discharges from wastewater treatment plants, urban runoff, and agricultural runoff;

(2)     Continue and enhance education and outreach programs to encourage integrated pest management and less toxic pest control;

(3)     Require registrants to provide information necessary to assess potential water quality impacts as a condition of registration, including, when necessary, adequate ecotoxicity data to develop water and sediment quality criteria for pesticides of concern and development of analytical methods with adequately low limits of quantification in appropriate matrices;

(4)     Complete studies to address critical data needs;

(5)     Respond in a timely manner to identified deficiencies in product labels for products that threaten water quality;

(6)     Continue and enhance internal coordination efforts between the Office of Pesticide Programs and the Office of Water to implement the above-stated actions to ensure pesticide registration decisions protect water quality.

## 4.4    CONTINUOUS PLANNING FOR IMPLEMENTATION OF WATER QUALITY CONTROL

In order to effectively protect beneficial uses, the Regional Water Board updates the Basin Plan regularly in response to changing water quality conditions. The Regional Water Board is periodically apprised of water quality problems in the Sacramento and San Joaquin River Basins, but the major review of water quality is done every three years as part of the Triennial Review of water quality standards.

During the triennial review, the Regional Water Board holds a public hearing to receive comments on actual and potential water quality problems. A workplan is prepared which identifies the control actions that will be implemented over the succeeding three years to address the problems. The actions may include or result in revision of the Basin Plan's water quality standards if that is an appropriate problem remedy. Until such time that a basin plan is revised, the triennial review also serves to reaffirm existing standards.

The control actions that are identified through the triennial review process are incorporated into the Basin Plan to meet requirements to describe actions (to achieve objectives) and a time schedule of their implementation as called for in the Water Code, Section 13242(a) and (b). The actions recommended in the most recent triennial review are described in the following section.

## 4.5    ACTIONS AND SCHEDULE TO ACHIEVE WATER QUALITY OBJECTIVES

## 4.5.1    Agricultural Drainage Discharges in the San Joaquin River Basin

Water quality in the San Joaquin River has degraded significantly since the late 1940s. During this period, salt concentrations in the River, near Vernalis, have doubled. Concentrations of boron, selenium, molybdenum and other trace elements have also increased. These increases are primarily due to reservoir development on the east side tributaries and upper basin for agricultural development, the use of poorer quality, higher salinity, Delta water in lieu of San Joaquin River water on west side agricultural lands and drainage from upslope saline soils on the west side of the San Joaquin Valley. Point source discharges to surface waters only contribute a small fraction of the total salt and boron loads in the San Joaquin River.

The water quality degradation in the River was identified in the 1975 Basin Plan and the Lower San Joaquin River was classified as a Water Quality Limited Segment. At that time, it was envisioned that a Valley-wide Drain would be developed and these subsurface drainage water flows would then be discharged outside the Basin, thus improving River water quality. However, present day development is looking more toward a regional solution to the drainage water discharge problem rather than a valley-wide drain.

Because of the need to manage salt and other pollutants in the River, the Regional Water Board began developing a Regional Drainage Water Disposal Plan for the Basin. The development began in FY 87/88 when Basin Plan amendments were considered by the Water Board in FY 88/89. The amendment development process included review of beneficial uses, establishment of water quality objectives, and preparation of a regulatory plan, including a full implementation plan. The regulatory plan emphasized achieving objectives through reductions in drainage volumes and pollutant loads through best management practices and other on-farm methods.

The 88/89 amendment emphasized toxic elements in subsurface drainage discharges. The Regional Water Board however still recognizes salt management as the most serious long-term issue on the San Joaquin River. Salinity impairment in the Lower San Joaquin River remains a persistent problem as salinity water quality objectives continue to be exceeded. The Regional Water Board adopted the following control program for salt and boron in the Lower San Joaquin River to address salt and boron impairment and to bring the river into compliance with water quality objectives. Additionally, the Regional Water Board will continue as an active participant in the San Joaquin River Management Program implementation phase, as authorized by AB 3048, to promote salinity management schemes including time discharge releases, real time monitoring and source control.

Per the amendment to the Basin Plan for San Joaquin River subsurface agricultural drainage, approved by the State Water Board in Resolution No. 96-078, as amended by Resolution No. R5-2010-0046 and incorporated herein, the following actions will be implemented.

(1)    In developing control actions for selenium, the Regional Board will utilize a priority system which focuses on a combination of sensitivity of the beneficial use to selenium and the environmental benefit expected from the action.

(2)    Control actions which result in selenium load reduction are most effective in meeting water quality objectives.

(3)    With the uncertainty in the effectiveness of each control action, the regulatory program will be conducted as a series of short-term actions that are designed to meet long-term water quality objectives.

(4)    Best management practices, such as water conservation measures, are applicable to the control of agricultural subsurface drainage.

(5)    Performance goals will be used to measure progress toward achievement of water quality objectives for selenium. Prohibitions of discharge and waste discharge requirements will be used to control agricultural subsurface drainage discharges containing selenium. Compliance with performance goals and water quality objectives for nonpoint sources will occur no later than the dates specified in Table 4-5 for Mud Slough (north) and the San Joaquin River from the Mud Slough confluence to the Merced River.

**TABLE 4-5. COMPLIANCE TIME SCHEDULE FOR MEETING THE 4-DAY AVERAGE WATER QUALITY OBJECTIVE FOR SELENIUM**

**Selenium Water Quality Objectives (in bold) and Performance Goals (in italics)**

| Water Body | 31 December 2015 | 31 December 2019 |
|---|---|---|
| Mud Slough (north) and the San Joaquin River from the Mud Slough confluence to the Merced River | *15 $\mu$g/L monthly mean* | **5 $\mu$g/L 4-day avg.** |

(6)    Waste discharge requirements will be used to control agricultural subsurface drainage discharges containing selenium and may be used to control discharges containing other toxic trace elements.

(7)    Selenium load reduction requirements will be incorporated into waste discharge requirements as effluent limits as necessary to ensure that the selenium water quality objectives in the San Joaquin River downstream of the Merced River inflow is achieved. The Board adopted a TMDL for selenium in the San Joaquin River in 2001 after public review.

(8)    Selenium effluent limits established in waste discharge requirements will be applied to the discharge of subsurface drainage water from the Grassland watershed. In the absence of a regional entity to coordinate actions on the discharge, the Regional Board will consider setting the effluent limits at each drainage water source (discharger) to ensure that beneficial uses are protected at all points downstream.

(9)    Upslope irrigations and water facility operators whose actions contribute to subsurface drainage flows will participate in the program to control discharges.

(10)   Public and private managed-wetlands will participate in the program to achieve water quality objectives.

(11)   Achieving reductions in the load of selenium discharged is highly dependent upon the effectiveness of individual actions or technology not currently available; therefore, the Regional Board will review the waste discharge requirements and compliance schedule at least every 5 years.

(12)    All those discharging or contributing to the generation of agricultural subsurface drainage will be required to submit for approval a short-term (5-year) drainage management plan designed to meet interim milestones and a long-term drainage management plan designed to meet final water quality objectives.

(13)    An annual review of the effectiveness of control actions taken will be conducted by those contributing to the generation of agricultural subsurface drainage.

(14)    Evaporation basins in the San Joaquin Basin will be required to meet minimum design standards, have waste discharge requirements and be part of a regional plan to control agricultural subsurface drainage.

(15)    The Regional Board staff will coordinate with US EPA and the dischargers on a study plan to support the development of a site specific selenium water quality objective for the San Joaquin River and other effluent dominated waterbodies in the Grassland watershed.

(16)    The Regional Board will establish water quality objectives for salinity for the San Joaquin River.

### 4.5.1.1    Control Program for Salt and Boron Discharges into the Lower San Joaquin River (LSJR)

The goal of the salt and boron control program is to achieve compliance with salt and boron water quality objectives without restricting the ability of dischargers to export salt out of the San Joaquin River basin.

For the purpose of this control program, nonpoint source land uses include all irrigated lands and nonpoint source discharges are discharges from irrigated lands.

Irrigated lands are lands where water is applied for producing crops and, for the purpose of this control program, includes, but is not limited to, land planted to row, field and tree crops as well as commercial nurseries, nursery stock production, managed wetlands, and rice production.

This control program is phased to allow for implementation of existing water quality objectives, while providing the framework and timeline for implementing future water quality objectives.

The salt and boron control program establishes 1) a method for determining the maximum allowable salt loading to the LSJR from discharges to achieve compliance with salinity water quality objectives (WQOs) at the Airport Way Bridge near Vernalis and 2) WQOs and an implementation program for salinity between the mouth of the Merced River and the Airport Way Bridge.

#### 4.5.1.1.1    *Salt Loading and the Vernalis Salinity Control Program*

Load allocations to specific dischargers or groups of dischargers are proportionate to the area of nonpoint source land use contributing to the discharge. Control actions that result in salt load reductions will be effective in the control of boron.

Load allocations are established for nonpoint sources and waste load allocations are established for point sources.

Per the amendments to the Basin Plan for control of salt and boron discharges into the LSJR basin, approved by the Regional Water Board in Resolution No. 88-195, Resolution No. 2004-0108, and Resolution No. R5-2017-0062 and incorporated herein, the Regional Water Board will take the following actions, as necessary and appropriate, to implement this control program:

(1)    The Regional Water Board shall use waivers of waste discharge requirements or waste discharge requirements to apportion load allocations to each of the following seven geographic subareas that comprise the LSJR:

      (a)    San Joaquin River Upstream of Salt Slough
      (b)    Grassland
      (c)    Northwest Side
      (d)    East Valley Floor
      (e)    Merced River
      (f)    Tuolumne River
      (g)    Stanislaus River

These subareas are described in Chapter 1 and in more detail in Appendix 41.

(2)    Dischargers of irrigation return flows from irrigated lands are in compliance with this control program if they meet any of the following conditions:

      (a)    Cease discharge to surface water

      (b)    Discharge does not exceed 315 µS/cm electrical conductivity (based on a 30-day running average)

      (c)    Operate under waste discharge requirements that include effluent limits for salt

      (d)    Operate under a waiver of waste discharge requirements for salt and boron discharges to the LSJR

(3)    The Regional Water Board will adopt waivers of waste discharge requirements or waste discharge requirements for salinity management, or incorporate into existing agricultural waivers or waste discharge requirements, the conditions required to participate in a Regional Water Board approved real-time management program. Load allocations for nonpoint source dischargers participating in a Regional Water Board approved real-time management program are described in Table 4-9. Additional waiver conditions or waste discharge requirements will include use of Regional Water Board approved methods to measure and report flow and electrical conductivity. Participation in a Regional Water Board approved real-time management program and attainment of salinity water quality objectives at the Airport Way Bridge near Vernalis will constitute compliance with this control program.

(4)    The Regional Water Board will adopt waste discharge requirements with fixed monthly base load allocations specified as effluent limits for nonpoint source discharges that do not meet conditions specified in waivers of waste discharge requirements or waste discharge requirements for salinity management. Entities operating under waste discharge requirements, or that will be required to operate under waste discharge requirements in order to comply with other programs, may participate in a Regional Water Board approved real-time management program in lieu of additional waste

discharge requirements for salinity if they meet the conditions specified in the waiver of waste discharge requirements for salinity management, as described in item 3.

(5)    Fixed monthly base load allocations and the method used to calculate real-time load allocations are specified in Table 4-9.

(6)    Waste Load Allocations are established for point sources of salt in the basin. NPDES permitted discharges will not exceed the salinity water quality objectives established for the LSJR at the Airport Way Bridge near Vernalis unless the discharger is a member of a Regional Water board-approved real time management program or a pollutant trading program consistent with the Control Program for Salt and Boron Discharges into the LSJR. The Regional Water Board will revise NPDES permits to incorporate the requirements of the Control Program when the permits are renewed or reopened at the discretion of the Regional Water Board.

(7)    Supply water credits are established for irrigators that receive supply water from the Delta Mendota Canal (DMC) or the LSJR between the confluence of the Merced River and the Airport Way Bridge near Vernalis as described in Table 4-9.

(8)    Supply water Load Allocations are established for salts in irrigation water imported to the LSJR Watershed from the Sacramento/San Joaquin River Delta as described in Table 4-9.

Per Resolution No. R5-2014-0150, the Regional Water Board adopted a revised Management Agency Agreement (MAA) with the U.S. Bureau of Reclamation, replacing a 2008 MAA to address salt imports from the DMC to the LSJR watershed. The MAA includes provisions requiring the U.S. Bureau of Reclamation to:

(a)    Meet DMC load allocations; or
(b)    Provide mitigation and/or dilution flows to create additional assimilative capacity for salt in the LSJR equivalent to DMC salt loads in excess of their allocation

The Regional Water Board shall request a report of waste discharge from the U.S. Bureau of Reclamation to meet DMC load allocations if a MAA meeting the provisions identified above does not remain in place.

(9)    The Regional Water Board will review and, if necessary, update the load allocations and/or waste load allocations by 28 July 2012 and every 6 years thereafter. Any changes to waste load allocations and/or load allocations can be made through subsequent amendment to this control program. Changes to load allocations will be implemented through revisions of the applicable waste discharge requirements or waivers of waste discharge requirements. Changes to waste load allocations will be implemented through revisions of the applicable NPDES permits.

(10)   The Regional Water Board encourages real-time water quality management and pollutant trading of waste load allocations, load allocations, and supply water allocations as a means for attaining salt and boron water quality objectives while maximizing the export of salts out of the LSJR watershed. This control program shall in no way preclude basin-wide stakeholder efforts to attain salinity water quality objectives in the LSJR so long as such efforts are consistent with the control program.

(11)     The established waste load allocations, load allocations, and supply water allocations represent a maximum allowable level. The Regional Water Board may take other actions or require additional reductions in salt and boron loading to protect beneficial uses

(12)     Salt loads in water discharged into the LSJR or its tributaries for the express purpose of providing dilution flow are not subject to load limits described in this control program if the discharge:

(a)     complies with salinity water quality objectives for the LSJR at the Airport Way Bridge near Vernalis;

(b)     is not a discharge from irrigated lands; and

(c)     is not provided as a water supply to be consumptively used upstream of the San Joaquin River at the Airport Way Bridge near Vernalis.

(13)     Entities providing dilution flows, as described in item 12, will obtain an allocation equal to the salt load assimilative capacity provided by this flow. This dilution flow allocation can be used to: 1) offset salt loads discharged by this entity in excess of any allocation or; 2) trade, as described in item 10. The additional dilution flow allocation provided by dilution flows will be calculated as described in Table 4-9.

### 4.5.1.1.2    *Compliance with Water Quality Objectives Upstream of the Airport Way Bridge near Vernalis*

(1)     Per the amendments to the Basin Plan for control of salt and boron discharges into the LSJR basin between the Airport Way Bridge near Vernalis and the mouth of the Merced River, approved by the Regional Water Board in Resolution No. 88-195 and Resolution No. R5-2017-0062, and incorporated herein, the following actions will be implemented:

(a)     The Regional Water Board will determine nonpoint source discharge compliance with electrical conductivity and boron WQOs using data collected at Crows Landing and Maze Road. Daily average electrical conductivity data will be utilized to calculate the 30-day running averages for electrical conductivity compliance; weekly boron concentration data will be utilized to calculate the monthly average and maximum boron concentrations for compliance.

(b)     The Regional Water Board has established a non-regulatory performance goal for the LSJR that represents a potentially-achievable 30-day running average that is lower than the WQO. As the Salt and Boron Control Program is implemented, the Regional Water Board will continue to evaluate whether this performance goal is achievable during the irrigation seasons of Wet, Above Normal, Below Normal, and Dry Water Years, as specified in Table 4-6.

**TABLE 4-6: ELECTRICAL CONDUCTIVITY PERFORMANCE GOAL PERIODS**
**(except during Extended Dry Periods)**

| WY Type | Irrigation Season | | Non-irrigation Season |
|---|---|---|---|
| | Mar-Jun | Jul-Sept | Oct-Feb |
| Wet | 1350 µS/cm | | |
| Above Normal | 1350 µS/cm | | |
| Below Normal | 1350 µS/cm | | |
| Dry | 1350 µS/cm | | |
| Critical | | | |

(c)    Attainment of the electrical conductivity Performance Goal will be evaluated using data collected at Crows Landing and Maze Road.

(d)    Ten years after Regional Water Board's adoption of the Basin Plan Amendment, and based on the evaluations described in the subparagraphs above, the Regional Water Board will consider reopening the Basin Plan to potentially revise the LSJR electrical conductivity WQOs.

(e)    During an Extended Dry Period, the electrical conductivity WQO will be 2470 µS/cm (30-day running average) to protect the AGR beneficial use. In addition, during an Extended Dry Period, the electrical conductivity WQO for protection of the potential MUN beneficial use shall be 2200 µS/cm as the average of the previous four (4) consecutive quarterly samples at a minimum.

An Extended Dry Period is based in part on the water year type numeric indicator identified in the State Water Board's San Joaquin Valley "60-20-20" Water Year Hydrologic Classification[6] as follows:

- Wet – 5
- Above Normal – 4
- Below Normal – 3
- Dry – 2
- Critically Dry – 1

The indicator values will be used as follows to determine when an Extended Dry Period is in effect:

- An Extended Dry Period shall begin when the sum of the current year's 60-20-20 indicator value and the previous two year's 60-20-20 indicator values total six (6) or less.

---

[6]  The method for determining the San Joaquin Valley Water Year Hydrologic Classifications is defined in the State Water Board Revised Water Right Decision 1641, March 2000, Figure 2, page 189.  This method uses the best available estimate of the 60-20-20 San Joaquin Valley water year hydrologic classification at the 75% exceedance level using the best available data published in the California Department of Water Resources' ongoing Bulletin 120 series.

- An Extended Dry Period shall be deemed to exist for one water year (12 months) following a period with an indicator value total of six (6) or less.

(2)    In addition to meeting the requirements of the Vernalis Salinity Control Program, considerations for NPDES permitted discharges to the LSJR are as follows:

(a)    When evaluating whether an NPDES point source discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion of the EC WQOs for the Lower San Joaquin River, the Regional Water Board should consider available dilution of the effluent in the receiving water, and may consider dilution as determined down to the first downstream diversion that provides AGR irrigation supply or MUN beneficial use in establishing mixing zones for those beneficial uses.

(b)    If an NPDES point source discharge is deemed to have reasonable potential to cause or contribute to an instream excursion above the EC WQOs, water quality-based effluent limits shall be required. For publicly-owned treatment works (POTWs), the water quality-based effluent limitations may be established in terms of EC concentration or total dissolved solids (TDS) loading to account for site-specific consideration of dry weather versus wet weather conditions. However, concentration and loading limits shall not be applied at the same time. When establishing water quality-based effluent limitations for POTWs in terms of TDS loading, an EC to TDS ratio of 0.64 shall be used to convert EC concentrations to TDS concentrations, unless a discharger-specific ratio can be demonstrated. The design average dry weather flow of the POTW shall be used to calculate the TDS loading limits.

(c)    For NPDES point source discharges, if water quality-based effluent limits are required:

i.    effluent limitations for protection of AGR beneficial uses shall be expressed as monthly averages instead of thirty-day running averages;

ii.    effluent limitations for protection of MUN beneficial uses should be expressed as an annual average.

(d)    The Regional Water Board will incorporate the requirements of the EC water quality objectives for the Lower San Joaquin River when the NPDES permits are renewed or reopened at the discretion of the Regional Water Board.

### 4.5.1.1.3  *Implementation Priority and Schedules*

#### 4.5.1.1.3.1  Salt Loading and the Vernalis Water Quality Objectives

The Regional Water Board will focus control actions on the most significant sources of salt and boron discharges to the LSJR. Priority for implementation of load allocations to control salt and boron discharges will be given to subareas with the greatest unit area salt loading (tons per acre per year) to the LSJR (Table 4-7). The priorities established in Table 4-7 will be reviewed by 28 July 2012 and every 6 years thereafter.

**TABLE 4-7: PRIORITIES FOR IMPLEMENTING LOAD ALLOCATIONS[1]**

| Subarea | Priority |
|---|---|
| San Joaquin River Upstream of Salt Slough | Low |
| Grassland | High |
| Northwest Side | High |
| East Valley Floor | Low |
| Merced River | Low |
| Tuolumne River | Medium |
| Stanislaus River | Low |
| Delta Mendota Canal[2] | High |
| [1] Priorities based on the unit area salt loading from each subarea and mass load from the DMC [2] Delta Mendota Canal is not a subarea | |

(1)     The Regional Water Board will incorporate base load allocations into waste discharge requirements and real-time load allocations into conditions of waiver of waste discharge requirements by 28 July 2008. Dischargers regulated under a waiver of waste discharge requirements for dischargers participating in a real-time management program for the control of salt and boron in the LSJR shall comply with the waiver conditions within 1 year of the date of adoption of the waiver.

(2)     Existing NPDES point source dischargers are low priority and subject to the compliance schedules for low priority discharges in Table 4-8. New point source discharges that begin discharging after the date of the adoption of this control program must meet the requirements of the Control Program for Salt and Boron Discharges into the LSJR upon the commencement of the discharge.

**TABLE 4-8: SCHEDULE FOR COMPLIANCE WITH THE LOAD ALLOCATIONS FOR SALT AND BORON DISCHARGES INTO THE LSJR**

| Priority | Year to implement[1] | |
|---|---|---|
| | Wet through Dry Year Types | Critical Year Types |
| High | 8 | 12 |
| Medium | 12 | 16 |
| Low | 16 | 20 |
| [1] number of years from the effective date [28 July 2006] of this control program | | |

(3)     A groundwater control program for sources of salt discharges into the LSJR will be developed by June 2020 if water quality objectives in the LSJR are not being attained.

4.5.1.1.3.2     Water Quality Objectives Upstream of the Airport Way Bridge near Vernalis

(1)     The electrical conductivity water quality objectives for the San Joaquin River between its confluence with the Merced River and the Airport Way Bridge near Vernalis will be implemented by 1 January 2020.

**TABLE 4-9 SUMMARY OF ALLOCATIONS AND CREDITS**

| BASE SALT LOAD ALLOCATIONS | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base Load Allocations (thousand tons of salt) | | | | | | | | | | | | |
| Year-type[1] | Month / Period | | | | | | | | | | | |
| | Jan | Feb | Mar | Apr 1 to Apr. 14 | Pulse Period [2] | May 16 to May 31 | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| Wet | 41 | 84 | 116 | 23 | 72 | 31 | 0 | 0 | 5 | 45 | 98 | 44 | 36 |
| Abv. Norm | 44 | 84 | 64 | 26 | 71 | 14 | 0 | 0 | 0 | 44 | 58 | 35 | 32 |
| Blw. Norm | 22 | 23 | 31 | 11 | 45 | 8 | 0 | 0 | 0 | 38 | 41 | 34 | 30 |
| Dry | 28 | 39 | 25 | 5 | 25 | 1 | 0 | 0 | 0 | 25 | 31 | 27 | 28 |
| Critical | 18 | 15 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 19 | 30 | 26 | 23 |

**REAL-TIME SALT LOAD ALLOCATIONS**

Nonpoint source dischargers operating under waiver of waste discharge requirements or waste discharge requirements must participate in a Regional Water Board approved real-time management program and meet real-time load allocations. Loading capacity and real-time load allocations are calculated for a monthly time step. The following method is used to calculate real-time load allocations. Flows are expressed in thousand acre-feet per month and loads are expressed in tons per month.

Loading Capacity (LC) in tons per month is calculated by multiplying flow in thousand acre-ft per month by the salinity water quality objective in μS/cm, a unit conversion factor of 0.8293, and a coefficient of 0.85 to provide a 15 percent margin of safety to account for any uncertainty.

$$LC = Q * WQO * 0.8293 * 0.85$$

Where:
LC    = total loading capacity in tons per month
Q      = flow in the San Joaquin River at the Airport way Bridge near Vernalis in thousand acre-feet per month
WQO  = salinity water quality objective for the LSJR at Airport Way Bridge near Vernalis in μS/cm

**TABLE 4-9 SUMMARY OF ALLOCATIONS AND CREDITS (continued)**

The sum of the real-time Load Allocations (LA) for nonpoint source dischargers are equal to a portion of the LSJR's total Loading Capacity (LC) as described by the following equation:

$$LA = LC - L_{BG} - L_{CUA} - L_{GW} - \Sigma WLA$$

Where:
LA    = sum of the real-time Load Allocations for nonpoint source dischargers
$L_{BG}$    = loading from background sources
$L_{CUA}$    = consumptive use allowance
$L_{GW}$    = loading from groundwater
$\Sigma WLA$ = sum of the waste load allocations for all point sources

Background loading in tons is calculated using the following equation:

$$L_{BG} = Q * 85 \; \mu S/cm * 0.8293$$

Consumptive use allowance loading is calculated with the following equation:

$$L_{CUA} = Q * 230 \; \mu S/cm * 0.8293$$

| Monthly groundwater Loading ($L_{GW}$) (in thousand tons) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| 15 | 15 | 30 | 32 | 36 | 53 | 46 | 27 | 16 | 13 | 14 | 15 |

Waste load allocations for individual point sources are calculated using the following equation:

$$WLA = Q_{PS} * WQO * 0.8293$$

where:
WLA = waste load allocation in tons per month
$Q_{PS}$    = effluent flow to surface waters from the NPDES permitted point source discharger (in thousand acre-feet per month)
WQO = salinity water quality objective for the LSJR at Airport Way Bridge near Venalis in $\mu S/cm$

**APPORTIONING OF SALT LOAD ALLOCATION**

An individual discharger or group of dischargers can calculate their load allocation by multiplying the nonpoint source acreage drained by the load allocation per acre.

$$LA \; per \; acre = \frac{LA}{Total \; nonpoint \; source \; acreage}$$

As of 1 August 2003, the total nonpoint source acreage of the LSJR Basin is 1.21-million acres. Nonpoint source land uses include all irrigated agricultural lands (including managed wetlands). Agricultural land includes all areas designated as agricultural or semi-agricultural land uses in the most recent land use surveys published by the California Department of Water Resources. California Department of Water Resources land use surveys are prepared and published on a county-by-county basis. Multiple counties or portions of counties may overlay a given subarea. The land use surveys must be used in combination with a Geographic Information System to quantify the agricultural land use in each subarea. Nonpoint source land areas will be updated every 6 years though an amendment to the Basin Plan if updated California Department of Water Resources land use surveys have been published. The following land use surveys (or portions thereof) are used to quantify agricultural land use in the LSJR watershed.

**TABLE 4-9 SUMMARY OF ALLOCATIONS AND CREDITS (continued)**

**APPORTIONING OF SALT LOAD ALLOCATION (continued)**

| County | Year of most recent land use survey[1] |
|---|---|
| Merced | 1995 |
| Madera | 1995 |
| San Joaquin | 1996 |
| Fresno | 1994 |
| Stanislaus | 1996 |
| [1]-as of 1 August 2003 | |

Acreage of managed wetlands is based on the boundaries of the federal, private and state owned wetlands that comprise the Grassland Ecological Area in Merced County. Agricultural lands (as designated in DWR land uses surveys) within the Grassland Ecological Area are counted as an agricultural land use and not as managed wetlands. All other lands within the Grassland Ecological Area are considered to be managed wetlands.

**CONSUMPTIVE USE ALLOWANCE**

In addition to the base load allocations or real-time load allocations shown above, a consumptive use allowance ($L_{CUA}$) is provided to each discharger:

$L_{CUA}$ in tons per month = discharge volume in thousand acre-feet per month * 230 $\mu$S/cm * 0.8293

**SUPPLY WATER CREDITS**

A supply water credit is provided to irrigators in the Grassland and Northwest Side Subareas that receive water from the DMC. This DMC supply water credit is equal to 50 percent of the added salt load, in excess of background, delivered to Grassland and Northwest Side subareas. The following fixed DMC supply water credits apply to dischargers operating under base load allocations:

DMC supply water credits (thousand tons)

| Year-type[1] | Jan | Feb | Mar | Apr 1 to Apr. 14 | Pulse Period [2] | May 16 to May 31 | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| NORTHWEST SIDE SUBAREA | | | | | | | | | | | | | |
| Wet | 0.0 | 0.2 | 0.0 | 0.7 | 1.4 | 0.7 | 2.0 | 2.6 | 2.6 | 1.0 | 0.9 | 0.6 | 0.0 |
| Abv. Norm | 0.0 | 0.0 | 0.0 | 0.8 | 1.9 | 1.0 | 2.3 | 2.3 | 2.6 | 1.2 | 0.8 | 0.3 | 0.0 |
| Blw. Norm | 0.0 | 0.0 | 0.0 | 1.0 | 2.6 | 1.5 | 3.4 | 4.2 | 3.3 | 2.5 | 1.9 | 0.8 | 0.0 |
| Dry | 0.0 | 0.0 | 0.0 | 0.1 | 0.3 | 0.2 | 0.3 | 0.5 | 0.5 | 0.2 | 0.2 | 0.0 | 0.0 |
| Critical | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| GRASSLAND SUBAREA | | | | | | | | | | | | | |
| Wet | 2.1 | 5.9 | 13.9 | 7.8 | 17.3 | 8.8 | 22.6 | 20.8 | 23.2 | 17.2 | 16.0 | 10.4 | 3.7 |
| Abv. Norm | 1.2 | 4.8 | 9.4 | 10.4 | 24.7 | 13.6 | 27.6 | 20.3 | 24.5 | 23.9 | 16.6 | 7.5 | 2.6 |
| Blw. Norm | 1.4 | 5.7 | 13.8 | 12.5 | 29.5 | 15.9 | 32.6 | 29.2 | 29.8 | 32.9 | 25.3 | 12.8 | 4.5 |
| Dry | 2.2 | 6.7 | 15.9 | 11.1 | 23.4 | 11.2 | 22.9 | 23.1 | 24.0 | 28.0 | 23.7 | 13.0 | 5.3 |
| Critical | 3.3 | 8.9 | 17.2 | 10.2 | 24.1 | 13.3 | 33.3 | 32.5 | 31.8 | 27.5 | 28.7 | 13.6 | 5.9 |

**TABLE 4-9 SUMMARY OF ALLOCATIONS AND CREDITS (continued)**

The following method is used to calculate real-time DMC supply water credits in tons per month and applies to dischargers operating under real-time load allocations.

Real-time CVP Supply Water Credit = $Q_{CVP}$* ($C_{CVP}$ - $C_{BG}$) * 0.8293*0.5

Where:
$Q_{CVP}$ = volume of water delivered from CVP in thousand acre-feet per month[3]
$C_{CVP}$ = electrical conductivity of water delivered from CVP in μS/cm[3]
$C_{BG}$ = background electrical conductivity of 85 μS/cm

---

For irrigators in the Northwest Side Subarea an additional supply water credit is provided to account for salts contained in supply water diverted directly from the LSJR (LSJR diversion water credit). The LSJR diversion credit is equal to 50 percent of the added salt load (in excess of background) in supply water diverted from the San Joaquin River between the confluence of the Merced River and the Airport Way Bridge near Vernalis. The following fixed LSJR supply water credits apply to dischargers operating under base load allocations:

LSJR supply water credits (thousand tons)

| Year-type[1] | Jan | Feb | Mar | Apr 1 to Apr. 14 | Pulse Period [2] | May 16 to May 31 | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wet | 0.0 | 0.6 | 9.2 | 6.2 | 9.4 | 11.0 | 17.2 | 23.5 | 20.5 | 9.5 | 1.3 | 0 | 0 |
| Abv. Norm | 0.0 | 0.8 | 5.0 | 7.4 | 12.3 | 11.2 | 21.8 | 24.9 | 20.3 | 10.7 | 1.5 | 0 | 0 |
| Blw. Norm | 0.0 | 0.6 | 5.5 | 7.0 | 14.4 | 13.4 | 27.3 | 33.1 | 24.9 | 13.9 | 2.4 | 0 | 0 |
| Dry | 0.0 | 0.7 | 5.3 | 6.4 | 11.1 | 10.7 | 27.5 | 34.0 | 20.3 | 11.4 | 2.4 | 0 | 0 |
| Critical | 0.0 | 0.8 | 4.5 | 5.1 | 14.8 | 10.6 | 25.2 | 28.5 | 22.3 | 8.7 | 2.5 | 0 | 0 |

The following method is used to calculate Real-time LSJR supply water credits in tons per month and applies to dischargers operating under real-time load allocations.

Real-time LSJR Supply Water Credit = $Q_{LSJR\ DIV}$* ($C_{LSJR\ DIV}$ -$C_{BG}$) * 0.8293 * 0.5

Where:
$Q_{LSJR\ DIV}$ = volume of water diverted from LSJR between the Merced River Confluence and the Airport Way Bridge near Vernalis in thousand acre-feet per month[4]
$C_{LSJR\ DIV}$ = electrical conductivity of water diverted from the LSJR in μS/cm[4]
$C_{BG}$        = background electrical conductivity of 85 μS/cm

**SUPPLY WATER ALLOCATIONS**

The U.S. Bureau of Reclamation DMC load allocation ($LA_{DMC}$) is equal to the volume of water delivered from the DMC ($Q_{DMC}$) to the Grassland and Northwest side Subareas at a background Sierra Nevada quality of 85 μS/cm.

$LA_{DMC}$ = $Q_{DMC}$ * 85 μS/cm * 0.8293

**TABLE 4-9 SUMMARY OF ALLOCATIONS AND CREDITS (continued)**

| DILUTION FLOW ALLOCATIONS |
|---|
| Entities providing dilution flows obtain an allocation equal to the salt load assimilative capacity provided by this flow, calculated as follows:<br><br>$A_{dil} = Q_{dil}*(C_{dil}-WQO)*0.8293$<br><br>Where:<br>$A_{dil}$ = dilution flow allocation in tons of salt per month<br>$Q_{dil}$ = dilution flow volume in thousand acre-feet per month<br>$C_{dil}$ = dilution flow electrical conductivity in µS/cm<br>WQO = salinity water quality objective for the LSJR at Airport Way Bridge near Vernalis in µS/cm |
| [1] The water year classification will be established using the best available estimate of the 60-20-20 San Joaquin Valley water year hydrologic classification (as defined in Footnote 17 for Table 3 in the State Water Board's *Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary*, December 2006) at the 75% exceedance level using data from the Department of Water Resources Bulletin 120 series. The previous water year's classification will apply until an estimate is made of the current water year.<br><br>[2] Pulse period runs from 4/15-5/15. Period and distribution of base load allocation and supply water credits between April 1 and May 31 may change based on scheduling of pulse flow as specified in State Water Board Revised Water Rights Decision 1641. Total base load allocation for April 1 through May 31 does not change but will be redistributed based on any changes in the timing of the pulse period<br><br>[3]Methods used to measure and report the volume and electrical conductivity of water delivered from the CVP to irrigated lands must be approved by the Regional Water Board as part of the waiver conditions required to participate in a Regional Water Board approved real-time management program<br><br>[4] Methods used to measure and report the volume and electrical conductivity of water diverted from the SJR between the confluence of the Merced and the Airport Way Bridge near Vernalis must be approved by the Regional Water Board as part of waste discharge requirements or waivers of waste discharge requirements conditions required to participate in a Regional Water Board approved real-time management program |

## 4.5.2   Assessment of Biotoxicity of Major Point and Nonpoint Source Discharges in the Sacramento River and San Joaquin River Basins

In addition to numerical water quality objectives for toxicity, the Basin Plan contains a narrative water quality objective that requires all surface waters to "...be maintained free of toxic substances in concentrations that are toxic to or that produce detrimental physiological responses to human, plant, animal, and aquatic life." To check for compliance with this objective, the Regional Water Board initiated a biotoxicity monitoring program to assess toxic impacts from point and nonpoint sources in FY 86-87.

Toxicity testing monitoring requirements have been placed in NPDES permits, as appropriate. Since 1986-87, ambient toxicity testing (coupled with water quality chemistry to identify toxic

constituents) has been concentrated in the Delta and major tributaries. The Regional Water Board will continue to impose toxicity testing monitoring requirements in NPDES permits. The focus of ambient toxicity testing will continue to be the Delta and major tributaries.

### 4.5.3    Heavy Metals From Point and Nonpoint Sources

Heavy metals such as copper, zinc, mercury, lead, and cadmium impair beneficial uses of surface streams. These metals result from various point and nonpoint sources throughout the region, including mines, urban runoff, agriculture, and wastewater treatment plants. Discharges from abandoned or inactive mines, particularly in the Sacramento River watershed, severely impair local receiving waters. Available information suggests that such mines are by far the largest contributors of copper, zinc, and cadmium to surface waters in the Sacramento and San Joaquin River Basins.

Because the Delta and San Francisco Bay receive all upstream inputs, the effects of heavy metals may be focused on these water bodies. Although the relationship between cause and effect remains unclear, heavy metals have been implicated as a cause of problems in Delta biota (e.g., there is a health advisory limiting the consumption of striped bass because of elevated levels of mercury) and copper objectives have been exceeded in the Bay. Problems in the Bay and Delta are related to the effects of total metals loadings and dissolved metals concentrations.

The Regional Water Board plans to develop a mass emission strategy to control the loads of metals entering receiving waters and the Delta. Although the strategy will focus on control of discharges from inactive and abandoned mines, reasonable steps will also be taken to limit loads of metals from other significant sources. The Regional Water Board also plans to continue to monitor for metals in the Delta and principal tributaries to the Delta to assess compliance with water quality objectives, to assess impacts on beneficial uses, and to coordinate monitoring and metal reduction programs with the San Francisco Regional Water Quality Control Board.

Where circumstances warrant, the Regional Water Board will support action to clean up and abate pollution from identified sources. Funds from the State Water Pollution Cleanup and Abatement Account have been and are being used to clean up and abate discharges from selected abandoned or inactive mines. Abatement projects are underway at Iron Mountain Mine, Walker Mine, Mammoth Mine, Balaklala Mine, Keystone Mine, Stowell Mine, and Penn Mine, as data show that these mines are the most significant sources in terms of total metals discharged to receiving waters.

However, recent judicial decisions have imposed liability on the Regional Water Board for its cleanup actions at the Penn Mine. As long as the risk of such liability exists, the Regional Water Board will likely choose not to perform cleanup at any additional sites. Action by the State Legislature or the Congress will probably be required to resolve concerns of liability and facilitate the State's role in site remediation.

The Regional Water Board also will seek additional resources to update the Regional Abandoned Mines Inventory, to establish a monitoring program to track metals across the Delta and into the Bay, and to determine what loads the Delta can assimilate without resulting in adverse impacts. Although most of the significant mine portal discharges are in the process of being controlled, others need studies to determine their potential for cleanup. Since a major uncharacterized source of metals are the tailings piles associated with the mines, studies are needed to define the loads from these sources in order to establish priorities for abatement activities.

## 4.5.4 Mercury Discharges in the Sacramento River and San Joaquin River Basins

Mercury problems are evident region-wide. The main concern with mercury is that, like selenium, it bioaccumulates in aquatic systems to levels that are harmful to fish and their predators. Health advisories have been issued which recommend limiting consumption of fish taken from the Bay/Delta, Clear Lake, Lake Berryessa, Black Butte Reservoir, Lake Pilsbury, and Marsh Creek Reservoir. Concentrations of mercury in other water bodies approach or exceed National Academy of Science (NAS), U.S. Environmental Protection Agency (EPA), and/or U.S. Food and Drug Administration (FDA) guidelines for wildlife and human protection. In addition to these concerns, fish-eating birds taken from some bodies of water in the Basins have levels of mercury that can be expected to cause toxic effects. Bird-kills from mercury also have been documented in Lake Berryessa. (There is also concern for birds in the Delta, but no studies have been completed.) The Regional Water Board has done a preliminary assessment of the mercury situation in the Central Valley Region and concluded that the problem is serious and remedies will be complex and expensive.

The short-term strategy is to concentrate on correcting problems at upstream sites while monitoring the Delta to see whether upstream control activities measurably benefit the Delta. The Regional Water Board will support efforts to fund the detailed studies necessary to define assimilative capacity and to fully define uptake mechanisms in the biota.

In the next few years monitoring is scheduled to be done in the Delta and at upstream sources. The Regional Water Board will continue to support efforts to study how mercury is cycled through the Delta and to further characterize upstream sources.

### 4.5.4.1 Clear Lake Mercury

The Regional Water Board has a goal to reduce methylmercury concentrations in Clear Lake fish by reducing total mercury loads from various sources within the Clear Lake watershed.

Sources of mercury include past and present discharges from the Sulphur Bank Mercury Mine (SBMM) site, small mercury mines and geothermal sources, natural and anthropogenic erosion of soils with naturally occurring mercury, and atmospheric deposition. The goal of the Clear Lake mercury management strategy is to reduce fish tissue methylmercury concentrations by 60% of existing levels. This will be accomplished by reducing the concentration of total mercury in the surficial layer of lakebed sediment by 70% of existing levels and by further investigation and reduction of other mercury sources believed to have a high potential for mercury methylation. Through a complex process, total mercury is methylated and becomes bioavailable to organisms in the food web. The linkage between (1) the total mercury in the sediments derived from various sources and other sources of total mercury and (2) the concentration of methylmercury in ecological receptors, is complicated and subject to uncertainty. As additional information about these relationships becomes available, the Regional Water Board will revise and refine as appropriate the load allocation and implementation strategy to achieve fish tissue objectives.

#### 4.5.4.1.1 Mercury Load Allocations

The strategy for meeting the fish tissue objectives is to reduce the inputs of mercury to the lake from tributaries and the SBMM site, combined with active and passive remediation of contaminated lake sediments. The load allocations for Clear Lake will result in a reduction in the overall mercury sediment concentration by 70% of existing concentrations. The load allocations

are assigned to the active sediment layer of the lakebed, the SBMM terrestrial site, the tributary creeks and surface water runoff to Clear Lake, and atmospheric deposition. Table 4-10 summarizes the load allocations. The load allocation to the active sediment layer is expressed as reducing concentrations of total mercury in the active sediment layer to 30% of current concentrations. The load allocation to the SBMM terrestrial site is 5% of the ongoing loads from the terrestrial mine site. The load allocation for the mine also includes reducing mercury concentrations in surficial sediment to achieve the sediment compliance goals for Oaks Arm shown in Table 4-11. The load allocation to tributary and surface water runoff is 80% of existing loads. These load allocations account for seasonal variation in mercury loads, which vary with water flow and rainfall. The analysis includes an implicit margin of safety in the reference doses for methylmercury that were used to develop the fish tissue objectives. It also includes an explicit margin of safety of 10% to account for uncertainty in the relationship between fish tissue concentrations and loads of total mercury. The reductions in loads of total mercury from all sources are expected to result in attainment of water quality objectives.

**TABLE 4-10**
**MERCURY LOAD ALLOCATIONS**

| Mercury Source | Allocation |
|---|---|
| Clear Lake Sediment | 30% of existing concentration |
| Sulphur Bank Mine | 5% of existing load |
| Tributaries | 80% of existing load |
| Atmosphere | No change |

*4.5.4.1.2   Sulphur Bank Mercury Mine*

Reducing mercury concentrations in surficial sediment by 70% is an overall goal for the entire lake. To achieve water quality objectives, extremely high levels of mercury in the eastern end of Oaks Arm near SBMM must be reduced by more than 70%. To evaluate progress in lowering sediment concentrations, the following sediment compliance goals are established at sites that have been sampled previously.

Current and past releases from the Sulphur Bank Mercury Mine are a significant source of total mercury loading to Clear Lake. Ongoing annual loads from the terrestrial mine site to the lakebed sediments occur through groundwater, surface water, and atmospheric routes. Loads from ongoing releases from the terrestrial mine site should be reduced to 5% of existing inputs. Because of its high potential for methylation relative to mercury in lakebed sediments, mercury entering the lake through groundwater from the mine site should be reduced to 0.5 kg/year.

Past releases from the mine site are a current source of exposure through remobilization of mercury that exists in the lakebed sediments as a result of past releases to the lake from the terrestrial mine site. Past active mining operations, erosion and other mercury transport processes at SBMM have contaminated sediment in Oaks Arm. The load allocation assigned to SBMM includes reducing surficial sediment concentrations in Oaks Arm by 70% (more at sites nearest the mine site) to meet the sediment compliance goals in Table 4-11.

In 1990, the U.S. Environmental Protection Agency (USEPA) placed Sulphur Bank Mercury Mine on the National Priorities List under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). The USEPA has already performed remediation actions to stabilize waste rock piles, reduce erosion, and control surface water on the site.

**TABLE 4-11**
**SEDIMENT COMPLIANCE GOALS FOR MERCURY IN CLEAR LAKE**

| Site Designation | Location | Sediment Mercury Goal (a) (mg/kg dry weight) |
|---|---|---|
| Upper Arm UA-03 | Center of Upper Arm on transect from Lakeport to Lucerne | 0.8 |
| Lower Arm LA-03 | Center of Lower Arm, North and west of Monitor Point | 1 |
| Oaks Arm | | |
| OA-01 (c) | 0.3 km from SBMM | 16 (b) |
| OA-02 (c) | 0.8 km from SBMM | 16 (b) |
| OA-03 (c) | 1.8 km from SBMM | 16 |
| OA-04 (c) | 3 km from SBMM | 10 |
| Narrows O1 | 7.7 km from SBMM | 3 |

(a) Sediment goals are 30% of existing concentrations. Existing concentrations are taken as the average mercury concentrations in samples collected in 1996-2000 (Clear Lake Basin Plan Amendment Staff Report).
(b) Due to the exceptionally high concentrations existing at the eastern end of Oaks Arm, sediment goals at OA-01 and OA-02 are not 70% of existing concentrations. These goals are equal to the sediment goal established for OA-03.
(c) Sediment goal is part of the load allocation for SBMM.

Estimates of the current annual loads from the terrestrial mine site to the surficial lakebed sediment are under investigation. Existing data indicate that loads of total mercury from the terrestrial mine site are within a broad range of 1 to 568 kg mercury per year. New data may be used to refine the load estimates as discussed below. As part of verifying compliance with the load allocations, remediation activities to address current and past releases from SBMM should be conducted to meet the sediment compliance goals listed in Table 4-11 for sediments within one kilometer of the mine site, specifically at sites OA-01 and OA-02.

The Regional Water Board anticipates that fish tissue objectives for mercury will not be met unless the load reductions from Sulphur Bank Mercury Mine are attained.

The Regional Water Board will request that USEPA continue remediation activities on the mine site and prepare an implementation plan or plans that address the following: reduction of ongoing releases of mercury from the SBMM site through surface water, groundwater, and the atmosphere; necessary remediation for mercury in lakebed sediments previously deposited through mining, erosion, and other processes at the mine site; and monitoring and review activities. The implementation plans should provide interim sediment goals and explain how control actions will assist in achieving fish tissue objectives for mercury in Clear Lake. The Regional Water Board will request that USEPA submit remediation plans for Regional Board approval for the SBMM site within eight years after the effective date of this amendment and implement the plan two years thereafter. USEPA should complete remediation activities at the mine site and active lakebed sediment remediation within ten years of plan implementation.

USEPA anticipates implementing additional actions to address the ongoing surface and groundwater releases from the SBMM over the next several years. These actions are expected to lead to significant reductions in the ongoing releases from the mine pit, the mine waste piles and other ongoing sources of mercury releases from the terrestrial mine site. USEPA also currently plans to investigate what steps are appropriate under CERCLA to address the existing contamination in the lakebed sediments due to past releases from the SBMM. Regional Water Board staff will continue to work closely with the USEPA on these important activities. In addition, Regional Water Board staff will coordinate monitoring activities to investigate other sources of mercury loads to Clear Lake. These investigations by USEPA and the Regional Water Board should reduce the uncertainty that currently exists regarding the annual load of total mercury to the lake, the contribution of each source to that load, and the degree to which those sources lead to methylmercury exposure to and mercury uptake by fish in the lake. This information should lead to more refined decisions about what additional steps are appropriate and feasible to achieve the applicable water quality criteria.

The sediment compliance goals for Oaks Arm will require USEPA to address both (1) the ongoing releases from the terrestrial mine site and (2) the load of total mercury that currently exists in the active lakebed sediment layer as a result of past releases. Potential options to control the ongoing releases of mercury from the terrestrial mine site include: remediation of onsite waste rock, tailings and ore piles to minimize the erosion of mercury contaminated sediments into the lake; diversion of surface water run-on away from waste piles and the inactive mine pit; control and containment or treatment of surface water runoff; control of groundwater flow into Clear Lake; and reduction of mercury flux from the mine waste piles into the atmosphere.

Meeting the load allocation for the lakebed sediment will require remediation of contaminated sediment. Potential options to address the mercury that currently exists in the lakebed as a result of past releases and is being remobilized may include dredging the contaminated sediment, capping with clean sediments, facilitating natural burial of highly contaminated sediments, or reducing the transport of highly contaminated sediments from the Oaks Arm into the rest of the lake. Monitoring to assess progress toward meeting the load reduction goals from Sulphur Bank Mercury Mine should be planned and conducted as part of specific remediation activities. Baselines for mercury loads from the various ongoing inputs from the mine site should be established in order to evaluate successes of the remediation activities.

In order to refine the load estimates from SBMM, the Regional Water Board recommends that USEPA determine the following information: mercury concentrations and sediment deposition rates for sediment cores collected near the mine site; characterization of porewater in sediments near the mine site to determine sources, magnitude and impacts of mercury-containing fluids/groundwater entering the lake; estimates of total surface water and groundwater fluxes of mercury from SBMM, including transport through the wetlands north of the site; and patterns of sediment transport and deposition within the lake.

If additional information reveals that reaching the 95% reduction in mercury loads from the terrestrial mine site is technically infeasible or cost prohibitive, or otherwise not technically justified, the Regional Water Board will consider internal adjustments to the SBMM load allocation. It may be possible to adjust the allocation among the terrestrial site and the contaminated sediments associated with the SBMM, provided the internal reallocation achieves the same overall reduction in loads from mine-related sources (terrestrial mine site and ongoing contributions from highly contaminated sediments). Any internal adjustment must achieve the sediment compliance goals in the east end of Oaks Arm.

Although USEPA is currently spending public funds to address the releases from the SBMM, the owner of SBMM is the party that is legally responsible for addressing the past, current and future releases from the SBMM and for developing implementation plans, implementing control activities that result in achievement of the load reduction, and performing monitoring to verify the load reduction.

### 4.5.4.1.3    Tributaries and Surface Water Runoff

Past and current loads of total mercury from the tributaries and direct surface water runoff are also a source of mercury loading to the lake and to the active sediment layer in the lakebed. This section excludes loads from surface water runoff associated with the SBMM because those are addressed separately above. The loads of total mercury from the tributaries and surface water runoff to Clear Lake should be reduced by 20% of existing levels. In an average water year, existing loads are estimated to be 18 kg/year. Loads range from 1 to 60 kg/year, depending upon water flow rates and other factors. The load allocation applies to tributary inputs as a whole, instead of to individual tributaries. Efforts should be focused on identifying and controlling inputs from hot spots. The U.S. Bureau of Land Management, U.S. Forest Service, other land management agencies in the Clear Lake Basin, and Lake County shall submit plans for monitoring and implementation to achieve the necessary load reductions. The Regional Water Board will coordinate with the above named agencies and other interested parties to develop the monitoring and implementation plans. The purpose of the monitoring shall be to refine load estimates and identify potential hot spots of mercury loading from tributaries or direct surface runoff into Clear Lake. Hot spots may include erosion of soils with concentrations of mercury above the average for the rest of the tributary. If significant sources are identified, the Regional Water Board will coordinate with the agencies to develop and implement load reductions. The implementation plans shall include a summation of existing erosion control efforts and a discussion of feasibility and proposed actions to control loads from identified hot spots. The agencies will provide monitoring and implementation plans within five years after the effective date of this amendment and implement load reduction plans within five years thereafter. The goal is to complete the load reductions within ten years of implementation plan approval.

Regional Water Board staff will work with the Native American Tribes in the Clear Lake watershed on mercury reduction programs for the tributaries and surface water runoff. Staff will solicit the Tribe's participation in the development of monitoring and implementation plans.

### 4.5.4.1.4    Wetlands

The Regional Water Board is concerned about the potential for wetland areas to be significant sources of methylmercury. Loads and fate of methylmercury from wetlands that drain to Clear Lake are not fully understood. The potential for production of methylmercury should be assessed during the planning of any wetlands or floodplain restoration projects within the Clear Lake watershed. The Regional Water Board establishes a goal of no significant increases of methylmercury to Clear Lake resulting from such activities. As factors contributing to mercury methylation are better understood, the possible control of existing methylmercury production within tributary watersheds should be examined.

### 4.5.4.1.5    Atmospheric Deposition

Atmospheric loads of mercury originating outside of the Clear Lake watershed and depositing locally are minimal. Global and regional atmospheric inputs of mercury are not under the jurisdiction of the Regional Water Board. Loads of mercury from outside of the Clear Lake

watershed and depositing from air onto the lake surface are established at the existing input rate, which is estimated to be 1 to 2 kg/year.

### 4.5.4.1.6   Public Education

An important component of the Clear Lake mercury strategy is public education. Until the effects of all mercury reduction efforts are reflected in fish tissue levels, the public needs to be continually informed about safe fish consumption levels. The Lake County Public Health Department will provide outreach and education to the community, emphasizing portions of the population that are at risk, such as pregnant women and children. Education efforts may include recommendations to eat smaller fish and species having lower mercury concentrations.

### 4.5.4.1.7   Monitoring and Review

The monitoring plan for Clear Lake will determine whether mercury loads have been reduced to meet sediment compliance goals and fish tissue objectives. Monitoring will include fish tissue, water and sediment sampling. The Regional Water Board will oversee the preparation of detailed monitoring plans and resources to conduct monitoring of sediment, water and fish to assess progress toward meeting the water quality objectives. Chapter 5, Surveillance and Monitoring, provides details for monitoring in Clear Lake.

The Regional Water Board will review the progress toward meeting the fish tissue objectives for Clear Lake every five years. The review will be timed to coincide with the five-year review to be conducted by USEPA for the Record of Decision for the Sulphur Bank Mercury Mine Superfund Site. The Clear Lake mercury management strategy was developed with existing information. The Regional Water Board recognizes that there are uncertainties with the load estimates and the correlation between reductions in loads of total mercury, methylmercury uptake by biota, and fish tissue concentrations. Regional Water Board staff will consider any new data to refine load estimates and allocations from sources within the Clear Lake watershed. Estimates of existing loads from SBMM or the tributaries will be refined during the review process. If new data indicate that the linkage analysis or load allocations will not result in attainment of the fish tissue objectives, or the fish tissue objectives or load allocations require adjustment, revisions to the Basin Plan will be proposed.

### 4.5.4.2   Cache Creek Watershed Mercury Program

The Cache Creek watershed methylmercury and total mercury implementation program applies to Cache Creek (from Clear Lake to the Settling Basin outflow and North Fork Cache Creek from Indian Valley Reservoir Dam to the main stem Cache Creek), Bear Creek, Sulphur Creek, and Harley Gulch. This implementation program is intended to reduce loads of methylmercury and total mercury to achieve all applicable water quality standards for mercury and methylmercury, including the site-specific water quality objectives for methylmercury in fish tissue. Guidance for monitoring mercury in fish, water, and sediment is provided in Chapter 5, Surveillance and Monitoring.

Historic mining activities in the Cache Creek watershed have discharged and continue to discharge large volumes of inorganic mercury (termed total mercury) to creeks in the watershed. Much of the mercury discharged from the mines is now distributed in the creek channels and floodplain downstream from the mines. Natural erosion processes can be expected to slowly move the mercury downstream out of the watershed over the next several hundred years. However, current and proposed activities in and around the creek channel can enhance mobilization of this mercury. Activities in upland areas, such as road maintenance and grazing

and timber activities can add to the mercury loads reaching Cache Creek, particularly when the activities take place in areas that have elevated mercury levels.

Total mercury in the creeks is converted to methylmercury by bacteria in the sediment. The concentration of methylmercury in fish tissue is directly related to the concentration of methylmercury in the water. The concentration of methylmercury in the water column is controlled in part by the concentration of total mercury in the sediment and the rate at which the total mercury is converted to methylmercury. The rate at which total mercury is converted to methylmercury is variable from site to site, with some sites (i.e., wetlands and marshes) having greatly enhanced rates of methylation.

Since methylmercury in the water column is directly related to mercury levels in fish, the following methylmercury load allocations are assigned to tributaries and the main stem of Cache Creek.

### 4.5.4.2.1   Methylmercury Load Allocations

Tables 4-12 and 13 provide methylmercury load allocations for Cache Creek, its tributaries, and instream methylmercury production. Allocations are expressed as a percent of existing methylmercury loads. The methylmercury allocations will be achieved by reducing the annual average methylmercury (unfiltered) concentrations to site-specific, aqueous methylmercury goals, which are 0.14 ng/L in Cache Creek, 0.06 ng/L in Bear Creek, and 0.09 ng/L in Harley Gulch. The allocations in Tables 4-12 and 4-13 apply to sources of methylmercury entering each tributary or stream segment. In aggregate, the sources to each tributary or stream segment shall have reductions of methylmercury loads as shown below.

Table 4-13 provides the load allocation within Bear Creek and its tributaries to attain the allocation for Bear Creek described in Table 4-12. The inactive mines listed in Table 4-15 are assigned a 95% total mercury load reduction. Reductions in mercury loads from mines, erosion, and other sources in the Sulphur Creek watershed are expected to reduce in channel production of methylmercury to meet the Sulphur Creek methylmercury allocation.

To achieve the water quality objectives and the methylmercury allocations listed in Tables 4-12 and 13, the following actions are needed: 1) reduce loads of total mercury from inactive mines, 2) where feasible, implement projects to reduce total mercury inputs from existing mercury-containing sediment deposits in creek channels and creek banks downstream from historic mine discharges, 3) reduce erosion of soils with enriched total mercury concentrations, 4) limit activities in the watershed that will increase methylmercury discharges to the creeks and, where feasible, reduce discharges of methylmercury from existing sources, and 5) evaluate other remediation actions that are not directly linked to activities of a discharger. Because methylmercury is a function of total mercury, reductions in total mercury loads are needed to achieve the methylmercury load allocations. Methylmercury allocations will be achieved in part by natural erosion processes that remove mercury that has deposited in creek beds and banks since the start of mining.

Table 4-14 summarizes implementation actions, affected watersheds, and agencies or persons assigned primary responsibility for mercury load reduction projects, and required completion dates for the projects. For purposes of this Basin Plan Implementation Program, the term "project" refers to actions or activities that result in a discharge of mercury to Cache Creek or are conducted within the 10-year floodplain.

**TABLE 4-12**
**CACHE CREEK METHYLMERCURY ALLOCATIONS**

| Source | Existing Annual Load (g/yr) | Acceptable Annual Load (g/yr) | Allocation (% of existing load) |
|---|---|---|---|
| Cache Creek (Clear Lake to North Fork confluence) | 36.8 | 11 | 30% |
| North Fork Cache Creek | 12.4 | 12.4 | 100% |
| Harley Gulch | 1.0 | 0.04 | 4% |
| Davis Creek | 1.3 | 0.7 | 50% |
| Bear Creek @ Highway 20 | 21.1 | 3 | 15% |
| Within channel production and ungauged tributaries | 49.5 | 32 | 65% |
| | | 7 (a) | 10% (a) |
| *Total of loads* | 122 | 66 | 54% |
| Cache Creek at Yolo (b) | 72.5 | 39 | 54% |
| Cache Creek Settling Basin Outflow (c) | 87 | 12 | 14% |

a. The allocation includes a margin of safety, which is set to 10% of the acceptable loads. In terms of acceptable annual load estimates, the margin of safety is 7 g/yr.
b. Cache Creek at Yolo is the compliance point for the tributaries and Cache Creek channel for meeting the allocations and aqueous goals. Agricultural water diversions upstream of Yolo remove methylmercury (50 g/year existing load).
c. The Settling Basin Outflow is the compliance point for methylmercury produced in the Settling Basin.

**TABLE 4-13**
**BEAR CREEK METHYLMERCURY ALLOCATIONS**

| Source | Existing Annual Load (g/yr) | Acceptable Annual Load (g/yr) | Allocation (% of existing load) |
|---|---|---|---|
| Bear Creek @ Bear Valley Road | 1.7 | 0.9 | 50% |
| Sulphur Creek | 8 | 0.8 | 10% |
| In channel production and ungauged tributaries | 11.4 | 1 | 10% |
| | | 0.3 (a) | 10% (a) |
| *Total of loads* | 21.1 | 3 | 15% |
| Bear Creek at Hwy 20 (b) | 21.1 | 3 | 15% |

a. The allocation includes a margin of safety, which is set to 10% of the acceptable loads. In terms of acceptable annual load estimates, the margin of safety is 0.3 g/yr.
b. Bear Creek at Highway 20 is the compliance point for Bear Creek and its tributaries.

**TABLE 4-14**
**IMPLEMENTATION SUMMARY**

| Implementation Activity | Affected Watersheds | Assigned Responsibility | Action | Completion Date |
|---|---|---|---|---|
| Inactive Mines | Bear Creek, Harley Gulch, Sulphur Creek | Mine owners and other responsible parties, USBLM | Cleanup mines, sediment, and wetlands | 2011 |
| Creek Sediments- Harley Gulch Delta | Harley Gulch | USBLM | Conduct additional studies | 2006 |
| | | | Submit report on engineering options | 2008 |
| | | | Conduct projects, as required | 2011 |
| Creek Sediments- Upper Watershed | Bear Creek, Davis Creek, Harley Gulch, Sulphur Creek, and Cache Creek (Harley Gulch to Camp Haswell) | USBLM, SLC, CDFW, Colusa, Lake, and Yolo Counties, private landowners | Conduct additional studies | 2007 |
| | | | Feasibility studies | (Scope and time schedule for plan and reports determined as needed) |
| | | | Conduct Projects (as required) | |
| Erosion Control- Upper Watershed | Sub-watersheds with "enriched" mercury. Includes areas of Bear Creek, Sulphur Creek, and Cache Creek (Harley Gulch to Camp Haswell) | USBLM, SLC, CDFW, Colusa, Lake, and Yolo Counties, private landowners | Conduct additional studies | 2006 |
| | | | Identify activities that increase erosion | 2007 |
| | | | Submit erosion control plans, as required | 2009 |
| | | | Implement erosion control plans, as required | 2011 |
| Erosion Control from New Projects, 10-yr Floodplains | Cache Creek (Harley Gulch to Settling Basin), Bear and Sulphur Creeks, Harley Gulch | Yolo County, Reclamation Board, private landowners, US Army Corps of Engineers | Implement management practices and monitoring for erosion control | During and after project construction |
| New Reservoirs, Ponds, and Wetlands | Cache Creek watershed | Yolo County or project proponents | Submit plans to control methylmercury discharges | Prior to project construction |

**TABLE 4-14**
**IMPLEMENTATION SUMMARY**

| Implementation Activity | Affected Watersheds | Assigned Responsibility | Action | Completion Date |
|---|---|---|---|---|
| Anderson Marsh | Cache Creek at Clear Lake | California Department of Parks and Recreation | Conduct additional studies | 2006 |
| | | | Submit report on management options | 2008 |
| | | | Conduct Project (as required) | 2011 |

### 4.5.4.2.2   Inactive Mines

By 6 February 2009, the Regional Water Board shall adopt cleanup and abatement orders or take other appropriate actions to control discharges from the inactive mines (Table 4-14) in the Cache Creek watershed. Responsible parties shall develop and submit for Executive Officer approval plans, including a time schedule, to reduce loads of mercury from mining or other anthropogenic activities by 95% of existing loads consistent with State Water Resources Control Board Resolution 92-49. The goal of the cleanup is to restore the mines to pre-mining conditions with respect to the discharge of mercury. Mercury and methylmercury loads produced by interaction of thermal springs with mine wastes from the Turkey Run and Elgin mines are considered to be anthropogenic loading. The responsible parties shall be deemed in compliance with this requirement if cleanup actions and maintenance activities are conducted in accordance with the approved plans. Cleanup actions at the mines shall be completed by 2011.

The wetland immediately downstream from the Abbott and Turkey Run mines in Harley Gulch contains mercury and is a source of methylmercury. After mine cleanup has been initiated, the responsible parties and owners of the wetland shall develop and submit for Executive Officer approval a cleanup and abatement plan to reduce the wetland's methylmercury loads to meet the Harley Gulch aqueous methylmercury allocation. The wetland cleanup and abatement shall be completed by 2011. Cleanup and abatement at the wetland should not be implemented prior to cleanup actions at the upstream mines.

The Sulphur Creek streambed and flood plain directly below the Central, Cherry Hill, Empire, Manzanita, West End and Wide Awake Mines contains mine waste. After mine cleanup has been initiated, the responsible parties and owners of the streambed and floodplain shall develop and submit for Executive Officer approval a cleanup and abatement plan to reduce anthropogenic mercury loading in the creek.

**TABLE 4-15**
**CACHE CREEK WATERSHED INACTIVE MINES (a)**

| Mine | Average Annual Load Estimate, kg mercury/year (b) |
|---|---|
| Abbott and Turkey Run Mines | 7 |
| Rathburn and Rathburn-Petray Mines | 20 |
| Petray North and South Mines | 5 |
| Wide Awake Mine | 0.8 |
| Central, Cherry Hill, Empire, Manzanita, and West End Mines | 5 |
| Elgin Mine | 3 |
| Clyde Mine | 0.4 |

a.   The mines are grouped by current landowner. Although cleanup requirements apply to each mine, a single owner or responsible party having adjacent mines may apply the 95% reduction to the total discharge from their mines.

b.   Estimates of average annual loads are preliminary, based on data collected by the California Geological Survey (Rathburn, Rathburn-Petray, Petray North, and Petray South mines) and Regional Water Board staff (other mines). Load estimates do not include mercury that would be discharged in extreme erosional events. Responsible parties may be required to refine the load estimates.

*4.5.4.2.3   Creek Sediment – Upper Watershed*

There are areas downstream from mines in Harley Gulch, Bear Creek, Sulphur Creek, Davis Creek and Cache Creek that have significant deposits of mercury-containing sediment that were derived, at least in part, from historic discharges from the mines. Where feasible, sediment discharges from these deposits need to be reduced or eliminated.

The Regional Water Board and the USBLM will conduct additional studies to determine the extent of mercury in sediment at the confluence of Harley Gulch and Cache Creek. The Regional Water Board will require the USBLM to evaluate engineering options to reduce erosion of this material to Cache Creek. If feasible projects are identified, the Regional Water Board will require USBLM to cleanup the sediment.

At other sites, further assessments are needed to determine whether responsible parties should be required to conduct feasibility studies to evaluate methods to control sources of mercury and methylmercury. The Executive Officer will, to the extent appropriate, prioritize the need for feasibility studies and subsequent remediation actions based on mercury concentrations and masses, erosion potential, and accessibility. Staff intends to complete the assessments by 6 February 2009. Where applicable, the Executive Officer will notify responsible parties to submit feasibility studies. Following review of the feasibility studies, the Executive Officer will determine whether cleanup actions will be required. Responsible parties that could be required to conduct feasibility studies include the US Bureau of Land Management (USBLM); State Lands Commission (SLC), California Department of Fish and Wildlife (CDFW); Yolo, Lake, and Colusa Counties, mine owners, and private landowners. Assessments are needed of stream beds and banks in the following areas: Cache Creek from Harley Gulch to Camp Haswell, Harley Gulch, Sulphur Creek, and Bear Creek south of the Bear Valley Road crossing.

*4.5.4.2.4   Erosion Control – Upper Watershed*

Activities in upland parts of the watershed (i.e., outside the active floodplain), such as road construction and maintenance, grazing, timber management and other activities, can result in increased erosion and transport of mercury to the creeks, especially in parts of the watershed where the soils have enriched levels of mercury. Enriched soil and sediment is defined as having an average concentration of mercury of 0.4 mg/kg, dry weight in the silt/clay fraction (less than 63 microns). Provisions described below are applicable in the following areas: the Cache Creek watershed (Harley Gulch to Camp Haswell), Harley Gulch and Sulphur Creek watersheds, and the Bear Creek watershed south of the Bear Valley Road crossing. Some projects subject to this implementation plan may be subject to permits, including general stormwater permits. This implementation plan does not preclude the requirement to obtain any applicable federal, state, or local permit applicable to such projects.

4.5.4.2.4.1    Road Construction and Maintenance

Management practices shall be implemented to control erosion from road construction and maintenance activities in parts of the watershed identified above. All California Department of Transportation (Caltrans) road construction projects or maintenance activities that result in soil disturbance shall comply with the Caltrans statewide Storm Water Management Plan and implement best management practices to control erosion, including pre-project assessments to identify areas with enriched mercury and descriptions of additional management practices that will be implemented in these areas. Water quality and sediment monitoring may be required to ensure compliance with these requirements. For paved roads, entities maintaining or constructing road shall implement the Caltrans or equivalent management practices to comply with these requirements. For unpaved roads, entities maintaining or constructing road shall implement all reasonable management practices to control erosion during construction and maintenance activities. By 6 February 2009, county and agency road departments shall submit information describing the management practices that will be implemented to control erosion.

4.5.4.2.4.2    Other Activities

A goal of the Regional Water Board is to minimize erosion from areas with enriched mercury concentrations. Further studies are needed to identify specific upland sites within the watershed areas described above that have enriched mercury concentrations and to evaluate whether activities at these sites could result in increased erosion (i.e., grazing, timber harvest activities, etc.) or contribute to increases in methylmercury production. Staff will identify areas with enriched mercury concentrations by 6 February 2008. After the studies are complete, the Executive Officer will require affected landowners and/or land managers to 1) submit reports that identify anthropogenic activities on their lands that could result in increased erosion and 2) implement management practices to control erosion. As necessary, erosion control plans will be required no later than 6 February 2011. Entities responsible for controlling erosion include the US Bureau of Land Management (USBLM); State Lands Commission (SLC); California Department of Fish and Wildlife (CDFW); Yolo, Lake, and Colusa Counties; and private landowners.

Landowners implementing new projects or proposing change in land use on land in the enriched areas shall implement practices to control erosion and minimize discharges of mercury and methylmercury. If the dischargers are not implementing management practices to control erosion or methylmercury discharges, the Regional Water Board may consider individual prohibitions of waste discharge. For proposed changes in land use or new projects, landowners

shall submit a plan including erosion estimates from the new project, erosion control practices, and, if a net increase in erosion is expected to occur, a remediation plan.

### 4.5.4.2.5  *Erosion Control in the 10-Year Floodplains*

Sediment and soil in the depositional zone of creeks downstream of mines in the Cache Creek watershed contains mercury. A goal of this plan is to minimize erosion of the mercury-containing sediment and soil due to human activities in order to protect beneficial uses in Cache Creek and to reduce loads of mercury moving downstream to the Settling Basin and the Delta. Some projects subject to this implementation plan may be subject to permits, including general stormwater permits. This implementation plan does not preclude the requirement to obtain any applicable federal, state, or local permit applicable to such projects.

The following requirements for erosion control apply to all projects conducted within the 10 year floodplains of Cache Creek (from Harley Gulch to the Settling Basin outflow), Bear Creek (from tributaries draining Petray and Rathburn Mines to Cache Creek), Sulphur Creek, and Harley Gulch.

Project proponents are required to: 1) implement management practices to control erosion and 2) conduct monitoring programs that evaluate compliance with the turbidity objective, and submit monitoring results to the Regional Water Board. The monitoring program must include monitoring during the next wet season in which the project sites are inundated. In general, there must be monitoring for each project. However, in cases where projects are being implemented as part of a detailed resource management plan that includes erosion control practices, monitoring is not required as a condition of this amendment for individual projects. Instead, the project proponent may conduct monitoring at designated sites up and downstream of the entire management plan area.

Upon written request by project proponents, the Executive Officer may waive the turbidity monitoring requirements for a project, or group of projects, if the project proponents submit an alternative method for assessing compliance with the turbidity objective.

Whenever practicable, proponents should maximize removal of mercury enriched sediment from the floodplain. Sediment removed from the channel or the Settling Basin must be placed so that it will not erode into the creek. For projects related to habitat restoration or erosion control consistent with a comprehensive resource management plan, the project proponent may relocate sediment within the channel if the proponent uses the sediment to enhance habitat and provides appropriate erosion controls.

Some projects may not be able to meet the turbidity objectives even when all reasonable management practices will be implemented to control erosion. These projects may still be implemented if project proponents implement actions (offset projects) in some other part of the watershed that would reduce or otherwise prevent discharges of sediment containing mercury in an amount at least equivalent to the incremental increases expected from the original project. Removal of sediment from the Settling Basin would be an acceptable offset project.

All bridge, culvert, or road construction or maintenance activities that may cause erosion within the 10-year flood plains must follow the Caltrans management practices or equivalent to control erosion.

The Executive Officer may waive, consistent with State and federal law, the requirement for erosion control from a project conducted in the 10-year floodplain for habitat conservation or development activities for bank swallows that are proposed under the State's adopted Bank

Swallow Recovery Plan (Department of Fish and Game (later renamed the Department of Fish and Wildlife), 1992).

### 4.5.4.2.6  New Reservoirs, Ponds, and Wetlands

Reservoirs, ponds, impoundments and wetlands generally produce more methylmercury than streams or rivers. Building new impoundments and wetlands that discharge to creeks in the Cache Creek watershed can add to the existing loads of methylmercury in Cache Creek and its tributaries. New impoundments, including reservoirs and ponds, and constructed wetlands shall be constructed and operated in a manner that would preclude an increase in methylmercury concentrations in Cache Creek, Bear Creek, Harley Gulch, or Sulphur Creek. This requirement applies to all new projects in the watershed, including gravel mining pits in lower Cache Creek that are being reclaimed as ponds and wetlands, for which physical construction is started after the approval of this implementation plan. "Preclude an increase in methylmercury concentrations" shall be defined as a measurable increase in aqueous concentration of methylmercury downstream of the discharge relative to upstream of the discharge.

Any entity creating an impoundment or constructed wetland that has the potential through its design to discharge surface water to Cache Creek, Bear Creek, Harley Gulch, or Sulphur Creek (uncontrollable discharge after inundation by winter storm flows is excepted) must submit plans to the Regional Water Board that describe design and management practices that will be implemented to limit the concentration of methylmercury in discharges to the creek.

The Executive Officer will consider granting exceptions to the no net increase requirement in methylmercury concentration if: 1) dischargers provide information that demonstrates that all reasonable management practices to limit discharge concentrations of methylmercury are being implemented and 2) the projects are being developed for the primary purpose of enhancing fish and wildlife beneficial uses. In granting exceptions to the no net increase requirement, the Executive Officer will consider the merits of the project and whether to require the discharger to propose other activities in the watershed that could offset the incremental increases in methylmercury concentration in the creek. The Regional Water Board will periodically review the progress towards achieving the objectives and may consider prohibitions of methylmercury discharge if the plan described above is ineffective.

The Cache Creek Nature Preserve (CCNP), which includes a wetland restored from a gravel excavation, currently minimizes any methylmercury discharges to Cache Creek by holding water within the wetlands. If water management in the CCNP wetlands is changed significantly, the operator must submit plans describing management practices that will be implemented to limit methylmercury discharge to Cache Creek.

### 4.5.4.2.7  Anderson Marsh Methylmercury

The Regional Water Board, in coordination with California Department of Parks and Recreation (DPR), will continue to conduct methylmercury studies in Anderson Marsh. If the Regional Water Board finds that Anderson Marsh is a significant methylmercury source to Cache Creek, the Regional Water Board will require DPR to evaluate potential management practices to reduce methylmercury loads. The Regional Water Board will then consider whether to require DPR to implement a load reduction project.

### 4.5.4.2.8  Cache Creek Settling Basin

Although the Cache Creek settling basin retains about one half of the total mercury attached to sediment that enters the basin, there is a net increase in methylmercury discharged from the

settling basin. Methylmercury loads are expected to decrease as inflow mercury concentrations decline. The Regional Water Board will continue to conduct methylmercury studies in the basin and work with the Reclamation Board and the US Army Corps of Engineers to develop settling basin improvements to retain more sediment and reduce methylmercury loads. The Sacramento-San Joaquin Delta mercury implementation plan will include total mercury load reduction requirements for the settling basin.

### 4.5.4.2.9   Geothermal and Spring Sources

In general, geothermal springs that discharge mercury and sulfate may not be controllable. However, geothermal discharges adjacent to Sulphur Creek are potential candidates for remediation or mercury offset projects. As needed, the Executive Officer will make a determination of the suitability of geothermal source controls for offset or remediation projects.

Thermal springs used by the Wilbur Hot Springs resort are a source of mercury and methylmercury to Sulphur Creek. Discharges of mercury or methylmercury from springs used or developed by the Wilbur Hot Springs resort shall not exceed current loads.

### 4.5.4.2.10  Potential Actions

This control plan focuses on reducing mercury discharges from mercury mines, controlling activities that mobilize past discharges from the mines, controlling activities that enhance methylation of mercury, and implementing cleanup and abatement activities at sites where sediment rich in mercury has accumulated. Responsibility for these actions may be assigned to responsible parties. There are a number of other actions that may be considered that would reduce loads of mercury in the creek that are not directly the responsibility of a discharger. The following actions are recommended for further evaluation:

- Construction of a settling basin upstream of Rumsey. The facility could trap mercury enriched sediment, reduce downstream loads and preserve space in the existing settling basin in Yolo Bypass.
- Methylmercury reduction plans for Bear Creek
- Load reductions from Davis Creek

### 4.5.4.2.11  Mercury Offset Program and Alternative Load Allocations

The Regional Water Board recognizes that cleanup of mines and non-point sources will require substantial financial resources. The Regional Water Board, therefore, will allow entities participating in approved mercury offset programs to conduct offset projects in the Cache Creek watershed. Offset programs shall be focused on projects where funding is not otherwise available. Subject to approval by the Executive Officer, entities participating in an offset program may partner with agencies in mercury control actions. The framework for offset programs will be developed in future Basin Plan amendments.

The methylmercury load allocations in Tables 4-12 and 13 are assigned to watersheds. To allow offset program proponents to conduct projects within the watersheds to reduce loads, the Regional Water Board may consider alternative load allocations that will achieve the water quality objectives.

*4.5.4.2.12  Public Education*

The local county health departments should provide outreach and education regarding the risks of consuming fish containing mercury, emphasizing portions of the population that are at risk, such as pregnant women and children.

*4.5.4.2.13  Adaptive Implementation*

The Regional Water Board will review the progress toward meeting the water quality objectives and the Basin Plan requirements at least every five years. The Regional Water Board recognizes that it may take hundreds of years to achieve the fish tissue objectives. The Regional Water Board considers entities to be in compliance with this mercury reduction plan if they comply with the above requirements for mercury, methylmercury, and erosion controls. The Regional Water Board recognizes that there are uncertainties with the load estimates and the correlation between reductions in loads of total mercury, methylmercury uptake by biota, and fish tissue concentrations. Using an adaptive management approach, however, the Regional Water Board will evaluate new data and scientific information to determine the most effective control program and allocations to reduce methylmercury and total mercury sources in the watershed.

*4.5.4.2.14  Monitoring and Review*

The monitoring guidance for Cache Creek is described in Chapter 5, Surveillance and Monitoring. Regional Water Board staff will oversee the preparation of detailed monitoring plans and resources to conduct monitoring of sediment, water, and fish to assess progress toward meeting the water quality objectives. Regional Water Board staff will take the lead in determining compliance with fish tissue objectives for Cache Creek. Monitoring for cleanup of mines or compliance with the erosion control requirements is the responsibility of the entity performing the cleanup or erosion control.

## 4.5.4.3    Delta Mercury Control Program

The Delta Mercury Control Program applies specifically to the Delta and Yolo Bypass waterways listed in Appendix 43.

This amendment was adopted by the Regional Water Quality Control Board on 22 April 2010, and approved by the U.S. Environmental Protection Agency on 20 October 2011. The Effective Date of the Delta Mercury Control Program shall be 20 October 2011, the date of U.S. EPA approval.

*4.5.4.3.1  Program Overview*

The Delta Mercury Control Program is designed to protect people eating one meal/week (32 g/day) of trophic levels 3 and 4 Delta fish, plus some non-Delta (commercial market) fish. The Regional Water Board recognizes that some consumers eat four to five meals per week (128-160 g/day) of a variety of Delta fish species. The fish tissue objectives will be re-evaluated during the Phase 1 Delta Mercury Control Program Review and later program reviews to determine whether objectives protective of a higher consumption rate can be attained as methylmercury reduction actions are developed and implemented.

Additional information about methylmercury source control methods must be developed to determine how and if Dischargers can attain load and waste load allocations set by the Board. Information is also needed about the methylmercury control methods' potential benefits and

adverse impacts to humans, wildlife, and the environment. Therefore, the Delta Mercury Control Program will be implemented through a phased, adaptive management approach.

Phase 1 spans from 20 October 2011 through the Phase I Delta Mercury Control Program Review, expected to be by 20 October 2020. Phase 1 emphasizes studies and pilot projects to develop and evaluate management practices to control methylmercury. Phase 1 includes provisions for: implementing pollution minimization programs and interim mass limits for inorganic (total) mercury point sources in the Delta and Yolo Bypass; controlling sediment-bound mercury in the Delta and Yolo Bypass that may become methylated in agricultural lands, wetland, and open-water habitats; and reducing total mercury loading to San Francisco Bay, as required by the Water Quality Control Plan for the San Francisco Bay Basin.

Phase 1 also includes: the development of upstream mercury control programs for major tributaries; the development and implementation of a mercury exposure reduction program to protect humans; and the development of a mercury offset program.

At the end of Phase 1, the Regional Water Board shall conduct a Phase 1 Delta Mercury Control Program Review that considers: modification of methylmercury goals, objectives, allocations and/or the Final Compliance Date; implementation of management practices and schedules for methylmercury controls; and adoption of a mercury offset program for dischargers who cannot meet their load and waste load allocations after implementing all reasonable load reduction strategies. The review also shall consider other potential public and environmental benefits and negative impacts (e.g., habitat restoration, flood protection, water supply, fish consumption) of attaining the allocations. The fish tissue objectives, the linkage analysis between objectives and sources, and the attainability of the allocations will be re-evaluated based on the findings of Phase 1 control studies and other information. The linkage analysis, fish tissue objectives, allocations, and time schedules shall be adjusted at the end of Phase 1, or subsequent program reviews, if appropriate.

Phase 2 begins after the Phase 1 Delta Mercury Control Program Review or 20 October 2022, whichever occurs first, and ends in 2030. During Phase 2, dischargers shall implement methylmercury control programs and continue inorganic (total) mercury reduction programs. Compliance monitoring and implementation of upstream control programs also shall occur in Phase 2.

### 4.5.4.3.2   Load and Waste Load Allocations

Final methylmercury waste load allocations for point sources and load allocations for non-point sources are listed in Tables 4-16 through 4-19. For each subarea listed in Table 4-16, the sum of allocations for agricultural drainage, atmospheric wet deposition, open water, urban (nonpoint source), and wetlands and the individual allocations for tributary inputs (Table 4-19), NPDES facilities and NPDES facilities future growth (Table 4-17), and NPDES MS4 (Table 4-18) within that subarea equals that subarea's assimilative capacity. New or expanded methylmercury discharges that begin after 20 October 2011 may necessitate adjustments to the allocations.

Load allocations are specific to Delta subareas, which are shown on Figure A43. The load allocations for each Delta subarea apply to the sum of annual methylmercury loads produced by different types of nonpoint sources: agricultural lands, wetlands, and open-water habitat in each subarea, as well as atmospheric wet deposition to each subarea (Table 4-16), and runoff from urban areas outside of Municipal Separate Storm Sewer System (MS4) service areas. The subarea allocations apply to both existing and future discharges.

Waste load allocations apply to point sources, which include individual NPDES permitted facility discharges and runoff from urban areas within MS4 service areas within the Delta and Yolo Bypass (Tables 4-17 and 4-18, respectively).

Methylmercury allocations are assigned to tributary inputs to the Delta and Yolo Bypass (Table 4-19). Future upstream control programs are planned for tributaries to the Delta through which management practices will be implemented to meet load allocations for tributary inputs assigned by the Delta Mercury Control Program.

Load allocations for the tributary inputs, urban areas outside of MS4 service areas, open-water habitat, and atmospheric deposition, and waste load allocations for the MS4s, are based on water years 2000 through 2003, a relatively dry period. Annual loads are expected to fluctuate with rainfall volume and other factors. As a result, attainment of these allocations shall be assessed as a five-year average annual load. Allocations for these sources will be re-evaluated during review of the Phase 1 Delta Mercury Control Program as wet year data become available.

### 4.5.4.3.3   Margin of Safety

The Delta Mercury Control program includes an explicit margin of safety of 10%.

### 4.5.4.3.4   Final Compliance Date

Methylmercury load and waste load allocations for dischargers in the Delta and Yolo Bypass shall be met as soon as possible, but no later than 2030, unless the Regional Water Board modifies the implementation schedule and Final Compliance Date.

During Phase 1, all dischargers shall implement reasonable, feasible controls for inorganic (total) mercury.

All dischargers should implement methylmercury management practices identified during Phase 1 that are reasonable and feasible. However, implementation of methylmercury management practices identified in Phase 1 is not required for the purposes of achieving methylmercury load allocations for nonpoint sources until the beginning of Phase 2.

The Regional Water Board will, as necessary, include schedules of compliance in NPDES permits for compliance with water quality-based effluent limits based on the waste load allocations. The compliance schedules must be consistent with the requirements of federal laws and regulations, including, USEPA regulations 40 CFR 122.47, State laws and regulations, including State Water Board Policy for Compliance Schedules in National Pollutant Discharge Elimination System Permits, and the Final Compliance Date. The Regional Board will review the feasibility of meeting wasteload allocations based on reliable data and information regarding variability in methylmercury concentrations and treatment efficiencies and time needed to comply with the wasteload allocations. The Phase 1 Control Studies are designed to provide this information. As needed, the Regional Board shall incorporate the Phase 1 Control Studies into compliance schedules. When Phase 1 studies are complete, the Regional Board will review the need for additional time during Phase 2 for NPDES permittees to comply with the final wasteload allocations.

*4.5.4.3.5    Implementation Program*

4.5.4.3.5.1    Point Sources

The regulatory mechanism to implement the Delta Mercury Control Program for point sources shall be through NPDES permits.

*4.5.4.3.5.1.1    Requirements for NPDES Permitted Facilities*

By 20 April 2012, all facilities listed in Table 4-17 shall submit individual pollutant minimization program workplans to the Regional Water Board. The dischargers shall implement their respective pollutant minimization programs within 30 days after receipt of written Executive Officer approval of the workplans. Until the NPDES permitted facility achieves compliance with its waste load allocation, the discharger shall submit annual progress reports on pollution minimization activities implemented and evaluation of their effectiveness, including a summary of mercury and methylmercury monitoring results.

During Phase 1, all facilities listed in Table 4-17 shall limit their discharges of inorganic (total) mercury to facility performance-based levels. The interim inorganic (total) mercury effluent mass limit is to be derived using current, representative data and shall not exceed the 99.9th percentile of 12-month running effluent inorganic (total) mercury loads (lbs/year). For intermittent dischargers, the interim inorganic (total) mercury effluent mass limit shall consider site-specific discharge conditions. The limit shall be assigned in permits and reported as an annual load based on a calendar year. At the end of Phase 1, the interim inorganic (total) mercury mass limit will be re-evaluated and modified as appropriate.

NPDES permitted facilities that begin discharging to the Delta or Yolo Bypass during Phase 1 shall comply with the above requirements.

*4.5.4.3.5.1.2    Requirements for NPDES Permitted Urban Runoff Discharges*

MS4 dischargers listed in Table 4-18 shall implement best management practices (BMPs) to control erosion and sediment discharges consistent with their existing permits and orders with the goal of reducing mercury discharges.

The Sacramento MS4 (CAS082597), Contra Costa County MS4 (CAS083313), and Stockton MS4 (CAS083470) permittees shall implement pollution prevention measures and BMPs to minimize total mercury discharges. This requirement shall be implemented through mercury reduction strategies required by their existing permits and orders. Annually, the dischargers shall report on the results of monitoring and a description of implemented pollution prevention measures and their effectiveness.

The Sacramento MS4 (CAS082597), Contra Costa County MS4 (CAS083313), and Stockton MS4 (CAS083470) shall continue to conduct mercury control studies to monitor and evaluate the effectiveness of existing BMPs per existing requirements in permits and orders, and to develop and evaluate additional BMPs as needed to reduce their mercury and methylmercury discharges into the Delta and Yolo Bypass.

4.5.4.3.5.2    Nonpoint Sources

Nonpoint sources shall be regulated through the authority contained in State and federal laws and regulations, including State Water Board's Nonpoint Source Implementation and Enforcement Policy.

Table 4-16 contains methylmercury load allocations for non-point sources in the Delta and Yolo Bypass waterways listed in Appendix 43.

During Phase 1, all nonpoint sources in the Delta and Yolo Bypass shall implement reasonable, feasible actions to reduce sediment in runoff with the goal of reducing inorganic mercury loading to the Yolo Bypass and Delta, in compliance with existing Basin Plan objectives and requirements, and Irrigated Lands Regulatory Program requirements.

Attainment of methylmercury load allocations at the end of 2030 will be determined by comparing monitoring data and documentation of methylmercury management practice implementation for each subarea with loads specified in Table 4-16 and Table 4-19.

For subareas not in compliance with allocations by 2030, the Regional Water Board may develop load allocations for individual sources and require individual monitoring and waste discharge requirements.

In subareas needing reductions in methylmercury, proponents of new wetland and wetland restoration projects scheduled for construction after 20 October 2011 shall (a) participate in Control Studies as described below, or shall implement site-specific study plans, that evaluate practices to minimize methylmercury discharges, and (b) implement methylmercury controls as feasible. New wetland projects may include pilot projects and associated monitoring to evaluate management practices that minimize methylmercury discharges.

4.5.4.3.5.3    Phase 1 Control Studies

Point and nonpoint source dischargers, working with other stakeholders, shall conduct methylmercury control studies (Control Studies) to evaluate existing control methods and, as needed, develop additional control methods that could be implemented to achieve their methylmercury load and waste load allocations. The Regional Water Board will use the Phase 1 Control Studies' results and other information to consider amendments to the Delta Mercury Control Program during the Phase 1 Delta Mercury Control Program Review. A Technical Advisory Committee, described below, will review the Control Studies' designs and results.

*4.5.4.3.5.3.1    Study Participants*

Control Studies can be developed through a stakeholder group approach or other collaborative mechanism, or by individual dischargers. Individual dischargers are not required to do individual studies if the individual dischargers join a collaborative study group(s).

Control Studies are required for:
(1)    Irrigated agricultural lands that discharge to the Yolo Bypass and Delta subareas that require methylmercury source reductions.
(2)    Managed wetlands and wetland restoration projects that discharge to the Yolo Bypass and Delta subareas that require methylmercury source reductions.
(3)    Existing NPDES permitted facilities in the Delta and the Yolo Bypass (listed in Table 4-17).
(4)    Sacramento Area MS4, Stockton MS4, and Contra Costa County MS4 service areas within and upstream of the legal Delta boundary.
(5)    State and Federal agencies whose activities affect the transport of mercury and the production and transport of methylmercury through the Yolo Bypass and Delta, or which manage open water areas in the Yolo Bypass and Delta, including but not limited to Department of Water Resources, State Lands Commission, Central Valley Flood

Protection Board, U.S. Army Corps of Engineers, and U.S. Bureau of Reclamation. If appropriate during Phase 1, the Executive Officer will require other water management agencies whose activities affect methylmercury levels in the Delta and Yolo Bypass to participate in the Control Studies.

(6)    Other significant sources of methylmercury not listed above, as identified and deemed appropriate by the Executive Officer.

Dischargers in the Central Valley that are not subject to the Delta Mercury Control Program but may be subject to future mercury control programs in upstream tributary watersheds are encouraged to participate in the coordinated Delta Control Studies. Dischargers in and upstream of the Delta who participate in the Control Studies will be exempt from conducting equivalent Control Studies required by future upstream mercury control programs.

### 4.5.4.3.5.3.2    Study Objectives

The Control Studies shall evaluate existing control methods and, as needed, additional control methods that could be implemented to achieve methylmercury load and waste load allocations. The Control Studies shall evaluate the feasibility of reducing sources more than the minimum amount needed to achieve allocations.

Phase 1 studies also may include an evaluation of innovative actions, watershed approaches, offsets projects, and other short and long-term actions that result in reducing inorganic (total) mercury and methylmercury to address the accumulation of methylmercury in fish tissue and to reduce methylmercury exposure.

Dischargers may evaluate the effectiveness of using inorganic (total) mercury controls to control methylmercury discharges.

Dischargers may conduct characterization studies to inform and prioritize the Control Studies. Characterization studies may include, but not be limited to, evaluations of methylmercury and total mercury concentrations and loads in source waters, receiving waters, and discharges, to determine which discharges act as net sources of methylmercury, and which land uses result in the greatest net methylmercury production and loss.

Final reports for Control Studies shall include a description of methylmercury and/or inorganic (total) mercury management practices identified in Phase 1; an evaluation of the effectiveness, and costs, potential environmental effects, and overall feasibility of the control actions. Final reports shall also include proposed implementation plans and schedules to comply with methylmercury allocations as soon as possible.

If the Control Study results indicate that achieving a given methylmercury allocation is infeasible, then the discharger, or an entity representing a discharger, shall provide detailed information on why full compliance is not achievable, what methylmercury load reduction is achievable, and an implementation plan and schedule to achieve partial compliance.

### 4.5.4.3.5.3.3    Control Study Workplans

Control Studies shall be implemented through Control Study Workplan(s). The Control Study Workplan(s) shall provide detailed descriptions of how methylmercury control methods will be identified, developed, and monitored, and how effectiveness, costs, potential environmental effects, and overall feasibility will be evaluated for the control methods.

The Control Study Workplan(s) shall include details for organizing, planning, developing, prioritizing, and implementing the Control Studies.

The Control Studies will be governed using an Adaptive Management approach.

### 4.5.4.3.5.3.4    Technical Advisory Committee and Adaptive Management Approach

The Regional Water Board commits to supporting an Adaptive Management approach. The adaptive management approach includes the formation of a Stakeholder Group(s) and a Technical Advisory Committee (TAC). Regional Water Board staff, working with the TAC and Stakeholder Group(s), will provide a Control Study Guidance Document for stakeholders to reference.

The TAC shall be comprised of independent experts who would convene as needed to provide scientific and technical peer review of the Control Study Workplan(s) and results, advise the Board on scientific and technical issues, and provide recommendations for additional studies and implementation alternatives developed by the dischargers. The Board shall form and manage the TAC with recommendations from the dischargers and other stakeholders, including tribes and community organizations.

Board staff shall work with the TAC and Stakeholder Group(s) to review the Control Study Workplan(s) and results. As new information becomes available from the Control Studies or outside studies that result in redirection and/or prioritization of existing studies, dischargers may amend the Control Study Workplan(s) with Executive Officer approval.

### 4.5.4.3.5.3.5    Mercury Control Studies Schedule

(1)     By 20 April 2012, entities required to conduct Control Studies shall submit for Executive Officer approval either: (1) a report(s) describing how dischargers and stakeholders plan to organize to develop a coordinated, comprehensive Control Study Workplan(s), or (2) a report describing how individual dischargers will develop individual Control Study Workplans. For dischargers conducting coordinated studies, the report shall include a list of participating dischargers, stakeholders, tribes, and community groups. Dischargers shall be considered in compliance with this reporting requirement upon written commitment to either be part of a group developing a Control Study Workplan or develop an individual Control Study Workplan.

(2)     Control Study Workplans shall be submitted to the Regional Water Board by 20 July 2012. With Executive Officer approval, an additional nine months may be allowed for Workplans being developed by a collaborative stakeholder approach. The Control Study Workplan(s) shall contain a detailed plan for the Control Studies and the work to be accomplished during Phase 1. Regional Water Board staff and the TAC will review the Workplans and provide recommendations for revising Workplans if necessary.

Within four months of submittal, the Executive Officer must determine if the Workplans are acceptable. After four months, Workplans are deemed approved and ready to implement if no written approval is provided by the Executive Officer, unless the Executive Officer provides written notification to extend the approval process.

Dischargers shall be considered in compliance with this reporting requirement upon timely submittal of workplans and revisions.

(3)    By 20 October 2015, entities responsible for Control Studies shall submit report(s) to the Regional Water Board documenting progress towards complying with the Control Study Workplan(s). The report shall include amended workplans for any additional studies needed to address methylmercury reductions. The TAC will review the progress reports and may recommend what additional or revised studies should be undertaken to complete the objectives of the Control Studies. Staff will review the progress reports and recommendations of the TAC and provide a progress report to the Regional Water Board.

(4)    By 20 October 2018, entities responsible for Control Studies shall complete the studies and submit to the Regional Water Board Control Studies final reports that present the results and descriptions of methylmercury control options, their preferred methylmercury controls, and proposed methylmercury management plan(s) (including implementation schedules), for achieving methylmercury allocations. In addition, final report(s) shall propose points of compliance for non-point sources.

If the Executive Officer determines that dischargers are making significant progress towards developing, implementing and/or completing the Phase 1 Control Studies but that more time is needed to finish the studies, the Executive Officer may consider extending a study's deadlines.

The Executive Officer may, after public notice, extend time schedules up to two years if the dischargers demonstrate reasonable attempts to secure funding for the Phase 1 studies but experience severe budget shortfalls.

Annually, staff shall publicly report to the Regional Water Board progress of upstream mercury program development, discharger and stakeholder coordination, Control Study Workplan status, implementation of Control Studies, actions implemented or proposed to meet load and waste load allocations, and the status of the formation and activities of the TAC.

By 20 October 2015, the Executive Officer shall provide a comprehensive report to the Regional Water Board on Phase 1 progress, including progress of upstream mercury control program development, Control Studies, actions implemented or proposed to meet Delta Mercury Control Program load and waste load allocations, and the status and progress of the TAC.

If dischargers do not comply with Control Study implementation schedules, the Executive Officer shall consider issuing individual waste discharge requirements or ordering the production of technical reports and/or management plans.

### 4.5.4.3.5.3.6    Phase 1 Delta Mercury Control Program Review

By 20 October 2020, at a public hearing, and after a scientific peer review and public review process, the Regional Water Board shall review the Delta Mercury Control Program and may consider modification of objectives, allocations, implementation provisions and schedules, and the Final Compliance Date.

If the Executive Officer allows an extension for the Control Studies' schedule, then the Delta Mercury Control Program Review may be delayed up to two years. If the Delta Mercury Control Program Review is delayed more than one year, the Regional Water Board should consider extending the schedule for Phase 2 implementation of methylmercury controls, and the Final Compliance Date.

The Regional Water Board shall assess: (a) the effectiveness, costs, potential environmental effects, and technical and economic feasibility of potential methylmercury control methods; (b)

whether implementation of some control methods would have negative impacts on other project or activity benefits; (c) methods that can be employed to minimize or avoid potentially significant negative impacts to project or activity benefits that may result from control methods; (d) implementation plans and schedules proposed by the dischargers; and (e) whether methylmercury allocations can be attained.

The Regional Water Board shall use any applicable new information and results of the Control Studies to adjust the relevant allocations and implementation requirements as appropriate. Interim limits established during Phase 1 and allocations will not be reduced as a result of early actions that result in reduced inorganic (total) mercury and/or methylmercury in discharges.

As part of the Phase 1 Delta Mercury Control Program Review and subsequent program reviews, the Regional Water Board may consider adjusting the allocations to allow methylmercury discharges from existing and new wetland restoration and other aquatic habitat enhancement projects if dischargers provide information that demonstrates that 1) all reasonable management practices to limit methylmercury discharges are being implemented and 2) implementing additional methylmercury management practices would negatively impact fish and wildlife habitat or other project benefits. The Regional Water Board will consider the merits of the project(s) and whether to require the discharger(s) to propose other activities in the watershed that could offset the methylmercury. The Regional Water Board will periodically review the progress towards achieving the allocations and may consider additional conditions if the plan described above is ineffective.

The Regional Water Board shall conduct the Phase 1 Delta Mercury Program Review based on information received in Phase 1. If the Regional Water Board does not receive timely information to review and update the Delta Mercury Control Program, then allocations shall not be raised but may be lowered and the 2030 Final Compliance Date shall not be changed for those individual dischargers who did not complete the Phase 1 requirements.

The Regional Water Board shall require implementation of appropriate management practices. The methylmercury management plan(s) developed in Phase 1 shall be initiated as soon as possible, but no later than one (1) year after Phase 2 begins.

The Regional Water Board shall review this control program two years prior to the end of Phase 2, and at intervals no more than 10 years thereafter.

### 4.5.4.3.5.4    Compliance Monitoring

Within two years after the start of Phase 2, entities responsible for meeting load and waste load allocations shall monitor methylmercury loads and concentrations and submit annual reports to the Regional Water Board. The points of compliance for waste load allocations for NPDES facilities shall be the effluent monitoring points described in individual NPDES permits. The points of compliance for MS4s required to conduct methylmercury monitoring are those locations described in the individual MS4 NPDES permits or otherwise determined to be representative of the MS4 service areas and approved by the Executive Officer on an MS4-specific basis. The points of compliance and monitoring plans for non-point sources shall be determined during the Control Studies. Compliance with the load allocations for nonpoint sources and waste load allocations for MS4s may be documented by monitoring methylmercury loads at the compliance points or by quantifying the annual average methylmercury load reduced by implementing pollution prevention activities and source and treatment controls.

Entities will be allowed to comply with their mercury receiving water monitoring requirements by participating in a regional monitoring program, when such a program is implemented.

Chapter 5, Surveillance and Monitoring, contains additional monitoring guidance.

4.5.4.3.5.5    Requirements for State and Federal Agencies

Open water allocations are assigned jointly to the State Lands Commission, the Department of Water Resources, and the Central Valley Flood Protection Board as applicable. Other agencies that are identified in Phase 1 that implement actions and activities that have the potential to contribute to methylmercury production and loss in open water will be required to take part in the studies. In the Phase 1 review, the Regional Water Board will modify, as appropriate, the list of entities that are responsible for meeting the open water allocations. Open water allocations apply to the methylmercury load that fluxes to the water column from sediments in open-water habitats within channels and floodplains in the Delta and Yolo Bypass.

The State Lands Commission, Central Valley Flood Protection Board, Department of Water Resources, and other identified agencies shall conduct Control Studies and evaluate options to reduce methylmercury in open waters under jurisdiction of the State Lands Commission and floodplain areas inundated by flood flows. These agencies shall evaluate their activities to determine whether operational changes or other practices or strategies could be implemented to reduce ambient methylmercury concentrations in Delta open water areas and floodplain areas inundated by managed floodplain flows. Evaluations shall include inorganic mercury reduction projects. By 20 April 2012, these agencies shall demonstrate how the agencies have secured adequate resources to fund the Control Studies. Regional Water Board staff will work with the agencies to develop the Control Studies and evaluate potential mercury and methylmercury reduction actions.

Activities including water management and impoundment in the Delta and Yolo Bypass, maintenance of and changes to salinity objectives, dredging and dredge materials disposal and reuse, and management of flood conveyance flows are subject to the open water methylmercury allocations. Agencies responsible for these activities in the Delta and Yolo Bypass include, but are not limited to, Department of Water Resources, State Lands Commission, Central Valley Flood Protection Board, U.S. Bureau of Reclamation, U.S. Army Corps of Engineers (USACE), and the State Water Resources Control Board. Control Studies shall be completed for the activities that have the potential to increase ambient methylmercury levels. These agencies may conduct their own coordinated Control Studies or may work with the other stakeholders in comprehensive, coordinated Control Studies.

The agencies should coordinate with wetland and agricultural landowners during Phase 1 to characterize existing methylmercury discharges to open waters from lands immersed by managed flood flows and develop methylmercury control measures.

New wetland, floodplain, and other aquatic habitat restoration and enhancement projects, including but not limited to projects developed, planned, funded, or approved by individuals, private businesses, non-profit organizations, and local, State, and federal agencies such as USACE, U.S. Fish and Wildlife Service, National Oceanic and Atmospheric Administration Fisheries, U.S. Environmental Protection Agency, U.S. Bureau of Reclamation, State Water Resources Control Board, California Department of Water Resources, and California Department of Fish and Wildlife, shall comply with all applicable requirements of this program, including conducting or participating in Control Studies and complying with allocations. To the extent allowable by their regulatory authority, Federal, State, and local agencies that fund, approve, or implement such new projects shall direct project applicants/grantees/loanees to apply to or consult with the Regional Water Board to ensure full compliance with the water quality requirements herein.

4.5.4.3.5.6     <u>Dredging and Dredge Material Reuse</u>

Dredging activities and activities that reuse dredge material in the Delta should minimize increases in methyl and total mercury discharges to Delta waterways (Appendix 43). The following requirements apply to dredging and excavating projects in the Delta and Yolo Bypass where a Clean Water Act 401 Water Quality Certification or other waste discharge requirements are required. The Clean Water Act 401 Water Quality Certifications shall include the following conditions:

(1)     Employ management practices during and after dredging activities to minimize sediment releases into the water column.

(2)     Ensure that under normal operational circumstances, including during wet weather, dredged and excavated material reused at upland sites, including the tops and dry-side of levees, is protected from erosion into open waters.

In addition to the above requirements, the following requirements apply to the California Department of Water Resources, USACE, the Port of Sacramento, the Port of Stockton, and other State and federal agencies conducting dredging and excavating projects in the Delta and Yolo Bypass:

(1)     Characterize the total mercury mass and concentration of material removed from Delta waterways (Appendix 43) by dredging activities.

(2)     Conduct monitoring and studies to evaluate management practices to minimize methylmercury discharges from dredge return flows and dredge material reuse sites. Agencies shall:

   •     By 20 October 2013, project proponents shall submit a study workplan(s) to evaluate methylmercury and mercury discharges from dredging and dredge material reuse, and to develop and evaluate management practices to minimize increases in methyl and total mercury discharges. The proponents may submit a comprehensive study workplan rather than conduct studies for individual projects. The comprehensive workplan may include exemptions for small projects. Upon Executive Officer approval, the plan shall be implemented.

   •     By 20 October 2018, final reports that present the results and descriptions of mercury and methylmercury control management practices shall be submitted to the Regional Water Board.

   Studies should be designed to achieve the following aims for all dredging and dredge material reuse projects. When dredge material disposal sites are utilized to settle out solids and return waters are discharged into the adjacent surface water, methylmercury concentrations in return flows should be equal to or less than concentrations in the receiving water. When dredge material is reused at aquatic locations, such as wetland and riparian habitat restoration sites, the reuse should not add mercury-enriched sediment to the site or result in a net increase of methylmercury discharges from the reuse site.

The results of the management practices studies should be applied to future projects.

4.5.4.3.5.7    Cache Creek Settling Basin Improvement Plan and Schedule

Department of Water Resources, Central Valley Flood Protection Board, and USACE, in conjunction with any landowners and other interested stakeholders, shall implement a plan for management of mercury contaminated sediment that has entered and continues to enter the Cache Creek Settling Basin (Basin) from the upstream Cache Creek watershed. The agencies shall:

(1)    By 20 October 2012, the agencies shall take all necessary actions to initiate the process for Congressional authorization to modify the Basin, or other actions as appropriate, including coordinating with the USACE.

(2)    By 20 October 2013, the agencies shall develop a strategy to reduce total mercury from the Basin for the next 20 years. The strategy shall include a description of, and schedule for, potential studies and control alternatives, and an evaluation of funding options. The agencies shall work with the landowners within the Basin and local communities affected by Basin improvements.

(3)    By 20 October 2015, the agencies shall submit a report describing the long term environmental benefits and costs of sustaining the Basin's mercury trapping abilities indefinitely.

(4)    By 20 October 2015, the agencies shall submit a report that evaluates the trapping efficiency of the Cache Creek Settling Basin and proposes, evaluates, and recommends potentially feasible alternative(s) for mercury reduction from the Basin. The report shall evaluate the feasibility of decreasing mercury loads from the basin, up to and including a 50% reduction from existing loads.

(5)    By 20 October 2017, the agencies shall submit a detailed plan for improvements to the Basin to decrease mercury loads from the Basin.

The agencies shall submit the strategy and planning documents described above to the Regional Water Board for approval by the Executive Officer. During Phase 1, the agencies should consider implementing actions to reduce mercury loads from the Basin. Beginning in Phase 2, the agencies shall implement a mercury reduction plan.

4.5.4.3.5.8    Tributary Watersheds

Table 4-19 identifies methylmercury allocations for tributary inputs to the Delta and Yolo Bypass.

The sum total of 20-year average total mercury loads from the tributary watersheds identified in Table 4-19 needs to be reduced by 110 kg/yr. Initial reduction efforts should focus on watersheds that contribute the most mercury-contaminated sediment to the Delta and Yolo Bypass, such as the Cache Creek, American River, Putah Creek, Cosumnes River, and Feather River watersheds.

Future mercury control programs will address the tributary watershed methylmercury allocations and total mercury load reductions assigned to tributary inputs to the Delta and Yolo Bypass. Additional methylmercury and total mercury load reductions may be required within those watersheds to address any mercury impairment within those watersheds.

Mercury control programs will be developed for tributary inputs to the Delta by the following dates:

    2012:  American River;
    2016:  Feather, Sacramento, San Joaquin, and Mokelumne Rivers, and Marsh and Putah Creeks; and
    2017:  Cosumnes River and Morrison Creek.

### 4.5.4.3.5.9    Mercury Offsets

The intent of an offset program is to optimize limited resources to maximize environmental benefits. The overall objectives for an offset program are to (1) provide more flexibility than the current regulatory system provides to improve the environment while meeting regulatory requirements (i.e., load and wasteload allocations) at a lower overall cost and (2) promote watershed-based initiatives that encourage earlier and larger load reductions to the Delta than would otherwise occur.

On or before 20 October 2020, the Regional Water Board will consider adoption of a mercury (inorganic and/or methyl) offsets program. During Phase 1, stakeholders may propose pilot offset projects for public review and Regional Water Board approval. The offsets program and any Phase 1 pilot offset projects shall be based on the following key principles:

•    Offsets shall be consistent with existing USEPA and State Board policies and with the assumptions and requirements upon which this and other mercury control programs are established.
•    Offsets should not include requirements that would leverage existing discharges as a means of forcing dischargers to bear more than their fair share of responsibility for causing or contributing to any violation of water quality standards. In this context "fair share" refers to the dischargers' proportional contribution of methylmercury load.
•    Offset credits should only be available to fulfill a discharger's responsibility to meet its (waste) load allocation after reasonable load reduction and pollution prevention strategies have been implemented.
•    Offsets should not be allowed in cases where local human or wildlife communities bear a disparate or disproportionate pollution burden as a result of the offset.
•    Offset credits should be available upon generation and last long enough (i.e., not expire quickly) to encourage feasible projects.
•    Creditable load reductions achieved should be real, quantifiable, verifiable, and enforceable by the Regional Water Board.

Alternatives to direct load credits may be developed.

### 4.5.4.3.5.10    Exposure Reduction Program

While methylmercury and mercury source reductions are occurring, the Regional Water Board recognizes that activities should be undertaken to protect those people who eat Delta fish by reducing their methylmercury exposure and its potential health risks. The Exposure Reduction Program (ERP) is not intended to replace timely reduction of mercury and methylmercury loads to Delta waters.

The Regional Water Board will investigate ways, consistent with its regulatory authority, to address public health impacts of mercury in Delta fish, including activities that reduce actual and potential exposure of and mitigate health impacts to those people and communities most likely to be affected by mercury in Delta caught fish, such as subsistence fishers and their families (State Water Board Resolution No. 2005-0060).

By 20 October 2012, Regional Water Board staff shall work with dischargers (either directly or through their representatives), State and local public health agencies (including California Department of Public Health, California Office of Health Hazard Assessment, and county public health and/or environmental health departments), and other stakeholders, including community-based organizations, tribes, and Delta fish consumers, to complete an Exposure Reduction Strategy. The purposes of the Strategy will be to recommend to the Executive Officer how dischargers will be responsible for participating in an ERP, to set performance measures, and to propose a collaborative process for developing, funding and implementing the program. The Strategy shall take into account the proportional share of methylmercury contributed by individual dischargers. If dischargers (either directly or through their representatives) do not participate in the collaborative effort to develop the ERP, the Regional Water Board will evaluate and implement strategies, consistent with the Regional Water Board's regulatory authority, to assure participation from all dischargers or their representatives.

The objective of the Exposure Reduction Program is to reduce mercury exposure of Delta fish consumers most likely affected by mercury.

The Exposure Reduction Program must include elements directed toward:
- Developing and implementing community-driven activities to reduce mercury exposure;
- Raising awareness of fish contamination issues among people and communities most likely affected by mercury in Delta-caught fish such as subsistence fishers and their families;
- Integrating community-based organizations that serve Delta fish consumers, tribes, and public health agencies in the design and implementation of an exposure reduction program;
- Identifying resources, as needed, for community-based organizations and tribes to participate in the Program;
- Utilizing and expanding upon existing programs and materials or activities in place to reduce mercury, and as needed, create new materials or activities; and
- Developing measures for program effectiveness.

The dischargers, either individually or collectively, or based on the Exposure Reduction Strategy, shall submit an exposure reduction workplan for Executive Officer approval by 20 October 2013. The workplan shall address the Exposure Reduction Program objective, elements, and dischargers' coordination with other stakeholders. Dischargers shall integrate or, at a minimum, provide good-faith opportunities for integration of community-based organizations, tribes, and consumers of Delta fish into planning, decision making, and implementation of exposure reduction activities.

The dischargers shall implement the workplan by six months after Executive Officer approval of workplan. Every three years after workplan implementation begins, the dischargers, individually or collectively, shall provide a progress report to the Executive Officer. Dischargers shall participate in the Exposure Reduction Program until they comply with all requirements related to their individual or subarea methylmercury allocation.

The California Department of Public Health, the California Office of Environmental Health Hazard Assessment, and the local county public health and/or environmental health departments should collaborate with dischargers and community and tribal members to develop and implement exposure reduction programs and provide guidance to dischargers and others that are conducting such activities. The California Department of Public Health and/or other appropriate agency should seek funds to contribute to the Exposure Reduction Program and to continue it beyond 2030, if needed, until fish tissue objectives are attained.

The State Water Board should develop a statewide policy that defines the authority and provides guidance for exposure reduction programs, including guidance on addressing public health impacts of mercury, activities that reduce actual and potential exposure of, and mitigating health impacts to those people and communities most likely to be affected by mercury.

4.5.4.3.5.11    Exceptions for Low Threat Discharges

Discharges subject to a waiver of waste discharge requirements based on a finding that the discharges pose a low threat to water quality, except for discharges subject to water quality certifications, are exempt from the mercury requirements of this Delta Mercury Control Program.

Discharges subject to waste discharge requirements for dewatering and other low threat discharges to surface waters are exempt from the mercury requirements of this Delta Mercury Control Program.

| | TABLE 4-16 METHYLMERCURY LOAD AND WASTE LOAD ALLOCATIONS FOR EACH DELTA SUBAREA BY SOURCE CATEGORY | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DELTA SUBAREA | | | | | | | | | | | | | |
| | Central Delta | | Marsh Creek | | Mokelumne River | | Sacramento River | | San Joaquin River | | West Delta | | Yolo Bypass | |
| Source Type | Current Load (g/yr) | Allocation (g/yr) | Current Load (g/yr) | Allocation (g/yr) | Current Load (g/yr) | Allocation (g/yr) | Current Load (g/yr) | Allocation (g/yr) | Current Load (g/yr) | Allocation (g/yr) | Current Load (g/yr) | Allocation (g/yr) | Current Load (g/yr) | Allocation (g/yr) |
| **Methylmercury Load Allocations** | | | | | | | | | | | | | | |
| Agricultural drainage [d] | 37 | 37 | 2.2 | 0.40 | 1.6 | 0.57 | 36 | 20 | 23 | 8.3 | 4.1 | 4.1 | 19 | 4.1 |
| Atmospheric wet deposition | 7.3 | 7.3 | 0.23 | 0.23 | 0.29 | 0.29 | 5.6 | 5.6 | 2.7 | 2.7 | 2.4 | 2.4 | 4.2 | 4.2 |
| Open water | 370 | 370 | 0.18 | 0.032 | 4.0 | 1.4 | 140 | 78 | 48 | 17 | 190 | 190 | 100 | 22 |
| Tributary Inputs [a] | 37 | 37 | 1.9 | 0.34 | 110 | 39 | 2,034 | 1,129 | 367 | 133 | | | 462 | 100 |
| Inputs from Upstream Subareas | (b) | (b) | - - - | - - - | - - - | - - - | - - - | - - - | - - - | - - - | (b) | (b) | - - - | - - - |
| Urban (nonpoint source) | 0.14 | 0.14 | --- | --- | 0.018 | 0.018 | 0.62 | 0.62 | 0.0022 | 0.0022 | 0.066 | 0.066 | --- | --- |
| Wetlands [d] | 210 | 210 | 0.34 | 0.061 | 30 | 11 | 94 | 52 | 43 | 16 | 130 | 130 | 480 | 103 |
| **Methylmercury Waste Load Allocations** | | | | | | | | | | | | | | |
| NPDES facilities [a] | 1.3 | 1.3 | 0.086 | 0.086 | 0 | 0 | 162 | 90 | 40 | 15 | 0.0019 | 0.0019 | 1.0 | 0.42 |
| NPDES facilities future growth [a] | --- | 0.32 [b] | --- | 0.21 | --- | 0 | --- | 8.6 | --- | 2.1 | --- | 0.25 [b] | --- | 0.60 |
| NPDES MS4 [a] | 5.4 | 5.4 | 1.2 | 0.30 | 0.045 | 0.016 | 2.8 | 1.6 | 4.8 | 1.7 | 3.2 | 3.2 | 1.5 | 0.38 |
| **Total Loads [c] (g/yr)** | **668** | **668** | **6.14** | **1.66** | **146** | **52.6** | **2,475** | **1,385** | **528** | **195** | **330** | **330** | **1,068** | **235** |

**Table 4-16 Footnotes:**

(a)    Values shown for Tributary Inputs, NPDES Facilities, NPDES Facilities Future Growth, and NPDES MS4 represent the sum of several individual discharges. See Tables 4-17, 4-18, and 4-19 for allocations for the individual discharges that should be used for compliance purposes.

(b)    The Central Delta subarea receives flows from the Sacramento, Yolo Bypass, Mokelumne, and San Joaquin subareas. The West Delta subarea receives flows from the Central Delta and Marsh Creek subareas. These within-Delta flows have not yet been quantified because additional data are needed for loss rates across the subareas. Federal and state agencies whose activities affect methylmercury loss and production processes in the Delta and Yolo Bypass are assigned joint responsibility for the open water allocation. These subarea inflows are expected to decrease substantially (e.g., 40-80%) as upstream mercury management practices take place. As a result, reductions for sources within the Central and West subareas and tributaries that drain directly to these subareas are not required.

(c)    For each Delta subarea, the allocations in Table 4-16 for agricultural drainage, atmospheric wet deposition, open water, urban (nonpoint source), and wetlands plus the individual allocations for tributary inputs (Table 4-19), NPDES facilities and NPDES facilities future growth (Table 4-17), and NPDES MS4 (Table 4-18) within that subarea equal the Delta subarea's TMDL (assimilative capacity).

(d)    The load allocations apply to the net methylmercury loads, where the net loads equal the methylmercury load in outflow minus the methylmercury loads in source water (e.g., irrigation water and precipitation).

**TABLE 4-17**
**MUNICIPAL AND INDUSTRIAL WASTEWATER METHYLMERCURY (MEHG) ALLOCATIONS**

| PERMITTEE [a] | NPDES Permit No. | MeHg Waste Load Allocation [b] (g/yr) |
|---|---|---|
| **Central Delta** | | |
| Discovery Bay WWTP | CA0078590 | 0.37 |
| Lincoln Center Groundwater Treatment Facility | CA0084255 | 0.018 |
| Lodi White Slough WWTP | CA0079243 | 0.94 |
| Metropolitan Stevedore Company | CA0084174 | [c] |
| Unassigned allocation for NPDES facility discharges | [d] | 0.31 |
| **Marsh Creek** | | |
| Brentwood WWTP | CA0082660 | 0.14 |
| Unassigned allocation for NPDES facility discharges | [d] | 0.16 |
| **Sacramento River** | | |
| Rio Vista Northwest WWTP | CA0083771 | 0.069 |
| Rio Vista WWTP | CA0079588 | 0.056 |
| Sacramento Combined WWTP | CA0079111 | 0.53 |
| SRCSD Sacramento River WWTP | CA0077682 | 89 |
| Unassigned allocation for NPDES facility discharges | [d] | 8.5 |
| **San Joaquin River** | | |
| Deuel Vocational Inst. WWTP | CA0078093 | 0.021 |
| Manteca WWTP | CA0081558 | 0.38 |
| Mountain House Community Services District WWTP | CA0084271 | 0.37 |
| Oakwood Lake Subdivision Mining Reclamation [f] | CA0082783 | 0.38 [f] |
| Stockton WWTP | CA0079138 | 13 |
| Tracy WWTP | CA0079154 | 0.77 |
| Unassigned allocation for NPDES facility discharges | [d] | 1.7 |
| **West Delta** | | |
| GWF Power Systems [e] | CA0082309 | 0.0052 |
| Mirant Delta LLC Contra Costa Power Plant | CA0004863 | [e] |
| Ironhouse Sanitation District | CA0085260 | 0.030 |
| Unassigned allocation for NPDES facility discharges | [d] | 0.22 |
| **Yolo Bypass** | | |
| Davis WWTP [g] | CA0079049 | 0.17 [g] |
| Woodland WWTP | CA0077950 | 0.43 |
| Unassigned allocation for NPDES facility discharges | [d] | 0.42 |

**Table 4-17 Footnotes:**

(a)     If NPDES facilities that have allocations in Table 4-17 regionalize or consolidate, their waste load allocations can be summed.

(b)     Methylmercury waste load allocations apply to annual (calendar year) discharge methylmercury loads.

(c)     A methylmercury waste load allocation for non-storm water discharges from the Metropolitan Stevedore Company (CA0084174) shall be established in its NPDES permit once it completes three sampling events for methylmercury in its discharges. Its waste load allocation is a component of the "Unassigned Allocation" for the Central Delta subarea.

(d)     Table 4-17 contains unassigned waste load allocations for new discharges to surface water that begin after 20 October 2011. New discharges that may be allotted a portion of the unassigned allocation may come from (1) existing facilities that previously discharged to land and then began to discharge to surface water or diverted discharges to another facility that discharges to surface water as part of ongoing regionalization efforts; (2) newly built facilities that have not previously discharged to land or water; and (3) expansions to existing facilities beyond their allocations listed in Table 4-17 where the additional allocation does not exceed the product of the net increase in flow volume and 0.06 ng/l methylmercury. The sum of all new and/or expanded methylmercury discharges from NPDES facilities within each Delta subarea shall not exceed the Delta subarea-specific waste load allocation listed in Table 4-17.

(e)     Methylmercury loads and concentrations in heating/cooling and power facility discharges vary with intake water conditions. To determine compliance with the allocations, dischargers that that use ambient surface water for cooling water shall conduct concurrent monitoring of the intake water and effluent. The methylmercury allocations for such heating/cooling and power facility discharges are 100%, such that the allocations shall become the detected methylmercury concentration found in the intake water. GWF Power Systems (CA0082309) acquires its intake water from sources other than ambient surface water and therefore has a methylmercury allocation based on its effluent methylmercury load.

(f)     The waste load allocation for the Oakwood Lake Subdivision Mining Reclamation (CA0082783) shall be assessed as a five-year average annual methylmercury load.

(g)     The City of Davis WWTP (CA0079049) has two discharge locations; wastewater is discharged from Discharge 001 to the Willow Slough Bypass upstream of the Yolo Bypass and from Discharge 002 to the Conaway Ranch Toe Drain in the Yolo Bypass. The methylmercury load allocation listed in Table 4-17 applies only to Discharge 002, which discharges seasonally from about February to June. Discharge 001 is encompassed by the Willow Slough watershed methylmercury allocation listed in Table 4-19.

**TABLE 4-18**
**MS4 METHYLMERCURY (MEHG) WASTE LOAD ALLOCATIONS**
**FOR URBAN RUNOFF WITHIN EACH DELTA SUBAREA**

| Permittee | NPDES Permit No. | MeHg Waste Load Allocation [a, b] (g/yr) |
|---|---|---|
| **Central Delta** | | |
| Contra Costa (County of) [c] | CAS083313 | 0.75 |
| Lodi (City of) | CAS000004 | 0.053 |
| Port of Stockton MS4 | CAS084077 | 0.39 |
| San Joaquin (County of) | CAS000004 | 0.57 |
| Stockton Area MS4 | CAS083470 | 3.6 |
| **Marsh Creek** | | |
| Contra Costa (County of) [c] | CAS083313 | 0.30 |
| **Mokelumne River** | | |
| San Joaquin (County of) | CAS000004 | 0.016 |
| **Sacramento River** | | |
| Rio Vista (City of) | CAS000004 | 0.0078 |
| Sacramento Area MS4 | CAS082597 | 1.0 |
| San Joaquin (County of) | CAS000004 | 0.11 |
| Solano (County of) | CAS000004 | 0.041 |
| West Sacramento (City of) | CAS000004 | 0.36 |
| Yolo (County of) | CAS000004 | 0.041 |
| **San Joaquin River** | | |
| Lathrop (City of) | CAS000004 | 0.097 |
| Port of Stockton MS4 | CAS084077 | 0.0036 |
| San Joaquin (County of) | CAS000004 | 0.79 |
| Stockton Area MS4 | CAS083470 | 0.18 |
| Tracy (City of) | CAS000004 | 0.65 |
| **West Delta** | | |
| Contra Costa (County of) [c] | CAS083313 | 3.2 |
| **Yolo Bypass** | | |
| Solano (County of) | CAS000004 | 0.021 |
| West Sacramento (City of) | CAS000004 | 0.28 |
| Yolo (County of) | CAS000004 | 0.083 |

**Table 4-18 Footnotes:**

(a)     Some MS4s service areas span multiple Delta subareas and are therefore listed more than once. The allocated methylmercury loads for all MS4s are based on the average methylmercury concentrations observed in runoff from urban areas in or near the Delta during water years 2000 through 2003, a relatively dry period. Annual loads are expected to fluctuate with water volume and other factors. As a result, attainment of these allocations shall be assessed as a five-year average annual load. Allocations may be revised during review of the Delta Mercury Control Program to include available wet year data.

(b)     The methylmercury waste load allocations include all current and future permitted urban discharges not otherwise addressed by another allocation within the geographic boundaries of urban runoff management agencies within the Delta and Yolo Bypass, including but not limited to Caltrans facilities and rights-of-way (NPDES No. CAS000003), public facilities, properties proximate to banks of waterways, industrial facilities, and construction sites.

(c)     The Contra Costa County MS4 discharges to both the Delta and San Francisco Bay. The above allocations apply only to the portions of the MS4 service area that discharge to the Delta within the Central Valley Water Quality Control Board's jurisdiction.

**TABLE 4-19**
**TRIBUTARY WATERSHED**
**METHYLMERCURY (MEHG) ALLOCATIONS**

| Tributary | MeHg Load Allocation [a] (g/yr) |
|---|---|
| **Central Delta** | |
| Bear Creek @ West Lane / Mosher Creek @ Morada Lane (sum of watershed loads) | 11 |
| Calaveras River @ railroad tracks u/s West Lane | 26 |
| **Marsh Creek** | |
| Marsh Creek @ Highway 4 | 0.34 |
| **Mokelumne River** | |
| Mokelumne River @ Interstate 5 | 39.3 (39) [b] |
| **Sacramento River** | |
| Morrison Creek @ Franklin Boulevard | 4.2 |
| Sacramento River @ Freeport | 1,125 (1,100) [b] |
| **San Joaquin River** | |
| French Camp Slough downstream of Airport Way | 4.0 |
| San Joaquin River @ Vernalis | 129 (130) [b] |
| **Yolo Bypass** | |
| Cache Creek | 30 [c] |
| Dixon Area | 0.77 |
| Fremont Weir | 39 |
| Knights Landing Ridge Cut | 22 |
| Putah Creek @ Mace Boulevard | 2.4 |
| Ulatis Creek near Main Prairie Road | 2.1 |
| Willow Slough | 3.9 |

**Table 4-19 Footnotes:**

(a)     Methylmercury allocations are assigned to tributary inputs to the Delta and Yolo Bypass. Mercury control programs designed to achieve the allocations for tributaries listed in Table 4-19 will be implemented by future Basin Plan amendments. Methylmercury load allocations are based on water years 2000 through 2003, a relative dry period. Annual loads are expected to fluctuate with water volume and other factors. As a result, attainment of these allocations shall be assessed as a five-year average annual load. Allocations will be revised during review of the Delta Mercury Control Program to include available wet year data.

(b)     Tributary load allocations rounded to two significant figures for compliance evaluation.

(c)     The allocation for water from Cache Creek entering the Yolo Bypass in this table is designed to achieve fish tissue objectives in the Yolo Bypass and Delta established by the Delta Mercury Control Program. The allocation in Table 4-12 assigned by the Cache Creek Mercury Control Program applies to the Cache Creek Settling Basin and requires a greater reduction so that fish within the Settling Basin can achieve water quality objectives for methylmercury in fish tissue that apply to Cache Creek, including the Settling Basin.

## 4.5.5    Pesticide Discharges

The control of pesticide discharges to surface waters from nonpoint sources will be achieved primarily by the development and implementation of management practices that minimize or eliminate the amount discharged. The Board will use water quality monitoring results to evaluate the effectiveness of control efforts and to help prioritize control efforts.

Regional Board monitoring will consist primarily of chemical analysis and biotoxicity testing of major water bodies receiving irrigation return flows. The focus will be on pesticides with use patterns and chemical characteristics that indicate a high probability of entering surface waters at levels that may impact beneficial uses. Board staff will advise other agencies that conduct water quality and aquatic biota monitoring of high priority chemicals, and will review monitoring data developed by these agencies. Review of the impacts of "inert" ingredients contained in pesticide formulations will be integrated into the Board's pesticide monitoring program.

When a pesticide is detected more than once in surface waters, investigations will be conducted to identify sources. Priority for investigation will be determined through consideration of the following factors: toxicity of the compound, use patterns and the number of detections. These investigations will be limited to specific watersheds where the pesticide is heavily used or local practices result in unusually high discharges. Special studies will also be conducted to determine pesticide content of sediment and aquatic life when conditions warrant. Other agencies will be consulted regarding prioritization of monitoring projects, protocol, and interpretation of results.

The Board recognizes that implementation of the authorities of agencies that regulate pesticide use, including CDPR, USEPA Office of Pesticide Programs, and County Agricultural Commissioners, should be one of the primary mechanisms for addressing pesticide-caused water quality impairments. To ensure that new pesticides do not create a threat to water quality, the Board, either directly or through the State Water Resources Control Board, will review the pesticides that are processed through the Department of Pesticide Regulation's (DPR) registration program. Where use of the pesticide may result in a discharge to surface waters, the Board staff will make efforts to ensure that label instructions or use restrictions require management practices that will result in compliance with water quality objectives. When the Board determines that despite any actions taken by DPR, use of the pesticide may result in discharge to surface waters in violation of the objectives, the Board will take regulatory action, such as adoption of a prohibition of discharge or issuance of waste discharge requirements to control discharges of the pesticide. Monitoring may be required to verify that management practices are effective in protecting water quality.

The Board will notify pesticide dischargers through public notices, educational programs and DPR of the water quality objectives related to pesticide discharges. Dischargers will be advised to implement management practices that result in full compliance with these objectives by 1 January 1993, unless required to do so earlier. (Dischargers of carbofuran, malathion, methyl parathion, molinate and thiobencarb must meet the requirements detailed in the Prohibitions section.) During this time period, dischargers will remain legally responsible for the impacts caused by their discharges.

The Board will conduct reviews of the management practices being followed to verify that they produce discharges that comply with water quality objectives. It is anticipated that practices associated with one or two pesticides can be reviewed each year. Since criteria, control methods and other factors are subject to change, it is also anticipated that allowable management practices will change over time, and control practices for individual pesticides will have to be reevaluated periodically.

Public hearings will be held at least once every two years to review the progress of the pesticide control program. At these hearings, the Board will

•       review monitoring results and identify pesticides of greatest concern,

•       review changes or trends in pesticide use that may impact water quality,

•       consider approval of proposed management practices for the control of pesticide discharges,

•       set the schedule for reviewing management practices for specific pesticides, and

•       consider enforcement action.

After reviewing the testimony, the Board will place the pesticides into one of the following three classifications. When compliance with water quality objectives and performance goals is not obtained within the timeframes allowed, the Board will consider alternate control options, such as prohibition of discharge or issuance of waste discharge requirements.

(1)     Where the Board finds that pesticide discharges pose a significant threat to drinking water supplies or other beneficial uses, it will request DPR to act to prevent further impacts. If DPR does not proceed with such action(s) within six months of the Board's request, the Board will act within a reasonable time period to place restrictions on the discharges.

(2)     Where the Board finds that currently used discharge management practices are resulting in violations of water quality objectives, but the impacts of the discharge are not so severe as to require immediate changes, dischargers will be given three years, with a possibility of three one year time extensions depending on the circumstances involved, to develop and implement practices that will meet the objectives. During this period of time, dischargers may be required to take interim steps, such as meeting Board established performance goals to reduce impacts of the discharges. Monitoring will be required to show that the interim steps and proposed management practices are effective.

(3)     The Board may approve the management practices as adequate to meet water quality objectives. After the Board has approved specific management practices for the use and discharge of a pesticide, no other management practice may be used until it has been reviewed by the Board and found to be equivalent to or better than previously approved practices. Waste discharge requirements will be waived for irrigation return water per Resolution No. 82-036 if the Board determines that the management practices are adequate to meet water quality objectives and meet the conditions of the waiver policy. Enforcement action may be taken against those who do not follow management practices approved by the Board.

Carbofuran, malathion, methyl parathion, molinate and thiobencarb have been detected in surface waters at levels that impact aquatic organisms. Review of management practices associated with these materials is under way and is expected to continue for at least another two years. A timetable of activities related to these pesticides is at the end of the Prohibitions section. A detailed assessment of the impacts of these pesticides on aquatic organisms is also being conducted and water quality objectives will be adopted for these materials by the State or Regional Board by the end of 1993.

In conducting a review of pesticide monitoring data, the Board will consider the cumulative impact if more than one pesticide is present in the water body. This will be done by initially assuming that the toxicities of pesticides are additive. This will be evaluated separately for each beneficial use using the following additive. This will be evaluated separately for each beneficial use using the following formula:

$$\frac{C_1}{O_1} + \frac{C_2}{O_2} + \cdots + \frac{C_i}{O_i} = S$$

Where:

C =     The concentration of each pesticide.

O =     The water quality objective or criterion for the specific beneficial use for each pesticide present, based on the best available information. Note that the numbers must be acceptable to the Board and performance goals are not to be used in this equation.

S =     The sum. A sum exceeding one (1.0) indicates that the beneficial use may be impacted.

The above formula will not be used if it is determined that it does not apply to the pesticides being evaluated. When more than one pesticide is present, the impacts may not be cumulative or they may be additive, synergistic or antagonistic. A detailed assessment of the pesticides involved must be conducted to determine the exact nature of the impacts.

For most pesticides, numerical water quality objectives have not been adopted. USEPA criteria and other guidance are also extremely limited. Since this situation is not likely to change in the near future, the Board will use the best available technical information to evaluate compliance with the narrative objectives. Where valid testing has developed 96 hour LC50 values for aquatic organisms (the concentration that kills one half of the test organisms in 96 hours), the Board will consider one tenth of this value for the most sensitive species tested as the upper limit (daily maximum) for the protection of aquatic life. Other available technical information on the pesticide (such as Lowest Observed Effect Concentrations and No Observed Effect Levels), the water bodies and the organisms involved will be evaluated to determine if lower concentrations are required to meet the narrative objectives.

To ensure the best possible program, the Board will coordinate its pesticide control efforts with other agencies and organizations. Wherever possible, the burdens on pesticide dischargers will be reduced by working through the DPR or other appropriate regulatory processes. The Board may also designate another agency or organization as the responsible party for the development and/or implementation of management practices, but it will retain overall review and control authority. The Board will work with water agencies and others whose activities may influence pesticide levels to minimize concentrations in surface waters.

Since the discharge of pesticides into surface waters will be allowed under certain conditions, the Board will take steps to ensure that this control program is conducted in compliance with the federal and state antidegradation policies. This will primarily be done as pesticide discharges are evaluated on a case by case basis.

#### 4.5.5.1    Central Valley Regional Water Quality Control Board Actions

The Regional Water Board will implement the following actions related to programs regulating pesticide discharges:

(1)    Track USEPA and DPR pesticide evaluation and registration activities as they relate to water quality and share monitoring and research data with USEPA and DPR;

(2)    When necessary, request that USEPA coordinate implementation of the Federal Insecticide, Fungicide, and Rodenticide Act and the Clean Water Act;

(3)    Encourage USEPA and DPR to fully address water quality concerns within their pesticide registration and use regulation processes, including urban runoff and wastewater discharges as well as agricultural runoff. This shall include providing comments in coordination with the State Water Resources Control Board on USEPA registration reviews for pesticides of concern;

(4)    Work with DPR, County Agricultural Commissioners, and the Structural Pest Control Board to promote pesticide application practices that result in discharges that comply with water quality regulations by participating in and providing support for regulatory and educational activities that promote these practices;

(5)    Assemble available information (such as monitoring data) to assist USEPA and DPR in taking actions necessary to protect water quality;

(6)    Use authorities (e.g., through permits or waste discharge requirements) to require implementation of best management practices and control measures to minimize pesticide discharges to surface waters;

(7)    Staff will provide periodic updates to the Board on overall progress at addressing pesticide related water quality concerns. These updates may include implementation control programs for specific pesticides, and coordination with USEPA and DPR;

(8)    Work with stakeholders to develop a Pyrethroid Research Plan no later than 19 February 2021 that will describe research and studies to inform future iterations of this control program (e.g., potential objectives, program refinement). The Board will coordinate and consult with the Delta Science Program, Delta Independent Science Board, Delta Stewardship Council, Department of Fish and Wildlife, and Delta Regional Monitoring Program, as appropriate, and will seek to implement the plan through available funding mechanisms; including, but not limited to grants, bonds, agency/department funding, fees, etc. Topics of the Plan could include: potential refinement of partition coefficients; further assessing the need to incorporate temperature effects in toxicity relationships; consideration of synergists and potential mixture effects with other commonly occurring contaminants (e.g., piperonyl butoxide) on pyrethroid toxicity; consideration of the need for chronic toxicity values for taxa for which data are not currently available; evaluation of sub-lethal effects; fate and transport of particulate bound pyrethroids; consideration of monitoring and laboratory methods for both pyrethroid chemistry and toxicity testing and inter-laboratory comparison.

#### 4.5.5.2    Pyrethroid Pesticides Control Program

In order to reduce discharges of pyrethroids to surface waters, the pyrethroids control program will rely on coordination with the agencies that regulate pesticide use (California Department of Pesticide Regulation and U.S. EPA Office of Pesticide Programs), implementation of

management practices as part of a conditional prohibition to address elevated levels of pyrethroids before a water body becomes impaired, and data collection to inform future actions. The pyrethroids control program is taking a phased approach and the Board will periodically re-visit the program in the future to consider whether additional actions are required.

(1)     The Regional Water Board will take actions and encourage actions by other agencies that support attainment of the narrative water quality objective for toxicity with respect to pyrethroid pesticides, as specified in the Basin Plan under the heading Pesticide Discharges.

(2)     Following 19 February 2019, the Board will require monitoring information from dischargers, as described in the Monitoring and Surveillance Chapter under the heading Pyrethroid Pesticides Discharges (p. 5-12).

(3)     The pyrethroid pesticides numeric triggers represent maximum allowable levels above which additional management actions may be required. The Regional Water Board may seek additional reductions in pyrethroid pesticides concentrations and exceedance frequencies if such reductions are necessary to account for additive effects with pyrethroids not identified in Table 4-2 or synergistic effects with other chemicals or to protect beneficial uses.

(4)     The Regional Water Board will review the pyrethroid pesticides prohibition, the pyrethroid pesticides total maximum daily load allocations, the numeric pyrethroid triggers, and the implementation provisions for pyrethroid pesticide discharges in the Basin Plan no later than 19 February 2034 as part of the Triennial Review process or other process. Following this review, the Regional Water Board may consider the adoption of pyrethroid water quality objectives. Board staff will provide updates to the Regional Water Board on the progress of the pyrethroids control program at least every 3 years as part of the Triennial Review or Executive Officer report, beginning with the first Triennial Review scheduled after 19 February 2021.

### 4.5.5.2.1    Addressing Known Water Quality Impairments

#### 4.5.5.2.1.1    Total Maximum Daily Loads for Pyrethroids in Urban Water Bodies

The loading capacity for each water body segment listed in Table 4-21 is equal to the numeric triggers for pyrethroids (Table 4-2). Wasteload allocations equal to the loading capacity are assigned to all permitted municipal separate storm sewer systems (MS4s) that discharge to Table 4-21 water bodies. Compliance with wasteload allocations will be determined using appropriate representative receiving water monitoring as described in Chapter 5, Surveillance and Monitoring.

The following TMDL numeric targets will be used to protect aquatic life:

(1)     Pyrethroid Pesticides Water Column Additivity Numeric Target: The numeric target is equal to the Acute Pyrethroid Trigger and Chronic Pyrethroid Trigger in Table 4-2 and applies to the receiving waters listed in Table 4-21.

(2)     Pyrethroid-Caused Sediment Toxicity Numeric Target: The pyrethroid-caused sediment toxicity numeric target is the evaluation of the narrative water quality objective for toxicity using standard aquatic toxicity tests to determine toxicity in bed sediments. The toxic determination is based on comparison of the test organism's response to the sample and a control. The standard aquatic toxicity test in Table 4-20 will be

used to determine compliance with the sediment toxicity numeric target. If other stressors are identified as the cause of toxicity, it will not be considered an exceedance of the pyrethroid-caused sediment toxicity numeric target.

**TABLE 4-20: SEDIMENT TOXICITY TEST TO EVALUATE THE
SEDIMENT TOXICITY NUMERIC TARGET**

| Parameter | Test | Biological Endpoint Assessed |
|---|---|---|
| Sediment Toxicity | *Hyalella azteca* (10-day) | Survival |

In the water bodies listed in Table 4-21, discharges shall be reduced to ensure attainment of the pyrethroid numeric targets and allocations as soon as practicable but no later than 19 February 2039.

MS4 permittees who discharge to water bodies listed in Table 4-21 shall attain the wasteload allocations by developing and implementing a Pesticide Plan that identifies management practices to reduce pyrethroid pesticides in urban runoff to the maximum extent practicable. MS4 permittees who discharge to water bodies listed in Table 4-21 are required to submit pyrethroid management plans (which may be included in existing pesticide management plans) for the control of pyrethroid pesticide discharges to those water bodies no later than 19 February 2020. Pyrethroid management plans may include actions required by state and federal regulations. The pyrethroid management plan can be included with the MS4's storm water management plan, as appropriate. The management practices listed in Section 4.5.5.2.2.3 shall be considered for inclusion in the pyrethroid management plan. A MS4 discharger has the discretion to implement any of the practices listed in Section 4.5.5.2.2.3, or may identify others that are not included here, but must provide justification to the Board regarding their decision whether to select or not select each management practice listed in this section. Management practices may be implemented by individual urban runoff management entities, jointly by two or more entities acting in concert, or cooperatively through a regional or statewide approach that addresses urban pesticide water pollution, including with domestic or municipal wastewater dischargers, as appropriate.

A progress report shall be provided to the Board annually or at a frequency consistent with a discharger's permit requirements to document the management practices that have been implemented, to evaluate attainment of the wasteload allocations, and to identify effective actions to be taken in the future. The progress report can be included in existing reports to the Board, as appropriate. If the management practices do not result in attainment of the wasteload allocations, then the MS4 discharger shall either identify reasonable and feasible additional/alternative practices for implementation if any are available, or provide a justification for why current practices will result in attainment by the compliance date. This justification may include actions required by state and federal regulations.

**TABLE 4-21: WATER BODY SEGMENTS WITH TOTAL MAXIMUM DAILY LOADS (TMDLs) FOR PYRETHROID PESTICIDES**

| Water Body Segment |
|---|
| Arcade Creek |
| Chicken Ranch Slough |
| Curry Creek (Placer and Sutter Counties) |
| Elder Creek |
| Kaseberg Creek (tributary to Pleasant Grove Creek, Placer County) |
| Morrison Creek |
| Pleasant Grove Creek (upstream of Fiddyment Road) |
| Pleasant Grove Creek, South Branch |
| Strong Ranch Slough |

4.5.5.2.1.2    Agricultural Waters Bodies with Known Pyrethroid Pesticides Impairments

Discharges of pyrethroid pesticides to water bodies listed in Table 4-22 will be controlled using existing Regional Water Board regulatory programs. Agricultural dischargers (either individual dischargers or a discharger group or coalition) to water bodies listed in Table 4-22 are required to submit pyrethroid management plans (or modifications to existing pesticide management plans) for the control of pyrethroid pesticide discharges to those water bodies no later than 20 April 2019. The pyrethroid management plans will describe the actions that dischargers will take to reduce pyrethroid pesticides discharges to levels that do not exceed the narrative water quality objective for toxicity by the required compliance date.

At a minimum, pyrethroid management plans for agricultural dischargers to the water bodies listed in Table 4-22 must describe:

(1)    The sources of pyrethroid pesticides causing nonattainment of narrative water quality objective for toxicity;

(2)    The actions that the dischargers will take to reduce pyrethroid pesticides discharges and attain the narrative water quality objective for toxicity as soon as practicable, but no later than 19 February 2039;

(3)    A schedule for the implementation of those actions;

(4)    A monitoring plan to track effectiveness of pollution control practices;

(5)    The process for revising the pyrethroid management plan if the actions do not effectively reduce pyrethroid pesticides discharges or the implemented actions have water quality impacts that must be addressed.

Pyrethroid management plans may address discharges to multiple downstream water bodies for which discharge reductions are required. Pyrethroid management plans may include actions required by state and federal regulations. Revisions to pyrethroid management plans may be required if applicable triggers are not achieved. If a water body that is not attaining the narrative water quality objective for toxicity with respect to pyrethroid pesticides is being used by the discharger to represent water quality conditions in multiple water bodies, pyrethroid management plans must address pyrethroid pesticides in all of the represented water bodies.

**TABLE 4-22: WATER BODY SEGMENTS WITH KNOWN PYRETHROID PESTICIDE IMPAIRMENTS RECEIVING AGRICULTURAL DISCHARGES**

| Water Body Segment |
|---|
| Del Puerto Creek |
| Hospital Creek (San Joaquin and Stanislaus Counties) |
| Ingram Creek (from confluence with Hospital Creek to Highway 33 crossing) |
| Ingram Creek (from confluence with San Joaquin River to confluence with Hospital Creek) |
| Mustang Creek (Merced County) |

*4.5.5.2.2   Conditional Prohibition Implementation Components*

4.5.5.2.2.1    Municipal Storm Water Discharges

Dischargers subject to the conditional prohibition of pyrethroid pesticides discharges are required to develop and implement pyrethroid management plans to reduce pyrethroid levels in their discharges to the maximum extent practicable. A pyrethroid management plan may be included in the discharger's storm water management plan (SWMP). A pyrethroid management plan must identify a set of management practices that, taken as a whole, may be reasonably expected to effectively reduce pyrethroid levels in their discharges, and to consider whether there are potential water quality concerns with replacement insecticide products. The management practices listed in Section 4.5.5.2.2.3 shall be considered for inclusion in a discharger's pyrethroid management plan. A pyrethroid management plan may include any of the practices listed in Section 4.5.5.2.2.3, or may identify others that are not included here, but must provide justification to the Board regarding their decision whether to select or not select each practice listed in this section. Pyrethroid management plans may include actions required by state and federal regulations. Management practices may be implemented by individual urban runoff management entities, jointly by two or more entities acting in concert, or cooperatively through a regional or statewide approach that addresses urban pesticide water pollution, including with domestic or municipal wastewater dischargers, as appropriate.

A progress report shall be provided to the Board annually or at a frequency consistent with the discharger's permit requirements to document the management practices that have been implemented, to evaluate pyrethroid concentrations with respect to the pyrethroid triggers, and to identify effective actions to be taken in the future. The progress report can be included in other reports submitted to the Board, as appropriate. If the management practices do not result in discharge concentrations at or below the pyrethroid numeric triggers, then the MS4 discharger shall either identify any available, reasonable and feasible additional/alternative practices for implementation, or provide a justification for why current practices are expected to result in achieving the triggers within a reasonable timeframe. This justification may include actions required by state and federal regulations.

Pyrethroid management plans are completed when it can be demonstrated that the Acute and Chronic Pyrethroid Triggers are not exceeded in discharges and the demonstration is approved by the Executive Officer.

4.5.5.2.2.2    Municipal and Domestic Wastewater Discharges

Dischargers subject to the conditional prohibition of pyrethroid pesticides discharges are required to develop and implement pyrethroid management plans to reduce pyrethroid levels in their discharges. Pyrethroid management plans, which can be included in dischargers' Pollution Prevention Plan, shall identify management practices to reduce discharges of pyrethroid pesticides. The pyrethroid triggers are intended to indicate when management practices are to be implemented by the discharger; the pyrethroid triggers are not criteria for interpreting the

narrative toxicity objective, and are not for use as numeric water quality-based effluent limitations or for reasonable potential analysis.

A pyrethroid management plan must identify a set of management practices that taken as a whole, may be reasonably expected to effectively reduce pyrethroid levels in their discharges, and to consider whether there are potential water quality concerns with replacement insecticide products. The management practices listed in Section 4.5.5.2.2.3 shall be considered for inclusion in a discharger's pyrethroid management plan. In considering management practices for pyrethroids, a domestic or municipal wastewater discharger has the discretion to implement any of the practices listed in Section 4.5.5.2.2.3, or may identify others that are not included here, but must provide justification to the Board regarding decision whether to select or not select each practice listed in this section. Management practices may be implemented by individual NPDES permittees, jointly by two or more permittees acting in concert, or cooperatively through a regional or statewide approach, including with municipal storm water dischargers, as appropriate.

Mid-term and end-term progress reports shall be provided to the Board to document the management practices that have been implemented and to track effectiveness during each permit term. These progress reports can be included in existing reports to the Board as appropriate. If the management practices are inadequate to result in pyrethroid discharge concentrations at or below the numeric triggers in Table 4-2, then the modification of the pyrethroid management plan will be required to identify additional actions to be taken to reduce pyrethroid discharges if reasonable and feasible actions are available or a justification for why current practices will result in achieving the applicable triggers within a reasonable timeframe. This justification may include actions required by state and federal regulations.

Pyrethroid management plans are completed when it can be demonstrated that the Acute and Chronic Pyrethroid Triggers are not exceeded in discharges and the demonstration is approved by the Executive Officer.

4.5.5.2.2.3    Best Management Practices for Storm Water and Wastewater Dischargers

The following management practices shall be considered by municipal storm water dischargers and by municipal and domestic wastewater dischargers and implemented as appropriate. Some of these practices may be accomplished by participation in organizations such as California Stormwater Quality Association (CASQA), which coordinates with DPR and other organizations taking actions to protect water quality from the use of pesticides in the urban environment. Other practices may also be proposed. If the State Water Resources Control Board establishes a statewide water quality control plan that requires best management practices for the control of urban pesticide discharges, compliance with those requirements shall be deemed in compliance with this section.

*4.5.5.2.2.3.1    Education and outreach activities*

(1)    Undertake targeted outreach programs to encourage communities within a discharger's jurisdiction to reduce their reliance on pesticides that threaten water quality, focusing efforts on those most likely to use pesticides that threaten water quality, potentially by working with DPR, County Agricultural Commissioners, and the University of California Statewide Integrated Pest Management Program, or other entities as appropriate;

(2)    Make available point-of-purchase outreach materials to pesticide retailer(s) in or near the Permittee's jurisdiction. These materials shall provide targeted information on proper pesticide use and disposal, potential adverse impacts on water quality, and less toxic methods of pest prevention and control.

(3)     Conduct outreach to Permittee's residents and businesses who may hire structural pest control and landscape professionals that contains messages that (a) explain the links between pesticide usage and water quality; and (b) provides information about structural pest control IPM certification programs and IPM for landscape professionals;

(4)     Encourage public and private management practices (e.g., landscape design, irrigation management, etc.) that minimize pesticide runoff.

*4.5.5.2.2.3.2   Pesticide pollution prevention activities*

(1)     Reduce reliance on pyrethroids and other pesticides that threaten water quality by adopting and implementing policies or procedures that minimize the use of pesticides that threaten water quality in the discharger's operations and on the discharger's property;

(2)     Develop and implement an Integrated Pest Management policy that:

(a)     Is consistent with IPM as defined by the University of California Statewide IPM Program (UC-IPM) or the California Structural Pest Control Board definition.

(b)     Applies to all Permittee staff who conduct or contract for pest management and to pest management vendors under contract to the Permittee.

(c)     Assigns responsibilities to a designated staff position and/or department to coordinate Permittee activities and ensure that the IPM policy is implemented.

*4.5.5.2.2.3.3   Support of Pollution Prevention through the Pesticide Regulatory Process*

Track USEPA and DPR pesticide evaluation and registration activities as they relate to surface water quality and encourage these agencies to accommodate urban water quality concerns within their pesticide registration processes. This may include assembling and submitting available information (such as monitoring data) to USEPA and DPR during public comment periods to assist in their pesticide evaluation and registration activities. This best management practice would be implemented most effectively through a cooperative regional or statewide approach.

4.5.5.2.2.4   <u>Agricultural Discharges</u>

If the prohibition trigger is exceeded in a receiving water after 19 February 2022, all dischargers in the areas represented by that receiving water monitoring location shall implement a pyrethroid management plan for pyrethroids. Pyrethroid management plans may be developed by a third-party representing multiple dischargers in an area under a Water Board regulatory program, such as the Irrigated Lands Regulatory Program or Dairy Order. Pyrethroid management plans are due no later than 1 year after the discharger or the Board identifies that an applicable trigger has been exceeded.

*4.5.5.2.3   Vector Control Discharges*

Discharges of pyrethroid pesticides from vector control applications are subject to the *Statewide NPDES Permit for Biological and Residual Pesticide Discharges to waters of the United States from Vector Control Applications*. Vector control dischargers are not subject to any additional implementation provisions for attainment of the pyrethroid triggers or TMDLs for pyrethroids.

### 4.5.5.3     Diazinon and Chlorpyrifos Runoff into the Sacramento and Feather Rivers

(1)     The Sacramento and Feather River pesticide runoff control program shall:

    (a)     ensure compliance with water quality objectives applicable to diazinon and chlorpyrifos water quality objectives in the Sacramento and Feather Rivers through the implementation of management practices;

    (b)     ensure that measures that are implemented to reduce discharges of diazinon and chlorpyrifos do not lead to an increase in the discharge of other pesticides to levels that cause or contribute to violations of applicable water quality objectives and Regional and State Water Board policies; and

    (c)     ensure that discharges of pesticides to surface waters are controlled so that the pesticide concentrations are at the lowest levels that are technically and economically achievable.

(2)     Dischargers must consider whether a proposed alternative to diazinon or chlorpyrifos has the potential to degrade ground or surface water. If the alternative to diazinon or chlorpyrifos has the potential to degrade ground water, alternative pest control methods must be considered. If the alternative to diazinon or chlorpyrifos has the potential to degrade surface water, control measures must be implemented to ensure that applicable water quality objectives and Regional Water and State Board policies are not violated, including State Water Resources Control Board Resolution 68-16.

(3)     Compliance with water quality objectives, waste load allocations, and load allocations for diazinon and chlorpyrifos in the Sacramento and Feather Rivers is required by August 11, 2008.

    The water quality objectives and allocations will be implemented through the adoption or modification of waivers of waste discharge requirements, and general or individual waste discharge requirements where provisions necessary for implementation are not already in place.

(4)     The Regional Water Board will review the diazinon and chlorpyrifos allocations and the implementation provisions in the Basin Plan no later than 30 June 2013.

(5)     Regional Water Board staff will meet at least annually with staff from the Department of Pesticide Regulation and representatives from the California Agricultural Commissioners and Sealers Association to review pesticide use and instream pesticide concentrations during the dormant spray and irrigation application season and to consider the effectiveness of management measures in meeting water quality objectives and load allocations.

(6)     The Waste Load Allocations (WLA) for all NPDES-permitted dischargers, Load Allocations (LA) for nonpoint source discharges, and the Loading Capacity of the Sacramento and Feather Rivers shall not exceed the sum (S) of one (1) as defined below.

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \leq 1.0$$

where

$C_D$    =   diazinon concentration in µg/L of point source discharge for the WLA; nonpoint source discharge for the LA; or the Sacramento or Feather Rivers for the LC.

$C_C$    =   chlorpyrifos concentration in µg/L of point source discharge for the WLA; nonpoint source discharge for the LA; or the Sacramento or Feather Rivers for the LC.

$WQO_D$ =   acute or chronic diazinon water quality objective in µg/L.

$WQO_C$ =   acute or chronic chlorpyrifos water quality objective in µg/L.

Available samples collected within the applicable averaging period for the water quality objective will be used to determine compliance with the allocations and loading capacity. Prior to performing any averaging calculations, only chlorpyrifos and diazinon results from the same sample will be used in calculating the sum (S). For purposes of calculating the sum (S) above, analytical results that are reported as "nondetectable" concentrations are considered to be zero.

Compliance with the load allocations will be determined where the nonpoint source discharges into the Sacramento or Feather Rivers.

(7)     The established waste load and load allocations for diazinon and chlorpyrifos and the water quality objectives for diazinon and chlorpyrifos in the Sacramento and Feather Rivers represent a maximum allowable level. The Regional Water Board shall require any additional reductions in diazinon or chlorpyrifos levels necessary to account for additive or synergistic toxicity effects or to protect beneficial uses in tributary waters.

(8)     Pursuant to CWC §13267, the Executive Officer will require dischargers to submit a management plan that describes the actions that the discharger will take to reduce diazinon and chlorpyrifos discharges and meet the applicable allocations.

The management plan may include actions required by State and federal pesticide regulations. The Executive Officer will require the discharger to document the relationship between the actions to be taken and the expected reductions in diazinon and chlorpyrifos discharge(s). The Executive Officer will allow individual dischargers or a discharger group or coalition to submit management plans.

The management plan must comply with the provisions of any applicable waiver of waste discharge requirements or waste discharge requirements. The Executive Officer may require revisions to the management plan if compliance with applicable allocations is not attained or the management plan is not reasonably likely to attain compliance. When requiring any revisions to the management plan, the Executive Officer may consider the relative contributions of diazinon and chlorpyrifos to the lack of compliance with the allocations.

(9)     Any waiver of waste discharge requirements or waste discharge requirements that govern the control of pesticide runoff that is discharged directly or indirectly into the Sacramento or Feather Rivers must be consistent with the policies and actions described in paragraphs 1-8.

(10)    In determining compliance with the waste load allocations, the Regional Water Board will consider any data or information submitted by the discharger regarding diazinon and chlorpyrifos inputs from sources outside of the jurisdiction of the permitted discharge, including any diazinon and chlorpyrifos present in precipitation; and any applicable provisions in the discharger's NPDES permit requiring the discharger to reduce the discharge of pollutants to the maximum extent practicable.

(11)    The above provisions for control of diazinon and chlorpyrifos discharges apply to the Sacramento and Feather Rivers as described in Table 3-4.

### 4.5.5.4    Diazinon and Chlorpyrifos Runoff in the San Joaquin River Basin

(1)    The pesticide runoff control program shall:

(a)    Ensure compliance with water quality objectives applicable to diazinon and chlorpyrifos in the San Joaquin River through the implementation of management practices.

(b)    Ensure that measures that are implemented to reduce discharges of diazinon and chlorpyrifos do not lead to an increase in the discharge of other pesticides to levels that cause or contribute to violations of applicable water quality objectives and Regional Water Board policies; and

(c)    Ensure that discharges of pesticides to surface waters are controlled so that pesticide concentrations are at the lowest levels that are technically and economically achievable.

(2)    Dischargers must consider whether a proposed alternative to diazinon or chlorpyrifos has the potential to degrade ground or surface water. If the alternative has the potential to degrade groundwater, alternative pest control methods must be considered. If the alternative has the potential to degrade surface water, control measures must be implemented to ensure that applicable water quality objectives and Regional Water Board policies are not violated, including State Water Resources Control Board Resolution 68-16.

(3)    Compliance with applicable water quality objectives, load allocations, and waste load allocations for diazinon and chlorpyrifos in the San Joaquin River is required by 1 December 2010.

The water quality objectives and allocations will be implemented through one or a combination of the following: the adoption of one or more waivers of waste discharge requirements, and general or individual waste discharge requirements. To the extent not already in place, the Regional Water Board expects to adopt or revise the appropriate waiver(s) or waste discharge requirements by 31 December 2007.

(4)    The Regional Water Board intends to review the diazinon and chlorpyrifos allocations and the implementation provisions in the Basin Plan at least once every five years, beginning no later than 31 December 2009.

(5)    Regional Water Board staff will meet at least annually with staff from the Department of Pesticide Regulation and representatives from the California Agricultural Commissioners and Sealers Association to review pesticide use and instream pesticide concentrations during the dormant spray and irrigation application seasons, and to consider the effectiveness of management measures in meeting water quality objectives and load allocations.

(6)    The Waste Load Allocations (WLA) for all NPDES-permitted dischargers, Load Allocations (LA) for nonpoint source discharges, and the Loading Capacity of the San Joaquin River from the Mendota Dam to Vernalis shall not exceed the sum (S) of one (1) as defined below.

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \le 1.0$$

where

$C_D$     =    diazinon concentration in µg/L of point source discharge for the WLA; nonpoint source discharge for the LA; or San Joaquin River for the LC.

$C_C$     =    chlorpyrifos concentration in µg/L of point source discharge for the WLA; nonpoint source discharge for the LA; or San Joaquin River for the LC.

$WQO_D$ =    acute or chronic diazinon water quality objective in µg/L.

$WQO_C$ =    acute or chronic chlorpyrifos water quality objective in µg/L.

Available samples collected within the applicable averaging period for the water quality objective will be used to determine compliance with the allocations and loading capacity. For purposes of calculating the sum (S) above, analytical results that are reported as "non-detectable" concentrations are considered to be zero.

(7)    At a minimum, Loading Capacity shall be calculated for each of the following six water quality compliance points in the San Joaquin River:

- San Joaquin River at the Airport Way Bridge near Vernalis (United States Geological Survey (USGS) Identification Number 11303500)
- San Joaquin River at the Maze Boulevard (Highway 132) Bridge (USGS Identification Number 11290500)
- San Joaquin River at Las Palmas Avenue near Patterson (USGS Identification Number 11274570)
- San Joaquin River at Hills Ferry Road
- San Joaquin River at Highway 165 near Stevinson (USGS Identification Number 11260815)
- San Joaquin River at Sack Dam

The load allocations for non-point source discharges into the San Joaquin River are assigned to the following subareas:

(a)    The combined Stanislaus River; North Stanislaus; and Vernalis North subareas.
(b)    The combined Tuolumne River; Northeast Bank; and Westside Creek subareas.
(c)    The combined Turlock; Merced; and Greater Orestimba subareas.
(d)    The combined Stevinson and Grassland subareas.
(e)    The combined Bear Creek and Fresno-Chowchilla subareas.

The established waste load and load allocations for diazinon and chlorpyrifos, and the water quality objectives for chlorpyrifos and diazinon in the San Joaquin River represent a maximum allowable level. The Regional Water Board shall require any additional reductions in diazinon and chlorpyrifos levels necessary to account for additional additive or synergistic toxicity effects or to protect beneficial uses in tributary waters.

(8)    Pursuant to CWC Section 13267, the Executive Officer will require dischargers to submit a management plan that describes the actions that the discharger will take to reduce diazinon and chlorpyrifos discharges and meet the applicable allocations by the required compliance date.

The management plan may include actions required by State and federal pesticide regulations. The Executive Officer will require the discharger to document the

relationship between the actions to be taken and the expected reductions in diazinon and chlorpyrifos discharges. The Executive Officer will allow individual dischargers or a discharger group or coalition to submit management plans.

The management plan must comply with the provisions of any applicable waiver of waste discharge requirements or waste discharge requirements.

The Executive Officer may require revisions to the management plan if compliance with applicable allocations is not attained or the management plan is not reasonably likely to attain compliance.

(9)     If the loading capacity in the San Joaquin River is not being met by the compliance date, dischargers in subareas where load allocations are not being met will be required to revise their management plans and implement an improved complement of management measures to meet the loading capacity.

(10)    Any waiver of waste discharge requirements or waste discharge requirements that govern the control of pesticide runoff that is discharged directly or indirectly into the San Joaquin River must be consistent with the policies and actions described in paragraphs 1 - 9.

(11)    In determining compliance with the waste load allocations, the Regional Water Board will consider any data or information submitted by the discharger regarding diazinon and chlorpyrifos inputs from sources outside of the jurisdiction of the permitted discharger, including any diazinon and chlorpyrifos present in precipitation, and other available relevant information; and any applicable provisions in the discharger's NPDES permit requiring the discharger to reduce the discharge of pollutants to the maximum extent possible.

### 4.5.5.5    Diazinon and Chlorpyrifos Runoff into the Sacramento-San Joaquin Delta Waterways (as identified in Appendix 42)

(1)     The pesticide runoff control program shall:
   (a)     Ensure compliance with water quality objectives applicable to diazinon and chlorpyrifos in the Sacramento-San Joaquin Delta Waterways through the implementation of management practices.
   (b)     Ensure that measures that are implemented to reduce discharges of diazinon and chlorpyrifos do not lead to an increase in the discharge of other pesticides to levels that cause or contribute to violations of applicable water quality objectives and Regional Water Board plans and policies, and
   (c)     Ensure that discharges of pesticides to surface waters are controlled so that pesticide concentrations are at the lowest levels that are technically and economically achievable.

(2)     Dischargers must consider whether any proposed alternative to the use of diazinon or chlorpyrifos has the potential to degrade ground or surface water. If the alternative has the potential to degrade groundwater, alternative pest control methods must be considered. If the alternative has the potential to degrade surface water, control measures must be implemented to ensure that applicable water quality objectives and Regional Water Board plans and policies are not violated, including State Water Resources Control Board Resolution 68-16.

(3) Compliance with applicable water quality objectives, load allocations, and waste load allocations for diazinon and chlorpyrifos in the Delta Waterways is required by December 1, 2011.

The water quality objectives and allocations will be implemented through one or a combination of the following: the adoption of one or more waivers of waste discharge requirements, and general or individual waste discharge requirements. To the extent not already in place, the Regional Water Board expects to adopt or revise the appropriate waiver(s) or waste discharge requirements by December 31, 2009.

(4) The Regional Water Board intends to review the diazinon and chlorpyrifos allocations and the implementation provisions in the Basin Plan at least once every five years, beginning no later than December 31, 2010.

(5) Regional Water Board staff will meet at least annually with staff from the Department of Pesticide Regulation and representatives from the California Agricultural Commissioners and Sealers Association to review pesticide use and instream pesticide concentrations during the dormant spray and irrigation application seasons and to consider the effectiveness of management measures in meeting water quality objectives and load allocations.

(6) The waste load allocations (WLA) for all NPDES-permitted dischargers, load allocations (LA) for nonpoint source discharges, and the loading capacity (LC) of each of the Sacramento-San Joaquin Delta Waterways defined in Appendix 42 shall not exceed the sum (S) of one (1) as defined below.

$$S = \frac{C_D}{WQO_D} + \frac{C_C}{WQO_C} \leq 1.0$$

where

$\quad$ $C_D$ $\quad$ = $\quad$ diazinon concentration in µg/L of point source discharge for the WLA; nonpoint source discharge for the LA; or a Delta Waterway for the LC.
$\quad$ $C_C$ $\quad$ = $\quad$ chlorpyrifos concentration in µg/L of point source discharge for the WLA; nonpoint source discharge for the LA; or a Delta Waterway for the LC.
$\quad$ $WQO_D$ = $\quad$ acute or chronic diazinon water quality objective in µg/L.
$\quad$ $WQO_C$ = $\quad$ acute or chronic chlorpyrifos water quality objective in µg/L.

Available samples collected within the applicable averaging period for the water quality objective will be used to determine compliance with the allocations and loading capacity. For purposes of calculating the sum (S) above, analytical results that are reported as "non-detectable" concentrations are considered to be zero.

(7) The established waste load and load allocations for diazinon and chlorpyrifos, and the water quality objectives for chlorpyrifos and diazinon in the Delta Waterways represent a maximum allowable level. The Regional Water Board shall require any additional reductions in diazinon and chlorpyrifos levels necessary to account for additional additive or synergistic toxicity effects or to protect beneficial uses in tributary waters.

(8) Pursuant to CWC Section 13267, the Executive Officer will require dischargers to submit a management plan that describes the actions that the discharger will take to reduce diazinon and chlorpyrifos discharges and meet the applicable allocations by the required compliance date. The management plan may include actions required by State and

Federal pesticide regulations. The Executive Officer will require the discharger to document the relationship between the actions to be taken and the expected reductions in diazinon and chlorpyrifos discharges. The Executive Officer will allow individual dischargers or a discharger group or coalition to submit management plans. The management plan must comply with the provisions of any applicable waiver of waste discharge requirements or waste discharge requirements. The Executive Officer may require revisions to the management plan if compliance with applicable allocations is not attained or the management plan is not reasonably likely to attain compliance.

(9)     If the loading capacity in one or more Delta Waterways is not being met by the compliance date, direct or indirect dischargers to the those waterways whose discharge exceeds their load allocation will be required to revise their management plans and implement an improved complement of management measures to meet the loading capacity.

(10)    Any waiver of waste discharge requirements or waste discharge requirements that govern the control of pesticide runoff that is discharged directly or indirectly into the Delta Waterways must be consistent with the policies and actions described in paragraphs 1 – 9.

(11)    In determining compliance with the waste load allocations, the Regional Water Board will consider any data or information submitted by the discharger regarding diazinon and chlorpyrifos inputs from sources outside of the jurisdiction of the permitted discharger, including any diazinon and chlorpyrifos present in precipitation and other available relevant information; and any applicable provisions in the discharger's NPDES permit requiring the discharger to reduce the discharge of pollutants to the maximum extent possible.

(12)    The above provisions for control of diazinon and chlorpyrifos discharges to the Delta Waterways do not apply to dischargers to the Sacramento and San Joaquin Rivers upstream of the Delta.

### 4.5.5.6    Diazinon and Chlorpyrifos Discharges

(1)     The diazinon and chlorpyrifos discharge control program shall:

    (a)     Ensure compliance with water quality objectives for diazinon and chlorpyrifos in the Sacramento and San Joaquin River Basins through the implementation of management practices;

    (b)     Ensure measures that are implemented to reduce discharges of diazinon and/or chlorpyrifos do not lead to an increase in the discharge of other pesticides to levels that cause or contribute to exceedances of applicable water quality objectives.

    (c)     Encourage implementation of measures or practices by all dischargers that result in concentrations of chlorpyrifos and diazinon in all discharges that are below the water quality objective concentrations.

(2)     Dischargers are responsible for ensuring that their pesticide discharges to surface water and groundwater, including discharges of pesticides used as alternatives to diazinon and/or chlorpyrifos do not cause or contribute to exceedance of applicable water quality objectives.

(3)     Except as otherwise stated in the Basin Plan, compliance with water quality objectives for diazinon and chlorpyrifos shall be as soon as practicable. The Regional Board shall establish time schedules for compliance with such objectives in Waste Discharge Requirements or waivers in accordance with existing laws and policies. Where no existing law or policy directs the length of the compliance schedule, discharges shall be reduced to ensure compliance with the proposed water quality objectives not later than 16 August 2027.

The Board will ensure that dischargers will comply with diazinon and chlorpyrifos water quality objectives by modifying existing waste discharge requirements and existing waivers (where provisions necessary for implementation are not already in place), by adopting new waste discharge requirements or waivers, or by enforcing the diazinon and chlorpyrifos discharge prohibition. If necessary, the Board will ensure that existing waste discharge requirements and waivers will be modified as soon as possible, but no later than 16 August 2022.

(4)     The Central Valley Water Board intends to review the diazinon and chlorpyrifos implementation provisions in the Basin Plan no later than 16 August 2024.

(5)     The water quality objectives for diazinon and chlorpyrifos represent a maximum allowable level and shall be considered additively as defined by the Policy for Application of Water Quality Objectives (Section 4.2.2.1.9). The Board shall require additional reductions in diazinon or chlorpyrifos levels if such reductions are necessary to account for additive or synergistic toxicity effects or to protect beneficial uses.

(6)     The Executive Officer shall require agricultural dischargers that discharge diazinon and/or chlorpyrifos to water bodies listed in Table 3-4 Applicable Water Bodies that are not attaining the diazinon and/or chlorpyrifos objective(s) to submit management plans. These management plans shall consider the watershed of the water body that is not attaining the objective(s) and must describe actions that the agricultural discharger will take to meet applicable diazinon and chlorpyrifos water quality objectives by the required compliance dates. Management plans must describe:

The causes of the nonattainment of objectives;
(b)     The actions that the discharger will take to reduce diazinon and/or chlorpyrifos discharges in order to meet the diazinon and/or chlorpyrifos water quality objectives as soon as practicable but no later than 16 August 2027.
(c)     A schedule for the implementation of those actions;
(d)     A monitoring plan to track effectiveness of pollution controls; and
(e)     A commitment to revise pollution controls, as necessary.

Management plans for water bodies not attaining the water quality objective(s) as of 16 August 2017 are due no later than 16 August 2018. Management plans that address diazinon and/or chlorpyrifos exceedances and that have already been submitted can be used to fulfill this requirement, provided that they contain all the required elements 6a through 6e described above.

After 16 August 2017, if the Executive Officer determines that a water body listed in Table 3-4 Applicable Water Bodies is exceeding an applicable diazinon and/or chlorpyrifos water quality objective, the Executive Officer shall require that dischargers that discharge diazinon and/or chlorpyrifos to that water body submit a management plan to the Board. Management plans are due within one year after the discharger receives notification that such a determination has been made.

If a water body that is exceeding the diazinon and/or chlorpyrifos objective(s) is being used by a discharger to represent water quality conditions in multiple water bodies, the Executive Officer shall require the submittal of a management plan that addresses all of the represented water bodies.

Management plans may include actions required under state and federal pesticide laws and regulations. Management plans must include documentation of the relationship between the actions to be taken and reductions in diazinon and/or chlorpyrifos discharges that are reasonably likely to attain compliance with diazinon and chlorpyrifos water quality objectives. The Executive Officer may allow individual dischargers or a discharger group or coalition to submit management plans. The management plan must comply with the provisions of any applicable waste discharge requirements or waiver. Management plans may address discharges to multiple downstream water bodies for which discharge reductions are required. The Executive Officer may require revisions to the management plan if compliance with applicable water quality objectives is not attained.

(7)    Any waste discharge requirements or waivers that govern the control of pesticide discharges to Table 3-4 Applicable Water Bodies, must be consistent with the policies and actions described in paragraphs 1-6 of this section.

## 4.5.6    Dredging in the Sacramento River and San Joaquin River Basins

Large volumes of sediment are transported in the waters of the Sacramento and San Joaquin Rivers which drain the Central Valley. The average annual sediment load to San Francisco Bay from these two rivers is estimated to be 8 million cubic yards. Dredging and riverbank protection projects are ongoing, continuing activities necessary to keep ship channels open, prevent flooding, and control riverbank erosion. The Delta, with over 700 miles of waterways, is a major area of activity. At present, the Corps is overseeing the conduct and planning of rehabilitation work along 165 miles of levees surrounding 15 Delta islands. In addition, virtually all of the Delta levees have been upgraded by island owners or reclamation districts. The magnitude of recent operations, such as the Stockton and Sacramento Ship Channel Deepening Projects and Sacramento River Bank Protection Project, is discussed in recent U.S. Army Corps of Engineers Reports. For example, the Corps removes over 10 million cubic yards of sediment yearly from the Sacramento River. If the Sacramento River Deep Water Ship Channel is widened and deepened as proposed currently, 25 million cubic yards of bottom material will be removed from the river during the 5-year project.

Environmental impacts of dredging operations and materials disposal include temporary dissolved oxygen reduction, increased turbidity and, under certain conditions, the mobilization of toxic chemicals and release of biostimulatory substances from the sediments. The direct destruction and burial of spawning gravels and alteration of benthic habitat may be the most severe impacts. The existing regulatory process must be consistently implemented to assure protection of water quality and compliance with the certification requirements of Section 401 of the Federal Clean Water Act.

The Regional Water Board continues to work with dredging interests in the San Francisco Bay and Delta to develop a long term management strategy (LTMS) for handling dredge spoils. We will adopt requirements for all significant dredging operations and upland disposal projects in the Region.

## 4.5.7    Nitrate Pollution of Ground Water in the Sacramento and San Joaquin River Basins

Since 1980, over 200 municipal supply wells have been closed in the Central Valley because of nitrate levels exceeding the State's 45 mg/l drinking water standard. Proposals have been submitted to assess the extent of the problem and explore possible regulatory responses, but without success. The increasing population growth in the Valley is expected to accelerate the problem's occurrence in the years ahead.

The Regional Water Board considers nitrate pollution to be a critical issue for beneficial use protection in the Central Valley Region. Staff will continue efforts to obtain study funds. Since nitrate pollution of ground water is not restricted to the Central Valley Region, the Regional Water Board recommends the State Water
Board take the lead in developing programs for controlling ground water contamination resulting from the use of nitrogen fertilizer on irrigated crops.

## 4.5.8    Temperature and Turbidity Increases Below Large Water Storage and Diversion Projects in the Sacramento River Basin

The storage and diversion of water for hydroelectric and other purposes can impact downstream beneficial uses because of changes in temperature and the introduction of turbidity. There are several large facilities in the Basin which have had a history of documented or suspected downstream impairments.

Where problems have been identified, the staff will work with operators to prepare management agency agreements or make recommendations to State Water Board regarding requirements to remedy the problems. Where problems are suspected, the staff will seek additional monitoring.

## 4.5.9    Control Program for Factors Contributing to the Dissolved Oxygen Impairment in the Stockton Deep Water Ship Channel (DWSC) (Regional Water Board Resolution No. R5-2005-0005)

The purpose of this control program is to implement a dissolved oxygen TMDL to achieve compliance with the Basin Plan dissolved oxygen water quality objectives in the DWSC. The numeric targets for this TMDL are the existing dissolved oxygen water quality objectives.

The dissolved oxygen impairment in the DWSC is caused by the following three main contributing factors:

•    Loads of oxygen demanding substances from upstream sources that react by numerous chemical, biological, and physical mechanisms to remove dissolved oxygen from the water column in the DWSC.

•    Geometry of the DWSC that impacts various mechanisms that add or remove dissolved oxygen from the water column, such that net oxygen demand exerted in the DWSC is increased.

•    Reduced flow through the DWSC impacts various mechanisms that add or remove dissolved oxygen from the water column, such that net oxygen demand exerted in the DWSC is increased.

For the purpose of this control program, net oxygen demand is defined as the combined impact of all chemical, biological, and physical mechanisms that add or remove dissolved oxygen from the water column. When the amount of oxygen removed from the water column is greater than the amount added there is a decrease in the dissolved oxygen concentration. When dissolved oxygen concentrations in the DWSC are below Basin Plan objectives, the assimilative capacity of the water column has been exceeded and the associated excess net oxygen demand (ENOD) is given by the equation:

$$ENOD = \{DO_{obj} - DO_{meas}\} \times \{Q_{DWSC} + 40\} \times 5.4$$

In the above equation $DO_{obj}$ is the applicable Basin Plan dissolved oxygen objective in milligrams per liter, $DO_{meas}$ is the measured dissolved oxygen concentration in the DWSC in milligrams per liter, $Q_{DWSC}$ is the net daily flow rate through the DWSC in cubic feet per second (adjusted by 40 cfs to account for flow measurement error), and 5.4 is a unit conversion factor that provides ENOD in units of pounds of net oxygen demand per day in the DWSC.

To account for technical uncertainty a margin of safety (MOS) equal to 20% of ENOD is added to the overall required reduction of ENOD:

$$MOS = -0.2 \times ENOD$$

ENOD plus the MOS must be addressed by those collectively responsible for each of the three contributing factors:

$$ENOD - MOS = 1.2 \times ENOD = [\Sigma WLA + \Sigma LA] + R_{DWSC} + R_{Flow}$$

where $[\Sigma WLA + \Sigma LA]$ is the amount of ENOD and MOS for which sources of oxygen demanding substances are responsible, $R_{DWSC}$ is the amount of ENOD and MOS for which DWSC geometry is responsible, and $R_{Flow}$ is the amount of ENOD and MOS for which reduced DWSC flow is responsible.

This TMDL does not specify the relative responsibility among the three contributing factors. Each of the three contributing factors are considered to be 100% responsible for addressing ENOD and MOS. Those parties collectively responsible for each contributing factor must coordinate with those collectively responsible for the other factors to implement control measures addressing ENOD and MOS.

Those parties responsible for sources of oxygen demanding substances $[\Sigma WLA + \Sigma LA]$ are allocated relative responsibility for excess net oxygen demand as follows:

(1)    30% as a waste load allocation for the City of Stockton Regional Wastewater Control Facility.
(2)    60% as a load allocation to non-point sources of algae and/or precursors in the watershed.
(3)    10% as a reserve for unknown sources and impacts, and known or new sources that have no reasonable potential to impact.

In measuring compliance with waste load and load allocations, credit will be given for control measures implemented after 12 July 2004.

For the purpose of this control program, non-point source discharges are discharges from irrigated lands. Irrigated lands are lands where water is applied for producing crops and, for the purpose of this control program, includes, but is not limited to, land planted to row, field, and

tree crops, as well as commercial nurseries, nursery stock production, managed wetlands and rice production.

For the purpose of this control program, oxygen demanding substances and their precursors are any substance or substances that consume, have the potential to consume, or contribute to the growth or formation of substances that consume or have the potential to consume oxygen from the water column.

The source area for loads of oxygen demanding substances and their precursors being addressed by this TMDL includes the SJR watershed that drains downstream of Friant Dam and upstream of the confluence of the San Joaquin River and Disappointment Slough, with the exception of the western slope of the Sierra Nevada foothills above the major reservoirs of New Melones Lake on the Stanislaus, Don Pedro Reservoir on the Tuolumne, Lake McClure on the Merced, New Hogan Reservoir on the Calaveras, Comanche Reservoir on the Mokelumne, and those portions of the SJR watershed that fall within Mariposa, Tuolumne, Calaveras, and Amador Counties.

Measures will also need to be implemented to reduce the impact of both the DWSC geometry and reduced flow through the DWSC.

The Regional Water Board will take the following actions, as necessary and appropriate, to implement this TMDL:

(1)     The Regional Water Board will use its authority under California Water Code § 13267 (or alternately by Waste Discharge Requirements and NPDES permits) to require that entities responsible for point and non-point sources of oxygen demanding substances and their precursors within the TMDL source area perform the following studies by December 2008. These studies must identify and quantify:

(a)     sources of oxygen demanding substances and their precursors in the dissolved oxygen TMDL source area

(b)     growth or degradation mechanisms of these oxygen demanding substances in transit through the source area to the DWSC

(c)     the impact of these oxygen demanding substances on dissolved oxygen concentrations in the DWSC under a range of environmental conditions and considering the effects of chemical, biological, and physical mechanisms that add or remove dissolved oxygen from the water column in the DWSC

A study plan describing how ongoing studies and future studies will address these information needs must be submitted to Regional Water Board staff by 23 October 2006. The study plan and studies may be conducted by individual responsible entities or in collaboration with other entities.

(2)     The Regional Water Board establishes the following waste load allocations:

(a)     The waste load allocations of oxygen demanding substances and their pre-cursors for all NPDES-permitted discharges are initially set at the corresponding effluent limitations applicable on 28 January 2005.

(b)     Waste load allocations and permit conditions for new or expanded point source discharges in the SJR Basin upstream of the DWSC, including NPDES and stormwater, will be based on the discharger demonstrating that the discharge will

have no reasonable potential to cause or contribute to a negative impact on the dissolved oxygen impairment in the DWSC.

(3)     The Regional Water Board will require any project that requires a Clean Water Act Section 401 Water Quality Certification from the Regional Water Board, and that has the potential to impact dissolved oxygen conditions in the DWSC, to evaluate and fully mitigate those impacts. This includes, but is not limited to:

  (a)     Future projects that increase the cross-sectional area of the DWSC

  (b)     Future water resources facilities projects that reduce flow through the DWSC

(4)     The Regional Water Board will require, pursuant to California Water Code § 13267, the United States Army Corps of Engineers to submit by 31 December 2006 a technical report identifying and quantifying:

  (a)     the chemical, biological, and physical mechanisms by which loads of substances into, or generated within the DWSC, are converted to oxygen demand

  (b)     the impact that the Stockton Deep Water Ship Channel has on re-aeration and other mechanisms that affect dissolved oxygen concentrations in the water column

(5)     The Regional Water Board may consider alternate measures, as opposed to direct control, of certain contributing factors if these measures adequately address the impact on the dissolved oxygen impairment and do not degrade water quality in any other way.

(6)     The Regional Water Board will review allocations and implementation provisions based on the results of the oxygen demand and precursor studies and the prevailing dissolved oxygen conditions in the DWSC by December 2009.

(7)     The Regional Water Board will require compliance with waste load allocations and load allocations for oxygen demanding substances and their precursors, and development of alternate measures to address non-load related factors by 31 December 2011.

(8)     The established allocations and implementation provisions represent a maximum allowable level for the purpose of addressing the dissolved oxygen impairment in the DWSC. Where more than one allocation may be applicable, the most stringent allocation applies. The Regional Water Board may take other, more restrictive, actions affecting the contributing factors to this impairment as needed to protect other beneficial uses or to implement other water quality objectives.

## 4.5.10   Clear Lake Nutrients

Nuisance algae blooms impair beneficial uses in Clear Lake, which is a violation of the narrative basin plan objective that states "water shall not contain biostimulatory substances which promote aquatic growths in concentrations that cause nuisance or adversely affect beneficial uses"

Research and studies have concluded that there are likely multiple factors that influence the occurrence of nuisance algae blooms in Clear Lake. Recent improvements in water clarity may be due to a reduction in phosphorus loading or a result of other factors such as iron or sulfur availability, changes to lake ecology (introduced species, etc.), water year type or a combination

of factors. For the purposes of this program of implementation both phosphorus loading and other factors that may affect algae growth will be addressed.

(1)    Modeling studies predict that a 40% reduction in average phosphorus loading will significantly reduce the incidence of algae blooms. A 40% reduction would equal an annual allowable loading of approximately 87,100 kg. Therefore, for this program of implementation, an average annual (five year rolling average) phosphorus load of 87,100 kg is established as the loading capacity for Clear Lake.

(2)    Waste load allocations for the NPDES facilities discharging to the lake or tributaries are as follows:

(a)    Lake County Stormwater Permittees (Lake County, City of Clearlake, City of Lakeport) - 2,000 kg phosphorus/yr
(b)    California Department of Transportation (Caltrans) – 100 kg phosphorus/yr

(3)    The load allocation for nonpoint source dischargers is 85,000 kg/yr average annual load (five year rolling average). The U.S. Bureau of Land Management (USBLM), U.S. Forest Service (USFS), Lake County (County) and irrigated agriculture are responsible for controlling phosphorus discharges from those portions of the watershed within their respective authority.

(4)    Regional Water Board staff will work with the responsible parties – Stormwater permittees, Caltrans, USBLM, USFS, County and irrigated agriculture – to develop and implement a plan to collect the information needed to determine what factors are important in controlling nuisance blooms and to recommend what control strategy should be implemented. The responsible parties will submit the plan to the Regional Water Board by 19 June 2008. The plan should address the following topics:
•    Studies to assess the current limnological conditions and to determine the appropriate measures necessary for Clear Lake to meet the Basin Plan objectives
•    Appropriate monitoring for evaluating conditions in the lake
•    Effective collection of phosphorus loading information from the various sources
•    Practices implemented or planned to control phosphorus loading to the lake
•    Develop criteria to determine when Clear Lake is no longer impaired

(5)    Compliance with load and waste load allocations for phosphorus in Clear Lake is required by 19 June 2017. However, by 19 September 2012, the Regional Water Board will consider information developed and determine whether the phosphorus load and waste load allocations should continue to be required or if some other control strategy or approach is more appropriate. To the extent that other controllable water quality factors, besides phosphorus, cause or contribute to nuisance algae blooms, those factors will be addressed in revisions to this program of implementation. Implementation of phosphorus control practices to achieve load and waste load allocations will occur under waste discharge requirements or waivers of waste discharge requirements.

(6)    If Clear Lake is attaining its beneficial uses and the Regional Water Board determine that phosphorus loads above allocated amounts are not causing or contributing to nuisance algae problems, the Regional Water Board will amend the Basin Plan to revise this nutrient control program for Clear Lake.

## 4.5.11    Point Source Discharges Containing Trihalomethanes Lower New Alamo and Ulatis Creeks

Municipal wastewater that is chlorinated to remove bacteria generally forms trihalomethanes as disinfection by-products. The Policy for Implementation of Toxics Standards for Inland Waters, Enclosed Bays, and Estuaries of California ("State Implementation Plan" or "SIP") (see the 15th Policy in State Water Board Policies and Plans, page IV-10.01) implements criteria for priority pollutants, including trihalomethanes. However, the SIP does not address situations where water quality objectives for water bodies downstream of the first receiving water are more stringent than the water quality objectives for the first receiving water.

Old Alamo Creek is tributary to New Alamo Creek and Ulatis Creek. Ulatis Creek, downstream of the confluence with New Alamo Creek, is within the legal boundary of the Delta. Old Alamo Creek is not designated MUN, but New Alamo and Ulatis Creeks are designated MUN. The SIP does not specifically address how to determine the need for water quality-based effluent limitations or calculate water quality-based effluent limitations in this situation, so special permitting provisions are needed for discharges of trihalomethanes to Old Alamo Creek.

With respect to the site-specific water quality objectives in Table 3-2 for trihalomethanes in New Alamo Creek, from Old Alamo Creek to Ulatis Creek, and Ulatis Creek, from New Alamo Creek to Cache Slough, the following provisions shall apply to any point source discharges into Old Alamo Creek. For determining if water quality-based effluent limitations are necessary, Section 1.3 of the SIP does not apply. For calculation of water quality-based effluent limitations, Section 1.4 of the SIP does not apply, unless specified below.

*Determination of Need for Water Quality-Based Effluent Limitations*:

*Step 1*: For chlorodibromomethane (DBCM), dichlorobromomethane (DCBM) and chloroform, if the pollutant is not detected in the effluent and any of the reported detection limits is less than or equal to the site-specific objectives specified in Table 3-2 (the site-specific objectives specified in Table 3-2 will be referred to as C), then water quality-based effluent limitations are not necessary. If the pollutant is not detected in the effluent and all of the detection limits are greater than site-specific objectives (C), then proceed to Step 5. If the pollutant is detected in the effluent then proceed to Step 2.

*Step 2*: Determine the observed maximum ambient background concentration for DBCM, DCBM, and chloroform. The observed maximum ambient background concentrations shall be measured in New Alamo Creek at Lewis Road and is the B, as defined in section 1.4.3.1 of the SIP. If the background (B) is greater than the site-specific objectives (C), then water quality-based effluent limitations are necessary. If the background (B) is less than or equal to the site-specific objectives (C), then proceed to Step 3.

*Step 3*: Determine the observed maximum pollutant concentration for the effluent (MEC). If the MEC is less than or equal to the site-specific objectives (C), water quality-based effluent limitations are not necessary. If the MEC is greater than the site-specific objectives (C), then proceed to Step 4 to determine if water quality-based effluent limitations are necessary.

*Step 4*: If the in-stream maximum concentrations of DBCM, DCBM or chloroform at the terminus of Old Alamo Creek are greater than the site-specific objectives (C), then water quality-based effluent limitations are necessary for the constituents that exceeded the applicable objectives.

*Step 5*: If the pollutant has not been detected in the effluent and all detection limits are greater than the site-specific objectives (C), then the discharger shall be required to conduct twice-

monthly monitoring of the effluent and of the terminus of Old Alamo Creek between 1 November and 31 March using detection limits less than or equal to the site-specific objectives (C). Steps 1-4 above will then be applied to these data to determine whether water-quality based effluent limitations are necessary.

*Calculation of water quality-based effluent limitations for DBCM, DCBM, and chloroform shall be as follows:*

An Attenuation Factor, which is the median of the individual sample attenuation values, is necessary because the water quality objectives do not apply in the first receiving water of the discharge (i.e., do not apply in Old Alamo Creek). If water quality-based effluent limitations are required, an attenuation factor to account for the reduction in constituent concentrations between the point of effluent discharge to Old Alamo Creek and the terminus of Old Alamo Creek shall be applied to the calculation of the Effluent Concentration Allowance (ECA), which is one of the factors used in the derivation of the effluent limitations as described in Section 1.4B of the SIP.

The ECA shall be calculated as:
ECA = Attenuation Factor x [C + D(C-B)]when C > B
ECA = Attenuation Factor x C      when C ≤ B

Where:
Attenuation Factor = the median of the individual sample attenuation values derived from all representative historical data for the 1 November through 31 March period of each year. An individual sample attenuation value is calculated as the effluent constituent concentration measured on a given day divided by the in-stream constituent concentration at the terminus of Old Alamo Creek measured the same day. It should be noted that the effluent should be sampled prior to sampling at the terminus of Old Alamo Creek.
C = the site-specific objective specified in Table 3-2
D = dilution credit, as determined in section 1.4.2 of the SIP
B = background concentration, as defined by Section 1.4.3 of the SIP, and measured in New Alamo Creek at Lewis Road

Dilution credits may be allowed in deriving water quality-based effluent limitations for DBCM, DCBM, and chloroform in accordance with Section 1.4.2 of the SIP.

The Average Monthly Effluent Limitation (AMEL) and the Maximum Daily Effluent Limitation (MDEL) shall be calculated in accordance with Section 1.4 of the SIP using the ECA calculated above.

## 4.6   ESTIMATED COSTS OF AGRICULTURAL WATER QUALITY CONTROL PROGRAMS AND POTENTIAL SOURCES OF FINANCING

### 4.6.1   San Joaquin River Subsurface Agricultural Drainage Control Program

The estimates of capital and operational costs to achieve the selenium objective for the San Joaquin River range from $3.6 million/year to $27.4 million/year (1990 dollars). The cost of meeting water quality objectives in Mud Slough (north), Salt Slough, and the wetland supply channels is approximately $2.7 million /year (1990 dollars).

Potential funding sources include:

(1) Private financing by individual sources.

(2) Bonded indebtedness or loans from governmental institutions.

(3) Surcharge on water deliveries to lands contributing to the drainage problem.

(4) Ad Valorem tax on lands contributing to the drainage problem.

(5) Taxes and fees levied by a district created for the purpose of drainage management.

(6) State or federal grants or low-interest loan programs.

(7) Single-purpose appropriations from federal or State legislative bodies (including land retirement programs).

## 4.6.2    Lower San Joaquin River Salt and Boron Control Program

The estimates of capital and operational costs to implement drainage controls needed to achieve the salt and boron water quality objectives at the Airport Way Bridge near Vernalis range from 27 to 38 million dollars per year (2003 dollars).

Potential funding sources include:

(1)    Those identified in the San Joaquin River Subsurface Agricultural Drainage Program and the Pesticide Control Program.

(2)    Annual fees for waste discharge requirements.

## 4.6.3    Pesticide Control Program

Based on an average of $15 per acre per year for 500,000 acres of land planted to rice and an average of $5 per acre per year for the remaining 3,500,000 acres of irrigated agriculture in the Sacramento and San Joaquin River Basins, the total annual cost to agriculture is estimated at $25,000,000. Financial assistance for complying with this program may be obtainable through the U.S.D.A. Agricultural Stabilization and Conservation Service and technical assistance is available from the University of California Cooperative Extension Service and the U.S.D.A. Soil Conservation Service.

## 4.6.4    Sacramento and Feather Rivers Diazinon and Chlorpyrifos Runoff Control Program

The total estimated costs for management practices to meet the diazinon and chlorpyrifos objectives for the Sacramento and Feather Rivers range from $0 to $6.2 million/year (2007 dollars). The estimated costs for discharger monitoring, planning, and evaluation range from $0.3 to $1.5 million/year (2007 dollars).

Potential funding sources include:

(1)    Those identified in the San Joaquin River Subsurface Agricultural Drainage Control Program and the Pesticide Control Program.

## 4.6.5     San Joaquin River Dissolved Oxygen Control Program

The *Control Program for Factors Contributing to the Dissolved Oxygen Impairment in the Stockton Deep Water Ship Channel (DWSC)* requires agricultural and municipal dischargers to perform various studies. The total estimated cost of the studies to be performed as part of this control program is approximately $15.6 million. The preferred alternative also includes a prohibition of discharge if water quality objectives are not achieved by 31 December 2011. The estimated cost to cease discharge of water from irrigated lands ranges from $95 to $133 million per year. The estimated cost to provide minimum flows that would remove the need for the prohibition is approximately $37 million dollars per year to eliminate the impairment through provision of purchased water. The cost of construction of an aeration device of adequate capacity to eliminate the impairment, in conjunction with point source load reductions already required, is estimated to be $10 million, with yearly operation and maintenance costs of $200,000 per year.

Potential funding sources:

(1)     Proposition 13 includes $40 million in bond funds to address the dissolved oxygen impairment in the DWSC. Approximately $14.4 million of this $40 million has been identified to fund the oxygen demanding substance and precursor studies. An additional $1.2 million is being provided from various watershed stakeholders. Approximately $24 million of Proposition 13 funds are available to pay for projects such as the design and construction of an aeration device.

(2)     The State Water Contractors, Port of Stockton, San Luis and Delta Mendota Water Authority, San Joaquin Valley Drainage Authority, and the San Joaquin River Group Authority have proposed to develop an operating entity for an aeration device and have indicated their commitment to execute a funding agreement among themselves and other interested parties, (subject to ultimate approval of respective governing boards) that would provide the mechanism to support operation of a permanent aerator at a cost expected to be in the annual range of $250,000 to $400,000.

## 4.6.6     Diazinon and Chlorpyrifos Runoff into the San Joaquin River Control Program

The total estimated costs for management practices to meet the diazinon and chlorpyrifos objectives for the San Joaquin River range from $56,000 to $2.5 million for the dormant season, and from $3.9 million to $5.3 million for the irrigation season. The estimated costs for discharger compliance monitoring, planning and evaluation range from $600,000 to $3.1 million. The estimated total annual costs range from $4.4 million to $10.9 million (2004 dollars).

Potential funding sources include:

(1)     Those identified in the San Joaquin River Subsurface Agricultural Drainage Control Program and the Pesticide Control Program.

## 4.6.7     Diazinon and Chlorpyrifos Runoff into the Sacramento-San Joaquin Delta Waterways

The total estimated costs for management practices to meet the diazinon and chlorpyrifos objectives for the Delta Waterways range from $5.9 to $12.7 million. The estimated costs for

discharger compliance monitoring, planning and evaluation range from $600,000 to $1.8 million. The estimated total annual costs range from $6.5 to $14.4 million (2005 dollars).

Potential funding sources include:

(1)     Those identified in the San Joaquin River Subsurface Agricultural Drainage Control Program and the Pesticide Control Program.

## 4.6.8    Clear Lake Nutrient Control Program

Estimated costs to implement best management practices, if necessary, are $400,000 to $1,800,000 (2006 dollars).

Potential funding sources include:

(1)     Those identified in the San Joaquin River Subsurface Agricultural Drainage Control Program and the Pesticide Control Program.

## 4.6.9    Delta Mercury Control Program

The total estimated costs (2007 dollars) for the agricultural methylmercury control studies to develop management practices to meet the Delta methylmercury allocations range from $290,000 to $1.4 million. The estimated annual costs for agricultural discharger compliance monitoring range from $14,000 to $25,000. The estimated annual costs for Phase 2 implementation of methylmercury management practices range from $590,000 to $1.3 million.

(1)     Potential funding sources include those identified in the San Joaquin River Subsurface Agricultural Drainage Control Program and the Pesticide Control Program.

## 4.6.10   Long-Term Irrigated Lands Regulatory Program

The Central Valley Water Board intends on establishing a long-term irrigated lands regulatory program (Long-Term Program) by adopting one or more general waste discharge requirements and/or conditional waivers of WDRs to regulate the discharge of waste to ground and surface waters from irrigated agricultural operations. The Long-Term Program will be based, in whole or in part, on six alternatives described in the *Irrigated Lands Regulatory Program Final Environmental Impact Report* (Final PEIR; ICF International 2011) certified by resolution R5-2011-0017. The cost estimate below is based upon and encompasses the full range of those alternatives.

The cost estimate for the Long-Term Program accounts for program administration (e.g., Board oversight and third-party activities), monitoring for groundwater and surface water quality, and implementation of management practices throughout the Central Valley. The estimated cost for the annual capital and operational costs to comply with the Long-Term Program range from $216 million to $1,321 million (2007 dollars). This cost estimate is a cumulative total that includes costs from the Sacramento River and San Joaquin River Basins, and the Tulare Lake Basin.

Potential funding sources include:

(1)     The Federal Farm Bill, which authorizes funding for conservation programs such as the Environmental Quality Incentives Program (EQIP) and the Conservation Stewardship Program.

(2)    Grant and loan programs administered by the State Water Resources Control Board and Department of Water Resources, which are targeted for agricultural drainage management, water use efficiency, and water quality improvement. These programs include:

    (a)    Agricultural Drainage Management Program (State Water Resources Control Board)

    (b)    Agricultural Drainage Loan Program (State Water Resources Control Board)

    (c)    Clean Water Act funds (State Water Resources Control Board)

    (d)    Agricultural Water Quality Grant Program (State Water Resources Control Board)

    (e)    Clean Water State Revolving Fund (State Water Resources Control Board)

    (f)    Integrated Regional Water Management grants (State Water Resources Control Board, Department of Water Resources)

(3)    Those identified in the San Joaquin River Subsurface Agricultural Drainage Control Program.

## 4.6.11    Drinking Water Policy

The total estimated costs to implement management practices, if necessary, range from zero to approximately $6.8 million (2013 dollars).

Potential funding sources include:

(1)    Those identified in the San Joaquin River Subsurface Agricultural Drainage Control Program and Pesticide Control Program.

## 4.6.12    Diazinon and Chlorpyrifos Discharges

The costs estimated in this section were calculated in consideration of the requirements for diazinon and chlorpyrifos discharges only. Most of these compliance costs likely already exist due to other Board Requirements under the Irrigated Lands Regulatory Program, and the requirements for diazinon and chlorpyrifos in the Sacramento and Feather Rivers, the San Joaquin River Basin, and the Sacramento-San Joaquin Delta.

The total estimated costs for management practices to meet the diazinon and chlorpyrifos objectives in the Sacramento and San Joaquin River Basins range from $5 to $21.6 million/year (2010 dollars). The estimated costs for agricultural discharger compliance monitoring, planning, and evaluation range from $1.6 to $6.0 million/year (2010 dollars). The estimated annual costs range from $6.6 to $27.6 million (2010 dollars).

Potential funding sources include:

(1)    Those identified in the San Joaquin River Subsurface Agricultural Drainage Control Program and Pesticide Control Program.

## 4.6.13    Pyrethroid Pesticides Discharges into Sacramento River and San Joaquin River Basin Waters

Estimated costs for implementation of practices to control pyrethroid pesticide discharges are encompassed in the costs of the Long-Term Irrigated Lands Regulatory Program, as described above.

Estimated costs for monitoring and reporting associated with the pyrethroid pesticide control program are 1.4 million dollars per year (2017 dollars). This is a high-end estimate, as similar monitoring and reporting costs would likely be incurred due to other Board Requirements to meet pre-existing Basin Plan requirements under the Long-Term Irrigated Lands Regulatory Program.

Potential funding sources include:

(1)    Those identified in the San Joaquin River Subsurface Agricultural Drainage Control Program and the Pesticide Control Program.

# 5   SURVEILLANCE AND MONITORING

This chapter describes the methods and programs that the Regional Water Board uses to acquire water quality information. Acquisition of data is a basic need of a water quality control program and is required by both the Clean Water Act and the Porter-Cologne Water Quality Control Act.

The Regional Water Board's surveillance and monitoring efforts include different types of sample collection and analysis. Surface water surveillance may involve analyses of water, sediment, or tissue samples and ground water surveillance often includes collection and analysis of soil samples. Soil, water, and sediment samples are analyzed via standard, EPA approved, laboratory methods. The Regional Water Board addresses quality assurance through bid specifications and individual sampling actions such as submittal of split, duplicate, or spiked samples and lab inspections.

Although surveillance and monitoring efforts have traditionally relied upon measurement of key chemical/physical parameters (e.g., metals, organic and inorganic compounds, bacteria, temperature, and dissolved oxygen) as indicators of water quality, there is increasing recognition that close approximation of water quality impacts requires the use of biological indicators. This is particularly true for regulation of toxic compounds in surface waters where standard physical/chemical measurement may be inadequate to indicate the wide range of substances and circumstances able to cause toxicity to aquatic organisms. The use of biological indicators to identify or measure toxic discharges is often referred to as biotoxicity testing. EPA has issued guidelines and technical support materials for biotoxicity testing. A key use of the method is to monitor for compliance with narrative water quality objectives or permit requirements that specify that there is to be no discharge of toxic materials in toxic amounts. The Regional Water Board will continue to use biotoxicity procedures and testing in its surveillance and monitoring program.

As discussed previously, the protection, attainment, and maintenance of beneficial uses occur as part of a continuing cycle of identifying beneficial use impairments, applying control measures, and assessing program effectiveness. The Regional Water Board surveillance and monitoring program provides for the collection, analysis, and distribution of the water quality data needed to sustain its control program. Under ideal circumstances, the Regional Water Board surveillance and monitoring program would produce information on the frequency, duration, source, extent, and severity of beneficial use impairments. In attempting to meet this goal, the Regional Water Board relies upon a variety of measures to obtain information. The current surveillance and monitoring program consists primarily of seven elements:

## 5.1   DATA COLLECTED BY OTHER AGENCIES

The Regional Water Board currently relies on internal staff coordination and compilation of data collected by a variety of other agencies to augment data collected by internal programs in order to assess ambient water quality conditions and program effectiveness. For example, the Department of Water Resources (DWR) has an ongoing monitoring program in the Delta and the United States Geological Survey (USGS) and DWR conduct monitoring in some upstream rivers. The Department of Fish and Wildlife, Fish and Wildlife Service, USGS, and State Water Board Division of Drinking Water Programs also conduct special studies and collect data, as do local entities such as water purveyors, county health departments and wastewater treatment plants.

The long-term goal is to have a system in place that facilitates consolidation of information gathered from all agencies in a format that can be readily utilized to provide the foundation for regular assessments of ambient surface water quality conditions and program effectiveness including support of updates to the California Integrated Report (Clean Water Act Sections 303(d)/305(b)) which provides a water quality conditions assessment of surface water bodies.

## 5.2   REGIONAL WATER BOARD AND STATE WATER BOARD MONITORING PROGRAMS

The State Water Board manages its own Toxic Substances Monitoring (TSM) program to collect and analyze fish tissue for the presence of bioaccumulative chemicals. The Regional Water Board participates in the selection of sampling sites for its basins and annually is provided with a report of the testing results.

## 5.3   SPECIAL STUDIES

Intensive water quality studies provide detailed data to locate and evaluate violations of receiving water standards and to make waste load allocations. They usually involve localized, frequent and/or continuous sampling. These studies are specially designed to evaluate problems in potential water quality limited segments, areas of special biological significance or hydrologic units requiring sampling in addition to the routine collection efforts.

One such study is the *San Joaquin River Subsurface Agricultural Drainage Monitoring Program*. The program includes the following tasks:

(1)     The dischargers will monitor discharge points and receiving waters for constituents of concern and flow (discharge points and receiving water points)

(2)     The Regional Board will inspect discharge flow monitoring facilities and will continue its cooperative effort with dischargers to ensure the quality of laboratory results.

(3)     The Regional Board will, on a regular basis, inspect any facilities constructed to store or treat agricultural subsurface drainage.

(4)     The Regional Board will continue to maintain and update its information on agricultural subsurface drainage facilities in the Grassland watershed. Efforts at collecting basic data on all facilities, including flow estimates and water quality will continue.

(5)     The Regional Water Board, in cooperation with other agencies, will regularly assess water conservation achievements, cost of such efforts and drainage reduction effectiveness information. In addition, in cooperation with the programs of other agencies and local district managers, the Regional Board will gather information on irrigation practices, i.e., irrigation efficiency, pre-irrigation efficiency, excessive deep percolation and on seepage losses.

Another such study is a surveillance and monitoring program conducted by the El Dorado Irrigation District (EID) on Deer Creek in El Dorado and Sacramento Counties. Regional Board staff will work with EID to ensure adequate temperature, flow and biological monitoring is conducted to evaluate compliance with the site-specific temperature objectives for Deer Creek and their effect on beneficial uses.

## 5.4    AERIAL SURVEILLANCE

Low-altitude flights are conducted primarily to observe variations in field conditions, gather photographic records of discharges, and document variations in water quality.

## 5.5    SELF-MONITORING

Self-monitoring reports are normally submitted by the discharger on a monthly or quarterly basis as required by the permit conditions. They are routinely reviewed by Regional Water Board staff.

For point source discharges to Old Alamo Creek that contain detectable concentrations of chlorodibromomethane (DBCM), dichlorobromomethane (DCBM) or chloroform, the discharger's monitoring and reporting program shall include coordinated monitoring of the effluent and Old Alamo Creek at its terminus, immediately prior to Old Alamo Creek's discharge into New Alamo Creek, for DBCM, DCBM or chloroform. It should be noted that the effluent should be sampled prior to sampling at the terminus of Old Alamo Creek. At a minimum, the discharger shall conduct the coordinated monitoring twice-monthly from 1 November through 31 March once during the 5-year term of the NPDES permit.

## 5.6    COMPLIANCE MONITORING

Compliance monitoring determines permit compliance, validates self-monitoring reports, and provides support for enforcement actions. Discharger compliance monitoring and enforcement actions are the responsibility of the Regional Water Board staff.

## 5.7    COMPLAINT INVESTIGATION

Complaints from the public or governmental agencies regarding the discharge of pollutants or creation of nuisance conditions are investigated and pertinent information collected.

## 5.8    MERCURY AND METHYLMERCURY

The Regional Water Board will use the following criteria to determine compliance with the methylmercury fish tissue objectives. Site-specific criteria for various water bodies are described below.

The number of fish collected to determine compliance with the methylmercury objective will be based on the statistical variance within each species. The sample size will be determined by methods described in USEPA's Guidance for Assessing Chemical Contaminant Data for Use in Fish Advisories (Third Edition, 2000) or other statistical methods approved by the Executive Officer.

Analysis of fish tissue for total mercury is acceptable for assessing compliance. Compliance with the fish tissue objective is achieved when the average concentrations in local fish are equivalent to the respective objective for three consecutive years.

## 5.8.1    Clear Lake

Fish from the following species will be collected and analyzed every ten years. The representative fish species for trophic level 4 shall be largemouth bass (total length 300-400 mm), catfish (total length 300 – 400 mm), brown bullhead (total length 300-400 mm), and crappie (total length 200-300 mm). The representative fish species for trophic level 3 shall be carp, hitch, Sacramento blackfish, black bullhead, and bluegill of all sizes; and brown bullhead and catfish of lengths less than the trophic level 4 lengths.

Fish tissue mercury concentrations are not expected to respond quickly to remediation activities at Sulphur Bank Mercury Mine, Clear Lake sediments, or the tributaries. Adult fish integrate methylmercury over a lifetime and load reduction efforts are not expected to be discernable for more than five years after remediation efforts. To assess remedial activities, part of the monitoring at Clear Lake will include indicator species, consisting of inland silversides and largemouth bass less than one year old, to be sampled every five years. Juveniles of these species will reflect recent exposure to methylmercury and can be indicators of mercury reduction efforts.Average concentrations of methylmercury by trophic level should be determined in a combination of the identified species collected throughout Clear Lake.

Total mercury in tributary sediment, lake sediment, and water will be monitored to determine whether loads have decreased. The water and sediment monitoring frequency will be every five years.

## 5.8.2    Cache Creek, Bear Creek, Harley Gulch, and Sulphur Creek

The Regional Water Board will use the following criteria to determine compliance with the methylmercury fish tissue objectives in Cache and Bear Creeks. Compliance with the respective objectives shall be determined based on fish tissue analysis in Cache Creek from Clear Lake to the Settling Basin, North Fork Cache Creek, and Bear Creek upstream and downstream of Sulphur Creek.

The representative fish species for each trophic level shall be:

- Trophic Level 3: green sunfish, bluegill, and/or Sacramento sucker (rainbow trout also an option for North Fork Cache Creek);
- Trophic Level 4: Sacramento pikeminnow, largemouth bass, smallmouth bass and/or channel catfish.

The sample sets will include at least two species from each trophic level (i.e., bass and Sacramento pikeminnow, for TL4) collected at each compliance point or stream section. The samples will include a range of sizes of fish between 250 and 350 mm, total length, with average length of 300 mm. If green sunfish and bluegill are not available in this size range; those sampled should be greater than 125 mm total length. If two species per trophic level are not available and are unlikely to be present given historical sampling information, one species is acceptable (the only TL4 species typically in North Fork is Sacramento pikeminnow).

Compliance with the Harley Gulch methylmercury water quality objective will be determined using hardhead, California roach, or other small (TL2/3), resident species in the size range of 75-100 mm total length.

Aqueous methylmercury goals are in the form of the annual, average concentration in unfiltered samples. For comparison of methylmercury concentration data with aqueous methylmercury goals, water samples are recommended to be collected periodically throughout the year and during typical flow conditions as they vary by season, rather than targeting extreme low or high flow events. Aqueous methylmercury data may be collected by Regional Water Board staff or required of project proponents.

Monitoring for mine cleanups or other projects that are expected to significantly affect methylmercury or mercury loads are recommended to include the following parameters. The data may be collected by Regional Water Board staff or required of project proponents.

- Monitoring parameters for soil and sediment: concentration of total mercury in soil or sediment in the silt/clay (<63 microns) fraction.
- Monitoring parameters for water: methylmercury (if project is methylmercury source), total mercury, total suspended solids, turbidity, and stream flow. Water sampling in major tributaries is recommended to include high flow events for mercury and total suspended solids. More frequent monitoring (two to four significant storm events for three consecutive years) is recommended after cleanup to evaluate the effectiveness of cleanup actions.
- Monitoring of mercury in suspended sediment: The ratio of concentrations of mercury in suspended sediment (Hg/TSS) is a useful measure of mercury contamination. Effectiveness of cleanup of the mines may be assessed by comparing concentration of mercury in fine-grained sediment discharging from the mines to the average concentration in background (not affected by mining activities) soil or sediment.

## 5.8.3    Delta

### 5.8.3.1    Fish Methylmercury Compliance Monitoring

The Regional Water Board will use the following specifications to determine compliance with the methylmercury fish tissue objectives in the Sacramento-San Joaquin Delta. Beginning 2025, Regional Water Board staff will initiate fish tissue monitoring. Thereafter compliance monitoring will ensue every ten years, more frequently as needed where substantial changes in methyl or total mercury concentrations or loading occur, but not to exceed ten years elsewhere.

Initial fish tissue monitoring will take place at the following compliance reaches in each subarea:
- Central Delta subarea: Middle River between Bullfrog Landing and Mildred Island;
- Marsh Creek subarea: Marsh Creek from Highway 4 to Cypress Road;
- Mokelumne/Cosumnes River subarea: Mokelumne River from the Interstate 5 bridge to New Hope Landing;
- Sacramento River subarea: Sacramento River from River Mile 40 to River Mile 44;
- San Joaquin River subarea: San Joaquin River from Vernalis to the Highway 120 bridge;
- West Delta subarea: Sacramento/San Joaquin River confluence near Sherman Island;
- Yolo Bypass-North subarea: Tule Canal downstream of its confluence with Cache Creek; and
- Yolo Bypass-South subarea: Toe Drain between Lisbon and Little Holland Tract.

Compliance fish methylmercury monitoring will include representative fish species for comparison to each of the methylmercury fish tissue objectives:
- Trophic Level 4: bass (largemouth and striped), channel and white catfish, crappie, and Sacramento pikeminnow.

- Trophic Level 3: American shad, black bullhead, bluegill, carp, Chinook salmon, redear sunfish, Sacramento blackfish, Sacramento sucker, and white sturgeon.
- Small (<50 mm) fish: primary prey species consumed by wildlife in the Delta, which may include the species listed above, as well as inland silverside, juvenile bluegill, mosquitofish, red shiner, threadfin shad, or other fish less than 50 mm.

Trophic level 3 and 4 fish sample sets will include three species from each trophic level and will include both anadromous and non-anadromous fish. Trophic level 3 and 4 fish sample sets will include a range of fish sizes between 150 and 500 mm total length. Striped bass, largemouth bass, and sturgeon caught for mercury analysis will be within the CDFW legal catch size limits. Sample sets for fish less than 50 mm will include at least two fish species that are the primary prey species consumed by wildlife at sensitive life stages. In any subarea, if multiple species for a particular trophic level are not available, one species in the sample set is acceptable.

### 5.8.3.2    Water Methylmercury and Total Mercury Compliance Monitoring

Compliance points for irrigated agriculture and managed wetlands methylmercury allocations shall be developed during the Phase 1 Control Studies.

In conjunction with the Phase 1 Control Studies, nonpoint sources, irrigated agriculture, and managed wetlands shall develop and implement mercury and/or methylmercury monitoring, and submit monitoring reports.

NPDES facilities' compliance points for methylmercury and total mercury monitoring are the effluent monitoring points currently described in individual NPDES permits.

During Phase 1 and Phase 2, facilities listed in Table 4-17 shall conduct effluent total mercury and methylmercury monitoring starting by 20 October 2012. Monitoring frequencies shall be defined in the NPDES permits. Effluent monitoring requirements will be re-evaluated during the Delta Mercury Control Program Reviews.

Facilities that begin discharging to surface water during Phase 1 and facilities for which effluent methylmercury data were not available at the time Table 4-17 was compiled, shall conduct monitoring.

Compliance points and monitoring frequencies for MS4s required to conduct methylmercury and total mercury monitoring are those locations and wet and dry weather sampling periods currently described in the individual MS4 NPDES permits or otherwise determined to be representative of the MS4 service areas and approved by the Executive Officer on an MS4-specific basis.

Annual methylmercury loads in urban runoff in MS4 service areas within the Delta and Yolo Bypass may be calculated by the following method or by an alternate method approved by the Executive Officer. The annual methylmercury load in urban runoff for a given MS4 service area during a given year may be calculated by the sum of wet weather and dry weather methylmercury loads. To estimate wet weather methylmercury loads discharged by MS4 urban areas, the average of wet weather methylmercury concentrations observed at the MS4's compliance locations may be multiplied by the wet weather runoff volume estimated for all urban areas within the MS4 service area within the Delta and Yolo Bypass. To estimate dry weather methylmercury loads, the average of dry weather methylmercury concentrations observed at the MS4's compliance locations may be multiplied by the estimated dry weather urban runoff volume in the MS4 service area within the Delta and Yolo Bypass.

## 5.9    DIAZINON AND CHLORPYRIFOS RUNOFF INTO THE SACRAMENTO AND FEATHER RIVERS

The Regional Water Board requires a focused monitoring effort of agricultural pesticide runoff into the Sacramento and Feather Rivers.

The monitoring and reporting program for any waste discharge requirements or waiver of waste discharge requirements that addresses agricultural pesticide runoff into the Sacramento and Feather Rivers must be designed to collect the information necessary to:

(1)    determine compliance with established water quality objectives and the loading capacity applicable to diazinon and chlorpyrifos in the Sacramento and Feather Rivers;

(2)    determine compliance with load allocations for diazinon and chlorpyrifos;

(3)    determine the degree of implementation of management practices to reduce off-site migration of diazinon and chlorpyrifos;

(4)    determine the effectiveness of management practices and strategies to reduce off-site migration of diazinon and chlorpyrifos;

(5)    determine whether alternatives to diazinon or chlorpyrifos are causing surface water quality impacts;

(6)    determine whether the discharge causes or contributes to a toxicity impairment due to additive or synergistic effects of multiple pollutants; and

(7)    demonstrate that management practices are achieving the lowest pesticide levels technically and economically achievable.

Dischargers are responsible for providing the necessary information. The information may come from the dischargers' monitoring efforts; monitoring programs conducted by State or federal agencies or collaborative watershed efforts; or from special studies that evaluate the effectiveness of management practices.

## 5.10    DIAZINON AND CHLORPYRIFOS RUNOFF IN THE SAN JOAQUIN RIVER BASIN

The Regional Water Board requires a focused monitoring effort of pesticide runoff from orchards and fields in the San Joaquin Valley.

The monitoring and reporting program for any waste discharge requirements or waiver of waste discharge requirements that addresses pesticide runoff from orchards and fields in the San Joaquin valley must be designed to collect the information necessary to:

(1)    determine compliance with established water quality objectives and the loading capacity applicable to diazinon and chlorpyrifos in the San Joaquin River;

(2)    determine compliance with established load allocations for diazinon and chlorpyrifos;

(3)     determine the degree of implementation of management practices to reduce off-site movement of diazinon and chlorpyrifos;

(4)     determine the effectiveness of management practices and strategies to reduce off-site migration of diazinon and chlorpyrifos;

(5)     determine whether alternatives to diazinon and chlorpyrifos are causing surface water quality impacts;

(6)     determine whether the discharge causes or contributes to a toxicity impairment due to additive or synergistic effects of multiple pollutants; and

(7)     demonstrate that management practices are achieving the lowest pesticide levels technically and economically achievable.

Dischargers are responsible for providing the necessary information. The information may come from the dischargers' monitoring efforts; monitoring programs conducted by State or federal agencies or collaborative watershed efforts; or from special studies that evaluate the effectiveness of management practices.

## 5.11  DIAZINON AND CHLORPYRIFOS RUNOFF INTO THE SACRAMENTO-SAN JOAQUIN DELTA WATERWAYS

The Regional Water Board requires a focused monitoring effort of pesticide runoff from orchards and fields discharging to the Sacramento-San Joaquin Delta Waterways (as identified in Appendix 42).

The monitoring and reporting program for any waste discharge requirements or waiver of waste discharge requirements that addresses pesticide runoff into the Delta Waterways must be designed to collect the information necessary to:

(1)     Determine compliance with established water quality objectives and loading capacity, applicable to diazinon and chlorpyrifos in the Delta Waterways.

(2)     Determine compliance with the load allocations applicable to discharges of diazinon and chlorpyrifos into the Delta Waterways.

(3)     Determine the degree of implementation of management practices to reduce off-site movement of diazinon and chlorpyrifos.

(4)     Determine the effectiveness of management practices and strategies to reduce off-site migration of diazinon and chlorpyrifos.

(5)     Determine whether alternatives to diazinon and chlorpyrifos are causing surface water quality impacts.

(6)     Determine whether the discharge causes or contributes to a toxicity impairment due to additive or synergistic effects of multiple pollutants.

(7)     Demonstrate that management practices are achieving the lowest pesticide levels technically and economically achievable.

Dischargers are responsible for providing the necessary information. The information may come from the dischargers' monitoring efforts; monitoring programs conducted by State or federal agencies or collaborative watershed efforts; or from special studies that evaluate the effectiveness of management practices.

With Regional Water Board Executive Officer approval, monitoring can be performed in a subset of the Delta Waterways listed in Appendix 42, and the tributaries of those waterways, to determine compliance with the water quality objectives, loading capacity and load allocations.

## 5.12  CLEAR LAKE NUTRIENTS

The responsible parties – Lake County, City of Clearlake, City of Lakeport, Caltrans, USBLM, USFS and irrigated agriculture – will work with Regional Water Board staff to estimate nutrient loadings from activities in the watershed. Loading estimates can be conducted using either water quality monitoring or computer modeling or a combination of the two.

## 5.13  DRINKING WATER POLICY

Monitoring and surveillance for the Drinking Water Policy consists of two elements.

### 5.13.1  *Cryptosporidium* and *Giardia* Monitoring

It is not the intent of the Drinking Water Policy to require routine effluent monitoring for *Cryptosporidium* and *Giardia*. Rather, the Regional Water Board should work with interested stakeholders to gather data that could be used to help identify potential sources if *Cryptosporidium* levels increase to the trigger level (in Chapter 4) at an existing public water system intake in the future. This one-time *Cryptosporidium* special study could be conducted through the Delta Regional Monitoring Program or through another coordinated effort between dischargers, drinking water suppliers, and state agencies. The study will characterize ambient background conditions and potential sources to be used when and if exceedance of a trigger occurs. The study is envisioned to last two years targeting the period of Long Term 2 Enhanced Surface Water Treatment Rule second round monitoring. The study may consist of the following elements:

- Literature review to identify available source information
- Continued monitoring at existing public water systems intakes
- Monitoring at several ambient locations that will be identified as sites that integrate the pathogen sources where historic pathogen data are unavailable
- Monitoring at several representative discharge locations, if representative pathogen concentrations are not available or if coordinated data are necessary
- Hydrodynamic and particle tracking models to simulate the transport of pathogens from potential sources to public water system intakes
- If needed, focused studies to identify the viability and fate and transport of *Cryptosporidium*.

A report documenting the results of the special study should be prepared.

## 5.13.2   Organic carbon, salinity, and nutrients

As waste discharge requirements are renewed, the Regional Water Board should consider the necessity for inclusion of monitoring of organic carbon, salinity, and nutrients. This consideration should include a combination of the following:

(1) The location with respect to drinking water intakes.

(2) The importance of the load based on available information.

(3) Whether the information exists that the load has significantly increased.

(4) Importance of data to management decisions to protect drinking water.

For general permits, agriculture and small dischargers (smaller than 5 mgd), careful consideration should be made as to whether monitoring for these constituents is necessary.

Where water quality monitoring is performed to evaluate management practices to control other constituents, the Regional Water Board recommends monitoring of organic carbon, salinity, and nutrients be considered to evaluate the influence on drinking water quality.

## 5.14   DIAZINON AND CHLORPYRIFOS DISCHARGES

The Central Valley Water Board will ensure that there will be a focused monitoring effort to monitor pesticide discharges in the Sacramento and San Joaquin River Basins.

The Board will require those that discharge diazinon and chlorpyrifos to provide information to the Board. This information may come from the dischargers' monitoring efforts; monitoring programs conducted by state or federal agencies or collaborative watershed efforts; or from special studies that evaluate the effectiveness of management practices. To be used in determining compliance with the water quality objectives, diazinon and chlorpyrifos concentration data must be from analysis with limits of quantification (reporting limits) at or below the water quality objective concentrations.

## 5.14.1   Agricultural Discharge Monitoring

The monitoring and reporting program for any waste discharge requirements or waiver of waste discharge requirements that address agricultural pesticide discharges to Table 3-4 Applicable Water Bodies must be designed to collect the information necessary to:

(1)     Determine compliance with established water quality objectives applicable to diazinon and/or chlorpyrifos;

(2)     Determine the extent of implementation of management practices to reduce off-site migration of diazinon and/or chlorpyrifos;

(3)     Determine the effectiveness of management practices and strategies to reduce off-site migration of diazinon and/or chlorpyrifos;

(4)     Determine whether alternatives to diazinon and/or chlorpyrifos are being discharged at concentrations which have the potential to cause or contribute to exceedances of applicable water quality objectives; and

(5)     Determine whether the discharge causes or contributes to a toxicity impairment due to additive or synergistic effects of multiple pollutants.

Representative monitoring may be used to determine compliance with the water quality objectives. Monitoring shall be representative of all Table 3-4 Applicable Water Bodies, either directly or through a representative monitoring program. Changes in monitoring requirements may be required if pesticide use data, management practices, runoff potential, or other information indicates additional or less monitoring, including discontinuation of monitoring for diazinon and/or chlorpyrifos is needed to meet the monitoring requirements.

## 5.14.2    Municipal Storm Water and Municipal and Domestic Wastewater Monitoring

The monitoring and reporting program for any waste discharge requirements that address discharges to Table 3-4 Applicable Water Bodies from
- municipal storm water
- municipal or domestic wastewater, or
- other non-agricultural sites where diazinon or chlorpyrifos are applied,

must be designed to collect the information necessary to:

(1)     Determine whether the discharge causes or contributes to an exceedance of water quality objectives for diazinon and/or chlorpyrifos;

(2)     Determine whether alternatives to diazinon and/or chlorpyrifos are being discharged at concentrations with the potential to cause or contribute to exceedances of water quality objectives. In determining if monitoring for alternatives to diazinon and/or chlorpyrifos is necessary, and to identify alternatives for which monitoring might be appropriate, the Board will consult and coordinate with DPR and will consider the commercial availability of analytical methods.

With Executive Officer approval, representative monitoring programs, including coordinated regional monitoring programs, may be used to meet the monitoring requirements listed above. Regular monitoring for diazinon and chlorpyrifos and alternatives to diazinon and chlorpyrifos can be discontinued upon a showing by a discharger that such pesticides are not found in the effluent at concentrations with the potential to cause or contribute to exceedances of water quality objectives.

## 5.15  SALT AND BORON DISCHARGES INTO THE LOWER SAN JOAQUIN RIVER

The amendments to the Basin Plan that established boron and electrical conductivity WQOs for discharges into the lower San Joaquin River (LSJR) between the mouth of the Merced River and the Airport Way Bridge near Vernalis were approved by the Regional Water Board in Resolution No. 88-195 and Resolution No. 2017-0062, incorporated herein. The Regional Water Board will review data collected at Crows Landing and Maze Road to determine compliance with the LSJR electrical conductivity WQOs and attainment of the Performance Goal. Daily

average electrical conductivity measurement calculations will be utilized to calculate the 30-day running average for WQO compliance and Performance Goal attainment. The Regional Water Board will review boron concentration data collected weekly at Crows Landing to determine if the monthly average or maximum boron WQOs are being exceeded. Should the boron objectives be exceeded at Crows Landing, boron analyses should be expanded to weekly sampling at Maze Road and the Airport Way Bridge near Vernalis. To evaluate changing loads into the system that may result from changing management activities and/or changes in hydrology, continuous flow monitoring is recommended in the river at Crows Landing, Maze Road and the Airport Way Bridge near Vernalis.

## 5.16  PYRETHROID PESTICIDES DISCHARGES

The Regional Water Board will require pyrethroid pesticides dischargers to provide information to the Board. This information may come from the dischargers' monitoring efforts; monitoring programs conducted by state or federal agencies or collaborative watershed efforts; or from special studies that evaluate the effectiveness of management practices. For dischargers that do not discharge to water bodies listed in Table 4-21 and Table 4-22, the Board will require baseline monitoring to be completed by 19 February 2021 and continued trend monitoring to occur after 19 February 2022, except for municipal and domestic wastewater dischargers, which is set forth below. The baseline and trend monitoring will be designed to meet the goals outlined for each discharger type below. The Regional Water Board will work through existing regulatory programs to ensure that the goals of the monitoring program are met. If the required timelines cannot be met through existing processes, the Executive Officer has the discretion to authorize 13267 and/or 13383 orders, and/or extend the timeline for baseline monitoring. With Executive Officer approval, representative monitoring programs, including coordinated regional or statewide monitoring programs, may be used to meet the monitoring requirements.

Pyrethroid monitoring plans must describe at a minimum the proposed sampling frequency, sampling locations, and toxicity test and analytical methods for baseline and/or trend monitoring and can be provided as part of other monitoring plans as appropriate. Pyrethroid monitoring plans shall be approved by the Executive Officer before the data can be used to meet the monitoring requirements of this section. If reliable commercial analytical methods are available with reporting limits at or below the pyrethroid pesticides numeric trigger concentrations in the matrix being monitored, those methods shall be considered by dischargers for monitoring of pyrethroid pesticides. Methods with reporting limits above the pyrethroid trigger concentrations may be used if methods with reporting limits at or below the pyrethroid trigger concentrations are not available or based on the consideration of other factors, such as cost or the reporting limit needed after the calculation of freely dissolved pyrethroid concentrations. When evaluating the toxicity test and analytical methods, the Executive Officer will consider Environmental Laboratory Accreditation Program (ELAP) accreditation, associated quality assurance and quality control provisions, scientifically peer reviewed methods, results of interlaboratory comparison studies, and/or other factors.

Changes in monitoring frequency may result if information such as pesticide use data, pesticide registration status, allowable pesticide uses, use restrictions, management practices, runoff potential, or other monitoring studies indicates additional or less monitoring is needed to meet the monitoring requirements, which may include discontinuation of pyrethroid pesticides monitoring. Monitoring for pyrethroid pesticides and alternative insecticides can be discontinued upon a discharger showing that the specific pesticide is not found, or is not reasonably expected to be found, in receiving waters at concentrations with the potential to exceed the pyrethroid wasteload allocations and/or Acute and Chronic Pyrethroid Triggers or levels of concern for alternative insecticides.

**5.16.1    Municipal Storm Water**

Pyrethroid monitoring plans that address municipal storm water discharges to TMDL water bodies (Table 4-21) shall be designed to collect information necessary to:

(1)    Determine whether receiving waters are attaining the Pyrethroid Pesticides Water Column Additivity Numeric Targets and whether the wasteload allocations are being attained in discharges as measured at representative receiving water locations by providing pyrethroid and dissolved and particulate organic carbon concentration data;

(2)    Determine whether bed sediments are attaining the Sediment Toxicity Numeric Target. In order to link sediment toxicity to pyrethroid pesticides, chemical analysis of the sediment for pyrethroid pesticides shall be performed if the sediment is toxic;

(3)    Provide *Hyalella azteca* toxicity test data to determine whether pyrethroid pesticides are causing or contributing to exceedances of the narrative water quality objective for toxicity in surface waters;

(4)    Determine whether the implementation of management practices is sufficient to attain the TMDL Allocations and Numeric Targets.

(5)    In cooperation with the Regional Water Board, USEPA and DPR, determine if monitoring and reporting programs for alternatives to pyrethroid pesticides are necessary and identify alternative insecticides for which monitoring might be appropriate with consideration of the commercial availability of acceptable analytical methods. If an alternative insecticide is identified as appropriate for monitoring, monitoring shall be performed by the discharger to determine whether alternatives to pyrethroid pesticides are being discharged at concentrations with the potential to cause or contribute to exceedances of applicable water quality objectives.

Pyrethroid monitoring for municipal storm water that does not discharge to TMDL water bodies (Table 4-21) shall include baseline monitoring and, if required, trend monitoring.

Baseline pyrethroids monitoring for municipal storm water discharges shall be designed to collect information necessary to:

(1)    Determine through representative receiving water monitoring whether discharges from municipal separate storm sewer systems are exceeding the Acute and Chronic Pyrethroid Triggers (Table 4-2) by providing pyrethroid and dissolved and particulate organic carbon concentration data;

(2)    Provide pyrethroid and dissolved and particulate organic carbon concentration data and *Hyalella azteca* toxicity test data to determine whether pyrethroid pesticides are causing or contributing to exceedances of the narrative water quality objective for toxicity in surface waters or bed sediments. With Executive Officer approval, the baseline monitoring requirements may be met by submittal of a report, including a compilation and interpretation of representative monitoring data, demonstrating that the required information has been collected and is sufficient to make the required determinations.

Pyrethroids trend monitoring for municipal storm water discharges shall be designed to collect information necessary to meet the above goals for the baseline monitoring, as well as:

(3)     Determine the effectiveness of management practices that are implemented to reduce pyrethroid levels in discharges;

(4)     In cooperation with the Regional Water Board, USEPA and DPR, determine if monitoring and reporting programs for alternatives to pyrethroid pesticides are necessary and identify alternative insecticides for which monitoring might be appropriate with consideration of the commercial availability of acceptable analytical methods. If an alternative insecticide is identified as appropriate for monitoring, monitoring shall be performed by the discharger to determine whether alternatives to pyrethroid pesticides are being discharged at concentrations with the potential to cause or contribute to exceedances of applicable water quality objectives.

### 5.16.2    Discharges from Agricultural Operations

The pyrethroid monitoring plans that address agricultural discharges to water bodies named in Table 4-22 shall be representative of those water bodies and designed to collect information necessary to:

(1)     Determine whether receiving waters are attaining the Acute and Chronic Pyrethroid Triggers (Table 4-2) by providing pyrethroid and dissolved and particulate organic carbon concentration data;

(2)     Determine whether receiving waters and bed sediments are attaining the narrative water quality objective for toxicity by providing *Hyalella azteca* toxicity test data;

(3)     Determine whether the implementation of management practices is sufficient to attain the Acute and Chronic Pyrethroid Triggers (Table 4-2) in receiving waters.

(4)     Determine whether alternatives to pyrethroid pesticides are being discharged at concentrations that have the potential to cause or contribute to exceedances of applicable water quality objectives.

Pyrethroid monitoring for agricultural discharges that do not discharge to water bodies named in Table 4-22 shall include baseline monitoring and, if required, trend monitoring.

Baseline pyrethroids monitoring for agricultural discharges shall be designed to collect information necessary to:

(1)     Determine through representative receiving water monitoring whether discharges from agricultural operations are exceeding the Acute and Chronic Pyrethroid Triggers (Table 4-2) by providing pyrethroid and dissolved and particulate organic carbon concentration data;

(2)     Determine whether pyrethroid pesticides are causing or contributing to exceedances of the narrative water quality objective for toxicity in surface waters or bed sediments by providing *Hyalella azteca* toxicity test data.

Pyrethroids trend monitoring for agricultural discharges shall be designed to collect information necessary to meet the above goals for the baseline monitoring, as well as:

(3) Determine the extent of implementation of management practices to reduce off-site movement of pyrethroid pesticides and whether these practices are sufficient to attain the Acute and Chronic Pyrethroid Triggers;

(4) Determine whether alternatives to pyrethroid pesticides are being discharged at concentrations that have the potential to cause or contribute to exceedances of applicable water quality objectives.

### 5.16.3    Municipal and Domestic Wastewater

The monitoring requirements discussed in this section do not apply to facilities that discharge <1 million gallons per day unless requested by the Executive Officer. For all other municipal and domestic wastewater dischargers, monitoring for pyrethroid pesticides will be required concurrently with effluent characterization monitoring at least as long as pyrethroid pesticides specified in Table 4-2 are registered for use in the collection service area or at the discretion of the Executive Officer.

Baseline pyrethroids monitoring for municipal or domestic wastewater discharges shall be conducted concurrently with effluent characterization monitoring and shall be designed to collect information necessary to:

(1) Determine whether pyrethroid concentrations in municipal or domestic wastewater discharges are exceeding Acute and Chronic Pyrethroid Triggers (Table 4-2) by providing pyrethroid and dissolved and particulate organic carbon concentration data;

(2) Provide pyrethroid and dissolved and particulate organic carbon concentration data and *Hyalella azteca* toxicity test data to determine whether municipal or domestic wastewater discharges of pyrethroids are causing or contributing to exceedances of the narrative water quality objective for toxicity in receiving waters;

Pyrethroids trend monitoring for municipal or domestic wastewater discharges shall commence after the effluent characterization monitoring has been completed or after being directed to start such monitoring by the Executive Officer. The trend monitoring and reporting program shall be designed to collect information necessary to meet the above goals for the baseline monitoring, as well as:

(3) Determine the effectiveness of management practices that are implemented to reduce pyrethroid levels in discharges;

(4) In cooperation with the Regional Water Board, USEPA, and DPR, determine if monitoring and reporting for alternatives to pyrethroid pesticides is necessary and identify alternative insecticides for which monitoring might be appropriate with consideration of the commercial availability of acceptable analytical methods. If an alternative insecticide is identified as appropriate for monitoring, monitoring shall be performed by the discharger to determine whether alternatives to pyrethroid pesticides are being discharged at concentrations with the potential to cause or contribute to exceedances of applicable water quality objective.

# 6  GLOSSARY

Regional Water Board: California Regional Water Quality Control Board, Central Valley Region (Wat. Code, § 13203)

State Water Board: State Water Resources Control Board

# A P P E N D I X

# APPENDIX DIRECTORY

ITEM*                                                    DESCRIPTION

1.      State Water Board Policy for Water Quality Control

2.      State Water Board Resolution No. 68-16, Statement of Policy with Respect to Maintaining High Quality of Waters in California

3.      State Water Board Resolution No. 74-43, Water Quality Control Policy for the Enclosed Bays and Estuaries of California

4.      State Water Board Resolution No. 75-58, Water Quality Control Policy on the Use and Disposal of Inland Waters Used for Powerplant Cooling

5.      State Water Board Resolution No. 77-1, Policy with Respect to Water Reclamation in California

6.      State Water Board Resolution No. 87-22, Policy on the Disposal of Shredder Waste

7.      State Water Board Resolution No. 88-23, Policy Regarding the Underground Storage Tank Pilot Program

8.      State Water Board Resolution No. 88-63, Sources of Drinking Water Policy

9.      State Water Board Resolution No. 92-49, Policies and Procedures for Investigation and Cleanup and Abatement of Discharges Under Water Code Section 13304

10.     State Water Board Resolution No. 93-62, Policy for Regulation of Discharges of Municipal Solid Waste

11.     State Water Board Water Quality Control Plan for Temperature in Coastal and Inerstate Waters and Enclosed Bays and Estuaries in California (Thermal Plan)

12.     State Water Board Resolution No. 92-82, exception to the Thermal Plan for Sacramento Regional County Sanitation District

13.     State Water Board MAA with Forest Service, U. S. Department of Agriculture

14.     State Water Board MOA with Department of Health Services (later renamed the Department of Public Health) (implementation of hazardous waste program)

15.     State Water Board MOA with Department of Health Services (later renamed State Water Board Division of Drinking Water Programs) (use of reclaimed water)

16.     State Water Board MAA with the Board of Forestry and California Department of Forestry and Fire Protection

* Appendix items are paginated by: item number/item page/item total pages

# APPENDIX DIRECTORY

ITEM*                                                    DESCRIPTION

17.    State Water Board MOA with CA Department of Conservation, Division of Oil and Gas

18.    State Water Board MOU with Department of Health Services/Department of Toxic Substances Control (later the Department of Health Services was renamed the Department of Public Health and the Toxic Substances Control Program was reorganized into the Department of Toxic Substances Control)

19.    State Water Board MOU with Soil Conservation Service, U.S. Department of Agriculture for Planning and Technical Assistance Related to Water Quality Policies   and Activities

20.    State Water Board MOU with the Environmental Affairs Agency, Air Resources Board, and California Integrated Waste Management Board

21.    State Water Board MOU with the California Department of Pesticide Regulation for    the Protection of Water Quality from Potentially Adverse Effects of Pesticides

22.    State Water Board MOU with Several Agencies Regarding the Implementation of the  San Joaquin Valley Drainage Program's Recommended Plan

23.    State Water Board MOU with the California Integrated Waste Management Board

24.    State Water Board MOU with the Bureau of Land Management US Department of Interior - Nonpoint Source Issues, Planning and Coordination of Nonpoint Source Water Quality Policies and Activities

25.    Regional Water Board Resolution No. 70-118, Delegation of Certain Duties and Powers of the Regional Water Board to the Board's Executive Officer

26.    Regional Water Board MOU with U.S. Bureau of Land Management (Ukiah District)

27.    Regional Water Board MOU with U.S. Bureau of Land Management (Susanville District)

28.    Regional Water Board MOU with U.S. Bureau of Land Management (Bakersfield District)

29.    Regional Water Board MOA with U. S. Bureau of Reclamation

30.    Regional Water Board MOU with California Dept. of Fish and Game (later renamed the California Dept. of Fish and Wildlife) and Mosquito Abatement and Vector Control Districts of the South San Joaquin Valley Regarding Vegetation Management in Wastewater Treatment Facilities

* Appendix items are paginated by: item number/item page/item total pages

# APPENDIX DIRECTORY

<u>ITEM</u>*                                    <u>DESCRIPTION</u>

31.    ~~Regional Water Board Resolution No. 89-247, Conditional Waiver of Waste Discharge Requirements at Retail Fertilizer Facilities~~ - - -
Removed 13 August 2009

32.    ~~Regional Water Board Resolution No. 90-34, Conditional Waiver of Waste Discharge Requirements at Pesticide Applicator Facilities~~ - - -
Removed 13 August 2009

33.    Regional Water Board Guidelines for Winery Waste

34.    Regional Water Board Guidelines for Erosion

35.    Regional Water Board Guidelines for Small Hydroelectric Facilities

36.    ~~Regional Water Board Guidelines for Disposal from Land Developments~~ - - -
Removed 27 March 2014

37.    Regional Water Board Guidelines for Mining

38.    ~~Regional Water Board list of Water Quality Limited Segments~~ - - -
Removed 6 September 2002

39.    Federal Anti-degradation policy (40 CFR 131.12)

40.    Grassland Watershed Wetland Channels

41.    San Joaquin Area Subarea Descriptions

42.    Sacramento-San Joaquin Delta Waterways

43.    Delta and Yolo Bypass Waterways Applicable to the Delta Mercury Control Program

44.    Water Bodies That Meet One or More of the Sources of Drinking Water Policy (Resolution 88-63) Exceptions

* Appendix items are paginated by: item number/item page/item total pages

CALIFORNIA STATE WATER RESOURCES CONTROL BOARD

STATE POLICY FOR
WATER QUALITY CONTROL

I.   FOREWORD

To assure a comprehensive statewide program of water
quality control, the California Legislature by its adoption
of the Porter-Cologne Water Quality Control Act in 1969 set
forth the following statewide policy:

The people of the state have a primary interest
in the conservation, control, and utilization of the
water resources, and the quality of all the waters
shall be protected for use and enjoyment.

Activities and factors which may affect the
quality of the waters shall be regulated to attain
the highest water quality which is reasonable, con-
sidering all demands being made and to be made on
those waters and the total values involved, beneficial
and detrimental, economic and social, tangible and
intangible.

The health, safety, and welfare of the people
requires that there be a statewide program for the
control of the quality of all the waters of the state.
The state must be prepared to exercise its full power
and jurisdiction to protect the quality of waters from
degradation.

The waters of the state are increasingly influenced
by interbasin water development projects and other state-
wide considerations.  Factors of precipitation, topography,
population, recreation, agriculture, industry, and eco-
nomic development vary from region to region.  The state-
wide program for water quality control can be most effec-
tively administered regionally, within a framework of
statewide coordination and policy.

To carry out this policy, the Legislature established the
State Water Resources Control Board and nine California Regional
Water Quality Control Boards as the principal state agencies
with primary responsibilities for the coordination and control
of water quality.  The State Board is required pursuant to
legislative directives set forth in the California Water Code
(Division 7, Chapter 3, Article 3, Sections 13140 Ibid) to
formulate and adopt state policy for water quality control
consisting of all or any of the following:

Adopted by the State Water Resources Control Board by
motion of July 6, 1972.

State Policy for
Water Quality Control

I. (continued)

Water quality principles and guidelines for long-range resource planning, including groundwater and surface water management programs and control and use of reclaimed water.

Water quality objectives at key locations for planning and operation of water resource development projects and for water quality control activities.

Other principles and guidelines deemed essential by the State Board for water quality control.

## II.  GENERAL PRINCIPLES

The State Water Resources Control Board hereby finds and declares that protection of the quality of the waters of the State for use and enjoyment by the people of the State requires implementation of water resources management programs which will conform to the following general principles:

1. Water rights and water quality control decisions must assure protection of available fresh water and marine water resources for maximum beneficial use.

2. Municipal, agricultural, and industrial wastewaters must be considered as a potential integral part of the total available fresh water resource.

3. Coordinated management of water supplies and wastewaters on a regional basis must be promoted to achieve efficient utilization of water.

4. Efficient wastewater management is dependent upon a balanced program of source control of environmentally hazardous substances[1], treatment of wastewaters, reuse of reclaimed water, and proper disposal of effluents and residuals.

5. **Substances not amenable to removal by treatment systems presently available or planned for the immediate future must be prevented from entering sewer systems**

---

[1] Those substances which are harmful or potentially harmful even in extremely small concentration to man, animals, or plants because of biological concentration, acute or chronic toxicity, or other phenomenon.

State Policy for
Water Quality Control

II. 5. (continued)

in quantities which would be harmful to the aquatic
environment, adversely affect beneficial uses of
water, or affect treatment plant operation.
Persons responsible for the management of waste
collection, treatment, and disposal systems must
actively pursue the implementation of their objec-
tive of source control for environmentally hazardous
substances. Such substances must be disposed of
such that environmental damage does not result.

6. Wastewater treatment systems must provide sufficient
removal of environmentally hazardous substances which
cannot be controlled at the source to assure against
adverse effects on beneficial uses and aquatic
communities.

7. Wastewater collection and treatment facilities must
be consolidated in all cases where feasible and
desirable to implement sound water quality manage-
ment programs based upon long-range economic and
water quality benefits to an entire basin.

8. Institutional and financial programs for implementa-
tion of consolidated wastewater management systems
must be tailored to serve each particular area in an
equitable manner.

9. Wastewater reclamation and reuse systems which assure
maximum benefit from available fresh water resources
shall be encouraged. Reclamation systems must be an
appropriate integral part of the long-range solution
to the water resources needs of an area and incor-
porate provisions for salinity control and disposal
of nonreclaimable residues.

10. Wastewater management systems must be designed and
operated to achieve maximum long-term benefit from
the funds expended.

11. Water quality control must be based upon latest scien-
tific findings. Criteria must be continually refined
as additional knowledge becomes available.

12. Monitoring programs must be provided to determine the
effects of discharges on all beneficial water uses
including effects on aquatic life and its diversity
and seasonal fluctuations.

State Policy for
Water Quality Control

III.   PROGRAM OF IMPLEMENTATION

Water quality control plans and waste discharge require-
ments hereafter adopted by the State and Regional Boards under
Division 7 of the California Water Code shall conform to this
policy.

This policy and subsequent State plans will guide the
regulatory, planning, and financial assistance programs of
the State and Regional Boards.  Specifically, they will (1)
supersede any regional water quality control plans for the
same waters to the extent of any conflict, (2) provide a basis
for establishing or revising waste discharge requirements when
such action is indicated, and (3) provide general guidance for
the development of basin plans.

Water quality control plans adopted by the State Board
will include minimum requirements for effluent quality and may
specifically define the maximum constituent levels acceptable
for discharge to various waters of the State.  The minimum
effluent requirements will allow discretion in the application
of the latest available technology in the design and operation
of wastewater treatment systems.  Any treatment system which
provides secondary treatment, as defined by the specific minimum
requirements for effluent quality, will be considered as pro-
viding the minimum acceptable level of treatment.  Advanced
treatment systems will be required where necessary to meet water
quality objectives.

Departures from this policy and water quality control plans
adopted by the State Board may be desirable for certain indi-
vidual cases.  Exceptions to the specific provisions may be
permitted within the broad framework of well established goals
and water quality objectives.

1/4/4

Appendix 2

State Water Board Resolution No. 68-16
Statement of Policy with Respect to Maintaining High Quality of
Waters in California

https://www.waterboards.ca.gov/board_decisions/adopted_orders/resolutions/1968/rs68_016.pdf

State of California
The Resources Agency

## STATE WATER RESOURCES CONTROL BOARD

WATER QUALITY CONTROL POLICY

FOR THE

ENCLOSED BAYS AND ESTUARIES OF CALIFORNIA

MAY 1974

TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . | 1 |
| CHAPTER I . . . . . . . . . . . . . . . . . . . . . | 2 |
|    Principles for Management of Water Quality in Enclosed Bays and Estuaries | |
| CHAPTER II . . . . . . . . . . . . . . . . . . . . | 6 |
|    Quality Requirements for Waste Discharges | |
| CHAPTER III . . . . . . . . . . . . . . . . . . . . | 7 |
|    Discharge Prohibitions | |
| CHAPTER IV . . . . . . . . . . . . . . . . . . . | 8 |
|    General Provisions | |
| FOOTNOTES . . . . . . . . . . . . . . . . . . . . | 11 |
| RESOLUTION NO. 74-43. . . . . . . . . . . . . . . . | 13 |
| APPENDIX A | |
|    Analysis of Testimony and Written Comments to the State Board* | |

_____

\* To be furnished upon request.

3/2/16

## WATER QUALITY CONTROL POLICY
### FOR THE ENCLOSED
### BAYS AND ESTUARIES OF CALIFORNIA[1]

INTRODUCTION

The purpose of this policy is to provide water quality principles and guidelines to prevent water quality degradation and to protect the beneficial uses of waters of enclosed bays and estuaries.  Decisions on water quality control plans, waste discharge requirements, construction grant projects, water rights permits, and other specific water quality control implementing actions of the State and Regional Boards shall be consistent with the provisions of this policy.

The Board declares its intent to determine from time to time the need for revising this policy.

This policy does not apply to wastes from vessels or land runoff except as specifically indicated for siltation (Chapter III 4.) and combined sewer flows (Chapter III 7.).

CHAPTER I.

PRINCIPLES FOR MANAGEMENT OF
WATER QUALITY IN ENCLOSED BAYS AND ESTUARIES

A.  It is the policy of the State Board that the discharge of municipal wastewaters and industrial process waters[2] (exclusive of cooling water discharges) to enclosed bays and estuaries, other than the San Francisco Bay-Delta system, shall be phased out at the earliest practicable date.  Exceptions to this provision may be granted by a Regional Board only when the Regional Board finds that the wastewater in question would consistently be treated and discharged in such a manner that it would enhance the quality of receiving waters above that which would occur in the absence of the discharge. [3]

B.  With regard to the waters of the San Francisco Bay-Delta system, the State Board finds and directs as follows:

   la.  There is a considerable body of scientific evidence and opinion which suggests the existence of biological degradation due to long-term exposure to toxicants which have been discharged to the San Francisco Bay-Delta system.  Therefore, implementation of a program which controls toxic effects through a combination of source control for toxic materials, upgraded wastewater treatment, and improved dilution of wastewaters, shall proceed as rapidly as is practicable with the objective of providing full protection to the biota and the beneficial uses of Bay-Delta waters in a cost-effective manner.

3/4/16

1b.  A comprehensive understanding of the biological
effects of wastewater discharge on San Francisco
Bay, as a whole, must await the results of
further scientific study.  There is, however,
sufficient evidence at this time to indicate
that the continuation of wastewater discharges
to the southern reach of San Francisco Bay,
south of the Dumbarton Bridge, is an unacceptable con-
dition.  The State Board and the San Francisco Regional
Board shall take such action as is necessary to assure
the elimination of wastewater discharges to waters
of the San Francisco Bay, south of Dumbarton
Bridge, at the earliest practicable date.

1c.  In order to prevent excessive investment which
would unduly impact the limited funds available
to California for construction of publicly owned
treatment works, construction of such works shall
proceed in a staged fashion, and each stage shall
be fully evaluated by the State and Regional Boards
to determine the necessity for additional expen-
ditures.  Monitoring requirements shall be estab-
lished to evaluate any effects on water quality,
particularly changes in species diversity
and abundance, which may result from the
operation of each stage of planned facilities

3/5/16

and source control programs.  Such a staged construction program, in combination with an increased monitoring effort, will result in the most cost-effective and rapid progress toward a goal of maintaining and enhancing water quality in the San Francisco Bay-Delta system.

2.  Where a waste discharger has an alternative of in-bay or ocean disposal and where both alternatives offer a similar degree of environmental and public health protection, prime consideration shall be given to the alternative which offers the greater degree of flexibility for the implementation of economically feasible wastewater reclamation options.

\`. The following policies apply to all of California's enclosed bays and estuaries:

1. Persistent or cumulative toxic substances shall be removed from the waste to the maximum extent practicable through source control or adequate treatment prior to discharge.

2. Bay or estuarine outfall and diffuser systems shall be designed to achieve the most rapid initial dilution[4/] practicable to minimize concentrations of substances not removed by source control or treatment.

3. Wastes shall not be discharged into or adjacent to areas where the protection of beneficial uses requires spatial separation from waste fields.

4. Waste discharges shall not cause a blockage of zones of passage required for the migration of anadromous fish.

5. Nonpoint sources of pollutants shall be controlled to the maximum practicable extent.

## CHAPTER II.

### QUALITY REQUIREMENTS FOR
### WASTE DISCHARGES

1. In addition to any requirements of this policy, effluent limitations shall be as specified pursuant to Chapter 5.5 of the Porter-Cologne Water Quality Control Act, and Regional Boards shall limit the mass emissions of substances as necessary to meet such limitations.  Regional Boards may set more restrictive mass emission rates and concentration standards than those which are referenced in this policy to reflect dissimilar tolerances to wastewater constituents among different receiving water bodies.

2. All dischargers of thermal wastes or elevated temperature wastes to enclosed bays and estuaries which are permitted pursuant to this policy shall comply with the "Water Quality Control Plan for Control of Temperature in the Coastal and Interstate Waters and Enclosed Bays and Estuaries of Califonia", State Water Resources Control Board, 1972, and with amendments and supplements thereto.

3. Radiological limits for waste discharges (for which regulatory responsibility is not preempted by the Federal Government) shall be at least as restrictive as limitations indicated in Section 30269, and Section 30355, Appendix A, Table II, of the California Administrative Code.

4. Dredge spoils to be disposed of in bay and estuarine waters must comply with federal criteria for determining the acceptability of dredged spoils to marine waters, and must be certified by the State Board or Regional Boards as in compliance with State Plans and Policies.

3/8/16

# CHAPTER III.

## DISCHARGE PROHIBITIONS

1. New discharges[5/] of municipal wastewaters and industrial process waters[2/] (exclusive of cooling water discharges) to enclosed bays and estuaries, other than the San Francisco Bay-Delta system, which are not consistently treated and discharged in a manner that would enhance the quality of receiving waters above that which would occur in the absence of the discharge, shall be prohibited.

2. The discharge of municipal and industrial waste sludge and untreated sludge digester supernatant, centrate, or filtrate to enclosed bays and estuaries shall be prohibited.

3. The deposition of rubbish or refuse into surface waters or at any place where they would be eventually transported to enclosed bays or estuaries shall be prohibited.[6/]

4. The direct or indirect discharge of silt, sand, soil clay, or other earthen materials from onshore operations including mining, construction, agriculture, and lumbering, in quantities which unreasonably affect or threaten to affect beneficial uses shall be prohibited.

5. The discharge of materials of petroleum origin in sufficient quantities to be visible or in violation of waste discharge requirements shall be prohibited, except when such discharges are conducted for scientific purposes.  Such testing must be approved by the Executive Officer of the Regional Board and the Department of Fish and Game.

6. The discharge of any radiological, chemical, or biological warfare agent or high-level radioactive waste shall be prohibited.

7. The discharge or by-passing of untreated waste to bays and estuaries shall be prohibited.[7/]

3/9/16

CHAPTER IV.

GENERAL PROVISIONS

A. <u>Effective Date</u>

This policy is in effect as of the date of adoption by the State Water Resources Control Board.

B. <u>Review and Revision of Plans, Policies and Waste Discharge Requirements</u>

Provisions of existing or proposed policies or water quality control plans adopted by the State or Regional Boards for enclosed bays or estuaries shall be amended to conform with the applicable provisions of this policy.

Each appropriate Regional Board shall review and revise the waste discharge requirements with appropriate time schedules for existing discharges to achieve compliance with this policy and applicable water quality objectives.  Each Regional Board affected by this policy shall set forth for each discharge allowable mass emission rates for each applicable effluent characteristic included in waste discharge requirements.

Regional Boards shall finalize waste discharge requirements as rapidly as is consistent with the National Pollutant Discharge Elimination System Permit Program.

C.  <u>Administration of Clean Water Grants Program</u>

The Clean Water Grants Program shall require that the environmental impact report for any existing or proposed wastewater discharge to enclosed bays and estuaries, other than the San Francisco Bay-Delta system, shall evaluate whether or not the discharge would enhance the quality of receiving waters above that which would occur in the absence of the discharge.

The Clean Water Grants Program shall require that each study plan and project report (beginning with F. Y. 1974-75 projects) for a proposed wastewater treatment or conveyance facility within the San Francisco Bay-Delta system shall contain an evaluation of the degree to which the proposed project represents a necessary and cost-effective stage in a program leading to compliance with an objective of full protection of the biota and beneficial uses of Bay-Delta waters.

D.  <u>Administration of Water Rights</u>

Any applicant for a permit to appropriate from a watercourse which is tributary to an enclosed bay or estuary may be required to present to the State Board an analysis of the anticipated effects of the proposed appropriation on water quality and beneficial uses of the effected bay or estuary.

E.  <u>Monitoring Program</u>

The Regional Board shall require dischargers to conduct self-monitoring programs and submit reports as necessary to determine compliance with waste discharge requirements and to evaluate the effectiveness of wastewater control programs. Such monitoring programs shall comply with applicable sections of the State Board's Administrative Procedures, and any additional guidelines which may be issued by the Executive Officer of the State Board.

## FOOTNOTES

1/  Enclosed bays are indentations along the coast which enclose an area of oceanic water within distinct headlands or harbor works.  Enclosed bays include all bays where the narrowest distance between headlands or outer most harbor works is less than 75 percent of the greatest dimension of the enclosed portion of the bay.  This definition includes, but is not limited to:  Humboldt Bay, Bodega Harbor, Tomales Bay, Drakes Estero, San Francisco Bay, Morro Bay, Los Angeles-Long Beach Harbor, Upper and Lower Newport Bay, Mission Bay, and San Diego Bay.

Estuaries, including coastal lagoons, are waters at the mouths of streams which serve as mixing zones for fresh and ocean waters.
Mouths of streams which are temporarily separated from the ocean by sandbars shall be considered as estuaries.
Estuarine waters will generally be considered to extend from a bay or the open ocean to a point upstream where there is no significant mixing of fresh water and seawater.
Estuarine waters shall be considered to extend seaward if significant mixing of fresh and saltwater occurs in the open coastal waters.  Estuarine waters include, but are not limited to, the Sacramento-San Joaquin Delta, as defined by Section 12220 of the California Water Code, Suisun Bay, Carquinez Strait downstream to Carquinez Bridge, and appropriate areas of the Smith, Klamath, Mad, Eel, Noyo, and Russian Rivers.

2/  For the purpose of this policy, treated ballast waters and innocuous nonmunicipal wastewater such as clear brines, wash-water, and pool drains are not necessarily considered industrial process wastes, and may be allowed by Regional Boards under discharge requirements that provide protection to the beneficial uses of the receiving water.

3/  Undiluted wastewaters covered under this exception provision shall not produce less than 90 percent survival, 50 percent of the time, and not less than 70 percent survival, 10 percent of the time of a standard test species in a 96-hour static or continuous flow bioassay test using undiluted waste.  Maintenance of these levels of survival shall not by themselves constitute sufficient evidence that the discharge satisfies the criteria of enhancing the quality of the receiving water above that which occur in the absence of the discharge.  Full and uninterrupted protection for the beneficial uses of the receiving water must be maintained.  A Regional Board may require physical, chemical, bioassay, and bacteriological assessment of treated wastewater quality prior to authorizing release to the bay or estuary of concern.

4/  Initial dilution zone is defined as the volume of water near the point of discharge within which the waste immediately mixes with the bay or estuarine water due to the momentum of the waste discharge and the difference in density between the waste and receiving water.

5/  A new discharge is a discharge for which a Regional Board has not received a report of waste discharge prior to the date of adoption of this policy, and which was not in existence prior to the date of adoption of this policy.

6/  Rubbish and refuse include any cans, bottles, paper, plastic, vegetable matter, or dead animals or dead fish deposited or caused to be deposited by man.

7/  The prohibition does not apply to cooling water streams which comply with the "Water Quality Control Plan for the Control of Temperature in Coastal and Interstate Waters and Enclosed Bays and Estuaries of California" – State Water Resources Control Board.

STATE WATER RESOURCES CONTROL BOARD
RESOLUTION NO. 74-43

WATER QUALITY CONTROL POLICY FOR THE
ENCLOSED BAYS AND ESTUARIES OF CALIFORNIA

**WHEREAS:**

1.  The Board finds it necessary to promulgate water quality principles, guidelines, effluent quality requirements, and prohibitions to govern the disposal of waste into the enclosed bays and estuaries of California;

2.  The Board, after review and analysis of testimony received at public hearings, has determined that it is both feasible and desirable to require that the discharge of municipal wastewaters and industrial process waters to enclosed bays and estuaries (other than the San Francisco Bay-Delta system) should only be allowed when a discharge enhances the quality of the receiving water above that which would occur in the absence of the discharge;

3.  The Board has previously promulgated requirements for the discharge of thermal and elevated temperature wastes to enclosed bays and estuaries (Water Quality Control Plan for Control of Temperature in the Coastal and Interstate Waters and Enclosed Bays and Estuaries of California - SWRCB, 1972);

4.  The Board, after review and analysis of testimony received at public hearings, has determined that implementation of a program which controls toxic effects through a combination of source control for toxic materials, upgraded waste treatment, and improved dilution of wastewaters, will result in timely and cost-effective progress toward an objective of providing full protection to the biota and beneficial uses of San Francisco Bay-Delta waters;

5.  The Board intends to implement monitoring programs to determine the effects of source control programs, upgraded treatment, and improved dispersion of wastewaters on the condition of the biota and beneficial uses of San Francisco Bay-Delta waters.

**THEREFORE, BE IT RESOLVED, that**

1.  **The Board hereby adopts the "Water Quality Control Policy for the Enclosed Bays and Estuaries of California".**

2.  **The Board hereby directs all affected California Regional Water Quality Control Boards to implement the provisions of the policy.**

3/15/16

3.  The Board hereby declares its intent to determine from time
    to time the need for revising the policy to assure that it
    reflects current knowledge of water quality objectives
    necessary to protect beneficial uses of bay and estuarine
    waters and that it is based on latest technological improvements.

## CERTIFICATION

The undersigned, Executive Officer of the State Water Resources
Control Board, does hereby certify that the foregoing is a full,
true, and correct copy of a resolution duly and regularly adopted
at a meeting of the State Water Resources Control Board held on
May 16, 1974.

*Bill B. Dendy*

**Bill B. Dendy**
**Executive Officer**

Appendix 4

State Water Board Resolution No. 75-58
Water Quality Control Policy on the Use and Disposal of Inland
Waters Used for Powerplant Cooling

https://www.waterboards.ca.gov/board_decisions/adopted_orders/resolutions/1975/rs75_058.pdf

Appendix 5

State Water Board Resolution No. 77-1
Policy with Respect to Water Reclamation in California

https://www.waterboards.ca.gov/board_decisions/adopted_orders/resolutions/1977/rs77_001.pdf

Appendix 6

State Water Board Resolution No. 87-22
Policy on the Disposal of Shredder Waste

https://www.waterboards.ca.gov/board_decisions/adopted_orders/resolutions/1987/rs1987_0022.pdf

Appendix 7

State Water Board Resolution No. 88-23
Policy Regarding the Underground Storage Tank Pilot Program

https://www.waterboards.ca.gov/board_decisions/adopted_orders/resolutions/1988/rs1988_0023.pdf

Appendix 8

State Water Board Resolution No. 88-63
Sources of Drinking Water Policy

https://www.waterboards.ca.gov/board_decisions/adopted_orders/resolutions/2006/rs2006_0008_rev_rs88_63.pdf

STATE WATER RESOURCES CONTROL BOARD
RESOLUTION NO. 92-49
(As Amended on April 21, 1994)

POLICIES AND PROCEDURES
FOR INVESTIGATION AND
CLEANUP AND ABATEMENT OF
DISCHARGES UNDER WATER CODE
SECTION 13304

WHEREAS:

1. California Water Code (**WC**) Section 13001 provides that it is the intent of the Legislature that the State Water Resources Control Board (**State Water Board**) and each Regional Water Quality Control Board (**Regional Water Board**) shall be the principal state agencies with primary responsibility for the coordination and control of water quality. The State and Regional Water Boards shall conform to and implement the policies of the Porter-Cologne Water Quality Control Act (Division 7, commencing with WC Section 13000) and shall coordinate their respective activities so as to achieve a unified and effective water quality control program in the state;

2. WC Section 13140 provides that the State Water Board shall formulate and adopt State Policy for Water Quality Control;

3. WC Section 13240 provides that Water Quality Control Plans shall conform to any State Policy for Water Quality Control;

4. WC Section 13304 requires that any person who has discharged or discharges waste into waters of the state in violation of any waste discharge requirement or other order or prohibition issued by a Regional Water Board or the State Water Board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance may be required to clean up the discharge and abate the effects thereof. This section authorizes Regional Water Boards to require complete cleanup of all waste discharged and restoration of affected water to background conditions (i.e., the water quality that existed before the discharge). The term waste discharge requirements includes those which implement the National Pollutant Discharge Elimination System;

5. WC Section 13307 provides that the State Water Board shall establish policies and procedures that its representatives and the representatives of the Regional Water Boards shall follow for the oversight of investigations and cleanup and abatement activities resulting from discharges of hazardous substances, including:

   a. The procedures the State Water Board and the Regional Water Boards will follow in making decisions as to when a person may be required to undertake an investigation to determine if an unauthorized hazardous substance discharge has occurred;

   b. Policies for carrying out a phased, step-by-step investigation to determine the nature and extent of possible soil and ground water contamination or pollution at a site;

   c. Procedures for identifying and utilizing the most cost-effective methods for detecting contamination or pollution and cleaning up or abating the effects of contamination or pollution;

   d. Policies for determining reasonable schedules for investigation and cleanup, abatement, or other remedial action at a site. The policies shall recognize the danger to public health and the waters of the state posed by an unauthorized discharge and the need to mitigate those dangers while at the same time taking into account, to the extent possible, the resources, both financial and technical, available to the person responsible for the discharge;

6. "Waters of the state" include both ground water and surface water;

7. Regardless of the type of discharge, procedures and policies applicable to investigations, and cleanup and abatement activities are similar. It is in the best interest of the people of the state for the State Water Board to provide consistent guidance for Regional Water Boards to apply to investigation, and cleanup and abatement;

8. WC Section 13260 requires any person discharging or proposing to discharge waste that could affect waters of the state, or proposing to change the character, location, or volume of a discharge to file a report with and receive requirements from the Regional Water Board;

9. WC Section 13267 provides that the Regional Water Board may require dischargers, past dischargers, or suspected dischargers to furnish those technical or monitoring reports as the Regional Water Board may specify, provided that the burden, including costs, of these reports, shall bear a reasonable relationship to the need for the reports and the benefits to be obtained from the reports;

10. WC Section 13300 states that the Regional Water Board may require a discharger to submit a time schedule of specific actions the discharger shall take in order to correct or prevent a violation of requirements prescribed by the Regional Water Board or the State Water Board;

11. California Health and Safety Code (**HSC**) Section 25356.1 requires the Department of Toxic Substances Control (**DTSC**) or, if appropriate, the Regional Water Board to prepare or approve remedial action plans for sites where hazardous substances were released to the environment if the sites have been listed pursuant to HSC Section 25356 (state "Superfund" priority list for cleanup of sites);

12. Coordination with the U.S. Environmental Protection Agency (**USEPA**), state agencies within the California Environmental Protection Agency (**Cal/EPA**) (e.g., DTSC, Air Resources Control Board), air pollution control districts, local environmental health agencies, and other responsible federal, state, and local agencies: (l) promotes effective protection of water quality, human health, and the environment and (2) is in the best interest of the people of the state. The principles of coordination are embodied in many statutes, regulations, and interagency memoranda of understanding (**MOU**) or agreement which affect the State and Regional Water Boards and these agencies;

13. In order to clean up and abate the effects of a discharge or threat of a discharge, a discharger may be required to perform an investigation to define the nature and extent of the discharge or threatened discharge and to develop appropriate cleanup and abatement measures;

14. Investigations that were not properly planned have resulted in increases in overall costs and, in some cases, environmental damage. Overall costs have increased when original corrective actions were later found to have had no positive effect or to have exacerbated the pollution. Environmental damage may increase when a poorly conceived investigation or cleanup and abatement program allows pollutants to spread to previously unaffected waters of the state;

15. A phased approach to site investigation should facilitate adequate delineation of the nature and extent of the pollution, and may reduce overall costs and environmental damage, because: (1) investigations inherently build on information previously gained; (2) often data are dependent on seasonal and other temporal variations; and (3) adverse consequences of greater cost or increased environmental damage can result from improperly planned investigations and the lack of consultation and coordination with the Regional Water Board. However, there are circumstances under which a phased, iterative approach may not be necessary to protect water quality, and there are other circumstances under which phases may need to be compressed or combined to expedite cleanup and abatement;

16. Preparation of written workplans prior to initiation of significant elements or phases of investigation, and cleanup and abatement generally saves Regional Water Board and discharger resources. Results are superior, and the overall cost-effectiveness is enhanced;

17. Discharger reliance on qualified professionals promotes proper planning, implementation, and long-term cost-effectiveness of investigation, and cleanup and abatement activities. Professionals should be qualified, licensed where applicable, and competent and proficient in the fields pertinent to the required activities. California Business and Professions Code Sections 6735, 7835, and 7835.1 require that engineering and geologic evaluations and judgements be performed by or under the direction of registered professionals;

18. WC Section 13360 prohibits the Regional Water Boards from specifying, but not from suggesting, methods that a discharger may use to achieve compliance with requirements or orders. It is the responsibility of the discharger to propose methods for Regional Water Board review and concurrence to achieve compliance with requirements or orders;

19. The USEPA, California state agencies, the American Society for Testing and Materials, and similar organizations have developed or identified methods successful in particular applications. Reliance on established, appropriate methods can reduce costs of investigation, and cleanup and abatement;

20. The basis for Regional Water Board decisions regarding investigation, and cleanup and abatement includes: (1) site-specific characteristics; (2) applicable state and federal statutes and regulations; (3) applicable water quality control plans adopted by the State Water Board and Regional Water Boards, including beneficial uses, water quality objectives, and implementation plans; (4) State Water Board and Regional Water Board policies, including State Water Board Resolutions No. 68-16 (Statement of Policy with Respect to Maintaining High Quality of Waters in California) and No. 88-63 (Sources of Drinking Water); and (5) relevant standards, criteria, and advisories adopted by other state and federal agencies;

21. Discharges subject to WC Section 13304 may include discharges of waste to land; such discharges may cause, or threaten to cause, conditions of soil or water pollution or nuisance that are analogous to conditions associated with migration of waste or fluid from a waste management unit;

22. The State Water Board has adopted regulations governing discharges of waste to land (California

Code of Regulations (CCR), Title 23, Division 3, Chapter 15);

23. State Water Board regulations governing site investigation and corrective action at underground storage tank unauthorized release sites are found in 23 CCR Division 3, Chapter 16, in particular Article 11 commencing with Section 2720;

24. It is the responsibility of the Regional Water Board to make decisions regarding cleanup and abatement goals and objectives for the protection of water quality and the beneficial uses of waters of the state within each Region;

25. Cleanup and abatement alternatives that entail discharge of residual wastes to waters of the state, discharges to regulated waste management units, or leaving wastes in place, create additional regulatory constraints and long-term liability, which must be considered in any evaluation of cost-effectiveness;

26. The Porter-Cologne Water Quality Control Act allows Regional Water Boards to impose more stringent requirements on discharges of waste than any statewide requirements promulgated by the State Water Board (e.g., in this Policy) or than water quality objectives established in statewide or regional water quality control plans as needed to protect water quality and to reflect regional and site-specific conditions.

THEREFORE BE IT RESOLVED:

These policies and procedures apply to all investigations, and cleanup and abatement activities, for all types of discharges subject to Section 13304 of the Water Code.

I.   The Regional Water Board shall apply the following procedures in determining whether a person shall be required to investigate a discharge under WC Section 13267, or to clean up waste and abate the effects of a discharge or a threat of a discharge under WC Section 13304. The Regional Water Board shall:

A. Use any relevant evidence, whether direct or circumstantial, including, but not limited to, evidence in the following categories:

1. Documentation of historical or current activities, waste characteristics, chemical use, storage or disposal information, as documented by public records, responses to questionnaires, or other sources of information;

2. Site characteristics and location in relation to other potential sources of a discharge;

3. Hydrologic and hydrogeologic information, such as differences in upgradient and downgradient water quality;

4. Industry-wide operational practices that historically have led to discharges, such as leakage of pollutants from wastewater collection and conveyance systems, sumps, storage tanks, landfills, and clarifiers;

5. Evidence of poor management of materials or wastes, such as improper storage practices or inability to reconcile inventories;

6. Lack of documentation of responsible management of materials or wastes, such as lack of manifests or lack of documentation of proper disposal;

7. Physical evidence, such as analytical data, soil or pavement staining, distressed vegetation, or unusual odor or appearance;

8. Reports and complaints;

9. Other agencies' records of possible or known discharge; and

10. Refusal or failure to respond to Regional Water Board inquiries;

B. Make a reasonable effort to identify the dischargers associated with the discharge. It is not necessary to identify all dischargers for the Regional Water Board to proceed with requirements for a discharger to investigate and clean up;

C. Require one or more persons identified as a discharger associated with a discharge or threatened discharge subject to WC Section 13304 to undertake an investigation, based on findings of I.A and I.B above;

D. Notify appropriate federal, state, and local agencies regarding discharges subject to WC Section 13304 and coordinate with these agencies on investigation, and cleanup and abatement activities.

II.  The Regional Water Board shall apply the following policies in overseeing: (a) investigations to determine the nature and horizontal and vertical extent of a discharge and (b) appropriate cleanup and abatement measures.

A. The Regional Water Board shall:

1. Require the discharger to conduct investigation, and cleanup and abatement, in a progressive sequence ordinarily consisting of the following phases, provided that the sequence shall be adjusted to accommodate site-specific circumstances, if necessary:

9/3/6

a. Preliminary site assessment (to confirm the discharge and the identity of the dischargers; to identify affected or threatened waters of the state and their beneficial uses; and to develop preliminary information on the nature, and vertical and horizontal extent, of the discharge);

b. Soil and water investigation (to determine the source, nature and extent of the discharge with sufficient detail to provide the basis for decisions regarding subsequent cleanup and abatement actions, if any are determined by the Regional Water Board to be necessary);

c. Proposal and selection of cleanup and abatement action (to evaluate feasible and effective cleanup and abatement actions, and to develop preferred cleanup and abatement alternatives);

d. Implementation of cleanup and abatement action (to implement the selected alternative, and to monitor in order to verify progress);

e. Monitoring (to confirm short- and long-term effectiveness of cleanup and abatement);

2. Consider, where necessary to protect water quality, approval of plans for investigation, or cleanup and abatement, that proceed concurrently rather than sequentially, provided that overall cleanup and abatement goals and objectives are not compromised, under the following conditions:

a. Emergency situations involving acute pollution or contamination affecting present uses of waters of the state;

b. Imminent threat of pollution;

c. Protracted investigations resulting in unreasonable delay of cleanup and abatement; or

d. Discharges of limited extent which can be effectively investigated and cleaned up within a short time;

3. Require the discharger to extend the investigation, and cleanup and abatement, to any location affected by the discharge or threatened discharge.

4. Where necessary to protect water quality, name other persons as dischargers, to the extent permitted by law;

5. Require the discharger to submit written workplans for elements and phases of the investigation, and cleanup and abatement, whenever practicable;

6. Review and concur with adequate workplans prior to initiation of investigations, to the extent practicable. The Regional Water Board may give verbal concurrence for investigations to proceed, with written follow-up. An adequate workplan should include or reference, at least, a comprehensive description of proposed investigative, cleanup, and abatement activities, a sampling and analysis plan, a quality assurance project plan, a health and safety plan, and a commitment to implement the workplan;

7. Require the discharger to submit reports on results of all phases of investigations, and cleanup and abatement actions, regardless of degree of oversight by the Regional Water Board;

8. Require the discharger to provide documentation that plans and reports are prepared by professionals qualified to prepare such reports, and that each component of investigative and cleanup and abatement actions is conducted under the direction of appropriately qualified professionals. A statement of qualifications of the responsible lead professionals shall be included in all plans and reports submitted by the discharger;

9. Prescribe cleanup levels which are consistent with appropriate levels set by the Regional Water Board for analogous discharges that involve similar wastes, site characteristics, and water quality considerations;

B. The Regional Water Board may identify investigative and cleanup and abatement activities that the discharger could undertake without Regional Water Board oversight, provided that these investigations and cleanup and abatement activities shall be consistent with the policies and procedures established herein;

III. The Regional Water Board shall implement the following procedures to ensure that dischargers shall have the opportunity to select cost-effective methods for detecting discharges or threatened discharges and methods for cleaning up or abating the effects thereof. The Regional Water Board shall:

9/4/6

A. Concur with any investigative and cleanup and abatement proposal which the discharger demonstrates and the Regional Water Board finds to have a substantial likelihood to achieve compliance, within a reasonable time frame, with cleanup goals and objectives that implement the applicable Water Quality Control Plans and Policies adopted by the State Water Board and Regional Water Boards, and which implement permanent cleanup and abatement solutions which do not require ongoing maintenance, wherever feasible;

B. Consider whether the burden, including costs, of reports required of the discharger during the investigation and cleanup and abatement of a discharge bears a reasonable relationship to the need for the reports and the benefits to be obtained from the reports;

C. Require the discharger to consider the effectiveness, feasibility, and relative costs of applicable alternative methods for investigation, and cleanup and abatement. Such comparison may rely on previous analysis of analogous sites, and shall include supporting rationale for the selected methods;

D. Ensure that the discharger is aware of and considers techniques which provide a cost-effective basis for initial assessment of a discharge.

   1. The following techniques may be applicable:

     a. Use of available current and historical photographs and site records to focus investigative activities on locations and wastes or materials handled at the site;

     b. Soil gas surveys;

     c. Shallow geophysical surveys;

     d. Remote sensing techniques;

   2. The above techniques are in addition to the standard site assessment techniques, which include:

     a. Inventory and sampling and analysis of materials or wastes;

     b. Sampling and analysis of surface water;

     c. Sampling and analysis of sediment and aquatic biota;

     d. Sampling and analysis of ground water;

     e. Sampling and analysis of soil and soil pore moisture;

     f. Hydrogeologic investigation;

E. Ensure that the discharger is aware of and considers the following cleanup and abatement methods or combinations thereof, to the extent that they may be applicable to the discharge or threat thereof:

   1. Source removal and/or isolation;

   2. In-place treatment of soil or water:

     a. Bioremediation;

     b. Aeration;

     c. Fixation;

   3. Excavation or extraction of soil, water, or gas for on-site or off-site treatment by the following techniques:

     a. Bioremediation;

     b. Thermal destruction;

     c. Aeration;

     d. Sorption;

     e. Precipitation, flocculation, and sedimentation;

     f. Filtration;

     g. Fixation;

     h. Evaporation;

   4. Excavation or extraction of soil. water, or gas for appropriate recycling, re-use, or disposal;

F. Require actions for cleanup and abatement to:

   1. Conform to the provisions of Resolution No. 68-16 of the State Water Board, and the Water Quality Control Plans of the State and Regional Water Boards, provided that under no circumstances shall these provisions be interpreted to require cleanup and abatement which achieves water quality conditions that are better than background conditions;

   2. Implement the provisions of Chapter 15 that are applicable to cleanup and abatement, as follows:

     a. If cleanup and abatement involves corrective action at a waste management unit regulated by waste discharge requirements issued under Chapter 15, the Regional Water Board shall implement the provisions of that chapter;

     b. If cleanup and abatement involves removal of waste from the immediate place of release and discharge of the waste to land for treatment, storage, or disposal, the Regional Water Board

shall regulate the discharge of the waste through waste discharge requirements issued under Chapter 15, provided that the Regional Water Board may waive waste discharge requirements under WC Section 13269 if the waiver is not against the public interest (e.g., if the discharge is for short-term treatment or storage, and if the temporary waste management unit is equipped with features that will ensure full and complete containment of the waste for the treatment or storage period); and

   c. If cleanup and abatement involves actions other than removal of the waste, such as containment of waste in soil or ground water by physical or hydrological barriers to migration (natural or engineered), or in-situ treatment (e.g., chemical or thermal fixation, or bioremediation), the Regional Water Board shall apply the applicable provisions of Chapter 15, to the extent that it is technologically and economically feasible to do so; and

3. Implement the applicable provisions of Chapter 16 for investigations and cleanup and abatement of discharges of hazardous substances from underground storage tanks; and

G. Ensure that dischargers are required to clean up and abate the effects of discharges in a manner that promotes attainment of either background water quality, or the best water quality which is reasonable if background levels of water quality cannot be restored, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible; in approving any alternative cleanup levels less stringent than background, apply

Section 2550.4 of Chapter 15, or, for cleanup and abatement associated with underground storage tanks, apply Section 2725 of Chapter 16, provided that the Regional Water Board considers the conditions set forth in Section 2550.4 of Chapter 15 in setting alternative cleanup levels pursuant to Section 2725 of Chapter 16; any such alternative cleanup level shall:

1. Be consistent with maximum benefit to the people of the state;

2. Not unreasonably affect present and anticipated beneficial use of such water; and

3. Not result in water quality less than that prescribed in the Water Quality Control Plans and Policies adopted by the State and Regional Water Boards.

IV. The Regional Water Board shall determine schedules for investigation, and cleanup and abatement, taking into account the following factors:

A. The degree of threat or impact of the discharge on water quality and beneficial uses;

B. The obligation to achieve timely compliance with cleanup and abatement goals and objectives that implement the applicable Water Quality Control Plans and Policies adopted by the State Water Board and Regional Water Boards;

C. The financial and technical resources available to the discharger; and

D. Minimizing the likelihood of imposing a burden on the people of the state with the expense of cleanup and abatement, where feasible.

V. The State and Regional Water Boards shall develop an expedited technical conflict resolution process so when disagreements occur, a prompt appeal and resolution of the conflict is accomplished.

## CERTIFICATION

The undersigned, Administrative Assistant to the Board, does hereby certify that the foregoing is full, true, and correct copy of a resolution duly and regularly adopted at a meeting of the State Water Resources Control Board held on June 18, 1992, and amended at a meeting of the State Water Resources Control Board held on April 21, 1994.

Maureen Marchè
Administrative Assistant to the Board

9/6/6

# STATE WATER RESOURCES CONTROL BOARD
# RESOLUTION NO. 93-62

# POLICY FOR REGULATION OF DISCHARGES
# OF MUNICIPAL SOLID WASTE

WHEREAS:

1. **Water quality protection**–The State Water Resources Control Board (**State Water Board**) and each Regional Water Quality Control Board (**Regional Water Board**) are the state agencies with primary responsibility for the coordination and control of water quality (California Water Code Section 13001, "WC §13001");

2. **State Policy for Water Quality Control**–The State Water Board is authorized to adopt State Policy For Water Quality Control which may consist of or contain "...principles and guidelines deemed essential by the state board for water quality control" (Authority: WC §§1058, 13140, 13142);

3. **State agency compliance**–All State agencies shall comply with State Policy For Water Quality Control regarding any activities that could affect water quality (WC §13146);

4. **Waste Discharge Requirements**–Regional Water Boards regulate discharges of waste that could affect the quality of waters of the state, including discharges of solid waste to land, through the issuance of waste discharge requirements (WC §13263);

5. **Solid waste disposal**–The State Water Board is directed to classify wastes according to threat to water quality and to classify waste disposal sites according to ability to protect water quality (WC §13172);

6. **Chapter 15**–The State Water Board promulgated regulations, codified in Chapter 15 of Division 3 of Title 23 of the California Code of Regulations (23 CCR §§2510-2601, "**Chapter 15**"), governing discharges of waste to land. These regulations:

   a. Contain classification criteria for wastes and for disposal sites;

   b. Prescribe minimum standards for the siting, design, construction, monitoring, and closure of waste management units;

7. **Federal authority**–The federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 USC §6901, *et*

*seq*, "**SWDA**"), authorizes development of nationwide standards for disposal sites for municipal solid waste [**MSW**], including criteria for sanitary landfills (SWDA §§1007, 4004, 42 USC §§6907, 6944);

8. **Federal MSW regulations**–On October 9, 1991, the United States Environmental Protection Agency (**USEPA**) promulgated regulations that apply, in California, to dischargers who own or operate landfills which accept municipal solid waste on or after October 9, 1991, (MSW **landfills**), regardless of whether or not a permit is issued (Title 40, Code of Federal Regulations [**CFR**], Parts 257 and 258, "**federal MSW regulations**"). The majority of the federal MSW regulations become effective on what is hereinafter referred to as the "**Federal Deadline**" [40 CFR §258.1(e)], currently October 9, 1993;

9. **States required to apply federal MSW regulations**–Each state must "...adopt and implement a permit program or other system of prior approval and conditions to assure that each...[MSW landfill]...within such state...will comply with the...[federal MSW landfill regulations]." State regulations promulgated to satisfy this requirement are subject to approval by USEPA. (SWDA §§4003, 4005, 42 USC §§6943, 6945);

10. **Approved state's authority**–The permitting authority in an "approved state" may approve engineered alternatives to certain prescriptive standards contained in the federal MSW regulations, provided that the alternative meets specified conditions and performance standards (40 CFR 256.21);

11. **State application**–The State Water Board and the Integrated Waste Management Board submitted an application for program approval to the USEPA on February 1, 1993;

12. **Chapter 15 deficiencies**–The State Water Board's Chapter 15 regulations are comparable to the federal MSW regulations. Nevertheless, the USEPA has identified several areas of Chapter 15 which are not adequate to ensure compliance with

certain provisions of the federal MSW regulations, as summarized in Attachment I;

13. **Rulemaking to amend Chapter 15**—There is insufficient time, prior to October 9, 1993, for the State Water Board to amend Chapter 15 to ensure complete consistency with the federal MSW regulations and subsequently for the USEPA to carry out a review of the revised chapter and to render a decision approving California's permit program;

14. **Composite liner(s) needed**—Solid Waste Assessment Test Reports, submitted to Regional Water Boards pursuant to WC §13273, have shown that releases of leachate and gas from MSW landfills that are unlined are likely to degrade the quality of underlying ground water. Research on liner systems for landfills indicates that (a) single clay liners will only delay, rather than preclude, the onset of leachate leakage, and (b) the use of composite liners represents the most effective approach for reliably containing leachate and landfill gas;

15. **Lack of compliance with Chapter 15**—WDRs for many MSW landfills have not been revised to meet the most recent Chapter 15 amendments;

16. **CEQA**—Adoption of this policy is categorically exempt from the provisions of the California Environmental Quality Act (Division 13, commencing with §21000, of the Public Resources Code, "CEQA") because it is an action by a regulatory agency for the protection of natural resources, within the meaning of §15307 of the *Guidelines For Implementation of California Environmental Quality Act* in Title 14 of the California Code of Regulations;

17. **Public notice**—Notice of the State Water Board's proposal to adopt a State Policy for Water Quality Control regarding Regulation of Discharges of Municipal Solid Waste was published on March 31, 1993, and a public hearing on the matter was held on June 1, 1993; and

18. **Reference**—This Policy implements, interprets, or makes specific the following Water Code Sections: §13142, §13160, §13163, and §13172.

**THEREFORE BE IT RESOLVED:**

# I. Implementation of the Chapter 15 and federal MSW regulations:

A. **WDR revision**—In order to insure compliance with SWDA §§4003, 4005 (42 USC §§6943, 6945), each Regional Water Board shall henceforth implement in waste discharge requirements for discharges at MSW landfills, both the Chapter 15 regulations and those applicable provisions of the federal MSW regulations that are necessary to protect water quality, particularly the containment provisions stipulated in Section III of this Policy and the provisions identified in Attachment I to this Policy, and shall revise existing waste discharge requirements to accomplish this according to the schedule provided in Section II of this Policy;

B. **Alternatives limited**—The Regional Water Board shall not rely upon any exemption or alternative allowed by Chapter 15 if such an exemption or alternative would not be allowed under the federal MSW regulations, nor shall the Regional Water Board waive waste discharge requirements for the discharge of municipal solid waste at landfills;

C. **Applicability in the absence of useable waters**—Although all other provisions of this Policy would continue to apply, the Regional Water Board shall have the discretion to prescribe requirements for containment systems and water quality monitoring systems that are less stringent than the design and construction standards in this Policy, in the federal MSW regulations, and in Chapter 15 if the Regional Water Board finds that the containment systems satisfy the performance standard for liners in the federal MSW regulations.[40 CFR §§258.40(a)(1) and (c)], that the prerequisite for an exemption from ground water monitoring in the federal MSW regulations is satisfied [40 CFR §258.50(b)], and that either of the following two conditions is satisfied:

1. A hydrogeologic investigation shows that:

   a. There is no aquifer (i.e., a geological formation, group of formations, or portion of a formation capable of yielding significant quantities of ground water to wells or springs) underlying the facility property; and

   b. It is not reasonably foreseeable that fluids—including leachate and landfill gas—migrating from the landfill could reach any aquifer or surface water body in the ground water basin within which the landfill is located; or

2. The ground water in the basin underlying the facility has no beneficial uses and a hydrogeologic investigation shows that it is not reasonably foreseeable that fluids—including leachate and landfill gas—migrating from the landfill could reach any aquifer or surface water body having beneficial uses.

## II. Implementation schedule:

A. **MSW landfills**–By the Federal Deadline (e.g., October 9, 1993), each Regional Water Board shall amend the waste discharge requirements for discharges of waste at all MSW landfills in its region (including discharges to any area outside the actual waste boundaries of an MSW landfill as they exist on that date ["lateral expansion" hereinafter]), to require persons who own or operate such landfills to:

1. Except for the ground water monitoring and corrective action requirements under 40 CFR §§258.50-258.58, comply with all applicable portions of the federal MSW regulations by the Federal Deadline; and

2. Achieve full compliance with Chapter 15 and with the federal ground water monitoring and corrective action requirements under 40 CFR §§258.50-258.58 as follows:

   a. For all MSW landfills that are less than one mile from a drinking water intake (surface or subsurface), by no later than October 9, 1994; and

   b. For all other MSW landfills that have accepted waste prior to the effective date of this Policy, by no later than October 9, 1995;

B. **Proposed MSW landfills**–As of the date of the Federal Deadline, waste discharge requirements for the discharge of waste at all MSW landfills that have not accepted waste as of that date shall ensure full compliance both with Chapter 15 and with the federal MSW regulations prior to the discharge of waste to that landfill.

## III. Containment–As of the Federal
Deadline, discharges of waste to either an MSW landfill that has not received waste as of that date or to a lateral expansion of an MSW landfill unit are prohibited unless the discharge is to an area equipped with a containment system which is constructed in accordance with the standard of the industry and which meets the following additional requirements for both liners and leachate collection systems:

A. **Standards for liners**

1. **Post-Federal Deadline construction**–Except as provided in either §III.A.3. (for steep sideslopes) or §III.A.2. (for new discharges to pre-existing liners), after the Federal Deadline, all containment systems shall include a composite liner that consists of an upper synthetic flexible membrane

component (Synthetic Liner) and a lower component of soil, and that either:

a. **Prescriptive Design:**

   i. **Upper component**–Has a Synthetic Liner at least 40-mils thick (or at least 60-mils thick if of high density polyethylene) that is installed in direct and uniform contact with the underlying compacted soil component described in paragraph III.A.1.a.ii.; and

   ii. **Lower component**–Has a layer of compacted soil that is at least two feet thick and that has an hydraulic conductivity of no more than $1 \times 10^{-7}$ cm/sec (0.1 feet/year); or

b. **Alternative design**–Satisfies the performance criteria contained in 40 CFR §§258.40(a)(1) and (c), and satisfies the criteria for an engineered alternative to the above Prescriptive Design [as provided by 23 CCR §2510(b)], where the performance of the alternative composite liner's components, in combination, equal or exceed the waste containment capability of the Prescriptive Design;

2. **New discharges to liners constructed prior to the Federal Deadline**–Except as provided in §III.A.3. (for steep sideslopes), containment systems that will begin to accept municipal solid waste after the Federal Deadline, but which have been constructed prior to the Federal Deadline, are not required to meet the provisions of §III.A.1. if the containment system includes a composite liner that:

a. **Prescriptive Design**–Features as its uppermost component a Synthetic Liner at least 40-mils thick (or at least 60-mils if high density polyethylene) that is installed in direct and uniform contact with the underlying materials; and

b. **Performance**–Meets the performance criteria contained in 40 CFR §§258.40(a)(1) and (c);

3. **Steep sideslopes**–Containment systems installed in those portions of an MSW landfill where an engineering analysis shows, and the Regional Water Board finds, that sideslopes are too steep to permit construction of a stable composite liner that meets the prescriptive standards contained in §§III.A.1 or 2. shall include an alternative liner that meets the performance criteria

contained in 40 CFR §§258.40(a)(1) and (c) and that either:

    a. Is a composite system and includes as its uppermost component a Synthetic Liner at least 40-mils thick (or at least 60-mils if high density polyethylene) that is installed in direct and uniform contact with the underlying materials; or

    b. Is not a composite system, but includes a Synthetic Liner at least 60-mils thick (or at least 80-mils if of high density polyethylene) that is installed in direct and uniform contact with the underlying materials; and

B. **Standards for leachate collection**—Include a leachate collection and removal system which conveys to a sump (or other appropriate collection area lined in accordance with §III.A.) all leachate which reaches the liner, and which does not rely upon unlined or clay-lined areas for such conveyance.

## CERTIFICATION

The undersigned, Administrative Assistant to the Board, does hereby certify that the foregoing is a full, true, and correct copy of a resolution duly and regularly adopted at a meeting of the State Water Resources Control Board held on June 17, 1993.

Maureen Marchè
Administrative Assistant to the Board

# ATTACHMENT I

## To Resolution No. 93-62

Pursuant to §I.A, in writing or revising the waste discharge requirements for MSW landfills, Regional Water Boards shall implement those portions of the following sections of the federal MSW regulations that either are more stringent than, or do not exist within, Chapter 15.

o   **Floodplains**—40 CFR §§258.11 and 258.16

o   **Wetlands**—40 CFR §258.12

o   **Unstable areas**—40 CFR §§258.15 and 258.16

o   **Run-on/Run-off control systems**—40 CFR §258.26

o   **Liquids acceptance**—40 CFR §§258.28 [esp. §(a)(2)]

o   **Design Criteria**—40 CFR §258.40, according to the provisions of Section III

o   **Well/piezometer performance**—40 CFR §258.51

o   **Ground-water sampling/analysis**—40 CFR §258.53

o   **Monitoring Parameters**—40 CFR §258.54 and Appendix I to Part 258

o   **Constituents of Concern**—40 CFR §258.55 and Appendix II to Part 258

o   **Response to a release**—40 CFR §§258.55 [esp. §(g)(1)(ii, iii)]

o   **Establishing corrective action measures**—40 CFR §§258.56 [esp. §§(c and d)] and 258.57

o   **Ending corrective action program**—40 CFR §258.58 [esp. §(e)]

o   **Closure/post-closure**—40 CFR §§258.60-258.61 [esp. §§258.60(a-g)]

o   **Deed notation**—40 CFR §258.60(i)

o   **Ending post-closure**—40 CFR §258.61 [esp. §§(a and b)]

o   **Corrective action financial assurance**—40 CFR §258.73

Appendix 11

State Water Board Water Quality Control Plan for Temperature in
Coastal and Interstate Waters and Enclosed Bays and Estuaries
in California (Thermal Plan)

https://www.waterboards.ca.gov/water_issues/programs/ocean/docs/wqplans/thermpln.pdf

Appendix 12

State Water Board Resolution No. 92-82
Exception to the Thermal Plan for Sacramento Regional County
Sanitation District

https://www.waterboards.ca.gov/board_decisions/adopted_orders/resolutions/1992/rs1992_0082.pdf

MANAGEMENT AGENCY AGREEMENT BETWEEN THE
STATE WATER RESOURCES CONTROL BOARD, STATE OF CALIFORNIA
AND THE FOREST SERVICE, UNITED STATES DEPARTMENT OF AGRICULTURE

This Management Agency Agreement is entered into by and between the State
Water Resources Control Board, State of California (State Board), and the
Forest Service, United States Department of Agriculture (Forest Service),
acting through the Regional Forester of the Pacific Southwest Region, for
the purpose of carrying out portions of the State's Water Quality Manage-
ment Plan related to activities on National Forest System (NFS) lands.

WHEREAS:

1.  The Forest Service and the State Board mutually desire:

    (a)  To achieve the goals in the Federal Water Pollution Control Act,
         as amended;

    (b)  To minimize duplication of effort and accomplish complementary
         pollution control programs;

    (c)  To implement Forest Service legislative mandates for multiple
         use and sustained yield to meet both long- and short-term local,
         state, regional, and national needs consistent with the require-
         ment for environmental protection and/or enhancement; and

    (d)  To assure control of water pollution through implementation of
         Best Management Practices (BMPs).

2.  The State Board and the Regional Water Quality Control Boards are
    responsible for promulgating a Water Quality Management Plan pursuant
    to the Federal Water Pollution Control Act, Section 208, and for approving
    water quality control plans promulgated by the Regional Water Quality
    Control Boards pursuant to state law.  Both types of plans provide for
    attainment of water quality objectives and for protection of beneficial
    uses.

3.  The State Board and the Regional Water Quality Control Boards are respon-
    sible for protecting water quality and for ensuring that land management
    activities do not adversely affect beneficial water uses.

4.  Under Section 208 of the Federal Water Pollution Control Act, the State
    Board is required to designate management agencies to implement provisions
    of water quality management plans.

5.  The Forest Service has the authority and responsibility to manage and
    protect the lands which it administers, including protection of water
    quality thereon.

6.  The Forest Service has prepared a document entitled "Water Quality
    Management for National Forest System Lands in California" (hereafter
    referred to as the Forest Service 208 Report), which describes current
    Forest Service practices and procedures for protection of water quality.

-2-

7. On August 16, 1979, the State Board designated the Forest Service as the management agency for all activities on NFS lands effective upon execution of a management agency agreement.

NOW, THEREFORE, the parties hereto agree as follows:

1. The Forest Service agrees:

   (a) To accept responsibility of the Water Quality Management Agency designation for NFS lands in the State of California.

   (b) To implement on NFS lands statewide the practices and procedures in the Forest Service 208 Report.

   (c) To facilitate early State involvement in the project planning process by developing a procedure which will provide the State with notification of and communications concerning scheduled, in-process, and completed project Environmental Assessments (EAs) for projects that have potential to impact water quality.

   (d) To provide periodic project site reviews to ascertain implementation of management practices and environmental constraints identified in the EA and/or contract and permit documents.

   (e) To review annually and update the Forest Service documents as necessary to reflect changes in institutional direction, laws and implementation accomplishment as described in Section IV of the Forest Service 208 Report. A prioritization and schedule for this updating is provided in Attachment A to this Agreement.

   (f) That in cases where two or more BMPs are conflicting, the responsible Forest Service official shall assure that the practice selected meets water quality standards and protects beneficial uses.

   (g) That those issues in Attachment B to this agreement have been identified by the State and/or Regional Boards as needing further refinement before they are mutually acceptable to the Forest Service and the State Board as BMPs.

2. The State Board agrees:

   (a) The practices and procedures set forth in the Forest Service 208 Report constitute sound water quality protection and improvement on NFS lands, except with respect to those issues in Attachment B. The State and Regional Boards will work with the Forest Service to resolve those issues according to the time schedule in Attachment B.

   (b) That Section 313 of the Federal Water Pollution Control Act mandates federal agency compliance with the substantive and procedural requirements of state and local water pollution control law. It is contemplated by this agreement that Forest Service reasonable implementation of those practices and procedures and of this agreement will

-3-

2. (b)  (cont.)

constitute compliance with Section 13260, subdivision (a) of
Section 13263, and subdivision (b) of Section 13264, Water Code.
It is further contemplated that these provisions requiring a
report of proposed discharge and issuance of waste discharge
requirements for nonpoint source discharges will be waived by
the Regional Board pursuant to Section 13269, Water Code provided
that the Forest Service reasonably implements those practices
and procedures and the provisions of this agreement. However,
waste discharges from land management activities resulting in
point source discharges, as defined by the Federal Water
Pollution Control Act, will be subject to NPDES permit require-
ments, since neither the State Board nor the Regional Board
has authority to waive such permits.

(c)  That implementation will constitute following the Implementation
Statement, Section I of the Forest Service 208 Report.

3.  It is mutually agreed:

(a)  To meet no less than annually to maintain coordination/communication,
report on water quality management progress, review proceedings
under this agreement, and to consider revisions as requested by
either party.

(b)  To authorize the respective Regional Boards and National Forests
to meet periodically, as necessary, to discuss water quality policy,
goals, progress, and to resolve conflicts/concerns.

(c)  That the development and improvement of BMPs will be through a
coordinated effort with federal and state agencies for adjacent
lands and areas of comparable concern.

(d)  To meet periodically, as necessary, to resolve conflicts or concerns
that arise from and are not resolved at the Forest and Regional
Board meetings. Meetings may be initiated at the request of either
party, a National Forest, or a Regional Board.

(e)  To coordinate present and proposed water quality monitoring activ-
ities within or adjacent to the National Forests and to routinely
make available to the other party any unrestricted water quality
data and information; and to coordinate and involve one another in
subsequent/continuing water quality management planning and standard
development where appropriate.

(f)  That nothing herein shall be construed in any way as limiting the
authority of the State Board or the Regional Boards in carrying out
their legal responsibilities for management or regulation of water
quality.

3.  (cont.)

   (g)  That nothing herein shall be construed as limiting or affecting
        in any way the legal authority of the Forest Service in connection
        with the proper administration and protection of National Forest
        System lands in accordance with federal laws and regulations.

   (h)  That this Agreement shall become effective as soon as it is signed
        by the parties hereto and shall continue in force unless terminated
        by either party upon ninety (90) days notice in writing to the
        other of intention to terminate upon a date indicated.

IN WITNESS WHEREOF, the parties hereto, by their respective duly authorized
officers, have executed this Agreement in duplicate on the respective dates
indicated below.

FOREST SERVICE,                          STATE WATER RESOURCES CONTROL BOARD
U. S. DEPARTMENT OF AGRICULTURE          STATE OF CALIFORNIA

By _____              By _____
   Regional Forester                       Executive Director
   Pacific-Southwest Region

Date: 3/17/81                           Date: FEB 26 1981

By _____
   Regional Forester
   Intermountain Region

Date: 4-1-81

By _____
   Regional Forester
   Pacific Northwest Region

Date: 5-26-81

ATTACHMENT A

## Schedule for Completing the BMPs

| Priority | Best Management Practice | Completion Date (F.Y.) |
|---|---|---|
| 1 | Cumulative Watershed Impacts | '81 |
| 2 | Closure or Obliteration of Temporary Roads (2.26) | '81 |
| 3 | Minimization of Sidecasting (2.11) | '81 |
| 4 | Stabilization of Road Prisms and of Spoil Disposal Areas | '82 |
| 5 | Control of Road Maintenance Chemicals | '83-'86* |
| 6 | Tractor Windrowing on the Contour (5.5) | '83-'86* |
| 7 | Sanitary and Erosion Control for Temporary Camps | '84-86* |
| 8 | Administering Terms of the U. S. Mining Laws (3.1) | '84-86* |

* To be firmed up to a specific fiscal year two years in advance at the annual meeting called for in Section 3(a) of this Agreement.

ATTACHMENT B

Schedule for Resolving Regional Board Issues

| Region | Issue | Completion Date (F.Y.) |
|--------|-------|------------------------|
| 1 | Herbicide Use (Resolution 80-5) | '81 |
| 1 | Protection of Wild and Scenic Rivers | '82 |

MEMORANDUM OF AGREEMENT
BETWEEN
THE DEPARTMENT OF HEALTH SERVICES
AND
THE STATE WATER RESOURCES CONTROL BOARD
ON IMPLEMENTATION OF THE HAZARDOUS WASTE PROGRAM


This Memorandum of Agreement (hereinafter "MOA") sets forth those principles and procedures to which the Department of Health Services (hereinafter "Department") and the State Water Resources Control Board [hereinafter "Board", which also includes and represents the nine Regional Water Quality Control Boards (RWQCBs)] commit themselves to implement the State's Hazardous Waste Program, including support of the State's implementation of Subtitle C of the Resource Conservation and Recovery Act (RCRA, 42 USC 6921 et seq.). Specifically, the MOA covers surveillance and enforcement related to water quality at landfills, surface impoundments, waste piles, and land treatment facilities which treat, store, or dispose of hazardous waste (all hereinafter referred to as "hazardous waste management facilities"). This MOA also covers the issuance, modification, or denial of permits to facilities, including the revision of the water quality aspects of hazardous waste management facility siting, design, closure and post-closure, and surface and ground water monitoring and protection. This MOA hereby includes by reference Exhibit A, entitled "General Procedures for Permit Development for Hazardous Waste Management Facilities". This MOA and subsequent amendments shall be effective as of the date of signature by both the Director of the Department and the Chairperson of the Board. It shall be considered binding on both agencies, to the fullest extent allowed by law. No provision of this memorandum is intended to nor shall be interpreted as amending in any way the provisions of any statute, regulation, order, or permit.


BACKGROUND


The United States Environmental Protection Agency (hereinafter "EPA") may authorize states to administer and enforce a hazardous waste program pursuant to Subtitle C of RCRA, provided that the states can demonstrate to EPA that their state hazardous waste laws, regulations, and program procedures are equivalent to and consistent with the federal counterparts. The first phase of EPA's RCRA regulations were promulgated on May 19, 1980. They included hazardous waste criteria, standards for generators and transporters, and interim status standards for treatment, storage, and disposal facilities.

The remaining regulations were issued in three components, with standards for storage and treatment promulgated on January 12, 1981, standards for incinerators promulgated on January 26, 1981, and standards for land disposal promulgated on July 26, 1982. These regulations have undergone subsequent revisions and amendments to reflect changes in EPA policy and to provide for more effective environmental protection.

MEMORANDUM OF AGREEMENT                    -2-

The Department has been designated under State law as the agency to administer and enforce the State's hazardous waste management program authorized under Section 3006(c) of RCRA. The State was granted interim RCRA Phase I authorization on June 4, 1981 and Phase IIA authorization on January 11, 1983. Interim authorization was dependent upon the existence of a state program that is "substantially equivalent" to the federal RCRA program.

Substantial equivalency was demonstrated by using existing California laws governing hazardous waste control and water quality protection, and the administrative regulations of the Department and the Board.

The Department applied for final authorization, with full input from the Board on all water quality areas, for all phases of RCRA on November 7, 1985. Final authorization of the State program depends upon the State's ability to demonstrate equivalency to and consistency with the federal program. Any inconsistencies which would make the State program less stringent must be resolved.

The Department and the Board have promulgated and will maintain regulations which make the State program equivalent to or more stringent than federal laws and regulations.

## AUTHORITY

The RCRA regulations are codified in Title 40 of the Code of Federal Regulations (40 CFR) in Parts 124 and 260 through 271, inclusive.

Unless otherwise stated, all references to "federal law" shall refer to RCRA and references to federal regulations shall refer to 40 CFR, parts 124 and 260 through 271, inclusive. Because EPA may continue to amend their hazardous waste regulations, it may be necessary to revise the aforementioned list of federal regulations from time to time. Such revisions may be proposed by either party and, if agreed to by both parties, may be appended to this MOA, provided such revisions do not change the meaning of the Agreement or otherwise alter its intent.

With the exception of Article 9.5 ("Toxic Pits Cleanup Act of 1984") the Department has the authority to implement and enforce the State's Hazardous Waste Control Law, Health and Safety Code (HSC), Divison 20, Chapter 6.5. The Department also has the authority, pursuant to Sections 25159.5 and 25159.7 of the HSC, to enforce federal law until such time as the Department adopts regulations corresponding to and equivalent to, or more stringent or extensive than, federal regulations. The Department has promulgated regulations which establish, in detail, standards for the handling, processing, use, storage, and disposal of wastes, California Administrative Code, Title 22, Division 4, Chapter 30.

The Board has the authority to implement and enforce the Porter-Cologne Water Quality Control Act, Water Code, Division 7; Article 9.5 of Chapter 6.5 of Division 20 of the HSC; and to develop standards for local implementation and enforcement of Chapter 6.7 (Underground Storage of Hazardous Substances) of Division 20 of the HSC. The Board has promulgated regulations which

MEMORANDUM OF AGREEMENT                                 -5-

establish, in detail, water quality protection standards for discharges of
waste to land: California Administrative Code, Title 23, Chapter 3, Subchapter
15. The Board also has regulations governing other discharges of waste which
could affect the quality of waters of the State, and regulations implementing
Chapter 6.7 of the HSC. The Board also is the lead agency for implementation
of the Federal Clean Water Act in California.

Nothing in this MOA shall be construed as a waiver of the Department's
authority to administer and enforce the State hazardous waste management
program authorized under Section 3006(c) of RCRA.

### PRINCIPLES OF AGREEMENT

For the purpose of this MOA, the Department and the Board agree to the
following principles:

1. Only one Hazardous Waste Facility Permit, encompassing all Department and
   Board standards, shall be issued. It is the intent of the Department and
   Board to hold a joint public hearing prior to the issuance of a Hazardous
   Waste Facility Permit and in accordance with Exhibit A. The Department
   shall be responsible for issuing the Hazardous Waste Facility Permit.

   The Board will adopt necessary waste discharge requirements and agrees to
   ensure that such requirements are consistent with and no less stringent
   than 40 CFR 264, Subpart F. Further, in other regulatory areas of this
   program where the Board's Waste Discharge Requirements may contain water
   quality requirements or standards which parallel RCRA, the Board agrees to
   ensure, subject to the availability of supporting resources, that such
   requirements and standards are consistent with and no less stringent than
   counterpart Federal regulations at 40 CFR 264.

   The Department shall be responsible for providing assurance to EPA that
   all applicable RCRA standards are incorporated into the Hazardous Waste
   Facility Permit issued by the Department.

   The Hazardous Waste Facility Permit shall incorporate as a condition of the
   permit any applicable waste discharge requirements issued by the State
   Water Resources Control Board or a California Regional Water Quality
   Control Board, and shall be consistent with all applicable water quality
   control plans adopted pursuant to Section 13170 of the Water Code and
   Article 3 (commencing with Section 13240) of Chapter 4 of Division 7 of the
   Water Code and state policies for water quality control adopted pursuant to
   Article 3 (commencing with Section 13140) of Chapter 3 of Division 7 of the
   Water Code, and any amendments made to these plans, policies or
   requirements. The Hazardous Waste Facility Permit shall also include
   such additional provisions as may be required by the Federal RCRA program.
   The Board may also issue and enforce additional requirements and
   orders authorized by state law.

MEMORANDUM OF AGREEMENT                    -4-

The Board shall notify and provide two copies to the Department of any proposed revision of waste discharge requirements for hazardous waste management facilities at least 30 days before such requirements are issued except where such requirements are issued to correct a deficiency of interim status or permit requirements, in which case the Board shall promptly notify the Department of such action.

The Department shall notify and provide two copies to the Board of any proposed change in a Hazardous Waste Facility Permit or Interim Status Document. Such notice shall occur at least 30 days before modification of an Interim Status Document or public notice of a permit modification except when such a modification is issued to correct a deficiency of interim status documents or permit requirements, in which case the Department shall promptly notify the Board of such action.

The Department and the Board shall develop detailed procedures for permit processing as necessary to ensure an effective and efficient hazardous waste permit program and shall forward draft and final versions and modifications to each other in a timely manner. When finalized, such procedures are included and made part of this MOA.

As a condition of final RCRA authorization, EPA has requested assurance that the Department has the authority to impose RCRA-equivalent water quality standards as hazardous waste facility permit conditions in the unlikely event that the Board's waste discharge requirements for a facility are not RCRA-equivalent. The Department has given EPA the requested assurances with recognition of the Board's primary role in adopting water quality control plans (Basin Plans) and waste discharge requirements for all hazardous waste management facilities.

If EPA or the Department identify a lack of RCRA equivalency in water quality control plans or waste discharge requirements applicable to a Hazardous Waste Facility Permit, the Department will notify the appropriate Regional Board in writing requesting necessary corrections or additions to the applicable water quality control plans or waste discharge requirements. If Regional Board fails to act on the Department's notice, or if the response is inadequate to correct the deficiency, the Department agrees to petition the matter to the State Board for a final ruling. In the interim, the Department may impose the necessary water quality requirements in the permit in order to assure RCRA equivalency. Even if the appeal to the State Board is resolved in favor of the Regional Board, the Department may impose any additional water quality requirements on Hazardous Waste Facility Permits that are necessary to assure RCRA equivalency.

2.  The Board shall be responsible for conducting the RCRA surveillance activities for hazardous waste management facilities in accordance with the annually negotiated Interagency Agreement and with the terms and conditions of this MOA.

MEMORANDUM OF AGREEMENT                    -5-

3.  The Department and the Board recognize the separate, but parallel,
    enforcement authorities of each agency.  It is the intent of the
    Department and Board to strive to eliminate duplicative enforcement action.

    The Department agrees that in instances where the Board's authorities are
    similar to those of the Department's and where the Board uses, subject to
    the availability of supporting resources, those activities in a timely and
    appropriate manner, the Department may decide that a particular Board
    action is sufficient for purposes of RCRA and the authorized State
    hazardous waste management program, and that further or separate action by
    the Department is not necessary.

    The Department also agrees to provide the Board with notice of any
    hazardous waste management facility compliance inspection which indicates
    the violation of water quality protection requirements.  If the Board
    does not act in a timely manner to bring the facility into compliance or
    demonstrate that the indicated violation does not exist, to the
    satisfaction of the Department, the Department will take separate action to
    bring the facility into compliance and shall notify the Board prior to
    taking such action.  The Board shall notify the Department of any
    enforcement action taken relating to hazardous waste land disposal prior to
    such action.

    If EPA advises the Department of a violation of RCRA water quality
    standards needing corrections, EPA will also send a copy of the letter to
    the appropriate Regional Board.  If the Board has taken or intends to take
    action in response to EPA's letter, the Board agrees to notify, in a
    timely manner, the appropriate DHS regional office that an action has been,
    or will be, taken.  If EPA or the Department is not satisfied with the
    timeliness or appropriateness, with respect to RCRA, of the Board's action,
    the Department or EPA will take separate action to bring the facility into
    compliance.  The Department will contact the Board prior to taking such
    action.

    The Department and the Board shall develop detailed surveillance and en-
    forcement procedures to ensure an effective and efficient hazardous
    waste compliance program and shall forward draft and final versions and
    modifications to each other in a timely manner.  The Department and the
    Board shall prepare jointly and incorporate into this MOA "General
    Procedures for Surveillance and Enforcement Activities for Hazardous
    Waste Land Disposal".

4.  The Board shall be responsible for providing the Department with water
    quality protection requirements consistent with and no less stringent than
    40 CFR 264 and 265, Subpart F for facilities operating under interim status
    or Hazardous Waste Facility Permit.

MEMORANDUM OF AGREEMENT                    -5-

The Department shall be responsible for all aspects outside of 40 CFR 264 and 265, Subpart F for hazardous waste management facilities operating under interim status or Hazardous Waste Facility Permit.

The Department and Board recognize that the Board also has separate regulatory authority that parallels RCRA regulations at Subparts in addition to 40 CFR 264 and 265, Subpart F. For this area of parallel authority, subject to the availability of supporting resources, the Board's responsibilities shall include:

a.    the review and evaluation of the water quality aspects of facility siting and design, ground water (including that found in the unsaturated zone) and surface water monitoring and protection programs, the water quality aspects of facility closure plans and post-closure monitoring programs; and

b.    the development of appropriate water quality protection requirements and permit conditions to prevent water quality degradation.

These responsibilities shall be carried out in a manner that is sufficient to assure compliance with applicable RCRA regulations. The specific commitments and responsibilities will be negotiated annually through the Interagency Agreement.

5.    The Department and the Board agree to develop jointly and sign an interagency agreement, prior to the beginning of each fiscal year, which clearly defines the tasks, work products, time of performance, and associated costs for the Board's performance of the responsibilities described in this MOA. The Department, contingent upon availability of funding, agrees to reimburse the Board in fulfillment of their responsibilities under the interagency agreement.

6.    As the State does not allow intervention as a right in any civil action by any citizen having an interest which may be or is adversely affected, the Board agrees, at a minimum, to provide public participation, relative to enforcement actions taken on behalf of the Department at hazardous waste management facilities, in a manner that is not less stringent than RCRA statute or regulations.

7.    The Board agrees that any information obtained or used in the administration of those portions of Subchapter 15 and the Porter-Cologne Act that relate to the terms and conditions of this MOA or the annually negotiated Interagency Agreement shall be available to the Department without restriction. If the information has been submitted to the Board under a claim of confidentiality, the Board agrees to submit that claim to the Department when providing the information. The Department shall acknowledge and respond to such claims of confidentiality as required by state law.

MEMORANDUM OF AGREEMENT                    -7-

8. On or before September 30 of each year, the Board shall submit to the Department a final accounting of all costs incurred by the Board for all work performed in compliance with this MOA during the previous fiscal year.

9. This MOA may be amended by mutual agreement as necessary to assure effective and timely implementation and operation of the State's hazardous waste program.

10. The Secretary for Environmental Affairs and the Secretary for the Department of Health Services shall make the final determination in any jurisdictional dispute between the Department and the Board concerning the implementation of this memorandum, to the extent such dispute resolution does not render the State's authorization program inconsistent with, or less stringent then, the Federal RCRA program.


Kenneth W. Kizer, M.D., M.P.H.
Director
Department of Health Services

Raymond R. Stone, Chairperson
State Water Resources Control Board


Date

Date    1/27/86


14/7/10

EXHIBIT A

General Procedures for Permit Review Process for Hazardous Waste Land
Disposal Facilities*

1. The Department Requests Permit Application (Part B)

   The Department will request Board [State Water Resources Control Board
   (SWRCB) and Regional Water Quality Control Boards (RWQCBs)] recommendations
   when selecting facilities for Part B call-in. All recommendations by the
   Board for Part B call-ins will be considered by the Department. The
   Department will issue a formal written request for the Part B of the appli-
   cation for a Hazardous Waste Facility Permit. The Department's request
   will also state the authority under which the request is made, set a due
   date, describe the consequences of a failure to submit a Part B applica-
   tion, and give the number of copies to be submitted.

2. Orientation Meetings for Permit Applicants

   Orientation or pre-application meetings for permit applicants will be
   provided to each applicant upon request by representatives from the
   Department. The Board (RWQCB and SWRCB, where appropriate) will attend
   these meetings to discuss the permitting process and application require-
   ments. Subsequent meetings with individual applicants will be part of the
   technical assistance portion of the Program.

3. Technical Assistance for Permit Applicants

   During preparation of the application (Part B), the Department and the
   Board (RWQCB and SWRCB, where appropriate) will provide technical assis-
   tance to permit applicants and track the progress of application develop-
   ment. This assistance will include reviews of preliminary materials
   prepared for the application package (including documents required under
   Interim Status), attendance at technical and progress meetings, and inspec-
   tion of facilities. Areas of technical assistance will include, but not
   be limited to, design features, ground water monitoring, closure/post-
   closure plans, and the amount of detail required in general throughout
   the Part B application.

4. Part B Received by the Department

   The Department will request at least five copies of the Part B application.
   The Department will forward one copy to the SWRCB, one copy to the appro-
   priate RWQCB, and two copies to the appropriate Department regional office.
   The Department headquarters will retain one copy and maintain records of
   transmittal.

* After program authorization by EPA

EXHIBIT A                                                          Page 2

5. Review of Application

The Department (regional office or headquarters, where appropriate) and the Board (RWQCB and SWRCB, where appropriate) will review the Part B for completeness and for compliance with RCRA in the respective areas in which these groups will be working. As part of the review, one or more hazardous waste management facility inspections may be needed. The Department and the RWQCB's will strive to make joint inspections of the facilities whenever feasible. The Department and the Board (RWQCB and SWRCB, where appropriate) will complete their review using applicable state and federal guidance documents. Cost estimates submitted by the applicant for closure/post-closure will be "verified" by Department staff and used during the review for financial responsibility. The Department will track the progress of the application reviews. The RWQCB (and SWRCB, where appropriate) will submit comments to the Department in accordance with guidance documents and checklists provided by the Department.

6. The Department Prepares Responses to Permit Applicant

The Department will consolidate all comments. The Department will incor-porate all comments from the Board (RWQCB and SWRCB, where appropriate) relevant to the Board's responsibilities outlined in the interagency agreement. The Department will prepare a Notice of Deficiency (NOD) to the permit applicant regarding the completeness and compliance of the applicant. The Department will seek the Board's input and concurrence prior to sending the NOD to the applicant.

7. Permit Applicant Responds to NOD or Prepares and re-Submits Application, when Required

If more information is needed to complete the Part B application, the applicant will submit such information as directed. At least five copies shall again be submitted to the Department for distribution as previously discussed. Once the application is judged by the Department (with input from the appropriate RWQCB and SWRCB, where appropriate) to be complete, the Department will notify the applicant in writing and the permitting process begins. If the application is judged incomplete, the Department will inform the applicant in writing and a resubmittal will be necessary.

14/9/10

EXHIBIT A

8. RWQCB Prepares Draft Waste Discharge Requirements

The appropriate Department Regional Office shall coordinate a permitting schedule with the appropriate RWQCB. The appropriate RWQCB will prepare draft waste discharge requirements (WDR) or a draft revision of existing WDR and forward these to the Department.

NOTE: The Department will notify and give to the Air Resources Board (ARB) a copy of the complete Part B application whenever air quality could be affected by the facility. ARB comments on the application will be submitted to the Department.

9. The Department Prepares Preliminary Draft Hazardous Waste Facility Permit

The Department will prepare a preliminary draft Hazardous Waste Facility Permit which incorporates the draft WDR and other appropriate input from the SWRCB and RWQCB. The Department will transmit a copy of the draft Hazardous Waste Facility Permit to the RWQCB, SWRCB, and ARB (when appropriate) for concurrence.

10. The Department prepares final draft Hazardous Waste Facility Permit incorporating requirements and input from the SWRCB and RWQCB.

11. The Department gives notice of the proposed permit and public hearing to be held by the Department, as lead agency, and jointly with the RWQCB. The Department shall give notice to the public and all interested parties. With the concurrence of the Department and the appropriate RWQCB, the joint hearing may be held by the RWQCB provided that such a hearing is conducted in a manner that is not less stringent than RCRA statute or regulations.

12. Joint public hearing by the Department and the RWQCB.

13. The RWQCB (and SWRCB, where appropriate) shall provide comments to the Department within 30 days after the hearing. The Department will prepare a joint response to comments from the hearing.

14. RWQCB Adopts the WDR

The adoption of the WDR will occur concurrently with the processing of the permit application. The WDR adoption may also occur following the joint public hearing. A copy of the WDR, as adopted, will be forwarded to the Department and incorporated into the permit.

15. The Department will adopt and issue the final Hazardous Waste Facility Permit.

14/10/10

MEMORANDUM OF AGREEMENT
BETWEEN
THE DEPARTMENT OF HEALTH SERVICES
AND
THE STATE WATER RESOURCES CONTROL BOARD
ON USE OF RECLAIMED WATER


This Memorandum of Agreement (hereafter MOA) is made between the Department of Health Services (hereafter the Department) and the State Water Resources Control Board (hereafter the State Board). This MOA sets forth principles, procedures and agreements to which these agencies commit themselves relative to use of reclaimed water in California.

## I.  PURPOSE AND SCOPE OF MOA.

This MOA is intended to assure that the respective authority of the Department, the State Board and the nine California Regional Water Quality Control Boards (hereafter the State Board and the Regional Boards) relative to use of reclaimed water will be exercised in a coordinated and cohesive manner designed to eliminate overlap of activities, duplication of effort, and inconsistency of action. To that end, this MOA establishes basic principles relative to activities of the agencies hereto and the Regional Boards, allocates primary areas of responsibility and authority between these agencies, and provides for methods and mechanisms necessary to assure ongoing, continuous future coordination of activities relative to use of reclaimed water in this State.

The initial MOA is intended to serve as an umbrella agreement between the agencies hereto. It will be supplemented, as appropriate, by addenda which will reflect any additional agreements, commitments and understandings arrived at by the agencies hereto.

## II.  GENERAL BACKGROUND.

In order to supplement existing surface and underground water supplies to help meet water needs in the State, it is state policy that use of reclaimed water in the State be promoted to the maximum extent commensurate with protection of public health. (See Chapter 7, Div. 7, California Water Code.)

So long as its use is compatible with public health and water quality objectives, reclaimed water can be used in a variety of ways to assist in meeting the water needs of this State. Uses of reclaimed water include use for crop and landscape irrigation, supply for recreation impoundments, industrial cooling, and groundwater recharge including protection against saltwater intrusion.

The Department is the primary state agency responsible for protection of public health. To assure protection of public health where reclaimed water use is involved, the Department has been statutorily directed to establish statewide reclamation criteria for the various uses of reclaimed water. (Water Code Section 13521.) The Department has promulgated regulatory criteria, which are currently set forth in the California Code of Regulations, Title 22, Division 4, Section 60301 et seq. The Department's regulatory criteria include numerical limitations and requirements, treatment method requirements, and provisions and requirements related to sampling and analysis, engineering

reports, and design, operation, maintenance and reliability of facilities. The Department's regulations also permit the granting of exceptions to reclaimed water quality requirements in some cases, call for a case-by-case review of groundwater recharge projects, and allow use of alternative methods of treatment so long as the alternative methods used are determined by the Department to assure equivalent treatment and reliability. Many of the regulatory requirements related to sampling, analysis, engineering reports, personnel, operation and design are narrative in nature and leave room for discretionary decisions based on the individual situation in each case.

The Department has also developed Guidelines For Use of Reclaimed Water (hereafter Guidelines). The Guidelines, except insofar as they may incorporate provisions of the Department's regulatory criteria, are not considered binding or mandatory upon permit issuing agencies, such as the Regional Boards.

The State Board and the Regional Boards are the primary state agencies charged with protection, coordination and control of water quality in the State. Where regulatory reclamation criteria have been adopted by the Department, all persons who reclaim or propose to reclaim water, or who use or propose to use reclaimed water, must file a report with the appropriate Regional Board. (Water Code Section 13522.5.) Where regulatory reclamation criteria have been adopted, no person may either reclaim water or use reclaimed water until the appropriate Regional Board has either issued reclamation requirements or waived the necessity for such requirements. (Water Code Section 13524.) In the process of issuing reclamation requirements, the Regional Boards must consult with and consider recommendations of the Department. (Water Code Section 13523.) Any reclamation requirements which are issued by the Regional Boards, whether applicable to the reclaimer or to the user of reclaimed water, must include or be in conformance with any regulatory reclamation criteria adopted by the Department.

Where reclaimed water use is involved or proposed, both the Department and the Regional Boards have authority to require construction reports and such other reports as may be necessary to assure protection of both public health and water quality.

Where use of reclaimed water is involved, both the Department and the Regional Boards have enforcement authority. The Department may take steps to abate any contamination which may result from use of reclaimed water. The Regional Boards may undertake various actions, both of a civil nature and relative to criminal sanctions, for failure to file necessary reports, for reclamation or use of reclaimed water without reclamation requirements, or for violation of any reclamation requirements imposed by a Regional Board.

There are other specific areas involving or associated with use of reclaimed water where interaction between the Department, the State Board and the Regional Boards is required. These areas include direct injection of reclaimed water into groundwater which is suitable for domestic water supply and use of reclaimed water for irrigation of greenbelt areas.

In addition to the authority vested in the Department, the State Board and the Regional Boards relative to use of reclaimed water, various local health authorities have an independent and autonomous role and authority in assuring protection of public health and water quality in areas subject to their jurisdiction.

15/2/8

III.  GENERAL PRINCIPLES.

The general principles agreed to by the Department and the State Board are as follows:

(A)  Reclamation requirements issued by the Regional Boards will impose all absolute reclamation criteria established by the Department's regulations.

(B)  All recommendations of the Department which involve areas of critical or essential health concern shall be included in any reclamation requirements issued by a Regional Board or by the State Board, unless variation therefrom is adequately documented and justified by the Regional Board.  This principle encompasses all absolute criteria contained in the Department's Guidelines.

(C)  Each agency hereto and the Regional Boards shall, to the maximum extent compatible with fulfillment of its primary responsibility to protect and preserve public health or water quality, promote and facilitate use of reclaimed water in this State.

IV.  PROGRAM PROVISIONS AND COMMITMENTS.

To assure fulfillment of the purposes and principles set forth in the MOA, the agencies hereto commit themselves to the following programmatic approaches:

(A)  Issuance and Enforcement of Reclamation Requirements:

1.  The Regional Boards will consult with and seek recommendations from the Department prior to the issuance of any reclamation requirements.  The Department will be provided with a copy of any reclamation requirements which a Regional Board proposes to issue as a part of the consultation process, and shall have reasonable opportunity to comment thereon prior to any adoption thereof.  Any comments or recommendations which the Department intends to make on proposed reclamation requirements will be expeditiously provided.  As a part of the consultation process, the Regional Boards will notify the Department of any intended departure from any absolute criteria contained in the Department's Guidelines.

2.  Any Department recommendations to the Regional Boards relative to proposed reclamation requirements will identify those nonregulatory recommendations which the Department believes are critical and essential for protection of public health.  In the event that the staff of any Regional Board does not intend to recommend inclusion of any such recommendation in the proposed reclamation requirements which will be submitted to the Regional Board, the Department will be notified at the Branch Chief level. The Regional Board Executive Officer and the appropriate Department Branch Chief will attempt to resolve any differences over the terms of the proposed reclamation requirements.  If the differences cannot be resolved at this level, the matter will be brought to the attention of the Chief of the Department's Environmental Health Division.  If the differences are not resolved at this level, the Regional Board staff will proceed toward presentation of the proposed reclamation requirements to

the Regional Board. The Department will be given adequate notice of any meeting or hearing relative to adoption of the proposed reclamation requirements, and a reasonable opportunity to present its perspectives, arguments and rationale to the Regional Board prior to adoption of the reclamation requirements.

In the event that a Regional Board determines not to impose any nonregulatory recommendations which have been identified by the Department as critical and essential for the protection of public health, the Regional Board will expeditiously provide the Department with a full and detailed written explanation of the basis and rationale for its decision.

3. Other recommendations of the Department, not identified by the Department as critical or essential for the protection of public health, will be included by the Regional Boards in their reclamation requirements in the manner and to the extent determined to be appropriate by the Regional Boards after full consideration of the Department's recommendations. In each case where there is any significant variation from any such recommendation given by the Department to which the Department has not agreed, the Regional Boards will notify the Department in writing that changes have been made to the Department's recommendations. Such notice will clearly identify the changes that have been made and provide a statement of the reasons and rationale for variation from the Department's recommendations.

4. If a Regional Board accepts and imposes any recommendation made by the Department and the requirement so imposed is challenged by any person, the Department will supply justification for, and otherwise reasonably support and defend, such recommendation.

5. The provisions of Paragraphs 2 and 3 above are intended to apply, as appropriate, to all recommendations of the Department, including but not limited to, recommendations related to treatment requirements, treatment methods, necessary facilities, monitoring, sampling requirements and analyses thereof, reporting requirements, reliability features, operation and maintenance requirements, alarm and warning systems, cross connection protections, set back and buffer zones, and pipeline separation.

6. The Regional Boards will not waive the necessity of reclamation requirements for any proposed use of reclaimed water without consultation with the Department.

7. The Regional Boards shall be primarily responsible for reasonable surveillance and monitoring of all activities subject to reclamation requirements. The Regional Boards will expeditiously notify the Department of all significant violations of reclamation requirements or improper reclamation uses within their jurisdictions. The Department will expeditiously notify the appropriate Regional Board of improper reclamation uses or violation of reclamation requirements which become known to the Department.

8.  As between the agencies hereto, it is understood that the Regional Boards shall have primary responsibility for enforcement of reclamation requirements and prevention of improper reclamation uses in their respective jurisdictions. The Regional Boards and the State Board will commit sufficient staff resources to assure adequate enforcement of reclamation requirements and reclamation uses within their regions. It is recognized, however, that enforcement action may be undertaken by the Department and by local health authorities for violation of reclamation requirements or improper reclamation use where action by the Department or local health authorities is deemed essential for adequate protection of public health.

9   The Department will take reasonable steps to assure consistency of action between its various regions and offices.

10. The State Board will take reasonable steps to assure consistency of action between the Regional Boards.

(B) Revision of Department Guidelines For Use of Reclaimed Water. The agencies hereto recognize that the current Department Guidelines need to be reviewed and revised as appropriate. The Department will undertake to develop updated, mutually acceptable Guidelines, in the following manner:

1.  The Department will forward a copy of the current Guidelines and relevant and related material to the Regional Boards, the State Board, the California Conference of Local Health Officers (CCLHO) and the California Conference of Directors of Environmental Health (CCDEH) soliciting comments regarding the Guidelines including any changes or revisions desired.

2.  The recipients will expeditiously, and in any event not later than November 10, 1988, provide any comments which they intend to make.

3.  The Department will prepare and distribute the first draft of proposed revised Guidelines by January 1, 1989.

4.  The agencies hereto will form a Joint Task Force to provide advice to the Department on development of Guidelines. It is anticipated that this Task Force will be comprised of three representatives from the Department, two Regional Board Executive Officers, two representatives from the State Board, one representative from Tri-TAC, and two representatives on behalf of local health authorities, presumably from CCLHO and/or CCDEH.

5.  It is anticipated that final revised Guidelines will be concurred in by the agencies hereto and that, in addition, the revised Guidelines will be endorsed and concurred in by both CCDEH and CCLHO.

6.  In addition to advising the Department on development of revised Guidelines, the Task Force will also make recommendations to the Department concerning what portions of the revised Guidelines should be promulgated in the formally adopted regulations of the Department.

(C)  Review of the Department's Regulatory Reclamation Criteria.
The agencies hereto recognize that the Department's regulatory
reclamation criteria, presently set forth in the California Code of
Regulations, Title 22, Division 4, Section 60301 et seq., should be
reviewed.  In addition, concerns have been periodically expressed over
the adequacy of the Department's justification for its current
Title 22 reclamation criteria.  In the light of these circumstances,
the agencies hereto  agree as follows:

1.  The Department will undertake and expeditiously complete a review
of its Title 22 reclamation criteria.  The Joint Task Force which
is to be formed under Part IV, (B) 4 above will review the current
regulatory criteria and provide its comments and recommendations
to the Department.  Dependent upon the recommendations of the Task
Force, the Department may reestablish and reconstitute its
Health Effects Advisory Committee to provide additional
assistance in the development of revised regulatory criteria.  The
State Board will supply reasonable support and resources to the
Department toward the effort of revision of the regulatory
criteria upon request of the Department.  The Department
anticipates that, by July 1, 1989, it will be able to determine
whether the Title 22 regulations do require modification.  If
modification is determined to be appropriate, the Department will
expeditiously undertake the necessary revision.

2.  The Department will develop and make available an issue paper
which explains and sets forth the justification and rationale for
the Current Title 22 reclamation criteria.  It is anticipated that
the necessary document will be developed by January 1, 1989.

(D)  Groundwater Recharge.  The State Board and the Department, in
conjunction with the Department of Water Resources, are in the process
of development of an interagency policy and guidelines relative to use
of reclaimed water for groundwater recharge.  It is anticipated that
the policy and guidelines will be developed in two phases, will
address planned, unplanned, and incidental recharge, and will also
address mutual goals, objectives, principles and coordination of
activities of the agencies hereto relative to groundwater recharge.
The State Board and the Department will continue their efforts to
develop the necessary interagency policy and guidelines in accordance
with the following schedule:

Completion of final draft of Phase I      January 15, 1989
Completion of final draft of  Phase II     January 15, 1990

It is anticipated that the final policy/guidelines will be approved
and adopted jointly by the Department and the State Board, and that,
upon concurrence of the Regional Boards, the final approved
policy/guidelines will be incorporated by addendum into this MOA.

(E)  Inconsistencies Between Regulation of Use of Reclaimed Water and
Nonregulation of Reuse of Treated Wastewater (Incidental Reuse);
Development of Programs and Strategies.  The agencies hereto
recognize that, unlike the strict regulation that occurs where use of

15/6/8

reclaimed water is involved, there are instances where somewhat similar uses of treated wastewater are presently unregulated. It is also recognized that some instances of nonregulation of reuse of treated wastewater may result in cases which involve significant health concerns, and that additional work needs to be done to develop those programs and strategies necessary to assure protection of public health and water quality in such situations. The agencies hereto, however, also recognize that the issues involved are complex. As the other requirements of this MOA are fulfilled and as staff and resources become available, the agencies hereto commit themselves to resolve the problems and issues noted in this paragraph.

As an interim measure, pending further action pursuant to the foregoing paragraph, if the Department notifies a Regional Board of any instance of unregulated reuse of treated wastewater which the Department believes involves critical or essential health concerns, the Regional Board which is involved shall take whatever action is appropriate to protect public health. If the Regional Board declines to take any action, or if the Regional Board in taking action decides not to impose any recommendation of the Department, the Regional Board will expeditiously provide the Department with a full and detailed written explanation of the basis and rationale for its decision.

(F)  Coordination with Local Health Authorities.  The agencies hereto acknowledge the need to and desirability of working with and cooperating with local health authorities to assure coordination of activities relative to use of reclaimed water, to reduce conflicts, and to promptly and effectly resolve any conflict which may arise. The Task Force formed under Part IV, B 4 above will undertake to ~~attempt~~ develop appropriate mechanisms to promote cooperation and coordination between state agencies and local health authorities in the reclamation area and to resolve any disputes that may arise. Proposed mechanisms when developed will be presented to the agencies hereto for consideration of appropriate action.

V.  DISPUTE AND CONFLICT RESOLUTION.

(A)  It is the desire of the agencies hereto to establish a speedy, efficient, informal method for resolution of interagency problems, disputes or conflicts. To that end, except as otherwise provided in this MOA, and to the extent not inconsistent with any formal administrative appeals which may be pending:

1.  Department concerns with Regional Board action or inaction, which cannot otherwise be informally resolved, will be brought to the attention of the State Board Executive Director who will attempt to resolve the same with the appropriate Regional Board or Boards. In the event that such concerns still cannot be resolved to the satisfaction of the Department, the matter shall be referred to the Director of the Department and the Chairman of the State Board for consideration and appropriate action toward resolution.

2.  Regional Board concerns with Department action or inaction, which cannot otherwise be informally resolved, will be referred to the

State Board Executive Director who will attempt to resolve the same with the Department's Deputy Director for Public Health. In the event that the concerns still cannot be resolved to the satisfaction of the Regional Board or Boards involved, the matter shall be referred to the Director of the Department and the Chairman of the State Board for consideration and appropriate action for resolution.

3.  Concerns between the Department and the State Board which cannot otherwise be informally resolved will be referred to the State Board Executive Director and the Department's Deputy Director for Public Health. In the event that the concerns still cannot be resolved to the mutual satisfaction of the State Board and the Department, the matters in issue shall be referred to the Director of the Department and the Chairman of the State Board for appropriate action.

4.  Nothing contained herein shall be construed to deprive the Department of formal appeal rights relative to any alleged Regional Board action or inaction. In the event of such an appeal, the State Board will expedite any review process.

## VI.  MODIFICATION AND PERIODIC REVIEW.

This MOA may be modified in writing at any time by mutual agreement of the agencies hereto. Proposed modifications may be suggested by any agency hereto at any time.

The agencies hereto will meet periodically, not less than once each year, to discuss the actions of each agency relative to this agreement, to devise and agree to appropriate activities for the forthcoming fiscal year, and to consider additional actions and activities which each agency can take to better coordinate their activities and further promote use of reclaimed water in the State.

Director
Department of Health Services

12-5-88

Chairman
State Water Resources Control Board

11-15-88

15/8/8

MANAGEMENT AGENCY AGREEMENT BETWEEN
THE WATER RESOURCES CONTROL BOARD,
THE BOARD OF FORESTRY, AND THE
DEPARTMENT OF FORESTRY AND FIRE PROTECTION,
STATE OF CALIFORNIA

This Management Agency Agreement (Agreement) is entered into by and between the State Water Resources Control Board (Water Board), the State Board of Forestry (BOF), and the State Department of Forestry and Fire Protection (Department, CDF), State of California, for the purpose of carrying out, pursuant to Section 208 of the Federal Clean Water Act, those portions of the State's Water Quality Management Plan related to silvicultural activities on nonfederal lands in the State of California.

WHEREAS:

1.  The Board of Forestry has the authority and responsibility, pursuant to the State's Z'berg-Nejedly Forest Practice Act, to promulgate Forest Practice Rules (Rules) and policies to specify practices related to timber operations on non-federal lands in order to restore, enhance and maintain the maximum sustained production of high-quality timber while giving consideration to other natural resources, including the quality and beneficial uses of water.

2.  The Department has the authority and responsibility to administer these Rules and policies.

3.  The Water Board and the Regional Water Quality Control Boards (Regional Boards) have the authority and responsibility, pursuant to the State Porter-Cologne Act and the Federal Clean Water Act (as amended), to promulgate Water Quality Management (WQM) plans and water quality control plans (Basin Plans) which set forth objectives for restoring, enhancing, and maintaining the quality and beneficial uses of the State's waters, to promulgate regulations and policies to attain these objectives, and to administer these regulations and policies to ensure that waste discharges, including those from silvicultural activities, do not degrade the quality and beneficial uses of the State's waters.

4.  The Water Board has the authority and responsibility, pursuant to Section 208 of the Federal Clean Water Act and Title 40, Part 35, Subchapter G, of the Code of Federal Regulations, to designate appropriate management agencies for implementing certain provisions of 208 WQM plans and to certify 208 WQM plans which incorporate Best Management Practices (BMPs) for control of nonpoint sources of pollution, including silvicultural land uses.

5. The Board of Forestry, the Department and the Water Board mutually desire:

   a. To achieve the goals of the Federal Clean Water Act (as amended), of the State Porter-Cologne Act, and of the State Z'berg-Nejedly Forest Practice Act by restoring, enhancing, and maintaining the quality and beneficial uses of the State's waters;

   b. To achieve the water quality objectives set forth in applicable Basin Plans of the State;

   c. To minimize duplication of effort and to establish complementary resource protection programs; and

   d. To assure protection of the quality and beneficial uses of the State's waters through development and implementation of BMPs.

6. The Board of Forestry has promulgated, and the Department administers, Rules which are intended to be BMPs for protection of the quality and beneficial uses of the State's waters from waste discharges due to timber operations on nonfederal lands. The BOF has requested certification of these Rules and the procedures (Process) by which they are promulgated and implemented.

7. On January 21, 1988 and effective upon execution of this Agreement, the Water Board designated the Board of Forestry and the Department as joint management agencies for timber operations on nonfederal lands in the State and certified a 208 WQM plan consisting of: (a) the water quality-related Rules effective through December 31, 1986 (See Item C. 1.), (b) the Process by which they are promulgated and implemented, and (c) this Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

A. The Board of Forestry agrees:

   1. To refine, continue to develop, and adopt BMPs based on consideration of the potential for protecting the quality and beneficial uses of water, technical soundness, and economic and institutional feasibility, in accordance with the Forest Practice Act and with the issues and anticipated schedules set forth in the following attachments:

Attachment A - ITEMS FOR DEVELOPMENT
Attachment B - ITEMS FOR REFINEMENT
Attachment C - ITEMS FOR FURTHER CONSIDERATION

2. That BOF in consultation with the interagency liaison committee (as described in Item D. 8. et. seq.) and others, will approach each issue in Attachments A and B by defining the problem, stating suggested solutions, drafting Rule language and presenting any alternative non-rule approaches which would implement such solutions. Recommendations will be referred through the BOF chairman to the appropriate BOF committee and then, as appropriate, to the BOF District Technical Advisory Committees (DTACs). The DTACs will then review issues and make recommendations after hearing from the public, industry, and concerned agencies. The DTACs' recommendations will be reported to the BOF.

Following receipt of recommendations from DTACs and/or other appropriate committees, BOF will, as part of its regular agenda (including public hearings), do the following in accordance with the anticipated schedules in Attachments A and B:

a. Evaluate any recommended Rule language and adopt that found to be appropriate;

b. Evaluate any recommended non-Rule approaches, and in cooperation with other appropriate parties, affect implementation of those found to be appropriate; and

c. Report results to the Water Board in accordance with Items B.4 and B.5 below.

B. The Board of Forestry and the Department jointly agree:

1. To each accept designation as, and the responsibilities of, a water quality management agency for timber operations on nonfederal lands in the State of California.

2. To consider, in consultation with the interagency liaison committee (as described in Item D. 7. et. seq.) and others, the best means of resolving issues regarding improvement of BMPs and their implementation which are set forth in Attachment C and to develop and implement appropriate improvements.

3. To develop and carry out improved auditing of agency performance in implementing BMPs.

16 /3/24

4. To jointly provide progress reports at Water Board workshops regarding resolution of the issues specified herein:

   a. Semi-annually for the first two years following the date of certification; and

   b. As mutually deemed necessary thereafter, but not more frequently than semi-annually.

5. To submit, with the annual BOF report to the Legislature, a concurrent written report to the Water Board which:

   a. Summarizes the following:

      (1) Progress in resolving issues in accordance with any attachment hereto,

      (2) Any significant additions, deletions, or amendments of the laws, Rules and Process which have or will become effective after January 1, 1987 and which may affect protection of the quality and beneficial uses of water, with explanation for each such change, and

      (3) The results of any agency studies or audits of the performance of foresters, timber operators, and agency personnel, and of the Rules and implementation Process; and

   b. Presents any suggestions for needed studies and for changes in the Rules, the Process, or in this Agreement.

C. The Water Board agrees:

   1. That those provisions of the Rules which were in effect before January 1, 1987, and which are set forth in the following Subchapters and Articles of the California Administrative Code, Title 14, Division 1.5, Chapter 4 constitute BMPs:

   Subchapter 1 (Abbreviations and Definitions)

      Article 1

<u>Subchapters 4, 5, and 6 (Coast, Northern, and Southern Forest Districts, respectively)</u>

> Article 2 (Definitions, Ratings, and Standards),
> Article 3 (Silvicultural Methods),
> Article 4 (Harvesting Practices and Erosion Control), and
> Article 6 (Watercourse and Lake Protection)

<u>Subchapter 4 (Coast Forest District)</u>

> Article 11 (Coastal Commission Special Treatment Areas), and
>
> Article 12 (Logging Roads and Landings)

<u>Subchapters 5 and 6 (Northern and Southern Forest Districts, Respectively)</u>

> Article 11 (Logging Roads and Landings)

2.  That this Agreement, together with the Rules referenced in Item C.1 above, and the Process (including interagency Review Teams) constitute a 208 WQM plan for control of nonpoint source pollution from timber operations on nonfederal lands which:

    a.  Is consistent with relevant provisions of the State/EPA Agreement and Work Program, Federal regulations, and the Federal Clean Water Act;

    b.  Is technically sound and economically feasible;

    c.  Is consistent with other relevant and approved WQM plans; and

    d.  Represents substantial progress toward achievement of water quality goals.

3.  To review the annual written report specified in Item B.5, and to identify any concerns regarding protection of water quality due to changes in the Rules or Process made or proposed by BOF and/or CDF.

4.  To direct Regional Boards, upon EPA approval of the 208 WQM plan, to cease issuance of Waste Discharge Requirements for timber operations on nonfederal lands except as provided in Section 4514.3 of the Public Resources Code.

D. The Water Board, the Board of Forestry, and the Department agree:

1. That Rule modifications or other means to resolve, in a manner acceptable to the parties hereto, the issues set forth in Attachments A and B will be pursued through normal BOF procedures.

2. That resolution of the issues in Attachment C will be pursued in a manner acceptable to the parties hereto, after further study.

3. That improved methods for implementing BMPs shall be developed and carried out as follows:

   a. Implementation of guidance documents developed in accordance with Attachment D shall begin within 2 years after the effective date of certification or as soon thereafter as feasible;

   b. Training and education programs, and participation therein, shall be pursued on a continuing basis in accordance with Attachment E; and

   c. State agency procedures which are acceptable to the parties hereto and which are developed in accordance with Attachment F shall be incorporated into appropriate Memoranda of Understanding (MOUs) within one year after the effective date of certification.

4. That improved private sector procedures for implementing BMPs shall be encouraged on a continuing basis in accordance with Attachment G.

5. That additional studies to further assess the effects of timber operations on water quality and to provide for continued evaluation, development, and improvement of BMPs and their implementation shall be developed in accordance with Attachment H. Study workplans will be submitted to the parties no more than 2 years after the effective date of certification or as soon thereafter as feasible.

6. That the development and implementation of BMPs and the additional studies conducted by the parties hereto shall be coordinated with concerned state agencies, especially the Department of Fish and Game (DFG) and Regional Boards, with Federal agencies, with BOF DTACS, and with the private sector.

7.   That activities needed to carry out Items D.1 through D.5 above shall begin within 30 days after the effective date of certification.

8.   That the Chairpersons of BOF and the Water Board (or another Board member) and the Director of CDF shall serve as an interagency liaison committee, and the Director of DFG shall be invited to serve with them.

9.   That each agency liaison shall:

a.   Designate an alternate liaison member, if necessary; and

b.   Coordinate the activities of the designating agency as set forth herein with the activities of the other parties hereto, as well as with DFG, Regional Boards, and Federal agencies.

10.   That the liaison committee shall seek mutually acceptable technical support, as needed.

11.   That the liaison committee members shall meet no less than annually to maintain coordination and communication, to review and discuss the BOF/CDF annual report, to review activities under this agreement, and to consider any revisions to this Agreement, including anticipated target dates and schedules, which are requested by any party hereto.  The Director of DFG, or an authorized representative, shall be invited to participate in such meetings.

12.   That the parties hereto shall work together to resolve any conflicts which may arise.

13.   That representatives of Regional Boards and CDF Regions shall meet with each other, and with DFG representatives, as needed to resolve conflicts and concerns, and shall submit brief written summaries of the reasons for and results of such meetings to the designated liaison in each agency.

14.   That the liaison committee shall meet as necessary to resolve conflicts or concerns which arise from and are not resolved by other meetings or reports.  Meetings may be initiated at the request of the Executive Director of BOF and the Water Board, the Director of CDF and DFG, or the Executive Officer of a Regional Board.

15. That this Agreement may be terminated upon a 90 day notice by either board.

16. That another multidisciplinary assessment, in a mutually accepted format, of the adequacy of the Rules and the Process shall be conducted by the parties hereto not more than 5 years after certification. DFG shall be invited to participate in such assessment.

17. That, based on the results of said assessment, certification of the Rules and Process as part of a 208 WQM plan shall be formally reviewed no more than 6 years from the date of certification.

18. That future assessments and related review of certification may again be carried out at such time thereafter as may be mutually agreed upon among the parties.

19. That 208 WQM plan certification or management agency designation shall be reviewed in one or more Water Board hearings under any of the following conditions:

    a. If, for other than financial reasons, the assessments specified herein cannot be implemented;

    b. If, at any time, there is substantial evidence that BOF or CDF have failed to maintain a water quality regulatory program consistent with certification or have failed to satisfy terms of this Agreement; or

    c. If BOF requests such a review.

20. That, except for the provisions of Item C.4 above, nothing herein shall be construed in any way as limiting the legal authority or responsibility of the Water Board or Regional Boards in carrying out their mandates for control of water pollution and protection of the quality and beneficial uses of the State's waters.

16/8/24

21. That nothing herein shall be construed in any way as limiting the legal authority or responsibility of the Board of Forestry or of the Department in carrying out their mandates for regulation of timber and other natural resources on nonfederal lands.

IN WITNESS WHEREOF, the parties hereto, by their respective duly authorized officers, have executed this Agreement in triplicate, on the respective dates indicated below.

STATE BOARD OF FORESTRY,          STATE WATER RESOURCES CONTROL BOARD
STATE OF CALIFORNIA               STATE OF CALIFORNIA

By _Harold R. Walt_              By _W. Don Maughan_
      Harold R. Walt,                  W. Don Maughan,
      Chairman                         Chairman

Date: _2/3/88_                   Date: _FEB 1 1988_

                DEPARTMENT OF FORESTRY AND FIRE PROTECTION
                   STATE OF CALIFORNIA

                By _Jerry Partain_
                      Jerry Partain,
                      Director

                Date: _Feb 3, 1988_

16/9/24

ATTACHMENT A

ITEMS FOR DEVELOPMENT

(These issues are not covered by current Rules.  Consistent with
the process set forth in Item A.2, language for new Rules will be
proposed, evaluated and, if appropriate, adopted by BOF.  Non-Rule
resolutions will also be evaluated and, if appropriate, implemented.)

| | Issue | | Suggested Resolution | | Target Date |
|---|---|---|---|---|---|
| 1. | Practices for site pre- paration after timber harvesting | 1. | Regulation of site pre- paration activities pursuant to AB 1629 (Statute 87; Chapter 987). | 1. | 11/88 |
| 2. | Long-term maintenance of erosion control facilities | 2. | Regulation of long-term maintenance of erosion control facilities in logging area pursuant to AB 1629 (Statute 87; Chapter 987). | 2. | 11/88 |
| 3. | Evaluation of cumulative watershed effects | 3. | Improved requirements and procedures for evaluating cumulative effects. | 3. | 12/88 |
| 4. | Notification of startup date of operations | 4. | Requirement that licensed timber operator (LTO) or landowner notify CDF of actual date logging starts. | 4. | 12/89 |
| 5. | Timber operator licens- ing requirements | 5. | Requirements for manda- tory training for timber operator's license. | 5. | 12/89 |

ATTACHMENT B

ITEMS FOR REFINEMENT

(These issues are at least partially covered by existing Rules.
Consistent with the process set forth in Item A.2, Rule language
to refine and supplement the existing Rules will be proposed,
evaluated and, if appropriate, adopted by BOF.  Non-Rule resolutions
will also be evaluated and, if appropriate,
implemented.)

| Issue | Suggested Resolution | Target Date |
|---|---|---|
| 1. Transfer of Timber Harvesting Plan (THP) information from preparer to LTO | 1. Pre-operation meeting between THP preparer and timber operator, and operator's signature on any THP or amendment. | 1. 9/88 |
| 2. Extra protection measures where tractor operations, or roads or landings are near or within standard watercourse and lake protection zone (WLPZ) widths or on very highly erodible slopes | 2. THP specification of extra protective measures. | 2. 12/88 |
| 3. Performance standard for planning, locating, constructing, and maintaining all roads to protect water-related values | 3. Improved language in 14 CAC 923, 943, 963 to provide enforceable protection performance standards. | 3. 12/88 |
| 4. Road and landing construction standards | 4. Additional specifications for road and landing construction standards. | 4. 12/89 |
| 5. Temporary road crossing removal | 5. Improved specifications for appropriate removal procedures. | 5. 12/88 |
| 6. Disposal of landing debris over edge of landing above water courses | 6. Improved requirements for disposal of landing debris. | 6. 12/88 |

| Issue | Suggested Resolution | Target Date |
|---|---|---|
| 7. Alternative protection practices | 7. Clarification of Section 916.2(c), 936.2(c), 956.2(c) regarding "feasible practices" and "adequate protection". | 7. 12/88 |
| 8. Vegetative canopy and structure in WLPZ | 8. Improved criteria and methods for retaining vegetative canopy within WLPZ and for retaining riparian vegetation. | 8. 12/88 |
| 9. Ground cover retention in WLPZ | 9. Improved language in 14 CAC 916.5e, 936.5e, 956.5e, to require retention of adequate ground cover. | 9. 12/88 |
| 10. Terms used in determination of WLPZ width | 10. Rule definitions for "bank" and "change in slope". | 10. 12/88 |
| 11. Flood prone area protection | 11. Inclusion of flood prone areas in WLPZ and/or extra protection to prevent erosion or debris flotation. | 11. 12/88 |
| 12. Determination of WLPZ width and protection measures | 12. Inclusion of geological, hydrological and biological factors in determining appropriate WLPZ width and protection measures. | 12. 12/88 |
| 13. Standards for existing roads | 13. Application of new-road standards for drainage facilities, ditch drains, soil stabilization, etc., to existing roads. | 13. 12/88 |

| <u>Issue</u> | | <u>Suggested Resolution</u> | | Target<br><u>Date</u> |
|---|---|---|---|---|
| 14. Domestic water supply protection | 14. | Requirements for: (a) protection for water supply springs and pipelines, and identification in THP; (b) identification of potable water supplies within an appropriate distance downstream from operation; (c) notification of THP filing to the owners of such water supplies; and (d) protection for likely potential and restorable human uses. | 14. | 12/88 |
| 15. Clear, enforceable performance standards for water quality protection | 15. | Clarification of intent Sections 914, 916, 934, 936, 954, and 956, to provide clear, enforceable performance standards. | 15. | 12/89 |
| 16. Skid trail erosion control requirements | 16. | Requirements for: (a) extra protective measures where skid trails are close to other skid trails, roads and landings; (b) temporary road maintenance and abandonment provisions when skid trails are equivalent to a temporary road; and (c) application of temporary road crossing, drainage stabilization and removal provisions to temporary skid trail crossings. | 16. | 12/89 |

16/13/24

| Issue | Suggested Resolution | Target Date |
|-------|---------------------|-------------|
| 17. Winter operations procedures | 17. THP justification for using 914.7c, 934.7c, 954.7c, in lieu of a winter operating plan. | 17. 12/89 |
| 18. Sensitive area operations | 18. THP specification of methods and equipment for road and landing construction, disposal, drainage, stabilization, maintenance, and abandonment. | 18. 12/89 |
| 19. Erosion control on roads | 19. Requirements for: (a) THP specification of erosion and drainage control on road crossings; (b) THP specification measures to prevent or reduce future failure of road areas being reconstructed; and (c) improved seasonal abandonment of temporary roads. | 19. 12/89 |

16/14/24

ATTACHMENT  C

<u>ITEMS  FOR  FURTHER  CONSIDERATION</u>

(These issues need further study to determine the most appropriate
resolutions.  Both Rule and non-Rule approaches will be considered.
Evaluation of Rule language will occur consistent with the process
set forth in Item A.2.)

| | Issue | | Suggested Resolution | | Target Date |
|---|---|---|---|---|---|
| 1. | Erosion hazard rating | 1. | Improved use of erosion hazard rating system and minor adjustments to rating system. | 1. | 12/89 |
| 2. | Retention of riparian hardwood and non-commercial trees | 2. | Improved treatment of riparian hardwoods and noncommercial trees, especially after conifer harvest. | 2. | 12/89 |
| 3. | Registered Professional Forester (RPF) responsibility | 3. | Evaluation of:  (a) increased RPF account-ability for THP adequacy; (b) addition of RPF super-vision and (c) reevaluation of present rules for suspension or revocation of RPF and LTO licenses for serious violations of the Rules. | 3. | 12/89 |
| 4. | Repeal of 14 CAC 898.2e | 4. | Consider reinstatement 14 CAC 898.2e which required denial of THPs if implementa-tion would violate state or federal standards. | 4. | 12/89 |
| 5. | Culvert sizing | 5. | THP specification of culvert sizing method used. | 5. | 12/89 |
| 6. | Agency disagreement over approval of plan | 6. | Provide dispute resolu-tion procedure through MOU or consider head-of-agency appeal. | 6. | 12/88 |

16/15/24

| Issue | Suggest Resolution | | Target Date |
|---|---|---|---|
| 7. Confusion over meaning of "in lieu" practice | 7. Evaluate use of "in lieu" concept in Rules. | 7. | 12/88 |
| 8. Agency consultation prior to approving in-stream cleanup | 8. Provide for such consultation through MOU | 8. | 12/88 |
| 9. Improved participation by public and nonreview agencies in review process | 9. Improved procedures for participation | 9. | 12/88 |
| 10. Reevaluation by review team after response by RPF | 10. Provide for such re-evaluation through MOU | 10. | 12/88 |
| 11. Point of RPF transfer of responsibility to LTO | 11. Study need for Rule. | 11. | 12/89 |
| 12. Recognition of and pro-tection against mass wasting hazard | 12. Improved criteria and methods for evaluating and protecting against mass wasting hazard. | 12. | 12/89 |
| 13. Use of guidance documents | 13. Requirements for use of guidance docu-ments (if necessary) after development of documents. | 13. | 12/89 |

16/16/24

ATTACHMENT D

DEVELOPMENT AND IMPLEMENTATION OF GUIDANCE DOCUMENTS TO
COMMUNICATE INFORMATION TO PRACTITIONERS

A.  Develop or improve guidance documents on the following
    topics:

1.  Criteria and methods for identifying and evaluating (or
    rating) the following types of sensitive areas or
    conditions:

    a.  Erodible and unstable slopes;
    b.  Near-stream geological and hydrological conditions;
    c.  Near-stream biological conditions, including riparian
        zone, canopy cover, and windthrow potential;
    d.  Instream structure, habitat, and wildlife value; and
    e.  Offsite beneficial uses of water.

2.  Criteria and methods for evaluating potential adverse
    effects and for selecting measures to protect any of the
    above from adverse effects of:

    a.  Felling, yarding, and stream clearing activities;
    b.  Road and landing location, construction, and
        maintenance; and
    c.  Site preparation activities; and
    d.  Cumulative watershed effects.

3.  Criteria and methods for road and landing construction,
    maintenance and abandonment.

4.  THP content needed to:

    a.  Describe the following:

        (1)  site environmental conditions,
        (2)  proposed practices, especially if non-standard,
             and
        (3)  probable environmental effects of practices;

    b.  Describe and justify proposed protection measures;
        and

    c.  Set forth the above in a manner which provides for:

        (1)  thorough disclosure and environmental review,
        (2)  clear and comprehensive guidance to LTOs and
             other responsible parties, and
        (3)  specific and enforceable standards.

B. Determine the most effective and appropriate methods of assuring use of the guidance documents, considering the following:

    1. Incorporation into training and education programs;
    2. Promotion through professional meetings and publications;
    3. Implementation by THP review teams;
    4. Amendment of THP forms to demonstrate use where appropriate;
    5. Amendment of Rules to require use; and
    6. Adoption as Technical Rule Addendum.

C. In carrying out the above, perform the following tasks:

    1. Compile and review available reference material to determine whether, for each subject area, available material is adequate, can be readily supplemented, or whether new guidance documents are needed.

    2. Determine the need for additional financial and administrative assistance, for scientific or technical assistance, and/or for additional studies in order to carry out the foregoing tasks.

## ATTACHMENT E

## IMPROVEMENT AND DEVELOPMENT OF TRAINING AND EDUCATION PROGRAMS

A. Continue to develop and upgrade training and education programs on the topics set forth in Attachment D and on any other topics deemed appropriate by the liaison committee.

B. In carrying out the above, the following tasks are recommended:

1. Review existing programs and training materials to determine whether, for each topic, existing programs are adequate, could be adequately supplemented, and/or whether new programs are needed.

2. Determine the most important training and education needs of:

   a. Foresters involved in planning, supervising, or monitoring timber operations;

   b. Non-foresters (agency personnel) involved in planning, reviewing, inspecting, and monitoring timber operations;

   c. Timber operators, timber owners, and other parties responsible for operations and environmental protection.

3. Determine the most appropriate program formats and materials (e.g., guidelines, handouts, video cassettes, seminars, workshops, tailgate sessions, etc.).

4. Determine the most appropriate parties (including review team agency representatives) to develop and present program materials.

5. Determine any administrative and financial needs and feasible methods for satisfying these needs.

6. Determine the most appropriate methods of encouraging participation (e.g., credits toward education requirements, payment or waiver of fees, etc.).

C. Continue to update training programs to meet changing needs.

16/19/24

## ATTACHMENT F

## INTERAGENCY PROCEDURES FOR BMP IMPLEMENTATION

A. Determine appropriate interagency procedures for each of the following:

   1. Improved training programs in forestry and protection of water-related values for Review Team agencies and assuring adequate agency participation.

   2. Procedures by which Review Team agencies shall more consistently seek and provide consultation before, during, and after timber operations, giving special consideration in the following:

      a. Appropriate use of watercourse classification system, especially for Class II and III watercourses;

      b. Sensitivity of onsite geological, hydrological, and biological conditions which may affect water-related values;

      c. Probable effects of timber operations on sensitive conditions and water-related values, especially where:

         (1) Yarding, roads, or landings will be, are or were within or close to standard WLPZ widths, reducing density of ground cover or canopy cover,

         (2) Sensitive geological, hydrological, or biological conditions exist onsite which are likely to be disturbed by operations,

         (3) Non-standard practices will be, are, or were used, and

         (4) Special concerns have been raised;

      d. Appropriateness of practices and protection measures which may be, are, or were used.

   3. Procedures to provide for cooperative monitoring studies to better determine the effects of forest practices, especially under the conditions listed in Item A.2.

   4. Access by DFG and Regional Board representatives onto nonfederal timberlands.

   5. Improved procedures for assuring the adequacy of THP content.

6. Improved procedures for THP review, including the following:

    a. Increased review agency attendance at Review Team meetings and preharvest inspections;

    b. Increased participation by public and non-Review Team agencies in Timber Harvesting Plan review;

    c. Increased review times if needed;

    d. Review Team re-evaluation of any post-review changes made to THP between review and approval of THP; and

    e. Improved resolution of conflicts between representatives of Review Team agencies, including a stepwise time-certain process for negotiating or appealing disagreements to higher levels of authority within each agency.

7. Procedures to improve operator compliance with Rule and THP requirements, including the following:

    a. Increased use of unannounced inspections;
    b. Increased use of inspections focused on operations in sensitive areas which may threaten water-related values;
    c. Increased participation in compliance inspections by other Review Team representatives;
    d. Increased and improved inspection of road construction practices; and
    e. Increased use of DFG and Regional Boards in support of CDF enforcement actions.

B. Incorporate appropriate improvements in agency procedures into any needed and mutually acceptable MOUs (or other agreements) which specify:

    1. The authority and responsibility (including decision-making and advisory roles) given to each agency for implementing such improvements; and

    2. The levels of adequately trained staff and other resources to be maintained by each agency in order to implement these improvements.

ATTACHMENT G

## DEVELOPMENT AND IMPROVEMENT OF VOLUNTARY
## PROCEDURES FOR PRIVATE SECTOR BMP IMPLEMENTATION

A.  Encourage adoption of clear comprehensive policy statements
    by landowners, companies and/or professional associations by
    doing the following:

    1.  Working with representatives of the timber industry and
        related professional associations to assist in
        development of policy statements regarding environmental
        protection for use by the private sector.

    2.  Where feasible, developing key concepts and suggested
        language for incorporation into policy statements.

B.  Encourage private sector implementation of BMPs by suggesting
    feasible procedures, such as the following:

    1.  Encouraging foresters to more frequently consult with
        other subject matter experts when warranted.

    2.  Training employees using appropriate techniques.

    3.  Improving communication between foresters and operators
        regarding desired site-specific environmental results of
        operations.

    4.  Improving and standardizing flagging and marking codes
        used in site layout to assist operator.

    5.  Improving supervision of operations by foresters.

    6.  Improving inhouse monitoring of effects of operations to
        ensure that desired results are being achieved.

    7.  Improving auditing of operator performance.

    8.  Improving self-policing within industry and professional
        associations of persons who repeatedly violate
        environmental protection policies.

ATTACHMENT H

DEVELOPMENT AND IMPLEMENTATION OF
PROGRAMS FOR ADDITIONAL STUDIES

A.  Study appropriate criteria and methods for evaluating or
    rating sensitive conditions listed in Attachment D, Item A.

B.  Develop and conduct studies of the best feasible methods for
the following:

1.  Establishing natural resource databases which are:

    a.  Located in state agencies (including DFG, CDMG, CDF,
        Water Board, and Regional Boards) and Federal
        agencies involved with natural resource management.

    b.  Mutually compatible in structure and format in order
        to facilitate interagency use;

    c.  Capable of using the existing files, databases, and
        unorganized information currently in the State
        agencies, and, to the degree feasible, in Federal
        agencies, educational institutions, and the private
        sector;

    d.  Capable of expanding to incorporate new information
        developed by additional studies of natural resources;

    e.  Accessible to users in the private sector,
        educational institutions, and Federal agencies;

    f.  Descriptive of the characteristics and geographical
        distribution of geologic, topographic and climatic
        features, soils, vegetation, animals, wildlife
        habitats, land uses (past, present, and potential),
        water quality, and beneficial uses.

2.  Establishing watershed planning programs which are:

    a.  Capable of facilitating evaluation of the location
        and sensitivity of unstable or erodible slopes, near-
        stream geological, hydrological, and biological
        conditions, instream or lacustrine aquatic habitats,
        and human uses of water; and

    b.  Capable of facilitating evaluation of the probable
        effects of alternative courses of action or
        combinations of activities within a watershed.

16/23/24

C.  Study criteria and methods for evaluating actual and potential cumulative watershed effects.  The methods shall be:

    1.  Feasible and reasonably accurate.

    2.  Mutually acceptable to State and Federal agencies and capable of being used in areas of mixed Federal and nonfederal ownership of land.

    3.  Capable of evaluating contributions to cumulative effects from every significant land use or activity within a watershed.

    4.  Capable of evaluating the variability of individual cumulative effects with time and location.

D.  Study long-term effects on mass wasting and water-related values caused by timber harvesting and related activities, especially in sensitive near-stream locations.

16/24/24

MEMORANDUM OF AGREEMENT
BETWEEN THE
STATE WATER RESOURCES CONTROL BOARD
AND THE
DEPARTMENT OF CONSERVATION
DIVISION OF OIL AND GAS

## Purpose

The purpose of this Memorandum of Agreement (MOA) is to outline the procedures for reporting proposed oil, gas, and geothermal field discharges and for prescribing permit requirements. These procedures are intended to provide a coordinated approach resulting in a single permit satisfying the statutory obligations of both parties to this MOA. These procedures will ensure that construction or operation of oil, gas, and geothermal injection wells and surface disposal of waste water from oil and gas and geothermal production does not cause degradation of waters of the State of California.

## General

### Responsibilities of the Agencies

The Department of Conservation, Division of Oil and Gas (CDOG) has the statutory responsibility to prevent, as far as possible, damage to underground and surface waters suitable for irrigation or domestic purposes resulting from the drilling, operation, maintenance, or abandonment of oil, gas, and geothermal wells (Public Resources Code Sections 3106 and 3714). In March 1983, CDOG received primacy from the Environmental Protection Agency (EPA) pursuant to the provisions of Section 1425(a) of the federal Safe Drinking Water Act that gives CDOG additional authority and responsibility to regulate Class II wells in the State. Class II wells are used to inject fluids into the subsurface that are related to oil and gas production.

The State Water Resources Control Board (SWRCB) and the nine California Regional Water Quality Control Boards (collectively RWQCB) have statutory responsibility to protect the waters of the State and to preserve all present and anticipated beneficial uses of those waters (Water Code, Division 7, Chapters 1 through 7).

### Scope of Agreement

The following procedures have been formulated and adopted by the CDOG and SWRCB to: (1) simplify reporting of proposed waste discharges by the oil, gas, and geothermal operators; (2) achieve coordination of activity; and, (3) eliminate duplication of effort among the State agencies. As far as these agencies are concerned, the method of reporting proposed oil, gas, and geothermal underground injection and surface discharges will be uniform throughout the State. The attached maps show district and regional boundaries and office addresses.

Page 2

The following procedures will not generally be applicable to
injection wells or surface disposal methods used by operators to
dispose of wastes other than produced water and fluids defined by
the EPA as Class II.  Other discharges (e.g., refinery wastes) must
be issued waste discharge requirements or waivers through the
appropriate Regional Water Quality Control Board (Water Code,
Division 7, Chapter 4).  Such discharges will not be subject to
regulation by CDOG unless the subject disposal well is within the
administrative limits of an oil, gas, or geothermal field.  In such
case, the CDOG must also issue a permit for the well construction
(Public Resources Code Sections 3008 and 3203).  The conditions of
this permit should be in agreement with the waste discharge
requirements for this well.

The CDOG personnel shall report all pollution problems, including
spills to the ground surface or surface streams, to the appropriate
Regional Board.

Procedures

Underground Injection

1.    Application:  Oil, gas, or geothermal operators must file an
      application for all proposed injection projects with the
      appropriate CDOG District office.  The District office will
      forward a copy of the application to the appropriate Regional
      Board for its review and comment.  Data to be included with the
      application shall include:  (1) a chemical analysis, as
      appropriate, to characterize the proposed injection fluid
      considering the source of the fluid and/or the exposures the
      fluid has or will undergo before disposal; (2) a chemical
      analysis, as appropriate, from the proposed zone of injection
      considering the characteristics of the zone (to include name,
      location, depth and formation for well from which zone fluid
      was sampled); and, (3) depth, location, and injection formation
      of the proposed well.  If the Regional Board wishes to comment
      prior to the issuance of a draft permit for review, comments
      shall be received by CDOG within 14 days.

2.    Review and Consultation:  During the review of the application,
      the CDOG, the Regional Board and the State Board shall consult
      with one another and local agencies, as necessary, and may
      require the applicant to submit additional data, as necessary,
      to demonstrate that the proposed injection will not cause a
      water quality problem.  Additional data required by the RWQCB,
      if reasonably available, shall be forwarded upon request.  Data
      regarded as confidential by CDOG, or the applicant, will be
      identified and kept confidential by the RWQCB.

3.  Permit Preparation and Issuance:

    a.  CDOG will prepare a draft permit, including monitoring
        requirements, for the injection in accordance with
        statutory obligations, furnishing a copy of the draft
        document to the appropriate Regional Board.

    b.  The Regional Board will have the opportunity to comment on
        the draft requirements during the public review period
        established pursuant to the Memorandum of Agreement (MOA)
        between the CDOG and the Environmental Protection Agency
        (EPA).

    c.  The Regional Board shall determine whether or not the draft
        requirements provide protection to ground and surface
        waters having present or anticipated beneficial uses.  If
        the draft requirements are not adequate, the Regional Board
        shall, within 30 days, propose conditions or revisions
        which would satisfy Regional Board concerns.  CDOG will not
        issue final requirements until Regional Board concerns have
        been satisfied.

        If no response is received from the Regional Board by the
        end of the public comment period, the requirements will be
        presumed to be acceptable to the Regional Board.

        CDOG will furnish a copy of the final requirements to the
        Regional Board.

Surface Discharge

1.  Application:  The oil, gas, or geothermal operator shall file a
    Report of Waste Discharge with the appropriate Regional Board.
    The Regional Board will review the Report of Waste Discharge in
    accordance with applicable state and federal requirements,
    including 40 CFR Part 435.  No report need be filed when such a
    requirement is waived by the Regional Board pursuant to Water
    Code Section 13269.

    When a Report of Waste Discharge is not adequate in the
    judgment of the Regional Board, the Board may require the
    applicant to supply additional information as it deems
    necessary.  If a surface disposal site is within the
    administrative limits of an oil, gas, or geothermal field, the
    Regional Board shall send a copy of the Report of Waste
    Discharge to the CDOG for review and comment when the report is
    complete.  If CDOG wishes to comment, the Regional Board should
    receive comments within 14 days to ensure consideration of
    these comments during the drafting of waste discharge
    requirements.

2.  **Preparation and Adoption of Waste Discharge Requirements:**

    a.  The Regional Board will prepare draft waste discharge requirements for the disposal of production waters by surface discharge.  If a surface disposal site is within the administrative limits of an oil, gas, or geothermal field, a copy of the draft document shall be furnished to the appropriate CDOG District office.

    b.  The CDOG shall determine whether or not the draft requirements fulfill CDOG's statutory obligations related to water quality.  If the draft requirements are not adequate, the CDOG shall, within 30 days, propose conditions to the Regional Board which would meet these statutory obligations.  The Regional Board will not issue final requirements until CDOG concerns have been satisfied.

    If no response is received from CDOG by the end of the public comment period, the requirements will be presumed to be acceptable to CDOG.  The Regional Board will furnish a copy of the final requirements to CDOG.

## Enforcement Coordination

After construction, CDOG will notify the appropriate Regional Board of any pollution problems noticed during its inspection activities. The Regional Boards will notify CDOG of any suspected violations of CDOG requirements uncovered during the Regional Boards' inspection activities.

If a determination is made by CDOG, or by the Regional Board, or the SWRCB, that an injection or surface disposal operation is violating the terms of its permit or is causing an unacceptable water quality problem, the permitting agency shall take any necessary actions to assure that compliance is achieved, or that the practice causing water pollution is abated forthwith.  If necessary, the permitting agency shall order work to be done and/or order operation to be halted.  Enforcement actions involving both statutory authorities should be coordinated among the parties involved in this MOA, but neither agency is precluded from taking independent enforcement action.

## Modification of this Agreement

This agreement will be effective upon signature by the designated parties.  The agreement may be modified upon the initiative of either party for the purpose of ensuring consistency with State or Federal statutes or regulations, or for any other purpose mutually agreed upon.  Any such modifications must be in writing and must be signed by the Director of the Department of Conservation, the State Oil and Gas Supervisor, and the Chairman of the SWRCB.

Page 5
Memorandum of Agreement Between the State Water Resources Control Board
and the Department of Conservation Division of Oil and Gas


_____          3-9-88
State Department of Conservation              Date


_____          3-4-1988
State Oil and Gas Supervisor                  Date


_____          MAY 19 1988
Chairman, State Water Resources Control Board     Date


_____          MAY 19 1988
Executive Director, State Water Resources         Date
Control Board


17/5/8

STATE WATER RESOURCES CONTROL BOARD
RESOLUTION 88- 61

APPROVAL OF AMENDMENTS TO THE MEMORANDUM OF AGREEMENT
BETWEEN THE STATE WATER RESOURCES CONTROL BOARD AND
THE DEPARTMENT OF CONSERVATION, DIVISION OF OIL AND GAS
REGARDING CLASS II INJECTION WELLS

WHEREAS:

1.  The State Water Resources Control Board (State Board) and the Department
    of Conservation, Division of Oil and Gas executed a Memorandum of
    Agreement (MOA) in August 1982 that outlined the procedures for reporting
    proposed oil, gas, and geothermal field discharges and the procedures for
    prescribing permit requirements for said discharges.

2.  The CDOG received primacy to administer the federal Underground Injection
    Control Program for Class II wells in California from the U.S. Environmental
    Protection Agency (EPA) in March 1983.

3.  The EPA revised its classification of materials that are considered Class II
    fluids in July 1987.

4.  The EPA revised classification requires revisions to the MOA for consistency.

5.  Additional revisions to the MOA are necessary to clarify procedures.

THEREFORE BE IT RESOLVED:

That the State Board approves the revised MOA with CDOG and directs the
Chairman and Executive Director to sign said agreement.

## CERTIFICATION

The undersigned, Administrative Assistant to the Board, does hereby certify that
the foregoing is a full, true, and correct copy of a resolution duly and regularly
adopted at a meeting of the State Water Resources Control Board held on

MAY 19 1988

Maureen Marche'
Administrative Assistant to the Board

# GEOTHERMAL DISTRICT AND FIELD MAPS



**MAP KEY**

G1-1 _____ Casa Diablo
G1-2 _____ Lake City
G1-3 _ Litchfield, Wendel, Susanville
G2-1 _____ Salton Sea (North)
G2-2 _____ Salton Sea (South)
G2-3 _____ Brawley
G2-4 _____ Heber
G2-5 _____ East Mesa
G2-6 _____ Mesquite
G3-1 _____ The Geysers
G3-2 _____ Calistoga
GW-1 _____ The Geysers Area
W1-8 _____ Imperial County

**OFFICES**

Headquarters     1416 Ninth St., Room 1310
& District G1:    Sacramento 95814
                 Phone (916) 323-1788

District G2:      485 Broadway
                 Suite B
                 El Centro 92243
                 Phone (619) 353-9900

District G3:      50 D St., Room 300
                 Santa Rosa 95404
                 Phone (707) 576-2385

17/7/8

# OIL AND GAS DISTRICT BOUNDARIES

### Offices

| | |
|---|---|
| Headquarters: | 1416 9th Street, Rm. 1310, Sacramento 95814<br>Phone: (916) 445-9686 |
| District No. 1: | 245 W. Broadway, Suite 475, Long Beach 90802<br>Phone: (213) 590-5311 |
| District No. 2: | 6401 Telephone Road, Suite 240, Ventura 93003-4458<br>Phone: (805) 654-4761 |
| District No. 3: | 301 W. Church Street, Santa Maria 93454<br>Phone: (805) 925-2686 |
| District No. 4: | 4800 Stockdale Hwy., Suite 417, Bakersfield 93309<br>Phone: (805) 322-4031 |
| District No. 5: | 466 N. Fifth Street, Coalinga 93210<br>Phone: (209) 935-2941 |
| District No. 6: | 221 West Court Street, Suite 1, Woodland 95695<br>Phone: (916) 662-4683 |



MEMORANDUM OF UNDERSTANDING
BETWEEN
THE DEPARTMENT OF HEALTH SERVICES
AND
THE STATE WATER RESOURCES CONTROL BOARD
THE REGIONAL WATER QUALITY CONTROL BOARDS
FOR THE CLEANUP OF HAZARDOUS WASTE SITES

August 1, 1990

INTRODUCTION

This Memorandum of Understanding (MOU) consists of general and specific provisions for the cleanup of hazardous waste sites. General provisions include the scope of the agreement, which defines the parties and the type of sites to which the MOU applies; the principles, not found in law or regulation, which govern the conduct of the parties; and the methods for implementation, which explain the manner by which the parties will execute, and perform according to, this MOU.

Specific provisions, which address the protocol the parties will follow for the cleanup of hazardous waste sites, include: the method by which the lead agency and, consequently, the support agency are determined; the responsibilities of the lead and support agencies, which are defined in terms of tasks to be accomplished; procedures to be followed to ensure coordination; outputs to be produced to ensure that minimum technical requirements are satisfied; the manner by which the parties will enforce their respective authorities and settle their claims against hazardous waste site owners, operators, or dischargers; and the manner by which the parties will settle their disputes.

BACKGROUND

Based on a recommendation of the Governor's Task Force on Toxics, Waste, and Technology, Governor Deukmejian issued Executive Order D-55-86, which states, in part, that the Department of Health Services (DHS), the State Water Resources Control Board (SWRCB), and the Regional Water Quality Control Boards (RWQCB) shall enter into an MOU that specifies each agency's responsibilities in hazardous waste site cleanup, defines standards and criteria for use in Remedial Action Plan (RAP) development, and identifies a conflict resolution process to resolve interagency disputes. Subsequently, the Legislature included a provision in the Supplemental Report of the 1988 Budget Act requiring the development of this MOU.

Statutes of the State of California, embodied in the state codes, authorize certain actions or express fundamental principles which must govern the intent and goals of the MOU. Relevant code sections include, but are not limited to, the following:

A. DHS is mandated to carry out all hazardous waste management responsibilities imposed or authorized by the Resources Conservation and Recovery Act (RCRA), the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and any regulations promulgated pursuant to these federal acts (Health and Safety Code [HSC] 25159.7).

B. DHS shall prepare a plan for the expeditious implementation of the Hazardous Substance Cleanup Bond Act of 1984 which shall include procedures required for the development and adoption of final RAPs by DHS and RWQCB (HSC 25351.6 and 25334.5).

C. DHS, or if appropriate, the RWQCB shall prepare or approve RAPs for all sites listed by DHS for Remedial Action (RA) (HSC 25356.1 and 25356).

18/1/17

D. DHS or the RWQCB shall review and consider any public comments, revise the draft plan if appropriate, and then issue the final RAP. (HSC 25356).

E. DHS shall implement procedures for the abatement of an imminent and substantial endangerment (HSC 25358.3).

F. DHS is authorized to spend funds from the Hazardous Substance Account or the Hazardous Substance Cleanup Fund for removal or remedial actions on any site included on the list established pursuant to HSC 25356 only if DHS enters into an enforceable agreement or issues an order and determines in writing that the potential responsible party(s) is not in compliance with the order or agreement. (HSC 25355.5)

G. The SWRCB and each RWQCB shall be the principal state agencies with primary responsibility for the coordination and control of water quality (Water Code [WC] 13001).

H. Each RWQCB shall obtain coordinated action in water quality control, including the prevention and abatement of water pollution and nuisance (WC 13225).

Under direction from the Governor, DHS signed a Defense (Department)-State Memorandum of Agreement (DSMOA) in May 1990, which allows for funding state oversight of remedial actions at military facilities in California. Although both DHS and the State and Regional Boards are eligible to receive payment for their oversight costs, federal funding is limited and qualified. Separate agreements between DHS regional offices and the RWQCBs for specific sites will be required in order to allocate available funding. This MOU provides a basis for DHS and the Boards to agree on funding and performance at military facilities.

DHS, also, has recently signed an Agreement in Principle (AIP) with the U.S. Department of Energy (DOE). The AIP will provide reimbursement of state costs for oversight of specified environmental compliance activities at DOE sites. An Interagency Agreement between the DHS Environmental Health Division and the SWRCB will specify water quality oversight tasks which the State and Regional Boards will perform.

THE DHS AND THE SWRCB AND THE RWQCBS AGREE TO THE FOLLOWING:

I.    SCOPE

This MOU is effective immediately and is binding upon DHS, the SWRCB, and the nine RWQCBs. It covers the cleanup of hazardous substances at all sites or facilities where such substances must be cleaned up in order to protect public health or the environment. The cleanup of other substances is not covered under this agreement. Sites include, but are not limited to, sites listed on the National Priorities List (NPL) and in the DHS Site Mitigation annual work plan. This MOU shall be used to determine the relationship of the parties and to guide the site-specific communications between them on activities at the sites. The provisions of this MOU are applicable both at sites where a state agency is the lead agency as well as at sites where the U.S. Environmental Protection Agency, Region 9 (EPA) is the lead agency. In the latter case, the provisions of this MOU shall be utilized to determine which state agency will act as the liaison between the State and EPA and how the state agencies will coordinate their review and comment on site-specific documents submitted by EPA.

Contracts and agreements also exist which involve DHS, SWRCB, RWQCB, and local agencies in the cleanup of leaking underground storage tanks. There are also other specific agreements between state and/or federal agencies. This MOU is not intended to conflict with the provisions of those contracts and agreements nor is it intended to add procedure and requirements which the agencies agree are not necessary for the satisfactory cleanup of leaking underground storage tanks.

A Memorandum of Agreement (MOA) exists between DHS and the SWRCB regarding coordination of activities at facilities subject to regulation pursuant to RCRA. For coordination of cleanup activities at these facilities, the agencies should refer to both this MOU and the RCRA MOA.

## II.  PRINCIPLES

The parties recognize that certain principles, not found in law or regulation, should govern their conduct. One principle is that the participation of both agencies acting within their respective authorities, jurisdiction, and expertise, whether acting as lead agency or support agency, is essential for the successful cleanup of hazardous waste sites and is in the best interest of the State.

In the cleanup of hazardous waste sites, mutual trust, confidence, cooperation, and communication between the parties are to be expected. It is a basic aim of this MOU and the policy of the parties that duplication of effort in the site cleanup program be avoided. Public health and the environment are best served by each party minimizing duplication of effort on the greatest number of sites possible. Both parties do, however, recognize that there are certain situations where one or the other will have the necessary technical resources, expertise, or authority. To the extent staff and other resources allow, and in a manner set forth in this MOU, the parties agree to assist each other. This cooperative approach is in the best interest of public health and the environment.

Finally, the parties recognize that cleanup of hazardous waste sites throughout California can best be achieved if the state agencies act with consistency and predictability. Both the public and the responsible parties expect that state government will apply rational methodologies and standards to site cleanup. Compliance with the terms of this MOU will eliminate or significantly reduce any apparent inconsistencies between the agencies. Consistency will be achieved by agreement on minimum technical and procedural requirements, coordination of enforcement actions, close and constant communication between project staff, and exchange of Applicable or Relevant and Appropriate Requirements (ARARs) or state standards for site cleanup. If either agency is developing such standards, that agency will involve the other agency in the development at an early stage so that consistency in technical issues can be maintained.

## III.  IMPLEMENTATION

In order to facilitate implementation of this MOU, the parties will establish an "MOU Technical Advisory Committee" (TAC) within four months of the effective date of this MOU. The TAC will serve to provide guidance and advice to management and staff on technical issues that develop during performance under this agreement and will assist, if called upon, in the settlement of technical disputes. The TAC will also evaluate the achievement of the goals of the Executive Order and the compliance principles of this MOU and will provide an annual report to management. This report will be submitted by March 1 of each year, will cover the prior calendar year and will, if appropriate, include recommendations for modifications to this MOU to improve attainment of the principles of the parties. The TAC will consist of a total of six members, each at a level equivalent to Supervising Engineer, Supervising Hazardous Materials Specialist, or above, as follows: one member from DHS Headquarters, two members from DHS Regional Sections, one member from SWRCB, and two members from RWQCBs. Annually the TAC will elect one of its members as chairman who will be responsible for coordinating the activities of the TAC.

## IV.  LEAD AGENCY DETERMINATION

DHS Regional Offices and RWQCBs will meet to determine the lead agency as appropriate under this section.

A. The agency which first discovers a potential or actual hazardous waste site shall serve as the lead agency until the criteria of this MOU are utilized to determine a lead agency.

B. Within 180 days after the effective date of this MOU, the agencies shall determine the lead and support agencies for each hazardous waste site on which either agency plans to work in Fiscal Year 1990-91. Each Regional Board Executive Officer (EO) and Department Regional Administrator (RA) shall compile an inventory of hazardous waste sites within their respective regions and shall determine whether resources are or will be available to perform the tasks required by this MOU. The EO and RA shall then agree on which agency shall be lead and which shall be support for sites of common jurisdiction. Sites for which neither agency has resources shall be listed in a holding pool until resources become available or priorities change. This process shall be repeated for each subsequent fiscal year as necessary to implement this MOU. The designation of lead agency may be changed at any time by agreement of the agencies.

C. The determination of a lead agency shall be made by considering the factors listed in Paragraph D of this section. It is probable that more than one factor may be applicable to a site. In these situations, more weight should be given to those factors listed first.

D. The lead agency as between DHS and SWRCB/RWQCB, for the cleanup of hazardous waste sites shall be determined using the following guidance:

1. DHS should be the lead agency at sites where there is no responsible party.

2. If the site does not meet the criteria in number 1 above, then the following conditions apply:

   a. If after reasonable enforcement actions are implemented, the responsible party is unwilling or is financially unable to perform cleanup and the expenditure of state Superfund monies is deemed appropriate to perform actual site cleanup, then DHS should be the lead agency.

   b. If the site is on the NPL, then DHS should be the lead agency.

   c. If one agency has a significantly longer history of involvement working to clean up the site, then it should be the lead agency.

   d. If the source of the contamination is a leaking underground storage tank, then the RWQCB or a local agency, upon delegation by a Regional Board, or by contracting with the state Board, should be the lead agency.

   e. If the contamination is primarily airborne, then DHS should be the lead agency in consultation with the Air Resources Board and the appropriate Air Quality Management District.

   f. If the site is primarily a result of agricultural activities, then the RWQCB should be the lead agency.

   g. If the source of the contamination is an inactive mine, then the RWQCB should be the lead agency.

   h. If the contamination is confined to soils, then DHS should be the lead agency.

   i. If the contamination is primarily impacting surface waters, then the RWQCB should be the lead agency.

18/4/17

j    If the source of the contamination is a RCRA regulated disposal facility, then DHS should be the lead.

k.   If the source of the contamination is a non-RCRA surface impoundment, then the RWQCB should be the lead agency.

l.    If the source of the contamination is a landfill which would not normally be regulated by DHS, then the RWQCB should be the lead agency in consultation with the California Integrated Waste Management Board.

E.  Notwithstanding a determination under Paragraph D of this section, DHS Regional Offices and the RWQCB may otherwise agree which agency shall be lead agency. Specific examples of situations where this provision may be used are where multiple sources are contributing to the same problem or where resource availability affects the determination; however, other situations may warrant a decision using this provision.

F.  The agency determined to be the lead agency for purposes of site cleanup under this MOU is not necessarily the lead agency for implementing programs or tasks that are applicable to the site but not within its authority or jurisdiction. Where the support agency happens to have sole or primary responsibility or exclusive capability for a program or task related to cleanup activities, then that agency shall perform those required tasks pursuant to its exclusive lead authority in a manner consistent with its role under this MOU. Examples of such tasks and programs include, but are not limited to, issuance of a National Pollutant Discharge Elimination System permit, approval of a transportation plan, regulation of nonhazardous wastes, enforcement of the Toxic Pits Control Act, approval of a solid waste water quality assessment test report, performance of a public health evaluation, or the imposition of restrictions for land use. The support agency will coordinate all activities described in this paragraph with the lead agency.

G. Any dispute regarding the determination of the lead agency shall be resolved pursuant to Section VII.

## V.   RESPONSIBILITIES OF LEAD AND SUPPORT AGENCIES

A.  Coordination Procedures

1.  General

a.  The lead agency is responsible for coordinating and communicating with the support agency in a timely manner. This includes, but is not limited to, providing schedules, technical reports, correspondence, and enforcement papers; soliciting and responding to comment, analysis, evaluation, and advice; and meeting, conferring and discussing the project.

b.  The support agency is responsible for coordinating and communicating with the lead agency in a timely manner. This includes, but is not limited to, providing notification that selected sites are of particular interest; providing comment, analysis, evaluation, and advice, especially that within the unique expertise of the agency; and meeting, conferring, and discussing the project.

c.  EPA will be the lead agency for many sites listed on the NPL. The State will designate a state lead agency using the criteria specified in Section IV. The agency so designated has the responsibility of maintaining communications between the State and EPA. This agency does not have responsibility for ensuring completion of the tasks listed in Section V B. However, this agency shall ensure that comments from all state agencies

are transmitted to EPA and shall coordinate the resolution of any disputes so that the State presents only one position to EPA.

d. Neither agency will significantly change its procedures for the cleanup of hazardous substances without notification to and review and comment from the other agency. Examples of such changes include technical guidance documents and applicable regulations.

2. Specific

a. Each agency will coordinate with the other agencies on its enforcement activities as specified in Section VI.

b. The lead agency shall provide to the support agency any California Environmental Quality Act (CEQA) documents at least ten working days prior to sending these documents to the state clearinghouse. If the support agency decides to comment, it shall do so within ten working days after receipt, or during the formal review process as mandated by CEQA.

c. The lead agency shall contact the support agency to identify ARARs for each specific site at the following times:

(1) During the scoping phase of the remedial investigation/ feasibility study (RI/FS) or equivalent.

(2) During the site characterization phase of the RI or equivalent.

(3) During the development of alternatives in the FS or equivalent.

(4) During Remedial Design (RD).

The support agency shall respond within 30 calendar days after a request for ARARs. The lead agency shall apply the ARARs identified by the support agency or it shall provide to the support agency, at least 20 calendar days prior to informing the responsible party or the public, a written memorandum which identifies ARARs that will not be applied and the reasons for such decisions.

For those sites where EPA is the lead agency, the state lead agency as determined according to this MOU, shall notify EPA of all ARARs identified by the parties to this agreement. However, the party identifying the ARARs shall be responsible for defending the application of its ARARs should EPA elect not to apply them.

d. The lead agency shall prepare or have the responsible party(ies) prepare the draft RAP or equivalent cleanup plan as an internal working draft document and provide a copy to the support agency at least 20 working days prior to general public distribution. If the support agency decides to comment, it will do so within 20 working days after receipt. Unless a shorter period of time is mutually agreed upon, any dispute shall be resolved by Section VII.

e. The lead agency shall provide all other technical documents, as specified in Section V.B.9. , and not otherwise referred to above, within a time sufficient for review and comment. In all cases. the lead agency shall provide at least 15 working days for review and response by a support agency unless a shorter period of time is mutually agreed upon. The support agency shall respond, as appropriate, in a timely manner.

B. Tasks

1. For sites listed on the NPL or in the DHS Site Mitigation annual work plan:

    a. The lead agency shall be responsible for ensuring completion of the following tasks:

        (1) Identifying imminent threats and initiate removal actions (if necessary).

        (2) Identifying responsible parties.

        (3) Issuing an order or entering into an enforceable agreement (if necessary).

        (4) Coordinating enforcement actions (see Enforcement and Settlement Section VI).

        (5) Establishing and maintaining an administrative record.

        (6) Providing project oversight:

            (i) Assigning a remedial project manager.

            (ii) Maintaining a field presence including, if necessary, providing an on-scene coordinator.

            (iii) Preparing and maintaining site schedules and workplans.

            (iv) Reviewing technical documents listed in Section 9 of this paragraph for comment or approval.

            (v) Managing applicable contracts.

            (vi) Accounting for project costs.

        (7) Preparing and/or reviewing RI/FS which includes:

            (i) Site characterization.

            (ii) RA alternatives.

            (iii) Risk assessment.

        (8) Requiring and approving the Quality Assurance Project Plan (QAPP) and Sampling and Analysis Plan (SAP).

        (9) Providing technical documents to the support agency, including, but not limited to, as appropriate:

            (i) Site schedule.

            (ii) RI/FS workplan.

            (iii) RI report.

            (iv) FS report.

18/7/17

       (v)    Health and Safety Plan.

       (vi)   QAPP.

       (vii)  SAP.

       (viii) Community relations plan.

       (ix)   RAP.

       (x)    CEQA documents.

       (xi)   Transportation plan.

(10)  Maintaining community relations:

       (i)    Developing and implementing a community relations program.

       (ii)   Managing any technical assistance grants.

(11)  Compiling ARARs.

(12)  Conducting a complete Public Health Evaluation (PHE) (as appropriate).

(13)  Preparing and approving the RAP.

(14)  Preparing and/or approving RD/RA

(15)  Complying with CEQA.

(16)  Recovering cost (if necessary).

(17)  Overseeing operations and maintenance, including long-term monitoring (if necessary).

(18)  Restricting land use (as appropriate).

b.   The support agency shall be responsible for reviewing and, if appropriate, providing comments on the documents listed in Section V.B.l.a.(9) within the time periods determined utilizing Section V.A.2. or the lead agency may assume that the support agency does not have any comments. Additionally, the support agency shall always respond to a request for ARARs, and shall perform tasks as appropriate according to its exclusive authority or capability.

2.   For sites not listed on the NPL nor on the DHS Site Mitigation annual work plan:

a.   The lead agency shall be responsible for ensuring completion of the following tasks:

(1)  Conducting removal actions (if necessary).

(2)  Identifying a responsible party.

(3)  Coordinating enforcement action (see Enforcement and Settlement, Section VI).

   (4) Establishing and maintaining an administrative record.

   (5) Providing project oversight.

     (i)  Assigning a project manager.

     (ii)  Preparing and maintaining site schedules and workplans.

     (iii)  Reviewing technical documents.

     (iv)  Maintaining a field presence, as necessary.

   (6) Preparing or approving an Employee Health and Safety Plan.

   (7) Characterizing the nature and extent of the problem.

   (8) Requiring and approving quality assurance and sampling plans.

   (9) Evaluating cleanup alternatives.

   (10) Complying with CEQA.

   (11) Conducting community relations.

   (12) Preparing or approving the cleanup plan.

   (13) Overseeing cleanup.

   (14) Providing technical reports to the support agency.

  b. The support agency shall be responsible for reviewing and, if appropriate, providing written comments on the documents submitted pursuant to Section V.B.2.a within the time periods determined utilizing Section V.A.2. or the lead agency may assume that the support agency does not have any comments. Additionally, the support agency shall always respond to a request for ARARs, and shall perform tasks as appropriate according to its exclusive authority or capability.

C. Technical Requirements

 1. The following outputs or items, in whole or in part, are required to be addressed for the completion of RAs at hazardous waste sites:

  a. For sites Listed on the NPL or in the DHS Site Mitigation annual work plan:

   (1) RAs (if needed).

   (2) Identification of responsible parties.

   (3) Enforceable agreement or order.

   (4) Cooperative agreement.

   (5) Administrative record.

(6) Remedial project manager.

(7) On-scene coordinator.

(8) Site schedule.

(9) Workplans.

(10) Community relations plan.

(11) QAPP.

(12) SAP.

(13) RI.

    (i) Site history.

    (ii) Identification of sources.

    (iii) Site characterization.

(14) ARARs.

(15) FS.

(16) Record of decision (ROD)/RAP

(17) RD

(18) RA.

(19) PHE.

(20) CEQA document.

(21) Health and Safety Plan.

(22) Transportation plan (if needed).

b.   For sites not listed on the NPL nor in the DHS Site Mitigation annual work plan:

(1) RAs.

(2) Identification of responsible parties.

(3) Administrative record.

(4) Remedial project manager.

(5) Site schedule.

(6) Workplan.

    (7)  Quality assurance plan.

    (8)  Sampling and analysis plan.

    (9)  RAP or cleanup plan.

        (i)     Site history.

        (ii)    Identification of sources.

        (iii)   Site characterization.

        (iv)   Feasible remedial alternative.

        (v)    RD.

    (10)  Community relations plan.

    (11)  RA.

    (12)  Employee Health and Safety Plan.

    (13)  Community Health and Safety Plan (if needed).

    (14)  CEQA compliance.

    (15)  Transportation plan (if needed).

2.  The agencies shall define these requirements, as appropriate, according to 40 CFR 300 et seq., and HSC 25350 et seq., in addition to the guidance documents listed in Attachment A.

## VI.  ENFORCEMENT AND SETTLEMENT

A.  For purposes of this MOU, enforcement means the action by an agency to compel performance by a responsible party, such as the issuance of an order or the filing of a complaint. Settlement means the resolution by agreement with the responsible party, in whole or in part, of matters in dispute, such as the performance required for satisfactory remedial action, claims for money, or liability.

B.  The lead agency will communicate with the other agencies regarding its enforcement and settlement activities for hazardous waste sites. Communication means, for example, notification at least 10 working days in advance, if feasible, of a decision to issue an order or to initiate settlement negotiations; provision of enforcement or settlement documents for information or for review and comment; and, to the extent feasible, modification of a proposed order or agreement to incorporate the other agency's concerns. Staffs will meet and confer, as necessary, during drafting of enforcement and settlement documents.

C.  Unnecessary or redundant enforcement documents are to be avoided. Neither agency will take enforcement actions that are not compatible or complementary to the enforcement actions of the other agencies. To the extent possible, consistent with preserving their respective authority or mandates, each agency will coordinate time schedules and demands so that responsible parties can respond to consistent direction.

D.  To the extent practicable, each agency will assist the other in enforcement. Information that may be used to determine compliance or noncompliance will be transmitted to the enforcing agency as soon as possible but no later than 15 working days after being obtained and formalized.

E.  Upon a determination of noncompliance with an administrative order and a decision to pursue litigation (i.e., referral to the Attorney General or filing a complaint), the responsible agency will notify the other agencies at least seven working days prior to referring a matter to the Attorney General. Each agency will coordinate its legal actions to the extent practicable so that the Attorney General may bring joined or consolidated causes of action.

F.  Negotiations may be commenced with a responsible party to enter into an enforceable agreement either to take cleanup action without the issuance of an order, to resolve noncompliance with an order that has been issued, or to resolve causes of action alleged in complaint. All decisions to negotiate with a responsible party will be coordinated between the agencies.

G.  The lead agency will act as lead spokesperson for the negotiating team. The lead spokesperson will be responsible only for initiating and maintaining communications with the responsible parties, for coordinating the State's position, and for directing the agenda for settlement. The negotiating team will be composed of representatives from each agency with authority, with legitimate claims, and electing to participate. For purposes of dispute resolution in Federal Facility Agreements (FFAs), the lead agency and support agency may agree to designate which state agency will cast the State's vote.

Each agency is responsible for presenting its respective position. If an agency fails to attend negotiations or to meet other negotiating responsibilities without good cause, or without notifying the other participating agency in advance, then that agency must either defer to negotiating participants on issues discussed at the missed negotiation or withdraw from further negotiations relative to that particular site.

However, where practicable, in order to avoid unnecessary expenditure of resources for conducting negotiations, the support agency, after prior notification to and agreement by the lead agency, may elect to withdraw from or not participate in active negotiations, either temporarily or permanently. In such cases, the support agency is responsible for providing to the lead agency the details of their specific concerns regarding settlement. If this information is not provided, the lead agency will negotiate in the best interest of the State, but will have no responsibility to negotiate on behalf of the support agency issues for which the lead agency has neither authority nor assistance.

When the support agency does not attend negotiations, the lead agency is responsible for obtaining for the support agency terms of settlement identical to its own, provided that: the support agency provides the necessary information and assistance to the lead agency pursuant to this section; and the terms requested by the support agency are similar in scope and documentation to that of the lead agency ("identical terms" means similar percentage of settlement request or similar conditions as opposed to a dollar-for-dollar separation). Moreover, the lead agency is responsible for notifying the support agency if new issues arise which may be within the sole authority of the support agency, in order that the support agency has the opportunity to participate in those portions of the negotiations addressing such issues. The negotiation of FFAs with the federal government is an example of when this situation may occur. In this example, the lead agency will not settle for recovery of their costs without including those similarly justifiable costs of the support agency.

H.  All communications with a responsible party related to negotiations will be coordinated by the lead spokesperson. Documents related to negotiations will be shared freely between the agencies and such documents which are confidential will be maintained in a manner consistent with any applicable requirements for confidentiality.

18/12/17

I. Each agency will support the other during negotiations. A single position is essential, and the agency advocating the most conservative or stringent position will be responsible for defending its position. A disagreeing agency will remain silent or request a recess. All agencies involved should meet prior to each negotiating session in order to minimize disagreements.

J. Before agreement or settlement with responsible parties can be reached, the concerns and claims of each agency regarding the issues to be agreed upon or settled will be resolved. An agency will not settle independently with responsible parties without advance concurrence by the other participating parties. Disputes shall be settled pursuant to the procedure described in Section VII.

K. Settlement with a responsible party will include provision for payment by the responsible party for all oversight costs incurred or to be incurred by any negotiating agency that will participate in the RA procedure.

## VII. DISPUTE RESOLUTION

A. Disputes shall be resolved, if at all possible, through informal discussion, negotiation, and consensus. Such informal discussions may, if necessary, include staff at all levels, including those listed in Section VII.B.1. If the dispute cannot be resolved informally within a reasonable length of time or if continuing nonresolution of the dispute would place either party at a disadvantage, then either party may notify the other party that such a dispute exists and exercise the formal dispute resolution procedure described below.

B. Disputes shall be resolved formally using the following procedure:

1. Jointly the staffs of the agencies involved in the dispute shall prepare a memorandum describing the dispute. The lead agency shall provide copies to the appropriate RA of the Toxic Substances Control Program (TSCP) and to the Executive Officer (EO) of the appropriate Regional Board. The memorandum shall address and explain all sides to the dispute, shall state the consequences of each recommended decision and shall provide a date by which a decision is needed. The lead staff person for each agency shall co-sign the memorandum prior to submitting it to management.

2. If the DHS RA and the RWQCB EO cannot resolve the dispute within the time requested in the memorandum, then they will jointly present written notification of the dispute to both the Executive Director (ED) of the SWRCB and the Deputy Director of the TSCP.

3. If the SWRCB ED and the TSCP Deputy Director cannot resolve the dispute within 30 calendar days from the day the memorandum is delivered to them, then the memorandum shall be delivered to the SWRCB and the Director of DHS. If within 30 calendar days they cannot resolve the dispute, the memorandum shall be delivered to the Secretary of Environmental Affairs and to the Secretary of Health and Welfare. If within 30 calendar days they cannot resolve the dispute, the memorandum shall be delivered to the Governor.

4. When the dispute is resolved, a written decision shall be provided to all parties to this MOU.

C. During such time that any formal or informal dispute is not yet resolved, neither agency will comment adversely in public. The time required to resolve a dispute shall not be used to unnecessarily or unfairly delay action by either agency.

John J. Kearns
Acting Deputy Director
Toxic Substances Control Program
Department of Health Services
State of California

James W. Baetge
Executive Director
State Water Resources Control Board
State of California

Date: 7/30/90

Date: 7-31-90

18/14/17

ATTACHMENT A

APPLICABLE LAWS, REGULATIONS, AND GUIDANCE DOCUMENTS

A.    California Water Code.

B.    California Health and Safety Code.

C.    Titles 22/23 (Subchapter 15) California Code of Regulations.

D.    California Environmental Quality Act.

F.    National Oil and Hazardous Substances Contingency Plan.

G.    Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA.

H.    Superfund Public Health Evaluation Manual.

I.    Superfund Exposure Assessment Manual.

J.    Methodology for Characterization of Uncertainty in Exposure Assessments.

K.    RCRA Ground-Water Monitoring Technical Enforcement Guidance Document.

L.    The Endangerment Assessment Handbook.

M.    Superfund Remedial Design and Remedial Action Guidance.

N.    Standard Operation Safety Guides (OSWER).

O.    Occupational Safety and Health Guidance Manual for Hazardous Waste Site Activities (DHS [NIOSH]).

P.    Data Quality Objectives for Remedial Response Activities (OSWER).

Q.    Samplers and Sampling Procedures for Hazardous Waste Sources (EPA).

R.    A Compendium of Superfund Field Operations Methods.

S.    Handbook on Remedial Action on Waste Disposal Sites.

T.    Uncontrolled Hazardous Waste Site Ranking System—A User's Manual.

U.    Community Relations in Superfund: A Handbook (EPA) 03/86.

V.    The California Site Mitigation Decision Tree Manual.

W.    Small Site Cleanup Guidance Document (to be completed).

X.    Leaking Underground Fuel Tank Manual.

ATTACHMENT B

ACRONYMS USED IN THE MEMORANDUM OF UNDERSTANDING

| | | |
|---|---|---|
| 1. | AIP | Agreement In Principle |
| 2. | ARARS | Applicable or Relevant and Appropriate Requirements |
| 3. | CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| 4. | CEQA | California Environmental Quality Act |
| 5. | DHS | Department of Health Services |
| 6. | DOE | U.S. Department of Energy |
| 7. | DSMOA | Defense (Department)-State Memorandum of Agreement |
| 8. | ED | Executive Director |
| 9. | EO | Executive Officer |
| 10. | EPA | U.S. Environmental Protection Agency, Region 9 |
| 11. | FFA | Federal Facility Agreement |
| 12. | FS | Feasibility Study |
| 13. | HSC | Health and Safety Code |
| 14. | MOA | Memorandum of Agreement |
| 15 | MOU | Memorandum of Understanding |
| 16. | NPL | National Priorities List |
| 17 | PHE | Public Health Evaluation |
| 18 | QAPP | Quality Assurance Project Plan |
| 19. | RA | Remedial Action or Regional Administrator |
| 20. | RAP | Remedial Action Plan (State equivalent to ROD) |
| 21. | RCRA | Resource Conservation and Recovery Act |
| 22. | RD | Remedial Design |
| 23. | RI | Remedial Investigation |
| 24. | ROD | Record of Decision (Federal equivalent to RAP) |
| 25. | RWQCB | Regional Water Quality Control Board |

18/16/17

26.  SAP              Sampling and Analysis Plan

27   SWRCB            State Water Resources Control Board

28.  TAC              Technical Advisory Committee

29.  TSCP             Toxic Substances Control Program

30.  WC               Water Code

18/17/17

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
SOIL CONSERVATION SERVICE
U.S. DEPARTMENT OF AGRICULTURE
AND THE
STATE WATER RESOURCES CONTROL BOARD
FOR
PLANNING AND TECHNICAL ASSISTANCE RELATED TO
WATER QUALITY POLICIES AND ACTIVITIES

I.  PURPOSE:

The purpose of this Memorandum of Understanding (MOU) is to formalize cooperation between U.S. Department of Agriculture (USDA), Soil Conservation Service (SCS) and the State Water Resources Control Board (State Board), and to develop appropriate guidelines and procedures related to water quality activities.  The SCS and State Board share a common interest in maintaining, protecting, and improving the quality of waters (surface and ground water) of the State.

Through this MOU, the State Board seeks to utilize the personnel and expertise of SCS to increase the assistance available to California in the development and implementation of water quality programs and projects. Coordination and cooperation between SCS and State Board will reduce unnecessary duplication of effort, accelerate the implementation of best management practices (BMPs) and other nonpoint source (NPS) measures, and increase overall program effectiveness.

II.  AUTHORITIES:

This MOU is entered into under the authorities of the Soil Conservation and Domestic Allotment Act (16 U.S.C. Section 590-f), as amended, Division 7 of the California Water Code (Porter-Cologne Act), and the authorities of the Clean Water Act (CWA), [Section 304(1), 314, 319, and 320], as amended.

Nothing in this MOU alters the statutory or regulatory authority of SCS or the State Board.  This MOU is intended to strengthen those statutory requirements through the development of cooperative federal-State efforts.

III.  BACKGROUND:

USDA Regulation 9500-7, Nonpoint Source Water Quality Policy, December 5, 1986 and USDA Regulation 9500-8, Policy for Groundwater Quality, November 9, 1987 established policy for integrating surface and ground water quality protection and improvement into the appropriate programs and activities.

The report to the Congress by the Secretary of Agriculture in the National Program for Conservation of Soil and Water:  The 1988-90 Update gives top priority to the solution of soil erosion on agricultural land.  The second priority is the "protection of the quality of surface and ground water from harmful contamination from nonpoint sources".

SCS, a technical agency of the USDA and, in cooperation with Resource Conservation Districts in California, provides technical assistance for implementation of water quality programs. SCS has a number of field offices which can provide technical assistance to most of the counties within California.

The Porter-Cologne Act, administered by the State Board, establishes a comprehensive program for the protection of water quality and the beneficial uses of the waters of the State. The Porter-Cologne Act is intended to provide a "statewide program for water quality control".

Section 319 of the CWA, as amended, requires the State to develop a NPS management program for controlling NPS pollution. The State Board has developed a State NPS Management Program which lists the SCS as providing technical and financial assistance to improve and protect land and water resources.

The State Board and SCS recognize the need to improve, conserve, and protect the quality of surface and ground water by undertaking efforts to avoid harmful NPS contamination and, thereby maintain the quality and quantity of water available for safe drinking supplies, irrigated agriculture, fisheries, and other beneficial uses. A coordinated effort is necessary to address these issues.

IV. <u>SCS AGREES TO:</u>

A. Integrate water quality concepts and management techniques into all programs and activities to address surface and ground water NPS pollution.

B. Implement internal policies that elevate the importance of water quality in all SCS programs and assure consistency of SCS actions with the State NPS Management Program.

C. Provide technical assistance to the State Board in the support and development of BMPs appropriate for the control and reduction of NPS pollution.

D. Encourage the targeting of water resource projects to hydrologic units that are tributary to the high priority waterbodies identified in the State Board's Clean Water Strategy and Water Quality Assessment Process.

E. Encourage the California Association of Resource Conservation Districts (CARCDs) and their more than 100 member districts to cooperate with appropriate State and local agencies in addressing the water quality priorities of federal agencies and the State Board.

F. Provide technical assistance through RCDs to landowners in dealing with NPS pollution problems.

19/2/4

V. STATE BOARD AGREES TO:

A. Use the SCS Field Office Technical Guide as a resource reference in the development and implementation of BMPs.

B. Assist the SCS in the selection of priority hydrologic units for the implementation of water resource projects.

C. Jointly develop with the SCS and CARCD demonstration projects addressing water quality concerns.

D. Encourage the voluntary or cooperative approach as the first step in the development and implementation of solutions to the NPS problem.

E. Consider the development of a statewide water quality policy for reducing NPS pollution of surface and ground waters and achieving water quality standards by working with other agencies.

F. Coordinate the activities of the California Regional Water Quality Control Boards with those activities being proposed and implemented by the SCS.

G. Define the goals and objectives of the NPS Interagency Advisory Committee and conduct regular meetings.

VI. SCS AND STATE BOARD MUTUALLY AGREE TO:

A. Develop a process for BMP selection and implementation to reduce or prevent agricultural pollution in priority waterbodies.

B. Continue to upgrade and update the SCS's Field Office Technical Guide and BMPs as new technology is developed.

C. Develop agricultural BMPs for NPS pollution control with input from the NPS Interagency Advisory Committee, and others.

D. Develop implementation priorities and policies for NPS pollution activities.

E. Provide guidance and technical assistance to implementation agencies.

F. Encourage participation of other federal, State, and local agencies in the control of NPS pollution.

VII. OTHER CONDITIONS OF THE MOU:

A. This is not a fiscal or a funds obligation document. Endeavors involving reimbursements or transfer of funds between SCS and the State Board for the purposes of this Agreement will be in accordance with USDA/SCS and State Board financial procedures. Any reimbursement agreement will be contingent upon the availability of funds and upon limitations of appropriations authorized by law.

B. This MOU complies with the nondiscrimination provisions of Title VI of the Civil Rights Act of 1964 and other nondiscrimination statutes, namely, Section 504, Title IX and the Age Discrimination Act of 1975 provides that no person in the United States shall, on the grounds of race, color, national origin, age, sex, religion, or handicap be excluded from participation in, or be denied the benefits of, or be otherwise subjected to discrimination under any program or activity receiving federal or State assistance.

C. This MOU becomes effective on the date of signature by both parties and shall continue indefinitely. It may be modified at any time upon the mutual consent of the parties and it may be terminated by either party giving a 30-day advance written notice to the other party.

BY: _W. Won Maughan_                    BY: _Pearlie S. Reed_
W. Don Maughan                          Pearlie S. Reed
Chairman                                State Conservationist
State Water Resources                   Soil Conservation Service
    Control Board                       Davis, California
Sacramento, California

Date: _July 31, 1990_                   Date: _July 31, 1990_

19/4/4

MEMORANDUM OF UNDERSTANDING

AMONG

ENVIRONMENTAL AFFAIRS AGENCY
AIR RESOURCES BOARD
STATE WATER RESOURCES CONTROL BOARD
CALIFORNIA INTEGRATED WASTE MANAGEMENT BOARD

## I.  INTRODUCTION

This Memorandum of Understanding (MOU) expresses the desire of the Air Resources Board (ARB), State Water Resources Control Board (SWRCB), California Integrated Waste Management Board (CIWMB), and Environmental Affairs Agency (Agency) to enhance program coordination.  We undertake this task to minimize risks to public health and the environment, eliminate duplication of effort, and provide regulatory consistency.

The MOU consists of general and specific provisions.  General provisions include (A) the scope of the agreement, which defines the parties and issues to which the MOU applies, (B) the principles which will govern the conduct of the parties and, (C) the existing statutory framework.

Specific provisions, which address the protocols the parties will follow, include (A) the responsibilities of the Boards and the Agency, (B) procedures to be followed to ensure communication and program coordination, (C) the manner by which the parties will settle their disputes, (D) implementation steps, and (E) procedures for amending, withdrawing from, and repealing this MOU.

## II.  BACKGROUND

California has a decentralized environmental management system.  At the state level, the ARB, SWRCB, CIWMB, and Department of Health Services (DHS) formulate policies and regulations pertaining to air quality, water quality, solid waste, and hazardous waste, respectively.  At the regional and local levels, the Air Quality Management Districts, Air Pollution Control Districts, Regional Water Quality Control Boards, and Local Enforcement Agencies conduct permitting and enforcement activities.

Many environmental issues cut across organizational lines.  These interagency issues stem from the fact that pollutants do not recognize the boundaries of environmental media or political and institutional subdivisions.  To effectively deal with interagency issues, the management of the Boards and the Agency set forth in this MOU some guiding principles and procedures to govern our conduct.

20/1/10

## III. GENERAL PROVISIONS

### A. SCOPE

This MOU is binding upon the ARB, SWRCB, CIWMB, and Agency.  This MOU is effective immediately.

This MOU covers all activities of the Boards, and shall be used to determine the relationship of the Boards and guide communication among them and with the Agency.

An MOU is being prepared by the three Boards regarding solid waste disposal site testing and remediation (the SWAT program).  For coordination of SWAT program activities, the parties should refer to both this MOU and the SWAT program MOU.

It is anticipated that in a limited number of instances, other, program-specific MOUs may be developed as a result of the problem identification and dispute resolution provisions of this MOU.

Although the local air districts, regional water quality control boards, and solid waste local enforcement agencies are not signatories to this agreement, the three Boards understand and agree that it is each Board's responsibility to inform and coordinate with their respective local or regional counterparts as outlined in Section IV(B)(3)(a) below.

### B. PRINCIPLES

The Boards and the Agency recognize that we share a common goal--protection of public health and the environment.  We also recognize that the resources available to achieve this goal are limited, and that duplication of effort, conflict, and confusion detract from our collective efforts.  It therefore is the policy of the Agency and the Boards that the parties work together, in an atmosphere of mutual trust, confidence, cooperation and communication, to maximize the efficient use of our resources.  Accordingly, the ARB, SWRCB, CIWMB, and the Agency are committed to work together, with other state agencies and other levels of government, to closely follow these guiding principles:

- We will resolve conflicts promptly.

- We will promote a multimedia approach to pollution control and pollution prevention that minimizes the total exposure to pollution faced by humans and the environment.

- We will avoid duplication of effort, and maximize the efficient use of resources.

## C. EXISTING STATUTORY FRAMEWORK

1. Statutes of the State of California authorize certain actions or provide fundamental authority which must govern the operation of this MOU. Relevant sections include:

   a. The ARB has the responsibility for control of emissions from motor vehicles and shall coordinate, encourage, and review the efforts of all levels of government as they affect air quality (Health and Safety Code Section 39500).

   The ARB is the air pollution control agency for all purposes set forth in federal law (Health and Safety Code Section 39602).

   b. The SWRCB is the principal state agency with primary responsibility for the coordination and control of water quality (Water Code Section 13001).

   The SWRCB is the state water pollution control agency for all purposes stated in the Federal Water Pollution Control Act and any other federal act (Water Code Section 13160).

   c. The CIWMB shall adopt and revise minimum standards for solid waste handling and disposal for the protection of air, water and land from pollution (Public Resources Code Section 43020). The Board shall adopt rules and regulations, as necessary, to carry out Division 30 of the Public Resources Code (Public Resources Code Section 40502). The standards which the CIWMB must adopt shall include the design, operation, maintenance and ultimate reuse of solid waste processing or disposal facilities (Public Resources Code Section 43021).

   The CIWMB is the state solid waste management agency for all purposes stated in the Federal Resources Conservation and Recovery Act of 1976 and any other federal act affecting solid waste (Public Resources Code Section 40508).

   d. The Chairperson of the ARB serves as the principal advisor to the Governor on, and assists the Governor in establishing, major policy and program matters on environmental protection. The Chairperson also serves as the principal communications link for the effective transmission of policy problems and decisions to the Governor relating to the activities of the SWRCB and the CIWMB (Health and Safety Code Section 39511).

2. Other statutory provisions, noted below, speak to the interaction of the Boards. In particular, these provisions address the interaction of the Boards with respect to control of the air quality and water quality impacts of solid waste management facilities. However, these provisions do not adequately cover all

situations that arise, they are themselves subject to interpretation, and in general they need to be viewed in the context of each Board's general authority as outlined above. Section IV(A)(4) below sets forth procedures to be used to address such issues.

3.  The statutory provisions which speak to the interaction of the Boards are as follows:

    a.  The CIWMB shall consider any recommendations of the ARB for the prevention of air pollution and the SWRCB for the prevention of water pollution (Public Resources Code Section 43020).

    b.  Division 30 of the Public Resources Code (which confers CIWMB authority) is not a limitation on the power of any state agency in the enforcement or administration of any provision of law which it is specifically authorized or required to enforce or administer, including, but not limited to, the exercise by the state water board or the regional water boards of any of their powers and duties pursuant to Division 7 (commencing with Section 13000) of the Water Code, and the exercise by the State Air Resources Board or any air pollution control district or air quality management district of any of its powers and duties pursuant to Part 3 (commencing with Section 40000) of Division 26 of the Health and Safety Code. (Public Resources Code Section 40055 (a)).

    c.  The exercise of CIWMB authority under Division 30, including, but not limited to, the adoption of regulations, plans, permits, or standards and enforcement actions shall not duplicate or be in conflict with any determination relating to water quality control made by the state water board or regional water boards. (Public Resources Code Section 40055(b)).

    d.  Any plans, permits, standards, or corrective action taken by the CIWMB pursuant to Division 30 shall incorporate, as a condition of the action, any applicable waste discharge requirements issued by the state water board or a regional water board, and shall be consistent with all applicable water control plans adopted pursuant to Section 13170, and Article 3 (commencing with Section 13240) of Chapter 4 of Division 7, of the Water Code and the state policies for water quality control adopted pursuant to Article 3 (commencing with Section 13140) of Chapter 3 of Division 7 of the Water Code existing at the time of the action or proposed action. (Public Resources Code Section 40055(c)).

    e.  No provision of Division 7 of the Water Code (which confers SWRCB authority) or any ruling of the state [water] board or a regional board . . . on the power of a state agency in the enforcement or administration of any provision of law which it is specifically permitted or required to enforce or administer (Water Code Section 13002).

## IV. SPECIFIC PROVISIONS

### A. BOARD AND AGENCY RESPONSIBILITIES

1. The ARB is responsible for development of standards and regulations pertaining to air quality, the SWRCB is responsible for development of standards and regulations pertaining to water quality, and the CIWMB is responsible for development of standards and regulations pertaining to waste management.

2. It is the responsibility of all Boards to act in a fashion to minimize overlap and duplication of effort. Management of the Boards has an affirmative responsibility to identify areas of duplication and overlap, work towards a mutually-agreeable delineation of activity, and foster a multimedia approach to pollution prevention and pollution control. The Agency will, as a back-up mechanism, screen Board material to identify issues with potential multi-Board implications.

3. It is the intent of the Boards and the Agency that regulations pertaining to issues of mutual interest, to the extent possible, be jointly developed by the affected Boards. The development of regulations by the Boards shall be governed by the following procedure:

    a. When a Board determines that it intends to develop or modify regulations, it shall notify the other Boards and the Agency in writing as to the subject matter of any proposed new regulation, and the section numbers of any existing regulations proposed to be modified.

    b. The other Boards shall review the notice and, within 30 days, notify the originating Board and the Agency in writing as to which proposals, if any, deal with issues that are of concern.

    c. For issues so identified, regulatory language shall be jointly developed by the affected Boards. The resulting language shall be adopted by each affected Board and placed in the relevant portion of the California Administrative Code for each affected Board.

    d. Any disputes that arise during this process shall be resolved according to the dispute resolution procedure outlined in Section IV(C) below. If the dispute cannot be resolved in a manner that results in the adoption of identical language by each affected Board, then any Board may proceed with individually developed regulations.

4. The Boards shall apply the following procedures when interpreting and implementing the statutory provisions regarding the interaction of the Boards cited in Section III(C)(3) above:

20/5/10

    a.  Any disagreement as to the interpretation of the above-referenced statutory provisions shall be resolved according to the dispute resolution procedure outlined in Section IV(C) below.

    b.  The CIWMB shall be the principal coordinating agency for all matters concerning the collection and disposal of solid waste in California, acting in concert with other affected state agencies. To "act in concert" means to act in a manner consistent with the intent and the provisions of this MOU.

    c.  As a pro-active measure to prevent potential conflict, the Executive Officers, at the first quarterly meeting convened pursuant to Section IV(D) below, shall identify critical waste management-related regulatory areas where cooperative work is needed. ("Executive Officers" refers to the Executive Officer of the ARB, the Executive Director of the SWRCB, and the Chief Executive Officer of the CIWMB). The Executive Officers shall define tasks and milestones necessary to address the identified issues.

    d.  At subsequent quarterly meetings the Executive Officers shall review progress on waste management coordination, take corrective action as needed, and identify future needs.

5. It is the responsibility of each Board to:

    a.  Communicate with the other Boards in a timely manner.

    b.  Forward applicable draft policies, regulations, guidance documents or other relevant materials to the Agency for screening.

    c.  Notify other Boards when a particular facility, site or issue is of interest.

    d.  Provide comment, analysis, evaluation and advice on areas within its unique expertise.

    e.  Carry forward to other Boards the concerns and positions expressed by advocacy groups active in its issue areas.

6. It is the responsibility of the Agency to:

    a.  Screen the draft materials forwarded pursuant to Section IV(A)(5)(b) above to identify areas with potential multi-Board impact. If the Agency identifies such a potential impact, the Agency will provide comments to all Boards.

## B. COMMUNICATION

The parties recognize that achieving the goals of this MOU rests upon effective communication across programmatic and organizational lines. This MOU therefore sets forth procedures addressing communication at the management level, at the staff level, with other levels of government, and with regulated facilities. The purpose of these procedures is to systematize and formalize the existing communication mechanisms.

1. At the management level, the Executive Officers or their designees will meet quarterly as described in Section (IV)(D) below.

2. Another essential step is fostering an awareness, at the staff level, that our environmental programs are inter-related, and that actions taken in one program can have an effect upon other programs. In order to encourage such an awareness, the Executive Officers will:

   a. Identify the issues where inter-staff communication is needed.

   b. Designate, for each Board, a contact person on that issue.

   c. Ensure that the contact persons meet on a regular basis.

   d. Provide regular opportunities for cross-program training and orientation.

   e. Provide copies of Office of Administrative Law rulemaking calendars to Agency and to the other Boards.

3. Local government and the federal government are essential components of California's environmental regulatory system. The Boards and the Agency recognize that the state must work with other levels of government in a clear, consistent fashion, and that each Board has a unique relationship with its local and federal counterparts.

   a. Each Board and the Agency agrees to work through the appropriate Board when communicating with local and regional agencies on a statewide basis. Any communication addressed to all local air pollution districts shall be routed through the ARB, communication addressed to all Regional Boards shall be routed through the SWRCB, and communication addressed to all Local Enforcement Agencies shall be routed through the CIWMB. Communication addressed to a single local or regional agency on a site-specific basis need not be routed through the appropriate Board. In such cases, however, the Board shall receive a copy of the correspondence.

   b. When providing comments to or otherwise communicating with federal agencies, each Board shall work with the other Boards to ensure that a consistent, coordinated state position is expressed.

4. It also is important that the Boards and the Agency deal with regulated facilities in a consistent, predictable fashion. The long-term credibility and effectiveness of our environmental programs suffers whenever regulatory agencies impose conflicting or duplicative requirements on facilities.

In order to prevent such occurrences, each Board will establish procedures to ensure that appropriate notification is provided to other Boards regarding activities which affect facilities which are also regulated by other Boards.

C. DISPUTE RESOLUTION

1. It is the intent of the three Boards and the Agency that programmatic conflicts be resolved, to the extent possible, through informal discussion, negotiation, and consensus. However, it is also the intent that conflicts be resolved promptly.

If a dispute cannot be resolved informally within a reasonable length of time or if continuing nonresolution of the dispute would place a Board at a disadvantage, then any Board may notify the other Boards and the Agency that a dispute exists and invoke the formal dispute resolution procedure described below.

2. Disputes shall be resolved formally using the following procedure:

a. A meeting shall be convened involving staff from the affected Boards. At the meeting the staffs shall clarify the issues subject to dispute, identify alternative solutions, identify the consequences that would result from each alternative, and determine the date by which a decision is needed. This information shall be provided to the relevant Division Chiefs, who shall have no more than 30 days to resolve the issue.

b. If the Division Chiefs from the affected Boards cannot resolve the dispute within the time allowed, then they will jointly notify the Executive Officers of the affected Boards, and the Agency Secretary.

The affected Boards shall jointly be responsible for resolving the dispute. If the dispute is not resolved within 30 days, then the issue shall be referred to the Agency Secretary for resolution. The Agency Secretary, acting in consultation with the affected Boards, shall develop a recommended course of action and act as coordinator to bring about a resolution to the dispute.

c. If the Agency Secretary is unable to develop a consensus course of action acceptable to all affected Boards within 30 calendar days of referral from the Boards, then each affected Board shall prepare a memorandum providing direction to their respective staffs as to how to proceed in the case. These memoranda will not necessarily describe a single course of action, but are intended to communicate and document each Board's future direction.

      d.  If the dispute is resolved by the Agency Secretary, then a
         written decision shall be provided to all parties of this MOU.

  3.  If, on an issue for which the formal dispute resolution mechanism
     has been invoked, a formal petition for review of an action or
     inaction by a Board is filed by a third party, the statutory or
     regulatory time periods required for action on the petition shall
     take precedence over those in Section IV(C)(2) above.  However, the
     parties shall attempt to complete the actions described in Section
     IV(C)(2) to resolve the dispute within the statutory or regulatory
     time periods associated with the petition.

## D. IMPLEMENTATION

  1.  In order to facilitate implementation of this MOU, the Executive
     Officers or their designees and the Secretary of Environmental
     Affairs designee will meet quarterly.  This group will provide
     guidance and advice to the Agency Secretary and Board staff on
     technical issues that develop during performance under this
     agreement, and will assist, if called upon, in the settlement of
     technical disputes.  The group will also evaluate the achievement
     of the principles of this MOU and will provide an annual report to
     the Agency Secretary.  This report will be submitted by March 1 of
     each year, will cover the prior calendar year and will, if
     appropriate, include recommendations for modifications to this MOU
     to improve attainment of the principles of the parties.

     The quarterly meetings will be held on a rotating chair basis, with
     each Executive Officer or designee and the Agency Secretary
     designee being responsible, in turn, for organizing and hosting the
     meeting and preparing the agenda.

  2.  The first quarterly meeting of the Executive Officers or their
     designees will be held within 30 days of the execution of this MOU.

## E.  AMENDMENT, WITHDRAWAL, AND REPEAL

  1.  This MOU may be amended with the mutual written approval of all
     signatories or their successors.

  2.  Any signatory to the MOU, or his or her successor, may withdraw
     from the MOU by sending written notification to the Agency
     Secretary.  In the event that one party withdraws from the MOU, the
     MOU continues in full force for the remaining parties and continues
     to govern their activities.

  3.  This MOU may be repealed in its entirety with the mutual written
     approval of all signatories or their successors.

The parties hereto have caused this MOU to be duly executed on the respective dates set forth opposite their signatures.


Jananne Sharpless
Secretary of Environmental Affairs

8/27/90
Date


James Boyd, Executive Officer
Air Resources Board

8/27/90
Date


James Baetge, Executive Director
State Water Resources Control Board

8/27/90
Date


George Larson, Chief Executive Officer
California Integrated Waste Management Board

8/27/90
Date

# MEMORANDUM OF UNDERSTANDING
## BETWEEN THE
## STATE WATER RESOURCES CONTROL BOARD
## AND THE
## CALIFORNIA DEPARTMENT OF PESTICIDE REGULATION
## FOR THE PROTECTION OF
## WATER QUALITY (SURFACE AND GROUND WATER)
## FROM POTENTIALLY ADVERSE
## EFFECTS OF PESTICIDES

## BACKGROUND

The State Water Resources Control Board (SWRCB) and the California Department of Pesticide Regulation (CDPR) have responsibilities relating to the protection of water quality from the potentially adverse effects of pesticides. Both agencies believe that the State will benefit by a unified and cooperative program to address water quality problems related to the use of pesticides.

The purpose of this Memorandum of Understanding (MOU) between the SWRCB and CDPR is to ensure that pesticides registered in California are used in a manner that protects water quality and the beneficial uses of water while recognizing the need for pest control.

The Food and Agricultural Code, as amended by the 1991 Governor's Reorganization Plan No. 1, charges CDPR with the responsibility of ensuring the orderly regulation of pesticides while protecting the quality of the total environment (including water quality) and the health, and safety of the public.

## SCOPE

This MOU is intended to assure that the respective authorities of the SWRCB and CDPR, relative to the protection of water quality and beneficial uses from impairment by the use of pesticides, will be exercised in a coordinated and cohesive manner designed to eliminate overlap of activities, duplication of effort, and inconsistency of action. To that end, this MOU establishes principles of agreement regarding activities of the signatory agencies, identifies primary areas of responsibility and authority between these agencies, and provides methods and mechanisms necessary to assure ongoing coordination of activities relative to such purposes. This MOU also describes how the agencies will work cooperatively to achieve the goals of the respective agencies.

## STATUTORY AUTHORITIES

The Porter-Cologne Water Quality Control Act establishes a comprehensive water quality control program for California. The Federal Clean Water Act adds additional water quality control provisions to be implemented nationwide.  The SWRCB and the nine California Regional Water Quality Control Boards (CRWQCB) are responsible for protecting the beneficial uses of water in California and for controlling all discharges of waste into waters of the State.  The SWRCB sets overall State policy, adopts or approves all water quality control plans, and hears petitions to review CRWQCB decisions.  The CRWQCBs have primary responsibility for permitting, inspection, and enforcement actions.  The CRWQCBs implement and enforce the policies adopted by the SWRCB.

CDPR is the lead agency for pesticide regulation in California.  California law requires CDPR to register and regulate the use of pesticides and protect public health and safety by providing for environmentally sound pest management.

The Pesticide Contamination Prevention Act of 1985 (Article 15, Chapter 2, Division 7 of the Food and Agricultural Code) authorizes CDPR to:

1. Collect and analyze environmental fate data on all pesticides registered for agricultural use in California to determine ground water data gaps and identify and monitor potential ground water contaminants;

2. Review any pesticide or related chemical found in ground water or in soil under certain conditions to determine if that chemical pollutes or threatens to pollute ground water as a result of legal agricultural use and take appropriate corrective action when necessary; and

3. Compile and maintain a statewide database of wells sampled for pesticide active ingredients and to make an annual report on that inventory and any corrective actions taken by CDPR and/or the SWRCB.

The Pesticide Contamination Prevention Act (Act) also prescribes a cooperative working relationship between CDPR, as the lead agency, and the SWRCB for the purpose of protecting ground water from pesticide pollution as a result of agricultural uses.  A subcommittee of CDPR's Pesticide Registration and Evaluation Committee (PREC) is established by the Act for this purpose.

The local administration of CDPR's pesticide regulatory program is the responsibility of the County Agricultural Commissioners (Commissioners), with coordination, supervision, and training provided by CDPR. The Commissioners enforce pesticide laws and regulations and evaluate permit requests for the use of restricted pesticides. In addition, the Commissioners monitor and inspect pesticide handling and use operations, investigate suspected pesticide misuse, and take enforcement action against violators.

PRINCIPLES OF AGREEMENT

The SWRCB and CDPR agree that the use of certain pesticides may degrade water quality and threaten beneficial uses. To protect the State's water, it is necessary to prevent water pollution by pesticides by establishing water quality objectives and by implementing control measures for those pesticides which have a potential to unreasonably affect beneficial uses.

In order to provide for better protection of water quality and beneficial uses for the people of California, the SWRCB and CDPR mutually agree to:

1.  Promote both technical and policy consultations concerning pesticide water quality issues through formal channels, such as standing interagency committees and SWRCB workshops and meetings, as well as through informal staff exchanges of information. The SWRCB and CRWQCBs and CDPR will consult during the early stages of planning any investigation related to pesticides and water quality. The agencies will provide technical assistance to each other upon request.

2.  Implement a pesticide detection notification system to ensure mutual awareness of pesticide finds in the waters of the State. Results of pesticide monitoring will be provided in an expeditious manner. Results of pesticide monitoring related to ground water will be provided in compliance with "Minimum Reporting Requirements for Well Sampling" approved by the SWRCB, California Department of Food and Agriculture, and California Department of Health Services in July 1986. Reporting requirements and procedures for data referrals relative to surface water will be described in an implementation document.

3.  Collect, exchange, and disseminate information on (a) the use of pesticides, (b) impacts on the quality of the State's waters from such uses, and (c) any efforts to mitigate those impacts.

4. Share information on pesticide formulations and environmental fate and toxicity of active ingredients, inert ingredients, and break-down products. Procedures to protect proprietary information will be described in an implementation document.

5. Consult each other in developing or revising water quality objectives for pesticides and in developing or revising regulations which may impact water quality.

6. Participate in the development of State policies, guidelines, and management plans relative to pesticide use and water quality control.

7. Promote the development and implementation of Best Management Practices (BMPs) whenever necessary to protect the beneficial uses of the waters of the State from the potentially adverse effects of the use of certain pesticides. CDPR's plans to implement BMPs, as furnished to the SWRCB and/or CRWQCBs, should (a) describe the nature of the actions which are necessary to achieve the objectives, including recommendations for appropriate actions by any entity, public or private; (b) set a time schedule for actions to be taken; and (c) describe the points of application and the monitoring to be undertaken to determine compliance with the water quality objectives.

8. Implement BMPs initially upon voluntary compliance to be followed by regulatory-based encouragement of BMPs as circumstances dictate. Mandatory compliance will be based, whenever possible, on CDPR's implementation of regulations and/or pesticide use permit requirements. However, the SWRCB and CRWQCBs retain ultimate responsibility for compliance with water quality objectives. This responsibility may be implemented through the SWRCB and CRWQCBs' Basin Planning Programs or other appropriate regulatory measures consistent with applicable authorities and the provisions of the Nonpoint Source Management Plan approved by the SWRCB in November 1988.

9. Develop an implementation plan to (a) provide uniform guidance and direction to the CRWQCBs and to the Commissioners regarding the implementation of this MOU, (b) describe in detail procedures to implement specific sections of this MOU, and (c) make specific the respective roles of units within the signatory agencies.

## DISPUTE AND CONFLICT RESOLUTION

It is the desire of both agencies to establish a speedy, efficient, and informal method for the resolution of interagency conflicts. Conflicts between the SWRCB and CRWQCBs, CDPR, and the Commissioners which cannot otherwise be informally resolved will be referred to the Executive Director of the SWRCB and the Director of CDPR. Conflicts which cannot be resolved at this level will be elevated to the Secretary of the California Environmental Protection Agency.

To assist the Executive Director of the SWRCB and the Director of CDPR in resolving conflicts, two staff persons will be appointed by the Chairman of the SWRCB and the Director of CDPR representing the interests of the SWRCB and CRWQCBs and CDPR and Commissioners, respectively.

This MOU shall become effective upon the date of final signature and shall continue in effect until modified by the mutual written consent of both parties or until terminated by either party upon a thirty (30) day advance written notice to the other party.

STATE WATER RESOURCES CONTROL BOARD

_W. Won Maugha_          _Dec. 23, 1991_
W. Don Maughan, Chairman        Date

CALIFORNIA DEPARTMENT OF PESTICIDE REGULATION

_James W Wells_          _Dec 23, 1991_
James W. Wells, Interim Director      Date

MEMORANDUM OF UNDERSTANDING (MOU)

FOR IMPLEMENTATION OF

THE SAN JOAQUIN VALLEY DRAINAGE PROGRAM'S RECOMMENDED PLAN

DECEMBER 1991

The U. S. Bureau of Reclamation, U. S. Fish and Wildlife Service, U. S. Soil Conservation Service, U. S. Geological Survey, Department of Water Resources, Department of Fish and Game, Department of Food and Agriculture, and the State Water Resources Control Board agree to the following:

1. Background. A management plan for agricultural subsurface drainage and related problems on the westside San Joaquin Valley was developed by the Federal-State San Joaquin Valley Drainage Program (SJVDP) during the period 1985-1990, and published in a September 1990 report by the same name.

2. Purpose. All parties to this MOU will use the management plan described in the September 1990 final report of the San Joaquin Valley Drainage Program (SJVDP Recommended Plan) as the principal guide for remedying subsurface agricultural drainage and related problems. All parties will work together to identify and define specific tasks and associated responsible parties, to seek needed funding and authorities, and to determine schedules for accomplishment, as necessary to implement all components of the SJVDP Recommended Plan.

3. Program. The parties will use the strategy described in "A Strategy for Implementation of the Management Plan for Agricultural Subsurface Drainage and Related Problems on the Westside San Joaquin Valley", December 1991, as the initial step in developing an action plan. Based on it, the parties will prepare an annual work plan to establish priorities and coordinate activities to address the objectives of the Recommended Plan. During 1992, the parties will prepare work plans for 1992 and 1993. Subsequent work plans will be prepared two years in advance to facilitate budget development and funding requests. The parties will prepare an annual report that will outline and evaluate accomplishments during the year.

parties that implementation of this MOU and the SJVDP
Recommended Plan are subject to the availability of funding
and legal authority.  All parties to this MOU agree to
support attempts by signatory agencies to secure the funding
and authority necessary to implement work plans adopted
pursuant to this MOU.

In order to enhance efficiency and economy, and reduce
duplications or conflicts in efforts, all parties to this
MOU agree to coordinate requests for funding and authority.

5.  <u>Amendments</u>.  This MOU may be modified by mutual agreement as
necessary to accomplish drainage management objectives.

6.  <u>Withdrawal</u>.  Any party to this MOU may withdraw by sub-
mitting a written notice to each of the other parties 120
days in advance of the intended withdrawal.

7.  <u>MOU not a contract</u>.  In entering into this MOU, it is the
intention of the parties that this MOU shall not be
construed to be an enforceable contract or agreement, but
is rather a statement of principles.

8.  <u>Term of MOU</u>.  This MOU shall remain in effect until all
components of the SJVDP Recommended Plan have been fully
implemented or until it is dissolved by unanimous agreement
of the signatory parties.

<u>SIGNATURES</u>

U. S. Bureau of Reclamation       Department of Water Resources

U. S. Fish and Wildlife Service   Department of Fish and Game

U. S. Soil Conservation Service   Department of Food and Agriculture

U. S. Geological Survey           State Water Resources Control
                                  Board

22/2/2

MEMORANDUM OF UNDERSTANDING
BETWEEN
THE STATE WATER RESOURCES CONTROL BOARD
AND
THE CALIFORNIA INTEGRATED WASTE MANAGEMENT BOARD
FOR THE REVIEW OF
BACKLOGGED SOLID WASTE ASSESSMENT TEST REPORTS

## INTRODUCTION

This Memorandum of Understanding (MOU) consists of general and specific provisions for the review of Solid Waste Assessment Test (SWAT) reports as required by Assembly Bill 3348 (Eastin), signed by the Governor September 29, 1992.

## BACKGROUND

1.     **Agency Authority:**

The California Water Code, Division 7 designates the State Water Resources Control Board (State Water Board) as the State's lead regulatory agency for water quality protection.

The California Public Resources Code, Division 30 designates the California Integrated Waste Management Board (CIWMB) as the state's lead regulatory agency for solid waste disposal.

2.     **Solid Waste Assessment Test Program:**

In 1984, the Legislature adopted California Water Code §13273 which, among other things, required:

A.  The State Water Resources Control Board (State Water Board) to group all solid waste disposal sites (both active and closed) in ranks of 150 each in accordance with their threat to water quality,

B.  All landfill owner/operators, one rank per year, to conduct a SWAT (a determination whether the landfill is leaking hazardous waste) and to submit to the appropriate California Regional Water Quality Control Boards (Regional Water Boards) a report signed by a specified professional containing the findings of the SWAT together with appropriate conclusions,

C.  The Regional Water Boards are to review this report and determine whether, (1) the monitoring system was adequate to determine whether hazardous waste had leaked for the site and (2) the report author's conclusions were credible.

-2-

3.    **Current SWAT Program Status:**

Between the start up of the SWAT program and June 30, 1991, 195 SWAT reports were approved and 15 SWAT waivers granted (for those cases where hazardous waste leakage was already well known). In addition, another 231 SWAT reports had been received, but not approved. Because of the heavy demands on the State's General Fund, funding for SWAT report review was eliminated in July 1991, leaving this large backlog of unreviewed SWAT reports.

4.    **Assembly Bill Number 3348 (Eastin):**

In 1992, the Legislature adopted Assembly Bill 3348 (Eastin) which contains in Section 10, the following language:

*"The following sums are hereby appropriated from the Solid Waste Disposal Site Cleanup and Maintenance Account in the Integrated Waste Management fund to the State Water Resources Control Board:*

*"(a) (1) Two million five hundred thousand dollars ($2,500,000), as a one-time allocation, but without regard to fiscal year, to complete a review of all solid waste assessment test reports that are required to be submitted to the appropriate regional water quality control boards by July 1, 1991, that have been classified in ranks one through five in the Solid Waste Assessment Test (SWAT) program pursuant to Section 13273 of the Water Code.*

*"(2) The expenditure of these funds shall be subject to the conditions specified in a memorandum of understanding which shall be entered into by the California Integrated Waste Management Board and the State Water Resources Control Board and which shall include, but need not be limited to, provisions linking the review and ranking of solid waste landfill facilities by the State Water Resources Control Board with the Solid Waste Disposal Site Cleanup and Maintenance Program implemented by the California Integrated Waste Management Board."*

and the following:

*"(c) The Legislature encourages the State Water Resources Control Board to complete the review performed pursuant to paragraph (1) of subdivision (a) on or before June 30, 1995."*

-3-

**THE CIWMB AND THE STATE WATER BOARD AGREE TO THE FOLLOWING:**

1. **Scope:**

    This MOU is effective immediately and is binding upon CIWMB, the State Water Board, and the nine Regional Water Boards.

    This MOU includes provisions for sharing data, ensuring that activities at sites of common interest are coordinated, and conflict resolution.

2. **Sharing of Data:**

    A. **SWAT Report Summaries:** The State Water Board will provide the CIWMB copies of all SWAT Report Summaries as prepared by the Regional Water Boards. Newly prepared Summaries shall be transmitted quarterly.

    B. **Quarterly Progress Report:** Every three months, the State Water Board will provide the CIWMB an updated SWAT Status Report showing the current SWAT report review status for each landfill included in Ranks 1 through 5. For those SWAT reports which have not been approved yet, these status reports shall include for each, the name of the staff person assigned to work on it and the anticipated quarters (1) the review will start, (2) a corrected Report will be submitted, or (3) the SWAT report will be approved.

    C. **Final Report:** The State Water Board will prepare a Summary Report of the findings of all the SWAT reports to date including, but not limited to, discussions of the following:

        1. Hazardous waste presence in landfills,

        2. General characterization of solid waste disposal site leakage,

        3. Chemical characterization of leakage,

        4. Impact of leakage on quality of nearby waters,

        5. Impact of leakage on beneficial uses of nearby waters, especially of drinking water supply wells, and

        6. Completed or proposed remedial actions.

        In addition, this report shall contain a discussion of needed improvements in landfill designs and monitoring to reduce the threat which landfills pose to the beneficial uses of the State's waters.

        A copy of this report shall be provided to the CIWMB by June 30, 1995.

-4-

3.    **Ensuring that Activities of Common Interest are Coordinated:**

Whenever the CIWMB has a need for expedited Regional Water Board review of any landfill's SWAT report, CIWMB shall:

A.  Request such a review in writing to the State Water Board and

B.  State the date by which they need these data.

The State Water Board shall respond within 10 working days of the receipt of the request with:

A.  The anticipated date the review will be completed, and

B   Reasons for delay should it be impossible to meet the CIWMB's due date.

4.    **Conflict Resolution:**

Any dispute arising out of the implementation of this Agreement shall be resolved in the following manner:

A.  The designated Program Managers for the CIWMB and the State Water Board shall meet within ten (10) days of a request by either party.  The party calling the meeting shall provide, in writing, at least five (5) days in advance of the meeting, a clear description of the dispute and a proposed solution.  Following the meeting, the CIWMB Program Manager shall make a determination on the dispute, in writing, including reasons for the determination.  The determination shall be sent to the State Water Board Program Manager within ten (10) days of the meeting.

B.  If the State Water Board does not agree with the determination, the State Water Board may make a written request for a meeting between the Deputy Executive Director of the CIWMB , and the Chief of the Division of Clean Water Programs of the State Water Board.  Such a meeting should occur within fifteen (15) days of the receipt of such request.  The request must be accompanied by a statement of the disputed issues and a proposed solution.  The CIWMB shall make a determination, in writing, and shall send this to the Chief, Division of Clean Water Programs, State Water Board, within fifteen (15) days of the meeting.

C.  If the two Division Chiefs cannot resolve the issue in dispute, the matter shall be elevated to the Executive Directors of the two agencies for resolution.

D.  Unresolved issues may be elevated to the Board Chairpersons of the State Water Board and the CIWMB.

-5-

E. Any issues which cannot be resolved by the Board Chairpersons shall be forwarded to the Secretary for Environmental Protection for a final and binding decision.


Ralph Chandler
Executive Director
California Integrated Waste
  Management Board
State of California

Date: _1/8/93_


Walt Pettit
Executive Director
State Water Resources Control Board
State of California

Date: DEC 1 6 1992

23/5/6

**SOLID WASTE ASSESSMENT TEST (SWAT)/AB 3348 PROGRAM**
**QUARTERLY STATUS REPORT**
**EXAMPLE FORMAT**

For each landfill included in Rands 1 through 5:

1. <u>Rank</u>: 4

2. <u>Name (including SWIS and WMUDS numbers)</u>: Klamath County Landfill, 59-AA-001, 1A123456789

3. <u>Location (County and Nearest Community)</u>: Klamath, Deadman's Bar

4. <u>Review Status</u>:

   A. <u>Approved</u>,                                               |☐|

   B. <u>Awaiting Review</u>,                                        |☐|

   C. <u>In Review</u>,                                              |☐|

   D. <u>Returned to Owner/Operator for Corrections</u>, or         |☒|

   E. <u>Never received</u>.                                        |☐|

5. <u>Regional Water Board (if status 4B, 4C, or 4D above, name and telephone number of review)</u>:  North Coast, Jane Doe, (209) 555-1212

6. <u>Review Target Dates (by Quarter)</u>

   A. <u>State of Review</u>:

   B. <u>Due date for Owner/Operator to have corrections made</u>:        3rd Quarter, FY 1992-93

   C. <u>Approval of SWAT Report</u>:

7. <u>Comments</u>:  No ground water sample taken.  SWAT Investigation was clearly inadequate.  Letter to owner/operator ordering correction of deficiencies was sent out February 1992 with a March 1993 deadline.

MEMORANDUM OF UNDERSTANDING
BETWEEN THE
BUREAU OF LAND MANAGEMENT
U.S. DEPARTMENT OF THE INTERIOR
AND THE
CALIFORNIA STATE WATER RESOURCES CONTROL BOARD
FOR
PLANNING AND COORDINATION OF
NONPOINT SOURCE WATER QUALITY POLICIES AND ACTIVITIES

I.  **PURPOSE:**

The purpose of this Memorandum of Understanding (MOU) is
to formalize cooperation between the Bureau of Land
Management (BLM), U.S. Department of the Interior, and
the State Water Resources Control Board (SWRCB) and to
develop appropriate procedures and clarify
responsibilities related to nonpoint source (NPS) water
quality issues and activities.  The BLM and SWRCB share a
common interest in maintaining, protecting, and improving
the quality of waters (surface and ground water) of the
State.

II.  **OBJECTIVES:**

Through this MOU, SWRCB seeks to utilize the personnel
and expertise of BLM to increase the development and
implementation of water quality programs and projects
relative to, but not limited to, agricultural, animal
husbandry, silvicultural, mining, and construction
activities on the public lands managed by BLM within the
State of California.  Coordination and cooperation
between BLM and SWRCB will reduce unnecessary duplication
of effort, accelerate the implementation of best
management practices (BMPs), management measures (MM),
and other NPS measures (NPSM)  and increase overall
program effectiveness.

The SWRCB and BLM recognize the need to improve,
conserve, and protect the quality of surface and ground
water by undertaking efforts to avoid pollution by NPSs
and thereby maintain the quality and quantity of water
available for safe drinking water supplies, irrigated
agriculture, fisheries, and other beneficial uses.  A
coordinated effort will improve the likelihood of meeting
these goals.

III.  **AUTHORITIES:**

This MOU is entered into under the authorities of
Division 7 of the California Water Code (Porter-Cologne
Water Quality Control Act [Porter-Cologne Act]), the

authorities of the federal Clean Water Act (CWA), [Section 304(1), 314, 319, and 320], as amended, and the Federal Land Policy and Management Act of 1976, as amended, 43 U.S.C. 1701, et seq.

BLM Manual Section 7000.06(D-E), March 8, 1984, established BLM's policy for coordination with State agencies for related programs and provided for compliance with applicable State and federal water pollution control laws, standards, programs, and implementation plans.

BLM Instruction Memorandum No. 88-511, June 17, 1988, provides guidance to BLM field offices regarding coordination with State agencies on NPS pollution control activities. Instruction Memorandum No. 88-511 also addresses how BLM's NPS actions will be incorporated into the BLM planning process and into BLM's overall multiple-use resource objectives.

BLM has management responsibility for over 17 million acres of federal public lands throughout California. BLM's land-use oversight is provided through four district offices which are further subdivided into 15 resource area offices.

The Porter-Cologne Act, administered by SWRCB and the California Regional Water Quality Control Boards (CRWQCBs) establishes a comprehensive program for the protection of water quality and the beneficial uses of the waters of the State. The Porter-Cologne Act provides a "statewide program for water quality control."

SWRCB sets overall State policy, adopts statewide water quality control plans, approves all water quality control plans adopted by the CRWQCBs, and hears petitions to review CRWQCBs actions or inactions. The CRWQCBs have primary responsibility for permitting, inspecting, and enforcing actions regarding dischargers of waste. The CRWQCBs implement and enforce the policies and plans adopted by SWRCB.

Section 319 of CWA, as amended, requires the State to develop an NPS management program for controlling NPS pollution. SWRCB has developed a State NPS management program which lists the BLM as an agency with BMP/MM/NPSM implementation capability.

24/2/5

IV.   PROCEDURES:

    A.   BLM AGREES TO:

        1.   Integrate water quality concepts and management techniques into the BLM planning system and into environmental review and clearance of land-use proposals to address surface and ground water NPS pollution.

        2.   Provide copies of draft Resource Management Plans, draft Environmental Impact Statements, and draft Environmental Assessments which have significant water quality issues to the CRWQCBs responsible for the affected area.

        3.   Provide BLM activity plans for those actions which have NPS issues as a primary concern to the responsible CRWQCBs for review and comment.

        4.   Incorporate BMP/MM/NPSM into BLM land uses and BLM permitted land uses, when necessary, to protect or maintain water quality.

    B.   SWRCB AGREES TO:

        1.   Encourage the voluntary or cooperative approach as the first step in the development and implementation of solutions to the NPS problem.

        2.   Coordinate the activities of the CRWQCBs with those activities being proposed and implemented by the BLM.

        3.   Define the goals and objectives of the NPS Interagency Advisory Committee and conduct regular meetings.

        4.   Emphasize to the CRWQCBs the importance of a timely response to BLM documents submitted for review.

    C.   BLM AND SWRCB MUTUALLY AGREE TO:

        1.   Encourage participation of other federal, State, and local agencies and land users in the control of NPS pollution.

2. Develop a process for BMP/MM/NPSM selection and implementation to reduce or prevent NPS pollution from public lands.

3. Develop BMP/MM/NPSM for federal land uses with input from the NPS Interagency Advisory Committee and other affected parties.

4. Develop implementation priorities and policies for NPS pollution activities.

5. Provide NPS guidance and technical assistance to parties responsible for implementation of NPS pollution control on public lands.

6. Encourage the participation of BLM, SWRCB, and CRWQCB staffs in on-the-ground inspections and tours to discuss public land NPS issues and proposed, ongoing, or completed BMPs.

7. Develop a Water Quality Management Plan and a Management Agency Agreement for the purpose of carrying out portions of the State's NPS Management Program on BLM lands.

8. Wherever appropriate, encourage the development and implementation of comprehensive management plans covering entire or significant portions of watersheds. These plans would be developed using the principles of Coordinated Resource Management and Planning and, as appropriate, would seek to resolve issues relating to biological diversity as they relate to NPS pollution.

V. ADMINISTRATION:

A. Nothing in this MOU alters the statutory or regulatory authority of BLM or SWRCB or requires the participants to obligate or expend funds in excess of available appropriations.

B. The terms of this MOU may be renegotiated at any time at the initiative of one of the participants following at least 30 days notice to the other participant.

C. This MOU may be cancelled at any time by one of the participants following at least 30 days notice to the other participant.

-5-

D. Any participant may propose changes to the MOU during its term. Such changes will be in the form of an amendment and will become effective upon signature by all of the participants.

E. The need for this MOU is expected to continue until the Water Quality Management Plan and Management Agency Agreement are in effect.

F. This MOU will become effective upon the date of signature by both parties.

APPROVED:

_____          2/3/93
Ed Hastey, California State Director       Date
U.S. Bureau of Land Management


_____          January 27, 1993
Eliseo M. Samaniego, Vice Chairman        Date
State Water Resources Control Board

RESOLUTION
CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
CENTRAL VALLEY REGION

DELEGATION OF CERTAIN DUTIES AND POWERS OF THE BOARD
TO ITS EXECUTIVE OFFICER PURSUANT TO SECTION 13223
CALIFORNIA WATER CODE

Resolution No:    70-118                            Adopted:   1-22-70

WHEREAS, Section 13223 of the Porter-Cologne Water Quality Control Act provides that the Regional Board may delegate any of its powers and duties, with certain exceptions, to its Executive Officer, be it, therefore;

RESOLVED, that the California Regional Water Quality Control Board, Central Valley Region, does hereby delegate to its Executive Officer, under the general direction and control of the Board, all of the powers and duties of the Board under Division 7 of the California Water Code except those specified in Section 13223(a); and,

RESOLVED further, That the Executive Officer is authorized, and he is hereby directed to certify and submit copies of this resolution to such agencies and individuals as may have need therefor or as may request same; and

RESOLVED further, That any action that may be taken by the Regional Board pursuant to Division 7, California Water Code, includes such action by its Executive Officer pursuant to powers and duties delegated to him by the Board.

_Norman F. Clevenger_
Chairman

ATTEST:

_Shan T. Charushat_
Executive Officer

25/1/1

# Memorandum of Understanding
### Between

### Ukiah District
### U.S. Bureau of Land Management

### and

### California Regional Water Quality
### Control Board, Central Valley Region

This agreement expresses an understanding made this date between the Bureau of Land Management, Ukiah District, hereinafter referred to as the BLM, and the California Regional Water Quality Control Board, Central Valley Region, hereinafter referred to as the "Board."

Whereas:

The State Water Resources Control Board and Regional Water Quality Control Boards have overall responsibility for water quality protection and, as such, must ensure that land management activities do not cause adverse impacts on beneficial water uses, and

Whereas:

The BLM is responsible for management and protection of the public land,

Therefore:

This agreement is hereby entered into between the BLM and the Board in order to improve and facilitate future coordination between these agencies, thereby ensuring that environmental degradation resulting from actions taken on the BLM lands relating to locatable minerals, solid leasable minerals, and other leasable minerals including oil and gas and geothermal activities in California is minimized.

## Agreement

I.  **Permitting:**

1)  BLM approval of plans of operations, permits, leases or other use authorization on the BLM lands that involve the potential for a discharge of hazardous wastes or substances [1] into the environment will be conditioned on the approval by the Board of waste discharge requirements for the proposed activity, when applicable prior to commencement of any discharge.

2)  The Board agrees to notify the BLM of the earliest possible time of any new applications for waste discharge requirements or permits for activities located on BLM lands and to provide the BLM with the opportunity to recommend requirements necessary to ensure adequate bonding for site closure, neutralization and surface reclamation, i.e., removal and/or neutralization necessary for full cleanup.

3) BLM agrees to notify the Board of and to circulate documents prepared pursuant to the National Environmental Protection Act (NEPA) which involve the interests of the State, such as the issuance of waste discharge requirements. This action is consistent with the Memorandum of Understanding entered into between the State and BLM on November 23, 1983.

4) BLM will supply lists of mining operations that may involve the use of hazardous materials when 3809 "Notice" has been submitted for a plan of operations (operations under 5 acres), to ensure the Board is aware of all operations occurring on the BLM lands and to ensure that operators required to obtain waste discharge requirements have applied for them.

## II.  Compliance

1) The Board will provide the BLM with a list identifying the operator/discharger and locations of all sites on BLM lands where hazardous materials are used or stored onsite that are currently regulated under waste discharge requirements.

2) The Board will provide BLM with a list of indicators of potential waste discharge violations that BLM inspectors can use to assist in the identification of potential violations, i.e., lists of the types of indicators at a site that should be noted when performing an inspection.

3) The BLM will notify the Board of any potential violations of waste discharge requirements established by the Board on the BLM lands discovered during routine compliance checks or otherwise brought to the BLM's attention.

4) The Board will provide BLM with a summary of all compliance inspection reports issued for sites on the BLM lands and copies of those reports which document violation.

5) Upon the Board's determination that a violation exists, the Board will take appropriate action to enforce the stipulations found in waste discharge requirements with assistance from BLM.

6) BLM will assist the Board in obtaining the operator/discharger's compliance with State and Federal regulations during any cleanup/detoxification of a site.

## III.  Abandonment

For purposes of this agreement, "abandonment cases" means sites located on the BLM lands where the operator/discharger is unknown.

Prior to taking any formal enforcement action for violations of federal, state, or local requirements respecting waste discharges on abandoned sites located on the BLM lands, the Board will notify the BLM of the violation and provide the BLM with an opportunity to meet with the Board staff to explore methods of abating the violation. It is understood that this may not be possible in emergency situations. It is jointly agreed that this MOU can be canceled with 30 days notice and this agreement does not commit funds.


William Crooks
EXECUTIVE OFFICER
Central Valley RWQCB

9-30-85
Date


Van W. Manning
DISTRICT MANAGER
BLM, Ukiah District

9/6/85
Date


1/   As defined in Title 22 of the California Administrative Code, Division Chapter 30.

Between

Susanville District
U.S. Bureau of Land Management

and

California Regional Water Quality
Control Board, Central Valley Region

This agreement expresses an understanding made this date between the Bureau of
Land Management, Susanville District, hereinafter referred to as the BLM,
and the California Regional Water Quality Control Board, Central Valley Region,
hereinafter referred to as the "Board."

Whereas:

The State Water Resources Control Board and Regional Water Quality Control
Boards have overall responsibility for water quality protection and, as such,
must ensure that land management activities do not cause adverse impacts on
beneficial water uses, and

Whereas:

The BLM is responsible for management and protection of the public land,

Therefore:

This agreement is hereby entered into between the BLM and the Board in order
to improve and facilitate future coordination between these agencies, thereby
ensuring that environmental degradation resulting from actions taken on the
BLM lands relating to locatable minerals, solid leasable minerals, and other
leasable minerals including oil and gas and geothermal activities in California
is minimized.

Agreement

I.  Permitting:

1) BLM approval of plans of operations, permits, leases or other use
   authorization on the BLM lands that involve the potential for a
   discharge of hazardous wastes or substances[1] into the environment
   will be conditioned on the approval by the Board of waste discharge
   requirements for the proposed activity, when applicable prior to
   commencement of any discharge.

2) The Board agrees to notify the BLM of the earliest possible time
   of any new applications for waste discharge requirements or permits
   for activities located on BLM lands and to provide the BLM with
   the opportunity to recommend requirements necessary to ensure
   adequate bonding for site closure, neutralization and surface
   reclamation, i.e., removal and/or neutralization necessary for
   full cleanup.

3) BLM agrees to notify the Board of and to circulate documents prepared pursuant to the National Environmental Protection Act (NEPA) which involve the interests of the State, such as the issuance of waste discharge requirements. This action is consistent with the Memorandum of Understanding entered into between the State and BLM on November 23, 1983.

4) BLM will supply lists of mining operations that may involve the use of hazardous materials when 3809 "Notice" has been submitted for a plan of operations (operations under 5 acres), to ensure the Board is aware of all operations occurring on the BLM lands and to ensure that operators required to obtain waste discharge requirements have applied for them.

## II. Compliance

1) The Board will provide the BLM with a list identifying the operator/discharger and locations of all sites on BLM lands where hazardous materials are used or stored onsite that are currently regulated under waste discharge requirements.

2) The Board will provide BLM with a list of indicators of potential waste discharge violations that BLM inspectors can use to assist in the identification of potential violations, i.e., lists of the types of indicators at a site that should be noted when performing an inspection.

3) The BLM will notify the Board of any potential violations of waste discharge requirements established by the Board on the BLM lands discovered during routine compliance checks or otherwise brought to the BLM's attention.

4) The Board will provide BLM with a summary of all compliance inspection reports issued for sites on the BLM lands and copies of those reports which document violation.

5) Upon the Board's determination that a violation exists, the Board will take appropriate action to enforce the stipulations found in waste discharge requirements with assistance from BLM.

6) BLM will assist the Board in obtaining the operator/discharger's compliance with State and Federal regulations during any cleanup/ detoxification of a site.

## III. Abandonment

For purposes of this agreement, "abandonment cases" means sites located on the BLM lands where the operator/discharger is unknown.

Prior to taking any formal enforcement action for violations of federal, state, or local requirements respecting waste discharges on abandoned sites located on the BLM lands, the Board will notify the BLM of the violation and provide the BLM with an opportunity to meet with the Board staff to explore methods of abating the violation. It is understood that this may not be possible in emergency situations. It is jointly agreed that this MOU can be canceled with 30 days notice and this agreement does not commit funds.


William Crooks
EXECUTIVE OFFICER
Central Valley RWQCB

9-30-85
Date


Rex Cleary
DISTRICT MANAGER
BLM, Susanville District

9/5/85
Date


---

1/  As defined in Title 22 of the California Administrative Code, Division 4, Chapter 30.

Memorandum of Understanding

Between

Bakersfield District
U.S. Bureau of Land Management

and

California Regional Water Quality
Control Board, Central Valley Region

This agreement expresses an understanding made this date between the Bureau of Land Management, Bakersfield District, hereinafter referred to as the BLM, and the California Regional Water Quality Control Board, Central Valley Region, hereinafter referred to as the "Board."

Whereas:

The State Water Resources Control Board and Regional Water Quality Control Boards have overall responsibility for water quality protection and, as such, must ensure that land management activities do not cause adverse impacts on beneficial water uses, and

Whereas:

The BLM is responsible for management and protection of the public land,

Therefore:

This agreement is hereby entered into between the BLM and the Board in order to improve and facilitate future coordination between these agencies, thereby ensuring that environmental degradation resulting from actions taken on the BLM lands relating to locatable minerals, solid leasable minerals, and other leasable minerals including oil and gas and geothermal activities in California is minimized.

Agreement

I.  Permitting:

1)  BLM approval of plans of operations, permits, leases or other use authorization on the BLM lands that involve the potential for a discharge of hazardous wastes or substances[1] into the environment will be conditioned on the approval by the Board of waste discharge requirements for the proposed activity, when applicable prior to commencement of any discharge.

2)  The Board agrees to notify the BLM of the earliest possible time of any new applications for waste discharge requirements or permits for activities located on BLM lands and to provide the BLM with the opportunity to recommend requirements necessary to ensure adequate bonding for site closure, neutralization and surface reclamation, i.e., removal and/or neutralization necessary for full cleanup.

3) BLM agrees to notify the Board of and to circulate documents prepared pursuant to the National Environmental Protection Act (NEPA) which involve the interests of the State, such as the issuance of waste discharge requirements. This action is consistent with the Memorandum of Understanding entered into between the State and BLM on November 23, 1983.

4) BLM will supply lists of mining operations that may involve the use of hazardous materials when 3809 "Notice" has been submitted for a plan of operations (operations under 5 acres), to ensure the Board is aware of all operations occurring on the BLM lands and to ensure that operators required to obtain waste discharge requirements have applied for them.

## II. Compliance

1) The Board will provide the BLM with a list identifying the operator/discharger and locations of all sites on BLM lands where hazardous materials are used or stored onsite that are currently regulated under waste discharge requirements.

2) The Board will provide BLM with a list of indicators of potential waste discharge violations that BLM inspectors can use to assist in the identification of potential violations, i.e., lists of the types of indicators at a site that should be noted when performing an inspection.

3) The BLM will notify the Board of any potential violations of waste discharge requirements established by the Board on the BLM lands discovered during routine compliance checks or otherwise brought to the BLM's attention.

4) The Board will provide BLM with a summary of all compliance inspection reports issued for sites on the BLM lands and copies of those reports which document violation.

5) Upon the Board's determination that a violation exists, the Board will take appropriate action to enforce the stipulations found in waste discharge requirements with assistance from BLM.

6) BLM will assist the Board in obtaining the operator/discharger's compliance with State and Federal regulations during any cleanup/detoxification of a site.

## III. Abandonment

For purposes of this agreement, "abandonment cases" means sites located on the BLM lands where the operator/discharger is unknown.

Prior to taking any formal enforcement action for violations of federal, state, or local requirements respecting waste discharges on abandoned sites located on the BLM lands, the Board will notify the BLM of the violation and provide the BLM with an opportunity to meet with the Board staff to explore methods of abating the violation. It is understood that this may not be possible in emergency situations. It is jointly agreed that this MOU can be canceled with 30 days notice and this agreement does not commit funds.


_William H. Crooks_      9-30-85

William Crooks         Date
EXECUTIVE OFFICER
Central Valley RWQCB


_Robert D. Rheiner Jr._      8/13/85

Robert D. Rheiner, Jr.      Date
DISTRICT MANAGER
BLM, Bakersfield District

---

1/ As defined in Title 22 of the California Administrative Code, Division 4, Chapter 30.

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
NEW MELONES UNIT
CENTRAL VALLEY PROJECT, CALIFORNIA

MEMORANDUM OF AGREEMENT FOR THE PROTECTION AND ENHANCEMENT
OF THE WATER QUALITY OF THE STANISLAUS AND SAN JOAQUIN RIVERS
AS AFFECTED BY THE NEW MELONES PROJECT
UNDER WATER RIGHT APPLICATION 19304
OF THE UNITED STATES OF AMERICA
AND BY MUNICIPAL AND INDUSTRIAL WASTES

WHEREAS, THE UNITED STATES INTENDS TO CONSTRUCT A DAM AND RESERVOIR IN
AND ACROSS THE STANISLAUS RIVER AT A POINT UPSTREAM FROM OAKDALE, STANISLAUS
COUNTY, CALIFORNIA, AND WILL UTILIZE SAID DAM AND RESERVOIR AND THEIR RELATED
WORKS FOR THE DIVERSION AND STORAGE OF WATER OF THE STANISLAUS RIVER PRIMARILY
FOR FLOOD CONTROL, DOMESTIC, IRRIGATION, RECREATION, MUNICIPAL AND INDUSTRIAL,
FISH CULTURE, AND WATER QUALITY CONTROL PURPOSES AND FOR THE GENERATION OF
HYDROELECTRIC ENERGY; SAID DAM TO BE KNOWN AS NEW MELONES DAM AND THE RESERVOIR
CREATED THEREBY TO BE KNOWN AS NEW MELONES RESERVOIR; AND

WHEREAS, THE UNITED STATES HAS FILED AN APPLICATION AND IS SEEKING TO
OBTAIN A PERMIT AND LICENSE TO APPROPRIATE AND APPLY TO BENEFICIAL USE WATERS
OF THE STANISLAUS RIVER AND ITS TRIBUTARIES IN CONNECTION WITH THE OPERATION
OF THE NEW MELONES DAM AND RESERVOIR, SUCH APPLICATION BEING DESIGNATED IN THE
FILES OF THE CALIFORNIA STATE WATER RESOURCES CONTROL BOARD AS NUMBER 19304;
AND

WHEREAS, THE CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD WITH RE-
SPECT TO ITS REGION HAS THE DUTY TO OBTAIN COORDINATED ACTION IN WATER QUALITY
CONTROL AND IN THE ABATEMENT, PREVENTION AND CONTROL OF WATER POLLUTION AND
NUISANCE; AND

WHEREAS, THE BENEFICIAL USES OF THE STANISLAUS AND SAN JOAQUIN RIVERS
ARE DEPENDENT UPON WATER QUALITY CONDITIONS, AND THE PARTIES RECOGNIZE THAT
WATER QUALITY CONDITIONS MAY BE PROTECTED AND ENHANCED BY FACILITIES CON-
STRUCTED AND OPERATED UNDER A PERMIT AND LICENSE ISSUED ON APPLICATION 19304;
AND

1   WHEREAS, AUTHORITY TO INVESTIGATE THE NEED FOR WATER QUALITY CONTROL IS

2   CONTAINED IN THE FEDERAL WATER POLLUTION CONTROL ACT AMENDMENTS OF 1961 (PUBLIC

3   LAW 87-88, APPROVED JULY 20, 1961) WHICH PROVIDES IN PART

4       "...IN THE SURVEY OR PLANNING OF ANY RESERVOIRS OF THE CORPS
        OF ENGINEERS, BUREAU OF RECLAMATION, OR OTHER FEDERAL AGENCY,
5       CONSIDERATION SHALL BE GIVEN TO INCLUSION OF STORAGE FOR
        REGULATION OF STREAMFLOW FOR THE PURPOSE OF WATER QUALITY
6       CONTROL..."

7   AND, IN ADDITION, THE 1962 FLOOD CONTROL ACT AUTHORIZING THE NEW MELONES

8   PROJECT (PUBLIC LAW 87-874) PROVIDES

9       "...THAT THE SECRETARY OF THE ARMY GIVE CONSIDERATION DURING
        THE PRECONSTRUCTION PLANNING FOR THE NEW MELONES PROJECT TO
10      THE ADVISABILITY OF INCLUDING STORAGE FOR THE REGULATION OF
        STREAMFLOW FOR THE PURPOSE OF DOWNSTREAM WATER QUALITY CON-
11      TROL...;"

12  AND

13      WHEREAS, COOPERATIVE STUDIES BY THE PUBLIC HEALTH SERVICE, BUREAU OF

14  RECLAMATION, AND CORPS OF ENGINEERS OF WATER QUALITY REQUIREMENTS IN STANISLAUS

15  RIVER AND LOWER SAN JOAQUIN RIVER FOR IRRIGATION, FISH, AND OTHER PURPOSES WERE

16  MADE DEMONSTRATING THE FEASIBILITY OF ADDING WATER QUALITY CONTROL AS A FUNCTION

17  OF THE NEW MELONES PROJECT; AND

18      WHEREAS, THE CONSTRUCTION OF THE NEW MELONES DAM BY THE UNITED STATES

19  AND OPERATION, AS PROVIDED IN THIS AGREEMENT, WILL ASSIST IN PROVIDING PRO-

20  TECTION AND ENHANCEMENT OF THE QUALITY OF THE WATERS OF THE STANISLAUS AND

21  SAN JOAQUIN RIVERS AND IT IS MUTUALLY BENEFICIAL AND DESIRABLE THAT THE PARTIES

22  FORMALIZE THEIR UNDERSTANDING BY THIS MEMORANDUM OF OPERATING AGREEMENT:

23      NOW, THEREFORE, THE UNITED STATES ACTING BY AND THROUGH THE BUREAU OF

24  RECLAMATION, HEREINAFTER CALLED THE BUREAU, ITS SUCCESSORS AND ASSIGNS, AND

25  THE STATE OF CALIFORNIA, ACTING BY AND THROUGH ITS CENTRAL VALLEY REGIONAL

26  WATER QUALITY CONTROL BOARD, HEREINAFTER CALLED THE REGIONAL BOARD, ITS SUCCES-

27  SORS AND ASSIGNS, AND IN CONSIDERATION OF THE PREMISES CONTAINED AGREE AS

28  FOLLOWS:

29      1.  THE BUREAU SHALL, IN ADDITION TO FISHERY REQUIREMENTS, RELEASE FROM

30          NEW MELONES DAM, FOR WATER QUALITY CONTROL PURPOSES IN THE DOWNSTREAM

31          REACHES OF THE STANISLAUS RIVER AND IN THE SAN JOAQUIN RIVER BELOW THE

1   CONFLUENCE OF THE TWO RIVERS, FLOWS NECESSARY TO MAINTAIN THE OB-

2   JECTIVES LISTED BELOW, BUT NOT IN EXCESS OF 70,000 ACRE-FEET IN ANY

3   ONE YEAR.  RELEASES OF WATER FOR QUALITY CONTROL PURPOSES SHALL BE

4   SCHEDULED TO MAINTAIN THE OXYGEN LEVEL AT OR ABOVE 5 MILLIGRAMS PER

5   LITER (MG/L) IN THE STANISLAUS RIVER AND THE LEVEL OF TOTAL DISSOLVED

6   SOLIDS NOT TO EXCEED A MEAN MONTHLY CONCENTRATION OF 500 MG/L IN THE

7   SAN JOAQUIN RIVER IMMEDIATELY BELOW THE MOUTH OF THE STANISLAUS RIVER.

8   PROVIDED:  THAT IF HYDROLOGIC OR OTHER CONDITIONS PREVENT MAINTENANCE

9   OF A 500 MG/L TDS LEVEL ON A MEAN MONTHLY BASIS DURING THE ENTIRE

10   YEAR IN THE SAN JOAQUIN RIVER IMMEDIATELY BELOW THE MOUTH OF THE

11   STANISLAUS RIVER, OPERATIONAL RELEASES OF THE WATER QUALITY RESER-

12   VATION WILL BE RESTRICTED TO THE IRRIGATION SEASON IN ACCORDANCE

13   WITH IRRIGATIONISTS' NEEDS.

14   2.  THE BUREAU SHALL MAKE ALL REASONABLE EFFORTS TO PERFECT AND PROTECT

15   WATER RIGHTS NECESSARY FOR THE WATER QUALITY RESERVATION AND FOR

16   WATER QUALITY OPERATIONAL PURPOSES.

17   3.  THE REGIONAL BOARD SHALL MAKE ALL REASONABLE EFFORTS TO SUPPORT THE

18   BUREAU TO OBTAIN AND PROTECT WATER RIGHTS FOR THE WATER QUALITY RESER-

19   VATION OF THIS PROJECT AND TO PROTECT THE WATER RELEASED FOR WATER

20   QUALITY CONTROL PURPOSES.

21   4.  SHOULD THE BUREAU ASSIGN, CONVEY OR OTHERWISE DISPOSE OF ANY INTEREST

22   IN THIS PROJECT OR RIGHTS PURSUANT TO APPLICATION 19304, SUCH DIS-

23   POSITION SHALL EXPRESSLY BE MADE SUBJECT TO THE PROVISIONS OF THIS

24   AGREEMENT.

25   5.  THE BUREAU AND THE REGIONAL BOARD HEREBY AGREE THAT THE PROVISIONS

26   OF THIS AGREEMENT SHOULD BE INCLUDED BY WAY OF REFERENCE OR OTHERWISE

27   IN ANY PERMIT OR LICENSE BY THE STATE WATER RESOURCES CONTROL BOARD

28   OF CALIFORNIA PURSUANT TO WATER RIGHT APPLICATION 19304.

1  DATED: THIS ___2___ DAY OF ___July___, 1969.

5  UNITED STATES BUREAU OF RECLAMATION

7  By _____
8     REGIONAL DIRECTOR, REGION 2

11  CENTRAL VALLEY REGIONAL WATER QUALITY CONTROL BOARD

13  By _____
14     CHAIRMAN, CENTRAL VALLEY REGIONAL BOARD

**MEMORANDUM OF UNDERSTANDING BETWEEN THE CALIFORNIA DEPARTMENT OF FISH AND GAME, THE CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD AND MOSQUITO ABATEMENT AND VECTOR CONTROL DISTRICTS OF THE SOUTH SAN JOAQUIN VALLEY REGARDING VEGETATION MANAGEMENT IN WASTEWATER TREATMENT FACILITIES.**

A meeting of representatives of the California Department of Fish and Game and the California Regional Water Quality Control Board, Central Valley Region and representatives from Mosquito Abatement and Vector Control Districts (Districts) from the Southern San Joaquin Valley Region was held on June 22, 1992 in the Department of Fish and Game office in Fresno, California. Also present at the meeting, though not in a participatory function, were representatives from the United States Fish and Wildlife Service and the California Department of Health Services, Environmental Management Branch. The purpose of the meeting was to discuss concerns regarding the vegetation management operations of Wastewater Treatment Facilities in the region.

During the course of the meeting several areas of agreement between the Department of Fish and Game, the Regional Water Quality Control Board and the Districts were reached. It is the intent of this Memorandum of Understanding to record and formalize these understandings.

Whereas, it is understood and agreed that:

1.  The Districts have the legal authority to abate mosquitoes and mosquito breeding sources pursuant to California Health and Safety Code Section 2270.

2.  The Department of Fish and Game has the legal authority for the protection of nesting birds, eggs and nests pursuant to California Fish and Game Code Section 3503.

3.  The Regional Water Quality Control Board has the legal authority to order abatement of nuisances created by and to regulate discharges from wastewater treatment facilities, and may establish conditions in waste discharge requirements to prevent nuisance and pollution pursuant to California Water Code Sections 13304 and 13263.

4.  Wastewater treatment facility operators are subject to waste discharge requirements and are responsible for the vegetation management operations at their respective facilities. Vegetation management includes the chemical or physical control of weeds in and around water impoundments

5.   Vegetation associated with impounded water promotes mosquito breeding and the production of mosquitoes constitutes a public health nuisance.

6.   Effective, on site, vegetation control by operators of wastewater treatment facilities is essential for the reduction of mosquito breeding in water impoundments and to maintain accessibility to the impoundments for inspection and mosquito control activities.

7.   Birds, including waterfowl, shorebirds and passerines, utilize wastewater treatment facilities during the nesting season that occurs from April 1 through June 30.

8.   Weed control operations, during the nesting season, are potentially detrimental and may result in the destruction of nesting birds, nests and eggs.

9.   The diverse authorities of the various regulatory agencies has led to confusion on the part of wastewater treatment facility operators with regard to weed control operations.

Therefore, it is understood and agreed that:

1.   The District will act as the lead agency in determining the adequacy of vegetation management operations in abating mosquito breeding sources.

2.   On site, vegetative management operations at wastewater treatment facilities should include the maintenance of weed-free embankments, water edges and peripheral access roads, and the elimination of emergent and floating vegetation in all water impoundments.

3.   Vegetation management operations in areas that attract nesting birds at wastewater treatment facilities should be carried out either before or after, **but not during**, the April 1 to June 30 bird nesting season.

4.   In the event the District determines the existence of a potential public health nuisance from mosquito breeding, weed control may be conducted during the nesting season; provided that wastewater treatment facility personnel first survey the area and flag all existing nests and assure that these nests and birds are avoided during the weed control activities. Prior to conducting the survey, the Department of Fish and Game must be notified and given the opportunity to advise or assist facility personnel.

30/2/4

5. Should a public health threat create a situation where the destruction of nests and eggs due to weed control activity is unavoidable, the District will first contact the Department of Fish and Game and the U.S. Fish and Wildlife Service to request the issuance of an incidental take permit.

6. Areas away from impounded water may be left in a vegetated (weedy) state to attract nesting birds and to offer nesting habitat throughout the nesting season. These areas cannot be flooded unless vegetation is removed and vegetation cannot be removed during the nesting season.

These understandings were reached and this memorandum is signed in a spirit of cooperation among the signatory agencies. It is signed in the belief that a healthy environment and the protection of natural resources and the concern for and protection of the public health are compatible issues.

These understandings may be amended or terminated at any time provided that the Department of Fish and Game, the Regional Water Quality Control Board and the Districts agree in writing.

Concurrence:

By _____     Dated 3/16/93
CALIFORNIA DEPARTMENT OF
FISH AND GAME

By _____     Dated 2-24-93
CALIFORNIA REGIONAL WATER QUALITY
CONTROL BOARD, CENTRAL VALLEY REGION

By _____     Dated 3-25-93
COALINGA-HURON MOSQUITO ABATEMENT
DISTRICT

By _____     Dated 2-25-93
CONSOLIDATED MOSQUITO ABATEMENT
DISTRICT

By _____     Dated 2-24-93
DELANO MOSQUITO ABATEMENT DISTRICT

WWTF MOU Page 3 of 4

30/3/4

By _Michael W. Alburn_                          Dated _2-25-93_
DELTA VECTOR CONTROL DISTRICT

By _____                       Dated _3-18-93_
FRESNO MOSQUITO AND VECTOR CONTROL
DISTRICT

By _Elizabeth Ann Cline_                         Dated _2/25/93_
FRESNO WESTSIDE MOSQUITO ABATEMENT
DISTRICT

By _Harmon L. Clement_                           Dated _2-25-93_
KERN MOSQUITO AND VECTOR CONTROL
DISTRICT

By _____                       Dated _02-25-93_
KINGS MOSQUITO ABATEMENT DISTRICT

By _____                       Dated _2-25-93_
MADERA COUNTY MOSQUITO ABATEMENT
DISTRICT

By _Marshall Norgaard_                           Dated _2-25-93_
TULARE MOSQUITO ABATEMENT DISTRICT

By _____                       Dated _2-25-93_
WEST SIDE MOSQUITO AND VECTOR CONTROL
DISTRICT

**WWTF MOU Page 4 of 4**                         30/4/4

CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
CENTRAL VALLEY REGION

RESOLUTION NO. 89-247

CONDITIONAL WAIVER OF WASTE DISCHARGE REQUIREMENTS AT
RETAIL FERTILIZER FACILITIES


WHEREAS, Section 13269 of the Porter-Cologne Water Quality Control Act authorizes the Regional Board to waive waste discharge requirements for a specific discharge or a specific type of discharger; and

WHEREAS, there are approximately 195 retail fertilizer facilities in the Central Valley Region; only 11 of which are covered by waste discharge requirements; and

WHEREAS, all retail fertilizer facilities generate waste associated with the mixing and/or transport and/or application of fertilizer materials; and,

WHEREAS, the waste generated has the potential to affect water quality if improperly disposed of; and

WHEREAS, the California Fertilizer Association, in cooperation with Regional Board staff, has developed a set of management practices to protect water quality at retail fertilizer facilities; and

WHEREAS, the fertilizer industry has indicated a willingness to implement these management practices at retail fertilizer facilities; and

WHEREAS, implementation of these management practices will ensure the future protection of water quality, will limit the need for waste discharge requirements, and will reduce the amount of Regional Board staff time needed to oversee these facilities; and

WHEREAS, the implementation of these management practices is to the benefit of the public and the waiver of individual waste discharge requirements is not against the public interest; and

WHEREAS, the Regional Board has assumed lead agency role for this project and has conducted an Initial Study in accordance with Title 14, California Code of Regulations, Section 15603; and

WHEREAS, the Initial Study concluded that the project as proposed would not have a significant effect on the environment and that a Negative Declaration should be prepared; and

WHEREAS, copies of the Initial Study, Negative Declaration, and attached *Conditions for Waiver of Waste Discharge Requirements at Retail Fertilizer Facilities* were transmitted to all agencies, and persons known to be interested in this matter, and to the State Clearinghouse; and

31/1/10

CONDITIONAL WAIVER OF                                    -_2_-_
WASTE DISCHARGE REQUIREMENTS
FOR RETAIL FERTILIZER FACILITIES


     WHEREAS, no comments were received from any party receiving the Initial Study and proposed Negative Declaration; and

     WHEREAS, the Board considered all testimony and evidence at a public hearing on 8 December 1989 in Sacramento, California, and good cause was found to approve the Initial Study and adopt a Negative Declaration; and

     WHEREAS, in accordance with Title 14, California Code of Regulations, Section 15074, a Negative Declaration has been adopted for this project; Therefore, be it

     RESOLVED, that the Board hereby waives waste discharge requirements for retail fertilizer facilities. This waiver shall only apply to those facilities that comply with the attached *Conditions for Waiver of Waste Discharge Requirements at Retail Fertilizer Facilities*; and be it further

     RESOLVED, that this action waiving waste discharge requirements is conditional and may be terminated for any specific discharger at any time.


I, WILLIAM H. CROOKS, Executive Officer, do hereby certify the foregoing is a full, true, and correct copy of a Resolution adopted by the California Regional Water Quality Control Board, Central Valley Region, on 8 December 1989.


                                        WILLIAM H. CROOKS, Executive Officer


Attachment


                                31/2/10

ATTACHMENT I

## CONDITIONS FOR WAIVER OF WASTE DISCHARGE REQUIREMENTS AT RETAIL FERTILIZER FACILITIES

The following management practices have been recommended by the California Fertilizer Association and the Regional Water Quality Control Board as methods to protect water quality at retail fertilizer facilities. The Regional Board waived waste discharge requirements for retail fertilizer facilities, conditioned on their compliance with these management practices. A Time Schedule for implementing these management practices is given in Section 2. If the time schedule and the Management Practices are not followed by an individual facility, waste discharge requirements will be issued for that facility.

## 1. MANAGEMENT PRACTICES

### A. Office Buildings

1. Good housekeeping practices shall be implemented which will prevent contamination of groundwater, surface water, and rain runoff.

2. If conditions are such that the office building and associated parking area are separated from the rest of the facility, signs should be posted indicating "Office Parking Only." By restricting delivery, vendor and application equipment from these areas, the potential for accidental contamination will be eliminated.

3. Roof and parking lot runoff should be controlled to the extent that they are prevented from intercepting potential contamination areas. Collection of this water will be necessary if contamination occurs.

4. Berming, rain gutters, and/or other control devices shall be used where necessary.

### B. Equipment Storage Area

1. Good housekeeping practices and organizational practices shall be implemented which will prevent contamination of groundwater, surface water, and rain runoff.

2. Equipment, known or suspected of being in disrepair, shall not be stored in these areas unless completely empty of commercial grade fertilizer material.

3. Equipment that contains visual evidence of overfilling, or visual evidence of exterior residues, shall be cleaned by rinsing in the field or at a properly designed wash facility prior to storing in this area.

31/3/10

CONDITIONS FOR WAIVER                                              - 2 -

C.  Bulk Warehousing and Storage of Fertilizer Materials

    1. Good housekeeping practices shall be implemented which will prevent contamination of groundwater, surface water, and rain runoff.

    2. If a fertilizer material is susceptible to wind suspension, it should be placed away from the open areas of the warehouse in order to prevent airborne contamination of soil, surface water, groundwater, or rain runoff.

    3. Provided good housekeeping practices are sufficient, collection of surface runoff will not be necessary.  If conditions are such that good housekeeping practices are not sufficient, surface runoff shall be collected from all contaminated areas associated with the warehouse and overhead bins, and transferred to an approved storage facility for dilute fertilizer solutions.

    4. Berms, sloping rain gutters, and/or other water control devices shall be used where necessary.

    5. All spilled dry material shall be collected immediately and handled in an appropriate manner.

D. Material Transfer Points

    1. Good housekeeping practices shall be implemented which will prevent contamination of groundwater, surface water, and rain runoff.

    2. Transfer systems shall be installed which eliminate unnecessary spillage.  Hoses should not be drained in these areas unless facilities have been designated for this practice.

    3. Provided good housekeeping practices are sufficient, collection of surface runoff will not be necessary.  If conditions are such that good housekeeping practices are not sufficient, surface runoff shall be collected from this area, and transferred to an approved storage facility for dilute fertilizer solutions.

    4. Berms, sloping rain gutters, and/or other water control devices shall be used where necessary.

E. Blending and Mixing Areas

    1. Good housekeeping practices shall be implemented which will prevent contamination of groundwater, surface water, and rain runoff.

    2. Dust and splash control devices shall be used where necessary.

3. Acceptable spill containment shall be provided in all newly constructed or renovated blending and mixing areas. The spill containment shall be capable of containing the maximum anticipated spill in accordance with operating conditions and practices.

4. Provided good housekeeping practices are sufficient, collection of surface runoff will not be necessary. If conditions are such that good housekeeping practices are not sufficient, surface runoff shall be collected from the blending and mixing area, and transferred to an approved storage facility for dilute fertilizer solutions.

5. Berms, below-grade construction, sumps, and/or other water control devices shall be used where necessary.

6. Liquid contained in an approved storage facility for dilute fertilizer solutions can be used in the blending and mixing operations.

F. Fertilizer Wash and Rinse Facility

1. Rinse water from facility equipment and application equipment shall be collected and transferred to an approved storage facility for dilute fertilizer solutions.

2. Contaminated surface runoff from the rinse pad shall be collected and transferred to an approved storage facility for dilute fertilizer solutions.

3. Berms, sloping, sumps, and other water control devices shall be used where necessary.

4. Solids from central collection points or from settling devices can be disposed of on agricultural land, provided that good agronomic practices are used.

5. Identification of the type of products that can be washed and rinsed at the wash/rinse facility shall be posted in a conspicuous area and enforced.

G. Tank Farms and Other Liquid Storage Areas

1. Good housekeeping practices shall be implemented which will prevent contamination of groundwater, surface water, and rain runoff.

2. Transfer systems shall be constructed that eliminate spillage. Hoses and connections shall not be drained into these areas.

3. Acceptable spill containment shall be provided for all new tank farms or renovated tank farms.

CONDITIONS FOR WAIVER                                                    - 4 -

4. Pipes, connections, pumps, and/or tanks in disrepair shall not be used until the situation is rectified.

4. Provided good housekeeping practices are sufficient, collection of surface runoff will not be necessary.  If conditions are such that good housekeeping practices are not sufficient, surface runoff shall be collected from all contaminated areas associated with the tank farm, and transferred to an approved storage facility for dilute fertilizer solutions.

5. Berms, sloping, and other water control devices shall be used where necessary.

H. Dilute Fertilizer Solutions Containment

1. Tanks and/or above ground containment shall be used to contain all liquids classified as dilute fertilizer solutions.

2. Adequate capacity shall be provided such that the system is operational at all times, and has the capability of containing all contaminated surface runoff.

3. Adequate storage shall be provided in the design of a tank or above ground containment, such that containment and/or evaporation of all collected dilute fertilizer solutions is available at all times, unless alternative methods of use are available (i.e. agronomical use on agricultural land, use in processes, or disposal to approved discharge facilities).

4. Access to the tank and/or above ground containment shall be restricted to qualified personnel only.

I.  Pesticide Use

Note: These conditions implement existing laws and regulations, and do not impose any new restrictions.

1. There shall be no discharge of pesticide rinse water to any surface water, ground water, or subsurface disposal system.

2. There shall be no disposal or storage of a) pesticide rinse waters, b) unrinsed pesticide containers, or c) ineffectively rinsed pesticide containers, if there is the potential for residual pesticides to affect water quality via percolation, runoff, or soil erosion.

3. Facilities used to generate, collect, or store pesticide rinse waters shall not allow percolation to underlying soils or ground water.

CONDITIONS FOR WAIVER                                                  - 5 -

4. Disposal or treatment areas for pesticide rinse water, pesticide containers, and wastes from spills or leaks shall comply with *Discharges of Waste to Land*, Subchapter 15, Chapter 3, Title 23, California Code of Regulations. In particular, there is no on-site treatment or disposal of 'hazardous waste' without a permit from the California Department of Health Services.

5. Waste management facilities shall be designed and managed to prevent nuisances and to provide for controlling access to the facilities.

6. If wastewater containing pesticides is applied to fields, such application must be in compliance with regulations contained in Title 3, Food and Agriculture, California Code of Regulations.

7. A report shall be submitted to the Regional Board addressing the containment and disposal of the following wastes: pesticide rinse waters, pesticide containers, contaminated soils resulting from leaks or spills, and wastes from any on-site rinse water recycling system. (See 1 January 1991 report, below).


2.  TIME SCHEDULE FOR IMPLEMENTATION OF MANAGEMENT PRACTICES

In order to implement the above management practices, the following time schedule shall be utilized.  Considerations of exemptions for specific facilities will be made by the Regional Board on a case-by-case basis.


By 1 June 1990

~ designate office parking only area (A2)[1]
~ clean equipment containing fertilizer residues before parking in equipment storage (B3)
~ move fertilizer that may become airborne (C2)
~ identify products that can be washed at the washrack, post a sign (F5)
~ broken pipes, connections, pumps, and tanks can not be used until fixed (G4)
~ broken application equipment may not be parked in equipment area unless empty (B2)
~ restrict access to dilute fertilizer storage area to qualified personnel (H4)
~ collect all dry material spilled in the bulk warehouse (C6)
~ comply with provisions 1-6 of the Pesticide section (I)


-----------
[1] numbers in parentheses refer to the specific items in Section 1 (Management Practices)

CONDITIONS FOR WAIVER                                              = 6 =

### By 1 January 1991

= submit a report to the RWQCB detailing 1) the facility's 'good housekeeping' plans (A1, B1, C1, C3, D3, E4, G1, G5); 2) pesticide use/disposal practices (I.7); and a listing of the dates that facility modifications will be in place

### By 1 January 1992

= control roof and office parking lot runoff (A3)
= control dust in bulk warehouse (C4)
= install transfer systems which eliminate spillage (D2, G2)
= control dust and splash in blending areas (E2)
= dispose of any solids onto agricultural lands (F4)

### By 1 January 1994

= collect contaminated surface runoff from the bulk warehouse, material transfer points, blending/mixing areas, and tank farms, and transfer to an approved storage facility (C3, D3, E4, G4)
= construct spill containment structures for new or renovated blending and tank farms (E3, G3)
= collect rinsewater and transfer to an approved facility (F1)
= collect contaminated surface runoff from the wash pad (F2)
= construct a dilute fertilizer solutions containment system (H1, H2, H3)

Amended 12/8/89

31/8/10

CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
CENTRAL VALLEY REGION

RESOLUTION NO. 89-246

APPROVING THE INITIAL STUDY AND
ADOPTING A NEGATIVE DECLARATION FOR
THE CONDITIONAL WAIVER OF WASTE DISCHARGE REQUIREMENTS
AT RETAIL FERTILIZER FACILITIES

WHEREAS, Section 13269 of the Porter-Cologne Water Quality Control Act authorizes the Regional Board to waive waste discharge requirements for a specific discharge or a specific type of discharger; and

WHEREAS, there are approximately 195 retail fertilizer facilities in the Central Valley Region; only 11 of which are covered by waste discharge requirements; and

WHEREAS, all retail fertilizer facilities generate waste associated with the mixing and/or transport and/or application of fertilizer materials; and,

WHEREAS, the waste generated has the potential to affect water quality if improperly disposed of; and

WHEREAS, the California Fertilizer Association, in cooperation with Regional Board staff, has developed a set of management practices to protect water quality at retail fertilizer facilities; and

WHEREAS, the fertilizer industry has indicated a willingness to implement these management practices at retail fertilizer facilities; and

WHEREAS, implementation of these management practices will ensure the future protection of water quality, will limit the need for waste discharge requirements, and will reduce the amount of Regional Board staff time needed to oversee these facilities; and

WHEREAS, the implementation of these management practices is to the benefit of the public and the waiver of individual waste discharge requirements is not against the public interest; and

WHEREAS, the Regional Board has assumed lead agency role for this project and has conducted an Initial Study in accordance with Title 14, California Code of Regulations, Section 15603; and

WHEREAS, the Initial Study concluded that the project as proposed would not have a significant effect on the environment and that a Negative Declaration should be prepared; and

APPROVAL OF INITIAL STUDY                                                    - 2 -
AND ADOPTION OF A NEGATIVE DECLARATION


WHEREAS, copies of the Initial Study, Negative Declaration, and attached *Conditions for Waiver of Waste Discharge Requirements at Retail Fertilizer Facilities* were transmitted to all agencies, and persons known to be interested in this matter, and to the State Clearinghouse; and

WHEREAS, no comments were received during the thirty day public comment period from any party receiving the Initial Study and proposed Negative Declaration; and

WHEREAS, the Board considered all testimony and evidence at a public hearing on 8 December 1989 in Sacramento, California, and good cause was found to approve the Initial Study and adopt a Negative Declaration:  Therefore, be it

RESOLVED, that the California Regional Water Quality Control Board, Central Valley Region, approves the Initial Study and adopts a Negative Declaraton for conditional waiver of waste discharge requirements at retail fertilizer facilities.


I, WILLIAM H. CROOKS, Executive Officer, do hereby certify the foregoing is a full, true, and correct copy of a Resolution adopted by the California Regional Water Quality Control Board, Central Valley Region, on 8 December 1989.


WILLIAM H. CROOKS, Executive Officer


31/10/10

CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
CENTRAL VALLEY REGION

RESOLUTION 90-034

CONDITIONAL WAIVER OF WASTE DISCHARGE REQUIREMENTS AT
PESTICIDE APPLICATOR FACILITIES

WHEREAS, Section 13269 of the Porter-Cologne Water Quality Control Act states that the Regional Board may waive waste discharge requirements for a specific type of discharge; and

WHEREAS, there are several hundred pesticide applicators in the Central Valley Region who have the potential to discharge waste which could be regulated by the Regional Board; and

WHEREAS, pesticide waste management practices that comply with existing laws and regulations and will protect water quality have been described in a Regional Board document "Conditions for Waiver of Waste Discharge Requirements at Pesticide Applicator Facilities" a copy of which is incorporated in this Resolution as Attachment I; and

WHEREAS, staff have developed a regulatory program for pesticide applicators so that the waste management practices that they utilize can be reviewed; and

WHEREAS, it is anticipated that reviews will reveal that waste management practices at many of these facilities <u>do not</u> pose a threat to water quality; and

WHEREAS, only a few of the facilities operated by pesticide applicators are currently under waste discharge requirements; and

WHEREAS, it is to the benefit of the public that waste discharge requirements be waived at pesticide applicator facilities that do not pose a threat to water quality and such waiver is not against the public interest; and

WHEREAS, such a waiver program is a "project" under the California Environmental Quality Act and the Regional Board has assumed lead agency role for the project and has conducted an Initial Study in accordance with Title 14, California Code of Regulations, Section 15603; and

WHEREAS, the Initial Study concluded that the project as proposed would not have a significant effect on the environment and that a Negative Declaration should be prepared; and

WHEREAS, copies of the Initial Study, proposed Negative Declaration, and the "Conditions for Waiver of Waste Discharge Requirements at Pesticide Applicator Facilities" were transmitted to all agencies and persons known to be interested in this matter and to the State Clearinghouse; and

WHEREAS, no comments were received during the thirty-day public comment period from any party receiving the Initial Study, proposed Negative Declaration,

RESOLUTION 90-034                                                    -2-

and the waiver conditions; and

WHEREAS, the Regional Board considered all testimony and evidence at a public hearing on 26 January 1990 in Sacramento, California, and good cause was found to approve the Initial Study and adopt a Negative Declaration for conditional waiver of waste discharge requirements at pesticide applicator facilities; and

WHEREAS, in accordance with Title 14, California Code of Regulations, Section 15074, a Negative Declaration has been adopted for this project; Therefore, be it

RESOLVED, that the Board hereby waives waste discharge requirements for pesticide applicator facilities which meet the "Conditions for Waiver of Waste Discharge Requirements at Pesticide Applicator Facilities". This waiver is conditional and may be revoked at any time.

I, WILLIAM H. CROOKS, Executive Officer, do hereby certify the foregoing is a full, true, and correct copy of a Resolution adopted by the California Regional Water Quality Control Board, Central Valley Region, on 26 January 1990.

_____
WILLIAM H. CROOKS, Executive Officer

Ammended

## ATTACHMENT 1 / RESOLUTION 90-034

## CONDITIONS FOR WAIVER OF WASTE DISCHARGE REQUIREMENTS
## AT PESTICIDE APPLICATOR FACILITIES

### Purpose Of This Document

Pesticide application using aerial or ground equipment may result in production of wastes which can affect water quality. The subject wastes consist of pesticide rinse waters, unrinsed or ineffectively rinsed pesticide containers, leaks, and accidental spills. Residual pesticides from treated fields are not addressed by this document.

This document describes waste management practices which, if utilized by pesticide applicators, will not result in an adverse impact on surface or ground water. Those applicators who adopt the practices presented in this document will qualify for a waiver of waste discharge requirements. The waiver will be issued at the discretion of the Regional Board and may be revoked by the Board at any time.

### Acceptable Waste Management Practices

1.  There is no discharge of pesticide rinse water to any surface water, ground water, or subsurface disposal system.

2.  There is no disposal or storage of pesticide rinse waters or unrinsed or ineffectively rinsed pesticide containers where residual pesticides can affect water quality via percolation, runoff, or soil erosion.

3.  Facilities used to generate, collect, or store pesticide rinse waters do not allow percolation to underlying soils or ground water.

4.  Disposal or treatment areas for pesticide rinse waters, pesticide containers, and wastes from spills or leaks comply with Subchapter 15, Chapter 3, Title 23, California Code of Regulations (CCR). In particular, there is no on-site treatment or disposal of 'hazardous waste' without a permit from the California Department of Health Services (DHS) if such a permit is required by law or regulation.

5.  Waste management facilities are designed and managed to prevent nuisances and to provide for controlling access to the facilities.

6.  If wastewater containing pesticides is applied to fields, such application must be in compliance with regulations contained in Title 3, CCR.

### Regional Board's Review Program

All pesticide applicators are expected to manage their waste in compliance with State laws and regulations. Upon order by the Regional Board, a Certified Commercial Applicator or other pesticide applicator shall prepare a technical report for his facility. The report shall be submitted to the Regional Board upon request and shall address containment and disposal of the following wastes:

1. Pesticide rinse waters.

2. Pesticide containers.

3. Contaminated materials resulting from leaks or spills.

4. Wastes from on-site rinse water recycling systems.

Based on a review of the technical report, Board staff shall determine if:

A. Investigation by staff demonstrates that there is no expected impact on water quality from the proposed waste management practices and that the pesticide applicator facilities meet the conditions for waiver of waste discharge requirements, or

B. A monitoring program should be implemented to develop additional information on the impacts from on-site waste discharges, or

C. The conditions for waiver of waste discharge requirements have not been met and, consequently, a Report of Waste Discharge should be requested and waste discharge requirements prepared.

If staff makes the finding in A above, a waiver of waste discharge requirements shall apply pursuant to Board Resolution 90-034 and shall apply only for the practices described in the technical report. Staff shall instruct the operator to file an updated technical report if there is any substantial change in waste management practices.

If staff makes the finding in B above, the Regional Board may choose to waive waste discharge requirements for that specific operator pending review of monitoring reports. The waiver shall be at the discretion of the Board.

Definition of Terms Used in This Document

Some of the terms used in this document are defined in the CCR, and appropriate citations are given below:

1. "Certified Commercial Applicator" means:

   (a) a current authorized agent on an Agricultural Pest Control Operator license issued by the director of the Department of Food and Agriculture (director);

   (b) a pilot holding a valid Journeyman certificate issued by the director;

   (c) a person holding a Certified Technician certificate issued by the Vector Biology and Control Section of the Department of Health Services;

ATTACHMENT 1                                                        Page 3
RESOLUTION 90-034

     (d) a person holding a valid Structural Pest Control Operator or Field
        Representative license issued by the Structural Pest Control Board of
        the Department of Consumer Affairs; and

     (e) a person holding a valid Certified Commercial Applicator certificate
        issued by the director.  (Section 6000.2, Title 3, CCR.)

2.   "Designated waste" is defined in Section 2522 of Title 23, CCR.

3.   "Field" means any area (including a greenhouse) upon which one or more
     crops are commercially grown.  (Section 6000.4, Title 3, CCR.)

4.   "Hazardous waste" means waste that is hazardous pursuant to Section 66693
     et seq., Title 22, CCR.

5.   "Ineffectively rinsed pesticide container" means a container which has
     residual pesticides at levels that are hazardous or designated waste.

6.   "Pesticide rinse water" is wastewater from washing the interior (tanks,
     lines, spray nozzles, etc.) or exterior of pesticide application
     equipment.

CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
CENTRAL VALLEY REGION

RESOLUTION NO. 83-105

ADOPTION OF AN AMENDMENT TO PART I OF THE WATER QUALITY CONTROL PLANS FOR THE
SACRAMENTO RIVER (5A), SACRAMENTO-SAN JOAQUIN DELTA (5B), SAN JOAQUIN RIVER (5C),
AND TULARE LAKE (5D) BASINS
FOR
LAND DISPOSAL OF STILLAGE WASTE FROM WINERIES

WHEREAS, under Section 13240 of the Porter-Cologne Water Quality Control Act and Section 303(e) of the Federal Clean Water Act amendments of 1972 (PL 92-500), the California Regional Water Quality Control Board, Central Valley Region (hereafter Board), adopted Water Quality Control Plans for Basins 5A, 5B, 5C, and 5D on 25 July 1975; and

WHEREAS, the potential exists for disposal of stillage waste by land application to adversely affect water quality and create nuisance conditions; and

WHEREAS, a study was completed for The Wine Institute by Metcalf and Eddy Engineers in February of 1980, entitled, "Land Application of Stillage Waste: Odor Control and Environmental Effects"; and

WHEREAS, the Board has developed an amendment to Part I of the Water Quality Control Plans for Basins 5A, 5B, 5C, and 5D regarding disposal of winery stillage waste by land application; and

WHEREAS, the amendment prescribes guidelines to minimize the potential for adverse water quality effects and nuisance conditions but does not preclude the establishment of more stringent requirements by local agencies or the Board for control of water quality concerns associated with land disposal of stillage waste; and

WHEREAS, the basin planning process has been certified as a "functional equivalent" to the California Environmental Quality Act requirements for preparing environmental documents and is therefore exempt from those requirements (Public Resources Code Section 21000, et seq.) in accordance with Section 15108 of the State EIR guidelines (California Administrative Code, Title 14, Division 7, Chapter 3); and

WHEREAS, on 12 August 1983, the Board conducted a public hearing after notice to all interested persons, in accordance with PL 92-500 and the California Water Code, and has considered the evidence regarding the amendment introduced at that hearing and submitted to the Board prior to the hearing: Therefore be it

RESOLVED, That the Board adopts the above described amendment to the Water Quality Control Plans for Basins 5A, 5B, 5C, and 5D, and be it further

RESOLUTION NO. 83-105
ADOPTION OF AN AMENDMENT TO PART I OF THE WATER
QUALITY CONTROL PLANS FOR THE SACRAMENTO RIVER (5A),
SACRAMENTO-SAN JOAQUIN DELTA (5B), SAN JOAQUIN
RIVER (5C), AND TULARE LAKE (5D) BASINS FOR LAND
DISPOSAL OF STILLAGE WASTE FROM WINERIES                    -2-

        RESOLVED, That the Executive Officer is instructed to transmit the Water
Quality Control Plan amendment to the State Water Resources Control Board for
its consideration and approval.

I, WILLIAM H. CROOKS, Executive Officer, do hereby certify the foregoing is a
full, true, and correct copy of a Resolution adopted by the California Regional
Water Quality Control Board, Central Valley Region, on 12 August 1983.

                        _William H. Crooks_
                        WILLIAM H. CROOKS, Executive Officer

AMENDMENT TO WATER QUALITY
CONTROL PLAN

## Land Disposal of Stillage Waste from Wineries

### Problem Statement

A substantial number of wineries operate throughout the Central Valley. Many of these wineries operate stills. Wineries with stills produce substantial quantities of stillage waste which is high in concentrations of BOD and nitrogen. The stillage is normally discharged directly to land without any prior treatment. There is a potential for the waste to affect water quality and to create nuisance conditions.

A study has been conducted[1] to develop recommendations for minimizing water quality effects and nuisance conditions resulting from land application of stillage waste. There is a need to implement guidelines for land disposal of stillage waste that can be used by the industry as a general indication of minimum disposal practices when accompanied with suitable soil, weather, ground water and other conditions affecting the discharge.

The guidelines address the unique problems associated with the management of the land disposal of stillage wastes. They will be utilized in the evaluation of the adequacy of technical reports submitted for the development of waste discharge requirements. Portions of the criteria contained herein may be included as part of the waste discharge requirements on a case-by-case basis depending on the site conditions.

### Guidelines for Land Disposal of Stillage Waste from Wineries

The following guidelines will be applied for the preservation and enhancement of state waters for all present and anticipated beneficial uses, prevention of water pollution, health hazards and nuisance conditions. The guidelines may not be applicable in cases where local soil, ground water, weather or other conditions are not compatible with the stillage to be disposed. These guidelines prescribe criteria for disposal of stillage waste from wineries and do not preclude the establishment of more stringent requirements by local agencies or the Board.

The Board has determined that the following guidelines should be followed by wineries which practice land disposal of stillage without any prior treatment of the waste.

### Rapid Infiltration Method

    I.  **Disposal Site Requirements**

        1.  The land used for disposal should be as remote from habitation as possible.

        2.  The soils should be capable of infiltrating 3 to 4 inches of stillage in 24 hours or less.

---

[1] "Land Application of Stillage Waste: Odor Control and Environmental Effects" prepared for The Wine Institute, by Metcalf and Eddy, Engineers, Palo Alto, California, February 1980.

3.  Soil permeability should be greater than 2 inches per hour for the entire profile.

4.  There should be no unripped hardpan within the top 10 feet of the soil profile.

5.  Soil depth should be 10 feet or greater.

6.  Depth to ground water should be 10 feet or greater.

II.  Operational Procedures

1.  Cooling water and any other wastewater with low COD concentrations should be separated from the stillage before land application.

2.  Stillage waste should be spread on land between long, narrow, "level checks. The surface should be leveled uniformly within 0.1 foot per 100 feet, without potholes.

3.  At the inlet of the checks, the flow should be distributed using splash plates or other devices to prevent deep holes from forming.

4.  The depth of each stillage application should not exceed the following:

| Period of Year | Depth of Stillage Application (inches) |
|---|---|
| Aug 1 to Oct 1 | 3.7 |
| Oct 1 to Dec 1 | 3 |
| Dec 1 to May 1 | 2.5 |

5.  Standing stillage should not be present 24 hours after application has ceased.

6.  After stillage waste has been applied to an area, the area should be allowed to dry for at least the following period before re-application of waste:

| Period of Year | Drying Time (days) |
|---|---|
| Aug 1 to Oct 1 | 6 |
| Oct 1 to Dec 1 | 9 |
| Dec 1 to May 1 | 13 |

7.  After stillage has been applied to an area, if leathers have not been removed, the area should be raked or rototilled before re-application of stillage.

8.  Loading rates and drying times for stillage waste from raisins or pomace should follow the criteria for December 1 to May 1 operations.

9. Land area used for disposal should equal or exceed the following:

| Period of Year | Land Area[1]/ (acres per 100,000 gpd of stillage waste) |
|---|---|
| Aug 1 to Oct 1 | 7 |
| Oct 1 to Dec 1 | 12.3 |
| Dec 1 to May 1 | 20.6 |

[1]/ These land areas are directly related to the drying time stated in No. 6 above. Complete infiltration recovery to the original values may not be obtained by these relatively short resting cycles. At some application sites, the infiltration rate constantly decreases as the application season progresses. A decrease in infiltration of about 75% can be expected with only three applications. Therefore the number of stillage applications at a specific site should be kept to a minimum. Repeated application of stillage with minimum drying times may require larger land areas.

10. During periods when it is not used for stillage disposal, the disposal area should be planted with crops to assist in the removal of residual nitrogen concentrations from the soil if necessary.

## Slow Rate Irrigation Method

Most existing stillage disposal sites are located on relatively permeable soils. Where the available land for application of stillage is such that the limiting permeability is slow to moderately slow, the use of slow rate irrigation may be used as an alternative to rapid infiltration. The application depends on the expected evaporation and infiltration and can range from less than 0.5 to 1.5 inches (13,600 to 40,000 gal/acre). Resting periods should range from 18 to 20 days or more. The resultant average loading rates and land areas are shown in Table 1. All other Disposal Site Requirements and Operation Procedures for the rapid infiltration method also apply to the slow rate irrigation method.

33/5/6

Amendment to Water Quality Control Plan                                    -4-

## TABLE 1.  SLOW RATE IRRIGATION
### AREA REQUIREMENTS

|  | Soil Permeability, Slow | Soil Permeability, Moderately Slow |
|---|---|---|
| Limiting soil permeability, in/hr | 0.06-0.2 (clay loam) | 0.2-0.6 (clay loam or silt loam) |
| Infiltration capacity, in/day | 0.5 | 1.0 |
| Resting period, days | 20 | 13 |
| Average loading rate, gal/acre/day | 670 | 1,940 |
| Area required per 100,000 gal/day of stillage, acres | 150 | 52 |

Basin Plan Amendment and Action Plan
for Erosion/Sedimentation*

## Problem Statement

Accelerated erosion from man's disturbance of soil resources (construction, agricultural operations, highway construction, etc.) contributes to turbidity and sedimentation in basin streams.  For example, the US Army Corps of Engineers removes over 10 million cubic yards of sediment yearly from the Sacramento River.

There exists a tremendous push by the urban population for construction of primary residences and second-homes (with support activities) in the rural lands of the Central Valley.  Exposure of soil during construction of house pads and access roads, and the subsequent earth disturbing cuts and fills can accelerate erosion many times above that which occurs in undeveloped watershed lands.

Agricultural activities can cause a long-term persistent erosion/sedimentation problem.  Conversion of steeper sloping lands for agricultural production is occurring as new water sources become available and flatter land becomes more scarce.  The conversion of these lands involves the removal of natural vegetation and alteration of natural drainage patterns, which can increase erosion from irrigation and rainfall runoff.

Highway construction, management of forest lands and federal grazing lands are also sources of accelerated erosion; however, these are dealt with in other 208 issues.

Sediment from erosion can have both short and long-term effects on water quality/beneficial uses.  The immediate effect is increased turbidity in adjacent water ways, resulting in adverse impacts on fish and wildlife habitat, reduced water pump life due to abrasion, increased municipal/industrial water treatment costs for turbidity removal, and impaired recreation and aesthetic value.  Some of the long-term effects are reduced reservoirs capacity, increased flooding hazard from reduced channel capacities, increased irrigation system maintenance and increased dredging costs.  Sediment is also a carrier of other pollutants such as pesticides, heavy metals, and nutrients.

## Action Plan

The State and Regional Boards contracted with several agencies to collect existing data and make recommendations for developing a statewide policy and a regional action plan for the control of erosion/sedimentation.  These studies have been completed and used as supportive studies (Attachment 1) for this Regional Board action plan.

Objective are:
1.  Beneficial uses of receiving waters that are presently significantly impacted by sediment should be restored to a water quality level consistent with state and federal water quality standards.

* As adopted in Resolution No. 79-180

34/1/5

2.  Beneficial uses of receiving waters presently unimpaired but threatened by impacts of sediment should be protected.

3.  Sediment control standards and program performance evaluation criteria should be based upon Best Management Practices and understanding of the impacts of sediment on beneficial uses.

4.  Local units of government should have the lead role, with the Regional Board involving and assisting them, in the assessment of sediment problems, the determination of problem areas, and the estimate of sediment control priorities within their jurisdiction.

5.  Land use activities that produce significant sediment impacts upon beneficial uses should be addressed by local voluntary programs that provide for inclusion of Best Management Practices applied in the context of management plans acceptable to the affected land users..

6.  Minimum county-wide erosion control and surface runoff management criteria should be enacted to address impacts of sediment produced by construction activities.

7.  Regional Board participation in sediment control programs shall include assistance in the establishment of local control programs, participation in the determination of water quality problem areas and a cooperative program evaluation with local units of government.  Upon failure of local programs to address impacts, waste discharge permits shall be issued for sediment control purposes.

8.  In critical water quality problem areas, counties and cities in the Central Valley should submit action plans to the Regional Board within a reasonable time frame that sets forth local sediment control programs consistent with basin plan objectives and criteria.  The control features of such action plans shall be incorporated into subsequent water quality management plans.


Guidelines for Existing Erosion/Sedimentation Probelms

1.  The resource management subsystem approach developed by the USDA-Soil Conservation Service and reported in their "Recommended Plan for Best Management Practices" shall be considered as Best Management Practices to control or reduce erosion/sedimentation.

2.  The Regional Board recognizes the sediment problem area maps developed by the USDA-Soil Conservation Service as the most comprehensive regional assessment of erosion problems for private lands presently available.  These maps will be refined to assess significantly impacted water with the ehlp of SCS/RCD, county, and interested agencies.

3. Regional Board will cooperate with counties to establish county erosion control committees, composed of interest groups including those representing the public interest, and local, state, and federal agencies with resource management skills. Committee duties are:

   a. Provide local input and assistance to develop a control plan for the problem area.

   b. Define with the Regional Board, seasonal water quality and soil loss standards for their area.

   c. Seek technical assistance from agencies in planning, review, and implementation of Best Management Practices.

   d. Seek funding for implementation of Best Management Practices.

   e. Provide leadership in working with land users in the problem area.

   f. Encourage development and/or implementation of local erosion/sedimentation control ordinance.

## Guidelines for Potential Erosion/Sediment Problems

A. Agriculture

   Potential problems stem from conversion of one type of agricultural land use to another (i.e., range to cultivated agriculture) which result in soil disturbing activities and removal of vegetative cover.

   1. Local units of government should identify areas where such conversions are likely to occur and erosion/sedimentation will have adverse impacts on water quality.

   2. The county erosion control committees should work with the county to develop a control plan for identified areas.

   3. Local USDA-Soil Conservation Service/RCD and UC Cooperative Extension offices should establish education and information programs to assist agricultural land users in planning and applying Best Management Practices to mitigate erosion during and after conversion.

B. Construction

   1. Plans for erosion/sedimentation control should be a requirement for issuance of a county or city grading and/or building permit for construction activities that will disturb greater than 10,000 square feet of surface area and/or more than 100 cubic yards of excavated material.

Erosion/Sedimentation

2. Plans for erosion/sedimentation control should meet the following minimum criteria:

   a. During development and/or construction, adequate measures to protect against erosion/sedimentation shall be provided.

   b. Land shall be developed in increments of workable size that can be completed during a single construction season. Erosion and sediment control measures shall be coordinated with the sequence of grading, development and construction operations.

   c. Vegetation shall be removed only when absolutely necessary.

   d. Every effort shall be made to conserve top soil for reuse in revegetation of disturbed areas.

   e. All disturbed soil surfaces shall be stabilized and revegetated before the rainy season.

   In addition, plans should address the need for the following criteria:

   a. Sediment basins and traps shall be installed in conjunction with the initial grading operation.

   b. The drainage and storm water runoff control system and its component facilities shall be designed to fit the hydrology of the area under full development and have adequate capacity to transport the flow from all upstream areas.

   c. The drainage and storm water runoff control system and its component facilities shall be nonerosive in design, shall conduct runoff to a stable outlet, and be installed prior to the rainy season.

3. Those counties and cities that have adopted and are implementing ordinances and programs compatible with these guidelines shall transmit tentative maps for land develpments containing 100 lots or more with sufficient information that the proposed development will meet these guidelines or the approved county/city erosion control ordinances.

4. Construction activities in counties and cities having no erosion control programs or one which is not in compliance with the Regional Board guidelines may be required to file a report of waste discharge.

Erosion/Sedimentation                                                    -5-

## Supportive Studies

The following studies were performed to provide much of the technical and institutional information on which the recommendations of this plan are based:

1. Recommended Plan of Best Management Practices, Soil Conservation Service, 1979.

2. 208 Institutional Study, John Muir Institute, 1979.

3. Nevada County Sediment Control Plan, Nevada County RCD and Nevada County, 1979.

4. Placer County Sediment Control Plan, Placer County RCD and Placer County, 1979.

5. A Water Quality Study for Spanish Grant Drainage District and Crow Creek Watersned, G.L. Gustafson and Orestimba RCD, 1978.

6. A Gully Control Demonstration Project, Cottonwood RCD, 1979.

7. Erosion and Sediment Control Handbook, Department of Conservation Resources Agency, State of California, 1978.

CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD
CENTRAL VALLEY REGION

RESOLUTION NO. 83-135

AMENDING THE WATER QUALITY CONTROL PLAN
FOR
GUIDELINES FOR PROTECTION OF WATER QUALITY
DURING CONSTRUCTION AND OPERATION OF
SMALL HYDRO PROJECTS


WHEREAS, the California Regional Water Quality Control Board, Central Valley Region, (hereafter Board) adopted a Water Quality Control Plan on 25 July 1975; and

WHEREAS, high energy costs and attractive economic benefits have resulted in a recent boom in the development of small hydropower projects in Central Valley watersheds; and

WHEREAS, these projects can adversely affect water quality, aquatic and riparian habitat. and recreational/aesthetic uses of streams; and

WHEREAS, guidelines have been developed which set forth Regional Board policy on small hydro development, project standards for water quality protection, and procedures for project approval; and

WHEREAS, the Regional Board has conducted an environmental assessment pursuant to Title 14, California Administrative Code, and has determined that the proposed action will not have a significant effect on the environment; and

WHEREAS, the Regional Board, on 23 September 1983 in Sacramento and on 28 October 1983 in Redding, held public hearings and considered all evidence concerning this matter:  Therefore be it

RESOLVED, That the Board hereby adopts the Guidelines for Protection of Water Quality During Construction and Operation of Small Hydro Projects as an amendment to the Water Quality Control Plan; and be it further

RESOLVED, That the Executive Officer is instructed to transmit the Water Quality Control Plan amendments to the State Water Resources Control Board for its consideration and approval.


I, WILLIAM H. CROOKS, Executive Officer, do hereby certify the foregoing is a full, true, and correct copy of a Resolution adopted by the California Regional Water Quality Control Board, Central Valley Region, on 28 October 1983.


WILLIAM H. CROOKS, Executive Officer

GUIDELINES FOR PROTECTION OF WATER QUALITY
DURING CONSTRUCTION AND OPERATION OF
SMALL HYDRO PROJECTS

## I. POLICIES AND PRINCIPLES

All beneficial instream uses, including water quality, aquatic and riparian habitat, recreational and aesthetic uses, should be protected.

The Regional Board will be responsible for addressing water quality-related impacts of small hydro projects. Nonwater quality-related impacts will be addressed by other authorities; i.e., Department of Fish and Game; State Water Resources Control Board, Division of Water Rights; federal land management agencies; and local governments.

Construction and operation of small hydro projects shall not result in a violation of adopted water quality objectives as contained in the Board's Water Quality Control Plan. The following objectives are considered of particular importance in protecting beneficial uses from adverse impacts of small hydro projects.

### A. TEMPERATURE

Water temperature shall not be altered unless it can be demonstrated to the satisfaction of the Regional Board that such alteration does not adversely affect beneficial uses. At no time shall temperature be increased by more than 5°F above background levels. Where temperature increases would threaten fisheries or other beneficial uses, the applicant may be required to establish baseline temperature conditions.

### B. TURBIDITY

Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

Increases in turbidity attributable to controllable water quality factors shall not exceed the following limits:

- Where natural turbidity is between 0 and 50 Jackson Turbidity Units (JTU), increases shall not exceed 20%.

- Where natural turbidity is between 50 and 100 JTU, increases shall not exceed 10 JTU.

- Where natural turbidity is greater than 100 JTU, increases shall not exceed 10%.

The above turbidity limits will be eased during any working period when construction work must occur in flowing water, to allow a turbidity increase of 15 JTU as measured 300 feet below the discharge.

35/2/5

GUIDELINES FOR PROTECTION OF WATER QUALITY                                    -2-
DURING CONSTRUCTION AND OPERATION OF
SMALL HYDRO PROJECTS

C.  SEDIMENT

The suspended sediment load and concentration shall not be altered in
such a manner as to cause nuisance or adversely affect beneficial uses.
Where suspended or settleable sediment would threaten fisheries or other
beneficial uses, the applicant may be required to establish baseline
sediment conditions.

D.  SETTLEABLE MATERIAL

Waters shall not contain substances in concentrations that result in
deposition of material that causes nuisance or adversely affects benefi-
cial uses.

E.  DISSOLVED OXYGEN

Dissolved oxygen shall not be depressed below levels specified in the
Board's Water Quality Control Plan.

II.  PROJECT STANDARDS AND REQUIREMENTS

A.  CONSTRUCTION

The project applicant shall submit to the Regional Board an Erosion
Control Plan specifying those measures which will be used to prevent
erosion/sedimentation problems during project construction.  The plan
shall include a map of the project site delineating where erosion
control measures will be applied.  The erosion control plan shall
include the following minimum criteria.

1.  Construction equipment shall not be operated in flowing water except
    as may be necessary to construct crossings or barriers.

2.  Where working areas are adjacent to or encroach on live streams,
    barriers shall be constructed which are adequate to prevent the
    discharge of turbid water in excess of those limits specified above.

3.  Material from construction work shall not be deposited where it
    could be eroded and carried to the stream by surface runoff or high
    stream flows.

4.  All permanent roads shall be surfaced with material sufficient to
    maintain a stable road surface.

5.  All disturbed soil and fill slopes shall be stabilized in an appro-
    priate manner.

GUIDELINES FOR PROTECTION OF WATER QUALITY                                    -3-
DURING CONSTRUCTION AND OPERATION OF
SMALL HYDRO PROJECTS

6. Surface drainage facilities shall be designed to transport runoff in a nonerosive manner.

7. Riparian vegetation shall be removed only when absolutely necessary.

8. There shall be no discharge of petroleum products, cement washings or other construction materials.

9. Erosion control measures shall be in place by October 15 of each year.

10. Stream diversion structures should be designed to preclude accumulation of sediment. If this is not feasible, the applicant must develop an operation plan that will prevent adverse downstream effects from sediment discharges.

11. The project shall be designed to avoid erosion and degradation of water quality in the event of a failure in the water transport system. An automatic, immediate shutoff mechanism is an acceptable method (in many cases, the only feasible method).

III. PROJECT REVIEW AND REGULATION

A. Applicants should seek early consultation with the Regional Board to determine water quality concerns and to arrange a site inspection if needed.

B. Where appropriate, the Regional Board will participate with the applicant and other reviewing agencies to determine the scope of the project's environmental assessment.

C. The Regional Board will review the FERC application which should include the following water quality-related information:

1. All environmental assessment information.

2. A copy of the Erosion Control Plan.

3. A description of all project mitigations for water quality protection.

D. The Regional Board will issue a letter addressing the need for Water Quality Certification and waste discharge requirements.

GUIDELINES FOR PROTECTION OF WATER QUALITY                                    -4-
DURING CONSTRUCTION AND OPERATION OF
SMALL HYDRO PROJECTS

### Waste Discharge Requirements

1. The Regional Board believes the standard specifications contained in Section II of these guidelines will provide water quality protection from small hydro construction and operation. In most instances, the Regional Board will waive the need for Reports of Waste Discharge and waste discharge requirements for projects which comply with these standard specifications.

2. Waste discharge requirements may be required for projects having high potential for water quality impairment or for major projects where construction work will be continued beyond one year.

### Water Quality Certification

1. Regulations under Section 401 of the Clean Water Act require applicants for federal licenses or permits (such as FERC licenses or U.S. Corps Dredge and Fill Permits) to obtain state certification of conformance with water quality standards.

2. In most instances, the Regional Board will waive water quality certification provided the project includes the standards specified in Section II of these guidelines and it is determined that project operation will not violate adopted water quality objectives.

IV. ENFORCEMENT

When investigations by staff reveal that a project is impairing, or threatens to impair, beneficial uses of water, the project owner/operator is required to take corrective action as follows:

A. The responsible party shall be promptly notified and asked to submit a description of actions and a time schedule to be taken to bring the project into compliance with these guidelines.

B. A Cleanup and Abatement Order may be issued where the discharge of waste to surface waters is imminent and normal administrative procedures will not afford timely water quality protection. Upon failure to comply with such Cleanup and Abatement Order, the matter shall be referred to the Attorney General for appropriate action.

C. The Regional Board may expend available monies to perform any cleanup and abatement work which, in its judgment, is required to prevent substantial adverse impacts on water quality and beneficial uses. The discharger shall be liable for all costs incurred in taking the cleanup and abatement action.

October 1983

Guidelines for Waste Disposal from Land Developments

In its June 1971 Interim Water Quality Control Plan the Board included Guidelines for Land Development Planning. These Guidelines were substantially modified on 15 December 1972 and retitled Guidelines for Waste Disposal From Land Develop-ments. The Guidelines that follow are substantially the same as those adopted in 1972 but contain changes based upon experience gained from working closely with local governmental agencies in the development of individual waste disposal ordinances.

Section 13260 of the Porter-Cologne Water Quality Control Act requires any person discharging waste or proposing to discharge waste to file a report of the dis-charge containing such information as may be required by the Board. In the early 1950's, the Board waived the filing of reports for discharges from individual sewage disposal systems in those counties having satisfactory ordinances or regulations. Traditionally, these individual discharges have been treated by septic tank - leaching systems.

The Water Quality Control Act requires local governmental agencies to notify the Board of the filing of tentative subdivision maps or applications for building permits involving six or more family units except where the waste is discharged to a community sewer system.

The Board believes that control of individual waste treatment and disposal systems can best be accomplished by local county environmental health departments if these departments are strictly enforcing an ordinance that is designed to provide complete protection to ground and surface waters and to the public health.

The following principles and policies will be applied by the Board in review of water quality factors related to land developments and waste disposal from septic tank-leaching systems:

- There are great differences in the geology, hydrology, geography, and meteo-rology of the 40 counties which lie partially or wholly within the Central Valley. The criteria contained herein are considered to be applicable to the Central Valley and pertain to: (a) all tentative maps filed after 15 December 1972, (b) all divisions of land made after 15 December 1972, and (c) all final maps for which tentative maps were filed prior to 15 December 1971. Local agencies and the Board may adopt and enforce more stringent regulations which recognize particular local conditions that may be limiting to waste-water treatment and disposal.

- The Board does not intend to preempt local authority and will support local authority to the fullest extent possible. Where local authority demonstrates the inability or unwillingness to adopt an ordinance compatible with these guidelines, the Board intends to withdraw its waiver concerning waste dis-posal from individual systems and will require each and every party proposing to discharge waste within that county to submit a report of waste discharge as required by Section 13260 of the Porter-Cologne Water Quality Act.

Guidelines for Waste Disposal from Land Developments                    -2-

- Evaluation of the capability of individual waste treatment systems to achieve continuous safe disposal of wastes requires detailed local knowledge of the area involved. The experience and recommendations of local agencies will, therefore, be an important input to the information upon which the Board will base its decision.

- There are many areas within the Central Valley that are not conducive to individual waste treatment and disposal systems. In these areas, connection to an adequate community sewerage system is the most satisfactory method of disposing of sewage. The Board believes that individual disposal systems should not be used where community systems are available and that every effort should be made to secure public sewer extensions, particularly in urban areas. Where connection to a public sewer is not feasible and a number of residences are to be served, due consideration should be given to construction of a community sewage treatment and disposal system.

- The installation of individual disposal systems, especially in large numbers, creates discrete discharges which must be considered on an individual basis. The life of such disposal systems may be quite limited. Failures, once they begin in an area, generally will occur on an areawide basis. Further, regular maintenance is important to successful operation of individual disposal systems. To assure continued protection of water quality, to prevent water pollution and to avoid the creation of public health hazards and nuisance conditions, a public entity* shall be formed with powers and responsibilities defined herein for all subdivisions having 100 lots or more. Subdivisions with less than 100 lots which threaten to cause water quality or public health problems will also be required to form a public entity.

## Criteria for Septic Tank - Leaching Systems

The following criteria will be applied to assure continued preservation and enhancement of state waters for all present and anticipated beneficial uses, prevention of water pollution, health hazards, and nuisance conditions. These

---

\* Public Entity - A local agency, as defined in the State of California Government Code Section 53090 et seq., which is empowered to plan, design, finance, construct, operate, maintain, and to abandon, if necessary, any sewerage system or the expansion of any sewerage system and sewage treatment facilities serving a land development. In addition, the entity shall be empowered to provide permits and to have supervision over the location, design, construction, operation, maintenance, and abandonment of individual sewage disposal systems within a land development, and shall be empowered to design, finance, construct, opeate, and maintain any facilities necessary for the disposal of wastes pumped from individual sewage disposal systems and to conduct any monitoring or surveillance programs required for water quality control purposes. (Unless there is an existing public entity performing these tasks.)

criteria prescribe conditions for waste disposal from septic tank-leaching systems for single family residential units or the equivalent and do not preclude the establishment of more stringent criteria by local agencies or the Board. The Board may prohibit the discharge from septic tank-leaching systems which do not conform to these criteria. Systems which cannot meet the following criteria may be allowed in selected areas if they are individually designed. The criteria may not be applicable in all cases to commercial or industrial developments.

The septic tank, absorption systems, and disposal area requirements for other than single family residential units shall be based upon the current edition of the "Manual of Septic Tank Practice" or in accordance with methods approved by the Executive Officer. An adequate replacement area equivalent to at least the initial disposal area shall be required at the time of design of the initial installation and incompatible uses of the replacement area shall be prohibited.

Minimum Distances

The Board has determined the following minimum distances (in feet) should be followed in order to provide protection to water quality and/or public health:

| Facility | Domestic Well | Public Well | Flowing Stream(1) | Drainage Course of Ephemeral Stream(2) | Cut or Fill Bank(3) | Property Line(4) | Lake or Reservoir(5) |
|---|---|---|---|---|---|---|---|
| Septic Tank or Sewer Line | 50 | 100 | 50 | 25 | 10 | 25 | 50 |
| Leaching Field | 100 | 100 | 100 | 50 | 4h | 50 | 200 |
| Seepage Pit | 150 | 150 | 150 | 50 | 4h | 75 | 200 |

(1) As measured from the line which defines the limit of a 10-year frequency flood.

(2) As measured from the edge of the drainage course or stream.

(3) Distance in feet equals four times the vertical height of the cut or fill bank. Distance is measured from the top edge of the bank.

(4) This distance shall be maintained when individual wells are to be installed and the minimum distance between waste disposal and wells cannot be assured.

(5) As measured from the high water line.

Guidelines for Waste Disposal from Land Developments                                    -4-

Minimum Criteria

- The percolation rate* in the disposal area shall not be slower than 60 minutes per inch, or not slower than 30 minutes per inch if seepage pits are proposed. The percolation rate shall not be faster than five minutes per inch unless it can be shown that a sufficient distance of soil is available to assure proper filtration.

- Soil depth below the bottom of a leaching trench shall not be less than five feet, nor less than 10 feet below bottom of a seepage pit.

- Depth to anticipated highest level of ground water below the bottom of a leaching trench shall not be less than five feet, nor less than 10 feet below bottom of seepage pit. Greater depths are required if soils do not provide adequate filtration.

- Ground slope in the disposal area shall not be greater than 30 percent.

- The minimum disposal area shall conform to the following:

| Percolation Rate (minutes/inch) | Minimum Usable Disposal Area (sq ft) |
|---|---|
| 41-60 | 12,000 |
| 21-40 | 10,000 |
| 11-20 | 8,000 |
| Less than 10 | 6,000 |

- Areas that are within the minimum distances which are necessary to provide protection to water quality and/or public health shall not be used for waste disposal. The following areas are also considered unsuitable for the location of disposal systems or replacement area:

  - Areas within any easement which is dedicated for surface or subsurface improvement.

  - Paved areas.

  - Areas not owned or controlled by property owners unless said area is dedicated for waste disposal purposes.

  - Areas occupied or to be occupied by structures.

---

* Determined in accordance with procedures contained in current US Department of Health, Education, and Welfare "Manual of Septic Tank Practice" or a method approved by the Executive Officer.

Guidelines for Waste Disposal from Land Developments                                    -5-

Implementation

- The Board will review local ordinances for the control of individual waste disposal systems and will request local agencies to adopt criteria which are compatible with or more stringent than these guidelines.

- In those counties which have adopted an ordinance compatible with these guidelines, the Board will pursue the following course of action for discharges from individual septic tank-leaching systems.

    - Land developments consisting of less than 100 lots will be processed entirely by the county. Tentative maps for subdivisions involving six or more family units shall be transmitted to the Board along with sufficient information* to clearly determine that the proposed development will meet the approved county ordinance. The Board or the appropriate local authority may require a public entity if potential water quality or public health problems are anticipated.

    - Tentative maps for land developments containing 100 lots or more shall be transmitted to the Board. The map shall be accompanied by a report of waste discharge and sufficient information to clearly demonstrate that the proposed development will meet these guidelines or the approved county ordinance. A public entity is required prior to any discharge of waste.

- The Board will prohibit the discharge of wastes from land developments which threaten to cause water pollution, quality degradation, or the creation of health hazards or nuisance conditions. These guidelines will be used to evaluate potential water quality or health problems. In certain locations and under special circumstances the Board's Executive Officer may waive individual criteria or he may waive the formation of a public entity. Land developers are to be aware that a waiver by the Executive Officer is not binding on any location entity.

Examples of these special circumstances would be:

    - Short time, interim use of individual septic tank-leaching systems may be acceptable in areas which do not meet these guidelines if sufficient, dependable funding of community collection, treatment, and disposal is demonstrated and a plan and time schedule for implementation is being followed.

---

* The Board's staff has developed a document entitled "Information Needs for Waste Disposal from Land Developments". This document discusses the necessary reports, maps, etc., that must be submitted in order to evalute proposed land developments.

Guidelines for Waste Disposal from Land Developments

-6-

- A failure to meet the minimum criteria could be negated by other favorable conditions. for example, the installation of individual septic tank-leaching systems may be allowed in areas which cannot meet the minimum criteria in these guidelines if the disposal area is increased sufficiently to allow for special design systems* that have been shown to be effective in similar areas.

• Severe impact on water quality has resulted from improper storm drainage and erosion control. Land developers must provide plans for the control of such runoff from initial construction up to complete build-out of the development.

• The disposal of solid waste can have an impact on water quality and public health. Land developers must submit a plan which conforms to the regional or county master plan and contains adequate provisions for solid waste disposal for complete build-out of the development.

• The disposal of septic tank sludge is an important part of any areawide master plan for waste disposal. Land developers must submit a plan which con- forms to the regional or county master plan and contains adequate provisions for septic tank sludge disposal for complete build-out of the development.

• The responsibility for the timely submittal of information necessary for the Board or the appropriate local authority to determine compliance with these guidelines rests with persons submitting proposals for development or discharge. For those developments which are to be submitted to the Board, the Porter-Cologne Water Quality Control Act provides that no person shall initiate any new discharges of wastes prior to filing a report of waste discharge and prior to (1) issuance of waste discharge requirements, (2) the expiration of 120 days after submittal of an adequate report of waste discharge, or (3) the issuance of a waiver by the Regional Board.

• A report of waste discharge which does not provide the information required by these guidelines is an inadequate report. The 120-day time period does not begin until an adequate report has been submitted. Thus, to avoid extensive delay, every effort should be made to comply with these guidelines at the earliest possible date during formulation of proposals.

---

* Special design systems will be accepted for review from registered engineers, geologists, or sanitarians who are knowledgeable and experienced in the field of septic tank-leaching system design and installation. These systems will include at least a 100 percent replacement disposal area. these systems shall be installed under the supervision of the designer, the public entity responsible, and the local health department.

Amendment to Water Quality Control Plan and Action Plan
for Mining*

Problem Statement

Although water quality problems from active mines are effectively controlled
through traditional avenues of waste discharge requirements, permits, and enforce-
ment, acid mine drainage and heavy metals from inactive mines have created sterile
stream conditions in isolated locations throughout central and northern California.
Most of those mines known to be causing water quality problems are in the Central
Valley Region.

Action Plan and Development

In planning to correct water quality problems caused by past mining activity, the
Board undertook several related studies, the summaries and general recommendations
of which are given below.

Tables 1 and 2 show, respectively, an inventory and ranking of problem mines in the
Central Valley Region.  A report was prepared describing the method used to rank
the mines.

A study of enforcement and funding options was also completed.

Technical feasibility studies were conducted or are underway.  These site-specific
studies at Walker Mine in Plumas County; Malakoff Diggins in Nevada County; and
Leviathan Mine in Alpine County will be used to promote cleanup at those sites and
serve as examples of the application of BMPs for tunnel, open pit spoils, and
sediment problems, respectively, with transfer value to other mines.  The abatement
project a Penn Mine, Calaveras County, begun as a 208 project, will also aid in
identifying controls and techniques for other mines.  A summary of acid mine
drainage control technology has been prepared.  Control methods (BMPs) that appear
most promising for application in California are suggested in Figure 1.  A Memor-
andum of Understanding among the State Water Resources Control Board, the US Bureau
of Reclamation, and the Department of Fish and Game was prepared which outlines a
program of correction for the Spring Creek watershed, Iron Mountain Mine, Shasta
County.

The Board will take the following approach in applying the results of the studies
described above:

1.  The Board finds there are serious water quality problems related to inactive
    mines and will take necessary actions to control those problems using the
    priorities shown in Table 2 as a guide.

2.  In implementing necessary controls, the Board will take appropriate actions
    identified in the legal, institutional, and funding studies conducted during
    the 208 planning program.

* As adopted in Resolution No. 79-149

37/1/5

Mining, continued                                                    -2-

3. As an important initial step in implementation and enforcement, feasibility studies should be developed for all high priority problem mines. Owners and operators will be required to prepared such plans, or in some cases, as appropriate, the Board will seek funds from the identified sources to conduct the studies. BMPs shown in Figure 1 should be considered in developing those plans.

4. The State Board and EPA should assist the Region in pursuing promising funding sources and other appropriate measures as recommended in the legal, institutional, and funding studies.

5. To prevent future problems, the Board will require owners and operators of active mines to prepare plans for closure and reclamation. Closure and reclamation plans for all operations will meet the minimum requirements of regulations in the Surface Minign and Reclamation Act of 1975 and will be coordinated with the State Board of Mining and Geology.


## Public Participation

Work plans and products were reviewed by a Mining Technical Advisory Group (MTAG) and individuals and groups on the Regional and State Board agenda lists. A Penn Mine subcommittee toured the mine site and reviewed proposed abatement plans. One meeting with the MTAG was held to review the draft inventory and assessment report, discuss the legal study, and evaluate staff proposals for the site-specific feasibility studies.


## Negative Declaration

A Negative Declaration was prepared for this project.

FIGURE 1

BEST MANAGEMENT PRACTICES AVAILABLE FOR
CONTROL OF AMD FROM ABANDONED MINES



adapted from unpublished literature
review by the Sanitary Engineering
Research Lab, U.C. Berkeley

37/3/5

## TABLE 1. INVENTORY OF PROBLEM MINES

| Watershed | Mine Name | County | CDMG Map No. | USGS Map | Latitude | Longitude | Commodity Mined | Type of Operation | Receiving Stream |
|---|---|---|---|---|---|---|---|---|---|
| American River, Er | Alhambra Shumway | El Dorado | 5A-723 | Georgetown | 38 49.54' | 120 47.37' | Gold | Undergrnd | Mosquito Trail Glch—Rock Crk—Sr American R |
| Bear River | Dairy Farm | Placer | 5A-633 | Cap Far W | 33 1.81' | 121 17.25' | Copper | Undergrnd | Camp Far West Reservoir |
| | Lava Cap-Banner | Nevada | 5A-571 | Chicago Pk | 39 15.64' | 120 53.19' | Gold | Undergrnd | L.Clipper Crk—Greenhorn Crk—Rolling Hu—oron |
| Butte Creek | Cherokee | Butte | 5A-278 | Cherokee | 39 38.2' | 121 37.7' | Gold | Hyd Placer | Sawmill Ravine—Dry Creek—Butte Crk |
| | Mineral Slide | Butte | (none) | Paradise | 39 47.4' | 121 37.63' | Gold | Undergrnd | L.Butte Crk—Butte Crk |
| Cache Creek | Abbott | Lake | 5A-645 | Wilbur Spg | 39 1.23' | 122 26.63' | Mercury | Undergrnd | Harley Glch—Cache Crk |
| | Manzanita | Colusa | 5A-644 | Wilbur Spg | 39 2.33' | 122 25.82' | Mercury | Undergrnd | Sulfur Crk—Bear Crk—Cache Crk |
| | Reid | Yolo | 5A-656 | Knoxville | 38 51.80' | 122 22.20' | Mercury | Undergrnd | Davis Crk—Cache Crk |
| | Sulfur Bank | Lake | 5A-650 | Clr Lk Hi | 38 53.90' | 122 40.35' | Merc,Sul | Open Pit | Clear Lake—Cache Crk |
| Cosumnes River | Copper Hill | Amador | 5B-044 | Latrobe | 38 35.13' | 120 58.00' | Copper | Undergrnd | Cosumnes River |
| Feather River | China Gulch | Plumas | (none) | Greenville | 40 12.7' | 120 45.17' | Gold | Undergrnd | Lights Crk—Wolf Crk—Nf Feather R |
| | Engel | Plumas | 5A-076A | Greenville | 40 12.20' | 120 46.41' | Cop,Silv | Undergrnd | Lights Crk—Wolf Crk—Nf Feather R |
| | Iron Dyke | Plumas | 5A-080 | Greenville | 40 3.90' | 120 50.60' | Cu,Ag,Au | Undergrnd | Taylor Crk—Indian Crk—Wolf Crk—Nf Feather R |
| | Walker | Plumas | 5A-159 | Mt Ingls | 39 58.72' | 120 39.80' | Copper | Undergrnd | L.Grizzly Crk—Indian Crk—Wolf Crk—Nf Feather R |
| Fresno Slough | New Idria | San Benito | 5D-045 | Idria | 36 24.85' | 120 40.39' | Mercury | OPit&Undg | San Carlos Crk—Silver Crk—Panoche Crk |
| Mokelumne River | Argonaut | Amador | 5B-105 | Jackson | 38 21'27" | 120 47.10' | Gold | Undergrnd | Jackson Crk—Dry Crk—Mokelumne R |
| | Newton | Amador | 5B-069 | Ione | 38 23.45' | 120 55.20' | Copper | Undergrnd | Copper Crk—Butter Crk—Dry Crk—Mokelumne R |
| | Penn | Calaveras | 5B-223 | Vlly Spg | 38 13.97' | 120 52.50' | Copper | OPit&Undg | Mokelumne River (Camanche Res) |
| Putah Creek | Aetna | Napa | 5A-785 | Aetna Spg | 38 39.45' | 122 29.51' | Mercury | Surf&Undg | Swartz Crk—Pope Crk—Putah Crk—Lake Berryessa |
| | Anderson | Lake | 5A-652 | Whisp Pre | 38 46.35' | 122 42.40' | Mercury | Undergrnd | Anderson Crk—Bear Canyon Crk—Putah Crk—Lk. B... |
| | Big Injun | Lake | 5A-650A | Whisp Pre | 38 45.85' | 122 42.40' | Mercury | Surf&OPit | Bear Canyon Crk—Putah Crk—Lake Berryessa |
| | Corona | Napa | 5A-790 | Detert Spg | 38 40.21' | 122 32.47' | Mercury | Undergrnd | James Crk—Pope Crk—Putah Crk—Lake Berryessa |
| | Great Western | Lake | 5A-795 | Mt St Hel | 38 42.87' | 122 38.44' | Mercury | OPit&Undg | Hoodoo Crk—Dry Crk—Putah Crk—Lake Berryessa |
| | Knoxville | Napa | 5A-659 | Knoxville | 38 49.61' | 122 20.34' | Mercury | OPit&Undg | Knoxville Crk—Eticuera Crk—Lake Berryessa |
| | Oat Hill | Napa | 5A-789 | Detert Spg | 38 49.80' | 122 21.65' | Mercury | Surface | James Crk—Pope Crk—Putah Crk—Lake Berryessa |
| Sacramento River | Afterthought | Shasta | 5A-019 | Millville | 40 44.10' | 122 4.10' | Cu+Ag,Au | Undergrnd | L.Cow Crk—Sacramento R |
| | Balaklala | Shasta | 5A-033 | Shasta Dam | 40 43.59' | 122 29.79' | Cu,Zn,Ag | Undergrnd | West Squaw Crk—Shasta lake |
| | Bully Hill | Shasta | 5A-017 | Bllbka Mt | 40 47.80' | 122 12.20' | Cu,Zn,Pb | Undg&Surf | First Crk, Town Crk—Shasta Lake |
| | Golinsky | Shasta | 5A-014 | Lamoine | 40 45.84' | 122 27.40' | Cu,Zn,Au | Undergrnd | L.Backbone Crk—Shasta Lake |
| | Greenhorn | Shasta | 5A-055 | Frnch Glch | 40 39.75' | 122 41.65' | Cu,Au,Ag | Undergrnd | Willow Crk—Clear Crk—Whiskeytown Lake |
| | Iron Mountain | Shasta | 5A-041 | Frnch Glch | 40 40.59' | 122 31.47' | Cu,Zn,Au | Undg&Surf | Spring Crk—Keswick Res (Sacramento R ) |
| | Keystone | Shasta | 5A-037 | Frnch Glch | 40 43.10' | 122 30.32' | Cu,Au,Ag | Undergrnd | West Squaw Crk—Shasta lake |
| | Mammoth | Shasta | 5A-031 | Lamoine | 40 45.84' | 122 27.40' | Cu,Zn,Au | Undergrnd | L.Backbone Crk—Shasta lake |
| | Shasta King | Shasta | 5A-035 | Shasta Dam | 40 43.80' | 122 29.80' | Cu,Au,Ag | Undergrnd | West Squaw Crk—Shasta lake |
| San Joaquin Delta | Mount Diablo | Contra Costa | (none) | Antioch So | 37 53.87' | 121 52.54' | Mercury | Undergrnd | Marsh Crk—Marsh Crk Res—San Joaquin Delta |
| Stanislaus River | Empire | Calaveras | 5C-072 | Copperopolis | 37 58.60' | 120 38.30' | Copper | OPit&Undg | Copper Crk—Black Crk—Tulloch Res (Stanislaus R... |
| | Keystone | Calaveras | 5C-073 | Copperopolis | 37 59.20' | 120 38.90' | Copper | Undergrnd | Penny Crk—Sawmill Crk—Black Crk—Tulloch Res |
| Yuba River | Kenton | Sierra | 5A-357 | Allegheny | 39 27.31' | 120 51.52' | Gold | Undergrnd | Kanaka Crk—M Yuba R |
| | Malakoff Diggings | Nevada | 5A-345 | Pike,NBlaf | 39 22.20' | 120 55.00' | Gold | Surf Hydr | Humbug Crk—SF Yuba R |
| | Plumbago | Sierra | 5A-384 | Allegheny | 39 27.17' | 120 48.74' | Gold | Undergrnd | Buckeye Ravine—M Yuba R |
| | Sixteen to One | Sierra | 5A-367 | Allegheny | 39 27.92' | 120 50.53' | Gold | Undergrnd | Kanaka Crk—M Yuba R |

## TABLE 2  MINE RANKING

| Mine Name | Rank | C | Q | Pollution Problem | Data Source |
|---|---|---|---|---|---|
| Iron Mountain | H | 30 | 5-70 | acid,Cu,Zn,Fe from tailings and adits to creeks | USGS WRI78-32, CDFG, CIMG reports, and CVRWQCB inspection |
| Monmoth | H | 30 | 3 | acid,Cu,Zn,Fe from adits to creek | USGS WRI78-32 |
| Penn | H | 26 | 680 | acid,Cu,Zn,Fe from tailings and adits to river | CDFG and CVRWQCB reports and inspections |
| McLaehia | H | 26 | 5 | acid,Cd,Cu,Zn from adits and dump to creek | USGS WRI78-32 and DWR report |
| Keystone | H | 26 | 5 | acid,Cd,Cu,Zn from adits and dump to creek | USGS WRI78-32 and DWR report |
| Afterthought | H | 24 | 68 | acid,Cd,Cu,Zn from main portal to creek | CDFG report |
| Mount Diablo | H | 23 | .6-1 | acid,Hg,Fe from tailings and overburden to creek | CVRWQCB and DWR inspections and reports |
| Sully Hill | H | 21 | 1.8 | acid,Cd,Cu,Zn from mine to creek | USGS WRI78-32 |
| Walker | H | 17 | 11 | Cu,Zn from tailings and portal to creek | CVRWQCB, CDNCOO, and AMAX inspections and sampling |
| Sulfur Bank | H | 15 | 5 | Hg from open pit to lake | USGS and DWR reports |
| Newton | M | 30 | .3 | acid,Cu,Fe from tailings to creek | CVRWQCB inspections |
| Greenhorn | M | 19 | .6-5 | Cu,Zn,Fe from tailings to creek | CDFG inspection |
| New Idria | M | 19 | .6-5 | Hg,Fe from mine to creek | CVRWQCB inspection |
| Coruna | M | 17 | 1.2 | acid,Hg,Fe from adits to creek | CVRWQCB inspections |
| Mazzanite | M | 15 | 3.5 | Hg from mine area to creek | CVRWQCB inspection |
| Cherokee | M | 15 | .6-5 | Hg from mine area to creek | CVRWQCB inspection |
| Copper Hill | M | 5 | 47* | Cu,Zn from tailings area to river | STORET and USGS-DWR data |
| Empire | L | 20 | .3 | Cu from tailings to creek | CVRWQCB inspection |
| Abbott | L | 15 | .1 | Hg from tailings to creek | CVRWQCB inspections |
| Knoxville | L | 10 | 2 | Hg from mine area to creek | CVRWQCB inspection |
| Keystone | L | 4 | 2 | none observed but Cu suspected, perhaps Fe | CVRWQCB inspection |
| Lava Cap-Banner | L | 3 | 1.3 | none detected in creek but As,Ag,Hg are possible | CVRWQCB inspection |
| Great Western | L | 3 | 1 | none detected but Hg suspected | CVRWQCB inspection |
| Alhambra Shumway | L | 2 | 1 | none detected and sedimentation suspected | CVRWQCB inspection |
| Anderson | L | 0 | 2 | none detected but Hg suspected | CVRWQCB inspection |
| big Injun | L | 0 | 8 | none detected but Hg suspected | CVRWQCB inspection |
| Kenton | L | 0 | 5 | none detected but As possible | STORET data and CVRWQCB inspections of creek |
| 16 to 1 | L | 0 | 5 | none detected but As possible | STORET data and CVRWQCB inspections of creek |
| Engel | L | 0 | 5 | none detected but Cu suspected | STORET data |
| China Gulch | L | 0 | 3 | none detected but Cu suspected | STORET data |
| Oat Hill | L | 0 | 3 | none detected in creek but zinc runoff high in Hg,Fe | CVRWQCB inspections |
| Aetna | L | 0 | -5 | none detected but Hg suspected | CVRWQCB inspection |
| Shasta King | L | 0 | .1 | none detected in creek but mine water high in acid,Cu | USGS WRI78-32 and DWR report |
| Golinsky | L | 0 | 0 | none observed (no flow from mine) but Cu,Zn are possible | USGS WRI78-32 |
| Iron Dyke | L | 0 | 0 | none observed (no flow from mine) but Cu is possible | CVRWQCB inspections |
| Argonaut | L | 0 | 0 | none observed (no flow from mine) but acid is possible | CVRWQCB inspection |
| Dairy Farm | L | 0 | 0 | none observed but acid,Cu are possible | CVRWQCB communication with S. Sutter Water District |
| Plumbago | UNKNOWN | | | no inspection, due to remote location, As suspected | |
| Reid | UNKNOWN | | | no inspection due to inaccessibility, acid,Hg suspected | |
| Malakoff Diggings | SPECIAL | | | high sediment and turbidity from mine area to creek | CVRWQCB inspection |
| Mineral Slide | SPECIAL | | | sediment and turbidity from mine area to creek | CVRWQCB observation |

37/5/5

### The Federal Antidegradation Policy
### (40 CFR 131.12)

(a)    The State shall develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy pursuant to this subpart. The antidegradation policy and implementation methods shall, at a minimum, be consistent with the following:

(1)    Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.

(2)    Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for nonpoint source control.

(3)    Where high quality waters constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance, that water quality shall be maintained and protected.

(4)    In those cases where potential water quality impairment associated with a thermal discharge is involved, the antidegradation policy and implementing method shall be consistent with section 316 of the (Clean Water) Act.

88 29480

**Appendix 40 – Grassland Watershed Wetland Channels
for Which Beneficial Uses Have Been Identified**

**Southern Grassland Wetland Channels**

| | Starting Location | Ending Location |
|---|---|---|
| Agatha Canal North | Starts at the Agatha North/Geis split at NE1/4, SE1/4, SE1/4, Sec. 12, T11S, R11E | Discharges to the Santa Fe Canal at Mueller Weir at NW1/4, SW1/4, SW1/4, Sec. 21, T10S, R11E |
| Agatha Canal South | Diversion from Helm or Main Canal at NW1/4, SE1/4, NE1/4, Sec. 31, T11S, R12E | Terminates at the Agatha North/Geir split at NE1/4, SE1/4, SE1/4, Sec. 12, T11S, R11E |
| Almaden Ditch | Begins at the Agatha Canal at Mallard Rd at SE1/4, NE1/4, SE1/4, Sec. 12, T11S, R11E | Terminates at Mesquite Drain siphon at the SW1/4, SW1/4, SW1/4, Sec. 11, T11E, R11E |
| Almond Drive Ranch | Diversions from the Main Canal and Main Drain at the SW1/4, SW1/4, SW1/4, Sec. 6, T11S, R10E | Discharges to Reedly Ditch at SW1/4, SW1/4, SW1/4, Sec. 5, T11S, R10E |
| Ascot Ditch | Diversion from the Main Canal at the SE1/4, SW1/4, SW1/4, Sec. 7, T11S, R11E | Terminates at the SW1/4, SE1/4, SE1/4, Sec. 8, T11S, R11E |
| Britto Ditch | Diversion from Camp 13 at the NW1/4, SE1/4, NE1/4, Sec. 22, T11S, R11E | Terminates at the SW1/4, SE1/4, NE1/4, Sec. 10, T11S, R11E |
| Camp 13 | Diversion of the Main Canal or Main Drain or Hamburg Drain at the SW1/4, SE1/4, SE1/4, Sec. 27, T11S, R11E | Discharges to Mud Slough (south) at the SE1/4, NE1/4, NE1/4, Sec. 33, T10S, R11E |
| Charleston Drain | Freshwater diversions from the Outside Canal at the SW1/4, NE1/4, Sec. 32, T11S, R11E | Discharges to Upper Gadwall Ditch at the SW1/4, SW1/4, NW1/4, Sec. 6, T11S, R11E |
| Cocke Ditch | Diversion from the Arroyo Canal at the NE1/4, SW1/4, SW1/4, Sec. 21, T10S, R11E | Terminates at the NW1/4, SE1/4, Sec. 16, T10S, R11E |
| Colony Branch 2 | Enters the Southern Grassland at the SW1/4, NW1/4, SW1/4, Sec. 8, T11S, R12E | Drains into Bennett Drain at the NE1/4, SE1/4, NE1/4, Sec. 7, T11S, R12E |
| Colony Branch 3/Bennett | Enters the Southern Grassland at the SE1/4, SW1/4, SW1/4, Sec. 5, T11S, R12E | Terminates at the Agatha Canal North at the SW1/4, SW1/4, SW1/4, Sec. 6, T11S, R12E |
| Cotton Drain | Enters the Grassland at the NW1/4, NE1/4, SE1/4, Sec. 32, T10S, R11E | Discharges to Mud Slough(s) at the SE1/4, SW1/4, SE1/4, Sec. 28, T10S, R11E |

3 May 1996 (as adopted by the RWQCB)

| | Starting Location | Ending Location |
|---|---|---|
| Flyway Ditch | Diversion from Almond Dr. Ditch at SE1/4, SW1/4, SW1/4, Sec. 5, T11S, R11E | Discharges to Cotton Drain at the NW1/4, SE1/4, NE1/4, Sec. 32, T10S, R11E |
| Gables Ditch | Diversion of Main Canal at the NE1/4, NW1/4, NW1/4, Sec. 31, T11S, R12E | Terminates at the SW1/4, NW1/4, SW1/4, Sec. 18, T11S, R12E |
| Geis Ditch | Begins at the Agatha North/Geis split at the NE1/4, SE1/4, SE1/4, Sec. 12, T11S, R11E | Discharges to Camp 13 at NW1/4, NW1/4, SW1/4, Sec. 3, T11S, R11E |
| Helm Canal | Takeouts from the Main Canal at NE1/4, SE1/4, NE1/4, Sec. 31, T11S, R11E | Terminates at the Helm Canal extension at the SW1/4, SW1/4, NW1/4, Sec. 26, T11S, R11E |
| Line Ditch | Enters Grassland at the SW1/4, SE1/4, NE1/4, Sec. 5, T11S, R12E | Terminates at the NE1/4, NE1/4, NE1/4, Sec. 6, T11S, R12E |
| Lower Gadwall Canal | Continuation of the upper Gadwall, starts at the Almond Dr. intersection at the SE1/4, SE1/4, SE1/4, Sec. 5, T11S, R11E | Discharges to Mud Slough (south) at the NE1/4, NE1/4, NW1/4, Sec. 33, T10S, R11E |
| Meyers Ditch | Diversion from Helm Canal at SE1/4, SW1/4, SW1/4, Sec. 26, T11S, R11E | Terminates at the SE1/4, SW1/4, SW1/4, Sec. 23, T11S, R11E |
| Mud Slough (south) | Begins at the end of Camp 13 at the SE1/4, NE1/4, NE1/4, Sec. 33, T10, R11E | Discharges to Salt Slough at the Los Banos WA at the NW1/4, NE1/4, SW1/4, Sec. 18, T9S, R10E |
| Pozo Drain | Enters the GWD at SW1/4, SW1/4, SW1/4, Sec. 8, T11S, R12E | Discharges to the Agatha Canal North at the NE1/4, SE1/4, NE1/4, Sec. 12, T11S, R12E |
| Reedly Ditch | Continuation of Almond Dr. Drain at the SW1/4, SW1/4, SW1/4, Sec. 4, T11S, R11E | Discharges to Camp 13 at the SE1/4, SE1/4, SE1/4, Sec. 4, T11S, R11E |
| San Pedro Canal | Diversion from the Arroyo Canal at the NW1/4, NE1/4, NW1/4, Sec. 26, T9S, R11E | Discharges to Boundary/Devon Drain at the NE1/4, NE1/4, SE1/4, Sec. 31, T9S, R11E |
| SLCC Arroyo Canal | Enters the Southern Grassland at the NE1/4, SE1/4, NE1/4, Sec. 25, T10S, R11E | Discharges to the Santa Fe Canal at Mueller Weir at the NW1/4, SW1/4, SW1/4, Sec. 21, T10S, R11E |
| Sorsky Ditch | Diversion of Camp 13 and Continuation of Sorsky Bypass at the NE1/4, NW1/4, NW1/4, Sec. 27, T11S, R11E | Discharges to Camp 13 at SW1/4, SW1/4, SW1/4, Sec. 3, T11S, R11E |
| Stillbow Ditch | Begins at Bennett Ditch at the SW1/4, SE1/4, SW1/4, Sec. 6, T11S, R12E | Discharges to the Agatha Canal North at the SW1/4, NW1/4, NW1/4, Sec. 36, T10S, R11E |
| 240 Ditch | Diversion from Helm Canal at NE1/4, NW1/4, NW1/4, Sec. 36, T11S, R11E | Terminates at Sorsky Ditch at NE1/4, NW1/4, NE1/4, Sec. 23, T11S, R11E |
| Upper Gadwall Ditch | Diversion of Camp 13 at the NW1/4, SE1/4, SE1/4, Sec. 22, T11S, R11E | Terminates at Reedly Ditch at the NE1/4, NE1/4, NE1/4, Sec. 8, T11S, R11E |

3 May 1996 (as adopted by the RWQCB)

40/2/3

**Northern Grassland Wetland Channels**

|  | Starting Location | Ending Location |
|---|---|---|
| Eagle Ditch | Diversion of the Santa Fe Canal at the NE1/4, SE1/4, NE1/4, Sec. 30, T.8S, R.10E | Discharges to Mud Slough (north) at the SW1/4, SE1/4, NE1/4, Sec. 7, T.8S, R.9E |
| Fremont Ditch | Diversion from San Luis Canal at the SE1/4, SW1/4, SW1/4, Sec. 35, T.8S, R.10E | Discharges to Mud Slough (north0 at the NW1/4, NW1/4, NE1/4, Sec. 20, T.8S, R.10 |
| Garzas Creek | Enters Grassland Water District (GWD) at the intersection of Sections 22, 23, 26, 27, T.8S, R.9E | Discharges to Los Banos Creek NE1/4, NE1/4, NE1/4, Sec. 13, T.8S, R.9E |
| Gun Club Road Ditch | Diversion of Los Banos Cr at the intersection sof Sections 13, 14, 23, 24, T.8S, R.9E | Terminates at Eagle Ditch at the SW1/4, SE1/4, SE1/4, Sec. 13, T.8S, R.9E |
| Kesterson Ditch | Diversion of the Santa Fe Canal at the SE1/4, SE1/4, SW1/4, Sec. 32, T.8S, R.10E | Terminates at the NW1/4, NW1/4, SE1/4, Sec. 34, T.8S, R.10E |
| Los Banos Creek | Begins service at CCID Main Canal at the SE1/4, SW1/4, SW1/4, Sec. 9, T.10S, R.10E | Discharges to Mud Slough (north) at the NE1/4, NW1/4, SW1/4, Sec. 26, T.7S, R.9E |
| Mosquito Ditch | Diversion from the San Luis Wasteway at the NE1/4, NW1/4, NW1/4, Sec. 19, T.9S, R.10E | Discharges to Los Banos Creek at NE1/4, NE1/4, SE1/4, Sec. 6, T.9S, R10E |
| Rubino Ditch | Diversion of the San Luis Spillway at the SW1/4, SE1/4, SW1/4, Sec. 17, T.9S, R.10E | Terminates at the NW1/4, SW1/4, SW1/4, Sec. 8, T.9S, R.10E |
| San Luis Canal | Starts at a diversion of the Main Canal at NE1/4, NW1/4, SW1/4, Sec. 36, T.10S, R.10E | NE1/4, NE1/4, SW1/4, Sec. 5, T.8S, R.10E |
| San Luis Spillway Ditch | Diversion of the San Luis Wasteway at the intersection of Sections 17, 18, 19, 20, T.9S, R.10E | Discharges to the Santa Fe Canal at SE1/4, SE1/4, SW1/4, Sec. 16, T.9S, R.10E |
| San Luis Wasteway[1] |  |  |
| Standard Ditch | Diversion from San Luis Canal at the NE1/4, SW1/4, NE1/4, Sec. 25 T.9S, R.10E | Terminates at the NE1/4, NE1/4, SW1/4, Sec. 15, T.9S, R.10E |
| Santa Fe Canal[2] | Extension of the Arroyo Canal at Mueller Weir at the NW1/4, SW1/4, SW1/4, Sec. 21, T.10S, R.11E | Terminates at a tributary of Mud Slough (north) at the SW1/4, SE1/4, SE1/4, Sec. 7, T.8S, R.10E |
| Santa Fe Canal Extension | Diversion of the Santa Fe Canal at the SW1/4, Sec. 7, T.8S, R.10E |  |
| Westside Ditch | Diversion of Garzas Cr at the intersection of Sections 22, 23, 26, 27, T.8S, R.9E | Discharges to Los Banos Creek at the SE1/4, NW1/4, NW1/4, Sec. 11, T.8S, R.9E |

[1] Begins as an extension of the Arroyo Canal. Receives only SLCC operational spill water at this point.
[2] Source is the Delta-Mendota Canal.

3 May 1996 (as adopted by the RWQCB)

40/3/3

The Lower San Joaquin River watershed has been divided into seven major geographic subareas. In some cases, the major subareas have been further subdivided into minor subareas to provide a greater level of detail. The following is a technical description of each of the subareas comprising the LSJR Basin.

**East Valley Floor Subarea**

BEGINNING at the junction of the Stanislaus River and the San Joaquin River lying in Section 19, Township 3 South, Range 7 East, Mount Diablo Meridian; thence along the following courses:

1. Meander the centerline of the Stanislaus River northeasterly upstream to its intersection with boundary of Calwater RBUASPW area 6535100000 (Manteca Hydrologic Area) near Caswell Memorial State Park;

2. North on the said boundary of Calwater RBUASPW area 6535100000 (Manteca Hydrologic Area) near Caswell Memorial State Park to its intersection with the centerline of a road located slightly more than one half mile north of the river;

3. East on centerline of said road to its junction with the centerline of the north levee of the Stanislaus River;

4. Southwesterly on centerline of said Stanislaus River levee to its intersection with the centerline of the park road connecting to the campsites, were said road extended to intersect the levee;

5. Easterly on said road to the point of intersection with a line perpendicular from the bank of the Stanislaus River directly opposite of Campsite number 24;

6. North-Northeasterly on said perpendicular line to its intersection with the centerline of the Stanislaus River;

7. East to the intersection with the crest of the ridge parallel to the opposite side of the river bend from the Caswell Memorial State Park;

8. Southeast on said ridge to its intersection with the centerline of the south bank levee of the Stanislaus River;

9. Meander centerline of said levee northeasterly to its intersection with the centerline of Modesto Irrigation District Lateral Number 6;

10. Meander centerline of said Lateral No. 6 easterly to its junction with the centerline of Modesto Main Canal;

11. Meander centerline of said Main Canal southeasterly to its junction with the centerline of Thompson Lateral;

12. Meander centerline of said Thompson Lateral northerly to its junction with the centerline of Stowell Lateral;

13. Meander centerline of said Stowell Lateral northeasterly to its junction with the centerline of Claribel Lateral;

14. Meander centerline of said Claribel Lateral southerly to its junction with the centerline of Dry Creek;

15. Meander centerline of Dry Creek westerly to its intersection with the centerline of Modesto Main Canal;

16. Meander centerline of said Main Canal northwesterly to its junction with Modesto Irrigation District Lateral Number 3;

17. Meander centerline of said Lateral No. 3 westerly to its junction with Modesto Irrigation District Lateral Number 4;

18. Meander centerline of said Lateral No. 4 southwest to its intersection with the boundary of the McHenry Avenue Stormdrain Basin, as defined by the City of Modesto, in Modesto;

19. Meander the boundary of the said McHenry Avenue Stormdrain Basin to its intersection with the boundary of the Ninth Street Stormdrain Basin, as defined by the City of Modesto, in Modesto;

20. Meander boundary of the said Ninth Street Stormdrain Basin to its intersection with the centerline of Franklin Street;

21. South on the centerline of Franklin Street to the intersection with the centerline of Locust Street;

22. West on the centerline of Locust Street to its intersection with the centerline of Modesto Irrigation District Lateral Number 5, were it extended west to intersect the centerline of said Lateral No. 5;

23. Meander centerline of said Lateral No. 5 southwesterly to its intersection with the centerline of Hart Road;

24. South on the centerline of said road to its junction with the centerline of Paradise Road;

25. West on the centerline of Paradise Road to its junction with the centerline of Shiloh Road;

26. Southerly 1.5 miles on the centerline of said Shiloh Road to the location where it bends to the due west;

27. Meander the drainage boundary of the Tuolumne River southeasterly to its intersection with the centerline of Turlock Irrigation District Lower Lateral Number 2;

28. Meander centerline of said Lateral No. 2 westerly to its junction with the centerline of Turlock Irrigation District Lateral Number 1;

29. Meander centerline of said Lateral No. 1 to its junction with the centerline of Ceres Main Canal;

30. Meander centerline of said Ceres Main Canal easterly to its junction with the centerline of Turlock Main Canal;

31. Meander centerline of said Turlock Main Canal easterly to its junction with the centerline of Highline Canal;

32. Meander centerline of said Highline Canal southerly to its intersection with the drainage boundary of Sand Creek approximately 2000 feet upstream of the intersection with Keyes Road in Stanislaus County;

33. Meander drainage boundary of Sand Creek such that it is included in the East Valley Floor back to its intersection with the centerline of Highline Canal approximately one half mile southeast of the intersection of Hickman Road and Monte Vista Avenue in Stanislaus County;

34. Meander centerline of said Highline Canal southwest to its intersection with the drainage divide between Turlock Irrigation District Cross Ditch Number 1 and Turlock Irrigation District Cross Ditch Number 2 approximately 0.33 miles southwest of the intersection of Santa Fe Drive with the Merced County line;

35. Meander said drainage divide southwesterly to its intersection with the centerline of Turlock Irrigation District Lateral Number 6 at the junction of the centerlines of Turlock Main Canal, Turlock Irrigation District Lateral Number 5 (Harding Drain), and said Lateral No. 6;

36. Meander centerline of said Lateral No. 6 southwesterly to its junction with the centerline of Turlock Irrigation District Lateral Number 7;

37. Meander centerline of said Lateral No. 7 southwesterly to its junction with the centerline of Stevinson Lower Lateral;

38. Meander centerline of said Stevinson Lower Lateral southwesterly to its intersection with the centerline of an unnamed aqueduct approximately one quarter of one mile west of the intersection of Tegner Road and Taylor Avenue in Merced County;

39. Westerly on the centerline of said aqueduct to its junction with the centerline of the Merced River at its apparent point of discharge;

40. Meander centerline of the Merced River to its junction with the centerline of an unnamed canal pumped from the river less than one fifth of a mile downstream of the discharge point of the unnamed aqueduct;

41. Northwest on centerline of said unnamed canal to its intersection with the centerline of an unnamed unpaved road parallel to the Merced River, which begins nearly at the pump on the river;

42. Meander the centerline of said road westerly to its junction with the centerline of Kelley Road;

43. South on the centerline of Kelley Road to its intersection with the centerline of River Road;

44. Southeast on centerline of said River Road to its intersection with the centerline of the East Side Canal;

45. Meander centerline of said East Side Canal northeasterly to its intersection with a line due east coincident with the ninety degree bend in River Road in Section 4, Township 7 South, Range 14 East, Mount Diablo Meridian;

46. East on said line to its intersection with the centerline of River Road in Merced County;

47. Northeasterly on centerline of said River Road to its intersection with the West Side Boulevard, were said road extended to intersect River Road;

48. East on centerline of said West Side Boulevard to its junction with the centerline of Weir Road in Merced County;

49. Northeast to the junction of the centerlines of Magnolia Avenue and Howard Avenue in Merced County;

50. East on centerline of said Magnolia Avenue to its intersection with the southern drainage boundary of the Garibaldi Lateral;

51. Meander said southern boundary of Garibaldi Lateral to its intersection with the centerline of Hammatt Lateral at its junction with the centerline of Arena Canal near Livingston;

52. South on said drainage boundary of Bear Creek to its intersection with the centerline of the East Side Irrigation Canal, also known as the East Side Bypass Project, near said canal's junction with Howard Lateral;

53. Southwesterly on the drainage boundary of the San Joaquin River upstream of its intersection with Lander Avenue (Highway 165) to its intersection with the centerline of the San Joaquin River at its intersection with the centerline of Lander Avenue (Highway 165);

54. Meander centerline of said San Joaquin River northwesterly to its junction with the centerline of the Stanislaus River and the point of beginning of this description.


**North Stanislaus Minor Subarea**

BEGINNING at the junction of the Stanislaus River and the San Joaquin River lying in Section 19, Township 3 South, Range 7 East, Mount Diablo Meridian; thence along the following courses:

1. Meander the centerline of the Stanislaus River northeasterly upstream to its intersection with boundary of Calwater RBUASPW area 6535100000 (Manteca Hydrologic Area) near Caswell Memorial State Park;

2. North on the said boundary of Calwater RBUASPW area 6535100000 (Manteca Hydrologic Area) near Caswell Memorial State Park to its intersection with the centerline of a road located slightly more than one half mile north of the river;

3. East on centerline of said road to its junction with the centerline of the north levee of the Stanislaus River;

4. Southwesterly on centerline of said Stanislaus River levee to its intersection with the centerline of the park road connecting to the campsites, were said road extended to intersect the levee;

5. Easterly on said road to the point of intersection with a line perpendicular from the bank of the Stanislaus River directly opposite of Campsite number 24;

6. North-Northeasterly on said perpendicular line to its intersection with the centerline of the Stanislaus River;

7. East to the intersection with the crest of the ridge parallel to the opposite side of the river bend from the Caswell Memorial State Park;

8. Southeast on said ridge to its intersection with the centerline of the south bank levee of the Stanislaus River;

9. Meander centerline of said levee northeasterly to its intersection with the centerline of Modesto Irrigation District Lateral Number 6;

10. Meander centerline of said Main Canal southeasterly to its junction with the centerline of Thompson Lateral;

11. Meander centerline of said Thompson Lateral northerly to its junction with the centerline of Stowell Lateral;

12. Meander centerline of said Stowell Lateral northeasterly to its junction with the centerline of Claribel Lateral;

13. Meander centerline of said Claribel Lateral southerly to its junction with the centerline of Dry Creek;

14. Meander centerline of Dry Creek westerly to its intersection with the centerline of Modesto Main Canal;

15. Meander centerline of said Main Canal northwesterly to its junction with Modesto Irrigation District Lateral Number 3;

16. Meander centerline of said Lateral No. 3 westerly to its junction with Modesto Irrigation District Lateral Number 4;

17. Meander centerline of said Lateral No. 4 southwest to its intersection with the boundary of the McHenry Avenue Stormdrain Basin, as defined by the City of Modesto, in Modesto;

18. North, west, and south on the boundary of the said McHenry Avenue Stormdrain Basin to its intersection with the boundary of the Ninth Street Stormdrain Basin, as defined by the City of Modesto, in Modesto;

19. West and south on the boundary of the said Ninth Street Stormdrain Basin to its intersection with the centerline Highway 99;

20. Northwest on centerline of said Highway 99 to its intersection with the centerline of Woodland Avenue/Coldwell Avenue;

21. West on centerline on said centerline of Woodland Avenue to its intersection with the western boundary intersection of Sections 21 and 28, Township 3 South, Range 8 East, Mount Diablo Meridian;

22. North on boundary of Section 21, Township 3 South, Range 8 East, Mount Diablo Meridian to its intersection with the centerline of Modesto Irrigation District Lateral Number 3;

23. West on centerline of said Lateral No. 3 to its junction with the centerline of an unnamed lateral approximately one half mile downstream of the intersection with the section boundary;

24. Meander centerline of said unnamed canal southwesterly to its junction with the centerline of the north levee of Modesto Irrigation District Lateral Number 4 if it were extended to cross said unnamed canal;

25. Meander centerline of said levee of Lateral No. 4 westerly to its junction with the centerline of the eastern levee of Finnegan Cut on San Joaquin River;

26. Meander centerline of said levee of Finnegan Cut on the San Joaquin River to its intersection with the centerline of Maze Boulevard in Stanislaus County;

27. Westerly on centerline of said Maze Boulevard to its intersection with the centerline of the San Joaquin River;

28. Meander centerline of said San Joaquin River northerly to its intersection with the centerline of the Stanislaus River and the point of beginning of this description.

**Northeast Bank Minor Subarea**
BEGINNING at the centerline of the San Joaquin River at the Maze Boulevard Bridge lying in Section 29, Township 3 South, Range 7 East, Mount Diablo Meridian; thence along the following courses:

1. Easterly on centerline of said Maze Boulevard to its intersection with the centerline of the east bank levee of the San Joaquin River;

2. Meander centerline of said levee of the San Joaquin River southeasterly to its intersection with the north bank levee of Modesto Irrigation District Lateral Number 4;

3. Meander centerline of said levee of Lateral No. 4 easterly to its intersection with the centerline of an unnamed lateral connecting Lateral No. 3 and Lateral No. 4, were it extended east to said centerline;

4. Meander centerline of said unnamed lateral to its junction with the centerline of Modesto Irrigation District Lateral Number 3;

5. East on centerline of said Lateral No. 3 to its intersection with the western boundary of Section 21, Township 3 South, Range 8 East, Mount Diablo Meridian;

6. South on boundary of said Section 21 to its intersection with the centerline of Woodland Avenue;

7. East on the centerline of said Woodland Avenue to its intersection with the centerline of Highway 99;

8. Southeast on the centerline of said Highway 99 to its intersection with the centerline of Franklin Street;

9. South on the centerline of Franklin Street to the intersection with the centerline of the centerline of Locust Street;

10. West on the centerline of Locust Street to its intersection with the centerline of Modesto Irrigation District Lateral Number 5, were it extended west to intersect said Lateral No. 5;

11. Meander centerline of said Lateral No. 5 southwesterly to its intersection with the centerline of Hart Road;

12. South on the centerline of said road to its junction with the centerline of Paradise Road;

13. West on the centerline of Paradise Road to its junction with the centerline of Shiloh Road;

14. South 1.5 miles on the centerline of said Shiloh Road to the location where it bends to the due west;

15. Meander the drainage boundary of the Tuolumne River southeasterly to its intersection with the centerline of Turlock Irrigation District Lower Lateral Number 2;

16. Meander centerline of said Lateral No. 2 westerly to its junction with the centerline of Turlock Irrigation District Lateral Number 1;

17. Meander centerline of said Lateral No. 1 to its junction with the centerline of Ceres Main Canal;

18. Meander centerline of said Ceres Main Canal easterly to its junction with the centerline of Turlock Main Canal;

19. Meander centerline of said Turlock Main Canal southerly to its junction with the centerline of Turlock Irrigation District Upper Lateral Number 3;

20. Meander centerline of said Lateral No. 3 westerly to its junction with the centerline of Turlock Irrigation District Lower Lateral Number 3;

21. West on centerline of said Lateral No. 3 to its intersection with the centerline of an unnamed lateral located approximately 3000 feet downstream of the Lateral No. 3 intersection with the centerline of Carpenter Road in Stanislaus County;

22. South on centerline of said unnamed lateral to its intersection with the centerline of Monte Vista Avenue in Stanislaus County;

23. Southwesterly on the drainage boundary separating the San Joaquin River from the unnamed drain and associated natural channel to its junction with the centerline of the east bank levee of the San Joaquin River;

24. Northwesterly on centerline of said levee of the San Joaquin River to its intersection with the drainage of the San Joaquin River upstream of West Main Street approximately 700 feet southeast of the intersection of the centerline of the east bank levee of the San Joaquin River and the centerline of West Main Street;

25. Northwesterly on drainage boundary of the San Joaquin River upstream of Las Palmas Avenue in Stanislaus County to its intersection with the centerline of the San Joaquin River at its intersection with the centerline of Las Palmas Avenue;

26. Northwesterly on the centerline of said San Joaquin River to its intersection with the centerline of Maze Boulevard and the point of beginning of this description.

**Stevinson Minor Subarea**

BEGINNING at the centerline of the San Joaquin River at its junction with the centerline of the Merced River lying in Section 03, Township 07 South, Range 09 East, Mount Diablo Meridian; thence along the following courses:

1. East on centerline of Hills Ferry Road to its intersection with the centerline of River Road in Merced County;

2. Southeast on centerline of said River Road to its intersection with the centerline of the East Side Canal;

3. Meander centerline of said East Side Canal northeasterly to its intersection with a line due east coincident with the ninety degree bend in River Road in Section 4, Township 7 South, Range 14 East, Mount Diablo Meridian;

4. East on said line to its intersection with the centerline of River Road in Merced County;

5. Northeasterly on centerline of said River Road to its intersection with the West Side Boulevard, were said road extended to intersect River Road;

6. East on centerline of said West Side Boulevard to its junction with the centerline of Weir Road in Merced County;

7. Northeast to the junction of the centerlines of Magnolia Avenue and Howard Avenue in Merced County;

8. East on centerline of said Magnolia Avenue to its intersection with the southern drainage boundary of the Garibaldi Lateral;

9. Meander said southern boundary of Garibaldi Lateral to its intersection with the centerline of Hammatt Lateral at its junction with the centerline of Arena Canal near Livingston;

10. South on said drainage boundary of Bear Creek to its intersection with the centerline of the East Side Irrigation Canal, also known as the East Side Bypass Project, near said canal's junction with Howard Lateral;

11. Southwesterly on the drainage boundary of the San Joaquin River upstream of its intersection with Lander Avenue (Highway 165) to its intersection with the centerline of the San Joaquin River at its intersection with the centerline of Lander Avenue (Highway 165);

12. Northwesterly on centerline of said San Joaquin River to its junction with the centerline of the Merced River and the point of beginning of this description.

**Turlock Area Minor Subarea**

BEGINNING at the centerline of the San Joaquin River at the intersection with the centerline of the Las Palmas Avenue Bridge lying in Section 15, Township 05 South, Range 08 East, Mount Diablo Meridian; thence along the following courses:

1.  Southeasterly on the drainage boundary of the San Joaquin River upstream of West Main Street in Stanislaus County to its intersection with the centerline of the east bank levee of the San Joaquin River approximately 700 feet southeast of the intersection of the centerline of said levee and the centerline of West Main Street;

2.  Southeasterly on centerline of said levee of the San Joaquin River to its intersection with the drainage boundary approximately 3500 feet south of the intersection of the centerline of Jennings Road and the centerline of West Main Street in Stanislaus County separating the San Joaquin River from an unnamed lateral and associated natural channel downstream of its intersection with the centerline with Monte Vista Avenue in Stanislaus County;

3.  Northwesterly on said drainage boundary to its intersection with the centerline of Monte Vista Avenue at its intersection with the centerline of the unnamed lateral;

4.  North on centerline of said unnamed lateral to its junction with the centerline of Turlock Irrigation District Lower Lateral Number 3 approximately 3000 feet downstream of said Lateral No. 3 intersection with the centerline of Carpenter Road in Stanislaus County;

5.  Meander centerline of said Lateral No.3 east to its junction with the centerline of Turlock Irrigation District Upper Lateral Number 3;

6.  Meander centerline of said Lateral No. 3 east to its junction with the centerline of Turlock Main Canal;

7.  Meander centerline of said Turlock Main Canal north to its junction with the centerline of Highline Canal;

8.  Meander centerline of said Highline Canal southerly to its intersection with the drainage boundary of Sand Creek approximately 2000 feet upstream of the intersection with Keyes Road in Stanislaus County;

9.  Meander drainage boundary of Sand Creek such that it is included in the East Valley Floor back to its intersection with the centerline of Highline Canal approximately one half mile southeast of the intersection of Hickman Road and Monte Vista Avenue in Stanislaus County;

10. Meander centerline of said Highline Canal southwest to its intersection with the drainage divide between Turlock Irrigation District Cross Ditch Number 1 and Turlock Irrigation District Cross Ditch Number 2 approximately 0.33 miles southwest of the intersection of Santa Fe Drive with the Merced County line;

11. Meander said drainage divide southwesterly to its intersection with the centerline of Turlock Irrigation District Lateral Number 6 at the junction of the centerlines of Turlock Main Canal, Turlock Irrigation District Lateral Number 5 (Harding Drain), and said Lateral No. 6;

12. Meander centerline of said Lateral No. 6 southwesterly to its junction with the centerline of Turlock Irrigation District Lateral Number 7;

13. Meander centerline of said Lateral No. 7 southwesterly to its junction with the centerline of Stevinson Lower Lateral;

14. Meander centerline of said Stevinson Lower Lateral southwesterly to its intersection with the centerline of an unnamed aqueduct approximately one quarter of one mile west of the intersection of Tegner Road and Taylor Avenue in Merced County;

15. Westerly on the centerline of said aqueduct to its junction with the centerline of the Merced River at its apparent point of discharge;

16. Meander centerline of the Merced River to its junction with the centerline of an unnamed canal pumped from the river less than one fifth of a mile downstream of the discharge point of the unnamed aqueduct;

17. Northwest on centerline of said unnamed canal to its intersection with the centerline of an unnamed unpaved road parallel to the Merced River, which begins nearly at the pump on the river;

18. Meander the centerline of said road westerly to its junction with the centerline of Kelley Road;

19. South on the centerline of Kelley Road to its intersection with the centerline of Hills Ferry/River Road;

20. West on centerline of said Hills Ferry Road to its intersection with the centerline of the San Joaquin River;

21. Meander centerline of said San Joaquin River northwesterly to its intersection with the centerline of West Main Street and the point of beginning of this description.

## Grassland Subarea

BEGINNING at the junction of the Newman Wasteway and the San Joaquin River lying in Section 10, Township 7 South, Range 9 East, Mount Diablo Meridian; thence along the following courses:

1. Meander the centerline of the San Joaquin River southeasterly upstream to its junction with the jurisdictional boundary of Columbia Canal Company;
2. West and south on the jurisdictional boundary of Columbia Canal Company to its intersection with the San Joaquin River;
3. Meander said centerline of the San Joaquin River easterly to its intersection with the center point of the Mendota Pool;
4. Meander the centerline of the Fresno Slough channel southerly to its intersection with the centerline of the Firebaugh Canal Water District Main Lift;
5. West southwest on the centerline of said Main Lift to its intersection with the centerline of the Firebaugh Canal Water District Third Lift Canal;
6. Northwesterly and westerly on the boundary of Westlands Water District, as defined by said district, to its intersection with the southern drainage boundary of Capita Canyon;
7. Meander on said drainage boundary of Capita Canyon southwesterly to its intersection with the southern drainage boundary of Moreno Gulch;
8. Meander on said drainage boundary of Moreno Gulch westerly to its intersection with southern drainage boundary of Little Panoche Creek;
9. Meander on said drainage boundary of Little Panoche Creek northwesterly to its intersection with the county line between Fresno and San Benito counties where the county line crosses the southern boundary of Section 31, Township 14 South, Range 11 East, Mount Diablo Meridian;
10. Northwesterly on the San Benito County line to its intersection with the crest of the Coast Range;
11. Meander on the crest of the Coast Range north-northwesterly to its intersection with the peak of Mustang Peak, where the drainage divide between Orestimba Creek and Garzas Creek diverges from crest of the Coast Range;
12. Meander on said drainage boundary of Garzas Creek westerly to point where the drainage of Garzas Creek and Bennett Valley diverge;
13. Meander said southern boundary of Bennett Valley and associated watersheds to its intersection with the centerline of Eastin Road in Merced County;
14. North on centerline of said Eastin Road to its intersection with the centerline of the first and southern-most of the associated creeks of Bennett Valley, just south of its junction with Moorehead Road;
15. Meander centerline of said creek northeasterly to its intersection with the centerline of Central California Irrigation District's Main Canal;
16. Meander centerline of said Main Canal northwesterly to its intersection with the centerline of the Newman Wasteway;
17. East on centerline of said Newman Wasteway to its junction with the centerline of the San Joaquin River and the point of beginning of this description.

## Merced River Subarea

BEGINNING at the intersection of the centerline of the Merced River and the centerline of River Road lying in Section 3, Township 7 South, Range 9 East, Mount Diablo Meridian; thence along the following courses:

1. West on centerline of said River Road to its intersection with the centerline of Kelley Road;
2. North on centerline of said Kelley Road to its intersection with the centerline of an unnamed, unpaved road approximately 4000 feet north of the intersection of Kelley Road and River Road;
3. Meander centerline of said unnamed road to its intersection with the centerline of an unnamed lateral pumped from the Merced River;
4. Southeast on the centerline of said unnamed lateral to its intersection with the centerline of the Merced River;
5. Meander centerline of the Merced River to the discharge point of an unnamed aqueduct located less than one fifth of a mile upstream of the pump on said unnamed lateral;
6. Easterly on centerline of said aqueduct to its intersection with the centerline of Stevinson Lower Lateral;

7. Meander centerline of said Stevinson Lower Lateral northwesterly to its junction with the centerline of Turlock Irrigation District Lateral Number 7;

8. Meander centerline of said Lateral No. 7 northeasterly to its junction with the centerline of Turlock Irrigation District Lateral Number 6;

9. Meander centerline of said Lateral No. 6 northeasterly to its intersection with the drainage divide between Turlock Irrigation District Cross Ditch Number 1 and Turlock Irrigation District Cross Ditch Number 2 at the junction of the centerlines of Turlock Main Canal, Turlock Irrigation District Lateral Number 5 (Harding Drain), and said Lateral No. 6;

10. Meander said drainage northeasterly to its intersection with the centerline of Highline Canal approximately 0.33 miles southwest of the intersection of Santa Fe Drive with the Merced County line;

11. Meander centerline of said Highline Canal north to its junction with the centerline of Turlock Main Canal;

12. Meander drainage boundary of unnamed creeks draining easterly toward Highline Canal and to the Merced River via said canal southeasterly to its intersection with the drainage boundary of Sand Creek;

13. Meander said drainage boundary of Sand Creek southwesterly to its intersection with the centerline of Highline Canal approximately 2000 feet upstream of the intersection with Keyes Road;

14. Meander centerline of said Highline Canal southerly to its intersection with the southern drainage boundary of Sand Creek, approximately one half mile southeast of the intersection of Hickman Road and Monte Vista Avenue in Stanislaus County;

15. Meander said drainage boundary of Sand Creek easterly to its junction with the unnamed interior drainage basin west of Turlock Lake;

16. Meander said interior drainage basin northeasterly to its junction with the southern drainage boundary of Turlock Lake;

17. Meander said drainage boundary of Turlock Lake northeasterly to its junction with the southern drainage boundary of Peaslee Creek;

18. Meander said drainage boundary of Peaslee Creek northeasterly to its junction with the southern drainage boundary of Evans Creek;

19. Meander said drainage boundary of Evans Creek northeasterly to its junction with the southern drainage boundary of Vizard Creek;

20. Meander said drainage boundary of Vizard Creek easterly to its intersection with the Stanislaus County line, near the four-corner intersection of Stanislaus, Tuolumne, Merced, and Mariposa counties;

21. Southeast on said Stanislaus County line to its intersection with the Merced County line;

22. Southeasterly on the Merced County line to its intersection with the drainage boundary between Merced River and Burns Creek;

23. Meander said drainage boundary of Burns Creek southwesterly to its junction with the drainage boundary of Black Rascal Creek;

24. Meander said drainage boundary of Black Rascal Creek northwesterly to its junction with the drainage boundary of Stoney Creek;

25. Meander said drainage boundary of Stoney Creek northerly to its intersection with the centerline of the Merced River;

26. Meander centerline of said Merced River westerly to its junction with the centerline of the Merced Irrigation District Main Canal;

27. Meander centerline of said Main Canal southwesterly, excluding any creeks or canals flowing into it, to its intersection with the southern drainage boundary of Edendale Creek;

28. Meander said drainage boundary of Edendale Creek southwesterly to its junction with the drainage boundary of Canal Creek;

29. Meander said drainage boundary of Canal Creek southerly to its intersection with the centerline of Bellevue Road near Castle Airport in Merced County;

30. West on centerline of said Bellevue road to its intersection with the centerline of Canal Creek, were it extended to intersect said creek;

31. Southerly on the centerline of said Canal Creek to the point of divergence between Canal Creek and Livingston Canal;

32. Meander centerline of said Livingston Canal westerly to its junction with a small, unnamed creek south of Castle Gardens, approximately 1000 feet downstream of Buhach Road in Merced County;

33. Meander centerline of said unnamed creek southerly to its intersection with northern boundary of Section 7, Township 7 South, Range 13 East, Mount Diablo Meridian;

34. West on said section boundary to its intersection with the centerline of Sierra Madre Drive in the City of Atwater in Merced County, were it extended to intersect said section;

35. North on centerline of said Sierra Madre Drive to its junction with the centerline of Juniper Avenue in the City of Atwater in Merced County;

36. West on centerline of said Juniper Avenue to its junction with the centerline of Shaffer Road in the City of Atwater in Merced County;

37. North on centerline of said Shaffer Road to its junction with the centerline of Bellevue Road in the City of Atwater in Merced County;

38. West on centerline of said Bellevue Road to its intersection with the southeast corner of the subdivision boundary near the intersection with Bellevue Road and 5th Street in the City of Atwater in Merced County;

39. North on boundary of said subdivision to its intersection with the centerline Fruitland Avenue in the City of Atwater in Merced County, near its intersection with Chardonnay Way;

40. West on centerline of said Fruitland Avenue to its intersection with the western boundary of the subdivision lying south of said avenue;

41. South on the boundary of said subdivision to its intersection with the centerline of Bellevue Road in the City of Atwater in Merced County, near its intersection with 7th Street;

42. West on centerline of said Bellevue Road to its junction with the centerline of Winton Way in the City of Atwater in Merced County;

43. North on centerline of said Winton Way to its junction with the centerline of Fruitland Avenue in the City of Atwater in Merced County;

44. Meander centerline of said Fruitland Avenue northwesterly to its junction with the centerline of Vine Avenue in Merced County;

45. North on centerline of said Vine Avenue to its intersection with the centerline of the Livingston Canal;

46. Meander centerline of said Livingston Canal northwesterly to its junction with the centerline of Arena Canal;

47. Meander centerline of said Arena Canal southeasterly to the point of divergence between Arena Canal and the Wakefield Lateral on the west side of the intersection between Arena Canal and Cressy Way in Merced County;

48. Meander drainage divide between said Arena Canal and Wakefield Lateral westerly to its intersection with the centerline of the Hammatt Lateral;

49. Meander southern drainage boundary of Garibaldi Lateral southwesterly to its intersection with the centerline of Magnolia Avenue in Merced County;

50. West on centerline of said Magnolia Avenue to its junction with the centerline of Howard Avenue in Merced County;

51. Southwest to the junction of the centerlines of West Side Boulevard and Weir Avenues;

52. West on centerline of said West Side Boulevard to its intersection with the centerline of River Road, were it extended to intersect said road;

53. Southwesterly on centerline of said River Road to point that said road makes a ninety degree bend to the south in Section 4, Township 7 South, Range 14 East, Mount Diablo Meridian;

54. Due West to the intersection with the centerline of the East Side Canal;

55. Meander centerline of said East Side Canal southwesterly to its intersection with the centerline of River Road in Merced County;

56. West on centerline of said River Road to its intersection with the centerline of the Merced River and the point of beginning of this description.

**Northwest Side Subarea**

BEGINNING at the intersection of the centerline of the San Joaquin River and the centerline of the Airport Way Bridge lying in Section 13, Township 3 South, Range 6 East, Mount Diablo Meridian; thence along the following courses:

1. Southeasterly on centerline of said San Joaquin River to its junction with the centerline of the Newman Wasteway;

2.  Southwesterly on centerline of said Newman Wasteway to its intersection with the centerline of Central California Irrigation District's Main Canal;

3.  Southeasterly on centerline of said Main Canal to its junction with the centerline of the discharge point of an unnamed creek approximately 2200 feet downstream of the Newman Wasteway;

4.  Southwesterly on centerline of said unnamed creek to its intersection with Eastin Road in Stanislaus County;

5.  South on centerline of said Eastin Road to its intersection with the southern drainage boundary of the unnamed creek approximately 500 feet south of said road's junction with Pete Miller Road in Stanislaus County;

6.  Meander said southern drainage boundary of unnamed creek southwesterly to its junction with the drainage boundary of Garzas Creek;

7.  Meander said drainage boundary of Garzas Creek to its intersection with Mustang Peak, at which point the drainage boundary and Garzas Creek becomes the crest of the Coast Range;

8.  Meander said crest of the Coast Range northwesterly to its intersection with the drainage boundary of Hospital Creek;

9.  Meander said drainage boundary of Hospital Creek northerly to its intersection with the drainage boundary of Lone Tree Creek;

10. Meander drainage boundary of Lone Tree Creek northeasterly, excluding Lone Tree Creek, to its intersection with the centerline of Bird Road in San Joaquin County;

11. North on centerline of said Bird Road to its intersection with the centerline of Lone Tree Creek;

12. Northerly on the centerline of Lone Tree Creek to its intersection with the centerline of Vernalis Road in San Joaquin County;

13. East on centerline of said Vernalis Road to its intersection with a known underground gas pipeline approximately 2700 feet east of Koster Avenue;

14. Northeast on said gas pipeline to its intersection with the centerline of Durham Ferry Road in San Joaquin County;

15. Northeast on said centerline of Durham Ferry Road to its intersection with the centerline of the San Joaquin River at the Airport Way Bridge and the point of beginning of this description.


**Greater Orestimba Minor Subarea**

BEGINNING at the centerline of the San Joaquin River at the intersection with the centerline of the Las Palmas Avenue Bridge lying in Section 15, Township 05 South, Range 08 East, Mount Diablo Meridian; thence along the following courses:

1.  Southeasterly on centerline of said San Joaquin River to its junction with the centerline of the Newman Wasteway;

2.  Southwesterly on centerline of said Newman Wasteway to its intersection with the centerline of Central California Irrigation District's Main Canal;

3.  Southeasterly on centerline of said Main Canal to its junction with the centerline of the discharge point of an unnamed creek approximately 2200 feet downstream of the Newman Wasteway;

4.  Southwesterly on centerline of said unnamed creek to its intersection with Eastin Road in Merced County;

5.  South on centerline of said Eastin Road to its intersection with the southern drainage boundary of the unnamed creek approximately 500 feet south of said road's junction with Pete Miller Road in Merced County;

6.  Meander said southern drainage boundary of unnamed creek southwesterly to its junction with the drainage boundary of Garzas Creek;

7.  Meander said drainage boundary of Garzas Creek to its intersection with Mustang Peak, the point at which said drainage of Garzas Creek intersects the crest of the Coast Range;

8.  Meander said crest of the Coast Range northwesterly to its intersection with the northern drainage boundary of Orestimba Creek;

9.  Meander said drainage boundary of Orestimba Creek easterly to its intersection with the drainage boundary of Little Salado Creek near Oaks Flat Ranch;

10. Meander said drainage boundary of Little Salado Creek northeasterly to its intersection with the centerline of Elfers Road at its intersection with the centerline of Del Puerto Avenue in Stanislaus County near Patterson;

11. East on centerline of said Elfers Road to its intersection with the centerline of Highway 33;

12. Northwest on centerline of said Highway 33 to its intersection with the centerline of Patterson Main Canal;

13. Northeast on centerline of said Patterson Main Canal to its intersection with the centerline of Las Palmas Avenue in Stanislaus County;

14. Northeast on centerline of said Las Palmas Avenue to its intersection with the centerline of the San Joaquin River and the point of beginning of this description.


**Vernalis North Minor Subarea**

BEGINNING at the intersection of the centerline of the San Joaquin River and the centerline of the Airport Way Bridge lying in Section 13, Township 3 South, Range 6 East, Mount Diablo Meridian; thence along the following courses:

1. Southeasterly on centerline of said San Joaquin River to its intersection with the centerline of an unnamed, unpaved road approximately 250 feet south of Maze Boulevard in Stanislaus County, north of the El Solyo Lift, were said unnamed, unpaved road extended to intersect the centerline of the San Joaquin River;

2. Southwest on centerline of said unnamed, unpaved road to its junction with the centerline of McCracken Road in Stanislaus County near Vernalis;

3. South on centerline of said McCracken Road to its junction with the centerline of Blewett Road in San Joaquin County;

4. West on centerline of said Blewett Road to its intersection with the centerline of Lone Tree Creek;

5. Northerly on the centerline of Lone Tree Creek to its intersection with the centerline of Vernalis Road in San Joaquin County;

6. East on centerline of said Vernalis Road to its intersection with a known underground gas pipeline approximately 2700 feet east of Koster Avenue;

7. Northeast on said gas pipeline to its intersection with the centerline of Durham Ferry Road in San Joaquin County;

8. Northeast on said centerline of Durham Ferry Road to its intersection with the centerline of the San Joaquin River at the Airport Way Bridge and the point of beginning of this description.


**Westside Creeks Minor Subarea**

BEGINNING at the centerline of the San Joaquin River at the Maze Boulevard Bridge lying in Section 29, Township 3 South, Range 7 East, Mount Diablo Meridian; thence along the following courses:

1. Meander centerline of said San Joaquin River southeasterly to its intersection with the centerline of Las Palmas Avenue in Stanislaus County near Patterson;

2. Southwesterly on centerline of said Las Palmas Avenue to its intersection with the centerline of the Patterson Main Canal;

3. Southwesterly on centerline of said Patterson Main Canal to its intersection with the centerline of Highway 33 in Stanislaus County near Patterson;

4. Southeast on centerline of said Highway 33 to its intersection with the centerline of Elfers Road;

5. West on centerline of said Elfers Road to its intersection with the centerline of Del Puerto Avenue;

6. Meander the drainage boundary of Little Salado Creek southwesterly to its intersection with drainage boundary of Orestimba Creek;

7. Meander said drainage boundary of Orestimba Creek southwesterly to its intersection with intersects the hydrologic divide of the San Joaquin River basin in the Coast Range, heretofore referred to as the crest of the Coast Range;

8. Meander said crest of the Coast Range northwesterly to its intersection with the northern drainage boundary of Hospital Creek;

9. Meander said drainage boundary of Hospital Creek northerly to its intersection with the drainage boundary of Lone Tree Creek;

10. Meander drainage boundary of Lone Tree Creek northwesterly to its intersection with the centerline of Blewett Road in San Joaquin County;

11. East on centerline of said Blewett Road to its junction with the centerline of McCracken Road in Stanislaus County near Vernalis;

12. North on McCracken Road to its junction with an unnamed, unpaved road approximately 1000 feet north of said Blewett Road;

13. Norteasterly on said unnamed, unpaved road to its intersection with the centerline of the San Joaquin River, were it extended to intersect said river;

14. Northerly on said San Joaquin River to its intersection with the centerline of Maze Boulevard in Stanislaus County and the point of beginning of this description;

**San Joaquin River Upstream of Salt Slough Subarea**

BEGINNING at the centerline of the San Joaquin River at its intersection with the centerline of Lander Avenue (Highway 165) in Merced County lying in Section 27, Township 07 South, Range 10 East, Mount Diablo Meridian; thence along the following courses:

1. Northeasterly on the drainage boundary of the San Joaquin River upstream of its intersection with Lander Avenue (Highway 165) to its intersection with the centerline of the East Side Irrigation Canal near said canal's junction with Howard Lateral;

2. Meander the drainage boundary of Bear Creek northeasterly to its intersection with centerline of Arena Canal at its junction with Hammatt Lateral near Livingston;

3. Meander to drainage divide between Arena Canal and Wakefield Lateral easterly to its intersection with the centerline of Arena Canal at the point of divergence between said canal and lateral near the intersection of Arena Canal and Cressy Way in Merced County;

4. Meander centerline of Arena Canal northwesterly to its junction with the centerline of Livingston Canal;

5. Meander centerline of Livingston Canal southeasterly to its intersection with the centerline of Vine Avenue in Merced County near Atwater;

6. South on centerline of said Vine Avenue to its junction with the centerline of Fruitland Avenue in the City of Atwater in Merced County;

7. Meander centerline of Fruitland Avenue southeasterly to its intersection with the centerline of Winton Way in the City of Atwater in Merced County;

8. South on centerline of said Winton Way to its junction with the centerline of Bellevue Road in the City of Atwater in Merced County;

9. East on centerline of said Bellevue Road to its intersection with the southwest corner of a subdivision near said road's intersection with 7th Street in the City of Atwater in Merced County;

10. North on the boundary of said subdivision to its intersection with the centerline of Fruitland Avenue in the City of Atwater in Merced County;

11. East on centerline of said Fruitland Avenue to its intersection with the eastern boundary of the subdivision lying south of said avenue, near the intersection with Chardonnay Way;

12. South on boundary of said subdivision to its intersection with the centerline of Bellevue Road in the City of Atwater in Merced County, near said road's intersection with 5th Street;

13. East on centerline of said Bellevue Road to its junction with the centerline of Shaffer Road in the City of Atwater in Merced County;

14. South on the centerline of said Shaffer Road to its junction with the centerline of Juniper Avenue in the City of Atwater in Merced County;

15. East on the centerline of said Juniper Avenue to its junction with the centerline of Sierra Madre Drive in the City of Atwater in Merced County;

16. South on the centerline of said Sierra Madre Drive to its intersection with the northern boundary of Section 7, Township 7 South, Range 13 East, Mount Diablo Meridian;

17. East on said section boundary to its intersection with the centerline of an unnamed creek about 750 feet before said section boundary intersects Buhach Road;

18. Meander centerline of said unnamed creek northerly to its junction with the centerline of the Livingston Canal;

19. Meander centerline of said Livingston Canal easterly to the point of divergence between Canal Creek and said canal;

20. Northerly on centerline of said Canal Creek to its intersection with the centerline of Bellevue Road in Merced County near Castle Airport;

21. East on centerline of said Bellevue Road to its intersection with the drainage boundary of Canal Creek near the intersection of Franklin Road and Bellevue Road in Merced County near Castle Airport;

22. Meander said drainage boundary of Canal Creek northerly to its junction with the drainage boundary of Edendale Creek;

23. Meander said drainage boundary of Edendale Creek northeasterly to its intersection with the centerline of Merced Irrigation District's Main Canal;

24. Meander centerline of said Main Canal northeasterly to its junction with the centerline of the Merced River, including any creeks and canals flowing into it along that length;

25. Meander centerline of said Merced River easterly to its intersection with the drainage boundary of Stoney Creek;

26. Meander said drainage boundary of Stoney Creek southerly to its junction with the drainage boundary of Black Rascal Creek;

27. Meander said drainage boundary of Black Rascal Creek southeasterly to its junction with the drainage boundary of Burns Creek;

28. Meander said drainage boundary of Burns Creek northeasterly to its intersection with the Merced County line;

29. Southeasterly on said Merced County line to its junction with Madera County line and Calwater 654530000 (Berenda Creek Hydrologic Area);

30. Southeasterly on the boundary of Calwater 654530000 (Berenda Creek Hydrologic Area) to its intersection with the centerline of the San Joaquin River at Friant Dam;

31. Southwesterly on centerline of said San Joaquin River to its intersection with the jurisdictional boundary of Columbia Canal Company;

32. Northwesterly on said boundary of Columbia Canal Company to its intersection with the centerline of the San Joaquin River;

33. Northwesterly on said San Joaquin River to its intersection with the centerline of Lander Avenue (Highway 165) and the point of beginning of this description.


**Bear Creek Minor Subarea**

BEGINNING at the centerline of the San Joaquin River at its intersection with the centerline of Lander Avenue (Highway 165) in Merced County lying in Section 27, Township 07 South, Range 10 East, Mount Diablo Meridian; thence along the following courses:

1. Northeasterly on the drainage boundary of the San Joaquin River upstream at its intersection with Lander Avenue (Highway 165) to its intersection with the centerline of the East Side Irrigation Canal near said canal's junction with Howard Lateral;

2. Meander the drainage boundary of Bear Creek northeasterly to its intersection with centerline of Arena Canal at its junction with Hammatt Lateral near Livingston;

3. Meander to drainage divide between Arena Canal and Wakefield Lateral easterly to its intersection with the centerline of Arena Canal at the point of divergence between said canal and lateral near the intersection of Arena Canal and Cressy Way in Merced County;

4. Meander centerline of Arena Canal northwesterly to its junction with the centerline of Livingston Canal;

5. Meander centerline of Livingston Canal southeasterly to its intersection with the centerline of Vine Avenue in Merced County near Atwater;

6. South on centerline of said Vine Avenue to its junction with the centerline of Fruitland Avenue in the City of Atwater in Merced County;

7. Meander centerline of Fruitland Avenue southeasterly to its intersection with the centerline of Winton Way in the City of Atwater in Merced County;

8. South on centerline of said Winton Way to its junction with the centerline of Bellevue Road in the City of Atwater in Merced County;

9. East on centerline of said Bellevue Road to its intersection with the southwest corner of a subdivision near said road's intersection with 7th Street in the City of Atwater in Merced County;

10. North on the boundary of said subdivision to its intersection with the centerline of Fruitland Avenue in the City of Atwater in Merced County;

11. East on centerline of said Fruitland Avenue to its intersection with the eastern boundary of the subdivision lying south of said avenue, near the intersection with Chardonnay Way;

12. South on boundary of said subdivision to its intersection with the centerline of Bellevue Road in the City of Atwater in Merced County, near said road's intersection with 5th Street;

13. East on centerline of said Bellevue Road to its junction with the centerline of Shaffer Road in the City of Atwater in Merced County;

14. South on the centerline of said Shaffer Road to its junction with the centerline of Juniper Avenue in the City of Atwater in Merced County;

15. East on the centerline of said Juniper Avenue to its junction with the centerline of Sierra Madre Drive in the City of Atwater in Merced County;

16. South on the centerline of said Sierra Madre Drive to its intersection with the northern boundary of Section 7, Township 7 South, Range 13 East, Mount Diablo Maridian;

17. East on said section boundary to its intersection with the centerline of an unnamed creek about 750 feet before said section boundary intersects Buhach Road;

18. Meander centerline of said unnamed creek northerly to its junction with the centerline of the Livingston Canal;

19. Meander centerline of said Livingston Canal easterly to the point of divergence between Canal Creek and said canal;

20. Northerly on centerline of said Canal Creek to its intersection with the centerline of Bellevue Road in Merced County near Castle Airport;

21. East on centerline of said Bellevue Road to its intersection with the drainage boundary of Canal Creek near the intersection of Franklin Road and Bellevue Road in Merced County near Castle Airport;

22. Meander said drainage boundary of Canal Creek northerly to its junction with the drainage boundary of Edendale Creek;

23. Meander said drainage boundary of Edendale Creek northeasterly to its intersection with the centerline of Merced Irrigation District's Main Canal;

24. Meander centerline of said Main Canal northeasterly to its junction with the centerline of the Merced River, including any creeks and canals flowing into it along that length;

25. Meander centerline of said Merced River easterly to its intersection with the drainage boundary of Stoney Creek;

26. Meander said drainage boundary of Stoney Creek southerly to its junction with the drainage boundary of Black Rascal Creek;

27. Meander said drainage boundary of Black Rascal Creek southeasterly to its junction with the drainage boundary of Burns Creek;

28. Meander said drainage boundary of Burns Creek northeasterly to its intersection with the Merced County line;

29. Meander said Merced County line southeasterly to its intersection with the northern drainage boundary of the Chowchilla River;

30. Westerly on said drainage boundary of Chowchilla River to its intersection with the centerline of Marguerite Road;

31. West on centerline of said Marguerite Road to its intersection with the jurisdictional boundary of Chowchilla Water District, as defined by said water district, were said road extended to intersect Chowchilla Water District jurisdictional boundary;

32. Meander said Chowchilla Water District jurisdictional boundary to its intersection with the jurisdictional boundary of El Nido Irrigation District (now operated by Merced Irrigation District) as it existed at the time it changed hands;

33. Meander said jurisdictional boundary of El Nido Irrigation District to its intersection with the centerline of Vineyard Road in Merced County near El Nido;

34. South on centerline of said Vineyard Road to its intersection with the centerline of West Washington Road, were both roads extended such that they would make an intersection;

35. West on centerline of said West Washington Road to its intersection with the centerline of the San Joaquin River at the bridge where Indiana Road intersects from the opposite direction;

36. Northwesterly on centerline of said San Joaquin River to its intersection with the centerline of Lander Avenue (Highway 165) and the point of beginning of this description.


**Fresno-Chowchilla Minor Subarea**

BEGINNING at the centerline of the San Joaquin River at its intersection the centerline of West Washington Road in Merced County lying in Section 31, Township 9 South, Range 13 East, Mount Diablo Meridian; thence along the following courses:

1. West on centerline of said West Washington Road to its intersection with the jurisdictional boundary of El Nido Irrigation District (now operated by Merced Irrigation District) as it existed at the time it changed hands;

2. Meander said jurisdictional boundary of El Nido Irrigation District to its intersection with the jurisdictional boundary of Chowchilla Water District, as defined by said water district;

3. Meander said jurisdictional boundary of Chowchilla Water District to its intersection with the centerline of Harvey Petit Road in Merced County near Le Grande;

4. East on centerline of said Harvey Petit Road to its intersection with the northern drainage boundary of the Chowchilla River, were said road extended to intersect the drainage boundary of the Chowchilla River;

5. Meander said drainage boundary of the Chowchilla River northeasterly to its intersection with the Merced County line;

6. Meander Merced County line southeasterly to its intersection with the Madera County line;

7. Southeasterly on the boundary of Calwater 654530000 (Berenda Creek Hydrologic Area) to its intersection with the centerline of the San Joaquin River at Friant Dam;

8. Southwesterly on centerline of said San Joaquin River to its intersection with the jurisdictional boundary of Columbia Canal Company;

9. Northwesterly on said boundary of Columbia Canal Company to its intersection with the centerline of the San Joaquin River;

10. Northwesterly on said San Joaquin River to its intersection with the land boundary south of the confluence with Mariposa Slough in Merced County that denotes the beginning of agricultural production south of said confluence with Mariposa Slough, were the land boundary extended to said centerline of the San Joaquin River, and the point of beginning of this description.

## Stanislaus River Subarea

BEGINNING at the centerline of the parking slip of Campsite number 24 in Caswell Memorial State Park lying in Section 02, Township 03 South, Range 07 East, Mount Diablo Meridian, at its intersection with the centerline of the Stanislaus River, were the centerline of said parking slip extended to intersect the Stanislaus River; thence along the following courses:

1. Southwesterly on centerline of said parking slip to its intersection with the centerline of the main road connecting the campsites with the park entrance, were the centerline of said parking slip extended to said main road;

2. Westerly on centerline of said main park road to its intersection with the centerline of the north levee of the Stanislaus River, were the centerline of said main park road extended to intersect the centerline of the levee;

3. Meander centerline of said Stanislaus River levee northeasterly to its intersection with the centerline of Mohler Road at the point where said road bends west to become Moncure Road in San Joaquin County near Ripon, were the centerline of Mohler Road extended to intersect the centerline of said levee;

4. North on centerline of said Mohler Road to its intersection with the centerline of an unnamed canal underground a short distance south of the location at which Mohler Road bends to the east toward Ripon;

5. Meander centerline of said unnamed canal northerly to its junction with an unnamed canal approximately one quarter mile south of the intersection of Highland Avenue and Kamps Way in the City of Ripon in San Joaquin County;

6. Meander centerline of said unnamed canal northeasterly to its junction with the centerline of South San Joaquin Main District Canal;

7. Meander centerline of said Main District Canal northeasterly to its intersection with the centerline of Campbell Lateral;

8. Meander centerline of said Campbell Lateral southeasterly to its junction with the centerline of Tulloch Lateral;

9. Meander centerline of said Tulloch Lateral easterly to its intersection with the drainage boundary of Lone Tree Creek, approximately 3500 feet upstream of said lateral's intersection with Valley Home Road in Stanislaus County near Oakdale;

10. Meander said drainage boundary of Lone Tree Creek northeasterly to its intersection with the centerline of Twentysix Mile Road in Stanislaus County near Oakdale, approximately one half mile north of said road's intersection with Tulloch Lateral;

11. North on said Twentysix Mile Road to its intersection with the centerline of Young Lateral;

12. Easterly on centerline of said Young Lateral to its junction with the centerline of the Cometa Lateral;

13. Southerly on centerline of said Cometa Lateral to its intersection with the drainage boundary of an unnamed watershed north of this location approximately one quarter mile downstream of said lateral's intersection with Frankenheimer Road in Stanislaus County near the Woodward Reservoir;

14. Meander said drainage boundary of unnamed watershed northerly to its junction with the northern drainage boundary of the Cometa Lateral;

15. Meander said drainage boundary of Cometa Lateral northwesterly to its intersection with the centerline of Cometa Lateral approximately 1000 feet upstream of said lateral's intersection with Dodd Road in Stanislaus County near the Woodward Reservoir;

16. Northerly on centerline of said Cometa Lateral to its intersection with the South San Joaquin Water District's Main District Canal;

17. Meander centerline of said Main District Canal northeasterly to its junction with Woodward Reservoir;

18. Meander natural drainage boundary between Woodward Reservoir and Littlejohn's Creek easterly to its intersection with the centerline of Oakdale Irrigation District's North Main Canal, excluding Simmons Creek at the intersection of said North Main Canal and South San Joaquin Water District's Main District Canal;

19. Meander centerline of said North Main Canal easterly to its intersection with Little John's Dam;

20. Meander drainage boundary of Little John's Creek and its tributaries northeasterly to its intersection with the Stanislaus County line;

21. Southeast on said Stanislaus County line to its intersection with the southern drainage boundary of Wildcat Creek;

22. Meander said drainage boundary of Wildcat Creek southwesterly to its junction with the drainage boundary of Cashman Creek;

23. Meander said drainage boundary of Cashman Creek upstream of Cashman Dam southwesterly to its intersection with the centerline of Oakdale South Main Canal;

24. Meander centerline of said Oakdale South Main Canal southwesterly to its intersection with Sierra Railroad near Arnold Hill, approximately 1.25 miles northwest of said railroad's intersection with Fogarty Road in Stanislaus County;

25. Meander drainage boundary east of said Main Canal southeasterly to its intersection with the drainage boundary of Kearney Lateral;

26. Meander said drainage boundary of Kearney Lateral to its intersection with the centerline of Oakdale South Main Canal;

27. Meander centerline of said Oakdale South Main Canal westerly to its junction with the centerline of Claribel Lateral;

28. South on centerline of said Claribel Lateral to its junction with the centerline of Albers Lateral;

29. Meander centerline of said Albers Lateral southwesterly to its junction with the centerline of Stowell Lateral;

30. Meander centerline of said Stowell Lateral southwesterly to its junction with the centerline of Thompson Lateral;

31. Meander centerline of said Thompson Lateral southerly to its junction with the centerline of Modesto Irrigation District's Main Canal;

32. Meander centerline of said Modesto Main Canal northwesterly to its junction with the centerline of Modesto Irrigation District Lateral Number 6;

33. Meander centerline of said Lateral No. 6 westerly to its intersection with the centerline of the south bank levee of the Stanislaus River;

34. Meander said south bank levee westerly to its intersection with the crest of the ridge bordering the Stanislaus River on the peninsula opposite Caswell Memorial State Park;

35. Northwest on said crest to its intersection with a line due east from the intersection of the extension of the centerline of the slip of Campsite number 24 with the centerline of the Stanislaus River;

36. West on said line to its intersection with the centerline of the Stanislaus River and the point of beginning of this description.

**Tuolumne River Subarea**

BEGINNING at the intersection of the centerline of the Tuolumne River and the centerline of Shiloh Road in Stanislaus County lying in Section 7, Township 04 South, Range 08 East, Mount Diablo Meridian; thence along the following courses:

1.  North on centerline of said Shiloh Road to its intersection with the centerline of Paradise Road in Stanislaus County near Grayson;
2.  East on centerline of said Paradise Road to its intersection with the centerline of Hart Road in Stanislaus County near Modesto;
3.  North on centerline of said Hart Road to its intersection with the centerline of Modesto Irrigation District Lateral Number 5;
4.  Meander centerline of said Lateral No. 5 northeasterly to its intersection with the centerline of Locust Avenue in Stanislaus County, were it extended west to intersect the centerline of said Lateral No. 5;
5.  East on centerline of said Locust Avenue to its intersection with the centerline of Franklin Street;
6.  North on centerline of said Franklin Street to its intersection with the boundary of the Ninth Street Stormdrain Basin, as defined by the City of Modesto in Modesto;
7.  Meander boundary of said Ninth Street Stormdrain Basin to its intersection with the boundary of the McHenry Avenue Stormdrain Basin, as defined by the City of Modesto, in Modesto;
8.  Meander boundary of said McHenry Avenue Stormdrain Basin to its intersection with the centerline of Modesto Irrigation District Lateral Number 4;
9.  Meander centerline of said Lateral No. 4 northeast to its junction with the centerline of Modesto Irrigation District Lateral Number 3;
10. Meander centerline of said Lateral No. 3 to its junction with the centerline of Modesto Irrigation District Main Canal;
11. Meander centerline of said Main Canal southeasterly to its intersection with the centerline of Dry Creek;
12. Meander centerline of Dry Creek easterly to its junction with the centerline of Claribel Latereal;
13. Meander centerline of said Claribel Lateral northerly to its junction with the centerline of Oakdale South Main Canal;
14. Meander centerline of said Oakdale South Main Canal easterly to its intersection with the centerline of Kearney Lateral;
15. Meander drainage boundary of Kearney Lateral southeasterly to the point of divergence of the Kearny Lateral drainage boundary and the Oakdale South Main Canal;
16. Meander said drainage boundary of Oakdale South Main Canal downstream of its intersection with Sierra Railroad northeasterly to its intersection with the centerline of Oakdale South Main Canal at its intersection with the centerline of Sierra Railroad approximately one and one quarter mile northwest of said railroad's intersection with Fogarty Road in Stanislaus County near Oakdale;
17. Meander said Main Canal northeasterly to its intersection with Cashman Dam;
18. Meander drainage boundary of Cashman Creek upstream of Cashman Dam southeasterly to its intersection with the drainage boundary of Wildcat Creek;
19. Meander said drainage boundary of Wildcat Creek northeasterly to its intersection with the Stanislaus County line;
20. Southeast on said Stanislaus County line to its intersection with the drainage boundary of Vizard Creek;
21. Meander said drainage boundary of Vizard Creek southwesterly to its intersection with the drainage boundary of Goodwin Creek;
22. Meander said drainage boundary of Goodwin Creek southwesterly to its intersection with the drainage boundary of Evans Creek;
23. Meander said drainage boundary of Evans Creek southwesterly to its intersection with the drainage boundary of Peaslee Creek;
24. Meander said drainage boundary of Peaslee Creek southwesterly to its intersection with the drainage boundary of Turlock Lake;
25. Meander said drainage of Turlock Lake southwesterly to its intersection with the drainage boundary of an unnamed interior drainage area west of the Turlock Lake drainage basin;
26. Meander said unnamed drainage boundary southwesterly to its intersection with the drainage boundary of Sand Creek;

27. Meander said drainage boundary of Sand Creek northwesterly to its intersection with the drainage boundary of unnamed creeks draining easterly toward Highline Canal and to the Merced River via said canal;

28. Meander said drainage boundary of unnamed creeks to its intersection with the centerline of Turlock Irrigation District Main Canal;

29. Meander centerline of said Turlock Main Canal westerly to its junction with the centerline of Ceres Main Canal;

30. Meander centerline of said Ceres Main Canal westerly to its junction with the centerline of Turlock Irrigation District Lateral Number 1;

31. Meander centerline of said Lateral No. 1 southwesterly to its junction with the centerline of Turlock Irrigation District Lower Lateral Number 2;

32. Meander centerline of said Lateral No. 2 to the point at which said lateral bends from northwest to southwest approximately three quarters of one mile upstream of its intersection with Grayson Road;

33. Meander said drainage boundary of the Tuolumne River to its intersection with the centerline of Shiloh Road in Stanislaus County at the location where Shiloh Road makes a ninety degree turn to the west 1.5 miles south of its intersection with Paradise Road;

34. North on centerline of said Shiloh Road to its intersection with the centerline of the Tuolumne River and the point of beginning of this description.

Appendix 42 – Sacramento-San Joaquin Delta Waterways

This Appendix lists the Sacramento-San Joaquin Delta Waterways (Delta Waterways)(1) to which the site-specific diazinon and chlorpyrifos water quality objectives and implementation and monitoring provisions apply.  The following are distinct, readily identifiable waterbodies within the boundaries of the "Legal" Delta that are hydrologically connected by surface water flows (not including pumping) to the Sacramento and/or San Joaquin rivers.  Figures 1 and 2 show the locations of the Delta Waterways.

| | | | | |
|---|---|---|---|---|
| 1. | Alamo Creek | | 48. | Grizzly Slough |
| 2. | Babel Slough | | 49. | Haas Slough |
| 3. | Barker Slough | | 50. | Hastings Cut |
| 4. | Bear Creek | | 51. | Hog Slough |
| 5. | Bear Slough | | 52. | Holland Cut |
| 6. | Beaver Slough | | 53. | Honker Cut |
| 7. | Big Break | | 54. | Horseshoe Bend |
| 8. | Bishop Cut | | 55. | Indian Slough |
| 9. | Black Slough | | 56. | Italian Slough |
| 10. | Broad Slough | | 57. | Jackson Slough |
| 11. | Brushy Creek | | 58. | Kellogg Creek |
| 12. | Burns Cutoff | | 59. | Latham Slough |
| 13. | Cabin Slough | | 60. | Liberty Cut |
| 14. | Cache Slough | | 61. | Lindsey Slough |
| 15. | Calaveras River | | 62. | Little Connection Slough |
| 16. | Calhoun Cut | | 63. | Little Franks Tract |
| 17. | Clifton Court Forebay | | 64. | Little Mandeville Cut |
| 18. | Columbia Cut | | 65. | Little Potato Slough |
| 19. | Connection Slough | | 66. | Little Venice Island |
| 20. | Cosumnes River | | 67. | Livermore Yacht Club |
| 21. | Crocker Cut | | 68. | Lookout Slough |
| 22. | Dead Dog Slough | | 69. | Lost Slough |
| 23. | Dead Horse Cut | | 70. | Main Canal |
| 24. | Deer Creek | | | (Duck Slough tributary) |
| | (Tributary to Marsh Creek) | | 71. | Main Canal |
| 25. | Delta Cross Channel | | | (Italian Slough tributary) |
| 26. | Disappointment Slough | | 72. | Marsh Creek |
| 27. | Discovery Bay | | 73. | Mayberry Cut |
| 28. | Donlon Island | | 74. | Mayberry Slough |
| 29. | Doughty Cut | | 75. | Middle River |
| 30. | Dry Creek | | 76. | Mildred Island |
| | (Marsh Creek tributary) | | 77. | Miner Slough |
| 31. | Dry Creek | | 78. | Mokelumne River |
| | (Mokelumne River tributary) | | 79. | Mormon Slough |
| 32. | Duck Slough | | 80. | Morrison Creek |
| 33. | Dutch Slough | | 81. | Mosher Slough |
| 34. | Elk Slough | | 82. | Mountain House Creek |
| 35. | Elkhorn Slough | | 83. | North Canal |
| 36. | Emerson Slough | | 84. | North Fork Mokelumne River |
| 37. | Empire Cut | | 85. | North Victoria Canal |
| 38. | Fabian and Bell Canal | | 86. | Old River |
| 39. | False River | | 87. | Paradise Cut |
| 40. | Fisherman's Cut | | 88. | Piper Slough |
| 41. | Fivemile creek | | 89. | Pixley Slough |
| 42. | Fivemile Slough | | 90. | Potato Slough |
| 43. | Fourteenmile Slough | | 91. | Prospect Slough |
| 44. | Franks Tract | | 92. | Red Bridge Slough |
| 45. | French Camp Slough | | 93. | Rhode Island |
| 46. | Georgiana Slough | | 94. | Rock Slough |
| 47. | Grant Line Canal | | 95. | Sacramento Deep Water Channel |

| | | | | |
|---|---|---|---|---|
| 96. | Sacramento River | | 126. | Tomato Slough |
| 97. | Salmon Slough | | 127. | Trapper Slough |
| 98. | San Joaquin River | | 128. | Turner Cut |
| 99. | Sand Creek | | 129. | Ulatis Creek |
| 100. | Sand Mound Slough | | 130. | Upland Canal |
| 101. | Santa Fe Cut | | | (Sycamore Slough Tributary) |
| 102. | Sevenmile Slough | | 131. | Victoria Canal |
| 103. | Shag Slough | | 132. | Walker Slough |
| 104. | Sheep Slough | | 133. | Walthall Slough |
| 105. | Sherman Lake | | 134. | Washington Cut |
| 106. | Short Slough | | 135. | Werner Dredger Cut |
| 107. | Smith Canal | | 136. | West Canal |
| 108. | Snodgrass Slough | | 137. | Whiskey Slough |
| 109. | South Fork Mokelumne River | | 138. | White Slough |
| 110. | Steamboat Slough | | 139. | Winchester Lake |
| 111. | Stockton Deep Water Channel | | 140. | Woodward Canal |
| 112. | Stone Lakes | | 141. | Wright Cut |
| 113. | Sugar Cut | | 142. | Yosemite Lake |
| 114. | Sutter Slough | | 143. | Yolo Bypass (not labeled)(2) |
| 115. | Sweany Creek | | 144. | Deuel Drain |
| 116. | Sycamore Slough | | 145. | Dredger Cut |
| 117. | Taylor Slough | | 146. | Highline Canal |
| | (Elkhorn Slough tributary) | | | |
| 118. | Taylor Slough | | | |
| | (near Franks Tract) | | | |
| 119. | Telephone Cut | | | |
| 120. | The Big Ditch | | | |
| 121. | The Meadows Slough | | | |
| 122. | Three River Reach | | | |
| 123. | Threemile Slough | | | |
| 124. | Toe Drain | | | |
| 125. | Tom Paine Slough | | | |

*Footnotes:*
*(1) The Delta Waterways include only those reaches that are located within the "Legal" Delta, as defined in Section 12220 of the California Water Code.*

*(2) When flooded, the entire Yolo Bypass is a Delta Waterway. When the Yolo Bypass is not flooded, the Toe Drain is the only Delta Waterway within the Yolo Bypass.*

Appendix 42 – Sacramento-San Joaquin Delta Waterways



**Figure 1. Delta Waterways, Northern Panel**

Appendix 42 – Sacramento-San Joaquin Delta Waterways



**Figure 2. Delta Waterways, Southern Panel**

Table A43-1 lists the Sacramento-San Joaquin Delta waterways and the Yolo Bypass waterways within the Delta and north of the legal Delta boundary to which the COMM beneficial use, site-specific methylmercury fish tissue objectives, Delta mercury control implementation program, and monitoring provisions apply.  The list contains distinct, readily identifiable water bodies within the boundaries of the "Legal" Delta (as defined in California Water Code section 12220) that are hydrologically connected by surface water flows (not including pumping) to the Sacramento and/or San Joaquin rivers.  The list also includes Knights Landing Ridge Cut, Putah Creek, and Tule Canal in the Yolo Bypass north of the legal Delta boundary.  Figures A43-1, A43-2, and A43-3 show the locations of these waterways.

The methylmercury allocations set forth in the Delta methylmercury control program are specific to Delta subareas, which are shown on Figure A43-4.  Table A43-2 lists the waterways within each of the subareas.

### TABLE A43-1: DELTA AND YOLO BYPASS WATERWAYS

| Map Label # / Waterway Name | | Map Label # / Waterway Name | |
|---|---|---|---|
| 1. | Alamo Creek | 44. | Franks Tract |
| 2. | Babel Slough | 45. | French Camp Slough |
| 3. | Barker Slough | 46. | Georgiana Slough |
| 4. | Bear Creek | 47. | Grant Line Canal |
| 5. | Bear Slough | 48. | Grizzly Slough |
| 6. | Beaver Slough | 49. | Haas Slough |
| 7. | Big Break | 50. | Hastings Cut |
| 8. | Bishop Cut | 51. | Hog Slough |
| 9. | Black Slough | 52. | Holland Cut |
| 10. | Broad Slough | 53. | Honker Cut |
| 11. | Brushy Creek | 54. | Horseshoe Bend |
| 12. | Burns Cutoff | 55. | Indian Slough |
| 13. | Cabin Slough | 56. | Italian Slough |
| 14. | Cache Slough | 57. | Jackson Slough |
| 15. | Calaveras River | 58. | Kellogg Creek |
| 16. | Calhoun Cut | 59. | Latham Slough |
| 17. | Clifton Court Forebay | 60. | Liberty Cut |
| 18. | Columbia Cut | 61. | Lindsey Slough |
| 19. | Connection Slough | 62. | Little Connection Slough |
| 20. | Cosumnes River | 63. | Little Franks Tract |
| 21. | Crocker Cut | 64. | Little Mandeville Cut |
| 22. | Dead Dog Slough | 65. | Little Potato Slough |
| 23. | Dead Horse Cut | 66. | Little Venice Island |
| 24. | Deer Creek (Tributary to Marsh Creek) | 67. | Livermore Yacht Club |
| 25. | Delta Cross Channel | 68. | Lookout Slough |
| 26. | Disappointment Slough | 69. | Lost Slough |
| 27. | Discovery Bay | 70. | Main Canal (Duck Slough tributary) |
| 28. | Donlon Island | 71. | Main Canal (Italian Slough tributary) |
| 29. | Doughty Cut | 72. | Marsh Creek |
| 30. | Dry Creek (Marsh Creek tributary) | 73. | Mayberry Cut |
| 31. | Dry Creek (Mokelumne River tributary) | 74. | Mayberry Slough |
| 32. | Duck Slough | 75. | Middle River |
| 33. | Dutch Slough | 76. | Mildred Island |
| 34. | Elk Slough | 77. | Miner Slough |
| 35. | Elkhorn Slough | 78. | Mokelumne River |
| 36. | Emerson Slough | 79. | Mormon Slough |
| 37. | Empire Cut | 80. | Morrison Creek |
| 38. | Fabian and Bell Canal | 81. | Mosher Slough |
| 39. | False River | 82. | Mountain House Creek |
| 40. | Fisherman's Cut | 83. | North Canal |
| 41. | Fivemile Creek | 84. | North Fork Mokelumne River |
| 42. | Fivemile Slough | 85. | North Victoria Canal |
| 43. | Fourteenmile Slough | 86. | Old River |

**TABLE A43-1: DELTA AND YOLO BYPASS WATERWAYS, *Continued***

| Map Label # / Waterway Name | | Map Label # / Waterway Name | |
|---|---|---|---|
| 87. | Paradise Cut | 120. | The Big Ditch |
| 88. | Piper Slough | 121. | The Meadows Slough |
| 89. | Pixley Slough | 122. | Three River Reach |
| 90. | Potato Slough | 123. | Threemile Slough |
| 91. | Prospect Slough | 124. | Toe Drain |
| 92. | Red Bridge Slough | 125. | Tom Paine Slough |
| 93. | Rhode Island | 126. | Tomato Slough |
| 94. | Rock Slough | 127. | Trapper Slough |
| 95. | Sacramento Deep Water Channel | 128. | Turner Cut |
| 96. | Sacramento River | 129. | Ulatis Creek |
| 97. | Salmon Slough | 130. | Upland Canal (Sycamore Slough |
| 98. | San Joaquin River | | tributary) |
| 99. | Sand Creek | 131. | Victoria Canal |
| 100. | Sand Mound Slough | 132. | Walker Slough |
| 101. | Santa Fe Cut | 133. | Walthall Slough |
| 102. | Sevenmile Slough | 134. | Washington Cut |
| 103. | Shag Slough | 135. | Werner Dredger Cut |
| 104. | Sheep Slough | 136. | West Canal |
| 105. | Sherman Lake | 137. | Whiskey Slough |
| 106. | Short Slough | 138. | White Slough |
| 107. | Smith Canal | 139. | Winchester Lake |
| 108. | Snodgrass Slough | 140. | Woodward Canal |
| 109. | South Fork Mokelumne River | 141. | Wright Cut |
| 110. | Steamboat Slough | 142. | Yosemite Lake |
| 111. | Stockton Deep Water Channel | 143. | Yolo Bypass |
| 112. | Stone Lakes | 144. | Deuel Drain |
| 113. | Sugar Cut | 145. | Dredger Cut |
| 114. | Sutter Slough | 146. | Highline Canal |
| 115. | Sweany Creek | 147. | Cache Creek Settling Basin Outflow |
| 116. | Sycamore Slough | 148. | Knights Landing Ridge Cut |
| 117. | Taylor Slough (Elkhorn Slough tributary) | 149. | Putah Creek |
| 118. | Taylor Slough (near Franks Tract) | 150. | Tule Canal |
| 119. | Telephone Cut | | |



Figure A43-1: Delta Waterways (Northern Panel)

Appendix 43 - Delta and Yolo Bypass Waterways Applicable to the Delta Mercury Control Program



Figure A43-2: Delta Waterways (Southern Panel)



Figure A43-3: Northern Yolo Bypass

Appendix 43 - Delta and Yolo Bypass Waterways Applicable to the Delta Mercury Control Program



Figure A43-4: Subareas for the Delta Methylmercury Control Program

**TABLE A43-2: DELTA AND YOLO BYPASS WATERWAYS BY**
**METHYLMERCURY ALLOCATION SUBAREA**

| Waterway Name [Map Label #] | Waterway Name [Map Label #] | Waterway Name [Map Label #] |
|---|---|---|
| **CENTRAL DELTA** | | |
| Bear Creek [4] | Indian Slough [55] | San Joaquin River [98] |
| Bishop Cut [8] | Italian Slough [56] | Sand Mound Slough [100] |
| Black Slough [9] | Jackson Slough [57] | Santa Fe Cut [101] |
| Brushy Creek [11] | Kellogg Creek [58] | Sevenmile Slough [102] |
| Burns Cutoff [12] | Latham Slough [59] | Sheep Slough [104] |
| Calaveras River [15] | Little Connection Slough [62] | Short Slough [106] |
| Clifton Court Forebay [17] | Little Franks Tract [63] | Smith Canal [107] |
| Columbia Cut [18] | Little Mandeville Cut [64] | Stockton Deep Water Channel [111] |
| Connection Slough [19] | Little Potato Slough [65] | Taylor Slough [nr Franks Tract] [118] |
| Dead Dog Slough [22] | Little Venice Island [66] | Telephone Cut [119] |
| Disappointment Slough [26] | Livermore Yacht Club [67] | Three River Reach [122] |
| Discovery Bay [27] | Main Canal [Indian Slough trib.] [71] | Threemile Slough [123] |
| Dredger Cut [145] | Middle River [75] | Tomato Slough [126] |
| Empire Cut [37] | Mildred Island [76] | Trapper Slough [127] |
| Fabian and Bell Canal [39] | Mokelumne River [78] | Turner Cut [128] |
| False River [39] | Mormon Slough [79] | Upland Canal [Sycamore Slough |
| Fisherman's Cut [40] | Mosher Slough [81] | tributary] [130] |
| Fivemile Creek [41] | North Canal [83] | Victoria Canal [131] |
| Fivemile Slough [42] | North Victoria Canal [85] | Washington Cut [134] |
| Fourteenmile Slough [43] | Old River [86] | Werner Dredger Cut [135] |
| Franks Tract [44] | Piper Slough [88] | West Canal [136] |
| Grant Line Canal [47] | Pixley Slough [89] | Whiskey Slough [137] |
| Highline Canal [146] | Potato Slough [90] | White Slough [138] |
| Holland Cut [52] | Rhode Island [93] | Woodward Canal [140] |
| Honker Cut [53] | Rock Slough [94] | Yosemite Lake [142] |
| **MOKELUMNE/COSUMNES RIVERS** | | |
| Bear Slough [5] | Dry Creek [Mokelumne R. trib.] [31] | Lost Slough [69] |
| Cosumnes River [20] | Grizzly Slough [48] | Mokelumne River [78] |
| **MARSH CREEK** | | |
| Deer Creek [24] | Main Canal [Indian Slough trib.] [71] | Rock Slough [94] |
| Dry Creek [Marsh Creek trib.] [30] | Marsh Creek [72] | Sand Creek [99] |
| Kellogg Creek [58] | | |
| **SACRAMENTO RIVER** | | |
| Babel Slough [2] | Little Potato Slough [65] | Stone Lakes [112] |
| Beaver Slough [6] | Lost Slough [69] | Sutter Slough [114] |
| Cache Slough [14] | Main Canal [Duck Slough trib.] [70] | Sycamore Slough [116] |
| Dead Horse Cut [23] | Miner Slough [77] | Taylor Slough [Elkhorn Slough |
| Delta Cross Channel [25] | Mokelumne River [78] | tributary] [117] |
| Duck Slough [32] | Morrison Creek [80] | The Meadows Slough [121] |
| Elk Slough [34] | North Mokelumne River [84] | Tomato Slough [126] |
| Elkhorn Slough [35] | Sacramento River [96] | Upland Canal [Sycamore Slough |
| Georgiana Slough [46] | Snodgrass Slough [108] | tributary] [130] |
| Hog Slough [51] | South Mokelumne River [109] | Winchester Lake [139] |
| Jackson Slough [57] | Steamboat Slough [110] | |

**TABLE A43-2: DELTA AND YOLO BYPASS WATERWAYS BY METHYLMERCURY ALLOCATION SUBAREA,** *Continued*

| Waterway Name [Map Label #] | Waterway Name [Map Label #] | Waterway Name [Map Label #] |
|---|---|---|
| **SAN JOAQUIN RIVER** | | |
| Crocker Cut [21] | Middle River [75] | San Joaquin River [98] |
| Deuel Drain [144] | Mountain House Creek [82] | Sugar Cut [113] |
| Doughty Cut [29] | Old River [86] | Tom Paine Slough [125] |
| Fabian and Bell Canal [38] | Paradise Cut [87] | Walker Slough [132] |
| French Camp Slough [45] | Red Bridge Slough [92] | Walthall Slough [133] |
| Grant Line Canal [47] | Salmon Slough [97] | |
| **WEST DELTA** | | |
| Big Break [7] | Horseshoe Bend [54] | San Joaquin River [98] |
| Broad Slough [10] | Marsh Creek [72] | Sand Mound Slough [100] |
| Cabin Slough [13] | Mayberry Cut [73] | Sherman Lake [105] |
| Donlon Island [28] | Mayberry Slough [74] | Taylor Slough [near Franks |
| Dutch Slough [33] | Rock Slough [94] | Tract] [118] |
| Emerson Slough [36] | Sacramento River [96] | Threemile Slough [123] |
| False River [39] | | |
| **YOLO BYPASS-NORTH** [a] | | |
| Cache Creek Settling Basin | Toe Drain [124]/Tule Canal [150] | Sacramento Deep Water Ship |
| Outflow [147] | Putah Creek [149]] | Channel [95] |
| Knights Landing Ridge Cut [148] | | |
| **YOLO BYPASS-SOUTH** [a] | | |
| Alamo Creek [1] | Liberty Cut [60] | Sweany Creek [115] |
| Babel Slough [2] | Lindsey Slough [61] | Sycamore Slough [116] |
| Barker Slough [3] | Lookout Slough [68] | The Big Ditch [120] |
| Cache Slough [14] | Miner Slough [77] | Toe Drain [124] |
| Calhoun Cut [16] | Prospect Slough [91)] | Ulatis Creek [129] |
| Duck Slough [32] | Sacramento Deep Water Ship | Wright Cut [141] |
| Haas Slough [49] | Channel [95] | |
| Hastings Cut [50] | Shag Slough [103] | |

(a) Both the "Yolo Bypass-North" and "Yolo Bypass-South" subareas contain portions of the Yolo Bypass flood conveyance channel shown in Figure IV-4. When flooded, the entire Yolo Bypass is a Delta waterway. When the Yolo Bypass is not flooded, the Toe Drain [127] (referred to as Tule Canal [C] for its northern reach), Cache Creek Settling Basin Outflow [A], and Knights Landing Ridge Cut [B] are the only waterways within the Yolo Bypass hydrologically connected to the Sacramento River.

Appendix 44
Water Bodies That Meet One or More of the
Sources of Drinking Water Policy (Resolution 88-63) Exceptions

| County | Water Body Name | Description | Approximate GIS Coordinates (WGS84 Datum) | |
|---|---|---|---|---|
| | | | Starting Location | Ending Location |
| Butte | Cherokee Canal | Cherokee Canal runs southwest from the Richvale area (near Nelson Shippee Road) to Butte Creek, west of the City of Live Oak | (39.537741, -121.707079) | (39.285685, -121.921656) |
| Butte | Lateral K | Lateral K is part of Reclamation District 833 and starts near 8th Street in the City of Biggs and travels southwest past the City of Bigg's Wastewater Treatment Plant to the Main Drainage Canal | (39.421894, -121.71297) | (39.406837, -121.725361) |
| Butte | Main Drainage Canal | The Main Drainage Canal (also known as the Main Drain C) is part of Reclamation District 833 and starts on the south end of the City of Biggs near Trent Street and runs southwest to the Cherokee Canal | (39.41041, -121.704258) | 39.327924, -121.882067 |
| Colusa | New Ditch (2011) | New Ditch (2011) starts near the south end of the Colusa Wastewater Treatment Plant and runs south, parallel to the unnamed tributary, until the two water bodies join near the effluent outfall and weir. | (39.180224, -122.031358) | (39.174267, -122.031274) |
| Colusa | Powell Slough | Powell Slough begins just north of Highway 20, downstream of Hopkins Slough, and runs south until its confluence with the Colusa Basin Drain. | (39.211133, -122.062955) | (39.161267, -122.038445) |
| Colusa | Sulphur Creek | Lower two miles from Schoolhouse Canyon to its confluence with Little Bear Creek. | 39.035631, -122.437619 | 39.040144, -122.408168 |
| Colusa | unnamed tributary (to Powell Slough) | unnamed tributary to Powell Slough starts near Will S. Green Avenue and runs west and southwest to Powell Slough | (39.188028, -122.02328) | (39.166857, -122.034722) |
| Glenn | Ag Drain C | Glenn-Colusa Irrigation District's Ag Drain C (segments also known as North Fork Logan Creek and Logan Creek) runs southeast from Highway 5 near Highway 99W through the Sacramento Wildlife Refuge to the Colusa Basin Drain | (39.498519, -122.199216) | (39.356401, -122.082675) |
| Sutter | East Interceptor Canal | The East Interceptor Canal starts at Pease Road and runs west until it meets the Wadsworth Canal. | (39.170745, -121.670588) | (39.171003, -121.727014) |

Appendix 44

Water Bodies That Meet One or More of the
Sources of Drinking Water Policy (Resolution 88-63) Exceptions

| County | Water Body Name | Description | Approximate GIS Coordinates *(WGS84 Datum)* | |
|---|---|---|---|---|
| | | | **Starting Location** | **Ending Location** |
| Sutter | Lateral 1 | Lateral 1 is part of Reclamation District 777 and starts near the City of Live Oak's Wastewater Treatment Plant and runs south and west to the Western Intercepting Canal. | (39.257501, -121.678718) | (39.201248, -121.696329) |
| Sutter | Lateral 2 | Lateral 2 is part of Reclamation District 777. It starts on the south end of the City of Live Oak near Treatment Plant Access Road and runs south and then west past the City of Live Oak's Treatment Plant outfall until it meets Lateral 1. | (39.264739, -121.669314) | (39.257501, -121.678718) |
| Sutter | Western Intercepting Canal *(not to be confused with West Interceptor Canal)* | Western Interceptor Canal is under shared management between Reclamation District 777 and Reclamation District 2056. It starts south of Sanders Road and runs south until it meets the East Interceptor Canal. | (39.201248, -121.696329) | (39.17092, -121.695374) |
| Sutter | Wadsworth Canal | The Wadsworth Canal starts just north of Butte House Road and runs southwest until it meets the Sutter Bypass | (39.171003,-121.727014) | (39.113605,-121.768985) |