1  ANDREW L. PACKARD (Bar No. 168690)
   andrew@packardlawoffices.com
2  WILLIAM N. CARLON (Bar No. 305739)
   wncarlon@packardlawoffices.com
3  Law Offices of Andrew L. Packard
   245 Kentucky Street, Suite B3
4  Petaluma, CA 94952
   Tel: (707) 782-4060
5

6  Attorneys for Plaintiff
   CALIFORNIA SPORTFISHING PROTECTION ALLIANCE
7  [additional counsel next page]

                  **UNITED STATES DISTRICT COURT**
8                 **EASTERN DISTRICT OF CALIFORNIA**
                  **ROBERT T. MATSUI FEDERAL COURTHOUSE**
9

10 CALIFORNIA SPORTFISHING          Case No.: 2:20-cv-02482-WBS-AC
   PROTECTION ALLIANCE,
11                                  **PLAINTIFF CALIFORNIA**
            Plaintiff,              **SPORTFISHING PROTECTION**
12      v.                          **ALLIANCE'S OPPOSITION TO**
                                    **DEFENDANTS' MOTION FOR SUMMARY**
13 KATHLEEN ALLISON, in her official **JUDGMENT**
   capacity as Secretary of the
14 California Department of          Judge: Hon. William B. Shubb
   Corrections and Rehabilitation
15                                  Date: January 9, 2022
            Defendant              Time: 1:30 p.m.
16 _____     Courtroom: 5
   COUNTY OF AMADOR, a public agency
17 of the State of California       Action Filed: December 15, 2020
                                    Trial Date:  April 18, 2023
18          Plaintiff,
       v.
19
   KATHLEEN ALLISON in her official
20 capacity as Secretary of the
   California Department of
21 Corrections and Rehabilitation;
   PATRICK COVELLO in his official
22 capacity of Warden of California
   Department of Corrections and
23 Rehabilitation Mule Creek State
   Prison,
24
            Defendants
25 JASON FLANDERS (Bar No. 238007)

26

jrf@atalawgroup.com
ERICA MAHARG (Bar No. 279396)
eam@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Tel. (916) 202-3018


Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION
ALLIANCE

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**I.   INTRODUCTION** ............................................... **8**

**II.  FACTUAL BACKGROUND** ....................................... **10**

A.   Mule Creek State Prison MS4 ............................. 10

B.   The Regional Board's Initial Investigation into Reports of Discharges from the Facility.................................. 12

C.   Small MS4 Permit Coverage and 13383 Orders .............. 13

D.   Defendants' Stormwater and Receiving Water Sampling ...... 14

   1.   Sampling at MCSP2 and MCSP3 (April 2019-Dec. 2020) ...... 14

   2.   Sampling at MCSP5 and MCSP6 (Jan. 2021-March 2022) ...... 15

   3.   Reports of Ongoing Discharges at MCSP2 and MCSP3 ........ 16

E.   Defendants' Non-Stormwater Discharges ................... 16

   *1.*   Defects in the MS4 and Sanitary Sewer System ........... 16

   2.   Other Non-Stormwater Discharges........................ 17

F.   Limited Implementation of Best Management Practices ...... 18

**III. STANDARD OF REVIEW** ....................................... **19**

**IV.  ARGUMENT** ................................................. **20**

A.   Whether Violations of the Small MS4 Permit Were Ongoing at the Time the Complaint Was Filed Is a Disputed Fact.......... 20

B.   Background and Non-Human Sources of Contamination Do Not Excuse Defendants' Violations of the Small MS4 Permit........ 25

C.   The Arguments Defendants Make Related to Provision D — Receiving Water Limitations — Are Irrelevant to the Court's Analysis of Violations...................................... 26

   1.   Provision D Does Not Require CSPA to Show Mule Creek Is or Should Be Listed under the 303(d) .......................... 27

   2.   CSPA Need Not Show that Defendants Are the Sole Cause of *E. Coli* or Metals in Mule Creek. ............................... 28

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

3.   Engaging in the Iterative Process Does Not Excuse
Violations of Provision D. ................................ 29

D.   Defendants Improperly Interpret Provision B.1 by Limiting
the Types of Waste Prohibited by the Basin Plan.............. 31

E.   Whether or Not the Discharges Cause or Threaten to Cause a
Condition of Pollution or Nuisance in Violation of Provision B.2
Is a Disputed Question of Fact for Trial..................... 36

F.   There Are Numerous Disputes of Material Fact as to
Defendants' Violations of Provision B.3..................... 38

  1.   The Regional Board Has Found Defendants Have Discharged
  Wastewater from the MS4; and CSPA's Evidence Supports that
  Conclusion. .............................................. 39

  2.   Defendants Admit that Irrigation Water (i.e., Non-
  Stormwater) Has Discharged and Continues to Discharge through
  the MS4 Due to Defects in the Irrigation System. ............ 41

  3.   Defendants Have Not Effectively Prohibited the Identified
  Sources of Non-Stormwater. ................................ 41

G.   Defendants Misstate Plaintiff CSPA's Claim Regarding the
Land Application Areas........................................ 44

**V.     CONCLUSION** .............................................. **46**

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Federal Cases**

*Ambat v. City & County of San Francisco*, 757 F.3d 1017 (9th Cir. 2014) ................................................ 20, 25

*Baykeeper v. Kramer Metals, Inc.,* 619 F.Supp.2d 914 (C.D. Cal. 2009) ...................................................... 28

*Cal. Sportfishing Protection Alliance v. Chico Scrap Metal,* 124 F.Supp.3d 1007 (E.D. Cal. 2015)............................... 28

*Cal. Sportfishing Protection Alliance v. River City Waste Recyclers*, 205 F.Supp.3d 1128 (E.D. Cal 2016)................. 28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................. 20

*Chesapeake Bay Found. v. Gwaltney*, 844 F.2d 170 (4th Cir. 1988) 21, 25

*Defenders of Wildlife v. Browner,* 191 F.3d 1159 (9th Cir. 1999). 43

*Gwaltney of Smithfield v. Chesapeake Bay Found.,* 484 U.S. 49 (1987) ........................................................ 21

*Hall v. Hall*, 138 S. Ct. 1118 (2018) .......................... 44

*Hawaii Wildlife Fund v. Cnty. of Maui*, 550 F.Supp.3d 871 (D. Haw. 2021) ...................................................... 40

*Hawaii's Thousand Friends v. City and Cty. of Honolulu*, 821 F.Supp. 1368 (D. Haw. 1993).................................. 31

*Nat. Res. Def. Council v. Texaco Ref. & Mktg. Inc.,* 2 F.3d 493 (3d Cir. 1993) ................................................ 21

*NRDC v. Cnty of Los Angeles*, 673 F.3d 880 (9th Cir. 2011) ...... 30

*NRDC v. Cty. of L.A.,* 725 F.3d 1194, 1204 (9th Cir. 2013) ...... 28

*Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979 (9th Cir. 1995) ...................................................... 29

*Piney Run Pres. Ass'n v. Cty. Comm'rs.*, 268 F.3d 255, 270 (4th Cir. 2001) ................................................ 28

*S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) .................................................... 20, 25

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Sierra Club v. Union Oil*, 853 F.2d 667 (9th Cir. 1988) ......... 21

*TW Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*, 809 F.2d 626, (9th Cir. 1987) ......................... 20

**Federal Statutes**

33 U.S.C. § 1251(a) ......................................... 34

33 U.S.C. § 1312(a) ......................................... 34

33 U.S.C. § 1313 (2)(A) ..................................... 37

33 U.S.C. § 1313(d) ..................................... passim

33 U.S.C. § 1342(p)(3)(B)(ii) ............................ 42, 43

33 U.S.C. § 1365 ............................................ 20

**Federal Rules**

Fed. R. Civ. P. 56(a) ....................................... 19

**State Cases**

*Bldg. Indus. Assn. of San Diego Cty. v. State Water Res. Control Bd.*, 124 Cal.App.4th 866, 885 (2004) ......................... 43

*Santa Clara Valley Water Dist. v. Cal. Regional Water Quality Control Bd.*, 59 Cal. App. 5th 199 (2020) ................. 32, 33

*Sweeney v. Cal. Reg'l Water Quality Control Bd.*, 61 Cal. App. 5th 1093 (2021) ......................................... 34, 38

**State Statutes**

Cal. Water Code § 13000 ..................................... 34

Cal. Water Code § 13050 ..................................... 36

Cal. Water Code § 13050(c) .................................. 32

Cal. Water Code § 13050(l)(1) ............................... 36

Cal. Water Code § 13050(m) .................................. 36

Cal. Water Code § 13050(m)(1) ............................... 37

Cal. Water Code § 13304(e) .................................. 35

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Cal. Water Code §§ 13050(l)-(m) ................................ 36

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.   **INTRODUCTION**

Since April 2019, Defendants have sampled the discharges from the municipal separate storm sewer system ("MS4") at Mule Creek State Prison ("Facility") to Mule Creek. Those sampling results consistently show that their MS4 discharges far exceed water quality standards ("WQS") for *E. coli*, a fecal indicator bacteria, and various toxic metals. The MS4 is regulated by, and must strictly comply with, the Small MS4 Permit, which requires compliance with WQS. Defendants move for summary judgment yet have provided absolutely no evidence that their discharges meet WQS or otherwise comply with the Small MS4 Permit. Instead, Defendants make a variety of unavailing arguments, which, at a minimum, show multiple disputes of fact or misstate the requirements of the Small MS4 Permit in an attempt to excuse their past and ongoing violations.

