JENNIFER HARTMAN KING (SBN 211313)
ALANNA LUNGREN (SBN 269668)
WILLIAM MARSH (SBN 200082)
J. R. PARKER (SBN 320526)
ANDREYA WOO NAZAL (SBN 327651)
HARTMAN KING PC
520 Capitol Mall, Suite 750
Sacramento, CA  95814
Telephone:  (916) 379-7530
Facsimile:  (916) 379-7535
JHartmanKing@HartmanKingLaw.com
ALungren@HartmanKingLaw.com
WMarsh@HartmanKingLaw.com
JRParker@HartmanKingLaw.com
AWooNazal@HartmanKingLaw.com

Exempt From Filing Fees Pursuant
To Government Code Section 6103

Attorneys for Defendants KATHLEEN ALLISON,
in her official capacity as Secretary of the California Department
of Corrections and Rehabilitation; and PATRICK COVELLO,
in his official capacity as Warden of California Department of
Corrections and Rehabilitation Mule Creek State Prison

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN ALLISON, in her official capacity as Secretary of the California Department of Corrections and Rehabilitation,<br><br>Defendant. | Case No. 2:20-CV-02482-WBS-AC [consolidated with 2:21-CV-00038-WBS-AC]<br><br>**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date: January 9, 2023<br>Time: 1:30 p.m.<br>Judge: Hon. William B. Shubb<br>Ctrm. 5<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |
| COUNTY OF AMADOR, *a public agency of the State of California,*<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN ALLISON, in her official capacity as Secretary of the California Department of Corrections and Rehabilitation; and PATRICK COVELLO, in his official capacity as Warden of California Department of Corrections and Rehabilitation Mule Creek State Prison,<br><br>Defendants. | Final Pretrial Conf.: February 13, 2023<br>Trial Setting Conf.: April 18, 2023 |

00057550.1

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

LEGAL ARGUMENT ................................................................................................. 6

  I.   PLAINTIFFS DO NOT DISPUTE THAT WHETHER THE ALLEGED ONGOING DISCHARGE DATA SET IS REPRESENTATIVE OF STORMWATER THAT ACTUALLY REACHED MULE CREEK IS A THRESHOLD ISSUE THEY CANNOT OVERCOME. ................................................................................................ 6

    A.  There Is No Credible Evidence Of Any Past Or Ongoing Violations At The Facility. ... 6

    B.  Plaintiffs Inappropriately Claim That Alleged "Discharge" Sampling Results May Constitute Violations Of The Basin Plan's Water Quality Objectives. ................................. 7

    C.  The Alleged Ongoing Discharge Data Set Is Not Representative Of Actual Stormwater Discharges To Mule Creek. ..................................................................... 9

  II.   PLAINTIFFS DO NOT CREDIBLY REFUTE THAT ANALYSIS OF BACKGROUND SOURCES IS FUNDAMENTAL TO DETERMINING WHETHER STORMWATER SAMPLING RESULTS INDICATE VIOLATIONS OF THE SMALL MS4 PERMIT ......... 11

  III.  PLAINTIFFS DO NOT CREDIBLY REFUTE THAT CDCR HAS NOT CAUSED OR CONTRIBUTED TO EXCEEDANCES OF MULE CREEK'S RECEIVING WATER LIMITATIONS IN VIOLATION OF MS4 PERMIT PROVISION D, AS A MATTER OF LAW. ............................................................................................................... 14

    A.  The Regional Water Board Has Not Determined That Mule Creek's Beneficial Uses Have Been Unreasonably Impacted By Placing It On The Section 303(d) List Of Impaired Waterbodies. ............................................................................................ 14

    B.  Plaintiffs Cannot Establish That CDCR "Caused Or Contributed" To An Exceedance Of Mule Creek's Applicable Water Quality Objectives. ........................................ 16

  IV.  PLAINTIFFS DO NOT CREDIBLY REFUTE THAT THEY CANNOT DEMONSTRATE VIOLATIONS OF ANY OF THE OTHER SMALL MS4 PERMIT PROVISIONS AT ISSUE. ............................................................................... 19

    A.  Plaintiffs Did Not Raise Triable Issues On Whether There Have Been Ongoing Violations Of The Small MS4 Permit Provision B.1. ......................................... 19

    B.  Plaintiffs Did Not Raise Triable Issues On Whether There Have Been Ongoing Violations Of The Small MS4 Permit Provision B.2. ......................................... 20

    C.  Plaintiffs Do Not Raise Trible Issues On Whether There Are Ongoing Violations Of The Small MS4 Permit Provision B.3. ...................................................... 21

    D.  The County Did Not Raise Trible Issues On Whether There Are Ongoing Violations of the Small MS4 Permit Provision C. ........................................................... 22

CONCLUSION .......................................................................................................... 23

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Cal. Sportfishing Protection Alliance v. Chico Scrap Metal, Inc.,* 124 F. Supp. 3d 1007 (E.D. Cal. 2015)……………………………………………………………………….. 16, 18-19

*Cal. Sportfishing Protection Alliance v. River City Waste Recyclers*, *LLC,* 205 F. Supp. 3d 1128 (E.D. Cal. 2016)…………………………………………………………………… 16, 18-19

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy* 305 F.3d 943 (9th Cir. 2002)…. 7

*Gwaltney of Smithfield v. Chesapeake Bay Foundation,* 484 U.S. 49 (1987)……………….... 6, 7

*McClellan Ecol. Seepage Situation v. Weinberger*, 707 F. Supp. 1182 (E.D. Cal. 1988).. 8, 17, 23

*Nat. Res. Def. Council v. Texaco Ref. & Mktg.*, 2 F.3d 493 (3d Cir. 1993)…………………..... 7

*NRDC, Inc. v. Cty. Of L.A*., 673 F.3d 880 (9th Cir. 2011)………………………………... 17, 19

*NRDC v. Cty. Of L.A.*, 725 F.3d 1194 (9th Cir. 2013)………………………………… 16, 18

*Oregon Natural Resources Council v. U.S. Forest* Service, 834 F.2d 842 (9th Cir. 1987)…... 8, 18

*San Diego Gas & Elec. Co. v. San Diego Regional Water Quality Control Board*, 36 Cal.App. 5th 427 (2019)………………………………………………………………………... 21

*Santa Monica Baykeeper v. Kramer Metals, Inc.,* 619 F. Supp. 2d 914 (C.D. Cal. 2009)……………………………………………………………………….. 16, 18-19

**<u>Statutes</u>**

33 U.S.C. § 1362(11)…………………………………………………………………... 17

Cal. Wat. Code § 13050……………………………………………………………….... 5, 20

**<u>Regulations</u>**

40 C.F.R. § 131.3(i)………………………………………………………………………… 8

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Defendants Kathleen Allison, in her official capacity as Secretary of the California Department of Corrections and Rehabilitation, and Patrick Covello, in his official capacity as Warden of California Department of Corrections and Rehabilitation, Mule Creek State Prison ("CDCR" or "Defendants") hereby submit this Reply Brief in support of their Motion for Summary Judgment as to each of the claims for relief asserted by Plaintiffs California Sportfishing Protection Alliance ("CSPA") and the County of Amador (the "County").

