JENNIFER HARTMAN KING (SBN 211313)
ALANNA LUNGREN (SBN 269668)
WILLIAM D. MARSH (SBN 200082)
J. R. PARKER (SBN 320526)
ANDREYA WOO NAZAL (SBN 327651)
HARTMAN KING PC
520 Capitol Mall, Suite 750
Sacramento, CA 95814
Telephone: (916) 379-7530 Facsimile: (916) 379-7535
JHartmanKing@HartmanKingLaw.com
ALungren@HartmanKingLaw.com
WMarsh@HartmanKingLaw.com
JRParker@HartmanKingLaw.com
AWooNazal@HartmanKingLaw.com

Exempt From Filing Fees Pursuant
To Government Code Section 6103

Attorneys for Defendants KATHLEEN ALLISON,
in her official capacity as Secretary of the California Department
of Corrections and Rehabilitation; and PATRICK COVELLO,
in his official capacity as Warden of California Department of
Corrections and Rehabilitation Mule Creek State Prison

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN ALLISON, in her official capacity as Secretary of the California Department of Corrections and Rehabilitation,<br><br>Defendant.<br><br>COUNTY OF AMADOR, *a public agency of the State of California,*<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN ALLISON, in her official capacity as Secretary of the California Department of Corrections and Rehabilitation; and PATRICK COVELLO, in his official capacity as Warden of California Department of Corrections and Rehabilitation Mule Creek State Prison,<br><br>Defendants. | Case No. 2:20-CV-02482-WBS-AC [consolidated with 2:21-CV-00038-WBS-AC]<br><br>**DECLARATION OF WILLIAM D. MARSH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: January 9, 2023<br>Time: 1:30 p.m.<br>Judge: Hon. William B. Shubb<br>Ctrm. 5<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387)<br><br>Final Pretrial Conf.: February 13, 2023<br>Trial Setting Conf.: April 18, 2023 |

00057535.1

I, William D. Marsh, declare as follows:

1.      I am Senior Counsel at the law firm Hartman King PC, counsel of record for Defendants KATHLEEN ALLISON, in her official capacity as Secretary of the California Department of Corrections and Rehabilitation and PATRICK COVELLO, in his official capacity as Warden of California Department of Corrections and Rehabilitation Mule Creek State Prison ("Defendants"). I submit this declaration in support of Defendants' Motion for Summary Judgment and unless otherwise specified, I have personal knowledge of the matters set forth herein and, if called as a witness, could and would competently testify thereto.

2.      Attached hereto as Exhibit A is a true and correct copy of the California Department of Corrections and Rehabilitation's letter to the Central Valley Regional Water Quality Control Board ("Regional Water Board") dated January 21, 2021.

3.      On September 22, 2022 I attended the deposition of Elizabeth Lee from the Regional Water Board in which she was asked several questions regarding receiving water limitations of the Small MS4 Permit. Attached hereto as Exhibit B is a true and correct copy of excerpts from the deposition transcript of Ms. Lee, dated September 22, 2022.

I declare under the laws of the State of California under penalty of perjury that the foregoing is true and correct.

Executed on December 22, 2022, at Orinda, California.

_____
WILLIAM D. MARSH

DECLARATION OF WILLIAM D. MARSH ISO MOTION FOR SUMMARY JUDGMENT

# EXHIBIT A

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**DIVISION OF ADULT INSTITUTIONS**
MULE CREEK STATE PRISON
4001 Highway 104
P.O. Box 409099
Ione, CA, 95640



Date: January 21, 2021

State of California Water Resources Control Board
Central Valley Regional Water Quality Control Board
Sacramento Office
11020 Sun Center Drive, #200
Rancho Cordova, CA 95670-6114

Attention: Ms. Elizabeth Lee
          Senior Water Resource Control Engineer

*MULE CREEK STATE PRISON (MCSP) COMMENTS TO 22 December, 2020 WATER CODE SECTION 13383 ORDER TO MONITOR DISCHARGES TO SURFACE WATER; CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION – MULE CREEK STATE PRISON, WDID#:5S03M2000307, AMADOR COUNTY*

Dear Ms. Lee,

Please find our comments below to the above referenced order.

