1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11

12   CALIFORNIA SPORTFISHING              No. 2:20-cv-02482 WBS AC
     PROTECTION ALLIANCE,
13
                 Plaintiff,
14                                        ORDER RE: DEFENDANTS' MOTION
         v.                               FOR SUMMARY JUDGMENT
15
     KATHLEEN ALLISON, et al.,
16
                 Defendants.
17

18   COUNTY OF AMADOR, a public
     agency of the State of
19   California,

20               Plaintiff,

21       v.

22   KATHLEEN ALLISON, et al.,

23               Defendants.

24

25                        ----oo0oo----

26        Plaintiffs California Sportfishing Protection Alliance

27   ("CSPA") and County of Amador ("Amador") brought this now-

28   consolidated action against Kathleen Allison, in her official

                                1

capacity as Secretary of the California Department of Corrections and Rehabilitation ("CDCR"), and Patrick Covello, in his official capacity as Warden of CDCR's Mule Creek State Prison (collectively "defendants"), seeking declaratory and injunctive relief for alleged violations of the Clean Water Act, as amended by the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. (See CSPA Compl. (Docket No. 1); Amador First Amended Complaint ("Amador FAC") (Docket No. 35); Order Consolidating Cases (Docket No. 18).)

The court previously granted in part plaintiffs' motion for partial summary judgment (Order Re: Motion for Partial Summ. J. ("Order Re: Pls.' MSJ") (Docket No. 60)) and denied defendants' motion for partial summary judgment on the issue of Amador's statutory standing (Docket No. 92). The court does not recite a full background of the case as it has done so in its prior order. (See Order Re: Pls.' MSJ at 2-5.)[1] Defendants now move for summary judgment on all claims. (Defs.' Mot. for Summ. J. ("Mot.") (Docket No. 95).)

I.   Judicial Notice

A court may take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R.

---

[1] The court notes that its prior order (Docket No. 60) erroneously stated that the plaintiffs filed a single, joint complaint. There are two operative complaints: CSPA's Complaint (Docket No. 1) and Amador's First Amended Complaint (Docket No. 35.)

1   Evid. 201.

2        Defendants and Amador request that the court take

3   judicial notice of various documents from the Central Valley

4   Regional Water Quality Control Board, the State Water Resources

5   Control Board, and the U.S. Environmental Protection Agency.

6   (See Docket Nos. 95-6, 97-3.)  The court will take judicial

7   notice of these materials.  See Daniels-Hall v. Nat'l Educ.

8   Ass'n, 629 F.3d 992, 998-99 (9th Cir. 2010) (a court may take

9   judicial notice of "information [that] was made publicly

10  available by government entities" where "neither party disputes

11  the authenticity . . . or the accuracy of the information"); Mack

12  v. S. Bay Beer Distribs., Inc., 798 F.2d 1279, 1282 (9th Cir.

13  1986), abrogated on other grounds, Astoria Fed. Sav. & Loan Ass'n

14  v. Solimino, 501 U.S. 104 (1991) ("[A] court may take judicial

15  notice of 'records and reports of administrative bodies.'")

16  (citations omitted).

17  II.  Legal Standard

18       Summary judgment is proper "if the movant shows that

19  there is no genuine dispute as to any material fact and the

20  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

21  P. 56(a).  A party may move for summary judgment either for one

22  or more claims or defenses, or for portions thereof.  Id.  Where

23  a court grants summary judgment only as to a portion of a claim

24  or defense, it "may enter an order stating any material fact . .

25  . that is not genuinely in dispute and treating the fact as

26  established in the case."  Id. at 56(g).

27       A material fact is one "that might affect the outcome

28  of the suit under the governing law," and a genuine issue is one

1   that could permit a reasonable trier of fact to enter a verdict

2   in the non-moving party's favor.  Anderson v. Liberty Lobby,

3   Inc., 477 U.S. 242, 248 (1986).  The moving party bears the

4   initial burden of establishing the absence of a genuine issue of

5   material fact and may satisfy this burden by presenting evidence

6   that negates an essential element of the non-moving party's case.

7   See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

8   Alternatively, the movant may demonstrate that the non-moving

9   party cannot provide evidence to support an essential element

10  upon which it will bear the burden of proof at trial.  Id.  The

11  burden then shifts to the non-moving party to set forth specific

12  facts to show that there is a genuine issue for trial.  See id.

13  at 324.  Any inferences drawn from the underlying facts must,

14  however, be viewed in the light most favorable to the non-moving

15  party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

16  475 U.S. 574, 587 (1986).

17  III. Discussion

18       A.   Unpermitted Discharges

19            Both plaintiffs' first claims allege unpermitted

20  discharges to Mule Creek.  According to defendants' motion, these

21  claims "contend that Defendants have violated the Clean Water Act

22  by operating the LAAs [land application areas]" because "the

23  spraying of treated wastewater to the land surface is the

24  functional equivalent of a discharge to water of the United

25  States . . . ."[2]  (Mot. at 17.)  However, defendants

26  _____

27       [2]   Where the addition of pollutants to waters of the
    United States via a nonpoint source is the "functional equivalent
    of a direct discharge from the point source," the discharger must
28  obtain a permit pursuant to the Clean Water Act.  County of Maui

1   mischaracterize both plaintiffs' claims.  CSPA's first claim

2   applies only to the land application areas but does not rely on a

3   theory of functional equivalence.  (See CSPA Compl. ¶¶ 80-93.)

