1  CHRISTOPHER M. PISANO, Bar No. 192831
   christopher.pisano@bbklaw.com
2  SHAWN D. HAGERTY, Bar No. 182435
   shawn.hagerty@bbklaw.com
3  REBECCA ANDREWS, Bar No. 272967
   rebecca.andrews@bbklaw.com
4  ANYA KWAN, Bar No. 333854
   anya.kwan@bbklaw.com
5  BEST BEST & KRIEGER LLP
   300 South Grand Avenue
6  25th Floor
   Los Angeles, California  90071
7  Telephone:     (213) 617-8100
   Facsimile:     (213) 617-7480
8
   Attorneys for Plaintiff
9  COUNTY OF AMADOR
              [Additional Counsel on p. 2]

10            UNITED STATES DISTRICT COURT

11            EASTERN DISTRICT OF CALIFORNIA

      ROBERT T. MATSUI FEDERAL COURTHOUSE
12
   CALIFORNIA SPORTFISHING              Case No. 2:20-cv-02482-WBS-AC
13 PROTECTION ALLIANCE,                    [Consolidated with 2:21-cv-00038-WBS-
                                           AC]
14            Plaintiff,                 **JOINT TRIAL BRIEF OF PLAINTIFFS**
                                         **COUNTY OF AMADOR AND**
15    v.                                 **CALIFORNIA SPORTFISHING**
                                         **PROTECTION ALLIANCE**
16 KATHLEEN ALLISON, in her official
   capacity as Secretary of the California
17 Department of Corrections and Rehabilitation,  Date:          April 18, 2023
                                         Time:          9:00 a.m.
18            Defendants.                Dept:          5
                                         Judge:         William B. Shubb
19                                       Trial Date:    April 18, 2023
                                         Actions Filed: December 15, 2020
20                                                      January 7, 2021

21 COUNTY OF AMADOR, a public agency of
   the State of California,
22
              Plaintiff,
23
      v.
24
   KATHLEEN ALLISON in her official capacity
25 as Secretary of the California Department of
   Corrections and Rehabilitation; PATRICK
26 COVELLO in his official capacity of Warden
   of California Department of Corrections and
27 Rehabilitation Mule Creek State Prison; and
   CALIFORNIA DEPARTMENT OF
28 CORRECTIONS AND REHABILITATION,

              Defendants.

ANDREW L. PACKARD (Bar No. 168690)
andrew@packardlawoffices.com
WILLIAM N. CARLON (Bar No. 305739)
wncarlon@packardlawoffices.com
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060

JASON FLANDERS (Bar No. 238007)
jrf@atalawgroup.com
ERICA MAHARG (Bar No. 279396)
eam@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Tel. (916) 202-3018

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION
ALLIANCE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................................ 7

II. STATEMENT OF FACTS ............................................................................................. 7

    A. Introduction of Expert Witnesses .......................................................................... 8

    B. The Prison's MS4 and Sanitary Sewer System .................................................... 10

    C. The Prison's History of Violations Leading to Coverage Under the Small MS4 Permit and Issuance of the 13383 Orders ................................................... 12

    D. CDCR's Sampling Requirements ........................................................................ 15

    E. CDCR'S Monitoring Reports ............................................................................... 16

    F. Cross-Contamination of the Sanitary Sewer System and the MS4 ..................... 19

    G. CDCR's Failure to Fix the Infrastructure Defects and/or Implement Additional BMPs to Correct Its Violations of the Small MS4 Permit ................. 20

III. SUMMARY OF POINTS OF LAW ........................................................................... 22

    A. Points of Law Relevant to All Claims ................................................................. 22

        1. Plaintiffs Have Article III Standing. ....................................................... 22

        2. The Clean Water Act Is a Strict Liability Statute. .................................. 22

        3. The Act Prohibits CDCR from Impeaching Its Monitoring Reports. ...... 23

        4. The E. Coli and Metals Water Quality Standards Apply to Mule Creek. .................................................................................................... 25

            i. The MUN and REC-1 Uses Apply to Mule Creek. ..................... 26

                (1) E. Coli and Metals Water Quality Standards Apply. ........ 27

        5. Sampling at MCSP2, MCSP3, MCSP5, and MCSP6 Are All Representative of the Prison's MS4 Discharges. .................................... 28

        6. Violations Were Ongoing When the Complaints Were Filed. ................. 29

    B. Points of Law Specific to Each of Plaintiffs' Claims ......................................... 30

        1. Violations of Provision B.2 of the Small MS4 Permit ............................ 30

        2. Violation of Provision B.3 of the Small MS4 Permit ............................. 32

        3. Violation of Provision C.1 of the Small MS4 Permit ............................. 33

        4. Violation of Provision D of the Small MS4 Permit ................................ 35

    C. Request for Judicial Notice .................................................................................. 37

IV. REQUESTED REMEDY TO ADDRESS CDCR'S VIOLATION OF ITS SMALL MS4 PERMIT AND THE ACT ......................................................................... 38

V. CONCLUSION ............................................................................................................. 39

1

**TABLE OF AUTHORITIES**

2
                                                                              **Page**

3    **Federal Cases**

4    *American Iron and Steel Institute v. E.P.A.*
5        115 F.3d 979 (D.C. Cir. 1997) ...................................................................... 36

6    *Cal. Sportfishing Prot. All. v. Chico Scrap Metal*
         124 F. Supp. 3d 1007 (E.D. Cal. 2015)......................................................... 36
7
     *Cal. Sportfishing Prot. All. v. River City Waste Recyclers*
8        205 F. Supp. 3d 1128 (E.D. Cal. 2016)......................................................... 36

9    *Chesapeake Bay Found. v. Gwaltney*
10       844 F.2d 170 (4th Cir. 1988).......................................................................... 29

11   *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*
         305 F.3d 943 (9th Cir. 2002).......................................................................... 30
12
     *Gwaltney of Smithfield v. Chesapeake Bay Found.*
13       484 U.S. 49 (1987).......................................................................................... 29

14   *Hawai'i Wildlife Fund v. County of Maui*
15       550 F.Supp.3d 871 (D. Haw. 2021) .............................................................. 32

16   *Hawaii's Thousand Friends v. City & Cnty. of Honolulu*
         821 F. Supp. 1368 (D. Haw. 1993) ......................................................... 22, 23
17
     *Inland Empire Waterkeeper v. Corona Clay Co.*
18       17 F.4th 825, 829 (9th Cir. 2021) .................................................................. 30

19   *Nat. Res. Def. Council v. Texaco Ref. & Mktg. Inc.*
20       2 F.3d 493 (3d Cir. 1993)................................................................................ 29

21   *Nat'l Agr. Chemicals Ass'n v. Rominger*
         500 F. Supp. 465 (E.D. Cal. 1980)................................................................. 37
22
     *National Resources Defense Council, Inc. v. County of Los Angeles*
23       725 F.3d 1194 (9th Cir. 2013)............................................... 23, 24, 28, 29

24   *Natural. Resources Defense Council v. County of Los Angeles*
25       673 F.3d 880, 897-98 (9th Cir. 2011) ........................................................... 35

26   *Natural Resources Defense Council v. County of Los Angeles*
         725 F.3d 1197 (9th Cir. 2013).................................................................. 29, 35
27
     *PUD No. 1 v. Wash. Dep't of Ecology*
28       511 U.S. 700 (1994)........................................................................................ 31

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

*San Francisco Baykeeper v. W. Bay Sanitary Dist.*
791 F.Supp.2d 719 (N.D. Cal. 2011) ................................................................ 24

*Santa Monica Baykeeper v. International Metals Ekco, Limited*
619 F.Supp.2d 936 (C.D. Cal. 2009) ...................................................... 9, 24, 36

*Santa Monica Baykeeper v. Kramer Metals, Inc.*
619 F.Supp.2d 914 (C.D. Cal. 2009) .............................................. 9, 24, 34, 36

*Save Our Bays and Beach v. City and County of Honolulu*
904 F.Supp. 1098 (D. Haw. 1994) ................................................................... 23

*Sierra Club v. Union Oil Co.*
853 F.2d 667 (9th Cir.1988)............................................................... 22, 29, 30

*Sierra Club v. Union Oil Company of California*
813 F.2d 1480 (9th Cir. 1987) ........................................................... 22, 23, 24

**State Cases**

*California Assn. of Sanitation Agencies v. State Water Resources Control Bd.*
208 Cal.App.4th 1438 (2012) ...................................................................... 25, 26

*City of Arcadia v. State Water Resources Control Bd.*
191 Cal.App.4th 156 (2010)............................................................................. 25

*Jordan v. City of Santa Barbara*
46 Cal.App.4th 1245 (1996) ........................................................................... 31

*Newhall Land & Farming Co. v. Superior Court*
19 Cal.App.4th 334 (1993) ............................................................................. 31

*San Diego Gas & Electric Co. v. San Diego Regional Water Quality Control Bd.*
36 Cal.App.5th 427 (2019) ............................................................................. 31

**Federal Statutes**

33 U.S.C. § 1251 ..................................................................................................... 7

33 U.S.C. § 1311(a) ....................................................................................... 13, 22

33 U.S.C. § 1313 ................................................................................................... 25

33 U.S.C. § 1313(2)(A) ........................................................................................ 31

33 U.S.C. § 1313(c)(2) ......................................................................................... 25

33 U.S.C. § 1342(k) .............................................................................................. 22

33 U.S.C. § 1365 ............................................................................................. 24, 29

**State Statutes**

Cal. Water Code § 13050 ................................................................................................ 14, 30

Cal. Water Code § 13050(d) ................................................................................................ 31

Cal. Water Code § 13050(f) ................................................................................................ 25

Cal. Water Code § 13050(j) ................................................................................................ 25

Cal. Water Code § 13050(l) ................................................................................................ 31

Cal. Water Code § 13050(l)(1)(A) ...................................................................................... 30

Cal. Water Code § 13050(m) ............................................................................................... 31

Cal. Water Code § 13050(m)(1) .......................................................................................... 31

Cal. Water Code § 13267 .................................................................................................... 13

**Rules**

Fed. R. Evid. 201 ......................................................................................................... 25, 37

Fed. R. Evid. 201(c) ........................................................................................................... 37

Fed. R. Evid. 803(8) ........................................................................................................... 25

Fed. R. Evid. 902(5) ........................................................................................................... 25

**Other Authorities**

Available at
    https://www.waterboards.ca.gov/rwqcb5/board_decisions/adopted_orders/resolutions/r5-
    2017-0088_res.pdf ...................................................................................................... 25

BEST BEST & KRIEGER LLP

300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

In accordance with Local Rule 285, Plaintiffs the County of Amador (County) and the California Sportfishing Protection Alliance (CSPA) (collectively, Plaintiffs) respectfully submit this Joint Trial Brief in support of their claims against Defendants Jeffrey Macomber[1], in his official capacity as Secretary of the California Department of Corrections and Rehabilitation, and Patrick Covello, in his official capacity as Warden of the California Department of Corrections and Rehabilitation Mule Creek State Prison, (collectively, CDCR).

