JENNIFER HARTMAN KING (SBN 211313)
ALANNA LUNGREN (SBN 269668)
J. R. PARKER (SBN 320526)
ANDREYA WOO NAZAL (SBN 327651)
HARTMAN KING PC
2150 River Plaza Drive, Suite 320
Sacramento, CA  95833
Telephone:  (916) 379-7530; Facsimile:  (916) 379-7535
JHartmanKing@HartmanKingLaw.com
ALungren@HartmanKingLaw.com
JRParker@HartmanKingLaw.com
AWooNazal@HartmanKingLaw.com

Exempt From Filing Fees Pursuant
To Government Code Section 6103

Attorneys for Defendants JEFFREY MACOMBER,
in his official capacity as Secretary of the California Department
of Corrections and Rehabilitation; and PATRICK COVELLO,
in his official capacity as Warden of California Department of
Corrections and Rehabilitation Mule Creek State Prison

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY MACOMBER, in his official capacity as Secretary of the California Department of Corrections and Rehabilitation,<br><br>Defendant. | Case No. 2:20-CV-02482-WBS-AC [consolidated with 2:21-CV-00038-WBS-AC]<br><br>**DEFENDANTS' TRIAL BRIEF**<br><br>Trial: April 18, 2023<br>Time: 9:00 a.m.<br>Judge: Hon. William B. Shubb<br>Ctrm. 5<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |
| COUNTY OF AMADOR, a public agency of the State of California,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY MACOMBER, in his official capacity as Secretary of the California Department of Corrections and Rehabilitation; and PATRICK COVELLO, in his official capacity as Warden of California Department of Corrections and Rehabilitation Mule Creek State Prison,<br><br>Defendants. | |

00059942.1

DEFENDANTS' TRIAL BRIEF

## TABLE OF CONTENTS

I. **SHORT STATEMENT OF FACTS AND STATEMENT OF DEFENDANTS' LEGAL POSITION**……………………………………………………………………………... 1

  A. **Factual Background**…………………………………..……………………………... 1

    1. The Permit at Issue…………………………………………………………... 1

    2. Mule Creek Is Not Listed By the Regional Water Board As An Impaired Waterbody and Its Designated Beneficial Uses Do Not Include Municipal and Domestic Supply……... 4

    3. CDCR Has Implemented Best Management Practices to Manage Stormwater At The Facility……………………………………………………………………………… 6

      a. **CDCR's Engagement In "The Iterative Process" With The Regional Water Board To Improve The BMPs**……………………………………………... 6

      b. **The BMP Measures Implemented At The Facility**………………………7

    4. Two Investigations of MCSP's Stormwater System Conducted In Conjunction With the Regional Board's Permit Compliance Staff Identified Significant Background Sources of Metals and Bacteria…………………………………………………………..… 8

      a. **The 2020 Collection System Investigation Report**………………………. 8

      b. **The 2021 Sources of Fecal Pollution Report**………………………... 8

    5. Pre-Complaint Data Is Irrelevant For Establishing Ongoing Violations Entitling Plaintiffs To Injunctive Relief And Sampling Data Collected From MCSP5 and MCSP6 Do Not Establish Violations Of The MS4 Permit………………………………… 9

II. **ADMISSIONS AND STIPULATIONS NOT RECITED IN PRETRIAL ORDER**………. 10

III. **POINTS OF LAW, INCLUDING REASONABLY ANTICIPATED DISPUTES CONCERNING ADMISSIBILITY OF EVIDENCE**………………………………….. 10

  A. **Defendant's Request to Exclude Witnesses and Evidence**…………………………... 10

    1. Exclude Non-Party Witnesses from the Courtroom…………………………… 11

    2. Ultimate Facts/Legal Conclusions……………………………………………... 11

    3. Exclude All Data Collected Before The Plaintiffs Filed Their Complaints and All Data Collected from MCSP5 and MCSP6 at Any Time………………………….…... 11

  B. **Points of Law**…………...…………………………………………………................ 12

    1. CSPA Lacks Organizational Standing, and Therefore, Defendants Move for Judgment as to CSPA's Claims………………………………………………………………... 12

      a. **The Deposition Testimony by CSPA's Sole Remaining Standing Witness, CSPA Member Edmund Taylor, Reveals No Non-Speculative, Concrete and, Actual or Imminent Injury That Is Traceable to Facility Discharges into Mule Creek**… 12

      b. **The Court Should Grant Defendants' Request for Judgment Pursuant to Fed. R. Civ. Proc. 52(c)**……………………………………………………… 16

**DEFENDANTS' TRIAL BRIEF**

2.  Plaintiffs' First Claim for Relief: Alleged Discharges to Waters of the United States Without an Appropriate Permit in Violation of the Clean Water Act......................... 17

3.  Plaintiffs' Second Claim for Relief: Alleged Violations of the Small MS4 Permit....... 18

    **a.  Alleged Violation of Small MS4 Permit Provision B.2 (Alleged by CSPA & County)**.................................................................................................. 18

        *i.   Plaintiffs Cannot Prove that MCSP Post-Complaint Discharges Have Actually Entered Mule Creek And Unreasonably Affected Its Beneficial Uses*........... 19

        *ii.  Plaintiffs cannot account for background and non-human sources of contaminants and, therefore, cannot establish that there have been permit violations*..................................................................................................... 22

    **b.  Alleged Violation of Small MS4 Permit Provision B.3 (Alleged by CSPA Only)**.................................................................................................... 23

        *i.   CSPA Has No Evidence of a Discharge to Mule Creek of Water Containing Caffeine or Pharmaceuticals*.......................................................... 24

    **c.  Alleged Violation of Small MS4 Permit Provision C.1 (Alleged by County Only)**.............................................................................................. 27

        *i.   The Facility Implements, Evaluates, and Adjusts BMPs in Technically Appropriate and Economically Feasible Ways*.................................... 27

    **d.  Alleged Violation of Small MS4 Permit Provision D (Alleged by CSPA & County)**.................................................................................................. 28

        *i.   MUN Inapplicable, Therefore, MCL and CTR Water Quality Standards are Irrelevant*............................................................................................... 29

        *ii.  The Regional Board Has Not Made a Formal Determination That the Facility Caused or Contributed to an Exceedance of WQS, and If It Did, The Permit Would Require the Facility to Engage in the Iterative Process*................... 29

       *iii. Plaintiffs Failed to Consider Background Contributions*......................... 30

       *iv.  There is No Evidence Mule Creek's Beneficial Uses Are Impaired*............. 31

**IV.  RELIEF SOUGHT**....................................................................................... 31

V.  **CONCLUSION**................................................................................... 32

**TABLE OF AUTHORITIES**

Cases

*California Assn. of Sanitation Agencies v. State Water Resources Control Bd.*, 208 Cal.App.4[th] 1438 (2012)……………………………………………………………………….. 4-5

*Cal. Cmtys. Against Toxics v. Trojan Battery Co*., No. 2:18-cv-02189-SVW-FFM, 2018 U.S. Dist. LEXIS 226453 (C.D. Cal. Dec. 28, 2018)………………………………...……………… 15-16

*Coalition v. McCamman*, 725 F. Supp. 2d 1162 (E.D. Cal. 2010)………………………….. 12, 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993)…………………………. 11

*E&I Global Energy Servs. V. United States*, 155 Fed.Cl. 625 (Ct. Fed. Cl. 2021)…………….. 10-11

*Food & Water Watch v. United States EPA*, 20 F.4th 506 (9th Cir. 2021)………………….…. 17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)……………. 13

*Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023 (9th Cir. 1996)……………... 17

*Gwaltney v. Chesapeake Bay Foundation*, 484 U.S. 49 (1987)…………………………….. 9, 11, 18

*In re Chang*, No. LA CV13-01340 JAK (ANx), 2015 U.S. Dist. LEXIS 201289 (C.D. Cal. May 29, 2015)………………………………………………………………………….…. 11

*Jackson v. Cal. Dep't of Mental Health*, 399 F.3d 1069 (9th Cir. 2005)………………………….. 13

*Los Angeles Cnty. Flood Control Dist. v. Nat. Res. Def. Council, Inc*., 568 U.S. 78 (2013)……… 28

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)…………………………………………….. 13

*Montgomery Enviro. Coalition Citizen Coordinating Comm. v. Friendship Heights*, 607 F. 2d 378 (D.C. Cir. 1979)………………………………………………………………………... 27, 30

*Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 673 F.3d 880 (9th Cir. 2011)…………….. 28

*Nationwide Transport Finance v. Cass Information Systems, Inc*., 523 F.3d 1051 (9th Cir. 2008)……………………………………………………………………………. 11

*Plans, Inc. v. Sacramento City Unified Sch. Dist.*, 752 F. Supp. 2d 1136 (E.D. Cal. 2010)………. 17

*Ritchie v. United States*, 451 F.3d 1019 (9th Cir. 2006)……………………….……………...… 17

*Tyler v. Cuomo*, 236 F. 3d 1124 (9th Cir. 2000)……………………………………………... 15

Federal Statutes

33 U.S.C. §1311(a)……………………………………………………………………… 17

**DEFENDANTS' TRIAL BRIEF**

33 U.S.C. §1313…………………………………………………………………....... 4

33 U.S.C. §1313(c)(2)(A)……………………………………………………………. 28

33 U.S.C. §1342(p)(3)(B)(iii)……………………………………………………….. 17-18

33 U.S.C. §1362(12)(A)……………………………………………………………. 17

33 U.S.C. §1365(d)…………………………………………………………………. 31

40 C.F.R. §131.3………………………………………………………………….... 28

40 C.F.R §131.38…………………………………………………………………… 20

State Statutes

Cal. Wat. Code § 13050(l)(1)……………………………………………………… 19

Rules

Fed. R. Civ. P. 16……………………………………………………………………. 1

Fed R. Civ. P. 52(c)……………………………………………………………….. 16-17

Fed. R Evid. 401, 402……………………………………………………………… 11

Fed. R Evid. 615…………………………………………………………………… 11

Fed. R. Evid. 702, 702(a), 704(a)………………………………………………… 11

E.D. Cal. L.R. 285………………………………………………………………….... 1

Resolutions

State Water Board Resolution No. 68-16……………………………………….... 22, 30

**DEFENDANTS' TRIAL BRIEF**

Defendants Jeffrey Macomber, in his official capacity as Secretary of the California Department of Corrections and Rehabilitation, and Patrick Covello, in his official capacity as Warden of California Department of Corrections and Rehabilitation, Mule Creek State Prison (collectively, "CDCR" or "Defendants") hereby submit this Trial Brief pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P."), Rule 16, Local Rule ("L.R.") 285 of the United States District Court for the Eastern District of California, and the Court's Final Pretrial Order (ECF 110).

## I. STATEMENT OF FACTS AND STATEMENT OF DEFENDANTS' LEGAL POSITION

### A. Introduction.

This action is a "citizen suit" commenced by plaintiffs California Sportfishing Protection Alliance ("CSPA") and the County of Amador (the "County" or "Amador") pursuant to the Federal Water Pollution Control Act ("Clean Water Act"). Plaintiffs seek declaratory and injunctive relief regarding alleged violations of the State Water Resources Control Board's Permit for Waste Discharge Requirements for Storm Water Discharges from Small Municipal Separate Storm Sewer Systems, Order 2013-0001-DWQ (the "Small MS4 Permit" or "Permit")[1] that allows Defendants to discharge stormwater from the Mule Creek State Prison facility ("Facility" or "MCSP") into nearby Mule Creek. The California Regional Water Quality Control Board, Central Valley Region ("Regional Water Board") provides regulatory oversight over the Facility, including with regard to the Small MS4 Permit.

### 1. The Permit At Issue.

CDCR is the state agency that operates the Facility. The Facility is located in a remote, rural setting, covering approximately 866 acres. The surrounding areas of the Facility, including areas near the MS4 stormwater conveyance system ("MS4") and Mule Creek, are frequented by wildlife, including birds and deer. There are cattle ranches located near Mule Creek, upstream of the Facility. Mule Creek is a seasonal creek that flows during the wet season but not the dry season.

---

[1] The Facility is also permitted under the Central Valley Water Board's Waste Discharge Requirements Order R5-2015-0129 for MCSP's Wastewater Treatment Plant (the "WWTP Permit"), which authorizes CDCR to operate what are known as the land application areas ("LAA"). The WWTP Permit and the LAAs are no longer relevant to this action, however, because both Plaintiffs have dropped all claims regarding them. (Final Pretrial Order (ECF 110) at 3-4, n. 2.)

The Small MS4 Permit includes four provisions relevant to the action: (1) "Discharge Prohibitions" in Provisions B.2 and B.3, (2) "Effluent Limitations" in Provision C.1, and (3) "Receiving Water Limitations" in Provision D. The MS4 stormwater collection system includes a network of conveyances, outfalls, and bioswales that allow the settling out and filtering of contaminants. This occurs before the stormwater reaches nearby Mule Creek, which it only does when and if there is sufficient flow for the stormwater to travel that far.

As depicted in the below figure, stormwater runoff at the Facility collects in a conveyance ditch paralleling a lethal electrified fence surrounding the Facility, with the ditch leading to two culverts located at sampling points designated as "MCSP5" and "MCSP6." During most of the year (i.e., during dry weather and light rain), culvert "slide gates" block the flow and redirect it to the Facility's permitted WWTP where the water is treated with secondary level treatment before disposal pursuant to the WWTP Permit.



**DEFENDANTS' TRIAL BRIEF**

During periods of heavy rain, deemed "Significant Rain Events," the slide gates are opened to allow stormwater to pass through MCSP5 and MCSP6 due to capacity limits within the MS4 and at the WWTP. When stormwater passes through the culverts at MCSP5 and MCSP6, it flows into the vegetated bioswale channels before reaching the recently reconstructed monitoring locations "MCSP2" and "MCSP3." From MCSP6, the bioswale channel extends approximately 1,500 feet to the outfall at MCSP3. From MCSP5, the bioswale channel extends approximately 630 feet to the outfall at MCSP2. At MCSP2 and MCSP3, if there is sufficient flow and after undergoing filtration and settling in the vegetated channels, stormwater flows through a rip-rapped entrance through a weir and flume that are designed to direct and allow measurement of the stormwater flow. Stormwater flows then exit the flume through another reach of rip-rap channel, before discharging at the outfalls into Mule Creek as authorized by the MS4 Permit. The weirs, rip-rap, and monitoring stations were fully installed at MCSP2 and MCSP3 as of early 2023. As of February 6, 2023, sampling occurs at these locations (and no longer from within the MS4 collection system at locations MCSP 5 and MCSP6) when stormwater flows reach MCSP2 and MCSP3. An image of one of these newly constructed rip-rap, weir, and flume designs is shown in the image below.



**DEFENDANTS' TRIAL BRIEF**

The sampling locations denoted as "MCSP1" and "MCSP4" in the aerial figure above are collected from within Mule Creek. CDCR periodically samples the stormwater within the MS4 and surface water in Mule Creek pursuant to an order issued by the Regional Water Board and submits reports of the sampling results to the Board. MCSP4 is intended to be a "downstream" sampling location that reflects the condition of the receiving water body; however, this sampling location is so close to MCSP3 as to be more reflective of discharge water than true "downstream" conditions. Moreover, MCSP1 is intended to be an "upstream" sampling location that reflects the condition of Mule Creek before the creek reaches MCSP; however, this sampling location is so far upstream that other sources of contamination (such as bacteria from livestock and wildlife excrement and metals from mining operation runoff, etc.) can enter the Mule Creek before the creek reaches MCSP.