First, Defendants argue that Plaintiff California Sportfishing Protection Alliance ("CSPA") cannot show its violations are ongoing at the time the Complaint was filed. Yet post-Complaint sampling shows, at a minimum, a dispute of fact as to whether discharges exceeding WQS have reached Mule Creek. Moreover, Defendants have presented no evidence of actions taken before CSPA filed the Complaint to support a finding that violations are not likely to recur. As such, Defendants have failed to meet their high evidentiary burden as movants for summary judgment.

Second, Defendants' insistence that CSPA must account for 'background' and non-human sources of pollutants in the MS4 discharges at issue is a red herring because the *source* of the pollutants in their discharges is irrelevant to whether the

8

discharges violate the Small MS4 Permit. The WQS are not limited to *E. coli* derived from only human sources. Moreover, Defendants are responsible for controlling the levels of pollutants discharging from their MS4, regardless of the initial source.

Third, the Small MS4 Permit, Provision B.3, prohibits Defendants' discharges from causing <u>or</u> contributing to exceedances of WQS in Mule Creek. Provision B.3 applies regardless of whether Mule Creek is listed as impaired, and CSPA does not need to show that the Facility's discharges are the sole cause of an exceedance. Moreover, the Water Board, as well as Ninth Circuit precedent, has established that Defendants' engagement in an "iterative process" does not provide a "safe harbor" to violations of Provision B.3 (or any other permit provision).

Fourth, Defendants' discharge sampling demonstrates violations of Provision B.1 and B.2. With no evidence to support actual compliance with Provision B.1, Defendants attempt to define the problem away, arguing that their MS4 discharges are not "waste" when they plainly fall within the ambit of the Water Code definition. In relation to Provision B.2, Defendants confuse pollution and/or nuisance caused by the discharges, on the one hand, with the receiving water body's listing status on the 303(d)list of impaired water bodies. This argument ignores all the sampling results showing that Defendants' discharges to Mule Creek have exceeded WQS for metals and *E. coli,* and, therefore (as a matter of law or at least a disputed fact) threaten to "unreasonably affect" Mule Creek's beneficial uses or cause a nuisance.

Finally, Defendants' argument for summary judgment on CSPA's

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Provision B.3 claim (prohibiting discharges of "material other than storm water" from the MS4) is supported by just two contested studies and ignores all other evidence before the Court: years of Defendants' self-monitoring reports; the Central Valley Regional Water Quality Control Board's ("Regional Board's") investigation and findings that wastewater is commingled with stormwater in the MS4's discharges; the presence of pharmaceuticals and personal care products in the MS4 under dry conditions; Defendants' admission of irrigation system defects; and Defendants' deposition testimony establishing that Defendants have done nothing to address either source of non-stormwater.

In sum, Defendants have not come close to carrying their burden to show that summary judgment is warranted on any one of CSPA's claims, let alone all.

## II.   FACTUAL BACKGROUND

### A. Mule Creek State Prison MS4

The Facility's MS4 collects stormwater runoff and discharges directly to Mule Creek. *See* ECF No. 95-3 (2020 SHN Report) at 62-32. Stormwater at the Facility runs off of two drainage areas: the Main Drainage Basin and the Secondary Drainage Basin. *Id*. Runoff from both drainage basins is transported through the MS4, enters one of two vegetated areas (which Defendants refer to as "bioswales"), and then discharges to Mule Creek at outfalls identified as MCSP2 and MCSP3. *Id.*; ECF No. 95-2 (Dfts. Separate Statement of Undisputed Facts), ¶¶ 21, 24; ECF No. 95-4 at ¶ 4; Maharg Decl., Ex. 2 (Orta Tr.) at 88:7-89:17 (identifying MCSP2 and MCSP3 as outfalls). The aerial figure pasted below shows the Facility, the MS4, and Mule

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT



MCSP0004089

Creek.

    The MS4 has slide gates located just before (i.e., upstream in the MS4) of the bioswales. ECF No. 95-2, ¶ 18. During dry weather, the slide gates are closed, and pumps direct some of the water in the MS4 to the wastewater treatment plant (WWTP). *Id.* The gates are not water-tight and do not prevent water in the MS4 from flowing through them. Maharg Decl., Ex. 2 (Orta Tr.) at 121:16-22.

    Two sampling points—MCSP5 and MCSP6—are located just after the

11

slide gates. ECF No. 95-2, ¶ 17; Maharg Decl., Ex. 2 (Orta Tr.) at 96:20-97:10. Defendants open the slide gates during rain events above 0.10" per hour or 0.30" over 24 hours. *Id.* at 54:6-55:3; *see* Maharg Decl., Ex. 3 at MCSP32969. Defendants must notify the Regional Board whenever they open the slide gates and <u>discharge to Mule Creek</u>. Maharg Decl., Ex. 2 (Orta Tr.) at 120:18-20; *id.*, Ex. 7 at MCSP32218.

**B. The Regional Board's Initial Investigation into Reports of Discharges from the Facility**

On December 28, 2017, the Regional Board received a citizen complaint notifying them of polluted discharges from the Facility. Maharg Decl., Ex. 5 at CALSPORT7466. The complainant reported that discharges to Mule Creek had occurred since August 2017 (in the dry season) and appeared "clear and jet black, sometimes with solids, and sometimes steaming hot." *Id.* Regional Board staff inspected the Facility on January 4, 2018 and determined that the discharges to Mule Creek were coming from the Facility's MS4. *Id.*

The Regional Board's samples from the MS4 indicated high levels of bacteria (i.e., total coliforms, *E. coli*, and fecal coliforms), metals, oil and grease, phosphorus, and orthophosphate (a constituent commonly found in sewage). *Id.* At CALSPORT7466-67. Based on the sampling results, Regional Board staff determined that "the water being discharged [from the MS4] into Mule Creek is, at least partially, wastewater commingled with contaminated storm water and/or gray water." *Id.* at CALSPORT7466. At that time, Defendants were not permitted to discharge from the Facility's MS4. On February 14, 2018, the Regional Board issued an order pursuant to California Water Code section 13267 ("13267 Order") requiring Defendants to

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

investigate the quality of the discharges, the sources of the discharges, and the condition of the MS4 and sanitary sewer system on site. *See, generally*, *id.*

**C. Small MS4 Permit Coverage and 13383 Orders**

Subsequently, the State Water Resources Control Board ("State Board") designated MCSP as a non-traditional MS4, requiring Defendants to seek coverage under the Small MS4 Permit. ECF No. 95-2, ¶¶ 4-5; ECF No. 95-8 at 457-58. Defendants have been permitted under the Small MS4 Permit since April 24, 2019. *Id.*

Since then, the Regional Board has issued a series of orders under California Water Code section 13383 ("13383 Orders") requiring Defendants to report sampling of their MS4 discharges and Mule Creek, irrigation flows, the volume of water in the MS4 sent to the WWTP, and rainfall. *See, generally,* Maharg Decl., Ex. 6 (Aug. 2020 13383 Order); Ex. 7 (Dec. 2020 13383 Order). The stated need for the 13383 Orders is:

> Due to potential water quality impacts to Mule Creek while the Facility's storm water control program is being fully developed and implemented and to ensure compliance with Small MS4 General Permit requirements, the Central Valley Water Board has determined that an interim monitoring and reporting program <u>is necessary to monitor storm water discharges from the Facility to Mule Creek</u>.

Maharg Decl., Ex. 6 at MCSP29084 (emphasis added). The 13383 Order issued in August 2020 required sampling of discharges at MCSP2 and MCSP3, which are "stormwater outfall[s] to Mule Creek." *Id.* at MCSP29087-88; ECF No. 95-2, ¶ 24. The 13383 Order also required these outfall samples to be analyzed for, *inter alia*, metals and *E. coli*. *Id.* Defendants were also required to notify the Regional Board within

13

24 hours of discharging to Mule Creek. *Id*. at MCSP29085.

The Regional Board revised the 13383 Order on December 22, 2020. *See* Maharg Decl., Ex. 7 (Dec. 2020 13383 Order). The sampling requirements remained largely the same. *See id*. at MCSP32218-21. However, the Order modified the "outfall monitoring" points to MCSP5 and MCSP6. *Id*. at MCSP32220.

In November 2021, the Regional Board again revised the 13383 Order. ECF No. 95-5, Ex. A, at 15. The Order notes that Defendants are installing permanent monitoring structures at MCSP2 and MCSP3. *Id*. at 16-17. The order requires Defendants to sample discharges at MCSP2 and MCSP3 as soon as the monitoring structures are installed, which was anticipated to be November 2021. *Id*. at 17, 20.

In addition to the outfall sampling, the 13383 Orders require sampling in Mule Creek downstream of the MS4 outfalls, at MCSP4. *Id*. at 29; ECF No. 95-2, ¶ 27.