Plaintiffs asserted three claims for relief in the operative complaint: (1) alleged violations of the Clean Water Act related to CDCR's permitted Land Application Area ("LAA") operations that Plaintiffs contended were the "functional equivalent" of a direct discharge into Mule Creek; (2) alleged "ongoing" violations of CDCR's Small Municipal Separate Storm Sewer System ("MS4") Permit[1] related to stormwater discharges occurring after the complaint was filed; and (3) alleged violations of CDCR's Industrial General Permit. After the filing of this motion, Plaintiffs appropriately (but belatedly) abandoned the first[2] and third claims for relief—thereby streamlining the scope of this motion to whether CDCR violated the Small MS4 Permit. As set forth herein, Plaintiffs' claim that there have been hundreds of alleged violations of the Small MS4 Permit is pure hyperbole—in fact, their retained expert, Karen Ashby, does not even opine that there have been permit violations. Indeed, if such violations had been occurring, the California Regional Water Board, Central Valley Region ("Regional Water Board")[3] would have commenced enforcement proceedings long ago.

---

[1] The State Water Resource Control Board's Permit for Waste Discharge Requirements for Storm Water Discharges from Small Municipal Separate Storm Sewer Systems, Order 2013-0001-DWQ.

[2] As asserted in its Complaint, CSPA's first claim for relief includes the allegation that the LAA operations resulted in a direct discharge to Mule Creek. ECF 1, CSPA Complaint, at ¶¶ 88-89. However, other than supposition from the Regional Water Board's enforcement staff, CSPA has not produced *any* evidence (i.e., sampling data) to support this unfounded claim.

[3] Plaintiffs cite various Regional Water Board letters and orders to unfairly paint CDCR as recalcitrant, but scrutiny of such "evidence" indicates that while the Board *initially* believed that CDCR had allowed "non-stormwater" to enter and pass through the MS4 conveyance system (which could be a violation of Provision B.3 of the Small MS4 Permit), CDCR refuted this notion with conclusive evidence that the levels detected were caused by background sources. Since then, the Regional Water Board took no enforcement action on this previous potential

Plaintiffs cannot satisfy their burden of proof at trial that CDCR violated the Small MS4 Permit because they fail to overcome three threshold issues (which Plaintiffs fail to credibly address in their opposition briefs) that are critical to their crusade to show permit violations. First, the post-complaint stormwater sampling data[4] that Plaintiffs rely upon do not constitute violations because *none* of the samples were collected from the two outfalls near Mule Creek (designated as sampling locations MCSP2 and MCSP3). As this Court previously ruled, stormwater samples collected from "within" the MS4 conveyance system (i.e., from the "upstream" sampling locations MCSP5 and MCSP6) are not "representative" of the quality of the stormwater that actually reaches Mule Creek because stormwater leaving MCSP5 and MCSP6 passes through vegetated bioswales that act as a filter for pollutants before reaching the creek's outfalls. ECF 60, Order Re: Motion for Partial Summary Judgment ("Order"), at 21:2-8, 21:5-10, 25:6-9. While Plaintiffs conjure up conspiratorial theories as to why CDCR stopped (and then later resumed) sampling from MCSP2 and MCSP3, the undisputed evidence shows that the Regional Water Board *ordered* CDCR to change the sampling locations and CDCR complied. Thus, Plaintiffs have only themselves to blame for failing to collect sampling data from the two outfalls at sampling locations MCSP2 and MCSP3 during their two inspections of Mule Creek State Prison ("MCSP" or "Facility") or otherwise during discovery.

Second, Plaintiffs did not, and cannot, account for "background" contributions of bacteria and metals in *any* of the sampling results (i.e., this applies to both the Alleged Ongoing Discharge Data Set as well as the Alleged Past Discharge Data Set[5] that was collected before the operative complaint was filed). Plaintiffs do not dispute that accounting for background is a

---

concern. Moreover, such "evidence" does not indicate the Regional Water Board believed that any of the Small MS4 Permit's other provisions were violated.

[4] In Defendants' Memorandum of Points and Authorities (ECF 95-1, "MPA"), Defendants defined Plaintiffs' post-complaint stormwater sampling data as the "Alleged Ongoing Discharge Data Set" and Plaintiffs' pre-complaint stormwater sampling data as the "Alleged Past Discharge Data Set."

[5] Defendants drew the distinction between alleged "past" and ""ongoing" discharges based on the nomenclature used to describe the sets of data presented by the County's retained expert, Karen Ashby. To the extent Plaintiffs now claim that certain pre-complaint "metals" data fall within the Alleged Ongoing Discharge Data Set by using the CSPA's earlier complaint as the line of demarcation, they still do not evidence violations for the reasons set forth herein.

fundamental and required aspect of assessing stormwater sampling results, yet they persist in presenting data tables replete with purported pollutant concentrations that are skewed upwards by background contributions. Plaintiffs' claim that their expert, Karen Ashby, "considered" background is disingenuous—in fact, Ms. Ashby (in some cases) merely compared data collected from MCSP5 and MCSP6 with data collected from MCSP4—a wholly separate issue from accounting for the impacts of background in these samples. As set forth in the MPA, CDCR submitted two comprehensive investigation reports to the Regional Water Board conclusively demonstrating that background sources were skewing the results of the stormwater sampling at the Facility upward—and as a result, the Regional Water Board has never found CDCR to be out of compliance with the Small MS4 Permit since the two reports were submitted. Simply put, Plaintiffs cannot prevail at trial without accounting for background. As discovery is now closed, Plaintiffs are precluded from collecting the necessary background samples to prove their single remaining claim in this action.

Third, Plaintiffs cannot establish that CDCR's stormwater discharges "cause or contribute" to exceedances of Mule Creek's "Receiving Water Limitations," including the applicable water quality objectives that are set forth in the Basin Plan[6]. This is a threshold issue because Plaintiffs cannot establish that CDCR violated any of the "Discharge Prohibitions" or "Effluent Limitations" in the Small MS4 Permit as a matter of law—thus, leaving only the Receiving Water Limitations of Provision D at issue. Plaintiffs, however, cannot prevail at trial in proving that CDCR caused or contributed to exceedances of Mule Creek because there is no evidence that Mule Creek's beneficial uses have been unreasonably affected, nor has the Regional Water Board determined that Mule Creek is "impaired." The Regional Water Board's Section 303(d) listing process that takes into account the impacts on beneficial uses with measurable data[7] has never resulted in a finding of impairment for Mule Creek. Instead of

---

[6] The "Basin Plan" refers to the February 2019 Water Quality Control Plan for the California Regional Water Quality Control Board, Central Valley Region Basin Plan. ECF 95-6, Request for Judicial Notice in Support of Motion for Summary Judgment ("RJN"), Ex. C.

[7] Pursuant to Clean Water Act section 303(d), states develop a list of impaired waterbodies specifically based on an assessment of whether water quality standards have been exceeded and whether there are impacts on beneficial uses, but Mule Creek is not "listed" on the Regional

performing an independent assessment of Mule Creek's conditions, as would be required since there has never been a finding of impairment, Plaintiffs instead improperly rely on a few samples collected from a *single* sampling point from within Mule Creek (designated as "MCSP4") without considering results from the upstream sampling location at MCSP1 or collecting the additional data needed to even make this argument. Again, Plaintiffs have only themselves to blame for their failure during discovery to obtain a data set sufficient to prove that CDCR's stormwater discharges have "caused or contributed" to an exceedance of Mule Creek's receiving water limitations. Moreover, the authority that Plaintiffs rely upon to support their specious argument that *any* discharge of stormwater on the same day that a single sample from MCSP4 exceeds the Basin Plan's water quality objectives is a violation is a serious overreach that finds no support in the Small MS4 Permit or applicable law.