*8. D.  Non-Storm Water Discharge Report. The Permittee shall submit a Non-Storm Water Discharge Report by 1 February 2021.*

The Central Valley Regional Water Quality Control Board ("CVRWQCB") cites flowmeter readings from MCSP5 and MCSP6 as representative of non-storm water discharge to Mule Creek, and justification for the preparation and submission of a "Non-Storm Water Discharge Report". However, flowmeter readings from MCSP 5 and MCSP 6, reported weekly to the CVRWQCB, in response to a 13267 order, are not representative of non-storm water discharge from the MCSP MS4 system to Mule Creek, and provide no indication as to whether non-stormwater is discharged to Mule Creek. . These flowmeter locations are a substantial distance up-stream from the points of discharge to Mule Creek ("points of compliance"). Specifically, MCSP 5 is 630 feet up-stream from the point of compliance at MCSP 2, and MCSP 6 is 1500 feet up-stream from the point of compliance at MCSP 3. MCSP has is developing a plan to relocate the flowmeters from MCSP 5 and MCSP 6 to points of compliance MCSP 2 and MCSP 3, in order to accurately record actual discharges to Mule Creek through MCSP points of compliance.

Non-storm water flow recorded at MCSP 5 and MCSP 6 results from defects in the potable water, landscape irrigation system at the facility, and can be correlated with irrigation meter readings when the irrigation system is in use. MCSP is taking steps to repair the landscape irrigation system to address this identified non-storm water flow.

State of California Water Resources Control Board
Page 2

The non-storm water, landscape irrigation runoff recorded at MCSP 5 and MCSP 6 does not discharge to Mule Creek and is retained on MCSP property within the constructed earthen channels that run between MCSP 5 and MCSP 2, and MCSP 6 and MCSP 3. MCSP takes photographs daily of locations MCSP 5, MCSP 6, Main Junction Vault, Secondary Junction Vault, and Points of Compliance MCSP 2 and MCSP 3. These photographs are included in the Weekly Status Report that is submitted to the CVRWQCB every week by SHN on behalf of MCSP. MCSP has not observed non-storm water discharges through the MS4 system to Mule Creek.

The photographs provided within the Weekly Status Report to the CVRWQCB provide verification that non-storm water is not discharged to Mule Creek, even during times of high non-storm water flow readings at MCSP 5 and MCSP 6.

Based on the provided information, and Weekly Status Reports submitted to the CVRWQCB in response to the 13267 order, MCSP believes the Non-Storm Water Discharge Report due on February 1, 2021, is not warranted and requests that this requirement be removed from the Order.

***E. Discharge Notification.*** *The Permittee shall notify the Central Valley Water Board within 24 hours of the Facility discharging through the MS4 to the receiving water.*

Please confirm the preferred method *(verbal, written, electronic)* of notification to the CVRWQCB.

***I. MONITORING LOCATIONS***

A. ***Monitoring Locations.*** *The Permittee shall establish the monitoring locations identified in Table A.*

**Table A. Monitoring Station Locations**

| Discharge Point Name | Monitoring Location Name | Monitoring Location Description[1] |
|---|---|---|
| -- | RAIN-1 | Rain gage located at the Mule Creek Wastewater Treatment Plant |
| -- | MCSP1 (RSW-001) | Upstream receiving water location |
| 001 | MCSP5 (OUTFALL-1) | MS4 slide gate |
| 002 | MCSP6 (OUTFALL-2) | MS4 slide gate |
| -- | MCSP4 (RSW-002) | Downstream receiving water location approximately 200 feet downstream (south) of MCSP3. |

MCSP 5 and MCSP 6 are within the MCSP storm water management system, and are not representative of what MCSP discharges to Mule Creek in either water quality or volume.

State of California Water Resources Control Board
Page 3

MCSP requests monitoring locations MCSP 5 and MCSP 6 be replaced with monitoring at MCSP 2 and MCSP 3, which will represent the MCSP MS4 system discharge to Mule Creek.