4   Amador's first claim relies on the functional equivalence theory

5   but is not limited to the land application areas.  (See Amador

6   FAC ¶¶ 80-87.)

7          Defendants' motion addresses only the functional

8   equivalence theory, upon which CSPA does not rely.  (See Mot. at

9   17-18.)  Defendants' reply asserts in a footnote that "other than

10  supposition from the Regional Water Board's enforcement staff,

11  CSPA has not produced any evidence (i.e., sampling data) to

12  support [its] unfounded claim" that defendants' operation of the

13  land application areas resulted in a discharge to Mule Creek.

14  (Defs.' Reply (Docket No. 100) at 1 n.2.)  Because defendants

15  provide neither citations nor further discussion to support this

16  argument, defendants have not provided sufficient basis on which

17  to grant summary judgment.  Accordingly, the court will deny

18  summary judgment on CSPA's first claim.

19         Amador indicates that it "will no longer pursue" its

20  first claim as to the land application areas.  (Amador Opp'n at

21  8.)  The court will therefore grant defendants' motion for

22  summary judgment on Amador's first claim, only to the extent it

23  alleges violations resulting from operation of the land

24  application areas.

25      B.   Violations of Small MS4 Permit

26         Plaintiffs' second claims allege multiple violations of

27

28  v. Hawaii Wildlife Fund, 140 S. Ct. 1462, 1468 (2020).

1   the Small MS4 Permit.[3]  Both plaintiffs allege violations of

2   Provisions B.1, B.2, and D.  CSPA additionally alleges violation

3   of Provision B.3, and Amador alleges violation of Provision C.1.

4   (See CSPA Compl. ¶¶ 94-112; Amador FAC ¶¶ 104-112.)

5          Courts interpret and enforce NPDES permits "like any

6   other contract."  Nat. Res. Def. Council, Inc. v. County of Los

7   Angeles ("NRDC II"), 725 F.3d 1194, 1204 (9th Cir. 2013).  If the

8   language of the permit "is plain and capable of legal

9   construction, the language alone must determine the permit's

10   meaning."  Id. at 1204-05 (quoting Piney Run Pres. Ass'n v. Cnty.

11   Comm'rs of Carroll Cnty., MD, 268 F.3d 255, 270 (4th Cir. 2001)).

12          1. Sufficiency of Data

13          Defendants argue that plaintiffs lack sufficient data

14   to prove any violation of the Small MS4 Permit because plaintiffs

15   rely largely on data from the discharge sampling points denoted

16   MCSP5 and MCSP6.  Defendants assert that MCSP5 and MCSP6 do not

17   discharge to Mule Creek.  (Mot. at 19.)  However, as the court

18   found in its previous order, there is a question of fact as to

19   whether the sampled discharges from MCSP5 and MCSP6 reached Mule

20   Creek.  (See Order Re: Pls.' MSJ at 21; see also, e.g., CSPA Ex.

21   9-10, MCSP Discharge Notifications (Docket No. 96-2 at 165-68)

22   (notifying regional water board of discharges to Mule Creek from

23   _____

24          [3]    The term "MS4"--an abbreviation for "municipal separate
     storm sewer system"--refers to Mule Creek State Prison's
25   stormwater collection system, "which is composed of a variety of
     conveyances (such as drains, ditches, swales, and outfalls) that
26   operate to channel storm water away from the facility, toward
     Mule Creek."  (Order Re: Pls.' MSJ at 2.)  The regional water
27   board issued the Small MS4 Permit under the Clean Water Act's
     National Pollutant Discharge Elimination System ("NPDES").  (Id.
28   at 3.)

1  MCSP5 and MCSP6.)[4]

2          2.   Provision B.1

3          Both plaintiffs allege violation of Provision B.1,

4  which states: "Discharges of waste from the MS4 that are

5  prohibited by Statewide Water Quality Control Plans or applicable

6  Regional Water Quality Control Plans (Basin Plans) are

7  prohibited."  (Defs. Ex. A, State Water Res. Ctrl. Bd. Water

8  Quality Order No. 2013-001-DWQ, NPDES Gen. Permit No. CAS000004

9  ("Small MS4 Permit") (Docket No. 95-7 at 1-114) § B.1.)

10          The Small MS4 Permit contains "discharge prohibitions"

11  and "effluent limitations" that regulate the quality of

12  defendants' discharges.  (See id. §§ B.1-D.)  Provision B.1 is

13  one such discharge prohibition.  (Id. § B.1.)  In contrast, the

14  permit's "receiving water limitations" require that defendants'

15  discharges not "cause or contribute" to an exceedance of Basin

16  Plan water quality standards in the receiving water.  (Id. § D.)

17          Plaintiffs argue that defendants' discharges exceeded

18  the Basin Plan's water quality standards.  (CSPA Opp'n at 31-35;

19  Amador Opp'n at 23-25.)  However, Provision B.1--a discharge

20  limitation--does not incorporate the water quality standards,

21  only the Basin Plan's waste prohibitions.  (See Small MS4 Permit

22  § B.1.)  While the receiving water limitations explicitly

23

24          [4]   Plaintiffs also argue that there is (1) post-complaint
    data from MCSP2 and MCSP3 and (2) pre-complaint data showing a
25  "continuing likelihood of a recurrence in intermittent or
    sporadic violations" under Gwaltney of Smithfield v. Chesapeake
26  Bay Foundation, 484 U.S. 49 (1987).  The court need not address
    these points because the existence of a question of fact as to
27  whether the samples from MCSP5 and MCSP6 discharged to Mule Creek
    requires denial of summary judgment.
28
                                7

1  incorporate the Basin Plan's water quality standards, Provision

2  B.1 does not, nor do any other discharge prohibitions or effluent

3  limitations.  (See id. §§ B.1-D.)