## I.    INTRODUCTION

CDCR regularly discharges polluted water from the municipal separate storm sewer system (MS4) at Mule Creek State Prison (Prison) to Mule Creek, a water of the United States and a tributary to the Sacramento-San Joaquin Delta, one of the most important water bodies in the United States and a source of drinking water for millions of Californians. CDCR's self-monitoring reports demonstrate that the Prison's MS4 discharges consistently and significantly exceed water quality standards for bacteria and metals such as aluminum, iron, manganese, copper, lead, and zinc. Thus, CDCR's own sampling conclusively establishes that CDCR has in the past, and is currently violating the Federal Water Pollution Control Act, commonly known as the Clean Water Act (Act), 33 U.S.C. § 1251 *et seq*. Moreover, state and federal inspectors have determined, and Plaintiffs' sampling confirms, that untreated sewage is discharging from the MS4, further establishing violations of the Act. To stop CDCR's ongoing pollution of Mule Creek, the County and CSPA jointly ask this court to issue injunctive relief under the Act to compel CDCR to implement an existing (but inexplicably unimplemented) plan to correct the grave infrastructure deficiencies at the Prison that would help stop this ongoing pollution and put CDCR on a path to achieve compliance with the Act.

## II.    STATEMENT OF FACTS

Citizen suit trials under the Act can often be complicated and highly technical. However, the key facts about CDCR's ongoing pollution of Mule Creek are simple and straightforward. CDCR has consistently self-reported that its MS4 discharges exceed applicable water quality

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

---

[1] On February 10, 2023, CDCR filed notice that Jeffrey Macomber had replaced Kathleen Allison as Secretary of the California Department of Corrections and Rehabilitation, and that Mr. Macomber should be substituted as a party pursuant to Fed. R. Civ. P. 25.

1  standards, and that those are contributing to exceedances of pollutants in Mule Creek. Moreover,

2  the evidence shows that untreated sewage and irrigation water is entering the MS4 due to defects

3  in the Prison's infrastructure that CDCR has wholly failed to address. This portion of the Joint

4  Trial Brief introduces some of the key witnesses that will help the Court make its decision, and

5  then describes the key facts about the Prison, its discharges of polluted water to Mule Creek, and

6  its failing sewer and storm water infrastructure.

7        **A.    Introduction of Expert Witnesses**

8        This trial will primarily consist of expert testimony regarding the quality of the Prison's

9  MS4 discharges to Mule Creek and whether the quality of that water, as well as the actions taken

10  by CDCR in response to these discharges, meet the requirements of the Act. There will also be

11  some percipient testimony from employees of the Central Valley Regional Water Quality Control

12  Board (Regional Board) and CDCR. Some of the key witnesses are briefly introduced below.

13        Plaintiffs will prove their case primarily through CDCR's own self-monitoring reports and

14  the expert testimony of Karen Ashby and Doctor Robert Emerick. Karen Ashby is Vice President

15  at Larry Walker Associates, Inc., one of the preeminent environmental engineering and consulting

16  firms specializing in water quality management. Ms. Ashby has over 30 years of experience in

17  municipal storm water matters, including storm water program management, municipal storm

18  water permit compliance, water quality standards and beneficial uses, evaluating monitoring

19  reports and reporting on storm water program effectiveness. Ms. Ashby has "hands-on"

20  experience with municipal storm water programs because she managed the area-wide municipal

21  storm water program for the County of Orange for over ten years. She holds a Bachelor of

22  Science from the University of California at Irvine, has been certified as a Professional in Storm

23  Water Quality by Envirocert International, Inc., since 2004 and is an active member of the most

24  significant storm water association in California: the California Stormwater Quality Association

25  (CASQA). Ms. Ashby has served as a member of the CASQA Board of Directors and received

26  the CASQA Leadership Award in 2018 in recognition of her significant contributions to the storm

27  water profession.

28        Ms. Ashby will testify regarding the water quality standards that apply to Mule Creek,

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

how CDCR's monitoring reports conclusively establish hundreds of violations of those standards, and how CDCR's program regularly results in the discharge of highly-polluted water to Mule Creek. Ms. Ashby will testify that CDCR has violated the Act more than 350 times since February 2019.

Plaintiffs will also present expert testimony from Dr. Robert Emerick. Dr. Emerick holds a Ph.D. in Civil and Environmental Engineering from the University of California, Davis (1998), with doctoral minors in stochastic modeling and ecology. Dr. Emerick's doctoral dissertation focused on determining wastewater treatment process type impacts on coliform bacteria within wastewater particles. Dr. Emerick is a registered Professional Engineer with the State of California. He has over 30 years of experience in Clean Water Act permitting, including wastewater and storm water permitting, as well as design and operations of water, wastewater, and recycled water infrastructure. Dr. Emerick's storm water experience includes significant work for the California Department of Transportation and the County of Sacramento, developing feasible best management practices to reduce pollutants sufficient to comply with regulatory standards. Dr. Emerick has also conducted research with regard to the presence and treatment of pharmaceuticals and personal care products in wastewater.

Dr. Emerick will testify regarding the relationship between the sewer system and the storm water system at the Prison. He will express the opinions that CDCR's discharges to Mule Creek contain a sewage component, that these discharges contaminated with sewage occur during both rain events and during dry weather periods, and that the most likely source of that sewage is CDCR's sanitary sewer system.

CDCR has designated Timothy S. Simpson as its expert. Plaintiffs acknowledge Mr. Simpson's qualifications in the area of industrial storm water, although industrial storm water is no longer an issue in this trial. In fact, Mr. Simpson was the testifying expert in many important published industrial storm water decisions that Plaintiffs contend support their claims in this matter, including, but not limited to, the companion cases of *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp.2d 914 (C.D. Cal. 2009) and *Santa Monica Baykeeper v. International Metals Ekco, Limited*, 619 F.Supp.2d 936 (C.D. Cal. 2009). As the Court considers Mr.

Simpson's testimony, it should be mindful that 90% of Mr. Simpson's work is on the industrial storm water issues that are no longer part of this lawsuit. As Mr. Simpson admitted in his deposition, he does not find the municipal storm water issues—the issues that are at the core of this trial--"particularly interesting or challenging." In Mr. Simpson's own words, they are "not something that I spend a lot of time on." At the time of his deposition, Mr. Simpson could not identify a single prior project involving the municipal permit at issue in this case on which he had previously worked.

## B.    The Prison's MS4 and Sanitary Sewer System

CDCR owns and operates the Prison, an approximately 866-acre complex in Ione, California, housing approximately 4,300 inmates. Trial Ex. 51 (Stormwater Collection System Investigation Report of Findings) at p. 6, § 1.3. The Prison contains two major pieces of old and degraded infrastructure that individually and collectively result in regular and ongoing discharges of polluted water to Mule Creek—the Prison's MS4 and the Prison's sanitary sewer system.

CDCR owns and operates a system of conveyances, including channels, drains, culverts, ditches, swales, and outfalls that it uses to collect both storm water and dry-weather flows and then to discharge that water, and all the pollutants in it, to Mule Creek. *Id.* at pp. 7-9, § 1.4. Under the Act and its implementing regulations, such a system is referred to as a municipal separate storm sewer system or "MS4." 40 C.F.R § 122.26(b)(8). The aerial photograph below shows the Prison, the Prison's MS4, and its relationship to Mule Creek:

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

83653.00001\41092707.6

2:20-CV-02482-WBS-AC [CONSOLIDATED WITH 2:21-CV-00038-WBS-AC]
PLAINTIFFS' JOINT TRIAL BRIEF

1



**MCSP0004089**

As the depiction above illustrates, CDCR's MS4 employs a perimeter drain system to collect water from the Prison and discharge it at two different locations to Mule Creek. Any runoff (dry weather or wet weather) from the Prison's "A" Yard, "B" Yard, and Center Corridor collects in underground pipelines and is conveyed to a perimeter ditch, that flows generally from the guard tower marked as "GT-6" in the photograph toward the low point near the guard tower marked as "GT-3." Runoff from inside the Prison joins with the perimeter ditch at a location near

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   the guard tower marked as GT-4. The flows within the perimeter ditch from GT-6 to GT-3 collect

2   in drop inlets, flow through a culvert under a perimeter road, and enter an earthen channel at the

3   location indicated as "MCSP6" that discharges to Mule Creek via the location indicated as

4   "MCSP3" (sometimes called the "Main Outfall"). Trial Ex. 51 (Stormwater Collection System

5   Investigation Report of Findings) at pp. 7-9, § 1.4.1.

6          The remainder of the runoff from the Prison collects in a perimeter ditch on the opposite

7   side of GT-5, then flows through a culvert under a perimeter road, and into an earthen channel at

8   the location indicated as "MCSP5" that discharges to Mule Creek at the location indicated as

9   "MCSP2" (sometimes called the "Secondary Outfall"). Trial Ex. 51 (Stormwater Collection

10  System Investigation Report of Findings) at p. 9, § 1.4.2.

11         CDCR also owns and operates a sanitary sewer system and wastewater treatment plant

12  (WWTP) at the Prison to transport and treat wastewater at the Prison. Trial Ex. 8 (Order R5-

13  2015-0129) at p. 1, finding 1; Trial Ex. 57 (Sewer System Management Plan) at p. 3, § I. The

14  WWTP receives flows of domestic and industrial wastewater created at the Prison. *Id.*

15  Approximately 5.75 miles of sanitary sewer pipes transport wastewater through the Prison to the

16  WWTP. Trial Ex. 57 (Sewer System Management Plan) at MCSP0029661.

17         For the most part, the MS4 and sanitary sewer system are separate systems. However,

18  CDCR diverts some non-stormwater flows in the MS4 during dry weather to the WWTP, using

19  slide gates at locations "MCSP5" and "MCSP6." During rain events, CDCR opens the slide gates

20  in the MS4 and releases any water in the MS4, including any wastewater or non-stormwater in the

21  MS4 directly to Mule Creek. Trial Ex. 47 (Interim Disposal Plan) at p. 4, ¶ 3.0; see generally,

22  Trial Exs. 454-488 (discharge notifications).

23         **C.     The Prison's History of Violations Leading to Coverage Under the Small MS4**

24                 **Permit and Issuance of the 13383 Orders**

25         CDCR has a long history of violating the Act or comparable state water quality laws at the

26  Prison. For example, in December of 2006, the Regional Board issued a Cease and Desist Order

27  to CDCR related to the operations of the WWTP. Trial Ex. 8 (Order R5-2015-0129) at p. 6,

28  finding 21. Similarly, in March of 2007, the Regional Board issued Administrative Civil Liability

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   Complaint R5-2007-0505 because CDCR had "discharged waste to surface waters and outside of

2   the designated disposal area with a total flow of 54,750 gallons during July 2006 and January

3   2007." *Id* at p. 7, finding 22.

4         CDCR's history of repeated and ongoing water quality violations is most recently

5   illustrated by events starting in or about late December of 2017. At that time, the Regional Board

6   commenced an investigation of a complaint made by David Anderson that CDCR was

7   discharging water illegally to Mule Creek from the Prison. Trial Ex. 27 (ACL 2021 Order R5-

8   2021-0001) at pp. 2-4, findings 5-15. Mr. Anderson will testify that he witnessed water being

9   discharged "as varying between clear and jet black, sometimes with solids, and sometimes

10   steaming hot." *Id.*, at p. 2, finding 6.

11         The Regional Board inspected the Prison and observed water flowing through the MS4,

12   which discharges to Mule Creek; sampled the flowing water; and confirmed based on its own

13   samples and sampling conducted by CDCR that the results "show concentrations of waste-type

14   constituents at levels that would be expected in wastewater, sewage, and/or grey water" including

15   bacteria and metals, among other pollutants. *Id.*, at pp. 3, 5, findings 9, 17, tbl. 1. The Regional

16   Board also confirmed that CDCR had not properly obtained coverage under applicable permits

17   for these discharges. *Id.*, at p. 3, findings 11-12. Based on its investigation, the Regional Board

18   issued a California Water Code section 13267 Order requiring CDCR to take certain actions to

19   address the discharges to Mule Creek, including, but not limited to monitoring the discharges and

20   conducting certain studies. *Id.*, at p. 4, finding 13; see also Trial Ex. 11 (13267 Order).