2.    Mule Creek Is Not Listed By the Regional Water Board As An Impaired Waterbody and Its Designated Beneficial Uses Do Not Include Municipal and Domestic Supply.

Under the Clean Water Act section 303(d), states are required to identify waterbodies that do not meet, or are not expected to meet, water quality standards (known as "impaired waterbodies") for their beneficial uses. Based on California's Listing Policy, in developing the 303(d) list the State Water Board evaluates water quality-related data and the designated beneficial uses of various waterbodies. There is no assessment data for Mule Creek on the Water Board's 303(d) List for 2020-2022, the current watershed impairment list for the area, but there is assessment data for Dry Creek, which is the next waterbody receiving flows from Mule Creek. The State Water Board did not designate Dry Creek.

The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region, Fifth Edition, Revised May 2019, for the Sacramento River Basin and the San Joaquin River Basin ("Basin Plan") "consist[s] of a designation or establishment for the waters within a specified area of beneficial uses to be protected, water quality objectives to protect those uses, and a program of implementation needed for achieving the objectives." (Basin Plan at i.) The Basin Plan identifies water bodies within its jurisdiction and designates particular beneficial uses for those water bodies. "The beneficial uses of any specifically identified water body generally apply to its tributary streams […]." (Basin Plan at 2-3; *see also California Assn. of*

*Sanitation Agencies v. State Water Resources Control Bd.*, 208 Cal.App.4th 1438 (2012).) This is known as the tributary rule, which provides that "the beneficial uses of any specifically identified water body generally apply to its tributary streams." *California Assn. of Sanitation Agencies v. State Water Resources Control Bd.*, 208 Cal.App.4th at 1457.[2] The California Court of Appeal has found that, "Until the Regional Board has investigated each individual stream, the tributary rule is a reasonable means of protecting the beneficial uses of the water of the region." *Id.* at 1458.

Mule Creek has the following beneficial use designations: AGR (Agricultural Supply), REC-1 (Water Contact Recreation), REC-2 (Non-contact Water Recreation), WARM (Warm Freshwater Habitat), COLD (Cold Freshwater Habitat), MIGR (Migration of Aquatic Organisms), SPWN (Spawning, Reproduction, and/or Early Development), and WILD (Wildlife Habitat). (*See* CVRWQCB 13383 Orders dated Nov. 29, 2021, Dec. 22, 2020, Aug. 6, 2020 ("13383 Orders"); Basin Plan at 2-1, 2-2, and 2-11.) Mule Creek's beneficial use designations by the Regional Board do not include MUN (Municipal and Domestic Supply). Rather, Mule Creek, as a tributary of the Camanche Reservoir to Delta water body (Surface Water Body No. 63/Hydro. Unit 531.2), receives the beneficial use designations of that specifically identified water body. (Basin Plan at 2-3.) The beneficial uses of that specifically identified surface water body (Camanche Reservoir to Delta, Surface Water Body No. 63/Hydro. Unit 531.2), and thus of Mule Creek, are listed in Table 2-1 of the Basin Plan. (Basin Plan at 2-11, Surface Water Body No. 63/ Hydro. Unit 531.2; *see also*, Figure 2-1, Basin Plan at 2-6.[3]) Consistent with the Basin Plan, <u>all</u> of the Regional Water Board's Water Code 13383 Orders issued to MCSP <u>exclude</u> MUN in their identification of Mule Creek's designated beneficial uses. (*See* 13383 Orders.)

Importantly, because MUN <u>does not</u> apply to Mule Creek, the water quality standards for drinking water supply, i.e., the maximum contaminant limits ("MCLs") and the California Toxics Rule ("CTR") criteria for metals, do not apply Mule Creek. Indeed, Plaintiffs concede that the

---

[2] Plaintiffs might argue that State Water Resources Control Board Resolution 88-63 Adoption of Policy Entitled "Sources of Drinking Water" dictates that Mule Creek has a MUN beneficial use designation; however, that Resolution only applies to water bodies that do not have a designated beneficial use. Mule Creek has a beneficial use designation under the tributary rule.

[3] A visual depiction showing these water bodies in relation to one another and in relation to the location of MCSP is offered in **Exhibit A**, hereto.

**DEFENDANTS' TRIAL BRIEF**

MCLs and CTR only apply to surface water bodies designated MUN. (*See* Plaintiffs' Joint Pretrial Statement (ECF 104) at 10.) This conclusion comes from a careful reading of several sections of the Basin. (Basin Plan section 3.1.3 at 3-3, identifying MCLs as applicable to drinking water: "water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) […]."; Basin Plan section 4.1.8 Drinking Water Policy at 4-7 and 4-8, citing to Section 4.2.1.1.15 and the Policy for Implementation of Toxics Standards for Inland Surface Waters, Enclosed Bays, and Estuaries of California (a.k.a. State Implementation Plan or SIP).) The SIP is the State Water Board's policy establishing the CTR (40 CFR 131.38), which the Basin Plan deems applicable to surface water bodies having a MUN designation. (Basin Plan, section 4.1.8 Drinking Water Policy at 4-7 and 4-8, and section 4.2.1.1.15 at 4-15.) The Basin Plan does not appear to state that either the drinking water MCLs or CTR criteria for metals apply to water bodies that are not designated with a MUN beneficial use.

3.   CDCR Has Implemented Best Management Practices To Manage Stormwater At The Facility.

Under the express terms of the Small MS4 Permit, compliance is met by implementing controls to reduce pollutants to the maximum extent practicable (the "MEP standard"), which is achieved by implementing best management practices ("BMPs"). (*See* Small MS4 Permit at ¶ 36.) CDCR has implemented effective BMPs and further engaged the Regional Water Board in an iterative process to manage and improve upon the Facility's BMPs as follows.

a.   CDCR's Engagement In "The Iterative Process" With The Regional Water Board To Improve The BMPs.

As a permittee under the Small MS4 Permit since 2019, CDCR has been engaged in an iterative process with the Water Board to monitor and improve its Small MS4 Permit program to comply with the Permit. One way in which this dynamic process of BMP development occurs is through the Small MS4 Permit's Annual Reporting that documents and assesses the Small MS4 Permit program elements. (*See* Small MS4 Permit, section E.16.) The Small MS4 Permit requires that CDCR:

**DEFENDANTS' TRIAL BRIEF**

1

2

3

> "identify and make modifications to BMPs, including new BMPs or modification to existing BMPs, to improve effectiveness in each priority area. The Permittee shall consult with the applicable Regional Water Board in setting expectations for the scope, timing, and frequency of BMP modifications."

4    (Small MS4 Permit, Provision E.14.b., at 76.) Thus, the Water Board reviews CDCR's submittals

5    regarding its program effectiveness and provides feedback, which includes discussion on what

6    BMPs and controls CDCR has implemented or is in the process of implementing to comply with the

7    Small MS4 Permit.

8                    **b.        The BMP Measures Implemented At The Facility.**

9            Through the iterative compliance process with the Regional Water Board under the Permit,

10   MCSP has developed and implemented various BMP measures at the Facility. These BMPs include

11   informational memoranda from the Warden to the MCSP staff regarding the stormwater prevention

12   program, addressing such topics as the handling of trash to prevent it from entering the stormwater

13   collection system, administrative controls, landscape training and rescheduling for irrigation runoff

14   reduction, and physical control measures at designated areas of the stormwater collection system.

15   Specific to the stormwater collection system, BMPs are implemented at storm drains around the

16   Facility including fabric, wattles, designed v-ditches to catch sediment from runoff, and paved

17   aprons to filter or reduce contaminants in discharges. CDCR also installed curbs that redirect non-

18   stormwater flows to float-controlled pumps that pump water from the stormwater collection system

19   to the Facility's permitted WWTP where it receives secondary treatment. Importantly, MCSP staff

20   are trained on and implement numerous BMPs such as street sweeping, material handling and

21   storage, waste management, stockpile management, management of washout areas, vehicle and

22   equipment cleaning, fueling, and maintenance, and spill prevention and control. Weekly inspections

23   and clean-ups are also carried out throughout the Facility, and preventative maintenance work

24   orders are issued quarterly for stormwater and sanitary sewer inspections and cleaning.

25           BMP development at the Facility continues to be a dynamic process and control measures

26   are consistently improved upon. For instance, CDCR recently completed a BMP project that

27   consists of installing a permanent monitoring station at MCSP2 and MCSP3. CDCR is also

28   implementing the Regional Board-approved Enhanced Compliance Actions involving replacement

1   of the entire landscape irrigation system at the Facility.

2       4.   <u>Two Investigations Of MCSP's Stormwater System Conducted In Conjunction With</u>
        <u>The Regional Board's Permit Compliance Staff Identified Significant Background</u>
3       <u>Sources Of Metals And Bacteria.</u>

4       MCSP conducted two major investigations of its stormwater and wastewater systems in

5   conjunction with the Regional Water Board's permit compliance staff. The results of these two

6   investigations refute Plaintiffs' unsupported claims of commingling or cross-contamination of the

7   two systems and irrefutably establish that there are significant background sources of *E. Coli* and

8   metals in Mule Creek and in stormwater sampling results.

9               **a.     The 2020 Collection System Investigation Report.**

10      From 2018 to 2022, an independent consultant conducted a comprehensive investigation of

11  the stormwater and wastewater collection systems, in close consultation with the Regional Water

12  Board, specifically to determine if wastewater commingled with stormwater as the Regional Water

13  Board once believed. The 2020 Collection System Investigation Report that resulted from this study

14  concluded that: (1) there was no tracer dye observed in the stormwater system (Section 3.4.2.1); (2)

15  there are no cross-connections between the stormwater and sewer systems (Section 5.0); (3) there

16  was no evidence that the stormwater system was impacted by sewage, wastewater, or grey water;

17  and (4) there was no sewage discharging into Mule Creek. (2020 Collection System Investigation

18  Report, section 4.3.2., at 89.)

19              **b.     The 2021 Sources Of Fecal Pollution Report.**

20      The Regional Water Board and MCSP also worked closely with an independent public

21  research and development agency, known as the Southern California Coastal Water Research

22  Project ("SCCWRP"), established in 1969 to improve the management of aquatic ecosystems, to

23  further investigate the sources and scope of fecal matter detected in stormwater at the Facility and

24  in Mule Creek itself. In contrast to the limited dry-weather investigation performed by Plaintiffs,

25  SCCWRP conducted an extensive investigation consisting of twenty-two (22) days of sampling,

26  fourteen (14) of which were during or promptly after rain events, and numerous samples collected

27  from Mule Creek, both upstream and downstream of the Facility.

28      The report that resulted from this extensive study, SCCWRP's January 2021 report entitled,

00059942.1                                    8

"Quantification of Sources of Fecal Pollution at Mule Creek" (the "2021 Sources of Fecal Pollution Report"), demonstrates that fecal bacteria detected in Mule Creek and in stormwater at MCSP is almost entirely from animal sources (birds and deer) and not from any appreciable potential human sources. Of the 64 samples tested for genetic markers of human fecal material in the study, there were only two detections of the "human marker" HF183 (2021 Sources Fecal Pollution Report, at ii); however, even these two detections may not in fact be from the human population at the Facility. The study found that the "two low level human markers" could also be "a result of cross reactivity," as low levels of HF183 have also been found to be sourced from deer, not people. (2021 Sources Fecal Pollution Report, at 14.) Finally, the 2021 Sources of Fecal Pollution Report demonstrated that the overall water quality conditions of Mule Creek were heavily impacted by cows (i.e., cattle ranches) upstream of MCSP and background sources (birds and deer), rather than human fecal contributions. (2021 Sources Fecal Pollution Report, at 1, 20, 22-23.)

Plaintiffs have not accounted for the background levels of metals or bacteria in the data alleged to support ongoing violations of the Small MS4 Permit. Plaintiffs ignored this key analytical consideration, collected no background data, and will be unable to cure this defect at trial.

5.   Pre-Complaint Data Is Irrelevant For Establishing Ongoing Violations Entitling Plaintiffs To Injunctive Relief And Sampling Data Collected From MCSP5 and MCSP6 Do Not Establish Violations Of The MS4 Permit.

Plaintiffs rely on a set of sampling data that should be disregarded by the Court as irrelevant. Data from samples collected before the Plaintiffs' complaints were filed are irrelevant as is data collected from monitoring stations at MCSP5 and MCSP6.

To obtain injunctive relief under the Clean Water Act, Plaintiffs must demonstrate "ongoing" permit violations after they filed their respective complaints, pursuant to the United States Supreme Court's seminal *Gwaltney v. Chesapeake Bay Foundation*, 484 U.S. 49 (1987) decision holding that the Clean Water Act does not confer federal jurisdiction over citizen suits for "wholly past violations." Plaintiffs' post-complaint "discharge" sampling data (of *E. Coli* and metals concentrations) collected from sampling locations MCSP5 and MCSP6 are irrelevant for establishing violations of the MS4 Permit because they are not the discharge points to Mule Creek.

Indeed, this Court previously determined[4] that samples collected from MCSP5 and MCSP6 were not "representative" of discharges to Mule Creek and, therefore, do not establish that stormwater from MCSP actually discharged to Mule Creek or "caused or threatened to cause" a condition of pollution or nuisance. (*See* August 29, 2022 Order Re: Motion for Partial Summary Judgment ("Partial MSJ Order") (ECF 60) at 17:18-20:10.) This is because stormwater flowing through these two sampling locations travels approximately 630 and 1,500 feet, respectively, through vegetative bioswales that indisputably filter and remove contaminants (if any remain) prior to any potential discharge into waters of the United States. (*Id.*) For these reasons, all sampling data collected before the Plaintiffs filed their complaints and all sampling data from MCSP5 and MCSP6 are irrelevant.

## II.  ADMISSIONS AND STIPULATIONS NOT RECITED IN PRETRIAL ORDER

The parties have been meeting and conferring regarding a potential stipulation regarding authenticity for the parties' proposed exhibits to be introduced at trial. At this time, there are no admissions or stipulations not recited in the Court's Pretrial Order.

## III.  POINTS OF LAW, INCLUDING REASONABLY ANTICIPATED DISPUTES CONCERNING ADMISSIBILITY OF EVIDENCE

### A.  Defendant's Request To Exclude Witnesses And Evidence.

Defendants hereby request this Court to instruct the parties and counsel as follows:

1. Exclude non-party witnesses from the courtroom.

2. Preclude witnesses from testifying about ultimate facts/legal conclusions.

3. Exclude all sampling data collected before the Plaintiffs filed their complaints and all sampling data collected from MCSP5 and MCSP6 at any time.

As requested by the Court in its Pretrial Order, Defendants alert the Court to specific legal issues and defects regarding Plaintiffs' proposed witnesses and evidence. (Final Pretrial Order (ECF 110) at 3.) Although these actions are proceeding to a nonjury trial, resolving evidentiary issues before trial "serve often useful purposes, even in bench trial." *E&I Global Energy Servs. V. United States*, 155 Fed.Cl. 625, 627 (Ct. Fed. Cl. 2021) ("[p]retrial rulings regarding admissibility permit

---

[4] August 29, 2022 Order Re: Motion for Partial Summary Judgment (Partial MSJ Order) (ECF 60) at 17:18-18-1.)

the trial court to consider complicated evidentiary concerns in a deliberate manner informed by appropriate briefing.")