**D. Defendants' Stormwater and Receiving Water Sampling**

       1. <u>Sampling at MCSP2 and MCSP3 (April 2019-Dec. 2020)</u>

Defendants sampled their stormwater discharges to Mule Creek at MCSP2 and MCSP3 from April 8, 2019 to December 17, 2020. *See* Maharg Decl., Ex. 1 (Ashby Decl.)[1], ¶¶ 10-11, 14; tbls. 2-3, 5. These samples demonstrate that Defendants' discharges to Mule Creek exceeded *E. coli* and metals WQS on 41 and 25 occasions, respectively, during that time period. *Id*. This sampling also showed that on 19 occasions during that time period, Mule Creek, downstream of the Facility at MPCS4, exceeded *E. coli* WQS on the same day the Facility's discharges

---

[1] For ease of the Court, CSPA attached the Declaration of Karen Ashby in Support of Plaintiffs' Motion for Summary Judgment, ECF No 45-4, as Exhibit 1 to the Maharg Declaration.

14

to Mule Creek contained *E. coli* above those standards. *See id.*, ¶ 12; tbl. 4. Mule Creek exceeded metals WQS on 14 days when the MS4 discharges also exceeded metals WQS. *See id.*, ¶ 15; tbl. 6.

2. <u>Sampling at MCSP5 and MCSP6 (Jan. 2021–March 2022)</u>

While Defendants were installing a permanent monitoring structure at MCSP2 and MCSP3, Defendants regularly reported that the MS4 had discharged to Mule Creek. *See* Maharg Decl., Exs. 8-18 (Discharge Notifications). On each of these occasions, Defendants sampled their discharges at MCSP5 and MCSP6. *See id.*

Sampling of these discharge events at MCSP5 and MCSP6 between January 2021 and March 2022 showed that Defendants' discharges to Mule Creek exceeded *E. coli* and metals WQS on 9 and 77 occasions, respectively. Maharg Decl., Ex. 1 (Ashby Decl.), ¶¶ 17, 20; tbls. 8, 10. This sampling also showed that on 5 occasions during that time period, Mule Creek, downstream of the Facility at MPCS4, exceeded *E. coli* WQS on the same day the Facility's discharges contained *E. coli* above those standards. *See id.*, ¶ 19; tbl. 9. Mule Creek, again, downstream of the Facility at MPCS4, exceeded metals WQS on 29 days when the MS4 discharges also exceeded metals WQS. *See id.*, ¶ 21; tbl. 11.

In November 2022, the Regional Board noted that Defendants' sampling showed exceedances of aluminum and zinc, and found that Defendants are causing and contributing to exceedances of applicable WQS for metals in Mule Creek. Maharg Decl., Ex. 21 (11/3/2022 Letter) at 2-3. The Regional Board ordered Defendants to create a plan to address these discharges. *Id.*

1          3.  Reports of Ongoing Discharges at MCSP2 and MCSP3

2          According to Defendants' reporting to the Regional Board,

3   Defendants successfully calibrated the monitoring structures at

4   MCSP2 and MCSP3 in September 2022. Maharg Decl., Ex. 19 (Sept. 20,

5   2022 Discharge Report). Defendants reported a discharge to Mule Creek

6   on November 2, 2022. *Id.*, Ex. 20. Defendants should have taken

7   samples of those discharges at MCSP2 and MCSP3, which will be

8   reported in the next quarterly report. *See* ECF No. 95-5 at 17, 20.

9   **E. Defendants' Non-Stormwater Discharges**

10          *1.*  Defects in the MS4 and Sanitary Sewer System

11          Pursuant to Regional Board order, Defendants submitted a Storm

12  Water System Investigation Findings Report, in August 2018, which

13  they revised in October 2019 and again June 2020. *See* ECF No. 95-3

14  at 42-168 ("SHN Report"). In the SHN Report, Defendants' consultant

15  identified hundreds of defects in the Facility's MS4 and sanitary

16  sewer system. *See* Maharg Decl., Ex. 22 (Regional Board Review of SHN

17  Report) at MCSP31308. In most places, the report notes, the sanitary

18  sewer system is located *above* the MS4, which allows sewage to leak

19  out of the sanitary sewer system and drain into the MS4 through

20  defects, creating indirect cross connections between the two

21  systems. S*ee id*. at MCSP31306-07.

22          After reviewing these findings in the SHN Report as well as

23  the Facility's sampling data, both the Regional Board and the U.S.

24  Environmental Protection Agency ("EPA") determined that wastewater

25  was entering and discharging from the MS4. The Regional Board found:

26          [I]t is clear to Board staff that indirect cross
            connections have formed between the two systems [the
27          sanitary sewer system and MS4].  There are numerous

28                                  16

> locations documented in the CCTV [closed-circuit television] investigation where major defects in both systems could, and have, allowed infiltration and exfiltration. In several areas active infiltration was noted, even during the dry season with no recent rain. . . . The condition of the sanitary sewer and the stormwater system, along with observed practices at the facility, also support the conclusion that some volume of wastewater is entering the [MS4] system.

Maharg Decl., Ex. 22 at MCSP31320-21. EPA similarly found that there was "potential commingling of waters between the stormwater and wastewater systems." Maharg Decl., Ex. 4 at MCSP32976. EPA noted:

> the potential for commingling of stormwater and sanitary sewer waters may exist, as both systems are aging and built very close to each other. . . . Additionally, the Regional Board summarized . . . approximately 600 water samples MCSP collected from the stormwater system, and documented elevated levels of multiple pollutants which indicate contamination of the storm sewer system and discharges that exceed water quality standards. Without addressing these issues, the potential commingling and subsequent discharge of sewage through the stormwater system to Mule Creek exists.

*Id.* at MCSP32976. Defendants confirmed they had not fixed the defects in their sanitary sewer system as of August 2022. Maharg Decl., Ex. 2 (Orta Tr.) at 114:6-13.

## 2. Other Non-Stormwater Discharges

Defendants have reported that they regularly discharge large volumes of irrigation water through the MS4 into Mule Creek. Maharg Decl., Ex. 7 at MCSP32215. In response, the Regional Board ordered Defendants to prepare a report:

> …to demonstrate that the non-storm water discharges through the MS4 are in compliance with the Discharge Prohibitions in the Small MS4 General Permit or [] [i]f the non-storm water discharge does not comply with the Discharge Prohibitions, provide a proposed

17

plan . . . to eliminate the non-storm water discharge.

*Id.* at MCSP32217-18.

Because Defendants reported that irrigation discharges to the MS4 resulted from defects in the irrigation system, the Regional Board found that the irrigation discharges were not permissible non-stormwater discharges under the exceptions in Provision B.3 of the Small MS4 Permit. Maharg Decl., Ex. 24 at MCSP40146 ("the irrigation runoff does not meet the [Small MS4 Permit's] definition of incidental runoff"); *see also* Maharg Decl., Ex. 23 at MCSP33473. Defendants then submitted a plan, stating that they would not come into compliance with Provision B.3 with regard to their irrigation discharges, until February 2025. ECF No. 95-4 (Orta Decl.) at ¶ 19.

**F. Limited Implementation of Best Management Practices**

Defendants have implemented limited Best Management Practices ("BMPs") at the Facility. Defendants' representative designated to speak to the BMPs and the pollutants intended to be addressed by each BMP, Anthony Orta, testified he was only aware of BMPs intended to reduce sediment, not any such measures to reduce metals or *E. coli*. *See* Maharg Decl., Ex. 2 (Orta Tr.) at 18:24-19:15 (wattles and gravel bags to address sediment), 98:8-25.

In addition, the vast majority of the BMPs at the Facility were in place before long before this action was initiated. Mr. Orta testified that Defendants have not made any changes to the storm sewer system or the MS4 since September 17, 2019. *See* Maharg Decl., Ex. 2 (Orta Tr.) at 107:18-24; *see also id.*, Ex. 25 (SHN Report, Appendix 10) at MCSP4560); *see also* ECF No. 95-3 (SHN Report) at 72. Mr. Orta further testified that Defendants have not made any further

18

operational changes at the Facility, since October 2019, to reduce non-stormwater flows to the MS4, except for applying for funding to replace the irrigation system. *See* Maharg Decl., Ex. 2 (Orta Tr.) at 107:25-108:9, 110:6-16; see ECF No. 95-4 at 19 (BMPs to reduce non-stormwater discharges in place since June 29, 2018).

The bioswales between MCSP5 and MCSP2 and between MCSP6 and MCSP3, which Defendants identify as a stormwater BMP, were in place before the Facility was covered by the Small MS4 Permit, and Defendants have not made any changes to the bioswales since that time. Maharg Decl., Ex. 2 (Orta Tr.) at 97:19-24, 112:17-22. Moreover, Mr. Orta did not know whether or how the bioswales were designed, whether Defendants had ever evaluated their effectiveness, or even whether the purpose of the bioswales is to reduce pollutants. *Id*. at 97:25-98:7, 113:2-10.

The only BMP that Defendants have implemented after this action was initiated is the installation of monitoring structures at MCSP2 and MCSP3. Yet, the intent of this project is to "allow for accurate characterization of volume of water released to Mule Creek," not to reduce pollutants in these discharges. *See* ECF No. 95-4 at 18 (project "to accurately monitor discharge volumes to Mule Creek"); Maharg Decl., Ex. 3 (Larabee Tr.) at 77:11-15.