Instead of addressing these threshold deficiencies, Plaintiffs instead resort to hyperbole and distortion of the Small MS4 Permit's specific provisions, and their requirements, as follows. First, Plaintiffs erroneously claim that sampling results from locations MCSP5 and MCSP6, as well as the outfalls at MCSP2 and MCSP3, *in and of themselves*, constitute permit violations by improperly applying numerical water quality objectives to alleged discharges from these locations. This simplistic argument was soundly rejected by the Eastern District (in a decision that was endorsed by the Ninth Circuit), nullifying Plaintiffs' purported "authority" on this issue. The Basin Plan's water quality objectives are meant to assess the overall conditions of the given waterbody based on an assessment of numerous sampling results and their impacts on the waterbody's beneficial uses—they do not apply to individual discharges. Thus, Plaintiffs' claims of violations based solely on the contention that sampling results exceed water quality standards should be disregarded by the Court.

Second, Plaintiffs mistakenly claim that Provision B.1 prohibits *any* "waste" from being discharged in stormwater. Provision B.1 only prohibits the discharge of certain wastes that are specifically *prohibited from being discharged* by one of the referenced plans—none of which

---

Water Board's section 303(d) list as an impaired waterbody. ECF 95-2, Defendants' Separate Statement of Undisputed Facts ("Defs' SS") at ¶¶ 50-53.

apply to the Facility or Mule Creek. Plaintiffs' contention that the Basin Plan "prohibits" discharges above the water quality objectives for *E. Coli* and metals is nonsensical and finds no support in the Small MS4 Permit, the Basin Plan, or applicable law. Moreover, the consistently low levels of ammonia in the Facility's discharges belies any notion that the stormwater contains "waste." Again, Ms. Ashby doesn't even support this unfounded claim with an opinion in her supporting declaration.

Third, Plaintiffs erroneously contend that CDCR's stormwater discharges have violated Provision B.2 for causing a "condition of pollution or nuisance" without properly referencing the definitions in California Water Code section 13050 that are expressly incorporated into Provision B.2 of the Small MS4 Permit. Such definitions clearly require a showing that there has been an unreasonable impact on Mule Creek's beneficial uses, but Plaintiffs cannot make this showing as a matter of law because, again, it is undisputed that the Regional Water Board has never determined that Mule Creek is impaired or that its beneficial uses have been adversely impacted.

Fourth, Plaintiffs claim that CDCR has been violating Provision B.3 of the Small MS4 Permit by alleging that raw sewage has been commingling with stormwater based on certain "dry weather" sampling results CSPA's expert collected from ponded water (i.e., not from stormwater that was actually discharged to Mule Creek). While CDCR vehemently disagrees with the alleged source of the constituents detected in Plaintiffs' sampling results, as well as their significance, Plaintiffs cannot prove that such constituents ever reached Mule Creek. To prevail at trial, Plaintiffs must prove that the constituents that were allegedly detected were actually discharged to "waters of the United States" ("WOTUS")—they cannot do so.

Fifth, the County[8] cannot establish its allegation that CDCR violated Provision C of the Small MS4 Permit by purportedly failing to "maintain controls" as a matter of law because, even if true, the County fails to demonstrate how such alleged failure is a permit violation actually resulting in an unpermitted discharge to WOTUS, as is required in a citizen suit per applicable law.

---

[8] CSPA did not allege a violation of Provision C in its Complaint. CSPA Complaint.

Finally, Plaintiffs cannot establish that CDCR violated Provision D of the Small MS4 Permit, which generally provides that a permittee shall not "cause or contribute" to an exceedance of water quality standards (which are applicable to the *receiving water,* not to "discharges") that are set forth in various regulatory documents, including the Basin Plan. Again, Plaintiffs must prove that the receiving water, i.e., Mule Creek, has exceeded the applicable water quality objective (known as an "impairment"), as deemed by the Regional Water Board or proved independently by Plaintiffs, but neither Mule Creek nor the two waterbodies downstream of Mule Creek (Dry Creek and the Mokelumne River) are "listed" by the State of California as impaired waterbodies pursuant to 303(d) of the Clean Water Act. Even if Mule Creek could be deemed to be impaired, which it is not, Plaintiffs must prove that Mule Creek is impaired by discharges *attributable to MCSP* with a data set sufficiently robust to make that claim. In short, Plaintiffs cannot establish this element of causation because they: (1) fail to account for the substantial background and upstream contributors of contaminants detected in Mule Creek, including evidence of major contributions of upstream sources of *E. coli* from nearby cattle ranches; (2) ignore the dominant impacts of bird and deer contributions (i.e., background) to contaminants detected; and, (3) ignore stormwater toxicity data showing that effluent discharged from MCSP is not toxic and poses no real threat to human health or the environment.

Accordingly, Plaintiffs cannot establish that CDCR violated the Small MS4 Permit as a matter of law—thus, the Court should grant summary judgment in favor of Defendants as to Plaintiffs' second claim for relief (i.e., the only remaining claim in this action).

## LEGAL ARGUMENT

### I.   PLAINTIFFS DO NOT DISPUTE THAT WHETHER THE ALLEGED ONGOING DISCHARGE DATA SET IS REPRESENTATIVE OF STORMWATER THAT ACTUALLY REACHED MULE CREEK IS A THRESHOLD ISSUE THEY CANNOT OVERCOME.

#### A.   There Is No Credible Evidence Of Any Past Or Ongoing Violations At The Facility.

In order to bypass the inescapable logic of the United States Supreme Court's decision in *Gwaltney of Smithfield v. Chesapeake Bay Foundation*, 484 U.S. 49, 67 (1987), holding that the

Clean Water Act does not confer federal jurisdiction over citizen suits "for wholly past violations", Plaintiffs contend that the Court should consider purported past "violations" in determining whether they are likely to be repeated. Such attempt, however, falls like a house of cards because Plaintiffs cannot establish that the alleged past violations are actually violations of the Small MS4 Permit at all.

To prevail at trial, a citizen-plaintiff must prove an ongoing permit violation. *Id.* at 64. Importantly, the purported authority Plaintiffs rely upon for their contention that a history of alleged past violations constitutes evidence from which a reasonable trier of fact could find a continuing likelihood of recurrence in intermittent or sporadic violations is unavailing because such cases concern civil penalties, not the injunctive relief that is the subject of the present suit. It is undisputed that Plaintiffs do not seek, and cannot obtain, civil penalties from these Defendants; therefore, these cases are inapposite here. Even more importantly, Plaintiffs cannot prove that Defendants have actually violated the Small MS4 Permit; therefore, reliance on *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy,* 305 F.3d 943 (9th Cir. 2002) and *Nat. Res. Def. Council v. Texaco Ref. & Mktg.*, 2 F.3d 493 (3d Cir. 1993) is misplaced because the plaintiffs there had established ongoing Clean Water Act violations and a likelihood they would recur in the future. *Henry Bosma*, 305 F.3d at 953; *Texaco*, 2 F.3d at 501. Plaintiffs, however, cannot establish permit violations here.

Accordingly, the body of case law regarding Clean Water Act citizen suits dictates that for civil penalties and injunctive relief to be proper, ongoing violations must first be established. It is not sufficient to allege wholly past violations and, based upon those unproven allegations, infer ongoing violations to exist.