Please note that MCSP submitted similar comments and a request for information on November 13, 2020, in response to the *November 5, 2020 proposed reissuance of 13383 Order to Monitor Discharges*. MCSP also provided this feedback to CVRWQCB staff on November 19, 2020, during a site visit and inspection conducted by the CVRWQCB and USEPA. MCSP has not received a response from the CVRWQCB to the submitted comments and information request.

MCSP respectfully requests a response from the CVRWQCB to the comments provided and information requested in this letter.

Thank you for your consideration in this matter. Please let me know if you have any questions or need additional information.

CHRISTOFER HUDGENS
Correctional Plant Manager II
Mule Creek State Prison

# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ROBERT T. MATSUI FEDERAL COURTHOUSE

```
CALIFORNIA SPORTFISHING      )
PROTECTION ALLIANCE,         )
                             )
            Plaintiff,       )
                             ) Case No.
                             ) 2:20-cv-02482-WBS-AC
vs.                          )
                             )
KATHLEEN ALLISON, etc.,      )
                             )
            Defendants.      )
_____)
```

REMOTE VIDEOTAPED DEPOSITION OF ELIZABETH LEE

TAKEN BY A CERTIFIED COURT REPORTER

THURSDAY, SEPTEMBER 22, 2022

at 9:05 a.m.

Reported By: LISA MAKOWSKI, CCR 345, CA CSR 13400

JOB NO:  73909

ELIZABETH LEE

September 22, 2022

1       Q.   Okay.  And later on in that paragraph,
2   there is a sentence that starts with, "Finally, the
3   permittee identified MCSP 5 and MCSP 6 as the
4   outfall for purposes of the 13883 order and small
5   MS4 general permit due to the absence of monitoring
6   infrastructure at the true outfall locations MCSP 2
7   and MCSP 3."  Do you see that sentence?
8       A.   Yes.
9       Q.   And earlier we had been talking about
10  whether CDCR requested that the monitoring points
11  be changed to MCSP 5 and MCSP 6.  Does this
12  sentence sort of change your memory or trigger your
13  memory as to how MCSP 5 and MCSP 6 were identified?
14      A.   No, not exactly.
15      Q.   Okay.  And that -- the end of that
16  paragraph says, "Unless and until the permittee
17  installs monitoring at MCSP 2 and MCSP 3,
18  discharges monitored at MCSP 5 and MCSP 6," and I
19  am skipping, "will be assumed to represent the MS4
20  discharges to Mule Creek for compliance purposes."
21      And is that sentence just reiterating that they
22  are the points where the Regional Board will
23  determine compliance with discharge prohibitions?
24      A.   Yes.
25      Q.   And is that also -- are those also the

ELIZABETH LEE

September 22, 2022

1   points that the Regional Board is determining

2   whether CDCR is complying with receiving water

3   limitations?

4        **A.   At two and three?**

5        Q.   I'm sorry, at five and six.

6        **A.   I don't believe -- or receiving water**

7   **limitations.**

8        Q.   Yeah.  And I can -- it is kind of hard.

9   We have to kind of go back and forth.  But

10  Exhibit 8 is the excerpt of the small MS4 permit in

11  receiving water limitations.  State that,

12  "Discharges shall not cause or contribute to an

13  exceedance of water quality standards contained in

14  the State Water Quality Control Plan, the

15  California Toxics Rule or in the applicable

16  Regional Water Board Basin Plan."

17       So do you in your role overseeing compliance,

18  would you use sampling conducted at MCSP 5 and MCSP

19  to ascertain whether discharges met that?

20       **A.   No.**

21       Q.   No.  And what information would you use

22  to determine whether a permit was meeting the

23  receiving water limitations?

24       **A.   I believe we indicated on the order**

25  **itself another monitoring location that is the**

**ELIZABETH LEE**

1   receiving water.