4       It appears that the regional water board purposely

5  excluded the water quality standards from the permit's discharge

6  limitations, as water quality standards apply only to receiving

7  waters (i.e., waters of the United States), not to discharges.

8  The Basin Plan's "[water quality] objectives . . . are intended

9  to govern the levels of constituents and characteristics in the

10  main water mass unless otherwise designated," and "may not apply

11  at or in the immediate vicinity of effluent discharges . . . ."

12  (See Cent. Valley Reg'l. Water Quality Ctrl. Bd., Water Quality

13  Ctrl. Plan (Feb. 2019) ("Basin Plan") (Docket No. 95-7 at 545-

14  1006) at 3-2; see also Small MS4 Permit ¶ 40 (equating "water

15  quality standards" with "receiving water limitations" and stating

16  that permittees "achiev[e] the water quality standards in the

17  receiving water").)

18       The application of water quality standards exclusively

19  to receiving waters is consistent with statutory, regulatory, and

20  Ninth Circuit authority.  See 33 U.S.C. § 1313(c)(2)(A) ("water

21  quality standards shall consist of the designated uses of the

22  navigable waters involved and the water quality criteria for such

23  waters . . ." (emphasis added); 40 C.F.R. § 131.3 ("Water quality

24  standards are provisions of State or Federal law which consist of

25  a designated use or uses for the waters of the United States and

26  water quality criteria for such waters based upon such uses.")

27  (emphasis added); Nat. Res. Def. Council, Inc. v. County of Los

28  Angeles ("NRDC I"), 673 F.3d 880, 885, 887 (9th Cir. 2011), rev'd

1 on other grounds, Los Angeles Cnty. Flood Control Dist. v. Nat.

2 Res. Def. Council, Inc., 568 U.S. 78 (2013) (distinguishing

3 between "effluent limitations" and "water quality standards" and

4 explaining that "the regional boards' water quality plans, called

5 'basin plans,' must address the beneficial uses to be protected

6 as well as water quality objectives . . .") (internal quotation

7 marks omitted).

8          Defendants correctly point out that Provision B.1

9 refers to wastes specifically prohibited by the Basin Plan.  (See

10 Small MS4 Permit § B.1.)  Such waste prohibitions and other

11 discharge requirements are contained within various Basin Plan

12 amendments (which are listed on unnumbered pages at the beginning

13 of the plan).  (See Basin Plan.)  For example, Amendment 11

14 contains a "prohibition of waste discharge from leaching and

15 percolation systems within the Anderson-Cottonwood Irrigation

16 District," and Amendment 24 contains a "prohibition of waste

17 discharge from individual disposal systems in the Chico Urban

18 Area."  (Id.)  Plaintiffs have not identified, nor has the court

19 found, any Basin Plan amendment--or any other provision of the

20 Basin Plan--with a discharge prohibition that applies to

21 defendants.

22          Defendants have therefore established that plaintiffs

23 cannot demonstrate a violation of Provision B.1.  Accordingly,

24 the court will grant partial summary judgment for defendants on

25 plaintiffs' second claims to the extent that they allege

26 violations of Provision B.1 of the Small MS4 Permit.

27          3.   Provision B.2

28          Both plaintiffs allege violations of Provision B.2,

1  which provides: "Discharges of storm water from the MS4 to waters

2  of the U.S. in a manner causing or threatening to cause a

3  condition of pollution or nuisance as defined in Water Code §

4  13050 are prohibited."  (Small MS4 Permit § B.2.)  The California

5  Water Code defines pollution as "an alteration of the quality of

6  the waters of the state by waste to a degree which unreasonably

7  affects either of the following: (A) The waters for beneficial

8  uses. (B) Facilities which serve these beneficial uses."  Cal.

9  Water Code § 13050(l)(1).

10      Defendants argue that plaintiffs are unable to

11  establish a violation of Provision B.2 because Mule Creek has not

12  been included on the State Water Board's Section 303(d) list,

13  which identifies "impaired waterbodies."  (See Defs.' Separate

14  Statement of Undisputed Facts ("Defs.' SUF") (Docket No. 95-2) ¶

15  51.)  Based on this fact, defendants contend, plaintiffs cannot

16  prove that Mule Creek's beneficial uses were affected.  (Mot. at

17  24-25.)  However, the plain language of Provision B.2 does not

18  require plaintiffs to proffer such evidence.  The provision

19  states that the discharges must "caus[e] or threaten[] to cause a

20  condition of pollution or nuisance . . . ."  (Small MS4 Permit §

21  B.2 (emphasis added).)  Based on the permit's language, evidence

22  relating to whether the discharges actually impaired a beneficial

23  use of Mule Creek is not necessary to find a violation under

24  Provision B.2; it would be sufficient to prove that the

25  discharges merely threatened to impair a beneficial use.  (See

26  id.)

27      Defendants' only other argument concerning Provision

28  B.2 is premised on their contention that MCSP5 and MCSP6 did not

10

discharge to Mule Creek.  (<u>See</u> Mot. at 25.)  As stated above, a question of fact exists as to that issue.  Accordingly, the court will deny summary judgment as to plaintiffs' second claims to the extent they allege violations of Provision B.2 of the Small MS4 Permit.