21         In April 2019, the Regional Board took action to force CDCR to enroll and obtain

22   coverage under State Water Resources Control Board Order 2013-0001-DWQ, the Small

23   Municipal Separate Storm Sewer System Permit (Small MS4 Permit"). Trial Ex. 6 (WQ2019-

24   0009-EXEC).  Coverage under the Small MS4 Permit was required because CDCR was

25   discharging water from its MS4 to Mule Creek, a water of the United States. *Id.* Such discharges

26   are illegal under the Act unless done in compliance with a permit issued pursuant to the Act, a

27   permit which CDCR admittedly did not possess. 33 U.S.C. § 1311(a); Trial Ex. 27 (ACL 2021

28   Order R5-2021-0001) at pp. 3, 6, findings 11-12, 18-19.

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

The Small MS4 Permit contains the following four provisions at issue in this case:

- Provision B.2 (Discharge Prohibition)—Discharges of storm water from the MS4 to waters of the U.S. in a manner causing or threatening to cause a condition of nuisance as defined in Water Code § 13050 are prohibited.

- Provision B.3 (Discharge Prohibition)—Discharges through the MS4 of material other than storm water to waters of the U.S. shall be effectively prohibited, except as allowed under this Provision or as otherwise authorized by a separate NPDES permit.

- Provision C.1 (Effluent Limitation)—Permittees shall implement controls as required by this Order to reduce the discharge of pollutants from their MS4 to waters of the U.S. to the MEP.

- Provision D (Receiving Water Limitation)—Discharges shall not cause or contribute to an exceedance of water quality standards contained in a Statewide Water Quality Control Plan, the California Toxics Rule (CTR), or in the applicable Regional Water Board Basin Plan.

In addition, under Provision G of the Small MS4 Permit, CDCR must "modify and implement [its] storm water management programs *and monitoring* as required by the Regional Water Board Executive Officer." Trial Ex. 2. The Regional Board Executive Offer used this authority to add specific monitoring and reporting requirements to the Small MS4 Permit through the adoption of three orders under California Water Code section 13383 ("13383 Orders"). *See* Trial Ex. 20 (13383 Order, dated Aug. 6, 2020) at pp. 1-2, findings 4, 7; Trial Ex. 24 (13383 Order, dated Dec. 22, 2020) at p. 2, findings 4, 7; Trial Ex. 31 (13383 Order, dated Nov. 29, 2021) at pp. 2-3, findings 4, 8. The monitoring and reporting requirements added to the Small MS4 Permit by these 13383 Orders are intended to "ensure compliance" with the Small MS4 Permit. *Id.* The provisions added to the Small MS4 Permit by these 13383 Orders provide that the monitoring points required "shall be representative of the volume and nature of the monitored discharge." Trial Ex. 20 (13383 Order, dated Aug. 6, 2020) at p. 4, § II.A; Trial Ex. 24 (13383 Order, dated Dec. 22, 2020) at p. 5, § II.A; Trial Ex. 31 (13383 Order, dated Nov. 29, 2021) at p.

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

4, § II.A.

### D.   CDCR's Sampling Requirements

Under the 13383 Orders, CDCR is required by the Regional Board to maintain several representative sampling points to monitor its discharges to Mule Creek and to assess its compliance with the Small MS4 Permit and the Act. Trial Ex. 11 (13267 Order) at p. 7, § C-D; Trial Ex. 20 (13383 Order, dated Aug. 6, 2020) at pp. 4-10, §§ II-VI; Trial Ex. 24 (13383 Order, dated Dec. 22, 2020) at pp. 5-8, §§ II-VI; Trial Ex. 31 (13383 Order, dated Nov. 29, 2021) at pp. 4-10, §§ II – VI. These sampling points include locations designed to represent the quality of the water discharging from the Prison's MS4 to Mule Creek and the quality of the water in Mule Creek near and below the points of discharge. Each of these representative monitoring points assess compliance with the Act. *Id.*

The Regional Board requires CDCR to use one of two representative sampling locations, depicted as one of MCSP3 or MCSP6 and one of MCSP2 or MCSP5 in the diagram above, to assess the quality of the discharges from the Main Outfall. Trial Ex. 20 (13383 Order, dated Aug. 6, 2020) at pp. 4-7, §§ II-V; Trial Ex. 24 (13383 Order, dated Dec. 22, 2020) at pp. 5-9, §§II-V; Trial Ex. 31 (13383 Order, dated Nov. 29, 2021) at pp. 4-9, §§ II-V. The Regional Board makes clear that samples taken at any of these sampling points are "representative of the volume and nature of the monitored discharge" from the Prison's MS4. Trial Ex. 20 (13383 Order, dated Aug. 6, 2020) at p. 4, § II.A; Trial Ex. 24 (13383 Order, dated Dec. 22, 2020) at p. 5, § II.A; Trial Ex. 31 (13383 Order, dated Nov. 29, 2021) at p. 4, § II.A. Thus, as explained above infra § III.D, sampling at those point is sufficient to determine compliance with the Small MS4 Permit.

Moreover, as a factual matter, sampling at MCSP2, MCSP3, MCSP5, and MCSP6 accurately reflects the quality of the Prison's MS4 discharges. First, CDCR admits that MCSP2 and MCSP3 are located at the point where the MS4 discharges to Mule Creek. ECF No. 95-2, ¶ 24. Second, the evidence demonstrates that samples taken at MCSP5 and MCSP6 accurately reflect discharges to Mule Creek. CDCR takes samples at MCSP5 and MCSP6 when the slides gates are open, allowing releases to Mule Creek. See e.g., Trial Exs. 454-488 (Discharge Notifications). There is no evidence that the ditches between MCSP5/6 and MCSP2/3,

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

respectively reduce pollutants during those conditions. Ashby Testimony; see also Trial Ex. 51 (Stormwater Collection System Investigation Report of Findings) at Tbls. 3.5-9 and 3.5-10 (showing average *E. coli*, aluminum, and iron results at MCSP6 were higher than average result at MCSP3). Moreover, CDCR's designated representative has testified (and will presumably testify at trial) that he did not know whether the ditches were even intended to reduce pollutants.

The Regional Board also requires CDCR to monitor the quality of the water in Mule Creek upstream of and just downstream of the MS4 outfalls to Mule Creek. CDCR therefore monitors the water quality in Mule Creek at the location marked as "MCSP4" on the figure above, located in Mule Creek, downstream from the Prison. Trial Ex. 20 (13383 Order, dated Aug. 6, 2020) at p. 5, tbl. A; Trial Ex. 24 (13383 Order, dated Dec. 22, 2020) at p. 7, tbl. A; Trial Ex. 31 (13383 Order, dated Nov. 29, 2021) at pp. 5-6, tbl. A.

### E.    CDCR'S Monitoring Reports

CDCR's Small MS4 Permit, as modified by the 13383 Orders, require CDCR to conduct monitoring and report the results of that monitoring under penalty of perjury. Trial Ex. 20 (13383 Order, dated Aug. 6, 2020) at p. 3, § I.E; Trial Ex. 24 (13383 Order, dated Dec. 22, 2020) at p. 5, § I.F; Trial Ex. 31 (13383 Order, dated Nov. 29, 2021) at p. 4, § I.D. Between April 24, 2019 and February 6, 2023, the Prison discharged to Mule Creek on 156 days.[2] Prior to December 20, 2020, and beginning in February 2023, CDCR monitored its discharges at MCSP2 and MCSP3. These monitoring reports conclusively establish, between February 24, 2019 and December 19, 2021, the following occurred:

1.    **Forty-two (42) times**, the Prison's MS4 discharges to Mule Creek, as measured at MCSP2 and MCS3, contained levels of *E. coli* exceeding applicable water quality standard (WQS).[3] Ashby Expert Testimony; see also Trial Ex. 408, pp. 204-206,

[2] These days are as follows: In 2019: April 1-6, 8, 16, May 15 - 22, September 16, 18, November 26-30, December 1-9, 11, 22, 23. In 2020: January 8-12, 15-17, 24-27, March 6- 8, 13-19, 25, 26, April 4-7, 20, May 17-20, 28, December 11 - 14, 16, 17, 25 - 27. In 2021: January 4, 5, 23-31, February 1-3, 11-16, March 5-6, 9-11, 14-16, 18-19, October 20-27, November 8-10, December 9-31. In 2022: March 15-21, 27-29, April 11, November 2, December 1. In 2023: February 6. See Trial Exhs. 408-415, 421, 426, 431, 460-461, 464, 466-467, 469, 471, 480, 499-500.

[3] These discharges occurred on the following days: In 2019, April 8, May 16, May 20, September 16, December 11, December 23. In 2020, January 9, January 16, January 17, January 27, March

COA0005833-5835; Trial Ex. 409 pp. 185, 197, 209, COA0006116, 6128, 6140;

Trial Ex. 411 p. 203, COA7478; Trial Ex. 412 pp. 136, 253, 259, 265,

COA0007750, 7867, 7873, 7879; Trial Ex. 413 pp. 144, 156, 213, 219, 237, 296,

302, COA0008195, 8207, 8264, 8270, 8288, 8345-8347; Trial Ex. 414 pp. 150,

156, 162, 175, 235, COA0008524, 8530, 8536, 8549, 8609; Trial Ex. 415 pp. 175,

217, 223, 231, 237, COA0008822, 8864, 8816-8821, 8870, 8878, 8884; Trial Ex.

67 pp. 1-8, MCSP0058689-58696

2.   **Nineteen (19) times**, the MS4 discharges to Mule Creek, as measured at MCSP2 and MCSP3, contained *E. coli* at levels exceeding applicable WQS when Mule Creek also exceeded the *E. coli* WQS, as measured at MCSP4.[4] *Id.*

3.   **Nineteen (19) times**, the MS4 discharges to Mule Creek, as measured at MCSP2 and MCSP3, contained levels of aluminum, iron, lead, and/or zinc exceeding applicable WQS.[5] Ashby Expert Testimony; see also Trial Ex. 409 pp. 201-208, COA0006132-6139; Trial Ex. 412 pp. 128-135, COA0007742-7749; Trial Ex. 413 pp. 148-156, COA0008199-8207; Trial Ex. 415 pp. 167-175, COA0008816-8821; Trial Ex. 418 pp. 127-134, MCSP0032893-32900; Trial Ex. 67 pp. 1-8, MCSP0058689-58696.

4.   **Ten (10) times**, MS4 discharges to Mule Creek, as measured at MSCP2 and MCSP3, contained levels of aluminum, iron, lead, and/or zinc above WQS when Mule Creek, as measured at MSCP4, also exceeded WQS for those metals.[6] *Id.*

After December 20, 2021, CDCR sampled the Prison's MS4 discharges at MCSP5 and

MCSP6. These self-monitoring reports continue to show similar exceedances of WQS, as

16, March 17, March 25, March 26, April 6, April 7, April 20, May 18, May 19, May 28. In 2023, Feb. 6.

[4] These occurred on the following days: In 2019, May 16, May 20, September 16, December 11, December 23. In 2020, January 9, January 16, January 17, January 27, March 16, March 17, March 25, March 26, April 6, April 7, April 20, May 18, May 19, May 28.