### 1. Exclude Non-Party Witnesses From The Courtroom.

Defendants respectfully request this Court, under Federal Rules of Evidence Rule 615 preclude all non-party witnesses from being present in the courtroom during all trial-related proceedings. Fed. R Evid. 615.

### 2. Ultimate Facts/Legal Conclusions.

Although expert testimony is not objectionable solely because it embraces an ultimate issue under Fed. R. Evid. 704(a), expert witnesses cannot give an opinion as to their legal conclusion, such as an opinion on an ultimate issue of law. *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008). Rather, expert opinion "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." *Id.*; *see* also Fed. R. Evid. 702. Rule 702 specifically allows an expert witness to testify in the form of an opinion if their "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993). Accordingly, proposed testimony must be supported by an appropriate validation, or "good grounds," based on what is known to the expert. *Id*. Defendants request the Court preclude the Plaintiffs' experts from providing opinions about the ultimate facts of the case or legal conclusions.

### 3. Exclude All Data Collected Before The Plaintiffs Filed Their Complaints And All Data Collected From MCSP5 And MCSP6 At Any Time.

Federal Rule of Evidence 401 and 402 prohibits the admission of irrelevant evidence. Fed. R. Evid. R. 401, 402; *see In re Chang*, No. LA CV13-01340 JAK (ANx), 2015 U.S. Dist. LEXIS 201289 (C.D. Cal. May 29, 2015) (court sustained Defendants' objections to evidence in bench trial based on irrelevance, and other grounds). To prevail at trial, a citizen suit plaintiff must prove ongoing violations of the permit at issue after the action was filed. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found. Inc*., 484 U.S. 49, 64 (1987) (holding that the Clean Water Act does not

confer federal jurisdiction over citizen suits for "wholly past violations"). Therefore, data collected before the Plaintiffs filed their complaints are irrelevant and should be excluded.

Similarly, the Court should exclude all sampling data collected at any time from MCSP5 and MCSP6. Sampling locations MCSP5 and MCSP6 are 630 and 1,500 feet away from Mule Creek, respectively, and water flowing from those sampling locations passes through vegetative bioswales that filter and remove contaminants before any water discharges into Mule Creek. (*See* Partial MSJ Order (ECF 60) at 17:18-18:16.) The sole basis of Plaintiffs' argument that data from MCSP5 and MCSP6 are representative of discharges to Mule Creek is a single statement in the Water Board's December 2020 13383 Order. (See Dec. 22, 2020 13383 Order.) However, this Court already found that this 13383 Order does not support a conclusion that data from MCSP5 and MCSP6 constitute "'[d]ischarges…to waters of the U.S.' … or otherwise clearly indicate that samples collected from these locations are representative of those that ultimately enter Mule Creek." (Partial MSJ Order (ECF 60) at 20:3-10.) Indeed, with respect to data collected from MCSP5 and MCSP6, the Court found that "plaintiffs do not appear to have demonstrated that contaminants at issue here in fact reached or 'accumulated . . . in' Mule Creek." (*Id.* at 21:2-4.) For these reasons, the Court should exclude all data collected from MCSP5 and MCSP6 as irrelevant.

**B.     Points of Law.**

1.      CSPA Lacks Organizational Standing, And Therefore, Defendants Move For Judgment As To CSPA's Claims.

a.      **The Deposition Testimony By CSPA's Sole Remaining Standing Witness[5], CSPA Member Edmund Taylor, Reveals No Non-Speculative, Concrete And, Actual Or Imminent Injury That Is Traceable To Facility Discharges Into Mule Creek.**

A plaintiff must retain standing throughout the litigation, and the case-or-controversy requirement of Article III of the U.S. Constitution subsists through all stages of federal judicial proceedings, trial and appellate. *See Coalition v. McCamman*, 725 F. Supp. 2d 1162, 1187 (E.D. Cal. 2010) (previous ruling on standing not dispositive of later standing challenge). To satisfy the

---

[5]  The Court previously ruled that the other two CSPA members put forward as the organization's standing witnesses, Richard McHenry and Katherine Evatt, did not have standing to bring this action. (Partial MSJ Order (ECF 60) at 12:17-25.)

standing requirements in a Clean Water Act citizen enforcement action, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-181 (2000); *Jackson v. Cal. Dep't of Mental Health,* 399 F.3d 1069, 1071 (9th Cir. 2005).

Standing may not be based on the "conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In support of CSPA's Motion for Summary Adjudication, CSPA's "standing deponent," Mr. Edmund Taylor, filed two declarations that taken together, at the time, satisfied the Court that Mr. Taylor had standing, conferring organizational standing on CSPA. (Partial MSJ Order (ECF 60) at 13:3-10.) However, after the Court's Order, new evidence revealed that Mr. Taylor does not in fact have standing, and as such, CSPA's claims should be dismissed for lack of jurisdiction.[6]

To establish standing, Mr. Taylor must show he has suffered an actual or imminent, concrete and particularized injury that he can fairly trace to the Facility's alleged unlawful discharges to Mule Creek. *Friends of the Earth, Inc.*, 528 U.S. at 180-181. With respect to the injury element, Courts have found that "reasonable concerns about the effects" of a facility's discharges can rise to more than "conclusory allegations," as can standing affiants' conditional statements that they would use the water body at issue but for a facility's discharges. *Id.* at 183-184. However, Mr. Taylor's situation is critically different, as he has not identified a nonspeculative, concrete injury. Mr. Taylor's concerns about the Facility's alleged unlawful discharges to Mule Creek are not reasonable, and this is demonstrated through Mr. Taylor's sworn deposition testimony that he and his ranch continue to use the water supplied by Dry Creek (a creek that is downstream from Mule Creek). Importantly, Mr. Taylor's ranch, PT Ranch LLC ("PT Ranch"), is not the member of CSPA on whom Plaintiff bases its standing. (Partial MSJ Order (ECF 60) at 12:2-5.) However, Mr. Taylor, emphasizes alleged injuries suffered by PT Ranch as the purported

---

[6] Defendants deposed Mr. Taylor on September 28, 2022, after weeks of meeting and conferring with CSPA's counsel on the date of the deposition to accommodate Mr. Taylor's schedule.

**DEFENDANTS' TRIAL BRIEF**

basis for standing. (*See* Supplemental Declaration of Edmund Taylor in Support of Plaintiffs' Motion for Summary Adjudication ("Taylor Supp. Decl.") (ECF 55-3).) These alleged injuries are irrelevant. Nonetheless, we discuss below how Mr. Taylor's concerns of injury to non-CSPA member PT Ranch, are still speculative, conjectural, and fail to satisfy the first element of the Article III standing requirement.

Mr. Taylor explains that PT Ranch borders portions of Dry Creek, water from which (when Dry Creek is not dry) the ranch uses to irrigate its hay crop (which PT Ranch only began growing in 2022) and water livestock that it sells in the marketplace. (Deposition Transcript of Edmund Taylor, dated September 28, 2022 ("Taylor Deposition") at 68:10-14; 70:2-3; 111:17-19.)[7] Mr. Taylor averred he is concerned that pollutants from the Facility's alleged unlawful stormwater discharges nearly 4.5 miles upstream come into contact with the ranch's crops and livestock; however, Mr. Taylor testified that he has never had Dry Creek water analyzed, he has never had Mule Creek water analyzed, and he has never had water out of Mule Creek where it meets Dry Creek analyzed. (Taylor Deposition at 111:21-23; 113:7-16.) Mr. Taylor specifically stated that he "doesn't know" and has no evidence to suggest that irrigation water PT Ranch pulls from *Dry Creek* during portions of the year has caused any harm to the business' crops or livestock. (Taylor Deposition at 94:15-95:1.) He further testified that despite his concerns, they are not serious enough that Mr. Taylor feels he needs to disclose his concerns about alleged pollutants in the irrigation water to the customers that buy and consume PT Ranch's meat and feed PT Ranch's hay to their livestock. (Taylor Deposition at 122:4-11.) Furthermore, Mr. Taylor's "concerns" are so inconsistent and vague (e.g., he is unable to recall whether he became "concerned" in 2018 or 2020) that they cannot be reasonable. (Taylor Deposition at 85:7-86:4.)

Although Mr. Taylor says he no longer hunts along Dry Creek, he stopped hunting when the former owner of the ranch, his father-in-law, died three or four years before Mr. Taylor's September 28, 2022 deposition. (Taylor Deposition at 93:12-16.) This appears to be long before Mr. Taylor became "concerned" enough about the water quality of Mule Creek and Dry Creek to join

---

[7] Excerpts from the Deposition Transcript of Edmund Taylor, dated September 28, 2022, are attached hereto as **Exhibit B**.

CSPA. Mr. Taylor confirmed he has no evidence that Mule Creek or Dry Creek contain pollutants, and he is aware of no facts that alleged pollutants from Mule Creek flow into Dry Creek. (Taylor Deposition at 114:14-22.) Thus, Mr. Taylor's "concerns" are, in his own words, merely based on his "fear" and "assumption," and not based on any articulable facts. (Taylor Deposition at 116:4-117:1.) Moreover, only Mr. Taylor's individual "fears" (and not his concerns for non-CSPA member PT Ranch) are potentially relevant to the question of standing. Neither Mr. Taylor's fears nor his concerns about an imminent injury are reasonable, and this witness is unable to articulate any concrete facts that <u>he</u> has suffered an actual or imminent injury.

The next necessary hurdle Mr. Taylor must meet to establish Article III standing for CSPA, is to satisfy the causation element of standing. To do so, his alleged injury must be "fairly traceable" to the challenged action of the defendant, and not "the result of the independent action of some third party not before the court." *Coalition*, 725 F. Supp. at 1192 (quoting *Tyler v. Cuomo*, 236 F. 3d 1124, 1132 (9th Cir. 2000)). Moreover, "where a plaintiff 'relie[s] solely on the truism that water flows downstream and infer[s] therefrom that any injury suffered downstream is 'fairly traceable' to unlawful discharges upstream,' the plaintiff has not submitted enough competent evidence to satisfy Article III standing." *Cal. Cmtys. Against Toxics v. Trojan Battery Co*., No. 2:18-cv-02189-SVW-FFM, 2018 U.S. Dist. LEXIS 226453 *14 (C.D. Cal. Dec. 28, 2018) (holding no connection between "injury and the alleged unlawful activity simply by (1) providing [d]efendant's discharge monitoring reports indicating the discharge of lead and zinc, and (2) point to the flow of water across 13 miles of connected waterways from [d]efendant's facility to the waters [plaintiff] uses and allegedly is deterred from using." *Id.* at *20-21).

Even if Mr. Taylor could articulate an actual or imminent, concrete and particularized injury to himself, he is unable to establish the causation element by fairly tracing his alleged injury to Defendants' alleged unlawful conduct. Setting aside Mr. Taylor's irrelevant fears that the Facility's discharges to Mule Creek affect non-CSPA member PT Ranch, we are left with Mr. Taylor's testimony that he stopped swimming in Dry Creek and no longer hunts on the ranch. Mule Creek is an ephemeral creek that flows during the wet weather season when it rains and, very importantly, the Facility <u>only</u> discharges to Mule Creek during a Significant Rain Event to avoid flooding to the

**DEFENDANTS' TRIAL BRIEF**

prison (i.e., the Facility discharges in a rain event of more than 0.1 inches in an hour or 0.3 inches in a 24-hour period). This means that when Mr. Taylor supposedly used to swim in Dry Creek (presumably, in the Sierra foothills during the warm weather months when it was not raining), not only would Mule Creek have dried up, but the Facility would not have been discharging stormwater. Secondly, Mr. Taylor's testimony indicates that he stopped hunting along Dry Creek when his father-in-law died. (Taylor Deposition at 93:12-19.) Mr. Taylor testified that his amorphous concern is that he does not want to eat a bird he has hunted that has been eating out of the Dry Creek, but he also explained there were several other reasons why he stopped hunting. (Taylor Deposition at 119:12-19.) Again, Mr. Taylor's "concerns" are inconsistent and therefore, unreasonable. On the one hand, Mr. Taylor says he will not eat birds that water themselves in Dry Creek, yet he testified that he and his family eat the livestock that drink Dry Creek irrigation water and that are fed grass that is grown with Dry Creek irrigation water. (Taylor Deposition at 123:19-21.)

Furthermore, Mr. Taylor testified that he is aware of mining quarries in the area around his ranch, including some directly upstream. (Taylor Deposition at 120:1-14.) Also upstream from Dry Creek is the Castle Oaks Golf Club and living community, the City of Ione, and a number of other potential contributors to whatever unknown constituents may be present in Dry Creek. Mr. Taylor has done nothing to assess whether the concerns he has over alleged pollutants in Dry Creek are attributable to the Facility or to other upstream sources. (*Id*.) Like in *Cal Cmtys. Against Toxics*, Mr. Taylor is unable to establish a connection between his claimed injury and any alleged unlawful discharges from the Facility into Mule Creek.

Finally, because Mr. Taylor's concerns, fears, and assumptions about the Facility's alleged unlawful discharges to Mule Creek are not reasonable and do not identify an actual or imminent, concrete and particularized injury that Mr. Taylor can fairly trace to the Facility's alleged illegal conduct, there is no injury to redress, and his bid for standing must fail. *See Cal. Cmtys. Against Toxics.*, 2018 U.S. Dist. LEXIS 226453 at *28 (where plaintiff is unable to connect its injury to defendant's conduct, he's also failed to establish that the injury would be alleviated if defendant no longer engaged in that conduct).

**DEFENDANTS' TRIAL BRIEF**

Mr. Taylor fails to present sufficient competent evidence to satisfy the elements of Article III standing; therefore, the Court should find that CSPA's action fails for this same reason. Based on the foregoing, Defendants seek the Court's ruling now but will also move the Court at trial for judgment on partial findings as a matter of law pursuant to Federal Rule of Civil Procedure 52.

**b.      The Court Should Grant Defendants' Request For Judgment Pursuant To Fed. R. Civ. Proc. 52(C).**

Federal Rule of Civil Procedure 52(c) ("Rule 52(c)") expressly authorizes the district judge to "resolve disputed issues of fact." *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006); *see Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1031 (9th Cir. 1996) (finding that Rule 52(c) "authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence"). When facing a Rule 52(c) motion, the court does not view evidence in the light most favorable to the non-moving party or draw any special inferences. *Plans, Inc. v. Sacramento City Unified Sch. Dist.*, 752 F. Supp. 2d 1136, 1140 (E.D. Cal. 2010). Rather, the court may make findings in accordance with its own view of the evidence. *Ritchie*, 451 F.3d at 1023.

CSPA premises organizational standing chiefly on Mr. Taylor's interactions around Dry Creek (not Mule Creek). As set forth above, the record clearly demonstrates that Mr. Taylor's "concern" for Dry Creek's water quality is based on mere speculation and conjecture. Therefore, Mr. Taylor, and thus CSPA, have failed to satisfy even the minimal showing of injury-in-fact to meet the standing requirement. Moreover, purported facts showing any speculative injury are not fairly traceable to the Facility's stormwater discharges, according to Mr. Taylor's testimony, and therefore cannot be redressed by a change in Defendants' conduct. Accordingly, as CSPA cannot meet its burden to prove standing as a matter of law, Defendants respectfully request that judgment be entered in their favor, and that CSPA's claims be dismissed.