**III. STANDARD OF REVIEW**

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" with respect to a claim or defense. Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine

19

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Because summary judgment is a "drastic device" that cuts off a party's right to present its case to a jury, the moving party bears a "heavy burden" demonstrating the absence of any triable issue of material fact. *Ambat v. City & County of San Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014); *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (moving party must establish "beyond controversy every essential element" of each claim).

If the movant meets its high burden, the non-moving party then must designate specific facts showing there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324; *S. California Gas Co.*, 336 F.3d at 888 (non-moving party "can defeat summary judgment by demonstrating the evidence, taken as a whole, could lead a rational trier of fact to find in its favor"). Both direct and circumstantial evidence may be used to show that a genuine issue of material fact exists. At the summary judgment stage, the court must view the evidence in the light most favorable to the non-moving party. *S. Cal. Gas Co.*, 336 F.3d at 888. If evidence produced by the moving party conflicts with evidence proffered by the non-moving party, the court must assume the truth of the evidence submitted by the non-moving party. *TW Electrical Service, Inc. v. Pacific Electrical Contractors Assoc.*, 809 F.2d 626, 630-631 (9th Cir. 1987).

**IV.   ARGUMENT**

   **A. Whether Violations of the Small MS4 Permit Were Ongoing at the Time the Complaint Was Filed Is a Disputed Fact.**

Clean Water Act § 505, 33 U.S.C. § 1365, confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith

20

1   allegation of continuous or intermittent violation . . .." *Gwaltney*
2   *of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 64 (1987). A
3   plaintiff does not need to show ongoing violations throughout the
4   litigation. *See Gwaltney*, 484 U.S. at 66-67. A plaintiff's burden is
5   met when they allege an ongoing violation when the complaint is
6   filed. *See Nat. Res. Def. Council v. Texaco Ref. & Mktg. Inc.,* 2
7   F.3d 493, 503 (3d Cir. 1993) ("once a citizen plaintiff establishes
8   an ongoing violation of a parameter at the time the complaint is
9   filed, the court is obliged to assess penalties for all proven
10  violations of that parameter"). Thus, only facts evidencing whether
11  "defendant's continued violation had been completely eradicated when
12  citizen-plaintiffs filed suit" are relevant to this inquiry.
13  *Chesapeake Bay Found. v. Gwaltney*, 844 F.2d 170, 172 (4th Cir. 1988),
14  *on remand from* 484 U.S. 49 (1987).

15      Defendants assert that CSPA cannot meet its obligation to show
16  that violations were ongoing when it filed its Complaint on December
17  15, 2020 (ECF No. 1). *See* ECF No. 95-1 at 22-23. Defendants' argument
18  relies on a fundamental mischaracterization of the law. CSPA does
19  not need to prove violations occurred after the Complaint was filed
20  for Defendants to be held liable for their pre-Complaint violations.
21  Moreover, a plaintiff can show ongoing violations through additional
22  sampling or "by adducing evidence from which a reasonable trier of
23  fact could find a continuing likelihood of a recurrence in
24  intermittent or sporadic violations." *Sierra Club v. Union Oil*, 853
25  F.2d 667, 671 (9th Cir. 1988) (citing *Chesapeake Bay Foundation*, 844
26  F.2d at 171-72). Thus, Defendants are wholly incorrect when they
27  assert that only post-filing samples are "relevant to whether there
28

have been 'exceedances' that constitute alleged violations of the Small MS4 Permit." ECF No. 95-1 at 23:18-20. The pre-Complaint samples show Defendants violated the Small MS4 Permit. *See* Maharg Decl., Ex. 1 (Ashby Decl.), tbls. 2-6. The Court must find Defendants liable for those violations, unless Defendants show there is no dispute that they were in full compliance when CSPA filed the Complaint and have not violated the Small MS4 Permit since.

Defendants cannot meet this burden. Defendants presented no evidence they were in compliance with the Discharge Prohibitions and Receiving Water Limitations of the Small MS4 Permit when CSPA filed its Complaint. Rather, the only fact that Defendants rely on in support of this argument is that post-Complaint discharge samples were taken at MCSP5 and MCSP6, rather than MCSP2 and MCS3. *Id*. But Defendants miss a crucial fact: there is post-Complaint sampling at MCSP2 and MCSP3—undisputed points of discharge into Mule Creek—that show MS4 discharges exceeding aluminum, iron, lead, and zinc WQS, establishing violations post-Complaint. Maharg Decl., Ex. 1 at 36-37, tbls. 5-6 (Dec. 17, 2020 sampling). This fact alone is sufficient to defeat Defendants' motion.

Moreover, Defendants' argument is based solely on their assertion that it is indisputable that discharges at MCSP5 and MCSP6 do not reach Mule Creek. Yet, the Court has already ruled that there is a dispute of material fact as to that very point. ECF 60 at 19:22-20:2 (finding a dispute with regard to whether the concentrations of contaminants detected at MCSP5 and MCSP6 in fact reached Mule Creek). Defendants contort the Court's ruling to argue that Plaintiffs cannot prove this issue. ECF No. 95-1 at 6:24-26.

1    Defendants offer no further evidence to support a finding that
2    Defendants did not discharge to Mule Creek after the Complaint was
3    filed or that it is not likely they will do so in the future. In
4    fact, Defendants admit that "[i]f there is sufficient flow,
5    stormwater is [] discharged from the outfalls at MCSP2 and MCSP3
6    into Mule Creek." ECF No. 95-2, ¶ 24. Further, Defendants' post-
7    Complaint reporting demonstrates that waters sampled at MCSP5 and
8    MCSP6 have reached Mule Creek. Pursuant to the 13383 Orders,
9    Defendants must provide discharge notifications to the Regional
10   Board "within 24 hours of the Facility discharging through the MS4
11   to the receiving water" (i.e., Mule Creek). *See* ECF No. 95-5 at 18;
12   Maharg Decl., Ex. 7 at MCSP32218. Under this requirement, Defendants
13   have reported numerous discharges to Mule Creek from January 2021
14   to, as recent as, November 2, 2022. Maharg Decl., Exs. 8-20. The
15   reported sampling results of show that these discharges far exceeded
16   metals and *E. coli* WQS. S*ee* Maharg Decl., Ex. 1 at tbls. 7-11; *see*
17   Maharg Decl., Ex. 27 (2022 Q2 Monitoring Rpt.) at 3-1.

18   Moreover, Defendants finished installing monitoring structures
19   at MCSP2 and MCSP3 in September 2022 and should now be monitoring
20   discharges at the actual outfalls to Mule Creek. *See* Maharg Decl.,
21   Ex. 19 (9/20/2022 Discharge Notification); *see* ECF No. 95-5 at 20.
22   Thus, the November 2, 2022 discharge, which Defendants reported
23   (Maharg Decl., Ex. 20), was presumably monitored at MCSP2 and/or
24   MCSP3, confirming it did reach Mule Creek.

25   Finally, Defendants have not shown that it is undisputed that
26   there is no "continuing likelihood of a recurrence" in the
27   violations. *Sierra Club*, 853 F.2d at 671. CSPA has provided evidence

28
                                      23

of discharges from MCSP2 and MCSP3, which demonstrate years of violations of the Small MS4 Permit through December 2020. Maharg Decl., Ex. 1 at ¶¶ 10-13, 14-15; tbls. 2-6. Defendants moved their sampling locations to MCSP5 and MCSP6 in December 2020 yet have not made any improvements between the last sampling date at MCSP2 and MCSP3 and when CSPA filed its Complaint to reduce pollutants and ensure that their discharges complied with the Small MS4 Permit. Defendants cannot credibly argue that simply moving sampling locations reduced pollutants in their MS4 discharges.

Despite Defendants' contrary assertions (ECF No. 95-1 at 7:2-4), Defendants have presented no evidence that the bioswales filter or remove pollutants, let alone in such a way as to ensure discharges meet WQS. The bioswales have been in place since before Defendants were covered by the Small MS4 Permit, and Defendants made no changes to them when they moved sampling locations. Maharg Decl., Ex. 2 (Orta Tr.) at 97:19-24. Thus, the pre-Complaint sampling at MCSP2 and MCSP3 had the benefit of whatever pollution reduction the bioswales offered, but those samples far exceeded metals and *E.coli* WQS. Maharg Decl., Ex. 1 (Ashby Decl.) at ¶¶ 10-13, 14-15; tbls. 2-6.

Further, Mr. Orta—Defendants' designated representative—did not know if the bioswales were even intended to reduce pollutants. Maharg Decl., Ex. 2 (Orta Tr.) at 97:25-98:7; 113:2-10. And Defendants' sampling shows that the bioswales may increase pollutant concentrations. Samples taken at MCSP3, <u>after</u> the bioswale, showed much higher average levels of *E. coli* than at MCSP6, <u>before</u> the bioswale. *See* ECF No. 95-5 at 116-117 (compare Table 3.5-9, MSCP6 Results, showing average E. coli result at 127 MPN/100ml, and Table

3.5-10, MCSP3 Results, showing average E. coli result at 23,458
MPN/100mL; *see id.* (showing higher average results for aluminum and
iron at MCSP3 than at MCSP6). Thus, whether the bioswales reduce
pollutants is a genuine dispute of fact.