**B.  Plaintiffs Inappropriately Claim That Alleged "Discharge" Sampling Results May Constitute Violations Of The Basin Plan's Water Quality Objectives.**

Plaintiffs claim throughout their opposition briefs that two sets of stormwater sampling results, namely from (1) the two outfalls at MCSP2 and MCSP3, and (2) the two sampling locations at MCSP5 and MCSP6 in isolation constitute violations of the Small MS4 Permit simply because they allegedly "exceed" the water quality objectives (or water quality standards)

that apply to Mule Creek. *See* ECF 45-4, Declaration of Karen Ashby In Support Of Plaintiffs' Motion for Summary Adjudication ("Ashby Decl."), at ¶¶ 10, 11, tbls. 2, 3, ¶ 17, tbl. 8, ¶ 14, tbl. 5, ¶ 20, tbl. 10. This contention is an egregious mischaracterization of the permit's provisions and how they apply to stormwater management.

First, the Small MS4 Permit clearly distinguishes between "Discharge Prohibitions" (Provisions B.1-B.4) and "Effluent Limitations" (Provisions C.1-C.2), on the one hand, and the "Receiving Water Limitations" in Provision D. The Regional Water Board's Elizabeth Lee testified at her deposition that the Board could not determine compliance with samples only collected from MCSP5 and MCSP6, or only from MCSP2 and MCSP3, because additional sampling from MCSP4 (at a minimum) would be required, as well as samples from the upstream sampling location MCSP1. Declaration of William Marsh ("Marsh Decl."), ¶ 2, Ex. B, Lee Deposition Transcript, at 90:17-91:4; 91:12-92:13, 199:10-201:13.

Furthermore, a water quality standard is defined in 40 Code of Federal Regulations ("C.F.R.") section 131.3(i) as "provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses." Thus, as found by the Eastern District, there is a distinction between "effluent limitations" and "receiving water limitations," and water quality standards should not be conflated with the former. *See e.g.*, *McClellan Ecol. Seepage Situation v. Weinberger*, 707 F. Supp. 1182, 1203 (E.D. Cal. 1988) (holding that discharge "exceedances" of water quality standards are not enforceable by themselves); *in accord, Oregon Natural Resources Council v. U.S. Forest* Service, 834 F.2d 842, 849-850 (9th Cir. 1987) (holding that plaintiffs could not sue for alleged exceedances of water quality standards based on similar language in the Clean Water Act, 33 U.S.C. § 1311(b)(1)(C)). Per the *McClellan* decision, "[e]ffluent limitations specifically limit the quantity or concentration of a pollutant that may appear in [] discharges…" *McClellan*, 707 F. Supp. at 1203. "Receiving water limitations, by contrast, provide that "the discharge shall not cause" certain changes in the receiving waters or certain levels in the receiving waters to be exceeded." *Id*. Thus, Plaintiffs' misleading attempt to equate purported "exceedances" of numerical water quality objectives based on "discharge" data is antithetical to how stormwater

permits operate and applicable law.

Second, close scrutiny of the declaration of Plaintiffs' retained expert, Karen Ashby, reveals that the declaration deceptively suggests, *but never actually opines*, that the data she relied upon indicates a permit violation or that applying water quality standards to purported discharge data is an accepted methodology. In this regard, Ms. Ashby uses the headers in her declaration to suggest various violations, but tellingly, she never actually offers her opinion that the Small MS4 Permit has been violated. *See* ECF 45-4, Ashby Decl., at ¶¶ 10-12, 14-16, 17-21.

Accordingly, sampling results from a set of data from MCSP2 and MCSP3, or a set from MCSP5 and MCSP6, cannot establish that the discharges "caused" the receiving water to exceed an applicable water quality objective such that the Small MS4 Permit was violated.

**C.  The Alleged Ongoing Discharge Data Set Is Not Representative Of Actual Stormwater Discharges To Mule Creek.**

Plaintiffs concede that their purported evidence of post-complaint permit violations (the Alleged Ongoing Discharge Data Set) is comprised exclusively of samples collected from MCSP5 and MCSP6 (and in some cases MCSP4) rather than from the two outfalls from the Facility to Mule Creek. This data set, however, does not constitute evidence of permit violations because *none* of the samples were collected from the two outfalls to Mule Creek (designated as sampling locations MCSP2 and MCSP3) that are representative of the quality of stormwater that enters WOTUS from the Facility. Defs' SS, at ¶ 53. Indeed, the Court previously ruled that: (1) "Plaintiffs do not dispute that the samples upon which they rely came from MSCP5 and MCSP6"; (2) "plaintiffs do not appear to have demonstrated that contaminants at issue here in fact reached or 'accumulated . . . in' Mule Creek"; and (3) the Court could not conclude based on Plaintiffs' proffered evidence that the stormwater discharges at issue actually entered WOTUS or caused or threatened to cause a condition of pollution or nuisance. Defs' SS, at ¶ 75; Order, at 18:13-14, 21:2-8, 21:5-10, 25:6-9. Thus, the data set collected from MCSP5 and MCSP6 are not "representative" of the quality of the stormwater that actually reaches Mule Creek because stormwater leaving MCSP5 and MCSP6 pass through vegetated bioswales that act as a filter for pollutants before reaching the creek's outfalls. Defs' SS, at ¶¶ 21-23.

Instead of addressing this contention, Plaintiffs proffer a baseless theory that CDCR "intentionally" stopped, then later resumed, sampling from MCSP2 and MCSP3 for nefarious reasons. This contention, however, is outrageous and demonstrably false. The County alleges that "Defendants unilaterally notified the Regional [Water] Board that Defendants would no longer conduct monitoring at MCSP2 and MCSP3 and would instead rely solely on monitoring conducted at locations MCSP5 and MCSP6" after receiving the County's 60-Day Notice. ECF 97, County of Amador's Memorandum of Points and Authorities in Opposition to Defendants' Kathleen Allison and Patrick Covello's Motion for Summary Judgment ("County Opposition"), at 10:25-28. As support for the same, the County references a letter from the Regional Water Board dated June 29, 2021, which merely recapitulates the Regional Water Board and CDCR's understanding of the monitoring requirements pursuant to the operative 13383 Order—that discharges at MCSP5 and MCSP6 would be monitored until the planned monitoring infrastructure at MCSP2 and MCSP3 is installed. ECF 97-9, at p. 3.

Nowhere does the Regional Water Board claim in its June 29, 2021 letter that Defendants unilaterally decided to change the location of the monitoring locations for compliance purposes and for the County to allege otherwise is outrageous and wholly unsupported. *Id.* To the contrary, on December 22, 2020, the Regional Water Board issued a revised 13383 Order that expressly requires CDCR to monitor from MCSP5 and MCSP6. ECF 97-17, at p. 40. Moreover, in a letter to the Regional Water Board dated January 21, 2021, CDCR actually requested that the monitoring locations MCSP5 and MCSP6 be replaced with monitoring locations MCSP2 and MCSP3 because discharges from MCSP5 and MCSP6 are not representative of discharges to Mule Creek, in either water quality or volume. Marsh Decl., ¶ 1, Ex. A, at pp. 2-3. Thus, Plaintiffs badly misrepresent the facts to cover for their abject failure to collect samples from Mule Creek's two outfalls.