2        Q.   And is that MCSP 4?

3        A.   Off the top of my head, it probably is.

4   Yes, it is.

5        Q.   Okay.  And would you also compare the

6   pollutants in the discharges from the facility in

7   addition to the receiving water --

8             MR. MARSH:  Which discharges?

9             MS. MAHARG:  I am not finished.

10            MR. MARSH:  I apologize.

11  BY MS. MAHARG:

12       Q.   Let me just start that question over.  In

13  addition to assessing -- or, I'm sorry.  In

14  addition to reviewing the monitoring at MCSP 4,

15  which is within Mule Creek, would you also look at

16  the pollutants or the monitoring of the facility's

17  storm water discharges to determine whether they

18  were in compliance with receiving water

19  limitations?

20            MR. MARSH:  Vague and ambiguous.

21            THE WITNESS:  So you are asking whether I

22  look at the data from MCSP 2 and three, the

23  discharges, and use that to determine if they are

24  in compliance with the receiving water limitations?

25  Is that your question?

ELIZABETH LEE

September 22, 2022

```
 1   BY MS. MAHARG:

 2        Q.   Yes.   With the caveat that you are also

 3   looking at MCSP 4.   So kind of all of that data

 4   together.

 5        A.   Yes, I may.   Yes.

 6        Q.   Since the facility isn't sampling at MCSP

 7   2 and MCSP 3, would you look at the monitoring that

 8   has been conducted at MCSP 5 and MCSP 6 as well as

 9   MCSP 4 to determine compliance with the receiving

10   water limitations?

11        A.   Correct because five and six was the

12   revised compliance points for the December 2020,

13   order.

14             MS. MAHARG:   Okay.  And I think I am

15   actually done with that exhibit.  We have been

16   going for about an hour and a half, so let's take a

17   break.  And if we can go off the record.

18             THE VIDEOGRAPHER:   Okay.  We are now

19   going off the record.  The time is 11:42.

20

21             (A brief lunch recess was taken.)

22             THE VIDEOGRAPHER:   We are now back on the

23   record.  The time is 12:47 p.m.

24   BY MS. MAHARG:

25        Q.   Hi, Ms. Lee, I think we can just start
```

1    recall which ones specifically at this time.

2         Q.   Okay.  And as you said before, it is an

3    iterative process.  You may have future requests,

4    future revisions, future upgrades to the BMPs;

5    right?

6         A.   Correct.

7         Q.   You expect to be working with CDCR in

8    that process; correct?

9         A.   Correct.

10        Q.   Okay.  I appreciate that.  Going back to

11   Provision D, receiving water limitations.  Again, I

12   think you drew the distinction before between

13   receiving water samples as opposed to let's call

14   them discharge samples; right?

15        A.   Yes.

16        Q.   Okay.  And we also talked about

17   specifically MCSP Number 4 sampling location being

18   essentially taken out of the creek, out of Mule

19   Creek; right?

20        A.   Correct, that's the downstream receiving

21   water sampling location.

22        Q.   Right.  Based on your experience and in

23   your opinion, can you determine whether the

24   receiving water limitations have been exceeded

25   based only on let's say one sample from MCSP 4, or

ELIZABETH LEE

September 22, 2022

 1   would you require more than that?

 2            MS. MAHARG:  Objection, vague and

 3   ambiguous, incomplete hypothetical, calls for a

 4   legal conclusion.

 5            THE WITNESS:  So all I have is one data

 6   point or one sample from MCSP 4 and nowhere else?

 7   BY MR. MARSH:

 8       Q.   Correct.  Can you determine whether that

 9   is exceeding receiving water limitations based on

10   that one sample point?

11       A.   It can show exceedances in a water

12   quality objective, but that would not necessarily

13   lead to a conclusion that it was from MCSP.  If you

14   don't have upstream receiving water data, that

15   would kind of tell you -- upstream of MCSP, that

16   would kind of tell you if that was a condition that

17   had already existed prior to, I guess, passing by

18   adjacent to MCSP.

19       Q.   Right.  So evaluating MCSP 4 would not be

20   enough, you would also want to take into account

21   what's happening upstream of the facility.  Is that

22   fair to say?