           4.   <u>Provision B.3</u>

CSPA's second claim alleges violation of Provision B.3, which states in relevant part: "Discharges through the MS4 of material other than storm water to waters of the U.S. shall be <u>effectively prohibited</u>, except as allowed under this Provision or as otherwise authorized by a separate NPDES permit."  (Small MS4 Permit § B.3 (emphasis added).)

           a.   <u>Effectively Prohibit and Maximum Extent Practicable Standards</u>

Defendants argue that CSPA is unable to establish a violation of Provision B.3 because defendants have used "best efforts" to prevent non-stormwater from discharging through the MS4, in compliance with the "maximum extent practicable" standard.  (Mot. at 26-27.)  Relying on <u>Defenders of Wildlife v. Browner</u>, 191 F.3d 1159 (9th Cir. 1999), defendants seem to argue that "maximum extent practicable" is the standard imposed by all municipal permit provisions.  This argument incorrectly equates Provision D's "effectively prohibit" standard with the maximum extent practicable standard, misconstruing not only the permit language, but also the Clean Water Act and Ninth Circuit authority.

The Act provides in relevant part: "Permits for discharges from municipal storm sewers . . . (ii) shall include a

1  requirement to <u>effectively prohibit</u> non-stormwater discharges

2  into the storm sewers; and (iii) shall require controls to reduce

3  the discharge of pollutants to the <u>maximum extent practicable</u> . .

4  . .” 33 U.S.C. § 1342(p)(3)(B) (emphasis added).  The language

5  of the Act clearly treats the requirement to effectively prohibit

6  non-stormwater discharges as distinct from the requirement to

7  implement pollution controls to the maximum extent practicable.

8  <u>See</u> <u>id.</u>  The Small MS4 Permit similarly treats these as separate

9  requirements.  (<u>Compare</u> Small MS4 Permit § B.3 <u>with</u> <u>id.</u> § C.1.)

10        The court declines to adopt defendants’ interpretation,

11  which would render § 1342(p)(3)(B)(ii) and Provision B.3

12  superfluous.  <u>See</u> <u>Browner</u>, 191 F.3d at 1165 (“This court

13  generally refuses to interpret a statute in a way that renders a

14  provision superfluous.”) (quoting <u>Government of Guam ex rel. Guam</u>

15  <u>Econ. Dev. Auth. v. United States</u>, 179 F.3d 630, 634 (9th Cir.

16  1999)); <u>NRDC II</u> at 1206 (“[a] court must give effect to every

17  word or term in an NPDES permit and reject none as meaningless or

18  surplusage”) (quoting <u>In re Crystal Props., Ltd.</u>, 268 F.3d 743,

19  748 (9th Cir. 2001)) (alterations adopted).

20        <u>Browner</u> does not support defendants’ interpretation of

21  Provision B.3.  <u>Browner</u> dealt with a purported conflict between §

22  1342(p)(3)(B)(iii), requiring controls to reduce pollutants to

23  the maximum extent practicable, and § 1311(b)(1)(C), a provision

24  not at issue here that requires certain permits to mandate strict

25  compliance with state water-quality standards.  <u>See</u> 191 F.3d at

26  1164.  The <u>Browner</u> court held that Congress did not intend to

27  require municipalities to comply with § 1311(b)(1)(C) because

28  that interpretation would render the maximum extent practicable

1   standard at § 1342(p)(3)(B)(iii) superfluous.  See id. at 1165–

2   66.  The court did not discuss the separate requirement that

3   permits effectively prohibit non-stormwater discharges and did

4   not hold that all municipal permit provisions apply the maximum

5   extent practicable standard.  See id. at 1164-67.  On the

6   contrary, the Ninth Circuit has indicated that "maximum extent

7   practicable" is not "the exclusive measure that may be applied to

8   municipal storm sewer discharges," but rather, a regulatory

9   agency may require a discharger to exceed that standard.  See

10  NRDC I at 897 (quoting Bldg. Indus. Ass'n of San Diego Cnty. v.

11  State Water Res. Control Bd., 124 Cal. App. 4th 866 (4th Dist.

12  2004)).

13        Defendants have not cited any authority indicating that

14  the court should merge Provision D's effective prohibition of

15  non-stormwater discharges with the maximum extent practicable

16  standard.  Accordingly, the court will deny summary judgment on

17  CSPA's second claim as to Provision B.3 based on defendants'

18  purported compliance with the maximum extent practicable

19  standard.  Cf. San Francisco Baykeeper v. City of Sunnyvale, No.

20  5:20-cv-00824 EJD, 2020 WL 7696078, at *7 (N.D. Cal. Dec. 28,

21  2020) (rejecting argument that municipality's implementation of a

22  program to prevent illicit connections and discharges satisfied

23  MS4 permit provision "effectively prohibit[ing] the discharge of

24  non-stormwater" as a matter of law).  And even if the maximum

25  extent practicable standard did govern Provision D, there is a

26  question of fact as to whether defendants met that standard, as

27  discussed below.