[5] These occurred on the following days: In 2019, May 16 (aluminum, iron, zinc), September 16 (aluminum, iron, zinc). In 2020, January 9 (aluminum, iron, zinc), March 16 (aluminum, iron), May 18 (aluminum, iron, zinc). In 2023, February 2.

[6] These occurred on the following days: In 2019, May 16 (iron), September 16 (aluminum, iron, zinc). In 2020, January 9 (aluminum, iron), March 16 (aluminum, iron), May 18 (aluminum, iron).

2:20-CV-02482-WBS-AC [CONSOLIDATED
WITH 2:21-CV-00038-WBS-AC]
PLAINTIFFS' JOINT TRIAL BRIEF

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

follows:

1. **Ten (10) times**, the Prison's MS4 discharges to Mule Creek, as measured at MCSP5 and MCS6, contained levels of *E. coli* exceeding applicable WQS.[7] Ashby Expert Testimony; *see also* Trial Ex. 425 pp. 21-26, COA0031343-31348, pp. 39-45, COA31361-31367, pp. 56-62, COA31378-31384; Trial Ex. 426 pp. 25-32, COA68040-68047; pp. 43-50, COA68058-68065; Trial Ex. 427 pp. 30-37, COA0032294-32301.

2. **Six (6) times**, the MS4 discharges to Mule Creek, as measured at MCSP5 and MCSP6, contained *E. coli* at levels exceeding applicable WQS when Mule Creek also exceeded the *E. coli* WQS, as measured at MCSP4.[8] *Id.*

3. **Ninety-one (91) times**, the MS4 discharges to Mule Creek, as measured at MCSP5 and MCSP6, contained levels of aluminum, iron, lead, and/or zinc exceeding applicable WQS.[9] *Id.*; *see also* Trial Ex. 421 pp. 15-27, MCSP0001915-1927; pp. 33-38, MCSP0001933-1938, pp. 60-65, MCSP001960-1965, pp. 76-81, MCSP0001976-1981, pp. 105-110, MCSP0002005-2010;

4. **Thirty-seven (37) times**, the MS4 discharges to Mule Creek, as measured at MSCP5 and MCSP6, contained levels of aluminum, iron, lead, and/or zinc above WQS when Mule Creek, as measured at MSCP4, also exceeded WQS for those metals.[10] *Id.*

---

[7] These occurred on the following days: In 2021, October 22, November 9, December 9. In 2022, March 15, March 28, April 11.

[8] These occurred on the following days: In 2021, October 22, November 9, December 9. In 2022: March 15, March 28, April 11.

[9] These occurred on the following days: In 2020, December 17 (aluminum, iron, lead, zinc). In 2021, January 27 (aluminum, iron, manganese, copper, lead, zinc), February 2 (aluminum, iron, manganese, zinc), March 10 (aluminum, iron, zinc), March 15 (aluminum, iron, manganese, zinc), March 19 (aluminum, iron, copper, lead, zinc), October 22 (aluminum, iron, manganese, copper, zinc), November 9 (aluminum, iron, manganese, zinc), December 9 (aluminum, iron, manganese, zinc). In 2022, March 15 (aluminum, iron, manganese, zinc), March 28 (aluminum, iron, manganese, zinc), April 11 (aluminum, iron, manganese, zinc). In 2023, February 2.

[10] These occurred on the following days: In 2020, December 17 (aluminum, iron, lead, zinc). In 2021, January 27 (aluminum, iron, zinc), February 2 (aluminum, lead, zinc), February 12 (aluminum, lead), March 10 (aluminum, zinc), March 15 (aluminum, iron, zinc), March 19, (iron, lead), October 22 (aluminum, iron, manganese, copper, zinc), November 9 (aluminum, iron, manganese), December 9, 2021 (aluminum, iron, manganese). In 2022, March 15 (aluminum, iron), March 28 (aluminum, iron), April 11 (aluminum, iron, manganese, zinc).

83653.00001\41092707.6

2:20-CV-02482-WBS-AC [CONSOLIDATED WITH 2:21-CV-00038-WBS-AC] PLAINTIFFS' JOINT TRIAL BRIEF

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   Reflected in the numbers above, CDCR self-reported exceedances of *E. coli* at MCSP3

2   and exceedances of metals at both MCSP2 and MCSP3 as recently as February 6, 2023. Trial Ex.

3   67 (Feb. 6 lab results).

4   In other words, CDCR's self-monitoring reports show exceedances of water quality

5   standards at MCSP2, MCSP3, MCSP4, MCSP5, and MCSP6, which, as set forth in more detail

6   below, admit and conclusively establish at least 221 separate violations of the Small MS4 Permit

7   (and therefore the Act) since February of 2019.

8   **F.      Cross-Contamination of the Sanitary Sewer System and the MS4**

9   In addition to reporting consistent exceedances of WQS in their MS4 discharges and in

10   Mule Creek, CDCR has identified hundreds of defects in both its sanitary sewer system and the

11   MS4. See, e.g., Trial Ex. 51 (Stormwater Collection System Investigation Report of Findings) at

12   pp. 78-82, §§ 4.1 – 4.2.2. These defects include broken/collapsed pipes, fully separated joints,

13   deformations, compromised seals, failed previous repairs, and large holes, cracks, or breaks

14   where soil is visible. *Id.* at pp. 40-42, §§ 3.4.2.3(i), (ii). The sanitary sewer system and the MS4

15   were also constructed in close proximity to each other, with the sanitary sewer system located

16   *above* the MS4 in most areas. *Id.* at p. 80, § 4.2. The Regional Board "believes this is a clear

17   conduit for indirect cross connection anywhere that both systems have nearby defects." Trial Ex.

18   27 (Order R5-2021-0001) at p. 5, finding 16.

19   The Regional Board further concluded that sampling data showed "various waste

20   constituents have been consistently detected in the [MS4] discharge[,]" and that the discharges

21   from the MS4 "were clear violations of the Clean Water Act." Trial Ex. 22 (Review of

22   Stormwater System Report) at p. 18, § 8. Multiple times, Regional Board staff determined the

23   "list of recommended repairs to the stormwater and sanitary sewer system … must be completed

24   and Best Management Practices must be implemented in order to adequately protect downstream

25   beneficial uses." *Id.*, see also *id* at p. 4, § 2.2 ("This issue will need to be addressed more

26   aggressively going forward under the MS4 permit."); *id*. at p. 19, § 8 ("… no improvements have

27   been made to the site to address the waste constituents detected in stormwater system or the

28   defects in both system.").

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

83653.00001\41092707.6

2:20-CV-02482-WBS-AC [CONSOLIDATED
WITH 2:21-CV-00038-WBS-AC)]
PLAINTIFFS' JOINT TRIAL BRIEF

1   The Regional Board's conclusions are consistent with Dr. Emerick's opinion that the

2   sewage contained in the MS4 most likely comes from the sanitary sewer system. Notably, as Dr.

3   Emerick will testify, during Plaintiffs' dry-weather inspections in March 2022, the MS4 had

4   water within the system, and the sampling results of that water included high concentrations of

5   bacteria, as well as pharmaceuticals. Trial Ex. 525 (March 9, 2022 Sampling Data) (fecal

6   coliform was between 79-1600 MPN/100 mL; total coliform was greater than 1600 MPN/100 mL

7   in each sample; *E. coli* was present in all samples, pp. 759-806 (sampling showed the presence of

8   pharmaceuticals). Dr. Emerick will testify that the presence of these pollutants, particularly in dry

9   weather, demonstrates that wastewater is moving through the MS4, in violation of Provision B.3.

10   Thus, the evidence demonstrates that untreated sewage is present in the MS4. When

11   CDCR opens the slide gates in the MS4 during rain events, all non-stormwater in the MS4,

12   including untreated sewage, commingles with stormwater and discharges directly to Mule Creek.

13   Trial Ex. 47 (Interim Disposal Plan) at p. 4, § 3.0; see generally, Trial Exs. 454-488 (discharge

14   notifications).

15   **G.   CDCR's Failure to Fix the Infrastructure Defects and/or Implement**

16   **Additional BMPs to Correct Its Violations of the Small MS4 Permit**

17   CDCR is well-aware of the significant infrastructure deficiencies that result in this regular

18   discharge of polluted water to Mule Creek, which their own consultant identified in 2019. Trial

19   Ex. 51 (Stormwater Collection System Investigation Report of Findings) at pp. 40-42, 78-82,

20   §§ 3.4.2.3, 4.1 – 4.2.2; Trial Ex. 55 (Appendix 23); Trial Ex. 27 (Order R5-2021-0001) at p. 5,

21   ¶ 16. At that time, the consultant and the Regional Board indicated that CDCR must fix those

22   defects. *Id.* Yet, CDCR's designated representatives stated that CDCR has failed to make any of

23   those improvements three years later. Dkt. No. 103 at 18:7-10.

24   Moreover, CDCR has reported they regularly discharge large volumes of irrigation water

25   through the MS4 into Mule Creek. Trial Ex. 47 (Interim Disposal Plan) at p. 4, § 3.0; see generally,

26   Trial Exs. 454-488 (discharge notifications). CDCR has again not fixed the problem and, in fact,

27   admitted they will not come into compliance with Provision B.3 with regard to their irrigation

28   discharges, until February 2025. Trial Ex. 63 (May 13, 2022 Non-Stormwater Discharge

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1    Elimination Plan) at MCSP0058684.

2        Further, the evidence will show that CDCR has not added or improved their BMPs since

3    these actions were filed. CDCR's representative designated to speak to the BMPs and the pollutants

4    intended to be addressed by each BMP, Anthony Orta, stated he was only aware of BMPs intended

5    to reduce sediment, not any such measures to reduce metals or *E. coli*. Dkt. No. 108 at 17:20-25.

6    In addition, according to CDCR's designated representative, CDCR has not made any changes to

7    the storm sewer system or the MS4 since Fall 2019, except for applying for funding to replace the

8    irrigation system. In November 2022, the Regional Board twice notified CDCR that it failed to

9    submit any BMP plan to address discharges that contribute to exceedances of metals WQS in Mule

10   Creek. Trial Exs. 35-36 (Nov. 3, and Nov. 30 letters); see Dkt. No. 108 at 17:17-20.

11       For example, on February 11, 2022, November 3, 2022, and November 30, 2022, the

12   Regional Board notified CDCR of exceedances of the RWL provision in Small MS4 Permit

13   Provision D. In accordance with the Small MS4 Permit, the Regional Board required CDCR to

14   "[i]nclude best management practices (BMP) to be implemented to address the receiving water

15   exceedances and a schedule of the BMP implementation. BMPs which can immediately address

16   the exceedances must be proposed and immediately implemented." Trial Ex. 33 (Feb. 11, 2022

17   letter) at p. 2, ¶ 4. Despite receiving this notice from the Regional Board, CDCR failed to submit

18   a BMP plan to address the bacteria and metals pollutants in the Prison's polluted discharges.

19       In November 2022, the Regional Board again, twice notified CDCR that the Prison

20   violated Provision D and that CDCR had still failed to submit any BMP plan to address either the

21   dry weather or storm water discharges that contribute to water quality exceedances in Mule

22   Creek. Trial Exs. 35-36 (Nov. 3, and Nov. 30 letters). These notifications required CDCR to

23   "identify the source(s) of the aluminum, iron, manganese, and zinc" and to "describe the BMPs

24   that are being implemented to eliminate the exceedances from those sources and what additional

25   BMPs will be implemented. An implementation schedule must also be included … [and] be

26   submitted … by 17 February 2023." Trial Ex. 36 (Nov. 30 letter) at p. 2, ¶ 2.