2.      <u>Plaintiffs' First Claim For Relief: Alleged Discharges To Waters Of The United States Without An Appropriate Permit In Violation Of The Clean Water Act.</u>

To prevail against the Defendants under the Clean Water Act for alleged unpermitted discharges into Mule Creek, Plaintiffs must prove that Defendants' discharges resulted in: (1) the

addition of a pollutant, (2) from a "point source," (3) into "navigable waters," (4) without the appropriate permit. Federal Water Pollution Control Act, §§301(a), 502(12)(A), as amended by the Federal Water Pollution Control Act Amendments of 1972 (Clean Water Act) §2, 86 Stat. 844, 886, 33 U. S. C. §§1311(a), 1362(12)(A); *Food & Water Watch v. United States EPA,* 20 F.4th 506, 508 (9th Cir. 2021). Pursuant to the Clean Water Act's "Stormwater Amendments" in section 402(p)(3)(B)(iii), municipal permits require controls to reduce the discharge of pollutants to the maximum extent practicable (i.e., not according to any numerical limits or water quality standards). 33 U.S.C. § 1342(p)(3)(B)(iii).

At the February 13, 2023 Pretrial Conference, Plaintiffs agreed that in order to prove their first claim for relief, Plaintiffs must prove that Defendants violated the Small MS4 Permit. In other words, if Plaintiffs are unable to prevail on their Second Claim for Relief, Plaintiffs cannot prevail on their First Claim for Relief. Defendants will demonstrate at trial that Plaintiffs cannot carry their burden of proof on these claims.

3.    Plaintiffs' Second Claim For Relief: Alleged Violations Of The Small MS4 Permit.

Plaintiffs, collectively, allege only four purported bases for their respective Second Claims for Relief. Plaintiff CSPA alleges violations of Provisions B.2, B.3, and D of the Small MS4 Permit. Plaintiff Amador alleges violations of Provisions B.2, C.1, and D of the Small MS4 Permit. All other previously alleged violations of the Small MS4 Permit have been defeated on summary judgment or voluntarily dismissed.

As stated above, to obtain injunctive relief[8] in this action, Plaintiffs must demonstrate "ongoing" permit violations <u>after</u> they filed their respective complaints, pursuant to the United States Supreme Court's seminal *Gwaltney*, 484 U.S. 49 (1987), decision holding that the Clean Water Act does not confer federal jurisdiction over citizen suits for "wholly past violations." As discussed below, Plaintiffs are unable to demonstrate ongoing violations of the Small MS4 Permit for several reasons. Moreover, establishing violations of the Permit <u>cannot</u> be accomplished by simply comparing sampling data collected within the Facility's stormwater collection system, at the

---

[8] Under the Eleventh Amendment to the Constitution, Plaintiffs are precluded from obtaining civil penalties in this action.

**DEFENDANTS' TRIAL BRIEF**

Facility's discharge points, or within a receiving water body, to any purported water quality objectives or standards. As explained further below, the Permit does not apply <u>any</u> numeric limitations to the MCSP Facility.

      **a.**      **Alleged Violation Of Small MS4 Permit Provision B.2 (Alleged By CSPA & County).**

Provision B.2, Discharge Prohibitions, of the Small MS4 Permit provides: "Discharges of stormwater from the MS4 to waters of the U.S. in a manner causing or threatening to cause a condition of pollution or nuisance as defined in Water Code § 13050 are prohibited." (Small MS4 Permit, Provision B.2). The California Water Code defines pollution as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects either of the following: (A) The waters for beneficial uses. (B) Facilities which serve these beneficial uses." Cal. Water Code § 13050(l)(1); (*see also* Order Re: Defendants' Motion for Summary Judgment ("Order Re: Defendants' MSJ") (ECF 103) at 10:4-9.) Moreover, as this Court already found, "Provision B.2's plain language indicates that a violation thereof requires that the discharges actually enter a water of the United States." (Partial MSJ Order (ECF 60) at 17:5-7.) Thus, to prevail at trial Plaintiffs must prove that Defendants have caused discharges that actually entered Mule Creek after Plaintiffs filed their respective complaints and unreasonably affected its beneficial uses. Defendants will demonstrate at trial that Plaintiffs cannot carry their burden of proof concerning the alleged violation of Provision B.2 of the MS4 Permit.

      *i.*      *Plaintiffs Cannot Prove That MCSP Post-Complaint Discharges Have Actually Entered Mule Creek And Unreasonably Affected Its Beneficial Uses.*

Plaintiffs cannot prove that the Facility's discharges actually entered Mule Creek and unreasonably affected its beneficial uses. As an initial matter, as the Court already found, "plaintiffs do not appear to have demonstrated that contaminants at issue here in fact reached or 'accumulated . . . in' Mule Creek." (Partial MSJ Order (ECF 60) at 21:2-4.)

Moreover, even if Plaintiffs can prove that contaminants in stormwater discharges from the Facility reached Mule Creek, their reliance on numerical limitations to assert alleged violations of the Small MS4 Permit is fatally flawed. This is because Plaintiffs rely on the mistaken assumption

**DEFENDANTS' TRIAL BRIEF**

that Mule Creek, which is a seasonal (i.e., intermittent) water body that flows only during the wet season, has the beneficial use designation of MUN (Municipal and Domestic Supply). Based on this mistaken assumption, Plaintiffs incorrectly argue that any detection at the Facility's stormwater monitoring points that exceeds the drinking water quality objectives constitutes a violation. Plaintiffs are incorrect for multiple reasons.

First, Mule Creek's beneficial uses do not include MUN as explained above. Therefore, all water quality objectives that apply to MUN-designated water bodies are irrelevant. This includes the numeric maximum contaminant limits ("MCLs") for aluminum, iron, and manganese listed in Plaintiffs' Pretrial Joint Statement. (ECF 104 at 10:14-27); *see also*, Basin Plan section 3.1.3 at 3-3, identifying MCLs applicable to drinking water: "water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) […].") This also includes the numeric California Toxics Rule ("CTR") criteria for copper, lead, and zinc listed in Plaintiffs' Joint Pretrial Statement. (ECF 104 at 10:14-27; *see also* Basin Plan section 4.1.8 Drinking Water Policy at 4-7 and 4-8, citing to Section 4.2.1.1.15 and the Policy for Implementation of Toxics Standards for Inland Surface Waters, Enclosed Bays, and Estuaries of California (a.k.a. State Implementation Plan or SIP) and Basin Plan section 4.2.1.1.15, stating the SIP is the State Water Board's policy establishing the California Toxics Rule (40 CFR 131.38), which the Basin Plan deems applicable to water bodies having a MUN designation, Basin Plan at 4-15.) Because Mule Creek is not designated for MUN beneficial use, detections of metals above the numerical MCLs and CTR levels are not relevant to the Court's determination of whether Defendants discharges have altered or threatened to alter Mule Creek to a degree that unreasonably affected its beneficial uses.

Second, as this Court has already found, "[i]t appears that the regional water board purposely excluded the water quality standards from the permit's discharge limitations, as water quality standards apply only to receiving waters (i.e., waters of the United Sates), not the discharges." (Order Re: Defendants' MSJ (ECF 103) at 8:4-7.) As the Court explained, "[The Basin Plan's '[water quality] objectives . . . are intended to govern the levels of constituents and characteristics in the main water mass unless otherwise designated,' and 'may not apply at or in the

**DEFENDANTS' TRIAL BRIEF**

immediate vicinity of effluent discharges . . . ." (*Id.* at 8:8-17 (internal citations omitted).) Therefore, Plaintiffs cannot establish violations of Provision B.2 simply by comparing any allegedly applicable water quality standard to sampling data collected at the Facility's stormwater monitoring points. Instead, plaintiffs must prove discharges from the Facility actually entered Mule Creek and altered or threatened to alter Mule Creek to a degree that unreasonably affected its beneficial uses.

As explained above, Mule Creek has the following beneficial use designations: AGR (Agricultural Supply), REC-1 (Water Contact Recreation), REC-2 (Non-contact Water Recreation), WARM (Warm Freshwater Habitat), COLD (Cold Freshwater Habitat), MIGR (Migration of Aquatic Organisms), SPWN (Spawning, Reproduction, and/or Early Development, and WILD (Wildlife Habitat). (*See* 13383 Orders; Basin Plan at 2-1, 2-2, and 2-11.) Plaintiffs must, therefore, prove that discharges from the Facility have actually entered Mule Creek and unreasonably affected these beneficial uses; however, the evidence will show that they cannot meet this burden, as the following overview highlights:

- AGR (Agricultural Supply): Plaintiffs have put forward no facts or evidence that the Facility's discharges to Mule Creek have affected uses of water for farming, horticulture, or ranching including, but not limited to, irrigation (including leaching of salts), stock watering, or support of vegetation for range grazing.

- REC-1 (Water Contact Recreation): Mule Creek is a seasonal creek that flows only during the rainy season and the Facility only discharges stormwater during Significant Rain Events. The section of Mule Creek at issue, which is also the only section of Mule Creek for which Plaintiffs have presented any sampling data, is squarely on private property owned by the State of California and securely operated by CDCR. Recreational contact with waters in Mule Creek is not an authorized activity by Mule Creek State Prison. Further, it is highly unlikely that an individual would be recreating in Mule Creek during a storm event.

**DEFENDANTS' TRIAL BRIEF**

- REC-2 (Non-contact Water Recreation): As noted above, the section of Mule Creek at issue sits inside Mule Creek State Prison's property boundaries. Non-contact water recreation of Mule Creek is not an authorized activity by Mule Creek State Prison, and it is highly unlikely that during a Significant Rain Event, when flows are present in Mule Creek and the Facility is discharging stormwater, that an individual would be picnicking, hunting, or sunbathing at Mule Creek.

- WARM (Warm Freshwater Habitat): Plaintiffs have not proffered any facts or evidence that demonstrate that warm water ecosystems have been impacted by the Facility's alleged unlawful discharges to Mule Creek.

- COLD (Cold Freshwater Habitat): Plaintiffs have not proffered any facts or evidence that demonstrate that warm water ecosystems have been impacted by the Facility's alleged unlawful discharges to Mule Creek.

- MIGR (Migration of Aquatic Organisms): Plaintiffs have not proffered any facts or evidence that demonstrate that the Facility's alleged unlawful discharges to Mule Creek have impacted the ability of aquatic organisms to migrate.

- SPWN (Spawning, Reproduction, and/or Early Development): Plaintiffs have not proffered any facts or evidence that demonstrate the Facility's alleged unlawful discharges to Mule Creek have impacted high quality aquatic habitats suitable for reproduction and early development of fish.

- WILD (Wildlife Habitat): Plaintiffs have not proffered any facts or evidence that terrestrial or wetland ecosystems have been impacted by the Facility's alleged unlawful discharges to Mule Creek.

In sum, without the MUN beneficial use designation, Plaintiffs' assertion that the MCL and CTR water quality objectives for metals apply to Facility fails. Further, Plaintiffs have not offered and will not be able to offer at trial, credible evidence that discharges from the Facility actually entered Mule Creek and unreasonably affected its applicable beneficial uses.

1

2

    *ii.*  *Plaintiffs Cannot Account For Background And Non-Human Sources Of Contaminants And, Therefore, Cannot Establish That There Have Been Permit Violations.*

3    State Water Board Resolution No. 68-16 requires the maintenance of the existing high

4 quality of water (i.e., "background") unless a change in water quality "will be consistent with

5 maximum benefit to the people of the State...." (State Water Board Resolution No. 68-16; *see also*

6 Basin Plan, Section 4.2.2.1.9 at 4-27.) As the Basin Plan explains, "[m]aintenance of the existing

7 high quality of water means maintenance of 'background' water quality conditions, i.e., the water

8 quality found upstream or upgradient of the discharge, unaffected by other discharges." (Basin Plan,

9 Section 4.2.2.1.9 at 4-28.) Also, according to the Basin Plan, the water quality objectives do not

10 require improvement over naturally occurring background concentrations. In cases where the

11 natural background concentration of a particular constituent exceeds an applicable water quality

12 objective, the natural background concentration will be considered to comply with the objective.

13 (*Id.* at 4-27–4-28.) In other words, without accounting for background conditions, the Plaintiffs

14 cannot prove that the Facility's alleged unlawful discharges have altered or threatened to alter Mule

15 Creek to a degree that unreasonably affected its beneficial uses.

16    As explained in detail above, the evidence will show that Plaintiffs have not collected data

17 to account for background conditions. Nevertheless, there is credible evidence that metal

18 constituents and bacteria from non-human sources are contributing background sources. As

19 Plaintiffs have not accounted for these background contributions, they cannot establish an ongoing

20 violation of Provision B.2, and they will not be able to meet their burden of proof at trial that

21 CDCR's alleged unlawful stormwater discharges caused a "condition of pollution or nuisance" that

22 has unreasonably affected Mule Creek's beneficial uses.

23    **b.**  **Alleged Violation Of Small MS4 Permit Provision B.3 (Alleged By CSPA**

24        **Only).**

25    CSPA alleges a violation of Provision B.3, Discharge Prohibitions, which provides in

26 relevant part: "Discharges through the MS4 of material other than stormwater to waters of the U.S.

27 shall be effectively prohibited, except as allowed under this Provision or as otherwise authorized by

28 a separate NPDES permit." (Small MS4 Permit, Provision B.3.) Provision B.3 further provides that

the following "non-storm water discharges are not prohibited" (i.e., they are exempt), in pertinent part:

> d. rising ground waters;

> e. uncontaminated ground water infiltration (as defined at 40 C.F.R. §35.2005(20)) to separate storm sewers;

> f. uncontaminated pumped ground water;

> g. discharges from potable water sources;

> . . .

> i. air conditioning condensation; and,

> . . .

> o. incidental runoff from landscaped areas (as defined and in accordance with Section B.4 of this Order).

The non-stormwater that has been detected within the Facility's MS4 is exempt under the above-listed exceptions to the non-stormwater prohibition, and Defendants will demonstrate at trial that CSPA cannot carry its burden of proof concerning the alleged violation of Provision B.3 of the MS4 Permit.

> i.    *CSPA Has No Evidence Of A Discharge To Mule Creek Of Water Containing Caffeine Or Pharmaceuticals.*

As with Provision B.2 discussed above, this Court has already correctly determined that pursuant to the plain language of Provision B.3, "plaintiffs must establish that the contaminants at issue were '[d]ischarge[d] . . . to waters of the U.S.'" (Partial MSJ Order (ECF 60) at 21:19-21.) In support of CSPA's claim that stormwater commingled with wastewater is discharged from the Facility into Mule Creek during Significant Rain Events, CSPA's retained expert, Dr. Emerick, opined that the presence of pharmaceuticals and caffeine in samples collected from stagnant water at the Facility (i.e., not from Mule Creek itself) demonstrates a violation. (Declaration of Robert Emerick in Support of Plaintiffs' Motion for Summary Judgement ("Emerick Decl.") (ECF 45-2) at ¶ 15.) CSPA cannot prevail at trial on this claim for several reasons.