In short, Defendants failed to present any evidence of actions
taken before CSPA filed its Complaint that would be sufficient for
the Court to determine indisputably that "there is no real
likelihood" that Defendants would not violate the Discharge
Prohibitions or Receiving Water Limitations post-Complaint. *Gwaltney
II*, 844 F.2d at 172.

Finally, Defendants appear to argue that because the Court
denied Plaintiffs' Motion for Summary Judgment, CSPA's evidence
cannot prove their claims. Defendants overlook the high evidentiary
burden that CSPA bore on summary judgment, as compared to the
evidence that Plaintiffs can rely on at trial. *See Ambat*, 757 F.3d
at 1031; *S. Cal. Gas Co.*, 336 F.3d at 888. Defendants now bear the
heavy burden to demonstrate, using undisputed facts, that they came
into full compliance with the Small MS4 Permit before CSPA filed its
Complaint. Defendants have not come anywhere close to meeting this
burden, and their Motion must be denied.

**B. Background and Non-Human Sources of Contamination Do Not
Excuse Defendants' Violations of the Small MS4 Permit.**

Defendants argue that CSPA has "completely failed to account
for 'background' and non-human sources of alleged pollutants" and
contend that this is a "required element of causation" necessary for
CSPA to prevail at trial. ECF 95-1 at 21:17-19. In other words,
Defendants argue they are not responsible for pollutants in their
MS4 discharges if they are derived from natural sources. Defendants

25

do not, and cannot, cite any section of the Small MS4 Permit that supports that conclusion. The Small MS4 Permit holds Defendants responsible for their <u>discharges</u>. *See* ECF No. 95-7 at 22-23. Simply put, the source of the pollutants in the MS4 discharges is irrelevant to whether Defendants are violating the Small MS4 Permit.

The Regional Board has stressed this fact in response to Defendants' reports. *See* ECF 45-20 at 67 ("it is important to note that the Basin Plan Water Quality Objectives. . . for fecal coliforms in a surface water does not specify that the limit is restricted to human sources. Fecal coliforms, <u>regardless of source</u>, are subject to the Water Quality objective.") (emphasis added). Thus, Defendants are responsible for its MS4 and what discharges from it. To the extent that "background" or "non-human" sources of pollutants are causing or contributing to exceedances of WQS, Defendants are responsible for implementing BMPs designed to prevent those pollutants from discharging from its MS4. *See* ECF No. 95-7 at 22-23. Further, as explained below in Section IV.D, there is ample evidence to support a finding that the pollutants in Defendants' discharges are directly related to the Facility's activities, not merely "background" sources.

**C. The Arguments Defendants Make Related to Provision D — Receiving Water Limitations — Are Irrelevant to the Court's Analysis of Violations.**

Defendants' sampling shows that their MS4 discharges to Mule Creek have exceeded WQS for metals and *E. coli* on the same days that Mule Creek exceeds those WQS. Maharg Decl., Ex. 1 (Ashby Decl.), tbls. 4, 6, 9, 11. This evidence supports a finding that Defendants' discharges have contributed to exceedances of WQS, in violation of

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Provision D. *See* ECF No. 95-7 at 22. In fact, Defendants' expert, Timothy Simpson, agrees with the methodology of evaluating concurrent sampling at the discharge points and the downstream sampling point to determine whether a discharge causes or contributes to an exceedance of a WQS, ECF No. 95-5, ¶ 28, which is the approach that Plaintiffs have followed.

Yet Defendants argue that CSPA cannot show violations of Provision D, Receiving Water Limitations, for three unavailing reasons: (1) Mule Creek is not listed as impaired for metals or *E. coli* on the 303(d) list; (2) upstream sources contribute metals and *E. coli* to Mule Creek; and (3) Defendants have engaged in an iterative process to remedy violations. *See* ECF No. 95-1 at 26-27, 29-33. As explained below, all of these points are irrelevant and misstate the clear requirements of the Small MS4 Permit.

### 1. Provision D Does Not Require CSPA to Show Mule Creek Is or Should Be Listed under the 303(d)

Nothing in Provision D limits its application to discharges into waterbodies that are listed under California's 303(d) list. The 303(d) list includes waterbodies that do not attain WQS as a whole or on a regular basis. *See* 33 U.S.C. § 1313(d); *see* ECF No. 95-7 at 15. In contrast, Provision D prohibits discharges that "cause or contribute to <u>an exceedance</u> of WQS." ECF No. 95-1 at 22 (emphasis added). The Small MS4 Permit is clear when conditions only apply to waterbodies that are listed under the 303(d) list and/or have a Total Maximum Daily Load to address those impairments. *See, e.g.*, ECF No. 95-7 at 35 (Provision E.9.b); 41 (Provision E.10.a); 66 (Provision E.13.b-c), 78-82 (Provision E.15); and 313-386 (Attachment G). In

contrast, Provision D applies to all discharges, not only those that enter waterbodies listed under Clean Water Act § 303(d). *Id.* at 22; *see Cal. Sportfishing Protection Alliance v. River City Waste Recyclers*, 205 F.Supp.3d 1128, 1142, 1150-51 (E.D. Cal 2016) ("*River City*") (finding that a discharge above WQS violated this permit provision without evidence that the receiving water was listed under § 303(d).

### 2. CSPA Need Not Show that Defendants Are the Sole Cause of *E. Coli* or Metals in Mule Creek.

Contrary to Defendants' argument, ECF No. 95-1 at 27:12-13, the plain language of Provision D is unambiguous: CSPA does not need to show that an MS4 discharge is the sole cause of an exceedance of a WQS in Mule Creek; rather, it is sufficient that the discharges contribute to an exceedance. ECF 95-7 at 22. "If the language of the permit is plain and capable of legal construction, 'the language alone must determine the permit's meaning'" *NRDC v. Cty. of L.A.,* 725 F.3d 1194, 1204 (9th Cir. 2013) (quoting *Piney Run Pres. Ass'n v. Cty. Comm'rs.*, 268 F.3d 255, 270 (4th Cir. 2001)). Every discharge into a receiving water that exceeds applicable WQS contributes to the exceedance within the receiving water. *See NRDC, 725 F.3d at 1206-07; Cal. Sportfishing Protection Alliance v. Chico Scrap Metal,* 124 F.Supp.3d 1007, 1020-22 (E.D. Cal. 2015) (finding discharges above WQS "cause or contribute to an exceedance of any applicable [WQS]"); *accord River City Waste*, 205 F.Supp.3d at 1142, 1150-51; *Baykeeper v. Kramer Metals, Inc.,* 619 F.Supp.2d 914, 928-29 (C.D. Cal. 2009). Ms. Ashby counted a violation of Provision D only when outfall samples showed the Facility's discharges exceeded metals and

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*E. coli* WQS and samples within Mule Creek showed that it was exceeding the WQS on the same day. ECF 45-4 at tbls. 4, 6, 10-11. While CSPA does not dispute that upstream sources may contribute to an exceedance of WQS in Mule Creek, this does not excuse Defendants' contribution to those exceedances as evidenced by their MS4 discharges above WQS. Moreover, the study Defendants primarily rely on actually found that in one third of the sampling days, "the concentration [of *E. coli*] increase moving past the prison property was sufficient <u>to cause</u> a downstream water quality standard exceedance where the upstream sample was in compliance." ECF No. 97-3 at 8 (emphasis added). Thus, Defendants "caused," not just contributed, to an exceedance in Mule Creek on those days.

> 3. <u>Engaging in the Iterative Process Does Not Excuse Violations of Provision D.</u>

Defendants assert that, because they are engaged in a (largely undefined) "iterative process" to develop and implement BMPs with the Regional Board, they cannot be held liable for discharges that violate Provision D. See ECF 95-1 at 36. According to Defendants' theory, their discharges do not need to actually meet the requirements of Provision D, as long as they implement some BMPs and talk to the Regional Board. It does not matter whether the BMPs are effective or how much pollution their discharges contribute to Mule Creek. This theory must be rejected because it contradicts a plain reading of the Small MS4 Permit and would render the permit unenforceable, allowing Defendants to exceed Receiving Water Limitations indefinitely. *See Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 989-90 (9th Cir. 1995) (finding that permit

1  requirements to comply with WQS are enforceable).

2  Contrary to Defendants' argument, the Small MS4 Permit requires

3  strict compliance with Receiving Water Limitations, Provision D, and

4  does not excuse violations of this provision through such an

5  undefined process lacking any actual standards for compliance, and

6  finding support in the Fact Sheet, only, not the Small MS4 Permit

7  itself. In the Small MS4 Permit, the State Board exercised its

8  discretion to require strict compliance with all applicable WQS. *See*

9  ECF 95-7 at 22; *see also id*. at 421 ("The State Water Board has

10  previously determined that limitations necessary to meet WQS are

11  appropriate for the control of pollutants discharged by MS4s and

12  must be included in MS4 permits.").