Plaintiffs also offer up a "red herring" by mischaracterizing Defendants' argument on this point as to whether the stormwater at issue actually discharged to Mule Creek. County Opposition, at 12:26-14:10. To be clear, Defendants do not dispute that the stormwater samples that they collected during significant rain events—hence, when the slide gates were open—

actually reached Mule Creek. As the Court astutely noted above, the issue centers on the "representativeness" of the quality of the stormwater that is sampled at MCSP5 and MCSP6 because it passes through bioswales before it reaches Mule Creek, not on whether it ultimately reaches Mule Creek at all. Thus, Plaintiffs' claim that CDCR "admitted" to the California Office of Emergency Services ("OES") that the Facility discharged to Mule Creek thirteen times during significant storm events misses the point[9]. The County contends that the results reported to the OES consisted of data from the First Quarter of 2021 and the First Quarter of 2022 and that such data was derived from sample points MCSP5 and MCSP6. ECF 97-2, County Separate Statement of Disputed Facts ("County SS"), at ¶ 15. However, as set forth above, samples collected from these two locations are not representative of the quality of the stormwater that actually reaches Mule Creek—thus, Plaintiffs again have not established permit violations with data comprised exclusively of samples *not* collected from the Facility's two outfalls.

## II. PLAINTIFFS DO NOT CREDIBLY REFUTE THAT ANALYSIS OF BACKGROUND SOURCES IS FUNDAMENTAL TO DETERMINING WHETHER STORMWATER SAMPLING RESULTS INDICATE VIOLATIONS OF THE SMALL MS4 PERMIT.

As set forth in the MPA, a fundamental principle in evaluating groundwater sampling data is accounting for "background" and non-human sources in the levels detected. Defs' SS, at ¶ 63; *see* ECF 95-5, Declaration of Timothy Simpson ("Simpson Decl."), at ¶ 17. The obvious and undisputed impact of this principle is that the stormwater sampling levels that Plaintiffs contend are evidence of exceedances and "violations" are inflated due to the presence of background sources—and, therefore, do not indicate permit violations. Simpson Decl., at ¶ 17-19. Indeed, Plaintiffs retained expert, Dr. Robert Emerick, as well as the Regional Water Board's Elizabeth Lee, testified under oath that background considerations are crucial to any such analysis. Defs' SS, at ¶¶ 63, 66. Moreover, as opined by CDCR's expert, Timothy Simpson:

> Evaluating for the impacts of "background" sources is a fundamental principle of assessing the quality of stormwater discharges and impacts from a discharger. The Water Quality Control Plan for the California Regional Water Quality Control

---

[9] Tellingly, Plaintiffs do not provide the sampling results in their table. County Opposition, at 13:4-15.

Board, Central Valley Region (February 2019) (the "Basin Plan") states that "the Regional Water Board [is required] to establish water quality objectives, while acknowledging that it is possible for water quality to be changed to some degree without unreasonably affecting beneficial uses." The Basin Plan further explains that water quality objectives "do not require improvement over naturally occurring background concentrations. In cases where the natural background concentration of a particular constituent exceeds an applicable water quality objective, the natural background concentration will be considered to comply with the objective.

Defs' SS, at ¶ 63; Simpson Decl., at ¶ 17.

In response, Plaintiffs completely ignore that the Basin Plan's Bacteria Provisions expressly provides that background sources of bacteria should be considered. In Section 2.b Natural Sources of Bacteria, the State Board mandates that "a natural source exclusion approach may be utilized after all anthropogenic sources of bacteria are identified, quantified, and controlled." Defs' SS, at ¶ 64. Plaintiffs, however, fail to refute the applicability of this section of the Basin Plan that expressly provides for the accounting of background sources before a permit can be deemed to have been violated.

Plaintiffs' main response to the background argument is that a guidance manual funded by the federal Environmental Protection Agency ("EPA"), subjected to the EPA's peer and administrative review, and available at EPA's website, is somehow irrelevant to the importance of considering background. County Opposition, at 31:24-28. Per this guidance, an important caveat when interpreting stormwater monitoring data is that a violation of bacteria standards during dry weather flow does not always mean that an illicit discharge or sewage overflow is present. It notes that while raw sewage may exceed bacteria standards, other bacteria sources, such as urban wildlife, can also cause a stream to exceed standards. Defs' SS, at ¶ 65; October 2004 EPA Guidance Manual: Illicit Discharge Detection and Elimination ("EPA Guidance Manual"), RJN, Ex. G, at p. 142.

EPA also published the April 2021 Industrial Stormwater Monitoring and Sampling Guide (EPA 832-B-09-003, "2021 IMSG") that further sets forth the importance of accounting for background sources in stormwater sampling. There, the EPA stated that there may be circumstances where benchmark values "cannot be reasonably achieved because of local natural background concentrations." Defendants' Second Request for Judicial Notice in Support of

Motion for Summary Judgment ("RJN II"), Ex. A, 2021 IMSG, at p. 39. In such cases, including but not limited to, when exceedance of a benchmark value is "solely attributable to natural background pollutants levels" or "due to run-on from a neighboring source," the EPA exempts facilities from further control measure evaluation monitoring." *Id.* at 38.

Plaintiffs next proffer misleading citations to the record in falsely claiming that their retained expert, Karen Ashby, "considered" background and that Elizabeth Lee from the Regional Water Board agreed with the "appropriateness" of Plaintiffs' approach. ECF 97-2, Separate Statement of Disputed Facts in Support of County of Amador's Opposition [], at ¶ 43. In fact, Plaintiffs' assertions find no support in the record they cite. Moreover, considering samples from MCSP4, which is indisputably a sampling location within Mule Creek and *downstream* from the Facility, cannot be equated with adequate accounting for background sources of contaminants. Defs' SS, at ¶ 66; Simpson Decl., at ¶¶ 23-24, 30-31. Plaintiffs offer no explanation of, or support for, this dubious contention.

Finally, CSPA claims that the irrefutable background contributions to Plaintiffs' purported evidence of stormwater "exceedances" is "not excused," apparently meaning that CDCR should be held responsible for off-site and naturally occurring sources of bacteria and metals beyond the Facility's control. ECF 96, Plaintiff California Sportfishing Protection Alliance's Opposition to Defendants' Motion for Summary Judgment ("CSPA Opposition"), at 25:21-26-5. This contention, however, is an extreme overreach and not supported with any authority, other than a misreading of the Small MS4 Permit.

Thus, Plaintiffs' incessant claims of Small MS4 Permit violations are insufficient because no reasonable fact finder could find in their favor due to Plaintiffs' failure to account for readily-apparent "background" and non-human sources. Defs' SS, at ¶ 66; *see* Simpson Decl., at ¶¶ 18-19, 22-23. In summary, it is undisputed that Plaintiffs fail to account for: (1) the substantial background and upstream contributors of contaminants detected in Mule Creek, including evidence of major contributions of upstream sources of *E. coli* from upstream cattle; (2) the dominant impacts of bird and deer contributions (i.e., background) to contaminants detected at the Facility itself as demonstrated by DNA testing and the 2021 Sources of Fecal Pollution

Report; and (3) stormwater toxicity data showing that discharged effluent is not toxic and poses no real threat to aquatic life. *Id*. at ¶¶ 16, 22-23. It is also undisputed that the surrounding areas of the Facility, including areas near the stormwater conveyance system and Mule Creek, are frequented by wildlife, including birds and deer. Defs' SS, at ¶ 3. There are also cattle ranches located near Mule Creek upstream of the Facility. *Id*. Accordingly, Plaintiffs' failure to show how they can account for background in the stormwater sampling results—collected *both before and after* the filing of the operative complaint—precludes their ability to establish this element of causation for which they bear the burden of proof at trial.