23       A.   That's correct.

24       Q.   And why is that?

25       A.   Well, again like I said, you don't know

**ELIZABETH LEE**

```
 1   if -- if you only have that one downstream data
 2   point, if the discharges from MCSP had, in fact,
 3   contributed to that or caused it without knowing
 4   what the condition and the receiving water upstream
 5   of MCSP was to begin with.
 6        Q.   Right.  Is that typically referred to as
 7   what the background is?
 8        A.   Yeah, I guess that's what you would call
 9   it.  We just call it upstream and downstream but,
10   yes.
11        Q.   Okay.  And is that true for metals as
12   well as E. coli?
13        A.   Correct.
14        Q.   Okay.  And then similar to that question
15   I think you said you were trying to figure out
16   whether the facility caused or contributed, right,
17   that cause or contribute language you refer to?
18        A.   Uh-huh.
19        Q.   Now -- strike that.
20        Well no, I will go back to that.  Are you
21   familiar with the concept of a mixing zone in regar
22   to --
23        A.   Yes.
24        Q.   Can you explain that?
25        A.   A mixing zone is an area just downstream
```

1    of the discharge given a certain distance in which

2    the discharge itself mixes in with the receiving

3    water.  So you get basically some possible

4    dilution.

5        Q.   Okay.  And if you are focusing on the

6    cause or contribute aspect, do you need to take

7    into account whether that sample from taken --

8    collected from the creek is within or outside of

9    that mixing zone?

10            MS. MAHARG:  Objection, calls for a legal

11   conclusion and incomplete hypothetical, calls for

12   speculation.

13            THE WITNESS:  That's how we select that

14   downstream receiving water location to make sure

15   that there is -- not to guarantee that there is

16   dilution but that it's appropriate, where we are

17   not hitting a location where it is totally a

18   hundred percent or 80 percent of discharge, but

19   maybe more of a better characterization of the

20   discharge as it mixes in with the receiving water.

21   BY MR. MARSH:

22       Q.   Okay.  And before the Water Board would

23   take enforcement proceedings and allege a permit

24   violation, would it need more sampling data than

25   let's say even two sample points, MCSP 4, and then

ELIZABETH LEE
September 22, 2022

```
1   even if there was one sample taken upstream?
2   Before enforcement action, would it need more
3   sampling to determine whether the facility was
4   cause or contributing?
5           MS. MAHARG:  Objection, calls for a legal
6   conclusion and speculation.
7           THE WITNESS:  You would need something at
8   least at minimum that's statistically significant.
9   Number of samples that is.
10  BY MR. MARSH:
11      Q.   Statistically two samples are not
12  statistically significant; is that fair to say?
13      A.   Yeah, no.
14      Q.   And you laughed, is that because two is a
15  pretty small number; correct?
16      A.   It's like saying one is all it takes and
17  that's it.
18      Q.   And that's incorrect; right?
19      A.   That would be incorrect.  You would want
20  to have a sample that kind of covers a whole range
21  of situations, I guess.
22      Q.   Okay.  Fair enough.  Thank you for that.
23  And earlier today we were talking about
24  pharmaceuticals, and I think you said that you
25  weren't sure whether the presence of
```

1               REPORTER'S DECLARATION

2       I, Lisa Makowski, CSR 13400, declare as

3   follows:

4       That I reported the taking of the deposition of

5   the witness, ELIZABETH LEE, commencing on Thursday,

6   September 22, 2022, at the hour of 9:05 a.m.

7       That prior to being examined, the witness was by

8   me duly sworn to testify to the truth, the whole

9   truth, and nothing but the truth.

10      That I thereafter transcribed said shorthand

11  notes into typewriting and that the typewritten

12  transcript of said deposition is a complete, true and

13  accurate transcription of said shorthand notes taken

14  down at said time.

15      I further declare that I am not a relative or

16  employee of any party involved in said action, nor a

17  person financially interested in the action.

18      Dated this 18th day of October, 2022.

19

20

21             *Lisa Makowski*

22

23      Lisa Makowski, CCR 345

24

25