28              b.   Sufficiency of Data

1    Defendants also present arguments concerning the data

2  CSPA relies on.  CSPA tested samples from the MS4 and found

3  pharmaceuticals and caffeine.  (CSPA Ex. 29, Expert Op. Report of

4  Robert W. Emerick ("Emerick Report") (Docket No. 96-5 at 51-70)

5  at 15.)  Defendants argue that CSPA's pharmaceutical and caffeine

6  sampling data is insufficient to demonstrate a violation.  They

7  contend that because CSPA's experts collected samples from ponded

8  water during dry weather and not during a Significant Rain Event,

9  CSPA will be unable to establish that those samples reached Mule

10  Creek.  (Mot. at 26.)  CSPA's expert Dr. Emerick opined that if

11  pharmaceuticals and caffeine were "observed in stormwater

12  originating from the Mule Creek Prison complex, it is reasonable

13  to suggest that there is some contribution of sewage in the

14  stormwater."  (Emerick Report at 8.)  Dr. Emerick also explained

15  that it is possible for wastewater to enter the storm drain via

16  underground exfiltration, and that during his site visit, "[i]t

17  was evident that there had been a recent discharge" despite the

18  dry conditions.  (Id. at 8-9, 11.)  This evidence creates a

19  question of fact as to whether the samples containing

20  pharmaceuticals and caffeine discharged through the MS4 despite

21  the dry weather.

22    Defendants next argue that CSPA cannot prove that

23  sewage was present in the stormwater because the stormwater did

24  not contain high levels of ammonia.  Defendants point to the

25  testimony of regional water board employee Elizabeth Lee, who

26  stated that she would expect to observe ammonia levels "in the

27  hundreds, maybe even thousands" for "true wastewater," while the

28  data revealed an ammonia level of "less than 0.20."  (Dep. of

14

1   Elizabeth Lee (Docket No. 95-3 at 169-91) at 137-38.)  CSPA

2   points to Dr. Emerick's testimony that while ammonia is one

3   factor engineers analyze, ammonia is "not a reliable indicator"

4   of the presence of sewage in stormwater.  (Dep. of Dr. Robert

5   Emerick (Docket No. 96-5 at 71-97) at 56-57.)  This evidence

6   establishes a dispute of material fact as to whether the ammonia

7   testing data proves that sewage was not present in the

8   stormwater.

9          Finally, defendants argue that there is no evidence of

10  "commingling" of stormwater and non-stormwater.  (Mot. at 27.)

11  However, the court found in its previous order that there is

12  conflicting evidence that "creates a genuine dispute of material

13  fact as to whether defendants are violating [P]rovision B.3 based

14  on alleged cross-contamination [of stormwater] from the sanitary

15  sewer system."  (Order Re: Pls.' MSJ at 21-23.)

16         Accordingly, the court will deny summary judgment as to

17  CSPA's second claim to the extent it alleges violations of

18  Provision B.3 of the Small MS4 Permit.

19             5.   Provision C.1

20         Amador's second claim alleges violation of Provision

21  C.1, which states in relevant part: "Permittees shall implement

22  controls as required by this Order to reduce the discharge of

23  pollutants from their MS4s to waters of the U.S. to the MEP

24  [maximum extent practicable]."  (Small MS4 Permit § C.1.)  "The

25  MEP standard requires Permittees to apply Best Management

26  Practices (BMPs) that are effective in reducing or eliminating

27  the discharge of pollutants to the waters of the U.S."  (Small

28  MS4 Permit ¶ 38.)  "BMP development is a dynamic process and may

1  require changes over time as the Permittees gain experience

2  and/or the state of the science and art progresses.  To do this,

3  the Permittees must conduct and document evaluation and

4  assessment of each relevant element of its program, and their

5  program as a whole, and revise activities, control measures/BMPs,

6  and measurable goals, as necessary to meet MEP."  (Id.)  "MEP is

7  the cumulative effect of implementing, evaluating, and making

8  corresponding changes to a variety of technically appropriate and

9  economically feasible BMPs, ensuring that the most appropriate

10  controls are implemented in the most effective manner."

11  (Attachment I at 4.)  This process of "implementing, evaluating,

12  revising, or adding new BMPs is commonly referred to as the

13  iterative process."  (Id. (emphasis added).)

14          Defendants contend that they engaged in the iterative

15  process and point to implemented BMPs, including informational

16  memoranda to Mule Creek State Prison staff regarding the

17  stormwater prevention program; "fabric, wattles, designed v-

18  ditches to catch sediment from runoff, and paved aprons to filter

19  or reduce contaminants in discharges"; curbs that redirect non-

20  stormwater flows to appropriate drainage areas; various

21  materials- and waste-management practices; and the installation

22  of a permanent monitoring station at MCSP2 and MCSP3.  (See Decl.

23  of Anthony Orta (Docket No. 95-4) ¶¶ 8-13.)  Defendants also

24  point to the Small MS4 Permit Annual Reporting, which "documents

25  and assesses the Small MS4 Permit program elements."  (Defs.' SUF

26  ¶ 29.)

27          Amador contends that defendants did not engage in the

28  iterative process and points to notices from the regional water

1  board concerning defendants' receiving water BMPs.  In February

2  2022, the regional water board notified defendants that due to

3  exceedances of water quality standards, they were required to

4  provide the board with "[BMPs] to be implemented to address the

5  receiving water exceedances and a schedule of the BMP

6  implementation."  (Amador Ex. 5, Comments to the Phase II MS4

7  Annual Reports and 13383 Order Quarterly Monitoring Reports (Feb.

8  11, 2022) ("Feb. 2022 Comments") (Docket No. 97-4 at 16-20) at

9  2.)  The board also stated that "BMPs which can immediately

10  address the exceedances must be proposed and immediately

11  implemented."  (Id.)