27       CDCR failed to submit the source identification and BMP plan by February 17, 2023. On

28   February 24, 2023, CDCR belatedly submitted a "Revised Non-Storm Water Discharge

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

2:20-CV-02482-WBS-AC [CONSOLIDATED
WITH 2:21-CV-00038-WBS-AC]
PLAINTIFFS' JOINT TRIAL BRIEF

Elimination Plan" that did not include any source identification analysis. Trial Ex. 68 (Revised NSWD Plan). Further, all BMPs identified in the Revised Non-Storm Water Discharge Elimination Plan were developed or implemented before this action began. That is, CDCR did not develop new BMPs to address the new violations that the Regional Board had identified and required CDCR to address. Rather, it tried to recycle previously-identified or previously-required BMPs.

Finally, the ditches between MCSP5 and MCSP2 and between MCSP6 and MCSP3, which CDCR refers to as "bioswales" and touts as a stormwater BMP, were in place before the Facility was covered by the Small MS4 Permit, and CDCR's representative stated that CDCR has not made any changes to the ditches since that time. *See* Dkt. No. 108 at 18:2-7. Moreover, Mr. Orta did not know whether or how the ditches were designed, whether Defendants had ever evaluated their effectiveness, or even whether the purpose of the ditches is to reduce pollutants.

### III.   SUMMARY OF POINTS OF LAW

#### A.   Points of Law Relevant to All Claims

##### 1.   Plaintiffs Have Article III Standing.

Plaintiffs filed a motion for partial summary judgment on June 28, 2022, arguing that both Plaintiffs met the requirements of Article III standing. Dkt. No. 45. On August 29, 2022, the Court granted partial summary judgment, finding that both Plaintiffs had standing. Dkt. No. 60 at 13:9-10. The Court's pretrial order also determined both Plaintiffs have Article III standing. Dkt. No. 110 fn. 3. No further legal or factual argument is anticipated on this point.

##### 2.   The Clean Water Act Is a Strict Liability Statute.

The Clean Water Act is a strict liability statute and does not excuse "de minimis" or "rare" violations. *Sierra Club v. Union Oil Company of California*, 813 F.2d 1480, 1491 (9th Cir. 1987), *rev'd on other grounds*, 485 U.S. 931, *amended by* 853 F.2d 667 (9th Cir.), *remanded to*, 716 F.Supp. 429 (N.D. Cal. 1988) (CWA and the regulations promulgated under it "make no provision for 'rare' violations"); *Hawaii's Thousand Friends v. City & Cnty. of Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw. 1993). To establish a violation of the Act, a plaintiff need only prove that a discharger has violated the terms and conditions of its NPDES permit. 33 U.S.C. §§

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

83653.00001\41092707.6

2:20-CV-02482-WBS-AC [CONSOLIDATED WITH 2:21-CV-00038-WBS-AC] PLAINTIFFS' JOINT TRIAL BRIEF

1311(a), 1342(k); *Hawaii's Thousand Friends,* 821 F. Supp. at 1392 ("NPDES compliance is a matter of strict liability and a defendant's intent and good faith are irrelevant").

Here, the evidence will conclusively establish that CDCR has and continues to violate the Act by discharging polluted water to Mule Creek in violation of its Small MS4 Permit. CDCR must be held strictly liable for these violations related to its discharges from its MS4, regardless of whether other sources, including natural sources, contribute pollutants to its MS4 discharges or Mule Creek. *See National Resources Defense Council, Inc. v. County of Los Angeles,* 725 F.3d 1194, 1206 (9th Cir. 2013). Even if the pollutants that CDCR discharges from its MS4 originated elsewhere, CDCR is still responsible under the Act for the pollutants in its discharges. *Id.* In fact, the Court has already clearly stated that the Small MS4 Permit does not excuse contributions from background sources. *see also* Dkt. No. 103 at 20-22.

Second, although other sources upstream of the Prison may be polluting Mule Creek (i.e., CDCR's purported "background argument"), CDCR is responsible for its contribution to WQS exceedances in Mule Creek. See Trial Ex. 2 (MS4 Permit) at pp. 17, 19, provs. B.2, B.3, D.1; see also Trial Ex. 22 (RB Review of Storm Water System Report) at p. 16, §6. Thus, as explained further below (*infra* §§ III.G.1, III.G.4), CDCR violates its Small MS4 Permit when its discharges include pollutants in excess of applicable WQS when Mule Cree, downstream of the Prison, exceeds WQS.

### 3.     The Act Prohibits CDCR from Impeaching Its Monitoring Reports.

The law is settled in the Ninth Circuit that a discharger's self-monitoring reports in a Clean Water Act lawsuit provide: (1) conclusive evidence of an exceedance of a permit limitation; and (2) cannot be impeached by the discharger based on alleged sampling error. *Sierra Club v. Union Oil Company of California*, 813 F.2d 1480, 1492 (9th Cir. 1987), *rev'd on other grounds*, 485 U.S. 931, *amended by* 853 F.2d 667 (9th Cir.), *remanded to*, 716 F.Supp. 429 (N.D. Cal. 1988). The NPDES program fundamentally relies on self-monitoring, and such reports constitute admissions of noncompliance that bind the defendant in an enforcement proceeding. *Save Our Bays and Beach v. City and County of Honolulu,* 904 F.Supp. 1098, 1138 (D. Haw. 1994). A discharger cannot object to the quality of its own sampling and is therefore bound by the

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

admissions of noncompliance in its own reports. *Santa Monica Baykeeper v. Kramer Metals, Inc.* 619 F.Supp.2d 914, 927 (C.D. Cal. 2009). The Ninth Circuit explained the rationale for this rule as follows:

> Were we to accept Union Oil's argument regarding the use of sampling errors to excuse reported permit exceedances, we would be sanctioning countless additional hours of NPDES litigation and created new, complicated factual questions for district courts to resolve. As indicated by the legislative history, Congress hoped to limit such situations. In addition, if each self-monitoring report is to be considered only prima facie rather than conclusive evidence of an exceedance of a permit limitation, citizen groups like the Sierra Club would be taking a considerable risk whenever they initiated a citizen enforcement action pursuant to 33 U.S.C. § 1365. While a permittee's publicly filed reports might clearly indicate that illegal pollution was taking place, the permittee might have additional information unavailable to citizens groups indicating that sampling error rendered the reports meaningless. Finally and most importantly, allowing permittees to excuse their reported exceedances by showing sampling error would create the perverse result of rewarding permittees for sloppy laboratory practices. Such an approach would surely undermine the efficacy of the self-monitoring program.

*Sierra Club,* 813 F.2d at 1492.

The Ninth Circuit and its District Courts have consistently applied this settled law to Clean Water Act citizen suits. *Natural Resources Defense Council, Inc. v. County of Los Angeles* 725 F.3d 1194, 1207-1208 (9th Cir. 2013) (holding that County's self-monitoring reports conclusively demonstrated violations of receiving water limitations); *Santa Monica Baykeeper v. International Metals Ekco, Ltd.* 619 F.Supp.2d 936, 948 (C.D. Cal. 2009) (discharger cannot object to the quality of its own sampling and cannot dispute the information contained in its annual reports); *San Francisco Baykeeper v. W. Bay Sanitary Dist.* 791 F.Supp.2d 719, 755 (N.D. Cal. 2011) ("A monitoring report that shows a water sample with pollutant discharges in excess of permit limits is conclusive evidence of a violation").

Here, CDCR's monitoring reports provide conclusive evidence of hundreds of violations and cannot be impeached by CDCR based on settled Ninth Circuit law. See *Sierra Club,* 813 F.2d at 1492. Therefore, the Court should exclude any and all evidence by CDCR that questions the accuracy of its sampling results. *Id*. If this evidence were not excluded, Plaintiffs will be required to present evidence that every sample result is accurate. Thus, Plaintiffs would be forced to call

1  each and every person who collected a sample at the Prison and each and every lab technician that

2  analyzed the samples received by CDCR over the last three to four years. Because the Clean Water

3  Act prohibits CDCR from questioning the accuracy of its own samples, calling all of these

4  witnesses is a futile exercise and a waste of the Court's limited time and resources.

5      **4.   The *E. Coli* and Metals Water Quality Standards Apply to Mule**

6          **Creek.**

7      To understand CDCR's violations, the Court must understand the water quality standards

8  that apply to Mule Creek. Under the Act, states such as California are required to develop water

9  quality standards. 33 U.S.C. § 1313. Water quality standards consist of beneficial uses (known as

10  "designated uses" under federal law) of the water body in question and the water quality

11  objectives (known as "water quality criteria" under federal law) that must be maintained to

12  support those beneficial uses. 33 U.S.C. § 1313(c)(2)(A (water quality standards consist of

13  "designated uses of the navigable waters involved and the water quality criteria for such waters

14  based upon such uses"); *see, also*, *City of Arcadia v. State Water Resources Control Bd.,* 191

15  Cal.App.4th 156, 163 (2010); Water Code §§ 13050(f) (defining "beneficial uses") and

16  13050(h)(defining "water quality objectives"); 40 C.F.R. Part 131. These technical concepts can

17  be reduced to simple ideas—the beneficial uses define the types of things we want our waters to

18  be used for (drinking water, swimming, fishing, etc.) and the water quality criteria define the

19  quality of the water needed to reasonably support those uses.

20      In California, the beneficial uses of water bodies and their water quality criteria are

21  primarily established in what are commonly referred to as "Basin Plans." Cal. Water Code §

22  13050(j). Once established in a Basin Plan, beneficial uses and water quality criteria *cannot be*

23  *changed without an amendment of the Basin Plan. California Assn. of Sanitation Agencies v.*

24  *State Water Resources Control Bd.,* 208 Cal.App.4th 1438, 1458-1459 (2012); *see also,* Central

25  Valley Regional Water Quality Control Board Resolution R5-2017-0088[11] (finding that the

26

27  ───────────────
   [11] Available at
   https://www.waterboards.ca.gov/rwqcb5/board_decisions/adopted_orders/resolutions/r5-2017-

28  0088_res.pdf and judicially noticeable non-hearsay pursuant to Federal Rules of Evidence, Rules
   201 and 803(8) and self-authenticating pursuant to Federal Rules of Evidence, Rule 902(5).

2:20-CV-02482-WBS-AC [CONSOLIDATED
WITH 2:21-CV-00038-WBS-AC]
PLAINTIFFS' JOINT TRIAL BRIEF

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   "Board may only exempt water bodies in the Sacramento and San Joaquin River Basins and the

2   Tulare Lake Basin from MUN beneficial use designation by amending the Basin Plan").

3   Specifically, beneficial uses and water quality criteria cannot be changed through Regional Board

4   staff action or through the permitting process. *Id.*

5        The Basin Plan establishes the beneficial uses of Mule Creek and the water quality

6   objectives necessary to support those beneficial uses. Two beneficial uses and their water quality

7   objectives are relevant here: (1) municipal and domestic supply (MUN) beneficial use and the

8   metal standards that support the MUN beneficial use; and (2) contact recreation (REC-1)

9   beneficial use and the bacteria objectives that support the REC-1 beneficial use.

10             i.        The MUN and REC-1 Uses Apply to Mule Creek.