First, CSPA cannot prove that the samples containing pharmaceuticals and caffeine that they rely upon actually reached Mule Creek. As set forth above, Plaintiffs' experts collected stormwater samples from ponded water at MCSP5 and MCSP6 and analyzed it for the presence of pharmaceuticals and caffeine. These samples were collected during dry weather and not during a Significant Rain Event, which means that the ponded water sampled at MCSP5 and MCSP6 did not discharge to Mule Creek. (Emerick Decl. (ECF 45-2) at ¶ 17, Figure 6.) There is also no evidence that it rained shortly thereafter (i.e., before the sampled water dried up in the hot weather) to enable the trier of fact to infer that the sampled water subsequently flowed into Mule Creek. Additionally, the Court already determined that Plaintiffs have not established that samples collected from MCSP5 and MCSP6 are representative of discharges that ultimately enter Mule Creek. (*See* Partial MSJ Order (ECF 60) at 20:3-10.) As the Court previously recognized, Plaintiffs must demonstrate that there were actual discharges to Waters of the United States, in this case Mule Creek, in order to prevail under the Clean Water Act. (Partial MSJ Order (ECF 60) at 21:18-23.) Plaintiffs have produced no sampling data collected from Mule Creek indicating the presence of pharmaceuticals or caffeine, particularly during a Significant Rain Event when stormwater from MSCP's MS4 was discharging into Mule Creek. At the eve of trial, CSPA is unable to provide such evidence because it does not exist.

Second, it is undisputed that high levels of ammonia would be detected in the stormwater samples if sewage was present, but the levels of ammonia detected in the Alleged Ongoing Discharge Data Set are very low. Plaintiffs' expert, Dr. Emerick, admitted at his deposition that he reviewed the ammonia levels in the sampling data and found them to be below levels expected if they contained sewage. (Deposition Transcript of Dr. Robert Emerick, dated September 30, 2022 ("Emerick Deposition") at 43:22-44:3; 44:22-45:6; 56:24-57:1; 92:11-12.)[9] In addition, Ms. Lee of the Regional Water Board also testified that, based upon her extensive experience and training at the Regional Water Board, she would expect ammonia levels in stormwater samples to be "in the

---

[9] Excerpts from the Deposition Transcript of Dr. Robert Emerick, dated September 30, 2022, are attached hereto as **Exhibit C.**

**DEFENDANTS' TRIAL BRIEF**

hundreds" if there was sewage present, and the levels were nowhere near this high. (Deposition Transcript of Elizabeth Lee, dated September 22, 2022 ("Lee Deposition") at 138:3-11.)[10]

Finally, CSPA's claim of non-stormwater from MCSP's wastewater collection system "commingling" with stormwater in the MS4 is belied by the only actual study that has investigated the issue. Defendants conducted an exhaustive investigation <u>in direct cooperation with the Water Board's permitting staff</u> into this very same issue. Specifically, CDCR conducted two major investigations of its stormwater and wastewater systems that refute CSPA's claims of commingling or cross-contamination of the two systems that concluded there was no cross-connections between the stormwater and sewer systems and no evidence the stormwater system was impacted by sewage or that sewage was discharging into Mule Creek. (2020 Stormwater Collection System Investigation Report at Sections 4.3.2, 5.0.)

Subsequently, the Regional Water Board and Defendants also worked closely with SCCWRP to further investigate the sources and scope of fecal matter in the Facility's stormwater and in Mule Creek. In contrast to the two days of dry-weather sampling[11] performed by Plaintiffs, SCCWRP conducted an extensive investigation consisting of twenty-two (22) days of sampling, 14 of which were during or promptly after rain events, and collected numerous samples from Mule Creek both upstream and downstream of MCSP. (2021 Sources Fecal Pollution Report, at ii.)

The 2021 Sources of Fecal Pollution Report convincingly demonstrates that fecal bacteria detected in stormwater at MCSP is almost entirely from animal (birds and deer) and not from any appreciable human sources.[12] (2021 Sources Fecal Pollution Report, at ii.) It further concluded that fecal bacteria levels in Mule Creek were often higher upstream of MCSP and that potential human fecal matter in stormwater was at negligible levels. (2021 Sources Fecal Pollution Report, at ii, 3, 14, 23.) Moreover, of the 64 samples tested for genetic markers of human fecal material in the study, there were only two detections of the "human marker" HF183 (2021 Sources Fecal Pollution Report, at p. ii); however, even these two detections may not in fact be from the human population

---

[10] Excerpts from the Deposition Transcript of Elizabeth Lee, dated September 22, 2022, are attached hereto as **Exhibit D.**

[11] Plaintiffs conducted two dry weather inspections and sampling at the Facility on March 9 and May 24, 2022.

[12] The few potential human sources were barely above detection limits.

at the Facility. The study found that the "two low level human markers" could also be "a result of cross reactivity," as low levels of HF183 have also been found to be sourced from deer, not people. (2021 Sources Fecal Pollution Report, at 14.) Finally, the 2021 Sources of Fecal Pollution Report demonstrates that the overall water quality conditions of Mule Creek were heavily impacted by cows (i.e., cattle ranches) upstream of MCSP and background sources (birds and deer), rather than human fecal contributions. (2021 Sources Fecal Pollution Report at 1, 20, 22, 23.)

Accordingly, based on these considerations and the overwhelming evidence, CSPA will be unable to meet its burden of proof at trial. Moreover, because Defendants are engaged in the iterative process with the Regional Water Board to improve on the BMPs,[13] specifically as they pertain to non-stormwater issues, it would be imprudent for the Court to interfere with that process and demand any form of injunctive relief that varies from what the stormwater experts at the Regional Water Board will request, or have requested, in BMPs.[14]

### c.   Alleged Violation Of Small MS4 Permit Provision C.1 (Alleged By County Only).

The County alleges a violation of Provision C.1, Effluent Limitations, which provides, "Permittees shall implement controls as required by this Order to reduce the discharge of pollutants from their MS4s to waters of the U.S. to the MEP [maximum extent practicable]." (Small MS4 Permit, Provision C.1.) The MEP standard requires Permittees to apply BMPs that are effective in reducing or eliminating the discharge of pollutants to the waters of the United States. (Small MS4 Permit at ¶ 36.)

Importantly, the Small MS4 Permit does not impose numeric effluent limitations on

---

[13] CDCR has identified a $10 million dollar project to replace MCSP's existing sanitary sewer and stormwater system. This project will require excavating and demolishing the concrete and asphalt and existing piping system that underlies the prison facility and replacing the system with new pipe. This project's timeframe, as identified in CDCR's Master Plan Annual Report published in January 2022, is estimated to be within 5 years. In addition, CDCR is undertaking a $1 million dollar irrigation repair project.

[14] Defendants and the Regional Water Board are cooperatively working to improve the stormwater system pursuant to the iterative BMP process and an administrative agreement reached between the parties. Defendants submit that any injunctive relief sought by Plaintiffs regarding the elimination of non-stormwater from the MS4 would be duplicative of such efforts and involves complex issues that the Court should defer to the Regional Water Board's technical expertise under the primary jurisdiction doctrine. *See Montgomery Enviro. Coalition Citizen Coordinating Comm. v. Friendship Heights*, 607 F. 2d 378, 380 (D.C. Cir. 1979) (United States Court of Appeals for the District of Columbia dismisses action brought by a citizens group seeking injunctive relief over a NPDES permit and sewage allotments on the primary jurisdiction grounds).

facilities covered by the permit. (*See Small MS4 Permit*, ¶ X, Effluent Limitation, at 22.) Instead, "[c]onsistent with the federal regulations, the finding of the Blue Ribbon Panel, and precedential State Water Board Orders (State Water Board Orders Nos. WQ 91-03 and WQ 91-04, [the Permit] allows the Permittees to implement BMPs to comply with the requirements of the [Permit]." (*Id.*)

At trial, the evidence will show that Defendants have implemented BMPs in compliance with the Permit, and Defendants will demonstrate that the County cannot carry its burden of proof concerning the alleged violation of Provision C.1 of the MS4 Permit.

> i.   *The Facility Implements, Evaluates, And Adjusts BMPS In Technically Appropriate And Economically Feasible Ways.*

As set forth above, the Facility is actively engaged in the iterative BMP process with the Regional Water Board and continues to respond to feedback regarding the evaluation, and potential improvement or addition of BMPs. For example, the new monitoring stations at MCSP2 and MCSP3 were recently constructed and calibrated. Stormwater that will be discharged to Mule Creek will continue to undergo treatment and filtering out of contaminants as flows travel through the vegetated bioswales. The monitoring station project at MCSP2 and MCSP3 involved manufacturing specifically designed flumes to host sophisticated monitoring equipment, over 19 yards of concrete was poured to support the flume structures and 30 tons of rip-rap placed at the entrance and exit channels of the flumes. As the Facility gathers data from the new monitoring stations, it will continue to evaluate its BMPs for their effectiveness and implement changes that are technologically appropriate and economically feasible.

As Defendants have implemented BMPs in compliance with the Permit, have actively engaged in the iterative BMP process with the Regional Water Board, and continue to respond to feedback from the Regional Water Board regarding the evaluation, and potential improvement or addition of BMPs, the County cannot carry its burden of proof concerning the alleged violation of Provision C.1 of the MS4 Permit.

> d.   **Alleged Violation Of Small MS4 Permit Provision D (Alleged By CSPA & County).**

Provision D, Receiving Water Limitations, provides in pertinent part: "Discharges shall not

cause or contribute to an exceedance of water quality standards contained in a Statewide Water Quality Control Plan, the California Toxics Rule (CTR), or in the applicable Regional Water Board Basin Plan." (Small MS4 Permit, Provision D.) This Court previously found that the Basin Plan's water quality standards apply to receiving waters, not to discharges.  (Order Re: Defendants' MSJ (ECF 103 at 8:6-7); *see* 33 U.S.C. § 1313(c)(2)(A) ("water quality standards shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters . . ."; 40 C.F.R. § 131.3 ("Water quality standards are provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses."); *Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 673 F.3d 880, 885, 887 (9th Cir. 2011), rev'd on other grounds, *Los Angeles Cnty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*, 568 U.S. 78 (2013) (distinguishing between "effluent limitations" and "water quality standards" and explaining that "the regional boards' water quality plans, called 'basin plans,' must address the beneficial uses to be protected as well as water quality objectives"). Additionally, this Court has agreed that background data may be relevant to determining whether Defendants' discharges from the Facility caused or contributed to an exceedance of Provision D of the Small MS4 Permit. (Order Re: Defendants' MSJ (ECF 103) at 22:13-16.)

> ### i.   MUN Inapplicable, Therefore, MCL And CTR Water Quality Standards Are Irrelevant.

As discussed above, the MUN beneficial use designation does not apply to Mule Creek, as Mule Creek is a tributary of the stretch of surface waterbody from the Camanche Reservoir to the Delta that his not designated MUN, and tributaries receive the beneficial use designations of their downstream receiving water body. (*See* Basin Plan at 2-3, 2-11, Figure 2-1 at 2-6.) Here, because MUN does not apply, the water quality standards for drinking water supply put forward by Plaintiffs, i.e., the MCLs and the CTR, also do not apply.[15]

---

[15] For ease: *See* Basin Plan section 3.1.3 at 3-3, identifying MCLs applicable to drinking water: "water designated for use as domestic or municipal supple (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) […]."

   *See* Basin Plan section 4.1.8 Drinking Water Policy at 4-7 and 4-8, citing to Section 4.2.1.1.15 and the Policy for Implementation of Toxics Standards for Inland Surface Waters, Enclosed Bays, and Estuaries of California; a.k.a. State Implementation Plan or SIP; see also Basin Plan section 4.2.1.1.15, stating the SIP is the State Water Board's

ii.     *The Regional Board Has Not Made A Formal Determination That The Facility Caused Or Contributed To An Exceedance Of WQS, And If It Did, The Permit Would Require The Facility To Engage In The Iterative Process.*

The Regional Board has not made a formal determination that the Facility has caused or contributed to an exceedance of water quality standards in Mule Creek. The MS4 Fact Sheet explains that:

> "This Order accordingly prohibits discharges that cause or contribute to violations of water quality standards. Consistent with federal law, the State Water Board has also found it appropriate to require implementation of BMPs in lieu of numeric water quality-based effluent limitations and further, in lieu of "strict compliance" with water quality standards, has prescribed an iterative process of BMP improvement to achieve water quality standards. (State Water Board Orders WQ 91-03, 98-01, 2001-15; 40 C.F.R. §122.44(k).) As a result, this Order further sets out that, <u>upon determination</u> that a Permittee is causing or contributing to an exceedance of applicable water quality standards, the Permittee must engage in an iterative process of proposing and implementing additional control measures to prevent or reduce the pollutants causing or contributing to the exceedance.

(Basin Plan, Section XI, Receiving Water Limitations at 22-23 (emphasis added).)

Even if the Regional Water Board had made such a determination, the Facility would be required to engage in the iterative process of proposing and implementing BMPs to address the pollutants thought to be causing or contributing to the exceedance. However, the Facility is already engaged in the iterative process with the Regional Water Board, and it would be imprudent for the Court to interfere with that process and impose injunctive relief that could vary from what the stormwater experts at the Regional Water Board, as the agency vested with authority to oversee implementation of the Permit, might request of the Facility through the iterative process.[16]

iii.    *Plaintiffs Failed To Consider Background Contributions.*

As discussed above, State Water Board Resolution No. 68-16 requires the maintenance of the existing high quality of water (i.e., "background") unless a change in water quality "will be consistent with maximum benefit to the people of the State...." (State Water Board Resolution No.

---

policy establishing the California Toxics Rule (40 CFR 131.38) as applicable to drinking water supply, Basin Plan at 4-15.

[16] As with the Provisions B.3, Defendants submit that any injunctive relief sought by Plaintiffs regarding the Receiving Water Limitations Provision of the Permit would be duplicative of such efforts and involves complex issues that the Court should defer to the Regional Water Board's technical expertise under the primary jurisdiction doctrine. *See Montgomery Enviro. Coalition Citizen Coordinating Comm*, 607 F. 2d at 380.

68-16; *see also* Basin Plan, Section 4.2.2.1.9 at 4-27.) As the Basin Plan explains, "[m]aintenance of the existing high quality of water means maintenance of 'background' water quality conditions, i.e., the water quality found upstream or upgradient of the discharge, unaffected by other discharges." (Basin Plan, Section 4.2.2.1.9 at 4-28.) Also, according to the Basin Plan, "the water quality objectives do not require improvement over naturally occurring background concentrations. In cases where the natural background concentration of a particular constituent exceeds an applicable water quality objective, the natural background concentration will be considered to comply with the objective." (*Id.* at 4-27-4-28.) Consistent with this, the Court determined background contributions may be relevant to determining whether the Facility's discharges caused or contributed to an exceedance of Provision D. (Order Re: Defendants' MSJ (ECF 103) at 22.)

Plaintiffs do not have sufficient data to prove that Mule Creek's water quality standards were exceeded after the filing of the first complaint, much less that MCSP's Small MS4 caused or contributed to such exceedances. Determining whether a given waterbody's Receiving Water Limitations have been exceeded depends on assessing a robust data set consisting of samples collected from the waterbody itself, not on a handful of samples collected from a single sampling point from within a stormwater collection system (i.e., from within the Facility's Small MS4) without taking into account contributions from background sources.

Plaintiffs have not accounted for background sources of pollutants in CDCR's stormwater and in Mule Creek itself. As Plaintiffs have not collected data to confirm the background contributions, they will be unable to present any such evidence at trial.

> iv.    There Is No Evidence Mule Creek's Beneficial Uses Are Impaired.

As discussed in detail above, there is no assessment data for Mule Creek on the Water Board's 303(d) List for 2020-2022, the current watershed impairment list for the area. There is assessment data for Dry Creek, which is the next waterbody receiving flows from Mule Creek, but the Regional Water Board did not designate Dry Creek as impaired. Further, Plaintiffs have not identified any evidence proving that Mule Creek's beneficial uses are impaired by the Facility's stormwater discharges.