13  While Provision D requires further action when a permittee is

14  not complying with its terms, it does not exempt permittees from

15  enforcement of those violations. *See* ECF No. 95-7 at 22. The Small

16  MS4 Permit's Fact Sheet specifically rejects Defendants'

17  interpretation:

18  > [t]he Water Boards have maintained that the
19  > iterative process does not provide a "safe harbor"
> to MS4 permittees: that is, when a discharge is shown
20  > to be causing or contributing to an exceedance of
> water quality standards, that discharge is in
21  > violation of the relevant discharge prohibitions and
> receiving water limitations of the permit and
22  > potentially subject to enforcement by the Water
> Boards or through a citizen suit, *even if the*
23  > *discharge is activity engaged in the iterative*
> *process.*
24

25  ECF No. 95-7 at 422, emphasis added. The Ninth Circuit also has

26  rejected the argument asserted by Defendants here. *See NRDC v. Cnty*

27  *of Los Angeles*, 673 F.3d 880, 897 (9th Cir. 2011). As here,

28

defendants in that case argued that strict compliance with WQS was not enforceable because the permit provided that permittees shall engage in an "iterative process" when it was determined they were not meeting WQS. *Id.* at 887-88. The Ninth Circuit roundly rejected that position: "[a]lthough Defendants argue that compliance with other Permit provisions, in particular Part 2.3's iterative process, forgives violations of the discharge prohibitions in Parts 2.1 and 2.2, no such 'safe harbor' is present in this Permit." *Id.* at 897; *see also Hawaii's Thousand Friends v. City and Cty. of Honolulu*, 821 F.Supp. 1368, 1392 (D. Haw. 1993) ("Courts throughout the country have held that NPDES compliance is a matter of strict liability, and a defendant's intent and good faith are irrelevant").

Even if engagement in the iterative process were to safeguard Defendants from enforcement, which it does not, as recently as November 3, 2022, the Regional Board notified Defendants that they have not complied with orders to address ongoing violations of Provision D. *See* Maharg Decl., Ex. 21 at 1-3 (notifying Defendants that their NSWD Elimination Plan did not satisfy a requirement of the 13383 Order because it did not address metals exceedances). Thus, there is a dispute of fact as to whether Defendants have even adequately engaged in the iterative process.

### D. Defendants Improperly Interpret Provision B.1 by Limiting the Types of Waste Prohibited by the Basin Plan.

Defendants move for summary judgment on CSPA's claims under Provision B.1, yet they provide no authority or evidence demonstrating they are actually in compliance with that provision. *See* ECF 95-1 at 27-28. Rather, they base their argument solely on

their assertion that they do not know what discharges the Basin Plan prohibits. *See* ECF No. 95-1 at 28:16-17. To obtain summary judgment in their favor, Defendants must show there is no reasonable dispute of fact that were in compliance with Provision B.1 when the Complaint was filed and remain so. They have failed to do so, and for that reason, their motion for summary judgment as it relates to violations of Provision B.1 should be denied.

Here, the evidence shows that Defendants have violated Provision B.1 because they have discharged waste that is prohibited by the Basin Plan. *See* ECF No. 95-7 at 22 (Small MS4 Permit, Provision B.1, which states: "Discharges of waste from the MS4 that are prohibited by Statewide Water Quality Control Plans or applicable Regional Water Quality Control Plans (Basin Plans) are prohibited."). The California Water Code and Small MS4 Permit define "waste" broadly to include:

> sewage and any and all other waste substances,
> liquid, solid, gaseous, or radioactive, associated
> with human habitation, or of human or animal origin
> any substance associated with human habitation.

Cal. Water Code § 13050(c); ECF 95-7 at 397. The Facility's MS4 discharges, and the pollutant concentrations therein, fall under this definition of waste for a number of reasons.

At the outset, the stormwater at the Facility, regardless of its pollutant concentration, is a "substance associated with human habitation" because it is channelized and discharged from the Facility, which is manmade and houses humans. A substance that is natural or innocuous becomes a "waste" under the Water Code definition when a person or entity changes its natural state in the

32

environment. *See Santa Clara Valley Water Dist. v. Cal. Regional Water Quality Control Bd.*, 59 Cal. App. 5th 199, 210 (2020) (finding that sediment became a waste because the "project's widening of the creek bed will slow the flow of water and lead to increased sedimentation that will be concentrated in the creek instead of carried downstream."). Here, the stormwater is not merely running into Mule Creek as it would in its natural state, but instead runs over the Facility's infrastructure and grounds, is collected and transported through the MS4, and then discharged to Mule Creek. Thus, it is "associated with human habitation" and is a waste.

Moreover, the stormwater in this case, in contrast to the sediment in the *Santa Clara Valley Water Dist.* case, includes other known pollutants: metals and *E. coli*. The Regional Board has found that Defendants' discharges contain "waste constituents." Maharg Decl., Ex. 22 at MCSP31321. Metals are associated with human habitation, as well as industrial uses. *See id.* at MCSP31313. Defendants' Storm Water Master Plan lists several "hot spots" at the Facility that they identify as contributing metals to stormwater discharges, such as the firing range, the metal fabrication area, parking lots and outdoor storage areas associated with vehicle maintenance, the recycling yard, and the vocational welding area. Maharg Decl., Ex. 28 (MSCP Storm Water Master Plan) at MCSP2069-2081; *see id.*, Ex. 2 (Orta Tr.) 142:2-143:7. Thus, the metals in the stormwater, at least in part, are produced by human activities and therefore render the Facility's stormwater discharges waste within the meaning of the California Water Code.

Further, the Facility's stormwater discharges consistently

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

contain concentrations of *E. coli* well-above WQS. *See* Maharg Decl., Ex. 1 (Ashby Decl.) at tbls. 2-3, 8. *E. coli* could be present as a result of wastewater entering the MS4. *See* Maharg Decl., Ex. 29 (Emerick Expert Report) at 10-11, 15-16, 18; *see also, infra*, § IV.F. The likelihood that wastewater is contributing *E. coli* was confirmed by the fact that water in the MS4 also contained a variety of pharmaceuticals and personal care products. *Id*. at 10-11, 17-18. While Defendants dispute that wastewater is entering and/or discharging from the MS4, this dispute of fact requires the denial of Defendants' Motion.

Even so, Defendants' own admissions confirm that the discharges of *E. coli* are waste. Mr. Orta admits that pharmaceuticals in the Facility's MS4 are from inmates (i.e., human habitation). ECF 95-4, ¶ 14. Moreover, Defendants repeatedly state that the *E. coli* is from animals. *See* ECF No. 95-1 at 25. Because a "waste" can be of "animal origin," this is sufficient. Cal. Water Code §13050(c).

In short, there is no reasonable dispute that Defendants' stormwater discharges are "waste" under the broad definition of the term in the Water Code. *See also Sweeney v. Cal. Reg'l Water Quality Control Bd.*, 61 Cal. App. 5th 1093, 1116-17 (2021) (definition of waste should be construed liberally). At the very least, there is ample evidence for a reasonable trier of fact to determine the discharges are waste.

Further, Defendants' discharges of waste are prohibited by the Basin Plan when the discharges exceed WQS established by the Basin Plan or other applicable water quality control plan, such as the State Bacteria Objectives. The Basin Plan establishes the beneficial

34

1  uses and the objectives or standards necessary to protect those uses,

2  as required by the Clean Water Act and the California Water Code.

3  *See* ECF No. 95-7 at 560. The fundamental purpose of the Clean Water

4  Act is to protect beneficial uses. *See* 33 U.S.C. §§ 1251(a), 1312(a);

5  Cal. Water Code § 13000 ("The Legislature's goal in enacting the

6  Porter-Cologne Act was "to attain the highest water quality which is

7  reasonable. . .."); *see* ECF No. 95-7 at 560 (purpose of Basin Plan

8  is to establish beneficial uses and criteria (i.e., WQS) to protect

9  them). Thus, unless the discharges are otherwise permitted, any

10 discharge that exceeds WQS established by the Basin Plan are

11 prohibited, in accordance with Provision B.1.[2]

12     There is ample evidence to conclude that Defendants' discharges

13 exceed WQS in violation of the Basin Plan and Provision B.1.

14 Defendants do not dispute that their discharges from MCSP2 and MCSP3

15 reach Mule Creek and exceed WQS. ECF No. 95-2 at ¶24. There is also

16 no dispute that Defendants' sampling at MCSP5 and MCSP6 exceed WQS.

17 *See* Maharg Decl., Ex. 1, tbls. 8, 10. While there is a genuine

18 dispute of fact that the samples taken at MCSP5 and MCSP6 reach Mule

19 Creek, that dispute justifies denying this motion, not granting it.

20

21

22 ─────────────────

23 [2] Defendants imply that the only prohibitions in the Basin Plan are

24 based on amendments that include the word "Prohibition" in the title.
   *See* 95-1 at 28:14 (citing to Basin Plan, RJN, Ex. C at pp. 110-111,

25 112, 114). The page numbers that Defendants cite to in the Basin
   Plan do not exist, making it impossible to understand Defendants'

26 argument. However, there is no support for the assertion that only
   a few amendments include applicable prohibitions. The Basin Plan in

27 its entirety establishes the standards that govern water quality of
   receiving waters and discharges thereto. *See* ECF No. 95-7 at 560.