## III. PLAINTIFFS DO NOT CREDIBLY REFUTE THAT CDCR HAS NOT CAUSED OR CONTRIBUTED TO EXCEEDANCES OF MULE CREEK'S RECEIVING WATER LIMITATIONS IN VIOLATION OF MS4 PERMIT PROVISION D, AS A MATTER OF LAW.

Defendants' MPA sets forth two primary reasons for why Plaintiffs cannot establish that CDCR "caused or contributed" to any exceedances of Mule Creek's receiving water limitations in violation of the MS4 Permit Provision D as a matter of law, namely: (1) there is no evidence that Mule Creek's beneficial uses have been unreasonably affected as the Regional Water Board has not determined that it is impaired; and (2) Plaintiffs improperly relied upon a *single* sampling point within Mule Creek (MCSP4) without considering results from the upstream sampling location at MCSP1 or collecting sufficient samples from Mule Creek to independently make such a determination. Defs' SS, at ¶¶ 63, 66, 89; Simpson Decl., at ¶¶ 17, 19, 23-24, 30-31. In response, Plaintiffs offer only facile arguments that fail to meet their burden of proof sufficient to survive summary judgment as follows.

### A. The Regional Water Board Has Not Determined That Mule Creek's Beneficial Uses Have Been Unreasonably Impacted By Placing It On The Section 303(d) List Of Impaired Waterbodies.

In response to CDCR irrefutably demonstrating that Mule Creek has not been designated as impaired, Plaintiffs first claim that the "evidence presented" shows that the Facility's discharges "contribute" to an exceedance of Mule Creek's applicable water quality objectives, conveniently skipping over the Plaintiffs' threshold burden of establishing that Mule Creek is impaired and implicitly conceding they cannot prove direct causation. County Opposition, at

32:6-14. Indeed, Plaintiffs' unsupported assertion begs the question of "what evidence?" as Plaintiffs merely refer to the same data tables that have been discredited herein. Simply presenting evidence that CDCR has discharged stormwater into Mule Creek, which, incidentally, is devoid of any proof of concentrations discharged by the Facility, does not prove that Mule Creek's receiving water limitations have been exceeded. Defs' SS, at ¶¶ 66, 89.

Under the Clean Water Act section 303(d), states are required to identify waterbodies that do not meet, or are not expected to meet, water quality standards (known as "impaired waterbodies"). Thus, waterbodies in California that exceed water quality standards are placed on the State's 303(d) List. Defs' SS, at ¶ 51; Simpson Decl., at ¶ 29. Based on California's Listing Policy in developing the 303(d) list, the Water Board evaluates water quality-related data and information. Defs' SS, at ¶ 52; Simpson Decl., at ¶ 29, 30. The Water Board's 303(d) List for 2020-2022, the current watershed impairment list for the area, provides no assessment data for Mule Creek but does provide assessment data for Dry Creek, which is the next waterbody receiving flows from Mule Creek. Defs' SS, at ¶ 53; Simpson Decl., at ¶ 29. The Water Board did not designate Dry Creek as impaired. Defs' SS, at ¶ 54; Simpson Decl., at ¶ 29. *Notably*, Plaintiffs concede that a showing of impairment is required as the operative complaint acknowledges that this is an element of causation by alleging that CDCR discharged pollutants into impaired waterbodies—Plaintiffs, however, incorrectly focus on whether beneficial uses of "the Delta" have been impaired rather than focusing on Mule Creek specifically. ECF 35, County Complaint, at ¶¶ 77, 108.

Importantly, the section 303(d) listing process *takes into account* the impacts on beneficial uses with robust, measurable data, but such process has never resulted in a finding of Mule Creek's impairment or that its beneficial uses have been adversely impacted. Defs' SS, at ¶ 53-54; Simpson Decl., at ¶¶ 23-24, 29. Instead of independently performing a proper assessment of Mule Creek's conditions, as would be required since the State has not found the creek to be impaired, Plaintiffs proffer unsupported legal theories without collecting sufficient data or performing the requisite data analysis. Defs' SS, at ¶¶ 88-89; Simpson Decl., at ¶¶ 17, 23, 30-31; Marsh Decl., ¶ 2, Ex. B, Lee Deposition Transcript, at 202:22-203:21 (stating that "[y]ou would

1   need something at least at minimum that's statistically significant. Number of samples that is.").

2       Again, Plaintiffs have only themselves to blame for their failure during discovery to

3   obtain a data set sufficient to prove that CDCR's stormwater discharges have actually "caused or

4   contributed" to a receiving water exceedance.

5       **B.** **Plaintiffs Cannot Establish That CDCR "Caused Or Contributed" To An Exceedance Of Mule Creek's Applicable Water Quality Objectives.**

6

7       Plaintiffs claim that CDCR has ongoing violations of provision D, "when sampling

8   demonstrates a receiving water exceeds [water quality standards ('WQS')] for any pollutant and

9   the *facility discharges the same pollutant* to that receiving water above WQS" (emphasis added),

10  relying on *NRDC v. Cty. Of L.A.*, 725 F.3d 1194 (9th Cir. 2013) ("*NRDC II*"), *Cal. Sportfishing*

11  *Protection Alliance v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128 (E.D. Cal. 2016),

12  *Santa Monica Baykeeper v. Kramer Metals, Inc.,* 619 F. Supp. 2d 914 (C.D. Cal. 2009), and *Cal.*

13  *Sportfishing Protection Alliance v. Chico Scrap Metal, Inc.,* 124 F. Supp. 3d 1007 (E.D. Cal.

14  2015) for support. County Opposition, at 28:12-17; CSPA Opposition, at 28:18-20. These cases,

15  however, are wrongly decided to the extent they inappropriately apply water quality standards to

16  stormwater *discharge* sampling results as discussed in section I.B, above, and as follows.

17      The Small MS4 Permit's Receiving Water Limitations, Provision D, provides:

18  "Discharges shall not cause or contribute to an exceedance of water quality standards contained

19  in a Statewide Water Quality Control Plan, the California Toxics Rule (CTR), or in the

20  applicable Regional Water Board Basin Plan." Defs' SS, at ¶ 86. If the Small MS4 Permit is read

21  as whole in conjunction with the referenced plans (in this case the Basin Plan), it is clear that

22  Plaintiffs' simplistic interpretation is unavailing because demonstrating the receiving water (as a

23  whole) has exceeded water quality standings is a necessary element of causation as follows.

24  First, Provision D cannot be interpreted to mean the discharge itself shall not exceed the

25  referenced water quality standards because such interpretation would write the shall not "cause

26  or contribute" language out of the permit. In simple terms, the discharge must *cause* the

27  exceedance, it does not constitute the exceedance itself.

28      Second, Provision D is expressly termed "*Receiving Water* Limitations"—thus, any

limitations set forth in the referenced Basin Plan necessarily applies to the receiving water's limitations, not to a given facility's discharges. In this regard, the Small MS4 Permit contains two other provisions, "Provision B. Discharge Prohibitions" and "Provision C. Effluent Limitations," that *do* apply to discharges, lending further support to this logical interpretation.

Third, the plans referenced in Provision D regulate "ambient" conditions of waterbodies in the State of California, not individual discharges to them. For instance, the Basin Plan[10] provides that it consists of designations of beneficial uses of waterbodies, water quality standards to protect such uses, and an implementation program to achieve those objectives. RJN, Ex. C, Foreword, at p. i.