12       In November 2022, the board notified defendants that

13  they had failed to comply with its previous requirement to

14  implement BMPs addressing the receiving water's exceedance of

15  water quality standards.  (Amador Ex. 6, Clarification to the

16  Comment Letter Dated 11 February 2022 (Nov. 3, 2022) (Docket No.

17  97-4 at 21-31) at 2.)  Specifically, while defendants identified

18  BMPs related to irrigation water, they failed to implement BMPs

19  addressing aluminum and zinc despite exceedances of aluminum and

20  zinc water quality objectives.  (Id. at 3.)  The board's findings

21  align with the testimony of Paul Orta (who was responsible for

22  managing BMPs) that he was only aware of BMPs designed to "reduce

23  sediment," not to address any other pollution issues.  (See (CSPA

24  Ex. 2, Dep. of Paul Orta ("Orta Dep.") (Docket No. 96-2 at 47-72)

25  at 98.)  This evidence establishes a question of fact as to

26  whether defendants implemented BMPs to address all known water

27  quality issues.

28       Amador also contends that defendants have failed to

evaluate and update some of the cited BMPs since the initiation
of this action.  For instance, the bioswales were in place prior
to January 14, 2019 and were not updated after that date.  (Orta
Dep. at 97).  Mr. Orta testified that while some measures had
been evaluated for effectiveness (see id. at 111), he was unsure
if others--including the bioswales--had been evaluated (see id.
at 98).  Further, although defendants were aware of multiple
necessary repairs to the stormwater and sewer systems--repairs
that Mr. Orta classified as BMPs--defendants had not made any of
those repairs as of August 2022.  (Orta Dep. at 114.)  This
evidence establishes a question of fact as to whether defendants
evaluated and made appropriate changes to their BMPs as they
gained knowledge and experience, which is central to the
iterative process.  (See Small MS4 Permit ¶ 38; Attachment I at
4.)  It is not sufficient to merely implement some BMPs;
defendants must "evaluate" and "revise" their BMPs, possibly
adding additional BMPs over time, to "ensure that the most
appropriate controls are implemented in the most effective
manner."  (See Attachment I at 4.)

The court therefore finds that there is a genuine issue
of material fact as to whether defendants engaged in the
iterative process.  Accordingly, the court will deny summary
judgment as to Amador's second claim to the extent it alleges
violation of Provision C.1 of the Small MS4 Permit.

6.   Provision D

Both plaintiffs' second claims allege violations of
Provision D.  This provision, titled Receiving Water Limitations,
states: "Discharges shall not cause or contribute to an

18

exceedance of water quality standards contained in a Statewide Water Quality Control Plan, the California Toxics Rule (CTR), or in the applicable Regional Water Board Basin Plan." (Small MS4 Permit § D.)  Provision D further provides that defendants will timely implement "control measures/BMPs and other actions to reduce pollutants in the discharges and other requirements of this Order including any modifications," and outlines procedures for such implementation.  (Id.)

            a.   Sufficiency of Data

Defendants contend that plaintiffs' data does not account for "background" sources--i.e., upstream and non-human sources of contaminants[5]--and is therefore insufficient to establish exceedances of the Basin Plan's water quality standards.  In support of this argument, defendants cite two excerpts of guidance relating to the Basin Plan water quality standards.[6]

The State Water Resources Control Board's Water Quality

---

[5]    Defendants identify animal waste from cattle ranches, birds, and deer, and naturally occurring metals in upstream soil as possible background contributors.  (Mot. at 21.)

[6]    Defendants seem to argue that background contributions are relevant in determining violations of all provisions of the Small MS4 Permit.  However, defendants' arguments pertain only to the Basin Plan's water quality standards, which are relevant to Provision D but not to any other provisions at issue.

Defendants also cite expert testimony and various non-binding regulatory sources for the proposition that background sources are considered as a matter of general practice when evaluating sampling data.  However, the issue as framed by defendants is whether the Small MS4 Permit requires exclusion of background to establish an exceedance, not whether background is typically considered in the field.  (See Mot. at 20.)

1  Standards Variance Policy provides in relevant part: "In the

2  context of a TMDL [total maximum daily load] or a BASIN PLAN

3  amendment developed to implement the BACTERIA WATER QUALITY

4  OBJECTIVES, a natural source exclusion approach may be utilized

5  after all anthropogenic sources of bacteria are identified,

6  quantified, and controlled."  (Defs.' Ex. D, Part 3 of the Water

7  Quality Control Plan for Inland Surface Waters, Enclosed Bays,

8  and Estuaries of California — Bacteria Provisions and Water

9  Quality Standards Variance Policy (Docket No. 95-8 at 1-10) at

10  5.)  The Policy then states that in circumstances where there is

11  a naturally occurring background concentration of bacteria, the

12  relevant total maximum daily load or Basin Plan amendment can

13  account for that natural background by allowing some exceedance

14  of water quality objectives.  (See id.)  This language does not

15  require exclusion of background sources in determining

16  violations, but merely presents natural source exclusion as one

17  possible approach that regulators can take in crafting a total

18  maximum daily load or Basin Plan amendment.[7]

19          Defendants next point to guidance in the Basin Plan,

20  which provides in relevant part:

21      Numerical receiving water limitations will be established in
        Board orders for constituents and parameters which will, at
22      a minimum, meet all applicable water quality objectives.
        However, the water quality objectives do not require
23      improvement over naturally occurring background
        concentrations.  In cases where the natural background
24      concentration of a particular constituent exceeds an
        applicable water quality objective, the natural background
25      concentration will be considered to comply with the
        objective.
26

27  ───────────────────
        [7]   As discussed above, there is no Basin Plan amendment
28  applicable to Mule Creek.