11       Like many water bodies in California, Mule Creek is not specifically identified in the

12   Basin Plan. Under California law, the beneficial uses of Mule Creek are therefore established in

13   two ways as explained in the Basin Plan. First, and critically for this case, the State Board has

14   determined that all waterbodies in the State shall have a Municipal and Domestic Supply (MUN)

15   beneficial use, unless exempted pursuant to State Water Board Resolution No. 88-63 ("Drinking

16   Water Policy') which is, by reference, a part of the Basin Plan. Trial Ex. 16 (Basin Plan) at p. 2-

17   3; §2.1. The Basin Plan provides that "[w]ater bodies within the basin that do not have beneficial

18   uses designated in Table 2-1 *are assigned MUN designations* in accordance with the provisions of

19   State Water Board Resolution No. 88-63 which is, by reference, a part of this Basin Plan . . .." *Id.;*

20   see also, *California Assn. of Sanitation Agencies v. State Water Resources Control Bd.,* 208

21   Cal.App.4th at 1463. The list of exempted waterbodies are listed in Appendix 44 of the Basin

22   Plan. *Id*. The Regional Board did not include Mule Creek in Appendix 44, *id*.; therefore, by law

23   and the plain language of the Basin Plan, Mule Creek has been assigned the MUN beneficial use.

24       Second, Mule Creek has a MUN and REC-1 beneficial use based on a separate and

25   independent concept known as the tributary rule. The Basin Plan provides that the "beneficial

26   uses of any specifically identified water body generally apply to its tributary streams . . .." Trial

27   Ex. 16 (Basin Plan) at p. 2-3, § 2.1; *see also, California Assn. of Sanitation Agencies v. State*

28   *Water Resources Control Bd.,* 208 Cal.App.4th at 1458. This means that Mule Creek has the

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1    same beneficial uses of downstream waters, which includes the Mokelumne River and the Delta.

2    The beneficial uses of the Delta include REC-1 and MUN. Trial Ex. 16 (Basin Plan) at pp. 2-11,

3    2-14, tbl. 2-1.

4        These beneficial uses of Mule Creek are well-reflected in CDCR's permit to operate its

5    WWTP, which identifies the beneficial uses of Mule Creek as follows: "municipal and domestic

6    supply; agricultural supply; industrial process and service supply; water contact recreation; non-

7    contact water recreation; warm freshwater habitat; cold freshwater habitat; migration for aquatic

8    organisms; spawning, reproduction, and/or early development; wildlife habitat and navigation."

9    *See* Trial Ex. 8 (Order R5-2015-0129) pp. 14-15, finding 49.

10            (1)    E. Coli and Metals Water Quality Standards Apply.

11       Based on the REC-1 and MUN beneficial uses assigned to Mule Creek, the following

12    water quality standards apply to Mule Creek:

13       *E. coli* to support REC-1 beneficial use designation: 320 colony forming units (cfu) per

14    100/mL under a statistical threshold value (STV), where no more than 10% of samples may

15    exceed this limit in a calendar month. Trial Ex. 5 (Bacteria Objectives) at pp. 2, 3, § III.E.2, tbl. 1.

16    In addition, the geomean standard prohibits a geomean magnitude of greater than 100 cfu/100mL

17    in any six-week period. *Id.* CDCR appears to believe that *E. coli* is not the proper water quality

18    objective because of the salinity of Mule Creek. ECF 106, p.7. However, the Regional Board

19    specifically and repeatedly required CDCR to analyze its samples for *E. coli*. Trial Ex. 20 (13383

20    Order, dated Aug. 6, 2020) at pp. 5-7, tbls. B-C; Trial Ex. 24 (13383 Order, dated Dec. 22, 2020)

21    at pp. 7-9, tbls. B-C; Trial Ex. 31 (13383 Order, dated Nov. 29, 2021) at pp. 6-9, tbls. B-C; see

22    also Trial Ex. 11  (13267 Order) at p. 3, tbl 1.

23       Metals standards to support MUN beneficial use designation:

24       Title 22 of the California Code of Regulations (for aluminum, iron, manganese), Trial Ex.

25    16 (Basin Plan) at pp. 3-3, 3-4, § 3.1.3:

| Constituent | MCLs / Units |
|---|---|
| Aluminum | 200 µg/L |
| Iron | 300 µg/L |

Best Best & Krieger LLP
300 South Grand Avenue, 25th Floor
Los Angeles, California 90071

| | |
|---|---|
| Manganese | 50 µg/L |

California Toxics Rule (for copper, lead, and zinc), Trial Ex. 16 (Basin Plan) at p. 4-15, § 4.2.1.1.15:

| Constituent | CTR Criteria / Units |
|---|---|
| Copper | 9 µg/L dissolved (Chronic) |
| Lead | 2.5 µg/L dissolved (Chronic) |
| | 3.2 µg/L total (Chronic) |
| Zinc | 117 ug/L dissolved (Acute) |
| | 120 µg/L total (Acute) |

### 5.    Sampling at MCSP2, MCSP3, MCSP5, and MCSP6 Are All Representative of the Prison's MS4 Discharges.

The Act requires every NPDES permittee to monitor its discharges into the navigable waters of the United States in a manner sufficient to determine whether it is in compliance with the relevant NPDES permit. *Natural Resources Defense Council, Inc. v. County of Los Angeles* 725 F.3d 1194, 1207 (9th Cir. 2013). An NPDES permit is unlawful if a permittee is not required to effectively monitor its permit compliance. *Id*. Applied to municipal storm water, "EPA regulations make clear that while MS4 permits need not require monitoring of each stormwater source at the precise point of discharge, they may instead establish a monitoring scheme 'sufficient to yield data which are *representative of the monitored activity* . . ..'" *Id*. at 1209 (emphasis in original). If such representative monitoring data shows that the level of pollutants in federally protected water bodies exceeds those allowed under the Permit, then, as a matter of permit construction, the monitoring data conclusively demonstrate that the defendants are not in compliance with the permit conditions. *Id.*

As noted above, CDCR, pursuant to Regional Board direction, has monitored its compliance with the Small MS4 Permit at several representative monitoring locations at different times. *See supra* § II.D. All of these monitoring locations are "representative of the volume and nature of the monitored discharge" and are intended to "ensure compliance" with the Small MS4

Best Best & Krieger LLP
300 South Grand Avenue, 25th Floor
Los Angeles, California 90071

1   Permit. *Id.* Therefore, regardless of the location of the different monitoring stations, as a matter of

2   NPDES Permit construction, the data from any of those locations provides conclusive evidence of

3   a violation. *See Natural Resources Defense Council, Inc. v. County of Los Angeles,* 725 F.3d at

4   1207 ("as a matter of permit construction, the monitoring data conclusively demonstrate that the

5   County Defendants are not 'in compliance' with the Permit conditions. Thus, the County

6   Defendants are liable for Permit violations.").

7        Defendants have repeatedly admitted that sampling locations MCSP2 and MCSP3 are

8   MS4 outfalls to Mule Creek. *See, e.g.,* ECF 95-2 at ¶¶ 24, 56; ECF 95-4 at ¶ 4.

9        Moreover, the evidence will show that samples taken at MCSP5 and MCSP6, although

10  slightly upstream of the MCSP2 and MCSP3 outfalls to Mule Creek, respectively, accurately

11  represent pollutant concentrations in discharges to Mule Creek. *See supra* § II.D. Thus, as a

12  matter of law and fact, the sampling results at MCSP5 and MCSP6 are representative of the

13  Prison's MS4 discharges.

14          **6.      Violations Were Ongoing When the Complaints Were Filed.**

15       Clean Water Act § 505, 33 U.S.C. § 1365 "confers jurisdiction over citizen suits when the

16  citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation . . .."

17  *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 64 (1987). A plaintiff does not

18  need to show ongoing violations throughout the litigation. *See Gwaltney*, 484 U.S. at 66-67. A

19  plaintiff's burden is met when they allege an ongoing violation when the complaint is filed. *See*

20  *Nat. Res. Def. Council v. Texaco Ref. & Mktg. Inc.*, 2 F.3d 493, 503 (3d Cir. 1993). Thus, only

21  facts evidencing whether "defendant's continued violation had been completely eradicated when

22  citizen-plaintiffs filed suit" are relevant to this inquiry. *Chesapeake Bay Found. v. Gwaltney*, 844

23  F.2d 170, 172 (4th Cir. 1988), *on remand from* 484 U.S. 49 (1987).

24       Courts have recognized that a citizen-plaintiff may prove a person is "in violation" in two

25  ways: "(1) by proving violations that continue on or after the date the complaint is filed or (2) by

26  adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a

27  recurrence in intermittent or sporadic violations." *Sierra Club v. Union Oil Co.*, 853 F.2d 667,

28  671 (9th Cir.1988) (internal quotations omitted). "Intermittent or sporadic violations do not cease

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   to be ongoing until the date when there is no real likelihood of repetition." (*Sierra Club*, 853 F.2d

2   at 671 (internal quotations omitted).) As a result, a history of repeated, pre-complaint violations

3   of the Clean Water Act can create a reasonable likelihood the violations will recur. *See Cmty.*

4   *Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 954 (9th Cir. 2002).

5   Further, when proving a reasonable likelihood of a recurring violation, the past and recurring

6   violations do not need to be of the same type. *Inland Empire Waterkeeper v. Corona Clay Co.*, 17

7   F.4th 825, 829 (9th Cir. 2021), cert. denied (2022).

8       Here, the evidence will establish ongoing violations of the Small MS4 Permit and the Act

9   under both methods. First, CDCR's self-monitoring reports demonstrate that violations have

10  continued after the complaints were filed and as recently as February 6, 2023, the last reported

11  sampling event. The December 17, 2020 samples and February 6, 2023 sampling at MCSP2 and

12  MCSP3, which CDCR concedes are outfalls to Mule Creek, show the Prison's MS4 discharges

13  exceeded aluminum, iron, lead, zinc, and *E.coli* WQS post-complaint. Ashby Testimony; Trial

14  Ex. No. 67 (Feb. 6, 2023 Sampling Results). Moreover, CDCR has reported numerous

15  exceedances of WQS at MCSP5 and MCSP6, which, as explained below, are legally and factually

16  representative of the Prison's MS4 discharges.

17      Second, the evidence will also establish that past violations are "reasonably likely to

18  recur." CDCR's sampling at MCSP2 and MCSP3 demonstrate years of violations of the Small

19  MS4 Permit through December 2020. Ashby Testimony. As explained above, *supra* § II.G,

20  CDCR has not added or improved the Prison's BMPs.  Thus, the evidence supports the

21  conclusion that violations are likely to recur.

22      **B.    Points of Law Specific to Each of Plaintiffs' Claims**

23          **1.    Violations of Provision B.2 of the Small MS4 Permit**

24      Provision B.2 prohibits "[d]ischarges of storm water from the MS4 to waters of the U.S.

25  in a manner causing *or threatening to cause* a condition of pollution or nuisance as defined in

26  Water Code § 13050 are prohibited." Trial Ex. 2 (Small MS4 Permit) at § B.2 (emphasis added).

27  Water Code section 13050(l)(1)(A) defines "pollution" as "an alteration of the quality of the

28  waters of the state by waste to a degree which unreasonably affects … the waters for beneficial

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

2:20-CV-02482-WBS-AC [CONSOLIDATED
WITH 2:21-CV-00038-WBS-AC)]
PLAINTIFFS' JOINT TRIAL BRIEF

BEST BEST & KRIEGER LLP

300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

1   uses." WQS establish the maximum level of pollution that can exist in a water while still

2   protecting the waterbody's beneficial uses. *See* ECF No. 95-7 at 560; *see* 33 U.S.C. § 1313

3   (2)(A); *see also PUD No. 1 v. Wash. Dep't of Ecology*, 511 U.S. 700, 704 (1994) (WQS "prevent

4   water quality from falling below acceptable levels."). Therefore, discharges above a water quality

5   standard, as a matter of law, threaten to "unreasonably affect[]" Mule Creek's beneficial uses and,

6   thus, are pollution. Cal. Water Code §13050(l).