For all of the above reasons, Plaintiffs cannot meet their burden of proof to establish that

Defendants caused or contributed to an exceedance of any water quality standards applicable to Mule Creek in violation of Provision D of the Small MS4 Permit.

## IV.  <u>RELIEF SOUGHT</u>

Defendants seek a ruling from the Court that CSPA lacks organizational standing based upon new evidence obtained during discovery. Defendants also seek judgment in their favor as to any remaining claims and an appropriate award of costs and attorney's fees pursuant to 33 United States Code section 1365(d).

## V.  <u>CONCLUSION</u>

Based on the foregoing, and based upon the evidence and argument that will be presented at trial, the Court should rule in favor of Defendants as to CSPA's failure to establish organization standing, and dismiss CSPA's claims as a matter of law. Plaintiffs will be unable to carry their burden of proof on their claims and will not prevail at trial, and Defendants reserve all rights to raise and bring to the Court's attention any additional pertinent facts and points of law as issues arise during trial that were not previously anticipated.

Dated: April 4, 2023                          Respectfully submitted,

                                              HARTMAN KING PC


                                              By: _____
                                                   JENNIFER HARTMAN KING
                                                   ALANNA LUNGREN
                                                   J.R. PARKER
                                                   ANDREYA WOO NAZAL
                                              Attorneys for Defendants
                                              JEFFREY MACOMBER, in his official capacity as Secretary of the California Department of Corrections and Rehabilitation; and PATRICK COVELLO, in his official capacity as Warden of California Department of Corrections and Rehabilitation Mule Creek State Prison

**DEFENDANTS' TRIAL BRIEF**

EXHIBIT A



MULE CREEK
STATE PRISION

Mule Creek

Sutter Creek

Jackson Creek

Dry Creek

Mokelumne River
(Basin Plan Designation 60: Sources to Pardee Reservoir)

Pardee Reservoir
(Basin Plan Designation 61: Pardee Reservoir)

Camanche Reservoir
(Basin Plan Designation 62: Camanche Reservoir to Delta)

Delta

Mokelumne River
(Basin Plan Designation 63: Camanche Reservoir to Delta)

0  1  2      4
Miles

Delta Waterways (central portion)
Pardee Reservoir
Camanche Reservoir
Mokelumne River
Dry Creek
Mule Creek
Jackson Creek
Sutter Creek

Source: Esri, Maxar, Earthstar Geographics, and the GIS User Community

# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ROBERT T. MATSUI FEDERAL COURTHOUSE


| | |
|---|---|
| CALIFORNIA SPORTFISHING<br>PROTECTION ALLIANCE,<br><br>           Plaintiff,<br><br>      vs.<br><br>KATHLEEN ALLISON, etc.,<br><br>           Defendants. | )<br>)<br>)<br>) Case No.<br>)<br>) 2:20-cv-02482-<br>) WBS-AC<br>)<br>)<br>) |



DEPOSITION OF EDMUND TAYLOR

TETONIA, IDAHO

Wednesday, September 28, 2022












REPORTED BY:

Theresa Nadeau, CSR No. 10526


JOB NO. 76832

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3                ROBERT T. MATSUI FEDERAL COURTHOUSE

4
    CALIFORNIA SPORTFISHING                )
5   PROTECTION ALLIANCE,                   )
                                           )
6                    Plaintiff,            )
                                           ) Case No.
7            vs.                           )
                                           ) 2:20-cv-02482-
8   KATHLEEN ALLISON, etc.,                ) WBS-AC
                                           )
9                    Defendants.           )
                                           )
10

11

12

13          Deposition of EDMUND TAYLOR, taken remotely via

14   Zoom videoconference, on behalf of Defendants, with the

15   witness being outside the physical presence of the court

16   reporter, at 10:05 a.m. on Wednesday, September 28,

17   2022, before Theresa Nadeau, Certified Shorthand

18   Reporter No. 10526.

19

20

21

22

23

24

25

EDMUND TAYLOR

September 28, 2022

```
 1                         APPEARANCES

 2
     FOR THE PLAINTIFF CALIFORNIA SPORTFISHING PROTECTION
 3   ALLIANCE:

 4          LAW OFFICES OF ANDREW L. PACKARD
            BY:  WILLIAM N. CARLON
 5          245 Kentucky Street, Suite B3
            Petaluma, California 94952
 6          (707) 782-4060
            wncarlon@packardlawoffices.com
 7
     FOR THE DEFENDANTS:
 8
            HARTMAN KING, PC
 9          BY:  ALANNA LUNGREN
            520 Capitol Mall, Suite 750
10          Sacramento, California  95814-7530
            (916) 379-7530
11          alungren@hartmankinglaw.com

12          CDCR OFFICE OF LEGAL AFFAIRS
            BY:  ERIC PAPATHAKIS
13          1515 S Street
            Sacramento, California  95811
14          Eric.Papathakis@cdcr.ca.gov

15

16   Also present:  Peggy Donnelly, First Legal tech

17

18

19

20

21

22

23

24

25
```

**EDMUND TAYLOR**

September 28, 2022

```
 1               I N D E X

 2   WITNESS

 3   EDMUND TAYLOR

 4   Examination by:                        Page

 5    Ms. Lungren                           5

 6

 7

 8

 9

10               E X H I B I T S

11   Number          Description            Page

12   Exhibit 1        Defendant's Second Amended Subpoena   12

13                    dated September 22, 2022

14   Exhibit 1A       Subpoena to testify dated August      12

15                    26, 2022

16   Exhibit 1B       Subpoena to testify dated September   13

17                    6, 2022

18   Exhibit 2        June declaration of Edmund Taylor     44

19   Exhibit 3        August supplemental declaration of    49

20                    Edmund Taylor

21   Exhibit 4        Google Earth image                    53

22   Exhibit 5        Google Earth image                    62

23   Exhibit 6        Receipt for CSPA membership           76

24   Exhibit 7        E-mail                                77

25
```

**EDMUND TAYLOR**

September 28, 2022

```
 1              QUESTIONS INSTRUCTED NOT TO ANSWER
 2  Page 15, Line 4:  "Do you communicate -- have you been
 3  communicating daily with counsel for CSPA?"
 4
 5  Page 18, Line 17:  "When did you make that request?"
 6
 7  Page 21, Line 23:  "Did counsel for CSPA ask you if you
 8  could reschedule the appointment so you could still
 9  attend your September 21st deposition?"
10
11  Page 22, Line 18:  "Did anyone ask you if you could be
12  available to participate in your deposition on September
13  22nd or 23rd?"
14
15  Page 23, Line 14:  "Did anyone ask you what days you
16  were available this current week for your rescheduled
17  deposition the week of September 26th?"
18
19  Page 87, Line 17:  "What did you speak about?"
20
21
22
23
24
25
```

```
 1                    TETONIA, IDAHO
 2        Wednesday, September 28, 2022, 10:05 a.m.-2:48 p.m.
 3
 4                    EDMUND TAYLOR,
 5             a witness herein, having been
 6             administered the oath by the
 7             court reporter, was examined
 8             and testified as follows:
 9
10                 E X A M I N A T I O N
11
12  BY MS. LUNGREN:
13      Q.   Good morning, Mr. Taylor.  Can you please state
14  your name for the record.
15      A.   Edmund Taylor.
16      Q.   My name is Alanna Lungren.  I'm with the law
17  firm Hartman King PC, and we represent defendants in
18  this matter.  Also appearing at this deposition is our
19  client representative Eric Papathakis.  Thank you for
20  appearing today.
21           And you just testified that you are currently
22  joining this deposition from Tetonia, Idaho.  Did I get
23  that correctly?
24      A.   Yes.
25      Q.   So just to begin with I'm going to go through a
```

**EDMUND TAYLOR**

**September 28, 2022**

1  permanent residence and our driver's license and

2  everything to Ione, and I'd have to go check my records

3  when we did that.

4      Q.   Was it before March of 2020 or after?

5      A.   Could have been.

6      Q.   What do you grow on the ranch?

7      A.   We raise pigs, chickens, turkeys, lamb.  Those

8  are our main, if you will, sources of revenue.  And now,

9  actually, hay.

10     Q.   When did you begin growing hay?

11     A.   This is our first year of growing and selling

12  hay commercially.

13     Q.   2022 is?

14     A.   Yeah.  This is 2022.

15     Q.   What kind of hay do you plant?

16     A.   We don't plant.  It's grass hay.  It's

17  perennial.

18     Q.   Who do you sell your hay to?

19     A.   We sell it to individual farmers and a -- I

20  guess you'd call her a hay broker, a hay salesperson who

21  then resells it.

22     Q.   How many cuttings did you have this year?

23     A.   Only one cutting, I believe.  Yes.

24     Q.   Do you sell your livestock to customers?

25     A.   Yes.

1      A.   Yes.

2      Q.   Is the grass irrigated from Dry Creek?

3      A.   Yes.

4      Q.   Is your statement in your declaration correct

5  that you raise livestock with a regenerative approach

6  and try to incorporate sustainable practices --

7      A.   Yes.

8      Q.   -- and that clean water is a keystone of your

9  management?  Is that still correct?

10     A.   Yes.

11     Q.   You testified in your declaration that the

12 ranch draws irrigation water from Dry Creek.  How much

13 water do you draw from Dry Creek for irrigation?

14         MR. CARLON:  Objection, vague.

15 BY MS. LUNGREN:

16     Q.   Do you understand the question?

17     A.   Yes.

18     Q.   You may answer the question.

19     A.   We draw water from the creek.  I don't have the

20 exact records in front of me, but to flood irrigate

21 takes, you know, several thousand gallons to do.

22     Q.   Is there a water right that the property holds?

23     A.   Yes.

24     Q.   What's the nature of that water right?

25     A.   It's a riparian right.

**EDMUND TAYLOR**

**September 28, 2022**

1          MR. CARLON:  I'll repeat my objection.

2          THE WITNESS:  I don't know how I would know I

3   was not directly affected.  I was obviously fearful that

4   I was directly affected, otherwise I wouldn't even be

5   here.

6   BY MS. LUNGREN:

7      Q.   When you say that you were fearful you were

8   directly affected, what were you affected by?

9      A.   A statement that I read saying there is

10  possible discharges of pollutants coming from the

11  prison.  We're downstream.  We drink that water.

12  Theoretically in the water table, especially when the

13  river floods, and we irrigate with that water.  That's

14  pretty scary to me if it indeed contains pollutants that

15  are harmful.

16     Q.   At this point when you received this e-mail

17  from Ms. Evatt, you -- did you think before you received

18  this e-mail that you were directly affected by any

19  alleged discharge from Mule Creek State Prison?

20          MR. CARLON:  Objection, vague.

21          THE WITNESS:  I've been -- yeah, I've been

22  concerned for years based on rumors in the county, and

23  then when it hit the news website, it made me even more

24  concerned.

25  BY MS. LUNGREN:

**EDMUND TAYLOR**

**September 28, 2022**

1      Q.     When what hit the news website?

2      A.     The discharge -- can't remember which one.  I'd

3   have to go back through the articles.  I put it in my

4   declaration.  It's either 2018 or 2020.

5      Q.     In Ms. Yvette's e-mail she says so if you're

6   interested in that, let her know, referring to her

7   statement above that CSPA will need standing witnesses.

8   She goes on to state, "No huge rush, but if you want to

9   do this, let me know the best way for them to reach you

10   and I'll pass on your info.  You'd have to join CSPA

11   which you can do online, or if you don't want to pay, by

12   filling out a form and mailing it to ED Bill Jennings

13   with whom we've worked for three decades."  Did you

14   respond to Ms. Yvette's August 18th, 2020 e-mail?

15      A.     I believe I did.  Yes.

16      Q.     How did you respond?

17      A.     Not having the e-mail in front of me, I believe

18   I would have responded that I was interested and please

19   make an introduction.

20      Q.     So it sounds like you responded to Ms. Evatt by

21   e-mail?

22      A.     Either by e-mail or by phone.

23      Q.     Which one was it?  By e-mail or by phone?

24      A.     I don't recall.  Possibly both.

25      Q.     Did you produce an e-mail response to defendant

1  BY MS. LUNGREN:

2      Q.   You may answer.

3      **A.   It's a big long list of documents that CSPA**

4  **counsel, I guess, sent to you guys and I read -- it's a**

5  **long list.  I read through them, yes.**

6      Q.   So it's your understanding that these news

7  articles that you read and that form the basis of your

8  worry that there is a problem with the water in Dry

9  Creek, you produced those documents to defendant,

10  correct?

11      **A.   I believe so, yes.**

12      Q.   You said you walk along Dry Creek and do bird

13  hunting.  When's the last time you did those activities?

14      A.   Walk several times a week.  Bird hunting not

15  for, gosh, probably since my father-in-law died like

16  three or four years ago.

17      Q.   Have you ever become ill from swimming in Dry

18  Creek?

19      **A.   No.  Well, I did once a long time ago.  I drank**

20  **the water, so -- but that was about 30 years ago.**

21      Q.   When was the earliest point in time that you

22  became aware of what you call you're worried about in

23  Dry Creek?

24      **A.   I'd been hearing rumors for years, but until**

25  **the articles came out in the Ledger news I didn't have**

1  enough mental brain power to let that worry go too far.

2      Q.   What was the date of the article when you first

3  read it?

4      A.   I read multiple articles so I'd have to go

5  through the list.  I read one a couple weeks ago.  I

6  believe I read one in 2020.  I might have read one in

7  2018, 2019.  I don't clip and save the articles when I

8  read them.  I just consume them and then --

9      Q.   You testified that your ranch pulls water from

10  Dry Creek to irrigate the various crops on the ranch

11  property including your hay.  Have you ever observed any

12  negative impacts to your crops on the ranch property?

13          MR. CARLON:  Objection, vague.

14  BY MS. LUNGREN:

15      Q.   Do you understand my question?  Have you ever

16  observed any negative impacts on your crops as a result

17  of the Dry Creek irrigation water?

18          MR. CARLON:  Objection, vague.

19          THE WITNESS:  My short answer would be we've

20  only done hay one year, so it's been less than six

21  months so there's not enough historical data there, and

22  the rest are livestock, so I mean we -- livestock die.

23  We don't do a post-mortem on all of them, but our sheep

24  sometimes die, our chickens.  I mean it's part of

25  farming.  But was it caused by the irrigation water?

 1  Was it caused by something else?  I don't know.

 2  BY MS. LUNGREN:

 3      Q.   So you have no information that irrigation

 4  water that you pull from Dry Creek has harmed your

 5  livestock in any way, do you?

 6           MR. CARLON:  Objection, misstates prior

 7  testimony.

 8  BY MS. LUNGREN:

 9      Q.   You can answer.

10      A.   I -- same answer as before.  I don't have any

11  evidence, so --

12      Q.   So you'd just be speculating if you were trying

13  to say that irrigation water from Dry Creek caused any

14  harm to crops or livestock, correct?

15           MR. CARLON:  Objection, argumentative and

16  misstates prior testimony.

17  BY MS. LUNGREN:

18      Q.   Did I characterize your testimony correctly?

19           MR. CARLON:  Objection, vague.

20           THE WITNESS:  I don't have anything else other

21  than what I just said, so --

22  BY MS. LUNGREN:

23      Q.   And you testified that you have no evidence

24  that irrigation water that you pull from Dry Creek has

25  caused any harm to any of your crops or livestock,

**EDMUND TAYLOR**

**September 28, 2022**

1       Q.    So as we sit here right now, you are unable to

2   recall any other document other than a February 2018

3   Ledger article for your understanding that high levels

4   of pollutants including bacteria, metals and

5   pharmaceuticals are allegedly in Mule Creek discharges?