28

**E. Whether or Not the Discharges Cause or Threaten to Cause a Condition of Pollution or Nuisance in Violation of Provision B.2 Is a Disputed Question of Fact for Trial.**

Provision B.2 prohibits "[d]ischarges of storm water from the MS4 to waters of the U.S. in a manner causing or threatening[3] to cause a condition of pollution[4] or nuisance[5] as defined in Water Code § 13050." ECF No. 95-7 at 21. Defendants assert that CSPA cannot prove violations of Provision B.2 for two reasons: (1) Mule Creek has not been listed as impaired for metals or *E. coli*; and (2) CSPA has not yet established that discharges at MCSP5 and MCPS6 after the Complaint was filed reach Mule Creek. Both points are irrelevant to the Court's analysis of violations of Provision B.2.

Defendants' first argument improperly conflates pollution and/or nuisance with a waterbody's listing on the 303(d) list. There is nothing in the California Water Code definition of pollution or nuisance that states that these conditions only occur when a water body is listed under the 303(d) list. *See* Cal. Water Code §§ 13050(l)–(m).[6]

---

[3] "'Threaten'. . .means a condition creating a substantial probability of harm. . .." Cal. Water Code § 13304(e).

[4] "'Pollution' means an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects either of the following:(A) The waters for beneficial uses. (B) Facilities which serve these beneficial uses." Cal. Water Code § 13050(l)(1).

[5] "'Nuisance' means anything which meets all of the following requirements:(1) Is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. (2) Affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal. (3) Occurs during, or as a result of, the treatment or disposal of wastes." Cal. Water Code § 13050(m).

[6] Defendants also incorrectly conflate "impairment" with listing

---

36

1      Defendants do not dispute that their discharges to Mule Creek,

2 as evidenced by sampling at MCSP2 and MCSP3, have exceeded WQS for

3 metals and *E. coli*. Maharg Decl., Ex. 1, tbls. 2-3, 5; ECF No. 95-2

4 at ¶24. WQS equate to the level of pollution that is necessary to

5 protect beneficial uses. *See* ECF No. 95-7 at 560; *see* 33 U.S.C. §

6 1313 (2)(A); *see also PUD No. 1 v. Wash. 'ep't of Ecology*, 511 U.S.

7 700, 704 (1994) (WQS "prevent water quality from falling below

8 acceptable levels."). Therefore, discharges above a water quality

9 standard, as a matter of law, threaten to "unreasonably affect[]"

10 Mule Creek's beneficial uses and, thus, are pollution. Cal. Water

11 Code §13050(l). Moreover, because metals and *E. coli* WQS are

12 established to protect uses related to human health (i.e., drinking

13 water and water contact recreation uses, respectively), discharges

14 above WQS, as a matter of law, are or threaten to be "injurious to

15 health" and, thus, are a nuisance. Cal. Water Code § 13050(m)(1);

16 *see* ECF No. 95-8 at 3 (stating WQS set to protect people recreating

17 in waters). Accordingly, as a matter of law, discharges above WQS

18 set to protect human health "threaten to cause a condition of

19 pollution or nuisance." ECF No. 95-7 at 21.

20      Even if this Court were to determine that discharges that exceed

21 WQS were not sufficient to show a violation of Provision B.2 as a

22 matter of law, whether or not a discharge has created or threatened

23 to create a condition of pollution or nuisance would then be a

24

25 under Clean Water Act section 303(d). Even if CSPA was required to
show that Mule Creek is "impaired" (which nothing in B.2 requires),

26 a water body is impaired if it fails to meet WQS, even if it is not
formally listed under 303(d). ECF No. 95-7 at 12 (Small MS4 Permit

27 at 10, n. 4) Sampling in Mule Creek consistently shows that it
exceeds WQS. *See* Maharg Decl., Ex. 1, tbls. 4, 6, 9, 11.

28

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

question of fact. Defendants have offered no evidence to support a finding that their discharges exceeding WQS do not unreasonably affect the beneficial uses of Mule Creek or are not injurious to health, other than the fact that Mule Creek has not been formally listed under 303(d). However, the harm to beneficial uses need not be quantified or certain to qualify as pollution, let alone rise to the level of listing under Clean Water Act section 303(d). *See Sweeney, supra,* 61 Cal.App.5th at 1122.

Defendants next argue that CSPA cannot show violations of Provision B.2 because CSPA has not proven that MCSP5 and MCSP6 discharge to Mule Creek. ECF No. 95-1 at 29. For the reasons explained in Section IV.A, *supra*, Defendants have not met their burden of showing that they have not and are not likely to discharge to Mule Creek again.

In short, the undisputed evidence shows that Defendants' discharges to Mule Creek have exceeded WQS for metals and *E. coli*. This is sufficient, at a minimum, to create a dispute of fact as to whether the discharges have caused or threaten to cause a condition of pollution or nuisance in Mule Creek, in violation of Provision B.2. Thus, Defendants' Motion as it relates to violations of Provision B.2 should be denied.

### F. There Are Numerous Disputes of Material Fact as to Defendants' Violations of Provision B.3.

Defendants move for summary judgment on CSPA's claims that Defendants have violated Provision B.3. ECF No. 95-1 at 29-33. Provision B.3 requires that "[d]ischarges through the MS4 of material other than storm water to waters of the U.S. shall be effectively

38

prohibited." ECF No. 95-7 at 21. There is extensive evidence, including numerous findings by the Regional Board, that non-stormwater is getting into the MS4, both in the form of wastewater (sewage) and non-exempt irrigation discharges. Moreover, the evidence shows that Defendants have not yet taken measures to effectively prohibit these non-stormwater sources. Non-stormwater in the MS4 is discharged to Mule Creek during rain events when Defendants open the slide gates and allow for discharges to Mule Creek. *See, e.g.,* Maharg Decl., Exs. 8-20 (Discharge Notifications); *see also* Maharg Decl., Ex. 1 (Orta Tr.) at 121:16-22 (testifying that slide gates are not water-tight). Thus, there are host of disputed facts concerning whether Defendants have violated Provision B.3, and the Motion should be denied.

        1.  <u>The Regional Board Has Found Defendants Have</u>
            <u>Discharged Wastewater from the MS4; and CSPA's</u>
            <u>Evidence Supports that Conclusion.</u>

Defendants spend a significant amount of page space in their Motion describing two studies they conducted and that they assert prove the Facility is not discharging wastewater. ECF No. 95-1 at 31-33. Defendants also stress that they have conducted these investigations "in direct cooperation with the Water Board's permitting staff." *Id.* at 31:25. Yet, Defendants casually omit the fact that the Regional Board has consistently disagreed with Defendants' conclusions and have specifically found that Defendants have discharged wastewater commingled with stormwater.

Defendants' investigation of the stormwater collection system and sanitary sewer systems found hundreds of defects in both systems. *See* Maharg Decl., Ex. 22 (Regional Board Review of SHN Report) at

MCSP31308.   While  Defendants'  report  concludes  no  <u>direct</u>  cross

connections  exist,  the  investigations  do  not  support  a  conclusion

that  no  <u>indirect</u>  cross  connection  exist.  *Id.* at MCSP31320-21 ("it is

clear  to  Board  staff  that  indirect  cross  connections  have  formed

between  the  [storm  and  sewer]  systems."); *see also id.*, Ex.  4  at

MCSP32976  (EPA  finding  same); *see also id.*, Ex. 32 (Croyle  Tr.),

39:7-41:20,   70:8-73:4.    Critically,   Defendants'   designated

representative,  Mr.  Gregor  Larabee,  confirmed  that  the  SHN  Report

only  concludes  there  are  no  direct  connections,  i.e.,  "no  physical

connection  of  a  sanitary  sewer  [pipe]  to  a  stormwater  [pipe]." *See*

Maharg  Decl.,  Ex.  3  (Larabee  Tr.)  at  117:22-118:19.

Further,  Plaintiffs  sampled  liquid  within  the  MS4  during  dry

weather  and  found  pharmaceuticals  and  personal  care  products  present

in  the  samples.  Maharg  Decl.,  Ex.  1  (Ashby  Decl.),  ¶24; *see also*

Maharg  Decl.,  Ex.  29  (Emerick  Expert  Rpt.)  at  10,  15-18; *see also*

ECF  No.  95-2,  ¶  77  (Defendants  admitting  pharmaceuticals  were  found

in  the  MS4).  CSPA's  expert  consultant,  Dr.  Robert  Emerick,  testified

that  pharmaceutical  and  personal  care  products  strongly  indicate

wastewater  is  present  in  the  MS4.  Maharg  Decl.,  Ex.  29  at  4,  10-11;

*Id.*, Ex. 30 (Emerick  Tr.)  at  136:23-151:5; *see also Hawaii  Wildlife*

*Fund  v.  Cnty.  of  Maui*,  550  F.Supp.3d  871,  882,  890  (D.  Haw.

2021)(finding  that  the  presence  of  chemicals  with  only  human  sources,

"the  most  conclusive  being  pharmaceuticals,"  in  stormwater  indicated

a  wastewater  component).