The Ninth Circuit Court of Appeals endorsed this crucial distinction between effluent limitations and receiving water limitations in *NRDC, Inc. v. Cty. Of L.A.*, 673 F.3d 880, 885 (9th Cir. 2011), *vacated on other grounds* ("*NRDC I*"), in finding that the Clean Water Act uses two water quality-based performance standards by which stormwater discharges must be evaluated: effluent limitations and "water quality standards." Per the Ninth Circuit, an effluent limitation is "any restriction established by a State or the [EPA] on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters. . .." *Id.* (citing 33 U.S.C. § 1362(11)). On the other hand, water quality standards "are used as a supplementary basis for effluent limitations, so that numerous dischargers, despite their individual compliance with technology-based limitations, can be regulated to prevent water quality from falling below acceptable levels." *Id.*

In *McClellan,* as noted above, the Eastern District identically drew this distinction between "effluent limitations" and "receiving water limitations" in rejecting the precise argument that Plaintiffs make here in denying summary judgment for the plaintiff citizen group. *McClellan*, 707 F. Supp. at 1205. Specifically, the court concluded that effluent limitations limit the quantity or concentration of a pollutant that may appear in discharges. Receiving water limitations, by contrast, provide that "the discharge shall not cause" certain changes in the

---

[10]  In addition, Table 1 of the Bacteria Provisions in the Basin Plan that Plaintiffs rely upon specifies that the numerical objectives apply to the waterbody, not to individual discharges.

receiving waters or certain levels in the receiving waters to be exceeded. *Id.* at 1203; *see also*, *Oregon Natural Resources Council*, 834 F.2d at 849-850 (holding that plaintiffs could not sue for alleged exceedances of water quality standards based on similar language in the Clean Water Act).

Therefore, *NRDC II, River City Waste Recyclers*, *Kramer Metals,* and *Chico Scrap Metals,* were wrongly decided to the extent they simplistically find permit violations by applying water quality standards to stormwater discharges—indeed, they all mistakenly fail to assess the impacts of the discharges to the receiving water body as is required under the Small MS4 Permit.

This line of cases is also distinguishable in several important respects as follows. First, *River City Waste Recyclers*, contrary to Plaintiffs' contentions, does not refute Defendants' argument that Mule Creek must be deemed impaired because the defendant in that case never raised the issue of impairment as a defense at all. The opinion is further distinguishable because the alleged violations at issue were regulated under an entirely different compliance regime (the 1997 and 2015 California Industrial Stormwater General Permits, which regulate industrial storm water discharges) not under the Small MS4 Permit at issue here. More importantly, the defendant in that case readily conceded that its stormwater samples exceeded both the EPA benchmark values and the 1997 General Permit's receiving water limitations. *River City Waste Recyclers*, 205 F. Supp. 3d at 1141, 1150. Here, of course, Defendants do not concede that their stormwater discharges exceed any applicable water quality objective, particularly after taking background sources into account.

Second, *NRDC II* is distinguishable because the monitoring locations in question were located *within* two receiving waterbodies (the Los Angeles and San Gabriel rivers) that were indisputably in exceedance of the applicable water quality standards. *See NRDC II*, 725 F.3d at 1200, n.12. From *NRDC I*, it appears the plaintiffs relied on numerous samples collected from multiple locations (identified in the case as "mass-emissions monitoring stations") within the receiving waters at issue to determine whether the receiving water limitations were exceeded. *See NRDC I*, 673 F.3d at 889. Hence, the facts are in sharp contrast to the present case in that the receiving waterbody samples are from a single sampling location (from MCSP4) and Plaintiffs

have made no showing that Mule Creek has exceeded any water quality standard. The sampling locations that Plaintiffs rely upon to allege receiving water limitations violations here do not represent the overall water quality of Mule Creek or indicate that it exceeds any water quality standard. Def's SS, at ¶ 82.

Third, the similar *Kramer Metals* and *Chico Scrap Metal* decisions are distinguishable because the defendants held the same Industrial Stormwater General Permit at issue in *River City Waste Recyclers*, which is not at issue in this case, and because both defendants readily admitted that their respective facilities were the sole cause of the observed exceedances. *Kramer Metals,* 619 F. Supp. at 917, 926; *Chico Scrap Metal,* 124 F. Supp. 3d at 1022.

In sum, Plaintiffs improperly conflate sampling results from individual "discharges" (i.e., from sampling locations MCSP2 and MCSP3) and sampling results from within the stormwater system that are not representative of the discharge to Mule Creek (MCSP5 and MCSP6) with the water quality objectives that are set forth in the Basin Plan or the California Toxics Rule. Accordingly, Plaintiffs cannot establish their claim that CDCR "caused or contributed" to any exceedance of Mule Creek's receiving water limitations as a matter of law.

## IV. PLAINTIFFS DO NOT CREDIBLY REFUTE THAT THEY CANNOT DEMONSTRATE VIOLATIONS OF ANY OF THE OTHER SMALL MS4 PERMIT PROVISIONS AT ISSUE.

### A. Plaintiffs Did Not Raise Triable Issues On Whether There Have Been Ongoing Violations Of The Small MS4 Permit Provision B.1.

As Defendants set forth in the MPA, the Small MS4 Permit's Discharge Prohibitions, Provision B.1, prohibits the "[d]ischarges of waste from the MS4 that are prohibited by Statewide Water Quality Control Plans or applicable Regional Water Quality Control Plans (Basin Plans)." Defs' SS, at ¶ 69. Thus, to prevail at trial, Plaintiffs must prove that CDCR discharged "waste" that is specifically prohibited by one of the referenced plans.

In response, Plaintiffs do not credibly refute the plain language of Provision B.1's requirements and instead incorrectly interpret the term "waste" to essentially ban the discharge of *any* pollutant. County Opposition, at 23:11-24:5. Plaintiffs' interpretation, however, is unsupportable because the reference to "animal origin" in their interpretation would be so

expansive as to be meaningless. More importantly, Plaintiffs cannot point to any section of the Basin Plan that prohibits discharge of their incorrect definition of "waste." The Basin Plan prohibits the discharge of several forms of waste in several specified waterbodies, none of which apply here. Defs' SS, at ¶ 70.

Plaintiffs also again regurgitate their claim that a violation occurs "when the discharges exceed WQS established by the Basin Plan." CSPA Opposition, at 34:24-27; County Opposition, at 25:9-13. Plaintiffs, however, conspicuously do not cite the Basin Plan or any legal authority for support. This interpretation is inconsistent with the plain language of B.1 which does not incorporate any mention of water quality standards. If the State Water Resources Control Board had intended to prohibit discharges that exceed an applicable water quality standard, it would have included such language in the permit. Moreover, Plaintiffs' interpretation of Provision B.1 conflicts with their interpretation of the other provisions of the Small MS4 Permit in that Provisions C and D would be rendered superfluous if Plaintiffs' strained interpretation were adopted.

Finally, even if Plaintiffs' interpretation of the term "waste" were convincing, which it is not, they do not refute that the low levels of ammonia detected in the Facility's stormwater indicate that no waste is present. Defs' SS, at ¶ 81-83. Thus, Plaintiffs cannot prevail on their Provision B.1 claim as a matter of law.

### B. Plaintiffs Did Not Raise Triable Issues On Whether There Have Been Ongoing Violations Of The Small MS4 Permit Provision B.2.

Defendants set forth in the MPA why Plaintiffs cannot prevail on their Provision B.2 claim. The Small MS4 Permit's Discharge Prohibitions, Provision B.2, provides that "[d]ischarges of storm water from the MS4 to waters of the U.S. in a manner causing or threatening to cause a condition of pollution or nuisance as defined in Water Code § 13050 are prohibited." Defs' SS, at ¶ 72. Water Code section 13050 defines "pollution" as an alteration of the quality of water by "waste" to a degree which unreasonably affects" its beneficial uses. Thus, Plaintiffs must prove at trial that Defendants have (1) caused a discharge; (2) that causes a condition of pollution or nuisance; and (3) that alters Mule Creek to a degree that unreasonably

affects its beneficial uses.

Instead of addressing these required elements, Plaintiffs inappropriately rely on *San Diego Gas & Elec. Co. v. San Diego Regional Water Quality Control Board*, 36 Cal.App. 5th 427 (2019). However, the court there relied on a report finding the defendant's discharge of pollutants into a bay led the pollutants to "accumulate . . . in the marine sediment," thereby causing harm to "aquatic life, aquatic-dependent wildlife, and human health." *Id*. at 432, 439-40. As this Court has previously found, *San Diego Gas & Elec. Co*. is unavailing because there was a finding of actual impacts to human health and the environment. Order, at 21:1-10. Moreover, the case involved a defendant facing a Cleanup and Abatement order issued by the Water Board under the Water Code for illegal industrial discharges, not alleged violations of a stormwater permit. *San Diego Gas & Elec. Co*., 36 Cal.App. 5th at 430. Therefore, the issue of whether discharges of stormwater from an MS4 into WOTUS in a manner "causing or threatening to cause a condition of pollution or nuisance" was never at issue because the case is completely unrelated to stormwater permit compliance.

Provision B.2 of the Small MS4 Permit necessarily requires proof of an unreasonable effect on the water's beneficial use to constitute "pollution" or "nuisance" and, therefore, a permit violation. Defs' SS, at ¶ 72. Tellingly, Plaintiffs' expert, Karen Ashby, does not even offer her expert opinion in her supporting declaration that CDCR's stormwater discharges have had an unreasonable effect on Mule Creek's beneficial uses. Discovery closed for this matter on October 3, 2022, and Plaintiffs have produced no evidence to prove that the stormwater sampled from MCSP5 and MCSP6 actually reached Mule Creek. Therefore, as they cannot meet their burden to prove any ongoing violations of Provision B.2 of the Small MS4 Permit, the Court should grant summary judgment on this claim.

### C. <u>Plaintiffs Do Not Raise Trible Issues On Whether There Are Ongoing Violations Of The Small MS4 Permit Provision B.3.</u>

As Defendants set forth in the MPA, Plaintiffs cannot establish an ongoing violation of Provision B.3 as matter of law because they failed to show that any stormwater at issue actually reached Mule Creek. Defs' SS, at ¶ 75. Instead of addressing this argument, however, Plaintiffs

sidestep this crucial element of causation and attempt to demonstrate that there are genuine issues of material fact by claiming that the presence of caffeine and pharmaceutical compounds collected from ponded water at sampling location MCSP5 (i.e., upstream of the vegetated bioswales that filter contaminants) indicates that non-stormwater was discharged from the MS4 conveyance system.

Provision B.3 of the Small MS4 Permit, Discharge Prohibitions, provides in pertinent part that discharges of material other than storm water *to waters of the U.S.* shall be "effectively" prohibited, except as allowed under the provision. Defs' SS, at ¶ 76. In this regard, "effectively" is not an absolute prohibition because it means that the permittee must use best efforts to prevent non-stormwater from discharging through the MS4 and engage with the Board in the iterative process to implement best management practices ("BMPs"). Defs' SS, at ¶ 79. Even CSPA's own retained expert, Dr. Robert Emerick, admitted at his deposition that he did not know and could not assert "how much" sewage was present in the stormwater at the Facility. Defs' SS, at ¶ 80. Here, Plaintiffs cannot meet their burden of proof at trial that CDCR failed to effectively prevent non-stormwater from being discharged into WOTUS for the simple reason that there are *no* sampling results indicating that caffeine or pharmaceutical compounds were detected in Mule Creek. Without such sampling results, Plaintiffs' Provision B.3 claim falls apart.

Plaintiffs' second argument on this issue fares no better as it erroneously contends that "the Regional Board has confirmed that Defendants regularly discharge irrigation water from its (sic) MS4," and that irrigation water from landscaped areas at the Facility is non-stormwater that is not authorized to be discharged. Potable irrigation water, however, is exempted from the non-stormwater prohibitions pursuant to sections 3.g and 3.o. Small MS4 Permit Section B, RJN, Ex. A, at p. 18-19.

Accordingly, Plaintiffs cannot prevail on their Provision B.3 claim as a matter of law, and the Court should grant summary judgment on this claim.

### D. <u>The County Did Not Raise Trible Issues On Whether There Are Ongoing Violations of the Small MS4 Permit Provision C.</u>

Provision C of the Small MS4 Permit, Effluent Limitations, provides in pertinent part

that: (1) permittees shall implement controls to reduce pollutants discharged from their MS4s to WOTUS to the maximum extent practicable; and (2) stormwater discharges shall not contain hazardous substances above "reportable quantities." Defs' SS, at ¶ 84. The County hangs its hat on the first section as it claims that CDCR has failed to implement adequate BMPs to reduce pollutants discharged from their MS4 to the maximum extent practicable. County Opposition, at 33:10-34:2. In making this argument, however, the County essentially claims that CDCR must eliminate *all* stormwater discharges that contain *any* pollutants—thus, ignoring that BMPs are required to reduce pollutants to the maximum extent *practicable,* not to absolute perfection. As CDCR is irrefutably engaged in the iterative process with the Regional Water Board regarding its BMPs (including improvements to the BMPs as needed), it would be improper for the County, via the Court, to interfere with that iterative process with any form of injunctive relief. Defs' SS, at ¶¶ 28, 85.

Moreover, the permissible scope of citizen suits is limited to whether there have been violations of effluent standards or limitations, not whether BMPs have been implemented. *McClellan*, 707 F. Supp. at 1198-1200 (holding that federal courts lack jurisdiction under the Clean Water Act to consider issues other than alleged permit effluent violations).

For these reasons, the County cannot maintain its Provision C claim as a matter of law, and the Court should grant summary judgment on this claim.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment as to each of the claims for relief asserted by Plaintiffs in this action.

//

//

//

//

//

//

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1   Dated:  December 22, 2022          Respectfully submitted,

2                                                  HARTMAN KING PC

3
                                                   By: _____
4                                                        JENNIFER HARTMAN KING
                                                         ALANNA LUNGREN
5                                                        WILLIAM MARSH
                                                         J.R. PARKER
6                                                        ANDREYA WOO NAZAL
7                                                  Attorneys for Defendants
                                                   KATHLEEN ALLISON in her capacity as
8                                                  Secretary of THE CALIFORNIA DEPARTMENT
                                                   OF CORRECTIONS AND REHABILITATION;
9                                                  and PATRICK COVELLO, in his official capacity
                                                   as Warden of California Department of Corrections
10                                                 and Rehabilitation Mule Creek State Prison

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**