                            20

1    (Basin Plan at 4-27.)   This language is part of guidance

2    explaining the regional water board's "[c]onsiderations" in

3    carrying out control actions, which range from surveying and

4    monitoring to remedial measures including NPDES permits,

5    discharge prohibitions, and Cease and Desist and Cleanup and

6    Abatement orders.   (See id. at 4-10, 4-21.)

7         While this guidance indicates that the regional water

8    board may consider background in taking various regulatory

9    actions, it does not establish that the permit requires exclusion

10    of background sources to demonstrate an exceedance of water

11    quality standards.   Crucially, the Basin Plan's water quality

12    objectives do not require consideration of background.   (See

13    Basin Plan at 3-3 to 4-1.)   Provision D incorporates only the

14    Basin Plan's water quality standards, not other guidance

15    contained in the plan.   (See Small MS4 Permit § D.)   See also

16    NRDC II at 1199 (explaining that permit provision prohibiting

17    "discharges from the MS4 that cause or contribute to the

18    violation of the Water Quality Standards or water quality

19    objectives" incorporates the basin plan's "standards" and

20    prohibits discharges that cause or contribute to the violation

21    "of those incorporated standards") (emphasis added).

22         A report from the regional water board rejected

23    defendants' suggestion that background sources were relevant in

24    determining exceedances of the Basin Plan water quality objective

25    applicable to fecal coliforms.   (See Pls.' Ex. 21, Review of

26    Revised Storm Water System Investigation Findings Report (Docket

27    No. 45-20 at 59-80) at 8.)   The report explains that while

28    "[coliform bacteria] can come from many sources other than human

1   waste, it is important to note that the Basin Plan Water Quality

2   Objective . . . does not specify that the limit is restricted to

3   human sources.  Fecal coliforms, regardless of source, are

4   subject to this Water Quality Objective."  (Id.)  This

5   explanation from the regional water board confirms that the

6   language of the applicable water quality objectives--which do not

7   require consideration of background--determines whether

8   violations have occurred.  See NRDC II at 1207 (giving

9   "significant weight" to regional water board's rejection of

10  defendants' position because "intent of the permitting authority"

11  is relevant to permit interpretation, even where permit's

12  language is unambiguous).

13          While background data is not necessary to establish an

14  exceedance of the water quality standards, it may be relevant in

15  determining whether defendants' discharges "caused or contributed

16  to" an exceedance under Provision D.  (See Decl. of Timothy

17  Simpson (Docket No. 95-5) ¶¶ 17-24.)  There is sufficient

18  evidence to establish a question of material fact as to whether

19  an exceedance is attributable to defendants, not to background

20  sources.  (See, e.g., Defs.' Ex. A to Decl. of Alanna Lundgren

21  ("Lundgren Decl."), Quantification of Sources of Fecal Pollution

22  at Mule Creek (Jan. 2021) (Docket No. 95-3 at 4-40) at ii

23  (stating that one-third of E. coli sampling data collected showed

24  that "the concentration increase moving past the prison property

25  was sufficient to cause a downstream water quality standard

26  exceedance where the upstream sample was in compliance"); CSPA

27  Ex. 22, Review of Revised Storm Water System Investigation

28  Findings Report (Docket No. 96-4 at 1-22) at 17 (stating that

1    there is "strong evidence that wastewater of some sort is

2    entering the system," indicating that "discharges from the

3    stormwater system have impacted, and threaten to continue to

4    impact, Mule Creek"); Ex. B to Lundgren Decl., Revised Stormwater

5    Collection System Investigation Report of Findings (June 2020)

6    (Docket No. 95-3 at 41-168) at 88 (indicating that while

7    exceedances of aluminum, iron, and magnesium were likely

8    naturally occurring, zinc exceedances were attributable to

9    industrial materials at defendants' facility).  Further, despite

10   the sources cited by defendants suggesting that the regional

11   water board may consider background, the board nonetheless

12   required defendants to take remedial actions in response to

13   exceedances of water quality standards.  (See, e.g., Feb. 2022

14   Comments at 2.)  Accordingly, the court finds that the issue of

15   possible background sources does not warrant summary judgment on

16   plaintiffs' second claims as to Provision D.

17          Defendants also point out, as discussed above, that the

18   Basin Plan's water quality objectives apply to the receiving

19   water (i.e., Mule Creek), not to discharges.  Defendants'

20   argument on this point is unclear.  They first seem to argue that

21   plaintiffs solely rely on sampling data from discharges at MCSP2,

22   MCSP3, MCSP5, and MCSP6 and therefore cannot establish that the

23   receiving water exceeded water quality objectives.  (Defs.' Reply

24   at 8.)  Defendants later state that plaintiffs rely on samples

25   from MCSP4 (which is located within Mule Creek).  (Id. at 18.)

26          At any rate, plaintiffs rely not only on discharge

27   sampling data from the outfalls, but also sampling data from Mule

28   Creek.  (See CSPA Opp'n at 15; Amador Opp'n at 14.)  For

1   instance, plaintiffs point to sampling data collected from

2   February 2019 to January 2021 at MCSP4 indicating that samples

3   from Mule Creek exceeded water quality standards for E. coli and

4   metals.  (See CSPA Ex. 1, Decl. of Karen Ashby (Docket No. 45-4)

5   at 11-13).  The combination of sampling data from defendants'

6   discharges and from within Mule Creek is sufficient to establish

7   a question of fact as to whether defendants' discharges caused or

8   contributed to an exceedance of water quality standards in Mule

9   Creek.  See NRDC II at 1204, 1210 (holding that defendants'

10  discharges caused or contributed to exceedance of basin plan

11  water quality standards based on sampling data from receiving

12  water where defendants discharged pollutants at issue to

13  receiving water); McClellan Ecological Seepage Situation (MESS)

14  v. Weinberger, 707 F. Supp. 1182, 1203 (E.D. Cal. 1988), vacated

15  on other grounds McClellan Ecological Seepage Situation v. Perry,

16  47 F.3d 325 (9th Cir. 1995) (finding question of fact as to

17  whether defendants "caused" exceedance of receiving water

18  limitations where data showed exceedances in the receiving water

19  and in defendants' discharges).  Accord Cal. Sportfishing Prot.

20  All. v. River City Waste Recyclers, LLC, 205 F. Supp. 3d 1128,

21  1151 (E.D. Cal. 2016) (Mueller, J.) (finding that discharges in

22  exceedance of water quality standards "cause[d] or contribute[d]

23  to an exceedance of any applicable water quality standards");

24  Cal. Sportfishing Prot. All. v. Chico Scrap Metal, 124 F. Supp.

25  3d 1007, 1020-22 (E.D. Cal. 2015) (Burrell, J.) (same).

26       Defendants also argue that plaintiffs cannot establish

27  that any exceedance of water quality standards was solely

28  attributable to defendants.  (Mot. at 23.)  This argument is

1   unsupported by the plain language of the permit, which states

2   that discharges shall not "cause or contribute" to an exceedance

3   of water quality standards.  (See Small MS4 Permit § D (emphasis

4   added).)  Defendants do not point to any language in the Small

5   MS4 Permit, Basin Plan, or other authority suggesting that

6   exceedances must be solely attributable to defendants to

7   establish a violation of Provision D.

8                    b.   Section 303(d) List

9        Defendants argue that because Mule Creek has not been

10  included on the State Water Board's Section 303(d) list,

11  plaintiffs cannot prove that Mule Creek exceeded water quality

12  standards under Provision D.  However, defendants have not

13  identified any language in the permit--or any other authority--

14  indicating that being placed on the 303(d) list is necessary to

15  find a violation of Provision D.  Further, the standards for

16  being 303(d)-listed and for violating Provision D are not

17  coextensive.  Waterbodies with "chronic or recurring monitored

18  violations" are included on the 303(d) list.  (See Attachment I

19  at 3.)  In contrast, Provision D requires only an "exceedance" of

20  water quality standards.  (Small MS4 Permit § D.)

21                    c.   Iterative Process

22       Defendants argue that because they have engaged in the

23  iterative process, they cannot be liable under Provision D.

24  (Mot. at 32.)  As discussed above, there is a question of fact as

25  to whether defendants engaged in the iterative process.

26  Regardless, the language of Provision D does not provide that

27  engaging in the iterative process excuses defendants from

28  liability.  Provision D lays out two separate requirements:

1  first, that discharges not exceed water quality standards, and

2  second, that defendants implement measures to control any

3  exceedances. (See Small MS4 Permit § D.)

4         The regional water board has explained that, with

5  respect to receiving water limitations like Provision D, "the

6  iterative process does not provide a 'safe harbor' to MS4

7  permittees." (See MS4 Fact Sheet at 22.)  "When a discharger is

8  shown to be causing or contributing to an exceedance of water

9  quality standards, that discharger is in violation of the

10 relevant discharge prohibitions and receiving water limitations

11 of the permit and potentially subject to enforcement . . ., even

12 if the discharger is actively engaged in the iterative process."

13 (Id.)  Similarly, in NRDC I, the Ninth Circuit held that the

14 iterative process did not provide a "safe harbor" for violations

15 because the permit language did not support that interpretation,

16 and because the iterative process is not intended to "absolv[e]

17 noncompliance."  673 F.3d at 897.

18      Accordingly, the court will deny summary judgment on

19 plaintiffs' second claims to the extent they allege violations of

20 Provision D of the Small MS4 Permit.

21      C.   Violations of Industrial General Permit

22         Only Amador's third claim alleges violation of the

23 Industrial General Permit.  (See Amador FAC ¶¶ 113-22.)  Amador

24 indicates that it "withdraw[s] the third cause of action for

25 discharges in violation of the Industrial General Permit" and

26 "will no longer pursue this claim."  (Amador Opp'n at 8-9.)  The

27 court will therefore grant defendants' motion for summary

28 judgment on Amador's third claim.

1         IT IS THEREFORE ORDERED that defendants' motion for

2  summary judgment (Docket No. 95) be, and the same hereby is,

3  GRANTED as to Amador's first claim, to the extent it alleges

4  violations resulting from operation of the land application

5  areas; GRANTED as to CSPA's second claim and Amador's second

6  claim, to the extent they allege violations of Provision B.1 of

7  the Small MS4 Permit; and GRANTED as to Amador's third claim.

8  Summary judgment is DENIED in all other respects.

9  Dated:  January 10, 2023

                                    WILLIAM B. SHUBB

                                    UNITED STATES DISTRICT JUDGE