7       Moreover, the pollutants in the Prison's MS4 discharges contain waste. The Water Code

8   definition of "waste" includes:

9           sewage and any and all other waste substances, liquid, solid,
            gaseous, or radioactive, associated with human habitation, or of

10          human or animal origin, or from any producing, manufacturing, or
            processing operation, including waste placed within containers of

11          whatever nature prior to, and for purposes of disposal."

12  Cal. Water Code § 13050(d). This broad definition of "waste" easily includes the bacteria and

13  metals contained in the polluted water CDCR discharges because they are "associated with human

14  habitation, or of human or animal origin." *Id.*; see also Section II.F, above.

15      Further, the fact that the discharges threaten to cause pollution also renders them a

16  nuisance.[12] *Jordan v. City of Santa Barbara,* 46 Cal.App.4th 1245, 1257 (1996) ("[p]ollution of

17  water constitutes a public nuisance"); *accord Newhall Land & Farming Co. v. Superior Court,* 19

18  Cal.App.4th 334, 341 (1993). Moreover, because metals and *E. coli* WQS are established to

19  protect uses related to human health (i.e., drinking water and water contact recreation uses,

20  respectively), discharges above WQS, as a matter of law, are or threaten to be "injurious to

21  health" and, thus, are a nuisance. Cal. Water Code § 13050(m)(1).

22      Finally, this court and others have also determined that "threatening to cause a condition

23  of pollution a nuisance" does not require Plaintiffs to establish that pollution or nuisance has

24  occurred. See Dkt. No. 103 at 10:10-26; see also *San Diego Gas & Electric Co. v. San Diego*

25

26  [12] "'Nuisance' means anything which meets all of the following requirements:(1) Is injurious to
    health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as

27  to interfere with the comfortable enjoyment of life or property. (2) Affects at the same time an
    entire community or neighborhood, or any considerable number of persons, although the extent of

28  the annoyance or damage inflicted upon individuals may be unequal. (3) Occurs during, or as a
    result of, the treatment or disposal of wastes." Cal. Water Code § 13050(m).

*Regional Water Quality Control Bd.,* 36 Cal.App.5th 427, 439 (2019). Therefore, Plaintiffs need only show that CDCR's discharges *threaten* to cause a condition of pollution or nuisance. Because the water quality standards that apply to Mule Creek are expressly designed to support Mule Creek's beneficial uses, discharges that exceed those standards meet Plaintiffs' burden. CDCR's monitoring reports conclusively demonstrate that the MS4 discharges exceeded water quality standards on hundreds of occasions. Each exceedance threatens to cause a condition of pollution or nuisance and thus violates Provision B.2 for a total of 160 violations between April 24, 2019 and February 2023.

**2.    Violation of Provision B.3 of the Small MS4 Permit**

Provision B.3 of the Small MS4 Permit requires that "[d]ischarges through the MS4 of material other than storm water shall be effectively prohibited, except as allowed under this Provision or as otherwise authorized by a separate NPDES permit." As detailed below, the evidence establishes that untreated sewage is entering and discharging from the MS4 via defects in the sanitary sewer system. See *supra* § II.F. The presence of pharmaceuticals and personal care products, particularly in dry weather as was found in the Prison's MS4, demonstrates that wastewater is moving through the MS4, in violation of Provision B.3. *See Hawai'i Wildlife Fund v. County of Maui*, 550 F.Supp.3d 871, 882 (D. Haw. 2021) (finding pharmaceuticals demonstrates presence of wastewater).

In addition, CDCR reported and the Regional Board has confirmed that CDCR regularly discharges irrigation water from its MS4. Trial Ex. 24 (13383 Order, Dec. 22, 2020, ex) at p. 3, finding 7. These discharges are not authorized non-stormwater discharges. Regional Board "staff determined that the irrigation runoff (i.e., potable water from the landscaped areas) does not meet the Small MS4 General Permit's definition of incidental runoff because the runoff is due to defects in the irrigation system and that there may be occasional discharges of excessive irrigation runoff to Mule Creek." Trial Ex. 34 (Comments to the Non-Storm Water Discharge Elimination Plan, April 11, 2022) at p. 1. CDCR's discharges of wastewater and irrigation runoff through the MS4 violate Provision B.3.

Further, Defendants have not yet taken any action to address these sources of non-

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

stormwater; therefore, Defendants have not "effectively prohibited non-stormwater," as required by Provision B.3. In 2019, Defendants stated, and the Regional Board concurred, that the defects in the sanitary sewer system should and would be fixed to prevent wastewater from commingling with stormwater. *See* Trial Ex. 22 (Review of Stormwater System Report) at p. 4, § 2.2; p. 18, § 8; p. 19, § 8. Yet, in August 2022, Defendants' representative stated that those repairs had not yet been completed. Similarly, Defendants have not effectively prohibited irrigation flows from discharging through the MS4. Defendants have stated, under penalty of perjury, that they will not come into compliance with Provision B.3 with regards to their irrigation discharges until February 2025. Trial Ex. 63 (May 13, 2022 Non-Stormwater Discharge Elimination Plan) at MCSP0058684.

Thus, the evidence shows that non-storm water has been entering the MS4 since at least January 2018 when the Regional Board inspected the Facility. Trial Ex. 11 (13267 Order, Feb. 14, 2008) at p. 2. Every time it rains and CDCR opens the slide gates, the non-stormwater present is discharged into Mule Creek. Between April 2019 and February 6, 2023, the Prison's MS4 discharged non-stormwater to Mule Creek—and violated Provision B.3—on 156 days. *See* note 2 above. CDCR has taken no actions, let alone effectively prohibited, these non-stormwater discharges. Thus, CDCR has been violating Provision B.3 since they became subject to the Small MS4 Permit, and this violation is ongoing.

### 3. Violation of Provision C.1 of the Small MS4 Permit

Provision C.1 of the Small MS4 Permit provides that CDCR "shall implement controls as required by this Order to reduce the discharge of pollutants from [its] MS4 to waters of the U.S. to the MEP." As defined in the Permit, MEP is the "minimum required performance standard for implementation of municipal storm water management programs to reduce pollutants in storm water." Trial Ex. 2 (Small MS4 Permit) at p. 281, attach. I, p. 5. According to the Permit, "MEP is the cumulative effect of implementing, evaluating, and making corresponding changes to a variety of technically appropriate controls are implemented in the most effective manner. This process of implementing, evaluating, revising, or adding new BMPs is commonly referred to as the iterative process." *Id*.

Best Best & Krieger LLP
300 South Grand Avenue, 25th Floor
Los Angeles, California 90071

As further explained in the Fact Sheet to the Permit, the "MEP standard requires Permittees to apply Best Management Practices (BMPs) that are *effective* in reducing or eliminating the discharge of pollutants to the waters of the U.S." Trial Ex. 3 (NPDES Permit Fact Sheet) at p. 20, § X (emphasis added). "Permittees must *conduct and document* evaluation and assessment of each relevant element of the program, and of the program as a whole, and revise activities, control measures/BMPs, and measurable goals, as necessary to meet MEP." *Id.* (emphasis added). "MEP is the cumulative result of implementing, evaluating, and creating corresponding changes to a variety of technically appropriate and economically feasible BMPs, *ensuring that the most appropriate BMPs are implemented in the most effective manner.*" *Id.* (emphasis added).

The evidence at trial will demonstrate that CDCR has failed entirely to satisfy the MEP requirements of Provision C.1. CDCR's BMPs have not been effective at reducing the discharge of polluted water to Mule Creek. CDCR's discharges, in fact, continue to regularly violate applicable water quality standards, thus demonstrating that CDCR's actions are not effective or consistent with MEP. *See Santa Monica Baykeeper v. Kramer Metals,* 619 F.Supp.2d 914, 924-925 (C.D. Cal. 2009) (exceedances of EPA benchmark levels are relevant to evaluating the efficacy of a facility's BMPs and "sampling orders of magnitude in excess of the benchmark levels is evidence supporting Baykeeper's contention that Kramer did not have BMPs that achieve BAT/BCT.").

In addition, the evidence will demonstrate that CDCR has not assessed its BMPs or used that assessment to update and enhance them. The evidence will show that CDCR has taken no steps to improve the swales that lead to the two discharge points to Mule Creek. *See supra* § II.G; see also Dkt. No. 103 at 17-18 (Court's summary of evidence that CDCR has not engaged in iterative process). For example, CDCR's consultant in 2019 identified multiple corrections that are needed in its MS4 and sewer infrastructure, yet CDCR has not implemented even these recommendations. Trial Ex. 51 (Stormwater Collection System Investigation Report of Findings) at pp. 40-42, 78-82, §§ 3.4.2.3, 4.1 – 4.2.2; Trial Ex. 55 (Appendix 23); Trial Ex. 27 (Order R5-2021-0001) at p. 5, ¶ 16.  As explained in more detail below, CDCR has regularly failed to

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

engage in the iterative process required to comply with MEP, *even when expressly directed by the Regional Board to do so.* Such inactions are the antithesis of MEP. These and similar failures demonstrate that CDCR has violated the Provisions of C.1.

**4.      Violation of Provision D of the Small MS4 Permit**

Provision D of the Small MS4 Permit provides that "[d]ischarges shall not cause or contribute to an exceedance of water quality standards contained in a Statewide Water Quality Control Plan, the California Toxics Rule (CTR), or in the applicable Regional Water Board Basin Plan." Trial Ex. 2 (Small MS4 Permit) at p. 19, prov. D (Receiving Water Limitations). The Small MS4 Permit also provides that when exceedances of the receiving water limitations (RWL) provision occur, the discharger is required to engage in a process to assess the violation and implement additional best management practices (BMPs) to prevent or reduce the pollutants that are causing or contributing to the violation. Trial Ex. 2 (Small MS4 Permit) at p. 19, prov. D.1-D.4. Engaging in this process is required but does not excuse the RWL violations that have already occurred. See Dkt. No. 103 at 25-26 (Court determining that engaging in iterative process does not excuse liability); see also *Natural. Resources Defense Council v. County of Los Angeles*, 673 F.3d 880, 897-98 (9th Cir. 2011), *rev'd on other grounds* 568 U.S. 78 (2013), *modify by Natural Resources Defense Council v. County of Los Angeles*, 725 F.3d 1197 (9th Cir. 2013); *see also,* Trial Ex. 3 (Small MS4 Permit Fact Sheet) at p. 22 (noting that the iterative process does not provide a "safe harbor" to MS4 permittees.). In fact, failure to engage in the process outlined in the Small MS4 Permit to address RWL violations is itself a separate violation.

This Court has already held that Plaintiffs need not show the Prison's discharges are the sole cause of an exceedance of a WQS in Mule Creek. Dkt. No. 103 at 25:4-7. The discharges "contribute" to an exceedance when Mule Creek is exceeding WQS for a pollutant *and* the Prison discharges that same pollutant at or about the same time. *Natural. Resources Defense Council v. County of Los Angeles*, 673 F.3d 880, 898-899 (9th Cir. 2011), *rev'd on other grounds* 568 U.S. 78 (2013), *modify by Natural Resources Defense Council v. County of Los Angeles*, 725 F.3d 1197 (9th Cir. 2013) *I*, 673 F.3d 880, 898-899; *Natural Resources Defense Council, Inc. v. County of Los Angeles,* 725 F.3d at 1204-1207. Under these circumstances, the discharger is

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

2:20-CV-02482-WBS-AC [CONSOLIDATED WITH 2:21-CV-00038-WBS-AC]
PLAINTIFFS' JOINT TRIAL BRIEF

"contributing" to the exceedances in the receiving water by adding additional pollutants to a water that is already exceeding standards. Ms. Ashby will explain that CDCR's self-monitoring reports demonstrate these conditions exist on multiple occasions for both *E. coli* and metals.

By counting a violation only when discharges and Mule Creek both exceed WQS at or about the same time, Ms. Ashby has taken a very conservative approach that is, in fact, higher than is legally required. Numerous courts have found that a violation of a receiving water limitation occurs whenever discharges exceed WQS, with no evidence that the receiving water is in exceedance. See *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp.2d 914, 926-929 (C.D. Cal. 2009); *Santa Monica Baykeeper v. International Metals Ecko, Ltd.*, 619 F. Supp.2d 936, 947-50 (C.D. Cal. 2009); *Cal. Sportfishing Prot. All. v. River City Waste Recyclers,* 205 F. Supp. 3d 1128, 1151 (E.D. Cal. 2016); *Cal. Sportfishing Prot. All. v. Chico Scrap Metal,* 124 F. Supp. 3d 1007, 1020-22 (E.D. Cal. 2015). Courts have also found similar violations whenever a facility discharges a pollutant into a waterbody that exceeds WQS for that pollutant, regardless of whether the discharge itself exceeds the WQS. *See American Iron and Steel Institute v. E.P.A.*, 115 F.3d 979, 1000 (D.C. Cir. 1997) (upholding EPA's presumption that "a source that contributes a pollutant to a body of water in which the standard for that pollutant has been exceeded has the reasonable potential to contribute to that exceedance.").

Thus, Ms. Ashby's approach provides CDCR with the "benefit of the doubt." Under this approach, Ms. Ashby will testify that CDCR has violated the RWL provision at least 72 times during the time period relevant to this action. Ms. Ashby's opinion is consistent with the findings of the Regional Board. By letter dated February 11, 2022, when the Regional Board notified CDCR that the Prison's discharges repeatedly exceeded the receiving water limitations. Trial Ex. 33 (Feb. 11, 2022 RB letter) at p. 2, ¶ 4; Trial Ex. 32 (Comment Table dated Jan 24, 2022) at p. 11, row "Receiving Water Monitoring Requirements." Similarly, on November 3, 2022, the Regional Board again notified CDCR that the Prison violated Provision D of the Small MS4 Permit. Trial Ex. 35 (Nov. 3, 2022 Letter) at p. 2. Again, on November 30, 2022, the Regional Board again notified CDCR of the receiving water exceedances and required compliance with the iterative process. Trial Ex. 36 (Nov. 30, 2022 letter) at p. 2, ¶ 2.

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

In addition, CDCR has also violated Provision D by failing to take corrective actions to address these RWL violations. Provision D requires a discharger follow a specific process when "MS4 discharges are causing or contributing to an exceedance of an applicable water quality standard . . .." Trial Ex. 2 (Small MS4 Permit) at p. 19, prov. D.1. The discharger must promptly notify and submit a report to the Regional Board identifying the BMPs that the discharger will implement to "prevent or reduce any pollutants that are causing or contributing to the exceedances of water quality standards." *Id*. Once approved, the discharger must implement the required actions. *Id*. Failure to engage in this process is a violation of the RWL provisions.

In sum, the evidence will establish that CDCR has violated Provision D of the Small MS4 Permit at least 72 times. CDCR has also independently violated Provision D of the Small MS4 Permit every day since at least May 16, 2019 (the first RWL violation) by failing to follow the corrective action process required by the Small MS4 Permit.

### C.   Request for Judicial Notice

Plaintiffs seek to rely on two demonstratives not listed in Exhibit C, "Plaintiffs' Exhibits" to the Final Pretrial Order:

1.   California Code of Regulations, title 22, table 64449-A

2.   Code of Federal Regulations, title 40, section 131.38, subsection (b)(1)

A court may take judicial notice of a pertinent law or regulation at any stage of the proceedings. Fed. R. Evid. 201; *Nat'l Agr. Chemicals Ass'n v. Rominger*, 500 F. Supp. 465, 472 (E.D. Cal. 1980) ("I may, of course, take judicial notice of the California regulations."). A court "must" take notice if a party requests it and supplies the court with the requisite information. Fed. R. Evid. 201(c).

The regulations are not listed in Plaintiffs' exhibit list because they are intended to be used as a testimonial aid. The regulations are relevant to this action because they contain numeric values for various metals that are incorporated by reference into the Water Quality Control Plan ("Basin Plan") for the Sacramento River basin and the San Joaquin River Basin. Trial Ex. 16 (Basin Plan) §§ 3.1.3 (aluminum, iron, manganese), 4.2.1.1.15 (copper, lead, zinc). Because these values are incorporated by reference and are not set out in the Basin Plan, the regulations are

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

2:20-CV-02482-WBS-AC [CONSOLIDATED
WITH 2:21-CV-00038-WBS-AC]
PLAINTIFFS' JOINT TRIAL BRIEF

1   offered to aid testimony regarding those values.

2          The regulations are true and correct copies of the cited regulations, downloaded from

3   Westlaw in PDF format without modification.

4   **IV.     REQUESTED REMEDY TO ADDRESS CDCR'S VIOLATION OF ITS SMALL**

5   **MS4 PERMIT AND THE ACT**

6          The evidence Plaintiffs will present at trial, including but not limited to the results of

7   CDCR's own monitoring reports, will conclusively establish that CDCR has violated and

8   continues to violate or threaten to violation Provisions B.2, B.3, C.1 and D of the Small MS4

9   Permit, and therefore has violated and continues to violate the Act. To address these violations,

10  Plaintiffs request that this Court: (1) issue injunctive relief to compel CDCR to comply with the

11  Act and specifically to take specific measures on a fixed timeline to do so, including, but not

12  limited to, implementing all of the recommendations in the Revised Storm Water Collection

13  System Investigation Finding Report submitted by CDCR to the Regional Board on November 1,

14  2019; and (2) awarding Plaintiffs their attorneys' fees and costs as required by the Act.

15         With regard to the details of the injunctive relief, the Court has ordered Plaintiffs to

16  prepare and submit a proposed form of judgment including the specific actions to be taken by

17  CDCR to comply with the Act and a schedule of performance, which Plaintiffs will do. With

18  regard to attorneys' fees and costs, Plaintiffs will fix those fees and costs through appropriate

19  post-trial motions.

20

21

22

23

24

25

26

27

28

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

83653.00001\41092707.6

2:20-CV-02482-WBS-AC [CONSOLIDATED
WITH 2:21-CV-00038-WBS-AC]
PLAINTIFFS' JOINT TRIAL BRIEF

1

## V.   <u>CONCLUSION</u>

2

Plaintiffs look forward to the opportunity to present the Court with their evidence of

3

CDCR's multiple and ongoing violations of the Act. CDCR's continuing discharges of highly

4

polluted water to Mule Creek must finally stop.

5

6

Dated: April 4, 2023                                   BEST BEST & KRIEGER LLP

7

8

By: /s/ Rebecca Andrews

9

CHRISTOPHER M. PISANO
SHAWN D. HAGERTY

10

REBECCA ANDREWS
ANYA KWAN

11

Attorneys for Plaintiff
COUNTY OF AMADOR

12

13

Dated: April 4, 2023                                   AQUA TERRA AERIS LAW GROUP

14

15

*s/ Erica A. Maharg*

16

ERICA A. MAHARG
Attorneys for Plaintiff

17

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

18

19

20

21

22

23

24

25

26

27

28

BEST BEST & KRIEGER LLP
300 SOUTH GRAND AVENUE, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90071

California Sportsfishing Protection Alliance v. Allison, et al.;
Amador v. Allison, et al.
United States District Court, Eastern District of California,
Case No. 20-cv-02482 WBS AC

## **PROOF OF SERVICE**

I, Lisa Atwood, declare:

I am a citizen of the United States and employed in San Diego County, California. I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 655 West Broadway, 15th Floor, San Diego, California 92101.  On April 4, 2023, I served a copy of the within document(s):

JOINT TRIAL BRIEF OF PLAINTIFFS COUNTY OF AMADOR AND CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

☒  **By Electronic Service**.  Pursuant to CM/ECF System, registration as a CM/ECF user constitutes consent to electronic service through the Court's transmission facilities.  The Court's CM/ECF system sends an e-mail notification of the filing to the parties and counsel of record who are registered with the Court's EC/ECF system.

| | |
|---|---|
| Jennifer Hartman King, Esq. | ATTORNEYS FOR JEFFREY |
| Alanna Lungren, Esq. | MACOMBER in his official capacity as |
| J.R. Parker, Esq. | SECRETARY OF THE CALIFORNIA |
| Andreya Woo Nazal, Esq. | DEPARTMENT OF CORRECTIONS |
| HARTMAN KING PC | AND REHABILITATION |
| 2150 River Plaza Drive, Suite 320 | |
| Sacramento, CA 95833 | Tel: (916) 379-7530 |

Jennifer Hartman King, Esq.
Alanna Lungren, Esq.
J.R. Parker, Esq.
Andreya Woo Nazal, Esq.
HARTMAN KING PC
2150 River Plaza Drive, Suite 320
Sacramento, CA 95833

ATTORNEYS FOR JEFFREY MACOMBER in his official capacity as SECRETARY OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

Tel: (916) 379-7530
Email:
JHartmanKing@HartmanKingLaw.com
ALungren@HartmanKingLaw.com
KShipp@HartmanKingLaw.com
JRParker@HartmanKingLaw.com
AWooNazal@HartmanKingLaw.com

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
655 WEST BROADWAY, 15TH FLOOR
SAN DIEGO, CALIFORNIA 92101

- 1 -

| | |
|---|---|
| Andrew L. Packard, Esq.<br>William L. Carlon, Esq.<br>Law Offices of Andrew L. Packard<br>245 Kentucky Street, Suite B3<br>Petaluma, CA 94952 | ATTORNEYS FOR CALIFORNIA<br>SPORTFISHING PROTECTION<br>ALLIANCE<br><br>Tel: (707) 782-4060<br>Email:<br>andrew@packardlawoffices.com<br>wncarlon@packardlawoffices.com<br>wncarlon@packardlawoffices.com |
| Jason Flanders, Esq.<br>Erica A. Maharg, Esq.<br>Aqua Terra Aeris Law Group<br>4030 Martin Luther King Jr. Way<br>Oakland, CA 94609 | ATTORNEYS FOR CALIFORNIA<br>SPORTFISHING PROTECTION<br>ALLIANCE<br><br>Tel: (916) 202-3018<br>Email:<br>eam@atalawgroup.com<br>jrf@atalawgroup.com |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on April 4, 2023, at San Diego, California.

_____
Lisa Atwood

BEST BEST & KRIEGER LLP<br>ATTORNEYS AT LAW<br>655 WEST BROADWAY, 15TH FLOOR<br>SAN DIEGO, CALIFORNIA 92101