6       **A.    There could have been other articles and**

7   **reports.  I apologize.  After however many hours, my**

8   **brain is a little worn out now, and I'd go through all**

9   **those documents, but I stand by what I put in my**

10  **declaration.**

11      Q.    In your declaration you state that you're

12  concerned that those pollutants come into contact with

13  the crops that you grow on the ranch and that the

14  pollutants are ingested by the livestock that you raise.

15  Is that statement still correct today?

16      **A.    Yes.**

17      Q.    You testified earlier that the water you use to

18  irrigate your hay and your other crops and your

19  livestock is from Dry Creek, correct?

20      **A.    Yes.**

21      Q.    Have you ever had the Dry Creek irrigation

22  water you use analyzed?

23      **A.    Not yet.**

24      Q.    Are you planning to?

25      **A.    I'm planning on testing the creek water and all**

**EDMUND TAYLOR**

**September 28, 2022**

```
 1      Q.   You can answer.
 2      A.   Yes.
 3      Q.   Have you ever had water out of Mule Creek,
 4   where Mule Creek runs by Mule Creek State Prison
 5   analyzed?
 6      A.   No.
 7      Q.   Have you ever had any water out of Mule Creek
 8   analyzed?
 9           MR. CARLON:   Objection, vague.
10   BY MS. LUNGREN:
11      Q.   Do you understand my question?
12      A.   Yes.
13      Q.   You've never had water out of Mule Creek
14   analyzed, correct?
15           MR. CARLON:   Objection, vague.
16           THE WITNESS:   Yes.
17   BY MS. LUNGREN:
18      Q.   You never had water out of Mule Creek where
19   Mule Creek meets Dry Creek analyzed, correct?
20           MR. CARLON:   Objection, vague, asked and
21   answered.
22   BY MS. LUNGREN:
23      Q.   Do you understand my question?
24      A.   Yes.  I have not.
25      Q.   You have no evidence that Mule Creek at the
```

1  location where it meets Dry Creek contains pollutants,

2  do you?

3          MR. CARLON:  Objection, argumentative.

4  BY MS. LUNGREN:

5      Q.   You can answer.

6      **A.   It's a massively loaded question, so I don't --**

7  **I don't have water tests, no.**

8      Q.   You have no evidence?

9      **A.   I physically couldn't get them because that**

10  **would be trespassing.**

11     Q.   You previously testified that you have gone up

12  to the junction of Mule Creek and Dry Creek frequently.

13  Didn't you testify to that?

14     A.   Yes.   Over the last 20, 30 years, yeah.

15     Q.   You have no evidence that there are any

16  pollutants from Mule Creek that flow into Dry Creek, do

17  you?

18          MR. CARLON:  Objection, leading, misstates

19  prior testimony, argumentative.

20  BY MS. LUNGREN:

21     Q.   You can answer.

22     A.   I personally don't have any evidence.

23     Q.   Are you aware of any evidence that there are

24  pollutants from Mule Creek that flow into Dry Creek?

25          MR. CARLON:  Objection, vague.

**EDMUND TAYLOR**

**September 28, 2022**

 1  water is polluted, we're putting it on our crops and

 2  feeding it to our animals, that that would be unhealthy

 3  for both the crops and the animals.

 4      Q.    You just testified that you have no evidence

 5  that there are any pollutants from Mule Creek reaching

 6  Dry Creek, correct?

 7            MR. CARLON:   Objection, misstates prior

 8  testimony.

 9  BY MS. LUNGREN:

10      Q.    You can answer.

11      A.    No, I think I used the word assumption, and I

12  was trying to be clear there that it's my personal

13  assumption and fear that that could be happening.

14      Q.    So you are not relying on any documents or

15  information that there is actually a reduction in

16  quality of your hay and livestock as a result of an

17  alleged discharge of pollutants into Mule Creek; is that

18  correct?

19            MR. CARLON:   Objection, compound, vague.

20  BY MS. LUNGREN:

21      Q.    Do you understand the question?

22      A.    Yeah, and I don't have another answer.  Just

23  what I said before.

24      Q.    And what you said before was it's just an

25  assumption of yours, correct?

1       **A.     A fear and an assumption.   Yes.**

2       Q.    And that assumption and fear is not based on

3    any documents or evidence that you're aware of, correct?

4            MR. CARLON:   Objection, misstates prior

5    testimony, compound, vague.

6    BY MS. LUNGREN:

7       Q.    You may answer.

8       **A.    Same thing I said before.**

9       Q.    That your assumption and fear is not based on

10   any evidence, correct?

11           MR. CARLON:   Objection, misstates prior

12   testimony.

13           **THE WITNESS:   I don't have any more information**

14   **to add to that answer.**

15   BY MS. LUNGREN:

16      Q.    Respectfully, Mr. Taylor, you have not given me

17   an answer to my last couple of questions.  You keep

18   referring back to your old answer, and this is a

19   slightly different question.

20           So it's true, isn't it, that you're relying on

21   only your assumptions that there is an alleged reduction

22   of quality in your hay and livestock as a result of

23   alleged discharge of pollutants into Mule Creek,

24   correct?

25      **A.    Yes.**

**EDMUND TAYLOR**

**September 28, 2022**

1  BY MS. LUNGREN:

2      Q.   You stated in your declaration that discharges

3  of pollutants into Mule Creek negatively impacts how you

4  recreate on the ranch and that you regularly hunt duck,

5  dove, quail on the ranch.  You were concerned that the

6  animals you hunt are ingesting the chemicals and

7  pollutants discharged from Mule Creek State Prison

8  because they rely on waters downstream of the prison's

9  discharges.  Is that statement correct today?

10     A.   Yes.

11     Q.   Have you been hunting for a long time?

12     A.   I haven't hunted the last three or four years

13  because most of the birds are along the creek and I'm

14  afraid they're drinking the water, but before that I was

15  hunting there for almost 30 years.  25 years.

16     Q.   Are there other reasons that you have stopped

17  hunting on the ranch property?

18     A.   That's the main one.  I don't want to eat a

19  bird that's been drinking out of the creek.

20     Q.   Is that because you're concerned there are

21  pollutants in the creek?

22     A.   Yes.

23     Q.   What do you attribute those pollutants to?

24     A.   Possible water flows coming downstream Mule

25  Creek Prison that might have pollutants in them.

**EDMUND TAYLOR**

**September 28, 2022**

1    Q.   Are you aware that there are a few mining

2    quarries in the area around your ranch?

3    A.   Yes.

4    Q.   What quarries are you aware of are in your area

5    around your property?

6    A.   They keep changing the name, but the only

7    really active one is SGI.  And then there's dozens of

8    ones that are shut down, so -- but SGI's the main one.

9    Q.   What steps have you taken to look into whether

10   any of the mining activity in the area has contributed

11   to any pollutants in Dry Creek that you believe are

12   there?

13   A.   Other than reading on the Internet, I haven't

14   done much more than that.

15   Q.   So you've stopped hunting on a property you've

16   hunted on for decades because you believe there are

17   pollutants in Dry Creek, but you've never had the water

18   analyzed?

19   A.   Correct.

20   Q.   In your declaration you state that you're

21   concerned that Mule Creek State Prison's continuing

22   discharges of pollutants into Mule Creek will require

23   expensive filtration technology such as settlement

24   tanks, particulate filters and ionization treatment to

25   make the water safe for regenerative ranching purposes.

1  believe you're using polluted water on your hay that

2  they feed to their animals?

3      A.    No.

4      Q.    You don't inform your customers that you

5  believe you're using polluted water to raise animals for

6  their consumption for food?

7      A.    No.   All our livestock is USDA processed and

8  certified.

9      Q.    Is that because you actually don't know if your

10  water from Dry Creek is polluted or not?

11      A.    Probably.   Yes.

12      Q.    You stated in your declaration that you were

13  concerned that the property value of the ranch could be

14  diminished because the ranch's primary source of

15  irrigation is routinely polluted by discharges from Mule

16  Creek State Prison.   Without a clean source of water

17  with which to irrigate, the ranch cannot properly

18  realize its highest economic value.   What information

19  are you relying on for your belief that the water is

20  routinely polluted by discharges from Mule Creek State

21  Prison?

22      A.    Same articles I referenced on the Internet from

23  the Ledger news.

24      Q.    When did you gather that information?

25      A.    Same question -- same answer I've given you

**EDMUND TAYLOR**

**September 28, 2022**

1 several dozen times.  Starting in 2018 by reading

2 articles.

3      Q.   Have you gathered information about your

4 property value in order to assess whether the alleged

5 polluted Dry Creek water is diminishing the property

6 value?

7      A.   No.  We had an appraisal done when we purchased

8 it, and I just had appraisal for a loan, so --

9      Q.   Did that appraisal take into account your

10 beliefs that the water from Dry Creek is polluted?

11     A.   No.

12     Q.   It's true then you have no information that

13 demonstrates there's a diminished property value based

14 on an alleged pollution of Dry Creek, correct?

15          MR. CARLON:  Objection, misstates prior

16 testimony.

17          THE WITNESS:  Yes.

18 BY MS. LUNGREN:

19     Q.   You testified that you and your family consume

20 the livestock that you raise on the ranch, correct?

21     A.   Yes.

22     Q.   You don't have a concern then that the alleged

23 pollutants in Dry Creek that help raise your livestock

24 would harm your family, do you?

25          MR. CARLON:  Objection, misstates his

1              REPORTER'S CERTIFICATE

2              I, Theresa Nadeau, do hereby certify:

3              That I am a licensed, Certified Shorthand

4    Reporter, duly qualified and certified as such by the

5    State of California;

6              That prior to being examined, the witness

7    named in the foregoing deposition was by me duly sworn

8    to testify to the truth, the whole truth and nothing but

9    the truth;

10             That the said deposition was by me recorded

11   stenographically at the time and place first therein

12   mentioned; and the foregoing pages constitute a full,

13   true, complete and correct record of the testimony given

14   by the said witness;

15             That I am a disinterested person, not being in

16   any way interested in the outcome of said action, nor

17   connected with, nor related to any of the parties in

18   said action, or to their respective counsel, in any

19   manner whatsoever.

20             Dated this 4th day of October, 2022.

21

22

23

24

25        Theresa Nadeau, CSR No. 10526

EXHIBIT C

```
             UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF CALIFORNIA
            ROBERT T. MATSUI FEDERAL COURTHOUSE


                    ---oOo---


CALIFORNIA SPORTSFISHING        )
PROTECTION ALLIANCE,            )
                                )
            Plaintiff,          )
                                )
            vs.                 ) No. 2:20-CV-02482-WBS-AC
                                )
KATHLEEN ALLISON, in her        )
official capacity as Secretary of)
the California Department of     )
Corrections and Rehabilitation,  )
                                )
            Defendants.          )
_____)
COUNTY OF AMADOR, A PUBLIC       )
AGENCY OF THE STATE OF           )
CALIFORNIA,                      )
                                )
            Plaintiff,          )
                                )
            vs.                 ) No. 2:21-CV-0038-WBS-AC
                                )
KATHLEEN ALLISON, in her        )
official capacity as Secretary of)
the California Department of     )
Corrections and Rehabilitation;  )
PATRICK COVELLO in his official  )
capacity of Warden of California )
Department of Corrections and    )
Rehabilitation Mule Creek State  )
Prison,                          )
                                )
            Defendants.          )
_____)


            DEPOSITION OF DR. ROBERT EMERICK
              SAN FRANCISCO, CALIFORNIA
                 SEPTEMBER 30, 2022


REPORTED BY: OLIVIA M. RENDON, CSR 14306
JOB NO. 76840
```

**DR. ROBERT EMERICK**

**September 30, 2022**

```
1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF CALIFORNIA

3             ROBERT T. MATSUI FEDERAL COURTHOUSE

4                        ---oOo---

5    CALIFORNIA SPORTSFISHING          )
     PROTECTION ALLIANCE,              )
6                                      )
                     Plaintiff,        )
7                                      )
               vs.                     ) No. 2:20-CV-02482-WBS-AC
8                                      )
     KATHLEEN ALLISON, in her          )
9    official capacity as Secretary of)
     the California Department of      )
10   Corrections and Rehabilitation,   )
                                       )
11                   Defendants.       )
     _____  )
12   COUNTY OF AMADOR, A PUBLIC        )
     AGENCY OF THE STATE OF            )
13   CALIFORNIA,                       )
                                       )
14                   Plaintiff,        )
                                       )
15             vs.                     ) No. 2:21-CV-0038-WBS-AC
                                       )
16   KATHLEEN ALLISON, in her          )
     official capacity as Secretary of)
17   the California Department of      )
     Corrections and Rehabilitation;  )
18   PATRICK COVELLO in his official   )
     capacity of Warden of California  )
19   Department of Corrections and     )
     Rehabilitation Mule Creek State   )
20   Prison,                           )
                                       )
21                   Defendants.       )
     _____  )
22

23

24
     REPORTER: OLIVIA M. RENDON, CSR 14306
25   FILE NO.:  76840
```

```
 1                 A P P E A R A N C E S

 2

 3    FOR DEFENDANTS:

 4
             HARTMAN KING PC
 5           BY: WILLIAM D. MARSH

 6           520 CAPITOL MALL, SUITE 750
             Sacramento, CA 95814
 7
             (916)379-7530
 8           WMarsh@HartmanKingLaw.com

 9

10
      FOR PLAINTIFF:
11
             LAW OFFICES OF ANDREW L. PACKARD
12           BY: ANDREW L. PACKARD

13           245 Kentucky Street, Suite B3
             Petaluma, CA 94952
14
             (707) 787-7033
15           andrew@packardlawoffices.com

16

17

18    FOR COUNTY OF AMADOR:

19           BEST, BEST & KRIEGER
             BY: WEILAND CHIANG
20
             2001 N. Main Street, Suite 300
21           Walnut Creek, CA 94596

22           (925)977-3336
             weiland.chiang@bbklaw.com
23

24

25
```

**DR. ROBERT EMERICK**

September 30, 2022

```
 1                    I N D E X

 2   EXAMINATION                                    PAGE

 3   EXAMINATION BY MR. MARSH                          5

 4

 5

 6

 7                    ---oOo---

 8                  E X H I B I T S

 9   EXHIBIT         DESCRIPTION               PAGE

10   Exhibit 1    Subpoena                         14

11   Exhibit 2    Expert Disclosure                15

12   Exhibit 3    Bates Stamp MCSP0032459-MCSP0032464   114

13                E-mail from Patrick Palupa to Steve

14                Weisburg

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              SAN FRANCISCO, CALIFORNIA

 2            FRIDAY, SEPTEMBER 30TH, 2022

 3                    ---oOo---

 4    BE IT REMEMBERED that set on Friday on the 30th of

 5       September, 2022, at the hour of 9:59 a.m., at

 6   601 Montgomery Street, Suite 1110, San Francisco, CA 94111,

 7   before me, Olivia M. Rendon, CSR NO. 14306, a Certified

 8   Shorthand Reporter, personally appeared

 9                   DR. ROBERT EMERICK,

10   having been called by the DEFENDANTS, who, being first

11    duly sworn, was thereupon examine and testified as

12                 hereinafter set forth.

13                    ---oOo---

14             E X A M I N A T I O N

15   BY MR. MARSH:

16       Q.  All right.  Welcome, Dr. Emerick.  Appreciate

17   you coming in for your deposition today.  My name is

18   William Marsh, and, as you know, I represent the

19   defendants in this matter.  And, of course, you're

20   represented by counsel here.  And county counsel is also

21   present.

22          Let me just ask, have you had your deposition

23   taken before?

24       A.  Never.

25       Q.  Never.  First one.  All right.  Well,
```

1     Q.   I'm sorry.  Did I say Exhibit 1?  Still on

2  Exhibit 2.

3     A.   Okay.

4     Q.   It's been marked as Exhibit 1 within

5  Exhibit 2.  Your actual expert opinion report.

6     A.   Okay.

7     Q.   So I would like to ask you a few questions

8  about your expert opinion report.

9          What did you find to be the purpose behind

10  preparing this report?

11     A.   You think that would be an easy question.  But

12  I was told that in every legal case of this case, this

13  type of pattern, that when you have an expert witness,

14  they're required to do an expert opinion report.  So

15  they said, could you please prepare one for me?  So I

16  thought that was, kind of, required of the process.

17     Q.   Okay.  And then I see that you essentially

18  provided three opinions.  Just focusing on the first

19  opinion.  Where you say, "discharges occur through the

20  Mule Creek Storm Water Conveyance System," what do you

21  mean by "through the system"?

22     A.   I believe that the water that flows through

23  the storm water conveyance system has some sewage

24  component to it, to date, has not been fully quantified.

25  I don't know exactly, maybe, if I understand your

1    question.  But the system is the storm water system, and

2    that there is at least some sewage that is flowing

3    through that system.

4         Q.   Okay.  And when you say "flowing through that

5    system," do you necessarily mean being discharged into

6    Mule Creek, or just through the literal system?

7         A.   I believe I have seen a discharge up to Mule

8    Creek, but I did not personally view it going into Mule

9    Creek.  I did my two facility inspection on dry days,

10   so, in theory, that system should have been dry.  And I

11   saw water up to -- here's Mule Creek, here's a pipe, and

12   then the water was down here (indicating).  It did not

13   go over into that pipe that I saw, but it was pretty

14   darn close.

15             Is that the question that you asked?

16        Q.   That's fine.  Your response is fine.  I'm just

17   trying to understand what you mean by some of these

18   words and phrases.

19        A.   Okay.

20        Q.   So I appreciate that response.  You say that

21   discharges contain a sewage component.

22             What do you mean by "component"?

23        A.   The analogy that we're taught in engineering

24   school is, if you have a barrel of sewage and you put a

25   crop of wine in it, it's sewage.  If you have a barrel

**DR. ROBERT EMERICK**

**September 30, 2022**

1    of wine and you put a drop of sewage in it, it's sewage.

2    So that means sewage has gone through, that there's

3    something -- there's a component, I do not know what its

4    fraction is.   I do not know if it's one percent,

5    .1 percent, I don't know how much.   But that you're

6    getting some waste water into that pipe.

7         Q.   Okay.   And your reference to sewage

8    specifically, what do you mean by "sewage"?

9         A.   **Water that passed through the human.**

10        Q.   Okay.

11        A.   **Untreated.**

12        Q.   And do I understand correctly that your

13   opinions are essentially laid out here in this expert

14   opinion report, but that you're not opining on whether

15   the specific small MS4 permit was violated; is that fair

16   to say?

17             MR. PACKARD:   Objection.   Vague and ambiguous

18   and calls for a legal conclusion.

19             MR. MARSH:   You can answer unless your counsel

20   instructs you not to.

21             MR. PACKARD:   You can answer the question.

22             **THE WITNESS:   Okay.**

23             MR. MARSH:   Or he instructs you to.

24             **THE WITNESS:   So what did you ask me again?**

25   **This is something new to me to where I get distracted.**

1   perfect indicator.

2           One is you have a detection limit.  And so

3   unless your -- you have a lot of sewage, you're actually

4   diluting the sewage with storm water.  And you can

5   dilute the ammonia down below the detection limit of the

6   ammonia test quicker than you can dilute out coliform or

7   E.coli, because they occur in such high numbers.  So

8   that's one particular problem.

9           The other is when you have ammonia, and you go

10  through a fixed film, then you can nitrify.  And so you

11  can get ammonia getting converted, and then you still

12  have the nitrogen present.  And then it's the process of

13  denitrification that we would blow out all the nitrogen

14  into the atmosphere.  And if you don't have a lot of

15  knowledge of the system, then you don't really know what

16  you're getting, so then you look at nitrate.  But it's

17  one of those things where it's just -- it's not a

18  reliable indicator, ammonia.  If you solve the ammonia,

19  then it's absolute guarantee.  You got ammonia, then

20  yeah, you got sewage in here.  But if you don't have

21  ammonia, it just means that you may have been diluted

22  below the detection limit of the test.  The storm water

23  component versus sewage.

24          So I never stated anywhere that I thought that

25  the sewage was 10 percent of the flow, for instance.  I

1    think it's a very, very small fraction of the flow.  But

2    that's why I don't think ammonia is the -- is the

3    tell-all.

4         Q.   Okay.  I think I understand.

5         A.   But I did look for ammonia.  The first time

6    they gave me the data, they said, do you think sewages?

7              Any good engineer would first say, let's go

8    look at the ammonia.  That's standard practice.

9         Q.   Okay.  So you looked at the ammonia data?

10        A.   Hmm-hmm.

11        Q.   All right.  And then if I understand

12   correctly, you said something to the effect that ammonia

13   gets diluted more than bacteria.

14        A.   What happens is --

15        Q.   Can explain that a bit?

16        A.   Yeah.  So coliform and sewage or E.coli, those

17   things, they occur -- and, again, I didn't go to their

18   waste water plants.  I'm talking general numbers.  Okay.

19   Ten to the sixth -- you guys probably don't use ten to

20   the six, huh?

21        Q.   No.  I use as little math as possible.

22        A.   So ten to the sixth would be about 10 million.

23   No.  1,000,000.  1,000,000 is ten to the sixth.

24        Q.   That's what I was just about say -- I was

25   going to impress you.  I thought it was a million,

1    Q.   Fair enough.

2    A.   I mean, I told you that sewage contains BOD.

3  Sewage contains solids.  Sewage contains pathogens.

4  Sewage contains chemicals.  Is that you what you're

5  asking?

6    Q.   I'm asking what you were referring to in your

7  expert report where, in opinion one, you refer to a

8  sewage component.

9    A.   Okay.  Okay.  I was just saying that -- that

10  goes back to the whole barrel of wine analogy I gave

11  you.  That there's some sewage that got mixed up with

12  the storm water, the amount of which I don't know.

13  That's all I was stating.

14    Q.   Okay.  You weren't referring to various

15  substances within the sewage?

16    A.   No.

17    Q.   Okay.

18    A.   The only thing I was asked was, as it states

19  here in the report, hey, there's this elevated coliform.

20  We, they, CSPA thinks it's human.  You or your client

21  thinks it's animals.  They said, is there a way for you

22  to determine whether it could be some human?  That was

23  my charge.  Is there a way to figure it out if there's

24  some human sewage in this?  So I looked up chemicals

25  that you would expect to find from humans and not be

```
 1                REPORTER'S CERTIFICATE

 2                     ---oOo---

 3          I, Olivia M. Rendon, a Certified Shorthand Reporter

 4     in and for the State of California, hereby certify that the

 5     witness in the foregoing deposition was by me first duly

 6     sworn to testify to the truth, the whole truth, and nothing

 7     but the truth in the within-entitled cause; that said

 8     deposition was taken at the time and place therein stated;

 9     that the testimony of the said witness was reported by me, a

10     disinterested person, and was thereafter transcribed under

11     my direction into typewriting; that the foregoing is a full,

12     complete, and true record of said testimony; and that the

13     witness was given an opportunity to read it and, if

14     necessary, correct said deposition and to subscribe the

15     same.

16          I further certify that I am not of counsel or

17     attorney for either or any of the parties in the foregoing

18     deposition and caption named, nor in any way interested in

19     the outcome of the cause named in said caption.

20          Executed this 20th day of October, 2022.

21

22

23

24               Olivia M. Rendon, CSR 14306

25
```

EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ROBERT T. MATSUI FEDERAL COURTHOUSE

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, )<br><br>            Plaintiff, )<br><br>vs. )<br><br>KATHLEEN ALLISON, etc., )<br><br>            Defendants. )<br>_____ ) | )<br>)<br>)<br>)<br>) Case No.<br>) 2:20-cv-02482-WBS-AC<br>)<br>)<br>)<br>)<br> |

REMOTE VIDEOTAPED DEPOSITION OF ELIZABETH LEE

TAKEN BY A CERTIFIED COURT REPORTER

THURSDAY, SEPTEMBER 22, 2022

at 9:05 a.m.

Reported By: LISA MAKOWSKI, CCR 345, CA CSR 13400

JOB NO:  73909

```
 1    APPEARANCES:

 2    For the Plaintiff:

 3                    AQUA TERRA AERIS LAW GROUP
                      BY:  ERICA MAHARG, ESQ.
 4                    4030 Martin Luther King Jr. Way
                      Oakland, California 94609
 5                    (916)202-3018
                      Eal@atalawgroup.com
 6

 7    For County of Amador:

 8                    BEST BEST & KRIEGER LLP
                      BY:  WEILAND CHIANG, ESQ.
 9                    2001 North Main Street
                      Suite 390
10                    Walnut Creek, California 94596
                      (925)977-3300
11                    weiland.chiang@bbklaw.com

12    For Central Valley Region Water Quality Control
      Board:
13
                      JESSICA JAHR, ESQ.
14                    STATE WATER RESOURCES CONTROL BOARD
                      1001 I Street
15                    Sacramento, California 95814
                      916)341-5168
16                    Jessica.jahr@waterboards.ca.gov
                      (916)341-5168
17

18    For the Defendants:

19                    HARTMAN KING PC
                      BY:  WILLIAM D. MARSH, ESQ.
20                    520 Capitol Mall
                      Suite 520
21                    Sacramento, California 95814
                      Wmarsh@hartmankinglaw.com
22

23

24

25
```

ELIZABETH LEE

September 22, 2022

```
 1   APPEARANCES (continued)

 2   For California Department of Corrections and
     Rehabilitation:
 3
                     ERIC PAPATHAKIS, ESQ.
 4                   Office of Legal Affairs
                     1515 S Street
 5                   Sacramento, California 95811
                     Eric.Papathakis@cdcr.ca.gov
 6

 7   THE VIDEOGRAPHER:  Nancy MacKell

 8                      *  *  *  *  *

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ELIZABETH LEE

September 22, 2022

```
 1                        INDEX

 2   WITNESS                                PAGE

 3   ELIZABETH LEE

 4       Examination by Ms. Maharg           7
         Examination by Mr. Chiang          126
 5       Examination by Mr. Marsh           140
         Further Examination by Ms. Maharg  208
 6       Further Examination by Mr. Marsh   221

 7

 8                  INDEX OF EXHIBITS

 9   EXHIBIT                                PAGE

10   Exhibit 1     Document                  14

11   Exhibit 2     13383 Order Issued to     43
                   CDCR Mule Creek State
12                 Prison

13   Exhibit 3     Map                       52

14   Exhibit 4     Reissued 13383 Order      58

15   Exhibit 5     1/21/21 Letter            64

16   Exhibit 6     Report on Discharges at   74
                   5 and 6
17
     Exhibit 7     Comments to Non-Storm     80
18                 Water Discharges

19   Exhibit 8     Phase 2 MS4 Permit        83

20   Exhibit 9     Non-Storm Water           87
                   Discharge Elimination
21                 Plan

22   Exhibit 10    Third Reissuance of       98
                   Revised 13383 Order
23
     Exhibit 11    Response to Comments      102
24
     Exhibit 12    Analytical Methods        108
25                 Report
```

**ELIZABETH LEE**

**September 22, 2022**

```
1                    INDEX OF EXHIBITS

2     EXHIBIT                                  PAGE

3     Exhibit 13     Quarterly Monitoring      112
                     Reports
4
      Exhibit 15     Basin Plan                128
5
      Exhibit 16     Resolution of 88-63       133
6
      Exhibit 17     State Bacteria            211
7                    Objectives

8                          *  *  *

9          (Exhibits 1-13, 17 retained by counsel)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2          THURSDAY, SEPTEMBER 22, 2022

3                 9:05 a.m.

4                  -oOo-

5

6          THE VIDEOGRAPHER:  Good morning, ladies

7    and gentlemen.  My name is Nancy MacKell, your

8    videographer, and I represent First Legal

9    Depositions.  Our phone number is (855)348-4997,

10   extension 3848.  Today's date is September 22,

11   2022, and the time on the monitor is 9:05 a.m.

12   This is the start of the videotaped deposition of

13   Elizabeth Lee in the matter of California

14   Sportfishing Protection Alliance versus Kathleen

15   Allison in the United States District Court,

16   Eastern Division of California, Case number

17   220-CV-02482-WBS-AC.  Taking place via Zoom web

18   conferencing, where the deponent, counsels, and the

19   court reporter are attending the deposition via an

20   internet connection from their separate locations.

21   This is taken on behalf of the plaintiff.

22          Counsel, would you please identify

23   yourselves starting with the questioning attorney.

24          MS. MAHARG:  Good morning.  My name is

25   Erica Maharg, and I am counsel for the plaintiff,

**ELIZABETH LEE**

**September 22, 2022**

```
1    data, it says it is less than 0.20.  So, no, it
2    would not concern me.
3         Q.   What -- what would -- what level of
4    ammonia would there have to be in order for you to
5    express any type of concern regarding that type of
6    measurement of E. coli?
7         A.   If I was looking at a wastewater type
8    overflow or discharge into the storm water system,
9    then the magnitude of that would be much higher.  I
10   want to say in the hundreds, maybe even thousands,
11   if it was true wastewater.
12        Q.   And just to clarify, the presence of E.
13   coli to you, it is only relevant in determining of
14   whether there is the presence of wastewater in the
15   MS4; is that correct?
16        A.   Correct, because that would be pretty
17   much the solitary source of E. coli in the storm
18   water system, aside from your natural sources,
19   which maybe is like dogs and other animals, birds.
20        Q.   So I know earlier you told me that you
21   weren't aware of whether there was an adoption of
22   the bacteria objectives by the State Board.  So
23   you're not looking at the E. coli levels to
24   determine whether there has been a possible
25   exceedance of any adopted bacteria objectives by
```

1                REPORTER'S DECLARATION

2        I, Lisa Makowski, CSR 13400, declare as

3   follows:

4        That I reported the taking of the deposition of

5   the witness, ELIZABETH LEE, commencing on Thursday,

6   September 22, 2022, at the hour of 9:05 a.m.

7        That prior to being examined, the witness was by

8   me duly sworn to testify to the truth, the whole

9   truth, and nothing but the truth.

10       That I thereafter transcribed said shorthand

11  notes into typewriting and that the typewritten

12  transcript of said deposition is a complete, true and

13  accurate transcription of said shorthand notes taken

14  down at said time.

15       I further declare that I am not a relative or

16  employee of any party involved in said action, nor a

17  person financially interested in the action.

18       Dated this 18th day of October, 2022.

19

20

21            *Lisa Makowski*

22

23       Lisa Makowski, CCR 345

24

25