Defendants'  assertions  that  wastewater  is  not  getting  into

their  MS4,  even  if  based  on  two  studies  they  conducted,  does  not

support  a  finding  of  summary  judgment.  Defendants'  assertions  that

CSPA'S  OPPOSITION  TO  DEFENDANTS'  MOTION  FOR  SUMMARY  JUDGMENT

the low levels of ammonia were present in their MS4 discharges does
not resolve this dispute of fact. Dr. Emerick directly addressed
this assertion and stated that while ammonia can be a "good
indicator" of sewage, it is "not a perfect indicator" because (a)
storm water "can dilute the ammonia down below the detection limit
of the ammonia test quicker than you can dilute out coliform or *E.
coli*," and (b) ammonia commonly goes through a nitrification process
and converts to nitrate in a low-oxygen environment, such as soil.
Maharg Decl., Ex. 30 (Emerick Tr.) at 55:17-63:4. In fact, Dr.
Emerick testified that where sewage is indirectly cross-
contaminating the MS4, as CSPA asserts in this case, he "wouldn't
have expected to see ammonia." *Id*. at 62:24-63:4. Defendants' expert
opinions to the contrary merely create a genuine dispute of material
fact that must be resolved at trial.

> ## 2. Defendants Admit that Irrigation Water (i.e., Non-Stormwater) Has Discharged and Continues to Discharge through the MS4 Due to Defects in the Irrigation System.

Defendants have admitted and self-reported for years that
irrigation water is getting into their MS4 due to defects in their
irrigation system. *See* Maharg Decl., Ex. 23 at MCSP33473; *see also
id*., Ex. 7 (Dec. 2020 13383 Order) at MCSP32215-16. The Regional
Board concluded that the irrigation discharges are not exempt under
Provision B.3 because they are caused by defects, not simply
incidental irrigation runoff. *Id*., Ex. 24 at MCSP40146.

> ## 3. Defendants Have Not Effectively Prohibited the Identified Sources of Non-Stormwater.

Further, Defendants have not yet taken any action to address

these sources of non-stormwater; therefore, Defendants have not "effectively prohibited non-stormwater," as required by Provision B.3. In 2019, Defendants stated, and the Regional Board concurred, that the defects in the sanitary sewer system should and would be fixed to prevent wastewater from commingling with stormwater. *See* ECF No. 95-3 at 165-166; Maharg Decl., Ex. 26 (SHN Report, Appendix 23); *Id.*, Ex. 20 (Regional Board Review) at MCSP31322. Yet, in August 2022, Defendants' representative stated that those repairs had not yet been completed. Maharg Decl., Ex. 2 (Orta Tr.) at 114:6-13. Moreover, Defendants have asserted that the pharmaceutical and personal care products could be entering the MS4 as a result of prisoners throwing their medicine into storm drains. ECF No. 95-4, ¶ 14. Yet Defendants testified they have not taken action to address this behavior, if it exists. Maharg Decl., Ex. 2 (Orta Tr.) at 128:19-22. This alone provides sufficient evidence for a trier of fact to determine that Defendants have not "effectively prohibited" wastewater or other sources of pharmaceutical and personal care products from being transported through the MS4 to Mule Creek.

Similarly, Defendants have not yet effectively prohibited irrigation flows from discharging through the MS4. Defendants have stated, under penalty of perjury, that they will not come into compliance with Provision B.3 with regards to their irrigation discharges until February 2025. ECF No. 95-4 at 19.

Defendants wrongly assert that they need only reduce pollution to the maximum extent possible to meet the requirements of Provision B.3. ECF No. 95-1 at 30-31. While the Small MS4 Permit does require Defendants to meet the "maximum extent possible" (MEP) standard, the

CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

requirement to effectively prohibit non-stormwater is a separate, enforceable requirement in the Small MS4 Permit and is required of every municipal stormwater permittee by the Clean Water Act. *See* 95-7 at 21-22 (Provision B.3 and Provision C.1); *id.* at 419 (Fact Sheet explaining that Clean Water Act requires effective prohibition of non-stormwater, citing Clean Water Act § 402(p)(3)(B)(ii)).

As they did in their opposition to Plaintiffs' Motion for Summary Judgment, Defendants misconstrue *Defenders of Wildlife v. Browner,* 191 F.3d 1159 (9th Cir. 1999). The Ninth Circuit has not stated that municipal stormwater permittees are only subject to the MEP standard, as Defendants assert. ECF No. 95-1 at 31. To the contrary, the Ninth Circuit, in *Defenders*, explicitly determined that permitting agencies retain "authority to determine that ensuring strict compliance with state water-quality standards is necessary to control pollutants" in MS4 permits. *Defenders,* 191 F.3d at 1166; *see also Bldg. Indus. Assn. of San Diego Cty. v. State Water Res. Control Bd.*, 124 Cal.App.4th 866, 885 (2004).

Here, the State Board, when adopting the Small MS4 Permit, exercised its discretion to require strict compliance with all applicable WQS.[7] While it is left to the State Board's discretion to require compliance with WQS, the Clean Water Act explicitly requires that all municipal stormwater permits, like the Small MS4 Permit, include a prohibition against discharging non-stormwater. 33 U.S.C. § 1342(p)(3)(B)(ii).

---

[7] Defendants' use of *Defenders* to argue they need not comply with Provision B.3's prohibition against discharging non-stormwater is confusing. *Defenders* concerns a municipal permittees' obligation to comply with WQS, which, in the Small MS4 Permit, is implemented through Provisions B.1 and D, not Provision B.3.

### G. Defendants Misstate Plaintiff CSPA's Claim Regarding the Land Application Areas.

Defendants assert they are challenging both Plaintiffs' allegations that Defendants' improper management of their Land Application Areas ("LAAs") cause unpermitted discharges to Mule Creek in violation of the Clean Water Act. ECF No. 95-1 at 21-22. However, Defendants only address the County's theory of the case, ignoring CSPA's claims entirely. *Id.* at 21, n. 10. Defendants take issue with the County's allegations that application of treated wastewater effluent to land is the functional equivalent of a direct discharge to Mule Creek. *Id*. at 21:9-12. While the County makes allegations based on a "functional equivalent" theory, CSPA instead alleges direct discharges from the LAAs in its complaint. ECF No. 1 at 12:10-13:11; 14:20-26.

Defendants apparently rely on a sentence in the Court Order on Plaintiffs' Motion for Summary Judgment that says "[a]fter the cases were consolidated, the plaintiffs jointly filed what is now the operative complaint on January 26, 2022. (Docket No. 35.)" ECF No. 60 at 5:6-8. However, Plaintiffs never jointly filed a complaint. Docket Number 35 is the County's First Amended Complaint and does not include CSPA as a plaintiff. *See*, *e.g.*, ECF No. 35 at 3:11-13 (naming the County as the sole plaintiff). This independent filing is consistent with the Court's Order on Consolidation, which did not order the Plaintiffs to file a joint complaint or otherwise designate either complaint as the operative complaint. *See* ECF No. 18; *see also Hall v. Hall*, 138 S. Ct. 1118, 1130 (2018) ("actions do not lose their separate identity because of consolidation.") Because Defendants' argument does not address CSPA's allegations, summary

44

1   judgment against CSPA on this issue would be improper.

2       In any event, Defendants' motion for summary judgment must be
3   denied because a genuine dispute of material fact exists as to
4   whether the LAAs have discharged via surface runoff to Mule Creek.
5   While Defendants may discharge treated wastewater to the LAA, the
6   discharges are not permitted to discharge to Mule Creek. ECF No. 95-
7   8 at 34 (prohibiting discharges to surface waters). Defendants
8   provided no evidence that their LAAs have not discharged to Mule
9   Creek. *See* ECF No. 95-1 at 21-22. Yet, there is evidence to support
10  a finding to the contrary.

11      On August 13 2020, Regional Board staff documented that the
12  LAAs "appear to be underutilized and inconsistently irrigated.
13  Uneven irrigation and poor vegetation management is likely
14  decreasing disposal capacity, and may be causing runoff or seepage
15  into the creek." Maharg Decl., Ex. 31 at COA0105778. Staff also
16  observed flowing water in Mule Creek from the Facility, and they
17  surmised the LAAs could be the source. *Id*. at COA0105778-79,
18  COA0105783. The Regional Board's lead staff contact, Kenneth Croyle,
19  testified that Defendants "put too much hydraulic loading on those
20  spray fields [LAAs], and so their staff has observed damp creek beds
21  after irrigation as well as ponded water in the bottom of the creek.
22  . . . the hydraulic loading is thought to be the cause of that water
23  in the creek during the dry season." Maharg Decl., Ex. 32 (Croyle
24  Tr.) at 106:2-6, 106:13-14. Mr. Croyle also testified he has ongoing
25  concerns that Defendants will discharge from their LAAs in the
26  future. *Id*. at 107:3-7. Thus, at a minimum, there is a dispute as to
27  whether the LAAs have discharged, and will continue to discharge, to

28
                                    45

1 Mule Creek, and the Motion must be denied on this ground.

2 **V.    CONCLUSION**

3     For all of the reasons set forth above, CSPA respectfully

4 submits that the Motion should be denied in its entirety.

5

6                                   Respectfully submitted,

7 Dated: December 12, 2022      LAW OFFICES OF ANDREW L. PACKARD

8

9                                   *s/ Andrew L. Packard*
10                                  ANDREW L. PACKARD
                                    WILLIAM N. CARLON
11                                  Attorneys for Plaintiff

12 Dated: December 12, 2022      AQUA TERRA AERIS LAW GROUP

13

14                                  *s/ Erica A. Maharg*
                                    JASON R. FLANDERS
15                                  ERICA A. MAHARG
                                    Attorneys for Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28
CSPA'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT